IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on October 31, 2003

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No. |
| | ) GRAND JURY ORIGINAL |
| v. | ) Count 1: Obstruction of Justice (18 U.S.C. § 1503) |
| | ) |
| | ) Counts 2-3: False Statements (18 U.S.C. § 1001(a)(2)) |
| I. LEWIS LIBBY, | ) |
| also known as "SCOOTER LIBBY" | ) Counts 4-5: Perjury (18 U.S.C. § 1623) |

## INDICTMENT

### COUNT ONE
### (Obstruction of Justice)

THE GRAND JURY CHARGES:

1.    At times material to this indictment:

### Defendant's Employment and Responsibilities

a.    Beginning on or about January 20, 2001, and continuing through the date of this indictment, defendant **I. LEWIS LIBBY**, also known as "**SCOOTER LIBBY**," was employed as Assistant to the President of the United States, Chief of Staff to the Vice President of the United States, and Assistant to the Vice President for National Security Affairs.  In the course of his work, **LIBBY** had frequent access to classified information and frequently spoke with officials of the U.S. intelligence community, as well as other government officials, regarding sensitive national security matters.

b.    In connection with his role as a senior government official with responsibilities for national security matters, **LIBBY** held security clearances entitling him to access

to classified information.  As a person with such clearances, **LIBBY** was obligated by applicable laws and regulations, including Title 18, United States Code, Section 793, and Executive Order 12958 (as modified by Executive Order 13292), not to disclose classified information to persons not authorized to receive such information, and otherwise to exercise proper care to safeguard classified information against unauthorized disclosure.  On or about January 23, 2001, **LIBBY** executed a written "Classified Information Nondisclosure Agreement," stating in part that "I understand and accept that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government," and that "I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation."

### The Central Intelligence Agency

c.     The Central Intelligence Agency (CIA) was an agency of the United States whose mission was to collect, produce, and disseminate intelligence and counterintelligence information to officers and departments of the United States government, including the President, the National Security Council, and the Joint Chiefs of Staff.

d.     The responsibilities of certain CIA employees required that their association with the CIA be kept secret; as a result, the fact that these individuals were employed by the CIA was classified.  Disclosure of the fact that such individuals were employed by the CIA had the potential to damage the national security in ways that ranged from preventing the future use of those individuals in a covert capacity, to compromising intelligence-gathering methods and operations, and endangering the safety of CIA employees and those who dealt with them.

**Joseph Wilson and Valerie Plame Wilson**

       e.      Joseph Wilson ("Wilson") was a former career State Department official who had held a variety of posts, including United States Ambassador.  In 2002, after an inquiry to the CIA by the Vice President concerning certain intelligence reporting, the CIA decided on its own initiative to send Wilson to the country of Niger to investigate allegations involving Iraqi efforts to acquire uranium yellowcake, a processed form of uranium ore.  Wilson orally reported his findings to the CIA upon his return.

       f.      Joseph Wilson was married to Valerie Plame Wilson ("Valerie Wilson").  At all relevant times from January 1, 2002 through July 2003, Valerie Wilson was employed by the CIA, and her employment status was classified.  Prior to July 14, 2003, Valerie Wilson's affiliation with the CIA was not common knowledge outside the intelligence community.

**Events Leading up to July 2003**

       2.      On or about January 28, 2003, President George W. Bush delivered his State of the Union address which included sixteen words asserting that "The British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa."

       3.      On May 6, 2003, the *New York Times* published a column by Nicholas Kristof which disputed the accuracy of the "sixteen words" in the State of the Union address.  The column reported that, following a request from the Vice President's office for an investigation of allegations that Iraq sought to buy uranium from Niger, an unnamed former ambassador was sent on a trip to Niger in 2002 to investigate the allegations.  According to the column, the ambassador reported back to the CIA and State Department in early 2002 that the allegations were unequivocally wrong and based on forged documents.

4.      On or about May 29, 2003, in the White House, **LIBBY** asked an Under Secretary of State ("Under Secretary") for information concerning the unnamed ambassador's travel to Niger to investigate claims about Iraqi efforts to acquire uranium yellowcake.  The Under Secretary thereafter directed the State Department's Bureau of Intelligence and Research to prepare a report concerning the ambassador and his trip.  The Under Secretary provided **LIBBY** with interim oral reports in late May and early June 2003, and advised **LIBBY** that Wilson was the former ambassador who took the trip.

5.      On or about June 9, 2003, a number of classified documents from the CIA were faxed to the Office of the Vice President to the personal attention of **LIBBY** and another person in the Office of the Vice President.  The faxed documents, which were marked as classified, discussed, among other things, Wilson and his trip to Niger, but did not mention Wilson by name.  After receiving these documents, **LIBBY** and one or more other persons in the Office of the Vice President handwrote the names "Wilson" and "Joe Wilson" on the documents.

6.      On or about June 11 or 12, 2003, the Under Secretary of State orally advised **LIBBY** in the White House that, in sum and substance, Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of his trip.

7.      On or about June 11, 2003, **LIBBY** spoke with a senior officer of the CIA to ask about the origin and circumstances of Wilson's trip, and was advised by the CIA officer that Wilson's wife worked at the CIA and was believed to be responsible for sending Wilson on the trip.

8.      Prior to June 12, 2003, *Washington Post* reporter Walter Pincus contacted the Office of the Vice President in connection with a story he was writing about Wilson's trip.  **LIBBY** participated in discussions in the Office of the Vice President concerning how to respond to Pincus.

9.    On or about June 12, 2003, **LIBBY** was advised by the Vice President of the United States that Wilson's wife worked at the Central Intelligence Agency in the Counterproliferation Division.  **LIBBY** understood that the Vice President had learned this information from the CIA.

10.    On June 12, 2003, the *Washington Post* published an article by reporter Walter Pincus about Wilson's trip to Niger, which described Wilson as a retired ambassador but not by name, and reported that the CIA had sent him to Niger after an aide to the Vice President raised questions about purported Iraqi efforts to acquire uranium.  Pincus's article questioned the accuracy of the "sixteen words," and stated that the retired ambassador had reported to the CIA that the uranium purchase story was false.

11.    On or about June 14, 2003, **LIBBY** met with a CIA briefer.  During their conversation he expressed displeasure that CIA officials were making comments to reporters critical of the Vice President's office, and discussed with the briefer, among other things, "Joe Wilson" and his wife "Valerie Wilson," in the context of Wilson's trip to Niger.

12.    On or about June 19, 2003, an article appeared in *The New Republic* magazine online entitled "*The First Casualty: The Selling of the Iraq War*."  Among other things, the article questioned the "sixteen words" and stated that following a request for information from the Vice President, the CIA had asked an unnamed ambassador to travel to Niger to investigate allegations that Iraq had sought uranium from Niger.  The article included a quotation attributed to the unnamed ambassador alleging that administration officials "knew the Niger story was a flat-out lie."  The article also was critical of how the administration, including the Office of the Vice President, portrayed intelligence concerning Iraqi capabilities with regard to weapons of mass destruction, and accused the administration of suppressing dissent from the intelligence agencies on this topic.

13.    Shortly after publication of the article in *The New Republic*, **LIBBY** spoke by telephone with his then Principal Deputy and discussed the article.  That official asked **LIBBY** whether information about Wilson's trip could be shared with the press to rebut the allegations that the Vice President had sent Wilson.  **LIBBY** responded that there would be complications at the CIA in disclosing that information publicly, and that he could not discuss the matter on a non-secure telephone line.

14.    On or about June 23, 2003, **LIBBY** met with *New York Times* reporter Judith Miller. During this meeting **LIBBY** was critical of the CIA, and disparaged what he termed "selective leaking" by the CIA concerning intelligence matters.  In discussing the CIA's handling of Wilson's trip to Niger, **LIBBY** informed her that Wilson's wife might work at a bureau of the CIA.

### The July 6 "Op Ed" Article by Wilson

15.    On July 6, 2003, the *New York Times* published an Op-Ed article by Wilson entitled "What I Didn't Find in Africa."  Also on July 6, 2003, the *Washington Post* published an article about Wilson's 2002 trip to Niger, which article was based in part upon an interview of Wilson. Also on July 6, Wilson appeared as a guest on the television interview show "*Meet the Press*."  In his Op-Ed article and interviews in print and on television, Wilson asserted, among other things, that he had taken a trip to Niger at the request of the CIA in February 2002 to investigate allegations that Iraq had sought or obtained uranium yellowcake from Niger, and that he doubted Iraq had obtained uranium from Niger recently, for a number of reasons.  Wilson stated that he believed, based on his understanding of government procedures, that the Office of the Vice President was advised of the results of his trip.

**LIBBY's Actions Following Wilson's July 6 "Op Ed" Column**

16.    On or about July 7, 2003, **LIBBY** had lunch with the then White House Press Secretary and advised the Press Secretary that Wilson's wife worked at the CIA and noted that such information was not widely known.

17.    On or about the morning of July 8, 2003, **LIBBY** met with *New York Times* reporter Judith Miller.  When the conversation turned to the subject of Joseph Wilson, **LIBBY** asked that the information **LIBBY** provided on the topic of Wilson be attributed to a "former Hill staffer" rather than to a "senior administration official," as had been the understanding with respect to other information that **LIBBY** provided to Miller during this meeting.  **LIBBY** thereafter discussed with Miller Wilson's trip and criticized the CIA reporting concerning Wilson's trip.  During this discussion, **LIBBY** advised Miller of his belief that Wilson's wife worked for the CIA.

18.    Also on or about July 8, 2003, **LIBBY** met with the Counsel to the Vice President in an anteroom outside the Vice President's Office.  During their brief conversation, **LIBBY** asked the Counsel to the Vice President, in sum and substance, what paperwork there would be at the CIA if an employee's spouse undertook an overseas trip.

19.    Not earlier than June 2003, but on or before July 8, 2003, the Assistant to the Vice President for Public Affairs learned from another government official that Wilson's wife worked at the CIA, and advised **LIBBY** of this information.

20.    On or about July 10, 2003, **LIBBY** spoke to *NBC* Washington Bureau Chief Tim Russert to complain about press coverage of **LIBBY** by an *MSNBC* reporter.  **LIBBY** did not discuss Wilson's wife with Russert.

21.     On or about July 10 or July 11, 2003, **LIBBY** spoke to a senior official in the White House ("Official A") who advised **LIBBY** of a conversation Official A had earlier that week with columnist Robert Novak in which Wilson's wife was discussed as a CIA employee involved in Wilson's trip.  **LIBBY** was advised by Official A that Novak would be writing a story about Wilson's wife.

22.     On or about July 12, 2003, **LIBBY** flew with the Vice President and others to and from Norfolk, Virginia, on Air Force Two.  On his return trip, **LIBBY** discussed with other officials aboard the plane what **LIBBY** should say in response to certain pending media inquiries, including questions from *Time* reporter Matthew Cooper.

23.     On or about July 12, 2003, in the afternoon, **LIBBY** spoke by telephone to Cooper, who asked whether **LIBBY** had heard that Wilson's wife was involved in sending Wilson on the trip to Niger.  **LIBBY** confirmed to Cooper, without elaboration or qualification, that he had heard this information too.

24.     On or about July 12, 2003, in the late afternoon, **LIBBY** spoke by telephone with Judith Miller of the *New York Times* and discussed Wilson's wife, and that she worked at the CIA.

### The Criminal Investigation

25.     On or about September 26, 2003, the Department of Justice authorized the Federal Bureau of Investigation ("FBI") to commence a criminal investigation into the possible unauthorized disclosure of classified information regarding the disclosure of Valerie Wilson's affiliation with the CIA to various reporters in the spring of 2003.

26.    As part of the criminal investigation, **LIBBY** was interviewed by Special Agents of the FBI on or about October 14 and November 26, 2003, each time in the presence of his counsel. During these interviews, **LIBBY** stated to FBI Special Agents that:

   a.    During a conversation with Tim Russert of *NBC News* on July 10 or 11, 2003, Russert asked **LIBBY** if **LIBBY** was aware that Wilson's wife worked for the CIA. **LIBBY** responded to Russert that he did not know that, and Russert replied that all the reporters knew it. **LIBBY** was surprised by this statement because, while speaking with Russert, **LIBBY** did not recall that he previously had learned about Wilson's wife's employment from the Vice President.

   b.    During a conversation with Matthew Cooper of *Time* magazine on or about July 12, 2003, **LIBBY** told Cooper that reporters were telling the administration that Wilson's wife worked for the CIA, but that **LIBBY** did not know if this was true; and

   c.    **LIBBY** did not discuss Wilson's wife with *New York Times* reporter Judith Miller during a meeting with Miller on or about July 8, 2003.

27.    Beginning in or about January 2004, and continuing until the date of this indictment, Grand Jury 03-3 sitting in the District of Columbia conducted an investigation ("the Grand Jury Investigation") into possible violations of federal criminal laws, including: Title 50, United States Code, Section 421 (disclosure of the identity of covert intelligence personnel); and Title 18, United States Code, Sections 793 (improper disclosure of national defense information), 1001 (false statements), 1503 (obstruction of justice), and 1623 (perjury).

28.     A major focus of the Grand Jury Investigation was to determine which government officials had disclosed to the media prior to July 14, 2003 information concerning the affiliation of Valerie Wilson with the CIA, and the nature, timing, extent, and purpose of such disclosures, as well as whether any official making such a disclosure did so knowing that the employment of Valerie Wilson by the CIA was classified information.

29.     During the course of the Grand Jury Investigation, the following matters, among others, were material to the Grand Jury Investigation:

i.     When, and the manner and means by which, defendant **LIBBY** learned that Wilson's wife was employed by the CIA;

ii.     Whether and when **LIBBY** disclosed to members of the media that Wilson's wife was employed by the CIA;

iii.     The language used by **LIBBY** in disclosing any such information to the media, including whether **LIBBY** expressed uncertainty about the accuracy of any information he may have disclosed, or described where he obtained the information;

iv.     **LIBBY**'s knowledge as to whether any information he disclosed was classified at the time he disclosed it; and

v.     Whether **LIBBY** was candid with Special Agents of the Federal Bureau of Investigation in describing his conversations with the other government officials and the media relating to Valerie Wilson.

## LIBBY's Grand Jury Testimony

30.     On or about March 5 and March 24, 2004, **LIBBY** testified before Grand Jury 03-3. On each occasion of **LIBBY**'s testimony, the foreperson of the Grand Jury administered the oath to **LIBBY** and **LIBBY** swore to tell the truth in the testimony he was about to give.

31.     In or about March 2004, in the District of Columbia,

**I. LEWIS LIBBY**,
also known as "**SCOOTER LIBBY**,"

defendant herein, did knowingly and corruptly endeavor to influence, obstruct and impede the due administration of justice, namely proceedings before Grand Jury 03-3, by misleading and deceiving the grand jury as to when, and the manner and means by which, **LIBBY** acquired and subsequently disclosed to the media information concerning the employment of Valerie Wilson by the CIA.

32.     It was part of the corrupt endeavor that during his grand jury testimony, defendant **LIBBY** made the following materially false and intentionally misleading statements and representations, in substance, under oath:

    a.     When **LIBBY** spoke with Tim Russert of *NBC News*, on or about July 10, 2003:

        i.     Russert asked **LIBBY** if **LIBBY** knew that Wilson's wife worked for the CIA, and told **LIBBY** that all the reporters knew it; and

        ii.    At the time of this conversation, **LIBBY** was surprised to hear that Wilson's wife worked for the CIA;

11

b.    **LIBBY** advised Matthew Cooper of *Time* magazine on or about July 12, 2003, that he had heard that other reporters were saying that Wilson's wife worked for the CIA, and further advised him that **LIBBY** did not know whether this assertion was true; and

c.    **LIBBY** advised Judith Miller of the *New York Times* on or about July 12, 2003 that he had heard that other reporters were saying that Wilson's wife worked for the CIA but **LIBBY** did not know whether that assertion was true.

33.    It was further part of the corrupt endeavor that at the time defendant **LIBBY** made each of the above-described materially false and intentionally misleading statements and representations to the grand jury, **LIBBY** was aware that they were false, in that:

a.    When **LIBBY** spoke with Tim Russert of *NBC News* on or about July 10, 2003:

    i.    Russert did not ask **LIBBY** if **LIBBY** knew that Wilson's wife worked for the CIA, nor did he tell **LIBBY** that all the reporters knew it; and

    ii.    At the time of this conversation, **LIBBY** was well aware that Wilson's wife worked at the CIA; in fact, **LIBBY** had participated in multiple prior conversations concerning this topic, including on the following occasions:

- In or about early June 2003, **LIBBY** learned from the Vice President that Wilson's wife worked for the CIA in the Counterproliferation Division;

- On or about June 11, 2003, **LIBBY** was informed by a senior CIA officer that Wilson's wife was employed by the CIA and that the idea of sending him to Niger originated with her;

- On or about June 12, 2003, **LIBBY** was informed by the Under Secretary of State that Wilson's wife worked for the CIA;

- On or about June 14, 2003, **LIBBY** discussed "Joe Wilson" and "Valerie Wilson" with his CIA briefer, in the context of Wilson's trip to Niger;

- On or about June 23, 2003, **LIBBY** informed reporter Judith Miller that Wilson's wife might work at a bureau of the CIA;

- On or about July 7, 2003, **LIBBY** advised the White House Press Secretary that Wilson's wife worked for the CIA;

- In or about June or July 2003, and in no case later than on or about July 8, 2003, **LIBBY** was advised by the Assistant to the Vice President for Public Affairs that Wilson's wife worked for the CIA;

- On or about July 8, 2003, **LIBBY** advised reporter Judith Miller of his belief that Wilson's wife worked at the CIA; and

- On or about July 8, 2003, **LIBBY** had a discussion with the Counsel to the Office of the Vice President concerning the paperwork that would exist if a person who was sent on an overseas trip by the CIA had a spouse who worked at the CIA;

b.     **LIBBY** did not advise Matthew Cooper, on or about July 12, 2003, that **LIBBY** had heard other reporters were saying that Wilson's wife worked for the CIA, nor did **LIBBY** advise him that **LIBBY** did not know whether this assertion was true; rather, **LIBBY** confirmed to Cooper, without qualification, that **LIBBY** had heard that Wilson's wife worked at the CIA; and

      c.      **LIBBY** did not advise Judith Miller, on or about July 12, 2003, that **LIBBY** had heard other reporters were saying that Wilson's wife worked for the CIA, nor did **LIBBY** advise her that **LIBBY** did not know whether this assertion was true;

      In violation of Title 18, United States Code, Section 1503.

14

## COUNT TWO
### (False Statement)

THE GRAND JURY FURTHER CHARGES:

1.     The Grand Jury realleges Paragraphs 1-26 of Count One as though fully set forth herein.

2.     During the course of the criminal investigation conducted by the Federal Bureau of Investigation and the Department of Justice, the following matters, among others, were material to that investigation:

a.     When, and the manner and means by which, defendant **LIBBY** learned that Wilson's wife was employed by the CIA;

b.     Whether and when **LIBBY** disclosed to members of the media that Wilson's wife was employed by the CIA;

c.     The language used by **LIBBY** in disclosing any such information to the media, including whether **LIBBY** expressed uncertainty about the accuracy of any information he may have disclosed, or described where he obtained the information; and

d.     **LIBBY**'s knowledge as to whether any information he disclosed was classified at the time he disclosed it.

3.     On or about October 14 and November 26, 2003, in the District of Columbia,

### I. LEWIS LIBBY,
### also known as "SCOOTER LIBBY,"

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of

Investigation, an agency within the executive branch of the United States, in that the defendant, in response to questions posed to him by agents of the Federal Bureau of Investigation, stated that:

> During a conversation with Tim Russert of *NBC News* on July 10 or 11, 2003, Russert asked **LIBBY** if **LIBBY** was aware that Wilson's wife worked for the CIA. **LIBBY** responded to Russert that he did not know that, and Russert replied that all the reporters knew it.   **LIBBY** was surprised by this statement because, while speaking with Russert, **LIBBY** did not recall that he previously had learned about Wilson's wife's employment from the Vice President.

4.     As defendant **LIBBY** well knew when he made it, this statement was false in that when **LIBBY** spoke with Russert on or about July 10 or 11, 2003:

a.     Russert did not ask **LIBBY** if **LIBBY** knew that Wilson's wife worked for the CIA, nor did he tell **LIBBY** that all the reporters knew it; and

b.     At the time of this conversation, **LIBBY** was well aware that Wilson's wife worked at the CIA;

In violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT THREE
### (False Statement)

THE GRAND JURY FURTHER CHARGES:

1.     The Grand Jury realleges Paragraphs 1 and 2 of Count Two as though fully set forth herein.

2.     On or about October 14 and November 26, 2003, in the District of Columbia,

### I. LEWIS LIBBY,
also known as "**SCOOTER LIBBY**,"

defendant herein, did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency within the executive branch of the United States, in that the defendant, in response to questions posed to him by agents of the Federal Bureau of Investigation, stated that:

> During a conversation with Matthew Cooper of *Time* magazine on July 12, 2003, **LIBBY** told Cooper that reporters were telling the administration that Wilson's wife worked for the CIA, but **LIBBY** did not know if this was true.

3.     As defendant **LIBBY** well knew when he made it, this statement was false in that: **LIBBY** did not advise Cooper on or about July 12, 2003 that reporters were telling the administration that Wilson's wife worked for the CIA, nor did **LIBBY** advise him that **LIBBY** did not know whether this was true; rather, **LIBBY** confirmed for Cooper, without qualification, that **LIBBY** had heard that Wilson's wife worked at the CIA;

In violation of Title 18, United States Code, Section 1001(a)(2).

17

## COUNT FOUR
**(Perjury)**

THE GRAND JURY FURTHER CHARGES:

1.    The Grand Jury realleges Paragraphs 1-30 of Count One as though fully set forth

herein.

2.    On or about March 5, 2004, in the District of Columbia,

**I. LEWIS LIBBY**,
also known as "**SCOOTER LIBBY**,"

defendant herein, having taken an oath to testify truthfully in a proceeding before a grand jury of the

United States, knowingly made a false material declaration, in that he gave the following testimony

regarding a conversation that he represented he had with Tim Russert of *NBC News*, on or about July

10, 2003 (underlined portions alleged as false):

> . . . . And then he said, you know, did you know that this – excuse me, did you know
> that Ambassador Wilson's wife works at the CIA?  And I was a little taken aback by
> that.  I remember being taken aback by it.  And I said – he may have said a little more
> but that was – he said that.  And I said, no, I don't know that.  And I said, no, I don't
> know that intentionally because I didn't want him to take anything I was saying as in
> any way confirming what he said, because at that point in time I did not recall that
> I had ever known, and I thought this is something that he was telling me that I was
> first learning.  And so I said, no, I don't know that because I want to be very careful
> not to confirm it for him, so that he didn't take my statement as confirmation for him.
>
> Now, I had said earlier in the conversation, which I omitted to tell you, that
> this – you know, as always, Tim, our discussion is off-the-record if that's okay with
> you, and he said, that's fine.
>
> So then he said – I said – he said, sorry – he, Mr. Russert said to me, did you
> know that Ambassador Wilson's wife, or his wife, works at the CIA?  And I said, no,
> I don't know that.  And then he said, yeah – yes, all the reporters know it.  And I said,
> again, I don't know that.  I just wanted to be clear that I wasn't confirming anything
> for him on this.  And you know, I was struck by what he was saying in that he
> thought it was an important fact, but I didn't ask him anymore about it because I

18

<u>didn't want to be digging in on him</u>, and he then moved on and finished the conversation, something like that.

3.     In truth and fact, as **LIBBY** well knew when he gave this testimony, it was false in that:

a.     Russert did not ask **LIBBY** if **LIBBY** knew that Wilson's wife worked for the CIA, nor did he tell **LIBBY** that all the reporters knew it; and

b.     At the time of this conversation, **LIBBY** was well aware that Wilson's wife worked at the CIA;

In violation of Title 18, United States Code, Section 1623.

## COUNT FIVE
### (Perjury)

THE GRAND JURY FURTHER CHARGES:

1.    The Grand Jury realleges Paragraphs 1-30 of Count One as though fully set forth herein.

2.    On or about March 5, 2004 and March 24, 2004, in the District of Columbia,

### I. LEWIS LIBBY,
### also known as "SCOOTER LIBBY,"

defendant herein, having taken an oath to testify truthfully in a proceeding before a grand jury of the United States, knowingly made a false material declaration, in that he gave the following testimony regarding his conversations with reporters concerning the employment of Joseph Wilson's wife by the CIA (underlined portions alleged as false):

    **a.**    **Testimony Given on or about March 5, 2004 Regarding a Conversation With Matthew Cooper on or About July 12, 2003:**

    Q.    And it's your specific recollection that when you told Cooper about Wilson's wife working at the CIA, you attributed that fact to what reporters –

    A.    <u>Yes</u>.

    Q.    – plural, were saying.  Correct?

    A.    <u>I was very clear to say reporters are telling us that because in my mind I still didn't know it as a fact.  I thought I was – all I had was this information that was coming in from the reporters.</u>

    . . . .

    Q.    And at the same time you have a specific recollection of telling him, you don't know whether it's true or not, you're just telling him what reporters are saying?

A.    Yes, that's correct, sir.  And I said, reporters are telling us that, I don't know if it's true.  I was careful about that because among other things, I wanted to be clear I didn't know Mr. Wilson. I don't know – I think I said, I don't know if he has a wife, but this is what we're hearing.

**b.    Testimony Given on or about March 24, 2004 Regarding Conversations With Reporters:**

Q.    And let me ask you this directly.  Did the fact that you knew that the law could turn, the law as to whether a crime was committed, could turn on where you learned the information from, affect your account for the FBI when you told them that you were telling reporters Wilson's wife worked at the CIA but your source was a reporter rather than the Vice-President?

A.    No, it's a fact.  It was a fact, that's what I told the reporters.

Q.    And you're, you're certain as you sit here today that every reporter you told that Wilson's wife worked at the CIA, you sourced it back to other reporters?

A.    Yes, sir, because it was important for what I was saying and because it was – that's what – that's how I did it.

. . . .

Q.    The next set of questions from the Grand Jury are – concern this fact.  If you did not understand the information about Wilson's wife to have been classified and didn't understand it when you heard it from Mr. Russert, why was it that you were so deliberate to make sure that you told other reporters that reporters were saying it and not assert it as something you knew?

A.    I want – I didn't want to – I didn't know if it was true and I didn't want people – I didn't want the reporters to think it was true because I said it.  I – all I had was that reporters are telling us that, and by that I wanted them to understand it wasn't coming from me and that it might not be true.  Reporters write things that aren't true sometimes, or get things that aren't true.  So I wanted to be clear they didn't't, they didn't think it was me saying it.  I didn't know it was true and I wanted them to understand that.  Also, it was important to me to let them know that because what I was telling them was that I don't know Mr. Wilson.  We didn't ask for his mission.  That I didn't see his report.

21

Basically, we didn't know anything about him until this stuff came out in June.  And among the other things, I didn't know he had a wife.  That was one of the things I said to Mr. Cooper.  I don't know if he's married.  And so I wanted to be very clear about all this stuff that I didn't, I didn't know about him.  And the only thing I had, I thought at the time, was what reporters are telling us.

. . . .

Well, talking to the other reporters about it, I don't see as a crime.  What I said to the other reporters is what, you know – I told a couple reporters what other reporters had told us, and I don't see that as a crime.

3.     In truth and fact, as **LIBBY** well knew when he gave this testimony, it was false in that **LIBBY** did not advise Matthew Cooper or other reporters that **LIBBY** had heard other reporters were saying that Wilson's wife worked for the CIA, nor did **LIBBY** advise Cooper or other reporters that **LIBBY** did not know whether this assertion was true;

In violation of Title 18, United States Code, Section 1623.

A TRUE BILL:

_____

FOREPERSON

_____
PATRICK J. FITZGERALD
Special Counsel

22