# EXHIBIT A

Westlaw.

2005 WL 3529834                                             Page 1
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
**(Cite as: 2005 WL 3529834 (D.D.C.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
UNITED STATES of America,
v.
David Hossein SAFAVIAN, Defendant.
**Crim. No. 05-0370 PLF.**

Dec. 23, 2005.

**Background:** Defendant charged with making false statements and obstruction of justice moved to compel discovery.

**Holdings:** The District Court, Friedman, J., held that:

(1) under criminal discovery rule, prosecution was required disclose any statement of defendant in the possession, custody or control of any executive branch agency or department, regardless of whether the statement originated from a local law enforcement agency, a non-law enforcement agency of the federal government, or a coordinate branch of the government such as the United States House of Representatives or the United States Senate, and

(2) under the *Brady* rule, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed, with the benefit of hindsight, as affecting the outcome of the trial.

So ordered.

**[1] Criminal Law ⌾627.5(5)**

110k627.5(5) Most Cited Cases
Under criminal discovery rule, prosecution was required disclose any statement of defendant in the possession, custody or control of any executive branch agency or department, regardless of whether the statement originated from a local law enforcement agency, a non-law enforcement agency of the federal government, or a coordinate branch of the government such as the United States House of Representatives or the United States Senate. Fed.Rules Cr.Proc.Rule 16(a)(1)(B)(i), 18 U.S.C.A.

**[2] Criminal Law ⌾627.6(1)**

110k627.6(1) Most Cited Cases
Criminal discovery rule requiring government to disclose items "material to preparing the defense" is not limited to evidence that is favorable or helpful to the defense and does not immunize inculpatory evidence from disclosure. Fed.Rules Cr.Proc.Rule 16(a)(1)(E), 18 U.S.C.A.

**[3] Criminal Law ⌾627.7(3)**

110k627.7(3) Most Cited Cases
Criminal discovery rule does not authorize the discovery or inspection of statements made by prospective government witnesses except as provided for by the Jencks Act, unless: (1) portions of those statements contain the substance of any relevant written or oral statements made by the defendant that are disclosable under the rule; or (2) they are exculpatory or favorable, so-called *Brady* material. 18 U.S.C.A. § 3500; Fed.Rules Cr.Proc.Rule 16(a)(2), 18 U.S.C.A.

**[4] Criminal Law ⌾700(2.1)**

110k700(2.1) Most Cited Cases
Under the *Brady* rule, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed, with the benefit of hindsight, as affecting the outcome of the trial.

**[5] Criminal Law ⌾700(7)**

110k700(7) Most Cited Cases
Under *Brady*, prosecutors have an affirmative duty to search possible sources of exculpatory information, including a duty to learn of favorable evidence known to others acting on the prosecution's behalf, including the police, and to cause files to be searched that are not only maintained by the prosecutor's or investigative agency's office, but also by other branches of government closely aligned with the prosecution.

Matthew Evan Corcoran, Wiley, Rein & Fielding LLP, Washington, DC, for David Hossein Safavian.

Peter Robert Zeidenberg, U.S. Department of Justice, Washington, DC, for United States of America.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
(Cite as: 2005 WL 3529834 (D.D.C.))

### *OPINION*

FRIEDMAN, District Judge.

**\*1** This matter is before the Court on the defendant David Safavian's motion to compel discovery under Rule 16 of the Federal Rules of Criminal Procedure and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. After the matter was briefed, the Court heard oral argument on November 14, 2005, and then accepted supplemental briefs from the parties during the ensuing two weeks. A summary of the defendant's outstanding discovery requests as of the time of the initial filing, and the defendant's characterization of the government's stated reasons for withholding production, is set forth in Attachment A to the motion to compel.

### I. BACKGROUND

The defendant is charged in a five-count indictment with three counts of making false statements under 18 U.S.C. § 1001, and two counts of obstruction of justice under 18 U.S.C. § 1505. The indictment charges that the defendant served as Chief of Staff for the Administrator of the General Services Administration ("GSA") from May 16, 2002 to January 2004, and then, from November 2004 to September 2005, as the Administrator of the Office of Federal Procurement Policy, Office of Management and Budget, Executive Office of the President. Indictment at ¶ 1. The centerpiece of the indictment is the allegation that in July of 2002 the defendant sought an opinion from a GSA ethics officer about whether he could attend a golf trip with lobbyist Jack Abramoff in Scotland and travel on a private jet chartered by Mr. Abramoff that would take the golfing party to Scotland. In the e-mail by which Mr. Safavian sought the ethics opinion, he stated that the lobbyist in question "is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill)." Indictment at ¶ 18. The GSA ethics officer responded by e-mail, permitting Mr. Safavian to go on the trip and to accept the gift of free transportation on the ground that "[y]ou stated that neither [Mr. Abramoff] nor his firm does business with or is seeking to do business with GSA." *See id.* ¶ 19.

Count One of the indictment charges Mr. Safavian with obstruction of justice with regard to an investigation conducted by the Office of the Inspector General ("OIG") of GSA, and specifically alleges that the defendant falsely stated in connection with the investigation that Mr. Abramoff had no business with GSA and that he had paid Abramoff for the total cost of the trip to Scotland. Indictment at ¶ 25. Count Two charges the defendant with making the same false statements in connection with obtaining the GSA ethics opinion. Count Three charges the making of the same false statements in the course of the GSA-OIG investigation. Count Four charges obstruction of justice in connection with an investigation into allegations of misconduct by Mr. Abramoff by the Senate Committee on Indian Affairs. It relates in part to statements made to the Committee investigator and to the Committee Chairman, Senator John McCain, with respect to Mr. Safavian's statements to the GSA ethics officer. *Id.* at ¶ ¶ 36-37. Count Five alleges that Mr. Safavian made false statements to the Committee to the effect that Mr. Abramoff did not have any business with GSA at the time of the trip to Scotland, that Mr. Safavian provided documentation to the Committee containing false statements (his e-mail to the GSA ethics officer), and that he concealed Mr. Abramoff's business relationships with GSA. *Id.* at ¶ 40.

**\*2** The defendant seeks documents and information that he contends are necessary and material to the preparation of his defense and/or constitute exculpatory material under *Brady.*

### II. DISCUSSION

*A. Relevant Standards under Rule 16 and Brady*

At the outset, it is apparent that the Justice Department and the defendant have very different views as to the scope of both Rule 16 and the government's *Brady* obligations. The Court will attempt first to clarify what the government's obligations are and then to apply the appropriate standards to the facts of this case and the requests made by the defendant.

#### 1. Rule 16

Under Rule 16 of the Federal Rules of Criminal Procedure, the government is required to disclose to the defendant the substance of any relevant oral statement made by the defendant, before or after arrest, in response to interrogation by a person that the defendant knew was a government agent "if the government intends to use the statement at trial." Fed. R. Crim. P. 16(a)(1)(A). This provision of Rule 16 is not limited to questions asked only by Justice Department prosecutors or law enforcement agents. At a minimum, it includes statements made, in response to interrogation, to any officers of the federal government "with criminal law enforcement responsibilities or their agents"--that is, "law enforcement agents or persons acting on their behalf." *United States v. Burns,* 15 F.3d 211, 214-15

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834                                                                    Page 3
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
(Cite as: 2005 WL 3529834 (D.D.C.))

(1st Cir.1994); *see also United States v. Griggs*, 111 F.Supp.2d 551, 554 (M.D.Pa.2000) (extends to any person "allied with the prosecution once a federal investigation or prosecution commences, such as a state officer working on a joint task force or with the U.S. Attorney's office," so long as that person "interrogates" the defendant). [FN1] In this case, therefore, Rule 16(a)(1)(A) includes questions put to Mr. Safavian by the GSA Office of the Inspector General ("OIG") as well as questions put to him by the FBI and other law enforcement agencies. It does not, however, include statements in response to questions asked by the GSA ethics officer or the GSA General Counsel's Office unless those questions were asked in conjunction with or as an adjunct to the OIG or FBI investigations.

Under another provision of Rule 16(a), the government also must provide the defendant with "any relevant written or recorded statement [made] by the defendant if ... the statement is within the government's possession, custody or control," and the attorney for the government knows "or through due diligence could know" that the statement exists, regardless of whether the government intends to use the statement at trial. Fed. R. Crim. P. 16(a)(1)(B)(i). Interrogation by a "government agent" is not required, only knowledge and possession, custody, or control by "the government." In the Court's view, "the government" includes any and all agencies and departments of the Executive Branch of the government and their subdivisions, not just the Justice Department, the FBI, the GSA-OIG, and other law enforcement agencies. *See United States v. Santiago*, 46 F.3d 885, 893-94 (9th Cir.1995); *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir.1989); *cf. United States v. Brooks*, 966 F.2d at 1503. It does not, however, include a committee of the United States Senate (or the House of Representatives) because the Congress is a separate branch of the government and was not intended by the Rules writers to be included within Rule 16. *Cf. United States v. Trie*, 21 F.Supp.2d 7, 25 n. 17 (D.D.C.) ("The Congress is not an 'agency,' and the DOJ has no obligation under *Brady* to disclose information in the possession of Congress that is not also in the possession of the DOJ or [another Executive Branch agency].")

*3 [1] Because Rule 16 talks of "possession, custody or control," Fed. R. Crim. P. 16(a)(1)(B)(i), however, the Justice Department must turn over any written or recorded statements in its possession *or* custody *or* control regardless of the origin of the statements, so long as the government knows or through due

diligence could know of their existence. Thus, the prosecution must disclose any statement of Mr. Safavian in the possession, custody or control of any Executive Branch agency or department, regardless of whether the statement originated from a local law enforcement agency, a non-law enforcement agency of the federal government, or a coordinate branch of the government such as the United States House of Representatives or the United States Senate. As with their *Brady* obligations, "[t]his personal responsibility [of the Justice Department] cannot be evaded by claiming lack of control over the files or procedures of other executive branch agencies." *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir.1992). In the course of their investigation, and in collecting and reviewing evidence, the prosecutors must ensure that any information relevant to this case that comes into the possession, control, or custody of the Justice Department remains available for disclosure. *See United States v. Marshall*, 132 F.3d 63, 69 (D.C.Cir.1998) (cautioning against government "gamesmanship in discovery matters."). Statements of the defendant are particularly important in this case, and the precise statements made by him to any government agency or official at each and every stage may be extremely relevant to his defense.

[2] Rule 16 next requires the disclosure of all books, papers, documents, data, tangible objects, etc., that are "within the government's possession, custody or control" and are "material to preparing the defense" or "[that] the government intends to use ... in its case in chief at trial [or that] was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). This portion of the Rule also uses the terms "possession, custody or control." So, again, the prosecution must turn over everything in its possession *or* custody *or* control, regardless of the original source of the document or other object, so long as it is "material" under the Rule. The defendant argues--and there is some support for his contention in both the oral and written submissions made by the government to this Court--that the government reads this part of the Rule in much too limited a way. While it is true that the government must produce items it intends to use at trial and items that it obtained from the defendant, its obligations are not limited to those categories only; it also must disclose items that are "material to preparing the defense." And the government cannot take a narrow reading of the term "material" in making its decisions on what to disclose under Rule 16. Nor may it put itself in the shoes of defense counsel in attempting to predict the nature of what the defense may be or what may be material to its preparation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834                                                                     Page 4
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
**(Cite as: 2005 WL 3529834 (D.D.C.))**

**\*4** As Judge Sentelle said for the D.C. Circuit in _United States v. Marshall, 132 F.3d at 67,_ Rule 16(a)(1)(E) (formally Rule 16(a)(1)(C)) covers evidence that is "material 'to _the preparation of_ the defendant's defense" ' (emphasis in original). It is not limited to evidence that is favorable or helpful to the defense and does not immunize inculpatory evidence from disclosure. _See id._ "Inculpatory evidence, after all, is just as likely to assist in 'the preparation of the defendant's defense' as exculpatory evidence.... [I]t is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." _Id._ (footnote omitted). Rule 16 is intended to provide a criminal defendant "the widest possible opportunity to inspect and receive such materials in the possession of the Government as may aid him in presenting his side of the case." _United States v. Poindexter,_ 727 F.Supp. 1470, 1473 (D.D.C.1989). _See also United States v. Lloyd,_ 992 F.2d 348, 351 (D.C.Cir.1993) (materiality standard "is not a heavy burden"; evidence is material if there is indication that it may play "important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal."); _United States v. George,_ 786 F.Supp. 11, 13 (D.D.C.1991) (the materiality hurdle "is not a high one"). Despite the government's arguments, _United States v. Lloyd,_ 992 F.2d 348 (D.C.Cir.1993), is not to the contrary. _See United States v. Marshall,_ 132 F.3d at 68.

[3] As the government points out, however, Rule 16 of the Federal Rules of Criminal Procedure does not authorize the discovery or inspection of statements made by prospective government witnesses except as provided for by the Jencks Act, 18 U.S.C. § 3500. Fed. R. Crim. P. 16(a)(2). This is true even if the statements are "material to preparing the defense" unless (1) portions of those statements contain the substance of any relevant written or oral statements made by the defendant that are disclosable under Rule 16(a)(1)(A) or (B); or (2) they are exculpatory or favorable, so-called _Brady_ material. _See Brady v. Maryland,_ 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). _Brady_ always trumps both Jencks and Rule 16. _See United States v. Tarantino,_ 846 F.2d 1384, 1414 n. 11 (D.C.Cir.1988) (limitations on discovery in Jencks Act do not lessen _Brady_ obligations); _see also United States v. Haldeman,_ 559 F.2d 31, 77-78 & n. 112 (D.C.Cir.1976); _United States v. Ramirez,_ 54 F.Supp.2d 25, 32-33 (D.D.C.1999); _United States v. Trie,_ 21 F.Supp.2d at 23; _United States v. Poindexter,_ 727 F.Supp. at 1485 ("The _Brady_ obligations are not modified merely because they happen to arise in the context of witness statements.").

_2. Brady_

The government and the defendant also have very different views concerning the government's _Brady_ obligations. The government acknowledges that under _Brady_ it has the affirmative duty to produce exculpatory evidence when such evidence is material to either guilt or punishment. But it contends that evidence is "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (quoting _Strickler v. Greene,_ 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). The problem with this iteration of _Brady_ and the government's view of its obligations at this stage of the proceedings, however, is that it permits prosecutors to withhold admittedly favorable evidence whenever the prosecutors, in their wisdom, conclude that it would not make a difference to the outcome of the trial. Most prosecutors are neither neutral (nor should they be) nor prescient, and any such judgment necessarily is speculative on so many matters that simply are unknown and unknowable before trial begins: which government witnesses will be available for trial, how they will testify and be evaluated by the jury, which objections to testimony and evidence the trial judge will sustain and which he will overrule, what the nature of the defense will be, what witnesses and evidence will support that defense, what instructions the Court ultimately will give, what questions the jury may pose during deliberations (and how they may be answered), and whether the jury finds guilt on all counts or only on some (and which ones).

**\*5** [4] The prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed--with the benefit of hindsight--as affecting the outcome of the trial. The question before trial is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is favorable and therefore must be disclosed. Because the definition of "materiality" discussed in _Strickler_ and other appellate cases is a standard articulated in the post-conviction context for appellate review, it is not the appropriate one for prosecutors to apply during the pretrial discovery phase. The only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834                                                                          Page 5
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
(Cite as: 2005 WL 3529834 (D.D.C.))

question before (and even during) trial is whether the
evidence at issue may be "favorable to the accused";
if so, it must be disclosed without regard to whether
the failure to disclose it likely would affect the
outcome of the upcoming trial. *United States v.
Sudikoff, 36 F.Supp.2d 1196, 1198-1199
(C.D.Cal.1999); see also United States v. Acosta, 357
F.Supp.2d 1228, 1233 (D.Nev.2005)*, and appended
magistrate judge's decision, *357 F.Supp.2d at 1237;
United States v. Carter, 313 F.Supp.2d 921, 924-25
(E.D.Wis.2004)*.

 The meaning of the term "favorable" under *Brady* is
not difficult to divine. It is any information in the
possession of the government--broadly defined to
include all Executive Branch agencies--that relates to
guilt or punishment and that tends to help the defense
by either bolstering the defense case or impeaching
potential prosecution witnesses. It covers both
exculpatory and impeachment evidence. *See United
States v. Bagley, 473 U.S. 667, 676-77, 105 S.Ct.
3375, 87 L.Ed.2d 481 (1985)* (both exculpatory and
impeachment evidence "fall[ ] within the *Brady*
rule"); *United States v. Smith, 77 F.3d 511, 514
(D.C.Cir.1996); United States v. Hsia, 24 F.Supp.2d
14 (D.D.C.1998)*. "The government is obligated to
disclose all evidence relating to guilt or punishment
which might be reasonably considered favorable to
the defendant's case," that is, all favorable evidence
that is itself admissible or "that is likely to lead to
favorable evidence that would be admissible," *United
States v. Sudikoff, 36 F.Supp.2d at 1199-1200*, or that
could be used to impeach a prosecution witness. *See
United States v. Trie, 21 F.Supp.2d at 23* ("favorable
evidence" encompasses "both evidence that is
exculpatory and evidence that could be used to
impeach a government witness"). Where doubt exists
as to the usefulness of the evidence to the defendant,
the government must resolve all such doubts in favor
of full disclosure. *See United States v. Paxson, 861
F.2d 730, 737 (D.C.Cir.1988)* (insufficient for
government to provide "niggling excuses" for its
failure to provide potentially exculpatory evidence).

 *6 [5] Under *Brady*, the prosecutors have an
affirmative duty to search possible sources of
exculpatory information, including a duty to learn of
favorable evidence known to others acting on the
prosecution's behalf, including the police, *Kyles v.
Whitley, 514 U.S. 419, 437, 115 S.Ct. 1555, 131
L.Ed.2d 490 (1995)*, and to cause files to be searched
that are not only maintained by the prosecutor's or
investigative agency's office, but also by other
branches of government "closely aligned with the
prosecution." *United States v. Brooks, 966 F.2d at*

*1503* ("affirmative duty of inquiry"). *See United
States v. Beers, 189 F.3d 1297, 1304 (10th Cir.1999)*
("[i]nformation possessed by other branches of the
federal government, including investigating officers,
is typically imputed to the prosecutors of the case"
for *Brady* purposes); *United States v. Jennings, 960
F.2d at 1490* ("[t]his personal responsibility cannot be
evaded by claiming lack of control over the files ... of
other executive branch agencies").

*B. Defendant's Specific Requests*
 The defendant first requests the FBI 302s of
interviews with the GSA Ethics Officer, Raymond
McKenna, and with Eugenia Ellison of the GSA
General Counsel's Office, who had drafted the ethics
opinion, as well as the rough notes (if any) taken by
the FBI agents regarding those interviews. [FN2] The
defendant argues that the 302s and the rough notes
would identify the substance of relevant oral
statements made by Mr. Safavian and/or address the
critical questions raised by the gap between the ethics
opinion's characterizations of Mr. Safavian's
statements to the Ethics Officer and his actual
statements to Mr. McKenna and Ms. Ellison. It is
clear to the Court that this request meets the
standards for disclosure under *Rule 16(a)(1)(A)* if the
government intends to use the statements at trial (as
surely it does intend) and/or *Rule 16(a)(1)(B)*,
without regard to whether the government intends to
use these statements at trial. Depending upon what is
contained in the statements, there also may be
evidence favorable to the defendant that must be
disclosed under the *Brady* standards announced
herein.

 Mr. Safavian stated in his e-mail that Mr. Abramoff
"has no business before GSA," while Ms. Ellison's
response states that Mr. Safavian told Mr. McKenna
(or perhaps someone else) that neither Mr. Abramoff
or his firm "does business with or is seeking to do
business with GSA." Indictment at ¶ 19. This
distinction could be crucial to the government's
ability to prove its case and/or to Mr. Safavian's
defense. Any other statements by Mr. Safavian that
either further inculpate or potentially exculpate him
therefore must be disclosed. And any information
that would elucidate this discrepancy necessarily is
"material" to the preparation of a defense. Its prompt
disclosure is required by either *Rule 16(a)(1)(A) or
(B)* or by *Rule 16(a)(1)(E)*. Such disclosure is not
precluded either by *Rule 16(a)(2)* or by the Jencks
Act.

 *7 The defendant's second request is for internal
GSA procedures and guidelines relating to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
(Cite as: 2005 WL 3529834 (D.D.C.))

consideration and issuance of ethics opinions and disciplinary actions. The request for guidelines and procedures also is material to the preparation of the defense in this case under Rule 16, regardless of whether the GSA procedures and guidelines could be evidence at trial. They therefore must be disclosed. On the other hand, the request for disciplinary actions relating to other government employees does not seem to be material and in fact strikes the Court as nothing more than a fishing expedition unlikely to lead to admissible evidence.

Third, the defendant requests e-mails and correspondence from May through August of 2002 between certain named associates of Mr. Abramoff concerning the Old Post Office and White Oak projects or properties, or concerning Mr. Safavian's participation in the Scotland trip. The government opposes Mr. Safavian's requests largely on the ground that since Mr. Safavian never saw these e-mails and other correspondence they could have no bearing on his state of mind when he communicated with the GSA Ethics Officer, the GSA-OIG or the Senate investigators, or be otherwise material to any conceivable defense. The government also represents that it has disclosed e-mails between Mr. Safavian, Mr. Abramoff and other individuals pertaining to the Old Post Office project, the White Oak project, and the Scotland trip that are in the possession of the Justice Department, as they comprise "the vast majority of the e-mail evidence [the government] intends to introduce at trial." Government's Memorandum in Opposition to Defendant's Motion to Compel Discovery at 13.

The Court does not agree with the government that these documents are only relevant if they relate to the defendant's state of mind when he communicated with various government officials. Rather, they could be "material" to the preparation of other defenses, a number of which are suggested in the defendant's filings in connection with this motion and have been alluded to in the hearings before the Court. For instance, the defense has stated its belief that the Old Post Office and White Oak projects were not available for any business dealings at the time Mr. Safavian requested the ethics opinion, and that Mr. Safavian's statements that Mr. Abramoff was not conducting business with GSA therefore were truthful. Simply because the e-mails themselves were not sent to or received by Mr. Safavian and therefore do not directly reflect his state of mind, and may or may not be admissible in evidence at trial, does not mean that they are not material to the preparation of a defense or that they will be unlikely to lead to admissible evidence. To the contrary, e-mails between certain named associates of Mr. Abramoff with knowledge of the status of these projects or the Scotland trip may very well include information helpful to the defendant in finding witnesses or documents that could support his contention.

*8 Fourth, the defendant requests reports, documents, e-mails and correspondence sent to or from various GSA officials, including GSA Commissioner Joseph Marovec, concerning the Old Post Office and White Oak properties and projects and/or relating to GSA procedures and of policies for disposal of such properties. Unlike the third request, respecting e-mails between Mr. Abramoff's associates, the defendant has not placed a time restriction upon this request. For that reason alone, this is not a reasonable request. While the documents themselves may be material to the preparation of a defense and therefore discoverable, the request does not have the required particularity. The defense is directed to narrow the requested documents to a time frame relevant to the matter and reasonable for discovery. [FN3]

With respect to both the third and fourth categories of documents requested, as the Court has already held, the term "government" in Rule 16(a)(1)(B) and (E) encompasses more than just the Justice Department, the FBI, the GSA-OIG and other investigative agencies; it includes all agencies and departments of the Executive Branch of the government and all subdivisions thereof. The fact that the documents requested may not presently be in the "possession" of the Justice Department prosecutors or the FBI is irrelevant. The documents must be produced if they are in the "possession, custody or control" of any agency of the Executive Branch of the government and are either material to the preparation of a defense or are exculpatory under Brady. It is insufficient for the Justice Department merely to state that while documents are not currently in its (or the FBI's) possession it is continuing to make inquires of GSA employees about e-mails, correspondence and other documents regarding the Old Post Office and White Oak projects during the course of witness interviews. While this certainly is a helpful step to obtain some relevant documents, it is not the systematic response that is required of the government under Rule 16 and Brady. Individual persons may or may not have kept copies of these e-mails, correspondence and other documents. [FN4] The GSA itself obviously has other more comprehensive means of searching for the e-mails, correspondence, and other documents that are more

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

likely to uncover all of the documents requested.

The Department of Justice therefore is required immediately--by formal request, in writing--to demand that the GSA conduct a thorough search for and produce to the Justice Department all e-mails--including archived e-mails on hard drives--and correspondence sent to or from GSA officials relating to the status of the Old Post Office and White Oak projects, as well as any other documents relating to the same. [FN5] The prosecutors will be able to determine whether they are required to disclose these documents under Rule 16 or *Brady*, as explicated in this Opinion, or to continue to assert their withholding only after they have actually seen them.

**\*9** Fifth, the defendant requests the rough notes of the FBI agents relating to their 302s or interview reports and/or tape recordings of interviews with Senate Committee investigators in connection with Mr. Safavian's interviews by and correspondence with the investigators or the Committee. The government argues that these rough notes are witness statements and therefore need not be produced pretrial under Rule 16 but must only be produced at or about the time of trial under the Jencks Act, 18 U.S.C. § 3500. [FN6] The defendant responds that he is not asking for the witness statements of the investigators *qua* witness statements but rather for "*Mr. Safavian's* allegedly incriminating statements to Senate investigators in Counts Four and Five via the only available sources." Defendant David H. Safavian's Reply to the Government's Response to Defendant's Supplemental Memorandum in Support of the Motion to Compel Discovery at 4 (emphasis in original). While these statements may constitute incriminating statements by the defendant to Senate investigators, the Senate investigators cannot be considered "government agents" under Rules 16(a)(1)(A) or (B)(ii). The government therefore does not have to turn the notes over under Rule 16(a)(1)(A) or (B)(ii). They must, however, turn them over under *Brady* if they are favorable or exculpatory or under Rule 16(a)(1)(B)(i) if they are in fact statements of the defendant to anyone.

Finally, the defendant makes two requests with respect to his "coercion defense." He seeks (1) all documents or evidence concerning other complaints made to the GSA by the individual believed to be the informant for the GSA-OIG investigation, and (2) documents and other items concerning Mr. Safavian's arrest and/or cooperation. The "coercion defense" as described seems attenuated at best, and the Court cannot conceive of how the reasons for the initiation

of the GSA-OIG investigation of Mr. Safavian, the possibility that the anonymous complainant is a serial complainant who had less than honorable motivations in making the complaint, or the circumstances regarding Mr. Safavian's arrest and/or cooperation can be material to any defense to the false statements of obstruction charges. Furthermore, the internal deliberative processes of the Department of Justice, the FBI, and the GSA-OIG are irrelevant to the preparation of a defense. Unless the defendant first can make out a selective or discriminatory prosecution claim, *see United States v. Armstrong*, 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Branch Ministries v. Rossotti*, 40 F.Supp.2d 15, 21-24 (D.D.C.1999), *aff'd*, 206 F.3d 1212 (D.C.Cir.2000); *Branch Ministries v. Richardson*, 970 F.Supp. 11, 15-17 (D.D.C.1997), requests for these categories of document must be denied--unless, of course, any information within these categories constitutes *Brady* material as defined by this Opinion.

An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

### ORDER

**\*10** For the reasons set forth in the Opinion issued this same day, it is hereby ORDERED that defendant's motion to compel discovery [9] is GRANTED in part and DENIED in part. Accordingly, it is hereby ORDERED that the government shall produce to the Defendant the following material:

1. All 302s, investigative reports, notes, documents, and tapes of General Services Administration ("GSA") Ethics Officer Ray McKenna and Eugenia Ellison of the GSA General Counsel's office pertaining to Mr. Safavian's request for an advisory ethics opinion.

2. All internal GSA procedures and guidelines relating to ethics opinions and disciplinary actions for violations of such policies, but not information about specific disciplinary actions related to other employees.

3. All e-mails and correspondence and any other documents from May 2002 through August 2002 sent or received by Pam Abramoff, Anthony Rudy, John Van Horne, Neil Volz, Holly Bowers, Colin Stevens, and Rabbi David Lapin concerning Mr. Safavian, the Old Post Office Building in Washington D.C. ("OPO"), the Naval Surface Warfare Center White

2005 WL 3529834
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
**(Cite as: 2005 WL 3529834 (D.D.C.))**

Page 8

Oak Property in Silver Spring, Maryland ("White Oak") or the 2002 Scotland trip.

4. All e-mails and correspondence and any other documents within a specified, reasonable and appropriate time frame sent from or received by GSA Commissioner Joseph Moravec, as well as GSA officials Paul Chrisolini, Leah Uhre, Tony Costa, Sharon Jenkins, Ann Everett, Ray McKenna, and Eugenia Ellison concerning the OPO or White Oak properties or projects, or Mr. Safavian's request for an advisory ethics opinion. [FN1]

5. All notes, documents and tapes of 302s and interviews of the Chief Investigative Counsel and Deputy Chief Investigative Counsel to the Senate Committee on Indian Affairs within the possession, custody or control of the government.

6. Upon producing the above materials, the government shall also provide the defendant information as to what specific efforts were made to search for responsive documents, including the extent of the search for responsive documents within the possession, custody or control of the GSA, GSA Office of the Inspector General, and the Department of Justice.

SO ORDERED.

> FN1. In the District of Columbia, it would also apply, for example, to the Metropolitan Police Department for obvious reasons. *Cf. United States v. Brooks,* 966 F.2d 1500, 1504 (D.C.Cir.1992).

> FN2. The government has represented that there are no rough notes or tape recordings of these interviews.

> FN3. The sooner the defendant narrows and refines this request and presents it in writing to the prosecutors, the sooner the Department of Justice will be able to comply with the directives in the next paragraph of this Opinion and in the Court's Order.

> FN4. Indeed at the last status conference on this matter, on December 13, 2005, the government advised the Court that at least some of the GSA employees it has interviewed have kept extensive personal records of e-mails and correspondence that may exceed even those of the agency itself. Clearly, investigating records kept by these

individuals personally will remain an important part of the government's fulfillment of its *Brady* obligations.

> FN5. At the December 13, 2005 status conference, the government informed the Court that it had communicated with GSA concerning its e-mail retention policies and had been told that all e-mails are deleted after 60 days (presumably from the GSA mail server). The government went on to advise the Court that some persons subject to the defense's discovery requests had personally archived some or many of the requested e-mails.
> This representation is not adequate. It is not clear how and where the government got its information about the GSA's information technology practices and retention capabilities, and through what channels, formal or informal, this information was obtained. The government also did not clarify whether the 60 day retention policy applies to the GSA's mail server or whether the e-mails in question may exist in back-up storage devices or media. While the Court certainly accepts that the Justice Department prosecutors have represented the GSA's practices to the best of their knowledge and ability, it nevertheless orders the prosecution to make a formal, written request of GSA for the e-mails that this Court finds subject to disclosure as well as a more specific, detailed explanation of the e-mail retention and storage policies and capabilities.

> FN6. The government acknowledges that such rough notes exist and will be produced at trial under the Jencks Act. It represents that no tape recordings of the interviews were made.

> FN1. As discussed in the Opinion accompanying this Order, the defendant is ordered to particularize his request with a time frame reasonable for discovery and relevant to the materials requested. If the parties cannot reach an agreement on what that time frame is, they may file an additional motion to resolve that issue. The parties are, however, expected to negotiate this matter to the best of their ability before bringing it to the Court's attention.

--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 3529834
--- F.R.D. ----, 2005 WL 3529834 (D.D.C.)
**(Cite as: 2005 WL 3529834 (D.D.C.))**

**Motions, Pleadings and Filings <u>(Back to top)</u>**

• <u>1:05cr00370</u> (Docket) (Oct. 05, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

FOCUS - 1 of 1 DOCUMENT

Copyright 2003 CNBC, Inc.
CNBC News Transcripts

SHOW: Capital Report (9:00 PM ET) - CNBC

October 3, 2003 Friday

**LENGTH:** 1133 words

**HEADLINE:** Possible criminal outing of CIA agent

**ANCHORS:** GLORIA BORGER; ALAN MURRAY

**BODY:**

GLORIA BORGER, co-host:

There was good news on the economy today with jobs rising for the first time since January. But the White House was preoccupied with the rapidly moving investigation into the possibly criminal outing of a CIA agent.

ALAN MURRAY, co-host:

Joining us now, NBC's Andrea **Mitchell.** Andrea, thanks for being with us.

ANDREA **MITCHELL** (NBC News): Thank you.

MURRAY: We have news that a memo was sent today to the White House, asking for information about this leak very quickly. In fact, there's a deadline set for next Tuesday. Looks like they're trying to move rapidly on this, right?

**MITCHELL:** They are. They are trying to narrow the focus of the investigation, and try to wrap it up as quickly as possible. And truth be told that if they are going to find anything and the track record on these leak investigations is that they rarely do, because journalists don't want to disclose their sources. But if they do find something, they want to do it as quickly as possible. And in this case, you've got a very small universe. All they have to find out is who are the people at the CIA who first talked to Bob Novak? We pretty well know that. That's been disclosed. And who were the people who talked to Novak and to at least these two other reporters from Newsday who have been mentioned in the White House memo, and that should be easily ascertained.

BORGER: Andrea, can you sort of explain to us how this story, which really started in July—I mean Ambassador Wilson wrote his piece criticizing the administration on July 6th. A week later, Bob Novak writes his column, talking about Ambassador Wilson's wife, and here we are at the beginning of October, and suddenly it's news.

**MITCHELL:** Well, it does seem a little mysterious. Why all of a sudden is there some political agenda going on? And obviously, there is a lot of politics going on here.

BORGER: Really?

**MITCHELL:** You know, shocking that politics would be taking place here in Washington, and there's a lot of hypocrisy on all sides. I mean, this is a situation where Democrats, including Hillary Rodham Clinton, have been calling for a special counsel. The very people who all during the Clinton years fought and fought and fought, she most primarily, fought against having a special counsel. And Republicans who always said, you know, that the Justice Department cannot handle this are saying, 'Well, why can't John Ashcroft handle this?' You know, just substitute Janet Reno's name for John Ashcroft, and you see just how silly all this appears on the surface.

But why did it take so long? July 6th, Joe Wilson comes out and discloses that he was, indeed, the secret envoy who went to Niger for the CIA, and this is an op-ed on a Sunday morning in the New York Times. Well, Saturday night, we see that this is coming, so I was substituting on "Meet The Press," and called Wilson and said, 'Would you come on?' And we had him come on the show, so he's also on television. Now that certainly was a double whammy as far as the Bush administration was concerned. Interestingly, Bob Novak was also one of my invited on that guests on that program a

Possible criminal outing of CIA agent CNBC News Transcripts October 3, 2

different subject, so they clearly met for the first time, Wilson and Novak that day.

BORGER: That's interesting.

MITCHELL: Great ironies. That week, I followed up. We did a report on NBC.

BORGER: Did Wilson's wife come, by the way, to the studio or not?

MITCHELL: Not at all.

BORGER: OK. All right. Just thought I'd ask.

MITCHELL: Separate lives. So that week, on the 8th of July, I did a story on "Nightly News" about Wilson's allegations focusing on Niger, the uranium, not focusing on any issue involving his spouse. Then on the 14th, the bombshell from Novak, which was the revelation which clearly he says came from two administration officials—he wrote that in his column—that she was a covert—rather an operative, as he put it, at the CIA. The clear implication that she had somehow been involved in getting him to take this assignment and in somehow positioning him, that this was part of the overall attempt of the CIA to go up against the White House and to challenge the president's policy. So this is where it fits within the ongoing wars which are only becoming more heated between the Cheney-Bush White House, Rumsfeld hard-liners on weapons of mass destruction, and the more skeptical analysts and operatives, CIA officers, covert officers at both the CIA and the State Department.

We should point out that I did do a story after that, on July 21st. I interviewed Wilson, did a story on the fact that he was now alleging that there was an attempt to bring his wife into it, that this was an administration attempt to intimidate him. So it was on the air in July. But then the CIA secretly asked the Justice Department to look into this. The Justice Department took its sweet time, frankly, came back to the CIA and said, 'Answer these 11 questions: Was she covert? Was there a possible violation?' Eleven questions had to be answered prima facie. The CIA responded to the Justice Department. And last Friday, as we reported at the time, the Justice Department said, 'OK, we're going to proceed and investigate.' That's why the lag time.

MURRAY: Andrea, a couple of quick questions. One, you said something earlier that I wasn't sure about. Bob Novak reported that two administration officials told him this. Are we any closer to having any idea who those two people are?

MITCHELL: No. And you know, there's a lot of rumor. There's been denials from the White House. Joe Wilson, he now inappropriately suggested that Karl Rove may have been the person. What he really should have been saying is that he believes Karl Rove was circulating the story after Novak put it out. So we don't know who that person was. There have been suggestions regarding the vice president's office. These have been denied. But it's really...

MURRAY: Right.

MITCHELL: ...inappropriate, I think, for any of us to suggest that someone might have been involved, because we're talking about a possible crime, and we have no evidence of that.

MURRAY And the second question is: Do we have any idea how widely known it was in Washington that Joe Wilson's wife worked for the CIA?

MITCHELL: It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger. So a number of us began to pick up on that. But frankly I wasn't aware of her actual role at the CIA and the fact that she had a covert role involving weapons of mass destruction, not until Bob Novak wrote it.

MURRAY: All right. Andrea, thanks very much for being with us.

MITCHELL: My pleasure.

LOAD-DATE: October 4, 2003

# EXHIBIT C

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

November 16, 2005 Wednesday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1366 words

**HEADLINE:** Woodward Was Told of Plame More Than Two Years Ago

**BYLINE:** Jim VandeHei and Carol D. Leonnig, Washington Post Staff Writers

**BODY:**

Washington Post Assistant Managing Editor Bob Woodward testified under oath Monday in the CIA leak case that a senior administration official told him about CIA operative Valerie Plame and her position at the agency nearly a month before her identity was disclosed.

In a more than two-hour deposition, Woodward told Special Counsel Patrick J. Fitzgerald that the official casually told him in mid-June 2003 that Plame worked as a CIA analyst on weapons of mass destruction, and that he did not believe the information to be classified or sensitive, according to a statement Woodward released yesterday.

Fitzgerald interviewed Woodward about the previously undisclosed conversation after the official alerted the prosecutor to it on Nov. 3 -- one week after Vice President Cheney's chief of staff, I. Lewis "Scooter" Libby, was indicted in the investigation.

Citing a confidentiality agreement in which the source freed Woodward to testify but would not allow him to discuss their conversations publicly, Woodward and Post editors refused to disclose the official's name or provide crucial details about the testimony. Woodward did not share the information with Washington Post Executive Editor Leonard Downie Jr. until last month, and the only Post reporter whom Woodward said he remembers telling in the summer of 2003 does not recall the conversation taking place.

Woodward said he also testified that he met with Libby on June 27, 2003, and discussed Iraq policy as part of his research for a book on President Bush's march to war. He said he does not believe Libby said anything about Plame.

He also told Fitzgerald that it is possible he asked Libby about Plame or her husband, former ambassador Joseph C. Wilson IV. He based that testimony on an 18-page list of questions he planned to ask Libby in an interview that included the phrases "yellowcake" and "Joe Wilson's wife." Woodward said in his statement, however, that "I had no recollection" of mentioning the pair to Libby. He also said that his original government source did not mention Plame by name, referring to her only as "Wilson's wife."

Woodward's testimony appears to change key elements in the chronology Fitzgerald laid out in his investigation and announced when indicting Libby three weeks ago. It would make the unnamed official -- not Libby -- the first government employee to disclose Plame's CIA employment to a reporter. It would also make Woodward, who has been publicly critical of the investigation, the first reporter known to have learned about Plame from a government source.

The testimony, however, does not appear to shed new light on whether Libby is guilty of lying and obstructing justice in the nearly two-year-old probe or provide new insight into the role of senior Bush adviser Karl Rove, who remains under investigation.

Mark Corallo, a spokesman for Rove, said that Rove is not the unnamed official who told Woodward about Plame and that he did not discuss Plame with Woodward.

Woodward Was Told of Plame More Than Two Years Ago The Washington Post N

William Jeffress Jr., one of Libby's lawyers, said yesterday that Woodward's testimony undermines Fitzgerald's public claims about his client and raises questions about what else the prosecutor may not know. Libby has said he learned Plame's identity from NBC's Tim Russert.

"If what Woodward says is so, will Mr. Fitzgerald now say he was wrong to say on TV that Scooter Libby was the first official to give this information to a reporter?" Jeffress said last night. "The second question I would have is: Why did Mr. Fitzgerald indict Mr. Libby before fully investigating what other reporters knew about Wilson's wife?"

Fitzgerald has spent nearly two years investigating whether senior Bush administration officials illegally leaked classified information -- Plame's identity as a CIA operative -- to reporters to discredit allegations made by Wilson. Plame's name was revealed in a July 14, 2003, column by Robert D. Novak, eight days after Wilson publicly accused the administration of twisting intelligence to justify the Iraq war. Fitzgerald's spokesman, Randall Samborn, declined to comment yesterday.

Woodward is a Pulitzer Prize-winning investigative reporter and author best known for exposing the Watergate scandal and keeping secret for 30 years the identity of his government source "Deep Throat."

"It was the first time in 35 years as a reporter that I have been asked to provide information to a grand jury," he said in the statement.

Downie said The Post waited until late yesterday to disclose Woodward's deposition in the case in hopes of persuading his sources to allow him to speak publicly. Woodward declined to elaborate on the statement he released to The Post late yesterday afternoon and publicly last night. He would not answer any questions, including those not governed by his confidentiality agreement with sources.

According to his statement, Woodward also testified about a third unnamed source. He told Fitzgerald that he does not recall discussing Plame with this person when they spoke on June 20, 2003.

It is unclear what prompted Woodward's original unnamed source to alert Fitzgerald to the mid-June 2003 mention of Plame to Woodward. Once he did, Fitzgerald sought Woodward's testimony, and three officials released him to testify about conversations he had with them. Downie, Woodward and a Post lawyer declined to discuss why the official may have stepped forward this month.

Downie defended the newspaper's decision not to release certain details about what triggered Woodward's deposition because "we can't do anything in any way to unravel the confidentiality agreements our reporters make."

Woodward never mentioned this contact -- which was at the center of a criminal investigation and a high-stakes First Amendment legal battle between the prosecutor and two news organizations -- to his supervisors until last month. Downie said in an interview yesterday that Woodward told him about the contact to alert him to a possible story. He declined to say whether he was upset that Woodward withheld the information from him.

Downie said he could not explain why Woodward said he provided a tip about Wilson's wife to Walter Pincus, a Post reporter writing about the subject, but did not pursue the matter when the CIA leak investigation began. He said Woodward has often worked under ground rules while doing research for his books that prevent him from naming sources or even using the information they provide until much later.

Woodward's statement said he testified: "I told Walter Pincus, a reporter at The Post, without naming my source, that I understood Wilson's wife worked at the CIA as a WMD analyst."

Pincus said he does not recall Woodward telling him that. In an interview, Pincus said he cannot imagine he would have forgotten such a conversation around the same time he was writing about Wilson.

"Are you kidding?" Pincus said. "I certainly would have remembered that."

Pincus said Woodward may be confused about the timing and the exact nature of the conversation. He said he remembers Woodward making a vague mention to him in October 2003. That month, Pincus had written a story explaining how an administration source had contacted him about Wilson. He recalled Woodward telling him that Pincus was not the only person who had been contacted.

Pincus and fellow Post reporter Glenn Kessler have been questioned in the investigation.

Woodward Was Told of Plame More Than Two Years Ago The Washington Post N

Woodward, who is preparing a third book on the Bush administration, has called Fitzgerald "a junkyard-dog prosecutor" who turns over every rock looking for evidence. The night before Fitzgerald announced Libby's indictment, Woodward said he did not see evidence of criminal intent or of a major crime behind the leak.

"When the story comes out, I'm quite confident we're going to find out that it started kind of as gossip, as chatter," he told CNN's Larry King.

Woodward also said in interviews this summer and fall that the damage done by Plame's name being revealed in the media was "quite minimal."

"When I think all of the facts come out in this case, it's going to be laughable because the consequences are not that great," he told National Public Radio this summer.

**LOAD-DATE:** November 16, 2005

# EXHIBIT D

1 of 1 DOCUMENT

Copyright 2005 The Washington Post
The Washington Post

November 16, 2005 Wednesday
Final Edition

**SECTION:** A Section; A08

**LENGTH:** 987 words

**HEADLINE:** Testifying in the CIA Leak Case

**BODY:**

On Monday, November 14, I testified under oath in a sworn deposition to Special Counsel Patrick J. Fitzgerald for more than two hours about small portions of interviews I conducted with three current or former Bush administration officials that relate to the investigation of the public disclosure of the identity of undercover CIA officer Valerie Plame.

The interviews were mostly confidential background interviews for my 2004 book "Plan of Attack" about the leadup to the Iraq war, ongoing reporting for The Washington Post and research for a book on Bush's second term to be published in 2006. The testimony was given under an agreement with Fitzgerald that he would only ask about specific matters directly relating to his investigation.

All three persons provided written statements waiving the previous agreements of confidentiality on the issues being investigated by Fitzgerald. Each confirmed those releases verbally this month, and requested that I testify.

Plame is the wife of former ambassador Joseph Wilson, who had been sent by the CIA in February 2002 to Niger to determine if there was any substance to intelligence reports that Niger had made a deal to sell "yellowcake" or raw uranium to Iraq. Wilson later emerged as an outspoken critic of the Bush administration.

I was first contacted by Fitzgerald's office on Nov. 3 after one of these officials went to Fitzgerald to discuss an interview with me in mid-June 2003 during which the person told me Wilson's wife worked for the CIA on weapons of mass destruction as a WMD analyst.

I have not been released to disclose the source's name publicly.

Fitzgerald asked for my impression about the context in which Mrs. Wilson was mentioned. I testified that the reference seemed to me to be casual and offhand, and that it did not appear to me to be either classified or sensitive. I testified that according to my understanding an analyst in the CIA is not normally an undercover position.

I testified that after the mid-June 2003 interview, I told Walter Pincus, a reporter at The Post, without naming my source, that I understood Wilson's wife worked at the CIA as a WMD analyst. Pincus does not recall that I passed this information on.

Fitzgerald asked if I had discussed Wilson's wife with any other government officials before Robert Novak's column on July 14, 2003. I testified that I had no recollection of doing so.

He asked if I had possibly planned to ask questions about what I had learned about Wilson's wife with any other government official.

I testified that on June 20, 2003, I interviewed a second administration official for my book "Plan of Attack" and that one of the lists of questions I believe I brought to the interview included on a single line the phrase "Joe Wilson's wife." I testified that I have no recollection of asking about her, and that the tape-recorded interview contains no indication that the subject arose.

I also testified that I had a conversation with a third person on June 23, 2003. The person was I. Lewis "Scooter" Libby, and we talked on the phone. I told him I was sending to him an 18-page list of questions I wanted to ask Vice President Cheney. On page 5 of that list there was a question about "yellowcake" and the October 2002 National Intelligence Estimate regarding Iraq's weapons programs. I testified that I believed I had both the 18-page question list and the question list from the June 20 interview with the phrase "Joe Wilson's wife" on my desk during this discussion. I testified that I have no recollection that Wilson or his wife was discussed, and I have no notes of the conversation.

Though neither Wilson nor Wilson's wife's name had surfaced publicly at this point, Pincus had published a story the day before, Sunday, June 22, about the Iraq intelligence before the war. I testified that I had read the story, which referred to the CIA mission by "a former senior American diplomat to visit Niger." Although his name was not used in the story, I knew that referred to Wilson.

I testified that on June 27, 2003, I met with Libby at 5:10 p.m. in his office adjacent to the White House. I took the 18-page list of questions with the Page-5 reference to "yellowcake" to this interview and I believe I also had the other question list from June 20, which had the "Joe Wilson's wife" reference.

I have four pages of typed notes from this interview, and I testified that there is no reference in them to Wilson or his wife. A portion of the typed notes shows that Libby discussed the October 2002 National Intelligence Estimate on Iraq's alleged weapons of mass destruction, mentioned "yellowcake" and said there was an "effort by the Iraqis to get it from Africa. It goes back to February '02." This was the time of Wilson's trip to Niger.

When asked by Fitzgerald if it was possible I told Libby I knew Wilson's wife worked for the CIA and was involved in his assignment, I testified that it was possible I asked a question about Wilson or his wife, but that I had no recollection of doing so. My notes do not include all the questions I asked, but I testified that if Libby had said anything on the subject, I would have recorded it in my notes.

My testimony was given in a sworn deposition at the law office of Howard Shapiro of the firm of Wilmer Cutler Pickering Hale and Dorr instead of appearing under subpoena before a grand jury.

I testified after consulting with the Post's executive and managing editors, the publisher, and our lawyers. We determined that I could testify based on the specific releases obtained from these three people. I answered all of Fitzgerald's questions during my testimony without breaking promises to sources or infringing on conversations I had on unrelated matters for books or news reporting -- past, present or future.

It was the first time in 35 years as a reporter that I have been asked to provide information to a grand jury.

**LOAD-DATE:** November 16, 2005

# EXHIBIT E



*EarthLink*
**trueVoice**
earthlinktruevoice.com

**KEEP TALKING.**
Unlimited broadband phone service:
**$24.95** /MO

Level(3
ENABLE
learn mo

# TIME

## NATION POLITICS

Thursday, Jul. 17, 2003

# A War on Wilson?

### Inside the Bush Administration's feud with the diplomat who poured cold water on the Iraq-uranium connection

By MATTHEW COOPER, MASSIMO CALABRESI AND JOHN F. DICKERSON

Has the Bush Administration declared war on a former ambassador who conducted a fact-finding mission to probe possible Iraqi interest in African uranium? Perhaps.

Former Ambassador Joseph C. Wilson raised the Administration's ire with an op-ed piece in The New York Times on July 6 saying that the Administration had "twisted" intelligence to "exaggerate" the Iraqi threat. Since then Administration officials have taken public and private whacks at Wilson, charging that his 2002 report, made at the behest of U.S. intelligence, was faulty and that his mission was a scheme cooked up by mid-level operatives. George Tenet, the director of the Central Intelligence Agency, took a shot at Wilson last week as did ex-White House Press Secretary Ari Fleischer. Both contended that Wilson's report on an alleged Iraqi effort to purchase uranium from Niger, far from undermining the president's claim in his State of the Union address that Iraq sought uranium in Africa, as Wilson had said, actually strengthened it. And some government officials have noted to TIME in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction. These officials have suggested that she was involved in her husband's being dispatched Niger to investigate reports that Saddam Hussein's government had sought to purchase large quantities of uranium ore, sometimes referred to as yellow cake, which is used to build nuclear devices.

In an interview with TIME, Wilson, who served as an ambassador to Gabon and as a senior American diplomat in Baghdad under the current president's father, angrily said that his wife had nothing to do with his trip to Africa. "That is bulls__t. That is absolutely not the case," Wilson told TIME. "I met with between six and eight analysts and operators from CIA and elsewhere [before the Feb 2002 trip]. None of the people in that meeting did I know, and they took the decision to send me. This is a smear job."

Government officials are not only privately disputing the genesis of
Wilson's trip, but publicly contesting what he found. Last week Bush
Administration officials said that Wilson's report reinforced the president's
claim that Iraq had sought uranium from Africa. They say that when
Wilson returned from Africa in Feb. 2002, he included in his report to the
CIA an encounter with a former Nigerien government official who told him
that Iraq had approached him in June 1999, expressing interest in
expanding commercial relations between Iraq and Niger. The
Administration claims Wilson reported that the former Nigerien official
interpreted the overture as an attempt to discuss uranium sales.

"This is in Wilson's report back to the CIA," White House Press Secretary
Ari Fleischer told reporters last week, a few days before he left his post to
join the private sector. "Wilson's own report, the very man who was on
television saying Niger denies it...reports himself that officials in Niger said
that Iraq was seeking to contact officials in Niger about sales."

Wilson tells the story differently and in a crucial respect. He says the
official in question was contacted by an Algerian-Nigerien intermediary
who inquired if the official would meet with an Iraqi about "commercial"
sales — an offer he declined. Wilson dismisses CIA Director George
Tenet's suggestion in his own mea culpa last week that the meeting
validates the President's State of the Union claim: "That then translates into
an Iraqi effort to import a significant quantity of uranium as the president
alleged? These guys really need to get serious."

Government officials also chide Wilson for not delving into the details of
the now infamous forged papers that pointed to a sale of uranium to Iraq.
When Tenet issued his I-take-the-blame statement on the alleged Iraq-Niger
uranium connection last week, he took a none-too-subtle jab at Wilson's
report. "There was no mention in the report of forged documents — or any
suggestion of the existence of documents at all," Tenet wrote. For his part
Wilson says he did not deal with the forgeries explicitly in his report
because he never saw them. However, Wilson says he refuted the forgeries'
central allegation that Niger had been negotiating a sale of uranium to Iraq.
Wilson says he explained in the report that several Nigerien government
signatures would be required to permit such a sale — signatures that were
either absent or clearly botched in the forged documents.

Administration officials also claim that Wilson took at face value the
claims of Nigerien officials that they had not sold uranium ore to Saddam
Hussein. (Such sales would have been forbidden under then-existing United
Nations sanctions on Iraq.) "He spent eight days in Niger and he concluded
that Niger denied the allegation." Fleischer told reporters last week. "Well,
typically nations don't admit to going around nuclear nonproliferation,"

For his part, Wilson says that the Administration conflated the prior report
of the American ambassador to Niger with his own. Wilson says a report by
Barbro Owens-Kirkpatrick, the American ambassador to Niger, addresses
the issue of Nigerien government officials disputing the allegation. Wilson
says that he never made the naïve argument that if Nigerien officials denied

Case 1:05-cr-00394-RBW    Document 29-2    Filed 01/26/2006    Page 24 of 32

TIME.com Print Page: Nation-Politics -- A War on Wilson?                    Page 3 of 3

the sales, then their claims must be believed.

A source close to the matter says that Wilson was dispatched to Niger because Vice President Dick Cheney had questions about an intelligence report about Iraq seeking uranium and that he asked that the CIA get back to him with answers. Cheney's staff has adamantly denied and Tenet has reinforced the claim that the Vice President had anything to do with initiating the Wilson mission. They say the Vice President merely asked routine questions at an intelligence briefing and that mid-level CIA officials, on their own, chose to dispatch Wilson.

In an exclusive interview Lewis Libby, the Vice President's Chief of Staff, told TIME: "The Vice President heard about the possibility of Iraq trying to acquire uranium from Niger in February 2002. As part of his regular intelligence briefing, the Vice President asked a question about the implication of the report. During the course of a year, the Vice President asked many such questions and the agency responded within a day or two saying that they had reporting suggesting the possibility of such a transaction. But the agency noted that the reporting lacked detail. The agency pointed out that Iraq already had 500 tons of uranium, portions of which came from Niger, according to the International Atomic Energy Administration (IAEA). The Vice President was unaware of the trip by Ambassador Wilson and didn't know about it until this year when it became public in the last month or so. " Other senior Administration officials, including National Security Adviser Condoleezza Rice, have also claimed that they had not heard of Wilson's report until recently.

After he submitted his report in March 2002, Wilson says, his interest in the topic lay dormant until the State of the Union address in January 2003. In his speech, the President cited a British report claiming that Hussein's government had sought uranium in Africa. Afterward, Wilson says, he called a friend at the Africa bureau of the State Department and asked if the reference had been to Niger. The friend said that he didn't know but, says Wilson, allowed the possibility that Bush was referring to some other country on the continent. Wilson says he let the matter drop until he saw State Department spokesman Richard Boucher say a few months later that the U.S. had been fooled by bad intelligence. It was then that Wilson says he realized that his report had been overlooked, ignored, or buried. Wilson told TIME that he considers the matter settled now that the White House has admitted the Bush reference to Iraq and African uranium should not have been in the State of the Union address.

Copyright © 2005 Time Inc. All rights reserved.                    Privacy Policy
Reproduction in whole or in part without permission is prohibited.

# EXHIBIT F

1 of 1 DOCUMENT

Copyright 2004 Cable News Network
All Rights Reserved.

CNN

**SHOW:** CNN **RELIABLE SOURCES** 11:30 AM EST

**December** 12, 2004 Sunday

**TRANSCRIPT:** 121201CN.V50

**SECTION:** NEWS; Domestic

**LENGTH:** 3929 words

**HEADLINE:** Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Should Journalists Have Covered Steroid Abuse in Baseball Earlier?

**BYLINE:** Howard Kurtz, Jamie McIntyre

**GUESTS:** Matt **Cooper,** Warner Wolf, Steve Kettmann, Mike Wise

**HIGHLIGHT:**

Planted question. Was the reporter playing fair by having a soldier ask Donald Rumsfeld about the troops feeling vulnerable? Then, striking out. Was the press rooting on the likes of Barry Bonds and Jason Giambi as they bulked up their bodies and their home run totals, or should journalists have cried foul about steroids years ago?

**BODY:**

(BEGIN VIDEOTAPE)

HOWARD KURTZ, HOST (voice-over): Planted question. Was the reporter playing fair by having a soldier ask Donald Rumsfeld about the troops feeling vulnerable?

Striking out. Was the press rooting on the likes of Barry Bonds and Jason Giambi as they bulked up their bodies and their home run totals, or should journalists have cried foul about steroids years ago? Warner Wolf joins our discussion.

Risking jail. "Time's" Matt **Cooper** explains why he would rather serve time than reveal his confidential sources.

Plus, why is "The Baltimore Sun" suing Maryland's governor?

(END VIDEOTAPE)

KURTZ: Welcome to RELIABLE SOURCES. I'm Howard Kurtz. A jam-packed show today. And we begin with what seemed like a spontaneous moment, a tough question from an American soldier to the secretary of defense.

(BEGIN VIDEO CLIP)

SPC. THOMAS WILSON, U.S. ARMY: Now why do we soldiers have to dig through local landfills for pieces of scrap metal and compromised ballistic glass to up-armor our vehicles, and why don't we have those resources readily available to us?

(APPLAUSE)

DONALD RUMSFELD, SECRETARY OF DEFENSE: You go to war with the army you have, not the army you might want or wish to have at a later time.

(END VIDEO CLIP)

KURTZ: But that question in Kuwait on Wednesday was planted by Edward Lee Pitts, an embedded reporter for "The Chattanooga Times Free Press." He admitted in an e-mail, which ended up on the Web, that he prodded the soldier into asking the question.

Joining me now at the Pentagon, CNN senior Pentagon correspondent, Jamie McIntyre. And here with me in the studio, "Time" magazine's White House correspondent, Matt **Cooper.**

Matt **Cooper,** was it unfair, underhanded or sneaky for Pitts to ask the soldier to ask Rumsfeld that question?

MATT **COOPER,** TIME: No, I don't think so. I think it was clever. And look, the soldier was perfectly free not to ask it. Clearly, it was something that was on the soldier's mind and the minds of the other soldiers at the event, who whooped and hollered when he asked the question.

You know, this reporter probably should have mentioned in his own story that he'd been way involved in kind of planting the seeds of the question. But...

KURTZ: Should have mentioned that he stage-managed this, that he helped orchestrate this emotional moment.

**COOPER:** Yeah.

KURTZ: Jamie McIntyre, would you have done such a thing?

JAMIE MCINTYRE, CNN SR. PENTAGON CORRESPONDENT: Well, I've certainly been in crowds of soldiers, and when they've expressed an opinion about something, I might have encouraged them, you know, to — if someone said to me, gee, we're really concerned about armor, I might have said, boy, you know, you might ask the secretary, that's why this is here.

I think the question here though is that this issue has been around a long time. Lots of stories have been written about it. Congress is asking questions, stories have been written, including Edward Pitts', but what made this an event was that — not that it came from a reporter or a member of Congress, but from one of the soldiers on the front lines. And the fact that it might not have happened had this not been orchestrated by a reporter, I think is something that could cross the line.

KURTZ: And would you agree therefore that "The Chattanooga Times Free Press" made a mistake, as its editor, Tom Griscom, now acknowledges, in not at least disclosing that this was not some spontaneous emotional outburst on the soldier's part, but that the reporter had worked on the question with the soldier in advance, as he — as the reporter later admitted in this e-mail.

MCINTYRE: Right. And also arranged for him to be called on. I think that the paper has acknowledged in the discussions with CNN that in retrospect, that should have been disclosed. I think they have disclosed it in the follow-up article that they've done.

But again, this became a real seminal event. It sparked a whole debate about the armor thing. And it was because it came from the soldier. Now we find out it actually came from a reporter, who also brought the soldier with him, and as you said, didn't just suggest he write a question, but said he worked on it with him. And it looked like the soldier was actually reading it initially from a piece of paper. So I think it does cross a line.

KURTZ: None of us had any way of knowing that in advance. Jamie McIntyre at the Pentagon, thanks very much for joining us.

Matt **Cooper,** want to turn now to your legal situation. As the whole world, I think, knows, you've been cited for contempt of court in the case involving Valerie Plame and the outing of her status as a CIA operative. There was a federal appeals court hearing this week, two of the three judges did not sound sympathetic to your lawyer, Floyd Abrams, who is also representing Judith Miller of "The New York Times." How worried are you at this point about actually having to go to jail?

**COOPER:** Oh, well, Howie, I would have to be foolish not to be a little bit unsettled by that prospect. But look, this is not about me, it's really about the question of the reporters able to do their jobs and be able to retain confidential sources. And you know, it's worrisome to me. I've got a colleague, though, Michael Weisskopf, who lost his arm in Iraq, just down the hall from me. I mean, that's suffering, and what I'm going through is just the tedium of the American legal system.

Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Shou

KURTZ: But are you frustrated or angry that, as you see it, you were doing your job, you may have to pay for that by spending time behind bars?

COOPER: Well, I do, and I'm also baffled by it, frankly, this investigation has centered on, you know, Robert Novak, the CNN commentator and columnist who originally mentioned the CIA operative's name in print. I don't know how putting me in jail is going to reveal who leaked to Robert Novak, or what that was about.

KURTZ: Would you view yourself as outing Valerie Plame? Your story last year ran three days after Novak's column.

COOPER: No, I don't. I mean, it was out, and I mentioned her by name. What I was trying to do in my piece in July of 2003, Howard, was to point out what the leakers were doing. I was trying to call attention to it. And I think Novak was in a way kind of a transmission belt for the leakers, basically repeating their smears.

I was trying to say, hey, they're smearing this guy. There are some malevolent things going on here. Take a look.

KURTZ: Judith Miller, who, as I mentioned, also faces jail time. She is a "New York Times" reporter, had this to say the other day on CNN.

(BEGIN VIDEO CLIP)

JUDITH MILLER, THE NEW YORK TIMES: I don't think journalists really responded with the alarm that we should have. Some liberal journalists said, oh, Bob Novak is conservative, he was carrying water for the president and therefore he didn't deserve the protection of the First Amendment. Well, I think we were all a little perhaps quiescent about this threat.

(END VIDEO CLIP)

KURTZ: Does she have a point?

COOPER: I think I might differ with my co-defendant, Judy, on this. I mean, I think the press -- I don't recall anyone in the press saying Bob Novak didn't have the same right to protect his sources that Judy or I do. So I'm not quite sure I agree with her on that.

KURTZ: This is not a theoretical possibility. Jim Taricani, Rhode Island television reporter, was sentenced this week. He has also been cited for contempt in a source case. He was sentenced to six months of home confinement. The judge said the only reason he didn't send him to jail was because he has had a heart transplant.

In Taricani's case, the source at the last minute voluntarily came forward. Why are you still protecting the source or sources in this case, who, after all, may have possibly committed a crime in leaking the name of Valerie Plame?

COOPER: Sure. Well, I think there is a larger principle at issue here, Howard, which is protecting the confidentiality of sources. I think if reporters go picking and choosing which confidences to honor, which ones we'll break, whether we think our sources have proper motivations or not, we're really going to send a message to all potential sources who may be whistle-blowers uncovering government waste or what-not, that reporters' words can't be trusted.

And so I feel a need to protect this confidence, despite that.

KURTZ: And on that point, what has been the effect of all this on your daily reporting right now?

COOPER: Well, it has taken up some time and it's obviously unsettling to have to go through the legal system.

KURTZ: Chilling effect?

COOPER: Haven't seen the chilling effect, but I think in part by standing firm here I think if anyone doubted I could keep a secret I think they've seen I can.

KURTZ: Have you asked the source or sources involved to consider coming forward so that you don't have to face the possibility of going to jail?

COOPER: Well, I had this very thing happen earlier in the year. I did give a limited deposition to the special counsel after one of my sources, the vice president's chief of staff, Lewis Libby, waived me, essentially, of confidentiality...

KURTZ: You quoted him by name in that article. COOPER: Yes. And I went to him personally and said, look, can I talk about anything we might have discussed confidentially? And I got his explicit assurance. I didn't rely on one of these

Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Shou

written waivers that's getting a lot of attention now. And I went ahead and did that. I certainly have no problem with that, you know, if the source, if him–or herself wants to be outed, so to speak, I don't think it's a problem for the journalist to do it.

KURTZ: All right. You're married to a Democratic consultant, Mandy Grunwald, I'm sure she understands what's going on here, but what about your 6–year–old son, what do you tell him about this?

COOPER: Well, we haven't, Howard, it has been a strange situation. I mean, I — he does not watch CNN. He does not read "The New York Times." And so he doesn't know about this case. And we've kept him blissfully ignorant. Our feeling is, why worry him? Frankly, it's a very hard case to understand. It's very hard to explain...

KURTZ: Even for grown–ups.

COOPER: Even to me.

KURTZ: But what if you have to explain why you're going away for a while?

COOPER: Well, I think that's going to be very hard to do. I'm going to try to make the point that I'm doing it for what I hope is an honorable reason. And you know, that there's a principle involved here.

KURTZ: All right. Matt Cooper, thanks very much for joining us.

COOPER: Thanks, Howard.

KURTZ: Coming up, baseball and that steroid scandal. Is the age of innocence over or did sports reporters missed the real story all along? Warner Wolf is among our guests coming up next.

KURTZ: Welcome back to RELIABLE SOURCES. Ever since "The San Francisco Chronicle" reported sworn testimony that Jason Giambi of the New York Yankees had admitted using steroids and Barry Bonds of the San Francisco Giants admitted using an unknown substance from an accused steroid peddler, there has been an uproar that has tainted baseball's reputation.

Commissioner Bud Selig pledged to crack down on steroid use, and the player's union signaled a willingness to consider stricter drug testing. But have the media been too soft on this issue all along?

Joining me now in the studio, "Washington Post" sports columnist Mike Wise. And in New York, veteran sportscaster Warner Wolf, whose new radio show airs on WABC and ESPN Radio. And Steve Kettmann, former sportswriter for "The San Francisco Chronicle," and the author of "One Day at Fenway: A Day in the Life of Baseball in America." Welcome.

Warner Wolf, all you sports guys had suspicions that players like Bonds and Giambi were using steroids, but it remained a backburner issue. Why?

WARNER WOLF, SPORTSCASTER: Well, first of all, not only did the sportswriters and sportscaster all feel, or were suspicious that something was going on, even the fans did. I mean, I can recall, not in San Francisco, but other parks, Bonds would get up and you would hear "STE–ROIDS! STE–ROIDS!" I mean, it was there, but you had to have the proof. And until the three guys, Sheffield, Bonds and Giambi were faced with the choice of perjury or immunity and then said "Oh, oh, you mean those steroids," there was no proof. And I say "hats off" to "The San Francisco Chronicle."

KURTZ: Steve Kettmann, "The New York Post" had a headline recently, "Boot the Bum" meaning that the Yankees should now dump Giambi. Is the press in general overreacting now by declaring this the greatest scandal since the White Sox threw the series in 1919?

STEVE KETTMANN, AUTHOR: Well, it is admittedly a huge problem that I think every sports fan gets very concerned about, and you know, I don't want to say they are overreacting, I want to say they have been too slow. As far back as August, 2000, I wrote an article for "The New York Times" saying baseball must come clean on its darkest secret. At that time, because it was already obvious, and I wrote about Mark McGwire has used steroids.

KURTZ: And what was the thunderous media reaction to that piece in "The New York Times"?

KETTMANN: Well, it was a short term thunderous reaction. There was a lot of sports columns written all over the country. There was a lot of radio chatter, but then it died down after a few days, and it never translated into the players' association and Major League Baseball deciding at that point that they had to get tough and serious about this in the way that we're seeing them do now.

Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Shou

KURTZ: OK. Mike Wise, I want to put up some pictures. Jason Giambi back in 1991, when he was a normal–bodied athlete, you see that on the left, and then in 2001, while he has now admitted using steroids, he is a big Popeye kind of guy.

So journalists all saw this. Journalists saw the way he shriveled this year when he stopped using steroids. Did many reporters just look the other way?

MIKE WISE, "WASHINGTON POST": I think they not only looked the other way, they wrote the other way. There was a part of them that were driven by our news divisions now, where they tell us this is the story of the moment, and everything now has got a quick shelf life. And so I think in many cases, not that we didn't know what was going on, not that we didn't want to report it, but when some other trend is happening, when the hot stove league is going and everybody is worried about free agency, where do your bosses give you the time the research a story like that? KURTZ: But in fact, when Mark McGwire broke the home run record with 70 homers back in '98 and Bonds with 73 broke that record, those were great stories, and maybe nobody in the press wanted to interfere with what was a nice story for baseball.

WISE: And that's another question. Do we really want to know what lies behind the curtain? And I think a lot of us saw the — I don't know, even Sammy Sosa, Mark McGwire, their muscles were bulging out of their collars, but did we really want to recognize that and look deeper into that? And it wasn't until Mark McGwire was found that he had androstenedione in his locker that that even came out.

KURTZ: Warner Wolf, have journalists, some of them at least, gotten so accustomed to doped–up athletes after all these Olympic scandals and elsewhere that they've become perhaps a little bit jaded on the subject?

WOLF: Well, I'd hate to think that we're immune, and that's what it's come to. But you know what? There were two other tell-tale signs which you asked about, "Did we know about it? Did we suspect?" And this is a great statistic. In the first 95 years of baseball, only 18 times did players hit 50 or more home runs. In the next years, from 1995 to 2002, it was done 18 times. So in other words, they accomplished what it took 94 years, 95 years before, and then here's the key. No one hit 50 home runs or more the last two years. Well, why? Are you saying suddenly all these guys lost their power? No. They didn't take the steroids. They were afraid.

I think that is the most tell-tale sign of all.

KURTZ: I thought it was that the pitchers got a lot better. Steve Kettmann, six years ago, Jason Giambi told you that he had tried this testosterone booster that McGwire had used in his home run record year, which is now illegal in baseball. You are a baseball beat writer, why didn't you follow up on that? Did you ask him about steroid use?

KETTMANN: No, I didn't. I wrote recently in "Salon" that I should have. I had a conversation with Jason about using andro that same year that Mark was using it. He said it really wasn't a big deal. You got kind of a little bit of a high, you felt kind of tingly or something like that, and then the sensation passed quickly. But I didn't follow up.

I think it is important to remember that the strike of 1994 and the canceled World Series left everyone in baseball, including sportswriters, wondering about whether the game had much of a future. There was a lot of talk of football taking over, or basketball taking over. So when Sosa and McGwire pumped up so obviously — everyone knew what was going on, but there was a feeling that almost like if you criticize the war you're being unpatriotic, that if you criticize steroid use you are attacking the game itself at a time when it was weak. So I think that explains the silence of the media at that point.

KURTZ: That's a pretty troubling indictment. You say everyone knew what was going on, but they didn't want to be seen as unpatriotic in an athletic sense. That's really quite stunning.

KETTMANN: That's my belief, but I guess it comes down to what know means, because know — you can always hide behind legalisms or epistemological dodges, but the fact is they knew. They knew that these guys, especially little second basemen who had never hit more than 12 home runs all of the sudden pow, pow, pow, hitting 35 or 32 in a season. They knew what was producing this result.

KURTZ: OK, let me get Mike Wise in here.

WISE: I was going to say that I think we do a little bit of disservice to some of the people who have been following this story for five, 10 years, and I can name 10 of them from some of the biggest and smallest newspapers in this country.

The problem is their bosses don't want those stories on the front page. When we turn to a sports page now, we're so ready for human accomplishment because of all the bad news in the rest of the sections that we don't want to go into the nuances and subtleties of steroids, and I think that's what it was presents.

Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Shou

KURTZ: Including the violence like the big basketball brawl, including drug use, including the Kobe case. I mean, a lot of bad news coming up. But I want to ask you about Victor Conte. He's the guy who's been charged with steroids trafficking involved in this case. He was going to get on "20/20" and made all kinds of charges, 50 percent of the players in baseball are using steroids. Should journalists be skeptical about his claims and maybe it's not quite as big and widespread as he is contending?

WISE: Yeah, I mean, bottom line, Marion Jones hasn't been charged by the World Anti-Doping Agency. The other athletes haven't been banned. This is one man's opinion. If it's true, I think we should be as graphic as possible. You talked about the basketbrawl, that video was shown ad nauseam to where we got outraged by it. More outraged than we are by steroids, I think, in a lot of aspects, but if it's true, I want to see somebody reenact Marion Jones injecting herself. As disturbing as that would be, it would prevent a lot of kids from doing it.

KURTZ: Warner Wolf, do you expect Barry Bonds' home run record, the 73 home runs, to be struck down or covered with a giant asterisk? Do you think that people in the media should perhaps start some sort of campaign, because what we now know that we didn't know then about what Bonds was using?

WOLF: I wouldn't be opposed to an asterisk at all and say "home runs hit with steroids," or maybe we should take the opposite side and say, Roger Maris hit 60 home runs, asterisk, without steroids. That's one way to look at it. But I think except in San Francisco, Bonds, if he continues to play, he is going to be booed unmercifully. And you know, again, here's Hank Aaron. Hank Aaron made a great point. He said, "You know, when I was 39, I hit 40 home runs." That was a lot for a guy of 39. The next year when he hit 40, it went down to 20. When he hit 41, it went down to 12. And that's the way it's supposed to be. Not going this way. KURTZ: All right, Warner Wolf, always ready with the perfect baseball statistic. Thanks very much for joining us, as well as Steve Kettmann and Mike Wise, we appreciate it.

Just ahead, John McEnroe swings and misses on cable, and a governor orders his administration to stonewall some members of the press. We'll explain, next.

KURTZ: Time now for the latest from the world of media news. Maryland Governor Robert Ehrlich has a problem with "The Baltimore Sun." He does not like the reporting by state house bureau chief David Nitkin, who wrote a story that included an inaccurate map, and he doesn't like columnist Michael Olesker, who said the governor's spokesman, quote, "struggled to keep a straight face" without actually witnessing the facial expression.

(BEGIN VIDEO CLIP)

GOV. ROBERT EHRLICH (R), MARYLAND: With respect to this newspaper and the series of stories over the past few weeks, you are getting not just misstatements of facts, but in some cases wholly invented stories.

(END VIDEO CLIP)

KURTZ: So Ehrlich has not only stopped speaking to the two "Sun" men — nothing unusual there — but ordered everyone in state government to stonewall the journalists, which prompted the newspaper to sue the Republican governor for trying to punish its staffers for exercising their First Amendment rights.

Now Ehrlich may be backing down, agreeing to meet with top "Sun" editors next week to discuss the ban.

And game, set, match. John McEnroe is losing his CNBC talk show. And there's no umpire to yell at. The former tennis star never got any traction. His ratings sunk so low they couldn't be measured by Nielsen, and CNBC has pulled the plug after just five months. The network also recently axed the highly regarded but low-rated Washington show "Capitol Report," replacing it with reruns of "Conan O'Brien."

Coming up, Treasury Secretary John Snow on his way out, right? That's what the press told us. I'll explain when I go "Behind the Headlines" next.

KURTZ: If you believe what you read in the papers, John Snow was toast, history, practically packing his bags. "The Washington Post," November 29th: "One senior administration official said Treasury Secretary John Snow can stay as long as he wants, provided it is not very long." "The New York Times" this past Monday: "President Bush has decided to replace John Snow as treasury secretary and has been looking closely at a number of possible replacements." And television picked up the story as well.

(BEGIN VIDEO CLIP)

Was Reporter Playing Fair By Having Soldier Ask Rumsfeld Question?; Shou

UNIDENTIFIED FEMALE: I have not talked to a single senior official who has said that John Snow is going to stay in his job.

(END VIDEO CLIP)

KURTZ: Well, guess what? Bush this week asked Snow to stick around. So either the sources didn't know what they were talking about, the reporters were just passing on Beltway gossip, or the president changed his mind just to stick it to the press.

Well, that's it for this edition of RELIABLE SOURCES. I'm Howard Kurtz. Join us again next Sunday morning, 11:30 Eastern, for another critical look at the media. "LATE EDITION" with Wolf Blitzer begins right now.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

**LOAD-DATE:** December 13, 2004