## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA )
)
v. ) CR. NO. 05-394 (RBW)
)
I. LEWIS LIBBY ) <u>Oral Argument Requested</u>
also known as "Scooter Libby," )
Defendant. )

## <u>MOTION OF I. LEWIS LIBBY TO DISMISS THE INDICTMENT</u>
## <u>AND MEMORANDUM IN SUPPORT THEREOF</u>

Theodore V. Wells, Jr.
DC Bar No. 468934
James L. Brochin
DC Bar No. 455456
Paul, Weiss, Rifkind, Wharton
    & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3089

Joseph A. Tate
Dechert LLP
2929 Arch Street
Cira Centre
Philadelphia, PA 19104
(215) 994-2000

William H. Jeffress, Jr.
DC Bar No. 041152
Alex J. Bourelly
DC Bar No. 441422
Alexandra M. Walsh
DC Bar No. 490484
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 639-7751

John D. Cline
DC Bar No. 403824
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
(415) 875-5812

February 23, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................. iii

MOTION TO DISMISS INDICTMENT................................................................ 1

MEMORANDUM IN SUPPORT........................................................................ 1

INTRODUCTION .............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT...................................................................................................... 5

I.    THE ASSIGNMENT OF AUTHORITY TO THE SPECIAL COUNSEL
      VIOLATES THE APPOINTMENTS CLAUSE OF THE
      CONSTITUTION ....................................................................................6

      A.    The Constitution Requires That All Principal Officers Be
            Nominated By The President With The Advice And Consent Of
            The Senate.....................................................................................6

      B.    The Special Counsel Is A Principal Officer For Purposes Of The
            Appointments Clause .....................................................................8

            1.    The Special Counsel Is Subject To No Meaningful
                  Direction Or Supervision By Anyone Within The
                  Department Of Justice Or Elsewhere...............................9

            2.    The Special Counsel Has The Authority To Make
                  Important Public Policy Decisions That Should Be Made
                  Or Reviewed By A Properly Appointed Principal Officer ...........14

            3.    The Special Counsel's Authority Exceeds Even That Of
                  The Independent Counsel Upheld in *Morrison v. Olson* ...............18

            4.    Where A Person Is Granted The Power Of A Principal
                  Officer Subject To No Supervision Or Limitations On
                  Jurisdiction Or Tenure, Removability Is Not Sufficient To
                  Render Him An Inferior Officer ...................................22

II.   THE POWER GIVEN TO THE SPECIAL COUNSEL VIOLATES THE
      STATUTORY REQUIREMENT THAT THE ATTORNEY GENERAL
      DIRECT AND SUPERVISE ALL LITIGATION TO WHICH THE
      UNITED STATES IS A PARTY .........................................................25

i

III.   BECAUSE THE EXERCISE OF POWER BY THE SPECIAL
       COUNSEL VIOLATES THE CONSTITUTION AND FEDERAL
       STATUTES, THE INDICTMENT MUST BE DISMISSED................................31

CONCLUSION............................................................................................................................ 33

## TABLE OF AUTHORITIES

### CASES

* *Edmond v. United States*, 520 U.S. 651 (1997) ................................................................ *passim*

* *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
485 U.S. 568 (1988).................................................................................................31

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................29

*FTC v. Guignon*, 390 F.2d 323 (8th Cir. 1968) .............................................................28

* *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ............................6, 7, 8

* *HCSC-Laundry v. United States*, 450 U.S. 1 (1981) ...................................................29

*Hoye v. Meek*, 795 F.2d 893 (10th Cir. 1986)................................................................28

*ICC v. S. Ry. Co.*, 543 F.2d 534 (5th Cir. 1976) ......................................................25, 28

*In re Grand Jury Subpoena, Judith Miller*, __ F.3d __, 2006 WL 276726
(D.C. Cir. 2006) ....................................................................................13, 15, 17

*In re Olson*, 818 F.2d 34 (D.C. Cir. Indep. Couns. Div. 1987) ....................................20

*In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987)......................................................23, 24

*In re Special Counsel Investigation*, 338 F. Supp. 2d 16 (D.D.C. 2004)..........................5

*Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125 (D.C. Cir. 2000).............................32

*Marshall v. Gibson's Products, Inc.*, 584 F.2d 668 (5th Cir. 1978).............................28

*Morrison v. Olson*, 487 U.S. 654 (1988) .............................................................. *passim*

*Myers v. United States*, 272 U.S. 52 (1926)...................................................................7

*Nguyen v. United States*, 539 U.S. 69 (2003) ...............................................................32

* *Ryder v. United States*, 515 U.S. 177 (1995).......................................................31, 32

*Stern v. Lucy Webb Hayes Nat'l Training School*, 381 F. Supp. 1003 (D.D.C. 2003).................28

*U.S. Telecom Ass'n v. FCC*, 359 F.3d 554 (D.C. Cir. 2004) .....................................8, 23

*United States v. Eaton*, 169 U.S. 331 (1898) ..............................................................23, 24

*United States v. Germaine*, 99 U.S. (9 Otto) 508 (1878)...................................................6

*United States v. Providence Journal Co.*, 485 U.S. 693 (1988) ....................................31

*United States v. San Jacinto Tin Co.*, 125 U.S. 273 (1888)............................................25

*United States v. Williams*, 65 F.R.D. 422 (W.D. Mo. 1974) ...........................................9

*Weiss v. United States*, 510 U.S. 163 (1994) ................................................................21

*Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ......................32

## CONSTITUTIONAL PROVISION

* U.S. Const. art. II, § 2 ...........................................................................................1, 6

## FEDERAL STATUTES

28 U.S.C. § 508..................................................................................................3, 29

28 U.S.C. § 509............................................................................................................4

28 U.S.C. § 510.................................................................................................4, 28, 29

28 U.S.C. § 515.................................................................................................4, 28, 29

* 28 U.S.C. § 516 ................................................................................................ *passim*

* 28 U.S.C. § 519 ................................................................................................ *passim*

28 U.S.C. § 593(b)-(d) (Supp. V 1982) .....................................................................19, 20

28 U.S.C. § 594(f) (Supp. V 1982)................................................................................21

28 U.S.C. §596(b)(2) (Supp. V 1982)...........................................................................20

28 U.S.C. § 596(b)(2) (1994).......................................................................................20

Pub. L. No. 100-202, § 101(a), 101 Stat. 1329 (1987) .................................................13

S.J. Res. 54, 68th Cong., 1st Sess. 43 Stat. 5-6 (1924).................................................30

## LEGISLATIVE MATERIALS

*The Future of the Independent Counsel Act: S. Comm. on Governmental Affairs*,
    106th Cong. 10 (1999) (statement of Sen. Carl Levin, Member) ......................................18

*The Future of the Independent Counsel Act: S. Comm. on Governmental Affairs*,
    106th Cong. 16 (1999) (statement of Sen. Susan Collins Member) ..................................19

## FEDERAL REGULATIONS

28 C.F.R. § 50.10 ....................................................................................................................14

28 C.F.R. § 50.2 ...............................................................................................................12, 15, 16

28 C.F.R. Part 600 ..................................................................................................... *passim*

    § 600.6 ......................................................................................................................30

    § 600.7 .................................................................................................10, 11, 17, 30

    § 600.8 ................................................................................................................10, 13

28 C.F.R. Parts 600, 601 (1987) .............................................................................................23

## REGULATORY MATERIALS

64 Fed. Reg. 37,038 (July 9, 1999) .......................................................................................4, 12

## U.S. ATTORNEYS' MANUAL

United States Attorneys' Manual § 1-7.520 ...........................................................................15

United States Attorneys' Manual § 9-27.140 .........................................................................12

United States Attorneys' Manual § 9-90.100 .........................................................................15

United States Attorneys' Manual § 9-90.200 ......................................................................11, 15

## OTHER AUTHORITIES

Nick Bravin, Note, *Is Morrison v. Olson Still Good Law? The Court's New Appointments
    Clause Jurisprudence*, 98 Column. L. Rev. 1103 (1998) ...................................................19

Steven G. Calabresi, *The Structural Constitution and the Countermajoritarian Difficulty*,
    22 Harv. J.L. & Pub. Pol'y 3 (1998) .................................................................................19

The Federalist No. 76, at 457 (C. Rossiter ed., 1961) (1788) (A. Hamilton) ..................................7

John Harmon, Litigating Authority of the Office of the Federal Inspector,
    Alaska Natural Gas Transportation System, 4B U.S. Op. Off. Legal Counsel 820,
    1980 WL 20994 (1980).......................................................................................................26

Brief for Edward H. Levi, Griffin B. Bell, and William French Smith as Amici Curiae
    Supporting Appellees, *Morrison v. Olson*, 487 U.S. 654 (1988) (No. 87-1279),
    1988 WL 1031601 ............................................................................................................13

Theodore Olson, The Attorney General's Role as Chief Litigator for
    the United States, 6 U.S. Op. Off. Legal Counsel 47,
    1982 WL 170760 (1982)........................................................................................26, 27, 28

Letter from Roger Sherman to John Adams (1789), *in* 6 Works of John Adams 440
    (Adams ed., Boston 1850-56) ..............................................................................................7

Leon Ulman, United States Attorneys, Suggested Appointment Power of the Attorney
    General, Constitutional Law (Article 2, § 2, cl. 2), 2 U.S. Op. Off. Legal Counsel
    58, 1978 WL 15265 (1978)...................................................................................................8

2 M. Farrand, Records of the Federal Convention of 1787 (rev. ed. 1937) (J. Madison) ...............7

3 Joseph Story, Commentaries on the Constitution § 1524, at 376 (1833) .....................................7

3A Fletcher Cyc. Corp. § 1034.70 (perm. ed. 2002) .....................................................................28

## MOTION TO DISMISS THE INDICTMENT

The defendant I. Lewis Libby, through his counsel, hereby moves to dismiss the indictment on the ground that it was obtained, approved and signed by an official—Special Counsel Patrick J. Fitzgerald—who was appointed and exercised his powers in violation of the Appointments Clause of the Constitution and applicable federal statutes. The grounds for this motion are fully explained in the following Memorandum.

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Under the Appointments Clause of the Constitution, no person may assume the power of a principal officer of the United States unless he or she has been appointed to that office by the President with the advice and consent of the Senate. U.S. Const. art. II, § 2. Further, 28 U.S.C. §§ 516 and 519 provide that no federal officer may represent the United States in litigation without the Attorney General's direction and supervision unless the Congress has expressly authorized it. Those constitutional and statutory provisions have been violated in this case.

In *Edmond v. United States*, 520 U.S. 651, 662-63 (1997), the Supreme Court made clear that an officer who exercises authority on behalf of the government absent "direct[ion] and supervis[ion]" by a superior is a principal officer for Appointments Clause purposes. By the express terms of his charter, Mr. Fitzgerald operates "independent of any supervision or control of any officer" within the Department of Justice or elsewhere. Accordingly, under controlling Supreme Court precedent, he is a principal officer. Because he was not appointed to that office by the President with the advice and consent of the Senate, he holds that authority improperly and in direct contravention of the Appointments Clause.

Acting without any direction or supervision, Mr. Fitzgerald alone decides where the interests of the United States lie in an investigation that involves national security, the First

1

Amendment, and important political questions. He alone decides which individuals to subject to investigation, what evidence will be obtained or not obtained, and whether or not continued investigation and prosecution are warranted. He is subject to no oversight and has no obligation to comply with Department of Justice policies and regulations that constrain the exercise of law enforcement powers in all other federal cases. Furthermore, he has unilateral authority to expand his jurisdiction and the power to say when, if ever, his office should be terminated. It was limitations on those powers that led the Supreme Court to uphold the independent counsel provisions of the Ethics in Government Act. *See Morrison v. Olson*, 487 U.S. 654, 671-72 (1988). It is the absence of such controls that violates the Appointments Clause in this case.

In addition to violating the Constitution, the power given to Mr. Fitzgerald wholly ignores the Attorney General's statutory obligation to supervise all litigation to which the United States is a party, unless the Congress specifically says otherwise. 28 U.S.C. §§ 516, 519. That obligation is rooted in historic practice and reflects the Congress's policy judgment that litigation involving the government should be subject to the unifying influence of the Attorney General. The grant of virtually unchecked power to the Special Counsel pays no heed to that statutory obligation. What is more, it disregards the intent the Congress clearly expressed when, amid serious concerns about prosecutorial excesses, it abolished the Office of Independent Counsel. Finally, it sidesteps, for no good reason, the carefully calibrated regulations the Attorney General promulgated after the elimination of the independent counsel to ensure effective investigation of high-level government officials, without shirking the duty to supervise. *See* 28 C.F.R. Part 600.

By law the Attorney General may delegate powers, but he may not abdicate responsibility. If the abdication that occurred here is permitted by this Court, important constitutional and statutory protections of our form of government will be at risk. Our system

2

depends on the accountability of federal officers. If this newly created Office of Special Counsel is allowed to stand, there is nothing to stop the Department in the future from contracting out its core litigating responsibility whenever political expediency or convenience recommends it. Because the indictment against Mr. Libby was obtained through the Special Counsel's exercise of unlawful authority, it must be dismissed.

### STATEMENT OF FACTS

In the fall of 2003, the Department of Justice ("DOJ" or the "Department") launched an investigation into the alleged unauthorized disclosure of the identity and employment status of Valerie Plame Wilson, whose occupation as an employee of the CIA was publicly reported by columnist Robert Novak on July 14, 2003. Initially, this investigation was conducted by career attorneys within the Department's Criminal Division, under the supervision of the Assistant Attorney General in charge of that division, who reported through the Deputy Attorney General to then-Attorney General John Ashcroft. On December 30, 2003, Deputy Attorney General James Comey announced at a press conference that, effective that day, Mr. Ashcroft had recused himself from all matters related to the investigation. *See* Transcript of Dec. 30, 2003 Press Conference at 1 (Exh. A). Mr. Comey stated that, pursuant to 28 U.S.C. § 508, he would serve as Acting Attorney General for purposes of this investigation. *Id.*[1]

Mr. Comey further explained that he and Mr. Ashcroft had agreed that special counsel should be appointed to oversee the investigation, and that he (Mr. Comey) had chosen Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, for the job. Mr. Comey said that he had decided not to proceed under 28 C.F.R. Part 600, the DOJ regulations providing

---

[1] On August 12, 2005, Mr. Comey, who was leaving the Department of Justice, assigned his authority as Acting Attorney General to Associate Deputy Attorney General David Margolis. *See* Letter from James B. Comey, Deputy Attorney General, to David Margolis, Associate Deputy Attorney General (Aug. 12, 2005) (Exh. B).

for appointment of special counsel from outside the government. Those regulations,
promulgated after the expiration of the independent counsel provisions of the Ethics in
Government Act, were intended to govern investigations of this kind. *See* 64 Fed. Reg. 37,038
(July 9, 1999). Mr. Comey, however, sidestepped Part 600. He said that he did so because he
wanted to avoid "put[ting the investigation] on hold for any period of time" and because he had
decided to give the Special Counsel a mandate "significantly broader than . . . would go to an
outside special counsel." Exh. A at 3. In that regard, Mr. Comey stated that neither he nor
anyone else in the Department would act as an "ultimate supervisor[] and decision-maker[]" in
this case. Exh. A at 2.

     The same day, Mr. Comey delivered a letter to Mr. Fitzgerald giving to him "all the
authority of the Attorney General with respect to the Department's investigation into the alleged
unauthorized disclosure of a CIA employee's identity." Letter from James B. Comey, Acting
Attorney General, to Patrick J. Fitzgerald, United States Attorney (Dec. 30, 2003) (Exh. C). The
letter provides that Mr. Fitzgerald is to exercise his authority as Special Counsel "*independent of
the supervision or control of any officer of the Department.*" *Id.* (emphasis added). Mr. Comey
claimed he was empowered to give that broad power to the Special Counsel "by law, including
28 U.S.C. §§ 509, 510, and 515." *Id.*[2] In a subsequent letter, Mr. Comey confirmed that the
Special Counsel enjoys the "plenary" authority of the Attorney General, and that his authority is

---

[2] Section 509 vests in the Attorney General (with three exceptions not relevant here) "[a]ll
functions of other officers . . . and all functions of agencies and employees of the Department of
Justice." Section 510 permits the Attorney General to delegate his functions to "any other
officer, employee, or agency of the Department of Justice." Finally, section 515(a) authorizes
"any other officer of the Department of Justice, or any attorney specially appointed by the
Attorney General," to conduct criminal proceedings "when specifically directed by the Attorney
General."

4

not "defined and limited by 28 C.F.R. Part 600." Letter from James B. Comey, Acting Attorney

General, to Patrick J. Fitzgerald, United States Attorney (Feb. 6, 2004) (Exh. D).

Subsequently, in an affidavit filed in connection with *In re Special Counsel Investigation*,

338 F. Supp. 2d 16 (D.D.C. 2004), Mr. Fitzgerald described his authority as follows:

> [A]s Special Counsel, I serve as the functional equivalent of the
> Attorney General on this matter.

Affidavit of Patrick J. Fitzgerald ¶ 5 (Aug. 27, 2004) (excerpts attached as Exh. E). He further

explained that Mr. Comey's conferral of authority "is in many respects broader than the authority

conferred by [28 C.F.R. Part 600] as I need not seek approvals prior to significant investigative

or prosecutive steps." *Id.* at n.1. Later, in a press conference announcing the indictment in this

case, Mr. Fitzgerald described his position as "unique" and acknowledged that he was not

constrained by the regulations that govern other special counsel. Indeed, he acknowledged that,

for purposes of this matter, he wears the "hat" of the Acting Attorney General. *See* Transcript of

Mr. Fitzgerald's Oct. 28, 2005 Press Conference at 15-16 (Exh. F).

**ARGUMENT**

I.   **THE ASSIGNMENT OF AUTHORITY TO THE SPECIAL COUNSEL
VIOLATES THE APPOINTMENTS CLAUSE OF THE CONSTITUTION.**

Under the Appointments Clause of the Constitution, no person may be given the power of

a principal officer of the United States unless he has been appointed to that office by the

President with the advice and consent of the Senate.  U.S. Const. art. II, § 2.  The decision to

cede the plenary authority of the Attorney General to Mr. Fitzgerald in this matter—subject to no

supervision or direction by anyone in the Department of Justice or elsewhere—violates that

important structural safeguard of the constitutional scheme.

A.   **The Constitution Requires That All Principal Officers Be Nominated By The
President With The Advice And Consent Of The Senate.**

Section 2 of Article II of the Constitution provides:

> [The President] shall nominate, and by and with the Advice and Consent of the
> Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of
> the Supreme Court, and all other Officers of the United States, whose
> Appointments are not herein otherwise provided for, and which shall be
> established by Law: but the Congress may by Law vest the Appointment of such
> inferior Officers, as they think proper, in the President alone, in the Courts of
> Law, or in the Heads of Departments.

The Appointments Clause divides all Executive branch officers into two classes—principal and

inferior—and sets forth strict requirements for the appointment of each.  *See United States v.*

*Germaine*, 99 U.S. (9 Otto) 508, 509-10 (1878).  The provision mandates that no person may be

given the power of a principal officer unless he or she has been appointed to that office by the

President with the advice and consent of the Senate.

The appointment process for principal officers is "more than a matter of etiquette or

protocol; it is among the significant structural safeguards of the constitutional scheme."

*Edmond*, 520 U.S. at 659 (internal quotation marks and citation omitted).  "[T]he Clause

bespeaks a principle of limitation by dividing the power to appoint the principal federal officers

. . . between the Executive and Legislative Branches." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991). The Framers knew that principal officers would be given tremendous authority in the government they had devised, and were concerned that placing the power to appoint those officers exclusively in the Executive Branch would lead to "incautious or corrupt nomination[s]." 2 M. Farrand, Records of the Federal Convention of 1787, at 43 (rev. ed. 1937) (J. Madison). Roger Sherman, one of the Founding Fathers, explained that fear:

> If the president alone was vested with the power of appointing all officers, . . . he
> would be liable to be deceived by flatterers and pretenders to patriotism, who
> would have no motive but their own emolument. They would wish to extend the
> powers of the executive to increase their own importance . . . .

Letter from Roger Sherman to John Adams (1789), *in* 6 Works of John Adams 440 (Adams ed., Boston 1850-56); *see also* 3 Joseph Story, Commentaries on the Constitution § 1524, at 376 (1833) ("[T]he appointments to office are too important to the public welfare, not to induce great hesitation in vesting them exclusively in the president").

The Framers added the requirement of Senate confirmation as an "excellent check" against the risk of "incautious" appointments. *See* The Federalist No. 76, at 457 (C. Rossiter ed., 1961) (1788) (A. Hamilton). By requiring both Presidential nomination and Senate confirmation for all principal officers, the Clause "ensures public accountability for both the making of a bad appointment and the rejection of a good one." *Edmond*, 520 U.S. at 660. And in that way it helps to protect individual citizens against the arbitrary exercise of governmental power. *See Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting) ("In order to prevent arbitrary executive action, the Constitution provided in terms that presidential appointments be made with the consent of the Senate . . . "). Indeed, the Supreme Court has explicitly recognized that "[t]he structural principles embodied in the Appointments Clause do not speak only, or even

7

primarily, of Executive prerogatives." *Freytag*, 501 U.S. at 880.  Rather, the interests the Clause

protects are those "of the entire Republic." *Id.*

Once properly appointed, principal officers can delegate authority to subordinates who

work under their supervision. *See generally U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565

(D.C. Cir. 2004) ("When an agency delegates authority to its subordinate, responsibility—and

thus accountability—clearly remain with the federal agency").  But the power to delegate does

not include the power to give another person unchecked and unsupervised authority over a matter

for which the principal officer is responsible. *See id.* (explaining that when authority is

delegated to a non-subordinate, "lines of accountability may blur, undermining an important

democratic check on government decision-making").  Indeed, if a principal officer were

permitted to grant his plenary authority to another person subject to no direction or supervision at

all, the Appointments Clause would be a dead letter.  There would be no guarantee that the

individual nominated by the President and confirmed by the Senate would be the person who

exercised the fundamental powers of the office, and the Clause's structural protections against

the arbitrary exercise of power would be severely eroded.[3]

## B.     The Special Counsel Is A Principal Officer For Purposes Of The Appointments Clause.

By his unilateral action, Acting Attorney General Comey created a new Office of Special

Counsel and vested in that Office the plenary authority of the Attorney General.  The Special

---

[3] The constitutional infirmity in this case is not cured by the fact that Mr. Fitzgerald was
nominated by the President and confirmed by the Senate to serve as a United States Attorney,
which is an *inferior* officer position, *see Morrison*, 487 U.S. at 676-77; Leon Ulman, United
States Attorneys, Suggested Appointment Power of the Attorney General, Constitutional Law
(Article 2, § 2, cl. 2), 2 U.S. Op. Off. Legal Counsel 58, 1978 WL 15265 (1978).  Where an
individual is granted the tremendous power of a principal officer, he must be properly appointed
to *that* office, regardless of any prior appointments.  A contrary rule would create an exception
that would swallow the rule laid down in the Appointments Clause.

Counsel operates "independent of the supervision or control of any officer of the Department," across a jurisdiction he may freely expand, and for as long as he decides is necessary. Given those facts, the Special Counsel is not an inferior officer under the test set forth by the Supreme Court in its most recent Appointments Clause case, *Edmond v. United States*. Nor does he qualify as inferior under the analysis applied to the independent counsel provisions of the Ethics in Government Act in *Morrison v. Olson*. Rather, the Special Counsel is a principal officer—in Mr. Fitzgerald's own words, "the functional equivalent of the Attorney General" in this matter, Exh. E ¶ 5—and is prosecuting this case in contravention of the Appointments Clause.[4]

### 1. The Special Counsel Is Subject To No Meaningful Direction Or Supervision By Anyone Within The Department Of Justice Or Elsewhere.

In *Edmond*, the Supreme Court established a straightforward test for identifying inferior officers:

> [I]n the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

520 U.S. at 663. Whether the Special Counsel is merely an inferior officer, therefore, turns on whether he is subject to "direct[ion] and supervis[ion]" by other officers in the Executive branch. "It is not enough that other officers may be identified who formally maintain a higher rank." *Id.*

---

[4] Mr. Comey's letters to the Special Counsel and his public statements confirming the breadth of the Special Counsel's authority establish his status as a principal officer. Should the Court conclude, however, that available information is insufficient to make that judgment, Mr. Libby requests an evidentiary hearing and production by the Department of Justice of all documents and other information regarding the appointment of the Special Counsel and the precise scope of his power. *See United States v. Williams*, 65 F.R.D. 422, 434-37 (W.D. Mo. 1974) (ordering discovery to ascertain whether the prosecutor who indicted the defendant was properly appointed under 28 U.S.C. § 515(a)). This would include Mr. Fitzgerald's apparent request for clarification on the scope of his authority, which triggered Mr. Comey's letter of February 6, 2004, and has never been made public. *See* Exh. D.

at 662-63. Rather, in *Edmond* the Court made clear that a meaningful form of supervision is required. It held that the judges on the Coast Guard Court of Criminal Appeals are inferior officers because, for example, the Judge Advocate General exercises "administrative oversight" over their court and prescribes "uniform rules of procedure" that they must follow. *Id.* at 664 (internal quotation marks and citation omitted). In addition, their decisions are subject to reversal by the Court of Appeals for the Armed Forces; thus, they have "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665.

In the case of the Special Counsel, such "direction and supervision" is wholly absent. Indeed, by the express terms of his charter, Mr. Fitzgerald operates "independent of the supervision or control of any officer of the Department." Exh. C. At his December 30, 2003 press conference, Mr. Comey confirmed that neither he nor anyone else in the Department of Justice would act as an "ultimate supervisor[] and decision-maker[]" in this case. Exh. A at 2. Rather, the Special Counsel "alone will decide . . . how to continue the investigation and what prosecutive decisions to make." *Id.* He has the "power and authority to make whatever prosecutive judgments he believes are appropriate, without having to come back to [Comey] or anybody else at the Justice Department for approvals." *Id.*

The Special Counsel is not even required to inform anyone at the Department about the progress of his investigation. While other special counsel must "tell the attorney general before [bringing] charges against anybody" or before "a significant media event," Mr. Comey announced that *this* Special Counsel "does not have to do that." *Id.* at 9; *see* 28 C.F.R. § 600.8(b). He has no obligation to document or explain to the Acting Attorney General or anyone else any of his investigative or prosecutorial judgments. *Compare id.* § 600.7(b)

(requiring other special counsel to explain to the Attorney General "any investigative or prosecutorial step" upon request). Indeed, there is no mechanism whatsoever that would provide anyone outside the Office of Special Counsel with any insight into its internal deliberations or decision-making.

What is more, in carrying out this broad mandate, the Special Counsel has no obligation to comply with DOJ policies and procedures that normally constrain the exercise of federal law enforcement power. Under 28 C.F.R. Part 600, the regulatory scheme intended to apply to investigations of this kind, special counsel must "comply with the rules, regulations, procedures, practices and policies of the Department." 28 C.F.R. § 600.7(a). Mr. Comey, however, bypassed that scheme and announced that *this* Special Counsel's "position and authorities are [not] defined and limited by 28 C.F.R. Part 600." Exh. D. Mr. Comey made clear that the Special Counsel need not comply with any DOJ policies requiring prosecutors to seek approval from the Attorney General or other ranking DOJ officials on key decisions. Exh. A at 7, 8-9; *see also* Exh. E ¶ 5 n.1 (Special Counsel affidavit noting that he "need not seek approvals prior to significant investigative or prosecutive steps"); *compare* § 600.7(a) (requiring other special counsel to comply with such policies except under "extraordinary circumstances," and even then to consult directly with the Attorney General about how to proceed). Thus, unlike other special counsel (or United States Attorneys for that matter), this Special Counsel need not obtain approval to "issue a subpoena involving the media"; to "subpoena a lawyer"; to grant immunity; to take an appeal; or to seek access to classified information in the custody or control of U.S. intelligence agencies. *See* Exh. A at 7, 8-9; United States Attorneys' Manual ("USAM") § 9-90.200.

The Special Counsel's exemption from all approval policies represents a drastic relinquishment of supervision. Those policies "are the way in which the Department typically addresses the most sensitive legal and policy issues facing its prosecutors" and ensures that the Department's "institutional judgment" is brought to bear in particular cases. 64 Fed. Reg. at 37,039. This Special Counsel, however, has the authority to make those important policy judgments on his own, with no input or guidance from anyone. Indeed, Mr. Comey made clear that Mr. Fitzgerald enjoys "*all* the approval authorities . . . that are inherent in the attorney general." Exh. A at 9 (emphasis added). Armed with that authority, the Special Counsel can unilaterally decide whether to comply with or ignore substantive Department directives that guide all other federal prosecutors. *See, e.g.*, 28 C.F.R. § 50.2(b)(9) (only Attorney General may authorize public statements regarding pending criminal cases "beyond the[] guidelines" that are otherwise applicable); USAM § 9-27.140 (only the appropriate Assistant Attorney General and the Deputy Attorney General may authorize "significant modification[s] or departure[s] contemplated as a matter of policy or regular practice" from the Principles of Federal Prosecution).

The Special Counsel, moreover, is subject to no meaningful restriction on his jurisdiction or tenure. Though Mr. Comey defined the subject matter of the investigation at the outset, the Special Counsel has unilateral authority to expand his jurisdiction as he sees fit. As Mr. Comey explained, a special counsel appointed under 28 C.F.R. Part 600 "only gets the jurisdiction that is assigned to him and no other. The regulations provide that if he or she wants to expand that jurisdiction, they have to come back to the attorney general and get permission." Exh. A at 9. This Special Counsel, by contrast, is not required to seek such approval. He does not have to "come back to the attorney general and get permission"; rather, he can "pursue it [*i.e.*, his

investigation and prosecution] wherever he wants to pursue it." *Id.* Mr. Comey also gave the Special Counsel the power to prolong the duration of his tenure indefinitely, stating unequivocally that it will be Mr. Fitzgerald's "call" as to when the investigation is over: "He'll be in charge of the matter and he'll make that judgment." *Id.* at 5.

The Special Counsel's funding arrangement confirms the lack of any supervision or oversight of his office. Unlike other special counsel, whose budgets must be approved by the Attorney General, *see id.* § 600.8(a), the operations of *this* Special Counsel are funded from the permanent indefinite appropriation established for independent counsel appointed under the Ethics in Government Act. *See* Pub. L. No. 100-202, § 101(a), 101 Stat. 1329 (1987). The General Accounting Office agreed to the use of this fund because the Department had "delegat[ed] [to the Special Counsel] all of the Attorney General's authority with respect to the investigation and instruct[ed] him to exercise that authority independent of the control of any officer of the Department." Special Counsel and Permanent Indefinite Appropriation, GAO Op. B-302582 at 2 (Sept. 30, 2004) (Exh. G). Moreover, DOJ officials stated that use of the permanent indefinite appropriation was necessary "to facilitate Special Counsel Fitzgerald's investigation by freeing him from possible budget constraints that potentially might serve to limit his activities." *Id.* at 5.

Whether it is wise to give one person the power to investigate and prosecute a single matter, subject to no direction or supervision by any superior officer, is subject to serious doubt.[5]

---

[5] *See, e.g., In re Grand Jury Subpoena, Judith Miller*, __ F.3d __, 2006 WL 276726, *32 (D.C. Cir. 2006) (Tatel, J., concurring in the judgment) (opinion reissued to provide previously redacted material) ("Special prosecutors, immune to political control and lacking a docket of other cases, face pressure to justify their appointments by bagging their prey," which, in turn, creates a "concomitant risk of overzealousness"); Brief for Edward H. Levi, Griffin B. Bell, and William French Smith as Amici Curiae Supporting Appellees 11, *Morrison v. Olson*, 487 U.S. 654 (1988) (No. 87-1279), 1988 WL 1031601 ("[Prosecution in] isolation from the Executive

13

Whether a person vested with that power qualifies as a principal officer under the controlling test set forth in *Edmond* is not.

### 2. The Special Counsel Has The Authority To Make Important Public Policy Decisions That Should Be Made Or Reviewed By A Properly Appointed Principal Officer.

The constitutional principle at stake in this case is not academic. The Special Counsel has been entrusted with the power to make decisions implicating weighty public policy concerns. Those are *exactly* the kind of decisions that the Constitution requires to be made by or under the supervision of a principal officer appointed by the President with the advice and consent of the Senate.

For example, First Amendment interests as well as the delicate and enormously important relationship between the government and the press demand careful consideration before journalists are forced to testify against government officials. Indeed, even in cases *not* involving government officials, Department regulations require the Attorney General's express approval for all media subpoenas unless the subject of the subpoena has agreed to provide the material. *See* 28 C.F.R. § 50.10(e). Pursuant to that regulation, it is the Attorney General who weighs "the public's interest in the free dissemination of ideas and information [against] the public's interest in effective law enforcement and the fair administration of justice." *Id.* § 50.10(a). That requirement helps to ensure that decisions regarding media subpoenas reflect the institutional judgment of the Department as a whole, and account for the broader implications of a particular subpoena beyond the case at hand. Yet, the Special Counsel was exempted from that important approval requirement and left to make his own, unsupervised judgment about which subpoenas

---

Branch and the internal checks and balances it supplies [heightens] all of the occupational hazards of the dedicated prosecutor; the danger of too narrow a focus, of the loss of perspective, of preoccupation with the pursuit of one alleged suspect to the exclusion of other interests").

were necessary. *See In re Grand Jury Subpoena, Judith Miller*, 2006 WL 276726 at *32 (Tatel, J., concurring in the judgment) (noting that special prosecutors "may skew their assessments of the public interests implicated when a reporter is subpoenaed").[6]

Likewise, in cases (like this one) where classified information may be revealed if prosecution is pursued, only the Attorney General (or other senior Department of Justice officials under his supervision) can decide whether the need to protect against disclosure justifies forgoing a prosecution. *See* USAM § 9-90.200. Moreover, where prosecution *is* pursued in a case implicating national security issues, Department policy mandates that the case remain under the supervision of the Assistant Attorney General for the Criminal Division "from its inception until its conclusion, including appeal." *Id.* § 9-90.100. Notwithstanding those policies, Mr. Fitzgerald was given the authority to proceed on his own in this matter, without approval or supervision by anyone. *See* Exh. A at 2; Exh. C.

To take yet another example, DOJ regulations and policy impose strict controls on public statements in pending criminal cases. Prosecutors are limited to announcing basic background information about a defendant, the "substance or text" of the indictment, the identity of investigating agencies, the circumstances of a person's arrest, and the public policy significance of a case (but only when such information would further law enforcement goals). *See* 28 C.F.R. § 50.2(b)(3); USAM § 1-7.520. Public statements must contain only "incontrovertible, factual

---

[6] The Special Counsel has insisted that his decisions regarding which media subpoenas to issue and which to forgo fully comply with the substantive requirements of the Department's regulations. *See, e.g.,* Exh. E ¶¶ 94-100; Government's Response to Motion to Quash Grand Jury Subpoena 26-32, *In re: Special Counsel Investigation (Grand Jury Subpoena to Tim Russert)*, 332 F. Supp. 2d 26 (D.D.C. 2004) (No. 04-MS-297) (excerpts attached as Exh. H). The point, however, is not whether Mr. Fitzgerald struck the right balance in making these decisions. Rather, what matters for Appointments Clause purposes is that the Special Counsel was given decision-making authority that is properly exercised by the Attorney General—a point which Mr. Fitzgerald does not contest. *See* Exh. E ¶ 1; Exh. H at 24 n.12.

matters." § 50.2(b). "Subjective observations" or statements that "may reasonably be expected to influence the outcome of a pending or future trial" are strictly prohibited. *Id.*

The Special Counsel, however, was given "*all* the approval authorities" of the Attorney General, Exh. A at 9 (emphasis added), and thus the power to go "beyond these guidelines" in issuing public statements, *see* § 50.2(b)(9); *see supra* at 12. And he did, in fact, go far beyond those guidelines in Mr. Libby's case. In his 66-minute press conference announcing the indictment, the Special Counsel spoke as if Mr. Libby's guilt were already established—flatly stating that Mr. Libby had lied to the FBI and the grand jury, even though those charges have yet to be presented, much less proven, to a jury. *See* Exh. F at 6, 22. Moreover, even though the indictment does not charge Mr. Libby with unauthorized disclosure of classified information, Mr. Fitzgerald repeatedly claimed that the case involved "compromising national security information" and damage to the national security. He declared that "the damage wasn't to one person. It wasn't just Valerie Wilson. It was done to all of us." *Id.* at 7.[7]

What is more, the Special Counsel made the unqualified statement that Mr. Libby was "the first official to disclose [information about Ms. Plame's employment] outside the government to a reporter," *id.* at 6—an accusation that is not mentioned in the indictment and is plainly untrue. *See* Jim VandeHei & Carol Leonnig, *Woodward Was Told of Plame More than Two Years Ago*, Washington Post, Nov. 16, 2005, at A1 (Exh. I). Normally, where a prosecutor

---

[7] At another point, Mr. Fitzgerald suggested that even though compromising national security is not charged in the indictment, a prosecution for obstruction of justice was a way of holding Mr. Libby accountable for such uncharged conduct:

When you do a criminal case, if you find a violation, it doesn't really, in the end, matter what statute you use if you vindicate the interest. If Mr. Libby is proven to have done what we've alleged—convicting him of obstruction of justice, perjury and false statements—very serious felonies—will vindicate the interest of the public in making sure he's held accountable. It's not as if you say, "Well, this person was convicted but under the wrong statute."

Exh. F at 18.

so clearly oversteps the regulations and policies of the Department, a defendant might prevail upon the prosecutor's supervisor to take corrective action (*e.g.*, to issue a clarifying press release). Because the Special Counsel has no supervisor and is free to ignore otherwise applicable regulations, that opportunity does not exist for Mr. Libby.

Finally, in all other cases (including those prosecuted by other special counsel) the Attorney General retains the power to discontinue an investigation where he or she judges that the costs—financial or otherwise—outweigh any law enforcement interests that may be vindicated. *See* 28 C.F.R. § 600.7(b). Here, however, Mr. Comey announced that the Special Counsel has sole authority to decide when the investigation should end and whether a prosecution should be brought. Exh. A at 5. It now appears that Mr. Fitzgerald learned less than two months after he was appointed exactly who disclosed Valerie Plame Wilson's CIA status to Robert Novak. No one has been charged with any crime in connection with that disclosure; indeed, charges against Mr. Libby for any unlawful disclosure were "off the table for lack of evidence" long ago. *See In re Grand Jury Subpoena, Judith Miller*, 2006 WL 276726 at *38 (Tatel, J., concurring in the judgment); *see* Exh. E ¶ 81 n.15 (Aug. 27, 2004 affidavit of Mr. Fitzgerald) ("To date, we have no direct evidence that Libby knew or believed that Wilson's wife was engaged in covert work"). Yet, the Special Counsel's investigation continues to this day.

The decision whether to continue the Special Counsel's investigation long after the facts regarding the disclosure of Ms. Plame's occupation were established required a careful balancing of the interests. On the one hand, there is a law enforcement interest in investigating potential false-statement and perjury offenses. On the other hand, there is a public interest in avoiding confrontations between the government and the press—confrontations that Mr. Fitzgerald's investigation and prosecution continue to entail. There is also a public interest in avoiding

17

continued distraction of our nation's highest officials well after it has become apparent that the alleged crime that was the intended focus of the investigation did not in fact occur. Those competing interests should have been weighed by a properly appointed principal officer of the United States. Because the Special Counsel was given the power to operate without any supervision or direction in direct contravention of the Appointments Clause, that did not happen in this case.

Ultimately, whether the Special Counsel exercised his decision-making authority judiciously—with respect to the press or to the targets of his investigation—is beside the point. Rather, the issue presented by this motion is whether it is consistent with the wisdom of the Framers to permit the creation of an office by fiat of the Deputy Attorney General that supplants the authority of the Attorney General. Here, the Special Counsel was charged with making fundamental public policy decisions with no meaningful supervision or direction by the Attorney General or anyone else in the Executive branch. That power unquestionably renders him a principal officer under the test established in *Edmond*.

### 3.    The Special Counsel's Authority Exceeds Even That Of The Independent Counsel Upheld in *Morrison v. Olson.*

In *Morrison v. Olson*, the Supreme Court rejected an Appointments Clause challenge to the independent counsel provisions of the Ethics in Government Act. In the years that followed, the wisdom of that legislation was called into question, and in 1999 the Congress let the legislation expire amid serious concerns over prosecutorial excesses and lack of oversight. *See, e.g.*, *The Future of the Independent Counsel Act: S. Comm. on Governmental Affairs*, 106th Cong. 10, 15 (1999) (statement of Sen. Carl Levin, Member, S. Comm. on Governmental Affairs) ("[O]ur system of government is based on the premise that no official has unlimited power; we are all supposed to be subject to effective checks in how we exercise our authority");

18

*id.* at 16 (Sen. Susan Collins, Member, S. Comm. on Governmental Affairs) ("[T]he implementation of the Act has raised serious concerns about the unfettered powers of Independent Counsels and the impact of this law on the due process rights of those investigated"). Despite those concerns, Mr. Comey has now created an entity with *even greater* independent authority than the Office of Independent Counsel enjoyed.

     *Morrison* provides no support for Mr. Comey's unilateral action and is not controlling in this case. For one thing, *Morrison* must be read in light of the Supreme Court's subsequent decision in *Edmond*, which characterized *Morrison* as not establishing any "definitive test for whether an office is 'inferior' under the Appointments Clause," and then proceeded to set forth a straightforward "direct[ion] and supervis[ion]" rule for analyzing Appointments Clause challenges. 520 U.S. at 661, 663.[8] As shown above, the Special Counsel is not an inferior officer under *Edmond*'s direction and supervision rule.

     In any event, even under the analysis employed in *Morrison*, the Special Counsel does not qualify as an inferior officer. *Morrison* applied a multi-factor balancing test to conclude that the independent counsel was inferior. Several of the most important factors *Morrison* relied on are entirely absent here. For example, central to *Morrison*'s analysis were the limitations on the independent counsel's jurisdiction and tenure. *See* 487 U.S. at 672. Under the Ethics in Government Act, a three-judge panel assigned to the D.C. Circuit (the "Special Division") defined an independent counsel's jurisdiction at the outset of his appointment based on an

---

[8] Indeed, some have concluded that *Edmond* wholly supplanted the approach taken in *Morrison*. *See, e.g.*, Steven G. Calabresi, *The Structural Constitution and the Countermajoritarian Difficulty*, 22 Harv. J.L. & Pub. Pol'y 3, 5 (1998) ("[T]he Court's 1997 decision in *Edmond v. United States* essentially displaced the faulty Appointments Clause analysis of *Morrison v. Olson*"); Nick Bravin, Note, *Is Morrison v. Olson Still Good Law? The Court's New Appointments Clause Jurisprudence*, 98 Column. L. Rev. 1103, 1119 (1998) ("*Edmond* stands for the proposition that officer status for Appointments Clause purposes will be measured by supervision alone").

application from the Attorney General. 28 U.S.C. § 593(b)(1) (Supp. V 1982). Though the
independent counsel could request an expansion of jurisdiction, the Attorney General had
absolute authority to deny such requests, and his denials were final and could not be overridden.
*See id.* § 593(c)(2)(B), (d); *see also In re Olson*, 818 F.2d 34, 47 (D.C. Cir. Indep. Couns. Div.
1987).

      The Act also gave the Special Division the power to terminate an office of independent
counsel when investigation of the matters within the office's jurisdiction was complete. *See* 28
U.S.C. §596(b)(2) (Supp. V 1982). The Act was later amended to require the Special Division to
assess whether termination of the independent counsel's office was appropriate within two years
of appointment, "at the end of the succeeding 2-year period, and thereafter at the end of each
succeeding 1-year period." 28 U.S.C. § 596(b)(2) (1994). Thus, the office was "'temporary' in
the sense that an independent counsel is appointed essentially to accomplish a single task, and
when that task is over the office is terminated." 487 U.S. at 672.

      By contrast, though Mr. Comey defined the Special Counsel's jurisdiction at the outset as
"the alleged unauthorized disclosure of a CIA employee's identity," Exh. C, he announced that
the Special Counsel may unilaterally expand that jurisdiction without "com[ing] back to the
attorney general [to] get permission," Exh. A at 9. And, unlike in the independent counsel
regime, there is no procedure here by which anyone outside the Office of Special Counsel
assesses periodically whether the investigation has gone too far or lasted too long. Instead, Mr.
Comey made clear that Mr. Fitzgerald alone will decide when his investigation is complete. *See
id.* at 5.

      *Morrison*, moreover, relied on the fact that the independent counsel was constrained by a
statutorily imposed obligation to comply "except where not possible" with the policies of the

Department. 487 U.S. at 662, 671-72; *see* 28 U.S.C. § 594(f) (Supp. V 1982). In contrast, there is no statute or regulation making clear that this Office of Special Counsel—an *ad hoc* institution not contemplated or defined by any law or regulation—must comply with the policies of the Department. The terms of Mr. Fitzgerald's charter indicate the exact opposite. His "position and authorities are [not] defined and limited by 28 C.F.R. Part 600," Exh. D, which requires other special counsel to comply with all DOJ policies. What is more, he has "all the approval authority" of the Attorney General—which includes the power to depart from crucial DOJ policies as he sees fit. Exh. A at 9.

Finally, the Office of the Independent Counsel challenged in *Morrison* was created pursuant to an act of Congress. That legislation reflected the Congress's judgment that the independent counsel did not qualify as a principal officer and therefore did not need to be appointed by the President with the advice and consent of the Senate. Such legislative determinations may be entitled to some degree of deference. *See Weiss v. United States*, 510 U.S. 163, 194 (1994) (Souter, J., concurring) ("Where the label that better fits an officer is fairly debatable, the fully rational congressional determination surely merits tolerance") (citation and alterations omitted). Here, however, Congress has made no such determination.[9] Instead, the Office of Special Counsel in this case was created through the unilateral action of a Deputy Attorney General. Unlike a Congressional determination, Mr. Comey's judgment that he could give a single United States Attorney the "plenary authority" of the Attorney General to conduct an investigation, subject to no direction or supervision by any superior officer, deserves no deference at all.

---

[9] Indeed, in 1999 the Congress changed course and rejected the continued existence of an independent prosecutor with limited political accountability. *See supra* at 18-19.

4.    **Where A Person Is Granted The Power Of A Principal Officer Subject To No Supervision Or Limitations On Jurisdiction Or Tenure, Removability Is Not Sufficient To Render Him An Inferior Officer.**

During the press conference announcing the creation of the Office of Special Counsel, a reporter asked Mr. Comey whether he had the authority to revoke Mr. Fitzgerald's power. *See* Exh. A at 7. Mr. Comey responded that he believed he could do so, "in theory . . . if [he] kn[e]w what [Mr. Fitzgerald were] doing." *Id.* at 8. As set forth above, Mr. Fitzgerald's broad, unsupervised powers render him a principal officer. The Acting Attorney General's "theoretical" removal authority—an authority which is not set forth or defined in any law or regulation—does not change that result.

Under the test set forth in *Edmond*, the ultimate touchstone of inferior-officer status is *direction and supervision*. Thus, removability is relevant only to the extent that the threat of removal contributes to actual direction and supervision. Here, even assuming the power to remove does exist, it does not have that effect. Mr. Comey renounced any oversight of the Special Counsel, explaining that Mr. Fitzgerald would act "independent of the supervision or control of any officer of the Department," Exh. C, and indicating that he would have no meaningful insight into "what [the Special Counsel is] doing," Exh. A at 8. Without that oversight, the power to remove is essentially meaningless. How can the Acting Attorney General possibly know whether revocation of the Special Counsel's power is warranted when he lacks even basic insight into the Special Counsel's deliberations and decision-making? Mr. Comey created a scheme that quite clearly foreswore any oversight. The authority claimed by Mr. Comey in his press conference to remove the Special Counsel "in theory" is (at most) just that—a wholly theoretical possibility with no realistic prospect of constraining the Special Counsel's conduct, one to which this Court should attach no significance at all.

Prior to *Edmond*, the D.C. Circuit pointed to the ability to revoke a grant of authority as an indicator of inferior officer status. *See In re Sealed Case*, 829 F.2d 50, 56 (D.C. Cir. 1987). In that case, the court considered an Appointments Clause challenge to Independent Counsel Lawrence Walsh, who was appointed by the Special Division and charged with investigating the Iran-Contra affair. The Attorney General also promulgated regulations delegating to Mr. Walsh his investigative and prosecutorial authority with regard to the investigation. *See id.* at 52; *see also* 28 C.F.R. Parts 600, 601 (1987). Oliver North contended that this regulatory delegation rendered Mr. Walsh a principal officer and therefore violated the Appointments Clause. The D.C. Circuit rejected the argument, finding that because Mr. Walsh had been "'charged with the performance of the duty of the superior for a limited time and under special and temporary conditions,'" he was not a principal officer. 829 F.2d at 56-57 (quoting *United States v. Eaton*, 169 U.S. 331, 343 (1898)). In reaching that conclusion, the court cited the fact that the Attorney General could at any time, "[s]ubject to generally applicable procedural requirements," rescind the regulation that delegated Mr. Walsh his authority, and "thereby abolish[] the Office of the Independent Counsel: Iran/Contra." *Id.* at 56.

*In re Sealed Case* does not control the outcome here. Rather, the Supreme Court's more recent decision in *Edmond* provides the governing rule, and it holds that the guiding question is whether an officer is subject to "direct[ion] and supervis[ion]" by a properly appointed superior. *See* 520 U.S. at 663; *cf. U.S. Telecom Ass'n*, 359 F.3d at 568 ("[V]ague or inadequate assertions of final reviewing authority [cannot] save an unlawful subdelegation"). Removability is *one factor* relevant to the *Edmond* analysis, but the Court's opinion makes clear that "direct[ion] and supervis[ion]" is the test, and that removability alone is not sufficient to render an officer inferior. *See* 520 U.S. at 664-65 (basing its inferior officer holding on judges' at-will

23

removability *along with* the JAG's active administrative oversight, the existence of procedural rules governing the judges, and the lack of authority to make final decisions on behalf of the Executive); *id.* at 661 ("Our cases have not set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes"); *id.* at 667 (Souter, J., concurring in part and concurring in the judgment) (explaining that, under the Court's holding, the judges were inferior officers because of the "administrative supervision of these judges by the [JAG], *combined with* his power to control them by removal from a case") (emphasis added).

What is more, neither the delegation of authority to Independent Counsel Walsh, nor the delegation to the officer in *United States v. Eaton* (the case relied upon by *In re Sealed Case*), was nearly as broad as the power given to the Special Counsel. Rather, both were "for a limited time and under special and temporary conditions." *In re Sealed Case*, 829 F.2d at 56-57 (quotation marks and citation omitted). Under the governing regulations, Walsh was subject to the same limitations on jurisdiction and tenure, and the same obligation to comply with Department policy, as were imposed by the Ethics in Government Act. *See id.* at 52-53; *supra* at 19-21. Likewise, the question in *Eaton* was whether executive officials could delegate to a vice consul "the duty of temporarily performing the functions" of the consul, in the event that the consul was "temporarily absent or relieved from duty." 169 U.S. at 336, 343. The arrangement was "limited" and "temporary," and would be rescinded as soon as the existing consul was again able to discharge his duties or a new consul was appointed. *See* 169 U.S. at 343. By contrast, the Special Counsel's tenure is not limited by statute or regulation, nor will his power be automatically divested upon the occurrence of a particular event outside of his control. Instead, according to Mr. Comey, Mr. Fitzgerald alone has the power to say when his investigation is

complete. That, together with the other far-reaching powers he exercises without direction or

supervision, undeniably renders him a principal officer.

## II.    THE POWER GIVEN TO THE SPECIAL COUNSEL VIOLATES THE STATUTORY REQUIREMENT THAT THE ATTORNEY GENERAL DIRECT AND SUPERVISE ALL LITIGATION TO WHICH THE UNITED STATES IS A PARTY.

In addition to violating the Appointments Clause, Mr. Comey's assignment of power to

the Special Counsel also violates federal law. Section 516 of Title 28 provides:

> Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefore, is reserved to officers of the Department of Justice, *under the direction of the Attorney General.*

(Emphasis added.) Similarly, section 519 provides:

> Except as otherwise authorized by law, *the Attorney General shall supervise* all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties.

(Emphasis added.) Those two provisions make it clear that the Attorney General must

"supervise" and "direct[]" all litigation on behalf of the United States—absent a statute to the

contrary. That obligation reflects the Attorney General's historic duty to act as "the officer who

has charge of the institution and conduct of the pleas of the United States." *United States v. San

Jacinto Tin Co.*, 125 U.S. 273, 279 (1888); *see also ICC v. S. Ry. Co.*, 543 F.2d 534, 535 (5th

Cir. 1976) (sections 516 and 519 "merely restate[] the traditional responsibility of the Attorney

General over the conduct of all litigation on behalf of the United States and its agencies").

As the Office of Legal Counsel has explained, sections 516 and 519 limit the authority of

the Attorney General to hand over control of litigation to other entities that do not operate under

his supervision and direction. In 1980, the OLC considered whether the Attorney General could

grant litigating authority to other agencies with no independent statutory authority to litigate on

behalf of the United States. *See* John Harmon, Litigating Authority of the Office of Federal

Inspector, Alaska Natural Gas Transportation System, 4B U.S. Op. Off. Legal Counsel 820, 1980

WL 20994 (1980). It concluded that he could not:

> Section 516 states that, except as otherwise authorized by law, the conduct of government litigation is "reserved" to officers of the Department of Justice. Section 519 in terms imposes a *mandatory duty on the Attorney General to supervise all litigation involving the United States*, except as otherwise authorized by law.

*Id.* at 824 (emphasis added). The OLC reiterated that position two years later:

> Centralization of federal litigating authority in the Department of Justice, under the supervision of the Attorney General, is vitally necessary to ensure the Attorney General's proper discharge of his duty to oversee the legal affairs of the United States with which Congress has entrusted him. Centralization ensures that the Attorney General is properly informed of the legal involvements of each of the agencies for which he is responsible; supervisory authority permits him to act on that knowledge. . . . *[I]t is essential that the Attorney General not relinquish his supervisory authority over the agency's litigation functions, for the Attorney General alone is obligated to represent the broader interests of the Executive.*
>
>     \* \* \* \*
>
> While the Attorney General may delegate some litigating authority . . . , *he may not delegate the ultimate responsibility which is by law vested exclusively in the Attorney General.*

Theodore Olson, The Attorney General's Role as Chief Litigator for the United States, 6 U.S.

Op. Off. Legal Counsel 47, 54, 59, 1982 WL 170670 (1982) (emphasis added). The OLC noted

that supervision and direction were particularly important in criminal proceedings because, "[a]s

the Executive's chief legal officer, the Attorney General is singularly suited to carry out this

responsibility." *Id.* at 53 n.9.

    The Special Counsel's appointment violates sections 516 and 519 because Mr. Comey

expressly abdicated the supervision and direction that federal law requires the Attorney General

to exercise. In the appointment letter itself, Mr. Comey stated that the Special Counsel would act

"independent of the supervision or control of *any* officer of the Department," including the

Attorney General. Exh. C (emphasis added). The GAO relied on that renunciation of

supervision and direction when it agreed to the Special Counsel's funding arrangement, noting

that Mr. Comey had effectively "instruct[ed] [the Special Counsel] to exercise [his] authority

independent of the control of any officer of the Department." Exh. G at 2. Mr. Comey

confirmed at the press conference that the Department would not supervise or direct the Special

Counsel's investigation, explaining that he had considered retaining authority as "ultimate

supervisor[] and decision-maker[]" in his capacity as Acting Attorney General, but decided to

reject that option. Exh. A at 2. Finally, as explained above, this Special Counsel enjoys

unilateral authority to act without approval from any superior officer and to expand his

jurisdiction or extend his tenure as he sees fit. *See supra* at 11-12. Those remarkable powers

strikingly demonstrate that the Attorney General has abandoned his obligation, expressly

imposed by sections 516 and 519, to "direct[]" and "supervise" this litigation. *See* 6 U.S. Op.

Off. Legal Counsel at 59.

The OLC opinions cited above address assignment of the Attorney General's authority to

agencies *outside* the Department of Justice. But that distinction makes no difference here.

Sections 516 and 519 require the *Attorney General himself* to retain ultimate responsibility for

direction and supervision of litigation. *See* 28 U.S.C. § 516 ("the conduct of litigation . . . is

reserved to officers of the Department of Justice, *under the direction of the Attorney General*")

(emphasis added); *id.* § 519 ("the *Attorney General* shall supervise all litigation") (emphasis

added). If those provisions are violated by delegating litigating authority to an agency outside

the Department of Justice, they are equally violated by delegating litigating authority to an

officer who nominally remains within the Department of Justice but over whom the Attorney

General has renounced all supervision and direction. The statutory requirement of direction and supervision is equally missing in both cases.

Furthermore, although sections 516 and 519 do allow unsupervised litigation on behalf of the government "if otherwise authorized by law," 28 U.S.C. §§ 516, 519, that exception is not met here. The exception must be "narrowly construed," 6 U.S. Op. Off. Legal Counsel at 56, and applies only where a statute is "sufficiently concrete to act as an exception to the Attorney General's broad authority over agency litigation," *S. Ry. Co.*, 543 F.2d at 539. *See Marshall v. Gibson's Products, Inc.*, 584 F.2d 668, 676 n.11 (5th Cir. 1978) (statute must constitute an "express congressional directive"); *FTC v. Guignon*, 390 F.2d 323, 325 (8th Cir. 1968) (statute must not be "ambiguous"). "[A]mbiguous language, which, for example, authorizes an agency to 'sue and be sued,' 'bring a civil action,' or 'invoke the aid of a court,'" is not sufficient. 6 U.S. Op. Off. Legal Counsel at 57.

No statute exempts this case from sections 516 and 519. The only relevant provisions Mr. Comey relied on to give the Special Counsel authority to litigate unsupervised by any officer of the Department were 28 U.S.C. §§ 510 and 515. While those provisions authorize the Attorney General to delegate authority to conduct legal proceedings to DOJ employees or outside counsel, they in no way suggest that the Attorney General may *renounce entirely all supervision and direction*.[10] Absent more specific language indicating that the Congress

---

[10] By way of analogy, though a corporate director may delegate authority to others, failure to supervise his delegates in exercising that authority is an impermissible abandonment of responsibility, constituting a breach of fiduciary duty. *See* 3A Fletcher Cyc. Corp. § 1034.70 (perm. ed. 2002) (courts will impose liability on directors who "virtually abdicate[] their responsibilities and abandon[] their duties"); *see, e.g., Hoye v. Meek*, 795 F.2d 893 (10th Cir. 1986) (holding director liable for delegating authority to make investment decisions without maintaining adequate supervision and monitoring investments); *Stern v. Lucy Webb Hayes Nat'l Training School*, 381 F. Supp. 1003, 1013 (D.D.C. 1974) ("A corporate director . . . may delegate his investment responsibility to fellow directors, corporate officers, or even outsiders,

28

intended sections 510 and 515 to trump sections 516 and 519, those provisions should be given

their natural meaning—namely, as allowing the Attorney General to delegate his authority to

litigate but not to abdicate his ultimate responsibility to supervise and direct litigation. *See*

*generally HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) ("[I]t is a basic principle of

statutory construction that a specific statute . . . controls over a general provision . . . ,

particularly when the two are interrelated and closely positioned . . .").

      Indeed, a contrary interpretation—allowing the appointment of a prosecutor who is

unsupervised and undirected by anyone within the Department of Justice—would directly

undermine what Congress sought to accomplish when it abolished the Office of Independent

Counsel in 1999. *See supra* at 18-19; *cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120, 133 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly

where Congress has spoken subsequently and more specifically to the topic at hand"). Mr.

Comey's unilateral attempt to create a special counsel with *even more* authority than the

independent counsel the Congress deliberately eliminated is a direct renunciation of legislative

intent and must not be allowed.

      In some circumstances the Attorney General may be incapable of carrying out his

statutory obligation to supervise and direct all litigation involving the United States—including

where, as here, he arguably suffers from a conflict of interest. But 28 U.S.C. § 508 directly

addresses that situation. Section 508(a) provides that "the Deputy Attorney General may

exercise all of the duties of [the Attorney General]" in the event of the latter's absence, disability,

or vacancy in office. Should the Deputy Attorney General be unable to provide the necessary

supervision, § 508(b) mandates that the Associate Attorney General "act as the Attorney

---

but he must continue to exercise general supervision over the activities of his delegates. . . . Total
abdication of the supervisory role is improper").

General." *Id.* Failing that, "[t]he Attorney General may designate the Solicitor General and the Assistant Attorneys General, in further order of succession, to act as Attorney General."

Even assuming section 508 satisfies the "otherwise authorized by law" exception to sections 516 and 519, it could not possibly apply here since the provision does not authorize Mr. Fitzgerald, in his capacity as United States Attorney or as Special Counsel, to assume the Attorney General's supervisory duties. Nor, for that matter, does it permit Mr. Margolis, an Associate Deputy Attorney General who was neither nominated by the President nor confirmed by the Senate, to step in as Acting Attorney General. Yet, it was Mr. Margolis to whom Mr. Comey gave "all of his authority as Acting Attorney General with respect to this investigation" when Mr. Comey resigned from the Department in August 2005, two months before Mr. Libby was indicted. *See* Exh. B.[11]

Notably, the defects in the Special Counsel's appointment were not the unavoidable result of the circumstances of this case. The *Department's own regulations* (based on the foregoing statutory scheme) provide for the appointment of a special counsel who *is* subject to supervision and direction by the Attorney General. *See* 28 C.F.R. Part 600. Those regulations, promulgated after the abolition of the Office of Independent Counsel, give special counsel a degree of independence appropriate where high-ranking executive officials are under investigation, *see* §§ 600.6, 600.7(b)—but do so without ignoring the Attorney General's statutory obligation to supervise all litigation involving the United States.[12] *See supra* at 10-13.

---

[11] Mr. Comey's memorandum does not explain why Mr. Margolis, rather than an officer designated in § 508, was given this authority. *See* Exh. B.

[12] Alternately, Congress could have authorized an officer to prosecute on behalf of the United States without the Attorney General's supervision. *See, e.g.*, S.J. Res. 54, 68th Cong., 1st Sess. 43 Stat. 5-6 (1924) (authorizing the President to appoint, with the Senate's advice and consent, special counsel outside of the control of the Attorney General to investigate and prosecute

Mr. Comey indicated that he acted outside those regulations for reasons of convenience and because he concluded that Mr. Fitzgerald should have more power than other special counsel. *See* Exh. A at 3. That justification does not withstand scrutiny.

To the extent there is any doubt over whether sections 516 and 519 prohibit Mr. Comey's creation of this Office of Special Counsel, walled off from the command and control of the Attorney General, the grave constitutional questions presented by the Appointments Clause supply a persuasive reason to interpret those sections in that fashion. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). Even if there were doubts over whether the Special Counsel's appointment violates the Constitution, certainly there are at least "serious constitutional" questions on that score. And, even if there are doubts over whether sections 516 and 519 prohibit the appointment, that construction is not "plainly contrary to the intent of Congress." Under those circumstances, this Court has a duty to construe sections 516 and 519 in a manner that avoids the difficult constitutional issues presented by this case.

III. **BECAUSE THE EXERCISE OF POWER BY THE SPECIAL COUNSEL VIOLATES THE CONSTITUTION AND FEDERAL STATUTES, THE INDICTMENT MUST BE DISMISSED.**

Because Mr. Comey's assignment of unsupervised and undirected power to the Special Counsel in this case was contrary to both the Constitution and federal law, Mr. Fitzgerald must be prohibited from any further exercise of the power improperly given to him. *See Ryder v. United States*, 515 U.S. 177, 181-83 (1995); *cf. United States v. Providence Journal Co.*, 485

criminal wrongdoing arising out of the Teapot Dome scandal). The Department's own actions cannot, however, supply the necessary *statutory* exemption from sections 516 and 519.

31

U.S. 693 (1988) (dismissing case for want of jurisdiction because special prosecutor lacked the statutory authority to represent the United States in a petition for certiorari). What is more, all actions already taken by the Special Counsel are necessarily invalid. *See Ryder*, 515 U.S. at 180-84 (invalidating action taken by officers assigned authority in violation of the Appointments Clause); *see also Nguyen v. United States*, 539 U.S. 69, 79 (2003); *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1130-32 (D.C. Cir. 2000) (indicating that a violation of the Appointments Clause qualifies as structural error); *cf. Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809-14 (1987) (plurality) (contempt convictions must be reversed, regardless of any showing of harm, where district court erroneously appoints counsel for an interested party to prosecute alleged violations of a court order); *id.* at 815-25 (Scalia, J., concurring in the judgment) (concluding that appointment of counsel to prosecute contempt charges exceeded district court's power under Article III and that convictions were therefore automatically void).

In Mr. Libby's case, the Special Counsel opened the investigation before the grand jury that returned the indictment. He presented the evidence the grand jury considered, and he framed, presented, and signed the indictment it returned. He also decided what evidence *not* to present to the grand jury, what testimony of others *not* to question, which reporters *not* to subpoena, and what extenuating circumstances to ignore.

All of Mr. Fitzgerald's actions were taken pursuant to an unlawful and constitutionally defective assignment of power. If those actions are allowed to stand, nothing will stop the Department of Justice from wholly renouncing its supervisory obligations in future cases, and allowing any person it chooses to exercise the tremendous prosecutorial power of the federal government as he or she pleases. The indictment obtained by the Special Counsel against Mr. Libby must be dismissed.

32

## CONCLUSION

Because the Special Counsel received his authority in violation of the Appointments

Clause and 28 U.S.C. §§ 516 and 519, and because the indictment was obtained through Mr.

Fitzgerald's exercise of that unlawful authority, Mr. Libby respectfully moves this Court to

dismiss the indictment.

February 23, 2006                                    Respectfully submitted,

/s/ Theodore V. Wells, Jr.                           /s/ William H. Jeffress, Jr.
Theodore V. Wells, Jr.                               William H. Jeffress, Jr.
DC Bar No. 468934                                    DC Bar No. 041152
James L. Brochin                                     Alex J. Bourelly
DC Bar No. 455456                                    DC Bar No. 441422
Paul, Weiss, Rifkind, Wharton                        Alexandra M. Walsh
    & Garrison LLP                                    DC Bar No. 490484
1285 Avenue of the Americas                          Baker Botts LLP
New York, NY  10019-6064                             1299 Pennsylvania Avenue, NW
(212) 373-3089                                       Washington, DC  20004
                                                     (202) 639-7751

/s/ Joseph A. Tate                                   /s/ John D. Cline
Joseph A. Tate                                       John D. Cline
Dechert LLP                                          DC Bar No. 403824
2929 Arch Street                                     Jones Day
Cira Centre                                          555 California Street, 26th Floor
Philadelphia, PA  19104                              San Francisco, CA  94104
(215) 994-2000                                       (415) 875-5812

33