# 05-CR-394 -- EXHIBIT E

No. 04-3138
<u>In re: Grand Jury Subpoena, Judith Miller</u>
Consolidated with 04-3139, 04-3140

AUGUST 27, 2004 AFFIDAVIT OF PATRICK J. FITZGERALD

PLACED IN PUBLIC FILE PURSUANT

TO OPINION RELEASED FEBRUARY 3, 2006

# REDACTED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

·······································:

In re: Special Counsel Investigation    :     **Case No. 04-MS-407 (D.D.C.)**

                                                    :     **Case No. 04-MS-406 (D.D.C.)**

(Grand Jury Subpoena to Judith Miller)    :     **(Chief Judge Thomas F. Hogan)**

                                                    :

     REDACTED                          :     **UNDER SEAL**

·······································:

PATRICK J. FITZGERALD, being duly sworn, deposes and says:

### Introduction

1. I am the United States Attorney for the Northern District of Illinois, having been appointed by the President and confirmed by the Senate in October 2001. For purposes of the instant matter, I serve in the capacity as "Special Counsel," in that I have been delegated all the relevant powers vested in the Attorney General of the United States, including the power to issue subpoenas generally, to authorize subpoenas to the media and to appear in Court on behalf of the United States. I submit this affidavit in opposition to the motions by: ( i ) *New York Times* reporter Judith Miller;      **REDACTED**      to quash grand jury subpoenas.

2. In this affidavit, I set forth below: the basis for my authority to conduct this investigation (paragraph 5); the general subject matter of the investigation (paragraphs 6 through 8); general factual background on the investigation (paragraphs 9 through 16); the factual background giving rise to the subpoenas issued to Miller (paragraphs 18 through 48); **REDACTED** the need for the reporters' testimony (paragraphs 81 through 83); the extent to which alternative remedies have been exhausted (paragraphs 84 through 88); and that the subpoenas were validly issued after a careful balancing of appropriate interests in free speech (paragraphs 89 through 100).

3. As discussed in greater detail below, reporter Miller has been subpoenaed because her testimony is essential to determining whether or not Lewis Libby, the Vice President's Chief of Staff, has committed crimes involving the improper disclosure of national defense information and perjury. Libby has admitted speaking to reporter Miller in July 2003 and discussing the purported employment of former Ambassador Joseph Wilson's wife by the

1

# REDACTED

Central Intelligence Agency ("CIA"). However, Libby has testified under oath that he only advised Miller that other reporters were saying that Wilson's wife worked at the CIA and that Libby himself did not know if that were true. There is substantial reason to question Libby's account. First, Libby testified that he merely relayed to Miller on July 12 or 13 what Libby had learned from Tim Russert on July 10. However, Russert has testified under oath that he did not discuss Wilson's wife with Libby on that date and indeed did not know then about Wilson's wife. Thus, Russert could not have then imparted that information to Libby. Moreover, Libby has given accounts of conversation with two other reporters – **REDACTED**

and Matt Cooper of *Time* magazine – that are contradicted in many respects by the testimony of ]        and Cooper. And investigation to date has determined that Libby had spoken with as many as seven (7) different government officials about Wilson's wife employment prior to the date of the Russert conversation when he claimed to have heard the information from Russert as if it were new. One of those officials, Ari Flesicher, was told the information by Libby three days before the purported Russert conversation and advised by Libby that the information was "hush hush." The grand jury needs to hear the testimony of Miller before making any determination whether Libby should be charged. Libby has expressly waived any claim of confidentiality as to conversations with Miller regarding the subject matter of the investigation.

4.        REDACTED

## Authority to Conduct Investigation

5. In this particular matter, Attorney General John Ashcroft has recused himself from participation and delegated his full authority to Deputy Attorney General James B. Comey as Acting Attorney General. The Deputy Attorney General is not recused from this matter but has delegated all the power he has concerning this matter to me in letters dated December 30, 2003, and February 6, 2004, copies of which are annexed as Exhibits A and B. The Deputy Attorney General has exercised his discretion not to participate in the conduct of the investigation so as to allow him to participate fully in efforts to coordinate national security matters with other members of the administration. Thus, as Special Counsel I serve as the

I-SECA-2

REDACTED

functional equivalent of the Attorney General on this matter.[1]

### The General Subject Matter of the Investigation

6. This investigation concerns the disclosure by government officials to the press in July 2003 of then classified information concerning the employment of Valerie Wilson Plame by the Central Intelligence Agency ("CIA"). In particular, the investigation seeks to determine: which administration officials disseminated information concerning Ms. Plame to members of the media in spring 2003, the motive for the dissemination, and whether any violations of law were committed in the process. While the initial reporting regarding Ms. Plame's employment was in a column by syndicated columnist Robert Novak,[2] the investigation of unauthorized disclosures is not limited to disclosures to Novak.[3] Moreover, the investigation seeks to determine whether any witnesses interviewed to date have made false statements, committed perjury in the grand jury or otherwise obstructed justice.

7. In particular, this affidavit is submitted *ex parte* to apprise the Court why it is necessary that reporter Judith Miller of the *New York Times* be compelled to testify in compliance with a validly authorized grand jury subpoena as to conversations she had with I. Lewis Libby, a/k/a "Scooter Libby." Mr. Libby has signed a written waiver of confidentiality concerning his conversations with the media and, upon information and belief, has also expressly

---

[1] I have not been appointed pursuant to Title 28, United States Code, Part 600, which is the provision allowing the Attorney General to appoint an attorney outside the Department of Justice to investigate and prosecute certain matters. In fact, the authority delegated in this case is in many respects broader than the authority conferred by the latter provision as I need not seek approvals prior to significant investigative or prosecutive steps.

[2] Novak authored a July 14, 2003, *Chicago Sun Times* column revealing Plame's purported association with the CIA. (A copy of that column is annexed as Exhibit C.)

REDACTED

In seeking to determine the sources for these disclosures, and the motives for the disclosures, the investigation also necessarily has sought to determine whether, as was reported in *The Washington Post* in September 2003, administration officials called a number of other members of the media in order to reveal information about Ms. Plame.

The investigation has focused primarily on disclosures pre-dating July 14, 2003, the date of Novak's column.

3

REDACTED

released at least one other reporter (Matt Cooper from *Time*) from any agreement of confidentiality.

8.

REDACTED

This affidavit is submitted under seal because it concerns a grand jury matter and is filed *ex parte* because it describes in detail various sensitive aspects of the grand jury investigation.

## The Background Facts:
### *The Controversy About Niger and Uranium*

9. The "leaks" under investigation must be viewed in the context of a controversy concerning the content of the State of the Union address delivered by President George W. Bush on January 28, 2003. In that speech, President Bush stated: "The British government has learned that Saddam Hussein sought significant quantities of uranium from Africa." Those remarks, since referred to colloquially as the "16 words," were called into question by a series of articles in the spring of 2003, including several ultimately sourced in part to Ambassador Joseph Wilson. Wilson, a retired career State Department official who had been posted to a number of different African countries, had taken a trip to Niger at the request of the CIA in February 2002 to investigate allegations that yellowcake uranium had been sought or obtained by Iraq from Niger. (The CIA commissioned Wilson to take this trip after the CIA received inquiries from the Vice President about the allegation that uranium had been sought from Niger, but the Vice President himself did not request such a trip.) Wilson reported to the CIA that he doubted Iraq had obtained uranium from Niger recently, for a number of reasons. After the State of the Union speech, the International Atomic Energy Association revealed in March 2003 that documents apparently evidencing efforts to obtain yellowcake uranium from Niger were demonstrable forgeries. Thereafter, over the course of spring 2003, the "16 words" controversy attracted greater media attention. Wilson, who was not a government employee at the time of the trip and REDACTED                                                        , spoke to several reporters, including Nicholas Kristof of the *New York Times* and Walter Pincus of the *Washington Post*, who wrote articles on May 6 and June 12 respectively concerning Wilson's trip to Niger, without naming Wilson. The articles called into question the accuracy of the "16 words." Those news stories generated significant conversation within and between the Office of the Vice President, the CIA, the State Department and the White House as to the circumstances under which Wilson's trip was undertaken.

4

REDACTED


### *The Wilson Op Ed Piece*

10. On July 6, 2003, Wilson authored an Op-Ed piece in the *New York Times* entitled "What I Did Not Find in Africa," and was interviewed for an article in the *Washington Post* about his trip. Both items appeared in the July 6 editions of the respective newspapers. Also on July 6, Wilson appeared as a guest on "*Meet the Press*," hosted that day by Andrea Mitchell. Those media appearances by Wilson generated heightened media interest and increased frustration in the Office of Vice President that the Vice President was being identified incorrectly as the person sending Wilson on his trip. As a result of press inquiries at the White House the day following these articles and Wilson's television appearance, White House Press Secretary Ari Fleischer stated at a July 7, 2003, press "gaggle" that the Vice President had not requested Wilson's trip, had not been aware of it and had not been briefed on the results.

REDACTED

11. Thereafter, the issue of how the "16 words" came to be in the State of the Union was a very prominent issue during the week of July 7 to July 12, while the President and several cabinet members were on a trip to Africa. The attention was increased in part by remarks by National Security Adviser Dr. Condoleeza Rice on Air Force One on July 10, 2003, which appeared to attribute blame for the "16 words" to the CIA. On Friday, July 11, 2003, CIA Director Tenet issued a written statement accepting responsibility for the inclusion of the "16 words" in the State of the Union address.


12.



REDACTED

[4]

---

[4] As understood by various officials interviewed, "on the record" comments are statements made for attribution to a government official by name. "Background" comments are comments that are attributed to a generic description of the government official. "Deep background" comments can be reported as part of the story but not specifically attributed to a government official. "Off the record" comments cannot be reported in the story but can be used to inform the reporter's understanding of the facts.

5

REDACTED

13.

REDACTED

*The Novak Column*

14.  On Monday, July 14, 2003, Robert Novak published his syndicated column revealing that Wilson's wife was an "agency operative on weapons of mass destruction." Novak also reported, "[t]wo senior administration officials told me his [Wilson's] wife suggested sending Wilson to Niger to investigate the Italian report." A *Time* magazine piece authored by Mr. Cooper (as well as several coauthors) entitled "*A War on Wilson?*" appeared on the Internet later that week (July 17) which stated:

> And some government officials have noted to *Time* in interviews (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction. These officials have suggested that she was involved in her husband's being dispatched [] Niger to investigate reports ...

(Copy annexed as Exhibit F.)

15.  A *Newsday* article the following week quoted an intelligence official as confirming Valerie Plame's purported status as a CIA employee.  (Copy annexed as Exhibit D.)

16.  The media published more information in the fall of 2003 confirming that Novak was not the only reporter contacted during the relevant period.  The September 28, 2003, *Washington Post* reported that one unidentified source had advised that two top White House officials had contacted at least six reporters prior to the time that Novak published his July 14 story.  (Copy annexed as Exhibit G.)  The October 12 *Washington Post* story by Pincus and Allen revealed that a *Washington Post* reporter had been told about Wilson's wife's employment by an

6

REDACTED

administration official on July 12, two days before Novak's column was published. (Exhibit E.) And Novak himself described the circumstances of his contact with his two administration sources in his October 1, 2003, *Chicago Sun Times* column. (Copy annexed as Exhibit H.)

## The Instant Subpoenas

17. The instant subpoenas to *New York Times* reporter Miller concern conversations between I. Lewis Libby, a/k/a "Scooter Libby," and reporter Miller in July 2003 and related documents. Libby, a subject of the investigation who has testified twice before the grand jury to date, is Assistant to the President, Chief of Staff to the Vice President and Assistant to the Vice President for National Security Affairs.    REDACTED

## The Subpoena to Miller
### *Libby's Account of The July 8 Meeting Between Libby and Miller*

18. Libby met with *New York Times* reporter Judith Miller on July 8, 2003.

REDACTED

19.

REDACTED

20.

REDACTED

7

REDACTED


21.


REDACTED


Libby did not testify that Wilson's wife was discussed at the meeting – having repeatedly staked the position that he did not discuss Wilson's wife with any one prior to July 10, the date when he thought he learned about Wilson's wife for the first time from Tim Russert. As discussed elsewhere, however, there appears to have been no such conversation with Russert about Wilson's wife on July 10 and Libby was discussing Wilson's wife with others prior to July 10. Thus, it is plausible that Libby may have discussed with Miller Wilson's wife on July 8, given that he discussed Wilson's wife with Ari Fleischer on July 7 and he admits discussing Wilson's wife with Miller at least on July 12.

### *Libby's Account of The July 12 Telephone Call Between Libby and Miller*

22. Libby testified that he spoke to Judith Miller on July 12 or July 13 about Wilson's wife by telephone from his home, believing that the call occurred on July 12. The call to Miller would have followed conversations described below with reporters Matt Cooper (*Time*

_____

5


REDACTED


8

REDACTED

magazine)

REDACTED

### *Libby's Claimed Basis for Knowledge About Wilson's Wife*

23. Libby testified in the grand jury that Tim Russert of *NBC* advised him by telephone on or about July 10 or July 11, 2003, that Wilson's wife worked for the CIA. Libby testified that he believed he was learning this information for the first time from Russert. Libby further testified that he thereafter spoke to reporters ^REDACTED^ Matt Cooper of *Time* magazine and Judith Miller of the *New York Times* and discussed with them the fact that Wilson's wife worked at the CIA relaying what he heard from Russert (and what Karl Rove also told him that Rove had learned from Robert Novak). Libby acknowledged that his own notes indicated that he had been advised by the Vice President in early June 2003 that Wilson's wife worked at the CIA. Libby maintained, however, that while he had learned that fact from the Vice President in June, he had forgotten about it by the time he spoke to Russert in early July. Further, according to Libby, he did not recall his conversation with the Vice President even when Russert allegedly told him about Wilson's wife's employment.

REDACTED                                                                          Because Libby's account is substantially at odds with essentially every material witness questioned to date, Libby's account is set forth in detail below and compared with the accounts of other witnesses.

### *Libby's Account Of His July 10 Conversation With Tim Russert*

24. More specifically, Libby has testified that he spoke with Tim Russert on July 10 or 11, 2003, when Libby called to complain to Russert in Russert's capacity as *NBC* Washington Bureau chief about what Libby perceived to be unfair coverage by Chris Matthews

REDACTED

of *MSNBC*. (Matthews was reporting that the Vice President and/or his staff knew about Wilson's trip to Niger and thus, in Matthews' view, knowingly allowed the President to mislead the public in the State of the Union.)  During that conversation, Libby claims that Russert advised Libby that Wilson's wife worked at the CIA and that "all" the reporters knew that information.  As noted above, Libby specifically recalls believing that he was learning that fact for the first time, even though by his own admission Libby's notes show that he had been told this fact by the Vice President the month before. (Exhibit I at pages 84-87.)  When confronted on whether he had discussed Wilson's wife with other government officials earlier that week – including White House press secretary Ari Fleischer, Director of Communications for the Vice President Cathie Martin and others – Libby's repeated refrain was that he could not have discussed the matter earlier in the week because he specifically recalled that he learned about Wilson's wife from Russert that week as if it were new information. (Exh I at 156-60).

     25.  Libby explained in detail how he was certain he said nothing to confirm that what Russert said was true and that in fact that he did not recall what he knew about Wilson and his wife at the time of the conversation:

> [Russert asked] "did you know that Wilson's wife works at the CIA?" And I was a little taken aback by that.  I remember being taken aback by it.  And I said – he may have said a little more but that was – he said that.  And I said, no, I don't know that.  <u>And I said no, I don't know that intentionally because I didn't want him to take anything I was saying as in any way confirming what he said, because at that point in time I did not recall that I had ever known, and I thought that this was something that he was telling me that I was first learning.  And so I said, no, I don't know that because I want to be very careful not to confirm it for him, so that he didn't take my statement as confirmation for him.</u>

> . . . [Libby then clarifies that he had made clear that the Russert conversation had been off the record]

> So then he said – I said – he said, sorry – he, Mr. Russert said to me, did you know that Ambassador Wilson's wife, or his wife, works at the CIA?  <u>And I said, no, I don't know that.  And then he said, yeah – yes, all of the reporters know it.</u>  And I said again, I don't know that . . . I just wanted to be clear that I wasn't confirming anything for him on this.  And you know, I was struck by what he was saying in that he thought it was an important fact, but I didn't ask him any more about it because I didn't want to be digging in on him, and he then moved on and finished the conversation . . .

(Exh. I at 143)

I - SECA - 10

REDACTED

### *Russert's Account of His Conversation With Libby*

26. Russert testified under oath that he had no recollection that he and Libby discussed Wilson's wife during that week. Russert recalled neither being advised by Libby that Wilson's wife worked at the CIA nor advising Libby of the same. Russert recalled that Libby did call to complain to him about Chris Matthews' coverage. Russert recalled that when he first read Novak's column on July 14, 2003, that he had a reaction of "wow" because reading the article was the first time he had heard of Wilson's wife's purported affiliation with the CIA. (Transcript of Russert Deposition annexed as Exhibit K). In addition, Russert had not heard any reporters talking about Wilson's wife working at the CIA before the Novak column appeared. Having not heard that Wilson's wife worked at the CIA, and not having heard that any reporters were saying that prior to Novak's July 14 column, it thus appears impossible that Russert advised Libby on July 10 or 11 that "all" the reporters were saying Wilson's wife worked at the CIA. Indeed, Russert advised that had he known that Wilson's wife was purported to be a CIA employee prior to reading Novak's column, he would have taken steps to have NBC investigate that story, which he has no recollection of doing.

### *Other Information Inconsistent with Libby's Account*

27. Moreover, the record developed in the course of this investigation suggests that as many as seven government officials discussed Wilson's wife's employment at the CIA with Libby *prior* to the date when Libby claims to have learned this information (for what he claims to have then believed was the first time) from Russert:

> (1) As indicated above, Libby now admits being told by the Vice President about Wilson's wife's employment in early June 2003;[6]
>
> (2) Under Secretary of State Marc Grossman recalls telling Libby in early June 2003 that "Joe Wilson's wife works for the CIA" and that "our people say that she was involved in the organization of the trip."

---

[6]

REDACTED

11

REDACTED

(3)    REDACTED    a former member of the communications staff for the Office of Vice President, recalls advising Libby    REDACTED    in June or early July 2003 (at a time that appears to be prior to the date of the purported Russert conversation) that she had heard that Wilson's wife worked at the CIA.

(4) David Addington, Counsel for the Office of the Vice President, recalls being asked privately by Libby in the week of July 7 what kind of paperwork the CIA would maintain if an employee's spouse were sent on a trip by the CIA. Addington testified that from the context of the question he understood Libby to be discussing Wilson and Wilson's trip to Niger.

(5) A CIA employee assigned to provide daily intelligence briefs to the Vice President and Libby has handwritten notes indicating that Libby referred to "Joe Wilson" and "Valerie Wilson" by those names in conversation with the briefer on June 14, 2003 -- a month before the Russert conversation.

(6)

REDACTED

After a June 2003 article about Iraq and the uranium issues that caused concern to Edelman and Libby, Edelman asked Libby whether information about how the Wilson trip came about could be shared with the press to rebut allegations that the Vice president sent Wilson. Edelman testified that Libby responded by indicating that there would be 'complications" at the CIA in disclosing that information publicly. Ambassador Edelman indicated that he understood that he and Libby could not further discuss the matter because they were speaking on an open telephone line and Edelman understood that this might involve classified information.

(7) Former White House press secretary Ari Fleischer,    REDACTED    testified that he went to lunch with Libby on Monday, July 7, 2003, and in a conversation Fleischer described as "weird," Libby told Fleischer that Wilson's wife worked at the CIA. Libby told Fleischer the information about Wilson's wife was "hush hush" or "on the QT." Thus, according to Fleischer, Libby *imparted* what Libby appeared to have considered sensitive information about Wilson's wife's employment three days *prior* to when he claims to have received it as "new" information during the Russert conversation.

28.

REDACTED

7

12

REDACTED

31.

REDACTED

32.

REDACTED

33.  Libby testified that Cooper then asked why Wilson was claiming that the Vice President had sent him to Niger if the Vice President had not.  Libby testified that he then explained to Cooper that Wilson might have heard something unofficial (and inaccurate) about the Vice President sending Wilson and "in that context" and "off the record" Libby told Cooper that "reporters are telling us" that Wilson's wife worked at the CIA "and I don't know if it's true." (Exh. I at 182-86.)  Libby testified several times that he told Cooper (and the other relevant reporters discussed below, including Miller) that he did not know if the information was

---

**REDACTED**

14

REDACTED

true or even if Wilson had a wife.[9]

34.

REDACTED

35.

REDACTED

---

[9] "And when I talked to the reporters about it, I explicitly said, you know, I don't know if this is true, I don't know the man, I don't know if he has a wife, but reporters are telling us that." (Exhibit J at 177.)

"And you're certain as you sit here today that every reporter you told that Wilson's wife worked at the CIA, you sourced it back to other reporters?"
A: "Yes, sir ...
(Exhibit J at 181.)

[10]

REDACTED

[11]

REDACTED

15

REDACTED

REDACTED                    Paragraph one of the subpoena

requested documents concerning conversations between July 6 and July 13 between Judith Miller
and a "government official with whom she met in Washington. D.C., on July 8, 2003, concerning
Valerie Plame ... or concerning Iraqi efforts to obtain uranium."

REDACTED

## Libby's Waiver of Confidentiality

   47. To the extent that a "reporter's privilege" is claimed to exist under the law,
Libby has waived its protections. Libby has executed a signed waiver which recites in pertinent
part:

> I have informed the Federal Bureau of Investigation of my recollection of any
> communications I have had with members of the media regarding the subject matters
> under investigation. I hereby waive any promise of confidentiality, express or implied,
> made to me by any member of the media in connection with any communications that I
> may have had with that member of the media regarding the subject matters under
> investigation, including any communications made "on background," "off the record,"
> "not for attribution," or in any other form. I request any member of the media with whom
> I may have communicated to fully disclose all such communications to federal law
> enforcement authorities. In particular, I request that no member of the media assert any
> privilege or refuse to answer any questions from federal law enforcement authorities on
> my behalf or for my benefit in connection with the subject matters under investigation.

(Exh. L)

   48. Libby has also described his version of his conversations with reporter Miller
under oath before the grand jury on two occasions. And, as discussed above, Libby has
apparently provided express consent (through his lawyer) for Cooper to testify.  Cooper testified
at his deposition that he agreed to testify because he was convinced based upon his attorney's
conversation with Libby's attorney that Libby voluntarily released Libby from any promise of
confidentiality. Thus, to the extent that Judith Miller calls into question the voluntariness of
Libby's waiver, she need look no further than to her own attorney (who represents Cooper as
well) who, according to Cooper, has assessed that Libby's waiver of confidentiality has been
voluntary.

REDACTED

78.

REDACTED

79.

REDACTED

80.

REDACTED

## The Need for the Reporters' Testimony

81.  The testimony of reporter Miller is central to the resolution of that part of the criminal investigation concerning Libby.  Her testimony is essential to determining whether Libby is guilty of crimes, including perjury, false statements and the improper disclosure of national defense information.[15]  The grand jury needs to know when Libby advised Miller about Wilson's wife – during their private meeting outside the White House on July 8 or during the three minute telephone call on July 12 – and whether Libby qualified his disclosure to Miller by

---

[15] If Libby knowingly disclosed information about Plame's status with the CIA, Libby would appear to have violated Title 18, United States Code, Section 793 if the information is considered "information respecting the national defense."  In order to establish a violation of Title 50, United States Code, Section 421, it would be necessary to establish that Libby knew or believed that Plame was a person whose identity the CIA was making specific efforts to conceal and who had carried out covert work overseas within the last 5 years.  To date, we have no direct evidence that Libby knew or believed that Wilson's wife was engaged in covert work.

28

REDACTED

stating that he had heard it only from a reporter and did not know if it were true. Miller's testimony is essential to determining whether Libby fabricated his claim that he only told reporters what he claimed he had heard from Russert without a belief that the information he was passing on was either true or classified.

82.

REDACTED

Miller could shed light on the context in which any conversation about Wilson's wife took place.

83.

REDACTED

## Exhaustion of Alternative Remedies

84. All reasonable alternatives to compelling the reporters' testimony have been explored. Indeed, the effort expended to date far exceeds what could ever be reasonably required. An experienced team of FBI agents has been working on the case since October 2003, led by Special Agent Jack Eckenrode then of the Inspection Division. At least six agents have been assigned to the case at any time and extensive forensic computer and telephone work is being done. Attorneys with significant experience have spent substantial time on the matter, including five attorneys from the Criminal Division of the Department of Justice: a Deputy Assistant Attorney General; the Chief, Deputy Chief and a Trial Attorney from the Counterespionage Section; and a Trial Attorney from the Public Integrity Section. All five attorneys are well versed in the facts and participating to varying degrees in interviews of witnesses, review of documents and examination of witnesses before the grand jury. From the United States Attorney's Office in Illinois, a number of senior attorneys have participated. Besides my own participation in the factual investigation, the First Assistant United States Attorney, the Chief of the Criminal Division, the Chief of Appeals and the Chief of Public Corruption have participated to varying degrees in the discussion of legal issues, including analyzing the relevant statutes, analyzing the First Amendment issues and determining the available means to obtain electronic evidence. An additional attorney from the appellate section has spent substantial time on legal research and briefing in recent months.

29

REDACTED

85.  The Department of Justice has been investigating this matter since about October 1, 2003, and my participation as Special Counsel began in late December 2003.

REDACTED

86.

REDACTED

87.

REDACTED

30

REDACTED

88. In short, wherever the line should be drawn in requiring the government to explore alternative remedies, we respectfully submit that any reasonable threshold that might be set has been far exceeded.

## The Subpoenas Are Issued Legitimately and Not For Purposes to Harass

89. It is important to bear in mind that the applicable regulations do not "create any legally enforceable right in any person." (See Title 28 Code of Federal Regulations, Section 50.10, a copy of which is annexed as Exhibit 0, at paragraph (n)). Nonetheless, issuance of the subpoenas at issue was consistent with the principles set forth in those regulations. First, the subpoenas are narrowly drafted after a careful balancing of the First Amendment interests. Indeed, as set forth in the next section, a number of reporters, and their toll records, are not being subpoenaed at this time. Most will likely never be subpoenaed.

90.

REDACTED

91.

REDACTED

92. Subpoenas were issued to Matt Cooper and *Time* magazine, as well as Tim Russert and *NBC*. After motions to quash the subpoenas were denied, Russert and *NBC* agreed to a deposition. After Cooper and *Time* were held in contempt, but prior to appeal, they agreed to a deposition.

REDACTED

93.

REDACTED

31

REDACTED

REDACTED

94. In deciding whether to issue subpoenas to reporters, I have carefully weighed and balanced the competing interests of the First Amendment and the public interest in the free dissemination of ideas and information and the countervailing interests in effective law enforcement and the fair administration of justice: namely determining whether a crime was committed and whether someone should be prosecuted for that crime. One key factor in deciding

16

REDACTED

I-SECA - 32

REDACTED

whether to issue a subpoena has been whether the "source" to be identified appears to have leaked to discredit the earlier source.(Wilson) as opposed to a leak who revealed information as a "whistleblower" (e.g. the source for the September 28 *Washington Post* column). The First Amendment interests are clearly different when the "source" being sought may have committed a crime in order to attack a person such as Wilson who, correctly or incorrectly, sought to expose what he perceived as misconduct by the White House. Indeed, failure to take effective steps to identify such sources might chill future whistleblowers such as Wilson, thus impairing "a reporter's responsibility to cover as broadly as possible controversial public issues." (28 CFR Section 50.10.)  We have also not issued subpoenas to date where the reporter *may* have relevant information but it is not shown to be *likely* that the reporter does     REDACTED
.or where the information is not essential to determining guilt or innocence of a crime reasonably likely to be charged

95.

REDACTED

96.  The instant subpoenas were issued only after first making certain that any efforts at a negotiated resolution would be fruitless.  Indeed, Special Counsel has engaged in fruitful negotiations with other members of the media.

97.  There are reasonable grounds to believe based on information from nonmedia sources that a crime has occurred – both the improper disclosure of national defense information to the media and perjury before the grand jury – and that the testimony of reporters Miller is essential to a successful investigation and may directly establish Libby's guilt or innocence, and     REDACTED
The subpoenas are not issued to obtain peripheral, nonessential or speculative information.

98.  There are no alternative nonmedia sources to provide accounts of what Libby told Miller – all others, including Libby, have been questioned extensively.     REDACTED

33

REDACTED

REDACTED    . And the subpoenas are issued to verify published information and surrounding circumstances relating to the accuracy of the published information, including information published in the *Washington Post* that "top White House officials" were contacting reporters prior to July 14, 2003, and more specific information published in the *Washington Post* that one of its reporters was told about Wilson's wife on July 12, 2003. And the subpoenas are directed at material information regarding a limited subject matter. Miller's subpoena focuses on particular conversations with a single person (Libby) on given dates.    REDACTED

99. Indeed, on the facts of this case, it is hard to imagine a stronger case: Libby claims that he told Miller only what he heard "reporters are telling us." Thus, we are in the remarkable position of having identified the person who spoke to Miller and having obtained that person's consent to having Miller disclose the conversation. To deprive the grand jury of the ability to hear and assess Miller's account of what Libby told her is to ask the Special Counsel and the grand jury to make a decision on prosecution partly in the blind – where it is unknown whether the information will be inculpatory or exculpatory. The possible consequences of a mistake – either the failure to charge what would otherwise be determined to involve a crime carried out to discredit a source who was a whistleblower or, worse, charging a confidential source in good faith with a crime where the claim of a "reporter's privilege" deprived the investigation of exculpatory information — could do far more to undermine both First Amendment interests and the fair administration of justice than could enforcement of the subpoenas. Indeed, the testimony of reporter Cooper was distinctly different from what Libby testified    REDACTED    Given that Libby's account of conversations has been largely inconsistent with every other material witness to date.    REDACTED    the only way to make an appropriate decision as to whether Libby committed a crime in his conversation with Ms. Miller – or in his sworn testimony describing the same – is to question Miller.

100.

REDACTED

34

Patrick J. Fitzgerald
Special Counsel

Sworn to before me this
27th day of August 2004

Lucille Moore
Notary Public

"OFFICIAL SEAL"
Lucille Moore
Notary Public, State of Illinois
My Commission Exp. 07/11/2005

35