05-CR-394 -- EXHIBIT G



**United States Government Accountability Office**
**Washington, DC 20548**

B-302582

September 30, 2004

The Honorable Ted Stevens
Chairman
Committee on Appropriations
The Honorable Robert C. Byrd
Ranking Minority Member
Committee on Appropriations
United States Senate

The Honorable C.W. Bill Young
Chairman
Committee on Appropriations
The Honorable David Obey
Ranking Minority Member
Committee on Appropriations
House of Representatives

Subject: *Special Counsel and Permanent Indefinite Appropriation*

The Government Accountability Office (GAO) is required to audit twice a year the
expenditures by independent counsels and certain special counsels paid from the
permanent indefinite appropriation.[1]  In the course of auditing independent counsel
expenditures for the period ending March 31, 2004, we learned that the Department of
Justice was using the permanent indefinite appropriation to pay the expenses of the
investigation by Special Counsel Patrick J. Fitzgerald.  Mr. Fitzgerald continued to
perform his duties as a U.S. Attorney after his appointment as Special Counsel.  This
is the first time that the expenses of an investigation by a United States Attorney

---

[1] The independent counsel law expired in July 1999, although it continues in effect
with respect to matters pending before previously appointed independent counsels.
28 U.S.C. § 599, as amended by Pub. L. No. 103-270, § 2, 108 Stat. 732 (June 30, 1994).
Section 596(c) of title 28 of the United States Code requires covered independent
counsels to report on their expenditures on a semiannual basis and requires GAO to
audit these statements.  In addition, the permanent indefinite appropriation
established by Pub. L. No. 100-202, § 101(a), title II, 101 Stat. 1329, 1329-9 (1987), 28
U.S.C. § 591 note (2000), requires us to perform semiannual financial reviews of the
expenditures from the permanent indefinite appropriation.

appointed to serve as Special Counsel who continues to serve as a United States Attorney have been paid from the permanent indefinite appropriation. In addition, Department of Justice regulations at 28 C.F.R. Part 600 (2003) provide that Special Counsels shall be selected from outside the government.

Given our responsibility to audit the fund, the use of the account to finance Special Counsel Fitzgerald's activities, and the provisions of 28 C.F.R. Part 600 (2003), we initiated inquiries with the Department of Justice to assure ourselves of the availability of this account to defray his expenses.[2]  In considering this matter, we requested and received the written views of the Department of Justice. We also met with officials of the Department to discuss their views and obtained additional comments and information.  Finally, we reviewed the laws and their legislative histories, regulations, court decisions, and past practices of the Department of Justice, as they relate to this matter.

For the reasons discussed below, we do not object to the use of the permanent indefinite appropriation to fund Special Counsel Fitzgerald's expenses. Unlike the expired independent counsel law, the permanent indefinite appropriation does not require that a Special Counsel be appointed from outside the government.  The Department, in appointing Special Counsel Fitzgerald under "other law", has afforded him independence by delegating all of the Attorney General's authority with respect to the investigation and instructing him to exercise that authority independent of the control of any officer of the Department.  Finally, the Part 600 regulations are not substantive and may be waived by the Department.

**Background**

On December 30, 2003, Deputy Attorney General James B. Comey, acting in his capacity as Acting Attorney General, appointed Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, as Special Counsel to investigate the alleged unauthorized disclosure of a CIA employee's identity.  Special Counsel Fitzgerald's delegation reads as follows:

> "By the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509, 510, and 515, and in my capacity as Acting Attorney General pursuant to 28 U.S.C. § 508, I hereby delegate to you all the authority of the Attorney General with respect to the Department's investigation into the alleged unauthorized disclosure of a CIA employee's identity, and I direct you to exercise that authority as Special Counsel independent of the supervision or control of any officer of the Department."[3]

---

[2] The Government Accountability Office is authorized by 31 U.S.C. § 3526 (2000) to settle the accounts of the government and may take exception to illegal, improper, or unauthorized payments.

[3] Letter from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, United States Attorney, Dec. 30, 2003.

In February 2004, Acting Attorney General Comey clarified Special Counsel Fitzgerald's delegation of authority to state that the authority previously delegated to him is plenary. It also states, "Further, my conferral on you of the title of 'Special Counsel' in this matter should not be misunderstood to suggest that your position and authorities are defined and limited by 28 CFR Part 600."[4]

Following his appointment as Special Counsel, Mr. Fitzgerald continued to perform his duties as United States Attorney. As a result of our activities in connection with the audit of the Independent Counsel expenditures for the six-month period ending March 31, 2004, we learned that the Department of Justice was charging the expenses of Special Counsel Fitzgerald to the permanent indefinite appropriation established " . . . to pay all necessary expenses of investigations and prosecutions by independent counsels appointed pursuant to the provisions of 28 U.S.C. 591 *et seq.* or other law . . ."[5] In the following section we discuss two issues: whether the permanent indefinite appropriation is available to fund Special Counsel Fitzgerald's expenses and whether the Part 600 regulations, which among other things require the appointment of Special Counsel from outside the government, can be waived.

### Discussion

As you are aware, the authority to appoint independent counsels pursuant to the provisions of 28 U.S.C. §§ 591 *et seq.* expired on June 30, 1999. However, the permanent indefinite appropriation remains available to pay the expenses of an independent counsel (1) who was appointed by the Special Division of the United States Court of Appeals for the District of Columbia pursuant to the provisions of 28 U.S.C. §§ 591 *et seq.* whose investigation was underway when the law expired[6] or

---

[4] Letter from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald, United States Attorney, Feb. 6, 2004. The Department of Justice adopted 28 C.F.R. Part 600 (64 Fed. Reg. 37038, July 9, 1999), to replace the procedures of the expired Independent Counsel Reauthorization Act of 1994. While the Part 600 procedures provide that a Special Counsel appointed by the Attorney General (or in cases when the Attorney General is recused, by the Acting Attorney General) is to be selected from outside the government, the delegation clearly states that Special Counsel Fitzgerald is not a Special Counsel whose appointment is subject to Part 600.

[5] Pub. L. No. 100-202, § 101(a) [title II], 101 Stat. 1329, 1329-9 (1987).

[6] The law continues in effect with respect to matters pending before an independent counsel until the independent counsel determines that such matters have been completed. 28 U.S.C. § 599 (2000).

B-302582

(2) who was appointed under "other law."[7] Under the expired law, a person appointed as an independent counsel could not hold "any office of profit or trust under the United States, 28 U.S.C. § 593(b)(2) (2000)."[8] The purpose of the qualification was to avoid the public perception of an actual or apparent conflict of interest existing between the investigator and those being investigated for alleged violations of law.[9]

The permanent indefinite appropriation is available to pay all necessary expenses of investigations of independent counsels appointed under other law. However, the term "independent counsel" is not defined in the permanent indefinite appropriation. About the time the independent counsel law was being considered for reauthorization in 1987, legal challenges were underway regarding the constitutionality of the procedure followed to appoint independent counsels. Consequently, to avoid interruption of ongoing investigations should the law be ruled unconstitutional by a court, the Attorney General appointed the same persons to serve as independent counsels under the statutory authority that was relied upon to appoint Special

---

[7] The Department has at different times in various regulations characterized individuals appointed under other law (to investigate individuals who may have been proper subjects for investigation under the expired independent counsel law) as independent counsels or special counsels. *Compare* Justice's current regulation at 28 C.F.R. Part 600—General Powers of Special Counsel (July 1, 2003) with the regulation it replaced at 28 C.F.R. Part 600—General Powers of Independent Counsel (July 1, 1999). *See* 28 U.S.C. Parts 601 through 603 (July 1, 2003) relating to the Jurisdiction of the three Independent Counsels appointed under other authority for *Iran/Contra, In re Franklyn Nofziger* and *In re Madison Guaranty Savings & Loan Association.* Independent and special counsels are sometimes referred to as regulatory independent counsels

[8] A similar requirement was included in the independent counsel law as first enacted in 1978 and all subsequent reauthorizations. *See* 28 U.S.C. § 593(d) (Supp. III 1979) as enacted by section 601 of the Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824, 1869 (Oct. 26, 1978); 28 U.S.C. § 593(d) (1982) as amended by section 2(a)(1)(A) of the Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, 96 Stat. 2039 (Jan. 3, 1983); 28 U.S.C. § 593(b)(2) (1988) as amended by section 2 of the Independent Counsel Reauthorization Act of 1987, Pub. L. No. 100-191, 101 Stat. 1293, 1298 (Dec. 15, 1987); and 28 U.S.C. § 593(b)(2) (1994) as amended by the Independent Counsel Reauthorization Act of 1994, Pub. L. No. 103-270, 108 Stat. 732 (June 30, 1994).

[9] *See*, for example, S. Rep. No. 95-170, accompanying S. 555, at 65-66 (1977) discussing the proposed language of 28 U.S.C. § 593(d). Upon the enactment of S. 555 into law, it became known as the Ethics in Government Act of 1978. *See also* the Conference Committee Report accompanying S. 555, H.R. Rept. 95-1756, 77 (1978) for discussion on the origin of title VI to the act enacting the special prosecutor provisions into law. The act was subsequently amended to change the name special prosecutor to independent counsel.

Counsel Fitzgerald.[10] Thus, the independent counsels appointed under "other law" around the time that the Congress was considering the Department of Justice appropriation act for fiscal year 1988 (which enacted the permanent indefinite appropriation into law) were the independent counsels that also had been appointed in conformity with the requirements of the independent counsel law.[11]

In a meeting with Department of Justice officials,[12] the Department explained its view that use of the permanent indefinite appropriation to pay expenses of a U.S. Attorney appointed to serve as Special Counsel who continues to perform his duty as a U.S. Attorney is appropriate. The alleged violation that Special Counsel Fitzgerald is investigating involves the rank and level of government official that clearly would have been within the scope of the expired independent counsel law and the investigation of which could have been funded by the permanent indefinite appropriation. Additionally, the Department views the use of the permanent indefinite appropriation as important to facilitate Special Counsel Fitzgerald's investigation by freeing him from possible budget constraints that potentially might serve to limit his activities.

---

[10] *See* Offices of Independent Counsel; General Powers and Establishment of Independent Counsel—Iran/Contra, 52 Fed. Reg. 7270, Mar. 10, 1987, and Jurisdiction; Independent Counsel Offices; Regarding Franklyn C. Nofziger, 52 Fed. Reg. 22438, June 12, 1987, and *In re Sealed Case*, 829 F.2d 50, 52-53 (D.C. Cir. 1987), discussing the Attorney General's appointment of Lawrence Walsh as regulatory independent counsel under 28 C.F.R. Part 600 (1987) to mirror the appointment of Lawrence Walsh under the independent counsel law. Unlike the court that considered the effect of the predecessor Part 600, we have been unable to identify support for the proposition that 28 C.F.R. Part 600 issued in 1999 was intended to mirror the requirements of the expired independent counsel law.

[11] Heretofore, persons appointed regulatory independent/special counsels whose expenses have been paid from the permanent indefinite appropriation were not officers or employees of the United States government, including the first regulatory special counsel appointed following the 1999 amendment to 28 C.F.R. Part 600. They include Robert Fiske, appointed regulatory independent counsel on January 20, 1994, and John Danforth, appointed regulatory special counsel on September 9, 1999.

[12] Meeting on May 20, 2004, attended by Paul Colborn, Special Counsel, Office of Legal Counsel, Stuart Frisch, General Counsel, Justice Management Division, and Melinda Morgan, Acting Director of Finance, Justice Management Division, representing the Department of Justice, and Susan A. Poling, Associate General Counsel, Richard T. Cambosos, Senior Attorney, and Hodge Herry, Assistant Director, Financial Management and Assurance, representing GAO. *See also* letter from Paul R. Corts, Assistant Attorney General for Administration, Department of Justice, to Anthony H. Gamboa, General Counsel, GAO, April 1, 2004, p. 2.

Since the permanent indefinite appropriation is available for independent counsels, we looked for indicia of independence of Special Counsel Fitzgerald. The parameters of his authority and independence are defined in the appointment letters which delegate to Special Counsel Fitzgerald all (plenary) the authority of the Attorney General with respect to the Department's investigation into the alleged unauthorized disclosure of a CIA employee's identity with the direction that he exercise such authority independent of the supervision or control of any officer of the Department.[13] In addition, Department officials informed us that the express exclusion of Special Counsel Fitzgerald from the application of 28 C.F.R. Part 600, which contains provisions that might conflict with the notion that the Special Counsel in this investigation possesses all the power of the Attorney General, contributes to the Special Counsel's independence.[14] Thus, Special Counsel Fitzgerald need not follow the Department's practices and procedures if they would subject him to the approval of an officer or employee of the Department. For example, 28 C.F.R. § 600.7 requires that a Special Counsel consult with the Attorney General before taking particular actions. The consulting requirement would seem to be inconsistent with the notion that Special Counsel Fitzgerald possesses the plenary authority of the Attorney General. The Department also stated it would continue to provide the financial information for Special Counsel Fitzgerald as it has done with respect to other independent counsels appointed under "other law" whose expenses were paid from the permanent indefinite appropriation.[15]

Acting Attorney General Comey appointed Special Counsel Fitzgerald under 28 U.S.C. §§ 509, 510 and 515.[16] The Department has relied upon such authority in the past to

---

[13] *See supra* notes 3 and 4.

[14] *See supra* note 12.

[15] The Department has instituted procedures to separately account for costs associated with Special Counsel Fitzgerald's investigation of the alleged unauthorized disclosure of the identity of the CIA operative that are charged to permanent indefinite appropriation. We audited the statement of expenditures for the Office of Special Counsel Fitzgerald and found that (1) the statement of expenditures was presented fairly, in all material respects, in conformity with U.S. generally accepted accounting principles, (2) the Special Counsel had effective internal control over financial reporting and compliance with laws and regulations, and (3) there was no reportable noncompliance with laws and regulations we tested. Additional information on our audit of the Office of Special Counsel Fitzgerald can be obtained from our report, *Financial Audit: Independent and Special Counsel Expenditures for the Six Months Ended March 31, 2004* (GAO-04-1014, Sept. 30, 2004).

[16] These statutes establish the Attorney General's overall responsibility for Department functions, his authority to delegate Department functions to other Department officers, and authority to direct an individual Department officer or any attorney specially appointed under law to conduct any kind of legal proceeding, civil

appoint regulatory independent counsel from outside the government. In 1994, the Department first determined that it was authorized to finance the activity of a regulatory independent counsel who was appointed from outside the government pursuant to such authority from the permanent indefinite appropriation. We agree with the Department that the same statutory authorities that authorize the Attorney General (or Acting Attorney General) to delegate authority to a U.S. Attorney to investigate and prosecute high ranking government officials are "other law" for the purposes of authorizing the Department to finance the investigation and prosecution from the permanent indefinite appropriation. It should be noted that we have not objected to the use of the permanent indefinite appropriation to fund the expenses of regulatory independent counsels appointed from outside the government pursuant to such authority.[17]

The remaining issue is whether Part 600 can be waived by the Attorney General or acting Attorney General. We examined Part 600 and found it was issued in 1999 to replace the procedures of the expired Independent Counsel Reauthorization Act of 1994. In our view, Part 600 is not a substantive (legal) limitation on the authority of the Acting Attorney General to delegate departmental functions to Special Counsel Fitzgerald. First, 28 C.F.R. § 600.10 states that the regulations are "not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or equity, by any person or entity, in any matter, civil, criminal, or administrative." Further, in the supplemental information accompanying the issuance of Part 600, the Department explained that the effective date of the rule did not have to be delayed 30 days after publication because it was not a substantive rule, citing 5 U.S.C. §§ 553(d), 552(a)(1)(D). 64 Fed. Reg. 37038, at 37041 (July 9, 1999).

Finally, the only statute cited as authority for 28 C.F.R. Part 600 that expressly authorizes the Department to issue regulations is 5 U.S.C. § 301 (2000). It provides that the head of executive agencies may "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use and preservation of its records, papers and property..." The power conferred by 5 U.S.C. § 301 is administrative and not

---

or criminal, including grand jury proceedings whether or not he is a resident of the District in which the proceeding is brought.

[17] Department of Justice, Memorandum to Stephen R. Colgate, Assistant Attorney General for Administration, from Stuart Frisch, Acting General Counsel, *Availability of the Independent Counsel Appropriation to Pay Expenses of an Independent Counsel Appointed by the Attorney General*, Jan. 24, 1994. The determination related to the investigation by Robert B. Fiske, Jr., who was appointed by Attorney General Janet Reno on January 24, 1994, during a period between the expiration on December 15, 1992 and reauthorization on June 30, 1994, of the independent counsel law. *See*, GAO, *Financial Audit, Expenditures by Four Independent Counsels for the Six Months Ended March 31, 1994*, GAO/AIMD-95-112 (Washington, D.C.: March 31, 1995).

legislative. *Chrysler Corp. v. Brown*, 441 U.S. 281, 309 (1979); *United States v. George*, 228 U.S. 14, 21-22 (1914). It follows that such regulations governing internal procedures issued under this statute do not have the force and effect of law. *See Einhorn v. DeWitt*, 618 F. 2d 347 (5th Cir. 1980) (IRS procedural rules issued under 5 U.S.C. § 301 governing the internal affairs of the IRS do not have force and effect of law). Thus, 28 C.F.R Part 600 does not act as a substantive limitation on the Attorney General's (or Acting Attorney General's) authority to delegate authority to a U.S. Attorney to serve as a Special Counsel to investigate high ranking government officials and it may be waived. *See* 60 Comp. Gen. 208, 210 (1981) (an agency could waive its internal guidelines prescribing the specific evidence required to demonstrate a grantee's financial responsibility when the agency was otherwise satisfied that the government's interests were adequately protected). The Department was not limited by 28 C.F.R. Part 600 when it exercised its authority under 28 U.S.C. §§ 508, 509, 510 and 515 and appointed Special Counsel Fitzgerald from within the Department to investigate the alleged unauthorized leak of a CIA employee' identity.

We also note that the Part 600 regulations contemplate an outside Special Counsel when "it would be in the public interest to appoint an outside Special Counsel to assume responsibility" for an investigation and that an investigation by the Department would present a conflict of interest or other extraordinary circumstance. 28 C.F.R. §600.1(b). We defer to the Department's judgment in this regard.

**Conclusion**

Upon review and consideration, we do not object to the Department's determination that the permanent indefinite appropriation is available to pay the expenses of Special Counsel Fitzgerald's investigation. Admittedly one might infer from events occurring around the time that the Congress was considering establishing the permanent indefinite appropriation that it was within the Congress' contemplation that the appropriation would be used to pay the expenses of an independent counsel possessing the degree of independence similar to that possessed by an independent counsel appointed under 28 U.S.C. §§ 591 *et seq.* However, such an inference is insufficient to support our reading into the law a limitation on the use of the permanent indefinite appropriation to pay for investigations solely by Special Counsels appointed from outside the government. The independence conferred by the delegation of authority to Special Counsel Fitzgerald from the Department of Justice is consistent with a fair reading of the independence required of an "independent counsel" appointed under "other law." Finally, Part 600 regulations do not have the force and effect of law and may be waived by the Department. Thus we do not view the payment of the expenses associated with Special Counsel Fitzgerald's investigation from the permanent indefinite appropriation to be improper or unauthorized simply because he was not appointed from outside the government and continues to serve as a United States Attorney.

Should you have any questions regarding this matter, you may contact Susan A.
Poling, Associate General Counsel, on 202-512-2667 or Richard T. Cambosos, Senior
Attorney, on 202-512-8263.

/SIGNED/

Anthony H. Gamboa
General Counsel

cc:  Chairman and Ranking Minority Member
     Committee on Governmental Affairs
     United States Senate

     Chairman and Ranking Minority Member
     Committee on the Judiciary
     United States Senate

     Chairman and Ranking Minority Member
     Subcommittee on Commerce, Justice, State and the Judiciary
     Committee on Appropriations
     United States Senate

     Chairman and Ranking Minority Member
     Committee on Government Reform
     House of Representatives

     Chairman and Ranking Minority Member
     Committee on the Judiciary
     House of Representatives

     Chairman and Ranking Minority Member
     Subcommittee on Commerce, Justice, State,
         The Judiciary and Related Agencies
     Committee on Appropriations
     House of Representatives

B-302582

# 05-CR-394 -- EXHIBIT H

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| In re: Special Counsel Investigation | : | **Case No. 04-MS-297 (D.D.C.)** |
|  | : | **(Chief Judge Thomas F. Hogan)** |
| (Grand Jury Subpoena to Tim Russert) | : |  |
|  | : | **UNDER SEAL** |
|  | : |  |

**FILED**

**JUN 1 6 2004**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## GOVERNMENT'S RESPONSE TO MOTION TO QUASH GRAND JURY SUBPOENA

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, SPECIAL

COUNSEL, responds as follows to the motion to quash the grand jury subpoena served on

Tim Russert:

### INTRODUCTION

The Special Counsel is conducting a grand jury investigation into whether violations

of federal law occurred relating to unauthorized disclosure by government employees of

information concerning the identity of a purported CIA employee. Because the motion to

quash has been filed by a prospective witness in an ongoing grand jury investigation, the

movant and the government are filing their legal briefs under seal. In addition, the

government is filing *ex parte* and under seal the Affidavit of Special Counsel Patrick J.

Fitzgerald.

As this Court is well aware, the secrecy of grand jury proceedings must be

maintained in order to encourage voluntary participation, and full and frank testimony, of

1

3

A.    **Department of Justice Guidelines**

The Department of Justice guidelines for issuing subpoenas to news media as set forth

in 28 C.F.R. § 50.10 and United States Attorney's Manual § 9-2.161 provide that subpoenas

for testimony of members of the news media must be approved by the Attorney General,[12]

and should meet the following standards:

(a)    "In criminal cases, there should be reasonable grounds to believe, based on nonmedia sources, that a crime has occurred, and that the information sought is essential to a successful investigation–particularly with reference to establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information." § 50.10(f)(1);

(b)    Before issuing a subpoena to a member of the news media, all reasonable efforts should be made to obtain the desired information from alternative sources. § 50.10(b); § 50.10(f)(3);

(c)    Wherever possible, subpoenas should be directed at information regarding a limited subject matter and a reasonably limited period of time. Subpoenas should avoid requiring production of a large volume of unpublished materials and provide reasonable notice of the demand for documents. § 50.10(f)(6);

(d)    "The use of subpoenas to members of the news media should, except under exigent circumstances, be limited to the verification of published information and to such surrounding circumstances as relate to the accuracy of the published information." § 50.10(f)(4); and

(e)    When issuance of a subpoena to a member of the media is contemplated, the government shall pursue negotiations with the relevant media organization. The negotiations should seek accommodation of the interests of the grand jury and the media. "Where the nature of the investigation permits, the government should make clear what its needs are in a particular case as well as its

_____

[12] As set forth in the Affidavit of Special Counsel, prior to issuing the instant subpoena, Special Counsel determined that its issuance complied with all relevant Department of Justice guidelines. The movant does not contest the Special Counsel's authority to approve subpoenas to members of the media in connection with the instant investigation.

willingness to respond to particular problems of the media." § 50.10(c).

More generally, the guidelines provide that determinations regarding the issuance of subpoenas to members of the news media should be made with a goal of striking "the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice," (§ 50.10(a)), and "avoiding claims of harassment" (§ 50.10(f)(5)).

## B.    Balancing Test Applicable in Civil Cases

As discussed above, the D.C. Circuit has held that, in balancing "the public interest in protecting the reporter's sources against the private interest in compelling disclosure" in the context of civil litigation, the district court should consider (a) whether the information sought "is of central importance" to the litigant's claim or defense; (b) whether the litigant has exhausted reasonable alternative sources of the information; and (c) whether the journalist is a party to the action. *Zerilli v. Smith*, 656 F.2d 705, 712-14 (D.C. Cir. 1981). *See also Alexander v. FBI*, 186 F.R.D. 21, 49 (D.D.C. 1998). The first two of these factors overlap with the DOJ guidelines. *See* 28 C.F.R. § 50.10(f). The third factor, whether the journalist is a party, is generally only relevant where the journalist is the defendant, in which case compliance is generally required. *See Anderson v. Nixon*, 444 F. Supp. 1195, 1199 (D.D.C. 1978)("balancing" unrealistic where newsman himself has provoked legal controversy concerning which confidential sources may have relevant information; in such cases, disclosure of confidential sources is required).

C.    **The Subpoena Meets and Exceeds DOJ Guidelines and Easily Satisfies the Balancing Test Applicable in Non-Grand Jury Settings.**

*The Need for the Information*

As described in the Affidavit of Special Counsel, there are reasonable grounds to believe, based on substantial evidence obtained from non-media sources, that one or more crimes have occurred. *See* 28 C.F.R. § 50.10(f)(1). Specifically, there is reason to believe that one or more federal criminal statutes were violated in connection with disclosures to the news media of information relating to the CIA employment of Ambassador Joseph Wilson's wife (Valerie Plame), and in statements made to federal investigators, and testimony given to the grand jury, regarding those disclosures.

There is also reason to believe that the information sought by the subpoena is essential to a successful investigation, particularly with respect to guilt or innocence. *See id.* The subpoena seeks information related to specific telephone conversations between the movant and Lewis Libby, Chief of Staff to Vice President Richard Cheney, on or about July 10, 2003, and any follow up conversations. As described in the Affidavit of Special Counsel, this testimony bears a direct relationship to the grand jury's investigation and is expected to constitute direct evidence of guilt or innocence. By definition, evidence needed to establish guilt or innocence is "essential," and "goes to the heart" of a criminal case.

The movant argues that he should not be compelled to comply with the subpoena because his testimony may not be "crucial," and may be crucial only to matters other than the

26

"the unlawful disclosure of Ms. Plame's identity," which he characterizes as the "core mission" of the Special Counsel and grand jury. As an initial matter, the Court can determine based on the Affidavit of Special Counsel the specific issues to which the movant's testimony is relevant, and why that testimony is in fact essential to this investigation.. More fundamentally, however, movant's argument presupposes incorrectly that the grand jury's investigatory function may be artificially circumscribed. As the Supreme Court has made clear, "[t]he function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *See United States v. R. Enterprises*, 498 U.S. 292, 297 (1991). *See also Branzburg v. Hayes*, 408 U.S. 665, 701 (1972)("A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'")(*quoting United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970)). Moreover, to the extent that movant suggests or implies that inquiry into possible criminal obstruction of the investigation cannot satisfy balancing test, it cannot seriously be contended that crimes committed during the course of, and for the purpose of obstructing, the grand jury's investigation are outside the scope of the grand jury's, or the Special Counsel's, authority.

In light of the grand jury's "unique role" in the criminal justice system, the government cannot be required to show that information is "crucial" to establish guilt or innocence, or even probable cause, in order to be "essential" to the investigation. *R.*

*Enterprises*, 498 U.S. at 297-99 (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973)). Rather, the issuance of a subpoena to a member of the media is justified if there is some possibility that the information sought by the subpoena is "relevant to the general subject of the grand jury's investigation" *(United States v. R. Enterprises*, 498 U.S. at 301), and not merely "peripheral" or "speculative." 28 C.F.R. § 50.10(f)(1). To interpret the term "essential" as used in the DOJ guidelines any more narrowly would result in impeding the grand jury's investigation and "frustrating the public's interest in the fair and expeditious administration of the criminal laws." *R. Enterprises*, 498 U.S. at 297-99 (quoting *United States v. Dionisio*, 410 U.S. 1, 17 (1973)).

Therefore, the subpoena meets and exceeds the standards set forth in § 50.10(f)(1) of the DOJ guidelines, as well as the first prong of the balancing test applicable to civil actions under D.C. Circuit law.

*Lack of Alternative Sources of Information*

As described in the Affidavit of Special Counsel, prior to the issuance of the challenged subpoena, extensive efforts were made to obtain relevant information from alternative sources. *See* §§ 50.10(b) and 50.10(f)(3). However, because the movant was the only other party to the telephone conversations concerning which the movant's testimony is sought, there exists no alternative source of the information sought by the subpoena. Therefore, the subpoena meets both § 50.10(b) and (f) of the DOJ guidelines (*see In re Grand Jury 95-1*, 59 F. Supp. 2d 1, 6 (D.D.C. 1996)), and the second prong of the *Zerilli*

28

balancing test (*see, e.g., N.L.R.B. v. Mortensen*, 701 F. Supp. 244, 249 (D.D.C. 1988)(compliance required where reporters were the only other participants in conversations with source and, thus, were the "direct and most logical source" of information regarding statements made during conversations)).

### *Limited Scope of the Subpoena*

The information sought by the subpoena is appropriately limited to specific topics and time periods. *See* 28 C.F.R. §§ 50.10(f)(4) and 50.10(f)(6). Specifically, the information sought is strictly limited to one or more conversations between the movant and a single named individual, Lewis Libby, on or about July 10, 2003 (and any follow up conversations), which involved Libby complaining to the movant in his capacity as NBC Bureau Chief about the on-the-air comments of another NBC correspondent. The subpoena does not seek the production of any documents.

The extremely limited scope of the information sought by the subpoena cannot possibly be characterized as a "fishing expedition;" to the contrary, it is obvious that there is a real possibility that the information sought will be relevant, and of substantial importance, to the investigation. *See In re Grand Jury 95-1*, 59 F. Supp. 2d 1, 8 (D.D.C. 1996). In addition, because the subpoenaed testimony is essential to the investigation and is not available from any alternative source, it appropriately is not limited to the "verification of published information" or surrounding circumstances related to the accuracy of published information. *See* 28 C.F.R. § 50.10(f)(4); *In re Grand Jury 95-1*, 59 F. Supp. 2d at 8 (fact

that requested information was essential to investigation, and was unavailable from alternative sources created "exigent circumstances" sufficient to justify subpoena's request for information beyond mere verification of accuracy of subpoenaed documents).

Thus, the subpoena meets and exceeds DOJ guideline § 50.10(f).

*Unsuccessful Negotiations with Movant*

Prior to issuing the challenged subpoena, the Special Counsel, in good faith, attempted to negotiate with the movant and his counsel to obtain movant's voluntary testimony. Specifically, after receiving an agreement from the movant's counsel to engage in negotiations "off the record," meaning that the content of the negotiations would not be reported as news by NBC, the Special Counsel engaged in negotiations to obtain the movant's voluntary testimony. On May 13, 17, and 18, the Special Counsel and the movant, through counsel, engaged in negotiations during which the Special Counsel explained: (a) the limited scope of the desired testimony; (b) the fact that Lewis Libby, the only other participant in the subject conversations, had waived any agreement of confidentiality with respect to such conversations; and (c) Special Counsel's assessment that the request for the movant's testimony complied with Department of Justice guidelines in all respects.

On May 20, 2004, counsel for NBC informed the Special Counsel that, while he would agree to preserve any relevant notes, tapes, or other documents, the movant would not agree to provide testimony. Thus, despite the Special Counsel's efforts to negotiate in good faith, the movant was unwilling to provide any information absent a Court order compelling

30

him to do so.

Given the Special Counsel's attempts to negotiate voluntary compliance, the subpoena meets DOJ guideline § 50.10(c).

### Balancing of Competing Interests

Prior to the issuance of the subpoena, the Special Counsel determined that the subpoena struck "the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice." *See* 28 C.F.R. § 50.10(a). One consideration is that the investigation focuses on the improper release of information for possibly purely political or retaliatory reasons, rather than the release of information in the nature of "whistleblowing." In this case, the public's interest in fair and effective law enforcement far exceeds any claimed adverse impact on the free flow of information protected by the First Amendment.

As in any criminal grand jury matter, the public has an essential interest in the "detection and prosecution of crime." *See In re Possible Violations of 18 U.S.C.*, 564 F.2d 567, 571 (D.C. Cir. 1977). *See also Branzburg v. Hayes*, 408 U.S. 665, 690, 710 (1972). If anything, the public's interest is heightened in a case such as this one, in which the crimes being investigated have national security implications, and any obstructive crimes identified would go to the very core of our criminal justice system. *See, e.g., United States v. Kiszewski*, 877 F.2d 210, 214 (2d Cir. 1989) ("[P]erjury strikes at the heart of the integrity of the judicial system . . . ."); *cf. Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238,

31

246 (1944)("[T]ampering with the administration of justice involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society."), *overruled on other grounds by Standard Oil Co. v. United States*, 429 U.S. 17, 18 & n.2 (1976).

Moreover, as described in the Affidavit of Special Counsel, the testimony sought by the subpoena is not only relevant, but is likely to constitute direct evidence relating to guilt or innocence, and there is no alternative source for the information. Thus, the information sought by the subpoena is crucial to the successful completion of the investigation.

In contrast, the First Amendment interests implicated by the instant subpoena are minimal. As an initial matter, the confidentiality of media sources is not at issue in this case because the movant is not being asked to reveal the identity of a confidential source. To the contrary, as discussed above, the "source" has already been identified by investigators as Lewis Libby, and the information sought by the subpoena is limited to conversations with Libby.

Libby has waived any claim of confidentiality with respect to the subject conversations, thereby protecting the movant from any potential accusation of a breach of confidentiality, and from any potential impact on his credibility and trustworthiness in the eyes of other "sources." Libby's waiver essentially operates as an agreement for the movant to treat the substance of the subject conversations as "on-the-record" or "for attribution."

32

# 05-CR-394 -- EXHIBIT I

# The Washington Post

## Woodward Was Told of Plame More Than Two Years Ago
[FINAL Edition]

The Washington Post - Washington, D.C.

Author:  Jim VandeHei and Carol D. Leonnig
Date:  Nov 16, 2005
Start Page:  A.01
Section:  A SECTION
Text Word Count:  1323

**Full Text** (1323 words)

Copyright The Washington Post Company Nov 16, 2005

Washington Post Assistant Managing Editor Bob Woodward testified under oath Monday in the CIA leak case that a senior administration official told him about CIA operative Valerie Plame and her position at the agency nearly a month before her identity was disclosed.

In a more than two-hour deposition, Woodward told Special Counsel Patrick J. Fitzgerald that the official casually told him in mid- June 2003 that Plame worked as a CIA analyst on weapons of mass destruction, and that he did not believe the information to be classified or sensitive, according to a statement Woodward released yesterday.

Fitzgerald interviewed Woodward about the previously undisclosed conversation after the official alerted the prosecutor to it on Nov. 3 — one week after Vice President Cheney's chief of staff, I. Lewis "Scooter" Libby, was indicted in the investigation.

Citing a confidentiality agreement in which the source freed Woodward to testify but would not allow him to discuss their conversations publicly, Woodward and Post editors refused to disclose the official's name or provide crucial details about the testimony. Woodward did not share the information with Washington Post Executive Editor Leonard Downie Jr. until last month, and the only Post reporter whom Woodward said he remembers telling in the summer of 2003 does not recall the conversation taking place.

Woodward said he also testified that he met with Libby on June 27, 2003, and discussed Iraq policy as part of his research for a book on President Bush's march to war. He said he does not believe Libby said anything about Plame.

He also told Fitzgerald that it is possible he asked Libby about Plame or her husband, former ambassador Joseph C. Wilson IV. He based that testimony on an 18-page list of questions he planned to ask Libby in an interview that included the phrases "yellowcake" and "Joe Wilson's wife." Woodward said in his statement, however, that "I had no recollection" of mentioning the pair to Libby. He also said that his original government source did not mention Plame by name, referring to her only as "Wilson's wife."

Woodward's testimony appears to change key elements in the chronology Fitzgerald laid out in his investigation and announced when indicting Libby three weeks ago. It would make the unnamed official — not Libby — the first government employee to disclose Plame's CIA employment to a reporter. It would also make Woodward, who has been publicly critical of the investigation, the first reporter known to have learned about Plame from a government source.

The testimony, however, does not appear to shed new light on whether Libby is guilty of lying and obstructing justice in the nearly two-year-old probe or provide new insight into the role of senior Bush adviser Karl Rove, who remains under investigation.

Mark Corallo, a spokesman for Rove, said that Rove is not the unnamed official who told Woodward about Plame and that he did not discuss Plame with Woodward.

William Jeffress Jr., one of Libby's lawyers, said yesterday that Woodward's testimony undermines Fitzgerald's public claims about his client and raises questions about what else the prosecutor may not know. Libby has said he learned Plame's identity from NBC's Tim Russert.

"If what Woodward says is so, will Mr. Fitzgerald now say he was wrong to say on TV that Scooter Libby was the first official to give this information to a reporter?" Jeffress said last night. "The second question I would have is: Why did Mr. Fitzgerald indict Mr. Libby before fully investigating what other reporters knew about Wilson's wife?"

Fitzgerald has spent nearly two years investigating whether senior Bush administration officials illegally leaked classified information — Plame's identity as a CIA operative — to reporters to discredit allegations made by Wilson. Plame's name was revealed in a July 14, 2003, column by Robert D. Novak, eight days after Wilson publicly accused the administration of twisting intelligence to justify the Iraq war.

Fitzgerald's spokesman, Randall Samborn, declined to comment yesterday.

Woodward is a Pulitzer Prize-winning investigative reporter and author best known for exposing the Watergate scandal and keeping secret for 30 years the identity of his government source "Deep Throat."

"It was the first time in 35 years as a reporter that I have been asked to provide information to a grand jury," he said in the statement.

Downie said The Post waited until late yesterday to disclose Woodward's deposition in the case in hopes of persuading his sources to allow him to speak publicly. Woodward declined to elaborate on the statement he released to The Post late yesterday afternoon and publicly last night. He would not answer any questions, including those not governed by his confidentiality agreement with sources.

According to his statement, Woodward also testified about a third unnamed source. He told Fitzgerald that he does not recall discussing Plame with this person when they spoke on June 20, 2003.

It is unclear what prompted Woodward's original unnamed source to alert Fitzgerald to the mid-June 2003 mention of Plame to Woodward. Once he did, Fitzgerald sought Woodward's testimony, and three officials released him to testify about conversations he had with them. Downie, Woodward and a Post lawyer declined to discuss why the official may have stepped forward this month.

Downie defended the newspaper's decision not to release certain details about what triggered Woodward's deposition because "we can't do anything in any way to unravel the confidentiality agreements our reporters make."

Woodward never mentioned this contact -- which was at the center of a criminal investigation and a high-stakes First Amendment legal battle between the prosecutor and two news organizations -- to his supervisors until last month. Downie said in an interview yesterday that Woodward told him about the contact to alert him to a possible story. He declined to say whether he was upset that Woodward withheld the information from him.

Downie said he could not explain why Woodward said he provided a tip about Wilson's wife to Walter Pincus, a Post reporter writing about the subject, but did not pursue the matter when the CIA leak investigation began. He said Woodward has often worked under ground rules while doing research for his books that prevent him from naming sources or even using the information they provide until much later.

Woodward's statement said he testified: "I told Walter Pincus, a reporter at The Post, without naming my source, that I understood Wilson's wife worked at the CIA as a WMD analyst."

Pincus said he does not recall Woodward telling him that. In an interview, Pincus said he cannot imagine he would have forgotten such a conversation around the same time he was writing about Wilson.

"Are you kidding?" Pincus said. "I certainly would have remembered that."

Pincus said Woodward may be confused about the timing and the exact nature of the conversation. He said he remembers Woodward making a vague mention to him in October 2003. That month, Pincus had written a story explaining how an administration source had contacted him about Wilson. He recalled Woodward telling him that Pincus was not the only person who had been contacted.

Pincus and fellow Post reporter Glenn Kessler have been questioned in the investigation.

Woodward, who is preparing a third book on the Bush administration, has called Fitzgerald "a junkyard-dog prosecutor" who turns over every rock looking for evidence. The night before Fitzgerald announced Libby's indictment, Woodward said he did not see evidence of criminal intent or of a major crime behind the leak.

"When the story comes out, I'm quite confident we're going to find out that it started kind of as gossip, as chatter," he told CNN's Larry King.

Woodward also said in interviews this summer and fall that the damage done by Plame's name being revealed in the media was "quite minimal."

"When I think all of the facts come out in this case, it's going to be laughable because the consequences are not that great," he told National Public Radio this summer.

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.