UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CR. NO 05-394 (RBW) |
| v. ) | |
| ) | |
| I. LEWIS LIBBY, ) | |
| also known as "Scooter Libby" ) | |

UNSEALED

**FILED**

MAR 0 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## GOVERNMENT'S RESPONSE TO COURT ORDERS OF FEBRUARY 23 AND FEBRUARY 27, 2006

Pursuant to this Court's Orders of February 23, 2006 and February 27, 2006, the

UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special

Counsel, respectfully submits the attached affidavit. This affidavit is submitted under

seal to give the Administration an opportunity to review some of the information

contained therein to ensure that the Affidavit does not reveal sensitive information

relating to intelligence briefings that should not be released to the public. The affidavit is,

however, being shared with defense counsel. Special Counsel proposes that if this

Affidavit is to remain under seal, a further justification of the reasons for the sealing will

be submitted to the Court by Monday, March 6, 2006.

Respectfully submitted,

PATRICK J. FITZGERALD

By:   Kathleen M. Kedian

Dated: March 2, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        )
                                )
        v.                      )        CR. NO. 05-394 (RBW)
                                )
I. LEWIS LIBBY,                 )        ~~UNDER SEAL~~ UNSEALED
                                )
        Defendant.              )
_____)

**RECEIVED**

MAR - 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### DECLARATION OF MARILYN A. DORN
### INFORMATION REVIEW OFFICER
### CENTRAL INTELLIGENCE AGENCY

I, MARILYN A. DORN, hereby declare and state:

1. I am the Information Review Officer (IRO) for the National Clandestine Service (NCS)[1] of the Central Intelligence Agency (CIA). After serving 18 months as Associate DO/IRO, I was appointed to my current position on 1 August 2003. I have held operational and executive positions in the CIA since 1980.

2. The NCS is the organization within CIA responsible for conducting the CIA's foreign intelligence and counterintelligence activities; conducting covert action; conducting liaison with foreign intelligence and security services; serving as the repository for foreign counterintelligence information; supporting clandestine

_____
[1] The National Clandestine Service succeeded the CIA's Directorate of Operations (DO) in October 2005.

technical collection; and coordinating CIA support to the Department of Defense. Specifically, the NCS is responsible for the conduct of foreign intelligence collection activities through the clandestine use of human sources.

3. As the NCS/IRO, I am responsible for the protection of information originated by the NCS, or otherwise implicating NCS interests, which may be the subject of criminal proceedings. As part of my official duties, I ensure that any determinations as to the release or withholding of such information are proper and do not jeopardize NCS interests or endanger NCS personnel or facilities. As NCS/IRO, I am also authorized to make classification decisions and conduct classification reviews to determine whether the disclosure of CIA information reasonably could be expected to cause damage to the national security.

4. In addition to my role as NCS/IRO, the Executive Director of the CIA has appointed me Records Validation Officer (RVO) for purposes of this and certain other litigation. As RVO, I am authorized to have access to all CIA records on any subject relevant to this litigation and to sign declarations on behalf of the CIA regarding searches of CIA records systems and the contents of CIA

2

records, including those located in or containing information under the cognizance of CIA directorates other than the NCS.

5. I make the following statements based upon my personal knowledge and information made available to me in my official capacity.

I.  **THE PURPOSE OF THIS DECLARATION**

6. Through the exercise of my official duties, I have become familiar with the criminal charges brought against the defendant. In connection with this criminal proceeding, the defendant has requested that the CIA produce, for the period from May 6, 2003, through March 24, 2004, (a) copies of the morning intelligence briefing provided to Mr. Libby as part of the President's Daily Briefing (PDB) process, (b) Mr. Libby's inquiries resulting from such morning intelligence briefing, and (c) the responses to Mr. Libby's inquiries.

7. The Court has issued two orders requesting information concerning the defendant's discovery request. As discussed more fully below, the CIA estimates that searching, retrieving, reviewing and assembling the documents requested by the defense, including the materials referred to in the Court's Order dated February 23, 2006, likely would take approximately nine months. The CIA also

3

estimates that searching, retrieving, reviewing and assembling the information discussed in the Court's Order dated February 27, 2006, likely would take approximately three months. However, because the CIA has never undertaken comparable tasks, it is impossible to accurately estimate the time required.

8. The defendant's requests clearly implicate highly classified, compartmented information and potential claims of Executive privilege for Presidential communications and the deliberative process. The Court requested that the CIA address only the burden of producing the requested information to the defense, so this declaration does not address the classification and potential Executive privilege issues, other than to note that these issues would have to be resolved and would likely entail additional burden and delay. I understand that the Office of Special Counsel (OSC) has objected to the production to the defense of the requested information on the ground that it is not material to charges in the indictment. If after consideration of OSC's objection and the CIA's statement regarding burden the Court contemplates ordering the production of the requested information to the defense, the CIA respectfully requests the opportunity to consult with the Office of the President and to be heard on the issues

4

of classification and potential claims of Executive
privilege before the Court orders the production of the
requested information to the defense.

9. In the sections that follow, this declaration
describes the significant burden imposed upon the CIA to
comply with the defendant's request for hundreds of PDBs
and related records.[2]  In order to produce the requested
documents, the CIA would be forced to divert the limited
analytic resources of the President's professional
intelligence staff to time-consuming and painstaking
research and analysis to determine exactly what information
was provided to and received from the defendant in
connection with his morning intelligence briefing.

## II.  BACKGROUND AND NATURE OF THE PRESIDENT'S DAILY BRIEF

### A.  Background

10. The PDB is a unique intelligence product prepared
specifically for the President of the United States to
provide him with the most important current intelligence on
critical issues relating to the national security of the
United States.  In the PDB, the intelligence community
assembles the most sensitive intelligence information and

---

[2]  Currently, PDB records are maintained at the Office of the Director
of National Intelligence (ODNI).  However, the CIA continues to
maintain PDB records that pre-date the establishment of ODNI.  The
defendant's request encompasses records for the period from May 2003
through March 2004, which remain in CIA custody.

5

the best analytic judgments in a complete, accurate, and timely package intended to inform the President and his most senior advisors as they make and implement the nation's defense and foreign policies. Senior leaders throughout the Office of the Director of National Intelligence, the CIA, and other intelligence agencies are intimately involved in deciding what issues are worthy of the President's attention and ensuring that the PDB includes the most immediate and important intelligence on the subject.

11. Throughout the history of the PDB, it has been common for the President and his senior advisors who also receive PDB materials to ask follow-up questions about information presented in the briefing, and for the President's advisors to suggest to the CIA topics that should be brought to the President's attention through the PDB. In responding to such questions and suggestions, the PDB has become an ongoing dialogue between the President, together with his most senior advisors, and the intelligence community. As such, it serves as a critical element in the Presidential communications and Executive deliberations associated with the formulation and implementation of the national defense and foreign policy of the United States.

6

**B.  Sensitivity of the PDB**

12.  The PDB is the most sensitive intelligence report
produced by the CIA's Directorate of Intelligence.  As
noted above, each daily edition of the PDB contains the
information that the intelligence community deems most
important for the President and his most senior advisors to
see that day.

13.  Due to its primary customer, narrow audience, and
limited distribution, the PBD can and does provide more
immediate, specific, and sensitive intelligence information
than is included in other intelligence products intended
for wider audiences.  It is not uncommon for an edition of
the PDB to contain information that is not disseminated to
the rest of the intelligence community, including (a) raw
operational information, including source-identifying
information normally protected by cryptonyms or other
generic source descriptions, (b) sensitive operational
information specially added by the NCS, (c) specific
intelligence methods, including highly compartmented
technical operations that may indicate the method of
collection, and (d) information from methods specially
developed or acquired only by the CIA or the National
Security Agency.

7

14.   Furthermore, because the PDB assembles the most important information available on a given subject in the space of only a few pages, it enables the reader to identify the most sensitive intelligence sources and methods even where they are not explicitly revealed.   In addition, because the PDB also includes open-source information collected from public sources, the PDB's all-source intelligence analysis and comment on these seemingly unclassified public sources of information can reveal classified information from intelligence sources and methods.   In summary, on a daily basis the PDB is the most highly selective compendium of current intelligence available to the U.S. intelligence community and senior defense and foreign policy officials.   It presents a unique insight into the nation's intelligence collection platforms and priorities.

15.   Because the PDB contains such a wide range of information on such sensitive topics, it also poses a uniquely high risk of exposing intelligence sources and methods, including analytical methods.   Any disclosure of the PDB beyond its intended narrow audience--the President and his most senior advisors--increases the possibility of damage to the national security.

8

### III.   THE PDB BRIEFING PROCESS

16.   Six mornings a week, intelligence briefers meet
with the President and selected senior Executive officials
to provide a daily intelligence briefing.  Each briefer
meets with one or more designated officials to present an
oral briefing and a binder containing written materials for
each official's review.  Officials receiving these daily
briefings frequently ask questions regarding the items
presented.  The briefer may be able to answer those
questions immediately, based upon the briefer's own
knowledge or additional information in his or her
possession.  If the briefer cannot answer the question
immediately, the briefer transmits the question to the
CIA's Directorate of Intelligence for additional research
and analysis.  The CIA's response to the inquiry is
provided as soon as possible, but the time required to
provide an answer may be as short as one day or as long as
several weeks, depending upon the complexity of the
question and the additional research and analysis required.

17.   In addition, CIA responses to PDB-related
inquiries may be provided in any of several different
formats.  Some responses may be provided quickly by CIA
analysts via telephone, e-mail, or facsimile to the
inquiring official.  Other responses may be provided in an

analytic memorandum to the inquiring official, while others may be provided in the form of an analytic article included in a future edition of the PDB, or a more widely disseminated intelligence report provided to senior government officials and the intelligence community.

18. Due to the variance in response times and formats, it is very difficult to correlate the response to a specific inquiry when the inquiry is from an official other than the President. Preparation of the PDB is a dynamic process focused on providing the most up-to-date intelligence to the President on a daily basis, rather than on keeping detailed records of the inquiries from and responses to senior advisors. Records of senior advisors' follow-up inquiries are maintained in order to and only to the extent necessary to permit the CIA to respond to those inquiries in a timely manner, rather than to provide an historical record of the exchanges with those officials. PDB-derived taskings that are transmitted by the briefers to the CIA for further research and analysis are recorded according to the date received, not subject matter. In order to locate the defendant's inquiries, the CIA staff would have to review the records for a particular date or period of time. In order to locate the CIA's responses, the CIA staff would have to undertake a laborious and time-

10

consuming process of combing through multiple electronic
databases and hardcopy files of intelligence reports,
memoranda, and e-mail for a much broader range of dates to
be sure that the search sufficiently bracketed the unknown
date when the response was provided.

## IV.  MR. LIBBY'S MORNING INTELLIGENCE BRIEFING

19.   The PDB is an intelligence product created for
the President.  While variations of the briefing also are
offered to other senior officials as a courtesy, the
President's briefing is the definitive standard, and CIA
recordkeeping focuses on the materials provided to the
President.

20.   The briefing offered to other government
officials, such as Mr. Libby, is not identical to the
briefing provided to the President or the Vice President.
In many instances, certain extremely sensitive reporting
and source information is provided to the President and the
Vice President only.

21.   As a senior aide to the Vice President, Mr. Libby
received a morning briefing that was usually substantially
similar to the Vice President's briefing; often, the two
men received the briefing together.  However, Mr. Libby's
briefing was not necessarily identical to the Vice
President's briefing.  Occasionally, certain items were

11

provided to the Vice President but not to Mr. Libby.
Frequently, Mr. Libby received more information than the
Vice President because the CIA was responding to Mr.
Libby's questions or providing supplemental information on
particular subjects in which he had expressed an interest
previously. As Mr. Libby's briefer became familiar with
Mr. Libby's interests, the briefer, in his or her
experience and discretion, may have included additional
items that the briefer believed would be of interest to Mr.
Libby. As a result, the briefing provided to Mr. Libby on
any given day usually differed from, and only rarely would
have been identical to, the briefings provided to the Vice
President and the President.

        22. Because the briefings offered to different
officials were customized based on those officials'
positions, prior inquiries, and individual interests,
locating the precise items included in Mr. Libby's briefing
on any particular day would require extensive research,
including review and correlation of inquiries received,
briefers' notes, internal CIA e-mail, and subsequent
memoranda and reports. Moreover, such research and
analysis would have to be undertaken for each day that Mr.
Libby received a briefing.

## V.   STAFFING AND COMPARTMENTATION ISSUES

23.   In addition to the difficulties outlined above, searching, retrieving, reviewing and assembling the PDB documents, inquiries, and responses requested by the defense is further complicated by staffing and compartmentation issues.

24.   The CIA staff that prepares the PDB and maintains the PDB records is small and dedicated to this one mission. The primary focus of this staff is to ensure that the briefing provided to the President and his senior advisors each morning reflects the most important intelligence of the day.   Preparation of the PDB is a twenty-four hour-a-day, fast-paced, deadline-oriented process requiring extensive coordination among various components of the CIA and the intelligence community.

25.   As explained earlier in this declaration, the information provided to the President and his senior advisors in the PDB is the most sensitive, highly classified intelligence information in the possession of the United States Government.   Much of this information is compartmented, meaning that access to the information requires a special security briefing and authorization for access to a particular intelligence program.   Because the information involved is so highly classified and

13

compartmented, the CIA cannot simply increase the number of people assigned to the task of searching, retrieving, reviewing and assembling the documents implicated in the defendant's request. Rather, this job would have to be undertaken by the employees who are cleared for access to the materials: the same staff that is responsible for producing the PDB on a daily basis. The number of such persons is necessarily limited for security reasons, and also because a larger staff is not typically required in order to produce the daily intelligence briefing.

26. The small staff that prepares the PDB lacks the surplus personnel resources necessary to undertake the extensive research required to satisfy the defense request for approximately ten months of PDBs and related documents. Moreover, the job would divert their precious time and effort away from their primary task: preparing breaking intelligence for the President's immediate attention. The CIA estimates that it likely would take approximately nine months to respond to the defense's request for Mr. Libby's morning intelligence brief, his inquiries, and the CIA's responses for the period from May 6, 2003, through March 24, 2004. However, because the CIA has never undertaken a comparable task, it is impossible to estimate precisely the time that would be required to complete this task.

14

## VI.   THE COURT'S ORDER DATED FEBRUARY 23, 2006

27.   In an order dated February 23, 2006, the Court requested from the Government information concerning the defendant's request for "all documents relating to inquiries made during or in connection with Mr. Libby's morning intelligence briefings for the period May 6, 2003, through March 24, 2004, and all documents provided to Mr. Libby as a result of those inquiries." The Court inquired (a) whether it is possible to determine what documents would satisfy this request, (b) approximately how many documents the request would involve, and (c) how and in whose custody the documents are stored, and how much time and resources would be required to retrieve them.

28.   Both defense counsel and the CIA estimate that there may be approximately 300-500 documents that are responsive to the defendant's request for his inquiries and the CIA responses. The responsive documents are in the custody of the CIA, and are stored in a decentralized manner in a variety of databases and files. There is no central file in which the documents that the defendant requests are maintained. Inquiries received by the PDB briefers as a result of the briefings are recorded in a database maintained by the PDB staff. Responses to such taskings may be stored in several ways. Analytic memoranda

15

or intelligence reports are typically on file with the CIA component that produced them. If such a memorandum or report was also disseminated as a separate PDB item, it may also be on file with the PDB staff. Responses provided to briefers via e-mail may be stored in the e-mail accounts of the individuals involved in responding to the particular question.

29. As discussed in this declaration and during the hearing held on February 24, 2006, compliance with the defendant's request for his taskings and the CIA's responses to them would impose an enormous burden on the CIA. Searching, retrieving, reviewing and assembling these hundreds of documents and thousands of pages likely would require approximately nine months. Depending on the content of such responsive documents, coordination with other federal agencies or foreign governments may be required, and this could entail further delay.

VII. **THE COURT'S ORDER DATED FEBRUARY 27, 2006**

30. In an order dated February 27, 2006, the Court requested information concerning the CIA's ability to provide to the defendant (a) a written representation of the general subject matters covered in documents used to conduct the defendant's morning briefings during three

16

critical time periods and (b) an assessment of the time and
resources required to provide such a representation.

31.  The relevant time periods identified by the Court
include (a) June 23, 2003, through July 12, 2003, when the
defendant allegedly had conversations with Tim Russert,
Judith Miller and Matthew Cooper about Valerie Plame
Wilson, (b) when the defendant was interviewed by agents of
the Federal Bureau of Investigation (FBI), as well as two
days before and after each date, and (c) when the defendant
testified before the grand jury, as well as two days before
and after each date.

32.  The defendant spoke with FBI agents on two dates
and also testified before the grand jury on two dates.
These four occasions, in addition to the two days prior and
subsequent to each date, plus the twenty days from June 23
to July 12, comprise a total of forty days for which the
CIA would be required to locate the briefing materials, the
defendant's inquiries, and the CIA's responses.

33.  The CIA would be able to prepare a written
representation of the topics presented during the
defendant's morning intelligence briefings during the
specified time periods.  The process of identifying those
topics would be identical to the process described above
for retrieving the documents, except that in lieu of

17

copying the documents, the CIA could prepare a list of the topics addressed in those documents. Thus, in order to prepare this, the PDB staff would be required to determine what was presented to Mr. Libby, including locating his inquiries and researching the responses. While the size of the task would be reduced if the time periods were restricted, the process is nevertheless time-consuming and laborious. The CIA estimates that it would take approximately three months to conduct the necessary research and locate the documents pertaining to the forty days. Again, because no comparable task has been undertaken, a precise estimate of the time required cannot be made.

34. In addition, a list of the topics addressed during the defendant's morning intelligence briefings would disclose information classified at the TOP SECRET level and would be subject to potential claims of Executive privilege for Presidential communications and the deliberative process. Referring to the topics presented in the PDB, even in an abstracted or generalized manner, presents the same concerns about disclosure of classified information as are raised by the prospect of producing the documents themselves. The very fact that these topics were presented to the President discloses sensitive information concerning

18

U.S. intelligence and policy priorities. In addition, the
PDB is fundamentally a privileged Presidential
communication, because it is a report from the intelligence
community to the President. Disclosure of the topics
included in the PDB or Mr. Libby's morning intelligence
briefing would necessarily disclose Presidential inquiries
and interests, because many items are included in the PDB
in response to inquiries from the President, interests of
the President, or suggestions from senior advisors of
topics that should be brought to the attention of the
President.

35. In summary, although the burden on the CIA would
be reduced by restricting the time periods for which PDB
materials must be reviewed, the process of searching,
retrieving, reviewing, and assembling either the actual PDB
briefing presented to Mr. Libby and the related documents,
or a list of the topics addressed in Mr. Libby's briefing,
would require painstaking research over approximately three
months.

**VIII.   CONCLUSION**

36. In conclusion, assembling the documents requested
by defense counsel, or of a list of topics addressed in
those documents, would impose an enormous burden upon the
CIA. Locating the documents provided to Mr. Libby and

19

correlating the CIA's responses with Mr. Libby's inquiries would require months of painstaking research.  Such a task would impose a tremendous burden on a small staff whose primary responsibility is the daily preparation and delivery of critical intelligence information to the President.  Finally, producing such documents would implicate sensitive issues related to classified information and Executive privilege.

*   *   *   *

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of March, 2006.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency

20

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 2nd day of March, 2006, I caused true and correct copies of the foregoing Government's Response to Court Orders of February 23 and February 27, 2006 to be served on the following parties by electronic mail and first class mail:

William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

Joseph A. Tate, Esq.
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Facsimile: 215-994-2222

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700

Patrick J. Fitzgerald
Special Counsel
U.S. Department of Justice
10th & Constitution Ave., NW
Washington, D.C. 20530
202-514-1187

By: _____
Kathleen M. Kedian
Deputy Special Counsel