UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY | ) | |
|     also known as "Scooter Libby," | ) | |
|     Defendant. | ) | |

**RESPONSE OF I. LEWIS LIBBY TO MARCH 2, 2006 CIA DECLARATION
AND COURT'S FEBRUARY 27 ORDER**

Defendant I. Lewis Libby, through his counsel, submits this response to the CIA

declaration filed March 2, 2006 concerning Mr. Libby's morning intelligence briefing

materials, including the President's Daily Brief and associated documents.[1]  We also

address the Court's February 27, 2006 Order, which contemplates narrowing the scope of

the discovery that Mr. Libby will receive and providing summaries in lieu of the original

documents.

**I.      THE CIA DECLARATION**

A.      The CIA declaration emphasizes the sensitivity and urgency of the

information in the PDB and thus underscores Mr. Libby's need for the documents.  The

declaration describes the PDB as containing "the most important current intelligence on

critical issues relating to the national security of the United States."  CIA Decl. ¶ 10.

According to the declaration, the PDB "contains the information that the intelligence

---

[1]      Declaration of Marilyn A. Dorn, Information Review Officer, Central Intelligence
Agency (Mar. 2, 2006) ("CIA Decl.").

community deems most important for the President and his most senior advisors to see that day." *Id.* ¶ 12. That is why Mr. Libby needs access to his morning briefing materials, including the PDBs, for the relevant period.

Mr. Libby began his day, six days a week, with the PDB and the accompanying materials. *Id.* ¶¶ 16, 21. The PDB items were foremost among the matters that commanded his attention. The government distorts Mr. Libby's defense when it suggests Mr. Libby does not need the PDBs because the government will "agree he was important and he was a busy person." Feb. 24, 2004 Hearing Tr. at 76. Mr. Libby is not simply seeking to establish at trial that he was a busy person--that he had a daily calendar crowded with meetings, briefings and projects. Instead, Mr. Libby needs the information presented in the PDBs to show that the issues he was dealing with dwarfed in importance the snippets of conversation about Valerie Wilson that form the core of the indictment. A jury could very well conclude that, in light of Mr. Libby's absorption in the "the most important current intelligence on critical issues relating to the national security of the United States," it is understandable that he would innocently forget or confuse those conversations when asked to recall them three to nine months later.

B.    Mr. Libby's requests focused on three categories of materials: (1) the PDBs and accompanying materials; (2) records of inquiries made to the CIA by Mr. Libby; and (3) the CIA's responses to those inquiries. The declaration agrees with Mr. Libby's estimate that the total number of documents that fall into categories 2 and 3 is in the range of 300 to 500. Yet, the CIA declaration asserts that producing the relatively small number of responsive materials will take nine months and producing even the

2

smaller quantity of documents suggested in the February 27 Order will take three months. CIA Decl. ¶¶ 7, 26, 29, 33. These estimates are hard to accept at face value.

Nevertheless, Mr. Libby will narrow his requests still further. The limited scope of Mr. Libby's requests and his willingness to further narrow them distinguish this case from *United States v. George*, 786 F. Supp. 56 (D.D.C. 1992), on which the government relies heavily, where the defendant sought millions of classified documents and rejected repeated invitations to narrow his demands. *Id.* at 59, 65. Below, we point out certain rather obvious shortcomings in the CIA declaration and make proposals that should reduce the time required for production to a matter of weeks, not months.

C.    First, it is astonishing that the CIA cannot readily locate and produce the PDB materials and fewer than 500 other documents provided to and received from the National Security Advisor to the Vice President of the United States over a nine-month period less than three years ago. The CIA's time estimates are especially unreliable because the declaration does not identify the assumptions underlying them. In particular, the declaration does not state how many people it assumes will work on the production and for how many hours per week. For all that the declaration discloses, its nine-month and three-month estimates may rest on the assumption (for example) that minimal resources will be devoted to collecting the requested documents. If that is so, the Court might well conclude that the CIA is engaged in unjustified foot-dragging.[2]

---

[2]    It bears noting that the CIA referred this matter to the Department of Justice for prosecution in the first place and thus may not approach Mr. Libby's discovery requests from an entirely objective and impartial perspective. The government has also asserted that the CIA and the Department of Justice share a privileged attorney-client relationship with respect to this matter. *See* Letter from Kathleen M. Kedian, Deputy Special Counsel, to John D. Cline, *et al.*, dated February 21, 2006 (attached as

3

Second, and equally troubling, the declaration does not specify the time required to gather and produce each separate category of documents that Mr. Libby requests. This lack of specificity makes it difficult to determine which of these categories imposes the greatest burden on the CIA and thus--perhaps by design--makes it hard for Mr. Libby to respond to the declaration or propose additional limits on his already focused requests. To bring clarity to these issues, we respectfully suggest that the Court conduct an in camera hearing, with both parties present, at which it would question the CIA declarant about the specifics of the estimates.

D.      Despite the CIA's lack of clarity, Mr. Libby will further restrict his document requests in a good faith effort to ease the agency's asserted production burden.[3] We propose the following additional limitations:

1.      The CIA declaration suggests that producing the responses to Mr. Libby's inquiries during the morning intelligence briefings would be particularly burdensome. CIA Decl. ¶ 18 ("In order to locate the CIA's responses, the CIA staff would have to undertake a laborious and time-consuming process of combing through multiple electronic databases and hardcopy files of intelligence reports, memoranda, and e-mail for a much broader range of dates . . . ."). We strongly suspect that the CIA has exaggerated the difficulty of obtaining the responses to Mr. Libby's inquiries.

---

Exhibit A). This relationship constitutes a reason why the CIA's declaration should be tested through examination at a hearing and not simply be accepted at face value.

[3]   In our view, Mr. Libby's initial requests are reasonable and well within the scope of Fed. R. Crim. P. 16. We propose narrowing those requests solely as a means of facilitating discovery and obtaining as quickly as possible documents that we consider central to Mr. Libby's defense.

Nevertheless, we withdraw our request for the responses. This should substantially ease the burden of providing the discovery that Mr. Libby seeks.

Unlike the responses to the inquiries, it appears that CIA can produce the inquiries themselves with relative ease. According to the CIA declaration, "[i]nquiries received by the PDB briefers as a result of the briefings are recorded in a database maintained by the PDB staff." *Id.* ¶ 28. To obtain Mr. Libby's inquiries, therefore, the CIA need only review the database for the time period at issue and print out responsive documents. That should be a simple matter. Even without the CIA responses, the inquiries will be extraordinarily valuable in determining what matters commanded Mr. Libby's attention on a particular day or for a particular period.

2.    The CIA claims that it would have to undertake "extensive research, including review and correlation of inquiries received, briefers' notes, internal CIA email, and subsequent memoranda and reports" to locate the precise version of the PDB and associated materials provided to Mr. Libby each morning. *E.g., id.* ¶ 22. It is highly surprising that the CIA does not keep track of the morning briefing materials that it furnishes to senior Executive Branch officials such as Mr. Libby, but accepting that representation at face value, Mr. Libby will again narrow his request to ensure that he receives the most vital materials without unduly prolonging this proceeding.

On the assumption that the CIA *does* keep careful records of the materials it provides to the Vice President, we propose the following means of simplifying its task. As we have previously noted, Mr. Libby's morning briefing notebook contained three parts: (1) the PDB itself, (2) certain additional materials provided to the Vice President, and (3) still other materials provided only to Mr. Libby. We withdraw our request for the

items in category (3)--the materials provided only to Mr. Libby.  Thus, the CIA need only

produce the Vice President's morning briefing notebook for the dates at issue, minus any

items provided to the Vice President only.  We believe that the table of contents to the

notebook identifies those items--typically marked "Oval Office only"--and thus will

facilitate their removal from the production.

        3.      We understand from the February 27 Order that the Court intends

to restrict the date range for the requested materials.  Although we urge the Court to

expand that date range modestly (*see infra* Part II(A)), a reduced time period will

significantly alleviate the CIA's asserted production burden.  As discussed in Part II(B)

below, the burden will be reduced even further if the Court orders the documents

themselves produced, rather than the summaries contemplated by the Order.

        4.      The CIA declaration expresses understandable concern about

widespread dissemination of the PDBs.  *E.g.*, *id.* ¶ 15.  Mr. Libby and his counsel share

that concern.  In addition to the CIPA protective order already in place, therefore, we

propose entering a further stipulated protective order (a) stating that the PDBs and related

materials will be produced for examination only at the SCIF maintained by the

Department of Justice at the Department of Homeland Security in Washington, D.C.;

(b) restricting access to Mr. Libby (who has already read them) and to four lawyers

(Wells, Jeffress, Cline, and Maxwell) whose input is essential to the CIPA process and/or

to related decisions concerning trial strategy; and (c) barring the defense from copying

the materials in question.

These four limitations on Mr. Libby's original discovery requests will significantly reduce the CIA's burden of collecting the materials and ease any national security concerns arising from production of the PDBs to Mr. Libby and his counsel.

E.    The CIA again raises the spectre of Executive privilege. *Id.* ¶¶ 8, 11, 36. Through its repeated references to a possible future invocation of privilege and the resulting litigation, the government wants to discourage the Court from protecting Mr. Libby's right to discovery he needs to present his defense. But we have found no case denying a defendant discovery out of fear that the Executive *might* assert privilege sometime in the future.

Almost fifty years ago, the Supreme Court declared that "'since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.'" *Jencks v. United States*, 353 U.S. 657, 671 (1957) (quoting *United States v. Reynolds*, 345 U.S. 1, 12 (1953)); *see, e.g., United States v. Andolschek*, 142 F.2d 503, 506 (2d Cir. 1944) (L. Hand, J.). The Supreme Court's admonition applies with even greater force to the mere *threat* that a governmental privilege might be invoked in the future. The Court should order production of the documents, permit the Executive to assert any privileges it may wish to raise, and adjudicate those claims if and when they arise.

## II.    THE FEBRUARY 27 ORDER

The February 27 Order proposes restricting Mr. Libby's access to his morning briefing materials in two ways: limiting the time period for responsive documents, and permitting the government to provide summaries in lieu of the documents themselves.

We request a minor modification to the Court's proposed limitation of the time period at issue because conversations alleged in the indictment--that Mr. Libby testified he did not recall--began in early June of 2003, not June 23, 2003.  And we respectfully urge the Court to reconsider the idea of disclosing only summaries, rather than the documents themselves.

### A.    The Time Periods

The February 27 Order proposes limiting Mr. Libby's access to his morning briefing materials, including the PDBs and associated documents, to the periods June 23, 2003 through July 12, 2003, and two days before and after the dates on which the FBI interviewed Mr. Libby (October 14, 2003 and November 26, 2003) and on which he testified before the grand jury (March 5, 2004 and March 24, 2004).  We urge the Court to consider modifying this proposed limitation by moving the beginning date back from June 23 to June 9, 2003.

Although the Court is correct that the indictment alleges that Mr. Libby first discussed Ms. Wilson with a reporter (Judith Miller) on June 23, the indictment also alleges that Mr. Libby had at least four conversations with government officials *prior* to June 23 during which Ms. Wilson was discussed.  The indictment alleges that these pre-June 23 conversations constitute evidence that Mr. Libby lied to the FBI and the grand jury.  For example, the government claims that at the time he spoke to Mr. Russert, Mr. Libby "was well aware that Wilson's wife worked for the CIA" because he "had participated in multiple prior conversations concerning this topic," some of which occurred in early June 2003.  Indictment, ¶ 33(a)(ii).

According to the indictment, Mr. Libby received faxed documents from the CIA concerning Joseph Wilson on June 9, 2003, *id.* ¶ 5, and first discussed Valerie Wilson with a government official on or about June 11. *Id.* ¶¶ 6, 7. Documents provided to the defense in discovery indicate that such a discussion may have occurred as early as June 9 or 10. The indictment alleges that Mr. Libby had three additional conversations that touched upon Ambassador Wilson or his wife between June 11 and June 23. *Id.* ¶¶ 9, 11, 13. Mr. Libby's recollection, at the time of his FBI statements and grand jury testimony, of the events from June 9 through July 12 will be the central focus of the trial. The additional fourteen days of morning briefing materials we request will not add significantly to the CIA's burden, especially with the additional limitations which Mr. Libby has proposed. And those documents will be enormously helpful to the defense in reconstructing the matters that commanded Mr. Libby's attention during the most critical period in the case. The additional days are particularly important because PDB items often raise issues that retain their urgency for days or weeks. Thus, a PDB item that Mr. Libby read on June 9 might well have still consumed his attention on June 23 or July 12, or even later.

### B.    Summaries

We urge the Court to reconsider its proposal that the government furnish summaries in lieu of the actual PDBs and associated documents. The use of summaries will deprive Mr. Libby of information vital to preparation of his defense without providing any offsetting benefit.

Government-drafted summaries, reflecting only the "general subject matter" of the morning briefing materials, Feb. 27 Order at 1, will not permit Mr. Libby to recall or

the defense to assess the urgency of the national security issues that the documents reflect or to convey that urgency to the jury. To illustrate this point, we have attached as Exhibit B an August 6, 2001 PDB item released in redacted form by the 9/11 Commission. That item, captioned "Bin Ladin Determined to Strike in US," outlines intelligence suggesting that Osama Bin Ladin and Al Qaeda may be planning to attack the United States. A summary of the general subject matter of the item does not accurately convey its urgency. To make that assessment, the details are necessary--the number and sophistication of the Al-Qaeda members allegedly planning the attacks, the state of that planning, the current ability of the terrorists to carry out a planned attack, and--perhaps most important--the sources of the intelligence community's information about the planned attacks, the reliability of those sources, and the extent to which other intelligence corroborates their information.[4] In short, Mr. Libby needs what the Supreme Court calls the "persuasive power of the concrete and particular" to convince the jury that in a welter of more urgent matters, he confused or forgot the snippets of conversation concerning Ms. Wilson. *Old*

---

[4]    The 9/11 Commission itself made this point. The Commission noted that an August 7, 2001 Senior Executive Intelligence Brief ("SEIB") "repeated the title of [the August 6, 2001] PDB, [but] it did not contain the reference to hijackings, the alert in New York, the alleged casing of buildings in New York, the phoned threat to the embassy, or the fact that the FBI had approximately 70 on-going bin Laden-related investigations." National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 260-262 (2004). Because the SEIB omitted this critical detail, it failed adequately to alert policymakers to the threat that materialized just over a month later. By the same token, summaries of the morning intelligence briefing materials will not adequately alert Mr. Libby to the issues that he found most critical at the relevant time. *See also* Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction, *Report to the President of the United States* ("Robb-Silberman Report") 27 (2005) (recommending "elimination of the inherently misleading 'headline' summaries in PDBs," because the summaries fail to capture details that are essential to assessing the importance of the intelligence at issue).

*Chief v. United States*, 519 U.S. 172, 187 (1997); *see id.* at 189 ("A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it.").

Summaries are inadequate for another, related reason. The summaries will be prepared by CIA or OSC employees unfamiliar with Mr. Libby's thought processes at the time and unacquainted with his defense. In determining how to summarize detailed and complex material, those employees will likely omit details that Mr. Libby found critical. Indeed, the CIA declaration interprets the Court's reference to "summaries" to mean "a list of topics addressed during the defendant's morning intelligence briefings," presented in "an abstracted or generalized manner." CIA Decl. ¶ 34. Such "summaries" will likely not contain the information Mr. Libby needs to refresh his recollection and to explain to the jury his state of mind during the relevant period. They are not an adequate substitute for the morning briefing materials in their original form, with the detail that Mr. Libby saw at the time, and will not allow the defense to determine in the first instance what aspects of those materials are necessary to the defense. It is important to recognize that the issue at this time is not whether any of the requested materials may be disclosed at trial. The Court will have the final word through the CIPA § 6 process on what Mr. Libby can disclose to the jury.

No compensating benefits justify depriving Mr. Libby of the detail he needs to make his defense. First, there is no gain to national security. As the CIA declaration acknowledges, any summaries will be classified Top Secret and will "present[] the same concerns about disclosure of classified information as are raised by the prospect of producing the documents themselves." *Id.* ¶ 34. National security concerns are far better

addressed through the measures that we propose above--restrictions on access and
copying--than through the use of summaries.

Second, summaries will increase, rather than reduce, the production burden on the
CIA. If the Court orders the PDBs and associated documents produced to the defense,
we will analyze them, decide which documents we want to use at trial, and list those
documents on a CIPA § 5 Notice. The Court will then conduct a CIPA § 6 hearing at
which it will determine whether the listed documents are relevant and admissible. Only
the documents that survive this two-step winnowing--in all likelihood, a small fraction of
the total produced--will then enter the substitution process under CIPA § 6(c). The PDBs
and associated documents that are not listed on a CIPA Notice, or that the Court
determines to be irrelevant or otherwise inadmissible, need not be summarized or
otherwise considered further.

By contrast, if the Court orders summaries produced in lieu of the documents
themselves, CIA or OSC employees will have to review *all* of the documents at issue and
prepare a summary for each one. Summarizing the subset of documents that Mr. Libby
will ultimately seek to use will be time-consuming enough. But summaries will have to
be prepared even for those documents that Mr. Libby ultimately decides not to list on a
CIPA notice and even for documents that the Court finds irrelevant or otherwise
inadmissible. Given the CIA's professed scarcity of personnel available to work on the
document production, *e.g.*, *id.* ¶¶ 23-26, it seems strikingly inefficient to order production
of summaries rather than the morning briefing materials themselves.

## CONCLUSION

For these reasons, and for the reasons stated in Mr. Libby's prior briefs and at oral argument, the Court should grant Mr. Libby's motion to compel production of the PDBs and associated documents, as narrowed above.

March 7, 2006                                            Respectfully submitted,


_____/s/_____                    _____/s/_____
Theodore V. Wells, Jr.                                William H. Jeffress, Jr.
(D.C. Bar No. 468934)                              (D.C. Bar No. 041152)
James L. Brochin                                       Alex Bourelly
(D.C. Bar No. 455456)                              (D.C. Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                    Baker Botts LLP
 & Garrison LLP                                        1299 Pennsylvania Ave., NW
1285 Avenue of the Americas                    Washington, DC  20004
New York, NY  10019-6064                      (202) 639-7751
(212) 373-3089


_____/s/_____                    _____/s/_____
Joseph A. Tate                                          John D. Cline
Dechert LLP                                             (D.C. Bar No. 403824)
2929 Arch Street                                       Jones Day
Cira Centre                                               555 California Street, 26th Floor
Philadelphia, PA  19104                            San Francisco, CA  94104
                                                              (415) 626-3939