# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | <u>Oral Argument Requested</u> |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

## THIRD MOTION OF I. LEWIS LIBBY TO COMPEL
## DISCOVERY UNDER RULE 16 AND *BRADY*

Theodore V. Wells, Jr.
James L. Brochin
Paul, Weiss, Rifkind, Wharton
  & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3089

Joseph A. Tate
Dechert LLP
2929 Arch Street
Cira Centre
Philadelphia, PA  19104
(215) 994-2222

William H. Jeffress, Jr.
Alex J. Bourelly
Baker Botts LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004
(202) 639-7751

John D. Cline
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
(415) 626-3939

March 17, 2006

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 5

    A.    The Indictment ................................................................................... 5

    B.    Mr. Libby's Grand Jury Transcript ............................................. 10

    C.    Discovery Materials Requested by Mr. Libby ............................ 11

DOCUMENT REQUESTS ..................................................................................... 13

    A.    Documents Relating to Government Officials Who Are
            Likely To Testify as Witnesses at Trial ....................................... 13

    B.    Documents Relating to Mr. Libby's Grand Jury Testimony ........ 14

    C.    Other Materials Requested Pursuant to Rule 16 and *Brady* ......... 15

    D.    Potential Witnesses .................................................................... 15

ARGUMENT ......................................................................................................... 16

    A.    The Rule 16 Standard in this Jurisdiction Is Interpreted
            Expansively ................................................................................. 16

    B.    The Discovery Mr. Libby Has Requested Is Material to the
            Preparation of His Defense ......................................................... 19

            1.    The Defense Is Entitled to Documents Necessary
                  To Prepare To Examine Witnesses ................................. 19

            2.    The Defense Is Entitled To Documents that Will
                  Establish the Proper Context for the Events
                  Described in the Indictment ............................................. 27

            3.    Mr. Libby Is Entitled To Demonstrate that He Had
                  No Motive to Lie to the FBI or the Grand Jury ............... 29

            4.    The Defense Is Entitled To Documents Necessary
                  To Challenge the Government's Arguments
                  Relating to the NIE and Other Aspects of
                  Mr. Libby's Grand Jury Testimony ................................. 31

**Page(s)**

C.    Documents Relating to the CIA's Referral to DOJ Should
Be Produced to the Defense ........................................................ 32

D.    Documents and Information Sought by this Motion Are
Discoverable Under *Brady* and Its Progeny ................................ 34

CONCLUSION ........................................................................................... 35

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

*Brady* v. *Maryland*, 373 U.S. 83 (1963)........................................................................... 34

*In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998)................................................................. 33

*Old Chief* v. *United States*, 519 U.S. 172 (1997) ............................................................ 28

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)............................................................ 34

*In re Sealed Case*, 856 F.2d 268 (D.C. Cir. 1988)............................................................ 33

*United States* v. *Lloyd*, 992 F.2d 348 (D.C. Cir. 1993)...................................................... 16

*United States* v. *Marshall*, 132 F.3d 63 (D.C. Cir. 1998) ............................. 16, 17, 23, 29

*United States* v. *Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ................................................ 17

*United States* v. *Yunis*, 867 F.2d 617 (D.C. Cir. 1989).................................................... 17

### RULES

Fed. R. Crim. P. 16 ................................................................................................. *passim*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | <u>Oral Argument Requested</u> |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

## THIRD MOTION OF I. LEWIS LIBBY TO COMPEL
## DISCOVERY UNDER RULE 16 AND *BRADY*

Defendant I. Lewis Libby, through his counsel, hereby moves for an order

compelling the government to produce additional information in its possession that is (a)

material to the preparation of the defense under Fed. R. Crim. P. 16, and/or (b)

exculpatory or impeachment information discoverable under the *Brady* doctrine.  The

information sought by this motion has been requested by the defense from the Office of

Special Counsel ("OSC"), but our requests have been denied.

## <u>INTRODUCTION</u>

Previously, the defense moved to compel the production of:  (1) evidence

pertaining to news reporters and organizations; and (2) Mr. Libby's notes, information

connected to his morning intelligence briefings, and certain CIA documents relating to

Valerie Wilson.  The defense sought the Court's assistance in obtaining these materials

from the government early in the discovery process in part because it appeared that these

requests involved issues that might lead to future legal challenges or could otherwise

delay these proceedings.

The documents sought by this motion are just as important to Mr. Libby's

defense.  Here, we request documents concerning former Ambassador Joseph Wilson's

trip to Niger, and his wife's involvement with that trip, that were generated, sent or received by government officials who are likely to testify at trial in this case. We also request documents about these subjects that these witnesses may not have seen, but which were generated by the agencies where they worked, which include the White House, the State Department, and the CIA. Presumably, the government reviewed these documents during its investigation to identify useful witnesses or documents and to determine whether the testimony of witnesses was truthful. Rule 16 gives the defense the right to use these documents for precisely the same purposes.

The indictment relies heavily on the testimony of at least seven government officials about conversations with Mr. Libby that allegedly occurred between May 29 and July 8, 2003. The government claims that Mr. and/or Ms. Wilson were referred to in all of these conversations, and that these discussions should have been memorable to Mr. Libby three to nine months later. When these witnesses testify at trial, issues of memory, credibility, veracity and even potential bias will arise. It is inconceivable to think that the defense could adequately prepare to cross-examine these critical government witnesses without access to relevant memoranda, emails, and other documents from their files and the files of their employers.

The prosecution's refusal to provide the requested documents is a transparent attempt to force the defense to accept that the testimony of government witnesses is completely truthful, accurate and unbiased. But the indictment contains only unproven allegations. The defense has every right to test these allegations and to determine if supporting documents corroborate or contradict the testimony of government officials. Further, as set forth below, the defense may call additional witnesses who are

2

former government employees, and is entitled to review government documents that are necessary to prepare to examine them.

The documents Mr. Libby seeks are material to the preparation of the defense for two additional reasons. First, the indictment presents a distorted picture of the relevant events by exaggerating the importance government officials, including Mr. Libby, attributed to Ms. Wilson's employment status prior to July 14, 2003. The prosecution has an interest in continuing to overstate the significance of Ms. Wilson's affiliation with the CIA. Doing so makes it easier to suggest that Mr. Libby would not have forgotten or confused his conversations concerning Ms. Wilson and has therefore intentionally lied. In contrast, the defense intends to present a more complete and accurate narrative. The defense will show that during the controversy about the "sixteen words" in the President's 2003 State of the Union address and about Ambassador Wilson's criticism of the Bush Administration, government officials, including Mr. Libby, viewed Ms. Wilson's identity as at most a peripheral issue. To the extent that these officials were focused on Mr. Wilson, they were concerned with publicly disputing mistaken or misleading reports about his trip and his findings, not with where his wife worked.

The prosecution has largely denied Mr. Libby's requests for documents from agencies other than the Office of the Vice President ("OVP"). The Administration's response to Mr. Wilson's criticism and the "leak" of his wife's name, however, cannot be fully understood by focusing on the OVP alone. The actions of government officials from the White House, the State Department and the CIA – and the documents they generated – are part and parcel of this story. Indeed, many of the government's likely

witnesses are or were high ranking employees at the White House, the State Department and the CIA.

In addition, the events alleged in the indictment occurred during a period of increasing bureaucratic infighting, when certain officials at the CIA, the White House, and the State Department each sought to avoid or assign blame for intelligence failures relating to Iraq's weapons of mass destruction ("WMD") capability. The fingerpointing that went on within the Executive Branch about who was to blame will be a key issue in examining many of the government's witnesses because it goes to the question of bias. When the full context of the controversy over the sixteen words is presented to a jury, the jury will see that the relevant events were far more complex than the government has suggested in its discovery responses, and that the role of Ms. Wilson was peripheral. If the jury learns this background information, and also understands Mr. Libby's additional focus on urgent national security matters, the jury will more easily appreciate how Mr. Libby may have forgotten or misremembered the snippets of conversation the government alleges were so memorable.

The documents requested by this motion are also highly relevant to questions of motive. The defense has the right to make an affirmative showing that Mr. Libby had no motive to lie to the FBI or to the grand jury. Documents from other agencies, especially the White House and the State Department, will help the defense show that the Administration did not launch a concerted effort to "punish" Mr. Wilson by leaking his wife's identity, as has been suggested by a number of potential witnesses, including a key government witness, *Time* magazine reporter Matthew Cooper. These documents will also corroborate the defense position that neither Mr. Libby nor anyone

with whom he worked closely had done anything wrong with respect to Mr. Wilson or his wife.

Finally, we urge the Court to compel the document production requested because of the unique circumstances of this case.  That is, thorny issues of national security classification and executive privilege may need to be resolved before Mr. Libby is permitted to use certain documents as trial exhibits.  If it later becomes apparent during the trial that the OSC has withheld documents that are material to the preparation of the defense, the Court may not be able to cure such problems expeditiously, as would be possible in a more typical criminal trial.

FACTUAL BACKGROUND

A.     The Indictment

The indictment in this case is a far cry from the skeletal recitation of the elements of the offense necessary to meet the minimum requirements of the law.  Instead, through the indictment, the government introduces the key players, describes the context in which the alleged offenses took place, and weaves a story about the events leading up to Mr. Libby's allegedly false statements.  In other words, the government's own recitation of the relevant facts makes clear that the issues that will be raised and contested at trial involve far more than what Mr. Libby said or did not say to three reporters.

After describing Mr. Libby's former responsibilities as Assistant to the President, Chief of Staff to the Vice President, and Assistant to the Vice President for National Security Affairs, the indictment next discusses his obligations to safeguard classified information.  The indictment then introduces several other key individuals and entities, beginning with the CIA itself, which the indictment describes as "an agency of

5

the United States whose mission was to collect, produce, and disseminate intelligence and counterintelligence information to officers and departments of the United States government . . . ."  (Indictment, Count One, at ¶ 1(c), (d).)  Next to be introduced are Joseph Wilson, "a former career State Department official," and his wife, Valerie Plame Wilson.  (*Id.* ¶ 1(e), (f).)

The next subsection, entitled "Events Leading Up to July 2003," begins with a description of the sixteen words, delivered by President Bush as part of his 2003 State of the Union address, that led to a political firestorm:  "The British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa."  (*Id.* ¶ 2.)  The indictment goes on to describe the controversy surrounding those sixteen words that forms the backdrop of this case.  It jumps from the sixteen words to a description of a May 6, 2003 *New York Times* article by Nicholas Kristof, which, although it did not mention Mr. Wilson by name, was the first public report of Mr. Wilson's trip to Niger.  The indictment recounts how the Kristof column reported that the Vice President's Office had requested the investigation that led to Mr. Wilson's trip and stated that "an unnamed former ambassador" had "reported back to the CIA and the State Department in early 2002 that the allegations [of Iraqi efforts to obtain uranium from Niger] were unequivocally wrong and based on forged documents."  (*Id.* ¶ 3.)

The indictment then introduces a new character from the State Department:  "On or about May 29, 2003, in the White House, Libby asked an Under Secretary of State ("Under Secretary") for information concerning the unnamed ambassador's travel to Niger to investigate claims about Iraqi efforts to acquire uranium yellowcake. . . . The Under Secretary provided Libby with interim oral reports in late

6

May and early June 2003, and advised Libby that Wilson was the former ambassador who took the trip." (*Id.* ¶ 4.)  The indictment then describes several additional conversations between Mr. Libby and the Under Secretary during June 2003:  "On or about June 11 or 12, 2003, the Under Secretary of State orally advised Libby in the White House that, in sum and substance, Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of the trip." (*Id.* ¶ 6.)  We believe the Under Secretary referred to throughout the indictment is Marc Grossman, and we expect him to be a witness for the government at trial.

        The indictment next depicts Mr. Libby as manifesting a growing interest in Mr. Wilson's trip over the next several weeks.  It describes a conversation that took place on or about June 11, 2003 with a "senior officer of the CIA" in which the "senior officer" told Mr. Libby that Wilson's wife worked at the CIA "and was believed to be responsible for sending Wilson on the trip." (*Id.* ¶ 7.)  We understand this "senior officer" to be Robert Grenier, or possibly John McLaughlin, and we expect either or both men to be government witnesses at trial also.

        Paragraphs 8-14 paint a picture of government officials and journalists paying increasing attention to the issue of the sixteen words and Mr. Wilson's Niger trip during the first half of June 2003.  These paragraphs also convey a sense of the rising tension in various parts of the government as finger pointing began over who was responsible for the inclusion of the sixteen words in the State of the Union address.  For example, paragraph 11 describes another conversation Mr. Libby had with a government official about Wilson's trip, this time with a briefer from the CIA:  "On or about June 14, 2003, Libby met with a CIA briefer.  During their conversation he expressed displeasure

that CIA officials were making comments to reporters critical of the Vice President's office, and discussed with the briefer, among other things, 'Joe Wilson' and his wife 'Valerie Wilson,' in the context of Wilson's trip to Niger." (*Id.* ¶ 11.) The indictment also quotes Mr. Libby as criticizing the CIA for "selective leaking" of various "intelligence matters." (*Id.* ¶ 14.) We believe that the briefer referred to in paragraph 11 is Craig Schmall and that he will be a witness for the government at trial too. (However, it is also possible that the briefer referenced in this paragraph is Peter Clement or Matt Barrett.)

   After a paragraph describing Mr. Wilson's July 6 op-ed piece, as well as his other media exposure around that time, the indictment includes a section on "Libby's Actions Following Wilson's July 6 'Op-Ed' Column." This section provides, in effect, a list of the government's key trial witnesses. It details a series of conversations between Mr. Libby and officials in various parts of the government, including the White House, the CIA and the State Department. For example, the indictment describes a lunch conversation "on or about July 7, 2003" between Mr. Libby and the "then White House Press Secretary" at which Mr. Libby is alleged to have told the Press Secretary that Wilson's wife worked at the CIA and that the "information was not widely known." (*Id.* ¶ 16.) We believe that the official referred to in this paragraph is Ari Fleischer and that he will be a government witness.

   The indictment goes on to describe numerous additional conversations: a July 8 conversation between Mr. Libby and the Counsel to the Vice President, David Addington (*Id.* ¶ 18); a conversation between Mr. Libby and the "Assistant to the Vice President for Public Affairs," who we believe is Cathie Martin, in which she told

Mr. Libby that she had "learned from another government official that Wilson's wife worked at the CIA," whom we believe to be Bill Harlow (*Id.* ¶ 19); a July 10 or July 11 conversation with a "senior official in the White House," whom we believe to be Karl Rove, about the official's communications with Robert Novak concerning an article he was writing about Mr. Wilson's wife (*Id.* at ¶ 21); and conversations with Vice President Cheney (*Id.* ¶ 22). We believe that Mr. Addington, Ms. Martin, Mr. Rove and the Vice President will all testify at trial.

        The government clearly included these conversations in the indictment to create the impression of a world in which, during the period leading up to his conversations with Matthew Cooper, Tim Russert and Judith Miller, Mr. Libby was very focused on Mr. Wilson, his trip to Niger, and most of all, Mr. Wilson's wife. In fact, the portion of the indictment that describes Mr. Libby's grand jury testimony repeats each of these conversations with government officials in a summary format in order to drive this point home. The indictment contends that:

- In or about early June 2003, Libby learned from [Vice President Cheney] that Wilson's wife worked for the CIA in the Counterproliferation Division;

- On or about June 11, 2003, Libby was informed by a senior CIA officer [possibly Robert Grenier or John McLaughlin] that Wilson's wife was employed by the CIA and that the idea of sending him to Niger originated with her;

- On or about June 12, 2003, Libby was informed by the Under Secretary of State [Marc Grossman] that Wilson's wife worked for the CIA;

- On or about June 14, 2003, Libby discussed "Joe Wilson" and "Valerie Wilson" with his CIA briefer [possibly Craig Schmall], in the context of Wilson's trip to Niger;

…

- On or about July 7, 2003, Libby advised the White House Press Secretary [Ari Fleischer] that Wilson's wife worked for the CIA;

- In or about June or July 2003, and in no case later than on or about July 8, 2003, Libby was advised by the Assistant to the Vice President for Public Affairs [Cathie Martin] that Wilson's wife worked for the CIA;

…

- On or about July 8, 2003, Libby had a discussion with the Counsel to the Office of the Vice President [David Addington] concerning the paperwork that would exist if a person who was sent on an overseas trip by the CIA had a spouse who worked at the CIA.

(*Id.* at ¶ 33.)

As a threshold matter, Mr. Libby has the right to investigate, and, if he chooses, to contest the allegations relating to any of these conversations. Moreover, Mr. Libby's defense plans to fill in the gaps between these conversations with evidence showing the full extent of and context for his activities, including his national security duties and his efforts to work with other government officials to explain the controversy surrounding the sixteen words to the public.

B.    Mr. Libby's Grand Jury Transcript

In a letter dated January 23, 2006, the government informed the defense that it intends to introduce all of Mr. Libby's grand jury testimony at trial. (Jan. 23, 2006 Ltr. from Patrick J. Fitzgerald to William Jeffress, *et al.*, at 6, attached as Exhibit A.) The two transcripts collectively total 389 pages. The government also informed us that it seeks to make an issue at trial of Mr. Libby's alleged disclosures of a portion of the content of the October 2002 National Intelligence Estimate on Iraq's Continuing

Programs for Weapons of Mass Destruction, known as the NIE,[1] a subject the government claims is "inextricably intertwined with the narrative of spring 2003." (*Id.*)

Because Mr. Libby's testimony spanned a number of subject matters and because we have no way of knowing which of those matters, in addition to the NIE, the government will raise at trial, we are compelled to seek discovery regarding certain of the matters raised in the questions or answers given during Mr. Libby's testimony.

By making requests in this motion for documents connected to Mr. Libby's grand jury testimony, we do not concede the relevancy or admissibility at trial of these topics, and we reserve the right to object to the admission of the entire transcript of Mr. Libby's grand jury testimony at the appropriate time. We are seeking to compel production of documents related to these topics now because we cannot predict what motions *in limine* we may win or lose.

C.    Discovery Materials Requested by Mr. Libby

In a series of letters, the defense made and clarified requests to the government for the categories of discovery materials listed below. For example, the defense explained to the government that we would view an e-mail or memo sent, received or reviewed by a potential government or defense witness that contained a

---

[1]    The NIE was compiled by the various intelligence agencies within the government in response to requests for additional information regarding intelligence on Iraq. The NIE is the intelligence community's most authoritative document, and it details the findings of the work of several agencies. The government has further advised the defense that it is not willing to commit at this time to using the NIE only as background. (Feb. 15, 2003 Ltr. from Theodore V. Wells to Patrick J. Fitzgerald, at 2 n.2, filed under seal as Exhibit B.)

discussion or analysis of Mr. Wilson's trip to be relevant to this case and material to the

preparation of the defense within the meaning of Rule 16. Specifically, we explained that

> focusing on Mr. Grossman merely as an example, we
> would also view any other such documents that existed
> elsewhere in the State Department, where Grossman served
> as Under Secretary during the relevant time period, to be
> similarly relevant to the case and material to the
> preparation of the defense, even if Mr. Grossman did not
> personally send, receive or review them.

(Feb. 7, 2006 Ltr. from Theodore V. Wells to Patrick J. Fitzgerald, filed under seal as

Exhibit C.) The latter category of documents are material to the defense because they are

useful for, among other things, identifying admissible evidence, corroborating testimony

and preparing to examine witnesses.

In connection with documents that relate to Mr. Wilson's trip, which form

the core of the discovery requested here, the bulk of the documents the government has

agreed to provide voluntarily constitute documents produced by the OVP, and certain

other documents that were sent, received or reviewed by Mr. Libby, or that otherwise

refer to him. The government has largely denied Mr. Libby's discovery requests on

materiality grounds.

Finally, the prosecution has advised the defense that it has provided

certain additional documents from other government agencies that it does not view as

relevant, only as a matter of convenience and not because the law requires such

disclosure. The government's whim is no substitute for compliance with the

requirements of Rule 16. The government has provided the defense only a small fraction

of the documents in the OSC's actual possession relating to Mr. Wilson's trip that it

received from agencies other than the OVP. Indeed, in a March 7, 2006 letter the

prosecution stated that the investigation has gathered hundreds of thousands of documents. (*See* Mar. 7, 2006 Ltr. from Patrick J. Fitzgerald to John D. Cline, *et al.*, filed under seal as Exhibit D.) At present, the government has produced less than 12,000 pages of documents to the defense. This is a very small document production for a case that involves such complex issues. On the numbers alone, the government appears to have neglected its responsibilities under Rule 16.

DOCUMENT REQUESTS

On behalf of Mr. Libby, we hereby request the production of the following materials, to the extent they are within the possession, custody or control of the government:

A.    Documents Relating to Government Officials Who Are Likely To Testify as Witnesses at Trial

1.    All documents and information generated or received by the State Department, the CIA, the Executive Office of the President and/or the National Security Council ("NSC"), concerning Mr. Wilson's trip to Niger, including

a.    the origins of Mr. Wilson's trip to Niger, including any role played by Ms. Wilson in connection with the trip;

b.    reports about the trip; and

c.    subsequent discussion, comment or analysis concerning the trip, including government documents concerning the trip and/or Ms. Wilson's role in it that were generated after May 6, 2003, when the controversy surrounding the disputed sixteen words erupted.[2]

---

[2]    *See* Feb. 7 Ltr., Sealed Exhibit C; Feb. 14, 2006 Ltr. from Patrick J. Fitzgerald to John D. Cline, *et al.*, filed under seal as Exhibit E.

2.       All documents or communications reflecting any possible attempt or plan by any government official to punish or seek revenge against Mr. Wilson or Ms. Wilson.

3.       All documents reflecting Mr. Wilson's communications with officials at the State Department or other government agencies concerning his trip to Niger or the "sixteen words."

B.       Documents Relating to Mr. Libby's Grand Jury Testimony

1.       All documents relating to the possible declassification of the 2002 National Intelligence Estimate ("NIE") (in whole or in part).[3]

2.       All documents relating to or reflecting public comments by government officials about the NIE or its contents prior to July 18, 2003.

3.       All documents reflecting discussions within the government of whether to release a public statement during the week of July 7, 2003 regarding the inclusion of the "sixteen words" in the 2003 State of the Union Address, including all drafts of the July 11, 2003 statement issued by Director of Central Intelligence George Tenet.

---

[3]    The government has informed the defense that it possesses documents responsive to this request that it has chosen not to produce to the defense.  Although the government does not concede that these documents are material to the preparation of our defense, the government has agreed to "consider production" to the defense pending resolution of issues including waiver, privilege and confidentiality.  We hope to reach agreement with the government on these issues soon, but because a final agreement between the parties to facilitate the production of these documents has not yet been reached, and because the government does not agree that Rule 16 mandates their production, it is necessary for the defense to include this category of documents in this motion to compel.

4.    Any notes from the September 2003 meeting in the Situation Room at which Colin Powell is reported to have said that (a) everyone knows that Mr. Wilson's wife worked at the CIA and that (b) it was Mr. Wilson's wife who suggested that the CIA send her husband on a mission to Niger.

C.    Other Materials Requested Pursuant to Rule 16 and *Brady*

1.    The CIA's criminal referral to the Department of Justice ("DOJ") concerning the disclosure of Ms. Wilson's affiliation with the CIA, and all documents referenced or relied upon in the preparation of the referral.

2.    All documents or information concerning the identity of any government official outside the CIA who was aware prior to July 14, 2003 that Ms. Wilson worked for the CIA.

D.    Potential Witnesses

Documents responsive to Request A(1) from government files relating to the following potential trial witnesses are critical to trial preparation by the defense.[4]

1.    Richard Armitage, former Deputy Secretary of State

2.    Ari Fleischer, former White House Press Secretary

3.    Marc Grossman, former Under Secretary of State for Political Affairs

4.    Stephen Hadley, former Deputy National Security Advisor

5.    Bill Harlow, former CIA Spokesman

---

[4]    In addition, numerous witnesses from the OVP may testify at trial. We do not include witnesses from the OVP on this list because in light of the government's representation that it has produced all responsive documents from the OVP, we assume that the government has already produced documents from those witnesses that are responsive to the requests in this motion.

6.    Colin Powell, former Secretary of State

7.    Karl Rove, Deputy Chief of Staff to the President

8.    George Tenet, former Director of Central Intelligence

9.    The CIA Briefer referred to in paragraph 11 of the indictment
      (Craig Schmall, Peter Clement or Matt Barrett)

10.   The Senior CIA Official referred to in paragraph 7 of the
      indictment, who may be either Robert Grenier or John McLaughlin

11.   Joseph Wilson

12.   Valerie Plame Wilson

<u>ARGUMENT</u>

A.    <u>The Rule 16 Standard in this Jurisdiction Is Interpreted Expansively</u>

Because we have discussed the disclosure requirements of Federal Rule of

Criminal Procedure 16(a)(1)(E)(i) in detail in prior discovery motions, we will not

reiterate the applicable standard at length here.  Briefly put, courts in this jurisdiction

have interpreted Rule 16 expansively to ensure that the defense has a fair opportunity to

prepare for trial.  The D.C. Circuit has repeatedly held that evidence in the government's

possession is material under Rule 16 and must be disclosed to the defense "as long as

there is a strong indication that it will play an important role in uncovering admissible

evidence, aiding witness preparation, corroborating testimony, or assisting impeachment

or rebuttal."  *United States* v. *Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) (quoting *United

States* v. *Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)) (internal quotation marks omitted).

In this jurisdiction, the "materiality standard normally is not a heavy burden."  *Lloyd*, 992

F.2d at 351 (internal citation and quotation marks omitted).

Documents containing both inculpatory and exculpatory information are material and discoverable under Rule 16 if they help the defense to ascertain the strengths and weaknesses of the government's case. *Marshall*, 132 F.3d at 67-68. The defense is entitled to use such materials to prepare strategies to confront damaging evidence at trial, conduct investigations to discredit such evidence, or avoid presenting defenses that are undercut by such evidence. *Id.* at 68. Further, the government is not permitted to avoid its disclosure obligations under Rule 16 by relying on its own narrow view of what types of defenses are appropriate for the defendant to present at trial. *United States* v. *Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005).

In addition, "[s]imply because [documents] were not sent to or received by [the defendant] and therefore do not directly reflect his state of mind, and may or may not be admissible evidence at trial, does not mean that they are not material to the preparation of a defense or that they will be unlikely to lead to admissible evidence." *Id.* at 18. The Court rejected this contention by the government in *Safavian*, and ruled that even documents the defendant had never seen could corroborate his allegedly false statements, and could assist him in finding witnesses or documents to support other defenses. *Id.*

To the extent that any of the documents requested by this motion are classified, such documents are discoverable because they also satisfy the "helpfulness" standard set forth in *United States* v. *Yunis*, 867 F.2d 617 (D.C. Cir. 1989), and should therefore be produced to the defense. The highly sensitive nature of any classified documents requested should not prevent their production, because the use, relevance and admissibility of such documents at trial will be addressed under CIPA.

In a March 10, 2006 Memorandum Opinion in this case, the Court held that documents in the physical possession of government agencies other than the Office of Special Counsel will be considered within the possession, custody or control of the prosecution. The Court found that the prosecution had "knowledge of and access to the documents" from the OVP and the CIA, and that these two entities "are closely aligned with the prosecution." Mar. 10, 2006 Opinion at 15. Just like the White House (which includes the Executive Office of the President, the NSC and the OVP) and the CIA, the State Department has also sent a "rather free flow of documents" to the prosecution "which have then been used to investigate the alleged unauthorized disclosure of classified information and which were used as the basis for obtaining the indictment in this case." *Id.* at 14-15. Accordingly, the Executive Office of the President, the NSC and the State Department are also "aligned with the prosecution."

The prosecution should not face any significant burden in obtaining the documents requested here. We are confident that most of the documents we seek have already been produced by government agencies to the OSC, and that the prosecution will merely have to review its own files to identify responsive documents. Further, we anticipate that it will not be difficult for the prosecution to acquire the few targeted categories of documents that may not currently be in the OSC's physical possession. Finally, the requests in this motion should not be construed as requests for grand jury transcripts or FBI 302 reports that fall under the Jencks Act.

B.    **The Discovery Mr. Libby Has Requested Is Material to the Preparation of His Defense**

To reiterate the document request that is central to this motion, we seek documents that concern Mr. Wilson's trip to Niger, including reports about the origin and circumstances of the trip, and subsequent discussion, comment or analysis concerning the trip. The defense is entitled to all such documents from each government agency that has played a significant role in the case: the White House, the State Department and the CIA. At a minimum, we are entitled to documents concerning Mr. Wilson's trip to Niger that were generated, sent or received by officials from these agencies who are likely to testify at trial, so we can prepare to examine them.

Below, we first describe our requests on an agency-by-agency and witness-by-witness basis to furnish concrete examples that may assist the Court in understanding why the documents sought are material to the preparation of the defense. We then provide two separate and independent reasons that compel the conclusion that the documents requested are discoverable under Rule 16 – context and motive.

1.    **The Defense Is Entitled to Documents Necessary To Prepare To Examine Witnesses**

a.    **CIA Witnesses**

As discussed above, at least two witnesses from the CIA are likely to testify at trial for the government – the "senior officer of the CIA" mentioned in paragraph 7 of the indictment, and the "CIA briefer" referenced in paragraph 11 of the indictment. Either the government or the defense may call Mr. Tenet to testify about the Administration's public response to the controversy surrounding the sixteen words (and the declassification of the NIE, an issue described further below in subsection 4).

19

Additionally, the defense may call other current or former CIA officials as witnesses, including Bill Harlow, formerly the Agency's spokesman.

The defense is entitled to all CIA documents that concern to Mr. Wilson's trip to Niger, including reports about the trip and subsequent discussions of it. At the very least, the government must produce all documents that concern Mr. Wilson's trip that were generated, sent or received by CIA witnesses.

Such documents are also undoubtedly material to the defense because they relate directly to allegations in the indictment. Specifically, the indictment alleges that both the CIA senior officer and the CIA briefer discussed with Mr. Libby subjects including "the origin and circumstances of Wilson's trip" and the nature of Ms. Wilson's employment status. (Indictment, Count One at ¶¶ 7, 11.)

The CIA documents requested are also discoverable under Rule 16 for another reason. During the relevant time period, the CIA began to blame the White House for misusing intelligence reports relating to Iraq's WMD capabilities and improperly pressuring CIA analysts. The White House and the CIA were widely regarded to be at war in 2003 over the inclusion of the sixteen words in the President's State of the Union address. The indictment alleges that Mr. Libby expressed to the CIA briefer "displeasure that CIA officials were making comments to reporters critical of the Vice President's office," and that Mr. Libby made similar comments on at least two other occasions. (*Id.* ¶ 11.) To take another example, former *Time* reporter John Dickerson has written that in a July 2003 press conference, when the President blamed the CIA for the inclusion of the sixteen words in his speech,

> [t]his was news.  The president was known for his loyalty
> to subordinates, but here he was throwing his CIA director,
> George Tenet, under a bus.  This wasn't just a personal
> departure by the president.  It was the ultimate blow in the
> bureaucratic battle between the CIA and his White House.

(John Dickerson, *Where's* My *Subpoena? Valerie Plame, Scooter Libby, and me.*,

www.slate.com, Feb. 6, 2006 at 2, attached as Exhibit F.)

If CIA officials perceived that Mr. Tenet or the Agency were being

unfairly criticized or scapegoated, these officials likely expressed their discontent about

this bureaucratic infighting in email messages and other documents.  The defense is

entitled to review any such documents because they bear directly on potential bias against

Mr. Libby by CIA witnesses.

<u>Bill Harlow</u>.  After Mr. Novak disclosed Ms. Wilson's identity in his July

14, 2003 column, he wrote a follow-up article in which he stated:  "[T]he CIA never

warned me that the disclosure of Wilson's wife working at the agency would endanger

her or anybody else."  (Robert Novak, *Columnist wasn't pawn for leak*, CHICAGO SUN

TIMES, Oct. 1, 2003 at p. 49, attached as Exhibit G.)  Mr. Novak went on to explain that

he had discussed including Ms. Wilson's name in his July 14 column with a CIA official

before publishing it.  According to Mr. Novak, although that CIA official asked him not

use Ms. Wilson's name, "[h]e never suggested to me that Wilson's wife or anybody else

would be endangered.  If he had, I would not have used her name."  (*Id.*)

We now know that the CIA official in question is Bill Harlow, who was at

the time the CIA's spokesman.  At trial, the defense may question Mr. Harlow about

whether the CIA made any serious efforts to prevent the disclosure of Ms. Wilson's

employment status, which the government alleges was sensitive and classified.  In

addition, we believe that Mr. Harlow was the "government official," (Indictment, Count

One, at ¶ 19), who told Cathie Martin that Mr. Wilson's wife worked at the CIA.  The

CIA documents sought by this motion will allow the defense to prepare for Mr. Harlow's

examination.

b.      State Department Witnesses

Under Rule 16, the government is obligated to provide Mr. Libby with all

documents in the government's possession from the State Department that concern

Mr. Wilson's trip to Niger, including reports about the origin and circumstances of the

trip and subsequent discussion and analysis of it.  At a minimum, the government should

be required to produce all documents that concern Mr. Wilson's trip that were generated,

sent or received by any current or former State Department official who is likely to testify

at trial.

Marc Grossman.  Mr. Grossman, one of the highest ranking officials in the

State Department, will undoubtedly be a critical witness for the government.  The

indictment alleges that Mr. Grossman had at least two important conversations with

Mr. Libby about Mr. Wilson, on May 29, 2003 and June 11 or 12, 2003.  (*Id.* ¶¶ 4, 6.)

According to the indictment, during the latter conversation Mr. Grossman told Mr. Libby

that "Wilson's wife worked at the CIA and that State Department personnel were saying

that Wilson's wife was involved in the planning of his trip."  (*Id.* ¶ 6.)  The alleged

statements by Mr. Grossman in the indictment thus dovetail with our requests for State

Department documents that pertain to Mr. Wilson's trip to Niger.

Documents pertaining to Mr. Wilson's trip from Mr. Grossman's files

must also be examined carefully by the defense because Mr. Grossman may not be a

22

disinterested witness.  This week, *Vanity Fair*, the *Washington Post* and *The New York Times*, as well as other media outlets, reported that Richard Armitage, former Deputy Secretary of State, told Bob Woodward of the *Washington Post* that Ms. Wilson worked for the CIA.  There has been media speculation that Mr. Woodward's source and Mr. Novak's source are the same person.  If the facts ultimately show that Mr. Armitage or someone else from the State Department was also Mr. Novak's primary source, then the State Department (and certainly not Mr. Libby) bears responsibility for the "leak" that led to the public disclosure of Ms. Wilson's CIA identity.  Mr. Grossman worked closely with Mr. Armitage, who was then the second-highest ranking official in the State Department.  If Mr. Armitage or another State Department official was in fact the primary source for Mr. Novak's article, Mr. Grossman's testimony may be colored by either his personal relationship with Mr. Armitage or his concern for the institutional interests of the State Department.[5]  The discovery materials sought by this motion are precisely the documents that will allow the defense to probe such issues prior to trial, in order to ascertain which "pitfalls" to avoid or soft spots to exploit on cross-examination. *See Marshall*, 132 F.3d at 67.

   Colin Powell.  The defense may call Mr. Powell to testify about a September 2003 meeting at the White House during which he is reported to have commented that everyone knows that Mr. Wilson's wife works at the CIA.  At the same meeting, Mr. Powell also reportedly mentioned a 2002 meeting during which Ms. Wilson

---

[5] Regardless of whether Mr. Armitage is responsible for the leak to Mr. Novak, the defense may call him to testify about other matters, including the expected testimony of his former colleagues, Mr. Grossman and Mr. Powell.

suggested her husband for the CIA mission to Niger.  It has also been publicly reported that during a presidential trip to Africa that took place from July 7 through July 12, 2003, a copy of a State Department report about Mr. Wilson's trip was sent to Air Force One for Mr. Powell.  (Barton Gellman, *A Leak, Then a Deluge,* WASHINGTON POST, Oct. 30, 2005 at A01, attached as Exhibit I.)  That document, according to press reports, in a section marked Secret, stated that Mr. Wilson was sent to Niger because his wife, who worked at the CIA, recommended him for the mission.  Further, again according to press accounts, this report may have been reviewed and discussed by government officials on that trip, who in turn may have shared information about Ms. Wilson with journalists.

Mr. Libby is entitled to examine Mr. Powell about these issues, as well as his knowledge of Mr. Wilson's trip to Niger and his communications with other government officials about that trip.  The State Department documents sought by this motion are precisely the discovery materials that will allow the defense to prepare to examine Mr. Powell.

c.     White House Witnesses

At least three witnesses from the White House are likely to testify at trial: former White House Press Secretary Ari Fleischer, then-Deputy National Security Advisor Stephen Hadley, and senior presidential advisor Karl Rove.  The government is obligated to provide documents from the White House that concern Mr. Wilson's trip to Niger, and in particular must also produce documents that Mr. Fleischer, Mr. Hadley and Mr. Rove generated, sent or received that concern this subject.

Ari Fleischer.  The government's case appears to rely heavily on the testimony of Mr. Fleischer.  According to the indictment, on July 7, 2003, Mr. Libby

advised Mr. Fleischer "that Wilson's wife worked at the CIA and noted that such information was not widely known."  (Indictment, Count One, at ¶ 16.)[6]

The press has reported that Mr. Fleischer reviewed the State Department report sent to Air Force One during the Africa trip, and has speculated that he divulged information to reporters concerning Ms. Wilson during the trip.  (*A Leak, Then A Deluge*, Exhibit I; *Prosecutor's Probe Centers on Rove*, *Memo, Phone Calls (Update 2)*, BLOOMBERG, July 18, 2003, attached as Exhibit J.)  On cross-examination at trial, the defense will be entitled to question Mr. Fleischer on issues such as:  (1) when and how he learned about Ms. Wilson's identity; (2) the nature of his conversations with reporters; and (3) any efforts he undertook to criticize Mr. Wilson.  If the press reports are correct, and Mr. Fleischer disclosed information concerning Ms. Wilson to reporters, he himself may have been a subject of Mr. Fitzgerald's investigation.  Mr. Fleischer may thus have a motive to shade his testimony.  Such possible bias will be vigorously explored on cross-examination.  The White House documents the defense has requested are precisely the documents necessary to prepare to examine Mr. Fleischer on these and other subjects.

<u>Karl Rove</u>.  Either the government or the defense may call Mr. Rove as a witness at trial.  The indictment alleges that on July 10 or 11, 2003, "Official A" (who is now known to be Mr. Rove) told Mr. Libby that he had discussed Ms. Wilson's employment by the CIA with Mr. Novak, who would be writing a story about her.  (Indictment, Count One, at ¶ 21.)  Again, the White House documents Mr. Libby seeks

---

[6]    Additional information about Mr. Fleischer's role in this case is contained in a February 2, 2006 Letter from Patrick J. Fitzgerald to John D. Cline, *et al.*, filed under seal as Exhibit H.

are co-extensive with the documents that are necessary for the defense to prepare to examine this witness at trial.[7]

Stephen Hadley.  Although Mr. Hadley is not mentioned in the indictment, he may nevertheless be a witness at trial.  Based on our review of discovery and our own investigation, we believe that Mr. Hadley may offer important testimony about discussions within the Administration concerning the need to rebut Mr. Wilson's statements about his trip and his conclusions.  In addition, Mr. Hadley was active in discussions about the need to declassify and disseminate the NIE and had numerous conversations during the critical early July period with Mr. Tenet about the sixteen words and Mr. Tenet's public statement about that issue.

Finally, we stress that the government's disclosure obligations are not limited to the files of these particular White House witnesses.  The defense is also entitled to all White House documents relating to Mr. Wilson's trip to Niger that could undermine or corroborate the expected testimony of these witnesses, and other White House documents that could be used to develop lines of questioning for their examinations at trial.

---

[7]    Although the grand jury's investigation may be continuing with respect to Mr. Rove or other witnesses, the government has cited no case holding that concerns over grand jury secrecy can eviscerate the government's discovery obligations under Rule 16. Any such concerns should be addressed through amendments to the terms of the protective order entered by the Court on November 23, 2005.  Mr. Rove is going to be a key witness at this trial, and the government cannot sit on material documents that he reviewed or generated just because there is a continuing investigation.

2.    The Defense Is Entitled To Documents that Will Establish the
Proper Context for the Events Described in the Indictment

In the section above, we have explained one reason why certain documents sought by this motion are material to the defense – because they are necessary to prepare to examine witnesses at trial.  Here, we present a second, independent reason why production of these documents is required.  They are necessary to put the controversy over the sixteen words, and the peripheral role that Ms. Wilson played in that controversy, in proper context.

As described above, the media conflagration ignited by the failure to find WMD in Iraq and in part by Mr. Wilson's criticism of the Administration, led officials within the White House, the State Department, and the CIA to blame each other, publicly and in private, for faulty prewar intelligence about Iraq's WMD capabilities.  Although the indictment purports to portray this controversy, its portrayal is distorted.  The government's version of events blows out of proportion the minor role Ms. Wilson actually played and in doing so creates an impression that is highly prejudicial to Mr. Libby.

The indictment suggests that to Mr. Libby and other government officials, Ms. Wilson's role in sending her husband to Africa was important.  But in reality, Ms. Wilson was not important.  The falsity of statements made and attributed to Mr. Wilson about his trip to Niger was important, and to the extent Mr. Libby devoted attention to the matter during June and July 2003, he was focused on correcting the public record, not on Mr. Wilson's wife.  Mr. Libby has the right to tell the full story not only through his own testimony, but also by using documents from other government agencies that will corroborate the truthfulness and accuracy of his account of the facts.

We expect that documents from the White House, the State Department and the CIA will corroborate Mr. Libby's account that Ms. Wilson's affiliation with the CIA was regarded throughout the government as a minor issue prior to Mr. Novak's article. Such documents will show that the overwhelming focus of the government's response to Mr. Wilson's charges included making the following types of counter-arguments (among others) to reporters:

- Mr. Wilson was not sent to Niger at the Vice President's behest.

- The report of Mr. Wilson's debriefing after his trip was not shared with the Vice President, or any senior officials in the White House or CIA, before the State of the Union Address.

- Contrary to Mr. Wilson's claims, he did not debunk as forgeries documents suggesting that Iraq was attempting to purchase uranium from Africa.

- Mr. Wilson's report was not conclusive.

Documents that substantiate these themes are material to the preparation of the defense because they contain what the Supreme Court calls the "persuasive power of the concrete and particular." *Old Chief* v. *United States*, 519 U.S. 172, 187 (1997); *see id.* at 189 ("A syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it."). In other words, a jury is not likely to be convinced that Mr. Libby was not focused on Ms. Wilson's identity during June and July 2003 based only on his unsupported denials. The defense will need to demonstrate, in part through the documents sought by this motion, a more complete account of the government's response to Mr. Wilson's criticism, and the defense will also need to corroborate Mr. Libby's version of events.

28

The documents we have requested may further corroborate expected witness testimony that within the government Ms. Wilson's employment status was not regarded as classified, sensitive or secret, contrary to the allegations in the indictment. But these documents are just as material under Rule 16 if they tell a different story, so the defense can avoid presenting defenses that are "undercut by such evidence." *Marshall*, 132 F.3d at 68.

3.     Mr. Libby Is Entitled To Demonstrate that He Had No Motive to Lie to the FBI or the Grand Jury

The third independent reason why Mr. Libby is entitled to the documents requested in this motion is because they are relevant to issues of motive. First, Mr. Libby had no intent to lie because he did not believe that Ms. Wilson's employment status was classified. Second, Mr. Libby was not part of a conspiracy to harm Mr. Wilson by disclosing his wife's CIA affiliation and thus had no reason to cover up such involvement. Third, Mr. Libby did not believe anyone who worked closely with him had done anything wrong and thus had no motive to lie to protect anyone else.

By way of example, this motion requests documents from other government agencies that relate to whether an Administration plan to punish or discredit Mr. Wilson existed. The government may argue that such a request should be denied because Mr. Libby has not been charged with any conspiracy-based offenses. But such an argument is beside the point. The defense is entitled to make an affirmative showing on this point to support the argument that Mr. Libby lacked any motive to lie to the FBI or the grand jury, and needs the requested documents to do so adequately.

Such a showing is critical because for over two and a half years, the "leak" of Ms. Wilson's identity has been widely regarded as part of a White House plot to punish Mr. Wilson. In fact, a key government witness has made this allegation publicly.[8] Mr. Libby has been repeatedly and falsely accused of participating in such a conspiracy. It is now clear that such statements have no basis in fact. The primary source for Mr. Novak's article is an official from *outside* the White House.

Mr. Libby intends to show at trial that because he knew that he was not a source for Mr. Novak's article, he had no motive to obstruct justice or mislead the FBI or grand jury. The defense further intends to demonstrate that Mr. Libby did not participate in any supposed plot to punish Mr. Wilson by leaking his wife's identity. Such facts will help to explain that Mr. Libby had no conceivable reason to lie, because he did not think that he or anyone with whom he worked closely had done anything wrong. Because Mr. Libby may testify at trial about these issues, the defense needs to begin preparing now for challenges to his credibility on cross-examination. Finally, because Rule 16 gives the defense the right to determine whether evidence that undercuts defense theories

---

[8]    Matthew Cooper, has stated that his July 17, 2003 article titled "A War on Wilson?" was designed to call attention to government officials who were doing "malevolent things" to "smear" Mr. Wilson. (Tr. CNN, "Reliable Sources," December 12, 2004, attached as Exhibit K.) Additionally, Mr. Wilson – another potential trial witness – has published a book that names Mr. Libby as "quite possibly the person who exposed my wife's identity" and accuses the Administration of trying to intimidate whistleblowers from coming forward (even though evidence exists to show that Mr. Wilson himself disclosed his wife's identity outside the intelligence community prior to July 14, 2003). (JOSEPH WILSON, THE POLITICS OF TRUTH: INSIDE THE LIES THAT PUT THE WHITE HOUSE ON TRIAL AND BETRAYED MY WIFE'S CIA IDENTITY 442 (Carroll & Graf 2004).)

exists, the documents that Mr. Libby seeks are just as material under Rule 16 if they show

that certain White House officials sought to disparage Mr. Wilson unfairly in the press.

> 4. The Defense Is Entitled To Documents Necessary To Challenge
> the Government's Arguments Relating to the NIE and Other
> Aspects of Mr. Libby's Grand Jury Testimony

The government has put the defense on notice that at trial it plans to focus

on Mr. Libby's disclosure of certain portions of the NIE to Judith Miller, as discussed in

Mr. Libby's grand jury testimony. (Jan. 23 Ltr., Exhibit A at 6.) Mr. Libby has testified

before the grand jury that this disclosure was authorized. (*Id.*) The defense has the right

to rebut any suggestion by the government that Mr. Libby's disclosure of portions of the

NIE was improper by showing that Mr. Libby believed his actions were authorized and

involved only disclosure of declassified materials, which will demonstrate that his actions

did not constitute a "leak." Accordingly, through this motion, we seek any

communications within the Executive Branch pertaining to the disclosure and

declassification of the NIE that are discoverable under Rule 16 or *Brady*, as set forth in

Document Requests B(1) and (2) above.

The prosecution has also advised the defense that it wants to introduce the

entire transcript of Mr. Libby's grand jury testimony. We are therefore compelled to seek

discovery from the government concerning certain of the matters raised in either the

questions or answers during the course of Mr. Libby's testimony. These subjects include

documents relating to Mr. Tenet's July 11, 2003 statement and notes relating to a

September 2003 Situation Room meeting.

In addition, during his grand jury testimony, Mr. Libby was asked about

discussions concerning Mr. Wilson's trip, the government's response to Mr. Wilson's

criticism, and whether there was a concerted effort by any officials in the Administration

to leak his wife's name.  The defense must prepare for Mr. Libby's grand jury testimony

on these subjects to be introduced at trial, which is yet another reason why Mr. Libby is

entitled to further discovery from other government agencies about these subjects.

C.    Documents Relating to the CIA's Referral to DOJ Should Be Produced to
      the Defense

The defense also seeks production of the CIA's criminal referral to DOJ

concerning the disclosure of Ms. Wilson's affiliation with the CIA, and documents

referenced in the referral.  Based on published news reports, it appears that there were

several communications between the CIA and DOJ regarding whether or not an

investigation into the disclosure of Ms. Wilson's identity was "warranted," and that the

issue may have been the subject of some internal debate.  (*See* Jan. 30, 2004 Ltr. from

Stanley M. Moskowitz to The Hon. John Conyers, Jr., attached as Exhibit L; Mike Allen,

*Bush Aides Say They'll Cooperate With Probe Into Intelligence Leak*, WASHINGTON

POST, September 29, 2003 at A01, attached as Exhibit M.)

The referral documents reportedly contain information on the nature of

Ms. Wilson's employment status and the extent of any harm to national security caused

by the disclosure of her identity.  (Dana Milbank and Susan Schmidt, *Justice Department

Launches Criminal Probe of Leak,* WASHINGTON POST, October 1, 2003 at A01, attached

as Exhibit N.)  The OSC possesses the referral documents, but has refused to produce

them to the defense on the grounds that they are neither material to the preparation of the

defense, nor exculpatory.  (Feb. 21, 2006 Ltr. from Kathleen Kedian to John D. Cline, *et

al.*, attached as Exhibit O.)  The OSC further claims that the referral documents are

protected from disclosure because they are covered by the deliberative process privilege, the law enforcement privilege and the attorney-client privilege.

It is the burden of the party asserting a privilege to prove that the privilege covers the documents or communications at issue, and the government has yet to establish that any of the asserted privileges apply in this case. *In re Lindsey*, 148 F.3d 1100, 1106 (D.C. Cir. 1998). We recognize that the privileges to which the government has alluded are not easily overcome (although in this case, they may have been waived through disclosure to the press). Accordingly, for the time being, we seek only the unprivileged facts contained within the referral documents. To the extent that any of the documents are privileged, the defense requests that the Court conduct an *in camera* review of those documents to determine if the material contained therein is exculpatory or sufficiently important to the defense to overcome any qualified privilege.[9]

The deliberative process, law enforcement privileges, and the attorney work-product doctrine afford only qualified protection, which may be overcome by a sufficient showing of need by the defense. *See In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988) (law enforcement investigatory privilege and attorney work product); *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (the deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need). Mr. Libby's

---

[9]    It bears mentioning here that the entire criminal referral by the CIA to DOJ may be infected by bias on the part of the CIA. News reports have indicated that Mr. Tenet, a potential witness in the case, sent a memo to DOJ "raising a series of questions about whether a leaker had broken federal law" while DOJ officials were mulling over whether a formal investigation into the disclosure of Ms. Wilson's identity was even warranted. (*Bush Aides Say They'll Cooperate With Probe Into Intelligence Leak*, Exhibit M.)

need for the documents in this case is clear and sufficient to overcome any of these

qualified privileges, if they are even applicable, because the documents and the

information they contain cannot be obtained from any sources other than the CIA.

> **D.**   **Documents and Information Sought by this Motion Are Discoverable Under *Brady* and Its Progeny**

Certain documents and information responsive to the requests in this

motion are also discoverable under the doctrine set forth in *Brady* v. *Maryland*, 373 U.S.

83 (1963), and its progeny.  Because we have explained the government's disclosure

obligation under the *Brady* doctrine in detail in previous discovery motions, we need not

do so again here.

Many of the discovery materials Mr. Libby seeks through this motion

constitute information "favorable to the accused" and therefore must be produced.

Information, for example, that tends to show that Mr. Libby did not improperly disclose

the contents of the NIE is surely *Brady* material.  In addition, documents that help

establish that no White House-driven plot to punish Mr. Wilson caused the disclosure of

Ms. Wilson's identity also constitute *Brady* material.  The same is true for information

that tends to show that government officials who knew that Ms. Wilson worked for the

CIA did not treat that information as classified.

CONCLUSION

For the reasons stated herein, the requests for disclosure of documents and information should be granted, and an Order entered in the form attached hereto.

March 17, 2006                                     Respectfully submitted,


/s/ Theodore V. Wells, Jr.                        /s/ William H. Jeffress, Jr.
Theodore V. Wells, Jr.                            William H. Jeffress, Jr.
(DC Bar No. 468934)                               (DC Bar No. 041152)
James L. Brochin                                  Alex Bourelly
(DC Bar No. 455456)                               (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                     Baker Botts LLP
  & Garrison LLP                                  1299 Pennsylvania Ave., NW
1285 Avenue of the Americas                       Washington, DC  20004
New York, NY  10019-6064                          (202) 639-7751
(212) 373-3089


/s/ Joseph A. Tate                                /s/ John D. Cline
Joseph A. Tate                                    John D. Cline
Dechert LLP                                       (D.C. Bar No. 403824)
2929 Arch Street                                  Jones Day
Cira Centre                                       555 California Street, 26th Floor
Philadelphia, PA  19104                           San Francisco, CA  94104
                                                  Tel:  (415) 626-3939
                                                  Fax:  (415) 875-5700