# EXHIBIT A



# RECEIVED

## Office of Special Counsel    JAN 2   2006

---

*Patrick J. Fitzgerald*    *Chicago Office:* *Dirksen Federal Building*              *Washington Office:* *Bond Building*
*Special Counsel*                        *219 South Dearborn Street, Fifth Floor*                      *1400 New York Avenue, Ninth Floor*
                                         *Chicago, Illinois 60604*                                     *Washington, DC 20530*
                                         *(312) 353-5300*                                              *(202) 514-1187*

*Please address all correspondence to the Washington Office*

<u>**Via Telefax & Regular Mail**</u>          January 23, 2006

William Jeffress, Esquire          Theodore V. Wells, Esquire          Joseph A. Tate, Esquire
BAKER BOTTS                        PAUL WEISS LLP                      DECHERT LLP
The Warner                         1285 Avenue of the Americas         Cira Centre
1299 Pennsylvania Avenue, N.W.     New York, NY 10019-6064             2929 Arch Street
Washington, DC 20004-2400                                              Philadelphia, PA 19103

Re:   <u>United States v. I. Lewis Libby</u>

Dear Counsel:

This letter is in response to your letter of January 5, 2006. We incorporate the prior responses in our letters of December 3, 2005, and January 9, 2006. This follows our telephone conference of January 18, 2006.

As a preliminary matter, your letter indicates a belief that it is "very common" in the District of Columbia to engage in "open file" discovery, but my understanding is to the contrary. To my understanding, "open file" discovery is not common in that district, nor in the Department of Justice more broadly. That is particularly the case where the matter involves extensive classified and national security materials. Moreover, it is not the ordinary practice for federal prosecutors to provide discovery in a perjury/obstruction of justice prosecution as to all matters that were considered but not charged in the overarching grand jury investigation, particularly one that is ongoing. As you are aware, your client has not been charged with a substantive violation of Title 18, United States Code, Section 793. Accordingly, your client is not entitled to discovery of sensitive national security materials pertinent only to a prosecution of a substantive violation of that statute.

In any event, the fact that we have not elected to provide you with everything the defense has requested should not obscure the fact that the defense is being given far more discovery than is required by the language of Rule 16 of the Federal Rules of Criminal Procedure. To cite but one example, we are making available to you all material obtained from the Office of Vice President: in essence, "open file" discovery regarding the office where your client was employed. We have endeavored to draw a line that expedites resolution of this matter while at the same time safeguarding other governmental interests and the ongoing investigation. In making discovery

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 2

determinations, we have endeavored to provide no preferential treatment of Mr. Libby solely on account of his former official position.

I note that our January 18, 2006, telephone conference was productive in achieving a clearer understanding of the areas where we disagree which will lend itself to presentation to the court for resolution. We also agreed during the telephone conference that if we decided to produce any items to you despite our belief that we were not required to do so that you would not view such production as a waiver of our position that such discovery was not required or argue that such a production was a concession that we were obligated to produce any additional documents that may be in the possession of other government agencies.

In your requests, you greatly expand the sweep of subsection 16(a)(1)(E) which governs "documents and objects" by making requests for "information," rather than "documents and objects," and by defining documents "material to preparing the defense" to include memos, recordings and transcripts in a manner which would sweep in grand jury minutes and reports of interview (most commonly reports of interview in the form of FBI form 302's) . That is flatly inconsistent with the narrower category of "documents and objects" set forth in subsection 16(a)(1)(E) and is contrary to both subsection 16(a)(2) which says that reports and government memoranda (prepared by an attorney or agent) are not discoverable, and to subsection 16(a)(3) which limits grand jury transcript discovery to the defendant's grand jury testimony. To define "documents" to include grand jury transcripts and debriefing reports would contravene the Jencks Act and the enumerated provisions of Rule 16. Thus, in reviewing our response, you should understand that, unless specified otherwise below, we are not producing such grand jury transcripts or FBI 302's or other reports, as they are not required to be produced pursuant to Rule 16.

We respond in greater detail to your enumerated requests as follows:

(1): You demand access to all documents referencing Mr. Wilson's 2002 trip to Iraq. The relevance of Mr. Wilson's 2002 trip is the fact that it occurred and that it became a subject of discussion in spring 2003. What took place during that trip is not relevant to the issue of whether Mr. Libby lied about his spring 2003 conversations with various reporters and government officials about Mr. Wilson's wife's employment at the Central Intelligence Agency ("CIA"). Thus, a request for every document which in any way relates to Mr. Wilson's trip and any communications Mr. Wilson had with anybody at any time about the trip is over broad and any attempt to comply with such a request would significantly delay, not expedite, resolution of this matter. Nonetheless, all documents in our possession reflecting conversations involving defendant Libby about Wilson's trip, or meetings Mr. Libby attended during which Mr. Wilson's trip was discussed, have been produced or will be produced prior to February 3. Moreover, when you review the materials in our possession which we have produced or will be producing to you, specifically including the copies of all documents obtained from the Office of Vice President and the materials from our set of

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 3

documents obtained from the Central Intelligence Agency ("CIA"), you will note that they include substantial materials which concern or reflect Mr. Wilson's trip.

(2): We do not have any responsive materials other than material that would be produced pursuant to the Jencks Act if the Government were to call Mr. Wilson to testify at trial, which we do not expect to do. You are obviously aware that Mr. Wilson has made public speeches, written an Op Ed in the *New York Times*, published a book and has been interviewed by media.

(3): As set forth in our prior correspondence, we will not produce every document related in any way to Ms. Wilson's employment, nor is Mr. Libby entitled to every document that might reflect on the damage to national security from disclosure of her employment. However, as we discussed during our telephone conference call on January 18, we intend to address the matter of the use, relevance and admissibility of information concerning Ms. Wilson's employment at the CIA in the context of the Classified Information Procedures Act ("CIPA").

(4): While we do not believe we are required to do so, we will advise you of certain information responsive to your request by letter on or before February 3.

(5): As we previously advised you, we have no formal damage assessment in our possession but, as we discussed during our telephone conference call on January 18, we intend to address the matter of the relevance and admissibility of Ms. Wilson's employment at the CIA in the context of CIPA.

(6) (7) and (8): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3. As we noted during our conference call, we do not agree that you are entitled to all such materials or that the scope of your request is proper but you are receiving all responsive documents in our possession. We also advised you that when gathering materials during the investigation we did not focus our searches on a topic as broad as that set forth in the request in 7(e) .

(9): This request in effect seeks discovery concerning any other subjects of the ongoing investigation. We have not produced, and do not intend to produce, all documents regarding contacts between government officials other than Mr. Libby and reporters prior to July 14, 2003, but have produced (or will produce before February 3) all documents reflecting contact between Mr. Libby and reporters responsive to this request. Lest there be any doubt, we do have some documents responsive to your request which we are electing not to produce because we do not agree that we are obligated to provide them.

(10) and (11): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 4

In your section entitled "Information Relating to the Government's Investigation of the Media," you assert that the government takes the position that the defense is not entitled to receive in discovery the contemporaneous notes made by the reporters who spoke to Libby, but do not note that you have been provided with all notes in the government's possession that were made by reporters when speaking to Mr. Libby. (As discussed above, the Government has declined to provide notes of conversations between reporters and other government officials.) You elsewhere stated that we declined to provide "any" information about reporters when in fact we have produced documents obtained from media entities as you elsewhere acknowledge.

(12) - (16): While we do not intend to provide discovery in this regard, and while not required to do so, in order to expedite litigation of this matter we advised you during the January 18 conference call that we were not aware of any reporters who knew prior to July 14, 2003, that Valerie Plame, Ambassador Wilson's wife, worked at the CIA, other than: Bob Woodward, Judith Miller, Bob Novak, Walter Pincus and Matthew Cooper.[1] There are published accounts of when Ms. Miller and Mr. Cooper first learned about Mr. Wilson's wife and from whom. Mr. Woodward has publicly described his conversation with Mr. Libby on June 27, 2003, as well as the general timing ("mid-June") of his conversation with another unnamed government official with whom he then spoke about Mr. Wilson's wife. Mr. Woodward has also described his conversations in 2003 and later with Mr. Pincus on the subject. Mr. Pincus has published his account of when he first learned information about Wilson's wife from a source he does not name. Mr. Novak has published his account of when he learned about Wilson's wife (some time after July 6) without naming his sources in the account.

We also advise you that we understand that reporter John Dickerson of *Time* magazine discussed the trip by Mr. Wilson with government officials at some time on July 11 or after, subsequent to Mr. Cooper learning about Mr. Wilson's wife. Any conversations involving Mr. Dickerson likely took place in Africa and occurred after July 11.

We note that we understand from our January 18 telephone conference that the requests numbered 13 and 14 were intended to be requests limited to the time frame prior to July 14, 2003.

We otherwise are not producing documents responsive to your request concerning other officials who were in contact with other reporters, as outlined above.

In addition, you seek miscellaneous items for discovery in an effort to prepare motions. While we do not agree that there is a separate entitlement to discovery in order to facilitate motions which may or may not be well grounded, we advise you of the following in response to your enumerated requests:

---

[1] This statement is not meant to imply that each and every reporter named knew her name prior to July 14, 2003.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 5

(17): We are reviewing the CIA referral document and will either produce the same to you or advise you otherwise shortly. We do not intend to produce "all documents relating to" that referral document as that could potentially implicate all documents in this investigation.

(18): We are seeking to obtain a copy of the order empaneling the grand jury public which we did not have in our possession and will either produce the same to you or advise you otherwise shortly.

(19)-(22): We will be providing to you prior to February 3 copies of subpoenas and pertinent correspondence relating to reporters referenced in the Indictment and/or whom we expect to call at trial.[2] We are specifically withholding subpoenas (and correspondence) which were addressed to reporters whose testimony was directed towards government officials other than Mr. Libby.

The Requests for Asserted "Brady" Material

We recognize that your requests for discovery seek the categories of items requested both pursuant to Rule 16 as well as pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). We do not agree, however, that each of your requests is appropriate under the governing standards nor, as discussed in prior correspondence, do we agree with your implicit view that we are aligned with all government agencies for purposes of discovery.

(A): We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(B) and (C): We do not agree that if there were any documents indicating that Ms. Wilson's employment was not classified during the relevant times that any such documents would constitute *Brady* material in a case where Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.[3]

(C): We do not agree that if there were any documents indicating that Ms. Wilson did not act in an undercover capacity or did not act covertly in the five years prior to July 2003 (which we neither confirm nor deny) that any such documents would constitute *Brady* material in a case where

---

[2] We are not providing correspondence such as transmittal letters, legal briefs filed, appellate briefs filed and various correspondence concerning scheduling, filing, sealing, redacting and unsealing of briefs and other court documents regarding litigation.

[3] I note that Ms. Wilson's employment status was classified but has since been declassified so that we may now confirm such status. In any event, we are not aware of any documents in our possession stating that Ms. Wilson's affiliation with the CIA was not classified at the relevant times.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 6

Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.

(D) and (E): We do not agree that any documents indicating that any reporter heard or suspected prior to July 14, 2003, that Ms. Wilson worked at the CIA constitutes *Brady* material but in any event incorporate our earlier response on this issue.

(F): We do not agree that any time witnesses disagree on facts that you are entitled to all documents so indicating in advance. We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(G): We do not agree that all documents reflecting favorably on Mr. Libby's character or reputation for truthfulness or reflecting his propensity to comply with laws, regulations and nondisclosure agreements or of assuring that others complied with those regulations constitute *Brady* material (nor that such documents could be easily defined) as prior instances of non-criminal conduct are not considered exculpatory.

(H): Your request for *Giglio* impeachment material is premature and over broad. You will receive such material for Government witnesses, not for "potential" Government witnesses (however that term is defined). Moreover, the scope of records you seek is far beyond the scope of what is required. By way of illustrative (but not exhaustive) example, you seek all documents relating to any juvenile arrest of any potential government witness in a case where there will be no witnesses where any such arrest would be remotely recent or relevant to the trial.

Other requests:

There have been no search warrants executed and no communications intercepted pursuant to Title III at the direction of the prosecution team during the course of this investigation.

At this time we do not intend to offer any evidence of "other crimes" pursuant to Rule 404(b). As we discussed during our telephone conversation, Mr. Libby testified in the grand jury that he had contact with reporters in which he disclosed the content of the National Intelligence Estimate ("NIE") to such reporters in the course of his interaction with reporters in June and July 2003 (and caused at least one other government official to discuss the NIE with the media in July 2003). We also note that it is our understanding that Mr. Libby testified that he was authorized to disclose information about the NIE to the press by his superiors. We expect that such conduct will be the subject of proof at trial in that we intend to introduce Libby's grand jury transcript in evidence and Mr. Libby has testified that the purpose of his July 8 meeting with Ms. Miller was to transmit information concerning the NIE. Our anticipated basis for offering such evidence is that such facts are inextricably intertwined with the narrative of the events of spring 2003, as Libby's testimony itself makes plain. At this time, we do not intend to offer the evidence pursuant to Rule 404(b).

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 7

     We are not obligated at this time to disclose impeachment material of Mr. Libby should he testify in his defense.

     We are aware of no evidence pertinent to the charges against defendant Libby which has been destroyed. In an abundance of caution, we advise you that we have learned that not all email of the Office of Vice President and the Executive Office of President for certain time periods in 2003 was preserved through the normal archiving process on the White House computer system.

     Should you have any questions or comments regarding any of the foregoing, or should you wish to discuss this matter generally, please do not hesitate to call me at the number listed above.

                    Very truly yours,

                    PATRICK J. FITZGERALD
                    Special Counsel

# EXHIBIT F

politics
**Where's *My* Subpoena?**
Valerie Plame, Scooter Libby, and me.
By John Dickerson
Posted Tuesday, Feb. 7, 2006, at 6:36 AM ET

In Washington, the only thing worse than having to testify before a grand jury is not being asked to. I never wanted to go to prison or make hard choices about protecting my sources, but I thought I'd get more out of my bit part in the Valerie Plame saga than the overheated scrutiny of a few bloggers.

Back when I was at *Time*, I co-wrote the July, 2003 story that has made the last two years of Matthew Cooper's life so difficult. After the special counsel went after Matt so enthusiastically, the arrival of men in trench coats asking what I knew seemed imminent. But I never got to try out any of my Dashiell Hammett lines on them. When my other former *Time* colleague Viveca Novak got tangled in Fitzgerald's hunt last year, I thought, OK, they're coming now for sure. Nope. No Fitzgerald; no FBI; no nothing.

But it turns out the special counsel was on to me all along. Last week, Scooter Libby filed a motion requesting materials from Patrick Fitzgerald's investigation. The filing included a Jan. 23, 2006, letter from Fitzgerald to Libby's legal team (marked Exhibit C) that contained this paragraph:

> We also advise you that we understand that reporter John Dickerson of *Time* magazine discussed the trip by Mr. Wilson with government officials at some time on July 11 or after, subsequent to Mr. Cooper learning about Mr. Wilson's wife. Any conversations involving Mr. Dickerson likely took place in Africa and occurred after July 11.

The Fitzgerald letter (first discovered by a very sharp blogger) was written in response to the Libby team's questions about other government officials who talked to reporters about Joe Wilson's wife. This line of inquiry from Libby doesn't have any obvious connection to his main defense that he was a very busy man. The Jan. 31 filling reads: "Mr. Libby will show that, in the constant rush of more pressing matters, any errors he made in his FBI interviews or grand jury testimony, months after the conversations, were the result of confusion, mistake, or faulty memory, rather than a willful intent to deceive."

But there is a connection. Team Libby may be trying to show that Plame's name and identity were in wider circulation than Fitzgerald has suggested. That's not in itself a defense against the perjury and obstruction charges. But if journalists were chattering about Plame a lot, perhaps his lawyers will back up the "he was a busy man" line with "this wasn't that big a deal to him." In other words, they may try to argue that the Plame-Wilson connection was already a well-known bit of gossip and wouldn't be important enough for someone as busy and important as Libby to specifically remember it. Other conversations between government officials and reporters might also help Libby make a case that Fitzgerald didn't do a broad investigation, but zeroed in on Libby early and bent the facts to fit a predetermined conclusion.

Though Fitzgerald threw out the tidbit about me (thanks, Pat), he turned down Libby's request to pick through his investigative material. Now it's up to the judge to decide whether Libby gets to take a look. While the wheels of justice grind, here's my story, for whatever it's worth:

In July 2003, I was a White House correspondent for *Time* magazine, traveling with the president in Africa. Bush was trying to promote his $15 billion AIDS assistance package but he kept getting interrupted. He would visit a clinic and give a speech, but all reporters wanted to ask about was faulty prewar intelligence. Joe Wilson had published his infamous op-ed in the *New York Times* just before the trip. That, along with other disclosures, led White House spokesman Ari Fleischer to make a rare public admission: The 16 words mentioning Saddam's efforts to buy uranium from Africa were "incorrect" and should not have been in the 2003 State of the Union address.

That didn't stop the questions. It multiplied them. At every stop, we reporters clamored for an explanation of how that bad information about "yellowcake" had gotten into the speech. National Security Adviser Condoleezza Rice and Secretary of State Colin Powell, who were traveling with Bush, held press conferences, but they raised more questions than they answered. The papers seemed to have a damaging new disclosure about weak prewar intelligence every day. Administration officials assumed the leaks were coming from the CIA, where analysts didn't want to be blamed for the failure to uncover weapons stockpiles in Iraq.

The White House-CIA spat had been growing over the previous months. It was the second billing on the fight card below the Powell-Cheney cage match. When an administration official would say something that hinted the intelligence services might have made mistakes about Saddam's weapons, leaks would soon follow suggesting that White House officials had spun carefully nuanced information from the CIA into a case for war. "Remind me to take something more than a knife to a gun fight," one senior administration official on the trip said to me, referring to the spat.

Four days into the trip, on an early morning flight to Uganda, Condi Rice visited the small press cabin in the back of Air Force One, where I was in the pool of reporters that flies on the president's plane. We expected more of the same fancy footwork from earlier in the week about who was to blame for the 16 words. We didn't get it. Condi blamed the CIA. This was new. The Bush administration didn't usually point fingers that openly. (We later learned that Dr. Rice had called Tenet that morning to let him know she was going to ruin his day.)

Moments later, we landed in Entebbe, Uganda. We drove past the abandoned Air France jet still marooned at the airport more than 30 years after the famous 1976 Israeli raid. We thought that would be the biggest drama of our short four-hour visit. Though the travel pool was going to be allowed in to see the start of President Bush's meeting with Ugandan President Yoweri Museveni, we were told Bush wouldn't take a question, as he sometimes does in such situations. But moments before the meeting, we were told that Bush had changed his mind and would take a question. He knew that he would be asked about the faulty info and had a line prepared. "I gave a speech to the nation that was cleared by the intelligence services," Bush said.

This was news. The president was known for his loyalty to subordinates, but here he was throwing his CIA director, George Tenet, under a bus. This wasn't just a personal departure by the president. It was the ultimate blow in the bureaucratic battle between the CIA and his White House.

We pool reporters were hustled away from the dignitaries into a cramped holding room where they kept us until the larger press contingent arrived for the president's public remarks. They'd set up phone lines and I tried to dial out the news. Given the local technology, it took a while. When I finally made it through, I realized it was 8 a.m. in the States*. I left a rambling message on my bureau chief's voicemail, which he would pick up several hours later and relay in an e-mail to my colleagues working on the story: "John reports that they've dimed out Tenet."

*Click here for Part 2 to find out what government officials told me about Wilson's trip and why Patrick Fitzgerald's account of my conversations is wrong.*

*Correction, Feb. 8, 2006: The article originally and incorrectly stated that it was 5 a.m. in Washington when Bush finished his remarks. It was 8 a.m.*

*John Dickerson is Slate's chief political correspondent. He can be reached at slatepolitics@gmail.com.*

Article URL: http://www.slate.com/id/2135554/

Copyright 2006 Washingtonpost.Newsweek Interactive Co. LLC

politics
## Where's *My* Subpoena?
Valerie Plame, Scooter Libby, and me.
By John Dickerson
Updated Tuesday, Feb. 7, 2006, at 6:37 AM ET

*This is the second part of a two-part article. Click here for Part 1, explaining why John Dickerson's name has popped up in connection with the CIA leak case.*

While the president finished his meeting with Museveni, I hung out with a "senior administration official" by an old yellow school bus. This was the first of my two conversations about Wilson. In his letter to Libby, Fitzgerald has the chronology mixed up. When I had these conversations, I hadn't yet talked to my colleague Matt Cooper about Wilson, and Cooper hadn't yet talked to Rove.

The senior administration official spoke to me on background about Wilson and the president's amazing decision to blame the CIA. Other reporters wandered in and out of the conversation, but there were stretches where it was just the two of us (my tedious newsmagazine questions always had a tendency to drive other deadline-oriented reporters away). The official walked me through all the many problems with Wilson's report: His work was sloppy, contradictory, and hadn't been sanctioned by Tenet or any senior person. Some low-level person at the CIA was responsible for the mission. I was told I should go ask the CIA who sent Wilson.

An hour later, as Bush spoke at an AIDS treatment center, I chatted with a different senior administration official, also on background. We talked about many different aspects of the story—the fight with the CIA, the political implications for the president, and the administration's shoddy damage control. This official also pointed out a few times that Wilson had been sent by a low-level CIA employee and encouraged me to follow that angle. I thought I got the point: He'd been sent by someone around the rank of deputy assistant undersecretary or janitor.

At the end of the two conversations I wrote down in my notebook: "look who sent." It was about 10:30 a.m. in Washington as the event ended. I called the Washington bureau but couldn't reach anyone (they were all huddled in the morning meeting). What struck me was how hard both officials were working to knock down Wilson. Discrediting your opposition is a standard tactic in Washington, but the Bush team usually played the game differently. At that stage in the first term, Bush aides usually blew off their critics. Or, they continued to assert their set of facts in the hope of overcoming criticism by force of repetition.

We boarded Air Force One about 11 a.m. Washington time and flew to Nigeria. When I got into the press filing center there, I picked my way though dubious local food and checked my e-mail. White House officials had warned us the country was a hot zone of infestation. To avoid parasites we were not only told not to drink the water but not to shower, wash, or brush our teeth with it. We were also advised to bring our own sheets to sleep on. So, eating the locally provided dinner was probably a bad idea. I pushed aside the clumps of stew.

It had been a long week. I was co-writing a long story on the trip for the European edition, filing each day to the Web site and also filing for the domestic cover story on the fallout over the 16 words. Oh, and I also had to file a story on violence in Liberia. My inbox was a mess. In the middle of it was an e-mail from Matt Cooper telling me to call him from a land line when I had some privacy. At some time after 1 p.m. his time, I called him. He told me that he had talked to Karl Rove that morning and that Rove had given him the same Wilson takedown I'd been getting in Uganda. But Matt had the one key fact I didn't: Rove had said that Wilson's *wife* sent him.

So, that explained the wink-wink nudge-nudge I was getting about who sent Wilson. Matt and I agreed to point out in our files to the cover story that White House officials were going so directly after Wilson. We also agreed that I wouldn't go back to my sources about the wife business. The universe of people who knew this information was undoubtedly small. Mentioning it to other officials would potentially out Rove as *Time's* source to his colleagues. Plus, it was Matt's scoop and his arrangement with Rove. He had a better sense of how to get the information confirmed without violating their agreement.

That Friday night in Washington, CIA Director George Tenet fell on his sword, taking responsibility for not carefully vetting the State of the Union speech. That big news eclipsed the storyline about an effort by White House officials to discredit Wilson.

I missed the final sausage-making process of putting together the weekly magazine. As *Time's* cover story was being written in Washington, I was flying back from Africa. I saw the final piece only moments before it was closed. By then, Matt had talked to Scooter Libby, who confirmed Rove's tip. The attack on Wilson had not been included. The writers focused on his original trip and the damage his op-ed had done to administration credibility. *Time's* cover showed the president giving the State of the Union address under the headline "Untruth and Consequences."

Since the attack on Wilson was not included in the printed magazine that came out Monday, Cooper thought we should put it online. All administrations discredit their critics through whispers to reporters, but we hadn't seen high-level Bush people do anything like this in the past. It suggested desperation and unsteadiness in a national security team that had often been heralded for its smooth competency.

At this point the information about Valerie Plame was not the radioactive material it is today. No one knew she might have been a protected agent—and for whatever reason, the possibility didn't occur to us or anyone else at the time. But it was still newsworthy that the

White House was using her to make its case. That Scooter Libby and Karl Rove mentioned Plame to Matt was an example of how they were attempting to undermine Wilson. They were trying to make his trip look like a special family side deal not officially sanctioned by the agency. No one at a high level in the government was worried enough about the veracity of the uranium claim to send a "real" special envoy. And no one at a high level ever saw Wilson's report when he returned. Later we would learn that Deputy National Security Adviser Stephen Hadley had been warned by the CIA that the uranium claims were shaky and that Wilson's wife was one of many people involved in the decision to send her husband.

Our editors delayed publication of the Web piece, uncertain there was enough evidence the White House was trying to undermine Wilson's credibility. That was frustrating, since by that time the White House spokesman, Fleischer, was undermining him on the record. Bob Novak's story revealing Plame's name had come out, but those of us working on the story in Washington, which now included Massimo Calabresi, thought we still had a few facts Novak didn't. Our piece finally ran on the Web on July 17, 2003, six days after Cooper had learned about Wilson's wife.

Where did Fitzgerald learn about my activities? Matt told me he briefly mentioned me in front of the grand jury and Viveca Novak said my name came up in passing when she talked to Fitzgerald. He also subpoenaed White House e-mail records that included, White House officials tell me, e-mails I sent to them about the Wilson business in the days and months after that July trip to Africa. Those officials also told Fitzgerald and his grand jury about conversations we had. I came back from the trip harboring a suspicion that only fully made sense when I learned Plame's CIA cover had been blown. It seemed obvious that the people pushing me to look into who sent Wilson knew exactly the answer I'd find. Yet they were really careful not to let the information slip, which suggested that they knew at the time Plame's identity was radioactive.

That's my bit of the story. I don't expect my grandchildren will be asking me to repeat it again in 30 years on the porch swing. *Oh, Grampa, tell us again about the two senior administration officials in Africa.* If they want something more exciting, they'll have to ask Uncle Matt.

*John Dickerson is Slate's chief political correspondent. He can be reached at slatepolitics@gmail.com.*

Article URL: http://www.slate.com/id/2135565/

Copyright 2006 Washingtonpost.Newsweek Interactive Co. LLC

# EXHIBIT G

Copyright 2003 Chicago Sun-Times, Inc.
Chicago Sun-Times

October 1, 2003 Wednesday

**SECTION:** EDITORIAL; Pg. 49

**LENGTH:** 675 words

**HEADLINE:** Columnist wasn't pawn for leak

**BYLINE:** Robert Novak

**HIGHLIGHT:**
It was well-known around Washington that Wilson's wife worked for the CIA.

**BODY:**

I had thought I never again would write about retired diplomat Joseph Wilson's CIA-employee wife, but feel constrained to do so now that repercussions of my July 14 column have reached the front pages of major newspapers and led off network news broadcasts. My role and the role of the Bush White House have been distorted and need explanation.

The leak now under Justice Department investigation is described by former Ambassador Joseph Wilson and critics of President Bush's Iraq policy as a reprehensible effort to silence them. To protect my own integrity and credibility, I would like to stress three points. First, I did not receive a planned leak. Second, the CIA never warned me that the disclosure of Wilson's wife working at the agency would endanger her or anybody else. Third, it was not much of a secret.

The current Justice investigation stems from a routine, mandated probe of all CIA leaks, but follows weeks of agitation. Wilson, after telling me in July that he would say nothing about his wife, has made investigation of the leak his life's work -- aided by the relentless Sen. Charles Schumer of New York. These efforts cannot be separated from the massive political assault on President Bush.

This story began July 6 when Wilson went public and identified himself as the retired diplomat who had reported negatively to the CIA in 2002 on alleged Iraq efforts to buy uranium yellowcake from Niger. I was curious why a high-ranking official in President Bill Clinton's National Security Council was given this assignment. Wilson had become a vocal opponent of President Bush's policies in Iraq after contributing to Al Gore in the last election cycle and John Kerry in this one.

During a long conversation with a senior administration official, I asked why Wilson was assigned the mission to Niger. He said Wilson had been sent by the CIA's counterproliferation section at the suggestion of one of its employees, his wife. It was an offhand revelation from this official, who is no partisan gunslinger. When I called another official for confirmation, he said: "Oh, you know about it." The published report that somebody in the White House failed to plant this story with six reporters and finally found me as a willing pawn is simply untrue.

At the CIA, the official designated to talk to me denied that Wilson's wife had inspired his selection but said she was delegated to request his help. He asked me not to use her name, saying she probably never again will be given a foreign assignment but that exposure of her name might cause "difficulties" if she travels abroad. He never suggested to me that Wilson's wife or anybody else would be endangered. If he had, I would not have used her name. I used it in the sixth paragraph of my column because it looked like the missing explanation of an otherwise incredible choice by the CIA for its mission.

How big a secret was it? It was well-known around Washington that Wilson's wife worked for the CIA. Republican activist Clifford May wrote Monday, in National Review Online, that he had been told of her identity by a non-

. Columnist wasn't pawn for leak Chicago Sun-Times October 1, 2003 We

government source before my column appeared and that it was common knowledge. Her name, Valerie Plame, was no secret either, appearing in Wilson's *Who's Who in America* entry.

A big question is her duties at Langley. I regret that I referred to her in my column as an "operative" -- a word I have lavished on hack politicians for more than 40 years. While the CIA refuses to publicly define her status, the official contact says she is "covered" -- working under the guise of another agency. However, an unofficial source at the agency says she has been an analyst, not in covert operations.

The Justice Department investigation was not requested by CIA Director George Tenet. Any leak of classified information is routinely passed by the agency to Justice, averaging one a week. This investigative request was made in July shortly after the column was published. Reported only last weekend, the request ignited anti-Bush furor.

**LOAD-DATE:** October 11, 2003

# EXHIBIT I

# washingtonpost.com

**CORRECTION TO THIS ARTICLE**
An Oct. 30 article about the disclosure that Valerie Plame was a CIA operative gave an incorrect date for a burglary at Niger's embassy in Rome, when official letterhead stationery was stolen. The burglary occurred in 2001, not 1991. In some editions, the article gave conflicting dates for Vice President Cheney's trip to Norfolk. It was July 12, 2003, not June 12. Also, a reference to the vice president's principal deputy chief of staff should have identified him as Eric Edelman, not John Hannah.

## A Leak, Then a Deluge

Did a Bush loyalist, trying to protect the case for war in Iraq, obstruct an investigation into who blew the cover of a covert CIA operative?

Advertisement



Fares to Europe starting at $264
(one-way based on round-trip purchase)

click, book and fly

Lufthansa

By Barton Gellman
Washington Post Staff Writer
Sunday, October 30, 2005; A01

Air Force Two arrived in Norfolk on Saturday morning, July 12, 2003, with Vice President Cheney and his chief of staff aboard. They had come "to send forth a great American ship bearing a great American name," as Cheney said from the flag-draped flight deck of the aircraft carrier USS Ronald Reagan.

As Cheney returned to Washington with I. Lewis "Scooter" Libby, the two men spoke of the news on Iraq -- the most ambitious use of the war machine Reagan built two decades before. A troublesome critic was undermining a principal rationale for the war: the depiction of Baghdad, most urgently by Cheney, as a nuclear threat to the United States.

Defending the war became the animating priority aboard Air Force Two that day. According to his indictment on Friday, Libby "discussed with other officials aboard the plane" how he should respond to "pending media inquiries" about the critic, former ambassador Joseph C. Wilson IV. Apart from Libby, only press aide Catherine Martin is known to have accompanied Cheney on that flight.

The crimes alleged in Libby's indictment would come later. But the flight from Norfolk marked a transition in the four-month slide from politics as usual -- close combat in defense of the president's policies -- to what a special prosecutor described as perjury and obstruction of justice. Summer would give way to fall before Libby reached the point of no return, with his first alleged lies to the FBI. But he skirted the line soon after stepping off the aircraft.

That Saturday afternoon, the indictment states, is when Libby confirmed for Matthew Cooper of Time magazine and disclosed to Judith Miller of the New York Times the classified fact that Wilson's wife, who was known as Valerie Plame, "worked at the CIA." Just over two weeks earlier, after a previous conversation with Cheney, Libby had told Miller more tentatively that Plame "might work at a bureau of the CIA."

It may never be clear what drove Libby, the most cautious of Washington insiders, to take such risks, ostensibly to protect the administration. In a news conference Friday, Special Counsel Patrick J. Fitzgerald described the question as unanswerable so far. "If you're asking me what his motives were, I

can't tell you; we haven't charged it," Fitzgerald said. The obstruction of his inquiry, he said, "prevents us from making the fine judgments we want to make."

Libby's possible motive is only one of many unknowns left in the aftermath of Friday's indictment, which prompted the resignation of one of the most powerful figures in the White House and left the Bush administration reeling politically. Still to be determined is who first leaked Plame's name to syndicated columnist Robert D. Novak -- the original act that led to Fitzgerald's investigation -- and the roles of many other administration officials, including Deputy Chief of Staff Karl Rove.

Even so, the grand jury's 22-page indictment fleshes out a saga that has been largely shrouded for almost two years by grand jury secrecy. While Friday's disclosures allege no wrongdoing by Cheney, they place the vice president closer than has been known before to events at the heart of the case.

One notable disclosure is that Libby and Cheney made separate inquiries to the CIA about Wilson's wife, and each confirmed independently that she worked there. It was Cheney, the indictment states, who supplied Libby the detail "that Wilson's wife worked . . . in the Counterproliferation Division" -- an unambiguous declaration that her position was among the case officers of the operations directorate. That conversation took place on June 12, 2003, a month before the Norfolk flight and nearly two weeks before Libby first told a reporter about Plame's CIA affiliation.

Wilson was a former ambassador who traveled to Niger in February 2002 after Cheney requested elaboration on a Defense Department report -- based on erroneous information originating from the Italian security service -- that Iraq had an agreement to buy processed uranium ore, or "yellowcake." Upon his return, Wilson reported to CIA and State Department analysts that he had found no support for the allegation and had reasons to believe it was untrue. When the Bush administration nonetheless launched a public relations campaign that highlighted the uranium report -- most prominently in the president's State of the Union speech on Jan. 28, 2003 -- Wilson began raising questions among friends in government. In March, when the International Atomic Energy Agency exposed the documents as forged, a fact Wilson had not discovered, he began telling journalists in not-for-quotation interviews that the White House propounded a deliberate lie.

Wilson pressed himself fully into the spotlight in the late spring and early summer, a vulnerable moment for the president. The occupation of Iraq had turned unpredictably perilous, with casualties rising in an as-yet-unacknowledged insurgency and strong signs emerging that search teams were at a loss to discover evidence of "weapons of mass destruction."

The uranium claims had never been significant to career analysts -- Iraq had plenty already and lacked the means to enrich it. But the allegations proved irresistible to the White House Iraq Group, which devised the war's communications strategy and included Libby among its members. Every layman understood the connection between uranium and the bomb, participants in the group said in interviews at the time, and it was the easiest way for the Bush administration to raise alarms.

The threat Wilson posed was that his charges were equally simple and marketable. He charged that Cheney asked a question and then disregarded, as did the president and his staff, an answer he did not like.

Why some White House officials -- Rove among them -- used Wilson's wife in their counterattack has yet to be made entirely clear. Wilson himself described the outing as punishment, a threat to his family's safety meant to deter future whistle-blowers. Fragments of testimony unveiled Friday, and in published accounts by journalists who testified, suggest that the White House intended to challenge Wilson's

competence by asserting that his wife selected him for the mission to Niger.

Novak, whose July 14 column was the first to expose Plame, wrote three months later that nepotism provided "the missing explanation of an otherwise incredible choice by the CIA."

## Burglary, Forgery, Delivery

The chain of events that led to Friday's indictment can be traced as far back as 1991, when an unremarkable burglary took place at the embassy of Niger in Rome. All that turned up missing was a quantity of official letterhead with "Republique du Niger" at its top.

More than 10 years later, according to a retired high-ranking U.S. intelligence official, a businessman named Rocco Martino approached the CIA station chief in Rome. An occasional informant for U.S., British, French and Italian intelligence services, Martino brought documents on Niger government letterhead describing secret plans for the sale of uranium to Iraq.

The station chief "saw they were fakes and threw [Martino] out," the former CIA official said. But Italy shared a similar report with the Americans in October 2001, he said, and the CIA gave it circulation because it did not know the Italians relied on the same source.

On Feb. 12, 2002, Cheney received an expanded version of the unconfirmed Italian report. It said Iraq's then-ambassador to the Vatican had led a mission to Niger in 1999 and sealed a deal for the purchase of 500 tons of uranium in July 2000. Cheney asked for more information.

The same day, Plame wrote to her superior in the CIA's Counterproliferation Division that "my husband has good relations with both the PM [prime minister] and the former Minister of Mines (not to mention lots of French contacts), both of whom could possibly shed light on this sort of activity." Wilson -- who had undertaken a similar mission three years before -- soon departed for Niamey, the Niger capital. He said he found no support for the uranium report and said so when he returned.

Martino continued to peddle his documents, with an asking price of more than 10,000 euros -- this time to Panorama, an Italian magazine owned by Prime Minister Silvio Berlusconi. Panorama editor Carlo Rossella said his staff concluded the letters were bogus but in the interim sent copies to the U.S. Embassy in Rome in October 2002. "I believed the Americans were the best source for verifying authenticity," he said. When the documents reached the State Department, according to a commission that investigated prewar intelligence this year, analysts there said they had "serious doubts about the authenticity" of the "transparently forged" documents.

By summer 2002, the White House Iraq Group assigned Communications Director James R. Wilkinson to prepare a white paper for public release, describing the "grave and gathering danger" of Iraq's allegedly "reconstituted" nuclear weapons program. Wilkinson gave prominent place to the claim that Iraq "sought uranium oxide, an essential ingredient in the enrichment process, from Africa." That claim, along with repeated use of the "mushroom cloud" image by top officials beginning in September, became the emotional heart of the case against Iraq.

President Bush invoked the mushroom cloud in an Oct. 7, 2002, speech in Cincinnati. References to African uranium remained in his speech until its fifth draft, but a last-minute intervention by Director of Central Intelligence George J. Tenet excised them.

Tenet's success was short-lived. The uranium returned repeatedly to Bush administration rhetoric in

December and January. National security adviser Condoleezza Rice cited the report in a Jan. 23 newspaper column, and three days later, at the World Economic Forum in Davos, Switzerland, Secretary of State Colin L. Powell demanded, "Why is Iraq still trying to procure uranium and the special equipment needed to transform it into material for a nuclear weapon?"

## 16 Words and Wilson Strikes Back

By the time Bush stated the case personally -- in the notorious "16 words" of his Jan. 28 State of the Union address -- the uranium had been thoroughly integrated into his government's case for impending war with Iraq.

The IAEA exposed the documents as forgeries on March 7, 2003. The Bush administration, while acknowledging uncertainty, did not admit its primary evidence had been faked.

Late April and early May saw a succession of Bush administration assertions that the search for Iraq's weapons of mass destruction had just begun. By then, The Washington Post was reporting that teams looking for weapons in Iraq were departing in frustration, making way for a new Iraq Survey Group that became an 18-month forensic examination of where U.S. intelligence had gone wrong.

Wilson spoke anonymously about his trip to Niger to New York Times opinion writer Nicholas D. Kristof, whose May 6 column accused Cheney of permitting truth to go "missing in action." The failure of the weapons hunt, and alleged deception of the public, had been laid at Cheney's feet.

In the vice president's office, Libby had long since come to believe that the CIA was undermining Cheney and the president's conduct of the war. One undercurrent of the events to come was a venerable form of Washington institutional combat, between the White House and the executive agencies ostensibly under its command.

Miller of the New York Times wrote later that Libby believed the CIA was hedging against accusations of failure by blaming Cheney and Bush for its mistakes. Another top official, a longtime ally of Libby's, told a reporter at the time that the CIA was working actively to conceal evidence favorable to the White House.

Libby had known enemies inside government -- but an unknown enemy outside. It did not take him long to discover that the latter was Wilson.

## 'There Would Be Complications'

In late May and early June 2003, according to Fitzgerald's indictment, Libby asked for and received information about Wilson's trip from a senior State Department official, who is not named in the indictment but is identified by colleagues as then-Undersecretary of State Marc Grossman.

On June 9, the CIA faxed classified accounts of Wilson's assignment "to the personal attention of Libby and another person in the Office of the Vice President." Two or three days later, Grossman told Libby that Wilson's wife worked at the CIA and had been involved in planning Wilson's trip. An unidentified "senior officer of the CIA" confirmed Plame's employment for Libby on June 11, and Cheney told Libby the next day which part of the agency employed her.

For Libby, according to a senior official who worked with him at the time, "I think this just hit a nerve." By June, he said, "the blind, deaf and dumb had to be aware that something was wrong in Iraq."

Uranium was "always a side issue," but it was also "the beginning of the unraveling of the big story . . . calling attention to a huge mistake he was part of. So it's no wonder he took this personally."

A senior intelligence officer who knew of Libby's inquiries about Wilson and Plame said in an interview yesterday, "It didn't occur to anyone that the reason why was so that her name would go out to reporters." That, the official said, is "the lesson you learn from this."

On June 12, The Post published a story challenging the uranium claims. Wilson has since said he was among the sources for that story.

A man identified by colleagues as John Hannah, described in the indictment as Libby's "then principal deputy," asked Libby soon afterward whether "information about Wilson's trip could be shared with the press." Libby replied, the indictment states, "that there would be complications at the CIA in disclosing that information publicly."

On June 23, Libby allegedly crossed his first big line. At a meeting in his office with Miller of the Times, he said Wilson's wife might be a CIA employee.

**Attack and Counterattack**

Wilson emerged from anonymity with a splash on July 6, telling his story in a New York Times opinion column, a lengthy on-the-record interview with The Post and an appearance on NBC's "Meet the Press."

The next day, Libby lunched with Ari Fleischer, the White House press secretary, according to the indictment. He told Fleischer that Wilson's wife worked for the CIA and noted that the information was not widely known. The same day, the State Department sent Powell a classified memorandum written a month earlier identifying Wilson's wife as a CIA employee and saying it was believed she recommended Wilson for the Niger mission. Powell was traveling with Bush to Africa, and sources said the memorandum was widely circulated among officials with appropriate clearances aboard Air Force One.

On July 8, Libby met Miller, the reporter, for breakfast at the St. Regis Hotel at 16th and K streets. Asking that she attribute the information to a "former Hill staffer" -- he had once been legal adviser to a House select committee -- Libby criticized CIA reporting of Wilson's trip and "advised reporter Judith Miller of his belief that Wilson's wife worked at the CIA," the indictment states.

On July 12, the day Cheney and Libby flew together from Norfolk, Libby talked to Miller and Cooper. That same day, another administration official who has not been identified publicly returned a call from Walter Pincus of The Post. He "veered off the precise matter we were discussing" and said Wilson's trip was a boondoggle set up by Wilson's wife, Pincus has written in Nieman Reports.

Earlier that week Rove and another unknown source gave the information to Novak as well.

On July 14, for the first time, the name passed into the public domain in sixth paragraph of Novak's syndicated column: "his wife, Valerie Plame, is an agency operative." For all its seismic importance now, that column provoked little immediate response.

Time magazine reported on its Web site shortly afterward -- based on sources that Cooper, the author, has since identified as Rove and Libby -- that "some government officials have noted to Time in interviews . . . that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction."

David Corn of the Nation was among the first to protest. Naming Wilson's wife, he wrote July 16, "would have compromised every operation, every relationship, every network with which she had been associated her entire career."

By the following week the story reached NBC's "Today Show," and Sen. Charles E. Schumer (D-N.Y.) demanded an investigation. The administration replied without apology at first. According to Wilson, MSNBC's Chris Matthews told him off camera: "I just got off the phone with Karl Rove, who said your wife was 'fair game.' "

Out of view of the public, the CIA took the first steps towards a formal investigation. On July 30, it reported to the Justice Department a possible offense "concerning the unauthorized disclosure of classified information." In August the agency completed an 11-question form detailing the potential damage done. In September, Tenet followed up with a memo raising questions about whether the leakers had violated federal law.

On Sept. 26, 2003, the FBI launched an inquiry into who leaked Plame's name and occupation.

### 'If Only It Were True'

Justice Department lawyers notified then-White House Counsel Alberto R. Gonzales at about 8 p.m. Monday, Sept. 29, that the investigation had begun. Gonzales, now attorney general, has said he alerted Chief of Staff Andrew H. Card Jr. at once. But he did not tell anyone else -- or instruct White House employees to preserve all evidence -- until the following morning. According to Gonzales, lawyers at Justice said it would be fine to wait.

John Dion, a veteran counter-espionage prosecutor, ran the initial investigation with a team of FBI agents at his disposal. They soon brought in Rove and other top aides for questioning.

But early signals from the White House suggested the probe might come to nothing. Bush expressed doubts on Oct. 7. "I don't know if we're going to find out the senior administration official," he said. "Now, this is a large administration, and there's a lot of senior officials."

Three days later, White House spokesman Scott McClellan told reporters he had talked to three officials -- Libby, Rove and Elliot Abrams -- and "those individuals assured me they were not involved in this."

The following Tuesday, Oct. 14, Libby reached a decision point. The FBI asked whether he had disclosed Plame's job or identity to any reporter, and he said he had not even known those details until July 10 or 11. His source, he asserted, was NBC's Tim Russert. According to the indictment, he said he passed along Russert's information as gossip to Cooper of Time. He told the FBI that he did not discuss Plame with Miller at all when they met on July 8.

Current and former officials said they did not know why Libby made those statements. Perhaps, they said, Libby believed the reporters would never be forced to testify, or that the statements from Bush and McClellan encouraged him to believe the inquiry would reach no result. Whatever his reasons, Libby had committed himself. He would give much the same account to agents again in November, and repeated them twice in sworn testimony before a grand jury.

"It would be a compelling story that will lead the FBI to go away, if only it were true," Fitzgerald said in his Friday news conference. "It is not true, according to the indictment."

Libby's attorney, Joseph Tate, has said Libby testified to the best of his recollection. "We are quite distressed the special counsel has now sought to pursue alleged inconsistencies in Mr. Libby's recollection and those of others and to charge such inconsistencies as false statements," Tate said in a statement Friday.

## 'Eliot Ness With a Harvard Law Degree'

On the next to last day of 2003, John D. Ashcroft, then attorney general, abruptly recused himself from the case. He had ignored months of complaints from Democrats that his political ties to potential suspects should disqualify him from supervising the investigation. Rove, in particular, was a longtime friend and paid adviser to Ashcroft's campaigns for Missouri governor and the U.S. Senate.

Through the fall and winter, officials said, Ashcroft received periodic briefings on the case. In the last week of December, about a month after Libby's second interview with the FBI, then-Deputy Attorney General James B. Comey had multiple discussions with Ashcroft about whether it was time for a change, Comey has said.

Comey told reporters on Dec. 30 that an "accumulation of facts" in the investigation had brought about Ashcroft's recusal. Details of their conversations have not been made public, and it is not known who initiated them.

"The issue surrounding the attorney general's recusal is not one of actual conflict of interest," Comey said, but "one of appearance."

Juleanna Glover Weiss, a spokesman for Ashcroft's Washington consulting firm, said yesterday that the former attorney general would not discuss the decision.

Republican officials expressed the hope at that time that Ashcroft's recusal would provide political cover for the White House if no indictment resulted. One said the move would "depoliticize" the case on the eve of presidential campaign season.

Ashcroft's departure brought to the probe a man Comey described as "Eliot Ness with a Harvard law degree." Fitzgerald, an old colleague of Comey who had recently become U.S. attorney in Chicago, asked for and received the full delegated powers of the attorney general. A month later, Comey clarified in writing that Fitzgerald could pursue any violation of criminal law associated with the case -- including perjury and obstruction of justice, the heart of the indictment handed up Friday against the vice president's chief of staff.

## Indictment and Resignation

After a year-long struggle with journalists, who resisted demands to disclose their sources, Fitzgerald persuaded Chief U.S. District Judge Thomas F. Hogan -- and the appellate judges above him -- that reporters were the only available "eyewitness[es] to the crime." Pincus, Cooper and Russert gave testimony under negotiated limits after receiving the consent of their sources. Miller went to jail for 85 days, then testified after Libby gave her his direct consent, by letter and telephone. Novak has never disclosed whether he spoke to Fitzgerald's grand jury.

The denouement came Friday. Just after noon, six men and 13 women filed silently into Courtroom Four in the E. Barrett Prettyman federal courthouse. They had served on Fitzgerald's grand jury for two years. Now they sat silently before U.S. Magistrate Judge Deborah A. Robinson. Calling the courtroom to

order, Robinson asked whether the grand jury had something to present. The forewoman, wearing a black cardigan, rose and walked a few steps with a sheaf of papers. She handed them up to the magistrate's clerk. Robinson declared them in order and adjourned.

Charged with five felony counts, Libby resigned from the vice president's office that day.

Fitzgerald, in his news conference, said he could not speculate on whether anyone else would be charged. He said "the substantial bulk of the work of this investigation has concluded," but not all of it.

"I will not end the investigation," he said, "until I can look anyone in the eye and tell them that we have carried out our responsibility."

*Staff writers Dan Eggen, Dafna Linzer, Dana Milbank and Christopher Lee, and researcher Julie Tate contributed to this report.*

© 2005 The Washington Post Company

**Ads by Google**

**George W. Bush**
Should He Step Down As President? Vote Now To See Survey Results!
www.popularq.com

**Is Bush Doing A Good Job?**
Take Our Poll And You Can Get A Free Laptop Computer
www.will-bush-win.com

**The Truth About Torture**
Support Amnesty USA - Renounce torture so it never happens again.
www.AmnestyUSA.org

# EXHIBIT J

**Bloomberg.com**

▸ 🖶 **Print**

# Prosecutor's Probe Centers on Rove, Memo, Phone Calls (Update2)

July 18 (Bloomberg) -- The fate of White House Deputy Chief of Staff Karl Rove may rest with the old Watergate question: What did he know and when did he know it?

Special Prosecutor Patrick Fitzgerald's investigation of the leaking of a Central Intelligence Agency agent's name is now focused on how Rove, one of President George W. Bush's closest advisers, and other administration officials dealt with a key fact in an equally key memo.

The memo, prepared by the State Department on July 7, 2003, informed top administration officials that the wife of ex- diplomat and Bush critic Joseph Wilson was a CIA agent. Seven days later, Wilson's wife, Valerie Plame, was publicly identified as a CIA operative by syndicated columnist Robert Novak.

On the same day the memo was prepared, White House phone logs show Novak placed a call to White House Press Secretary Ari Fleischer, according to lawyers familiar with the case and a witness who has testified before the grand jury. Those people say it isn't clear whether Fleischer returned the call, and Fleischer has refused to comment.

The Novak call may loom large in the investigation because Fleischer was among a group of administration officials who left Washington later that day on a presidential trip to Africa. On the flight to Africa, Fleischer was seen perusing the State Department memo on Wilson and his wife, according to a former administration official who was also on the trip.

In addition, on July 8, 2003, the day after the memo was sent, Novak discussed Wilson and his wife with Rove, who had remained in Washington, according to the New York Times.

The Times quoted an attorney familiar with Fitzgerald's probe as saying that when Novak mentioned Wilson's wife worked for the CIA, Rove said, ``Yeah, I've heard that too.''

Mission to Niger

Three days after that, on July 11, Rove also discussed Wilson and his wife with Time magazine reporter Matthew Cooper, Cooper said yesterday. Rove told the reporter that Wilson's wife worked for the CIA and had a hand in having Wilson sent to Niger in 2002 to check out reports that Saddam Hussein was trying to buy uranium for a nuclear weapons program, Cooper said during an appearance on NBC's ``Meet the Press'' program.

Cooper, who recently testified before the grand jury after a long legal battle to keep his sources secret, said Vice President Dick Cheney's chief of staff, Lewis ``Scooter'' Libby, told him the same thing. Cooper said neither Rove nor Libby mentioned Wilson's wife by name.

Waiting for Judgment

Bush said today that he's waiting for the investigation to be completed before exercising judgment. ``If someone committed a crime, they will no longer work in my administration,'' Bush said in response to a question at a news conference.

By contrast, Bush told reporters on Sept. 30, 2003, that ``if somebody did leak classified information, I'd like to know it, and we'll take the appropriate action.'' The day before, his spokesman, Scott McClellan, said:``If anyone in this administration was involved in it, they would no longer be in this administration.''

On June 10, 2004, Bush answered ``Yes'' when asked whether he would fire anyone who leaked Plame's name.

Rove's attorney, Robert Luskin, has said that Rove mentioned to Cooper that Wilson's wife was a CIA agent but did not identify her by name.

In Time's July 18 edition, Cooper writes that Rove ended their brief telephone conversation by saying, ``I've already said too much.'' Cooper added that he was unsure whether that indicated Rove knew he had revealed information he should not have mentioned, or whether Rove was simply indicating he was pressed for time and had to end the call.

1982 Law

As a result of these facts, the State Department memo has become a central element in Fitzgerald's investigation of how Plame came to be publicly identified as a CIA agent and whether that violated a 1982 law making it a federal crime to divulge the identity of a covert intelligence operative.

The memo was prepared by the department's Bureau of Intelligence and Research at the request of then-Secretary of State Colin Powell, according to current and former government officials familiar with Powell's request.

Powell asked for it on July 6, 2003, the same day Wilson published an opinion article in the New York Times revealing his trip to Niger and his conclusion that there was no evidence to support the claim that Hussein was seeking uranium there. Wilson went on to accuse the Bush administration of ignoring his findings and similar intelligence to make a case for war in Iraq.

The current and former government officials say that the report reached Powell sometime on July 7. It said Wilson had been approved for the Niger trip by mid-level CIA officials on the recommendation of his wife, a counter-proliferation expert at the spy agency.

Inner Circle

A key question will be which officials received the report and when. The special prosecutor has subpoenaed telephone and fax records from Air Force One and the White House.

Fleischer, who saw the July 7 memo, wasn't part of Bush's inner circle during his tenure as press secretary, while Rove was at the heart of it. Fleischer has already announced that he was leaving his post, and the Africa trip was one of his last White House duties.

The July 7 memo was largely a reproduction of an earlier State Department report prepared around June 12. Another key question that Fitzgerald is interested in, according to the grand jury witness and the lawyers familiar with the case, is whether Rove or Libby learned of this earlier report and, if so, shared its content with reporters.

Rove's defenders say the recent revelations in the case -- some of which have emanated from his camp -- serve to exonerate rather than implicate him.

Five-Year Window

They say those revelations show that Rove was not the original source of Plame's identity for either Novak or Cooper. They note that the 1982 law sets a high bar for prosecution: Fitzgerald would have to prove that the person outing Plame did so knowingly and in awareness that the government was trying to conceal her identity.

In addition, the law only makes it illegal to divulge the identity of an agent who worked overseas within the past five years; Plame has lived in the U.S. since 1997.

Republican Party Chairman Ken Mehlman said yesterday on ``Meet the Press'' that recent newspaper stories ``have the effect of exonerating and vindicating Mr. Rove, not implicating him. That information says Karl Rove was not Bob Novak's source, that Novak told Rove, not the other way around, and it says that Karl warned Matt Cooper about Joe Wilson.''

Others see difficulties in these arguments. They note the contradiction between Rove's testimony to the grand jury that he learned Plame's name from Novak and his statement to Novak during the July 8 phone call that ``I've heard that, too.''

Potential Problem

This points toward a potential problem for Rove in the direction of Fitzgerald's investigation. It now has expanded beyond its original mission -- to determine if the 1982 law was violated -- to encompass whether any White House officials, including Rove and Fleischer, have testified falsely about the case or obstructed justice by trying to cover up their involvement in the leak, according to people familiar with the case who cite a pattern of questioning by Fitzgerald.

In addition, there is strong reason to believe that Fitzgerald is hunting big game, according to several legal experts. They say that is demonstrated by the fact that he has done something that no federal prosecutor has done in 30 years: send a reporter, Judith Miller of the New York Times, to jail for refusing to divulge with whom she spoke about the Wilson-Plame case.

``You wouldn't expect him to go to these lengths unless he thought he had something serious to look at,'' said Randall Eliason, the former chief of the public corruption section at the U.S. Attorney's office in Washington. ``You don't compel reporters to testify or jail reporters unless you have a pretty good reason.''

Tatel's Opinion

That ``pretty good reason'' was highlighted by U.S. Appellate Judge David Tatel in his Feb. 15 opinion concurring that Miller and Cooper must testify in the Plame case.

Tatel said the vast majority of the states, as well as the Justice Department, ``would require us to protect reporters' sources as a matter of federal common law were the leak at issue either less harmful or more newsworthy.''

However, he added, ``just as attorney-client communications made for the purpose of getting advice for the commission of a fraud or crime serve no public interest and receive no privilege, neither should courts protect sources whose leaks harm national security while providing minimal benefit to public debate.''

```
To contact the reporters on this story: Richard Keil in
Washington at (1)   dkeil@bloomberg.net
William Roberts in Washington at  wroberts@bloomberg.net.
```

*Last Updated: July 18, 2005 12:21 EDT*

▶ ⎙ **Print**

# EXHIBIT K

## 12/12/04, CNN's "Reliable Sources" - Cooper

HOWARD KURTZ: Welcome to RELIABLE SOURCES, I'm Howard Kurtz. A jam-packed show today. And we begin with what seemed like a spontaneous moment, a tough question from an American soldier to the secretary of defense.

(BEGIN VIDEO CLIP)

SPC. THOMAS WILSON, U.S. ARMY: Now why do we soldiers have to dig through local landfills for pieces of scrap metal and compromised ballistic glass to up-armor our vehicles, and why don't we have those resources readily available to us?

DONALD RUMSFELD, SECRETARY OF DEFENSE: You go to war with the army you have, not the army you might want or wish to have at a later time.

(END VIDEO CLIP)

KURTZ: But that question in Kuwait on Wednesday was planted by Edward Lee Pitts, an embedded reporter for "The Chattanooga Times Free Press." He admitted in an e-mail, which ended up on the Web, that he prodded the soldier into asking the question.

Joining me now at the Pentagon, CNN senior Pentagon correspondent, Jamie McIntyre. And here with me in the studio, "Time" magazine's White House correspondent, Matt Cooper.

Matt Cooper, was it unfair, underhanded or sneaky for Pitts to ask the soldier to ask Rumsfeld that question?

MATT COOPER, TIME: No, I don't think so. I think it was clever. And look, the soldier was perfectly free not to ask it. Clearly, it was something that was on the soldier's mind and the minds of the other soldiers at the event, who whooped and hollered when he asked the question.

You know, this reporter probably should have mentioned in his own story that he'd been way involved in kind of planting the seeds of the question. But...

KURTZ: Should have mentioned that he stage-managed this, that he helped orchestrate this emotional moment.

COOPER: Yeah.

KURTZ: Jamie McIntyre, would you have done such a thing?

JAMIE MCINTYRE, CNN SR. PENTAGON CORRESPONDENT: Well, I've certainly been in crowds of soldiers, and when they've expressed an opinion about something, I might have encouraged them, you know, to -- if someone said to me, gee, we're really concerned about armor, I might have said, boy, you know, you might ask the secretary, that's why this is here.

I think the question here though is that this issue has been around a long time. Lots of stories have been written about it. Congress is asking questions, stories have been written, including Edward Pitts', but what made this an event was that -- not that it came from a reporter or a member of Congress, but from one of the soldiers on the front lines. And the fact that it might not have happened had this not been orchestrated by a reporter, I think is something that could cross the line.

179

KURTZ: And would you agree therefore that "The Chattanooga Times Free Press" made a mistake, as its editor, Tom Griscom, now acknowledges, in not at least disclosing that this was not some spontaneous emotional outburst on the soldier's part, but that the reporter had worked on the question with the soldier in advance, as he -- as the reporter later admitted in this e-mail.

MCINTYRE: Right. And also arranged for him to be called on. I think that the paper has acknowledged in the discussions with CNN that in retrospect, that should have been disclosed. I think they have disclosed it in the follow-up article that they've done.

But again, this became a real seminal event. It sparked a whole debate about the armor thing. And it was because it came from the soldier. Now we find out it actually came from a reporter, who also brought the soldier with him, and as you said, didn't just suggest he write a question, but said he worked on it with him. And it looked like the soldier was actually reading it initially from a piece of paper. So I think it does cross a line.

KURTZ: None of us had any way of knowing that in advance. Jamie McIntyre at the Pentagon, thanks very much for joining us.

Matt Cooper, want to turn now to your legal situation. As the whole world, I think, knows, you've been cited for contempt of court in the case involving Valerie Plame and the outing of her status as a CIA operative. There was a federal appeals court hearing this week, two of the three judges did not sound sympathetic to your lawyer, Floyd Abrams, who is also representing Judith Miller of "The New York Times." How worried are you at this point about actually having to go to jail?

COOPER: Oh, well, Howie, I would have to be foolish not to be a little bit unsettled by that prospect. But look, this is not about me, it's really about the question of the reporters able to do their jobs and be able to retain confidential sources. And you know, it's worrisome to me. I've got a colleague, though, Michael Weisskopf, who lost his arm in Iraq, just down the hall from me. I mean, that's suffering, and what I'm going through is just the tedium of the American legal system.

KURTZ: But are you frustrated or angry that, as you see it, you were doing your job, you may have to pay for that by spending time behind bars?

COOPER: Well, I do, and I'm also baffled by it, frankly, this investigation has centered on, you know, Robert Novak, the CNN commentator and columnist who originally mentioned the CIA operative's name in print. I don't know how putting me in jail is going to reveal who leaked to Robert Novak, or what that was about.

KURTZ: Would you view yourself as outing Valerie Plame? Your story last year ran three days after Novak's column.

COOPER: No, I don't. I mean, it was out, and I mentioned her by name. What I was trying to do in my piece in July of 2003, Howard, was to point out what the leakers were doing. I was trying to call attention to it. And I think Novak was in a way kind of a transmission belt for the leakers, basically repeating their smears.

I was trying to say, hey, they're smearing this guy. There are some malevolent things going on here. Take a look.

KURTZ: Judith Miller, who, as I mentioned, also faces jail time. She is a "New York Times" reporter, had this to say the other day on CNN.

(BEGIN VIDEO CLIP)

JUDITH MILLER, THE NEW YORK TIMES: I don't think journalists really responded with the alarm that we should have. Some liberal journalists said, oh, Bob Novak is conservative, he was carrying water for the president and therefore he didn't deserve the protection of the First Amendment. Well, I think we were all a little perhaps quiescent about this threat.

(END VIDEO CLIP)

KURTZ: Does she have a point?

COOPER: I think I might differ with my co-defendant, Judy, on this. I mean, I think the press – I don't recall anyone in the press saying Bob Novak didn't have the same right to protect his sources that Judy or I do. So I'm not quite sure I agree with her on that.

KURTZ: This is not a theoretical possibility. Jim Taricani, Rhode Island television reporter, was sentenced this week. He has also been cited for contempt in a source case. He was sentenced to six months of home confinement. The judge said the only reason he didn't send him to jail was because he has had a heart transplant.

In Taricani's case, the source at the last minute voluntarily came forward. Why are you still protecting the source or sources in this case, who, after all, may have possibly committed a crime in leaking the name of Valerie Plame?

COOPER: Sure. Well, I think there is a larger principle at issue here, Howard, which is protecting the confidentiality of sources. I think if reporters go picking and choosing which confidences to honor, which ones we'll break, whether we think our sources have proper motivations or not, we're really going to send a message to all potential sources who may be whistle-blowers uncovering government waste or what-not, that reporters' words can't be trusted.

And so I feel a need to protect this confidence, despite that.

KURTZ: And on that point, what has been the effect of all this on your daily reporting right now?

COOPER: Well, it has taken up some time and it's obviously unsettling to have to go through the legal system.

KURTZ: Chilling effect?

COOPER: Haven't seen the chilling effect, but I think in part by standing firm here I think if anyone doubted I could keep a secret I think they've seen I can.

KURTZ: Have you asked the source or sources involved to consider coming forward so that you don't have to face the possibility of going to jail?

COOPER: Well, I had this very thing happen earlier in the year. I did give a limited deposition to the special counsel after one of my sources, the vice president's chief of staff, Lewis Libby, waived me, essentially, of confidentiality...

KURTZ: You quoted him by name in that article.

COOPER: Yes. And I went to him personally and said, look, can I talk about anything we might have discussed confidentially? And I got his explicit assurance. I didn't rely on one of these written waivers that's getting a lot of attention now. And I went ahead and did that. I certainly have no problem with that, you know, if the source, if him- or herself wants to be outed, so to speak, I don't think it's a problem for the journalist to do it.

KURTZ: All right. You're married to a Democratic consultant, Mandy Grunwald, I'm sure she understands what's going on here, but what about your 6-year-old son, what do you tell him about this?

181

COOPER: Well, we haven't, Howard, it has been a strange situation. I mean, I -- he does not watch CNN. He does not read "The New York Times." And so he doesn't know about this case. And we've kept him blissfully ignorant. Our feeling is, why worry him? Frankly, it's a very hard case to understand. It's very hard to explain...

KURTZ: Even for grown-ups.

COOPER: Even to me.

KURTZ: But what if you have to explain why you're going away for a while?

COOPER: Well, I think that's going to be very hard to do. I'm going to try to make the point that I'm doing it for what I hope is an honorable reason. And you know, that there's a principle involved here.

KURTZ: All right. Matt Cooper, thanks very much for joining us.

COOPER: Thanks, Howard.

KURTZ: Coming up, baseball and that steroid scandal. Is the age of innocence over or did sports reporters missed the real story all along? Warner Wolf is among our guests coming up next.

-END-

# EXHIBIT L

30 January 2004

The Honorable John Conyers, Jr.
Ranking Democratic Member
Committee on the Judiciary
House of Representatives
Washington, D.C.  20515

Dear Mr. Conyers:

Thank you for your letter of 29 September 2003 to the
Director of Central Intelligence (DCI) regarding any contacts
the Central Intelligence Agency (CIA) has had with the
Department of Justice (DoJ) to request an investigation into the
disclosure earlier that year of the identity of an employee
operating under cover.  The DCI has asked me to respond to your
letter on his behalf.

Executive Order 12333 requires CIA to report to the
Attorney General "possible violations of criminal law."  In
accordance with Executive Order 12333 on 24 July 2003, a CIA
attorney left a phone message for the Chief of the
Counterespionage Section of DoJ noting concern with recent
articles on this subject and stating that the CIA would forward
a written crimes report pending the outcome of a review of the
articles by subject matter experts.  By letter dated 30 July
2003, the CIA reported to the Criminal Division of DoJ a
possible violation of criminal law concerning the unauthorized
disclosure of classified information.  The letter also informed
DoJ that the CIA's Office of Security had opened an
investigation into this matter.  This letter was sent again to
DoJ by facsimile on 5 September 2003.

By letter dated 16 September 2003, and in accordance with
standard practice in such matters, the CIA informed DoJ that the
Agency's investigation into this matter was complete, provided
DoJ a memorandum setting forth the results of that
investigation, and requested that the Federal Bureau of
Investigation (FBI) undertake a criminal investigation of this
matter.  In a 29 September 2003 letter, DoJ advised that the
Counterespionage Section of DoJ had requested that the FBI
initiate an investigation of this matter.

The Honorable John Conyers, Jr.

I hope the information set forth in this letter provides the assistance you were seeking.

Sincerely,

Stanley M. Moskowitz
Director of Congressional Affairs

2

# EXHIBIT M

FOCUS - 1 of 1 DOCUMENT

Copyright 2003 The Washington Post
The Washington Post

**September 29, 2003 Monday**
Final Edition

SECTION: A SECTION; Pg. A01

LENGTH: 1329 words

HEADLINE: Bush Aides Say They'll Cooperate With Probe Into **Intelligence Leak**

BYLINE: Mike Allen, Washington Post Staff Writer

BODY:

President Bush's aides promised yesterday to cooperate with a Justice Department inquiry into an administration leak that exposed the identity of a CIA operative, but Democrats charged that the administration cannot credibly investigate itself and called for an independent probe.

White House officials said they would turn over phone logs if the Justice Department asked them to. But the aides said Bush has no plans to ask his staff members whether they played a role in revealing the name of an undercover officer who is married to former ambassador Joseph C. Wilson IV, one of the most visible critics of Bush's handling of intelligence about Iraq.

An administration official told The Washington Post on Saturday that two White House officials leaked the information to selected journalists to discredit Wilson. The leak could constitute a federal crime, and intelligence officials said it might have endangered confidential sources who had aided the operative throughout her career. CIA Director George J. Tenet has asked the Justice Department to investigate how the leak occurred.

National security adviser Condoleezza Rice said on "Fox News Sunday" that she knew "nothing of any such White House effort to reveal any of this, and it certainly would not be the way that the president would expect his White House to operate."

She also said the White House would leave the probe in the hands of the Justice Department, calling it the "appropriate channels now."

White House press secretary Scott McClellan said the Justice Department has requested no information so far. "Of course, we would always cooperate with the Department of Justice in a matter like this," he said.

Asked about the possibility of an internal White House investigation, McClellan said, "I'm not aware of any information that has come to our attention beyond the anonymous media sources to suggest there's anything to White House involvement."

The controversy erupted over the weekend, when administration officials reported that Tenet sent the Justice Department a letter raising questions about whether federal law was broken when the operative, Valerie Plame, was exposed. She was named in a column by Robert D. Novak that ran July 14 in The Post and other newspapers.

CIA officials approached the Justice Department about a possible investigation within a week of the column's publication. Tenet's letter was delivered more recently.

The department is determining whether a formal investigation is warranted, officials said. The officials said they did not know how long that would take.

Democratic lawmakers and presidential candidates seized on the investigation as a new vulnerability for Bush. Sen. Charles E. Schumer (N.Y.), who has been pushing the FBI to pursue the matter for two months, said that if "something

this sensitive is done under the wing of any direct appointees, at the very minimum, it's not going to have the appearance of fairness and thoroughness."

From the presidential campaign trail in New Hampshire, Rep. Richard A. Gephardt (Mo.) called it "a natural conflict of interest" for Justice Department appointees to investigate their superiors, and said congressional committees should step in to try to determine what happened.

Former Vermont governor Howard Dean said Attorney General John D. Ashcroft should play no role in the investigation and should turn it over to the Justice Department's inspector general, who operates independently of political appointees. "President Bush came into office promising to bring honor and integrity to the White House," Dean said. "It's time for accountability."

Sen. Joseph I. Lieberman (Conn.) said the investigation "must be conducted by an independent, nonpartisan counsel."

Although the Independent Counsel Act, created after the Watergate abuses, expired in 1999, the attorney general can appoint a special counsel to investigate the president and other top government officials. Special counsels have less independence from the attorney general, but proponents of the system said that makes them more accountable.

More specific details about the controversy emerged yesterday. Wilson said in a telephone interview that four reporters from three television networks called him in July and told him that White House officials had contacted them to encourage stories that would include his wife's identity.

Novak attributed his account to "two senior administration officials." An administration aide told The Post on Saturday that the two White House officials had cold-called at least six Washington journalists and identified Wilson's wife.

She is a case officer in the CIA's clandestine service and works as an analyst on weapons of mass destruction. Novak published her maiden name, Plame, which she had used overseas and has not been using publicly. Intelligence sources said top officials at the agency were very concerned about the disclosure because it could allow foreign intelligence services to track down some of her former contacts and lead to the exposure of agents.

The disclosure could have broken more than one law. In addition to the federal law prohibiting the identification of a covert officer, officials with high-level national security clearance sign nondisclosure agreements, with penalties for revealing classified information.

Wilson had touched off perhaps the most searing controversy of this administration by saying he had determined on a mission to Niger last year that there was no clear evidence that Saddam Hussein had tried to buy "yellowcake" uranium ore for possible use in a nuclear weapon.

His statement led to a retraction by the White House, and bolstered Democrats' contention that Bush had exaggerated intelligence to build a case against Iraq. The yellowcake allegation became known as "the 16 words" after Bush said in his State of the Union address in January that the British government had learned that Hussein recently sought significant quantities of uranium from Africa.

An administration official said the leaks were "simply for revenge" for the trouble Wilson had caused Bush.

Wilson said that in the week after the Novak column appeared, several journalists told him that the White House was trying to call attention to his wife, apparently hoping to undermine his credibility by implying he had received the Niger assignment only because his wife had suggested the mission and recommended him for the job.

"Each of the reporters quoted the White House official as using some variation on, 'The real story isn't the 16 words. The real story is Wilson and his wife,' " Wilson said. "The time frame led me to deduce that the White House was continuing to try to push this story."

Wilson identified one of the reporters as Andrea Mitchell of NBC News. Mitchell did not respond to requests for comment.

Wilson has suggested publicly that Bush's senior adviser, Karl Rove, was the one who broke his wife's cover. McClellan has called that "totally ridiculous" and "not true."

Bush Aides Say They'll Cooperate With Probe Into Intelligence Leak

Secretary of State Colin L. Powell said on ABC's "This Week" program: "The CIA has an obligation, when they believe somebody who is undercover was outed, so to speak, has an obligation to ask the Justice Department to look into it. But other than that, I don't know anything about the matter."

Democrats also questioned why Bush's aides had seemed to show little interest in the disclosure before the CIA request was made public. McClellan was asked about the Novak column during briefings on July 22 and Sept. 16. He replied that no one in the White House would have been authorized to reveal the operative's name and that he had no information to suggest White House involvement.

Democrats e-mailed a quotation from former president George H.W. Bush, a former CIA director, who said in 1999 at the dedication of the agency's new headquarters that those who expose the names of intelligence sources are "the most insidious of traitors."

Staff writer Walter Pincus contributed to this report.

LOAD-DATE: September 29, 2003

# EXHIBIT N

FOCUS - 1 of 1 DOCUMENT

Copyright 2003 The Washington Post
The Washington Post

October 1, 2003 Wednesday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1271 words

**HEADLINE:** Justice Dept. Launches Criminal Probe of Leak

**BYLINE:** Dana Milbank and Susan Schmidt, Washington Post Staff Writers

**BODY:**

The Justice Department announced yesterday that it has begun a full criminal investigation into allegations that Bush administration officials leaked the name of a covert CIA operative, leaving open the possibility a special counsel will be appointed when more facts are learned.

The expanding probe, which promptly shifted to a full investigation after an initial review, set its focus on the White House, which was directed to preserve all relevant records and files. White House counsel Alberto R. Gonzales, in a memo to White House staff yesterday, said the Justice Department informed aides to President Bush on Monday evening that it is probing "possible unauthorized disclosures concerning the identity of an undercover CIA employee."

Speaking about the probe for the first time yesterday afternoon in Chicago, Bush called the investigation "a good thing" and said he has told his administration "to be fully cooperative." "There's just too many leaks, and if there is a leak out of my administration, I want to know who it is," the president said. "If the person has violated law, the person will be taken care of. And so I welcome the investigation."

Bush asked anybody with information to come forward, and last night the White House said the Justice Department was looking for records of contacts with three journalists: syndicated columnist Robert D. Novak, and Newsday reporters Knut Royce and Timothy M. Phelps. But Bush's press secretary, Scott McClellan, said nobody in the White House is inquiring about the leak. "It's the Department of Justice that is looking into this matter," he said.

Word that the inquiry had broadened into a full investigation made clear that the matter of the leaks could become a fixture on the political scene for many months as it becomes shrouded in the criminal justice system and the possibility of grand jury secrecy.

Attorney General John D. Ashcroft said yesterday that career lawyers in the Justice Department's counterespionage section opened a criminal investigation Friday, four days after receiving a memo from the CIA detailing a possible violation of federal law that prohibits unauthorized disclosures of classified information.

The decision to open the investigation was made by career counterespionage section chief John Dion, without the consultation of the attorney general, as is standard practice, the department said. The Justice Department asked the FBI and the CIA to preserve relevant records; requests were apparently not made of the Pentagon or the State Department.

Ashcroft said the Justice Department prosecutors and FBI agents "who are and will be handling this investigation are career professionals with extensive experience in handling matters involving sensitive national security information." He refused to answer questions about the investigation, including whether there is an inherent conflict in his department's investigating allegations of wrongdoing by senior Bush administration officials.

A department spokesman said later that Ashcroft could decide to name a special counsel to take over the probe as facts emerge in the investigation. "No legal options are closed," the spokesman said. "Part of what is being investigated is whether there was an actual violation of law. That has not been determined yet."

Justice Dept. Launches Criminal Probe of Leak The Washington Post Octobe

Democrats in Congress continued their push for Ashcroft to name a special counsel. In the Senate, Republicans squelched a Democratic move to put Congress on record in favor of a special counsel; the non-binding proposal, sponsored by Sen. Charles E. Schumer (D-N.Y.) and backed by the Senate Democratic leadership, was killed on procedural grounds.

"This is not just a leak; this is a crime, plain and simple" and deserves an independent inquiry, Schumer said. Democrats say Bush's Justice Department has a conflict of interest in investigating the White House; they note that top Bush strategist Karl Rove, who has been accused of having a role in the leak, once was a consultant to Ashcroft.

A special counsel, if one is named, would be appointed by Ashcroft.

The investigation stems from allegations that Bush administration officials disclosed that the wife of former ambassador Joseph C. Wilson IV, a prominent critic of Bush's use of intelligence related to Iraq, worked for the CIA. A senior administration official has told The Washington Post that two White House officials leaked the information to several journalists in an effort to discredit Wilson.

Wilson, on ABC's "Nightline" last night, said that if investigators ask, "I will be revealing the names of everybody who called me," before or after the disclosure of his wife's identity. He said those reporters said White House sources or specific individuals had knowledge of the leak.

The controversy began when Novak on July 14 named Wilson's wife, Valerie Plame, as a CIA operative, citing two senior administration officials. In a column today, Novak said "I did not receive a planned leak" and called the information "an offhand revelation." He also wrote that an "unofficial source" at the CIA said Plame "has been an analyst, not in covert operations."

But on July 22, Newsday reported: "Novak, in an interview, said his sources had come to him with the information. 'I didn't dig it out, it was given to me,' he said. 'They thought it was significant, they gave me the name and I used it.' "

That article was written by Phelps and Royce, the other two journalists named in the White House order to preserve records. The article was the first to identify Plame as a clandestine operative, reporting: "Intelligence officials confirmed to Newsday yesterday that Valerie Plame, wife of retired Ambassador Joseph Wilson, works at the agency on weapons of mass destruction issues in an undercover capacity -- at least she was undercover until last week, when she was named by columnist Robert Novak."

Plame currently is an analyst at the CIA. But, intelligence officials said, she previously served overseas in a clandestine capacity, which means her name is kept classified to protect her previous contacts and operations, and her ability to work again undercover overseas.

There are two federal statutes that could make the disclosure of a covert CIA employee's identity a crime. One concerns unauthorized disclosure of classified information, and the other specifically protects the identity of intelligence officers.

For there to have been a crime, both statutes require there be evidence showing that the person who made the disclosure did so knowing the information was classified. The Intelligence Identities Protection Act also defines a "covert agent" as someone whose identity as an intelligence official is classified information and "who is serving outside the United States or has within the last five years outside the United States."

Before opening a criminal investigation into leaks of classified material, the Justice Department asks the referring agency to answer 11 questions that department officials have said are akin to filing a police report; the CIA submitted the questionnaire last Tuesday.

Among the questions are "whether the classified data disclosed is accurate"; "the extent of official dissemination of the data"; "whether the data has been the subject of prior official releases"; what effect disclosure has on national security; and "whether the material or portions thereof or enough background data has been published officially or in the press to make an educated speculation on the matter possible."

Staff writers Helen Dewar in Washington and Mike Allen in Chicago contributed to this report.

LOAD-DATE: October 2, 2003

# EXHIBIT O

FEB-21-2006  12:28    DOJ/CRIMINAL DIV/ISS                                    202 514 2836    P.02



# Office of Special Counsel

*Patrick J. Fitzgerald*        *Chicago Office: Dirksen Federal Building*      *Washington Office: Bond Building*
*Special Counsel*                         *219 South Dearborn Street, Fifth Floor*      *1400 New York Avenue, Ninth Floor*
                                          *Chicago, Illinois 60604*                      *Washington, DC 20530*
                                          *(312) 353-5300*                               *(202) 514-1187*

*Please address all correspondence to the Washington Office*

**Via Telefax & Regular Mail**                    February 21, 2006

John D. Cline, Esq.                      Theodore V. Wells, Esq.
JONES DAY                                PAUL WEISS LLP
555 California Street                    1285 Avenue of the Americas
San Francisco, CA 94104                  New York, NY 10019-6064

William Jeffress, Esq.                   Joseph A. Tate, Esq.
BAKER BOTTS                              DECHERT LLP
The Warner                               Cira Centre
1299 Pennsylvania Avenue, N.W.           2929 Arch Street
Washington, DC 20004-2400               Philadelphia, PA 19103

Re:  United States v. I. Lewis Libby

Dear Counsel:

   The following information is in response to your request for "all documents relating to the
CIA's criminal referral to the Department of Justice concerning the disclosure of Mrs. Wilson's
affiliation with the CIA." After consultation with the CIA, we advise that we view any such
documents in our possession as not discoverable. The documents remain classified and contain
information compiled for law enforcement purposes that is neither material to the preparation of the
defense, nor exculpatory as to Mr. Libby. In addition, the documents are protected from disclosure
because they contain inter-agency, pre-decisional preliminary evaluations and recommendations of
government officials covered by the deliberative process privilege. Moreover, the documents also
contain legal analysis and opinion prepared by a CIA attorney, as well as communications between
the CIA attorney and the Department of Justice, that are protected from disclosure by attorney-client
communications privilege and the attorney work product privilege.

   Should you have any questions or comments regarding any of the foregoing, or should you
wish to discuss this matter generally, please do not hesitate to call me at the number listed above.

                                     Very truly yours,

                                     Kathleen M. Kedian
                                     Deputy Special Counsel