**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY | ) | Oral Argument Requested |
|     also known as "Scooter Libby," | ) | |
|     Defendant. | ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION OF I. LEWIS LIBBY TO DISMISS THE INDICTMENT**

Theodore V. Wells, Jr.
D.C. Bar No. 468934
James L. Brochin
D.C. Bar No. 455456
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3089


Joseph A. Tate
Dechert LLP
2929 Arch Street
Cira Centre
Philadelphia, PA  19104
(215) 994-2000

William H. Jeffress, Jr.
D.C. Bar No. 041152
Alex J. Bourelly
D.C. Bar No. 441422
Alexandra M. Walsh
D.C. Bar No. 490484
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 639-7751


John D. Cline
D.C. Bar No. 403824
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
(415) 875-5812

March 31, 2006

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...............................................................................................ii

ARGUMENT ...................................................................................................................1

I.    THE LEGALITY OF THE SPECIAL COUNSEL'S APPOINTMENT DEPENDS
ON ITS OBJECTIVE TERMS, NOT ON THE SPECIAL COUNSEL'S
PREVIOUSLY UNDISCLOSED, SUBJECTIVE UNDERSTANDING.........................1

II.    THE SPECIAL COUNSEL IS A PRINCIPAL OFFICER FOR PURPOSES OF
THE APPOINTMENTS CLAUSE ..................................................................................5

    A.  The Special Counsel Is Subject To No Direction Or Supervision By Any
Superior In The Department Of Justice Or Elsewhere .................................................6

    B.  The Limitations On The Power Of The Independent Counsel Upheld In
*Morrison* Are Lacking Here.........................................................................................8

    C.  The Special Counsel's "Theoretical" Removability Does Not Render Him An
Inferior Officer .........................................................................................................10

    D.  Mr. Fitzgerald's Prior Appointment As A United States Attorney Does Not
Cure The Constitutional Defect In This Case ............................................................14

III.   THE SPECIAL COUNSEL'S APPOINTMENT VIOLATES FEDERAL LAW...........16

IV.  ALLOWING THE OFFICE OF SPECIAL COUNSEL TO STAND WOULD
CREATE A DANGEROUS PRECEDENT ..................................................................18

CONCLUSION ...............................................................................................................19

## TABLE OF AUTHORITIES

### CASES

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962)......................................................4

*C.F. Trust, Inc. v. Tyler*, 318 B.R. 795 (E.D. Va. 2004)...........................................................3

*\*Edmond v. United States*, 520 U.S. 651 (1997)....................................................................*passim*

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ...............................................................................7

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...........................................................................3

*\*In re Persico*, 522 F.2d 41 (2d Cir. 1975)...........................................................................4

*In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987) ......................................................... 11, 17, 18

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................................................*passim*

*Planned Parenthood of Metropolitan Washington, D.C. v. Homer*,
    691 F. Supp. 449 (D.D.C. 1988) ..............................................................................4

*Scott v. United States*, 436 U.S. 128 (1978).........................................................................3

*Shoemaker v. United States*, 147 U.S. 282 (1893).......................................................................15

*Small v. United States*, 125 S. Ct. 1752 (2005) .......................................................................16

*Stern v. Lucy Webb Hayes Nat'l Training School*, 381 F. Supp. 1003 (D.D.C. 1974).................18

*United States v. Nixon*, 418 U.S. 683 (1974) ................................................................... 10, 11

*\*United States v. Oakar*, 924 F. Supp. 232 (D.D.C. 1996)...........................................................4

*United States v. Sotomayor Vazquez*, 69 F. Supp. 2d 286 (D.P.R. 1999)....................................12

*Webster v. Fall*, 266 U.S. 507 (1925) .......................................................................... 10, 18

*Weiss v. United States*, 510 U.S. 163 (1994).........................................................................15

*Whren v. United States*, 517 U.S. 806 (1996) ..........................................................................3

## FEDERAL STATUTES

28 U.S.C. § 510 ................................................................................................ 16, 17

28 U.S.C. § 515 ...................................................................................................... 17

28 U.S.C. § 516 ..........................................................................................1, 16, 17, 18

28 U.S.C. § 519 ..........................................................................................1, 16, 17, 18

## FEDERAL REGULATIONS

28 C.F.R. § 0.37 (1973) ........................................................................................... 11

28 C.F.R. § 50.2(b)(9) ............................................................................................... 8

28 C.F.R. Part 600 ................................................................................................... 18

## UNITED STATES ATTORNEYS' MANUAL

§ 9-27.140 ................................................................................................................ 8

## OTHER AUTHORITIES

3 Am. Jur. 2d *Agency* § 2 (2002) ........................................................................... 18

Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747 (1999) ........................... 7

John Harmon, Litigating Authority of the Office of Federal Inspector, Alaska Natural
   Gas Transportation System, 4B U.S. Op. Off. Legal Counsel 820,
   1980 WL 20994 (1980) ...................................................................................... 16

Theodore Olson, The Attorney General's Role as Chief Litigator for the United States,
   6 U.S. Op. Off. Legal Counsel 47, 1982 WL 170670 (1982) ........................... 17

Restatement (Second) of Agency § 32 cmt. a .......................................................... 3

Leon Ulman, United States Attorneys, Suggested Appointment Power of the Attorney
   General, Constitutional Law (Article 2, § 2, cl. 2 ), 2 U.S. Op. Off. Legal Counsel
   58, 1978 WL 15265 (1978) ................................................................................ 15

**ARGUMENT**

I.    **THE LEGALITY OF THE SPECIAL COUNSEL'S APPOINTMENT DEPENDS ON ITS OBJECTIVE TERMS, NOT ON THE SPECIAL COUNSEL'S PREVIOUSLY UNDISCLOSED, SUBJECTIVE UNDERSTANDING.**

The Special Counsel does not reconcile his unprecedented grant of power with the controlling "direction and supervision" test set forth in *Edmond v. United States*, 520 U.S. 651, 662-63 (1997).  Nor does he establish that the limitations the Supreme Court relied on in *Morrison v. Olson*, 487 U.S. 654, 671-72 (1988), are present in the terms of his appointment.  Finally, he fails to explain how his mandate—to operate "independent of the supervision or control of any officer of the Department," Exh. C[1]—could possibly be squared with the Attorney General's statutory obligation to supervise all litigation to which the United States is a party, 28 U.S.C. §§ 516 and 519.

Instead, the government attempts to salvage the appointment by submitting two affidavits, recently prepared by Mr. Comey and Mr. Fitzgerald, claiming that their *previously undisclosed, subjective understanding* of the appointment was narrower.  For example, despite the fact that the Special Counsel was given "*all* the approval authority of the Attorney General"— including authority to exempt himself from substantive Department policies, *see infra* at 8— Mr. Comey now asserts that "it was my *intention* that the Special Counsel would follow substantive Department policies" in exercising that authority.  Comey Aff. ¶ 3 (emphasis added).  Despite the fact that Mr. Comey stated at the time of Mr. Fitzgerald's appointment that the Special Counsel did not "have to come back to the [A]ttorney [G]eneral and get permission" to "expand [his] jurisdiction," Exh. A. at 9, he now claims that it was his "*understanding* . . . that any expansion of the scope of the Special Counsel's investigation would require my approval." Comey Aff. ¶ 3 (emphasis added).  Mr. Comey dismisses his earlier statements as

_____

[1] All "Exh." citations herein refer to exhibits to our initial memorandum.

"inadvertent[]," "extemporaneous," and "inartful[]." *Id.* ¶ 4. Similarly, despite the fact that as recently as August 2004 Mr. Fitzgerald characterized himself as "the functional equivalent of the Attorney General on this matter," Exh. E ¶ 5, he now insists in response to Mr. Libby's challenge that he always "understood" he had no authority to expand his jurisdiction, and that he was required to follow certain substantive Department policies, *see* Fitzgerald Aff. ¶¶ 3, 4.[2]

Neither affidavit suggests that Mr. Comey ever told Mr. Fitzgerald about the newly claimed limitations on his powers as Special Counsel—limitations that are nowhere mentioned in the letters of appointment, or in Mr. Comey's public statements, or in Mr. Fitzgerald's prior affidavit, or, apparently, in any other contemporaneous document. Nor does Mr. Comey's affidavit state that he communicated those limitations to his "successors," Associate Deputy Attorney General Margolis and Associate Attorney General McCallum—whose role in this matter is asserted for the first time in the government's response, *see* Resp. at 21. The government fails, for that matter, to provide an affidavit from Mr. Margolis, or Mr. McCallum, or any other *present* employee of the Department confirming his awareness of the limitations Mr. Comey "intended" to apply. Whether anyone is now in a position to *enforce* those limitations

---

[2]  The fact that the Special Counsel *ignored* the Department's policies in his October 28, 2005 press conference is good evidence that he in fact understands his authority to be as broad as Mr. Comey defined it at the time of appointment. *See* Def.'s Mem. in Support of Mot. to Dismiss (hereinafter "Mem.") at 16-17. The Special Counsel denies that his press conference was not in compliance, pointing out that he "reminded the audience of the presumption of innocence on several occasions." Govt's Resp. to Mot. to Dismiss (hereinafter "Resp.") at 26. But nothing in the policy suggests that a passing reference to the presumption of innocence gives a prosecutor license to say whatever he wants in the remainder of his remarks. Mr. Fitzgerald also insists that he "stay[ed] within the four corners of the indictment in describing the charges." *Id.* Yet, he does not deny that he claimed the case involved disclosure of classified information or that at one point he *incorrectly* asserted that Mr. Libby was "the first official to disclose Plame's employment." *See id.* at 26 n.9. Neither of those allegations appears anywhere in the indictment, and both seem wholly irrelevant to what Mr. Fitzgerald has elsewhere characterized as a simple perjury case. Moreover, it is hard to see, as the Special Counsel now claims, how flatly asserting the defendant's guilt or accusing him of uncharged crimes furthers any legitimate law enforcement goal. *See id.* at 27.

therefore remains unknown. Mr. Comey—who left the Department to work in the private sector months ago—certainly does not have that power.

The Court should reject the government's attempt to defend Mr. Fitzgerald's appointment by changing the factual record in this manner. Government officials ought not be permitted to hand over vast, unsupervised powers to so-called inferior officers, and then deflect legal challenges by claiming that they never "intended" to do so. The legality of the Special Counsel's appointment should depend on the *objective* terms of Mr. Comey's action, not on undisclosed *subjective* understandings offered for the first time in response to a legal challenge.

In virtually every other context, courts refuse to consider an executive officer's undisclosed subjective intent in determining whether the officer's actions were lawful. *See, e.g.*, *Whren v. United States*, 517 U.S. 806, 814 (1996) (refusing to consider officer's "subjective intent" in Fourth Amendment context); *Harlow v. Fitzgerald*, 457 U.S. 800, 816-18 (1982) (refusing to consider "subjective intent" in qualified-immunity context); *cf. Scott v. United States*, 436 U.S. 128, 136-37 (1978) ("Subjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional"). The same objective standard applies to delegations of authority: The scope of a delegation "depends not upon the intent of either party but upon the *expressed* intent." Restatement (Second) of Agency § 32 cmt. a (emphasis added). The reasons for that objective approach are obvious: "[U]nexpressed beliefs or views [are] rarely helpful in discerning the parties' intent . . . ; each party, as here, typically claims to have understood and intended the meaning that best suits its current position." *C.F. Trust, Inc. v. Tyler*, 318 B.R. 795, 809-810 (E.D. Va. 2004).

Applying that objective approach, courts look to the "writings, guidelines, practices and oral directions transmitted through DOJ's chain of command" to determine the scope of a special

prosecutor's authority.  *United States v. Oakar*, 924 F. Supp. 232, 240 (D.D.C. 1996), *rev'd in part on other grounds*, 111 F.3d 146 (D.C. Cir. 1997); *see In re Persico*, 522 F.2d 41, 66 (2d Cir. 1975).  Here, Mr. Comey's affidavit merely sets forth limitations he "underst[ood]" and "intended" as restrictions on the Special Counsel's power.  Comey Aff. ¶ 3.  He does not claim he ever communicated those limitations to Mr. Fitzgerald, in writing or otherwise.  Rather, he asserts only that, "[t]o the best of [his] knowledge, the Special Counsel shared each of these understandings and knew of the intended limits on his authority."  *Id.*  Those recently expressed, subjective understandings are no substitute for objectively verifiable limits on the Special Counsel's power.  Mr. Comey's contemporaneous "writings" and "oral directions," *Oakar*, 924 F. Supp. at 240, make clear the Special Counsel is a principal officer.[3]

Reliance on undisclosed subjective intent is particularly problematic when the intent manifests itself for the first time in affidavits prepared in the course of litigation.  Courts routinely reject attempts to defend unlawful governmental action based on post hoc rationalizations—particularly where, as here, those rationalizations are offered by interested parties.  *See, e.g., Planned Parenthood of Metropolitan Washington, D.C. v. Homer*, 691 F. Supp. 449, 456 (D.D.C. 1988) (affidavits offered by agency officials in defense of regulations are "post-hoc statements of interested onlookers [that are] entitled to *no weight*") (emphasis in original); *cf. Burlington Truck Lines v. United States*, 371 U.S. 156, 169 (1962) ("Courts may not accept appellate counsel's post hoc rationalizations for agency action; an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself").  This Court should do the same.

---

[3] Notably, though the government dismisses Mr. Comey's statements at his press conference as "parol evidence," Resp. at 28, it freely cites those statements when it believes they support its position.  *See, e.g., id.* at 14, 23.

Should the Court conclude, despite the foregoing, that the subjective, undocumented, and previously undisclosed understanding of Mr. Comey and Mr. Fitzgerald is relevant, Mr. Libby requests an evidentiary hearing at which he may examine the witnesses and obtain heretofore undisclosed communications between Mr. Fitzgerald and Mr. Comey (or Mr. Margolis or Mr. McCallum) and other Department of Justice documents concerning the authority of the Special Counsel.  If Mr. Fitzgerald's and Mr. Comey's subjective intent regarding the appointment should be considered, then Mr. Libby certainly has a right to determine if, for example, there exist any contemporaneous internal Department documents or sealed court filings that bear upon the "understandings" now set forth in their after-the-fact affidavits.

## II.    THE SPECIAL COUNSEL IS A PRINCIPAL OFFICER FOR PURPOSES OF THE APPOINTMENTS CLAUSE.

In response to Mr. Libby's challenge, the government also relies heavily on the fact that other courts have rejected legal challenges to other special prosecutors.  *See* Resp. at 3, 6, 10. But all of those cases precede *Edmond*, in which the Supreme Court definitively established that unless an officer is subject to "direction and supervision" by a superior he is a principal for Appointments Clause purposes.  Because the Special Counsel acts without direction or supervision by anyone in the Department of Justice, or elsewhere, that irreducible constitutional minimum is not satisfied in this case.  What is more, none of the cases on which the government relies involved facts nearly as extreme as those here.  The Special Counsel was given the power to ignore Department policies as he sees fit, to expand his jurisdiction without limitation, and to continue his investigation indefinitely.  Neither *Morrison* nor any other case authorizes that unprecedented grant of power.

### A.    The Special Counsel Is Subject To No Direction Or Supervision By Any Superior In The Department Of Justice Or Elsewhere.

In *Edmond*, its most recent case on the line between principal and inferior officers, the Supreme Court held that:

> [I]n the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

520 U.S. at 663.  The terms of the Special Counsel's appointment make clear that the "direction and supervision" mandated by the Appointments Clause are entirely absent in this case.  *See* Mem. at 8-18.

Mr. Comey authorized the Special Counsel to operate "independent of the supervision or control of any officer of the Department."  Exh. C.  He explicitly renounced his obligation to serve as the "ultimate supervisor[] and decision-maker[] in this case," and instead assigned that core responsibility to the Special Counsel.  Exh. A at 2.  Under the terms of his appointment, the Special Counsel has sole power to "decide . . . how to continue the investigation and what prosecutive decisions to make," and he need not "come back to . . . any[one] at the Justice Department for approval[]."  *Id.*  Armed with that power, the Special Counsel has made numerous decisions implicating national security, the First Amendment and other fundamental public interests—with absolutely no input, guidance or responsibility by any properly appointed principal officer.  *See* Mem. at 14-18.

The Special Counsel is not even required to inform anyone at the Department or elsewhere of the progress of his investigation.  Exh. A at 9.  Even budgetary oversight has been eliminated so as to "free[] [the Special Counsel] from possible budget constraints that potentially might serve to limit his activities."  Exh. G. at 5.

As explained in our initial memorandum, the Appointments Clause reflects the Framers' fundamental concern for political accountability in the exercise of executive power. *See* Mem. at 6-8. The Special Counsel is, for all intents and purposes, accountable to no one. Given his vast power, he unquestionably qualifies as a principal officer under the constitutionally mandated standard set forth in *Edmond*.

The government tries to avoid the force of *Edmond* by suggesting that it does not control in this case. *See* Resp. at 11-13, 30-32. That is incorrect. *Edmond* is the Supreme Court's most recent decision on the distinction between principal and inferior officers. To the extent it conflicts with the *Morrison* analysis, *Edmond* must take precedence. *See generally Hamdi v. Rumsfeld*, 542 U.S. 507, 522-23 (2004) (noting that where an opinion both "postdates and clarifies" an earlier opinion, the later opinion provides the "most apposite precedent"). While *Edmond* did not explicitly overrule *Morrison*, it made clear that *Morrison* did not establish a "definitive test for whether an office is 'inferior' under the Appointments Clause." 520 U.S. at 661.[4] It then analyzed the history and purpose of the Clause and, based on that analysis, set forth a clear rule rooted in the text and purpose of the Appointments Clause: If an officer is not subject to direction and supervision by a superior, he *is* a principal officer for Appointments Clause purposes.

Contrary to the Special Counsel's suggestion, nothing in *Edmond* indicates that the Court intended that constitutional requirement to apply only to judges on the Coast Guard Court of Criminal Appeals, or some other limited class of officers. *See* Resp. at 4, 12. Rather, *Edmond*

---

[4] *See* Mem. at 19 n.8; *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 810, 811 (1999) (explaining that *Morrison* provided "a doctrinal test good for one day only" and that in *Edmond* the Supreme Court "apparently abandoned [that] *ad hoc* test").

provides the governing rule for all subsequent cases involving Appointments Clause challenges. Here, that rule makes clear that the Special Counsel's appointment is unconstitutional.

**B.    The Limitations On The Power Of The Independent Counsel Upheld In _Morrison_ Are Lacking Here.**

The government argues that the terms of Mr. Fitzgerald's appointment—that he shall act "independent of the supervision or control of any officer of the Department," Exh. C—is a matter of "semantics," and that he is actually "directed and supervised at some level" as required by _Edmond_ because he is subject to the same limitations as the independent counsel in _Morrison_, Resp. at 31. That argument is unpersuasive.

In _Morrison_, the Supreme Court upheld the independent counsel provisions of the Ethics in Government Act because of four key features: (1) the independent counsel was "subject to removal"; (2) she had only limited duties and was required to "comply to the extent possible with the policies of the Department"; (3) her office was "limited in jurisdiction"; and (4) she was "limited in tenure." 487 U.S. at 671-72. With the possible exception of removability, none of those features is present in the Special Counsel's case. _See_ Mem. at 19-21.

First, whereas the independent counsel was _statutorily required_ to comply with Department policies, there is no statute or regulation providing that Mr. Fitzgerald is subject to the same obligation in his role as Special Counsel. Mr. Comey's "writings" and "oral directions"—by which the legality of the appointment must be judged—indicate the exact opposite. Mr. Comey informed Mr. Fitzgerald that his power as Special Counsel is not "defined or limited" by Department regulations governing other special counsel, and that he enjoys "_all_ the approval authority of the Attorney General"—an authority which permits the Special Counsel to exempt himself from substantive Department policies. _See_ Mem. at 20-21; 28 C.F.R. § 50.2(b)(9); United States Attorneys' Manual § 9-27.140.

Second, whereas the independent counsel was *statutorily required* to obtain the Attorney General's permission before expanding his jurisdiction, the Special Counsel was told that he did *not* "have to come back to the attorney general and get permission" to "expand [his] jurisdiction," but could pursue the investigation "wherever he wants to pursue it." Mem. at 20; Exh. A at 9. Unlike the independent counsel in *Morrison*, if the Special Counsel decides he wants to investigate a crime not specified in his original mandate, he may do so without approval—and, according to Mr. Comey's instructions, without informing anyone at the Department of his decision.

Third, whereas the independent counsel's tenure was *statutorily subject* to review and termination by a three-judge panel sitting, the Special Counsel was given no "timeline" at all and was told that he alone would "make th[e] judgment" when his "investigation will be over." Exh. A at 5. Thus, unlike in the independent counsel regime, here there is no procedure by which anyone in the Department or elsewhere periodically assesses whether continued investigation is necessary and appropriate rather than unreasonable and unwarranted. *See* Mem. at 20.

Aside from these differences in their respective powers, there is another crucial distinction between *Morrison* and this case: Whereas the independent counsel regime was created by *an act of Congress*, the Office of Special Counsel was created through the unilateral action of an Acting Attorney General. Here, unlike in *Morrison*, Congress has not sanctioned the appointment at issue. To the contrary, in 1999, faced with resounding evidence of prosecutorial excesses, Congress chose to abolish the independent counsel. Now, however, Mr. Comey has vested the Special Counsel with powers *even greater* than those enjoyed by the independent counsel, thereby contravening the intent Congress clearly manifested when it allowed the independent counsel provisions to expire. *See* Mem. at 18-19, 29.

### C.    The Special Counsel's "Theoretical" Removability Does Not Render Him An Inferior Officer.

The *only* respect in which the Special Counsel's authority is even arguably more constrained than that of the independent counsel in *Morrison* is his removability:  Whereas the independent counsel was removable only for cause, the Special Counsel is purportedly removable at will.  *See* Resp. at 24; Exh. A at 7-8.[5]  According to the government, at-will removability "*by itself*, makes the Special Counsel an inferior officer and places political accountability in the principal officer to which the Special Counsel is subordinate."  Resp. at 23 (emphasis added).  The government is wrong.  At-will removability is not sufficient—as a matter of law or common sense—to render an officer inferior for Appointments Clause purposes.

The government claims that the power to remove at will "appears to have been decisive to the determination that the special prosecutors at issue in *Nixon* and *In re Sealed Case* were inferior officers."  *Id.*  But *Nixon* did not raise, much less resolve, any challenge to the prosecutor's appointment.  Rather, the questions presented were whether the President was obligated to comply with a subpoena and, preliminarily, whether that issue was justiciable.  *See* 418 U.S. 683, 692-716 (1974).  While the Court may have "presupposed the validity of [the] regulation appointing the Special Prosecutor," *In re Sealed Case*, 829 F.2d 50, 55 n.30 (D.C. Cir. 1987), unchallenged "presuppositions" have no precedential effect.  *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents").

---

[5] Whether the Special Counsel is actually subject to at-will removal is by no means clear.  *See* Mem. at 22.  Mr. Comey stated at his press conference that "in theory" he could remove the Special Counsel—but only "if [he] kn[ew] what [the Special Counsel was] doing" and only if he (Mr. Comey) had "a darn good reason for doing it."  Exh. A at 8.

The government's reliance on the D.C. Circuit's decision in *In re Sealed Case* is also misplaced. *See* Resp. at 10-11, 19-20, 23-24. Whatever the D.C. Circuit may have said about removability in that case, the Supreme Court's more recent pronouncements leave no doubt that removability is not dispositive. *Edmond* based its holding on removability *along with* active administrative oversight, governing procedural rules, and lack of authority to make final decisions on behalf of the Executive. *See* 520 U.S. at 664-65; *see also id.* at 667 (Souter, J., concurring and concurring in the judgment) (explaining that the Court held the judges inferior because of "administrative supervision . . . by the Judge Advocate General . . . , *combined with* his power to control them by removal from a case") (emphasis added).

Likewise, *Morrison* made clear that removability was merely *one* factor in a multi-factor test. *See* 487 U.S. at 671-72. The Special Counsel repeatedly quotes Justice Scalia's assertion that "[i]f [the Independent Counsel] were removable at will by the Attorney General, then she would be subordinate to him and thus properly designated as inferior." *Id.* at 716 (Scalia, J., dissenting); *see* Resp. at 9-10, 13 n.2, 23. But a statement in one Justice's *dissent* obviously has no bearing on how the Supreme Court's governing opinions apply.[6] In the end, the Special Counsel can cite no controlling precedent for the proposition that removability, at-will or otherwise, is sufficient to render an officer inferior. *See United States v. Sotomayor Vazquez*, 69

---

[6] The Court in *Morrison* stated that its decision to uphold the independent counsel provisions was consistent with *Nixon*'s "*reference*" to the Watergate Special Prosecutor as a "subordinate officer." 487 U.S. at 673 (emphasis added). But it based that statement on the fact that the "authority [of that prosecutor] was similar to that of [the independent counsel]," *id.*, not on at-will removability alone. The regulations appointing the special prosecutor in *Nixon* made clear that he was subject to limitations similar to those imposed on the independent counsel in *Morrison* (and in *In re Sealed Case*)—limitations that are not present here. *See* 28 C.F.R. § 0.37 (1973) (obligating the Watergate Special Prosecutor to comply with DOJ regulations and policies, unless the Attorney General agrees otherwise, and indicating that the special prosecutor's jurisdiction can be expanded only at the request of the Attorney General); Mem. at 20-21.

F. Supp. 2d 286, 291 (D.P.R. 1999) ("[W]e have not unearthed a single case in which a court has held that the power to remove is dispositive as to whether an officer is 'principal' or 'inferior.' Rather, the removal power is one of many factors which courts examine in making the distinction and determining whether an Executive official directs or supervises the official").

Refusal to rely on removability alone makes sense. *Edmond* establishes that *Morrison*'s four factors are relevant only to the extent they actually bear on direction and supervision. *Cf.* Resp. at 30-31. Absent any oversight, the "theoretical" power to remove simply does not amount to supervision, and thus does not provide the accountability the Appointments Clause demands. *See* Mem. at 7, 22. Here, Mr. Comey established no mechanism whatsoever that would provide anyone outside the Office of Special Counsel with any insight into its internal deliberations or decision-making. Removal may be a "powerful tool for control" in some circumstances, Resp. at 10, but it is no control at all when an officer's activities and decision-making are a mystery.

Perhaps recognizing that removability without information has no legal or practical significance, the Special Counsel insists that "the power to remove at will carries with it the power to demand information if the Acting Attorney General deems it necessary." *Id.* at 24. That argument is flatly contrary to the terms of Mr. Fitzgerald's appointment. *See* Exh. A at 2, 9 (Special Counsel has no duty to file reports or otherwise provide information to anyone within the Department). Furthermore, the reasoning is circular: How is the Acting Attorney General supposed to know that he should make such a demand?

The government also points out that "much information about the investigation of the Special Counsel is in the public domain and therefore available to the Acting Attorney General in exercising the power to remove the Special Counsel." Resp. at 24. In fact, most of the information regarding the Special Counsel's investigation remains cloaked in secrecy. For

example, during his press conference announcing Mr. Libby's indictment, the Special Counsel declined to answer *any* questions about the witnesses who had testified before the grand jury or possible indictments of other individuals. Exh. F at 5. He did announce that he intended to continue his investigation, *id.* at 7, and according to press reports, he convened another grand jury shortly thereafter to do so. There is, however, virtually no publicly available information regarding this ongoing investigation, including why it must continue or when it will ever end. Mr. Fitzgerald's refusal to release this information into the "public domain" may or may not be justified by the "rules of grand jury secrecy." *Id.* What is clear, however, is that such information would be crucial to any superior overseeing the investigation, and that it cannot possibly be obtained simply by reviewing the press reports on Mr. Fitzgerald's investigative efforts.

Further, where necessary information *does* enter the public domain, it typically does so long after the fact. For example, it only recently came to light that the Special Counsel learned as early as February 2004 who disclosed the CIA identity of Valerie Plame Wilson to Robert Novak. *See* Mem. at 17. A properly appointed principal officer may well have disagreed with the Special Counsel that, notwithstanding that revelation, it was worthwhile to pursue an investigation of Mr. Libby or others based on alleged inaccuracies in statements to the FBI. Now, however, it is too late for anyone to undo that decision. Whatever *Edmond* contemplated by "direction and supervision at some level," it surely meant something more than periodically checking the *Washington Post* to find out if one's unchecked "subordinate" has gone too far.

Finally, it is worth emphasizing that much of the information in the public domain about this case is flat wrong. As the government is surely aware, reporters and pundits continue to publish rumor and innuendo about the Special Counsel's investigation, the relevant evidence and

possible future developments. Certainly, the Acting Attorney General cannot meaningfully oversee the Special Counsel by reviewing the overheated speculation about this case.

The Special Counsel makes much of the distinction between removability for cause and at-will removability, Resp. at 9-10, but that distinction is beside the point here. *Morrison* and *Edmond* did not consider removability as a mere "theoretical" matter, but as a means of direction and supervision. Where the Acting Attorney General *expressly renounces* all direction and supervision, authorizes a special counsel to make important public policy decisions with no input from anyone, and leaves in place no mechanism by which anyone in the Department could have any insight into the Special Counsel's internal deliberations or decision-making, it is absurd to suggest that the theoretical power to remove—even if it is at-will—could provide the public accountability that the Appointments Clause requires. Restricted or not, that power has no practical significance at all.

In short, nearly every feature *Morrison* relied on to uphold the independent counsel statute is lacking in the Special Counsel's case, and the one feature even nominally present— removability—is meaningless.

**D.    Mr. Fitzgerald's Prior Appointment As A United States Attorney Does Not Cure The Constitutional Defect In This Case.**

Finally, the government contends that the Appointments Clause is not even implicated in this case because, prior to becoming Special Counsel, Mr. Fitzgerald was "appointed by the President and confirmed by the Senate" to serve as a United States Attorney, and because he was then given his power as Special Counsel by Mr. Comey rather than through a "formal appointment." Resp. at 2. Those arguments, if accepted, would render the Appointments Clause a dead letter.

14

The fact that a person has been properly appointed to serve in *one* particular executive office does not make him eligible to exercise the powers of all other executive offices.  Mr. Fitzgerald was nominated by the President and confirmed by the Senate to serve as the United States Attorney for the Northern District of Illinois—an *inferior* officer position.  *See Morrison*, 487 U.S. at 676-77; Leon Ulman, United States Attorneys, Suggested Appointment Power of the Attorney General, Constitutional Law (Article 2, § 2, cl. 2), 2 U.S. Op. Off. Legal Counsel 58, 1978 WL 15265 (1978).  Under some circumstances, a properly appointed inferior officer may be given additional *inferior-officer* powers without a second appointment.  *See Shoemaker v. United States*, 147 U.S. 282, 301 (1893); *see also Weiss v. United States*, 510 U.S. 163, 174 (1994).  But the appointments process cannot be dispensed with where, as here, an inferior officer is elevated to *principal* officer status.  *See Weiss*, 510 U.S. at 182, 189-91 (Souter, J., concurring); *cf. id.* at 196 n.* (Scalia, J., concurring in part and concurring in the judgment) ("[W]hether the Appointments Clause permits conferring principal-officer responsibilities upon an inferior officer in a manner other than that required for the appointment of a principal officer . . . w[as] in my view wisely avoided by the Court").

Furthermore, the notion that a wholesale transfer of principal-officer power to an inferior officer does not implicate the Appointments Clause because no "formal appointment" occurred makes no sense.  It is the very *lack* of a formal appointment by the President with the advice and consent of the Senate that creates the constitutional violation in this case.  Allowing the Acting Attorney General to cede his authority to another official by executive fiat is directly contrary to the fundamental purpose of the Clause: to prevent the arbitrary exercise of principal-officer power by ensuring that those who exercise it are fully vetted and approved by *two* branches of

government.  *See* Mem. at 6-8.  Here, contrary to the intent of the Framers, the legislature was entirely cut out of the process.  *See supra* at 9; *Mem.* at 6-8.

## III.    THE SPECIAL COUNSEL'S APPOINTMENT VIOLATES FEDERAL LAW.

The Special Counsel's appointment also runs afoul of 28 U.S.C. §§ 516 and 519, which impose a mandatory duty on the Attorney General to supervise and direct all litigation to which the United States is a party.  Mem. at 25-31.  The government offers two responses:  first, that the "plain language" of 28 U.S.C. § 510 allows the Attorney General to delegate "any function"; and second, that Mr. Comey's abdication of responsibility is itself "one manner of the exercise of his authority [to] supervise."  Resp. at 19-20.  The government's interpretation, however, reads the Attorney General's core supervisory duties out of the statute entirely.  That interpretation should be rejected.

Although section 510 literally permits delegation of "*any* function of the Attorney General," 28 U.S.C. § 510 (emphasis added), the Supreme Court has repeatedly cautioned that the word "any" in a statute does not literally mean "any."  Rather, the word is "limited in [its] application to those objects to which the legislature intended to apply [it]."  *Small v. United States*, 125 S. Ct. 1752, 1754-55 (2005) (internal quotation marks omitted; citing several other cases).  Sections 516 and 519 show that, as a general rule, Congress intended the Attorney General to retain *personal* responsibility for ultimate direction and supervision of litigation.  *See* 28 U.S.C. § 519 ("[T]he *Attorney General shall supervise* all litigation . . .") (emphasis added); John Harmon, Litigating Authority of the Office of Federal Inspector, Alaska Natural Gas Transportation System, 4B U.S. Op. Off. Legal Counsel 820, 824, 1980 WL 20994 (1980) (section 519 imposes a "mandatory duty on the Attorney General").  Interpreting "any function" to include even the core duty to supervise imposed by sections 516 and 519 would render that aspect of those provisions a nullity.  The Attorney General would then *never* have a personal

16

obligation to direct and supervise litigation; he could *always* hand off those duties to other Department officials and thereby absolve himself of any responsibility. This Court should not interpret "any function" in a manner that so clearly undermines the congressional scheme, particularly when doing so raises such grave constitutional concerns. *See* Mem. at 31.

The Special Counsel argues in the alternative that section 510 should be "harmon[ized]" with sections 516 and 519 by "interpreting the Attorney General's delegation of functions to other officers of the Department as one manner of the exercise of his authority [to] supervise and direct litigation." Resp. at 19-20. That argument "harmonizes" two provisions only by obliterating one of them completely. The Attorney General cannot "supervise" litigation by declining to supervise it. When it said "supervise," Congress obviously did not mean "supervise or not supervise."

The construction that *actually* harmonizes all these provisions is the one we propose: Section 510 allows delegation of litigating authority but *not* abdication of the ultimate responsibility for direction and supervision. *Cf.* Theodore Olson, The Attorney General's Role as Chief Litigator for the United States, 6 U.S. Op. Off. Legal Counsel 47, 59, 1982 WL 170670 (1982) ("While the Attorney General may delegate some litigating authority . . . , he may not delegate the ultimate responsibility which is by law vested exclusively in the Attorney General").

*In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987), is not to the contrary. *Cf.* Resp. at 18-19. That case did not mention, let alone analyze, sections 516 and 519. It addressed the general question whether sections 510 and 515 authorize the Attorney General to create an independent counsel's office. *See* 829 F.2d at 55. It did not consider, and therefore does not resolve, the more specific question presented here: whether those sections permit a delegation that conflicts directly with sections 516 and 519. *See Webster*, 266 U.S. at 511. In any event, as already

17

discussed, the delegation here goes far beyond the one in *In re Sealed Case*. Mr. Comey did not

merely free Mr. Fitzgerald from "ongoing supervision," 829 F.2d at 55; he renounced *all*

supervision and direction and then granted the Special Counsel authority to expand his

jurisdiction and extend his tenure as he sees fit. *See supra* at 6, 9; Mem. at 10-13, 24-25.

We do not contend that sections 516 and 519 require "ongoing, active monitoring and

oversight." Resp. at 20. Nor do we contend that 28 C.F.R. Part 600 is the "minimum required."

*Id.* But sections 516 and 519 do contemplate some level of ultimate direction and supervision.

Here, there is none at all.

## IV.    ALLOWING THE OFFICE OF SPECIAL COUNSEL TO STAND WOULD CREATE A DANGEROUS PRECEDENT.

The government warns that by granting this motion the Court would "open[] the door to

Appointments Clause challenges" every time the Attorney General delegates authority to

"prosecutors in the normal chain of command." Resp. at 32-33. But the question here is not

whether the Attorney General may *delegate* authority to inferiors under his control. A delegation

empowers a subordinate officer to exercise duties entrusted by law to his superior, but it does not

relieve the supervisor of the duty of direction and supervision. *See* Mem. at 8; 3 Am. Jur. 2d

*Agency* § 2 (2002) ("[A] prime element of an agency relationship is the existence of some degree

of control by the principal over the conduct and activities of the agent"); *cf. Stern v. Lucy Webb*

*Hayes Nat'l Training School*, 381 F. Supp. 1003, 1013 (D.D.C. 1974) (holding that a corporate

director may delegate "responsibility to fellow directors, corporate officers, or even outsiders,

but he must continue to exercise general supervision over the activities of his delegates").

Rather, the question presented by Mr. Libby's motion is whether the Attorney General

may expressly *abdicate* his core supervisory functions over a criminal prosecution to an officer

who, though nominally an inferior, is completely walled off from the command and control of the Department. Under the Constitution and federal law, the answer is no.

Indeed, it is not Mr. Libby's argument, but the government's that threatens to establish the dangerous precedent here. If the abdication of power to the Special Counsel is allowed to stand, the Attorney General would be free to shield any future investigation—however unwarranted and however motivated by malice—from any degree of public accountability. It would allow him to place all of his power in an unchecked prosecutor, selected solely by him, and then disclaim responsibility for any of the prosecutor's actions. It would place individual rights in jeopardy by leaving the targets of an investigation with no recourse to ranking Department officials where an unsupervised prosecutor overreaches or abuses his power. And it would undermine the effort to promote the fair and evenhanded administration of justice by allowing certain prosecutors to ignore entirely the carefully crafted policies and regulations that apply in all other federal criminal cases. To ensure that the protections and public accountability demanded by the Appointments Clause remain intact, the Court must reject the Special Counsel's unlawful exercise of power in this case.

## CONCLUSION

For the foregoing reasons and those stated in our initial memorandum, Mr. Libby respectfully moves this Court to dismiss the indictment.

March 31, 2006                        Respectfully submitted,


_____/s/_____              _____/s/_____
Theodore V. Wells, Jr.                          William H. Jeffress, Jr.
D.C. Bar No. 468934                             D.C. Bar No. 041152
James L. Brochin                                Alex J. Bourelly
D.C. Bar No. 455456                             D.C. Bar No. 441422
Paul, Weiss, Rifkind, Wharton                   Alexandra M. Walsh
   & Garrison LLP                               D.C. Bar No. 490484
1285 Avenue of the Americas                     Baker Botts LLP
New York, NY  10019-6064                        1299 Pennsylvania Avenue, NW
(212) 373-3089                                  Washington, DC  20004
                                                (202) 639-7751


_____/s/_____              _____/s/_____
Joseph A. Tate                                  John D. Cline
Dechert LLP                                     D.C. Bar No. 403824
2929 Arch Street                                Jones Day
Cira Centre                                     555 California Street, 26th Floor
Philadelphia, PA  19104                         San Francisco, CA  94104
(215) 994-2000                                  (415) 875-5812