UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. NO 05-394 (RBW) |
| v. | ) | |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby" | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**THIRD MOTION TO COMPEL DISCOVERY**

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, SPECIAL

COUNSEL, respectfully submits the following response to the "Third Motion of I. Lewis Libby to

Compel Discovery Under Rule 16 and *Brady*."

### INTRODUCTION

On October 28, 2005, a federal grand jury returned a five-count indictment charging

defendant I. Lewis "Scooter" Libby with obstruction of justice, perjury, and making false statements

to federal investigators, in violation of 18 U.S.C. §§ 1503, 1623 and 1001, in connection with an

investigation concerning leaks to reporters of classified information regarding the employment of

Valerie Plame Wilson.

To date, the government has provided defendant with approximately 12,300 pages of

classified and unclassified discovery, including the entire set of documents produced to the Office

of Special Counsel by the Office of the Vice President, a large quantity of classified and unclassified

documents from several other government agencies, and certain grand jury testimony and documents

provided by reporters. The government currently is in the process of obtaining from the Office of

the Vice President and producing to defendant an estimated 1,400 pages of additional handwritten

notes prepared during the period May 6, 2003 through March 24, 2004, pursuant to the Court's

ruling from the bench on February 24, 2006.  The government also is currently in the process of providing defendant with additional discovery concerning his morning intelligence briefings during the periods of June 7-14, 2003, October 12-16, 2003, November 24-28, 2003, March 3-7, 2003, and March 22-26, 2003, pursuant to the Court's Order of March 10, 2006.

## **ARGUMENT**

Defendant's third discovery motion seeks expansive additional discovery, principally on the ground that the documents sought are "material to the preparation of the defense," as that phrase is used in Fed. R. Evid. 16(a)(1)(E)(i).  Defendant asserts that the documents he seeks, which among other things include nearly every document generated by four large executive branch entities relating to Ambassador Joseph Wilson's trip to Niger, are discoverable under Rule 16 because they will assist in the preparation of witness examinations, provide context for the government's allegations, and demonstrate his lack of a motive to commit the perjury and false statement offenses charged in the indictment.

Defendant's motion is flawed in two fundamental respects.  First, it rests on an unsupportable reading of Rule 16 which, if adopted by the Court, would to a large extent substitute open file discovery for Rule 16, a proposition that has been repeatedly rejected by the courts.  Second, it is premised on relevance arguments which overlook the fact that defendant is charged with perjury, not a conspiracy to commit various other crimes.  When viewed against the correct legal standards for discovery and in the context of the crimes charged in the indictment, defendant's motion for miscellaneous additional discovery should be denied for the reasons set forth more fully below.

## I.    Applicable Legal Standards

The Supreme Court long ago established, and has continued to hold, that discovery in criminal cases is not unlimited and does not sweep in everything known to the government and uncovered during the investigation. *United States v. Agurs*, 427 U.S. 97, 109 (1975) (no constitutional duty to "allow complete discovery of . . . files as a matter of routine practice"); *United States v. Bagley*, 473 U.S. 667, 675 (1985) ("the prosecutor is not required to deliver his entire file to defense counsel"); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1997); *United States v. Ruiz*, 536 U. S. 622, 630 (2002); *see also United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003) (no right to unsupervised search through the government's files). Nor does Federal Rule of Criminal Procedure 16 authorize general access to the government's investigation file; rather, Rule 16(a)(1)(E) is limited to discovery of records "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Rule 16 requires disclosure only of evidence that "enables the defendant significantly to alter the quantum of proof in his favor." 3/10/06 Mem. Op. at 8 (citing *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998)). An "abstract logical relationship to the issues in the case" is insufficient. 3/10/06 Mem. Op. at 8; *Jordan*, 316 F.3d at 1251 (citing *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978)). And where classified information is sought, the defendant must also show that the classified information "is at least helpful to the defense." 3/10/06 Mem. Op. at 9 (citing *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989)).

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court provided specific instruction as to what records are "material to preparing the defense" – that term means "the defendant's response to the Government's case in chief." *Id.* at 462. Thus, the parameters of Rule 16 discovery are set by the indictment. *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991)

(cited by 3/10/06 Mem. Op. at 8).  Accordingly, there is no general Rule 16 right to broadly fish

through the government's investigative file simply because the defendant makes a "conclusory

allegation" of materiality.  *United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir. 1984) (citing

*United States v. Conder*, 423 F.2d 904, 910 (6th Cir. 1970)); *see Jordan*, 316 F.3d at 1251; *United

States v. Carrasquillo-Plaza*, 873 F.2d 10, 12 (1st Cir. 1989); *see also  Moore v. Illinois*, 408 U.S.

786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete

and detailed accounting to the defense of all police investigatory work on a case."); *United States

v. Heidecke*, 683 F.Supp. 1211, 1214 (N.D. Ill. 1988) (rejecting discovery request under *Brady* for

"all files reviewed by the investigators").

Nor is the defendant permitted to invoke Rule 16 to generally rummage through the files of

other federal agencies.  *United States v. Labovitz*, 1997 WL 289732, at *4 (D. Mass. May 30, 1997)

(rejecting a Rule 16 "broad fishing expedition" of FDIC's files concerning the victim-bank in bank

fraud prosecution).  Such casting about in the files of other government agencies simply has no basis:

defendant cannot require "an affirmative government-wide search for possibly exculpatory evidence"

or for "'any materials that might conceivably be useful to his defense.'"  *United States v. Poindexter*,

727 F. Supp. 1470, 1485 (D.D.C. 1989) (quoting *United States v. North*, 1988 WL 148527 (D.D.C.

July 13, 1988)).

Thus, defendant is wrong to suggest that Rule 16 grants him the right to review all of the

documents that the government reviewed during its investigation.  Def.'s Mem. at 2 ("Presumably,

the government reviewed these documents during its investigation to identify useful witnesses or

documents and to determine whether the testimony of witnesses was truthful.  Rule 16 gives the

defense the right to use these documents for precisely the same purposes.").  Putting aside the fact

that the government did not review all the myriad documents defendant now requests, there is no authority for the proposition – and defendant cites none – that Rule 16 allows the defense to look through every document the government examined.  To the contrary, documents are "material to preparing the defense" under Rule 16 only if the documents are specifically part of the "the defendant's response to the Government's case in chief" as delimited by the charges, *Armstrong*, 517 U.S. at 462, *not* simply because the government at some point reviewed the record during the investigation.  Allowing defendant to attempt to replicate the government's investigation is particularly inappropriate because the government's investigation was far broader in scope than the charges ultimately brought in the indictment.

Thus, in analyzing whether the documents sought in defendant's latest request for discovery are "material to the preparation of the defense" and disclosable under Rule 16(a)(1)(E), the Court should follow the analytical process set out in its March 10, 2006 Memorandum Opinion: examine the defendant's request in light of the allegations in the indictment, and assess whether "there is a strong indication that [the material sought] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal," *United States v. Lloyd*, 992 F.2d at 351 – recognizing also that when the defense seeks classified information it is held to the additional burden of demonstrating that the classified information is "helpful to the defense," *United States v. Yunis*, 867 F.2d at 623.  3/10/06 Mem. Op. at 8-9.

Against the backdrop of the limited charges in this indictment – that defendant lied to the grand jury and the Federal Bureau of Investigation about his acquisition and disclosures to the media of information concerning Valerie Plame Wilson's employment by the Central Intelligence Agency – defendant's latest discovery requests fail this test.

## II.     Analysis

### A.     The Requested Documents Are Not Discoverable on the Ground that They Would Be Helpful in Preparing to Examine Potential Witnesses.

Defendant argues that he is entitled to the following materials on the ground that they are material to the preparation of his defense in that they would aid in preparing to examine or cross-examine potential trial witnesses:

1.     All documents and information generated or received by the State Department, the CIA, the Executive Office of the President and/or the National Security Council ("NSC")" concerning former Ambassador Joseph Wilson's trip to Niger, and any involvement in that trip by his wife, including

   a.     the origins of Mr. Wilson's trip to Niger, including any role played by Ms. Wilson in connection with the trip;

   b.     reports about the trip; and

   c.     subsequent discussion, comment or analysis concerning the trip, including government documents concerning the trip and/or Ms. Wilson's role in it that were generated after May 6, 2003, when the controversy surrounding the disputed sixteen words erupted.

2.     All documents or communications reflecting any possible attempt or plan by any government official to punish or seek revenge against Mr. Wilson or Ms. Wilson.

3.     All documents reflecting Mr. Wilson's communications with officials at the State Department or other government agencies concerning his trip to Niger or the "sixteen words."[1]

4.     Any notes from the September 2003 meeting in the Situation Room at which Colin Powell is reported to have said that (1) everyone knows that Mr. Wilson's wife

---

[1]  Although defendant includes the documents in this category in his list of documents that would aid in preparing witness examinations he makes no specific argument as to why these documents would be helpful in that regard, and does not identify which witness or witnesses they would assist in examining.

6

worked at the CIA and that (b) it was Mr. Wilson's wife who suggested that the CIA send her husband on a mission to Niger."[2]

Memo. at 14-16, 23. [3]   The government has produced to defendant all documents related to Mr. Wilson's trip that it received from the OVP.  In addition, the government has produced to defendant documents, received from any source, relating to conversations, correspondence, or meetings involving defendant in which Mr. Wilson's trip was discussed, and has produced additional materials from the CIA and the State Department relating generally to Mr. Wilson's trip.  The government declined to produce some documents related to Mr. Wilson's trip on that the ground that those documents were completely irrelevant to defendant's knowledge or communications regarding Mr. Wilson, Ms. Wilson, or Mr. Wilson's trip to Niger.  The government is unaware of any documents reflecting communications between Mr. Wilson and the State Department regarding the "sixteen words" other than media reports and material that would fall within the Jencks Act if the government were to call Mr. Wilson as a witness.

Some documents produced to defendant could be characterized as reflecting a plan to discredit,  punish, or seek revenge against Mr. Wilson.  The government declined to produce documents relating solely to other subjects of the investigation, even if such documents could be so characterized as reflecting a possible attempt or plan to discredit or punish Mr. Wilson or Ms. Wilson.  The government has no knowledge of the existence of any notes reflecting comments by former Secretary of State Powell regarding Ms. Wilson during a September 2003 meeting.

---

[2]  Defendant's argument with respect to this category of documents is limited to the preparation of an examination of former Secretary of State Powell.  See, *infra*, at 14.

[3]  Defendant's requests as listed in his Third Motion to Compel do not track the precise language of the document requests made to the government by letter.

Defendant overreaches when he asserts that Rule 16 generally requires the production of all materials that may be helpful in preparing to examine witnesses. The bulk of the documents that defendant seeks to assist in preparing witness examinations (here correspondence, e-mails, and reports generated by potential witnesses and those around them) fall within the category of witness statements and arguable impeachment information covered by the Jencks Act and *Giglio*. If defendant's position were correct, the Jencks Act, Rule 26.2, and *Giglio* obligations would be unnecessary and redundant because all such material – and far more – would have been disclosed pursuant to Rule 16. To the contrary, Rule 16(a)(2) expressly prohibits the use of Rule 16 as an end-run around the Jencks Act: "Nor does this rule authorize the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(2). Furthermore, the defendant cannot simply recite that access to statements will "enhance[] defense counsels' ability to cross-examine" a witness as a basis for using Rule 16 to disregard the Jencks Act. *United States v. Tarantino*, 846 F.2d 1384, 1414-15 (D.C. Cir. 1988).

To be sure, *Brady* and *Giglio* may require disclosure of material beyond that required by Rule 16, but an argument that those cases up-end the normal timing of Jencks Act production is "an attempt to convert *Brady* into a broad rule of discovery in criminal cases." *Tarantino*, 846 F.2d at 1416; *see also United States v. Hart*, 760 F. Supp. 653, 659 (E.D. Mich. 1991) (timing of disclosure, if required, is based on defense's ability to make effective use of information at trial). That is particularly true where the defendant seeks statements from one witness that will purportedly be at odds with the statement of another witness: "witnesses are not impeached by prior inconsistent statements of *other* witnesses, but by their *own* prior inconsistent statements." *Id.* (emphasis in original). At bottom, Rule 16 also does not constitute a free-floating tool to cast about for

impeachment material on potential witnesses; rather, there must be a "strong" indication that the material will play an "important" role in assisting impeachment.  *Marshall*, 132 F.3d at 68.

***Potential Government Witnesses***

Defendant contends that the foregoing documents are discoverable because they are necessary to prepare to examine the following potential government witnesses in this case:

(a) former CIA Director George Tenet;

(b) CIA briefer Craig Schmall;[4]

(c) former senior CIA official Bob Grenier;[5]

(d) former Under Secretary of State Marc Grossman;

(e) former White House Press Secretary Ari Fleischer;

(f) former Deputy National Security Advisor Stephen Hadley; and

(g) current White House Deputy Chief of Staff Karl Rove.

Because the government does not intend at this time to call three of these individuals – Mr. Tenet, Mr. Hadley, and Mr. Rove – defendant is not entitled to discovery based on the need to prepare to cross-examine those individuals.

With respect to the individuals whom the government does intend to call as witnesses, the documents defendant demands go well beyond anything that would be necessary to prepare to examine these individuals, and indeed, far beyond the scope of what is relevant to the charges contained in the indictment.  Defendant demands the production of all "documents and information"

---

[4]  Defendant indicates that the "CIA briefer" described in paragraph 11 of the indictment may be Craig Schmall, Peter Clement, or Matt Barrett.

[5]  Defendant indicates that the "senior CIA official" described in paragraph 7 of the indictment may be Robert Grenier or John McLaughlin.

generated or received by anyone in the State Department, the CIA, the Executive Office of the President and/or the National Security Council ("NSC") concerning Mr. Wilson's trip to Niger,[6] which includes "the origins of Mr. Wilson's trip to Niger, including any role played by Ms. Wilson in connection with the trip," "any reports about the trip," and any "subsequent discussion, comment or analysis concerning the trip." Memo. at 14-16. Defendant seeks the requested materials without regard to whether defendant or any prospective witness actually wrote, reviewed, or even saw the materials, and without regard to whether any prospective witness is expect to testify about them.

For example, defendant makes a sweeping demand for State Department documents regarding Mr. Wilson's trip, despite the fact that, as is evident from the indictment, the testimony of the government's lone State Department witness, Under Secretary of State for Political Affairs Marc Grossman, will focus on conversations between Mr. Grossman and defendant in late May and early June 2003 concerning former Ambassador Wilson's trip, and Mr. Grossman's efforts during that period to gather information regarding the trip in response to defendant's inquiries. See Indict., Count One, ¶¶ 4, 5, 6.[7] As a result of defendant's inquiries, information was gathered and a classified report was prepared by the State Department's Bureau of Intelligence and Research ("the INR report"). In June 2003, Mr. Grossman orally advised defendant that he had learned that Wilson's wife worked at the CIA and that State Department personnel believed that Mr. Wilson's wife was involved in the planning of Mr. Wilson's trip. See Indict., Count One, ¶ 6.

---

[6] References to defendant's Third Motion to Compel are to "Memo.," followed by the relevant page number. Defendant states that documents that relate to Mr. Wilson's trip form the "core" of the discovery at issue in this motion. Memo. at 12. References to the exhibits to defendant's motion are to "Memo. Exhibit," followed by the exhibit number.

[7] References to the Indictment are to "Indict.," followed by the relevant count and paragraph number.

Defendant has been provided with a copy of the INR report in classified discovery, and the government understands that no contemporaneous reports written by Mr. Grossman about his conversations with defendant in May and June 2003 are available. Prior to trial, defendant will be provided with prior statements of Mr. Grossman as part of the government's Jencks Act disclosure, as well as any material required under *Giglio*.

The central issue at trial will be whether defendant lied when he testified that he was not aware that Mr. Wilson's wife worked at the CIA prior to his purported conversation with Tim Russert about Mr. Wilson's wife on or about July 10, 2003. *See* Indict., Count One, ¶ 20. Mr. Grossman's testimony is specifically relevant to show that defendant was told of Ms. Wilson's employment and possible role in planning Mr. Wilson's trip to Niger in early June 2003. This testimony will not be offered to prove the truth of the matter asserted; indeed, it is irrelevant whether Mr. Wilson's wife actually did work at the CIA or actually did play a role in arranging the trip, or how State Department employees viewed the results of the Wilson trip. Likewise, none of these issues are relevant to preparing for Mr. Grossman's examination.

Defendant makes the same sweeping demand for CIA and White House documents related to Mr. Wilson's trip, although, once again, the anticipated testimony of the government's CIA witnesses, Craig Schmall, a CIA briefer, and Robert Grenier, a former senior CIA official, and the testimony of the government's sole White House witness, Ari Fleischer, will focus on conversations with defendant regarding Ms. Wilson which took place in June and early July 2003. *See* Indict., Count One, at ¶¶ 7, 11, 16. All known documents relating to these conversations have been provided to defendant. The relevance of this testimony, like that of Marc Grossman, is to show that defendant knew about Ms. Wilson's employment and possible role in planning Mr. Wilson's trip to Niger as

early as June 2003, and no later than July 7, 2003. Neither the particulars of Mr. Wilson's trip, nor the views of CIA or White House officials regarding the results of the trip, are relevant to, or necessary for preparing cross-examinations of, Messrs. Schmall, Grenier, or Fleischer. Nor is defendant entitled to expansive discovery on the basis of speculations that government officials may have been biased as a result of purported disputes among the various agencies concerning intelligence issues.

With respect to Mr. Fleischer, defendant also asserts that press reports indicate that Mr. Fleischer reviewed a report containing information related to Mr. Wilson's wife that was sent to former Secretary of State Colin Powell while Secretary Powell, Mr. Fleischer and others were en route to Africa on Air Force One. Memo. at 25. If the press reports are correct, and if Mr. Fleischer disclosed information concerning Mr. Wilson's wife to reporters, defendant argues, then Mr. Fleischer would have a motive to shade his testimony in this case. *Id.* The government has provided defendant with a copy of the report in question. Defendant does not claim that Mr. Fleischer wrote, reviewed, or even saw any other documents concerning Mr. Wilson's trip, and does not establish any other connection between Mr. Fleischer and any of the requested documents. Thus, there is no support for defendant's claim that the requested documents would be helpful to defendant in preparing to cross-examine Mr. Fleischer.

### *Potential Defense Witnesses*

Defendant further argues that he is entitled to discovery of all documents that would be helpful in preparing to examine witnesses that may be called as defense witnesses at trial, including the following individuals: (a) former Deputy Secretary of State Richard Armitage; (b) former Secretary of State Colin Powell; (c) former CIA Director George Tenet; (d) "other current or former

12

CIA officials, including" Bill Harlow; and (e) Senior White House advisor Karl Rove.  Defendant cites, and research reveals, no authority for the proposition that the defendant is entitled to discover all documents related to witnesses whom defendant anticipates calling as witnesses at trial.  To the contrary, it is settled law that the government has no obligation to produce prior statements, or information reflecting negatively on the credibility, of witnesses called by the defense, much less witnesses who *may* be called by the defense.  *See* 18 U.S.C. § 3500 (which by its terms applies only to witnesses called by the government) and *United States v. Presser*, 844 F.2d 1275, 1285 (6th Cir. 1988)("the government need not disclose impeaching material in its possession relating to any potential defense witness where that impeaching material does not meet the *Brady* test of being material *and* exculpatory"); and *United States v. Souffront,* 338 F.3d 809, 824 (7th Cir. 2003) (When ATF Agent was called by defense to impeach a government witness and to testify to defendant's state of mind, no *Brady* violation occurred when government did not disclose that agent was accused by a former agent of participating in or covering up theft of jewelry and money by corrupt cop. "Impeaching the testimony of their own witness is not favorable to the defense . . . and does not raise the probability of a different verdict . . . This argument is without merit." (citations omitted)).

Given the limited nature of any admissible testimony that could be offered by the above individuals, the need to prepare their testimony could not possibly justify defendant's expansive discovery demands in any event.  For example, defendant asserts that he may call former Deputy Secretary of State Richard Armitage as a defense witness for the purpose of testifying regarding "the expected testimony of his former colleagues,  Mr. Grossman and Mr. Powell," Memo. at 23, n. 5 and, specifically, of establishing bias on the part of Under Secretary Grossman, Memo. at 23. Defendant argues that "[i]f Mr. Armitage or another State Department official was in fact the

primary source for Mr. Novak's article, Mr. Grossman's testimony may be colored by either by his personal relationship with Mr. Armitage or his concern for the institutional interests of the State Department." *Id.*

There is no precedent for a fact witness to be called to testify about the expected testimony of another fact witness – much less precedent that an intention to do so entitles a defendant to additional discovery. Putting aside defendant's failure to explain how loyalty to Mr. Armitage or to the State Department could rise to the level of causing Mr. Grossman to invent conversations with defendant and testify to them under oath, defendant has provided no connection between the requested materials and Messrs. Grossman, Armitage or Powell, and no basis for concluding that the materials would aid him in preparing to establishing bias on the part of Mr. Grossman.

Similarly, defendant is not entitled to discovery of additional documents regarding Mr. Wilson's trip in order to prepare to examine former Secretary of State Colin Powell as a defense witness. Defendant asserts that he is "entitled to examine Secretary Powell regarding his knowledge of Mr. Wilson's trip to Niger and his communications with other government officials about that trip," and that the State Department records concerning the trip will assist him in preparing to conduct this inquiry. Memo. at 24. Defendant fails, however, to establish how Secretary Powell's knowledge concerning Mr. Wilson's trip could be relevant to the perjury and false statement charges contained in the indictment, or his defense to those charges.

Nor has defendant established how "[a]ny notes from the September 2003 meeting in the Situation Room at which Colin Powell is reported to have said that (1) everyone knows that Mr. Wilson's wife worked at the CIA and that (b) it was Mr. Wilson's wife who suggested that the CIA send her husband on a mission to Niger" (see Memo. at 15) would be helpful to defendant in

preparing his defense, even if such documents existed, and it is the understanding of the government that there are no notes indicating that Secretary Powell made the purported statements.

Additionally, defendant asserts that he plans to question Secretary Powell concerning media reports regarding a document containing information regarding Ms. Wilson sent to Secretary Powell on Air Force One while Secretary Powell and others were en route to Africa between July 7 and July 12, 2003, and regarding the possibility that other government officials may have shared information about Ms. Wilson with journalists while in Africa.  Memo. at 24.  Defendant fails to establish that any documents other than that sent to Secretary Powell (which has been produced to defendant) would be useful in preparing to examine Secretary Powell, or even that the topics concerning which he plans to question Secretary Powell have any relevance to the issues of this case.  Accordingly, defendant's desire to question Secretary Powell does not entitle him to additional discovery.

Defendant claims that Karl Rove will be a "key witness" in the trial, in that he will testify concerning a conversation with defendant on July 10 or 11, 2003 regarding Robert Novak's intent to print a story regarding Ms. Wilson's employment at the CIA, Indict., Count One, ¶ 21, and that Stephen Hadley may "offer important testimony about discussions within the Administration concerning the need to rebut Mr. Wilson's statements about his trip and his conclusions," as well as "discussions about the need to declassify and disseminate the NIE" and George Tenet's public statements regarding the "sixteen words."  Memo. at 25-26.  As indicated above, the government does not intend to call Mr. Rove or Mr. Hadley as witnesses at this time.

Nor has defendant established any connection between the documents defendant has demanded and any relevant testimony Mr. Rove or Mr. Hadley could provide.  The trial in this case necessarily will focus on whether or not defendant committed perjury.  While defendant may prefer

to put the conduct of others on trial, he is not entitled to do so.  Nor is defendant entitled to discovery

so that he may examine witnesses at trial regarding their conduct and the conduct of others that is

not germane to the issue of whether defendant lied and obstructed justice.


*Agencies By Which Potential Witnesses Are or Were Employed*

The extraordinary scope of defendant's request for documents is illustrated by the fact that

the request is not limited to documents directly connected with the individuals he has identified as

potential witnesses, or even by time frame.  To the contrary, defendant argues that he is entitled to

"all CIA documents that concern (sic) Mr. Wilson's trip to Niger, including reports and subsequent

discussions of it," and, at the very least, all documents concerning Mr. Wilson's trip "generated, sent,

or received by CIA witnesses.'   Similarly, defendant argues that, "the government's disclosure

obligations are not limited to the files of [the] particular White House witnesses" that defendant has

identified, but rather, extends to "all White House documents relating to Mr. Wilson's trip to Niger

that could undermine or corroborate the expected testimony of these witnesses, and other White

House documents that could be used to develop lines of questioning for their examinations at trial."

Thus, in essence, defendant contends that the expected testimony of a witness triggers open

file discovery of that witnesses' agency on any related topic, whether or not relevant at trial.

Defendant cites no legal authority in support of this claim, which flies in the face of the long-

established limited nature of discovery in criminal cases, *see United States v. Agurs*, 427 U.S. at 109,

*United States v. Jordan*, 316 F.3d at 1251.

## B.    Defendant is Not Entitled to Discovery of the Requested Documents on the Basis that Such Documents Will Allow Him to Provide "Context" for Events Alleged in the Indictment.

Defendant argues as an alternative ground for his discovery requests the need to establish "context" for matters alleged in the indictment.  Defendant claims that, in order to put the alleged events in context, and specifically to establish that Ms. Wilson played a "peripheral" rather than an important role in the controversy concerning the "sixteen words," defendant is entitled to discovery of the above-described documents as well as to:

> All documents reflecting discussions within the government of whether to release a public statement during the week of July 7, 2003 regarding the inclusion of the "sixteen words" in the 2003 State of the Union Address, including all drafts of the July 11, 2003 statement issued by Director of Central Intelligence George Tenet.

Memo. at 15, 27.

The government has produced to defendant all documents responsive to the above request that were received from the Office of the Vice President, including notes of defendant and drafts of the July 11, 2003 statement issued by CIA Director George Tenet.  The government declined to seek copies or produce additional drafts of the July 11, 2003 statement maintained by other agencies on the ground that such documents would be irrelevant in the absence of any connection to defendant, and also potentially duplicative of documents already produced.

In an attempt to recast the relevant issues at trial, defendant claims he is entitled to correct the "distorted picture of the relevant events" presented in the indictment, including the "exaggerati[on of] the importance government officials, including [defendant], attributed to Ms. Wilson's employment status prior to July 14, 2003," and to present "a more complete and accurate narrative" of the alleged events, and to establish that defendant "and other government officials"

viewed Ms. Wilson's identity as at most a "peripheral issue."  Memo. at 27.  Defendant argues that information regarding bureaucratic infighting over responsibility for the "sixteen words" will help the jury appreciate how defendant "*may have forgotten or misremembered the snippets of conversation* the government alleges were so memorable."  Memo. at 3-4.

Though he might wish otherwise, this trial is not about the conduct or state of mind of persons other than defendant.  Indeed, the state of mind of other individuals is of negligible value in determining whether defendant lied to the FBI and grand jury.  In reality, it does not matter whether Ms. Wilson's role was thought to be important or peripheral by anyone other than defendant and the discrete number of persons with and for whom he worked.  Accordingly, it is clear that documents from outside the OVP are not sought to establish "context" but rather to provide an irrelevant distraction from the issues of the case.

Moreover, evidence from the CIA, State Department, and NSC about whether persons working there thought the issue of Ms. Wilson's employment was "peripheral" will not place in context the state of mind of defendant and others working in the Office of Vice President at the relevant time, nor explain whether defendant was likely to have forgotten conversations about the topic in which he participated.  In June 2003, when discussing Ambassador Wilson's trip to Niger, the Vice President advised defendant that Ambassador Wilson's wife worked at the CIA in the Counterproliferation Division.  Indict., Count One, ¶ 9.  The evidence will show that the July 6, 2003, Op Ed by Mr. Wilson was viewed in the Office of Vice President as a direct attack on the credibility of the Vice President (and the President) on a matter of signal importance:  the rationale for the war in Iraq.  Defendant undertook vigorous efforts to rebut this attack during the week following July 7, 2003.

At some point after the publication of the July 6, 2003 Op Ed by Mr. Wilson, Vice President Cheney, defendant's immediate superior, expressed concerns to defendant regarding whether Mr. Wilson's trip was legitimate or whether it was in effect a junket set up by Mr. Wilson's wife. And, in considering "context," there was press reporting that the Vice President had dispatched Mr. Wilson on the trip (which in fact was not accurate). Disclosing the belief that Mr. Wilson's wife sent him on the Niger trip was one way for defendant to contradict the assertion that the Vice President had done so, while at the same time undercutting Mr. Wilson's credibility if Mr. Wilson were perceived to have received the assignment on account of nepotism. The context for defendant's disclosures in the course of defending the Office of the Vice President will not be fleshed out in any files of CIA or State Department or NSC employees that might reflect what they thought. Put slightly differently, the thoughts and impressions of CIA, State Department, and NSC employees, absent any evidence that these thoughts and impressions were conveyed to defendant, simply cannot shed light on defendant's state of mind at the time of his alleged criminal conduct. *See United States v. Secord*, 726 F.Supp. 845, 848-49 (D.D.C. 1989) ("The subjective state of mind which Defendant Secord wishes to prove could have arisen *solely* from conversations in which he participated, correspondence which he himself read, meetings which he himself attended. . . . The point is simply that Defendant's state of mind can come only from what he hears or sees. Defendant is entitled to discover materials which evidence his personal knowledge about or belief in the legality of the Enterprise.").

Nor would such documents of the CIA, NSC and the State Department place in context the importance of the conversations in which defendant participated. Defendant's participation in a critical conversation with Judith Miller on July 8 (discussed further below) occurred only after the

Vice President advised defendant that the President specifically had authorized defendant to disclose certain information in the NIE. Defendant testified that the circumstances of his conversation with reporter Miller – getting approval from the President through the Vice President to discuss material that would be classified but for that approval – were unique in his recollection. Defendant further testified that on July 12, 2003, he was specifically directed by the Vice President to speak to the press in place of Cathie Martin (then the communications person for the Vice President) regarding the NIE and Wilson. Defendant was instructed to provide what was for him an extremely rare "on the record" statement, and to provide "background" and "deep background" statements, and to provide information contained in a document defendant understood to be the cable authored by Mr. Wilson. During the conversations that followed on July 12, defendant discussed Ms. Wilson's employment with both Matthew Cooper (for the first time) and Judith Miller (for the third time). Even if someone else in some other agency thought that the controversy about Mr. Wilson and/or his wife was a trifle, that person's state of mind would be irrelevant to the importance and focus defendant placed on the matter and the importance he attached to the surrounding conversations he was directed to engage in by the Vice President.

Likewise, documents from other agencies that defendant never saw will not provide context for defendant's grand jury testimony regarding these events. Defendant testified that he did not discuss the CIA employment of Ambassador Wilson's wife with reporter Judith Miller on July 8, 2003 and that he could not have done so because he had forgotten by that time that he had learned about Ms. Wilson's CIA employment a month earlier from the Vice President. Nor could such documents explain defendant's testimony disclaiming having discussed Ms. Wilson's employment with various other government officials prior to July 10, 2003, or his testimony that he was "taken

aback" when journalist Tim Russert asked about Ms. Wilson's employment with the CIA on July

12, 2003. Accordingly, none of the documents requested by defendant could possibly support the

defense that the specific perjury specifications are mere "snippets" of conversation he "may have

misremembered."

###    C.    Defendant is Not Entitled to the Requested Documents Related to the NIE.

Defendant further contends that he is entitled to additional discovery because the government

"informed [the defense] that it *seeks to make an issue at trial* of [defendant's] alleged disclosures

of a portion of the content of the October 2002 National Intelligence Estimate on Iraq's Continuing

Programs for Weapons of Mass Destruction, known as the NIE." Memo. at 10-11 (emphasis added).

Specifically, defendant claims that, in order to place this issue in "context," he is entitled to

discovery of:

>    1.    All documents relating to the possible declassification of the 2002 National
>            Intelligence Estimate ("NIE")(in whole or in part); and
>
>    2.    All documents relating to or reflecting public comments by government officials
>            about the NIE or its contents prior to July 18, 2003.

The government has produced to defendant all documents received from the OVP, which

would include any documents responsive to these requests, and is in the process of locating and

producing a limited number of additional responsive documents in the possession of the Special

Counsel although such documents were not authored or reviewed by defendant. The government

has declined to seek or produce additional responsive documents from other agencies unless such

documents reflect conversations and meetings in which defendant participated, on the ground that

such documents would be irrelevant to the defense. The government has also declined to produce

publicly available comments by government officials regarding this issue on the ground that they are equally accessible to defendant.

As an initial matter, it is defendant's conduct and testimony, rather than any whim of the government, that makes defendant's disclosure of the NIE an issue in this case.   However, contrary to defendant's contention, he is not entitled to rummage through other agencies' documents concerning the NIE where defendant himself has testified that he understood that no one at those agencies was aware of, or involved in, the declassification made known to him by the Vice President or the disclosures he made to reporters Cooper and Miller.

### The Relevance of the NIE to This Case

One of the key conversations that will be proved at trial took place between defendant and reporter Judith Miller at the St. Regis Hotel on the morning of July 8, 2003.  Defendant testified in the grand jury that he and Miller did not discuss the CIA employment of Ambassador Wilson's wife, Valerie Plame, on that occasion, and that he could not have done so because he had forgotten by that time that he had learned about Ms. Wilson's employment a month earlier from the Vice President. Defendant further testified that when he spoke with reporter Tim Russert the following day, Russert informed him that Wilson's wife worked at the CIA, and defendant was "taken aback."  Defendant testified that he thought that the information was new to him, and that he made sure not to confirm the information to Russert.  Defendant thereafter testified that he repeated what he learned from Russert to other reporters (including Cooper and Miller) on July 12, taking care to caution those reporters that he did not know if the information were true or even if Ambassador Wilson even had a wife.

As to the meeting on July 8, defendant testified that he was specifically authorized in advance of the meeting to disclose the key judgments of the classified NIE to Miller on that occasion because it was thought that the NIE was "pretty definitive" against what Ambassador Wilson had said and that the Vice President thought that it was "very important" for the key judgments of the NIE to come out. Defendant further testified that he at first advised the Vice President that he could not have this conversation with reporter Miller because of the classified nature of the NIE. Defendant testified that the Vice President later advised him that the President had authorized defendant to disclose the relevant portions of the NIE. Defendant testified that he also spoke to David Addington, then Counsel to the Vice President, whom defendant considered to be an expert in national security law, and Mr. Addington opined that Presidential authorization to publicly disclose a document amounted to a declassification of the document.

Defendant testified that he thought he brought a brief abstract of the NIE's key judgments to the meeting with Miller on July 8. Defendant understood that he was to tell Miller, among other things, that a key judgment of the NIE held that Iraq was "vigorously trying to procure" uranium. Defendant testified that this July 8th meeting was the only time he recalled in his government experience when he disclosed a document to a reporter that was effectively declassified by virtue of the President's authorization that it be disclosed. Defendant testified that one of the reasons why he met with Miller at a hotel was the fact that he was sharing this information with Miller exclusively.

In fact, on July 8, defendant spoke with Miller about Mr. Wilson after requesting that attribution of his remarks be changed to "former Hill staffer." Defendant discussed with Miller the contents of a then classified CIA report which defendant characterized to Miller as having been written by Wilson. Defendant advised Miller that Wilson had reported that he had learned that in

23

1999 an Iraqi delegation visited Niger and sought to expand commercial relations, which was understood to be a reference to a desire to obtain uranium. Later during the discussion about Wilson and the NIE, defendant advised Miller of his belief that Wilson's wife worked at the CIA. Indict., Count One, ¶ 17.

Defendant understood that the Vice President specifically selected him to talk to the press about the NIE and Mr. Wilson on July 12, 2003, in place of then-Assistant to the President for Public Affairs, Cathie Martin, the usual press contact person from OVP. This is relevant to show the importance that defendant and his boss placed on the conversation concerning which he later testified. During his conversations with the press that day, defendant discussed Ms. Wilson's CIA employment with both Matthew Cooper (for the first time) and Judith Miller (for the third time). Thus, there is no way to present the relevant events concerning defendant's discussions with reporters about Ms. Wilson without discussing defendant's role in disseminating the key judgments of the NIE in those same conversations.

There is no basis for extending disclosure of documents related to the declassification and disclosure of the NIE to documents from the NSC, State Department, CIA, or any other agency. According to defendant, at the time of his conversations with Miller and Cooper, he understood that only three people – the President, the Vice President and defendant – knew that the key judgments of the NIE had been declassified. Defendant testified in the grand jury that he understood that even in the days following his conversation with Ms. Miller, other key officials – including Cabinet level officials – were not made aware of the earlier declassification even as those officials were pressed to carry out a declassification of the NIE, the report about Wilson's trip and another classified document dated January 24, 2003. Given that, there is no reasonable possibility that the requested

24

documents from agencies outside the Office of Vice President will shed any light on, or provide any

"context" for, what defendant knew, thought and did at the time of his critical conversations.[8]

**D.    Defendant is Not Entitled to the Requested Documents for Purposes of Attempting to Establish that He Had No Motive to Lie.**

Defendant also seeks discovery on the theory that the defense "has the right to make an

affirmative showing that [he] had no motive to lie to the FBI or the grand jury." Memo. at 4.

Specifically, defendant argues that: (i) he did not believe Ms. Wilson's employment status was

classified; (ii) he was not "part of a conspiracy to harm Mr. Wilson by disclosing his wife's CIA

affiliation"; and (iii) he did not believe anyone who worked closely with him had done anything

wrong.  Purportedly for these purposes, defendant seeks:

1.    All documents or communications reflecting any possible attempt or plan by any government official to punish or seek revenge against Mr. Wilson or Ms. Wilson; and

2.    All documents or information concerning the identity of any government official outside the CIA who was aware prior to July 14, 2003 that Ms. Wilson worked for the CIA.

As indicated above, while some documents produced to defendant could be characterized as

reflecting a plan to discredit,  punish, or seek revenge against Mr. Wilson, the government declined

to produce documents relating solely to other subjects of the investigation.  The government has

---

[8]    As part of his effort to justify in essence "open file" discovery concerning the NIE, defendant notes that "Mr. Hadley was active in discussions about the need to declassify and disseminate the NIE . . . ." Defendant fails to mention, however, that he consciously decided not to make Mr. Hadley aware of the fact that defendant himself had already been disseminating the NIE by leaking it to reporters while Mr. Hadley sought to get it formally declassified.  There is no reason to root around in the files of the NSC or CIA or State Department given that no one at any of those three agencies was aware of any declassification of the NIE prior to July 18, 2003.  Since Mr. Hadley was involved in efforts to declassify what Mr. Libby testified had already been declassified, Mr. Hadley's files will create confusion rather than providing context.  The government is producing to defendant Mr. Hadley's notes of meetings and conversations in which both defendant and Mr. Hadley participated, and in which the potential declassification of the NIE was discussed.

identified to the defense individuals outside the intelligence community who were aware prior to July 14, 2003 of Ms. Wilson's CIA employment.  However, the government has declined to identify to the defense, or produce documents concerning, some government officials on the grounds that (a) such officials are either subjects of the ongoing grand jury investigation or "innocent accused" whose identities are protected from disclosure by Fed. Crim. P. 6(e), as this Court has held; and (b) such materials are irrelevant to any issue in the case.

Defendant is not charged with knowingly disclosing classified information, nor is he charged with any conspiracy offense.  Moreover, as a practical matter, there are no documents showing an absence of a plot, and it is unclear how any document custodian would set out to find documents showing an "absence of a plot."  Indeed, there exist documents, some of which have been provided to defendant,[9] and there were conversations in which defendant participated, that reveal a strong desire by many, including multiple people in the White House, to repudiate Mr. Wilson before and after July 14, 2003.

Defendant's request for discovery to show an absence of motive to lie or conceal his conduct overlooks the fact that even the materials defendant appended to his motion show that in early October 2003 (when defendant first gave his story) there would be great embarrassment to the administration if it became publicly known that defendant had participated in disseminating information about Ms. Wilson's CIA employment, and defendant would have had every reason to assume he would be fired if his true actions became known.  Then National Security Adviser Dr. Condoleeza Rice publicly stated that she knew "nothing of any such White House effort to reveal

---

[9] As discussed above, the government has not produced to defendant documents that relate to the conduct of other subjects of the grand jury investigation unless there is some connection between the document or its contents to defendant.

any of this, and it would certainly not be the way the president would expect his White House to operate." Memo. Exhibit M.

On September 29, 2003, the Washington Post reported that "two White House officials leaked the information to selected journalists to discredit Wilson." (Washington Post, "Bush Aides Say They'll Cooperate With Probe Into Intelligence Leak," by Mike Allen, September 29, 2003). Also on September 29, 2003, White House Press Secretary McClellan stated that:

> There are anonymous reports all the time in the media. The President has set high standards, the highest of standards, for people in his administration. He's made it very clear to people in his administration that he expects them to adhere to the highest standards of conduct. If anyone in this administration was involved in it, they would no longer be in this administration . . .
>
> I've made it clear that there's been nothing, absolutely nothing brought to our attention to suggest any White House involvement, and that includes the Vice President's office as well. When I'm talking about the White House, I'm talking about the Vice President's office as well.

http://www.whitehouse.gov/news/releases/2003/09/20030929-7.html.

During this time, while the President was unaware of the role that the Vice President's Chief of Staff and National Security Adviser had in fact played in disclosing Ms. Wilson's CIA employment, defendant implored White House officials to have a public statement issued exonerating him. When his initial efforts met with no success, defendant sought the assistance of the Vice President in having his name cleared.  Though defendant knew that another White House official had spoken to Novak in advance of Novak's column and that official had learned in advance that Novak would be publishing information about Wilson's wife, defendant did not disclose that fact to other White House officials (including the Vice President) but instead prepared a handwritten statement of what he wished White House Press Secretary McClellan would say to exonerate him:

> People have made too much of the difference in
> How I described Karl and Libby
> I've talked to Libby.
> I said it was ridiculous about Karl
> And it is ridiculous about Libby.
> Libby was not the source of the Novak story.
> And he did not leak classified information.

As a result of defendant's request, on October 4, 2003, White House Press Secretary McClellan stated that he had spoken to Mr. Libby (as well as Mr. Rove and Elliot Abrams) and "those individuals assured me that they were not involved in this." Memo. Exhibit I.

Thus, as defendant approached his first FBI interview he knew that the White House had publicly staked its credibility on there being no White House involvement in the leaking of information about Ms. Wilson and that, at defendant's specific request through the Vice President, the White House had publicly proclaimed that defendant was "not involved in this." The President had vowed to fire anyone involved in leaking classified information. In that context, defendant proceeded to tell the FBI that he had merely passed information from one reporter (Russert) to other reporters while disclaiming any knowledge of whether the information he passed was true, and certainly unaware that he knew this classified information from government channels. Once that die was cast, defendant repeated the story in a subsequent interview and during two grand jury appearances.

Against this backdrop, defendant argues that he is entitled to rummage around in government files in an effort to find documents that would somehow help him to establish he had no reason to conceal his role in disseminating then-classified information. He offers no explanation for how the categories of documents he seeks will assist in establishing his lack of motive, and as a result fails to explain how the materials sought would enable him "significantly to alter the quantum of proof

in his favor," 3/10/06 Mem. Op. at 8, or why there "is a strong indication that [the documents] will play an important role" in enabling the defendant to respond to the charges in the indictment, *id*. Absent such a showing, and in the face of specific evidence proffered by the government that does set out defendant's motive to lie, defendant's argument that the requested discovery generally may be useful in locating evidence of his lack of motive to lie can only be understood as a fishing expedition of the sort that is not permitted by the criminal discovery rules.

### E.    Defendant is Not Entitled to the Requested Documents Under *Brady*.

The *Brady* doctrine does not entitle the defense to everything it would like to have but which Rule 16 does not provide.  Defendant simply asserts in three sentences that certain documents that might exist must be *Brady*.

First, defendant asserts without elaboration that  "Information ... that tends to show that Mr. Libby did not improperly disclose the contents of the NIE is surely *Brady* material." Memo at p. 34. The question of whether defendant did anything improper in disclosing the NIE is not relevant to whether defendant committed perjury by lying about something else, and therefore it cannot constitute favorable evidence under *Brady*.   To the contrary, proof that the disclosure was proper would not negate proof that he committed perjury by lying about something else.

Defendant also asserts without elaboration that "documents that help establish that no White House-driven plot to punish Mr. Wilson caused the disclosure of Ms. Wilson's identity also constitute *Brady* material."  Once again, defendant ignores the fact that he is not charged with participating in *any* conspiracy, much less one defined as a "White House-driven plot to punish Mr. Wilson."  Thus, putative evidence that such a conspiracy did not exist is not *Brady* material. Moreover, given that there is evidence that other White House officials with whom defendant spoke

prior to July14, 2003 discussed Wilson's wife's employment with the press both prior to, and after, July 14, 2003 – which evidence has been shared with defendant – it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to "punish" Wilson.[10]  Surely, defendant cannot claim that any document on its face that does not reflect a plot is exculpatory.

Finally, defendant asserts, again without elaboration, that "information that tends to show that government officials who knew that Ms. Wilson worked for the CIA did not treat that information as classified" is *Brady* material as well.  (Memo. at 34.)  Defendant is neither charged with disclosing classified information nor with lying about what other officials thought about the classified nature of Ms. Wilson's employment.  He is charged with perjury for lying under oath when he testified that he thought he learned information about Wilson's wife as if it were new from Tim Russert on July 8 when in fact the information was neither new to him (he was dispensing it the days before his conversation with Russert) nor was it discussed with Mr. Russert.  What other persons, particularly persons outside the Office of the Vice President, thought about the classified nature of Wilson's wife's employment is irrelevant -- not *Brady* material.

### F.    Defendant is Not Entitled to the CIA Criminal Referral or Related Documents.

Defendant seeks production of the CIA's criminal referral to the Justice Department, as well as all documents referenced in that referral.  Beyond a naked assertion that "Mr. Libby's need for the

---

[10] To the extent that defendant would hang his hat on the argument that another person or persons outside the White House may have discussed Wilson's wife's employment with the press prior to July 14, 2003 (for whatever reason), any such evidence would not negate evidence that multiple officials in the White House discussed her employment with reporters prior to (and after) July 14.  But again the existence *vel non* of concerted action by White House officials is not dispositive of whether defendant committed perjury in describing what *he* did.

documents in this case is clear," defendant makes no attempt to explain how the criminal referral and related materials are "material to preparing the defense" within the meaning of Rule 16.

The criminal referral and related documents simply bear no relationship to the perjury and false statement offenses charged in the indictment. The author of the referral, a CIA attorney, will not be a government witness, the referral does not summarize statements made by persons who will be government witnesses, and the referral occurred well before defendant's alleged commission of the crimes charged in the indictment. Under these circumstances, defendant cannot plausibly contend that "there is a strong indication that [the criminal referral and related materials] will play an important role," 3/10/06 Mem. Op. at 8, in preparing his defense against the charges in the indictment.

Moreover, Rule 16(a)(2) provides that "[e]xcept as Rule 16(a)(1) provides otherwise, this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Other than his generic assertion that all of the documents he seeks are within the scope of Rule 16(a)(1)(E) because they are material to preparing the defense, defendant cites no provision of Rule 16(a)(1) that overcomes this exclusion, which clearly applies to the CIA referral documents. *See United States v. Goulding*, 26 F.3d 656, 661 (7th Cir. 1994) (in tax prosecution, district court correctly invoke Rule 16(a)(2) in refusing to order production of IRS criminal referral documents); *Gollaher v. United States*, 419 F.2d 520, 527-28 (9th Cir. 1969) (judge properly relied upon Rule 16(a)(2) in refusing disclosure of inter-agency communications sought on ground that they might have shown that the Federal Housing Administration's attitude in pursuing loan fraud prosecution was one of bias).

31

Finally, the criminal referral contains the legal analysis and opinions of a CIA attorney, communicated to an attorney in the Justice Department, and thus is protected by the attorney-client privilege, as well as pre-decisional preliminary evaluations and recommendations of government officials that are covered by the deliberative process privilege. Defendant represents that at present he seeks "only the unprivileged facts contained within the referral documents," Memo. at 33, but the presentation and analysis of facts relating to the leak of Ms. Wilson's name and employment are closely intertwined. Moreover, even if certain portions of the criminal referral and related documents are not protected by privilege, the non-privileged portions are not discoverable under Rule 16 simply because defendant demands them. As this Court made clear in its March 10, 2006 Memorandum Opinion, Rule 16 sets a higher bar, and may not serve as a vessel from which defendant can conduct fishing excursions through government files. Although defendant's request for the CIA referral and related materials should be denied outright in light of his complete failure to articulate a basis for their production under Rule 16, the government would not object to providing these materials to the Court *in camera* if the Court would find that of assistance.

### G. Neither the Office of the Vice President, the White House Office, the National Security Council, nor the State Department Should Be Considered Aligned With the Prosecution Based on White House Counsel's Directive to Cooperate or the Agencies' Compliance with Subpoenas.

In its March 10, 2006 Memorandum Opinion, the Court concluded that the Office of the Vice President (OVP) is "closely aligned" with the prosecution, and that the prosecution had "knowledge of and access to" documents in the possession of OVP for Rule 16 purposes. In its discussion of the alignment issue, the Court cited the undisputed fact that White House Counsel's Office had sent a message declaring "full cooperation" with the investigation. The Court also cited what it called the

"rather free flow of documents" from the OVP to the Office of Special Counsel (OSC). (March 10, 2006 Op. at 13-15.) In his Third Motion to Compel, defendant cites the Court's March 10 Opinion and claims that "the Executive Office of the President, the NSC and the State Department are also 'aligned with the prosecution'" because of the "rather free flow of documents" sent by those entities to the OSC. (Memo. at 18.)

The government respectfully requests that the Court reconsider the ruling that OVP is "closely aligned" with the prosecution,[11] and further asks that the Court find that the White House Office (also known as the Office of the President), the NSC, and the State Department are also not aligned with the prosecution.[12] The pledge of cooperation with the investigation made by White House Counsel's office in September 2003 does not and cannot dictate any alignment with the prosecution. A precedent holding that a pledge of cooperation dictates alignment for discovery purposes creates a serious disincentive for agencies to cooperate fully with Department of Justice investigations because such cooperation would potentially subject the agency to wide-ranging discovery requests by defendants and the need to litigate questions of privilege concerning agency documents and information. A finding of alignment based on that rationale would be unprecedented.

---

[11]The government is not asking the Court to reverse its prior ruling with respect to the documents that the Court ordered the government to produce. The government fully intends to abide by the Court's ruling and produce the documents specified by the Court. The government seeks reconsideration of only the Court's rationale for ordering the production of those documents.

[12]For clarity, it is important to note the distinctions between the various government entities. The defendant describes the White House as including "the Executive Office of the President, the NSC and the OVP." (Memo. at 18.) That is incorrect. The Executive Office of the President is the umbrella entity within which there are many additional components, such as the White House Office, the OVP, and the NSC, among others. *See* Office of the Federal Register, Nat'l Archive and Records Admin., *The United States Government Manual 1999/2000* v., 90-108 (1999).

Moreover, although the Department of Justice sought documents from various government entities by letter request in the initial stages of the investigation, as soon as Special Counsel became involved in January 2004, all documents were obtained through grand jury subpoenas. To the extent there was a steady flow of documents produced, that flow of documents was in response to a steady flow of subpoenas. A precedent holding that compliance with subpoenas aligns an agency with the prosecution creates a perverse incentive for an agency to attempt to quash any and all subpoenas it receives, or to otherwise avoid full compliance with grand jury subpoenas lest its cooperation deem it as part of the prosecution team with concomitant discovery obligations.[13]

Although OVP provided documents in response to subpoenas issued to it, it has not acted on the prosecution's behalf in this investigation and is not closely connected to the prosecution. *See e.g., Strickler v. Greene*, 527 U.S. 263, 281 (1991) (prosecutor's duty to disclose information under Rule 16 and *Brady* extends to "others acting on the government's behalf in the case") (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995))); *United States v. Jordan*, 316 F.3d 1215, 1249 (11th Cir. 2003) (possession, custody, or control of the government for Rule 16 purposes includes government agencies "closely connected to the prosecutor"). The same is true for the White House Office, the NSC, and the State Department – they provided documents in response to subpoenas, but they have not acted on the prosecution's behalf and are not closely connected to the prosecution.[14] Thus, in

---

[13]It is worth noting that executive branch agencies routinely cooperate with the Department of Justice in investigations. If cooperation with subpoena requests or other cooperation with the Department of Justice is akin to alignment with the Department of Justice, the result could be that any executive branch agency relevant to the case would be considered aligned with the prosecution. The Court rejected this result in its March 10 Opinion. (March 10, 2006 Op. at 7 n.10.)

[14]Put another way, this is not at all like the situation in *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992), where the close working relationship between Washington Metropolitan Police (MPD) and the U.S. Attorney for the District of Columbia aligned MPD with

the government's view, neither the OVP, the White House Office, the NSC, nor the State Department are aligned with the prosecution, and documents in the physical possession of those entities are not within the government's possession, custody or control.

In the event that the Court declines to reconsider its prior ruling regarding OVP's alignment with the prosecution, the government asks that the Court find that the White House Office, the NSC and the State Department are differently situated than OVP in terms of alignment. One distinction is that OVP was defendant's primary employer, and, as a result, defendant likely had or could have had access to a large majority of, if not the entirety of, the OVP documents, including those that were ultimately produced by OVP to the prosecution. *Cf. United States v. Poindexter*, 727 F. Supp. 1470, 1478 (D.D.C. 1989) (noting as a similarity between two cases that found alignment between the prosecution and an agency the fact that in both the agency from which the criminal defendant was seeking documents was the agency of his or his co-conspirator's employment).[15] That is not the case with documents from other governmental agencies. Moreover, other than the fact that the White House, the NSC, and the State Department provided documents to the prosecution, defendant has offered no explanation in his brief as to why those entities should be considered aligned with the prosecution.

Another important distinction regarding the White House Office in particular is that the Supreme Court has "long recognized the 'unique position in the constitutional scheme' that [the White House Office] occupies." *Clinton v. Jones*, 520 U.S. 681, 698 (1997) (quoting *Nixon v.*

---

the prosecution and obligated a federal prosecutor to search for and disclose a specific file related to a witness.

[15]In this case, the prosecution has provided defendant with all documents produced by OVP in connection with this investigation.

*Fitzgerald*, 457 U.S. 731, 749 (1982)). *See also Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 381-82 (2004). Thus, the Supreme Court instructs that, with respect to discovery addressed to the White House Office, "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton*, 520 U.S. at 707. *See generally*, *Cheney*, 542 U.S. at 381-92. Applying these principles to Rule 16, the Court should conclude that the prosecution does not have custody or control over material in the possession of the White House Office. It is a near impossibility that subordinate DOJ officers would have custody or control over material in the possession of the White House Office, which houses the President's closest staff.

The considerable potential for disrupting and complicating this litigation, as well as ongoing government functions, is a reason for this Court to exercise caution in finding alignment and in expanding discovery substantially beyond what is required by Rule 16, Jencks, and the Constitution. First, most of defendant's requests implicate extensive classified information, while others raise issues of executive privilege. Many are so broadly drawn as to require production of large amounts of irrelevant material, and to require the disclosure of sensitive information about third parties who are not government witnesses and who could not provide information exculpatory of defendant. Second, virtually all of the information sought by defendant involves sensitive governmental policy deliberations at the highest levels of government. In such a context, this Court should be reluctant to order discovery beyond that which is reasonably related to the preparation of the defense to the charges in the indictment. Finally, as discussed above, the degree to which subpoenaed government entities complied with, rather than contested, subpoenas issued by independent investigators made it possible to conduct this investigation in very sensitive circumstances. Disclosure of materials well

beyond that which is required under the Rules and necessary to the preparation of a defense may chill the willingness of future presidents and high-ranking government officials to assist criminal investigations of conduct by staff members holding sensitive positions. The government submits that these weighty considerations directly contradict defendant's assertion that providing the documents defendant requests from the other agencies would pose no "significant burden." (Memo. at 18.) Indeed, quite the opposite is true.

Defendant also argues that he should be granted more discovery, not less discovery, because "thorny issues of national security classification and executive privilege may need to be resolved." (Memo. at 5.) Defendant should be provided the discovery to which he is entitled. If he is not entitled to certain discovery, he should not be granted it merely because the documents he is seeking implicate "thorny" issues that will complicate, not expedite, litigation.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the United States respectfully requests that this Court deny the defendant's third motion to compel discovery.

Respectfully submitted,

_____/s_____
PATRICK J. FITZGERALD
Special Counsel
Office of the United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated:   April 5, 2006

38

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 5th day of April, 2006, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

Joseph A. Tate, Esq.
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793
Facsimile: 215-994-2222

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700

Patrick J. Fitzgerald
Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

By: _____/s/_____
Kathleen M. Kedian
Deputy Special Counsel