# EXHIBIT A

1 of 1 DOCUMENT

Copyright 2006 The Washington Post
The Washington Post

April 10, 2006 Monday
Final Edition

**SECTION:** A Section; A04

**LENGTH:** 664 words

**HEADLINE: Specter Says Bush,** Cheney Should Explain Leak

**BYLINE:** Walter Pincus, Washington Post Staff Writer

**BODY:**

President Bush and Vice President Cheney need to explain what classified information was authorized to be leaked to reporters in July 2003 and why, the Republican chairman of the Senate Judiciary Committee said yesterday.

"I think that there has to be a detailed explanation precisely as to what Vice President Cheney did, what the president said to him, and an explanation from the president as to what he said so that it can be evaluated," Sen. Arlen Specter (Pa.) said. He was referring to last week's revelation in a court document that Cheney's former chief of staff, I. Lewis "Scooter" Libby, testified that Cheney told him Bush approved leaking parts of a classified document about intelligence estimates of Iraq's weapons of mass destruction.

Specter said on "Fox News Sunday" that he had heard yesterday morning about a report, first published by the Associated Press, that a lawyer close to the case said Bush "didn't tell the vice president specifically what to do, but just said get it out."

Bush approved providing information from the then-classified October 2002 National Intelligence Estimate (NIE) on Iraq's nuclear, chemical and biological weapons, Special Counsel Patrick J. Fitzgerald said in a memorandum filed in federal court Wednesday. The prosecutor cited Libby's testimony to a grand jury investigating the leak of a CIA operative's name.

There has been no confirmation of Bush's role, nor of what exactly Libby was authorized to disclose from the 90-page NIE. Fitzgerald's memo, which provided new information on several aspects of the CIA leak case, came as a result of a request by Libby's lawyers for a range of classified documents to defend their client against charges of obstruction of justice, perjury and making false statements to the FBI.

Libby, according to the memo, told the grand jury that Cheney "specifically had authorized" him to disclose "certain information" from the classified NIE.

Libby also testified that he was "directed" by the vice president to speak to reporters about the NIE and to provide information from a "cable authored by [retired ambassador Joseph C.] Wilson." The latter apparently referred to a classified March 2002 CIA summary of Wilson's report on his trip to Niger in February 2002 to find out whether Iraq was trying to buy uranium.

Some of Libby's comments about the NIE that he made to reporter Judith Miller, then of the New York Times, on July 8, 2003, were inaccurate. Libby said one "key judgment of the NIE held that Iraq was 'vigorously trying to procure' uranium." That was not an NIE key judgment, and the CIA officials who wrote the document disputed that statement.

Libby also inaccurately described the CIA report on Wilson's trip, saying the former ambassador reported information about an Iraqi delegation visiting Niger in 1999 that was "understood to be a reference to a desire to obtain uranium." In fact, Wilson said he was told that a Niger official was contacted at a meeting outside the country by a businessman who said an Iraqi economic delegation wanted to meet with him. The Niger official guessed that the

  

Specter Says Bush, Cheney Should Explain Leak The Washington Post April

Iraqis might want to talk about uranium because Iraq had purchased uranium from Niger in the mid-1980s. But when they met, no talk of uranium took place.

Sen. John F. Kerry (D-Mass.) said that although Bush has the right to declassify information, it was wrong to do it for political purposes. "This was a declassification in order to mislead America . . . and in order to buttress their phony argument about the war," Kerry said on NBC's "Meet the Press."

Appearing on CNN's "Late Edition," Sen. Jon Kyl (R-Ariz.) said Bush was correct in declassifying the information because the administration believed that Wilson, in his statements in July 2003, had "gone public with half of the story." Kyl, who believes Britain had intelligence about Iraq seeking uranium from Niger that the United States could not confirm, said the administration had mishandled the matter.

**LOAD-DATE:** April 10, 2006





# EXHIBIT B



# Office of Special Counsel

Patrick J. Fitzgerald       Chicago Office: Dirksen Federal Building          Washington       Office: Bond Federal Building
Special Counsel                            219 South Dearborn Street, Fifth Floor                   1400 New York Avenue, Ninth Floor
                                           Chicago, Illinois 60604                                  Washington, DC 20530
                                           (312) 353-5300                                           (202) 514-1187

*Please address all correspondence to the Washington Office*

April 11, 2006

Honorable Reggie B. Walton
United States District Court
333 Constitution Avenue, N.W.
Washington, DC 20001

    Re:  <u>United States v. I. Lewis Libby, Cr. No. 05-394 (RBW)</u>

Dear Judge Walton:

  We are writing to correct a sentence from the Government's Response to Defendant's Third Motion to Compel Discovery, filed on April 5, 2006. The sentence, which is the second sentence of the second paragraph on page 23, reads, "Defendant understood that he was to tell Miller, among other things, that a key judgment of the NIE held that Iraq was 'vigorously trying to procure' uranium." That sentence should read, "Defendant understood that he was to tell Miller, among other things, some of the key judgments of the NIE, and that the NIE stated that Iraq was 'vigorously trying to procure' uranium."

    Respectfully Submitted,

    PATRICK J. FITZGERALD
    Special Counsel

cc:  William Jeffress, Esquire
   Theodore V. Wells, Esquire
   Joseph A. Tate, Esquire
   John D. Cline, Esquire

# EXHIBIT C



RECEIVED

**Office of Special Counsel**    JAN 2⁴ 2006

| | | |
|---|---|---|
| *Patrick J. Fitzgerald*<br>*Special Counsel* | *Chicago Office:* *Dirksen Federal Building*<br>*219 South Dearborn Street, Fifth Floor*<br>*Chicago, Illinois 60604*<br>*(312) 353-5300* | *Washington Office:* *Bond Building*<br>*1400 New York Avenue, Ninth Floor*<br>*Washington, DC 20530*<br>*(202) 514-1187* |

*Please address all correspondence to the Washington Office*

**Via Telefax & Regular Mail**    January 23, 2006

William Jeffress, Esquire
BAKER BOTTS
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400

Theodore V. Wells, Esquire
PAUL WEISS LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Joseph A. Tate, Esquire
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19103

Re:  United States v. I. Lewis Libby

Dear Counsel:

This letter is in response to your letter of January 5, 2006.  We incorporate the prior responses in our letters of December 3, 2005, and January 9, 2006.  This follows our telephone conference of January 18, 2006.

As a preliminary matter, your letter indicates a belief that it is "very common" in the District of Columbia to engage in "open file" discovery, but my understanding is to the contrary.  To my understanding, "open file" discovery is not common in that district, nor in the Department of Justice more broadly.  That is particularly the case where the matter involves extensive classified and national security materials.  Moreover, it is not the ordinary practice for federal prosecutors to provide discovery in a perjury/obstruction of justice prosecution as to all matters that were considered but not charged in the overarching grand jury investigation, particularly one that is ongoing.  As you are aware, your client has not been charged with a substantive violation of Title 18, United States Code, Section 793.  Accordingly, your client is not entitled to discovery of sensitive national security materials pertinent only to a prosecution of a substantive violation of that statute.

In any event, the fact that we have not elected to provide you with everything the defense has requested should not obscure the fact that the defense is being given far more discovery than is required by the language of Rule 16 of the Federal Rules of Criminal Procedure.  To cite but one example, we are making available to you all material obtained from the Office of Vice President: in essence, "open file" discovery regarding the office where your client was employed.  We have endeavored to draw a line that expedites resolution of this matter while at the same time safeguarding other governmental interests and the ongoing investigation.  In making discovery

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 2

determinations, we have endeavored to provide no preferential treatment of Mr. Libby solely on account of his former official position.

I note that our January 18, 2006, telephone conference was productive in achieving a clearer understanding of the areas where we disagree which will lend itself to presentation to the court for resolution. We also agreed during the telephone conference that if we decided to produce any items to you despite our belief that we were not required to do so that you would not view such production as a waiver of our position that such discovery was not required or argue that such a production was a concession that we were obligated to produce any additional documents that may be in the possession of other government agencies.

In your requests, you greatly expand the sweep of subsection 16(a)(1)(E) which governs "documents and objects" by making requests for "information," rather than "documents and objects," and by defining documents "material to preparing the defense" to include memos, recordings and transcripts in a manner which would sweep in grand jury minutes and reports of interview (most commonly reports of interview in the form of FBI form 302's) . That is flatly inconsistent with the narrower category of "documents and objects" set forth in subsection 16(a)(1)(E) and is contrary to both subsection 16(a)(2) which says that reports and government memoranda (prepared by an attorney or agent) are not discoverable, and to subsection 16(a)(3) which limits grand jury transcript discovery to the defendant's grand jury testimony. To define "documents" to include grand jury transcripts and debriefing reports would contravene the Jencks Act and the enumerated provisions of Rule 16. Thus, in reviewing our response, you should understand that, unless specified otherwise below, we are not producing such grand jury transcripts or FBI 302's or other reports, as they are not required to be produced pursuant to Rule 16.

We respond in greater detail to your enumerated requests as follows:

(1): You demand access to all documents referencing Mr. Wilson's 2002 trip to Iraq. The relevance of Mr. Wilson's 2002 trip is the fact that it occurred and that it became a subject of discussion in spring 2003. What took place during that trip is not relevant to the issue of whether Mr. Libby lied about his spring 2003 conversations with various reporters and government officials about Mr. Wilson's wife's employment at the Central Intelligence Agency ("CIA"). Thus, a request for every document which in any way relates to Mr. Wilson's trip and any communications Mr. Wilson had with anybody at any time about the trip is over broad and any attempt to comply with such a request would significantly delay, not expedite, resolution of this matter. Nonetheless, all documents in our possession reflecting conversations involving defendant Libby about Wilson's trip, or meetings Mr. Libby attended during which Mr. Wilson's trip was discussed, have been produced or will be produced prior to February 3. Moreover, when you review the materials in our possession which we have produced or will be producing to you, specifically including the copies of all documents obtained from the Office of Vice President and the materials from our set of

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 3

documents obtained from the Central Intelligence Agency ("CIA"), you will note that they include substantial materials which concern or reflect Mr. Wilson's trip.

(2): We do not have any responsive materials other than material that would be produced pursuant to the Jencks Act if the Government were to call Mr. Wilson to testify at trial, which we do not expect to do. You are obviously aware that Mr. Wilson has made public speeches, written an Op Ed in the *New York Times*, published a book and has been interviewed by media.

(3): As set forth in our prior correspondence, we will not produce every document related in any way to Ms. Wilson's employment, nor is Mr. Libby entitled to every document that might reflect on the damage to national security from disclosure of her employment. However, as we discussed during our telephone conference call on January 18, we intend to address the matter of the use, relevance and admissibility of information concerning Ms. Wilson's employment at the CIA in the context of the Classified Information Procedures Act ("CIPA").

(4): While we do not believe we are required to do so, we will advise you of certain information responsive to your request by letter on or before February 3.

(5): As we previously advised you, we have no formal damage assessment in our possession but, as we discussed during our telephone conference call on January 18, we intend to address the matter of the relevance and admissibility of Ms. Wilson's employment at the CIA in the context of CIPA.

(6) (7) and (8): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3. As we noted during our conference call, we do not agree that you are entitled to all such materials or that the scope of your request is proper but you are receiving all responsive documents in our possession. We also advised you that when gathering materials during the investigation we did not focus our searches on a topic as broad as that set forth in the request in 7(e) .

(9): This request in effect seeks discovery concerning any other subjects of the ongoing investigation. We have not produced, and do not intend to produce, all documents regarding contacts between government officials other than Mr. Libby and reporters prior to July 14, 2003, but have produced (or will produce before February 3) all documents reflecting contact between Mr. Libby and reporters responsive to this request. Lest there be any doubt, we do have some documents responsive to your request which we are electing not to produce because we do not agree that we are obligated to provide them.

(10) and (11): Aside from any Jencks Act material which will not be produced as discovery, all responsive documents have been produced to you or will be produced to you on or before February 3.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 4

In your section entitled "Information Relating to the Government's Investigation of the Media," you assert that the government takes the position that the defense is not entitled to receive in discovery the contemporaneous notes made by the reporters who spoke to Libby, but do not note that you have been provided with all notes in the government's possession that were made by reporters when speaking to Mr. Libby. (As discussed above, the Government has declined to provide notes of conversations between reporters and other government officials.) You elsewhere stated that we declined to provide "any" information about reporters when in fact we have produced documents obtained from media entities as you elsewhere acknowledge.

(12) - (16): While we do not intend to provide discovery in this regard, and while not required to do so, in order to expedite litigation of this matter we advised you during the January 18 conference call that we were not aware of any reporters who knew prior to July 14, 2003, that Valerie Plame, Ambassador Wilson's wife, worked at the CIA, other than: Bob Woodward, Judith Miller, Bob Novak, Walter Pincus and Matthew Cooper.[1] There are published accounts of when Ms. Miller and Mr. Cooper first learned about Mr. Wilson's wife and from whom. Mr. Woodward has publicly described his conversation with Mr. Libby on June 27, 2003, as well as the general timing ("mid-June") of his conversation with another unnamed government official with whom he then spoke about Mr. Wilson's wife. Mr. Woodward has also described his conversations in 2003 and later with Mr. Pincus on the subject. Mr. Pincus has published his account of when he first learned information about Wilson's wife from a source he does not name. Mr. Novak has published his account of when he learned about Wilson's wife (some time after July 6) without naming his sources in the account.

We also advise you that we understand that reporter John Dickerson of *Time* magazine discussed the trip by Mr. Wilson with government officials at some time on July 11 or after, subsequent to Mr. Cooper learning about Mr. Wilson's wife. Any conversations involving Mr. Dickerson likely took place in Africa and occurred after July 11.

We note that we understand from our January 18 telephone conference that the requests numbered 13 and 14 were intended to be requests limited to the time frame prior to July 14, 2003.

We otherwise are not producing documents responsive to your request concerning other officials who were in contact with other reporters, as outlined above.

In addition, you seek miscellaneous items for discovery in an effort to prepare motions. While we do not agree that there is a separate entitlement to discovery in order to facilitate motions which may or may not be well grounded, we advise you of the following in response to your enumerated requests:

---

[1] This statement is not meant to imply that each and every reporter named knew her name prior to July 14, 2003.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 5

(17): We are reviewing the CIA referral document and will either produce the same to you or advise you otherwise shortly. We do not intend to produce "all documents relating to" that referral document as that could potentially implicate all documents in this investigation.

(18): We are seeking to obtain a copy of the order empaneling the grand jury public which we did not have in our possession and will either produce the same to you or advise you otherwise shortly.

(19)-(22): We will be providing to you prior to February 3 copies of subpoenas and pertinent correspondence relating to reporters referenced in the Indictment and/or whom we expect to call at trial.[2] We are specifically withholding subpoenas (and correspondence) which were addressed to reporters whose testimony was directed towards government officials other than Mr. Libby.

The Requests for Asserted "Brady" Material

We recognize that your requests for discovery seek the categories of items requested both pursuant to Rule 16 as well as pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). We do not agree, however, that each of your requests is appropriate under the governing standards nor, as discussed in prior correspondence, do we agree with your implicit view that we are aligned with all government agencies for purposes of discovery.

(A): We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(B) and (C): We do not agree that if there were any documents indicating that Ms. Wilson's employment was not classified during the relevant times that any such documents would constitute *Brady* material in a case where Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.[3]

(C): We do not agree that if there were any documents indicating that Ms. Wilson did not act in an undercover capacity or did not act covertly in the five years prior to July 2003 (which we neither confirm nor deny) that any such documents would constitute *Brady* material in a case where

---

[2] We are not providing correspondence such as transmittal letters, legal briefs filed, appellate briefs filed and various correspondence concerning scheduling, filing, sealing, redacting and unsealing of briefs and other court documents regarding litigation.

[3] I note that Ms. Wilson's employment status was classified but has since been declassified so that we may now confirm such status. In any event, we are not aware of any documents in our possession stating that Ms. Wilson's affiliation with the CIA was not classified at the relevant times.

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 6

Mr. Libby is not charged with a violation of statutes prohibiting the disclosure of classified information.

(D) and (E): We do not agree that any documents indicating that any reporter heard or suspected prior to July 14, 2003, that Ms. Wilson worked at the CIA constitutes *Brady* material but in any event incorporate our earlier response on this issue.

(F): We do not agree that any time witnesses disagree on facts that you are entitled to all documents so indicating in advance. We are aware of our *Brady* and *Giglio* obligations regarding witnesses and will comply with those obligations.

(G): We do not agree that all documents reflecting favorably on Mr. Libby's character or reputation for truthfulness or reflecting his propensity to comply with laws, regulations and nondisclosure agreements or of assuring that others complied with those regulations constitute *Brady* material (nor that such documents could be easily defined) as prior instances of non-criminal conduct are not considered exculpatory.

(H): Your request for *Giglio* impeachment material is premature and over broad. You will receive such material for Government witnesses, not for "potential" Government witnesses (however that term is defined). Moreover, the scope of records you seek is far beyond the scope of what is required. By way of illustrative (but not exhaustive) example, you seek all documents relating to any juvenile arrest of any potential government witness in a case where there will be no witnesses where any such arrest would be remotely recent or relevant to the trial.

Other requests:

There have been no search warrants executed and no communications intercepted pursuant to Title III at the direction of the prosecution team during the course of this investigation.

At this time we do not intend to offer any evidence of "other crimes" pursuant to Rule 404(b). As we discussed during our telephone conversation, Mr. Libby testified in the grand jury that he had contact with reporters in which he disclosed the content of the National Intelligence Estimate ("NIE") to such reporters in the course of his interaction with reporters in June and July 2003 (and caused at least one other government official to discuss the NIE with the media in July 2003). We also note that it is our understanding that Mr. Libby testified that he was authorized to disclose information about the NIE to the press by his superiors. We expect that such conduct will be the subject of proof at trial in that we intend to introduce Libby's grand jury transcript in evidence and Mr. Libby has testified that the purpose of his July 8 meeting with Ms. Miller was to transmit information concerning the NIE. Our anticipated basis for offering such evidence is that such facts are inextricably intertwined with the narrative of the events of spring 2003, as Libby's testimony itself makes plain. At this time, we do not intend to offer the evidence pursuant to Rule 404(b).

Attorneys Jeffress, Wells & Tate
January 23, 2006
Page 7

We are not obligated at this time to disclose impeachment material of Mr. Libby should he testify in his defense.

We are aware of no evidence pertinent to the charges against defendant Libby which has been destroyed. In an abundance of caution, we advise you that we have learned that not all email of the Office of Vice President and the Executive Office of President for certain time periods in 2003 was preserved through the normal archiving process on the White House computer system.

Should you have any questions or comments regarding any of the foregoing, or should you wish to discuss this matter generally, please do not hesitate to call me at the number listed above.

Very truly yours,

PATRICK J. FITZGERALD
Special Counsel

# EXHIBIT D

1 of 6 DOCUMENTS

Copyright 2003 The Washington Post
The Washington Post

**September** 28, 2003 Sunday
Final Edition

**SECTION:** A SECTION; Pg. A01

**LENGTH:** 1354 words

**HEADLINE: Bush** Administration Is **Focus** of Inquiry;
CIA Agent's Identity Was Leaked to Media

**BYLINE:** Mike Allen and Dana Priest, Washington Post Staff Writers

**BODY:**

At CIA Director George J. Tenet's request, the Justice Department is looking into an allegation that administration officials leaked the name of an undercover CIA officer to a journalist, government sources said yesterday.

The operative's identity was published in July after her husband, former U.S. ambassador Joseph C. Wilson IV, publicly challenged President Bush's claim that Iraq had tried to buy "yellowcake" uranium ore from Africa for possible use in nuclear weapons. Bush later backed away from the claim.

The intentional disclosure of a covert operative's identity is a violation of federal law.

The officer's name was disclosed on July 14 in a syndicated column by Robert D. Novak, who said his sources were two senior administration officials.

Yesterday, a senior administration official said that before Novak's column ran, two top White House officials called at least six Washington journalists and disclosed the identity and occupation of Wilson's wife. Wilson had just revealed that the CIA had sent him to Niger last year to look into the uranium claim and that he had found no evidence to back up the charge. Wilson's account touched off a political fracas over Bush's use of intelligence as he made the case for attacking Iraq.

"Clearly, it was meant purely and simply for revenge," the senior official said of the alleged leak.

Sources familiar with the conversations said the leakers were seeking to undercut Wilson's credibility. They alleged that Wilson, who was not a CIA employee, was selected for the Niger mission partly because his wife had recommended him. Wilson said in an interview yesterday that a reporter had told him that the leaker said, "The real issue is Wilson and his wife."

A source said reporters quoted a leaker as describing Wilson's wife as "fair game."

The official would not name the leakers for the record and would not name the journalists. The official said there was no indication that Bush knew about the calls.

It is rare for one Bush administration official to turn on another. Asked about the motive for describing the leaks, the senior official said the leaks were "wrong and a huge miscalculation, because they were irrelevant and did nothing to diminish Wilson's credibility."

Wilson, while refusing to confirm his wife's occupation, has suggested publicly that he believes Bush's senior adviser, Karl C. Rove, broke her cover. Wilson said Aug. 21 at a public forum in suburban Seattle that it is of keen interest to him "to see whether or not we can get Karl Rove frog-marched out of the White House in handcuffs."

White House press secretary Scott McClellan said yesterday that he knows of no leaks about Wilson's wife. "That is not the way this White House operates, and no one would be authorized to do such a thing," McClellan said. "I don't have any information beyond an anonymous source in a media report to suggest there is anything to this. If

  

someone has information of this nature, then he or she should report it to the Department of Justice."

McClellan, who Rove had speak for him, said of Wilson's comments: "It is a ridiculous suggestion, and it is simply not true." McClellan was asked about Wilson's charge at a White House briefing Sept. 16 and said the accusation is "totally ridiculous."

Administration officials said Tenet sent a memo to the Justice Department raising a series of questions about whether a leaker had broken federal law by disclosing the identity of an undercover officer. The CIA request was reported Friday night by MSNBC.com. Administration sources familiar with the matter said the Justice Department is determining whether a formal investigation is warranted.

An intelligence official said Tenet "doesn't like leaks."

The CIA request could reopen the rift between the White House and the intelligence community that emerged this summer when Bush and his senior aides blamed Tenet for the inclusion of the now–discredited uranium claim — the so–called "16 words" — in the State of the Union address in January.

Tenet issued a statement taking responsibility for the CIA's approval of the address before it was delivered, but made clear the CIA had earlier warned the White House not to use the allegations about uranium ore. After an ensuing rush of leaks over White House handling of intelligence, Bush's aides said they believed in retrospect it had been a political mistake to blame Tenet.

The Intelligence Protection Act, passed in 1982, imposes maximum penalties of 10 years in prison and $50,000 in fines for unauthorized disclosure by government employees with access to classified information.

Members of the administration, especially Vice President Cheney and Defense Secretary Donald H. Rumsfeld, have been harshly critical of unauthorized leakers, and White House spokesmen are often dismissive of questions about news reports based on unnamed sources. The FBI is investigating senators for possibly leaking intercept information about Osama bin Laden.

The only recipient of a leak about the identity of Wilson's wife who went public with it was Novak, the conservative columnist, who wrote in The Washington Post and other newspapers that Wilson's wife, Valerie Plame, "is an agency operative on weapons of mass destruction." He added, "Two senior administration officials told me that Wilson's wife suggested sending him to Niger."

When Novak told a CIA spokesman he was going to write a column about Wilson's wife, the spokesman urged him not to print her name "for security reasons," according to one CIA official. Intelligence officials said they believed Novak understood there were reasons other than Plame's personal security not to use her name, even though the CIA has declined to confirm whether she was undercover.

Novak said in an interview last night that the request came at the end of a conversation about Wilson's trip to Niger and his wife's role in it. "They said it's doubtful she'll ever again have a foreign assignment," he said. "They said if her name was printed, it might be difficult if she was traveling abroad, and they said they would prefer I didn't use her name. It was a very weak request. If it was put on a stronger basis, I would have considered it."

After the column ran, the CIA began a damage assessment of whether any foreign contacts Plame had made over the years could be in danger. The assessment continues, sources said.

The CIA occasionally asks news organizations to withhold the names of undercover agents, and news organizations usually comply. An intelligence official told The Post yesterday that no further harm would come from repeating Plame's name.

Wilson was acting U.S. ambassador to Iraq during the run-up to the Persian Gulf War of 1991. He was in the diplomatic service from 1976 until 1998, and was the Clinton administration's senior director of African affairs on the National Security Council. He is now an international business consultant. Wilson said the mission to Niger was unpaid except for expenses.

Wilson said he believes an inquiry from Cheney's office launched his eight–day mission to Niger in February 2002 to check the uranium claim, which turned out to be based at least partly on forged documents. "The way it was briefed to me was that the office of the vice president had expressed an interest in a report covering uranium purchases by Iraq from Niger," Wilson said in a telephone interview yesterday.

  

Bush Administration Is Focus of Inquiry; CIA Agent's Identity Was L

He said that if Novak's account is accurate, the leak was part of "a deliberate attempt on the part of the White House to intimidate others and make them think twice about coming forward."

Sources said that some of the other journalists who received the leak did not use the information because they were uncomfortable with unmasking an undercover agent or because they did not consider the information relevant to Wilson's report about Niger.

Sen. Charles E. Schumer (D-N.Y.), who has been pushing the FBI to investigate the disclosure since July, said yesterday that it "not only put an agent's life in danger, but many of that agent's sources and contacts."

Staff writer Richard Leiby contributed to this report.

**LOAD-DATE:** September 28, 2003

  

# EXHIBIT E

1 of 8 DOCUMENTS

Copyright 2003 The Washington Post
The Washington Post

October 12, 2003 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1773 words

**HEADLINE:** Probe Focuses on Month Before Leak to Reporters;
FBI Agents Tracing Linkage of Envoy to CIA Operative

**BYLINE:** Walter Pincus and Mike Allen, Washington Post Staff Writers

**BODY:**

**FBI agents** investigating the **disclosure** of a CIA officer's identity have begun by examining events in the month before the leak, when the CIA, the White House and Vice President Cheney's office first were asked about former ambassador Joseph C. Wilson IV's CIA-sponsored trip to Niger, according to sources familiar with the probe.

The name of Wilson's wife, Valerie Plame, a clandestine case officer, was revealed in a July 14 column by Robert D. Novak that quoted two unidentified senior administration officials.

In their interviews, FBI agents are asking questions about events going back to at least early June, the sources said. That indicates  investigators are examining not just who passed the information to Novak and other reporters but also how Plame's name may have first become linked with Wilson and his mission, who did it and how the information made its way around the government.

Administration sources said they believe that the officials who discussed Plame were not trying to expose her, but were using the information as a tool to try to persuade reporters to ignore Wilson. The officials wanted to convince the reporters that he had benefited from nepotism in being chosen for the mission.

What started as political gossip and damage control has become a major criminal investigation that has already harmed the administration and could be a problem for President Bush for months to come.

One reason investigators are looking back is that even before Novak's column appeared, government officials had been trying for more than a month to convince journalists that Wilson's mission was not as important as it was being portrayed. Wilson concluded during the 2002 mission that there was no solid evidence for the administration's assertion that Iraq was trying to acquire uranium in Niger to develop nuclear weapons, and he angered the White House when he became an outspoken critic of the war.

The FBI is trying to determine when White House officials and members of the vice president's staff first focused on Wilson and learned about his wife's employment at the agency. One group that may have known of the connection before that time is the handful of CIA officers detailed to the White House, where they work primarily on the National Security Council staff. A former NSC staff member said one or more of those officers may have been aware of the Plame-Wilson relationship.

White House press secretary Scott McClellan said in response to a query for this article: "I think it would be counterproductive during an ongoing investigation for me to chase rumors and speculation. The president has directed the White House to cooperate fully, and that is exactly what we are doing."

Investigators are trying to establish the chain of events leading to the leak because, for a successful prosecution under the law prohibiting unauthorized disclosure of a covert U.S. officer's name, the disclosure must have been intentional, the accused must have known the person was a covert officer and the identity must not have been disclosed earlier.

  

Probe Focuses on Month Before Leak to Reporters; FBI Agents Tracing Link

The first public mention of Wilson's mission to Niger, albeit without identifying him by name, was in the New York Times on May 6, in a column by Nicholas D. Kristof. Kristof had been on a panel with Wilson four days earlier, when the former ambassador said State Department officials should know better than to say the United States had been duped by forged documents that allegedly had proved a deal for the uranium had been in the works between Iraq and Niger.

Wilson said he told Kristof about his trip to Niger on the condition that Kristof must keep his name out of the column. When the column appeared, it created little public stir, though it set a number of reporters on the trail of the anonymous former ambassador. Kristof confirmed that account.

The column mentioned the alleged role of the vice president's office for the first time. That was when Cheney aides became aware of Wilson's mission and they began asking questions about him within the government, according to an administration official.

In the meantime, Wilson was pressing his case. He briefed two congressional committees conducting inquiries into why the president had mentioned the uranium allegation in his Jan. 28 State of the Union address. He also began making frequent television appearances.

In early June, Wilson told his story to The Washington Post on the condition that his name be withheld. On June 12, The Post published a more complete account than Kristof's of Wilson's trip. Wilson has now given permission to The Post to identify him as one source for that article.

By that time, officials in the White House, Cheney's office, the CIA and the State Department were familiar with Wilson and his mission to Niger.

Starting that week, the officials repeatedly played down the importance of Wilson's trip and its findings, saying it had been authorized within the CIA's nonproliferation section at a low level without requiring the approval of senior agency officials. No one brought up Wilson's wife, and her employment at the agency was not known at the time the article was published.

Wilson's oral report to a CIA officer had been turned into a routine one-and-a-half page CIA intelligence memo to the White House and other agencies. By tradition, his identity as the source, even though he went under the auspices of the CIA, was not disclosed.

"This gent made a visit to the region and chatted up his friends," a senior intelligence official said last June in describing the agency's view of the mission. Regarding the allegation about Iraq seeking uranium, the official said: "He relayed back to us that they said it was not true and that he believed them."

The Post article generated little public response. But behind the scenes, Bush officials were concerned. "After the June story, a lot of people in government were scurrying around asking who is this envoy and why is he saying these things," a senior administration official said.

Wilson said he attempted to increase pressure on the White House the day after the June 12 article was published by calling some present and former senior administration officials who know  national security adviser Condoleezza Rice. He wanted them to tell Rice that she was wrong in her comment on NBC's "Meet the Press" on June 8 that there may be some intelligence "in the bowels of the agency," but that no one around her had any doubts about the uranium story.

Wilson said those officials told him Rice was not interested and he should publish his story in his own name if he wanted to attract attention.

On July 6, Wilson went public. In an interview published in The Post, Wilson accused the administration of "misrepresenting the facts on an issue that was a fundamental justification for going to war." In an opinion article the same day in the New York Times, he wrote that "some of the intelligence related to Iraq's nuclear weapons program was twisted to exaggerate the Iraqi threat."

On "Meet the Press" that day, Wilson said:  "Either the administration has some information that it has not shared with the public or, yes, they were using the selective use of facts and intelligence to bolster a decision in the case that had already been made, a decision that had been made to go war."

On July 7, the White House admitted it had been a mistake to include the 16 words about uranium in Bush's State





Probe Focuses on Month Before Leak to Reporters; FBI Agents Tracing Link

of the Union speech. Four days later, with the controversy dominating the airwaves and drowning out the messages Bush intended to send during his trip in Africa, CIA Director George J. Tenet took public blame for failing to have the sentence removed.

That same week, two top White House officials disclosed Plame's identity to least six Washington journalists, an administration official told The Post for an article published Sept. 28. The source elaborated on the conversations last week, saying that officials brought up Plame as part of their broader case against Wilson.

"It was unsolicited," the source said. "They were pushing back. They used everything they had."

Novak has said he began interviewing Bush officials about Wilson shortly after July 6, asking why such an outspoken Bush policy critic was picked for the Niger mission. Novak reported that Wilson's wife worked at the CIA on weapons of mass destruction and that she was the person who suggested Wilson for the job.

Officials have said Wilson, a former ambassador to Gabon and National Security Council senior director for African affairs, was not chosen because of his wife.

On July 12, two days before Novak's column, a Post reporter was told by an administration official that the White House had not paid attention to the former ambassador's CIA-sponsored trip to Niger because it was set up as a boondoggle by his wife, an analyst with the agency working on weapons of mass destruction. Plame's name was never mentioned and the purpose of the disclosure did not appear to be to generate an article, but rather to undermine Wilson's report.

After Novak's column appeared, several high-profile reporters told Wilson that they had received calls from White House officials drawing attention to his wife's role. Andrea Mitchell of NBC News said she received one of those calls.

Wilson said another reporter called him on July 21 and said he had just hung up with Bush's senior adviser, Karl Rove. The reporter quoted Rove as describing Wilson's wife as "fair game," Wilson said. Newsweek has identified that reporter as MSNBC television host Chris Matthews. Spokespeople said Matthews was unavailable for comment.

McClellan, the White House spokesman, has denied that Rove was involved in leaking classified material but has refused to discuss the possibility of a campaign to call attention to the revelations in Novak's column.

On July 17, the Time magazine Web site reported that "some government officials have noted to Time in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction." On July 22, Wilson appeared on NBC's "Today" show and said that disclosing the name of a U.S. intelligence officer would be "a breach of national security," could compromise that officer's entire network of contacts and could be a violation of federal law.

Wilson said that brought an immediate halt to the reports he had been getting of anonymous attacks on him by White House officials.

An administration source said, "One of the greatest mysteries in all this is what was really the rationale for doing it and doing it this way."

**LOAD-DATE:** October 12, 2003

  

# EXHIBIT F


Life Insurance
is one of the greatest gifts
you'll ever give your family

# TIME

### NATION POLITICS

Thursday, Jul. 17, 2003

## A War on Wilson?
### Inside the Bush Administration's feud with the diplomat who poured cold water on the Iraq-uranium connection

By MATTHEW COOPER, MASSIMO CALABRESI AND JOHN F. DICKERSON

Has the Bush Administration declared war on a former ambassador who conducted a fact-finding mission to probe possible Iraqi interest in African uranium? Perhaps.

Former Ambassador Joseph C. Wilson raised the Administration's ire with an op-ed piece in The New York Times on July 6 saying that the Administration had "twisted" intelligence to "exaggerate" the Iraqi threat. Since then Administration officials have taken public and private whacks at Wilson, charging that his 2002 report, made at the behest of U.S. intelligence, was faulty and that his mission was a scheme cooked up by mid-level operatives. George Tenet, the director of the Central Intelligence Agency, took a shot at Wilson last week as did ex-White House Press Secretary Ari Fleischer. Both contended that Wilson's report on an alleged Iraqi effort to purchase uranium from Niger, far from undermining the president's claim in his State of the Union address that Iraq sought uranium in Africa, as Wilson had said, actually strengthened it. And some government officials have noted to TIME in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction. These officials have suggested that she was involved in her husband's being dispatched Niger to investigate reports that Saddam Hussein's government had sought to purchase large quantities of uranium ore, sometimes referred to as yellow cake, which is used to build nuclear devices.

In an interview with TIME, Wilson, who served as an ambassador to Gabon and as a senior American diplomat in Baghdad under the current president's father, angrily said that his wife had nothing to do with his trip to Africa. "That is bulls__t. That is absolutely not the case," Wilson told TIME. "I met with between six and eight analysts and operators from CIA and elsewhere [before the Feb 2002 trip]. None of the people in that meeting did I know, and they took the decision to send me. This is a smear job."

Government officials are not only privately disputing the genesis of Wilson's trip, but publicly contesting what he found. Last week Bush Administration officials said that Wilson's report reinforced the president's claim that Iraq had sought uranium from Africa. They say that when Wilson returned from Africa in Feb. 2002, he included in his report to the CIA an encounter with a former Nigerien government official who told him that Iraq had approached him in June 1999, expressing interest in expanding commercial relations between Iraq and Niger. The Administration claims Wilson reported that the former Nigerien official interpreted the overture as an attempt to discuss uranium sales.

"This is in Wilson's report back to the CIA," White House Press Secretary Ari Fleischer told reporters last week, a few days before he left his post to join the private sector. "Wilson's own report, the very man who was on television saying Niger denies it...reports himself that officials in Niger said that Iraq was seeking to contact officials in Niger about sales."

Wilson tells the story differently and in a crucial respect. He says the official in question was contacted by an Algerian-Nigerien intermediary who inquired if the official would meet with an Iraqi about "commercial" sales — an offer he declined. Wilson dismisses CIA Director George Tenet's suggestion in his own mea culpa last week that the meeting validates the President's State of the Union claim: "That then translates into an Iraqi effort to import a significant quantity of uranium as the president alleged? These guys really need to get serious."

Government officials also chide Wilson for not delving into the details of the now infamous forged papers that pointed to a sale of uranium to Iraq. When Tenet issued his I-take-the-blame statement on the alleged Iraq-Niger uranium connection last week, he took a none-too-subtle jab at Wilson's report. "There was no mention in the report of forged documents — or any suggestion of the existence of documents at all," Tenet wrote. For his part Wilson says he did not deal with the forgeries explicitly in his report because he never saw them. However, Wilson says he refuted the forgeries' central allegation that Niger had been negotiating a sale of uranium to Iraq. Wilson says he explained in the report that several Nigerien government signatures would be required to permit such a sale — signatures that were either absent or clearly botched in the forged documents.

Administration officials also claim that Wilson took at face value the claims of Nigerien officials that they had not sold uranium ore to Saddam Hussein. (Such sales would have been forbidden under then-existing United Nations sanctions on Iraq.) "He spent eight days in Niger and he concluded that Niger denied the allegation." Fleischer told reporters last week. "Well, typically nations don't admit to going around nuclear nonproliferation,"

For his part, Wilson says that the Administration conflated the prior report of the American ambassador to Niger with his own. Wilson says a report by Barbro Owens-Kirkpatrick, the American ambassador to Niger, addresses the issue of Nigerien government officials disputing the allegation. Wilson says that he never made the naïve argument that if Nigerien officials denied

the sales, then their claims must be believed.

A source close to the matter says that Wilson was dispatched to Niger because Vice President Dick Cheney had questions about an intelligence report about Iraq seeking uranium and that he asked that the CIA get back to him with answers. Cheney's staff has adamantly denied and Tenet has reinforced the claim that the Vice President had anything to do with initiating the Wilson mission. They say the Vice President merely asked routine questions at an intelligence briefing and that mid-level CIA officials, on their own, chose to dispatch Wilson.

In an exclusive interview Lewis Libby, the Vice President's Chief of Staff, told TIME: "The Vice President heard about the possibility of Iraq trying to acquire uranium from Niger in February 2002. As part of his regular intelligence briefing, the Vice President asked a question about the implication of the report. During the course of a year, the Vice President asked many such questions and the agency responded within a day or two saying that they had reporting suggesting the possibility of such a transaction. But the agency noted that the reporting lacked detail. The agency pointed out that Iraq already had 500 tons of uranium, portions of which came from Niger, according to the International Atomic Energy Administration (IAEA). The Vice President was unaware of the trip by Ambassador Wilson and didn't know about it until this year when it became public in the last month or so. " Other senior Administration officials, including National Security Adviser Condoleezza Rice, have also claimed that they had not heard of Wilson's report until recently.

After he submitted his report in March 2002, Wilson says, his interest in the topic lay dormant until the State of the Union address in January 2003. In his speech, the President cited a British report claiming that Hussein's government had sought uranium in Africa. Afterward, Wilson says, he called a friend at the Africa bureau of the State Department and asked if the reference had been to Niger. The friend said that he didn't know but, says Wilson, allowed the possibility that Bush was referring to some other country on the continent. Wilson says he let the matter drop until he saw State Department spokesman Richard Boucher say a few months later that the U.S. had been fooled by bad intelligence. It was then that Wilson says he realized that his report had been overlooked, ignored, or buried. Wilson told TIME that he considers the matter settled now that the White House has admitted the Bush reference to Iraq and African uranium should not have been in the State of the Union address.

Copyright © 2006 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.

Privacy Policy