## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO APRIL 13, 2006 COURT ORDER TO SHOW CAUSE**

Theodore V. Wells, Jr.
James L. Brochin
Paul, Weiss, Rifkind, Wharton
   & Garrison LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Tel.:  (212) 373-3089
Fax:  (212) 492-0089

William H. Jeffress, Jr.
Alex J. Bourelly
Baker Botts LLP
1299 Pennsylvania Ave., NW
Washington, DC  20004
Tel.:  (202) 639-7751
Fax:  (202) 585-1087

Joseph A. Tate
Dechert LLP
2929 Arch Street
Cira Centre
Philadelphia, PA  19104
Tel:  (215) 994-2350
Fax: (215) 994-2222

John D. Cline
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700

April 21, 2006

On April 13, 2006, the Court issued an Order that the parties should show cause why the Court should not issue a special order pursuant to LCrR 57.7(c) to govern extrajudicial statements by the parties. We respectfully submit this response on behalf of the defense.

## INTRODUCTION

Counsel for Mr. Libby would like the Court to know that we take our ethical obligations seriously. We are mindful of our duties under LCrR 57.7(b)(1), which cautions lawyers not to disseminate information about a criminal case publicly that is likely to "interfere with a fair trial or otherwise prejudice the due administration of justice," and 57.7(b)(3), which bars extrajudicial comment on specific matters. We also understand our obligation to comply with the Court's caution concerning extrajudicial statements to the news media. Because we have endeavored to obey the local rules for criminal cases and the Court's instructions, and because we commit that we will continue to do so, we do not believe that a "gag order" pursuant to LCrR 57.7(c) is warranted. Further, we believe that entry of a gag order would embroil the Court and the parties in First Amendment litigation with news organizations that would distract us from the important issues in this litigation.

## ARGUMENT

A.    The Court's April 13 Order

Consistent with our desire to avoid trying this case in the media, since this case began defense counsel have turned down literally hundreds of requests for interviews from every major media organization in the United States. Every broadcast and cable news network has sought to book defense counsel as guests on television programs that range from hard news to talk shows – without any success. Similarly, dozens of print journalists from a broad array of newspapers and magazines, and even certain enterprising bloggers, have attempted to pry

1

information about the case loose from defense counsel. We have refused almost all of these invitations to comment about the case. On the rare occasions when defense counsel have disseminated information to the press, we believe that such communications have not run afoul of the local rules or our professional responsibilities to the Court.

Nevertheless, the Court's Order indicates that the Court is concerned about two particular types of actions: (1) "dissemination of material that has not been filed on the public docket" and (2) "public statements." We address both in turn below.

1.      Disclosure of the Government's April 11, 2006 Correction Letter

We speculate that the Court's Order may have been motivated in part by the release to the press of an April 11, 2006 letter from the government to the Court (the "Letter"), which corrected one sentence in the Government's Response to Defendant's Third Motion to Compel Discovery (the "Responsive Brief"). We released the Letter to the press in good faith, and we do not believe that such a disclosure breached either LCrR 57.7(b)(1) or the Court's instructions regarding contacts with the press. Below, we describe the factual background pertaining to the release of the Letter.

The government's Responsive Brief contained a section describing Mr. Libby's disclosures of portions of the 2002 National Intelligence Estimate ("NIE") to *New York Times* reporter Judith Miller and explaining the prosecution's view of the relevance of such disclosures to its case. That section included the following sentence: "Defendant understood that he was to tell Miller, among other things, *that a key judgment of the NIE held that Iraq was 'vigorously trying to procure' uranium*." (Responsive Brief at 23 (emphasis added).) This sentence materially misstated portions of Mr. Libby's grand jury testimony, which testimony had not previously been publicly disclosed.

The NIE opens with a section entitled "Key Judgments," which includes a summary of findings that reflect the consensus of the intelligence community. The statement that Iraq was "vigorously trying to procure" uranium from Africa was not included in that section of the NIE. In his testimony, Mr. Libby distinguished between the Key Judgments section of the NIE regarding Iraq's weapons of mass destruction ("WMD") capabilities, on the one hand, and a separate section of the NIE which stated that Iraq was "vigorously trying to procure" uranium, on the other hand. In short, contrary to news reports, Mr. Libby's testimony indicates that he did *not* describe the language about uranium as a Key Judgment of the NIE.

The government's inaccurate sentence led directly to highly prejudicial and inflammatory accusations in the news media that assailed the reputations of Mr. Libby, President Bush and Vice President Cheney. On April 9, a front-page story in the *Washington Post* inaccurately reported that "at [Vice President] Cheney's instruction, Libby testified, he told Miller that the uranium story was a 'key judgment' of the intelligence estimate . . . . In fact, the alleged effort to buy uranium was not among the estimate's key judgments . . ." (Barton Gellman and Dafna Linzer, *A 'Concerted Effort' to Discredit Bush Critic; Prosecutor Describes Cheney, Libby as Key Voices Pitching Iraq-Niger Story*, WASHINGTON POST, April 9, 2006, at A01, attached as Ex. A.)

An April 9 front page story in *The New York Times* included a similar account; it wrongly stated that Mr. Libby had "said he was authorized to portray as a 'key judgment' by intelligence officers [what] had in fact been given much less prominence" in the NIE. (David E. Sanger and David Barstow, *Iraq Findings Leaked by Aide Were Disputed*, THE NEW YORK TIMES, April 9, 2006, at A01, attached as Ex. B.) The article went on to assert that "if the new court filing is correct, . . . Mr. Libby, on behalf of Mr. Bush and Mr. Cheney, provided an

exaggerated account of the intelligence conclusions" about Iraq's alleged efforts to obtain uranium only one day after the White House spokesman had acknowledged that those conclusions were seriously flawed.  (*Id.*)  On April 10, the *Washington Post* printed a story that stated:  "Some of Libby's comments about the NIE that he made to reporter Judith Miller . . . were inaccurate."  (Walter Pincus, *Specter Says Bush, Cheney Should Explain Leak*, WASHINGTON POST, April 10, 2006, at A04, attached as Ex. C.)

        Subsequently, the story that Mr. Libby had inaccurately described a key judgment of the NIE to Ms. Miller began to spread through the media.  (*See, e.g.*, William Douglas, *Bush defends move to declassify*, THE PHILADELPHIA INQUIRER, April 11, 2006 at A01, attached as Ex. D (stating that the government's Responsive Brief "suggest[ed] that Libby mischaracterized the NIE"); *Ignoring its own paper and echoing GOP faithful, Wash. Post editorial furthered numerous CIA leak falsehoods*, www.MediaMatters.org, April 10, 2006, attached as Ex. E.) These specific allegations of wrongdoing came at a time when other media commentators and politicians were speculating that the President and/or the Vice President may have attempted to mislead the public about Iraq's WMD capabilities in 2003.  (*See, e.g.*, John Nichols, *Libby: Bush, Cheney Authorized Leaks*, www.TheNation.com, April 6, 2006, attached as Ex. F; Tr. MSNBC, "Hardball with Chris Matthews," April 6, 2006, attached as Ex. G.)  For example, Senator John Kerry said on television that if Mr. Libby had been authorized to disclose information from the NIE that the President knew was incomplete, this "certainly constitutes misleading the American people."  (Ex. G at 6.)

        Even though our client, along with the President and the Vice President, was being falsely accused of misleading the press about the contents of the NIE, defense counsel did not make a public statement to correct the public record on this point.  We did not respond to the

incendiary stories in the press partly out of concern that any such response might involve extrajudicial disclosures of grand jury information.

On Tuesday, April 11, the defense received the Letter from the government as an attachment to an e-mail message bearing a 5:17 p.m. time stamp. The Letter stated that the sentence that had sparked the untrue reports in the press should be replaced with one that read, "Defendant understood that he was to tell Miller, among other things, some of the key judgments of the NIE, and that the NIE stated that Iraq was 'vigorously trying to procure' uranium." This seemingly minor change was critical. It clarified that Mr. Libby's grand jury testimony did not suggest that he had mischaracterized the key judgments of the NIE to Ms. Miller, and eviscerated the basis for press reports that asserted that Mr. Libby had lied to her.

When we received the Letter, we assumed that the government wanted to correct the public record. We thought the government was motivated to file the Letter because the government had realized that the erroneous sentence in its brief was responsible for spawning false news reports and wholly unjustified conjecture about possible misdeeds by Mr. Libby and his superiors. Nothing about the Letter indicated that it was not to be disclosed publicly. It was not designated as confidential under the Protective Order in this case, and it did not contain any classified information.

When we received the Letter, we simply assumed that it was a public filing that was intended to be entered in the public docket, because we believed its sole purpose was to correct inaccurate statements in a publicly filed brief. Accordingly, we swiftly disseminated it to the media – without any public statements by defense counsel – for the purpose of preventing the publication of any additional incorrect reports that Mr. Libby, the President and/or the Vice President had lied to the press and the public. We sent the Letter to print, broadcast and

electronic media outlets on Tuesday evening. The Letter was entered electronically on the public docket at 12:22 p.m. on Wednesday, April 12.

We believe that our disclosure of the Letter was both appropriate and consistent with the government's purpose for the Letter. We never considered, then or now, that it was the government's intent secretly to correct a publicly filed brief that had led to a torrent of false and highly publicized news stories involving the President and Vice President as well as Mr. Libby.

In sum, the circumstances demonstrate that defense counsel did not disclose the Letter to the media to try to gain a tactical advantage or for any other improper purpose. Defense counsel had no intent to violate the local rule on extrajudicial statements or the Court's instructions. In the future, if there is any confusion about whether a document submitted to the Court is public for purposes of dissemination to the press, we will consult with the government and the Court for clarification and guidance.

2.    Public Statements by Defense Counsel

The government's Responsive Brief (which was filed on April 5) addressed at some length Mr. Libby's contention that the identity and occupation of former Ambassador Wilson's wife was a relatively peripheral fact to him in June and July 2003. The government, however, mischaracterized the issue as whether "the controversy about *Mr. Wilson and/or* his wife was a trifle." (Gov't Br. at 20 (emphasis added).) The government then argued that events having nothing to do with Mr. Wilson's wife – such as the President's decision to declassify portions of the NIE – showed how important her identity was to the White House and Mr. Libby.

On April 7, Mr. Libby's co-counsel William Jeffress received a voice mail from a *Washington Post* reporter who, as conscientious reporters often do, indicated that he was working on a story about Mr. Libby's case, and that he wanted to give Mr. Libby's counsel an

opportunity to respond. Specifically, the reporter said that he was planning to write about how the government's revelations undermined Mr. Libby's contention that former Ambassador Wilson was unimportant. It appeared to Mr. Jeffress that the reporter's misunderstanding of Mr. Libby's contention was based on a reading of the government's Responsive Brief rather than Mr. Libby's motion,[1] and he decided to return the reporter's call and attempt to avoid publication of an erroneous and prejudicial story in the jurisdiction from which trial jurors will be chosen.

In a brief conversation, Mr. Jeffress informed the reporter that Mr. Libby's motion contended that the subject of Mr. Wilson's wife was unimportant, not that the subject of Mr. Wilson's allegations was unimportant, and observed that the revelations in the government's brief about the NIE had nothing at all to do with Mr. Wilson's wife. The article published the next day in the Post, under the unfortunate subheading "Libby's Lawyer Rebuts Special Prosecutor's Filing," fails to mention that Mr. Jeffress referred the reporter to Mr. Libby's motion, but is otherwise a fair characterization of what he said in the conversation.[2] Mr. Jeffress' statement to the press on this issue was in no way intended to gain a tactical advantage, and was not meant to interfere with a fair trial or otherwise prejudice the due administration of justice. It was to correct a reporter's misunderstanding of publicly filed arguments that threatened to lead to an inaccurate story that would have been unfairly prejudicial to Mr. Libby.

---

[1] Mr. Libby's Third Motion to Compel Discovery Under Rule 16 and Brady, at page 27, stated in part as follows: "But in reality, Ms. Wilson was not important. The falsity of statements made by and attributed to Mr. Wilson about his trip to Niger was important, and to the extent Mr. Libby devoted attention to the matter during June and July 2003, he was focused on correcting the public record, not on Mr. Wilson's wife."

[2] According to the *Washington Post*, "Jeffress said Fitzgerald's revelation about Libby's disclosure of information from [the NIE] 'is a complete sidelight' to his accusation that Libby deliberately lied. 'It's got nothing to do with Wilson's wife,' Jeffress said in a brief interview, adding that Libby continues to expect to be exonerated at trial." (R. Jeffrey Smith and Jim VandeHei, *Disclosures Are Called Unrelated To Plame Case*, WASHINGTON POST, April 8, 2006, at A01, attached as Ex. H.)

B.    Communications Between Counsel and the Press About Public Information Serve
       Important First and Sixth Amendment Values

Finally, we address important issues of fairness and First and Sixth Amendment values that, we submit, caution against entry of a "gag order" in this case.

This case has unquestionably generated a tremendous amount of publicity.  But the media has not reported exclusively on the crime charged.  Instead, journalists and commentators have focused on, among other subjects:  (1) intelligence failures prior to the war in Iraq; (2) speculation that the White House "leaked" classified information; (3) allegations of a campaign at the highest levels of government to punish a war critic by revealing his wife's employment at the CIA; and (4) the news media's own role in the events and the investigation giving rise to the charges against Mr. Libby.  Responsible public debate regarding such issues of national interest is important, and the national interest is best served by enabling journalists to report and analyze accurate information.

The intense coverage of these issues in recent months, often involving front page headlines in newspapers and lead stories on news broadcasts, has been triggered almost entirely by motions and memoranda filed in the public record in this case, not by extrajudicial statements by the parties.  But the facts are so complex, the issues so varied, and the charges so widely misunderstood, that even well-intentioned reporters occasionally get it badly wrong.[3]  More often, reporters are genuinely puzzled by what is said in the filed papers and desire, before filing

---

[3]    For example, CNN initially broadcast that the government's Responsive Brief "said the President gave [Mr. Libby] permission to leak the name of CIA operative Valerie Plame to reporters," and later made a correction.  (Tr. CNN, "Your World Today," April 6, 2006 at 6, attached as Ex. I.)  As another example, an MSNBC correspondent reported the same day, based on misreading the government's filing, that Mr. Libby testified to the grand jury that the Vice President told him to give information to reporters about the nature of Wilson's trip "and by the way, it's ok to give information about his wife."  (Tr. MSNBC News Live, April 6, 2006, attached as Ex. J.)

their stories, clarification from the lawyers so that their reports will be accurate. These problems are compounded because reporters frequently have just a few hours to review complicated filings and write stories analyzing them.

      As described above, defense counsel are flooded with inquiries from reporters, and, in almost all of these situations, we do not respond to such inquiries. However, on certain occasions, when reporters have asked us for assistance in finding or understanding information in the public record, we have felt it proper and appropriate to provide such assistance. Our practice is never intentionally to release non-public information, never to comment on a ruling by the Court, and never to make statements that could fairly be regarded as a violation of Rule 57.7.

      We respectfully submit that neither defense counsel nor attorneys from the Office of Special Counsel should be wholly forbidden from responding to press inquiries in a manner that would facilitate accurate reporting on information in the public record. Indeed, to do so would raise serious concerns under the First Amendment's protections of the newsgathering function, and – where inaccurate press reports threaten the defendant's right to a fair trial – under the Sixth Amendment as well.

<u>CONCLUSION</u>

For the reasons stated herein, we respectfully submit that this Court should not issue a special order governing extrajudicial statements by the parties pursuant to LCrR 57.7(c).

April 21, 2006                                    Respectfully submitted,


/s/ Theodore V. Wells, Jr.                       /s/ William H. Jeffress, Jr.
Theodore V. Wells, Jr.                           William H. Jeffress, Jr.
(DC Bar No. 468934)                              (DC Bar No. 041152)
James L. Brochin                                 Alex J. Bourelly
(DC Bar No. 455456)                              (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                    Baker Botts LLP
  & Garrison LLP                                 1299 Pennsylvania Ave., NW
1285 Avenue of the Americas                      Washington, DC  20004
New York, NY  10019-6064                         Tel.:  (202) 639-7751
Tel.:  (212) 373-3089                            Fax:  (202) 585-1087
Fax:  (212) 492-0089


/s/ Joseph A. Tate                               /s/ John D. Cline
Joseph A. Tate                                   John D. Cline
Dechert LLP                                      (D.C. Bar No. 403824)
2929 Arch Street                                 Jones Day
Cira Centre                                      555 California Street, 26th Floor
Philadelphia, PA  19104                          San Francisco, CA  94104
Tel:  (215) 994-2350                             Tel:  (415) 626-3939
Fax: (215) 994-2222                              Fax: (415) 875-5700