# EXHIBIT A

1 of 1 DOCUMENT

Copyright 2006 The **Washington Post**
The **Washington Post**

**April 9,** 2006 Sunday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 1721 words

**HEADLINE:** A **'Concerted Effort'** to Discredit **Bush** Critic;
Prosecutor Describes Cheney, Libby as Key Voices Pitching Iraq-Niger Story

**BYLINE:** Barton Gellman and Dafna Linzer, Washington Post Staff Writers

**BODY:**

As he drew back the curtain this week on the evidence against Vice President Cheney's former top aide, Special Counsel Patrick J. Fitzgerald for the first time described a "concerted action" by "multiple people in the White House" -- using classified information -- to "discredit, punish or seek revenge against" a critic of President Bush's war in Iraq.

Bluntly and repeatedly, Fitzgerald placed Cheney at the center of that campaign. Citing grand jury testimony from the vice president's former chief of staff, I. Lewis "Scooter" Libby, Fitzgerald fingered Cheney as the first to voice a line of attack that at least three White House officials would soon deploy against former ambassador Joseph C. Wilson IV.

Cheney, in a conversation with Libby in early July 2003, was said to describe Wilson's CIA-sponsored trip to Niger the previous year -- in which the envoy found no support for charges that Iraq tried to buy uranium there -- as "a junket set up by Mr. Wilson's wife," CIA case officer Valerie Plame.

Libby is charged with perjury and obstruction of justice for denying under oath that he disclosed Plame's CIA employment to journalists. There is no public evidence to suggest Libby made any such disclosure with Cheney's knowledge. But according to Libby's grand jury testimony, described for the first time in legal papers filed this week, Cheney "specifically directed" Libby in late June or early July 2003 to pass information to reporters from two classified CIA documents: an October 2002 National Intelligence Estimate and a March 2002 summary of Wilson's visit to Niger.

One striking feature of that decision -- unremarked until now, in part because Fitzgerald did not mention it -- is that the evidence Cheney and Libby selected to share with reporters had been disproved months before.

United Nations inspectors had exposed the main evidence for the uranium charge as crude forgeries in March 2003, but the Bush administration and British Prime Minister Tony Blair maintained they had additional, secret evidence they could not disclose. In June, a British parliamentary inquiry concluded otherwise, delivering a scathing critique of Blair's role in promoting the story. With no ally left, the White House debated whether to abandon the uranium claim and became embroiled in bitter finger-pointing about whom to fault for the error. A legal brief filed for Libby last month said that "certain officials at the CIA, the White House, and the State Department each sought to avoid or assign blame for intelligence failures relating to Iraq's weapons of mass destruction."

It was at that moment that Libby, allegedly at Cheney's direction, sought out at least three reporters to bolster the discredited uranium allegation. Libby made careful selections of language from the 2002 estimate, quoting a passage that said Iraq was "vigorously trying to procure uranium" in Africa.

The first of those conversations, according to the evidence made known thus far, came when Libby met with Bob Woodward, an assistant managing editor of The Washington Post, on June 27, 2003. In sworn testimony for Fitzgerald, according to a statement Woodward released on Nov. 14, 2005, Woodward said Libby told him of the intelligence esti-

A 'Concerted Effort' to Discredit Bush Critic; Prosecutor Desc

mate's description of Iraqi efforts to obtain "yellowcake," a processed form of natural uranium ore, in Africa. In an interview Friday, Woodward said his notes showed that Libby described those efforts as "vigorous."

Libby's next known meeting with a reporter, according to Fitzgerald's legal filing, was with Judith Miller, then of the New York Times, on July 8, 2003. He spoke again to Miller, and to Time magazine's Matt Cooper, on July 12.

At Cheney's instruction, Libby testified, he told Miller that the uranium story was a "key judgment" of the intelligence estimate, a term of art indicating there was consensus on a question of central importance.

In fact, the alleged effort to buy uranium was not among the estimate's key judgments, which were identified by a headline and bold type and set out in bullet form in the first five pages of the 96-page document.

Unknown to the reporters, the uranium claim lay deeper inside the estimate, where it said a fresh supply of uranium ore would "shorten the time Baghdad needs to produce nuclear weapons." But it also said U.S. intelligence did not know the status of Iraq's procurement efforts, "cannot confirm" any success and had "inconclusive" evidence about Iraq's domestic uranium operations.

Iraq's alleged uranium shopping had been strongly disputed in the intelligence community from the start. In a closed Senate hearing in late September 2002, shortly before the October NIE was completed, then-director of central intelligence George J. Tenet and his top weapons analyst, Robert Walpole, expressed strong doubts about the uranium story, which had recently been unveiled publicly by the British government. The State Department's Bureau of Intelligence and Research, likewise, called the claim "highly dubious." For those reasons, the uranium story was relegated to a brief inside passage in the October estimate.

But the White House Iraq Group, formed in August 2002 to foster "public education" about Iraq's "grave and gathering danger" to the United States, repeatedly pitched the uranium story. The alleged procurement was a minor issue for most U.S. analysts -- the hard part for Iraq would be enriching uranium, not obtaining the ore, and Niger's controlled market made it an unlikely seller -- but the Niger story proved irresistible to speechwriters. Most nuclear arguments were highly technical, but the public could easily grasp the link between uranium and a bomb.

Tenet interceded to keep the claim out of a speech Bush gave in Cincinnati on Oct. 7, 2002, but by Dec. 19 it reappeared in a State Department "fact sheet." After that, the Pentagon asked for an authoritative judgment from the National Intelligence Council, the senior coordinating body for the 15 agencies that then constituted the U.S. intelligence community. Did Iraq and Niger discuss a uranium sale, or not? If they had, the Pentagon would need to reconsider its ties with Niger.

The council's reply, drafted in a January 2003 memo by the national intelligence officer for Africa, was unequivocal: The Niger story was baseless and should be laid to rest. Four U.S. officials with firsthand knowledge said in interviews that the memo, which has not been reported before, arrived at the White House as Bush and his highest-ranking advisers made the uranium story a centerpiece of their case for the rapidly approaching war against Iraq.

Bush put his prestige behind the uranium story in his Jan. 28, 2003, State of the Union address. Less than two months later, the International Atomic Energy Agency exposed the principal U.S. evidence as bogus. A Bush-appointed commission later concluded that the evidence, a set of contracts and correspondence sold by an Italian informant, was "transparently forged."

On the ground in Iraq, meanwhile, the hunt for weapons of mass destruction was producing no results, and as the bad news converged on the White House -- weeks after a banner behind Bush declared "Mission Accomplished" on the deck of the USS Abraham Lincoln -- Wilson emerged as a key critic. He focused his ire on Cheney, who had made the administration's earliest and strongest claims about Iraq's alleged nuclear program.

Fitzgerald wrote that Cheney and his aides saw Wilson as a threat to "the credibility of the Vice President (and the President) on a matter of signal importance: the rationale for the war in Iraq." They decided to respond by implying that Wilson got his CIA assignment by "nepotism."

They were not alone. Fitzgerald reported for the first time this week that "multiple officials in the White House" -- not only Libby and White House Deputy Chief of Staff Karl Rove, who have previously been identified -- discussed Plame's CIA employment with reporters before and after publication of her name on July 14, 2003, in a column by Robert D. Novak. Fitzgerald said the grand jury has collected so much testimony and so many documents that "it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' Wilson."

A 'Concerted Effort' to Discredit Bush Critic; Prosecutor Desc

At the same time, top officials such as then-deputy national security adviser Stephen J. Hadley were pressing the CIA to declassify more documents in hopes of defending the president's use of the uranium claim in his State of the Union speech. It was a losing battle. A "senior Bush administration official," speaking on the condition of anonymity as the president departed for Africa on July 7, 2003, told The Post that "the reference to Iraq's attempt to acquire uranium from Africa should not have been included in the State of the Union speech." The comment appeared on the front page of the July 8 paper, the same morning that Libby met Miller at the St. Regis hotel.

Libby was still defending the uranium claim as the administration's internal battle burst into the open. White House officials tried to blame Tenet for the debacle, but Tenet made public his intervention to keep uranium out of Bush's speech a few months earlier. Hadley then acknowledged that he had known of Tenet's objections but forgot them as the State of the Union approached.

Hoping to lay the controversy to rest, Hadley claimed responsibility for the Niger remarks.

In a speech two days later, at the American Enterprise Institute, Cheney defended the war by saying that no responsible leader could ignore the evidence in the NIE. Before a roomful of conservative policymakers, Cheney listed four of the "key judgments" on Iraq's alleged weapons capabilities but made no mention of Niger or uranium.

On July 30, 2003, two senior intelligence officials said in an interview that Niger was never an important part of the CIA's analysis, and that the language of Iraq's vigorous pursuit of uranium came verbatim from a Defense Intelligence Agency report that had caught the vice president's attention. The same day, the CIA referred the Plame leak to the Justice Department for criminal prosecution, the fateful step that would eventually lead to Libby's indictment.

Researcher Julie Tate contributed to this report.

**LOAD-DATE:** April 9, 2006

# EXHIBIT B

1 of 1 DOCUMENT

Copyright 2006 The New York Times Company
The New York Times

April 9, 2006 Sunday
Correction Appended
Late Edition - Final

**SECTION:** Section 1; Column 5; National Desk; Pg. 1

**LENGTH:** 1805 words

**HEADLINE:** Iraq Findings Leaked by Aide Were Disputed

**BYLINE:** By DAVID E. SANGER and DAVID BARSTOW

**DATELINE:** WASHINGTON, April 8

**BODY:**

President Bush's apparent order authorizing a senior White House official to reveal to a reporter previously classified intelligence about Saddam Hussein's efforts to obtain uranium came as the information was already being discredited by several other officials in the administration, interviews and documents from the time show.

A review of the records and interviews conducted during and after the crucial period in June and July of 2003 also show that what the aide, I. Lewis Libby Jr., said he was authorized to portray as a "key judgment" by intelligence officers had in fact been given much less prominence in the most important assessment of Iraq's weapons capability.

Mr. Libby said he drew on that report, the October 2002 National Intelligence Estimate on Iraq, when he spoke with the reporter. However, the conclusions about Mr. Hussein's search for uranium appear to have been buried deeper in the report in part because of doubts about their reliability.

The new account of the interactions among Mr. Bush, Mr. Cheney and Mr. Libby was spelled out last week in a court filing by Patrick J. Fitzgerald, the special prosecutor in the C.I.A. leak case. It adds considerably to a picture of an administration in some disarray as the failure to discover illicit weapons in Iraq had undermined the central rationale for the American invasion in March 2003.

Against the backdrop of what has previously been disclosed, the court filing sheds particular light on how Mr. Bush and some of his top deputies had begun to pull in different directions. Even as some officials, including Colin L. Powell, then secretary of state, started to reveal deep doubts that Mr. Hussein had sought uranium to reconstitute his nuclear program, Mr. Bush, Mr. Cheney and Mr. Libby were seeking to disseminate information suggesting that they had acted on credible intelligence, while not discussing their actions with other top aides.

Mr. Fitzgerald, in his filing, said that Mr. Libby had been authorized to tell Judith Miller, then a reporter for The New York Times, on July 8, 2003, that a key finding of the 2002 intelligence estimate on Iraq was that Baghdad had been vigorously seeking to acquire uranium from Africa.

But a week earlier, in an interview in his State Department office, Mr. Powell told three other reporters for The Times that intelligence agencies had essentially rejected that contention, and were "no longer carrying it as a credible item" by early 2003, when he was preparing to make the case against Iraq at the United Nations.

Mr. Powell's queasiness with some of the intelligence has been well known, but the new revelations suggest that long after he had concluded the intelligence was faulty, Mr. Bush, Mr. Cheney and Mr. Libby were still promoting it.

Iraq Findings Leaked by Aide Were Disputed  The New York Times April 9,

Much remains unknown about that period. In his filing, Mr. Fitzgerald recounted a prosecutor's summary of Mr. Libby's testimony to the grand jury. Mr. Libby was, in turn, describing conversations with Mr. Cheney that included the vice president's description of discussions he had with Mr. Bush. The White House is not commenting on the issue, saying it is still pending in court, but it has not disputed any of the assertions in the court filing. Mr. Libby has also not disputed the assertions.

The events took place at a time when the administration's failure to find illicit weapons in Iraq had raised serious questions about the credibility of prewar intelligence. The White House was finding itself under fire from critics, like former ambassador Joseph C. Wilson IV, who were suggesting that the administration's claims about Iraq's efforts to acquire uranium, featured in Mr. Bush's State of the Union address in 2003, had been exaggerated.

The court filing asserts that Mr. Bush authorized the disclosure of the intelligence in part to rebut claims that Mr. Wilson was making, including those in a television appearance and in an Op-Ed article in The New York Times on July 6, 2003. The filing revealed for the first time testimony by Mr. Libby saying that Mr. Bush, through Mr. Cheney, had authorized Mr. Libby to tell reporters that "a key judgment of the N.I.E. held that Iraq was 'vigorously trying to procure' uranium."

In fact, that was not one of the "key judgments" of the document. Instead, it was the subject of several paragraphs on Page 24 of the document, which also acknowledged that Mr. Hussein had long possessed 500 tons of uranium that was under seal by international inspectors, and that no intelligence agencies had ever confirmed whether he had obtained any more of the material from Africa.

A report by the British in 2004, however, concluded that there was a reasonable basis to conclude that Mr. Hussein had sought to obtain uranium from Africa. Once enriched, uranium can be used for weapons fuel.

In addition to Mr. Powell, other administration officials, speaking on a not-for-attribution basis in early July 2003, were also acknowledging that the intelligence was widely known as seriously flawed. Ari Fleischer, then the White House spokesman, acknowledged as much publicly in a White House briefing on July 7, 2003.

But if the new court filing is correct, the next day, Mr. Libby, on behalf of Mr. Bush and Mr. Cheney, provided an exaggerated account of the intelligence conclusions.

The court filing by Mr. Fitzgerald does not assert exactly when the conversation between Mr. Bush and Mr. Cheney took place, or exactly when Mr. Cheney communicated its contents to Mr. Libby, except that it was before July 8, 2003. The context of Mr. Fitzgerald's assertions makes clear, however, that the conversation took place in late June or early July 2003.

Mr. Libby also described the intelligence estimate to Bob Woodward of The Washington Post earlier, on June 27, 2003.

Mr. Fitzgerald's latest filing also describes the degree to which senior White House officials kept information from one another. Even as the president was dispatching Mr. Libby to disclose what until then had been classified intelligence to Ms. Miller of The Times, other White House officials, including Stephen J. Hadley, now Mr. Bush's national security adviser, were debating whether this same information should be formally declassified and made public, prosecutors assert.

But Mr. Libby "consciously decided not to make Mr. Hadley aware of the fact that defendant himself had already been disseminating the N.I.E. by leaking it to reporters while Mr. Hadley sought to get it formally declassified," Mr. Fitzgerald's motion states. Mr. Hadley's spokesman declined to comment on the filing on Friday.

But a senior official close to Mr. Hadley said that "it appears that the only three people who knew about the instant declassification were Dick Cheney, George Bush and Scooter Libby." The official refused to be named because he was not authorized to discuss the issue.

Why those three men were acting so quietly remains a mystery, and Mr. Bush and Mr. Cheney have never discussed it in public. Aides to Mr. Bush and Mr. Cheney were beginning to suggest at the time that any exaggerations about Iraq's weapons program had been the fault of the C.I.A., not the White House.

Mr. Fitzgerald argued in his filing to the court last week that by July 8, Mr. Libby was trying to rebut the Op-Ed article in The Times, published by Mr. Wilson. Mr. Wilson reported in that article that he had been sent to Niger by the

Iraq Findings Leaked by Aide Were Disputed  The New York Times April 9,

C.I.A. to search for evidence of the transaction, and reported back that there was insufficient evidence that any serious effort had taken place.

"The evidence will show that the July 6, 2003, Op-Ed by Mr. Wilson was viewed in the Office of the Vice President as a direct attack on the credibility of the vice president (and the president) on a matter of signal importance: the rationale for the war in Iraq," Mr. Fitzgerald argued.

But in interviews, other former and current senior officials have offered alternative explanations.

"Remember, this was taking place in the middle of the White House-C.I.A. war," one former White House official who witnessed the events said this week, refusing to be named because he was not authorized to discuss the subject.

As the controversy arose early that summer over why Mr. Bush had included mention of Iraqi uranium in his 2003 State of the Union address, the official recalled, White House officials were convinced that the C.I.A. was placing the blame on the president, suggesting he had politicized the intelligence.

By releasing Mr. Libby to discuss the conclusion in the National Intelligence Estimate, the official said, "they were dumping this back in Langley's lap," making it clear that Mr. Bush had relied on information provided by the intelligence agencies. The C.I.A. headquarters are in Langley, Va.

Later that week, George J. Tenet, then the C.I.A. director, took responsibility for the error, saying he had never read over the draft of the State of the Union address that had been sent to him.

According to Mr. Fitzgerald's motion, Mr. Libby testified that he was directed by Mr. Cheney and Mr. Bush to describe the uranium allegations to Ms. Miller of The Times as a "key judgment" of the National Intelligence Estimate. Citing intelligence as a "key judgment" in such estimates carries great weight with policy makers, because the reports are meant to highlight the most important and solid judgments of the government's intelligence agencies.

"Defendant understood that he was to tell Miller, among other things, that a key judgment of the N.I.E. held that Iraq was 'vigorously trying to procure' uranium," prosecutors wrote.

In fact, the estimate's key judgments, which were officially declassified 10 days after Mr. Libby's meeting with Ms. Miller, say nothing about the uranium allegations. The key judgments on Iraq's nuclear program -- namely, that Iraq was again trying to build a bomb -- were based instead on other intelligence, like the assertion that Iraq was seeking high-strength aluminum tubes for nuclear centrifuges. Ms. Miller authored no newspaper article about the leaked weapons information.

In an interview with The Times in 2004, a senior intelligence official involved in drafting the estimate said the uranium allegations were excluded from the key judgments because the drafters knew there were serious doubts about their accuracy.

As a result, the official said, the drafters cast the uranium allegations as a minor element in the overall assessment of Iraq's nuclear capabilities. The assertion that Iraq was "vigorously trying to procure" uranium was mentioned on the bottom of Page 24 of the 90-page document. The drafters also noted, in an annex attached to the end of the document, that State Department intelligence officials considered the uranium allegation "highly dubious."

**URL:** http://www.nytimes.com

**CORRECTION-DATE:** April 13, 2006

**CORRECTION:**

A front-page article in some copies on Sunday reported that a top aide to Vice President Dick Cheney said he had been authorized to disclose to a reporter that one of the key judgments in a 2002 National Intelligence Estimate was that Iraq was "vigorously trying to procure uranium." The assertion about the aide, I. Lewis Libby Jr., was based on a court filing last Wednesday by Patrick J. Fitzgerald, the special prosecutor overseeing the indictment of Mr. Libby in the C.I.A. leak case.

Yesterday, Mr. Fitzgerald filed a letter with the court correcting his original filing to say Mr. Libby had been authorized to disclose "some of the key judgments of the N.I.E., and that the N.I.E. stated that Iraq was vigorously trying

Iraq Findings Leaked by Aide Were Disputed  The New York Times April 9,

to procure uranium." This revised account of his filing undercut a basis of the Times article -- that Mr. Libby testified that he had been told to overstate the significance of the intelligence about uranium.

Although Mr. Fitzgerald formally filed his corrective yesterday, accounts of it were provided to some news organizations on Tuesday night, and were the basis for news articles yesterday. The Times did not publish one, as other organizations did, because a telephone message and an e-mail message about the court filing went unnoticed at the newspaper. An article on the filing appears today, on Page A17.

**LOAD-DATE:** April 9, 2006

# EXHIBIT C

FOCUS - 1 of 1 DOCUMENT

Copyright 2006 The **Washington Post**
The **Washington Post**

**April 10,** 2006 Monday
Final Edition

**SECTION:** A Section; A04

**LENGTH:** 664 words

**HEADLINE:** Specter Says Bush, Cheney Should Explain Leak

**BYLINE:** Walter **Pincus,** Washington Post Staff Writer

**BODY:**

President Bush and Vice President Cheney need to explain what classified information was authorized to be leaked to reporters in July 2003 and why, the Republican chairman of the Senate Judiciary Committee said yesterday.

"I think that there has to be a detailed explanation precisely as to what Vice President Cheney did, what the president said to him, and an explanation from the president as to what he said so that it can be evaluated," Sen. Arlen Specter (Pa.) said. He was referring to last week's revelation in a court document that Cheney's former chief of staff, I. Lewis "Scooter" Libby, testified that Cheney told him Bush approved leaking parts of a classified document about intelligence estimates of Iraq's weapons of mass destruction.

Specter said on "Fox News Sunday" that he had heard yesterday morning about a report, first published by the Associated Press, that a lawyer close to the case said Bush "didn't tell the vice president specifically what to do, but just said get it out."

Bush approved providing information from the then-classified October 2002 National Intelligence Estimate (NIE) on Iraq's nuclear, chemical and biological weapons, Special Counsel Patrick J. Fitzgerald said in a memorandum filed in federal court Wednesday. The prosecutor cited Libby's testimony to a grand jury investigating the leak of a CIA operative's name.

There has been no confirmation of Bush's role, nor of what exactly Libby was authorized to disclose from the 90-page NIE. Fitzgerald's memo, which provided new information on several aspects of the CIA leak case, came as a result of a request by Libby's lawyers for a range of classified documents to defend their client against charges of obstruction of justice, perjury and making false statements to the FBI.

Libby, according to the memo, told the grand jury that Cheney "specifically had authorized" him to disclose "certain information" from the classified NIE.

Libby also testified that he was "directed" by the vice president to speak to reporters about the NIE and to provide information from a "cable authored by [retired ambassador Joseph C.] Wilson." The latter apparently referred to a classified March 2002 CIA summary of Wilson's report on his trip to Niger in February 2002 to find out whether Iraq was trying to buy uranium.

Some of Libby's comments about the NIE that he made to reporter Judith Miller, then of the New York Times, on July 8, 2003, were inaccurate. Libby said one "key judgment of the NIE held that Iraq was 'vigorously trying to procure' uranium." That was not an NIE key judgment, and the CIA officials who wrote the document disputed that statement.

Libby also inaccurately described the CIA report on Wilson's trip, saying the former ambassador reported information about an Iraqi delegation visiting Niger in 1999 that was "understood to be a reference to a desire to obtain uranium." In fact, Wilson said he was told that a Niger official was contacted at a meeting outside the country by a busi-

Specter Says Bush, Cheney Should Explain Leak The Washington Post April

nessman who said an Iraqi economic delegation wanted to meet with him. The Niger official guessed that the Iraqis might want to talk about uranium because Iraq had purchased uranium from Niger in the mid-1980s. But when they met, no talk of uranium took place.

Sen. John F. Kerry (D-Mass.) said that although Bush has the right to declassify information, it was wrong to do it for political purposes. "This was a declassification in order to mislead America . . . and in order to buttress their phony argument about the war," Kerry said on NBC's "Meet the Press."

Appearing on CNN's "Late Edition," Sen. Jon Kyl (R-Ariz.) said Bush was correct in declassifying the information because the administration believed that Wilson, in his statements in July 2003, had "gone public with half of the story." Kyl, who believes Britain had intelligence about Iraq seeking uranium from Niger that the United States could not confirm, said the administration had mishandled the matter.

**LOAD-DATE:** April 10, 2006

# EXHIBIT D

FOCUS - 1 of 21 DOCUMENTS

Copyright 2006 The **Philadelphia Inquirer**
All Rights Reserved
The **Philadelphia Inquirer**

**April** 11, 2006 Tuesday

**SECTION:** NATIONAL; Pg. A01

**LENGTH:** 735 words

**HEADLINE: Bush** defends move to declassify;
To fight critics on Iraq, he said, he released parts of a report. It was flawed.

**BYLINE:** William Douglas, Inquirer Washington Bureau

**BODY:**

President **Bush** acknowledged yesterday that he had authorized the selective declassification of parts of a highly classified intelligence report in an effort to rebut critics who said the White House had manipulated intelligence to justify going to war against Iraq.

"I wanted people to see the truth and thought it made sense for people to see the truth," he said. "And that's why I declassified the document."

**Bush's** comments were his first public response to statements made in a court filing last week by special prosecutor Patrick Fitzgerald. In it, Fitzgerald wrote that I. Lewis "Scooter" Libby, Vice President Cheney's former chief of staff, had told a grand jury that **Bush** had authorized Libby, through Cheney, to disclose selected portions of a classified National Intelligence Estimate (NIE) to a New York Times reporter.

**Bush** did not say yesterday whether he had intended that the declassified information be shared with a reporter. But he said he thought that the information - much of which turned out to be flawed - needed to get out in public to battle critics who were suggesting that the White House had manipulated intelligence about Saddam Hussein's weapons programs to help make its case for war.

"After we liberated Iraq, there was questions in people's minds about the basis on which I made statements, in other words, going into Iraq," **Bush** told students at Johns Hopkins' Paul H. Nitze School of Advanced International Studies. "And so I decided to declassify the NIE for a reason... . I thought it was important for people to get a better sense for why I was saying what I was saying in my speeches."

**Bush** said he felt he could declassify the information "without jeopardizing ongoing intelligence matters."

**Bush** authorized the release shortly after former Ambassador Joseph Wilson, in a New York Times op-ed piece published July 6, 2003, contended that the administration's assertions that Hussein had been trying to obtain uranium from Niger was false.

Fitzgerald, in the court filing, said Libby told a grand jury that he had a conversation with then-Times reporter Judith Miller on July 8, 2003, "only after the vice president advised the defendant that the president specifically had authorized defendant to disclose certain information in the NIE."

Libby's conversation with Miller came under scrutiny during Fitzgerald's investigation into who leaked the undercover CIA identity of Wilson's wife, Valerie Plame Wilson, after her name appeared in a July 14, 2003, syndicated column by Robert Novak.

No one has been charged with leaking her name. Libby is charged with five counts of perjury, obstruction of justice and lying to the FBI about the case. If convicted, he could face up to 30 years in prison and a $1.25 million fine.

Bush defends move to declassify; To fight critics on Iraq, he said, he r

The latest disclosure has raised new questions about the administration's candor regarding what it knew about Hussein's weapons programs.

By the time Libby disclosed portions of the NIE, the Niger allegation had already been largely discredited. Much of the other classified information that administration officials revealed about Iraq turned out to be exaggerated or disputed.

The court papers also suggest that Libby mischaracterized the NIE. The filing said he "understood that he was to tell Miller, among other things, that a key judgment of the NIE held that Iraq was 'vigorously trying to procure' uranium."

But the key judgments of the NIE, which were released publicly days after Libby briefed Miller, made no reference to the uranium allegation, which the State Department disputed in the body of the estimate.

**Bush** yesterday did not directly address a question about the contention in Fitzgerald's filing that some documents the prosecution had given to Libby for his defense "could be characterized as reflecting a plan to discredit, punish, or seek revenge against Mr. Wilson."

Joseph Wilson has accused the White House of leaking his wife's identity to retaliate for his criticism of the administration's Niger uranium claim.

White House press secretary Scott McClellan, citing Fitzgerald's continuing investigation, said he could not comment on whether there was an effort to discredit Wilson.

**Bush** said: "You're just going to have to let Mr. Fitzgerald complete his case... . It's a serious legal matter that we've got to be careful in making public statements about it."

Contact reporter William Douglas at 202-383-6026 or bdouglas@krwashington.com.

**LOAD-DATE:** April 11, 2006

# EXHIBIT E



Back to this story | Home
http://mediamatters.org/

## Ignoring its own paper and echoing GOP faithful, *Wash. Post* editorial furthered numerous CIA leak falsehoods

Summary: *Media Matters for America* presents a side-by-side comparison of the claims put forth by an April 9 *Washington Post* editorial that repeated numerous falsehoods in defense of President Bush's reported authorization of I. Lewis "Scooter" Libby to disclose the 2002 National Intelligence Estimate on Iraq's alleged weapons of mass destruction, the corresponding falsehoods forwarded by conservatives and Republicans in the media, and the *Post*'s own reporting -- some of it appearing in the same edition of the paper as the editorial -- that debunks these falsehoods.

On April 9 -- the same day that NBC *Meet the Press* host Tim Russert described *The Washington Post* as "hardly an organ for Republican views" -- the *Post* published an editorial, titled "A Good Leak," that echoed numerous falsehoods also promoted by conservative media figures and Republican activists in defense of President Bush's reported authorization of I. Lewis "Scooter" Libby to disclose to the media classified portions of the 2002 National Intelligence Estimate (NIE) on Iraq's alleged weapons of mass destruction programs. The *Post* editorial board seemingly ignored its own paper's past reporting on the CIA leak scandal, which has thoroughly debunked the false claims made by conservative and Republican figures and echoed in the April 9 *Post* editorial.

The *Post* editorial commented on the April 6 revelation that court papers pertaining to special counsel Patrick J. Fitzgerald's investigation of Libby, Vice President Dick Cheney's former chief of staff, indicated that Bush authorized Libby to disclose specific, classified portions of the NIE to former *New York Times* reporter Judith Miller. Libby was indicted in October 2005 on five counts of perjury, obstruction of justice, and making false statements to the FBI regarding the federal investigation into the leaking of CIA operative Valerie Plame's identity.

As *Media Matters for America* has noted, the *Post*'s editorial page repeated without challenge the Bush administration's justifications for the Iraq war in the buildup to the March 2003 invasion and was complicit in forwarding many of the administration's false and misleading claims to justify the invasion retroactively. In a March 8 online discussion, a reader asked *Post* editorial page editor Fred Hiatt when the editorial writers will "own up" to this record. Hiatt responded, "[W]e've acknowledged that we were mistaken in our assumptions about WMD." But the *Post* has yet to retract its numerous false statements regarding an alleged Iraq-Al Qaeda connection and the Bush administration's use of intelligence. To the contrary, as the April 9 editorial shows, Hiatt has continued to print flagrant falsehoods concerning the Bush administration's efforts to justify the war, even while he and the board have every reason to know -- from the *Post*'s own reporting -- that those assertions are false.

Below, *Media Matters for America* presents a side-by-side comparison of the claims put forth by the April 9 *Post* editorial, the corresponding falsehoods forwarded by conservatives and Republicans in the media, and the *Post*'s own reporting -- some of it appearing in the same edition of the paper as the editorial -- that debunks these falsehoods.

| False Republican / conservative talking point | April 9 *Washington Post* editorial | Prior *Washington Post* reporting |
| --- | --- | --- |

| | | |
|---|---|---|
| **"Surely the President has a right -- even a duty -- to set the record straight."**<br><br>-- April 8 *Wall Street Journal* editorial, highlighted on the Republican National Committee website | **"Presidents are authorized to declassify sensitive material, and the public benefits when they do."** | Contrary to the suggestion in the *Post* and *Wall Street Journal* editorials that the administration was performing a public service in leaking the information -- that is, that Bush was fulfilling a duty to inform the public -- *Post* staff writers Barton Gellman and Dafna Linzer reported on April 9 that the classified information purportedly selected by Cheney and Libby to be leaked to the press, which asserted that Iraq had been "vigorously" attempting to procure uranium in Africa, had "been disproved months before." |
| **"In authorizing Mr. Libby to disclose previously classified information, Mr. Bush was divulging the truth.** That alone distinguishes it from the common 'leak.'"**<br><br>--April 8 *Journal* editorial | "President Bush was right to approve the declassification of parts of a National Intelligence Estimate about Iraq three years ago in order **to make clear** why he had believed that Saddam Hussein was seeking nuclear weapons.<br><br>[...]<br><br>"As Mr. Fitzgerald pointed out at the time of Mr. Libby's indictment last fall, none of this is particularly relevant to the question of whether the grounds for war in Iraq were sound or bogus. **It's unfortunate that those who seek to prove the latter would now claim that Mr. Bush did something wrong by releasing for public review some of the intelligence he used in making his most momentous decision."** | The *Post* editorial's claim -- that in authorizing the release of the information, President Bush sought "to make clear" why he had thought that Saddam was seeking nuclear weapons -- rests on the assumption that the information leaked by Libby accurately reflected the intelligence available to the Bush administration during the buildup to war. In fact, as reported by Gellman and Linzer, Libby "**made careful selections of language" from the NIE** to bolster the administration's case regarding Saddam's nuclear ambitions, as the weblog Firedoglake noted.<br><br>Moreover, Cheney reportedly instructed Libby to describe the uranium story as a "key judgment" of the NIE. In fact, "the alleged effort to buy uranium was not among the estimate's key judgments" because it "had been strongly disputed in the intelligence community from the start," as the *Post* reported and the weblog The Left Coaster noted. Indeed, elsewhere in the NIE, the State Department's Bureau of Intelligence and Research called the claim "highly dubious." |
| | | |

"Constitutionally, the authority to declare documents 'classified' resides with the president. So, under the terms of an executive order first drafted in 1982, **he can declassify a document merely by declaring it unclassified.**"

-- *New York Post* columnist John Podhoretz, April 7 column

"**Rather than follow the usual declassification procedures and then invite reporters to a briefing -- as the White House eventually did -- Vice President Cheney initially chose to be secretive,** ordering his chief of staff at the time, I. Lewis Libby, to leak the information to a favorite New York Times reporter. The full public disclosure followed 10 days later. **There was nothing illegal or even particularly unusual about that.**"

An April 7 article by *Post* staff writer R. Jeffrey Smith reported that "legal scholars and analysts" described it as "highly unusual for senior officials at the White House to take such an action so stealthily." Smith also noted that, in Fitzgerald's filing, Libby is said to have characterized the action as unique: "Defendant [Libby] testified that this July 8th meeting was the only time he recalled in his government experience when he disclosed a document to a reporter that was effectively declassified by the President's authorization that it be disclosed."

---

"Mentioned this for the past couple of weeks, but the real question is this: **Did Bush lie about yellowcake? Did the Brits lie about uranium in Niger or did [former ambassador and husband of Valerie Plame Joseph C.] Wilson [IV]? Did Wilson lie about Niger? Did Wilson commit treason? Did Wilson make up something that he's gonna sip tea and not even investigate, come back and just say what he wanted to say what the plan was?**"

-- Nationally syndicated radio host Rush Limbaugh, 10/31/05

"The Senate report includes a 48-page section on Wilson that demonstrates, in painstaking detail, that **virtually everything Joseph Wilson said publicly about his trip, from its origins to his conclusions, was false.**"

--*Weekly Standard* senior writer Stephen F. Hayes, 10/24/05

"The material that Mr. Bush ordered declassified established, as have several subsequent investigations, that **Mr. Wilson was the one guilty of twisting the truth. In fact, his report supported the conclusion that Iraq had sought uranium.**"

Former CIA director George Tenet asserted in a July 11, 2003, statement that Wilson's Niger findings "did not resolve whether Iraq was or was not seeking uranium from abroad," as *Post* staff writers Walter Pincus and Dana Milbank reported on October 25, 2005.

Further, in an April 10 *Post* article, Pincus took issue with Libby's claim, detailed in Fitzgerald's court filing, that Wilson had "reported information about an Iraqi delegation visiting Niger in 1999 that was 'understood to be a reference to a desire to obtain uranium.' " The article rebutted this claim as follows: "In fact, Wilson said he was told that a Niger official was contacted at a meeting outside the country by a businessman who said an Iraqi economic delegation wanted to meet with him. The Niger official guessed that the Iraqis might want to talk about uranium because Iraq had purchased uranium from Niger in the mid-1980s. But when they met, no talk of uranium took place."

| | | The *Post* has repeatedly reported that Wilson, during his 2002 trip to Niger, "found no evidence to support allegations that Iraq was seeking uranium" from the African nation. |
|---|---|---|
| **"I mean, obviously there was no conspiracy to ... punish Joe Wilson for what he had said about Bush's claims about Iraq.** And Wilson criticized him. It turns out his criticism was completely false and Bush was right." <br><br> -- *Weekly Standard* executive editor Fred Barnes, Fox News' *The Beltway Boys*, 11/19/05 <br><br> **"What did we learn [from federal prosecutor Patrick Fitzgerald] about this obsessed White House with Joe Wilson? That there was, in fact, no conspiracy to out his wife, that there was no coordinated smear campaign."** <br><br> -- *National Review* columnist Kate O'Bierne, MSNBC's *Hardball*, 10/30/05 <br><br> **"[T]his idea that somehow they were discrediting Wilson in this release is nonsense.** ... It's perfectly legitimate for a government to add in a fact which the guy had left out as a way to distort information. ... That's not discrediting him personally." <br><br> --*Washington Post* columnist Charles Krauthammer, Fox Broadcasting Co.'s *Fox News Sunday*, 4/9/06 | "Mr. Wilson subsequently claimed that the White House set out to punish him for his supposed whistle-blowing by deliberately blowing the cover of his wife, Valerie Plame, who he said was an undercover CIA operative. This prompted the investigation by Special Counsel Patrick J. Fitzgerald. **After more than 2 1/2 years of investigation, Mr. Fitzgerald has reported no evidence to support Mr. Wilson's charge."** | Gellman and Linzer's April 9 *Post* article reported that Fitzgerald wrote in his recent filing that "the grand jury has collected so much testimony and so many documents that 'it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' Wilson.' " They noted that the filing had "described a 'concerted action' by 'multiple people in the White House' -- using classified information -- to 'discredit, punish or seek revenge against' a critic of President Bush's war in Iraq." |
| He's [Rove is] the one who told the press the truth that **Mr. Wilson had been recommended for the CIA consulting gig by his wife, not by Vice President** | **"In fact Mr. Wilson was recommended for the trip by his wife."** | The *Post*'s prior reporting on the issue of who sent Wilson to Niger presents it as a matter of ongoing dispute and far from "fact." Indeed, as Pincus and Milbank |

**Dick Cheney** as Mr. Wilson was asserting on the airwaves.

-- *Wall Street Journal* editorial, 7/13/05

The administration did not send Wilson over to Niger. They were not his choice. George Tenet didn't send him. **It was Wilson's wife, Valerie Plame, who suggested him for the mission.**

-- Rush Limbaugh, 7/11/05

noted in their October 25 article, Wilson -- in response to the administration's claim that his selection for the Niger mission was the result of nepotism -- "has maintained that Plame was merely 'a conduit,' telling CNN last year that 'her supervisors asked her to contact me.'" Pincus and Milbank further reported: "The CIA has always said ... that Plame's superiors chose Wilson for the Niger trip and she only relayed their decision."

— J.K. & S.S.M.

**Posted to the web on Monday April 10, 2006 at 7:04 PM EST**

**EXHIBIT F**

# The Nation.

Home ▷ Blog: The Online Beat ▷ Libby: Bush, Cheney Authorized Leaks

 

**BLOG** | *Posted 04/06/2006 @ 4:19pm*

## Libby: Bush, Cheney Authorized Leaks

President Bush told Vice President Cheney to tell the vice president's chief of staff, I. Lewis "Scooter" Libby, to disclose highly classified information regarding Iraq intelligence in order to try and discredit legitimate criticism of the administration.

**SEE ALL POSTS**

**EMAIL THIS POST**

**PERMALINK**

**COMMENTS (511)**

What's this? The latest line from proponents of impeachment?

No, according to court records that became available Thursday, it is what Libby testified was the scenario that played out before he began contacting reporters in an effort to undermine the reputation of former Ambassador Joe Wilson.

According to a National Journal report on the documents: "I. Lewis "Scooter" Libby testified to a federal grand jury that he had received 'approval from the President through the Vice President' to divulge portions of a National Intelligence Estimate regarding Saddam Hussein's purported efforts to develop nuclear weapons, according to the court papers. Libby was said to have testified that such presidential authorization to disclose classified information was 'unique in his recollection,' the court papers further said."

The Journal report, which is based on both the court papers and interviews with senior government officials familiar with the investigation of Libby's actions by Patrick J. Fitzgerald, the special prosecutor in the CIA leak case, suggests that a fast-and-loose approach to the release of

**THE ONLIN**

JOHN NICHOLS



Every day in eve town across Am progressives ge morning and go work of fighting homophobia, de environment, or unions and tack hegemony. Som win--on the pick ballot box, in th outside the WTC Seattle.

The purpose of Beat is to report with immediacy political, social, cultural activism goes unremarke of the mainstrea ultimate goal? T hidden reality th left in America, active, growing more consistent pundits or the p

classified information was authorized by Bush and Cheney before the war as part of an effort to "make the case" for the invasion of Iraq.

After the invasion, when Wilson raised questions about the validity of claims made by the president, the Journal report suggests that the gloves came off, and the weapon of choice was classified information.

"Bush and Cheney authorized the release of the information regarding the NIE (National Intelligence Estimate) in the summer of 2003, according to court documents, as part of a damage-control effort undertaken only days after former ambassador Joseph C. Wilson IV alleged in an op-ed in The New York Times that claims by Bush that Saddam Hussein had attempted to procure uranium from the African nation of Niger were most likely a hoax."

The White House initial response Thursday was to refuse to comment on Libby's testimony, which has called into serious question the president's October, 2003, assertion that: "I don't know of anyone in my administration who has leaked. If somebody did leak classified information, I'd like to know it, and we'll take the appropriate action."

But if the president is not now in a position to take appropriate action, members of Congress are.

U.S. Representative Maurice Hinchey, D-New York, who has been the most determined Congressional watchdog with regard to the administration's misuse of intelligence information, says that, "If what Scooter Libby said to the grand jury is true, then this latest development clearly reveals yet again that the CIA leak case goes much deeper than the disclosure of a CIA agent's identity to the press. The heart and motive of this case is about the deliberate attempt at the highest levels of this administration to discredit those who were publicly revealing that the White House lied about its uranium claims leading up to the war. The Bush Administration knew that Iraq had not sought uranium from Africa for a nuclear weapon, yet they went around telling the Congress, the country, and the world just the opposite. When Ambassador Joseph Wilson, Valerie Wilson's husband, publicly spoke out with proof that the administration was not telling the truth on uranium, the administration engaged in an orchestrated plot, which now reportedly includes President Bush, to discredit Ambassador Wilson and dismiss any notion that they had lied about pre-

**Blog Back!**
Blog conversation on this article.

**Tomgram: De la Vega...**
In **verbena-19**
By **Annamarie Deneen**

**Libby: Bush, Cheney ...**
In **BushCo**
By **Marc Murison**

**Lots of Leak Links**
In **The Mahablog**
By **Barbara O\'Brien**
**View 16 posts »**

POWERED BY ⬤ Technorati

you to know.

Photo Credit: Mi

**ARCHIVES**

April 2006

March 2006

February 2006

January 2006

December 2005

November 2005

*also by*
**JOHN NICHOLS**

**What DeLay L**
**JOHN NICHOLS**
damage Tom De
wake, the Nover
must be a refere
political enviro
which continues
Congress.
*04/24/2006 issue*

**How to Free th**
**JOHN NICHOLS**
of Knight Ridder
could result in s
media models--
Newspaper Guile
with private inve
purchase twelve
newspapers nov
off from the cha
*04/17/2006 issue*

**Censoring Cen**
**JOHN NICHOLS**
support Russ Fe
motion to censu
President for ille
spying, Democra
the same path c
calculated cautio
them elections i
2004.
*04/10/2006 issue*

*more...*

war intelligence."

Hinchey, one of the rare members of the House who has made it his business to monitor and police abuses of executive powers, wrote the 1999 amendment to intelligence reauthorization legislation that forced the declassification of documents that revealed the role played by former Secretary of State Henry Kissinger and other members of the Nixon administration in the illegal 1973 overthrow of Chilean President Salvador Allende.

The congressman is one of 33 cosponsors of Representative John Conyers' resolution calling for the creation of a select committee to investigate, among other issues, the Bush administration's manipulation of pre-war and retaliating against critics. That committee would be charged with making recommendations regarding grounds for possible impeachment, which would, of course, require a finding that high crimes and misdemeanors had been committed by the president and vice president.

Hinchey's says that Libby's testimony adds to the mounting body of evidence that rules, regulations and laws have been bent far beyond the breaking point.

"It is an absolute disgrace to the institution of the presidency that President Bush authorized members of his administration to disclose select parts of highly classified information from a National Intelligence Estimate in order to make political advances and gain public support," says Hinchey. "How dare President Bush and Vice President Cheney say they want to prosecute those who leaked the NSA domestic surveillance program when they themselves authorized the disclosure of information from some of the most highly sensitive documents in the government. The White House opposes leaks when the disclosed information hurts them politically, but supports leaks when information advances their political cause."

Hinchey has for months been urging Fitzgerald to officially expand his investigation to include an examination of the motives behind the leaks by Libby, focusing in particular on the question of whether the administration's intent was to discredit Ambassador Wilson's revelation that Iraq had never sought uranium from Niger or other African countries. If that is proven to be the case, Hinchey has argued, "President Bush and other top members of his administration knowingly lied about uranium to the Congress, which is a crime."

"It is my belief, as well as the belief of my 39 House colleagues who signed my original letter to Special Counsel Fitzgerald, that he has the authority and obligation to expand his investigation to investigate the lies about uranium, which are the true heart of this case," Hinchey explained Thursday, in a statement outlining his intention to step up efforts to



EmailNati

Enter your em
for free email

[                ]

RSS FEEDS

*RSS is a format fo
news headlines on
special "newsrea*

Top Stories

Most E-Mailed

Take Action

All Blogs

The Online Beat



Ads by Goooooc

press for the expansion of the investigation.

The congressman is laying down the line that members of Congress, be they members of the Democratic opposition or honest Republicans who are beginning to recognize the extent to which they have been deceived by Bush, Cheney and their aides, will need to embrace at a moment when the administration and its media echo chamber will be doing everything in their power to constrain Fitzgerald's investigation.

Says Hinchey: "The heart of the CIA leak case cannot and must not be ignored."

**Withdrawal F**
Stay And Figh
And Run? Vot
See Survey R
www.popularq.cor

**Humorous A**
**Stuff**
Send a messa
have a laugh.
shirts, buttons
www.BeatBushGe

**George W. B**
Are You Happ
Won? Vote &
Razr Phone
bush.peel.com

**President Ge**
**Bush**
Bumper Stick
Signs, 2004 C
Cufflinks, Gift:
ronwadebuttons.c

**Hottest Diet i**
Lose 20 lbs in
As seen on O
Minutes.
www.WulongforLi

 

**COMMENTS**

... "I don't know of anyone in my administration who has leaked," Mr. Bush told reporters in Chicago. But, he added, "If somebody did leak classified information, I'd like to know it, and we'll take the appropriate action. And this investigation is a good thing."

The president added, "There's too much leaking in Washington. That's just the way it is. We've had leaks from the executive branch and leaks from the legislative branch. I want to know who the leakers are." ...

George Bush: http://www.cbsnews.com/stories/2003/10/01/national/main575986.shtml

Donald Rumsfeld on Leakers of Secret Information:

... No, I'll tell you about leaks. When a person takes classified information and gives it to someone who is not cleared for classified information, whether the person's from the Pentagon or any department of government, they're violating federal criminal law. And they ought to go to jail. That's not complicated.

Kalb: What are the laws they are violating? Just --

Rumsfeld: The laws relating to classified information are quite strict as to who may be given access to that information. And so to the extent that people violate the rules with respect to classified information, they are breaking federal criminal law.

Now, they are also potentially putting people's lives at risk, and that's a very -- it's a terrible thing to do ...

http://www.defenselink.mil/transcripts/2002/t04102002_t0410sd.html

i sincerely doubt that presidents have the legal power to arbitrarily "declassify" highly classified documents produced by the combined efforts of the nation's intelligence agencies at will, without documentation, without review, and without communicating to anyone except the press that the

decision has been made. i am not even sure that being the president has the ability to declassify ANYTHING arbitrarily.

and, in the very least, the president has been caught nakedly lying when he claimed in response to a direct question on the issue that he had no knowledge of any leakers pertaining to the issue. he used the word "leak" to characterize what he knew he had done, and he lied and said he didn't do it. he lied nakedly in front of the cameras.

so in addition to the FISA violation, we now have the leaking of classified information to the press specifically to TARGET A POLITICAL ENEMY.

likewise, if the NIE or part of it was "declassified" such that a nationally known and reprinted reporter could have access, I demand to see everything that was "declassified" immediately myself, unedited.

FISA violations and now leaking of (highly!) classified information to specifically TARGET A POLITICAL ENEMY. this should be impeachable.

*Posted by* **ZERO** *04/06/2006 @ 4:23pm |* ignore this person

To turn a phrase...."It all depends on how you define **'leak'** "

Bwah-ha-ha-ha-ha.

*Posted by* **LEFTOFCENTER** *04/06/2006 @ 4:28pm |* ignore this person

Oh please this is a big YAWN....She was NOT covert...end of story...You silly nitwits will grasp at any straws because of your desperation at being out of power crybabies...Go ahead...make a big stink about it....It is amusing to see the traitors once again get thier panties all twisted up over nothing

*Posted by* **LIBZSUK** *04/06/2006 @ 4:30pm |* ignore this person

Scott McClellan on The Leak:

*"If someone in this administration leaked classified information, they will no longer be a part of this administration, because that's not the way this White House operates."*

*Posted by* **ZERO** *04/06/2006 @ 4:33pm |* ignore this person

By the way...You better bring in Tony Blair and the MI6 to impeach as they said the same things.

*Posted by* **LIBZSUK** *04/06/2006 @ 4:33pm |* ignore this person

I'd like to know what traitorous LIB in congress leaked the NSA program to the New York Slimes???Can we say Jay Rockefeller???

*Posted by* **LIBZSUK** *04/06/2006 @ 4:38pm |* ignore this person

**LibZ**

Maybe you can get Dumbya to throw "Tony Blair and the MI6" into Gitmo...then Cheney can have their toenials pulled out. All in the name of security dontcha know!

*Posted by* **LEFTOFCENTER** *04/06/2006 @ 4:42pm | ignore this person*

(and if the president can declassify at will any information, no matter what it is, from whatever source or sources, of whatever magnitude, to anyone he pleases, without documentation, review, or communication to parties impacted, then the best the president accomplishes by doing so is establishing himself as a rogue agent within his own government who cannot be trusted with classified information by those responsible for producing and managing it.)

*Posted by* **ZERO** *04/06/2006 @ 4:44pm | ignore this person*

get that? george bush is rogue security threat to compartments and the information they contain.

*Posted by* **ZERO** *04/06/2006 @ 4:46pm | ignore this person*

## Read all of the comments and post a reply.

**OLDER <<** Wisconsin Towns Vote for Withdrawal

**NEWER >>** When Will Democrats Break With Bush?

MOBILE | ABOUT US | CONTACT | MEDIA KIT | PRIVACY POLICY | **MY YAHOO!**

Copyright © 2006 The Nation