UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA   ) | |
|   ) | CR. NO 05-394 (RBW) |
| v.   ) | |
|   ) | |
| I. LEWIS LIBBY,   ) | |
|   also known as "Scooter Libby"   ) | |

**REPLY TO THE RESPONSE OF I. LEWIS LIBBY TO
GOVERNMENT'S RESPONSE TO COURT'S INQUIRY REGARDING
NEWS ARTICLES THE GOVERNMENT INTENDS TO OFFER AT TRIAL**

The Government submits the following in reply to the "Response of I. Lewis Libby to Government's Response to Court's Inquiry Regarding News Articles The Government Intends to Offer as Evidence at Trial." ("Response").

**INTRODUCTION**

In his Response, defendant makes only one new argument in support of his claim of entitlement to broad discovery of materials relating to potential witnesses, as well as to others employed by the government agencies that employed those witnesses. Defendant asserts that, by arguing the relevance of the Vice President's handwritten annotations of the July 6, 2003, *New York Times* Op Ed by former Ambassador Joseph Wilson (the "Wilson Op Ed"), the government has broadly acknowledged that the mental state of persons other than the defendant is relevant to defendant's guilt or innocence. Therefore, defendant argues, the government cannot logically resist discovery of documents reflecting the views of other potential witnesses concerning Mr. Wilson and his trip to Niger.

Contrary to defendant's suggestion, the relevance of the Vice President's annotations of the Wilson Op Ed is not remotely comparable to the purported relevance of the documents defendant

1

seeks in his Third Motion to Compel. As the defendant admitted in his grand jury testimony, he communicated extensively with the Vice President regarding the Wilson Op Ed during the relevant period, and received direction from the Vice President regarding his response to the Wilson Op Ed. The Vice President's handwritten notes on a clipping of the Wilson Op Ed, which reflect his views concerning Mr. Wilson and his wife, are evidence of the views the Vice President communicated during the conversations that the Vice President and his chief of staff had during the period immediately following the publication of the Wilson Op Ed, and corroborate other evidence regarding these communications, which are central to the government's proof that defendant knowingly made false statements to federal agents and the grand jury. Accordingly, the Vice President's annotations of the Wilson Op Ed are uniquely relevant to the issues of this case.[1]

No comparable nexus exists with respect to any views concerning Mr. Wilson and his wife that may have been held or expressed to persons other than the defendant by the other individuals concerning whom defendant seeks discovery in the Third Motion to Compel. None of these individuals were defendant's immediate superior. None of them directed defendant's actions with respect to a response to the Wilson Op Ed. In fact, defendant's relevant contacts with former Under Secretary of State Marc Grossman, cited by defendant as illustrating the relevance of the state of mind of others, were limited to defendant's request for, and receipt of, information concerning Mr. Wilson's trip in May and June 2003.

Shorn of its efforts to misconstrue the government's argument concerning the relevancy of the Vice President's annotations to the Wilson Op Ed, defendant's Response amounts to a reiteration

---

[1] The government does not purport to recite here all the reasons why the annotated Wilson Op Ed is admissible at trial as this issue arises in the context of a discovery motion, not a motion *in limine*.

of his previously-stated position that he needs broad discovery in order to help him prepare cross-examinations of government witnesses (including by demonstrating bias), show the context of the defendant's alleged crimes, and demonstrate his client's state of mind. As the government previously has argued,[2] defendant's expansive discovery requests are inconsistent with applicable case law and amount to a demand to conduct a fishing expedition through the government's files. The government has produced to defendant all documents received from any source which relate to conversations, correspondence, or meetings in which defendant was involved, or which relate to the defendant's inquiries regarding former Ambassador Joseph Wilson's trip to Niger, including all documents reflecting relevant communications between defendant and any of the individuals concerning whom defendant seeks discovery in the Third Motion to Compel. The government has gone beyond its obligations under Rule 16 to produce additional materials from the Office of Vice President, Central Intelligence Agency and the State Department that relate generally to Mr. Wilson's trip. Defendant is entitled to no more.

---

[2] The government will not re-argue here the points made in its earlier submissions, and will not argue in advance issues related to admissibility of evidence that are not necessary to a determination of defendant's pending discovery motion.

**ARGUMENT**

I.  **The Annotated Wilson Op Ed is Relevant to Establish that Defendant's Immediate Superior Was Concerned that Mr. Wilson Was Sent on a "Junket" by his Wife, and Communicated His Concern to Defendant**.[3]

While defendant testified before the grand jury that he did not recall seeing the copy of the annotated Wilson Op Ed until it was shown to him by the FBI in the fall of 2003, as discussed below, he also testified that he discussed the substance of the Wilson Op Ed with the Vice President and their conversations included discussion of issues reflected in the Vice President's handwritten notes. More specifically, during his first grand jury appearance on March 5, 2005, defendant testified in general terms that he did not remember in any detail his first conversation with the Vice President about the Wilson Op Ed, but he did recall that the Vice President was upset that the column in his

---

[3] Any suggestion that defendant would have to have seen the annotated Wilson Op Ed for it to be relevant or admissible is meritless. Whether or not defendant ever saw the annotated Wilson Op Ed, it is relevant and admissible to establish some of the facts noted by defendant's immediate superior, including the suspicion that Mr. Wilson's wife had "sen[t] him on a junket," (handwriting annotated on the Wilson Op Ed), and that his superior communicated these facts to defendant at or near the time the Wilson Op Ed was published.

Evidence that the defendant understood the concern that Mr. Wilson might have been "sen[t] . . . on a junket" by his wife shortly after July 6 would directly contradict defendant's testimony that he did not recall knowing on July 12 that Mr. Wilson had a wife and did not think at that time that the wife might have been involved in sending Mr. Wilson on the trip. *See* "Government's Response to Court's Inquiry Regarding News Articles the Government Intends to Offer as Evidence at Trial" at p. 6-7.

Nor does the annotated Wilson Op Ed present authentication problems. The document could be authenticated through the testimony of the Vice President, or under Fed. R. Evid. 902(6)("printed material[] purporting to be newspaper[] . . . ." is self-authenticating) and Fed R. Evid. 901(b)(2) ("Nonexpert opinion on handwriting"). See generally Fed. R. Evid. 901(a)(all that is required is "evidence sufficient to support a finding that the matter in question is what its proponent claims"). Contrary to defendant's assertion, the government has not represented that it does not intend to call the Vice President as a witness at trial. To the best of government's counsel's recollection, the government has not commented on whether it intends to call the Vice President as a witness, and the representations it has made regarding the identity of potential government witnesses have been limited to responses to the defense assertions in defendant's Third Motion to Compel.

4

view falsely attacked his credibility. (March 5, 2004, Grand Jury Transcript at 79.) Defendant then testified that the Vice President told him repeatedly that he wanted to "get the truth out," including "all the facts about what he had or hadn't done; what the facts were or were not." (March 5, 2004, Grand Jury Transcript at 81; see Exhibit A.) Defendant recalled discussing with the Vice President the issues reflected in the Vice President's handwritten notes but testified that he believed that they did not discuss the specific issue of Wilson's wife's employment until after the July 14, 2003, publication of the Novak column, or at least not before the defendant's conversation with Tim Russert on July 10 or 11, 2003. Ex. A at 84-86. Defendant further testified that the Wilson Op Ed was discussed in the White House on a daily basis and on multiple occasions each day during the week following July 6, 2003.[4]  Ex. A at 81.

During his second grand jury appearance on March 24, 2004, defendant reaffirmed that he discussed the issue of Mr. Wilson's wife's employment with the Vice President. (March 24, 2004, Grand Jury Transcript at 83-84 and 86-91, copies of which are annexed as Exhibits B and C.) Specifically, defendant testified that the Vice President "at times" expressed suspicion regarding why Mr. Wilson was selected to go on the mission, in light of Mr. Wilson's marital relationship, and made comments about Mr. Wilson's wife working at the CIA. Ex. B at 83. Defendant placed these conversations in "late July, maybe September," and in any event not before defendant's conversation with Tim Russert. *Id*. at 83-84. Defendant testified that of the issues addressed in the Vice President's annotations of the Wilson Op Ed that were discussed, only the discussion about Mr. Wilson's wife "might not have occurred" during the week of July 7, 2003. Ex. C at 91. Defendant

---

[4] The President and several other officials traveled to Africa during this period. However, the Vice President and the defendant did not travel with them.

also testified that he was unsure whether he and the Vice President discussed Ms. Wilson's employment aboard Air Force Two on July 12, 2003, although he did not recall doing so. Ex. B at 84.

Defendant's testimony discussed above makes clear that defendant talked to the Vice President multiple times about the Wilson Op Ed and that, during one or more of these conversations, the Vice President discussed with defendant issues noted in the Vice President's handwritten annotations – including the issue of Mr. Wilson's wife's employment at the CIA. Therefore, the annotations corroborate the government's other evidence indicating that these issues were communicated to defendant by his immediate superior, who also directed defendant during the critical week after July 6 to get out into the public "all" the facts in response to the Wilson Op Ed.

The fact that comments regarding Wilson's wife were included among the Vice President's annotations also supports the proposition that defendant's conversation with the Vice President regarding Mr. Wilson's wife more likely than not occurred shortly after the publication of the Wilson Op Ed, rather than later, as defendant claimed.[5] Evidence placing defendant's conversation with the Vice President shortly after the publication of the Wilson Op Ed also corroborates the accounts of a number of government witnesses who will testify that defendant discussed Mr. Wilson's wife on or before July 8, 2003. Thus, the annotated Wilson Op Ed is highly, and uniquely, relevant to a determination regarding the truthfulness of defendant's testimony that he did not recall information

---

[5] To be clear, the government's argument is not (as the defendant claims) that it is more likely that the Vice President discussed these issues with defendant merely because he wrote them down but, rather that, in light of the Vice President's annotation of the Wilson Op Ed with the words, "Did Wilson's wife send him on a junket?," it is unlikely that, as defendant testified, the issue was not discussed in defendant's repeated conversations with the Vice President during the week following the Wilson Op Ed's publication.

regarding Mr. Wilson's wife's employment prior to his conversation with Tim Russert on July 11, 2003.

## II.    Documents Related to Other Witnesses Have No Comparable Relevance.

The defense argues:

> In the same way that the government finds the views of the Vice President regarding Wilson and his trip relevant to its case, the defense finds the views of other government officials, such as former Under Secretary of State Marc Grossman, regarding Ms. Wilson relevant to its case . . . .  Just as Mr. Libby was interacting with the Vice President regarding Mr. Wilson's charges, so was he also interacting with Mr. Grossman and other government officials and their respective agencies.

Response at 5.

This argument ignores the fact that the Vice President was the defendant's immediate superior with whom the defendant worked daily and closely, and from whom defendant received direction regarding the response to be made to the Wilson Op Ed. Understanding what conversations took place between the Vice President and the defendant during the week of July 7, 2003, is critical to determining relevant issues in the case: whether defendant recalled Wilson's wife's employment prior to the conversation with Tim Russert on July 10 or 11, and whether defendant thought it necessary or appropriate to disclose that fact to reporters that week. Understanding what other government officials knew or thought about Mr. Wilson's Op Ed simply is not.

The Vice President – not Mr. Grossman or any of the other potential witnesses concerning whom defendant seeks additional discovery – specifically directed the defendant to speak to reporters during the week following the publication of the Wilson Op Ed. At the time, the Vice President – rather than other potential witnesses – was upset that his personal credibility had been attacked, unfairly in his view.

By his own account, defendant understood from the Vice President that it was necessary to get out "all" the facts in response to the Wilson Op Ed. The response to the Wilson Op Ed was a matter of repeated discussion between the defendant and the Vice President following its publication. The same cannot be said of the other potential witnesses. As to Mr. Grossman, for example – the only witness other than the Vice President to whom defendant refers in his Response – the relevant conversations between defendant and Mr. Grossman took place in late May and early June, when defendant asked questions about the unnamed former ambassador who traveled to Niger, and Mr. Grossman reported information in response to defendant's inquiry. There is no evidence that defendant and Mr. Grossman had any relevant conversation after that time frame. While in May and June the defendant likely asked the questions of Mr. Grossman in response to the column written by Mr. Kristof, the defendant did not seek Mr. Grossman's advice, much less direction, as to how to respond to press inquiries either before or after publication of the Wilson Op Ed.

Neither Mr. Grossman nor any other potential witness concerning whom defendant seeks discovery in his Third Motion to Compel had any authority over defendant's communications with the press. After the Wilson Op Ed was published, defendant's focus was on what his superior thought were relevant facts and what should be done to respond to the accusations it contained. There is no evidence that defendant had any interest in crafting a public response to the Wilson Op Ed that would protect the interests of any officials or agencies whom he perceived as having interests in conflict with those of the Vice President and his office.

In sum, it is the knowledge and state of mind of defendant that is relevant to the issue of guilt or innocence. The knowledge and state of mind of other government officials is relevant only if probative of defendant's state of mind. Here, as defendant has acknowledged, the Vice President

8

communicated to defendant the facts he considered notable, and also directed defendant to get out to the public "all" the facts in response to the Wilson Op Ed. Defendant shared the interests of his superior and was subject to his direction. Therefore, the state of mind of the Vice President as communicated to defendant is directly relevant to the issue of whether defendant knowingly made false statements to federal agents and the grand jury regarding when and how he learned about Ms. Wilson's employment and what he said to reporters regarding this issue.

For the reasons set forth above and in the government's prior submissions, including the fact that the government has already produced to defendant all documents received from any source relating to relevant conversations, correspondence, or meetings involving defendant, defendant's Third Motion to Compel should be denied.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that this Court deny the defendant's motion.

Respectfully submitted,

_____/s/_____
PATRICK J. FITZGERALD
DEBRA RIGGS BONAMICI
Office of Special Counsel
Office of the United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: May 24, 2006

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 24th day of May, 2006, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

    William Jeffress, Esq.
    Baker Botts
    The Warner
    1299 Pennsylvania Avenue, N.W.
    Washington, DC 20004-2400
    Facsimile: 202-585-1087

    Theodore V. Wells, Esq.
    Paul Weiss
    1285 Avenue of the Americas
    New York, NY 10019-6064
    Facsimile: 212-373-2217

    Joseph A. Tate, Esq.
    Dechert LLP
    4000 Bell Atlantic Tower
    1717 Arch Street
    Philadelphia, PA 19103-2793
    Facsimile: 215-994-2222

    John D. Cline, Esq.
    Jones Day
    555 California Street
    San Francisco, CA 94104
    Facsimile: 415-875-5700

    Patrick J. Fitzgerald
    Special Counsel
    U.S. Department of Justice
    1400 New York Ave., N.W.
    Washington, D.C. 20530
    202-514-1187

    By: _____/s/_____
    Debra Riggs Bonamici
    Deputy Special Counsel