UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | <u>Oral Argument Requested</u> |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

**MOTION OF I. LEWIS LIBBY TO ADMIT EXPERT TESTIMONY
<u>UNDER FEDERAL RULE OF EVIDENCE 702</u>**

Defendant I. Lewis Libby, through his counsel, moves the Court to admit, under Fed. R. Evid. 702 and U.S. Const. Amends. V and VI, the expert testimony of Dr. Robert A. Bjork regarding widely-accepted findings from the science of memory. A summary of the testimony Mr. Libby proposes to offer through Dr. Bjork, as well as the bases and reasons for that testimony, have been provided to the government in accordance with Fed. R. Crim. P. 16(b)(1)(C), and are attached to this motion as Exhibit A. Dr. Bjork's curriculum vitae is attached as Exhibit B.

**<u>MEMORANDUM IN SUPPORT</u>**

The charges against Mr. Libby rest on statements and testimony he gave the FBI and the grand jury regarding details of conversations he had with three reporters and several government officials during the spring and summer of 2003. In an attempt to prove those charges, the government will present testimony by the reporters and the government officials about those conversations. With limited exceptions, that testimony will be unsupported by any contemporaneous notes or other corroborating evidence. For his part, Mr. Libby will contend that, in many cases, it is the government witnesses who have misremembered the facts, and that

- 2 -

any errors *he* made in describing the events were the result of confusion or faulty memory, not any intent to misrepresent the truth.  Mr. Libby will show that the snippets of conversation at issue in this case took place amid a rush of pressing national security matters that commanded his attention throughout his long and stressful work day.  Like most of the government witnesses, Mr. Libby has no notes reflecting the portions of the conversations at issue in this case, with the exception of a conversation in early June with the Vice President.  Except for that single conversation, he spoke to the FBI, testified before the grand jury, and will testify at trial (if he chooses to take the stand) based on his recollection alone.

As the foregoing makes clear, issues of memory—including how memory works and why it fails—will be crucial to the jury's determination of Mr. Libby's guilt or innocence.  The government will contend that both its witnesses and Mr. Libby remember the relevant snippets of conversation clearly and that Mr. Libby's descriptions of those snippets are deliberate lies.  To counter these contentions, Mr. Libby may seek to present Dr. Bjork's expert testimony to show that it is entirely plausible, given how memory has been found to function, that Mr. Libby or the government witnesses—or both—have innocently confused or misremembered the conversations on which this case turns.

The testimony that Mr. Libby may elicit from Dr. Bjork will assist the jury by providing information about the findings of memory research that are not already known to the jurors.  Several studies, including a recent survey of potential jurors in the District of Columbia, report that many of the core findings of memory research—findings that are well-established and generally accepted in the relevant scientific community—are not known or understood by the average juror.  Yet those findings are vitally necessary to a proper understanding of the issues in this case.  For these reasons, the expert testimony Mr. Libby proposes to offer through Dr. Bjork

is admissible under Fed. R. Evid. 702. Indeed, Mr. Libby must be permitted to present this testimony as part of his Fifth and Sixth Amendment right to challenge the government's case and present a full and vigorous defense.

**ARGUMENT**

**I.     THE STANDARD FOR ADMISSION OF EXPERT TESTIMONY UNDER FEDERAL RULE OF EVIDENCE 702.**

Under Rule 702, the trial court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). The rule does not impose a "heightened threshold" of admissibility for expert testimony. *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996). Rather, it charges the trial court with the "limited" role of "gatekeeper." *Id.* at 134-35, 138 n.11. As gatekeeper, a court must safeguard the jury from "subjective belief and unsupported speculation" irrelevant to the case at hand. *Id.* at 134 (citation and internal quotation marks omitted). But the court's role ends there. As the Supreme Court has recognized, any stricter scrutiny would threaten to invade the province of the jury and would be at odds with the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588 (citation and internal quotation marks omitted). Indeed, the presumption underlying Rule 702 is that expert testimony will be admitted. *Weinstein's Federal Evidence* § 702.02[1] (2d ed. 2006) (citing cases); *see* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendment [hereinafter 2000 Advisory Committee Notes] (noting that the exclusion of expert testimony is "the exception rather than the rule").

Consistent with Rule 702's basic purposes, the Supreme Court set forth in *Daubert* a two-prong test for admissibility of expert testimony. The test requires "a preliminary assessment [1] of whether the reasoning or methodology underlying the [expert] testimony is scientifically valid

and [2] of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. at 592-93; *see Ambrosini*, 101 F.3d at 133-35.

The first requirement, which tests "evidentiary reliability," is satisfied so long as the expert's testimony is "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590. The subject of the scientific testimony need not be "known to a certainty." *Id.* Nor is the trial court to act as an "evaluator of the persuasiveness of an expert's conclusions." *Ambrosini*, 101 F.3d at 134. Rather, the court's sole job is to ensure that the conclusions the expert will offer have been "derived by the scientific method." *Daubert*, 509 U.S. at 590. To assist in the reliability inquiry, *Daubert* provides trial courts with a non-exhaustive list of factors to consider, including (1) whether the subject of the expert's testimony "can be (and has been) tested"; (2) whether it has been "subjected to peer review and publication"; (3) "the known or potential rate of error" of the relevant scientific technique; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether it is "generally accepted" in the relevant scientific community. *Id.* at 593-94. The Supreme Court made clear that the test is a "flexible one." *Id.* at 594. "None of the factors discussed is necessarily applicable in every case." *Ambrosini*, 101 F.3d at 134. Likewise, no single factor is dispositive in deciding whether expert evidence is reliable. *Id.*; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (the relevant considerations will necessarily depend on "the particular circumstances of the particular case at issue").

In addition to reliability, the trial court must consider whether the expert's testimony "will assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. This requirement, which goes primarily to relevance, is met so long as the proposed testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual

dispute." *Daubert*, 509 U.S. at 591 (citation and quotation marks omitted); *see Ambrosini*, 101 F.3d at 134. As *Daubert* puts it, the proposed testimony must "fit" an issue relevant to the case. 509 U.S. at 591. This prong is satisfied as long as the expert's testimony "relates to a contested issue and could aid the jury's resolution" of that issue. *Ambrosini*, 101 F.3d at 135-36.

Notably, an expert need not offer an opinion on a specific issue that will be decided by the jury to satisfy *Daubert*'s "fit" requirement. Rather, the rule allows an expert to testify about general scientific principles "without ever attempting to apply these principles to the specific facts of the case." 2000 Advisory Committee Notes. In fact, according to the Advisory Committee, "the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference" is "encourage[d]." Fed. R. Evid. 702 Advisory Committee Notes. Accordingly, courts routinely admit expert testimony about general principles of science or other relevant technical or specialized areas, regardless of whether the expert himself applies those principles to the facts presented. *See, e.g.*, *United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (affirming admission of expert testimony about labor coalitions' general practice of using coercion and extortion to achieve goals); *TC Systems Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 175 (N.D.N.Y. 2002) ("Advisory Committee Note to Rule 702 expressly permits generalized testimony if, *inter alia*, the testimony addresses a subject matter on which the jury may be assisted and the testimony 'fits' the facts of the case"); *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l, Inc.*, 2006 WL 1329999, at *5 (N.D. Cal. May 15, 2006) (noting that courts "regularly uph[o]ld" the "practice of allowing an expert to educate the jury without necessarily expressing an opinion on the specific facts of the case"). As with other expert evidence, such testimony is appropriate so long as the expert is qualified, the testimony is reliable, and the principles to be explained "fit" the facts of the case and will assist the jury in its

determination. *See* Fed. R. Evid. 702; 2000 Advisory Committee Notes. As shown below, those requirements are met here.

## II. DR. BJORK'S PROPOSED TESTIMONY IS ADMISSIBLE UNDER RULE 702.

### A. Dr. Bjork Will Testify To Findings Of Memory Research That Have Been Well-Tested And Are Widely Accepted In The Relevant Scientific Community.

The science of memory is an established body of knowledge within the field of psychology and human cognition. Psychologists and other researchers have studied memory for over a century, and it is the subject of ongoing research at numerous major universities in this country and abroad, including Harvard University, Stanford University, St. Louis University, the University of Washington, and the University of California at Los Angeles and Irvine. As a result, the fundamental findings about which Dr. Bjork will testify have been tested and confirmed in numerous experiments adhering to the rigors of the scientific method. *See Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 692 (8th Cir. 2001) (expert testimony based on "research independent of litigation" is more likely to be reliable and limits "the degree to which [the expert] can tailor his testimony to serve a party's interests") (citation and internal quotation marks omitted). Those findings have been published in numerous prominent and peer-reviewed journals, *see* Exhibit A (listing representative studies on which Dr. Bjork bases his proposed testimony), and have received wide acceptance throughout the relevant scientific community.

In light of the sound scientific basis on which memory research rests, it is not surprising that courts have found expert testimony regarding the function of memory sufficiently reliable to be admitted. *See, e.g., Humphries v. Mack Trucks*, 1999 WL 815067, at *2-*5 (4th Cir. 1999) (unpublished) (district court properly admitted expert testimony about "functioning of human perception and memory," including ability of "retroactive interference" to cause memory errors, in products liability case) (attached as Exhibit C); *United States v. Smithers*, 212 F.3d 306, 315,

318 (6th Cir. 2000) (district court abused discretion in summarily excluding expert testimony on the accuracy of eyewitness identification as it almost certainly would have passed *Daubert*'s reliability analysis); *United States v. Sullivan*, 246 F. Supp. 2d 696, 698 (E.D. Ky. 2003) (holding that "general theories of memory" underlying expert's testimony are sufficiently reliable under *Daubert* as they are published in articles "subjected to peer review," and are "generally accepted within the field of memory study and in the field of psychology generally"); *see also United States v. Weiss*, 579 F. Supp. 1224, 1236 (S.D.N.Y. 1983) (noting that defendant in perjury case presented expert testimony on memory). *See generally United States v. Moore*, 786 F.2d 1308, 1312-13 (5th Cir. 1986) ("The scientific validity of the studies confirming the many weaknesses of eyewitness identification [including those related to memory] cannot be seriously questioned at this point") (citation and quotation marks excluded).

As his curriculum vitae makes clear, Dr. Bjork is eminently qualified to testify about the current state of memory research. *See* Exhibit B. He has published dozens of peer-reviewed articles on findings of memory research in a variety of academic journals; received numerous awards in this field, including from the American Psychological Association; served on 16 professional boards; edited four journals; and taught at two top universities for a total of nearly four decades. *Id.* In addition to his own research and study, Dr. Bjork is knowledgeable and well-read in the work and findings of other major contributors to his field.

For these reasons, *Daubert*'s reliability requirement is easily satisfied in this case.

**B.    Dr. Bjork's Proposed Testimony "Fits" The Facts Of This Case And Will Assist The Jury Greatly In Its Deliberations.**

In addition to assessing reliability, a trial court must ensure that proposed expert testimony "fits" the facts of the case. The testimony must be "sufficiently tied" to those facts "that it will aid the jury in resolving a factual dispute" related to its ultimate determination.

*Daubert*, 509 U.S. at 591 (citation and quotation marks omitted).  Those conditions are satisfied here.

In a case that hinges almost entirely on competing, largely unaided recollections of snippets of conversation that occurred months before Mr. Libby's statements and grand jury testimony and years before trial, there can be no question that the workings and limitations of memory are relevant.  Nor can there be any question that Dr. Bjork's expert testimony will assist the jury in properly understanding the memory issues that this case presents.  Research has shown that jurors are generally unaware of the frequency and causes of honest errors of recollection, and that they underestimate the fallibility of memory.  *See* Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air L. & Com. 1421, 1430 (2001) [hereinafter Davis & Follette]; Richard A. Wise & Martin A. Safer, *A Survey of Judges' Knowledge and Beliefs About Eyewitness Testimony*, Court Review, Spring 2003, at 6.  A recent survey of potential jurors in the District of Columbia reports that jurors misunderstand the intricacies of the memory process, including how certain factors, including stress and divided attention, can affect its accuracy.  *See* Richard S. Schmechel, Timothy P. O'Toole, Catharine Easterly & Elizabeth F. Loftus, *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence*, 46 Jurimetrics J. 177-244 (2006) [hereinafter Schmechel]; *see also* Kenneth A. Deffenbacher & Elizabeth F. Loftus, *Do Jurors Share a Common Understanding Concerning Eyewitness Behavior?*, 6 L. & Human Behavior 15 (1982) (reporting misunderstandings of potential jurors concerning eyewitness memory, including potential jurors in Washington, D.C.).

As one court recently put it, "science has firmly established the inherent unreliability of human perception and memory," a "reality" that is "outside the jury's common knowledge and

often contradicts jurors' commonsense understandings." *United States v. Brownlee*, 2006 WL 1984522, at *8 (3d Cir. July 18, 2006) (internal citations and quotation marks omitted). Given the established unreliability of human memory, courts have recognized the need for expert testimony to counter common misperceptions about the ability to remember accurately. *See, e.g., id.* at *7-*10 (reversing conviction and remanding for a new trial because, *inter alia*, expert testimony on the reliability of eyewitness memory was improperly excluded); *Smithers*, 212 F.3d at 316 (district court abused discretion by not conducting *Daubert* hearing to review proposed expert testimony on eyewitness memory; court notes that "there is no question that many aspects of perception and memory are not within the common experience of most jurors," and that "many factors that affect memory are counterintuitive"); *United States v. Norwood*, 939 F. Supp. 1132, 1137-41 (D.N.J. 1996) (admitting expert testimony to correct common misconceptions including, *inter alia*, the rate at which memories fade). This Court should do the same with respect to Dr. Bjork's proposed testimony. Where, as here, accepted findings of scientific research are relevant to the case at hand, yet not adequately understood by jurors, an expert's testimony regarding those findings is admissible under Rule 702.

Below we describe representative findings of memory research about which Dr. Bjork will testify at trial and offer examples of how his testimony will "fit" the facts of this case. As Dr. Bjork's disclosure indicates, his proposed testimony will cover other findings of memory research as well, all of which bear upon some aspect of Mr. Libby's statements and grand jury testimony, his potential trial testimony, the testimony of the government witnesses, or all three.

      **1.**      **A person's confidence in the accuracy of his memory may correlate weakly, if at all, with the actual accuracy of the memory.**

The Schmechel survey reports that nearly forty percent of potential D.C. jurors surveyed believe (incorrectly) that a person's confidence in the accuracy of his eyewitness memory is an

"excellent indicator" of the accuracy of that memory. *Schmechel* at 199. In fact, the opposite is true: numerous studies have shown that when it comes to memory the correlation between confidence and accuracy may be slight. Other studies have concluded that there may be no correlation at all. Confronted with this research, courts have permitted expert testimony to provide jurors with a proper understanding of the confidence-accuracy relationship. *See, e.g., Moore*, 786 F.2d at 1312-13 (expert evidence on reliability of eyewitness memory is admissible to correct common misconception "that the accuracy of a witness' recollection increases with the certainty of the witness," when "[i]n fact, the data reveal no correlation between witness certainty and accuracy"); *see also United States v. Downing*, 753 F.2d 1224, 1230-32, 1244 (3d Cir. 1985) (noting that confidence-accuracy studies are often counter-intuitive to jurors); *Smithers*, 212 F.3d at 311-12 (expert testimony on weaknesses in the memory process that may affect eyewitness identification will assist the jury).

The need to ensure a correct understanding of the relationship between confidence and accuracy is particularly acute in Mr. Libby's case. The jury will be called upon to assess competing recollections of various conversations, often without the benefit of any documentary or other extrinsic evidence to assist in making that assessment. The Schmechel study shows that without Dr. Bjork's testimony at least some jurors will likely place undue reliance on the confidence with which the witnesses testify to their recollections. Conversely, the lack of a confidence-accuracy correlation will help the jury to understand how Mr. Libby could have asserted with such assurance to the FBI and grand jury that certain conversations did or did not occur in a particular way and have been innocently mistaken, rather than engaged in an effort to hide the truth.

### 2. The memory function is dynamic and prone to error at various stages; it does not record, store, or retrieve memories in verbatim form.

Jurors also may not understand how memories are encoded, stored, and retrieved. As the Schmechel study indicates, the actual reasons for, and frequency of, incomplete or flawed encoding, storage, and retrieval are not intuitive to the average juror. Those little-understood aspects of memory are crucial to understanding how Mr. Libby, as well as the government witnesses, might vividly remember particular aspects of a certain conversation but have no recollection or an inaccurate recollection of other issues that were discussed, or how they might otherwise confuse or misremember the conversations at issue. Dr. Bjork's testimony will provide the jury with that necessary understanding.

Memory research, including work by Dr. Bjork, has established that, contrary to what many jurors believe, memory does not function like a tape recorder, with memories recorded, stored, and played back verbatim. *See* Schmechel at 196, 211 (reporting that over half of the potential D.C. jurors surveyed thought that the act of remembering a traumatic event "is like a video recording in that one can recall details as if they had been imprinted or burned into one's brain"); *see also Smithers*, 212 F.3d at 312 n.1 (noting that social science data show that "many jurors' assumptions about how memories are created are actively wrong"). At the encoding phase of memory (*i.e.*, during the event itself and the period immediately following the event), events and information are not stored in a literal way, but rather are interpreted and then stored in memory with respect to existing memories, expectations, schemas, and goals. During the retention interval (*i.e.*, the period between encoding and retrieval), stored memories do not tend to remain in the as-encoded state, but rather are malleable. Existing memory representations are influenced and modified by subsequent and prior related events and information. Finally, retrieved memories are reconstructions, rather than exact reproductions of past events. The

reconstruction process at retrieval, like the encoding process, may be affected by a number of factors.

Dr. Bjork can assist the jury in its deliberations by explaining how these processes commonly give rise to memory errors, including both inaccurate memories of real events and seemingly real memories of events that did not occur. Those findings bear upon the testimony of virtually every potential witness in this case, including both the government officials and reporters with whom Mr. Libby allegedly discussed Ms. Plame, as well as Mr. Libby himself. Dr. Bjork's testimony on these points could, to cite just one possible example among many, help the jury to understand that Mr. Cooper's apparent recollection that Mr. Libby confirmed "without qualification" that Mr. Wilson's wife worked for the CIA may well be based on an error in *Mr. Cooper's* memory caused by his expectation (or hope) that Mr. Libby could be relied upon as a confirming source for information obtained from Mr. Rove.

We also expect Dr. Bjork to testify that the retrieval of a memory may be compromised by events that occur before or after encoding. "Retroactive interference" occurs when information a person obtains between encoding and retrieval impairs the retrieval of encoded memories. "Proactive interference" occurs when events that a person experienced *before* encoding impair retrieval. The fact that one's ability to remember a particular event can be affected by occurrences both *before* and *after* that event is likely not common knowledge. But it shows why—counter to what the average juror might otherwise conclude—Mr. Libby's activities for the entire period surrounding the crucial events in this case may have caused errors in his memory.

In a similar vein, Dr. Bjork will explain that memory errors may be caused by processes called "content borrowing" and "memory conjunction." Through these processes, a person may

incorrectly combine true memories of two or more distinct events to form a single, inaccurate memory. For example, a person who has read the sentences, "I went to the dance with Susan" and "I went skating with Alice" might incorrectly recall seeing the sentences "I went to the dance with Alice" or "I went skating with Susan." Studies show that such errors occur not only in the laboratory, but also when people recall real events in their own lives. Research findings concerning content borrowing and memory conjunction errors may support a potential argument that Mr. Libby or the government witnesses confused the conversations at issue with other, similar conversations during the same period.

### 3. Divided attention, both during encoding and at the time of retrieval, may give rise to serious errors in memory.

The ability to recall information accurately is also affected by whether a person's attention is divided—not only at the time of encoding but also at the time of retrieval. While divided attention during recall has little effect on memory of the *information* obtained earlier, it has a strong negative effect on recall of the *source* of that information, a phenomenon which commonly gives rise to "source misattribution errors."

This aspect of the memory process may not be known to the average juror. *See, e.g.*, Daniel Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 5 (2001) ("Misattribution is far more common than most people realize"). But jurors need information about the effect of divided attention at recall to understand potential errors in witnesses' recollection, including, for example, how they might mistakenly attribute a conversation with one person to a different, but in some respects similar, source.

As a final example, Dr. Bjork will explain that divided attention during the encoding phase has a significant effect on the later recall of the actual information obtained. The evidence will show that, in his role as national security advisor to the Vice President, Mr. Libby's

attention was intently focused on issues of grave importance, including domestic terrorist threats, perilous conditions for American troops and citizens abroad, and emerging foreign policy crises. These issues, sometimes matters of life and death, occupied Mr. Libby's mind and time throughout his lengthy work days. Dr. Bjork's testimony will show why these issues, which persisted from the time Mr. Libby first learned about former Ambassador Wilson through the summer and beyond, could have easily caused him to confuse or misremember minor details of conversations about the former Ambassador's wife and her job at the CIA—topics Mr. Libby did not consider significant at the time.

These findings from decades of memory research, and the other findings set forth in the expert disclosure for Dr. Bjork, will unquestionably assist the jury in understanding how to evaluate the potentially conflicting recollections of Mr. Libby and the government witnesses concerning the snippets of conversation at issue in the indictment. Dr. Bjork's testimony is essential to Mr. Libby's defense and should be admitted.

## CONCLUSION

For the foregoing reasons, the Court should admit the proposed expert testimony of Dr. Bjork.

| Dated: July 31, 2006 | Respectfully submitted, |
|---|---|
| /s/<br>Theodore V. Wells, Jr.<br>(D.C. Bar No. 468934)<br>James L. Brochin<br>(D.C. Bar No. 455456)<br>Paul, Weiss, Rifkind, Wharton<br>  & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY  10019-6064<br>(212) 373-3089 | /s/<br>William H. Jeffress, Jr.<br>(D.C. Bar No. 041152)<br>Alex Bourelly<br>(D.C. Bar No. 441422)<br>Baker Botts LLP<br>Alexandra M. Walsh<br>(D.C. Bar. No. 490484)<br>1299 Pennsylvania Ave., NW<br>Washington, DC  20004<br>(202) 639-7751 |
| /s/<br>Joseph A. Tate<br>Dechert LLP<br>2929 Arch Street<br>Cira Centre<br>Philadelphia, PA  19104<br>(215) 994-2350 | /s/<br>John D. Cline<br>(D.C. Bar No. 403824)<br>Jones Day<br>555 California Street, 26th Floor<br>San Francisco, CA  94104<br> (415) 626-3939 |