UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | Oral Argument Requested |
|     also known as "Scooter Libby," | ) | |
|     Defendant. | ) | |

**REPLY OF I. LEWIS LIBBY IN SUPPORT OF HIS MOTION TO ADMIT
EXPERT TESTIMONY UNDER FEDERAL RULE OF EVIDENCE 702**

In its opposition, the government does not challenge Dr. Bjork's expertise in the well-established science of memory.  Nor does it dispute the reliability of any aspect of Dr. Bjork's proposed testimony.  It also does not contest the studies, cited in Mr. Libby's opening memorandum, showing that potential jurors (including potential jurors in the District of Columbia) harbor profound misconceptions about how memory works and why it fails.  Instead, the government insists that, to the extent memory is relevant in this case, the jury will already have all of the knowledge it needs to perform its task.  And it asserts that, rather than assist, Dr. Bjork's testimony will confuse and mislead the jury and unnecessarily delay Mr. Libby's trial.

The government's arguments trivialize both the importance of memory issues in this case and the substance of Dr. Bjork's proposed testimony regarding those issues.  A central and possibly determinative question for the jury will be whether Mr. Libby innocently misremembered, rather than deliberately lied about, certain conversations alleged in the indictment.  A well-developed and uncontested body of research shows that the average juror lacks the information necessary to answer that question accurately.  Dr. Bjork's testimony is not being offered, as the government pretends, to establish that "sometimes people forget," Resp. at

13, but to give the jury specific, scientifically established information that it needs to decide whether Mr. Libby did or did not innocently forget in this case. As for the government's argument under Fed. R. Evid. 403, it is no small irony that in a case that may well hinge on the jury's decision whether the defendant intentionally lied or innocently misremembered, the government contends that the truth about memory is too confusing and will take too much time to convey.

As shown below, each of the government's arguments is unavailing. The Court should grant Mr. Libby's Motion to Admit Expert Testimony and allow the jury the benefit of hearing from Dr. Bjork.

## I. DR. BJORK'S EXPERT TESTIMONY WILL GREATLY ASSIST THE JURY IN MAKING ITS DETERMINATION OF GUILT OR INNOCENCE IN THIS CASE.

### A. The Central Question For The Jury Will Be Whether Mr. Libby Innocently Misremembered Or Deliberately Lied About Certain Conversations Alleged In The Indictment.

In this case, the jury's determination of guilt or innocence may turn largely on whether it concludes that Mr. Libby intentionally misrepresented the truth, or whether he simply misremembered the snippets of conversation he was asked to recall months after they occurred. Between the time that these conversations happened and when Mr. Libby was asked about them—in some cases nearly nine months—he was barraged with vitally important information on a daily basis and involved in a nearly constant rush of highly stressful situations. Such conditions, as Dr. Bjork can explain, have a dramatically detrimental effect on the accuracy of recall. Moreover, with the exception of a conversation with the Vice President in early June 2003 (which Mr. Libby described to the FBI in his very first interview), he has no notes that might be used to refresh or support his recollection. In fact, as far as the defense is aware, there is no significant documentary evidence showing who said what during many of the conversations

alleged in the indictment. *See* Memorandum in Support of Motion to Admit Expert Testimony ("Mem.") at 1.[1] As a result, the jury will be required to assess the accuracy and reliability of Mr. Libby's memory aided by little, and in many cases no, evidence to corroborate that memory or the competing memories of other witnesses. For these reasons, principles of memory and its reliability are highly, and perhaps uniquely, relevant in this case.

The government wrongly insists that a decision to admit Dr. Bjork's testimony will "supply authority for the admission of [expert testimony on memory] in virtually *all* cases— criminal and civil." Resp. at 11 (emphasis added). The government's alarmism is unwarranted. General issues of witness credibility may be present in "virtually all cases." But, as is clear from his summary of proposed testimony, Dr. Bjork's testimony will not be offered to assist the jury in basic credibility determinations or to reiterate the common-sense principle that "people forget." *See* Exh. A to Motion to Admit Expert Testimony ("Exh. A"). Rather, he will present and explain certain well-established, though in many instances counter-intuitive, principles regarding the function and failings of memory, principles that are directly relevant to a central question in this case: whether, with respect to certain conversations, Mr. Libby's memory could have plausibly failed. Such a close fit between expert testimony on memory and the specific

---

[1] The government claims that "there are few aspects of this case that will turn on witness testimony regarding the specific content of conversations that are wholly uncorroborated by documents or other evidence." Resp. at 16. The defense, however, is aware of little, if any, corroborating evidence related to the "specific content" of the conversations critical to the charges. There is no documentary evidence regarding the specific topics Mr. Libby and Mr. Russert may (or may not) have discussed. Mr. Cooper's notes of what Mr. Libby told him tend to impeach, rather than corroborate, the claim that Mr. Libby confirmed anything about Mr. Wilson's wife. Ms. Miller has interpreted her notes as reflecting statements made by Mr. Libby about Ms. Wilson, but those notes are highly ambiguous and their import is subject to serious question. As for conversations Mr. Libby allegedly had with various government officials, in most cases there is little or no evidence reflecting what actually was said in those conversations.

questions the jury must resolve is rare, and certainly not present "within the mainstream of cases." Resp. at 10.

In addition to offering dire and unjustified predictions about the effect of granting Mr. Libby's motion, the government insists that Dr. Bjork's testimony should not be admitted because in *other* cases courts have concluded that expert testimony on memory was not warranted. *See* Resp. at 9-10, 13-14. None of those cases, however, involved the same confluence of circumstances present here, and many of them actually *support* the admission of expert testimony where such circumstances *are* present. For example, in *Robertson v. McCloskey*, 676 F. Supp. 351 (D.D.C. 1988), issues of memory were peripheral; the court noted that the proposed testimony would "bolster *some* of the claims made by" the civil plaintiff. *Id.* at 353 (emphasis added). And the court specifically acknowledged that the outcome could be different in a case implicating the "constitutional rights of [a] criminal defendant[] seeking to rebut charges" based on another person's recollection of the central events in the case. *Id.* That is precisely the situation here.

Likewise, in *United States v. Carter*, 410 F.3d 942 (7th Cir. 2005)—another case relied on by the government—the court upheld the exclusion of expert testimony, but one of its explicit grounds for doing so was that the government had presented "significant additional evidence" corroborating its version of events. *Id.* at 950; *United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) (excluding expert testimony because, *inter alia*, several pieces of physical evidence linked the defendant to the bank robbery and his "own sister unequivocally identified him as the person captured on film by the surveillance cameras"). Here, as noted above, "significant additional evidence" supporting the government's version of what was or was not said in critical conversations is largely lacking.

The cases the government cites also belie its suggestion that expert testimony on memory must satisfy a heightened "special circumstances" test or is warranted only in certain defined categories of cases that have already been recognized by other courts. *Compare* Resp. at 7-10 (indicating that expert testimony on memory should be limited to cases involving "eyewitness identifications," "witnesses with mental conditions affecting memory," "repressed memories," or "other circumstance[s] in which the admission of expert testimony on memory has been approved in past cases") *with Robertson*, 676 F. Supp. at 354 (refusing to apply a "categorical rule" or "magic formula" and instead considering on a case-specific basis whether the testimony on memory "would be helpful to the jury").

That is not surprising. Neither Rule 702 nor *Daubert* supports the notion that expert testimony on memory is subject to a stricter standard of admissibility or should be categorically limited in its admissibility. Rather, both make clear that as long as expert testimony is reliable, relevant, and will assist the jury, the presumption is that it should be admitted. *See* Mem. at 3-6. Here, the first requirement is uncontested and the second two are plainly met.

**B.     The Principles About Which Dr. Bjork Will Testify Are Directly Relevant To This Case Yet Are Not Commonly Understood By The Average Juror.**

The government asserts that, to the extent memory *does* play a role in this case, the jury already has all of the knowledge it requires to perform its function. *See* Resp. at 12-17. That is incorrect.

Jurors certainly understand that "people sometimes forget, that memory is imperfect, and that memories fade with the passage of time." Resp. at 13. But the government's conclusion that hearing from Dr. Bjork will therefore be of no assistance to the jury trivializes the nature, substance, and import of his proposed testimony. Contrary to what the government suggests, Dr. Bjork will not simply ascribe "scientific jargon" to common sense principles of memory. Resp.

at 16. Rather, he will present and explain specific scientific findings regarding how, why, and in what ways memory can fail—many of which are unknown to the average juror. *See* Exh. A; *see also United States v. Brien*, 59 F.3d 274, 276 (1st. Cir. 1995) (an expert could assist the jury by providing "information about the mechanism of memory, types of errors, error rates, and other information not commonly possessed by the jury—information that may even be at odds with what a judge or juror might expect").

Perhaps recognizing this, the government also argues that "scientific details regarding the function of memory are neither necessary nor helpful to the jury's task." Resp. at 16; *see id.* at 18 ("Details regarding *how* defendant *may* have misremembered do not make it more plausible that defendant innocently relayed incorrect information"). To the contrary, findings concerning the function and failings of memory are critically important in this case. The government will apparently argue that it is implausible that Mr. Libby could have misremembered portions of conversations allegedly concerning Ms. Wilson and that therefore his testimony regarding those conversations must have been deliberately false.[2] Dr. Bjork's testimony, which will explain the often counter-intuitive circumstances under which memory *can* fail, is directly relevant to the jury's assessment of that and other claims the government will make in this case.

To take one example, at trial Dr. Bjork will explain that divided attention at the time of encoding and at the time of retrieval can have profound—yet very different—effects on the accuracy of memory.[3] Divided attention during encoding may cause inaccuracies in *all* aspects

---

[2] *See, e.g.*, Tr. of Feb. 24, 2006 Status Conference at 31-32 (Dkt. 59); Government's Resp. to Court's Inquiry Regarding News Articles the Government Intends to Offer as Evidence at Trial at 4-5 (May 12, 2006) (Dkt. 105) (indicating government will argue at trial that Mr. Libby's "disclosures to the press concerning Mr. Wilson's wife were not casual disclosures that he [could have] forgotten by the time he was asked about them by the [FBI] and before the grand jury").
[3] As explained in the summary of proposed testimony, the encoding phase of the memory process takes place during and immediately following the event that is the subject of the

of memory. Mem. at 13-14; Exh. A ¶ 8. In contrast, when attention is divided at the time of retrieval (because, for example, of overwhelmingly urgent matters otherwise occupying one's mind), the person may accurately recall the *information* obtained, but attribute that information to the wrong *source*. *Id.* ¶ 9. "Source misattribution error"—which is common but not commonly understood—could explain several of the memory errors that may have occurred in this case. *See, e.g.*, Daniel Schacter, *The Seven Sins of Memory: How the Mind Forgets and Remembers* 5 (2001) ("Misattribution is far more common than most people realize."). Yet, unless Dr. Bjork is permitted to explain the cause and prevalence of this and other types of memory error, the jury may find it implausible that a person could, for example, accurately recall the details of a particular conversation but mistake the identity of the person with whom he or she had that conversation.

Dr. Bjork also proposes to testify that, according to numerous studies, the correlation between confidence and accuracy in memory is weak, if it exists at all. As explained in Mr. Libby's opening memorandum, it is crucial that the jurors in this case appreciate that well-established, but counter-intuitive, finding. Among other things, it will help the jury to understand how Mr. Libby could have testified with some degree of confidence to the grand jury about his recollection of certain events—and have been innocently mistaken, rather than deliberately lying. *See* Mem. at 10. Notwithstanding its obvious relevance, the government dismisses the need for Dr. Bjork's testimony on this point, asserting without any support that jurors are likely to appreciate that a person may "recount inaccurate facts with total confidence in their accuracy." Resp. at 16. But, as detailed in Mr. Libby's opening memorandum, several studies of potential jurors have demonstrated precisely the opposite. *See* Mem. at 9-10.

---

recollection. Exh. A ¶ 1. Retrieval occurs when the person is called upon to remember the information. *Id.* ¶ 2.

The government also states that testimony regarding the lack of a confidence-accuracy correlation is unnecessary "where other evidence indicates that a witness's confidence in his or her own recollection is misplaced." Resp. at 14. As noted above, however, here there is little, if any, evidence concerning what was or was not said during many of the conversations alleged in the indictment. *See supra*, at 2-3, n.1. In any event, nothing in studies regarding the undue reliance jurors place on a witness's confidence suggests that misplaced reliance evaporates in the presence of other evidence.

The government nowhere contests the studies showing that jurors suffer from misconceptions regarding memory, but tries to downplay the authorities Mr. Libby cites by asserting that they "focus primarily on the reliability of eyewitness identification, a context that is legally as well as factually distinct from that presented by this case." Resp. at 14-15. In fact, each of the studies cited discusses broadly applicable findings of memory research, findings which may be germane in the eyewitness context but certainly are not particular to it. *See, e.g.*, Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air. L. & Com. 1421, 1430 (2001) (concluding, based on survey of relevant research, that jurors "lack understanding of when and under what circumstances memory is most likely to be inaccurate"); Richard S. Schmechel, Timothy P. O'Toole, Catharine Easterly & Elizabeth F. Loftus, *Beyond the Ken? Testing Juror's Understanding of Eyewitness Reliability Evidence*, 46 Jurimetrics J. 177, 195-96 (2006) (reporting that "46% of potential jurors [incorrectly] believe that the witness on the stand is effectively narrating a video recording of events that she can see in her 'mind's eye' for jurors").

Take the lack of a confidence-accuracy correlation. There is no logical or scientific basis to believe that a juror's erroneous assumption about the accuracy of eyewitness testimony—*e.g.*,

"I recall with confidence seeing Bob rob the bank"—would magically disappear if confronted with testimony regarding one's recollection of a particular conversation—*e.g.*, "I recall with confidence hearing Bob order John to rob the bank."

What's more, the government is wrong that cases turning on eyewitness testimony are not "remotely analogous" to this case. *See* Resp. at 15. Issues involving eyewitness memory are simply specific manifestations of the issues involving memory generally. And, in both the eyewitness cases and here, the accuracy of recollection is a "central issue" and "the jury's determination of guilt or innocence rests heavily on its assessment of [that] accuracy." *Id.*

If anything, it is the authority the *government* cites that is inapposite here. The government relies on cases concluding that, under the circumstances presented, expert testimony on memory was unnecessary since the jury would already possess all of the knowledge necessary to its task. Many of those cases, however, involved experts who, unlike Dr. Bjork, proposed to testify about principles of memory that may well be known to the average juror. *See, e.g., Robertson*, 676 F. Supp. at 352 (expert proposed to testify that, *inter alia,* "the accuracy of memory diminishes over time"); *Labansat*, 94 F.3d at 530 (expert would have testified that "memory fades with time"). In *Robertson*, moreover, Judge Green acknowledged that even evidence of that nature may be admissible where, as here, a criminal defendant's constitutional rights are implicated and accuracy of memory is a central issue in the case. *See* 676 F. Supp. at 353.

Furthermore, *all* of the government's cases either predate or largely ignore the wealth of research showing that the average juror is unlikely to understand the principles of memory necessary to its task. As shown in Mr. Libby's opening memorandum, courts have become increasingly cognizant of that research and therefore increasingly sensitive to the need for expert

testimony on memory. *See* Mem. at 8-9; *see, e.g., United States v. Brownlee*, 454 F.3d 131, 144 (3d Cir. 2006) (concluding that expert testimony was the "only method" of imparting knowledge necessary to correct misconceptions about memory); *see generally United States v. Smithers*, 212 F.3d 306, 311-12 (6th Cir. 2000) (charting the history of courts' increasing willingness to permit expert testimony "on the subject of the psychological factors which influence the memory process"). In a case cited by the government itself, Judge Posner observes that the lack of a strong confidence-accuracy correlation runs counter to "lay intuition" regarding memory, and could be the proper subject of expert testimony depending on the circumstances of the case. *See Krist v. Eli Lilly and Co.*, 897 F.2d 293, 296-99 (7th Cir. 1991). Notably, *Krist* did not arise in the context of eyewitness testimony but rather involved the accuracy of a witness's recollection of her own actions. *Id.*

To the extent the studies attached to Mr. Libby's initial memorandum leave any doubt that jurors' "common sense" cannot substitute for Dr. Bjork's expert testimony about the science of memory, we propose to call at an evidentiary hearing on this motion Dr. Elizabeth Loftus, a co-author of those studies. Dr. Loftus—who, like Dr. Bjork, has impeccable credentials in the field of memory research—will testify about the significance of those studies and, based on her decades of experience and research, about the extent to which jurors' intuitions about memory diverge from scientific findings.

### C. The Principles Of Memory About Which Dr. Bjork Proposes To Testify Cannot Be Effectively Imparted To The Jury Through Cross-Examination or Jury Instructions.

Perhaps acknowledging that the jury may not, on its own, be aware of the principles of memory necessary to perform its task, the government proposes that any "issues related to faulty memory [can be] adequately addressed through cross-examination of witnesses and jury instructions." Resp. at 9; *see id.* at 11. Not so.

Cross-examination and jury instructions may be an effective approach in some circumstances where a defendant seeks to identify gaps or inconsistencies in a witness's recollection, or to remind the jury of certain principles that, as a matter of common sense, should be considered in assessing a witness's testimony. *See, e.g.*, *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994) (district court instructed the jury to consider, *inter alia*, whether the witness "had the capacity and adequate opportunity to observe the [defendant]"); *Carter*, 410 F.3d at 950-51 (instructions reminded jurors to consider, *e.g.*, "whether, or to what extent, the witness had the ability to observe the person at the time of the offense and to make a reliable observation later"). Here, however, the expert testimony is not offered to achieve either of those purposes. Rather, Dr. Bjork will testify regarding specific findings of memory research that are, as demonstrated above, not a matter of common sense, yet are directly relevant to the jury's deliberations.

No other witness in this case can testify about that science on direct or cross-examination. Indeed, cross-examination is obviously irrelevant when it comes to establishing how and why *Mr. Libby's* recollection of certain events could have innocently failed. Direct examination is also incapable of achieving that purpose. Rather, only expert testimony can educate the jury on scientific principles such as "proactive interference" and "retroactive interference," which may explain how events both *before* and *after* encoding could have impaired Mr. Libby's recollection. *See* Mem. at 12; Exh. A ¶ 10.[4]

---

[4] The government claims that "[i]t is common knowledge that people can forget things and confuse details, especially when they are focused on other matters." Resp. at 13. But its own filings in this case evidence that the government itself, like other non-experts, has no appreciation for processes like proactive and retroactive interference. *See* Reply Memorandum Concerning Use, Relevance, and Admissibility of Classified Documents and Information Listed in Defendant's Consolidated CIPA § 5 Notice, at 18-19 (Sept. 15, 2006) (citing Government's Mem. in Opp'n at 25 (Sept. 12, 2006)).

The cases the government cites provide no comfort that cross-examination could be used as a substitute for Dr. Bjork's testimony.  For example, in *United States v. Rodriguez-Felix*, 450 F.3d 1117 (10th Cir. 2006), the court held that questions about the "lengthy period of time that lapsed between the eyewitnesses' encounters with [the defendant] and their ultimate identification of [him] . . . amply exposed the common-sense deficiencies in the prosecution's identification case." *Id.* at 1126.  But the "common-sense" notion that a simple delay between observation and identification may cause inaccuracy bears no resemblance to the relevant, but more complicated and often counter-intuitive, principles about which Dr. Bjork proposes to testify.  In fact, the court in *Rodriguez-Felix* specifically recognized that "expert testimony, when directed at complex issues, may provide a more effective tool" than cross-examination.  *See id.* at 1125.

The government's assertion that jury instructions are an adequate substitute for Dr. Bjork's testimony misses the mark for similar reasons.  Jury instructions do, as a matter of course, remind jurors to account for general factors that, as a matter of common sense, tend to affect the accuracy or reliability of a person's recollection.  *See, e.g.,* 1A Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 15.01 (5th ed. 2000) (instructing jurors to consider, *inter alia*, a witness's ability to observe matters about which he testified) [hereinafter *Federal Jury Practice and Instructions*].  They do not, however, ordinarily impart the principles Mr. Libby seeks to convey through Dr. Bjork's proposed testimony.  Other courts have recognized the inadequacy of jury instructions as a substitute for this kind of testimony.  In *United States v. Sullivan*, 246 F. Supp. 2d 696 (E.D. Ky. 2003), the court concluded that jury instructions were a "problematic" alternative to expert testimony on the accuracy of eyewitness identification for two reasons:

> First, without expert testimony on the theories of memory that underlie these factors, there is no foundation supporting the issuance of such instructions. Second, the court finds that introducing such factors for the first time in the jury instructions, without providing the jury any information about how those factors affect the identification process, is likely to be more confusing than helpful.

*Id.* at 699. The same concerns preclude the use of jury instructions as a substitute for Dr. Bjork's expert testimony in this case.[5]

## II. DR. BJORK'S EXPERT TESTIMONY WILL NOT CONFUSE, MISLEAD, OR UNDULY INFLUENCE THE JURY; NOR WILL IT CAUSE UNNECESSARY DELAY.

In conclusion the government argues that even if Dr. Bjork's proposed testimony meets the requirements of Rule 702 and *Daubert* (which it does), the testimony should nonetheless be excluded under Rule 403. The government's arguments in support of that position are meritless.

The government first argues that Dr. Bjork's testimony will unnecessarily protract the proceedings because "jurors do not need expert testimony regarding the mechanics of forgetting to understand that the defendant or the other witnesses may have forgotten details of relevant events and conversations." Resp. at 18-19. That argument is yet another example of the government's repeated effort to trivialize the import of Dr. Bjork's proposed testimony. Dr. Bjork is not being called to testify that Mr. Libby "may have forgotten details," but to explain to the jurors scientific principles about the functioning of memory that will help them to decide whether Mr. Libby *did* forget.

Whether Mr. Libby did forget or did not innocently forget may well be the outcome-determinative question in this case. Information about how memory works and why it might fail

---

[5] The government's passing suggestion that the substance of Dr. Bjork's testimony can be conveyed through argument by counsel, Resp. at 12, must also be rejected. For, absent testimony establishing the principles Dr. Bjork will describe, counsel would have no basis for describing those principles and arguing that they are relevant in this case. *See United States v. Earle*, 375 F.3d 1159, 1163 (D.C. Cir. 2004) ("It is a serious error for counsel to make statements in closing argument unsupported by evidence.").

- 13 -

will be crucial to the jury's ability to answer that question accurately. Understanding well-established but often counter-intuitive principles of memory will, among other things, directly inform the jury's assessment of the evidence regarding the pressing issues that occupied Mr. Libby's mind—and their relative importance to him—as these conversations took place, months later when he was asked to recall the conversations for the FBI and the grand jury, and during the time in between. *See* Mem. at 7-14; *see supra* at 2-4, 6-9, 10-12. Mr. Libby cannot fairly be deprived of the opportunity to present reliable testimony regarding directly relevant, well-established findings of memory, which show under what circumstances and in what ways errors of memory can occur and which the jury is otherwise not likely to know. *See Brownlee*, 454 F.3d at 144 (refusing to hold that expert testimony "vitiat[ing] the primary evidence offered by the government" would "waste[] time or confuse[] the issue") (brackets, citation and quotation marks omitted).

      Nor, contrary to the government's suggestion, will Dr. Bjork's testimony involve a "wide-ranging inquiry into the mysteries of human perception and recollection." Resp. at 11 (citation and quotation marks omitted). Rather, as made clear from the summary attached to Mr. Libby's motion, Dr. Bjork will testify on a limited set of specific findings of memory research directly relevant to the issues presented by this case. His direct examination is expected to last no more than two hours. Because the direct testimony will be concise and targeted, cross-examination of Dr. Bjork should be similarly circumscribed. The government alludes to the "possibility" that it will present its own expert to rebut Dr. Bjork's testimony. Resp. at 19. That possibility seems unlikely given the widely-accepted nature of the findings Dr. Bjork will describe, and the fact that the government's response does not challenge the reliability of any aspect of Dr. Bjork's testimony. But even if a rebuttal witness were called, the time necessary to

present both witnesses would not be significant and cannot—consistent with Mr. Libby's right to present a full defense—be cited as a basis for exclusion. *See United States v. Downing*, 753 F.2d 1224, 1243 n.27 (3d Cir. 1985) (parties are "entitled" to present reliable, probative expert testimony that is specific "whether or not it adds to the length of the trial" since the benefit of enhanced fact-finding offsets any disadvantage of delay).

The government also worries that Dr. Bjork's testimony would "give undue weight to the defendant's innocent mistake theory by cloaking it in an unwarranted 'aura of special reliability and trustworthiness.'" Resp. at 19 (citing *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004)). But the concern about an "unwarranted aura" in *Cruz* stemmed from the fact that the expert in that case (a law enforcement official who testified as both a fact witness and an expert regarding drug trade parlance) strayed from his area of expertise and, instead of applying reliable methodology, depended on his knowledge of the defendant. 363 F.3d at 194-97. Here, the government *concedes* that Dr. Bjork is a well-qualified expert on memory, and that the subject of his proposed testimony directly relates to that expertise. *See* Resp. at 1. The government, moreover, does not contest that the findings about which Dr. Bjork will testify have been tested and confirmed in numerous studies meeting the rigors of the scientific method. *See* Mem. at 6-7.

Under these circumstances, any "aura of reliability" the jury attaches to Dr. Bjork's testimony would not be unwarranted or unfairly prejudicial. Indeed, in another case cited by the government, the court concluded that because the expert was qualified and his testimony reliable, any "aura of reliability" reflected the expert's "actual reliability as an expert witness" and therefore caused no unfair prejudice. *See United States v. Mathis*, 264 F.3d 321, 339 (3d Cir. 2001). Moreover, to the extent Dr. Bjork's testimony relates to or supports any theory of defense Mr. Libby may offer, that is a reason to *admit* the testimony, not to exclude it. As this Court well

knows, a party cannot be precluded from offering evidence simply because it prejudices the other side; rather, Rule 403 only prohibits evidence that causes *unfair* prejudice. *See United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) ("Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403"); *see also United States v. Cruz-Kuilan*, 75 F.3d 59, 61 (1st Cir. 1996) (because expert testimony was so "tightly linked" to the issues in the case, "it would be surpassingly difficult to justify a finding of unfair prejudice from its introduction"). As made clear above, Dr. Bjork's testimony would do no such thing.

The government, of course, is not without recourse in challenging Dr. Bjork's testimony or its application to this case. It remains free to conduct a rigorous cross-examination, to call a rebuttal expert witness, and to request an instruction that the jury is not required to credit what Dr. Bjork says. *See, e.g., Federal Jury Practice and Instructions* § 14.01 (reminding jurors that they may disregard opinion evidence provided by an expert witness).

Finally, the government contends that if presented with Dr. Bjork's testimony, the jurors could become "unduly skeptical of all witnesses," "surrender their own common sense in weighing testimony," or conclude that "witness testimony regarding past events and conversations" can *never* support a conviction in a criminal case. Resp. at 19-20. These concerns are hyperbolic—not least because the government does not challenge the accuracy of any aspect of Dr. Bjork's proposed testimony—and again reveal the government's misunderstanding of that testimony. Memory research has not established, and Dr. Bjork will not testify, that the processes of memory are always faulty or as a rule unreliable. Rather, he will explain how, why, and under what circumstances memory *may* fail. *See* Exh. A. To the extent that Dr. Bjork's relevant and concededly reliable testimony causes the jurors to re-examine and

question their "common-sense"—but mistaken—assumptions about memory, that again is a reason to *admit* the testimony, not to exclude it. It would disserve the truth-finding function of the criminal trial to deny jurors information that will allow them to reach more accurate conclusions.

Nor, contrary to the government's suggestion, will Dr. Bjork try to usurp the jury's role in weighing the testimony of the witnesses. Resp. at 17, 19. Dr. Bjork will offer no conclusions about whether the memory of any particular witness should be credited or discounted. Rather, he will testify regarding findings of memory research, which the jury may then *itself* apply in making its own particularized determinations of credibility and reliability. *Compare United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) (cited by the government and holding that expert psychological testimony that a key government witness was a sociopath and "would lie when it was to his advantage to do so" was properly excluded) *with Sullivan*, 246 F. Supp. 2d at 698-99 (admitting expert testimony on "general theories of memory" as it would "aid the jury in evaluating the accuracy" of the recollections at issue).

In short, any concerns that Dr. Bjork's testimony will unnecessarily protract the proceedings, cause unfair prejudice, or mislead or confuse the jury are unfounded.

## CONCLUSION

The same government that routinely and successfully sponsors gang experts, drug distribution experts, child abuse accommodation syndrome experts, counter-surveillance experts, pimp-prostitute experts, "Stockholm syndrome" experts, vehicle parts experts, and stone experts, among others,[6] now wants to draw the line at a concededly qualified expert on memory who

---

[6] *See United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (gang expert); *United States v. Young*, 745 F.2d 733, 761 (2d Cir. 1984) (heroin distribution expert); *United States v. Hadley*, 918 F.2d 848, 852-53 (9th Cir. 1990) (child sexual abuse accommodation expert); *United States*

seeks to testify about undisputed, scientifically based principles that are directly relevant to the central issue the jury must resolve. As shown above, its grounds for doing so are uniformly meritless. For the reasons given in his opening memorandum and above, Mr. Libby's Motion to Admit Expert Testimony should be granted.

Dated: September 15, 2006                                    Respectfully submitted,

| /s/ | /s/ |
|---|---|
| Theodore V. Wells, Jr. | William H. Jeffress, Jr. |
| (D.C. Bar No. 468934) | (D.C. Bar No. 041152) |
| James L. Brochin | Alex Bourelly |
| (D.C. Bar No. 455456) | (D.C. Bar No. 441422) |
| Paul, Weiss, Rifkind, Wharton | Baker Botts LLP |
|   & Garrison LLP | Alexandra M. Walsh |
| 1285 Avenue of the Americas | (D.C. Bar. No. 490484) |
| New York, NY 10019-6064 | 1299 Pennsylvania Ave., NW |
| (212) 373-3089 | Washington, DC 20004 |
|  | (202) 639-7751 |

| /s/ | /s/ |
|---|---|
| Joseph A. Tate | John D. Cline |
| Dechert LLP | (D.C. Bar No. 403824) |
| 2929 Arch Street | Jones Day |
| Cira Centre | 555 California Street, 26th Floor |
| Philadelphia, PA 19104 | San Francisco, CA 94104 |
| (215) 994-2350 | (415) 626-3939 |

---

v. *Alonso*, 48 F.3d 1536, 1540 (9th Cir. 1995) (expert in surveillance and counter surveillance practices used by drug dealers); *United States v. Anderson*, 851 F.2d 384, 392 (D.C. Cir. 1988) (expert on the lifestyle of pimps and their relationship with prostitutes); *United States v. Peralta*, 941 F.2d 1003, 1009 (9th Cir. 1991) ("Stockholm syndrome" expert); *United States v. Glover*, 265 F.3d 337, 343-44 (6th Cir. 2001) (vehicle parts expert); *United States v. McPhilomy*, 270 F.3d 1302, 1312-14 (10th Cir. 2001) (expert in quality, quantity, and value of stone).