## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | <u>Oral Argument Requested</u> |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

### I. LEWIS LIBBY'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO REPORTERS' FIRST AMENDMENT LITIGATION, CONTEMPT PROCEEDINGS, AND JUDITH MILLER'S INCARCERATION

I. Lewis Libby, through his counsel, hereby moves *in limine* to preclude the government from presenting evidence or argument at trial concerning any of the following four topics:

1.  Whether any news reporters refused to testify in the government's investigation of the disclosure of Valerie Wilson's identity (the "investigation");

2.  Litigation involving news reporters and relating to the investigation, including any news reporters' motions to quash grand jury subpoenas;

3.  Threatened or actual contempt proceedings against any news reporter, including Judith Miller and Matthew Cooper, relating to the investigation; and

4.  Judith Miller's imprisonment for contempt of court, including the letter dated September 15, 2005 that Mr. Libby sent to Ms. Miller in jail.

The government has indicated that it plans to argue at trial that Mr. Libby felt free to lie about his conversations with reporters because he expected that they would not cooperate with the investigation. The defense is concerned that the government will attempt to use the evidence we seek to exclude as part of an unfair and misleading effort to prop up this implausible argument. Such evidence also threatens to lure jurors into mistakenly believing that Mr. Libby did something to impede the government from obtaining testimony from certain reporters. Of

course, just the opposite is true.  Mr. Libby voluntarily waived all confidentiality guarantees he

had received from reporters and repeatedly requested them to testify.

     None of these issues has any relevance to the charges against Mr. Libby.  The reporters

who resisted testifying grounded their legal challenges on the First Amendment, reporters'

privilege, and principles of journalistic ethics.  Neither the litigation concerning reporters'

motions to quash the grand jury's subpoenas nor the related contempt proceedings are probative

of whether Mr. Libby lied to the FBI or the grand jury.  Mr. Libby's state of mind is at issue in

this matter—not the litigation strategies of reporters.

     If necessary, the defense is prepared to establish at trial that no reporter refused to comply

with a subpoena or went to jail at Mr. Libby's behest.  But proving this point would require a

lengthy "trial within a trial" involving extensive testimony from many additional witnesses,

including the attorneys who represented certain reporters.  The defense may even need to call the

Special Counsel to testify about his discussions with counsel for Mr. Libby and counsel for

reporters concerning the voluntariness of Mr. Libby's waiver.  To avoid such unnecessary

distractions, the subject matters listed above should be excluded at trial.

<u>MEMORANDUM OF LAW</u>

BACKGROUND

A.    <u>Mr. Libby Released All Reporters From Their Pledges Of Confidentiality To Him.</u>

     Shortly after the government's investigation of the disclosure of Valerie Wilson's identity

began, Mr. Libby was interviewed twice by the FBI, on October 14 and on November 26, 2003.

Mr. Libby answered questions during these interviews about his on- and off-the-record

conversations in June and July 2003 with numerous reporters, including Tim Russert, Matthew

Cooper, and Judith Miller, all of whom are mentioned in the indictment, as well as Evan Thomas

of *Newsweek*, David Sanger of the *New York Times* and Glenn Kessler of the *Washington Post*, who are not.

During the second interview, the FBI asked Mr. Libby to release reporters it wanted to question from any promises of confidentiality they had made to him, and to request that they fully disclose any conversations they may have had with him regarding former Ambassador Joseph Wilson or his wife. Consistent with his desire to cooperate fully with the investigation, Mr. Libby signed such a waiver on January 5, 2004. *See* Statement & Waiver of I. Lewis Libby (Jan. 5, 2004) (Ex. A). That waiver states:

> I request any member of the media with whom I may have communicated regarding the subject matters under investigation[1] to fully disclose all such communications to federal law enforcement authorities. In particular, I request that no member of the media assert any privilege or refuse to answer any questions from federal law enforcement authorities on my behalf or for my benefit in connection with the subject matters under investigation.

*Id.* Mr. Libby testified before the grand jury on March 5 and 24, 2004. Again, he testified fully about his conversations with reporters in June and July 2003.

Mr. Libby expected that all of the reporters to whom he had spoken would also cooperate with the government. Through his attorney, Joseph Tate, he confirmed the voluntariness of his confidentiality waiver every time he was asked to do so by counsel for reporters and requested that reporters disclose their communications with him to the government. Mr. Libby expected that he would be exonerated by the reporters' testimony, largely because—contrary to press speculation at the time—he was not a source for Robert Novak's column mentioning Ms. Wilson's CIA employment, because he had never engaged in any effort, concerted or otherwise,

---

[1] These subject matters were defined as "the possible disclosure to unauthorized persons of classified information in connection with Ambassador Joseph Wilson, his trip to Niger in February 2002, and matters relating thereto."

to disclose Ms. Wilson's identity, and because he had no reason to believe that the conversations

he had with reporters regarding Ms. Wilson were unlawful or wrongful in any respect.

B.   Certain Reporters Challenged Grand Jury Subpoenas Issued To
     Them Notwithstanding Mr. Libby's Voluntary And Unqualified
     Confidentiality Waiver And His Request That They Testify.

At various times during 2004, the grand jury issued subpoenas to reporters who had

spoken to Mr. Libby. These reporters reacted to the subpoenas in different ways. Certain of

them (such as Robert Novak, Glenn Kessler and Walter Pincus) testified without mounting legal

challenges to the subpoenas they had received. Mr. Kessler and Mr. Pincus made clear that they

were testifying because Mr. Libby had asked them to speak to the Special Counsel. For

example, Mr. Kessler made the following public statement: "Mr. Libby signed a waiver in

which he asked me to discuss with the Special Counsel whether the Wilson matter was raised in

two conversations I had with him in 2003. Under these circumstances, at the request of my

source, I am giving a deposition regarding these questions." Statement of Glenn Kessler (June

22, 2004) (Ex. B).

Mr. Russert, Mr. Cooper, and Ms. Miller moved to quash the subpoenas issued to them,

invoking a so-called "reporters' privilege" purportedly arising under the First Amendment and

common law. The resulting litigation, contempt proceedings, and negotiations involving the

Special Counsel and these reporters were protracted and complex.

The District Court rejected motions to quash by Mr. Russert and Mr. Cooper on July 20,

2004. Mr. Russert chose not to appeal and was interviewed by the Special Counsel on August 7,

2004 about what he had said and not said to Mr. Libby. A statement issued two days later by

NBC, Mr. Russert's employer, announced Mr. Russert's decision to testify, explaining that "Mr.

Libby had previously told the FBI about the conversation and had formally requested that the

conversation be disclosed." NBC News Statement (Aug. 9, 2004) (Ex. C).

Mr. Cooper resisted the District Court's order to testify. In his words, he "fought the order to protect the principle of source confidentiality." Matthew Cooper, *What Scooter Libby And I Talked About*, TIME, Oct. 30, 2005 at 1 (Ex. D). Upon the Special Counsel's subsequent contempt motion, Mr. Cooper was found in civil contempt on August 9, 2004. Mr. Cooper agreed to a deposition concerning his discussions with Mr. Libby after his attorney, Floyd Abrams, was reassured by Mr. Tate that Mr. Libby's confidentiality waiver was indeed voluntary.[2] *Id.* at 2. Mr. Cooper has made clear that he testified because he received personal assurances from Mr. Libby that his waiver was voluntary. *Id.*

In 2004, Ms. Miller, like Mr. Cooper, was represented by Mr. Abrams. After Ms. Miller received grand jury subpoenas in August 2004, Mr. Tate confirmed to Mr. Abrams that Mr. Libby had voluntarily agreed to waive confidentiality with respect to his conversations with Ms. Miller. *See* Letter from Joseph A. Tate to Patrack J. Fitzgerald at 1 (Sept. 16, 2005) (Ex. E). Mr. Abrams said he understood this, but that Ms. Miller was committed to challenging the subpoenas on principle and to protect sources other than Mr. Libby. *Id.* Throughout the legal struggle that followed, Ms. Miller maintained in her public statements and court filings that she was refusing to testify to vindicate "the highest traditions of the press." *See, e.g.*, Mot. of Judith Miller for Recons. of Oct. 7, 2004 Contempt Order at 1 (July 1, 2005).

Ms. Miller's motion to quash was denied by the District Court on September 9, 2004. The Special Counsel's subsequent contempt motion led to an order from the District Court holding Ms. Miller in civil contempt on October 7, 2004. The D.C. Circuit affirmed the

---

[2]    Mr. Cooper was held in contempt by the District Court again on October 13, 2004, based on his refusal to comply with a second subpoena seeking information solely relating to his communications with Karl Rove. After further proceedings, which were entirely unrelated to Mr. Cooper's testimony regarding Mr. Libby, Mr. Cooper eventually testified before the grand jury again on July 13, 2005.

contempt order on February 15, 2005.  After the Supreme Court denied *certiorari* on June 27, 2005, and Ms. Miller continued to defy the order to testify, the District Court ordered her to jail on July 6, 2005.

In August 2005, attorney Robert Bennett, who had taken over representation of Ms. Miller, began contacting Mr. Tate to discuss Ms. Miller's desire to get out of jail.  Mr. Tate was surprised to hear from Mr. Bennett.  Based on Mr. Abrams' previous statements, and because Mr. Libby had provided a full and voluntary waiver, Mr. Tate and Mr. Libby had both assumed that Ms. Miller's incarceration had to do with her principles and her desire to protect other sources, and had nothing to do with Mr. Libby.  Mr. Tate assured Mr. Bennett that he had told Mr. Abrams previously that Mr. Libby's waiver was indeed voluntary.

On September 12, 2005, the Special Counsel sent a letter to Mr. Tate expressing concern that Ms. Miller was in jail because of a possible "misunderstanding" about the waiver and stating that communications between Mr. Libby and Ms. Miller about the waiver would not "be viewed as obstructive conduct."  Letter from Patrick J. Fitzgerald to Joseph A. Tate at 3-4 (Sept. 12, 2005) (Ex. F).  "In fact," the Special Counsel stated, "I would welcome such a communication reaffirming Mr. Libby's waiver as it might assist the investigation and lead to Ms. Miller's release." *Id.* at 3.  Mr. Tate learned from Mr. Bennett (for the first time) that Ms. Miller wanted personal communications from Mr. Libby repeating that his waiver had not been coerced—specifically, a phone call and a letter.  In response to these requests from the Special Counsel and Ms. Miller's attorney, Mr. Libby, through his counsel, sent Ms. Miller a letter dated September 15, 2005.  In that letter, he reaffirmed that she should rely on his waiver and urged her to leave jail and testify.  Mr. Libby conveyed the same message to Ms. Miller by telephone on September 19, 2005.

After Ms. Miller agreed to testify, she was released from jail on September 29, 2005.  She has stated publicly that her decision to testify was based on Mr. Libby's personal encouragement and the Special Counsel's agreement to limit the scope of his questioning so that she could protect sources other than Mr. Libby.  *See* Judith Miller, *A Personal Account; My Four Hours Testifying in the Federal Grand Jury Room*, N.Y. TIMES, Oct. 16, 2005, at 2 (Ex. G).  Ms. Miller testified before the grand jury twice, on September 30 and October 12, 2005.

In sum, Mr. Libby repeatedly communicated to reporters that his waiver was voluntary and exhorted them to testify before the grand jury.  He will likely present such evidence at trial.  Mr. Libby bears no responsibility for the decisions some reporters made to invoke the reporters' privilege and refuse to testify.  No evidence adduced by the government suggests that Mr. Libby attempted to impede the grand jury from obtaining testimony from reporters, and Mr. Libby certainly has not been charged with such an offense.  In addition, in a letter dated January 23, 2006, the government informed the defense that it did not intend to offer any evidence of "other crimes" pursuant to Rule 404(b), and the government has never indicated to the defense that this position has changed.

## ARGUMENT

### I.    THE EVIDENCE AT ISSUE SHOULD BE EXCLUDED BECAUSE IT IS NOT RELEVANT.

Evidence and arguments about reporters' motions to quash, related contempt proceedings, and Ms. Miller's incarceration are irrelevant and therefore inadmissible.  *See* Fed. R. Evid. 402.  These are collateral matters that bear absolutely no relationship to the perjury, obstruction, and false statements charges against Mr. Libby.

"[T]he only question the jury will be asked to resolve in this matter will be whether the defendant intentionally lied when he testified before the grand jury and spoke with FBI

agents . . . ." Order at 2 (June 2, 2006) (Dkt. 112). The Court's rulings in this case have made

clear that this trial will focus primarily on Mr. Libby's state of mind. *See*, *e.g.*, *id.* at 6. The

decisions made by certain reporters and their attorneys to challenge grand jury subpoenas and

contempt orders are not probative of Mr. Libby's state of mind. And although reporters who

fought the grand jury's subpoenas will be important witnesses at trial, the proper focus of their

testimony will be their conversations with Mr. Libby in June and July 2003, not their First

Amendment litigation in 2004 and 2005.

The defense is particularly concerned that the government will attempt to use the

evidence we seek to exclude as part of an improper attempt to bolster its motive arguments. The

government's motive theory is that Mr. Libby decided to tell a false story in his October 14,

2003 FBI interview: specifically, that he learned that Mr. Wilson's wife worked for the CIA

from the Vice President, forgot this information, and later thought he learned it for the first time

from a reporter. *See* Government's Resp. to Def.'s Third Mot. to Compel Disc. at 28 (Apr. 5,

2006) (Dkt. 80). According to the government, after this interview, the "die was cast" and Mr.

Libby was subsequently locked in to this untrue version of events. *Id.* Based on this unfounded

conjecture, the government has argued—and will likely argue at trial—that Mr. Libby thought he

could lie about his conversations with reporters with impunity because he assumed they would

not cooperate with the investigation.[3] Sept. 28, 2006 Hr'g Tr. at 16-18. The reporters' legal

---

[3] This argument rings hollow for a number of reasons. For example, regardless of whether
Mr. Cooper chose to disclose the details of his conversation with Mr. Libby to the
government, Mr. Libby could not have assumed that he could falsely represent the details of
that conversation with abandon. This is because two other witnesses were present for that
call: Cathie Martin, Assistant to the Vice President for Public Affairs, and Jenny Mayfield,
Mr. Libby's personal assistant. Obviously, Mr. Libby could not have expected that either
Ms. Martin or Ms. Mayfield would refuse to cooperate with the investigation or testify
falsely.

battles, however, occurred months, if not years, after Mr. Libby supposedly concocted his cover story and repeated it to the FBI and the grand jury. These *later* developments could not possibly have influenced Mr. Libby's state of mind or motives during the relevant time period. For this reason alone, evidence of such topics should be excluded.

## II.    THE EVIDENCE AT ISSUE SHOULD BE EXCLUDED BECAUSE IT WILL DISTRACT AND MISLEAD THE JURY.

Even if the evidence at issue did have any relevance, it is slight at best, and it should be excluded under Rule 403 because of the likelihood that it will confuse the jury and protract the proceedings with litigation of what is indisputably a collateral matter.

If the subjects we request the Court to exclude are raised by the government at trial, jurors will undoubtedly speculate about why certain reporters resisted testifying notwithstanding Mr. Libby's urging—an issue wholly unrelated to Mr. Libby's guilt or innocence. They may assume, incorrectly, that certain reporters were trying to protect Mr. Libby by fighting the subpoenas from the grand jury. In fact, as shown above, each reporter who refused to testify appears to have been influenced by a different mix of personal and professional motivations, none of which had anything to do with Mr. Libby. To counter any suggestion otherwise, the defense would need, and be entitled, to show the jury that reporters resisted complying with the subpoenas for a variety of different reasons, such as defending what they perceived to be First Amendment values; upholding the integrity and tradition of their profession; enhancing their reputations among their peers; courting favorable media coverage; and protecting other sources.

The defense would demonstrate such points at trial by presenting evidence about reporters' legal and public relations strategies; about communications between and among Mr. Libby's counsel, the Special Counsel, and attorneys for the reporters; and about reporters' understandings of the nature of Mr. Libby's confidentiality waiver. The presentation of such

evidence could significantly delay the trial.  For example, the defense would need to call

attorneys including Mr. Abrams and Mr. Bennett to testify, which could lead to motions to quash

and/or litigation regarding the scope of the attorney-client privilege.  The defense may also need

additional discovery regarding certain reporters' efforts to avoid testifying.

Further, the defense would be entitled to show that Mr. Libby had no reason to believe

that the reporters would be successful in resisting grand jury subpoenas based on claims of

reporters' privilege, even if (for reasons unrelated to him) they attempted to do so.  Explaining

this complicated matter of constitutional law could require hours of testimony and argument

about a confusing legal issue that is ultimately irrelevant to Mr. Libby's guilt or innocence.

In sum, allowing the evidence Mr. Libby seeks to exclude would produce exactly the

kind of lengthy "trial within a trial" that this Court should prevent.  *See, e.g.*, *United States* v.

*Fonseca,* 435 F.3d 369, 376 (D.C. Cir. 2006) (Rule 403 intended to prevent delay and "mini-

trial[s]" on collateral issues); *United States* v. *Hill*, 322 F.3d 301, 309-10 (4th Cir. 2003)

(Traxler, J. concurring) (noting that district court could have excluded evidence because it may

have resulted in a "trial within a trial" and confused the issues to be decided by the jury).  Even if

jurors arrive at a complete understanding of why each reporter resisted testifying, they will be no

closer to determining whether the government has proved the charges set forth in the indictment

beyond a reasonable doubt.

Finally, the facts relating to the contempt proceedings against Judith Miller and her 85-

day stint in jail are particularly convoluted and have a heightened potential to confuse the jury.

The introduction of these issues would undoubtedly cause jurors to wonder whether Ms. Miller

went to jail in an effort to shield Mr. Libby from liability, and whether Mr. Libby is to blame for

her incarceration.  Such speculation would be particularly prejudicial to Mr. Libby.  In response,

the defense would seek to present the full story of why Ms. Miller decided to go to jail and why she chose to leave. The Special Counsel is a significant player in this story. He was involved in discussions with counsel for Ms. Miller and counsel for Mr. Libby about the voluntariness of Mr. Libby's waiver, and he made efforts to help broker an arrangement that would permit Ms. Miller to testify (including but not limited to his September 12, 2005 letter). If the government seeks to introduce evidence about Ms. Miller's imprisonment and about communications between Ms. Miller and Mr. Libby concerning his confidentiality waiver, the defense may need to call the Special Counsel as a witness at trial. It is manifest that such an unnecessary complication should be avoided.

CONCLUSION

For the foregoing reasons, I. Lewis Libby respectfully requests that the Court issue the attached order.

Dated:  October 30, 2006                          Respectfully submitted,


/s/ James L. Brochin_____          /s/ William H. Jeffress, Jr._____
Theodore V. Wells, Jr.                        William H. Jeffress, Jr.
(DC Bar No. 468934)                           (DC Bar No. 041152)
James L. Brochin                              Alex J. Bourelly
(DC Bar No. 455456)                           (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                 Baker Botts LLP
  & Garrison LLP                              1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas                   Washington, DC  20004
New York, NY  10019-6064                      Tel:  (202) 639-7751
Tel:  (212) 373-3089                          Fax: (202) 585-1087
Fax: (212) 373-2217


/s/ John D. Cline_____
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700