# EXHIBIT A

JAN-14-2004  13:35      OFFICE OF INSPECTIONS                    202 324 8028   P.02/02



# FEDERAL BUREAU OF INVESTIGATION

## STATEMENT AND WAIVER

I, _Lewis "Scooter" Libby_ have been advised by Special Agents

_Jack Eckenrode_ and _Deborah Bond_

of the Federal Bureau of Investigation that they are conducting an investigation into

_the possible disclosure to unauthorized persons of classified information in connection with_

_Ambassador Joseph Wilson, his trip to Niger in February 2002, and matters relating thereto_

("the subject matters under investigation").

I have informed the Federal Bureau of Investigation of my recollection of any communications I have had with members of the media regarding the subject matters under investigation. I hereby waive any promise of confidentiality, express or implied, made to me by any member of the media in connection with any communications that I may have had with that member of the media regarding the subject matters under investigation, including any communications made "on background," "off the record," "not for attribution," or in any other form. I request any member of the media with whom I may have communicated regarding the subject matters under investigation to fully disclose all such communications to federal law enforcement authorities. In particular, I request that no member of the media assert any privilege or refuse to answer any questions from federal law enforcement authorities on my behalf or for my benefit in connection with the subject matters under investigation.

Signed: _____

Witness: _____

Witness: _____

Date: _1/5/04_

TOTAL P.02

LL004-09394

# EXHIBIT B

washingtonpost.com: Statement by The Post's Glenn Kessler
Case 1:05-cr-00394-RBW   Document 67-2   Filed 10/30/2006   Page 4 of 24
Page 1 of 1

washingtonpost.com
# Statement by The Post's Glenn Kessler

Tuesday, June 22, 2004; 11:47 PM

Washington Post staff writer Glenn Kessler made the following statement before testifying today before special prosecutor Patrick J. Fitzgerald, who is investigating whether Bush administration officials illegally disclosed the name of a covert CIA officer last summer:

"It is important to me to explain why I am testifying.

"As a reporter for more than 20 years, I have always lived up to promises of confidentiality to my sources. Government officials and others have known they can rely on me to keep confidential any sensitive information they have provided to me under condition of anonymity. This trust is crucial to my ability to do my job. I will honor those confidences even if served with a grand jury subpoena.

"In this case, I face an unusual situation. Mr. Libby [I. Lewis Libby, Vice President Cheney's chief of staff] signed a waiver in which he asked me to discuss with the Special Counsel whether the Wilson matter was raised in two conversations that I had with him in 2003. Under these circumstances, at the request of my source, I am giving a deposition regarding these questions."

© 2004 The Washington Post Company

# EXHIBIT C

## NBC NEWS STATEMENT

Tim Russert, moderator of NBC's Meet the Press and Washington Bureau Chief of NBC News, was interviewed on Saturday under oath by the Special Prosecutor investigating the leak of a CIA employee's identity last summer. As NBC News previously reported, Mr. Russert was not a recipient of the leak, which resulted in the public disclosure of the name and CIA employment of Valerie Plame, the wife of former Ambassador Joseph Wilson.

During the interview, Mr. Russert was asked limited questions by Special Prosecutor Patrick Fitzgerald about a telephone conversation initiated by Lewis "Scooter" Libby, Vice President Cheney's Chief of Staff, in early July of last year. Mr. Russert told the Special Prosecutor that, at the time of that conversation, he did not know Ms. Plame's name or that she was a CIA operative and that he did not provide that information to Mr. Libby. Mr. Russert said that he first learned Ms. Plame's name and her role at the CIA when he read a column written by Robert Novak later that month.

Saturday's interview resulted from a dispute about whether Mr. Russert could be compelled to appear before the grand jury investigating the leak to testify about information provided to him by confidential sources. NBC News, on Mr. Russert's behalf, went to court to prevent such testimony based on the First Amendment. The court rejected the First Amendment arguments in a decision rendered on July 20, 2004 (but not made public until today) and ordered Mr. Russert to provide testimony.

Under an agreement subsequently reached with the Special Prosecutor, Mr. Russert was not required to appear before the grand jury and was not asked questions that would have required him to disclose information provided to him in confidence. Instead, the Special Prosecutor's questions addressed a telephone conversation initiated by Mr. Libby and focused on what Mr. Russert said during that conversation. Mr. Libby had previously told the FBI about the conversation and had formally requested that the conversation be disclosed. The Special Prosecutor can share Mr. Russert's answers with the grand jury.

NBC News President Neal Shapiro released the following statement regarding Saturday's interview: "Compelling reporters to reveal their newsgathering to government investigators is, in our view, contrary to the First Amendment's guarantee of a free press. In this case, we were able to reach a resolution with the Special Prosecutor that permitted Tim Russert to answer only limited questions focused on what he said during the telephone conversation without revealing any information he learned in confidence."

Press Contact: Barbara Levin, NBC News Communications, 212-664-2265

NBC News New York, August 9, 2004

# EXHIBIT D



*EarthLink*
**trueVoice**
earthlinktruevoice.com

**KEEP TALKING.**
Unlimited broadband phone service:
**$24.95** /MO

Level(3
ENABLE

learn mo

# TIME

### FROM THE MAGAZINE

Sunday, Oct. 30, 2005

## What Scooter Libby And I Talked About

**EXCLUSIVE: A TIME correspondent recounts his role in the Libby case**

By MATTHEW COOPER/WASHINGTON

I was wet, smelling of chlorine. It was July 12, 2003, in Washington, a beautiful summer day, and I had just come back from swimming. All morning I had been trying to reach I. Lewis (Scooter) Libby for a cover story about both President George W. Bush's claim that Iraq had sought uranium in Africa and former Ambassador Joseph Wilson's controversial Op-Ed. I had been invited to a fancy Washington country club by friends. Since the club didn't allow the use of cell phones, I kept running from pool to parking lot to try to reach Libby, who was traveling to Norfolk, Va., with Vice President Dick Cheney for the commissioning of the U.S.S. Ronald Reagan. Eventually I raced home without showering in order to take Libby's call. When he finally reached me at around 3 p.m., we spoke for a few minutes as I sprawled on my bed. I had no idea that that brief phone call, along with a conversation with Karl Rove the day before, would leave me embroiled in a federal investigation for more than two years and that Libby would end up facing a five-count indictment. I doubt it occurred to Libby either. That afternoon, we talked a bit on background and off the record, and he gave me an on-the-record quote distancing Cheney from Wilson's fact-finding trip to Africa for the CIA. In fact, he was so eager to distance his boss from Wilson that a few days later, he called to rebuke me for not having used the whole quote in the piece. We updated the online version of the story, and I went on to co-author a piece for TIME.com called "A War on Wilson?," which would attract the attention of special prosecutor Patrick Fitzgerald.

Almost a year passed between those pieces and my legal woes. In May 2004 I was subpoenaed by Fitzgerald, who was interested in my conversation with Libby. Since part of our conversation was on background, I, along with Time Inc.--which would be formally subpoenaed a few months later because the company controlled my computer-written notes and e-mails--fought the order to protect the principle of source confidentiality. We lost, and in early August 2004 we were both facing contempt. For Time Inc., part of the global behemoth Time Warner, that meant a fine; for me, jail.

On Aug. 5, 2004, the night before Time Inc. and I were scheduled to be sentenced, I called Libby to see if he would grant a waiver for my testifying. The lawyers representing Time Inc. and me, who supported my making that call, thought Libby might well do so. After all, he had granted a waiver to a Washington Post reporter, and Tim Russert of NBC had just avoided contempt by testifying about his end of his conversation with Libby. Most important, my exchange with Libby about Wilson had been short and, in my thinking and Time Inc.'s, not especially provocative. When I reached Libby to ask for the waiver I told him, "I've been called before the grand jury, and I think they're going to ask me about a conversation we had about a year ago. Most of it was on the record, but part of it wasn't, and I wanted to see if I could get your permission to talk about the part that wasn't on the record." I told him that I would tell the truth about our conversation. Libby told me that he used to be a lawyer and that "to be safe" our attorneys should talk and if it was O.K. with them, it was O.K. with him. So the following week my attorney, Floyd Abrams, spoke with Libby's lawyer, Joseph Tate, and they hammered out the details of the waiver. On Aug. 23, I had a tuna sandwich and gave a deposition in Abrams' Washington office about the conversation. The Wilson part that really interested Fitzgerald was tiny, as I told TIME readers. Basically, I asked Libby if he had heard anything about Wilson's wife having been involved in sending him to Niger. Libby responded with words to the effect of, "Yeah, I've heard that too."

The contempt citation was lifted against me that day, and I breathed easy. As it turned out, a week later, Fitzgerald came back and insisted he wanted to know what another source had told me, and the struggle began all over again, with my refusing to name the source and Time Inc. fighting the case all the way to the Supreme Court--which in June upheld the lower court's demand that the company turn over my notes and that I testify. Until now, that is the part of my involvement in the Plame affair that has drawn the biggest headlines: Time Inc. did turn over my notes, over my objections, and my other source--Rove--did grant me a waiver to testify (see "What I Told the Grand Jury," July 25, 2005).

I was surprised last week that the Libby indictment even mentioned me. But apparently his recollection of the conversation differed from mine in a way that led the prosecutor to think he was lying. As for me, I still have no idea if Libby or anyone else has committed a crime. I only know that if there is a Libby trial, I'll testify truthfully and completely, as I did before the grand jury.

Copyright © 2005 Time Inc. All rights reserved.
Reproduction in whole or in part without permission is prohibited.    Privacy Policy

# EXHIBIT E


**Dechert** LLP

Joseph A. Tate
Direct Tel: (215) 994-2350
Direct Fax: (215) 655-2350
joseph.tate@dechert.com

September 16, 2005

Patrick J. Fitzgerald, Esquire
Office of Special Counsel
Dirksen Federal Building
219 South Dearborn Street, Fifth Floor
Chicago, IL 60604

BOSTON

BRUSSELS

CHARLOTTE

FRANKFURT

HARRISBURG

HARTFORD

LONDON

LUXEMBOURG

MUNICH

NEW YORK

NEWPORT BEACH

PALO ALTO

PARIS

PHILADELPHIA

PRINCETON

SAN FRANCISCO

WASHINGTON

Dear Mr. Fitzgerald:

I am in receipt of your letter of September 12, 2005. To say I am surprised at its content is an understatement. We have followed closely the news reports of Ms. Miller's incarceration, comforted that this was a choice she was making based on personal principles and to protect others with whom she may have spoken. I had told Ms. Miller's counsel <u>over a year ago</u> that our waiver was voluntary, and he had assured me that there was nothing my client or I could do that would change her position.

You express a concern in your letter that she may be in jail because of her misunderstanding of Mr. Libby's waiver and that her incorrect impression cannot be cured because counsel may be concerned that any communication between counsel, or directly by the clients, might be viewed as obstructing the investigation. I assure you those are not the facts.

You recite quite correctly the facts regarding Mr. Libby's cooperation with your office and with the grand jury. Mr. Libby did voluntarily provide your team with the written waiver immediately when it was presented to us, well over a year ago. On several occasions, when counsel for other reporters reported to you that they were concerned that the waiver was coerced, you or members of your team reached out to me and asked me to allay their concern. I, with Mr. Libby's approval, did just that. In addition, there were others who asked for such assurances and I gave them. Our position has always been that it is in Mr. Libby's best interest for the reporters to testify fully.

With regard to Ms. Miller, we provided the same assurances long ago. Her attorney and I had several conversations about this matter. Over a year ago, I assured him that Mr. Libby's waiver was voluntary and not coerced and she should accept it for what it was. He assured me that he understood me completely. From these discussions I understood quite clearly that her position was not based on a reluctance to testify about her communications with Mr. Libby, but rather went to matters of journalistic principle and to protecting others with whom she may have spoken. That view was confirmed in my mind since I never received a telephone call from you or members of your team, as I had on prior occasions, urging me to allay her concerns, which I would willingly have done again. Neither my client nor I have imagined that her decision to go to jail could be affected by anything we could do.

10214345.1.LITIGATION 9/19/05 8:39 AM

Law Offices of Dechert LLP
4000 Bell Atlantic Tower • 1717 Arch Street • Philadelphia, PA 19103-2793 • Tel: 215.994.4000 • Fax: 215.994.2222 • www.dechert.com

Patrick J. Fitzgerald, Esquire
September 19, 2005
Page 2

I am dismayed that you had the impression that I had not spoken to counsel for Ms. Miller or that we did not want her to testify. If you had followed your earlier practice of calling me, you would have learned that we had already spoken to her counsel and allayed her concerns. You also would have known that we encouraged her to testify -- over a year ago -- believing that her testimony, when added to those of other reporters who have testified, will benefit my client.

(One final clarification to your letter may also be useful. Contrary to the implication in your letter, I was the one who related that our waiver was voluntary and covered Mr. Cooper. I offered that clarification to Mr. Cooper's attorney. Mr. Cooper first called Mr. Libby about this matter. Mr. Libby thanked Mr. Cooper for the courtesy of the call, but told Mr. Cooper that -- out of an excess of caution -- it would be better if any such discussions were held between the lawyers. I then clarified to Mr. Cooper's attorney -- who was also Ms. Miller's attorney -- that the waiver specifically covered Mr. Cooper. This is the practice I have followed with every reporter.)

I reiterated our waiver to her counsel yet again only a few weeks ago. But because you have expressed these concerns, I will reach out again to Ms. Miller's counsel and assure him and her that Mr. Libby's waiver was voluntary and not coerced. I will send him a copy of this letter and ask him to provide it to Ms. Miller so that she will not be under any misimpressions, if she is. Our hope is that she will be released as soon as possible and that her testimony, when added to those of the other reporters who had called Mr. Libby will assure you and the grand jury that Mr. Libby acted properly and lawfully in all respects.

Please call me if you have any further concerns.


Sincerely,


Joseph A. Tate

JAT/dt


10214345.1.LITIGATION 9/19/05 8:39 AM

Dechert LLP

# EXHIBIT F



# Office of Special Counsel

*Patrick J. Fitzgerald*          *Chicago Office: Dirksen Federal Building*          *Washington Office: Bond Federal Building*
*Special Counsel*                        *219 South Dearborn Street, Fifth Floor*                    *1400 New York Avenue, Ninth Floor*
                                                      *Chicago, Illinois 60604*                                      *Washington, DC NW 20530*
                                                      *(312) 353-5300*                                                    *(202) 514-1187*

*Please address all correspondence to the Washington Office*

September 12, 2005

**CONFIDENTIAL**
Joseph A. Tate, Esq.
Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, Pennsylvania 19103-2793

Re: *Special Counsel Investigation*

Dear Mr. Tate:

I am writing you because, after reading several recent media accounts relating to the confinement of Judith Miller for civil contempt in connection with this matter, I wish to make sure that Ms. Miller does not remain in jail because of any misunderstanding regarding the nature or extent of Mr. Libby's waiver of confidentiality. In particular, I wish to make certain that you, as counsel for Mr. Libby, are not laboring under the incorrect impression that communication of a waiver between Mr. Libby and Ms. Miller would be viewed as obstructive conduct. I can assure you that it would not be so viewed.

As you know, Mr. Libby voluntarily agreed to be interviewed by agents of the Federal Bureau of Investigation ("FBI") in October 2003 and November 2003 and thereafter voluntarily testified before the grand jury on two occasions in 2004. Moreover, on January 5, 2004, your client voluntarily signed an express waiver of confidentiality regarding any conversations he had with members of the media regarding Ambassador Joseph Wilson, his trip to Niger in February 2002 and matters relating thereto. As you are aware, the waiver form was presented to your client by FBI agents conducting this investigation and not by White House personnel.

Moreover, in addition to signing a waiver form, Mr. Libby testified as to his memory of his conversations with reporters relevant to this investigation, including relevant conversations with Judith Miller. Mr. Libby has discussed a meeting with Ms. Miller on July 8, 2003, at the St. Regis Hotel and a later conversation between Mr. Libby and Ms. Miller by telephone in the late afternoon on July 12, 2003. Mr. Libby has described his recollection of the substance of those two conversations, without limitation. Thus, Mr. Libby has waived any claim of confidentiality by his actions, separate and apart from signing the written waiver. In addition, on a later date, I understand that reporter Matthew Cooper contacted Mr. Libby and verified that there was indeed a valid waiver

Joseph Tate, Esq.
September 12, 2005
Page 2

of confidentiality, a conversation which I believe preceded a conversation between then counsel for Mr. Cooper and you concerning the validity of that waiver. After that conversation, Mr. Cooper and counsel both publicly confirmed the validity of that waiver by Mr. Libby to Mr. Cooper and Time Inc. I also understand that counsel for the *Washington Post* and counsel for NBC each verified the validity of the waiver executed by Mr. Libby with you.

As you are also aware, litigation ensued between Special Counsel and Ms. Miller concerning a subpoena which sought testimony concerning Ms. Miller's conversations with Mr. Libby, though your client was referred to in the subpoena (and publicly filed court documents) as an "identified government official." Ms. Miller and the New York Times maintained in that litigation that there had been no valid waiver by the "identified government official" (Mr. Libby), argued that the waiver form was not valid, and asserted that the waiver was coerced by the official's employer. Special Counsel represented that the waiver was not coerced. Chief Judge Thomas Hogan and the D.C. Circuit Court of Appeals issued rulings enforcing the subpoena and holding Ms. Miller in contempt.

At the time of the argument concerning Ms. Miller's contempt, I was obviously aware of Mr. Libby's waiver and Ms. Miller's refusal to testify in the face of that proffered waiver. Indeed, during the argument on the issue of contempt, after Judge Hogan noted that Ms. Miller held the proverbial key to her jail cell in her pocket, I stated that two people held the key to her jail cell: Ms. Miller and her source, who might proffer a waiver to Ms. Miller in the manner akin to the waiver Mr. Cooper received. In the three months that have passed, I have assumed that Ms. Miller chose to remain in contempt either in spite of her awareness of Mr. Libby's waiver or because Mr. Libby had decided that encouraging Ms. Miller to testify to the grand jury was not in his best interest. Indeed, there was press reporting to the same effect:

> Sources close to the investigation, and private attorneys representing clients embroiled in the federal probe, said that Libby's failure to produce a personal waiver may have played a significant role in Miller's decision not to testify about her conversations with Libby, including the one on July 8, 2003.

(*American Prospect*, August 8, 2005. )

At about that same time, Rep. John Conyers wrote (and publicly released) a letter cosigned by several Congressmen asserting: "[Mr. Libby's] failure to grant such a waiver to Ms. Miller has apparently led her to refuse to testify ... and, in turn, led to her recent incarceration for civil contempt. ... We urge you to immediately and publicly rectify this by issuing a personal waiver to Ms. Miller." When asked about the letter and whether Ms. Miller would testify if provided an additional waiver, counsel for Ms. Miller is quoted as saying: "I have no comment about what she might do in circumstances that do not now exist." Given that there is no public response to the Congressmen's letter, and in light of the comments of counsel for Ms. Miller, I had assumed that Mr. Libby had simply decided that encouraging Ms. Miller to testify was not in his best interest.

In the last two weeks, however, I have read two articles which cause me to question whether there might be a failure of communication regarding the waiver. First, an account in the

Joseph Tate, Esq.
September 12, 2005
Page 3

*Los Angeles Times* of August 25, 2005, indicates that reporter Matt Cooper agreed to testify in July only after he confirmed that Mr. Rove's waiver was valid. I particularly noted the statement in the article that "Rove's attorney, meantime, took the view that contacting Cooper would have amounted to interfering with the ongoing court battle between reporter and prosecutor." Reading that account gave me some concern that, however unlikely given the prior waiver by Mr. Libby to Mr. Cooper and others (and given that one of Ms. Miller's attorneys confirmed that same waiver between Mr. Libby and Mr. Cooper), Mr. Libby may not have contacted Ms. Miller to confirm his waiver for fear that such a communication would somehow be viewed as obstructive conduct.

Thereafter, on Friday of last week, there appeared a Reuters article dated September 8, 2005, which quoted one of Ms. Miller's attorneys as stating:

"She is there (in jail) for a reason. At this time, the reason is still there. She made a promise and, unless properly released from her promise by her source, she has no choice but to continue to take the position that she's taking," Abrams said.

He declined comment when asked if Miller, who was sent to jail on July 6 though she never wrote an article about the Plame matter, had reached out anew to her source for a clear release from confidentiality that would allow her to testify.

Thus, counsel for Ms. Miller appears to be operating on the assumption that there has been no "proper" or "clear" release from any promise of confidentiality. If this is so, it may be that Ms. Miller remains in jail because of a misunderstanding.

Given the statement by counsel for Mr. Rove that he felt inhibited from communications between counsel, I wish to make certain that you understand that if Mr. Libby maintains that his waiver is valid and he wishes to communicate that fact either through you or directly to Ms. Miller or her counsel (without discussing the substance of what her testimony might be), I would not view such a communication as obstruction. In fact, I would welcome such a communication reaffirming Mr. Libby's waiver as it might assist the investigation and lead to Ms. Miller's release. (Indeed, Mr. Libby's similar communication with Mr. Cooper and his counsel, as well as with the *Washington Post* and NBC, were not viewed as obstruction and those communications avoided the prospect of several other reporters being jailed for contempt.) Mr. Libby, of course, retains the right not to so reaffirm his waiver in a manner specific to Ms. Miller if he would prefer that the *status quo* continue and Ms. Miller remain in jail rather than testify about their conversations.

In closing, let me be clear that I cannot, and am not, seeking to compel a communication from either Ms. Miller or Mr. Libby or their respective counsel, nor do I wish to be copied on any such correspondence or to participate in any such conversation. I am simply making plain that

Joseph Tate, Esq.
September 12, 2005
Page 4

any communication reaffirming Mr. Libby's waiver would not be viewed as obstructive conduct. Rather, it would be viewed as cooperation with the investigation.

Very truly yours,

PATRICK J. FITZGERALD
Special Counsel

# EXHIBIT G

3 of 3 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

October 16, 2005 Sunday
Late Edition - Final

**SECTION:** Section 1; Column 2; National Desk; A PERSONAL ACCOUNT; Pg. 31

**LENGTH:** 3454 words

**HEADLINE:** My Four Hours Testifying in the Federal Grand Jury Room

**BYLINE:** By JUDITH MILLER

**BODY:**

In July 2003, Joseph C. Wilson IV, a former ambassador, created a firestorm by publishing an essay in The New York Times that accused the Bush administration of using faulty intelligence to justify the war in Iraq. The administration, he charged, ignored findings of a secret mission he had undertaken for the Central Intelligence Agency -- findings, he said, that undermined claims that Iraq was seeking uranium for a nuclear bomb.

It was the first time Mr. Wilson had gone public with his criticisms of the White House. Yet he had already become a focus of significant scrutiny at the highest levels of the Bush administration.

Almost two weeks earlier, in an interview with me on June 23, Vice President Dick Cheney's chief of staff, I. Lewis Libby, discussed Mr. Wilson's activities and placed blame for intelligence failures on the C.I.A. In later conversations with me, on July 8 and July 12, Mr. Libby, who is Mr. Cheney's top aide, played down the importance of Mr. Wilson's mission and questioned his performance.

My notes indicate that well before Mr. Wilson published his critique, Mr. Libby told me that Mr. Wilson's wife may have worked on unconventional weapons at the C.I.A.

My notes do not show that Mr. Libby identified Mr. Wilson's wife by name. Nor do they show that he described Valerie Wilson as a covert agent or "operative," as the conservative columnist Robert D. Novak first described her in a syndicated column published on July 14, 2003. (Mr. Novak used her maiden name, Valerie Plame.)

This is what I told a federal grand jury and the special counsel investigating whether administration officials committed a crime by leaking Ms. Plame's identity and the nature of her job to reporters.

During my testimony on Sept. 30 and Oct. 12, the special counsel, Patrick J. Fitzgerald, asked me whether Mr. Libby had shared classified information with me during our several encounters before Mr. Novak's article. He also asked whether I thought Mr. Libby had tried to shape my testimony through a letter he sent to me in jail last month. And Mr. Fitzgerald asked whether Mr. Cheney had known what his chief aide was doing and saying.

My interview notes show that Mr. Libby sought from the beginning, before Mr. Wilson's name became public, to insulate his boss from Mr. Wilson's charges. According to my notes, he told me at our June meeting that Mr. Cheney did not know of Mr. Wilson, much less know that Mr. Wilson had traveled to Niger, in West Africa, to verify reports that Iraq was seeking to acquire uranium for a weapons program.

My Four Hours Testifying in the Federal Grand Jury Room The New York Tim

As I told the grand jury, I recalled Mr. Libby's frustration and anger about what he called "selective leaking" by the C.I.A. and other agencies to distance themselves from what he recalled as their unequivocal prewar intelligence assessments. The selective leaks trying to shift blame to the White House, he told me, were part of a "perverted war" over the war in Iraq. I testified about these conversations after spending 85 days in jail for refusing to cooperate with the grand jury inquiry. Having been summoned to testify before the grand jury, I went to jail instead, to protect my source -- Mr. Libby -- because he had not communicated to me his personal and voluntary permission to speak.

At the behest of President Bush and Mr. Fitzgerald, Mr. Libby had signed a blanket form waiver, which his lawyer signaled to my counsel was not really voluntary, even though Mr. Libby's lawyer also said it had enabled other reporters to cooperate with the grand jury. But I believed that nothing short of a personal letter and a telephone call would allow me to assess whether Mr. Libby truly wished to free me from the pledge of confidentiality I had given him. The letter and the telephone call came last month.

Equally central to my decision was Mr. Fitzgerald, the prosecutor. He had declined to confine his questioning to the subject of Mr. Libby. This meant I would have been unable to protect other confidential sources who had provided information -- unrelated to Mr. Wilson or his wife -- for articles published in The Times. Last month, Mr. Fitzgerald agreed to limit his questioning.

Without both agreements, I would not have testified and would still be in jail.

I testified in Washington twice -- most recently last Wednesday after finding a notebook in my office at The Times that contained my first interview with Mr. Libby. Mr. Fitzgerald told the grand jury that I was testifying as a witness and not as a subject or target of his inquiry.

This account is based on what I remember of my meetings with Mr. Fitzgerald and my testimony before the grand jury. I testified for almost four hours, much of that time taken by Mr. Fitzgerald asking me to decipher and explain my notes of my interviews with Mr. Libby, which I had provided to him.

I was not permitted to take notes of what I told the grand jury, and my interview notes on Mr. Libby are sketchy in places. It is also difficult, more than two years later, to parse the meaning and context of phrases, of underlining and of parentheses. On one page of my interview notes, for example, I wrote the name "Valerie Flame." Yet, as I told Mr. Fitzgerald, I simply could not recall where that came from, when I wrote it or why the name was misspelled.

I testified that I did not believe the name came from Mr. Libby, in part because the notation does not appear in the same part of my notebook as the interview notes from him.

The First Libby Meeting

Early in my grand jury testimony, Mr. Fitzgerald asked me to describe my history with Mr. Libby and explain how I came to interview him in 2003.

I said I had known Mr. Libby indirectly through my work as a co-author of "Germs," a book on biological weapons published in September 2001. Mr. Libby had assisted one of my co-authors, and the first time I met Mr. Libby he asked for an inscribed copy of "Germs."

In June 2003 I had just returned from Iraq, where I had been embedded with a special military unit charged with finding Saddam Hussein's unconventional weapons. Now I was assigned to a team of reporters at The Times examining why no such weapons had been found.

On the afternoon of June 23, 2003, I arrived at the Old Executive Office Building to interview Mr. Libby, who was known to be an avid consumer of prewar intelligence assessments, which were already coming under fierce criticism. The first entry in my reporter's notebook from this interview neatly captured the question foremost in my

My Four Hours Testifying in the Federal Grand Jury Room The New York Tim

mind.

"Was the intell slanted?" I wrote, referring to the intelligence assessments of Iraq and underlining the word "slanted."

I recall that Mr. Libby was displeased with what he described as "selective leaking" by the C.I.A. He told me that the agency was engaged in a "hedging strategy" to protect itself in case no weapons were found in Iraq. "If we find it, fine, if not, we hedged," is how he described the strategy, my notes show.

I recall that Mr. Libby was angry about reports suggesting that senior administration officials, including Mr. Cheney, had embraced skimpy intelligence about Iraq's alleged efforts to buy uranium in Africa while ignoring evidence to the contrary. Such reports, he said, according to my notes, were "highly distorted."

Mr. Libby said the vice president's office had indeed pressed the Pentagon and the State Department for more information about reports that Iraq had renewed efforts to buy uranium. And Mr. Cheney, he said, had asked about the potential ramifications of such a purchase. But he added that the C.I.A. "took it upon itself to try and figure out more" by sending a "clandestine guy" to Niger to investigate. I told Mr. Fitzgerald that I thought "clandestine guy" was a reference to Mr. Wilson -- Mr. Libby's first reference to him in my notes.

In May and in early June, Nicholas D. Kristof, a columnist at The Times, wrote of Mr. Wilson's trip to Niger without naming him. Mr. Kristof wrote that Mr. Wilson had been sent to Niger "at the behest" of Mr. Cheney's office.

My notes indicate that Mr. Libby took issue with the suggestion that his boss had had anything to do with Mr. Wilson's trip. "Veep didn't know of Joe Wilson," I wrote, referring to the vice president. "Veep never knew what he did or what was said. Agency did not report to us."

Soon afterward Mr. Libby raised the subject of Mr. Wilson's wife for the first time. I wrote in my notes, inside parentheses, "Wife works in bureau?" I told Mr. Fitzgerald that I believed this was the first time I had been told that Mr. Wilson's wife might work for the C.I.A. The prosecutor asked me whether the word "bureau" might not mean the Federal Bureau of Investigation. Yes, I told him, normally. But Mr. Libby had been discussing the C.I.A., and therefore my impression was that he had been speaking about a particular bureau within the agency that dealt with the spread of nuclear, biological and chemical weapons. As to the question mark, I said I wasn't sure what it meant. Maybe it meant I found the statement interesting. Maybe Mr. Libby was not certain whether Mr. Wilson's wife actually worked there.

What was evident, I told the grand jury, was Mr. Libby's anger that Mr. Bush might have made inaccurate statements because the C.I.A. failed to share doubts about the Iraq intelligence.

"No briefer came in and said, 'You got it wrong, Mr. President,'" he said, according to my notes.

The Second Libby Meeting

I interviewed Mr. Libby for a second time on July 8, two days after Mr. Wilson published his essay attacking the administration on the Op-Ed Page of The Times.

Our meeting, which lasted about two hours, took place over breakfast at the St. Regis Hotel in Washington. I told Mr. Fitzgerald that I almost certainly began this interview by asking about Mr. Wilson's essay, which appeared to have agitated Mr. Libby. As I recall, Mr. Libby asserted that the essay was inaccurate.

Mr. Fitzgerald asked about a notation I made on the first page of my notes about this July 8 meeting, "Former Hill staffer."

My recollection, I told him, was that Mr. Libby wanted to modify our prior understanding that I would attribute information from him to a "senior administration official." When the subject turned to Mr. Wilson, Mr. Libby requested

My Four Hours Testifying in the Federal Grand Jury Room The New York Tim

that he be identified only as a "former Hill staffer." I agreed to the new ground rules because I knew that Mr. Libby had once worked on Capitol Hill.

Did Mr. Libby explain this request? Mr. Fitzgerald asked. No, I don't recall, I replied. But I said I assumed Mr. Libby did not want the White House to be seen as attacking Mr. Wilson.

Mr. Libby then proceeded through a lengthy and sharp critique of Mr. Wilson and what Mr. Libby viewed as the C.I.A.'s backpedaling on the intelligence leading to war. According to my notes, he began with a chronology of what he described as credible evidence of Iraq's efforts to procure uranium. As I told Mr. Fitzgerald and the grand jury, Mr. Libby alluded to the existence of two intelligence reports about Iraq's uranium procurement efforts. One report dated from February 2002. The other indicated that Iraq was seeking a broad trade relationship with Niger in 1999, a relationship that he said Niger officials had interpreted as an effort by Iraq to obtain uranium.

My notes indicate that Mr. Libby told me the report on the 1999 delegation had been attributed to Joe Wilson.

Mr. Libby also told me that on the basis of these two reports and other intelligence, his office had asked the C.I.A. for more analysis and investigation of Iraq's dealings with Niger. According to my interview notes, Mr. Libby told me that the resulting cable -- based on Mr. Wilson's fact-finding mission, as it turned out -- barely made it out of the bowels of the C.I.A. He asserted that George J. Tenet, then the director of central intelligence, had never even heard of Mr. Wilson.

As I told Mr. Fitzgerald, Mr. Libby also cited a National Intelligence Estimate on Iraq, produced by American intelligence agencies in October 2002, which he said had firmly concluded that Iraq was seeking uranium.

An unclassified version of that estimate had been made public before my interviews with Mr. Libby. I told Mr. Fitzgerald that I had pressed Mr. Libby to discuss additional information that was in the more detailed, classified version of the estimate. I said I had told Mr. Libby that if The Times was going to do an article, the newspaper needed more than a recap of the administration's weapons arguments. According to my interview notes, though, it appears that Mr. Libby said little more than that the assessments of the classified estimate were even stronger than those in the unclassified version.

Although I was interested primarily in my area of expertise -- chemical and biological weapons -- my notes show that Mr. Libby consistently steered our conversation back to the administration's nuclear claims. His main theme echoed that of other senior officials: that contrary to Mr. Wilson's criticism, the administration had had ample reason to be concerned about Iraq's nuclear capabilities based on the regime's history of weapons development, its use of unconventional weapons and fresh intelligence reports.

At that breakfast meeting, our conversation also turned to Mr. Wilson's wife. My notes contain a phrase inside parentheses: "Wife works at Winpac." Mr. Fitzgerald asked what that meant. Winpac stood for Weapons Intelligence, Non-Proliferation, and Arms Control, the name of a unit within the C.I.A. that, among other things, analyzes the spread of unconventional weapons.

I said I couldn't be certain whether I had known Ms. Plame's identity before this meeting, and I had no clear memory of the context of our conversation that resulted in this notation. But I told the grand jury that I believed that this was the first time I had heard that Mr. Wilson's wife worked for Winpac. In fact, I told the grand jury that when Mr. Libby indicated that Ms. Plame worked for Winpac, I assumed that she worked as an analyst, not as an undercover operative.

Mr. Fitzgerald asked me whether Mr. Libby had mentioned nepotism. I said no. And as I told the grand jury, I did not recall -- and my interview notes do not show -- that Mr. Libby suggested that Ms. Plame had helped arrange her husband's trip to Niger. My notes do suggest that our conversation about Ms. Plame was brief.

My Four Hours Testifying in the Federal Grand Jury Room The New York Tim

Mr. Fitzgerald asked me about another entry in my notebook, where I had written the words "Valerie Flame," clearly a reference to Ms. Plame. Mr. Fitzgerald wanted to know whether the entry was based on my conversations with Mr. Libby. I said I didn't think so. I said I believed the information came from another source, whom I could not recall.

Mr. Fitzgerald asked if I could recall discussing the Wilson-Plame connection with other sources. I said I had, though I could not recall any by name or when those conversations occurred.

Before the grand jury, Mr. Fitzgerald asked me questions about Mr. Cheney. He asked, for example, if Mr. Libby ever indicated whether Mr. Cheney had approved of his interviews with me or was aware of them. The answer was no.

In my grand jury testimony, Mr. Fitzgerald repeatedly turned to the subject of how Mr. Libby handled classified information with me. He asked, for example, whether I had discussed my security status with Mr. Libby. During the Iraq war, the Pentagon had given me clearance to see secret information as part of my assignment "embedded" with a special military unit hunting for unconventional weapons.

Mr. Fitzgerald asked if I had discussed classified information with Mr. Libby. I said I believed so, but could not be sure. He asked how Mr. Libby treated classified information. I said, Very carefully.

Mr. Fitzgerald asked me to examine a series of documents. Though I could not identify them with certainty, I said that some seemed familiar, and that they might be excerpts from the National Intelligence Estimate of Iraq's weapons. Mr. Fitzgerald asked whether Mr. Libby had shown any of the documents to me. I said no, I didn't think so. I thought I remembered him at one point reading from a piece of paper he pulled from his pocket.

I told Mr. Fitzgerald that Mr. Libby might have thought I still had security clearance, given my special embedded status in Iraq. At the same time, I told the grand jury I thought that at our July 8 meeting I might have expressed frustration to Mr. Libby that I was not permitted to discuss with editors some of the more sensitive information about Iraq.

Mr. Fitzgerald asked me if I knew whether I was cleared to discuss classified information at the time of my meetings with Mr. Libby. I said I did not know.

The Third Libby Conversation

My third interview with Mr. Libby occurred on July 12, two days before Robert D. Novak's column identified Ms. Plame for the first time as a C.I.A. operative. I believe I spoke to Mr. Libby by telephone from my home in Sag Harbor, N.Y.

I told Mr. Fitzgerald I believed that before this call, I might have called others about Mr. Wilson's wife. In my notebook I had written the words "Victoria Wilson" with a box around it, another apparent reference to Ms. Plame, who is also known as Valerie Wilson.

I told Mr. Fitzgerald that I was not sure whether Mr. Libby had used this name or whether I just made a mistake in writing it on my own. Another possibility, I said, is that I gave Mr. Libby the wrong name on purpose to see whether he would correct me and confirm her identity.

I also told the grand jury I thought it was odd that I had written "Wilson" because my memory is that I had heard her referred to only as Plame. Mr. Fitzgerald asked whether this suggested that Mr. Libby had given me the name Wilson. I told him I didn't know and didn't want to guess.

My notes of this phone call show that Mr. Libby quickly turned to criticizing Mr. Wilson's report on his mission to Niger. He said it was unclear whether Mr. Wilson had spoken with any Niger officials who had dealt with Iraq's trade representatives.

My Four Hours Testifying in the Federal Grand Jury Room The New York Tim

With the understanding that I would attribute the information to an administration official, Mr. Libby also sought to explain why Mr. Bush included the disputed uranium allegation in his 2003 State of the Union address, a sentence of 16 words that his administration would later retract. Mr. Libby described it as the product of a simple miscommunication between the White House and the C.I.A.

Mr. Fitzgerald asked whether I ever pursued an article about Mr. Wilson and his wife. I told him I had not, though I considered her connection to the C.I.A. potentially newsworthy. I testified that I recalled recommending to editors that we pursue a story.

Mr. Fitzgerald asked my reaction to Mr. Novak's column. I told the grand jury I was annoyed at having been beaten on a story. I said I felt that since The Times had run Mr. Wilson's original essay, it had an obligation to explore any allegation that undercut his credibility. At the same time, I added, I also believed that the newspaper needed to pursue the possibility that the White House was unfairly attacking a critic of the administration.

Mr. Libby's Letter

When I was last before the grand jury, Mr. Fitzgerald posed a series of questions about a letter I received in jail last month from Mr. Libby. The letter, two pages long, encouraged me to testify. "Your reporting, and you, are missed," it begins.

Mr. Fitzgerald asked me to read the final three paragraphs aloud to the grand jury. "The public report of every other reporter's testimony makes clear that they did not discuss Ms. Plame's name or identity with me," Mr. Libby wrote.

The prosecutor asked my reaction to those words. I replied that this portion of the letter had surprised me because it might be perceived as an effort by Mr. Libby to suggest that I, too, would say we had not discussed Ms. Plame's identity. Yet my notes suggested that we had discussed her job.

Mr. Fitzgerald also focused on the letter's closing lines. "Out West, where you vacation, the aspens will already be turning," Mr. Libby wrote. "They turn in clusters, because their roots connect them."

How did I interpret that? Mr. Fitzgerald asked.

In answer, I told the grand jury about my last encounter with Mr. Libby. It came in August 2003, shortly after I attended a conference on national security issues held in Aspen, Colo. After the conference, I traveled to Jackson Hole, Wyo. At a rodeo one afternoon, a man in jeans, a cowboy hat and sunglasses approached me. He asked me how the Aspen conference had gone. I had no idea who he was.

"Judy," he said. "It's Scooter Libby."

**URL:** http://www.nytimes.com

**GRAPHIC:** Photo: BREAKING A SILENCE -- Judith Miller speaking to reporters on Sept. 30 after her first testimony before a grand jury investigating the leak of C.I.A. information. (Photo by Luke Frazza/Agence France-Presse -- Getty Images)

**LOAD-DATE:** October 16, 2005