THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>I. LEWIS LIBBY )<br>    also known as Scooter Libby ) | CR. NO. 05-394 (RBW) |

### GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE EVIDENCE AND ARGUMENT RELATING TO VALERIE WILSON'S EMPLOYMENT STATUS

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special Counsel, respectfully submits the following memorandum of law in opposition to the Motion of I. Lewis Libby to Preclude Evidence and Argument related to Valerie Wilson's employment status and the actual or potential damage caused by public disclosure of that status.

### INTRODUCTION

Defendant is charged with obstruction of justice, perjury, and making false statements to investigators, in violation of 18 U.S.C. §§ 1503, 1623 and 1001, in connection with an investigation concerning leaks to reporters of previously-classified information regarding the employment of Valerie Plame Wilson, the wife of former Ambassador Joseph Wilson. Defendant has been provided with a disclosure of information from the Central Intelligence Agency ("CIA") establishing that Ms. Wilson's employment was previously classified, and outlining the potential risks of publicly disclosing her employment. Defendant seeks to preclude the government from offering this evidence at trial.

As discussed below, the government does not intend to establish at trial that Ms. Wilson's employment status was *in fact* classified in June and July 2003, or that the public disclosure of Ms.

1

Wilson's employment *in fact* posed a risk of damage to the national security, the CIA, or Ms. Wilson herself – *as long as* the defendant does not open the door by suggesting to the jury that Ms. Wilson's employment was actually *not* classified or that in fact there was no *real* risk to Ms. Wilson as a result of disclosure of her employment.[1]  Instead, the government intends to limit its proof to: (a) establishing that the FBI and grand jury investigations defendant sought to obstruct concerned the *possible* unauthorized disclosure of classified information and the *possible* unlawful disclosure of a covert agent, and that the false information defendant is charged with providing to investigators and the grand jury was therefore material; and (b) establishing that, before defendant was interviewed by the FBI or testified in the grand jury, defendant received information indicating that Ms. Wilson's employment could be classified and that disclosure could be damaging, and that this information made defendant's conversations regarding Ms. Wilson even more memorable to him, and provided defendant with a motive to lie.

## ARGUMENT

**I.      Background**

As charged in the indictment, in early June 2003 defendant was advised by the Vice President that, according to the CIA, former Ambassador Wilson's wife worked at the CIA and played a role in arranging Ambassador Wilson's 2002 trip to Niger and, shortly thereafter, defendant relayed this information to New York Times reporter Judith Miller and Time Magazine reporter Matthew

---

[1] The government reserves the right to offer proof of the classified status of Ms. Wilson's employment if the defendant contends that the questions and answers at issue were not material to the grand jury investigation or seeks jury nullification based on the absence of such evidence. To the government's knowledge, the defense intends to contend that defendant's answers were accurate but if they were not accurate they were misremembered – and does not intend that any intentionally false statement was not material.

Cooper. The indictment charges that, in the intervening period between defendant's conversation with the Vice President and his conversations with Miller and Cooper, defendant spoke with at least six government officials about Ms. Wilson's employment and possible role in sending Ambassador Wilson on the 2002 Niger trip.

As it turned out, Miller did not write a story about Ms. Wilson's employment at the CIA. Instead, that information was first publicly disclosed by Robert Novak, a reporter who learned it from a source other than defendant and the publication of Novak's column on July 14, 2003 sparked a firestorm of criticism regarding the "outing" of a "covert" CIA agent. After the publication of Novak's column, defendant was a party to conversations regarding Ms. Wilson's possible "covert" status, including a conversation in which the Director of Central Intelligence noted that people talking about Wilson's wife could be a "problem," a conversation in which a CIA briefer commented on the potential dangers posed by the disclosure of Ms. Wilson's employment, and a conversation with Counsel to the Vice President (now the Vice President's Chief of Staff), David Addington, in which defendant asked how one could determine whether a CIA employee was "covert."

Defendant and his staff closely tracked stories about the Wilsons beginning no later than July 2003. After the investigation became public in late September 2003, defendant and his staff closely tracked news reports and commentary regarding Ms. Wilson, including reports that speculated that defendant had been the source for Mr. Novak's column and thus was responsible for "outing" Ms. Wilson. Defendant also followed public statements made by White House Press Secretary Scott McClellan regarding the leak in late September and early October 2003 in response to press inquiries. During this period, McClellan publicly asserted that the President expected "everyone in his administration to adhere to the highest standards of conduct," and that the President considered

"leaking classified information [to be] a very serious matter [which] should be … pursued to the fullest extent . . . . " McClellan drew a distinction between "setting the record straight" and "spreading information to punish someone for speaking out," and noted that the White House would not condone the latter type of activity. McClellan told reporters that, "[i]f someone in this administration leaked classified information, they [would] no longer be a part of this administration[.]"

On September 29, 2003, Scott McClellan made a public statement exonerating Karl Rove of being involved in the leak. Defendant responded to McClellan's action by insisting he be publicly exonerated as well. On October 4, 2003, McClellan did so, stating (based on information defendant provided to him) that defendant "neither leaked the classified information, nor would he condone it."

On September 30, 2003, while speaking in Chicago, Illinois, the President personally commented regarding the disclosure of information regarding Ms. Wilson:

> [I]f there is a leak out of my administration, I want to know who it is. And if the person has violated law, the person will be taken care of. . . . I want to know the truth. If anybody has got any information inside our administration or outside our administration, it would be helpful if they came forward with the information . . . I've spoken out consistently against [leaks] and I want to know who the leakers are.

Defendant was interviewed by the FBI for the first time two weeks after the President made these remarks, and a second time approximately six weeks later. In his interviews, defendant admitted that he first learned of Ms. Wilson's employment and possible role in arranging Ambassador Wilson's trip to Niger from the Vice President, and that the Vice President learned this information from the CIA. Defendant further admitted that he spoke to New York Times reporter Judith Miller and Time Magazine reporter Matthew Cooper about Ms. Wilson's employment in July

2003. Defendant repeated these statements when he testified before the grand jury in March 2004.

With respect to his conversations with reporters, defendant told both the investigating agents and the grand jury that:

    (a) when he spoke to reporters Miller and Cooper on July 12, 2003, he did not remember having been told by the Vice President that former Ambassador Wilson's wife worked at the CIA and may have played a role in arranging Ambassador Wilson's 2002 trip to Niger;

    (b) instead, he conveyed to reporters Miller and Cooper information regarding Ms. Wilson which he believed he had learned during a telephone call with NBC News correspondent Tim Russert, who had told him on that day or the day before (July 11 or 12, 2003) that "all of the reporters" knew that former Ambassador Wilson's wife worked at the CIA;

    (c) he only remembered that the Vice President told him about Ms. Wilson's employment after finding a handwritten note among his records reflecting that fact; and

    (d) although he met with Judith Miller on July 8, 2003, he did not speak about Ms. Wilson during that meeting.

The indictment charges that these statements were false, as evidenced by, among other things, the facts that Tim Russert did not speak with defendant regarding Ms. Wilson on July 12, 2003 but, rather, merely listened to defendant's complaints regarding coverage by NBC correspondent Chris Matthews, and that defendant disclosed information regarding Ms. Wilson to Judith Miller and confirmed it to Matthew Cooper, without any suggestion that the information had come from other reporters. The indictment charges that defendant deliberately made the charged false statements in an effort to mislead and deceive both federal investigators and the grand jury as to how and when defendant acquired and disclosed to reporters information concerning the employment of Ms. Wilson by the CIA.

**II.     Direct Evidence of the Classified Status of Ms. Wilson's Employment**

In deciding whether the government has met its burden of proving the charges beyond a reasonable doubt, the jury will be required to determine whether the charged false statements related to matters within the jurisdiction of the Federal Bureau of Investigation and were material to the grand jury's investigation, and whether defendant innocently erred or, instead, deliberately lied when he made them. In doing so, the jury necessarily will consider the nature and scope of the investigation, as well as defendant's motives for lying to investigating agents and to the grand jury. Information regarding the possible crimes being investigated by the FBI and the grand jury, and the information known to defendant before he made the charged statements, is therefore directly relevant to the issues the jury must decide in this case.

The government agrees that evidence establishing the *facts* that "Valerie Wilson's employment status with the Central Intelligence Agency (the "CIA") was . . . classified or covert" and that "any damage to the national security, the CIA, or Ms. Wilson herself was . . . or could have been, caused by the disclosure of that status" (Mtn. at 1) is not strictly necessary to prove that the charged false statements were material to the grand jury's investigation and within the jurisdiction of the executive branch. Nor is evidence of these facts necessary to a determination that defendant had a motive to lie during his FBI interviews and grand jury testimony. Therefore, the government agrees not to offer a declaration from the CIA or any other direct evidence of the facts that Ms. Wilson's CIA employment *actually* was classified or that the public disclosure of that employment *actually* damaged the national security, the CIA, or Ms. Wilson, or had the potential of doing so. This agreement is not intended to confer upon defendant a license to mislead the jury, however. Thus, if defendant were to open the door by attempting to challenge the classified status of Ms.

Wilson's employment or the potential risks of publicly disclosing that employment, or if the defense disputed the materiality of the statements or sought nullification, the government would be entitled to, and would, seek to offer this evidence. In any event, government counsel would not consider, and need not be ordered to avoid, an improper attempt to "manufacture a wrongful conviction" by offering evidence for the purpose of "arousing the passions or prejudices" of this, or any other, jury.

II.   **Information Regarding Ms. Wilson's Status that Defendant Received Prior to Being Questioned.**

As defendant acknowledges, information regarding Ms. Wilson's status that defendant received is relevant to defendant's state of mind. Inexplicably, however, defendant seeks to restrict the government's proof to information regarding Ms. Wilson's status which defendant received *prior to July 14, 2003* (the date Ms. Wilson's status was publicly disclosed in a column written by Robert Novak).

Obviously, everything defendant knew about the classified status of Ms. Wilson's employment, and everything he knew about the potential ramifications of disclosing information regarding her employment – both to her and to himself – is directly relevant to defendant's state of mind and motive to lie at the time of his FBI interviews and grand jury appearances. Defendant's effort to restrict the government's presentation of relevant evidence is ironic in light of his extensive efforts to present to the jury hundreds of details regarding wholly unrelated events occurring well after July 14, 2003 in support of his memory defense. In short, defendant seeks to preclude the government from presenting evidence of motive and then argue that there is none. This he must not be permitted to do.

Instead, the government is entitled to present evidence of all the information that defendant

received regarding Ms. Wilson's status, the risks of public disclosure, and the risks faced by those who made the disclosures if their identities were revealed, at the time he was interviewed or testified. Thus, the government is entitled to present evidence of conversations, news reports or other means by which such information was disclosed to him at any time prior to the FBI interviews or defendant's grand jury appearances. All of this evidence is directly relevant to show that, far from being unremarkable "snippets" of conversation, defendant's conversations with reporters and others regarding former Ambassador Wilson, his 2002 trip to Niger, and his wife's possible role in arranging that trip, were unique and memorable events that took on more, rather than less, importance prior to the time defendant was questioned concerning them.

### III. Evidence Concerning Information Known to Other Government Officials But Not Communicated to Defendant

Defendant argues that information regarding the Ms. Wilson's employment known to other government officials with whom defendant spoke about Ms. Wilson is relevant to the case. (Mot. 1). However, as this Court previously held in the context of discovery, information known to other government officials regarding Ms. Wilson's employment is relevant only if such knowledge was shared with defendant, or with reporters Miller, Russert or Cooper.[2] See June 2, 2006 Order at 6. The government has no intention of straying from the limits previously set by this Court for purposes of discovery, and will confine its evidence concerning Ms. Wilson's classified status to information of which *defendant* was made aware. It is the government's expectation that the defense will do the same.

---

[2] These reporters were not made aware of any such information prior to their conversations with defendant.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court deny defendant's motion as moot.

Respectfully submitted,

/s/
PATRICK J. FITZGERALD
Special Counsel
DEBRA RIGGS BONAMICI
KATHLEEN M. KEDIAN
Deputy Special Counsels

Office of the United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

Dated: November 14, 2006

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 14th day of November, 2006, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

>William Jeffress, Esq.
>Baker Botts
>The Warner
>1299 Pennsylvania Avenue, N.W.
>Washington, DC 20004-2400
>Facsimile: 202-585-1087
>
>Theodore V. Wells, Esq.
>Paul Weiss
>1285 Avenue of the Americas
>New York, NY 10019-6064
>Facsimile: 212-373-2217
>
>Joseph A. Tate, Esq.
>Dechert LLP
>4000 Bell Atlantic Tower
>1717 Arch Street
>Philadelphia, PA 19103-2793
>Facsimile: 215-994-2222
>
>John D. Cline, Esq.
>Jones Day
>555 California Street
>San Francisco, CA 94104
>Facsimile: 415-875-5700

>>Patrick J. Fitzgerald
>>Special Counsel
>>U.S. Department of Justice
>>1400 New York Ave., N.W.
>>Washington, D.C.  20530
>>202-514-1187
>>
>>By: _____/s/_____
>> Debra Riggs Bonamici
>> Deputy Special Counsel