THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA  ) | |
| ) | CR. NO. 05-394 (RBW) |
| v.  ) | |
| ) | |
| I. LEWIS LIBBY  ) | |
|    also known as Scooter Libby  ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE EVIDENCE RELATING TO
REPORTERS' FIRST AMENDMENT LITIGATION,
CONTEMPT PROCEEDINGS, AND JUDITH MILLER'S INCARCERATION**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special Counsel, respectfully submits the following memorandum of law in opposition to the Motion of I. Lewis Libby to Exclude Evidence relating to Reporters' First Amendment Litigation, Contempt Proceedings, and Judith Miller's Incarceration.

**INTRODUCTION**

Defendant is charged with obstruction of justice, perjury, and making false statements to investigators, in violation of 18 U.S.C. §§ 1503, 1623 and 1001, in connection with an investigation concerning leaks to reporters of previously-classified information regarding the employment of Valerie Plame Wilson, the wife of former Ambassador Joseph Wilson. During the investigation of this case, several reporters refused to testify in response to grand jury subpoenas on the stated ground that they should not be required to disclose the identity of confidential sources or information provided to them by such sources under the First Amendment and federal common law. Ultimately, their claims were rejected, they testified, and defendant was indicted. Defendant seeks to preclude the government from offering any evidence related to these proceedings at trial.

1

As demonstrated below, by this motion defendant seeks free rein to offer in evidence the waiver of confidentiality he signed with respect to his conversations with reporters, and to use it to argue that defendant lacked a motive or opportunity to lie, and to argue that he exhorted reporters to testify, while preventing the government from offering contrary evidence that tends to show that: (a) at the time he first told the story about learning about Ms. Wilson's wife from Tim Russert, and repeating the information to reporters Miller and Cooper, he had a strong reason to believe that the reporters would never testify; and that (b) even after signing the waiver, defendant's actions reflected, at a minimum, ambivalence about the prospect of the reporters testifying and, at worst, an effort to color their testimony. The evidence defendant seeks to preclude is directly relevant to his state of mind – the issue defendant acknowledges is the central in the case. The motion should be denied.

## ARGUMENT

I.   **Background**

As charged in the indictment, in early June 2003 defendant was advised by the Vice President that, according to the CIA, former Ambassador Wilson's wife worked at the CIA and played a role in arranging Ambassador Wilson's 2002 trip to Niger. Defendant thereafter relayed this information to New York Times reporter Judith Miller and Time Magazine reporter Matthew Cooper. The indictment charges that, in the intervening period between defendant's conversation with the Vice President and his conversations with Miller and Cooper, defendant spoke with at least six government officials about Ms. Wilson's employment and possible role in sending Ambassador Wilson on the 2002 Niger trip.

As it turned out, Miller did not write a story about Ms. Wilson's employment at the CIA.

Instead, that information was first publicly disclosed by Robert Novak, a reporter who learned it from a source other than defendant. The publication of Novak's column on July 14, 2003 sparked a firestorm of criticism regarding the "outing" of a "covert" CIA agent. Ms. Wilson's employment was also reported in articles contributed to by Matthew Cooper and published on July 17, 2003 and July 21, 2003.

In connection with the investigation that ensued, defendant was interviewed by agents of the FBI on October 14 and November 26, 2003. In his interviews, defendant admitted that he first learned of Ms. Wilson's employment and possible role in arranging Ambassador Wilson's trip to Niger from the Vice President, and that he spoke to New York Times reporter Judith Miller and Time Magazine reporter Matthew Cooper about Ms. Wilson's employment in July 2003. Defendant made the same admissions when he was interviewed on November 26, 2003.

During the interviews, defendant provided the following details regarding his conversations with reporters:

    (a) when he spoke to reporters Miller and Cooper on July 12, 2003, he did not remember having been told by the Vice President that former Ambassador Wilson's wife worked at the CIA and may have played a role in arranging Ambassador Wilson's 2002 trip to Niger;

    (b) instead, he conveyed to reporters Miller and Cooper information regarding Ms. Wilson which he believed he had learned during a telephone call with NBC News correspondent Tim Russert, who had told him on that day or the day before (July 11 or 12, 2003) that "all of the reporters" knew that former Ambassador Wilson's wife worked at the CIA;

    (c) he only remembered that the Vice President told him about Ms. Wilson's employment after finding a handwritten note among his records reflecting that fact; and

    (d) although he met with Judith Miller on July 8, 2003, he did not speak about Ms. Wilson during that meeting.

At the conclusion of defendant's second FBI interview on November 26, 2003, defendant and his lawyer were presented with a form that released reporters from any promises of confidentiality related to conversations regarding Ambassador Joseph Wilson, his trip to Niger in February 2002, and matters related thereto," and defendant was asked to sign the form. On January 5, 2004, defendant signed the waiver.

Defendant testified before the grand jury in March 2004, and provided an account of his conversations with reporters that was essentially consistent with the details provided during his FBI interviews.

In May 2004, after defendant had testified before the grand jury, subpoenas were issued to various reporters with whom defendant spoke or claimed to have spoken regarding the Wilsons. Cooper, Miller and Russert moved to quash the subpoenas issued to them, asserting a purported "reporter's privilege" under the First Amendment and federal common law. While all three reporters ultimately testified,[1] Cooper and Miller declined to do so until their claims were rejected by the Court of Appeals and their petitions for certiorari were denied by the Supreme Court, and until they had received personal assurances from defendant or his counsel that his waivers of confidentiality applied to their conversations, and were voluntarily given.

In the case of Miller, Miller did not request or receive a personal assurance from defendant until September 2005, after she had exhausted her appeals and served 85 days in jail.

---

[1] Russert testified on August 7, 2004, after defendant called and asked Russert to speak with his lawyer, and after the government provided Russert with defendant's waiver. Cooper testified on October 13, 2004 and July 13, 2005, after defendant's lawyer confirmed to Cooper's lawyer that defendant's waiver was voluntary. Miller testified on September 30 and October 12, 2005. NBC reporter Glen Kessler also testified after receiving defendant's waiver.

After obtaining the testimony of reporters Cooper and Miller, the grand jury returned the present indictment. As the Court is aware, the indictment charges that defendant's descriptions of his conversations with reporters Miller, Cooper and Russert were false and misleading and that they were made deliberately in an effort to mislead and deceive both federal investigators and the grand jury. Specifically, the indictment charges that, contrary to defendant's account, (a) Tim Russert did not speak with defendant regarding Ms. Wilson on July 12, 2003 but, rather, merely listened to defendant's complaints regarding coverage by NBC correspondent Chris Matthews, (b) defendant disclosed information regarding Ms. Wilson to Judith Miller and confirmed it to Matthew Cooper, without any suggestion that the information had come from other reporters; and (c) defendant did speak with Ms. Miller regarding Ms. Wilson on July 8, 2003. Although not specifically charged in the indictment, defendant spoke with Ms. Miller regarding Ms. Wilson even earlier – on June 23, 2003, and provided information regarding Ms. Wilson to Ms. Miller only after seeking Miller's commitment that she attribute the information to a "former Hill staffer."

## II. Defendant's Expectations Regarding Confidentiality are Relevant to Defendant's State of Mind.

In deciding whether the government has met its burden of proving the charges beyond a reasonable doubt, the jury will be required to determine whether defendant innocently erred or, instead, deliberately lied when he made the charged false statements. Defendant's state of mind at the time he made the false statements is therefore an important issue in the case and the government obviously is entitled to present evidence relevant to defendant's state of mind.

Defendant testified that when he spoke with reporters, he did so under the conventional ground rules employed by reporters and their sources. In other words, defendant knew that, when

5

he wanted to relay information to a reporter without being identified as the source of that information, he need only ask that the information be used by the reporter "off-the-record," or as "background," or that it be attributed to a "senior administration official," or similar moniker. Defendant testified that he spoke with Miller, Cooper, and Russert under these ground rules.

Indeed, these "ground rules," and the fact that reporters generally may be depended upon to uphold promises of confidentiality, were well known not only to defendant but were widely reported at the time. For example, one week before defendant's first FBI interview, the President commented during remarks made to the press after a cabinet meeting:

> Q: Mr. President, how confident are you the investigation will find the leaker in the CIA case?
>
>           *      *      *
>
> THE PRESIDENT: [ ] Randy, you tell me, how many sources have you had that's leaked information that you've exposed or have been exposed? Probably none. I mean this town is a – is a town full of people who like to leak information. And I don't know if we're going to find out the senior administration official. Now, this is a large administration, and there's a lot of senior officials. I don't have any idea. I'd like to. I want to know the truth. That's why I've instructed this staff of mine to cooperate fully with the investigators – full disclosure, everything we know the investigators will find out. I have no idea whether we'll find out who the leaker is – partially because, in all due respect to your profession, you do a very good job of protecting the leakers. But we'll find out.

www.whitehouse.gov/news/releases/2003/10/20031007-2 (10/7/2003).

Accordingly, when defendant first told investigators that he merely conveyed information he had learned from one reporter to other reporters (and therefore could not possibly have disclosed classified information to reporters), he had every reason to believe that it was highly unlikely that reporters would become witnesses against him. Contrary to defendant's suggestion (Mot. 3), at that time, defendant had not signed, or discussed, any waiver of confidentiality with respect to his

conversations with reporters.

In support of his motion, defendant argues that the argument that the confidentiality with which he could expect his conversations to be treated by reporters emboldened him to make false claims about those conversations is "implausible." But the only basis he offers for this claim is (presumably) the testimony he will offer at trial (that he expected the reporters to cooperate and expected that the reporters testimony would exonerate him (Mot. 3)), and inferences he seek the jury to draw from all the evidence. The purpose of a trial is to seek the truth. As this Court has noted with respect to defendant's memory defense, relevance is not properly determined based on the Court's – much less the opposing litigant's – assessment of its persuasiveness. Defendant is not entitled to preclude the government from offering relevant evidence of opportunity and motive, and then argue to the jury that none exists.

### III.    The Government is Entitled to Rebut Defendant's Claim that he "Exhorted" Reporters to Testify.

The government will not dispute the fact that defendant voluntarily signed a waiver of confidentiality with respect to pertinent conversations with reporters in January 2004, or that in some instances, his counsel gave assurances to reporter witnesses that defendant's waiver was voluntary. However, the government *will* dispute an inference defendant will ask the jury to draw from this conduct – that defendant lacked any motive to lie or consciousness of guilt. And the government *will* offer evidence that tends to show that defendant did not, as he claims, at all times and in every respect "exhort" reporters to testify. Defendant is not entitled to prevent the government from rebutting inaccurate and misleading arguments he intends to make to the jury.

Specifically, before and during Ms. Miller's confinement, defendant was put on notice that

she did not regard his waiver as voluntary. Ms. Miller and her counsel made many public statements to this effect, inside and outside of court, and the contrast between Matthew Cooper choosing to testify after receiving personal assurances from defendant and Ms. Miller choosing to go to jail after receiving none was unmistakable. Press reports, which the defense closely followed according to defendant's lawyer, expressed the view that defendant had been less than cooperative in failing to provide Miller with a personal waiver. See, e.g., *Reuters* September 8, 2004 article (quoting Miller's attorney as commenting, "She is there (in jail) for a reason. At this time, the reason is still there. She made a promise and, unless properly released from her promise by her source, she has no choice but to continue to take the position that she's taking,")

Indeed, on August 8, 2005, defendant received a letter from certain members of Congress asking him give Miller a personal assurance and waiver:

> As you are aware, in the matter of the ongoing investigation of the leaking of the covert status of a Central Intelligence Agency operative (Valerie Wilson), the President has promised that his Administration will "fully cooperate" with the investigation. We are concerned that your conduct may have fallen far short of the President's pledge of full cooperation. . . . Your failure to grant [a personal] waiver to Ms. Miller has apparently led her to refuse to testify about her conversation(s) with you and, in turn, led to her recent incarceration for civil contempt. Only your willingness to step forward and permit Ms. Miller to testify about your July 8 meeting and any other communications with her will allow the whole truth to be known. We urge you to immediately and publicly rectify this by issuing a personal waiver to Ms. Miller.

August 8, 2005 Letter from John Conyers and other Members of Congress.

Yet defendant did nothing.

Finally, after discussions that were initiated by an inquiry from Ms. Miller's counsel, defendant provided the personal assurance Miller had been waiting for, orally and in writing. But

8

defendant did not stop at that. He commented on the testimony of other reporters:

> . . . as I am sure will not be news to you, the public report of every other reporter's testimony makes clear that they did not discuss Ms. Plame's name or identity with me, or knew about her before our call.

9/15/05 letter from defendant to Judith Miller, attached as an exhibit to defendant's motion.

Defendant argues that the presentation of this evidence will lead to a "trial within a trial," that is, it would necessitate his calling as witnesses for the defense counsel for Ms. Miller and even the Special Counsel. The defense proposes instead to have an "unopposed trial" within a trial. The defendant would like the Court to order that he can freely argue and testify that he had no motive to lie, when there is ample evidence that he did have such a motive, and to allow him to testify and argue that he exhorted reporters to testify, when he did somewhat less than that. And of the course, the defendant would like the Court to order the government to sit mute about these issues during the trial. If there is disputed testimony, so be it. That is what trials are for. But there should be no great delay. The reporter witnesses by their own published accounts will agree that they did not testify until they had received a waiver they were persuaded was voluntary. The defense and government both agree that Mr. Libby executed a waiver as requested. There is no need to call counsel for various witnesses or the government. Moreover, it is unlikely that that evidence would even be admissible. See *United States v. Fonseca*, 435 F.3d 369, 374 (D.C. Cir. 2006)((evidence at issue was offered to challenge a witness' credibility and did not involve the defendant or the charged offenses); *E.g., United States v. Regan*, 103 F.3d 1072, 1083 (2d Cir.1997)(the testimony of the prosecutor may only be presented in a criminal trial where defendant demonstrates compelling and legitimate need for evidence which is unavailable from any other source). See also *United States v. Ziesman*, 409

F.3d 941, 950 (8th Cir. 2005); *United States v. Wooten*, 377 F.3d 1134, 1143 (10th Cir. 2004); *U.S. v. Regan*, 103 F.3d 1072, 1083 (2d Cir. 1997); *United States v. Oreto*, 37 F.3d 739, 746 (1st Cir. 1994); *United States v. Ashman*, 979 F.2d 469, 494 (7th Cir. 1993); *United States v. Roberson,* 897 F.2d 1092, 1098 (11th Cir.1990); *United States v. Prantil*, 764 F.2d 548, 554 (9th Cir. 1985); *United States v. Weinberger,* Crim. A. No. 92-235, 1992 U.S. Dist. LEXIS 14534, at *14-15 (D.D.C. Sept. 29, 1992).

In sum, defendant's effort to require the government to stand mute while the defense makes assertions and arguments that are contradicted by the facts should be rejected.

**IV.    Evidence Regarding the Reporters' Litigation is Relevant to Explain Miller's Failure to Recall her June 23, 2003 Meeting with Defendant, and to Rebut Arguments of Bias.**

Defendant has indicated that he intends to elicit testimony regarding the fact that, during her first grand jury appearance, reporter Miller had no memory of discussing Wilson's wife with defendant on June 23, 2003, and did not recall it until she found her notes of that conversation. See 5/16/06 Tr. 7. The government is entitled to offer in evidence information that bears on Ms. Wilson's memory. Specifically, Miller's first grand jury appearance occurred on the morning after being released from 85 days in jail, and the fact that Miller did not have the opportunity to review all of her notes before that appearance. Defendant has vociferously argued that he is entitled to present an avalanche of evidence detailing events and issues with which he dealt, and evidence of his lack of opportunity to review notes, in order to persuade the jury that any errors in his testimony were the product of memory failure. Yet he seeks to exclude evidence of a lengthy and obviously stressful experience suffered by a witness, and evidence of a witness's lack of access to notes, as "irrelevant to any issue in the case."

Defendant has also indicated that he intends to explore the issue of bias of the reporter witnesses on cross examination (3/10/06 Tr. 96)("the credibility of Mr. Cooper with respect to his description that Mr. Libby confirmed Mr. Plame's employment by the CIA is going to be very much at issue in this case.") Defendant is certainly entitled to do this. But the government is likewise entitled to explore issues of bias – and to offer evidence that tends to undermine any suggestion that its witnesses are biased against defendant or in favor of witnesses. Evidence that the reporters spent more than a year battling the government in court and, in Miller's case, that the battle ended only after she suffered 85 days in jail, strongly rebuts an argument of bias in favor of the government. The government is entitled to use it.

## CONCLUSION

For all of the foregoing reasons, the government respectfully requests that this Court deny defendant's motion.

Respectfully submitted,

/s/
PATRICK J. FITZGERALD
Special Counsel
DEBRA RIGGS BONAMICI
KATHLEEN M. KEDIAN
Deputy Special Counsels

Office of the United States Attorney
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

                     (312) 353-5300

Dated:  November 15, 2006

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 15th day of November, 2006, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

> William Jeffress, Esq.
> Baker Botts
> The Warner
> 1299 Pennsylvania Avenue, N.W.
> Washington, DC 20004-2400
> Facsimile: 202-585-1087
>
> Theodore V. Wells, Esq.
> Paul Weiss
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Facsimile: 212-373-2217
>
> Joseph A. Tate, Esq.
> Dechert LLP
> 4000 Bell Atlantic Tower
> 1717 Arch Street
> Philadelphia, PA 19103-2793
> Facsimile: 215-994-2222
>
> John D. Cline, Esq.
> Jones Day
> 555 California Street
> San Francisco, CA 94104
> Facsimile: 415-875-5700

Patrick J. Fitzgerald
Special Counsel

          U.S. Department of Justice
          1400 New York Ave., N.W.
          Washington, D.C.  20530
          202-514-1187

By: _____/s/_____
 Debra Riggs Bonamici
 Deputy Special Counsel