**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF I. LEWIS LIBBY'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING VALERIE WILSON'S EMPLOYMENT STATUS AND ACTUAL OR POTENTIAL DAMAGE CAUSED BY DISCLOSURE OF THAT STATUS**

The government's response concedes that whether Valerie Wilson's employment status with the Central Intelligence Agency ("CIA") was in fact classified or covert is not a relevant issue in this case. *See* Government's Memo. in Opp'n to Def.'s Mot. to Preclude Evidence and Argument Relating to Valerie Wilson's Employment Status at 1-2, 6 (Nov. 14, 2006) (Dkt. 184) ("Resp."). The government also concedes that whether disclosure of Ms. Wilson's employment status did or did not pose a risk of damage to the national security, the CIA, or Ms. Wilson herself has nothing to do with the charges it has brought. *See id.* Based on those concessions, the government requests that the Court deny Mr. Libby's motion *in limine* "as moot." *Id.* at 9.

There remain, however, three areas of disagreement between the parties. Accordingly, Mr. Libby's motion is not moot, and he respectfully requests that it be granted.

**I.      IT IS NOT SUFFICIENT TO PRECLUDE DIRECT EVIDENCE THAT MS. WILSON'S CIA EMPLOYMENT WAS CLASSIFIED.**

In its response, the government "agrees not to offer a declaration from the CIA or any other direct evidence" that Ms. Wilson's employment status was in fact classified or covert, or that disclosure of that status did in fact pose a risk of any damage to anyone. *Id.* at 6. Given this

Court's prior rulings on what "this case is and is not about," the government's agreement is not

surprising. Order at 1 (June 2, 2006) (Dkt. 112) ("June 2 Order"). But it does not go far enough.

Rather, the order Mr. Libby has proposed is necessary to make clear that, in addition to

not offering any "direct evidence," the parties are also prohibited from making any statement to

the jury that suggests in any way that Ms. Wilson's employment status was (or was not)

classified or covert, or that the disclosure of that status did (or did not) create any risk of damage.

The order will also make clear that that prohibition applies equally to descriptions of "the

possible crimes being investigated by the FBI and the grand jury" and to explanations of why

Mr. Libby's statements were (or were not) material to the investigation taking place. *See* Resp.

at 6.[1]

Even with that order in place, there is a risk that the jury will consider certain evidence as

establishing that Ms. Wilson's CIA employment was protected information or that disclosure of

that information did trigger actual or potential damage. For example, the government has stated

that it will tell the jury that its investigation concerned "the possible unauthorized disclosure of

classified information and the possible unlawful disclosure of a covert agent." *Id.* at 2. To avoid

any risk that such statements will mislead the jury to conclude that Ms. Wilson was in fact

covert, Mr. Libby respectfully requests that the Court provide the following instruction at trial:

> No evidence has been presented that Valerie Wilson's CIA employment status
> was, or was not, classified or covert, or that disclosure of that status did, or did
> not, pose a risk of damage to the national security, the CIA, or Ms. Wilson
> herself. You may consider what, if anything, Mr. Libby knew or believed about
> her status or damage in determining his state of mind when he spoke to the FBI
> and testified before the grand jury. But you may not speculate as to whether Ms.

---

[1] The government "reserves the right to offer proof of the classified status of Ms. Wilson's employment" if Mr. Libby were to challenge the materiality of the questions posed to him. *See* Resp. at 2 n.1, 7. Mr. Libby has no intention of arguing that the government has failed to demonstrate materiality on the ground that at the time under investigation Ms. Wilson's CIA employment status was not classified or covert.

Wilson's employment was actually classified or covert, or whether disclosure of that employment did in fact cause a risk of damage to anyone.

That instruction, together with the order Mr. Libby proposes, will ensure that the parties and the jury remain focused on the task at hand and are not tempted to delve into issues that have no relevance to the charges brought.

## II.    EVIDENCE OR ARGUMENT REGARDING WHAT MR. LIBBY LEARNED ABOUT MS. WILSON'S EMPLOYMENT STATUS AND POTENTIAL DAMAGE *AFTER* HIS CONVERSATIONS WITH REPORTERS SHOULD NOT BE ADMITTED.

In its response, the government claims that it should be permitted to offer evidence of "everything" Mr. Libby heard about Ms. Wilson's CIA status "at *any time* prior to the FBI interviews or [his] grand jury appearances," including *after* his conversations with the three reporters. Resp. at 7-8. It would heap into this broad category news reports and commentary about Ms. Wilson, as well as conversations Mr. Libby allegedly had "regarding Ms. Wilson's possible 'covert' status" with various government officials (including the Director of Central Intelligence, "a CIA briefer," and the Counsel to the Vice President)—all after Mr. Novak's July 14 column was published. *Id.* at 3. According to the government, "all" of this evidence is "directly relevant" to whether Mr. Libby had a "motive to lie at the time of his FBI interviews and grand jury appearances." *Id.* at 7.

In fact, the relevance of such evidence is weak, at best. And whatever probative value it may have is clearly outweighed by the risk that it would distract the jury and cause unfair prejudice to Mr. Libby's defense.

In the weeks after Mr. Novak's column, there were allegations, including in various newspapers and magazines, that Ms. Wilson's CIA employment status had been covert and that disclosure of that status may have caused damage to the national security. But the notion that such evidence is relevant does not withstand scrutiny. For, even if Mr. Libby read or heard those

allegations and believed them to be true, such newly acquired information could not retroactively make any of his conduct improper, given what he knew (or more precisely did not know) about Ms. Wilson at the time the conversations occurred. The government's proposed evidence therefore has little, if any, bearing on whether Mr. Libby had a motive to lie.

Moreover, whatever slim relevance this after-the-fact evidence might conceivably have, its probative value is outweighed by the distraction and unfair prejudice it would inevitably cause. Both sides, and the Court, agree that whether Ms. Wilson's status was, in fact, classified or covert is irrelevant in this case. The same is true of the risk of damage. Yet, the evidence the government outlines in its response—including evidence of what the Director of Central Intelligence and a "CIA briefer" had to say about Ms. Wilson—will undoubtedly prompt the jury to speculate about Ms. Wilson's actual status and about questions of damage. Indeed, the government's evidence may well lead the jurors to conclude that Ms. Wilson *was* a covert agent and that the disclosure of that information *did* cause grave threat to the national security and the safety of Ms. Wilson, her family, and others. That risk is particularly acute given the rampant and often overheated speculation in some of the news commentary of that time.

As explained in our opening memorandum, such conclusions could well cause the jury to decide the case on an improper basis, rather than a fair consideration of the charges and evidence at issue. Mot. in Limine to Exclude Evidence and Argument Concerning Valerie Wilson's Employment Status and Actual or Potential Damage Caused by Disclosure of That Status at 10, 13-14 (Oct. 30, 2006) (Dkt. 166); *see United States v. Duran*, 884 F. Supp. 534, 536-37 (D.D.C. 1995) (evidence should not be admitted if there is a "danger that [it] will inflame the jury into reaching an impassioned and irrational verdict").

It would be one thing if Mr. Libby had received meaningful discovery on the nature and details of Ms. Wilson's CIA employment and the damage that the disclosure did (or did not) cause. Such information would allow Mr. Libby to dispel any misimpressions about status or damage that the evidence the government proposes might create. But the government has successfully denied Mr. Libby that discovery. And it now agrees that issues of actual status and damage are out of bounds. Given those facts, the government should not be left a backdoor route to offer evidence with the obvious (and potentially calculated) ability to convince the jury that Ms. Wilson's status was in fact classified and that the disclosure of her status did in fact pose a risk of damage.

At the very least, the government should be required to proffer the specific testimony it seeks to offer regarding Mr. Libby's alleged conversations with the Director of Central Intelligence, the "CIA briefer," and the Counsel to the Vice President.[2] To date, Mr. Libby has not received any documentation describing or corroborating the specifics of those conversations. In fact, the government's response is the first time it has mentioned the conversation with Mr. Addington. Moreover, though the government initially represented that the conversation with the CIA briefer was "in the defendant's presence," it now says that he was "a party to" that conversation. *Compare* Government's Resp. to Court's Inquiry Regarding News Articles the Government Intends To Offer As Evidence At Trial at 5 (May 12, 2006) (Dkt. 105-1) *and* Tr. of Mot. Hearing at 43 (May 5, 2006) (Dkt. 106) *with* Resp. at 3.

---

[2] The government should also be required to update the list of articles it intends to offer at trial (originally submitted on May 12 at the Court's request), or else confirm that the list remains the same. *See* Government's Resp. to Court's Inquiry Regarding News Articles the Government Intends To Offer As Evidence At Trial (May 12, 2006) (Dkt. 105-1). As it stands, that list indicates that the government intends to offer only one (or at most two) articles from the post-July 14 period. *See id.* at 3, 8.

Unless and until the government provides a detailed description of what the testimony regarding these alleged conversations will actually be, neither Mr. Libby nor the Court can accurately gauge just how much prejudice its introduction will cause, leaving exclusion as the only safe and fair option.

III.    **EVIDENCE OF WHAT OTHER WITNESSES KNEW OR BELIEVED ABOUT MS. WILSON'S CIA STATUS IS PROBATIVE OF MR. LIBBY'S STATE OF MIND AND HIS ALLEGED MOTIVE TO LIE.**

While seeking free rein in proving *its* theory of motive, the government asks the Court to constrict the evidence *the defense* may use to show that during the period that really matters, *i.e.*, *prior* to Mr. Libby's conversations with reporters, he did not know, or have any reason to believe, that Ms. Wilson's status was classified or covert—and therefore had no reason to lie. According to the government, the only evidence Mr. Libby may use for this purpose is information about Ms. Wilson that was actually relayed to him. *See* Resp. at 8. This cramped view of relevance should be rejected.

As reflected in its response, the government has developed a complicated theory to explain why Mr. Libby had a motive to lie about his conversations with reporters. *See* Resp. at 3-5. Mr. Libby will counter that theory by showing that when he spoke to the FBI and the grand jury he knew that he was not a source for the public disclosure of Ms. Wilson's employment. He also knew that at the time of the conversations he *did* have with reporters, he did not know or even suspect that Ms. Wilson's CIA employment status was protected information. Secure in that knowledge, Mr. Libby had no reason to lie.

That simple principle is critical to Mr. Libby's defense and he should not be unduly limited in offering evidence that supports it. At trial, Mr. Libby will establish that what he learned from the Vice President concerning Ms. Wilson's employment, and indeed even what other witnesses will say they told him prior to July 14, gave no indication that her status was

classified or covert. Nor did he have any other reason to believe that was so. Standing alone, however, that testimony may appear self-serving. Mr. Libby can, and should be permitted to, reinforce the point by showing that other witnesses—including witnesses who possessed as much or *more* information about Ms. Wilson and Agency operations—likewise had no idea that her status was protected.

The government will, for example, call as witnesses various government officials who will testify that they told Mr. Libby that Ms. Wilson worked at the CIA prior to his conversations with reporters. Mr. Libby should be permitted to question those witnesses about their knowledge of Ms. Wilson's status. If, as Mr. Libby has reason to believe, the very people who allegedly told him about Ms. Wilson did not themselves know or suspect that her status was classified or covert, that makes it all the more likely that Mr. Libby did not reach that conclusion either. Among other things, it confirms that he could not have learned such information from them. Yet, if the government had its way, Mr. Libby would be forced to rely entirely on evidence of information government officials affirmatively shared with Mr. Libby. *See id.* at 8. Obviously, evidence of what witnesses did not know, and therefore could not have shared, has equal relevance in this case.[3]

Likewise, Mr. Libby should be permitted to show that *other* government officials who knew as much or more about Ms. Wilson than he did had no inkling that her status was classified or covert. That is particularly true since the government—which apparently possesses no direct evidence that Mr. Libby knew Ms. Wilson's status was protected prior to July 14—will rely on the argument that Mr. Libby would or should have reached that conclusion based on what he had

---

[3] The government insists that its artificial view of relevance is consistent with this Court's prior rulings. In fact, the Court made clear in its June 2 order that "what, if anything" "the defendant, the three news reporters, *and any other key witnesses*" knew about Ms. Wilson's CIA affiliation prior to July 14 is relevant evidence in this case. June 2 Order at 3 (emphasis added).

heard about Ms. Wilson and knew about the operations of the CIA. *See, e.g.*, Tr. of Hearing at 84 (Feb. 24, 2006) (Dkt. 60) (the government "will argue that [Mr. Libby] knew or should have known that it [*i.e.*, Ms. Wilson's CIA employment status] was classified."). If the government is permitted to encourage such speculative inference, Mr. Libby certainly should be allowed to show that people standing in a similar (or more knowledgeable) position than his did not in fact arrive at the conclusion the government postulates.

Take for example former Deputy Secretary of State Richard Armitage. After acknowledging that he was the initial source for Mr. Novak's July 14 column, Mr. Armitage explained that he learned about Ms. Wilson from an internal State Department memorandum, but that nothing he learned from that memorandum (or apparently any other source) indicated to him Ms. Wilson's status was protected. *See* CBS News, *Armitage on CIA Leak: "I Screwed Up"* (Sept. 7, 2006) (Ex. A). Mr. Armitage explained that though the document was classified, "it doesn't mean that every sentence in the document is classified." *Id.* As for whether Ms. Wilson was covert, Mr. Armitage indicated that reading her name in the document would have signified the exact opposite: "I had never seen a covered agent's name in any memo in, I think, 28 years of government." *Id.*; *see also* R. Jeffrey Smith, *Armitage Says He Was Source of CIA Leak*, Wash. Post, Sept. 8, 2006, at A03 (quoting Mr. Armitage as saying "I have never seen in a memo . . . a covert agent's name") (Ex. B). Indeed, it appears that nothing Mr. Armitage knew about Ms. Wilson caused him to believe she was an operative with protected status. As he explained, "I didn't know she was an operative [and] I didn't try to out anybody." Ex. A.

Testimony of that kind is powerful evidence that, based on what Mr. Libby had heard about Ms. Wilson and how he had heard it, the thought never would have crossed his mind either. He should be permitted to use it in his defense.

- 9 -

## CONCLUSION

For the foregoing reasons and those stated in our opening memorandum, Mr. Libby

respectfully requests that the Court grant his Motion.


Dated: November 17, 2006                Respectfully submitted,

/s/ Theodore V. Wells, Jr.               /s/ William H. Jeffress, Jr.
Theodore V. Wells, Jr.                   William H. Jeffress, Jr.
(D.C. Bar No. 468934)                    (D.C. Bar No. 041152)
James L. Brochin                         Alex J. Bourelly
(D.C. Bar No. 455456)                    (D.C. Bar No. 441422)
Paul, Weiss, Rifkind, Wharton            Baker Botts LLP
  & Garrison LLP                         Alexandra M. Walsh
1285 Avenue of the Americas              (D.C. Bar. No. 490484)
New York, NY  10019-6064                 1299 Pennsylvania Ave., NW
(212) 373-3089                           Washington, DC  20004
                                         (202) 639-7751


/s/ John D. Cline
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
(415) 626-3939