UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR. NO. 05-394 (RBW) |
| ) | |
| I. LEWIS LIBBY, ) | Oral Argument Requested |
|     also known as "Scooter Libby," ) | |
|     Defendant. ) | |

**REPLY OF I. LEWIS LIBBY IN SUPPORT OF HIS
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATING TO
REPORTERS' FIRST AMENDMENT LITIGATION, CONTEMPT
PROCEEDINGS, AND JUDITH MILLER'S INCARCERATION**

The government, in its opposition to Mr. Libby's motion, makes clear that it views evidence of the litigation over reporters' privilege and Judith Miller's incarceration as important to its case, whether offered affirmatively or on rebuttal. Yet, its opposition makes similarly clear that such evidence is not relevant to the issues in this case and would create a mini-trial over a collateral matter that would unduly delay the proceedings, while offering scant probative value.

**I.    THE EVIDENCE THE GOVERNMENT SEEKS TO OFFER IS NOT RELEVANT.**

The government asserts that it is entitled to offer two categories of evidence. But its arguments about why it is entitled to offer that evidence mischaracterize the relief Mr. Libby seeks and the arguments he intends to make at trial.

    A.    Evidence Post-Dating Mr. Libby's Grand Jury Testimony Is Not Relevant to His State of Mind.

The government's first category of evidence would purportedly show that at the time Mr. Libby first spoke to the FBI about his conversations with reporters (that is, in October

2003) "he had a strong reason to believe that the reporters would never testify." Opp. at 2. Although the government attempts to manufacture a dispute over this type of evidence, the parties are not actually in disagreement on this point. The motion, if granted, would *not* exclude such evidence, so long as it relates to information that would have been known to Mr. Libby in October 2003 and is otherwise admissible.

It is apparent, however, that the government possesses no such evidence. The only support it specifically cites is an offhand comment by the President doubting "whether we'll find out who the leaker is." *Id.* at 6. This statement is a slender reed on which to base a motive theory, and it is of dubious admissibility. Similarly, even if it was "widely reported at the time" that "reporters generally may be depended upon to uphold promises of confidentiality," *id.*, as the government contends, these reports shed no light on Mr. Libby's state of mind, unless the government can show that Mr. Libby was aware of them. In any event, if granted, this motion would not preclude the government from offering such evidence.[1] Moreover, information widely available at the time, and known to Mr. Libby, showed that reporters could be compelled to testify in judicial proceedings. The defense would be permitted to demonstrate this fact.

The second category of evidence the government identified would purportedly show that "even after signing the waiver, defendant's actions reflected, at a minimum, ambivalence about the prospect of the reporters testifying and, at worst, an effort to color their testimony." *Id.* at 2. According to the government, it is entitled to use such evidence to rebut the claim that Mr. Libby "at all times and in every respect" encouraged reporters to testify. *Id.* at 7.

Again, the dispute the government refers to is contrived. The defense does *not* intend to introduce evidence at trial of communications with reporters that post-date Mr. Libby's

---

[1] The defense reserves its rights to object at trial to such evidence and arguments on other grounds, such as hearsay.

- 2 -

last grand jury appearance (March 24, 2004), because such evidence is not relevant to the charges in the indictment. What the government's opposition fails to grapple with is that events occurring *after* March 24, 2004 are not probative of Mr. Libby's state of mind at the time when the alleged offenses occurred. To be clear, Mr. Libby does plan to demonstrate that, contrary to the government's assertion, at the time he spoke to the FBI and testified before the grand jury, he expected reporters to provide information to the government. The government may attempt to disprove that, but it should not be permitted to use evidence that post-dates the statements at issue in this case in its effort to do so. If the government does introduce such evidence for any reason, however, the defense should be allowed to rebut it by showing that Mr. Libby, either directly or through counsel, explicitly confirmed that his waiver was voluntary in response to each and every inquiry from a reporter.

      B.      The Government's Proffered Evidence Relating to Reporters Is Both Irrelevant and Misleading.

The government concedes that Mr. Libby "voluntarily signed a waiver of confidentiality with respect to pertinent conversations with reporters." *Id.* at 7. The government also admits that Mr. Libby's "counsel gave assurances to reporter witnesses that defendant's waiver was voluntary." *Id.* The government, however, disputes that such assurances were given in all instances, and suggests that Mr. Libby was "at a minimum, ambivalen[t] about the prospect of the reporters testifying." *Id.* at 2.

Even assuming for the sake of argument that Mr. Libby had expressed "ambivalence" about whether reporters would testify, such indifference would not be probative of whether Mr. Libby committed perjury and obstruction of justice. By signing a confidentiality waiver and repeatedly confirming to reporters that it was voluntary, Mr. Libby went above and beyond what the law required him to do. The essence of the government's argument appears to

be that Mr. Libby's alleged "ambivalence" is evidence of his consciousness of guilt. In other words, the government wishes to offer evidence that because Mr. Libby did not volunteer to do even more to assist its investigation, the jury can infer that he did something wrong. The government does not cite any authority for the proposition that it may argue that negative inferences should be drawn when the subject of a grand jury investigation does not affirmatively reach out to other witnesses who are under subpoena. Indeed, there is a risk that such outreach might be viewed as obstructive conduct, as the Special Counsel's September 12, 2005 letter to Mr. Libby's counsel acknowledges. *See* Ex. F to Def. Mot. at 3.

It is important to note that although the government's memorandum refers to evidence about "reporters," *e.g.*, Opp. at 2, the evidence it proffers relates only to one reporter, Judith Miller. The government insinuates that it can establish Mr. Libby's "motive to lie and consciousness of guilt" because he did not provide a personal waiver to Ms. Miller before September 2005. *Id.* at 7-8. Presumably, the government would have the jury conclude from this fact that Mr. Libby did not want Ms. Miller to testify, even though it acknowledges that she "did not request . . . a personal assurance from [Mr. Libby] until September 2005." *Id.* at 4. In light of the fact that in August 2004 Mr. Libby's counsel assured Ms. Miller's counsel that his waiver was voluntary, and the fact that in September 2005 Mr. Libby provided additional, personal assurances to Ms. Miller promptly upon request, it would be a distraction and a waste of time for the government to invite the jury to join in its speculation that Mr. Libby's conduct belied a hidden, improper purpose.[2]

---

[2]  The government's current suggestion that Mr. Libby attempted to discourage Ms. Miller's testimony is at odds with the position the Special Counsel took in his September 12, 2005 letter to Mr. Libby's counsel. In that letter, the Special Counsel suggested that Ms. Miller was in jail because of a "misunderstanding" and because her counsel was operating under a mistaken assumption about the nature of the waiver, not because Mr. Libby had done

As this Court has held, at trial the jury should focus on Mr. Libby's state of mind during the relevant time period (May 2003 to March 2004). The jury should not be urged to convict Mr. Libby because he did not provide personal assurances to Ms. Miller when none were requested, or because he did not spring into action when he received a politically-charged letter from certain members of Congress. The Court should grant Mr. Libby's motion to preclude this manifestly unfair and irrelevant line of argument.

## II. THE EVIDENCE THE GOVERNMENT WISHES TO OFFER SHOULD BE EXCLUDED UNDER RULE 403.

### A. The Government's Proffered Evidence Would Require a "Trial Within a Trial."

Even if the government could establish that the evidence at issue had any relevance, it should be excluded under Rule 403 because of the likelihood that it will confuse the jury and unduly protract the proceedings. As Mr. Libby's motion explained, a "trial within a trial" will be necessary if the government seeks to introduce any evidence about collateral matters such as reporters' motions to quash, related contempt proceedings, and Ms. Miller's incarceration. The government argues in response that "no great delay" will result, and that "[t]here is no need to call counsel for various witnesses or the government." *Id*. at 9. Both of these contentions are wrong.

The government outlines a scenario in which Mr. Libby is permitted to rebut its allegations that he bears responsibility for reporters' initial refusals to testify with only his own testimony. That approach ignores reality. If the government is permitted to make such misleading arguments, the defense will be compelled to corroborate Mr. Libby's testimony by

---

anything wrong. *See* Ex. F to Def. Mot. at 3. The Special Counsel also assured Mr. Libby's counsel that he would not view communications with Ms. Miller about the waiver as obstructive conduct. *See id.*

introducing additional evidence that he encouraged reporters, including Ms. Miller, to testify about their conversations with him. For example:

- In 2003, Mr. Libby offered to sign confidentiality waivers that were personal to each reporter to whom he had spoken about the subject matters under investigation. The FBI refused this offer, and asked for a general blanket waiver.

- Joseph Tate, Mr. Libby's attorney, repeatedly confirmed the voluntariness of Mr. Libby's confidentiality waiver in numerous conversations with counsel for reporters, sometimes at the Special Counsel's direct request.

- Of the six reporters subpoenaed to testify about their conversations with Mr. Libby, three of them (Robert Novak, Glenn Kessler, and Walter Pincus) testified without mounting any legal challenges.

- Messrs. Kessler, Pincus, and Russert testified about their conversations with Mr. Libby in reliance on the waiver.

- Matthew Cooper testified based on representations Mr. Tate made to his counsel about the nature and scope of the waiver.

In addition, to combat the inferences the government would like the jury to draw concerning evidence of the contempt proceedings involving Ms. Miller and her 85-day stint in jail, Mr. Libby would need to offer additional evidence and arguments, including evidence that:

- In August 2004, Mr. Tate told Ms. Miller's counsel, Floyd Abrams, that Mr. Libby's waiver was voluntary and not coerced. In response, Mr. Abrams said Ms. Miller was refusing to testify not based on a reluctance to disclose her communications with Mr. Libby, but rather to champion journalistic principles and protect other sources.

- Ms. Miller's decision to defy the District Court's order to testify and go to jail led to favorable media coverage for her. *See, e.g.*, Editorial, *Free Judy Miller*, N.Y. TIMES, Aug. 29, 2005, at A14 (attached hereto as Ex. 1).

- The Special Counsel's agreement to "confine his questioning to the subject of Mr. Libby" so Ms. Miller could "protect other confidential sources" was important to her decision to leave prison. Judith Miller, *A Personal Account; My Four Hours Testifying in the Federal Grand Jury Room*, N.Y. TIMES, Oct. 16, 2005, at 2 (Ex. G to Def. Mot. at 2).

The story outlined above about reporters' decisions to testify is a complicated one. Presenting that story at trial would undoubtedly delay the proceedings, distract the jury

from the real issues, and require the testimony of various additional witnesses, including counsel for reporters. For example, the details of the conversations between Mr. Tate and Mr. Abrams are hotly contested. *Compare, e.g.,* Letter from Joseph A. Tate to Patrick J. Fitzgerald (Sept. 16, 2005) (Ex. E to Def. Mot.) to Letter from Floyd Abrams to Joseph A. Tate (Sept. 29, 2005) (attached hereto as Ex. 2). Neither Mr. Libby nor Ms. Miller participated in those phone calls, and it is unlikely that their testimony about discussions that occurred between their attorneys that they did not witness would be admissible. Thus, the government's suggestion that it can establish the relevant facts with Ms. Miller's testimony alone is absurd.

Whatever probative value the government's proffered evidence could conceivably have (and in our view there is none) is outweighed by both the volume and the complexity of the information necessary to rebut it. As demonstrated above, Mr. Libby's purported "ambivalence" about reporters testifying does not actually demonstrate any consciousness of guilt on his part. The government's proposed detour into the complicated motives of reporters is precisely the type of tangential issue that courts routinely exclude under Rule 403. *See, e.g.*, *United States* v. *Duran*, 884 F. Supp. 534, 536-37 (D.D.C. 1995).

B.  The Government's Proffered Evidence Places the Special Counsel's Actions at Issue.

As explained above, the defense position is that all of the events surrounding reporters' resistance to grand jury subpoenas – including Ms. Miller's refusal to testify, incarceration, and eventual release – are irrelevant to the charges in the indictment. But if the government insists on eliciting testimony or making arguments about those events, it may very well put the Special Counsel's actions at issue. Indeed, there can be little doubt about the Special Counsel's central role. For example, Ms. Miller has stated publicly that she would not have testified if the Special Counsel had not "agreed to limit his questioning" to Mr. Libby.

Miller, *A Personal Account*, at 2 (Ex. G to Def. Mot. at 2). Yet, the opposition fails to mention this agreement, or that Ms. Miller found it important. If the government insists that Mr. Libby is responsible for Ms. Miller's refusal to testify, but Ms. Miller takes the position that her testimony was conditioned on the Special Counsel's agreement to limit his questioning, the Special Counsel's testimony may be necessary to resolve this issue.

The Special Counsel also sent Mr. Tate a letter stating that he "would welcome" communications between Mr. Libby and Ms. Miller about the waiver, and hinting that if Mr. Libby did not "reaffirm his waiver in a manner specific to Ms. Miller" he would be blamed for her continued incarceration. Ex. F to Def. Mot. at 3. In addition, the Special Counsel called Mr. Tate to discuss these issues. These communications are also not mentioned in the opposition.

Mr. Libby does not dispute the high standard for calling a prosecutor to testify. *See United States* v. *Regan*, 103 F.3d 1072, 1083 (9th Cir. 1997). But if the government is permitted to inject collateral evidence concerning the reporters' resistance to testifying into this case, Mr. Libby must have the right to rebut that evidence, even if it requires testimony from the reporters' counsel, Mr. Libby's counsel, *and* the Special Counsel.

C.  The Government Has Misstated the Applicable Law and the Relevant Facts.

The government incorrectly claims that *United States* v. *Fonseca*, 435 F.3d 369 (D.C. Cir. 2006), supports its argument that although evidence that reporters did not accept Mr. Libby's waiver as voluntary will be admissible here, testimony from "counsel for various witnesses or the government" will not be. Opp. at 9. *Fonseca* says no such thing. Instead, *Fonseca* supports Mr. Libby's argument that the government should be precluded from offering evidence about reporters' legal challenges to grand jury subpoenas. In *Fonseca*, the D.C. Circuit upheld the district court's ruling that the question of whether a witness to a February 15, 2003 shooting possessed a crack pipe on January 11, 2003 was a "collateral" matter because it did not

involve the defendant or the shooting. *See Fonseca*, 435 F.3d at 374. Although the court found the evidence relevant to the witness's credibility, the danger of confusion and delay substantially outweighed its probative value. *Id.* at 376 ("Going down this road, then, would have led to both delay and a 'mini-trial' on a collateral matter, two of the problems that Rule 403 seeks to avoid."). Here, Mr. Libby is similarly attempting to exclude evidence of collateral matters.

The government's reliance on *Fonseca* is misplaced for another reason. The defense would call counsel for witnesses and the government not to challenge the credibility of Ms. Miller, but as fact witnesses to establish that Mr. Libby's account of events is correct and to undercut the government's motive theory through their testimony.

Finally, we are compelled to point out that the government's description of the events surrounding Mr. Cooper's testimony repeatedly misstates important facts. The government wrongly conflates Mr. Cooper's extended refusal to testify concerning his communications with Karl Rove with his brief resistance to a subpoena relating to his conversations with Mr. Libby. Specifically, the opposition states that "Cooper and Miller declined to [testify] until their claims were rejected by the Court of Appeals and their petitions for certiorari were denied by the Supreme Court, and until they had received personal assurances from defendant or his counsel . . . ." Opp. at 4. The government also claims that "Cooper testified on October 13, 2004 and July 13, 2005, after defendant's lawyer confirmed to Cooper's lawyer that defendant's waiver was voluntary." *Id.* at 4 n.1.

This account is inaccurate. On May 21, 2004, a subpoena requesting testimony about only Mr. Libby was issued to Mr. Cooper. On August 9, 2004, Mr. Cooper was held in contempt by the District Court for refusing to comply with an order to testify. Around the same time, Mr. Cooper's lawyer, Mr. Abrams, discussed Mr. Libby's waiver with Mr. Tate. Mr.

Cooper then decided to testify, and did so for the first time on August 23, 2004, not October 13, 2004. But Mr. Cooper was held in contempt again on October 13, after he refused to comply with a new subpoena, dated September 13, that called for testimony about his communications with Mr. Rove. Mr. Cooper fought the contempt order up to the Supreme Court, and ultimately testified before the grand jury again jury again on July 13, 2005. These latter proceedings to enforce the September 13 subpoena regarding Mr. Rove had nothing to do with Mr. Libby, and it is misleading for the government to suggest otherwise.

In sum, the government's opposition distorts both Mr. Libby's motion and the underlying facts. Even if the one-sided story the government wants to tell about reporters' refusals to testify had any relevance, this evidence should be excluded to avoid the unnecessary distraction and delay that would result if the defense was forced to rebut it.

## CONCLUSION

For the foregoing reasons and those stated in his opening memorandum, Mr. Libby respectfully requests that the Court grant his Motion and enter the proposed order as written.

Dated:  November 21, 2006                             Respectfully submitted,

/s/ Theodore V. Wells, Jr.                                    /s/ William H. Jeffress, Jr.
Theodore V. Wells, Jr.                                         William H. Jeffress, Jr.
(DC Bar No. 468934)                                          (DC Bar No. 041152)
James L. Brochin                                                 Alex J. Bourelly
(DC Bar No. 455456)                                          (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                             Baker Botts LLP
  & Garrison LLP                                                 1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas                              Washington, DC  20004
New York, NY  10019-6064                                Tel:  (202) 639-7751
Tel:  (212) 373-3089                                             Fax: (202) 585-1087
Fax: (212) 373-2217

/s/ John D. Cline
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700

- 11 -