# EXHIBIT A

September 15, 2005

Ms. Judith Miller
c/o Mr. Robert S. Bennett, Esq.
Skadden, Arps

Dear Judy,

Your reporting, and you, are missed. Like many Americans, I admire your principled stand. But, like many of your friends and readers, I would welcome you back among the rest of us, doing what you do best -- reporting.

A few days ago, your counsel, Mr. Bennett, asked that I repeat for you the waiver of confidentiality that I specifically gave to your counsel over a year ago. His request surprised me, but I am pleased to comply, if it will speed your return.

I was surprised at Mr. Bennett's request, because my counsel had reassured yours well over a year ago that I had voluntarily waived the confidentiality of discussions, if any, we may have had related to the Wilson-Plame matter. As you know, in January 2004 I waived the privilege for purposes of allowing certain reporters identified by the Special Counsel to testify before the Grand Jury about any discussions I may have had related to the Wilson-Plame matter. The Special Counsel identified every reporter with whom I had spoken about anything in July 2003, including you. My counsel then called counsel for each of the reporters, including yours, and confirmed that my waiver was voluntary. Your counsel reassured us that he understood this, that your stand was one of principle or otherwise unrelated to us, and that there was nothing more we could do. In all the months since, we have never heard otherwise from anyone on your legal team, until your new counsel's request just a few days ago.

In case you have any concerns about this letter, I note that the Special Counsel wrote to my attorney last week. In his letter, the Special Counsel offered that he would welcome my reaching out to you to reaffirm my earlier waiver. As you may know by now, my counsel responded to the Special Counsel, repeating all that we had done over a year ago, but offering to do so again. Finally, this letter has been approved by my counsel and will only reach you after your lawyer's review.

In the spirit of your counsel's and the Special Counsel's request, I would like to dispel any remaining concerns you may have that circumstances forced this waiver upon me. As noted above, my lawyer confirmed my waiver to other reporters in just the way he did with your

lawyer. Why? Because, as I am sure will not be news to you, the public report of every other reporter's testimony makes clear that they did not discuss Ms. Plame's name or identity with me, or knew about her before our call. I waived the privilege voluntarily to cooperate with the Grand Jury, but also because the reporters' testimony served my best interests. I believed a year ago, as now, that testimony by all will benefit all.

I admire your principled fight with the Government. But for my part, this is the rare case where this "source" would be better off if you testified. That's one reason why I waived over a year ago, and in large measure, why I write again today. Consider this the Miller Corollary: "It's okay to testify about a privileged communication, when the person you seek to protect has waived the privilege and would be better off if you testify." If you can find a way to testify about discussions we had, if any, that relate to the Wilson-Plame matter, I remain today just as interested as I was over a year ago.

You went into jail in the summer. It is fall now. You will have stories to cover — Iraqi elections and suicide bombers, biological threats and the Iranian nuclear program. Out West, where you vacation, the aspens will already be turning. They turn in clusters, because their roots connect them. Come back to work — and life.

Until then, you will remain in my thoughts and prayers.

With admiration,

*Lewis Libby*

Lewis Libby

2

# EXHIBIT B

 **Dechert** LLP

Joseph A. Tate
Direct Tel: (215) 994-2350
Direct Fax: (215) 655-2350
joseph.tate@dechert.com

October 3, 2005

**VIA FAX**

BOSTON

BRUSSELS

CHARLOTTE

FRANKFURT

HARRISBURG

HARTFORD

LONDON

LUXEMBOURG

MUNICH

NEW YORK

NEWPORT BEACH

PALO ALTO

PARIS

PHILADELPHIA

PRINCETON

SAN FRANCISCO

WASHINGTON

Floyd Abrams, Esquire
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY 10005-1702

Dear Floyd:

I was quite disappointed at your letter and your subsequent softball television interview with your son. I had not intended to respond to your letter because I did not think that this should be a battle between lawyers on who was best at "spin-control," but, your letter and interview now require a response.

Our conversations have been, and I hope will be, good faith efforts to zealously represent our clients. Your recollection of the words exchanged between us, and the meaning you have given to them, is quite different than mine. I do not believe that my words could be interpreted in any way to say that the waiver was anything other than voluntary and not-coerced. I used those words. I am pleased that you at least admitted that I said we had no objection to Ms. Miller's testifying about her conversations with my client.

I recall that you said your client felt that when the White House instructed staff to cooperate, these waivers were inherently coercive. As an aside, you and I discussed whether when an employer instructs an employee to sit for an interview in the course of an internal investigation, that might be considered coercive because if the employee refuses, he or she could be terminated. You asked if my client would be fired if he did not sign the waiver. I said I did not know because he voluntarily signed it. That was the end of our conversation on that point.

The significant fact that you continue to omit, and that seems to be lost here, is that you never told me that your client did not accept my representation of voluntariness or that she wanted to speak personally with my client. Even you can't spin those facts away. That is the answer to this unfortunate circumstance of your client's incarceration, not any failure on our part.

I am sorry that you found any ambiguity in my words and that you never informed me that your client wanted the personal contact from my client. She had the personal waiver. I gave it to you when we spoke. It was not generic. A personal contact is different, and you did not tell me she wanted that. Fortunately, when Bob Bennett called and asked for the personal contact, we immediately accommodated him and the situation was immediately resolved.

Floyd Abrams, Esquire
October 3, 2005
Page 2


My hope is that this media circus will end and our clients can get back to their normal lives.  I hope we will not have any misunderstanding of our role in accomplishing that.


Sincerely,


Joseph A. Tate


JAT/dt
bcc:    David Johnston/New York Times
        Sue Schmidt/Washington Post

EXHIBIT C

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY


October 16, 2005

# The Miller Case: A Notebook, a Cause, a Jail Cell and a Deal

### By DON VAN NATTA Jr., ADAM LIPTAK and CLIFFORD J. LEVY

In a notebook belonging to Judith Miller, a reporter for The New York Times, amid notations about Iraq and nuclear weapons, appear two small words: "Valerie Flame."

Ms. Miller should have written Valerie Plame. That name is at the core of a federal grand jury investigation that has reached deep into the White House. At issue is whether Bush administration officials leaked the identity of Ms. Plame, an undercover C.I.A. operative, to reporters as part of an effort to blunt criticism of the president's justification for the war in Iraq.

Ms. Miller spent 85 days in jail for refusing to testify and reveal her confidential source, then relented. On Sept. 30, she told the grand jury that her source was I. Lewis Libby, the vice president's chief of staff. But she said he did not reveal Ms. Plame's name.

And when the prosecutor in the case asked her to explain how "Valerie Flame" appeared in the same notebook she used in interviewing Mr. Libby, Ms. Miller said she "didn't think" she heard it from him. "I said I believed the information came from another source, whom I could not recall," she wrote on Friday, recounting her testimony for an article that appears today.

Whether Ms. Miller's testimony will prove valuable to the prosecution remains unclear, as do its ramifications for press freedom. Yet an examination of Ms. Miller's decision not to testify, and then to do so, offers fresh information about her role in the investigation and how The New York Times turned her case into a cause.

The grand jury investigation centers on whether administration officials leaked the identity of Ms. Plame, whose husband, a former diplomat named Joseph C. Wilson IV, became a public critic of the Iraq war in July 2003. But Ms. Miller said Mr. Libby first raised questions about the diplomat in an interview with her that June, an account suggesting that Mr. Wilson was on the White House's radar before he went public with his criticisms.

Once Ms. Miller was issued a subpoena in August 2004 to testify about her conversations with Mr. Libby, she and The Times vowed to fight it. Behind the scenes, however, her lawyer made inquiries to see if Mr. Libby would release her from their confidentiality agreement. Ms. Miller said she decided not to testify in part because she thought that Mr. Libby's lawyer might be signaling to keep her quiet unless she would exonerate his client. The lawyer denies that, and Mr. Libby did not respond to requests for an interview.

As Ms. Miller, 57, remained resolute and moved closer to going to jail for her silence, the leadership of The Times stood squarely behind her.

"She'd given her pledge of confidentiality," said Arthur Sulzberger Jr., the publisher. "She was prepared to honor that. We were going to support her."

But Mr. Sulzberger and the paper's executive editor, Bill Keller, knew few details about Ms. Miller's conversations with her confidential source other than his name. They did not review Ms. Miller's notes. Mr. Keller said he learned about the "Valerie Flame" notation only this month. Mr. Sulzberger was told about it by Times reporters on Thursday.

Interviews show that the paper's leaders, in taking what they considered to be a principled stand, ultimately left the major decisions in the case up to Ms. Miller, an intrepid reporter whom editors found hard to control.

"This car had her hand on the wheel because she was the one at risk," Mr. Sulzberger said.

Once Ms. Miller was jailed, her lawyers were in open conflict about whether she should stay there. She had refused to reopen communications with Mr. Libby for a year, saying she did not want to pressure a source into waiving confidentiality. But in the end, saying "I owed it to myself" after two months of jail, she had her lawyer reach out to Mr. Libby. This time, hearing directly from her source, she accepted his permission and was set free.

"We have everything to be proud of and nothing to apologize for," Ms. Miller said in an interview Friday.

Neither The Times nor its cause has emerged unbruised. Three courts, including the Supreme Court, declined to back Ms. Miller. Critics said The Times was protecting not a whistle-blower but an administration campaign intended to squelch dissent. The Times's coverage of itself was under assault: While the editorial page had crusaded on Ms. Miller's behalf, the news department had more than once been scooped on the paper's own story, even including the news of Ms. Miller's release from jail.

Asked what she regretted about The Times's handling of the matter, Jill Abramson, a managing editor, said: "The entire thing."

## A Divisive Newsroom Figure

In the spring of 2003, Ms. Miller returned from covering the war in Iraq, where she had been embedded with an American military team searching unsuccessfully for evidence of nuclear, chemical and biological weapons. Back in the States, another battle was brewing.

Ms. Miller had written a string of articles before the war - often based on the accounts of Bush administration officials and Iraqi defectors - strongly suggesting that Saddam Hussein was developing these weapons of mass destruction.

When no evidence of them was found, her reporting, along with that of some other journalists, came under fire. She was accused of writing articles that helped the Bush administration make its case for war.

"I told her there was unease, discomfort, unhappiness over some of the coverage," said Roger Cohen, who was the foreign editor at the time. "There was concern that she'd been convinced in an unwarranted way, a way that was not holding up, of the possible existence of W.M.D."

It was a blow to the reputation of Ms. Miller, an investigative reporter who has worked at The Times for three decades. Ms. Miller is known for her expertise in intelligence and security issues and her ability to cultivate relationships with influential sources in government. In 2002, she was part of a team of Times reporters that won a Pulitzer Prize for articles on Al Qaeda.

Inside the newsroom, she was a divisive figure. A few colleagues refused to work with her.

"Judy is a very intelligent, very pushy reporter," said Stephen Engelberg, who was Ms. Miller's editor at The Times for six years and is now a managing editor at The Oregonian in Portland. "Like a lot of investigative reporters, Judy enefits from having an editor who's very interested and involved with what she's doing."

In the year after Mr. Engelberg left the paper in 2002, though, Ms. Miller operated with a degree of autonomy rare at The Times.

Douglas Frantz, who succeeded Mr. Engelberg as the investigative editor, said that Ms. Miller once called herself "Miss Run Amok."

"I said, 'What does that mean?' " said Mr. Frantz, who was recently appointed managing editor at The Los Angeles Times. "And she said, 'I can do whatever I want.' "

Ms. Miller said she remembered the remark only vaguely but must have meant it as a joke, adding, "I have strong elbows, but I'm not a dope."

Ms. Miller said she was proud of her journalism career, including her work on Al Qaeda, biological warfare and Islamic militancy. But she acknowledged serious flaws in her articles on Iraqi weapons.

"W.M.D. - I got it totally wrong," she said. "The analysts, the experts and the journalists who covered them - we were all wrong. If your sources are wrong, you are wrong. I did the best job that I could."

In two interviews, Ms. Miller generally would not discuss her interactions with editors, elaborate on the written account of her grand jury testimony or allow reporters to review her notes.

On July 30, 2003, Mr. Keller became executive editor after his predecessor, Howell Raines, was dismissed after a fabrication scandal involving a young reporter named Jayson Blair.

Within a few weeks, in one of his first personnel moves, Mr. Keller told Ms. Miller that she could no longer cover Iraq and weapons issues. Even so, Mr. Keller said, "she kept kind of drifting on her own back into the national security realm."

Although criticism of Ms. Miller's Iraq coverage mounted, Mr. Keller waited until May 26, 2004, to publish an editors' note that criticized some of the paper's coverage of the run-up to the war.

The note said the paper's articles on unconventional weapons were credulous. It did not name any reporters and said the failures were institutional. Five of the six articles called into question were written or co-written by Ms. Miller.

## 'A Good-Faith Source'

On June 23, 2003, Ms. Miller visited Mr. Libby at the Old Executive Office Building in Washington. Mr. Libby was the vice president's top aide and had played an important role in shaping the argument for going to war in Iraq. He was "a good-faith source who was usually straight with me," Ms. Miller said in an interview.

Her assignment was to write an article about the failure to find unconventional weapons in Iraq. She said Mr. Libby wanted to talk about a diplomat's fact-finding trip in 2002 to the African nation of Niger to determine whether Iraq sought uranium there. The diplomat was Mr. Wilson, and his wife worked for the C.I.A.

Mr. Wilson had already become known among Washington insiders as a fierce Bush critic. He would go public the next month, accusing the White House in an opinion article in The Times of twisting intelligence to exaggerate the

Iraqi threat.

But Mr. Libby was already defending Vice President Dick Cheney, saying his boss knew nothing about Mr. Wil or his findings. Ms. Miller said her notes leave open the possibility that Mr. Libby told her Mr. Wilson's wife might work at the agency.

On July 8, two days after Mr. Wilson's article appeared in The Times, the reporter and her source met again, for breakfast at the St. Regis Hotel, near the White House.

The notebook Ms. Miller used that day includes the reference to "Valerie Flame." But she said the name did not appear in the same portion of her notebook as the interview notes from Mr. Libby.

During the breakfast, Mr. Libby provided a detail about Ms. Wilson, saying she worked in a C.I.A. unit known as Winpac; the name stands for weapons intelligence, nonproliferation and arms control. Ms. Miller said she understood this to mean that Ms. Wilson was an analyst rather than an undercover operative.

Ms. Miller returned to the subject on July 12 in a phone call with Mr. Libby. Another variant on Valerie Wilson's name - "Victoria Wilson" - appears in the notes of that call. Ms. Miller had by then called other sources about Mr. Wilson's wife. In an interview, she would not discuss her sources.

Two days later, on July 14, Robert D. Novak, the syndicated columnist, wrote that Mr. Wilson's wife had suggested sending him to Niger, citing "two administration sources." He went on to say, without attributing the information, that Mr. Wilson's wife, "Valerie Plame, is an agency operative on weapons of mass destruction."

Ms. Miller's article on the hunt for missing weapons was published on July 20, 2003. It acknowledged that the hunt could turn out to be fruitless but focused largely on the obstacles the searchers faced.

Neither that article nor any in the following months by Ms. Miller discussed Mr. Wilson or his wife.

It is not clear why. Ms. Miller said in an interview that she "made a strong recommendation to my editor" that an article be pursued. "I was told no," she said. She would not identify the editor.

Ms. Abramson, the Washington bureau chief at the time, said Ms. Miller never made any such recommendation.

In the fall of 2003, after The Washington Post reported that "two top White House officials disclosed Plame's identity to at least six Washington journalists," Philip Taubman, Ms. Abramson's successor as Washington bureau chief, asked Ms. Miller and other Times reporters whether they were among the six. Ms. Miller denied it.

"The answer was generally no," Mr. Taubman said. Ms. Miller said the subject of Mr. Wilson and his wife had come up in casual conversation with government officials, Mr. Taubman said, but Ms. Miller said "she had not been at the receiving end of a concerted effort, a deliberate organized effort to put out information."

**Enter a Special Prosecutor**

The Novak column prompted a criminal investigation into whether government officials had violated a 1982 law that makes it a crime in some circumstances to disclose the identity of an undercover agent. At the end of December 2003, the United States attorney in Chicago, Patrick J. Fitzgerald, was appointed special prosecutor.

Around the same time, F.B.I. investigators working for Mr. Fitzgerald asked officials in the White House, includ Mr. Libby, to sign waivers instructing reporters that they could disregard earlier promises of confidentiality and

reveal who their sources were.

When Ms. Miller <u>was subpoenaed in the investigation in August 2004</u>, The Times immediately retained Floyd Abrams, who had often represented the paper and is a noted First Amendment lawyer.

The Times said it believes that attempts by prosecutors to force reporters to reveal confidential information must be resisted. Otherwise, it argues, the public would be deprived of important information about the government and other powerful institutions.

The fact that Ms. Miller's judgment had been questioned in the past did not affect its stance. "The default position in a case like that is you support the reporter," Mr. Keller said.

It was in these early days that Mr. Keller and Mr. Sulzberger learned Mr. Libby's identity. Neither man asked Ms. Miller detailed questions about her conversations with him.

Both said they viewed the case as a matter of principle, which made the particulars less important. "I didn't interrogate her about the details of the interview," Mr. Keller said. "I didn't ask to see her notes. And I really didn't feel the need to do that."

Still, Mr. Keller said the case was not ideal: "I wish it had been a clear-cut whistle-blower case. I wish it had been a reporter who came with less public baggage."

Times lawyers warned company executives that they would have trouble persuading a judge to excuse Ms. Miller from testifying. The Supreme Court decided in 1972 that the First Amendment offers reporters no protection from grand jury subpoenas.

Ms. Miller authorized Mr. Abrams to talk to Mr. Libby's lawyer, Joseph A. Tate. The question was whether Mr. Libby really wanted her to testify. Mr. Abrams passed the details of his conversation with Mr. Tate along to Ms. Miller and to Times executives and lawyers, people involved in the internal discussion said.

People present at the meetings said that what they heard about the preliminary negotiations was troubling.

Mr. Abrams told Ms. Miller and the group that Mr. Tate had said she was free to testify. Mr. Abrams said Mr. Tate also passed along some information about Mr. Libby's grand jury testimony: that he had not told Ms. Miller the name or undercover status of Mr. Wilson's wife.

That raised a potential conflict for Ms. Miller. Did the references in her notes to "Valerie Flame" and "Victoria Wilson" suggest that she would have to contradict Mr. Libby's account of their conversations? Ms. Miller said in an interview that she concluded that Mr. Tate was sending her a message that Mr. Libby did not want her to testify.

According to Ms. Miller, this was what Mr. Abrams told her about his conversation with Mr. Tate: "He was pressing about what you would say. When I wouldn't give him an assurance that you would exonerate Libby, if you were to cooperate, he then immediately gave me this, 'Don't go there, or, we don't want you there.' "

Mr. Abrams said: "On more than one occasion, Mr. Tate asked me for a recitation of what Ms. Miller would say. I did not provide one."

In an e-mail message Friday, Mr. Tate called Ms. Miller's interpretation "outrageous."

I never once suggested that she should not testify," Mr. Tate wrote. "It was just the opposite. I told Mr. Abrams

that the waiver was voluntary."

He added: " 'Don't go there' or 'We don't want you there' is not something I said, would say, or ever implied or suggested."

Telling another witness about grand jury testimony is lawful as long as it is not an attempt to influence the other witness's testimony.

"Judy believed Libby was afraid of her testimony," Mr. Keller said, noting that he did not know the basis for the fear. "She thought Libby had reason to be afraid of her testimony."

Ms. Miller and the paper decided at that point not to pursue additional negotiations with Mr. Tate.

The two sides did not talk for a year.

Ms. Miller said in an interview that she was waiting for Mr. Libby to call her, but he never did. "I interpreted the silence as, 'Don't testify,' " Ms. Miller said.

She and her lawyers have also said it was inappropriate for them to hound a source for permission to testify.

Mr. Tate, for his part, said the silence of the Miller side was mystifying.

"You never told me," Mr. Tate wrote to Mr. Abrams recently, "that your client did not accept my representation of voluntariness or that she wanted to speak personally to my client." Mr. Abrams does not dispute that.

Talks between Ms. Miller's lawyer and the prosecutor, Mr. Fitzgerald, were at a dead end, too.

Not long after breaking off communications with Mr. Tate, Mr. Abrams spoke to Mr. Fitzgerald twice in September 2004. Mr. Abrams wanted to narrow the scope of the questions Ms. Miller would be asked if she testified before the grand jury.

Mr. Abrams said he wanted Mr. Fitzgerald to question Ms. Miller only on her conversations with Mr. Libby about Ms. Wilson. And he wanted a promise that Mr. Fitzgerald would not call her back for further questioning after she testified once.

Mr. Fitzgerald said no. His spokesman declined to comment for this article.

With negotiations at an impasse, Ms. Miller and The Times turned to the courts but were rebuffed. In October 2004, Chief Judge Thomas F. Hogan of the Federal District Court in Washington held Ms. Miller in contempt for not testifying. She remained free while she pursued appeals.

A few weeks later on Capitol Hill, in November 2004, Ms. Miller bumped into Robert S. Bennett, the prominent Washington criminal lawyer who represented President Bill Clinton during the Monica Lewinsky scandal and who is known for his blunt style and deal-making skills.

Ms. Miller recalled Mr. Bennett saying while he signed on to her case: "I don't want to represent a principle. I want to represent Judy Miller."

After the Supreme Court declined to hear the case, Ms. Miller made a final plea to Judge Hogan to stay out of jail. "My motive here is straightforward. A promise of confidentiality once made must be respected, or the journalist

will lose all credibility and the public will, in the end, suffer."

Judge Hogan ordered her jailed at Alexandria Detention Center in Northern Virginia until she agreed to testify or the grand jury's term expired on Oct. 28.

"She has the keys to release herself," the judge said. "She has a waiver she chooses not to recognize."

**Rising Tensions at Newspaper**

While the paper's leaders were rallying around Ms. Miller's cause in public, inside The Times tensions were growing.

Throughout this year, reporters at the paper spent weeks trying to determine the identity of Ms. Miller's source. All the while, Mr. Keller knew it, but declined to tell his own reporters.

Even after reporters learned it from outside sources, The Times did not publish Mr. Libby's name, though other news organizations already had. The Times did not tell its readers that Mr. Libby was Ms. Miller's source until Sept. 30, in an article about Ms. Miller's release from jail.

Mr. Keller said that before Ms. Miller went to jail, Mr. Sulzberger, the publisher, asked him to participate in meetings on legal strategy and public statements. Mr. Keller said he then turned over the supervision of the newspaper's coverage of the case to Ms. Abramson, though he said he did not entirely step aside.

"It was just too awkward," Mr. Keller said, "to have me coming from meetings where they were discussing the company's public posture, then overseeing stories that were trying to deal with the company's public posture."

Ms. Abramson called The Times's coverage of the case "constrained." She said that if Ms. Miller was willing to go to jail to protect her source, it would have been "unconscionable then to out her source in the pages of the paper."

Mr. Keller and Ms. Abramson said this created an almost impossible tension between covering the case and the principle they believed to be at the heart of it.

Some reporters said editors seemed reluctant to publish articles about other aspects of the case as well, like how it was being investigated by Mr. Fitzgerald. In July, Richard W. Stevenson and other reporters in the Washington bureau wrote an article about the role of Mr. Cheney's senior aides, including Mr. Libby, in the leak case. The article, which did not disclose that Mr. Libby was Ms. Miller's source, was not published.

Mr. Stevenson said he was told by his editors that the article did not break enough new ground. "It was taken pretty clearly among us as a signal that we were cutting too close to the bone, that we were getting into an area that could complicate Judy's situation," he said.

In August, Douglas Jehl and David Johnston, two other Washington reporters, sent a memo to the Washington bureau chief, Mr. Taubman, listing ideas for coverage of the case. Mr. Taubman said Mr. Keller did not want them pursued because of the risk of provoking Mr. Fitzgerald or exposing Mr. Libby while Ms. Miller was in jail.

Mr. Taubman said he felt bad for his reporters, but he added that he and other senior editors felt that they had no choice. "No editor wants to be in the position of keeping information out of the newspaper," Mr. Taubman said.

Both Mr. Taubman and Ms. Abramson called the situation "excruciatingly difficult."

One result was that other news organizations broke developments in the case before The Times. Reporters found it especially frustrating when on the day that Ms. Miller left jail, The Times had an article prepared at 2 p.m. but delayed posting it on its Web site until after the news appeared on the Web site of The Philadelphia Inquirer.

"We end up being late on our own story," Mr. Johnston said.

There were other awkward moments. On Oct. 7, shortly before Ms. Miller was to conduct a telephone interview with two Times reporters, George Freeman, a Times company lawyer, sent her a four-page memorandum.

Ms. Miller and her outside lawyer, Mr. Bennett, reacted furiously, calling it a "script" and nearly canceling the interview. Mr. Freeman said later that he had prepared and sent what he called a "narrative" of what happened to Ms. Miller. Mr. Freeman said it had been written long before the interview with Ms. Miller had even been contemplated.

"It was not meant to be a script," Mr. Freeman said.

The editorial page, which is run by Mr. Sulzberger and Gail Collins, the editorial page editor, championed Ms. Miller's cause. The Times published more than 15 editorials and called for Congress to pass a shield law that would make it harder for federal prosecutors to compel reporters to testify.

Mr. Sulzberger said he did not personally write the editorials, but regularly urged Ms. Collins to devote space to them. After Ms. Miller was jailed, an editorial acknowledged that "this is far from an ideal case," before saying, "If Ms. Miller testifies, it may be immeasurably harder in the future to persuade a frightened government employee to talk about malfeasance in high places."

Asked in the interview whether he had any regrets about the editorials, given the outcome of the case, Mr. Sulzberger said no.

"I felt strongly that, one, Judy deserved the support of the paper in this cause - and the editorial page is the right place for such support, not the news pages," Mr. Sulzberger said. "And secondly, that this issue of a federal shield law is really important to the nation."

Ms. Miller said the publisher's support was invaluable. "He galvanized the editors, the senior editorial staff," she said. "He metaphorically and literally put his arm around me."

**More Thoughts of a Waiver**

Inside her cell in the Alexandria Detention Center this summer, Ms. Miller was able to peer through a narrow concrete slit to get an obstructed view of a maple tree and a concrete highway barrier. She was losing weight and struggling to sleep on two thin mats on a concrete slab.

Although she told friends that she was feeling isolated and frustrated, Ms. Miller said she comforted herself with thousands of letters, the supportive editorials in The Times and frequent 30-minute visits from more than 100 friends and colleagues. Among them were Mr. Sulzberger; Tom Brokaw, the former anchor at NBC News; Richard A. Clarke, a former counterterrorism official; and John R. Bolton, the United States ambassador to the United Nations.

Every day, she checked outdated copies of The Times for a news article about her case. Most days she was disappointed.

She said she began thinking about whether she should reach out to Mr. Libby for "a personal, voluntary waiver."

"The longer I was there, the more chance I had to think about it," Ms. Miller said.

On July 20, William Safire, the former longtime columnist at The Times, testified about a federal shield law on Capitol Hill. Ms. Miller read his testimony and found it "inspiring."

While she mulled over her options, Mr. Bennett was urging her to allow him to approach Mr. Tate, Mr. Libby's lawyer, to try to negotiate a deal that would get her out of jail. Mr. Bennett wanted to revive the question of the waivers that Mr. Libby and other administration officials signed the previous year authorizing reporters to disclose their confidential discussions.

The other reporters subpoenaed in the case said such waivers were coerced. They said administration officials signed them only because they feared retribution from the prosecutor or the White House. Reporters for at least three news organizations had then gone back to their sources and obtained additional assurances that convinced them the waivers were genuine.

But Ms. Miller said she had not gotten an assurance that she felt would allow her to testify. And she said she felt that if Mr. Libby had wanted her to testify, he would have contacted her directly.

While Mr. Bennett urged Ms. Miller to test the waters, some of her other lawyers were counseling caution. Mr. Freeman, The Times's company lawyer, and Mr. Abrams worried that if Ms. Miller sought and received permission to testify and was released from jail, people would say that she and the newspaper had simply caved in.

"I was afraid that people would draw the wrong conclusions," Mr. Freeman said.

Mr. Freeman advised Ms. Miller to remain in jail until Oct. 28, when the term of the grand jury would expire and the investigation would presumably end.

Mr. Bennett thought that was a bad strategy; he argued that Mr. Fitzgerald would "almost certainly" empanel a new grand jury, which might mean Ms. Miller would have to spend an additional 18 months behind bars.

Mr. Freeman said he thought Mr. Fitzgerald was bluffing. Mr. Abrams was less sure. But he said Judge Hogan might release Ms. Miller if Mr. Fitzgerald tried to take further action against her.

"At that point," Ms. Miller said, "I realized if and when he did that, objectively things would change, and at that point, I might really be locked in."

After much deliberation, Ms. Miller said, she finally told Mr. Bennett to call Mr. Libby's lawyer. After two months in jail, Ms. Miller said, "I owed it to myself to see whether or not Libby had had a change of heart, the special prosecutor had had a change of heart."

Mr. Bennett called Mr. Tate on Aug. 31. Mr. Tate told Mr. Bennett that Mr. Libby had given permission to Ms. Miller to testify a year earlier. "I called Tate and this guy could not have been clearer - 'Bob, my client has given a waiver,' " Mr. Bennett said.

Mr. Fitzgerald wrote to Mr. Tate on Sept. 12, saying he was concerned that Ms. Miller was still in jail because of a "misunderstanding" between her and Mr. Libby.

Three days later, Ms. Miller heard from Mr. Libby.

In a folksy, conversational two-page letter dated Sept. 15, Mr. Libby assured Ms. Miller that he had wanted her to testify about their conversations all along. "I believed a year ago, as now, that testimony by all will benefit all," he wrote. And he noted that "the public report of every other reporter's testimony makes clear that they did not disc· . Ms. Plame's name or identity with me."

When Ms. Miller testified before the grand jury, Mr. Fitzgerald asked her about the letter. She said she responded that it could be perceived as an effort by Mr. Libby "to suggest that I, too, would say that we had not discussed Ms. Plame's identity." But she added that "my notes suggested that we had discussed her job."

Ms. Miller, though, wanted more than Mr. Libby's letter to feel free to testify. She told her lawyers that she still needed to hear from Mr. Libby in person. When that could not be arranged, she settled for a 10-minute jailhouse conference call on Sept. 19 with Mr. Libby, while two of her lawyers and one of Mr. Libby's listened in.

Ms. Miller said she was persuaded. "I mean, it's like the tone of the voice," she said. "When he talked to me about how unhappy he was that I was in jail, that he hadn't fully understood that I might have been going to jail just to protect him. He had thought there were other people whom I had been protecting. And there was kind of like an expression of genuine concern and sorrow."

Ms. Miller said she then "cross-examined" Mr. Libby. "When I pushed him hard, I said: 'Do you really want me to testify? Are you sure you really want me to testify?' He said something like: 'Absolutely. Believe it. I mean it.' "

At 1 p.m. on Sept. 26, Ms. Miller convened her lawyers in the jailhouse law library. All the lawyers agreed that Mr. Libby had released Ms. Miller from the pledge of confidentiality.

The next day, Mr. Bennett called Mr. Fitzgerald. He informed the prosecutor that Ms. Miller had a voluntary, personal waiver and asked Mr. Fitzgerald to restrict his questions to her conversations with Mr. Libby.

Mr. Bennett, who by now had carefully reviewed Ms. Miller's extensive notes taken from two interviews with Mr. Libby, assured Mr. Fitzgerald that Ms. Miller had only one meaningful source. Mr. Fitzgerald agreed to limit his questions to Mr. Libby and the Wilson matter.

Claudia Payne, a Times editor and a close friend of Ms. Miller, said that once Ms. Miller realized that her jail term could be extended, "it changed things a great deal. She said, 'I don't want to spend my life in here.' "

Ms. Payne added, "Her paramount concern was how her actions would be viewed by her colleagues."

On Sept. 29, Ms. Miller was released from jail and whisked by Mr. Sulzberger and Mr. Keller to the Ritz-Carlton Georgetown for a massage, a manicure, a martini and a steak dinner. The next morning, she testified before the grand jury for three hours. Afterward, Ms. Miller declared that her ordeal was a victory for journalists and the public.

She testified before the grand jury for a second time on Wednesday about notes from her first meeting with Mr. Libby.

Last week, Mr. Sulzberger said it was impossible to know whether Ms. Miller could have struck a deal a year earlier, as at least four other journalists had done.

"Maybe a deal was possible earlier," Mr. Sulzberger said. "And maybe, in retrospect, looking back, you could say this was a moment you could have jumped on. If so, shame on us. I tend to think not."

Case 1:05-cr-00394-RBW    Document 222-2    Filed 12/20/2006

## A Puzzling Outcome

On Oct. 3, four days after Ms. Miller left jail, she returned to the headquarters of The New York Times on West 43rd Street.

Before entering the building, she called her friend Ms. Payne and asked her to come downstairs and escort her in. "She felt very frightened," Ms. Payne said. "She felt very vulnerable."

At a gathering in the newsroom, she made a speech claiming victories for press freedom. Her colleagues responded with restrained applause, seemingly as mystified by the outcome of her case as the public. (Video From Miller's Speech)

"You could see it in people's faces," Ms. Miller said later. "I'm a reporter. People were confused and perplexed, and I realized then that The Times and I hadn't done a very good job of making people understand what has been accomplished."

In the days since, The Times has been consumed by discussions about how the newspaper handled the case, how Times journalists covered the news of their own paper - and about Ms. Miller herself.

"Everyone admires our paper's willingness to stand behind us and our work, but most people I talk to have been troubled and puzzled by Judy's seeming ability to operate outside of conventional reportorial channels and managerial controls," said Todd S. Purdum, a Washington reporter for The Times. "Partly because of that, many people have worried about whether this was the proper fight to fight."

Diana B. Henriques, a business reporter, said she and others at the paper took "great pride and comfort" in how The Times stood by Ms. Miller. But she said the episode and speculation surrounding it "left a lot of people feeling confused and anxious" about Ms. Miller's role in the investigation.

On Tuesday, Ms. Miller is to receive a First Amendment award from the Society of Professional Journalists. She said she thought she would write a book about her experiences in the leak case, although she added that she did not yet have a book deal. She also plans on taking some time off but says she hopes to return to the newsroom.

She said she hopes to cover "the same thing I've always covered - threats to our country."

The Times incurred millions of dollars in legal fees in Ms. Miller's case. It limited its own ability to cover aspects of one of the biggest scandals of the day. Even as the paper asked for the public's support, it was unable to answer its questions.

"It's too early to judge it, and it's probably for other people to judge," said Mr. Keller, the executive editor. "I hope that people will remember that this institution stood behind a reporter, and the principle, when it wasn't easy to do that, or popular to do that."

Janny Scott contributed reporting for this article.

Copyright 2005 The New York Times Company | Home | Privacy Policy | Search | Corrections | **XML** | Help | Contact Us | Wo

# EXHIBIT D

# washingtonpost.com

# My Leak Case Testimony

By Robert D. Novak
Wednesday, July 12, 2006; A15

Advertisement



Special Counsel Patrick Fitzgerald has informed my attorneys that, after 2 1/2 years, his investigation of the CIA leak case concerning matters directly relating to me has been concluded. That frees me to reveal my role in the federal inquiry that, at the request of Fitzgerald, I have kept secret.

I have cooperated in the investigation while trying to protect journalistic privileges under the First Amendment and shield sources who have not revealed themselves. I have been subpoenaed by and testified to a federal grand jury. Published reports that I took the Fifth Amendment, made a plea bargain with prosecutors or was a prosecutorial target were all untrue.

For nearly the entire time of his investigation, Fitzgerald knew -- independent of me -- the identity of the sources I used in my column of July 14, 2003. A federal investigation was triggered when I reported that former ambassador Joseph Wilson's wife, Valerie Plame Wilson, was employed by the CIA and helped initiate his 2002 mission to Niger. That Fitzgerald did not indict any of these sources may indicate his conclusion that none of them violated the Intelligence Identities Protection Act.

Some journalists have badgered me to disclose my role in the case, even demanding that I reveal my sources -- identified in the column as two senior Bush administration officials and an unspecified CIA source. I have promised to discuss my role in the investigation when permitted by the prosecution, and I do so now.

The news broke Sept. 26, 2003, that the Justice Department was investigating the CIA leak case. I contacted my longtime attorney, Lester Hyman, who brought his partner at Swidler Berlin, James Hamilton, into the case. Hamilton urged me not to comment publicly on the case, and I have followed that advice for the most part.

The FBI soon asked to interview me, prompting my first major decision. My attorneys advised me that I had no certain constitutional basis to refuse cooperation if subpoenaed by a grand jury. To do so would make me subject to imprisonment and inevitably result in court decisions that would diminish press freedom, all at heavy personal legal cost.

I was interrogated at the Swidler Berlin offices on Oct. 7, 2003, by an FBI inspector and two agents. I had not identified my sources to my attorneys, and I told them I would not reveal them to the FBI. I did disclose how Valerie Wilson's role was reported to me, but the FBI did not press me to disclose my sources.

On Dec. 30, 2003, the Justice Department named Fitzgerald as special prosecutor. An appointment was made for Fitzgerald to interview me at Swidler Berlin on Jan. 14, 2004. The problem facing me was that the special prosecutor had obtained signed waivers from every official who might have given me information about Valerie Wilson.

That created a dilemma. I did not believe blanket waivers in any way relieved me of my journalistic responsibility to protect a source. Hamilton told me that I was sure to lose a case in the courts, at great expense. Nevertheless, I still felt I could not reveal their names.

But on Jan. 12, two days before my meeting with Fitzgerald, the special prosecutor informed Hamilton that he would be bringing to the Swidler Berlin offices only two waivers. One was by my principal source in the Valerie Wilson column, a source whose name has not yet been revealed. The other was by presidential adviser Karl Rove, whom I

interpret as confirming my primary source's information. In other words, the special prosecutor knew the names of my sources.

When Fitzgerald arrived, he had a third waiver in hand -- from Bill Harlow, the CIA public information officer who was my CIA source for the column confirming Mrs. Wilson's identity. I answered questions using the names of Rove, Harlow and my primary source.

I had a second session with Fitzgerald at Swidler Berlin on Feb. 5, 2004, after which I was subpoenaed to appear before the grand jury. I testified at the U.S. courthouse in Washington on Feb. 25.

In these four appearances with federal authorities, I declined to answer when the questioning touched on matters beyond the CIA leak case. Neither the FBI nor the special prosecutor pressed me.

I have revealed Rove's name because his attorney has divulged the substance of our conversation, though in a form different from my recollection. I have revealed Harlow's name because he has publicly disclosed his version of our conversation, which also differs from my recollection. My primary source has not come forward to identify himself.

When I testified before the grand jury, I was permitted to read a statement I had written expressing my discomfort at disclosing confidential conversations with news sources. It should be remembered that the special prosecutor knew their identities and did not learn them from me.

In my sworn testimony, I said what I have contended in my columns and on television: The role of Joe Wilson's wife in instituting her husband's mission was revealed to me in the middle of a long interview with an official who I have previously said was not a political gunslinger. After the federal investigation was announced, he told me through a third party that the disclosure was inadvertent.

Following my interview with the primary source, I sought out the second administration official and the CIA spokesman for confirmation. I learned Valerie Plame's name from Joe Wilson's entry in "Who's Who in America."

I considered his wife's role in initiating Wilson's mission, later confirmed by the Senate intelligence committee, to be a previously undisclosed part of an important news story. I reported it on that basis.

*© 2006 Creators Syndicate Inc.*

© 2006 The Washington Post Company

**Ads by Google**

**Free Credit Score**
The average US credit score is 675 The cost to see yours: $0
www.FreeCreditReport.com