# EXHIBIT A

## U.S. DEPARTMENT OF JUSTICE
### Office of the Spokesman

**For Immediate Release**
**2005/**

**October 28, 2005**

PRESS CONFERENCE

**Special Counsel Patrick Fitzgerald**
**On the Indictment of I. Lewis Libby**

**October 28, 2005**
**Washington, D.C.**

(2:15 p.m. EDT)

**MR. FITZGERALD:** Good afternoon. I'm Pat Fitzgerald. I'm the United States Attorney in Chicago, but I'm appearing before you today as the Department of Justice for Special Counsel in the CIA leak investigation. Joining me to my left is Jack Eckenrode, the Special Agency in Charge of the FBI Office in Chicago, who has led the team of investigators and prosecutors from day one in this investigation.

A few hours ago, a federal Grand jury, sitting in the District of Columbia, returned a five-count indictment against I. Lewis Libby, also known as Scooter Libby, the Vice President's Chief of Staff. The Grand jury's indictment charges that Mr. Libby committed five crimes. The indictment charges one count of obstruction of justice of the federal grand jury, two counts of perjury and two counts of false statements. Before I talk about those charges and what the indictment alleges, I'd like to put the investigation with a little context.

Valerie Wilson was a CIA officer. In July 2003, the fact that Valerie Wilson was a CIA officer was classified. Not only was it classified, but it was not widely known outside the intelligence community. Valerie Wilson's friends, neighbors, college classmates had no idea she had another life. The fact that she was a CIA officer was not well known for her protection or for the benefit of all of us. It's important that a CIA officer's identity be protected, they be protected not just for the officer but for the nation's security.

Valerie Wilson's cover was blown in July 2003. The first sign of her cover being blown was that Mr. Novak published a column on July 14th 2003. But Mr. Novak was not the first reporter to be told that Wilson's wife, Valerie Wilson, Ambassador Wilson's wife, Valerie, worked at the CIA. Several other reporters were told. In fact, Mr. Libby was the first official known to have told a reporter when he talked with Judith Miller in June of 2003 about Valerie Wilson.

Now, something needs to be borne in mind about a criminal investigation. I recognize that there's been very little information about this criminal investigation, but for a very good reason. It may be frustrating, but when investigations are conducted in secret, when investigations use

grand juries, it's important that the information be closely held. So let me tell you a little bit about how an investigation works.

Investigators do not set out to investigate a statute. They set out to gather the facts. It's critical that when investigation is conducted by prosecutors, agents and a Grand jury, they learn who, what, when, where and why. And then they decide, based upon accurate facts, whether a crime has been committed, who has committed the crime, whether you can prove the crime and whether the crime should be charged.

Agent Eckenrode doesn't send people out when a million dollars is missing from a bank and tells them just come back if you find wire fraud. If the agent finds embezzlement, they follow through on that. That's the way this investigation was conducted. It was known that a CIA officer's identity is blown. It was known that there was a leak and we needed to figure out how that happened, who did it, why, whether a crime was committed, whether we could prove it, whether we should prove it. And given that national security was at stake, it was especially important that we find out accurate facts.

There's another thing about a Grand jury investigation. One of the obligations of the prosecutors and the grand juries is to keep the information contained in the investigation secret, not to share it with the public. And as frustrating that that may be for the public, that is important. Because the way our system of justice works, if information is gathered about people and they are not charged with a crime, we don't hold up that information for the public to look at. We either charge them with a crime or we don't. And that's why we've safeguarded information here to date. But as important as it for the Grand jury to follow the rules and follow the safeguards to make sure information doesn't get out, it's equally important that the witnesses who come before a Grand jury, especially the witnesses who come before a Grand jury who may be under an investigation, tell the complete truth. It's especially important in the national security area.

The laws involving disclosure of classified information in some places are very clear; in some places they're not so clear. And grand juries and prosecutors making decisions about who should be charged, whether anyone should be charged, what should be charged, even make fine distinctions about what people knew, why they knew it, what they exactly said, why they said it, what they were trying to do, what appreciation they had for the information and whether it was classified at the time. Those fine distinctions are important in determining what to do. That's why it's essential when a witness comes forward and gives their account of how they came across classified information and what they did with it, that it be accurate.

Now, that brings us to the fall of 2003 when it was clear that Valerie Wilson's cover had been blown, an investigation began. And in October 2003, the FBI interviewed Mr. Libby. Mr. Libby is the Vice President's Chief of Staff. He's also an Assistant to the President and Assistant to the Vice President for national security affairs. The focus of the interview was what was it that he had known about Wilson's wife, Valerie Wilson, what he knew about Ms. Wilson, what he said to people, why he said it and how he learned it.

And to be frank, Mr. Libby gave the FBI a compelling story. What he told the FBI is the essentially he was at the end of a long chain of phone calls. He spoke to a reporter, Tim Russert,

and during the conversation Mr. Russert told him that, hey, do you know that all the reporters know that Mr. Wilson's wife works at the CIA. And he told the FBI that he learned that information as if it were new and it struck him. So he took this information from Mr. Russert and later on he passed it on to other reporters, including reporter Mathew Cooper of Time Magazine and reporter Judith Miller of *The New Times*. And he told the FBI that when he passed the information on, on July 12th of 2003, two days before Mr. Novak's column, that he passed it on understanding that this was information he had gotten from a reporter, that he didn't even know if it was true. And he told the FBI that when he passed the information on to reporters, he made clear that he did not know if this were true. This was something that all the reporters were saying and in fact he just didn't know and he wanted to be clear of that.

Later, Mr. Libby went before the Grand jury on two occasions in March of 2004, he took an oath and he testified. And he essentially said the same thing. He said that in fact he had learned from the Vice President earlier in June 2003 information about Wilson's wife, but he'd forgotten it; that he had learned the information from Mr. Russert during his phone call, he'd learned it as if it were new. And he passed the information on to reporters, Cooper and Miller, late in week. He passed it on thinking it was just information he received from reporters, that he told the reporters that in fact he didn't even know if it were true. He was just passing gossip from one reporter to another, at the long end of a chain of phone calls.

It would be a compelling story that would lead the FBI to go away, if only -- (inaudible) -- it is not true, according to the indictment. In fact, Mr. Libby discussed the information about Valerie Wilson at least half a dozen times before this conversation with Mr. Russert ever took place, not to mention that when he spoke to Mr. Russert, Mr. Russert and he never discussed Valerie Wilson or Wilson's wife. He didn't learn it from Mr. Russert and if he had, it would not have been with the time.

Let me talk you through what the indictment alleges. The indictment alleges that Mr. Libby learned the information about Valerie Wilson at least three times in June of 2003 from government officials. Let me make clear there is nothing wrong with government officials discussing Valerie Wilson or Mr. Wilson or his wife in imparting the information to Mr. Libby. But in early June, Mr. Libby learned about Valerie Wilson and the role she was believed to play in having sent Mr. Wilson on a trip overseas for the senior CIA officer, on around June 11th, from an Under Secretary of State on around June 11th and for the Vice President on or about June 12th. It's also clear, as set forth in the indictment, that sometime prior to July 8th, he also learned it from somebody else working in the Vice President's office. So at least four people within the government told Mr. Libby about Valerie Wilson, often referred to as Wilson's wife, working at the CIA and believed to be responsible for helping organize a trip that Mr. Wilson took overseas.

In addition to hearing it from government officials, it's also alleged in the indictment that at least three times, Mr. Libby discussed this information with other government officials. It's alleged in the indictment that on June 14th of 2003, a full month before Mr. Novak's column, Mr. Libby discussed it in a conversation with a CIA briefer in which he was complaining to the CIA briefer his belief that the CIA was leaking information about something or making critical comments. And he brought up Joe Wilson and Valerie Wilson.

4                                     10/28/2005

It's also alleged in the indictment that Mr. Libby discussed it with a White House Press Secretary on July 7th 2003 over lunch. What's important about that is that Mr. Libby, the indictment alleges, was telling Mr. Fleischer something on Monday that he claims to have learned on Thursday

In addition to discussing with the Press Secretary on July 7th, there was also a discussion on or about July 8th, which Counsel for the Vice President was asked a question by Mr. Libby as to what paperwork the Central Intelligence Agency would have if an employee had a spouse going on a trip. So at least seven discussions involving government officials prior to the day when Mr. Libby claims he learned this information as if it were new from Mr. Russert and in fact when he spoke to Mr. Russert, they never discussed it.

But in addition to focusing on how it is that Mr. Libby learned this information and what he thought about it, it's important to focus on what it is that Mr. Libby said to the reporters. And the account he gave to the FBI and the Grand jury was that he told reporters Cooper and Miller at the end of the week on July 12th. Now, what he told them was he gave them information that he got from other reporters, that other reporters were saying this and Mr. Libby did not know if it were true and that in fact Mr. Libby testified that he told the reporters he did not even know if Mr. Wilson had a wife. And in fact, we now know that Mr. Libby discussed this information about Valerie Wilson at least four times prior to July 14th 2003 -- on three occasions with Judith Miller of *The New York Times* and on one occasion with Matthew Cooper of Time Magazine.

The first occasion on which Mr. Libby discussed it with Judith Miller was back in June 23rd of 2003, just days after an article appeared online on The New Republic, which quoted some critical commentary from Mr. Wilson. After that discussion with Judith Miller on June 23rd 2003, Mr. Libby also discussed Valerie Wilson on July 8th of 2003. And during that discussion, Mr. Libby talked about Mr. Wilson and in the conversation that was in background as a senior administration official -- and Mr. Libby talked about Wilson, he changed the attribution to a former Hill staffer. During that discussion, which was to be attributed to a former Hill staffer, Mr. Libby also discussed Wilson's wife, Valerie Wilson, working at the CIA. And then finally, again, on July 12th.

In short and in those conversations, Mr. Libby never said this is something that other reporters are saying. Mr. Libby never said this is something that I don't know if it's true. Mr. Libby never said I don't even know if he had a wife. At the end of the day, what appears is that Mr. Libby's story, that he was at the tail end of a chain of phone calls, passing on from one reporter what he heard from another, was not true. It was false. He was at the beginning of the chain of the phone calls, the first official to disclose this information outside the government to a reporter and that he lied about it afterwards, under oath and repeatedly.

Now, as I said before, this Grand jury investigation has been conducted in secret. I believe it should have been conducted in secret, not only because it was required by those rules but because the rules were wise. Those rules protect all of us. We are now going from a Grand jury investigation to an indictment, a public charge and a public trial. The rules will be different. But I think what we see here today, when a Vice President's Chief of Staff is charged with perjury

and obstruction of justice, it does show the world that this is a country that takes its law seriously; that all citizens are bound by the law. But what we need to also show the world is that we can also apply the same safeguards to all our citizens, including high officials. Much as they must bound by the law, we must follow the same rules. So I ask everyone involved in this process, anyone who participates in this trial, anyone who covers this trial, anyone sitting home watching these proceedings, to follow this process with an American appreciation for our values and our dignity. Let's let the process take place. Let's take a deep breath and let justice process the system.

I'll be remiss at this point if I didn't thank the team of investigators and prosecutors who worked on it, led by Agent Eckenrode, but particularly the staff under John Dion for the counter-espionage section in the Department of Justice, Mr. Zidenberg from Public Integrity, as well as the agents from the Washington field office and my close friends at the Chicago U.S. Attorney's Office, all of whom contributed to a joint effort.

And with that, I'll take questions.

Yes, sir.

**QUESTION:** Mr. Fitzgerald, this began as a leak investigation but no one is charged with any leaking. Is your investigation finished? Is this another leak investigation that doesn't lead to a charge of leaking?

**MR. FITZGERALD:** Let me answer the two questions you asked in one. Okay. Is the investigation finished? It's not over but I'll tell you this -- very rarely do you bring a charge in a case that's going to be tried and would you ever end a Grand jury investigation. I can tell you the substantial bulk of the work in this investigation is concluded. This Grand jury's term has expired by statute. It could not be extended. But it's an ordinary course to keep a Grand jury open to consider other matters and that's what we'll be doing.

Let me then answer your next question. Well, why is this a leak investigation that doesn't result in a charge? I've been trying to think about how to explain so let me try. I know baseball analogies are the fad these days. Let me try something.

If you saw a baseball game and you saw a pitcher wind up and throw a fastball and hit a batter right smack in the head and really, really hurt them, you'd want to know why the pitcher did that. You'd wonder whether or not the person just reared back and decided, "I've got bad blood with this batter, he hit two homeruns off me, I'm just going to hit him in the head as hard as I can." You also might wonder whether or not the pitcher just let go of the ball or his foot slipped and he had no idea that any -- throw the ball anywhere near the batter's head. And there's a lot of shades of gray in between. You might learn that you wanted to hit the batter in the back, it hit in the head because he moved. You might want to throw it at his chin, but end up hitting on the head. And what you'd want to do is have as much information as you could. You'd want to know what happened in the dugout, was this guy complaining about the person he threw out? Did he talk to anyone else? What was he thinking? How does he react? All those things, you'd want to know. And then you'd make a decision as to whether this person should be banned from baseball,

whether they should be suspended, whether you should nothing at all and just say, "Hey, the person threw a bad pitch, get over it."

In this case, it's a lot more serious than baseball. The damage wasn't to one person. It wasn't to Valerie Wilson, it was done to all of us. As you sit back, you want to learn why was this information going out? Why were people taking this information about Valerie Wilson and giving it to reporters? Why did Mr. Libby say what he did? Why did he tell Judith Miller three times? Why did he tell a Press Secretary on Monday? Why did he tell Mr. Cooper? And was this something where he intended to cause whatever damage was caused or did he intend to do something else? And where are the shades of gray?

And what we have when someone charges obstruction of justice is the umpire gets sand thrown in his eyes. He's trying to figure out what happened and somebody blocked their view. As you sit here now and if you're asking me what his motives were, I can't tell you, we haven't charged it. So what you were saying is the harm in an obstruction investigation is that it prevents us from making the very fine judgments we want to make.

I also want to take away from the notion that somehow we should take an obstruction charge less seriously than a leak charge. This is a very serious matter and compromising national security information is a very serious matter. But the need to get to the bottom of what happened and whether national security was compromised by inadvertence, by recklessness, by maliciousness, is extremely important. And we need to know the truth. And anyone who would go into a Grand jury and lie and obstruct and impede the investigation has committed a serious crime.

I will say this -- Mr. Libby is presumed innocent. He would not be guilty unless and until a jury of 12 people came back and returned a verdict saying so. But if what we alleged in the indictment is true, then what is charged is a very, very serious crime that will vindicate the public interest in finding out what happened here.

Yes, sir.

**QUESTION:** Mr. Fitzgerald, do you have any evidence that the Vice President of the United States is one of Mr. Libby's original sources for this information -- encouraged him to leak it or encouraged to lie about leaking?

**MR. FITZGERALD:** I'm not making allegations about anyone nor charging the indictment. Now, let me back up because I know what that sounds like to people if they're sitting at home. We don't talk about people that are not charged with a crime in the indictment. I would say that about anyone in this room who has nothing to do with the offenses. We make no allegation that the Vice President committed any criminal act. We make no allegation that any of the other people who provided or discussed with Mr. Libby committed any criminal act. But as to any person you ask me a question about, other than Mr. Libby, I'm not going to comment on anything. That's not the -- please don't take that as any indication that someone has done something wrong -- that's a standard practice. If you followed me in Chicago, I say that a thousand times a year, and we just don't comment on people because -- we could start telling

you, "Well, this person did nothing wrong, this person did nothing wrong" and then if we stop commenting, then you'll start jumping to conclusions. So please take no more.

Mr. Izakov(ph).

**QUESTION:** For all the sand thrown in our eyes, it sounds like you do know the identity of the leaker. There's a reference to a senior official at the White House, Official A, who had a discussion with Robert Novak about Jim Wilson's wife. Can you explain why that official was not charged in this indictment?

**MR. FITZGERALD:** I'll explain this. I know that people want to know whatever it is that we know and they're probably sitting at home at TV thinking, "I want to jump through the TV, grab him by his collar and tell him to tell us everything they've figured out over the last two years." We just can't do that. It's not because we enjoy holding back information from you. That's the law. And one of the things we do with a Grand jury is we gather information and the explicit requirement is, if we're not going to charge someone with a crime, if we decide that a person did not commit a crime, we cannot prove a crime, doesn't merit prosecution, we do not stand up and say, "We gathered all this information on the commitment that we're going to follow the rules of Grand jury secrecy, which say we don't talk about people not charged with a crime and then at the end say, "Well, it's a little inconvenient not to give answers out, so I'll give it out anyway." I can't give you answers on what we know and don't know, other than what's charged in the indictment. It's not because I enjoy being in that position, it's because the law is that way. I actually think the law should be that way. We can't talk about information not contained in the four corners of the indictment.

Yes.

**QUESTION:** Sir, is Karl Rove off the hook and are there any other individuals who might be charged? You say you're not quite finished?

**MR. FITZGERALD:** All I can say is the same answer I gave before. If you ask me any name, I'm not going to comment on anyone named because we either charge someone or we don't talk about them. And don't read answer in the context of the name you gave me.

Carol.

**QUESTION:** What can you say about what you're still working on then?

**MR. FITZGERALD:** I can't. I mean, let's be -- you know, I don't mean that flippantly, but the grand jury doesn't give an announcement about what they're doing, what they're looking at, unless they charge an indictment. I can tell you that no one wants this thing to be over as quickly as I do, as quickly as Mr. Eckenrode does. I'd like to wake up in my bed in Chicago. He'd like to wake up in his bed in Philadelphia. And we recognize that we want to get this thing done. I will not end the investigation until I can look anyone in the eye and tell them that we have carried out our responsibility sufficiently to be sure that we've done what we could to make intelligent decisions about when to end the investigation. We hope to do that as soon as

possible. I just hope that people will take a deep breath and just allow us to continue to what we have to do.

Yes, sir.

**QUESTION:** Mr. Fitzgerald, you said that there was damage done to all of us -- damage to the entire nation. Can you be anymore specific about what kind of damage you're talking about?

**MR. FITZGERALD:** The short answer is no. But I can just say this: I'm not going to comment on things beyond what's said in the indictment. I can say that for the people who work at the CIA and work at other places, they have to expect that when they do their jobs, that classified information will be protected. And they have to expect that when they do their jobs, that information about whether or not they're affiliated with the CIA will be protected and they run a risk when they work for the CIA that something bad could happen to them. But they have to make sure that they don't run the risk that something bad is going to happen to them for something done by their own fellow government employees. We're getting the specifics of the damage and won't -- I do owe Carol the next question.

**QUESTION:** You've mentioned the importance to you of grand jury secrecy and you have been leak free, but I want to know what your thoughts are about a series of leaks about your investigation. What was your interpretation of what some people have described as manipulative, selective leaking about your investigation by people close to your witnesses?

**MR. FITZGERALD:** Anne, all I can see is -- well, I'll say this, I'm not going to comment on why certain things were leaked or any speculation I might have where was a leak from. I think the average person does not understand that the rule of grand jury secrecy binds the prosecutors and the grand jury, it binds the agents who come across the grand jury information, it binds the grand jurors. Any one of us could go to jail if we leak that information. It does not bind witnesses. Witnesses can decide to tell their testimony or not. So if there were a bank robbery and we put a witness in the grand jury about the bank robbery, I would go to jail, he would go to jail and the grand jurors would go to jail if they walked out and told you about it. But the person who went into the grand jury could walk out and hold a press conference on the front steps. So they're not breaking the law by discussing their grand jury information.

I would prefer for the integrity of the investigation it not be discussed, but I just think people may not understand that certain people are not restricted in talking about grand jury information and certain are. All I can do is make sure that myself and everyone on our team follows those rules.

Yes.

**QUESTION:** But you already said that it was okay for government officials to be discussing among themselves Mrs. Wilson's identity. Were you troubled, though, that at least a half dozen people outside the CIA seemed to be talking about this in the weeks before her name was disclosed?

**MR. FITZGERALD:** My job is to investigate whether or not a crime is committed, can be proved and should be charged. I'm not going to comment on what to make beyond that. It's just not my jurisdiction, not my job, not my judgment.

Yes, ma'am.

**QUESTION:** I know you just talked about having sand in your eyes, the obstruction part here. Can you give us any sense of how you think you might -- how long it might take you now to determine if there was this underlying crime that occurred, even with the unauthorized -- alleged unauthorized disclosure?

**MR. FITZGERALD:** I can't and I wouldn't and if I had predicted, you know, two years ago when it started when we would be done, I would have been a year ago. So I'm -- all I can tell you is as soon as we can get it done, we will.

Yes, sir.

**QUESTION:** You identified Mr. Fleischer as one of the people that Mr. Libby spoke with. Can you say who the counsel to the VP was and also the Under Secretary of State that he spoke with?

**MR. FITZGERALD:** We've identify -- we refer to people by their titles in the indictment, just because that's our practice, we don't allege they did anything wrong. But we said the White House press secretary and we talked about counsel for the Vice President and I generally don't identify people beyond the indictment. And I'll talk to Randy Sanborn who tells me what I'm allowed to do at the break. If we can provide you those names, we will. I'm not so sure we can, so we better not do it in front of a microphone.

Let me just go over here.

**QUESTION:** In the end, was it worth keeping Judith Miller in jail for eighty-five days in this case? And can you say how important her testimony was in producing this event?

**MR. FITZGERALD:** Let me just say this, no one wanted to have a dispute with *The New York Times* or anyone else. We can't talk generally about witnesses; there's much said in the public record. I would have wished nothing better that when the subpoenas were issued in August 2004, witnesses testified then and we would have been here in October 2004 instead of October 2005. No one would have went to jail. I didn't have vested interest in litigating it. I was not looking for a First Amendment showdown.

I also have to say my job was to find out what happened here, make reasoned judgments about what testimony was necessary and then pursue it. And we couldn't walk away from that. I could not have told you a year ago that we think that there may be evidence that a crime is being committed here of obstruction, that there may be a crime behind it. I'm just going to walk away from it. And our job was to find the information responsibly.

We then, when we issued the subpoenas, we thought long and hard before we did that. And I can tell you there are a lot of reports, whose reporting and contacts have touched upon this case that we never even talked to. We didn't bluff people and what we decided to do was to make sure before we subpoenaed report that we really needed that testimony. In addition to that, we scrubbed it thoroughly within ourselves. But we also, when we went to court, we could have taken the position that it's our decision whether to issue a subpoena. But we made we sure that we put detailed classified, sealed filing before the district court judge, the Chief Judge Hogan in the District of Columbia.

So we wanted to make sure if he thought our efforts were off base, if what we were saying, representing to him, was the case was off that he would have those facts when he made the decision. Judge Hogan agreed and felt that we met whatever standard there might be for issuing a subpoena. Then went up the District of Columbia Court of Appeals with that same filing, and they found the same results and then went to the Supreme Court. So I think what we did, in seeking that testimony, was born out by how the judges ruled.

At the end of the day, I don't know how you could ever resolve this case, to walk into you a year ago and say, you know what, forget the reporters, we have someone telling us that they told Mr. Cooper and Ms. Miller that they didn't know if this information were true. The judge heard it from other reporters they didn't know he had a wife and charge a person with perjury; only to find out that that's what happened. That would be reckless.

On the other hand, if we walked away and said, well, there were indications that, in fact, this is not how the conversation would happen. There are indications that there might be perjury or obstruction of justice here, then I would fold up my tent and go home. That would not fulfill our mandate. I tell you, I will say this, I do not think that reporters should be subpoenaed anything close to routinely. It should be the extraordinary case. But if you're dealing with a crime and what's different here is the transaction that's between a person and a reporter, who is the eyewitness to the crime, if you walk away from that and don't talk to the eyewitness, you are doing a reckless job of either charging someone with a crime that may not turn out to have been committed and that frightens me because there are things that you can learn from a reporter that would show you the crime wasn't committed. What, if in fact, you know, the allegations turned out to be true that he said, "Hey, I sourced it to other reporters, I don't know if it's true."

So I think the only way you can do an investigation like this is to hear from all the witnesses. I wish Ms. Miller spent not a second in jail. I wish we didn't have to spend time arguing very, very important issues and just got down to the brass tacks and made the call of where we were, but I think it had to be done.

Yes, sir.

**QUESTION:** You said earlier in your statement here that Mr. Libby was the first person to leak this information outside of the government. That -- first of all, that implies that there might have been other people inside the government who may have since leaked.

Secondly, in Paragraph 21, the one on (inaudible), you imply that Novak might have heard this information about the woman -- Mrs. Wilson from another source, but you don't actually say that.  What can you tell us about the existence that you know of or do know of or whatever, of other leakers?  Are there definitely other leakers?  Is Ms. (inaudible) a leaker or just a facilitator?  Are you continuing to investigate other possible leakers?

**MR. FITZGERALD:**  I'm afraid I'm going to have to find a polite way of repeating my answer to Mr. Izakov's(ph) question which is to simply say, I can't go beyond the four corners of the indictment and I'll probably just say I repeat it, so I don't misstep and give you anything more than I should.

Yes.

**QUESTION:**  Can you say whether or not you know whether Mr. Libby knew that Valerie Wilson's identity was covert and whether or not that was pivotal at all in your inability or your decision not to charge over the intelligence identity --

**MR. FITZGERALD:**  Let me say two things.  Number one, I am not speaking to whether or not Valerie Wilson was covert and anything I say is not intended to say anything beyond this: that she was a CIA officer from January 1st, 2002 forward, I will confirm; that her association with the CIA was classified at that time through July 2003; and all I'll say is that, look, we have not made any allegation that Mr. Libby knowingly, intentionally, outed a covert agent.  We have not charged that and so I'm not making that assertion.

Yes, sir.

**QUESTION:**  Would you oppose a congressional investigation into the leak of Valerie Plame's identity and, if not, would you be willing to cooperate in such an investigation by handing over the work product of your investigation?

**MR. FITZGERALD:**  Well, I guess that's two questions and I know I can answer the first -- I can answer the second part.  Turning over the work product, there are strict rules about Grand jury secrecy, if there were an investigation.  And frankly, I have to pull the book out and get the people smarter than me about Grand jury rules in Chicago and sit down and tell me how it works.  My gut instinct is that we do not -- very, very rarely, as Grand jury information -- share it with the Congress.  And I also think I ought to be careful about what my charter is here.  I don't think it's my role to opine on whether the Justice Department would oppose or not oppose some other investigation.  So I'm certainly not going to figure that out standing up here with a bunch of cameras pointing at me.

Yes, ma'am.

**QUESTION:**  Mr. Fitzgerald, your critics are charging that you are a partisan who is conducting what that considered -- (inaudible) --

(Laughter.)

**MR. FITZGERALD:** What's that mean?

**QUESTION:** You tell us.

**MR. FITZGERALD:** You tell me.

**QUESTION:** It's like a political witch-hunt. I mean, how do you respond to these, since you are in Washington?

**MR. FITZGERALD:** Okay. I don't know, you know, sort of when you stop beating your wife. I have read -- one day I read that I was a Republican hack, another day I read I was a Democratic hack, and the only thing I did between those two nights was sleep. I'm not partisan; I'm not registered as part of a party and I'll leave it there.

**QUESTION:** You noted earlier that the Grand jury's term expired but you said something about holding it open? Or will you be working with a new Grand jury?

**MR. FITZGERALD:** The Grand jury by its terms can serve -- it was an 18-month Grand jury by statute, to my understanding, can only be extended six months. That six months expired. It's routine in long investigations that you would have available a new Grand jury if you needed to go back to them. And that's nothing unusual. I don't want to raise any expectations by that, that's an ordinary practice.

Yes, sir.

**QUESTION:** I think you've kind answered this but I assume that you have no plans and don't even think you'd be allowed to issue a final report of any sort?

**MR. FITZGERALD:** You're correct. But let me explain that. I think people -- what people may be confused about is that reports used to issued by independent counsels and one of the complaints about the independent counsel statute was that an ordinary citizen, when investigated, they're charged with a crime or they're not. They're not charged with a crime, people don't talk about it. Because of the interest in making sure that -- well, there was an interest in independent counsels to making sure those investigations were done thoroughly. But then, people ended up issuing reports for people not charged and one of the criticisms leveled was that you should not issue reports about people who are not charged with a crime. That statute lapsed. I'm not an independent counsel. And I do not have the authority to write a report and frankly I don't think I should have that authority. I think we should conduct this like any other criminal investigation, charge someone, or be quiet.

Yes, sir.

**QUESTION:** Isn't it true that Mr. Comb'(ph)* letter to you makes you, in essence, almost the de facto Attorney General and you can abide or not abide by the CFRs or the regulations as to whether or not to write -- to write a report or not to write a report?

And a follow up is, every Special Counsel prior to you has, in fact, written a report and turned it over to Congress. And they've gone around the Grand jury issue as well.

**MR. FITZGERALD:** That's a -- let me say this. I think any prior Special Counsel may have been special counsel appointed to -- certain regulations for people outside of the Department of Justice, which I do not fit into. I'm not an independent counsel. I may be unique in this sense. That I can tell you I'm comfortable, very clear that I do not have that authority. And the extent that I was given sort of the acting Attorney General hat for this case, it's the acting Attorney General or the Attorney General can't violate the law. And the law on Grand jury secrecy is the law.

So I may have a lot of power for this one case as acting Attorney General hat, but I follow the code of federal regulations in this case and I certainly would follow the law.

Yes, ma'am.

**QUESTION:** Mr. Fitzgerald, the Republicans have previously talking, for instance, this (inaudible) your indictment and they said that if you didn't indict it on the underlying crimes and you indict it on things exactly like (inaudible) today withheld statements, perjury, obstruction, these were "technicalities" and that it really was overreaching and excessive. And since when and if they make those claims now that you have indicted, you won't respond, I want to give you an opportunity, now, to respond to that allegation, which they may make. It seems like that's the road they're going down.

**MR. FITZGERALD:** And I don't know who provided those talking points. I assume --

**QUESTION:** (Off-mike.)

**MR. FITZGERALD:** I'm not asking. Okay.

**QUESTION:** (Inaudible) in anticipation of your --

**MR. FITZGERALD:** I'll be blunt. That talking point won't fly. If you're doing a national security investigation, if you're trying to find out who compromised the identify of a CIA officer, and you go before a Grand jury and if the charges are proven -- just remember there's a presumption of innocence -- but if it is proven that the Chief of Staff for the Vice President went before a federal Grand jury and lied under oath repeatedly and fabricated a story about how he learned this information, how he passed it on, and we prove obstruction of justice, perjury and false statements to the FBI, that's a very, very serious matter. And I'd say, I think people might not understand this, we as prosecutors and FBI agents, have to deal with false statements, obstruction of justice and perjury all the time. And the Department of Justice charges those statutes all the time.

When I was in New York working as a prosecutor, we brought those cases because we realize that the truth is the engine of our judicial system. And if you compromise the truth, the whole

process is lost. In Philadelphia where Jack works, they prosecute false statements and obstruction of justice. When I got to Chicago, I knew that people before me had prosecuted false statements, obstruction and perjury cases and we do it all the time. And a truck driver pays a bribe or someone else does something, where they go into a Grand jury afterward and lie about it, they get indicted all the time.

Any notion that anyone might have that there is a different standard for a high official or that this is somehow singling out obstruction of justice or perjury is upside down. If these facts are true, if we were to walk away from this and not charge obstruction of justice as perjury, we might as well just hand in our jobs because our jobs in the criminal justice system is to make sure people tell us the truth. And when it's a high level official in a very sensitive investigation, it is a very, very serious matter that no one should take lightly.

**QUESTION:** This doesn't relate to the charges so I'm hoping maybe you can shed some light on this. In your investigation, have you determined how it was that Ambassador Wilson became the person to be sent to Niger to investigate this situation? How directly involved was his wife in his selection, how much pressure she may have put on officials? Also, I'm wondering about the cooperation you've received from the CIA.

**MR. FITZGERALD:** I think all government agencies that we have turned to for cooperation have cooperated. I'm not going to comment on the circumstances of the trip. I think the only thing that's relevant, frankly, is the belief in the mind of some people that she was involved in the trip or responsible for sending the trip. The dispute as to whether, in fact, she was is irrelevant to the charge before us. What we're talking about is why -- the investigation was why someone compromised her identify and the issue in this indictment is whether or not Mr. Libby knowingly and intentionally lied about the facts. And whatever happened in that trip and what role, if any, the wife played is really irrelevant and not our focus.

**QUESTION:** But there is a possible motive, though?

**MR. FITZGERALD:** What is set forth is a belief on his part that she played a role on the trip and that is set forth in the indictment. Whether that belief is 100 percent true or 100 percent false or a mixture of both is sort of irrelevant, but it does set forth in there that he had that belief that she was involved in the trip.

**QUESTION:** Now, are you at all concerned that Mr. Libby or his counsel sought to object or discourage the testimony of Judy Miller by withholding, as some called, "a personal waiver" allowing her to testify, notwithstanding the pledge of confidentiality or his letter to her that she reported and received in June of (inaudible)?

**MR. FITZGERALD:** And I'm not going to comment on anything that's not in the indictment, but I can tell you that we're not relying upon anything other than the indictment, which the obstruction of justice charges set forth, the statements by Mr. Libby to the FBI and the testimony under oath to the Grand jury as being the basis of the obstruction charge and nothing else.

Yes, sir.

**QUESTION:** Thank you. The indictment describes Lewis Libby using classified information concerning the identity of a CIA agent to some individuals who are not eligible to receive that information. Can you explain why that does not, in and of itself, constitute a crime?

**MR. FITZGERALD:** That's a good question and I think, knowing that he gave the information to someone who was outside the government not entitled to receive it, and knowing that the information was classified is not enough. You need to know at the time that he transmitted the information, he appreciated that it was classified information, that he knew it or acted, you know, in certain statutes with recklessness. And that is sort of what gets back to my point in trying to figure that out, you need to know what the truth is. So our allegation is in trying to drill down and find out exactly what we got here, if we receive false information, that process is frustrated.

But at the end of the day, I think I want to say one more thing, which is when you do a criminal case, if you find a violation, it doesn't really, in the end, matter what statute you use if you vindicate the interest. If Mr. Libby is proven to have done what we've alleged, convicting him of obstruction of justice, perjury and false statements -- very serious felonies -- will vindicate the interest of the public in making sure he's held accountable. It's not as if, you know, you say well, this person as convicted, but under the wrong statute. I think -- but I will say this: The whole point here is that we're going to make fine distinctions and make sure that before we charge someone with a knowing intentional crime, we want to focus on why they did it, what they knew and what they appreciated. We need to know the truth about what they said and what they knew.

Carol.

**QUESTION:** Does that mean you don't feel that you know the truth about whether he intentionally did this and he knew and appreciated it or does that mean you're exercising your prosecutorial discretion of being conservative?

**MR. FITZGERALD:** Well, I don't want to -- look, a person who's charged with a crime, they're presumed innocent and I haven't charged them with any other crime. And all I'm saying the harm in the obstruction crime is it shields us from knowing the full truth. I won't go beyond that.

**QUESTION:** Will you -- first, will you actually prosecute this case indivisibly yourself?

And second, have you learned anything about the way inside Washington works that surprises you through this investigation?

(Laughter.)

**MR. FITZGERALD:** The latter, yes -- (laughter) -- and the former, yes and no. I will be involved in the prosecution. But if you meant individually, will I personally participate, yes. If you meant individually, I haven't done this individually. I have a great team from D.C., Main Justice, FBI and Chicago and it'll be a team effort.

**QUESTION:**  Well, if during the course of the public trial, information comes out with regard to other people who have leaked the source of the leak or other people who exposed Miss Plame's identity, would this then reverberate back to you since you had been studying this new information is forthcoming during the course of the trial?

**MR. FITZGERALD:**  If I can take it with -- to answer your question with a bucket of cold water and say, let not read too much into it -- any new information that would ever come to light, while the investigation is opened would be handled by our investigative team concerning these facts.  So if there's anything that we haven't learned yet that we learn that should be addressed, we will address it.  We don't want to create any great expectations out there by giving sort of a general answer.

Yes, sir.

**QUESTION:**  Just to be clear, you may have touched on this earlier, with the Grand jury's time being done, you have no plans to have another Grand jury related to this case at all?  Is that correct?

**MR. FITZGERALD:**  No.  I think what I said is we could use any other Grand jury -- or have another Grand jury.  We couldn't use the grand jurors who's service expired today any further.

Yes, sir.

**QUESTION:**  Mr. Fitzgerald, can you clarify for us, this is not just the word of three reporters versus the Vice President's Chief of Staff?  And I ask that in the sense of how it may be difficult to proceed at trial with memories of about something that happened long ago.

**MR. FITZGERALD:**  I can't comment on the trial evidence and I won't tell you the witnesses.  But we simply, you know, I can't.  I'm sorry.

**QUESTION:**  But I guess, to put it another way, why are you confident that this is the right thing to do, given that you're dealing with memories of people from something long ago?

**MR. FITZGERALD:**  And what I can tell you as a prosecutor, is allowed to lay out the charges and a prosecutor is not allowed to vouch for the charges.  And what I'll say is we're comfortable proceeding.  But you're right, let's go to a trial, let's reserve judgment, and our burden is to prove beyond a reasonable doubt, by indicting him, we're committing to doing that, while he is presumed innocent, and let's let the process play out.

Yes.

**QUESTION:**  Can you explain in general terms why a subject, a witness would be given multiple opportunities to come back before the Grand jury?  Are there times that you give them the opportunity to set the record straight?

**MR. FITZGERALD:** Anne, I don't want to answer that in this context because I think people will read too much into it. So I'm not going to give a hypothetical answer to something where I think your questions are based upon beliefs that are not hypothetical. Sorry.

(Laughter.)

I don't want to comment on -- when generally what happens in Grand jury investigations when you're here, after we've just returned an indictment from a particular Grand jury investigation, there's no way that people would read my answer as other than commenting on this Grand jury investigation. That's what I'm trying to say.

**QUESTION:** You also (inaudible) at the last minute that you would allow a defense lawyer to come in and see you one more time and to make a case, you know. It was very curious at the last minute there was considerable FBI activity. Wilson's neighbors were interviewed. Witnesses were contacted at the last minute. What are we supposed to read into that? You were just buttoning up your case, crossing the T's and dotting the I's. There was a considerable flurry of activity (inaudible) with great interest.

**MR. FITZGERALD:** I think -- with all respect, I think, you know, I think someone interviewed the person who shined my shoes the other day, I think. We've been doing lots of interests, but suddenly if you put a camera on everyone working on the case and follow them when they have coffee and when they have lunch, everything we do in the ordinary course of business looks like a flurry of activity. There was a flurry of attention. I won't go beyond that.

Look, people -- when we investigate things, we're always, you know, going out and doing things and I'm not going to do a timeline. We obviously wanted to get as much done before October 28th as we could. I would have loved to finish the case completely by October 28th. This Grand jury served long and hard and was very, very attentive. We're grateful for their service. So I wanted to get as much accomplished before October 28th, but I wouldn't read anything beyond that. I'm not going to comment on any discussions we had with any counsel.

Yes, sir.

**QUESTION:** A lot of American people who are opposed to the war critics, the Administration, have looked to your investigation and hope, in some ways, might see this indictment as a vindication of their argument that the Administration took the country to war on false prefaces. Does this indictment do that?

**MR. FITZGERALD:** This indictment is not about the war, this indictment is not about the propriety of the war, and people who believe fervently in the war effort, people who oppose it, people who have mixed feelings about it should not look to this indictment for any resolution of how they feel or any vindication of how they feel. This is simply an indictment that says, in a national security investigation about the compromise of a CIA officer's identity. That may have taken place in the context of a very heated debate over the war, whether a person, Mr. Libby, lied or not. The indictment will not seek to prove that the war was justified or unjustified. This is striped of that debate and this is focused on a narrow transaction.

And I think anyone who's concerned about the war and has feelings for or against shouldn't look to this criminal process for any answers or resolutions of that. They will be frustrated and, frankly, it wouldn't be good for the process and the fairness of a trial.

Yes, sir.

**QUESTION:** Have you sought any expansion of your authorities since February of 2004?

**MR. FITZGERALD:** No. I do know there was a letter and I haven't looked back. In fact, it was a clarified letter.

**QUESTION:** (Inaudible.)

**MR. FITZGERALD:** Yes, I think there were two letters in early 2004 and that's it. There's nothing changed since then.

**QUESTION:** Further issues that you want to look into or anything like that?

**MR. FITZGERALD:** I'm not looking to expand my authority or mandate and haven't. I think the second letter is a clarification of the first. Nothing has changed since February 2004 at all.

**QUESTION:** There's a saying in Washington that it's not the crime, it's the cover up. Can you -- (inaudible) -- if Mr. Libby had testified truthfully, would he be being charged with a crime today? Also have you decided whether or not to charge officials? And also it's a little hazy, I think, to many of us. You said that Valerie Plame's identity was classified but you're making no statements as to whether she was covert. Was the leaking her identity, of and in itself, a crime?

**MR. FITZGERALD:** Okay, I think you have three questions there. I'm trying to remember them in order. I'll go backwards.

And all I'll say is that if national defense information which is involved because her affiliation with the CIA, whether or not she was covert, was classified, if that was intentionally transmitted, that would violate the statute known as Section 793, which is the Espionage Act. That is a difficult statute to interpret. It's a statute you want to carefully apply. There are lots of -- I think there are people out there who would argue that you would never use that to prosecute the transmission of classified information because they think that would convert that statute into what is in England, the Official Secrets Act.

Let me back up. The average American may not appreciate that there's no law that specifically just says if you give classified information to somebody else it is a crime. There may be an Official Secrets Act in England but there are some narrow statutes and there's this one statute that has some flexibility in it.

So there are people who should argue that you should never use that statute because it would become like the Official Secrets Act. I don't buy that theory, but I do know you should be very

careful in applying that law because there are a lot of interests that could be implicated in making sure that you pick the right case to charge that statute.

That actually feeds into the other question. When you decide whether or not to charge some other crime, you want to know as many facts as possible. You want to know what their motive is. You want to know their state of knowledge. You want to know their intent. You want to know the facts. Let's not presume that Mr. Libby is guilty, but let's assume for the moment that the allegations in the indictment are true. If that is true, you cannot figure out the right judgment to make whether or not you should charge someone with a serious national security crime or walk away from it or recommend any other course of action if you don't know the truth.

So I understand your question, which is: Well, what if he had told the truth, what would you have done? Well, if he had told the truth, we would have made the judgment based upon those facts. We would have assessed what the accurate information is and made a decision. We have not charged him with a crime. I'm not making an allegation that he violated that statute. What I'm simply saying is one of the harms in obstruction is that you don't have a clear view of what should be done, and that's why when people ought to walk in, go into the grand jury, take an oath, tell us the who, what, when, where and why straight. And our commitment on the other end is to use our judgment as to what we prosecute and we don't prosecute to keep quiet. And we're simply saying here we didn't get the straight story and we had to, had to, take action.

Yes, sir.

**QUESTION:** Can you just (inaudible)?

**QUESTION:** (Inaudible) whether or not you had decided, made a definitive decision --

**MR. FITZGERALD:** (Inaudible) who took great notes on his question about people not charged, which I cannot answer.

**QUESTION:** Then I have four questions.

**MR. FITZGERALD:** Okay.

**QUESTION:** Now, can you clarify the business about keeping the grand jury open, which won't be the same grand jury, and you said you've done the substantial bulk of your investigation is finished. I mean, does that mean in layman's terms that you're just kind of in a mopping up phase? Are there things that you're actively pursuing? And if so, can you explain to us lay people, if you bring this to a grand jury that hasn't been involved for 24 years -- 24 months -- (laughter) -- what does that -- because it feels like 24 years. What does that entail? Do you have to sort of start from zero with them, bring them up to speed?

**MR. FITZGERALD:** I think it varies on what you need to do, but I just -- you could probably talk to lots of people who don't know the case who could tell you what the general experience is, but if I try to opine on how that happens, there's no way you're not going to look at my answer as telling you what's going on with this grand jury investigation, and I can't do that.

**QUESTION:** Do you feel that Judge Tatel, Judge Hogan and other circuit judges' references to an important -- evidence of an important potential breach of public trust that was carried in your ex parte submissions last year, do you feel that the charges you've brought now are in line with the submissions you made then and what you said you had potential evidence of?

**MR. FITZGERALD:** I think there's two questions in that, which I'll say is: Is our charge -- does that line up with the secret classified filing I can't talk about? So I won't comment because I don't want to give you an idea of what's in there.

However, if you're asking do these charges vindicate a serious breach of the public trust, absolutely. If you're going to have a grand jury investigation into the improper disclosure of national security information, you're going to have someone in the position Mr. Libby is lying to the FBI on two occasions and going before a grand jury on two occasions and telling false testimony, obstructing the investigation, that, to me, defines a serious breach of the public trust.

**QUESTION:** Thanks. You had said that the substantial bulk of the work in this investigation is completed. A lot of the players, some of the lawyers, some of the people involved, have been around through Watergate, through Iran-Contra, through Monica Lewinsky. Does this case, based on what you know now, remotely compare to the specter of any of those cases?

**MR. FITZGERALD:** I don't even know how to answer that. I'm just going to take a dive. (Laughter.) Sorry.

Someone who hasn't asked one yet. I just want to be sure. Yes, ma'am.

**QUESTION:** Did you seek any counts that the grand jury did not return?

**MR. FITZGERALD:** I don't know if I'm allowed to say that. Someone gave me a big shake of the head, no, that I'm not allowed to say it, so I better not do it.

Yes.

**QUESTION:** Can you tell us, was it all the dynamics of the grand jury? Were the members tired? Were they particularly active or involved? Were they worried this involved (inaudible) officials? Is there anything you can tell us about that?

**MR. FITZGERALD:** I can only say this, I can't comment on their emotions or reactions, but I'll say this, they were very, very hardworking grand jury, very, very dedicated. And I don't think people fully appreciate how an investigative grand jury can be different. You know, sometimes you can bring -- fairly routine to go into a grand jury and say Mr. Eckenrode is going to testify about a bank robbery. Here's a picture of the guy with the gun in his hand with a note. Here's his fingerprint on the note and here's his confession, you know, how do you vote? This grand jury is very, very different.

And what struck me, the one thing that's in the public record, which I hadn't realized it would be there, but if you look at the indictment, the indictment alleges that Mr. Libby is charged with perjury in response to a grand jury's question and it's phrased in there that a grand jury would like to know. And it shows that at the grand jury, people take their obligations seriously, they ask questions. And in this country, we have people who probably got notices who thought, "What a pain in the neck this is going to be." And it was a pain in the neck for them for two years, but they worked very, very hard. And if they asked a question and someone lied to them, that was vindicated.

Yes, sir.

**QUESTION:** Did Bob Novak cooperate with your investigation?

**MR. FITZGERALD:** I can't comment.

**QUESTION:** Is there anything that would prevent anyone who was a witness from telling of their experiences -- and grand jury rules?

**MR. FITZGERALD:** The grand jury rules limit the prosecutors, they don't limit the witnesses. I know there's a debate out there from people as to who should say what about what and I'm not wading into that, other than I have asked people, as a request, not to compromise the investigation by talking and I'll just leave it at that.

Yes, sir.

**QUESTION:** You anticipate needing to impanel a new grand jury in order to wrap up?

**MR. FITZGERALD:** I'm not going to comment.

**QUESTION:** Do you need a new grand jury? Would you need to impanel a new one if you wanted to bring further charges?

**MR. FITZGERALD:** I can't charge myself, so if we wanted to bring charges, we'd need a grand jury to do that. But I don't want to comment beyond that.

I think -- here's what I'm trying to convey. We're not quite done, but I don't want to add to a feverish pitch, you know, it's very, very routine that you keep a grand jury available for what you might need. And that's all I can say because of the rules of grand jury secrecy.

Yes, sir.

**QUESTION:** Is there any possibility of anybody else being charged?

**MR. FITZGERALD:** I'm not going -- I can't go beyond that, sorry.

**QUESTION:** It's legal jeopardy, right?

**MR. FITZGERALD:** That one -- that didn't get any better. (Laughter.) You're getting cold, not hot.

(Laughter.)

**QUESTION:** You said outside the -- you said you can't comment outside the four corners of the indictment but you did make a general statement when you said that all government agencies -- (inaudible). There were some deferred e-mails that were produced by the White House very late in the investigation, that in fact, in part triggered the expansion that earlier in the appointment of the special counsel, I understand. And you stand by the statement that all government agencies cooperated and was the delay of the e-mails (inaudible) or purposeful, getting looked at?

**MR. FITZGERALD:** I can't -- I realize you've built some facts into the question that I'm not going to adopt and so I'm not going to get into reports in the newspapers that certain things happened and then, if I'm not allowed to confirm or deny them, build them into a question. All I'll tell you is I'll stand by it, every agency cooperated with us.

Yes.

**QUESTION:** Can you tell us just in layman's terms because I don't know a lot about this. What's the maximum sentence that Mr. Libby could receive if all five -- if he's charged with all five --

**MR. FITZGERALD:** I believe the obstruction count has a maximum penalty of ten years. The perjury counts and the false statements counts each have a maximum penalty of five years, so there's four five-year counts and one ten-year count. Now, for a layman, I would step back and there are these guidelines called a sentencing guidelines that take certain offenses and they are now non-binding on the federal judges, but they would take into account all sorts of factors about the offense, the circumstances, the person who committed it -- if the person were convicted. And I want to jump pass -- there's a trial there -- but if they were convicted, they judge would look to the sentencing guidelines for guidance as to what actual sentence would be imposed.

So there's plenty of room but there's no mandatory minimums, you know, zero to 50 years. And that would be a judge's decision.

Anyone who has not asked a question? Yes, sir.

**MR. FITZGERALD:** Does Mr. Libby have any say now that he has resigned and of course he bought this indictment today, to come to you and say, well, this is -- in other words, break open some of these facts? And are there ramifications, both at the State Department, DOD, that then you're able to also investigate? And what is going on -- to what degree has that shaped the speech that Secretary Powell gave at the United Nations that many people have criticized him for?

**MR. FITZGERALD:** Anne, I don't think I can answer any of that. I'm not going to speculate what Mr. Libby would do and I haven't been tracking the ramifications at the various agencies. We've had our hands full.

**QUESTION:** Can I --

**MR. FITZGERALD:** Yes.

**QUESTION:** Just to go back to your comments about the damage that was done by exposing Valerie Wilson's identity? You know, some critics who are suggesting that she was not your traditional covert agent in harm's way, that she was working essentially at a desk job at Langley. Just to answer those critics and elaborate on -- except the fact that her neighbors may now know that she was out of the country for that matter. That she was a CIA officer. What jeopardy, what harm was there by disclosing her identity?

**MR. FITZGERALD:** I will say this, I won't touch the specific damage assessment of what specific damage was caused by her compromise. I won't touch that with a 10-foot pole. I'll let the CIA speak to that if they wish or not. I will say this -- to the CIA people who are going out at a time that we need more human intelligence, I think everyone agrees that -- at a time when we need our spy agencies to have people work there, I think just the notion that someone's identity could be compromised lightly, to me, compromises the ability to recruit people and say come work for us, come work for the government, come be trained, come invest your time, come work unanimously here or wherever else, go do jobs for the benefit of the country for which people will not thank you because they will not know. They need to know that we will not cast their anonymity aside lightly and that's damage, but I'm not going to go beyond that.

Yes, sir.

**QUESTION:** What happens to Mr. Libby now? What's your understanding? Is he going to be arrested or will he just have to appear at the first hearing? What's your agreement with his attorneys on that?

**MR. FITZGERALD:** My understanding is we will not be arresting Mr. Libby; we will arrange for him to appear before whatever judge was assigned, which you may know who the judge was assigned, but I don't because I came from there to here. And whatever the judge tells us to do, we will do.

**QUESTION:** And a federal shield law has been discussed, you know, in the wake of your arrest of -- your holding a (inaudible) in this trial? If there had been a federal shield law and there may be in the future, how would that have affected your work? Are you for or against the federal shield law, protecting reporters' confidentiality of sources?

**MR. FITZGERALD:** Okay. Then I see there's questions. Am I for or against a shield law and I don't think I should in my capacity opine for the Department of Justice on the shield law. I think Mr. Comb(ph), he gave some written testimony recently about one proposed shield law.

Mr. Rosenberg, the U.S. Attorney in Texas, gave written and oral testimony in the Department of Justice. I'm not schooled to tell you what the Department of Justice position is on the shield law.

I will also tell you that there are many people who -- and a shield law can be a very generic description. Doesn't it mean an absolute shield? Is it a qualified shield? What are the exceptions? And I've heard lots of people comment that many versions of the shield law, which still have allowed us to subpoena the testimony we did in this case. But I can tell you that the D.C. Circuit Court of Appeals affirmed Judge Hogan who said if there's any qualified privilege, whatever the hurdle was, no matter how high, it was exceeded in this case. And I think what people ought to understand -- I understand why it is that newspapers want sources and I read newspapers and I'm glad you have sources.

This is different. This was a situation where the conversation between the official and the reporter may have been a crime itself. It wasn't someone saying, "Hey, so and so is doing something really, really awful down the hall, but I may get fired if I tell you." If you're -- transmitting classified information is the crime itself. But also the reporter is the eyewitness. And what I think people don't appreciate is we interviewed lots of people -- very high officials before we ever went to reporters.

And if it is apparent the grand jury is investigating to find out whether Mr. Libby lied under oath about his conversations with reporters, how could you ever resolve it without talking to a reporter? You couldn't walk in and responsibly charge someone for lying about a conversation when there are only two witnesses to it and you talked to one. That would be insane. On the other hand, if you walked away from it with the belief that that conversation may have been falsely described under oath, you're walking away from your responsibility. And that's why when the subpoenas are challenged, we put forward what it is that we knew and we let judges pass on it. So I think people shouldn't read this exceptional case as being something more than it's not.

And I think there's a pendulum that shifts. I'm not recommending that reporters be subpoenaed to my colleagues. I don't -- you know, this is not -- we have to maintain a balance and I think what people recognize is that this was narrow grounds, that they were justified, that we followed the attorney general guidelines, that the court found that we satisfied those guidelines. The court found that we met any bar. The D.C. Circuit Court of appeals affirmed unanimously, the Supreme Court declined certiorari. I think we ought to step back, take a deep breath and appreciate what the facts were here, they're not the ordinary case, before we rush into debates about balancing two very important things, the First Amendment and national security, and I don't take either lightly.

Yes, sir.

**QUESTION:** Sir, can you say -- is your request to witnesses that they not discuss the case publicly continue beyond this point through the trial? If so, how long will it continue for? And is there a point at which that request conceivably could impede Mr. Libby's right to gather witnesses and facts on his own behalf?

25                                    10/28/2005

**MR. FITZGERALD:** I'll be perfectly frank. I haven't even thought about that. So it's going to be a long day and maybe I need to sleep on that.

**QUESTION:** Well, but are you continuing to request -- what about the first half of that? You're not sure if you think witnesses should remain silent?

**MR. FITZGERALD:** I probably need to take a step back and figure out what requests we're going to make or not. I don't want to wing it from here if I haven't thought it through.

Yes, sir.

**QUESTION:** You used the phrase "not quite done." There will be lots of speculation on what you mean. Can you help us by being any more specific?

**MR. FITZGERALD:** No, because I'd probably, in fact, choose other words that -- you're reading tea leaves, and don't, because I don't draw a good tea leaf. So if you're not quite trying to figure out what's going on in the grand jury, sorry, but that's a good thing; we're not supposed to tell you what 's going on in the grand jury. I'm trying to let the public know that we're trying to do our job responsibly; we're trying to do things as quickly as we can and we want to get things wrapped up. I've got plenty of other cases. I've got a full-time job. Jack has a full-time in Philadelphia. My full-time job is in Chicago. Everyone working on this case has another full-time job. So we want to get this resolved but I'm trying to give you just a brief readout on where we are without compromising anything on the grand jury.

Yes, sir.

**QUESTION:** How confident are you that there will be a trial?

**MR. FITZGERALD:** That's not for me to determine and I'm not going to

**QUESTION:** (Inaudible) plea bargain?

**MR. FITZGERALD:** That's not a conversation I'd have through a camera and I don't think -- and in all seriousness, if, in any case, when I've been asked about people charged with other crimes or people talk about plea bargains, you have to say, look, we brought a serious charge. The person is presumed innocent. I'm not going to have a conversation about a plea bargain that assumes a person is willing to admit their guilt when they haven't been proven guilty. So that's for Mr. Libby and his counsel to decide and I'm not going to be presumptuous and I'm not going to discuss anything like that on national television.

Yes, sir.

**QUESTION:** Maybe we can hone this down just a little but, but we know that there cannot be a conspiracy of one and he has not been charged with conspiracy. Considering that with which he is charged at this point, do you believe that Mr. Libby acted alone?

26                                    10/28/2005

**MR. FITZGERALD:** I'm not going to comment beyond the indictment. Don't read anything into that, but I just -- the indictment sets forth a charge. We're not going to go there. I've been told two more --

**MODERATOR:** Let's assume we're winding down or we're going to have to give him water and we'll take a break.

**MR. FITZGERALD:** Okay. Hopefully, we're winding down.

**QUESTION:** You said you're eager to go back to Chicago. How long do you think the second phase, the trial phase, might last? Years? A year?

**MR. FITZGERALD:** I thought I ducked that question several times, but if I didn't, I'm not going to put a time frame on it. As quickly as we can.

**QUESTION:** And secondly, if you impanel a second grand jury, is it always 18 months or is it 12 months?

**MR. FITZGERALD:** I don't know. They vary. And I'm just -- I'm not going to give you any time frame questions because I'll be as vague as I have been already and just waste time.

**QUESTION:** In the absence of independent counsel statute, there's been no suggestion here of political interference and the Attorney General and the previous Attorney General both recused themselves. But I'm wondering, after what you've been through, whether you think the special counsel rules under which you conducted this investigation gave you the absolute assurances that you needed throughout the whole process that there could not possibly be political interference for your team by this or any future Justice Department?

**MR. FITZGERALD:** Let me put it even more starkly. There was no political interference whatsoever with my team or our work on this case. That's all I can vouch for.

Yes, sir.

**QUESTION:** Did Harriet Miers' withdrawal yesterday have anything to do with the timing of your indictment today?

(Laughter.)

**MR. FITZGERALD:** No.

You did confuse me. Thank you.

# # #