# EXHIBIT C

AMERICAN UNIVERSITY RADIO WAMU 88.5 FM

THE DIANE REHM SHOW

ELECTRONIC VOTING MACHINES

MONDAY, JULY 17, 2006

GUESTS

AMBASSADOR JOSEPH WILSON
Former Ambassador to Gabon, former acting Ambassador
to Iraq, and author of *The Politics of Truth: Inside
the Lies that Led to War and Betrayed My Wife's CIA
Identity: A Diplomat's Memoir* (Carroll & Graf)


VICTORIA TOENSING
Former chief counsel to the Senate Intelligence
Committee and former Deputy Assistant Attorney
General.  While serving at the Department of Justice
Ms. Toensing created the Terrorism Section.
She is now in private practice in Washington, D.C.

<u>DISCLAIMER</u>

Transcripts of WAMU programs are available for personal
use.  To purchase a transcript, please order online at
www.wamu.org or call 1-800-871-7072.  Transcripts are
created by a contractor for WAMU, and WAMU has not verified
their accuracy.  Transcripts are provided "As Is" without
warranties of any kind, either express or implied.  WAMU
does not warrant that the transcript is error-free.  For
all WAMU programs, the broadcast audio should be considered
the authoritative version.

Transcripts are owned by WAMU 88.5 FM American University
Radio and are protected by laws in both the United States
and international law.  You may not sell or modify
transcripts or reproduce, display, distribute, or otherwise
use the transcript, in whole or in part, in any way for any
public or commercial purpose without the express written
permission of WAMU.  All requests for uses beyond personal
and noncommercial use should be referred to (202) 885-1200.

Transcripts are prepared by Soft Scribe LLC, which takes
sole responsibility for accuracy of transcription.  No
license is granted to the user of this material by Soft
Scribe LLC.  All license rights reside with WAMU 88.5
American Public Radio.  Media representatives should
contact WAMU at (202) 885-1200 for questions related to the
transcript.  You agree to indemnify, defend, and hold
harmless Soft Scribe LLC., its officers, directors, and
employees from and against any liability, loss or damage
(including attorney's fees) caused by or arising from your
use of the transcript.

Online streaming of the program you are about to hear is made possible by WAMU members.  If you are not a member of WAMU, we hope you'll consider joining today.  Your support will help keep our signal on the air and on the Internet. You can purchase compact discs and cassette copies of this program and many other programs you hear on WAMU.  Go to www.wamu.org and click on programs.

AMBASSADOR JOSEPH WILSON

10:00 a.m.

MS. REHM:  Thanks for joining us.  I am Diane Rehm.

On July 6, 2003, *The New York Times* published an op-ed by Ambassador Joseph Wilson.  He said, "I have little choice but to conclude that some of the intelligence related to Iraq's nuclear weapons program was twisted to exaggerate the Iraqi threat."  Just over a week later, writer Robert Novak referred to Wilson in his column saying, "His wife, Valerie Plame, is an Agency operative on weapons of mass destruction."  He was talking about the CIA.  Robert Novak continued, "Two senior administration officials told me that Wilson's wife suggested sending him to Niger."

Joining me to talk about the fallout from this disclosure and why Joseph Wilson and his wife are now filing a civil suit against administration officials, Ambassador Joseph Wilson.  He is former Ambassador to Gabon and former acting Ambassador to Iraq.  We'll take your calls throughout the hour, (800) 433-8850.  Send us your e-mail to drshow@wamu.org.  A little later in the hour we'll be joined by Victoria Toensing; she is former chief counsel to the Senate Intelligence Committee and former Deputy Attorney Assistant General.

Good morning to you, Ambassador Wilson.  It's good to see you.

AMBASSADOR WILSON:  Good morning.  It's nice to be with you.

MS. REHM:  Why exactly are you bringing this lawsuit?

AMBASSADOR WILSON:  Well, it's our belief that certain officials of the administration and their allies really conspired to deprive us of our civil rights and of our Constitutional rights.  It's as simple as that.  The larger question is whether or not it is appropriate for senior administration officials to use their positions of power in order to exact personal revenge, which this is clearly a case of the Vice President and his senior staff and others in the White House and elsewhere attempting to do.

MS. REHM:  When you mention your Constitutional rights, spell that out.

AMBASSADOR WILSON:  Well, my -- the First Amendment says that nothing should be done to abridge a citizen's right to petition his government for redress of a grievance.  In writing my article in *The New York Times* I was exercising what I believed to be my civic responsibility to hold my government to account for what my government said and did in the name of the American people. It's what we do at every level of our democracy everyday. Citizens who write to their mayors, their city planning commissions or their representatives all know what it means to petition your government for redress of a grievance.

In actual fact, the day after my article appeared, the White House acknowledged that the "16 Words" did not rise to the level of inclusion in the State of the Union address.  It should have ended there.  Instead, there was a whispering campaign that was undertaken by members of the White House that was directed at discrediting, seeking revenge, and punishing me, to quote the special counsel.

MS. REHM:  Before you wrote your article, did you try to address the issue with members of the administration on a private level?

AMBASSADOR WILSON:  On a private level I contacted the Department of State directly at a very senior level and said that I believe that if the administration did not correct the record I would feel obliged to do so. I was told very straightforwardly that if I wanted the record corrected I probably would have to do it myself.  I also made it very clear through people close to the White House, close to senior levels of the White House that I was not going to allow this to go uncorrected.

MS. REHM:  What kinds of responses did you get?

AMBASSADOR WILSON:  Well, I got no response from people who are close to the White House.  And I frankly have no idea whether that message was passed or not but the response I got from the senior level of the Department of State was that if I was going to correct the record I would probably have to do it myself if I wanted the record corrected.

MS. REHM:  Ambassador Wilson --

AMBASSADOR WILSON:  Before I wrote the article I also spoke to members of the staffs of both the House Intelligence Committee and the Senate Intelligence Committee and I also took the occasion of an offsite meeting of a number of Democratic senators to brief them on my trip.

MS. REHM:  Who sent you on that trip?

AMBASSADOR WILSON:  The way I was -- I was briefed at the CIA that the office of the Vice President had inquired into an allegation that Niger had purchased uranium from Iraq -- or had sold uranium to Iraq rather.  It was the CIA that made the decision to send me.  I made it very clear to them that I was not going to take this as a CIA mission because I don't do espionage, I do diplomacy, but I would do it on behalf of my government writ large.  And before I went I obtained the clearances of both the State Department and/or the ambassador on the ground.

MS. REHM:  What involvement did your wife have in the fact that you went there?

AMBASSADOR WILSON:  At the request of people in her office, her supervisor, she contacted me and invited me to a meeting at which it was discussed how to respond best to the legitimate question raised by the office of the Vice President.  I went to the CIA to attend to this meeting; she came to the reception area to get me and to walk me into the building.  She walked me into the meeting, she introduced me to the people who were at the meeting, and then she left.  That was the extent of her involvement.

MS. REHM:  Do you know whether in fact she was the one who recommended that you be sent on this mission?

AMBASSADOR WILSON:  No, the recommendation in fact flowed from the meeting.  The meeting at the CIA was undertaken for the purposes of determining what the intelligence community knew and whether or not they had enough information that they could respond to the Vice President's office's query or whether or not they needed to do something else to fill in the holes in their information and database.  As a consequence of that meeting, they asked me -- during that meeting they asked me if I would be prepared to go out there.  I said yes.

They then -- members of the meeting then

discussed what sorts of questions might be asked and what value I might actually bring to the exercise if I were to go out there.  When I left that meeting it wasn't clear to me that they were actually going to ask me to go.  My wife conveyed to me their request subsequently that I go ahead and undertake the trip, which I did.  Pro bono, by the way. At no cost to the U.S. Government other than for my travel expenses.

MS. REHM:  Ambassador Joseph Wilson, former Ambassador to Gabon and former acting Ambassador to Iraq. Do join us, (800) 433-8850.  Send your e-mail to drshow@wamu.org.  Just for the record, how long were you acting Ambassador to Iraq?

AMBASSADOR WILSON:  I served in Iraq for 2-1/2 years, from September of 1988 to January of 1991.  I left Iraq about five days before Desert Storm kicked off.  I was in charge of the embassy during the entire period of Desert Shield.

MS. REHM:  Why were you simply acting ambassador?

AMBASSADOR WILSON:  My official title was deputy chief of mission.  The ambassador was out of the country during the entire period of Desert Shield and that by definition makes chargé d'affaires, which translates as acting ambassador.

MS. REHM:  There are a lot of questions in people's minds as to why you have waited this long to bring your case.

AMBASSADOR WILSON:  Well, it took us this long to make that decision.  We wanted to give the special prosecutor all the time that we thought we could in order to do the criminal investigation.  We were obviously in no hurry to bring any particular case.  In fact, the only reason we brought it at this stage was because the -- we thought that we might -- one of the statute of limitations might have run out on July 14th of -- the three-year statute of limitations on bringing the case.

MS. REHM:  And actually, what are you asking for?

AMBASSADOR WILSON:  Well, we are asking for the court to make a determination on damages, but we are asking for basically redress of our grievances, for the violation of our rights by government officials who exercised their

public position to exact personal revenge.

MS. REHM:  Here is a piece in *Newsweek*, this week's *Newsweek*, which says that -- let's see, "The evidence is clear," you say that your legal attorneys say, "The evidence is clear that the Defendants abused their powers."  It goes on to say, "The case could be put on hold until after Scooter Libby's prosecution for perjury in connection with the case.  In any event, it's likely to cost the Defendants thousands in legal fees and devour energies at the White House."  Is that what you are after?

AMBASSADOR WILSON:  No, absolutely not.  Again, we did not bring this case lightly.  We did not, however, compromise Valerie's identity.  We did not engage in a whispering campaign designed to defame anybody.  And so we believe that our Constitution both protects citizens' rights to speak freely and also really require the citizens that they hold their government to account.  And we should be able to do so free of any -- all citizens should be able to do so free of any vengeful acts on the behalf of the government that is being asked to be accountable for its actions.

MS. REHM:  Do you think that if successful, your suit has long-term implications?

AMBASSADOR WILSON:  Well, I would hope that it does in fact.  I would hope that the message is sent to public officials that you just simply cannot engage in this sort of behavior, that it's unacceptable, it's inconsistent with the way this democracy is structured, it's inconsistent with the right of the citizens to participate in their democracy.

MS. REHM:  At the basis of this whole issue is whether the Government of the United States moved forward and went into war with Iraq on the basis of faulty, flimsy evidence.  Do you believe that to be the case?

AMBASSADOR WILSON:  Well, certainly that is separate from this particular case, but yes, I wrote in my opinion piece that I believe that they had twisted the intelligence to justify the invasion.  There is nothing I have seen since to indicate that that was not the case. Indeed, there has been lots of information that suggests that they did willfully ignore the views of not just the CIA but the intelligence community writ large on this particular matter.

Specifically, in October of 2002, both the Senate and the White House were informed by the director of Central Intelligence and his deputy, speaking on behalf of the entire intelligence community, that they believed the British had exaggerated or stretched the case on uranium sales from Niger to Iraq.  And indeed, the director of Central Intelligence conveyed to the White House on three different occasions in the first week of October his desire that the President not be a witness of fact on this matter because the evidence is weak and the British had exaggerated the case.

MS. REHM:  Joseph Wilson, former Ambassador to Gabon and acting Ambassador to Iraq, we'll be right back.

(Intermission)

MS. REHM:  And we are back with former Ambassador Joseph Wilson.  We are talking about a piece he published in *The New York Times* concluding that some of the intelligence related to Iraq's nuclear weapons program was twisted to exaggerate the Iraqi threat.

Just before the break, Joseph Wilson, you were talking about the intelligence community's view on WMD.

AMBASSADOR WILSON:  Right, I was just going to add that in January 2003, several weeks before the President's State of the Union address, the National Intelligence Officer, again offering the consensus view of the American intelligence community --

MS. REHM:  His name?

AMBASSADOR WILSON:  I don't know his name.  It's the National Intelligence Office, as in -- and it operates on behalf of the intelligence community, wrote a memo to the administration saying that in the judgment of the intelligence community the Niger allegation was "baseless." So the President had all that information.  Now, they would argue -- and they have made the argument that they were trying to set the record straight and get the facts out. Those facts did not come out in Mr. Libby's leaking operation in July or in June of 2003.  But those are the facts that have since come out.

MS. REHM:  Mr. Libby's leaking operation, refresh our memories.

AMBASSADOR WILSON:  Well, it's now very clear that from -- according to the testimony -- the filings of Special Counsel Fitzgerald that in June and July even before my article appeared, Mr. Libby and others, including Mr. Rove, were speaking to members of the press.  Among other things, they were compromising my wife's identity but they were also leaking information from the National Intelligence Estimate, as they say, to get the facts out.  And in fact, as the Senate Select Committee on Intelligence and other reports have since made clear and made public, the facts included the consensus view that there was -- that this allegation was baseless.

MS. REHM:  How have you and your wife been hurt?

AMBASSADOR WILSON:  Oh, I think it's very clear that she can no longer do the job that she was trained and paid to do for over 20 years.  In my case I think it's very clear that we have been subjected to an ongoing campaign of lies and disinformation with respect to our own role in this, with respect to my personal reputation.  And you know, there's other things that will be in the filings that the lawyers will give in.

MS. REHM:  There seems to be some question about the difference, if any, between a CIA operative and a CIA agent.  What's your view on that?

AMBASSADOR WILSON:  Well, my wife was an operations officer at the CIA.  She was a covert employee -- and don't take my word for it.  The CIA referred this matter to the Justice Department because they believed a crime had been committed and Special Counsel Fitzgerald when he gave his first press conference said very clearly she was a classified officer.

MS. REHM:  And the disclosure of the name of a classified officer is against the law?

AMBASSADOR WILSON:  Well, there are a number of statutes that cover the unauthorized disclosure of classified information of which the Intelligence Identities Protection Act is one.

MS. REHM:  What about classified versus covert?

AMBASSADOR WILSON:  Well, people can make their definitional distinctions any way they want.  The CIA --

MS. REHM:  You don't see any difference?

AMBASSADOR WILSON:  The CIA determined that they thought that a crime had been committed and referred it to Justice Department for investigation.  I will tell you that she was an operations officer and that she undertook covert operations on behalf of her government.

MS. REHM:  Do you feel that your lives have been hampered?

AMBASSADOR WILSON:  Well, there have been a number of threats that we have -- security threats that we have received.

MS. REHM:  Give me an example.

AMBASSADOR WILSON:  Well, I can't really.  Those will all be part of the testimony that we do but there have been threats that -- credible threats that have been relayed to us from various law enforcement authorities.

MS. REHM:  From law enforcement authorities?

AMBASSADOR WILSON:  That's correct.

MS. REHM:  And against you and your wife?

AMBASSADOR WILSON:  That's correct.

MS. REHM:  And your children as well?

AMBASSADOR WILSON:  Well, we are concerned about our children.  They are obviously part of the household. In fact, we are more concerned about our children than we are about us.

MS. REHM:  And joining us now is Victoria Toensing.  She is former chief counsel to the Senate Intelligence Committee, former Deputy Assistant Attorney General.  Good morning to you, Victoria, good to hear from you.

MS. TOENSING:  Good morning, from St. Michaels.

MS. REHM:  Thank you so much for joining us. While serving at the Department of Justice, Victoria Toensing created the Terrorism Section.  She is now in

private practice in Washington, D.C.  And as she has said, she joins us by phone from St. Michaels, Maryland.

Victoria, do you think it's appropriate for a government employee to speak out if he or she believes the facts are being misstated?

MS. TOENSING:  Oh, of course, and if it's classified information, then there is a procedure to go and report whatever the situation is or whatever the wrongful information is to the Intelligence Committee.  There is a statute that provides for that.  But Diane, let's not go too far because I hate for your listeners, of which my children are among them, to get confused about this covert agent situation because when I was at the Senate Intelligence Committee, I was responsible for writing the law that covered covert agents.

And indeed there is a great deal of difference between somebody covered as a covert agent.  And all the information I have is that Valerie Plame was not covered at the time of the publication or within five years of Bob Novak's column.  And that would be important.  And indeed, Patrick Fitzgerald, the special counsel has never ever claimed that she was a covert agent.  As far as being a "classified employee" there is not a statute that prohibits that particular kind of information.  It's not against the law, which is why we wrote the Covert Agent Identities Protection Act in the 1980s.

MS. REHM:  All right, let's go to the question that is at the center of the Wilson suit.  Do you believe that administration officials deliberately outed Valerie Plame --

MS. TOENSING:  There is --

MS. REHM:  -- as a CIA agent?

MS. TOENSING:  No -- well, they didn't have knowledge that she was in any way classified.  In fact, if you read this entire complaint, which I've done a couple of times, there is not one statement in the complaint that anybody told either Mr. Cheney, Mr. Rove, or Mr. Libby that Valerie Plame's status was either classified or covert.  They tell these people -- either they are all told by the State Department or told by the CIA, not only -- that she worked at the CIA or that she was in -- that she was an analyst.

But nobody has told them that she had any kind of particular status that had to be protected and that would be very important, because otherwise it's no different than a situation as if the Justice Department sent him on the trip and then somebody said, "Well, his wife was involved in the Justice Department sending somebody on a trip." It just so happened that at one time in her life she had been covert but not within five years of the publication.

MS. REHM:  So you are saying that neither the Vice President, neither Karl Rove nor any of those who are named in this suit had any knowledge that Valerie Plame was a covert CIA agent as the CIA itself came out and said?

MS. TOENSING:  No, they have never said she was covert.  Never.  They only sent it over as a classified -- which is very different, Diane.  I know Mr. Wilson's not a lawyer and he doesn't appreciate this significant difference, but it's very different if somebody is covered by the Identities Protection Act.

MS. REHM:  Tell me the difference between a covert agent and a classified agent.

MS. TOENSING:  Well, we don't know about the "classified," Diane, because the Special Counsel Fitzgerald has refused to give the basis for her being classified.  So I don't know what that's about but I can tell you in order to be a covert agent covered by the act we wrote in 1982, a person has to have a foreign assignment, be on a foreign assignment.  And why that was important to us is because we were really reacting to the assassination of the chief of station in Greece.  So that was a very important factor when we were writing the law, protecting our foreign agents, not people who were working in the United States.

And the way the five years came into the legislation was somebody said, well, you know, sometimes they come back for rotation.  And I can remember working on well, what would be a fair -- you know, if somebody were back on rotation or having a final assignment back in Langley and, you know, we went everywhere from two years to seven years, you know --

MS. REHM:  But Victoria, just to go back for a moment, it was the CIA itself that decided a law might have been broken and recommended a special counsel be appointed.

MS. TOENSING:  Well, they didn't recommend the
special counsel.  They sent it to the Justice Department
and they do this probably a couple of times a week.  That's
not an unusual situation, but they never said that she was
covert because another factor that we have put into the law
is that if -- the CIA and the agent have to be taking
affirmative measures to protect her identity.  So I think
that putting her name in *Who's Who* is not really something
that's keeping a low profile from somebody who is supposed
to be a covert agent.

MS. REHM:  As I understand it her name is listed
in *Who's Who* as the wife of Ambassador Joseph Wilson.
Victoria, if there was any question about the sensitivity,
why couldn't' someone in the White House simply have asked
the CIA about Valerie Plame's status?

MS. TOENSING:  You know, that's a good question
and let me tell you why -- what would have thrown people,
and that is that they were told that she was in the
counter-proliferation division and they knew she was an
analyst -- or they were also told that she was an analyst.
So that would just make you think that she is an analyst at
the CIA.  You would never -- in fact, WMD was her
specialty, not Ambassador Wilson's specialty.  So it
wouldn't even have opened somebody's mind to say, "Oh, my,
what is her status" when you know that at the present time
she has a desk job and Langley and somebody who is covert
wouldn't have that.

But before -- I know I'm not going to be on very
long, but before I leave I do want to bring up the point
that I can't -- I am perplexed why this case is being
brought because first-year law students know that the Vice
President has absolute immunity for acts that take place in
the course of conducting of his business.  And that the
aides, Mr. Rove and Mr. Libby, have qualified immunity.  So
I -- you know, are they just waiting for it to be
dismissed?  Because that's what's going to happen legally.

MS. REHM:  So you would not expect the Vice
President, Karl Rove, or anyone else to testify in this
case?

MS. TOENSING:  I don't even expect discovery to
occur, and I say unfortunately, because discovery goes both
ways.  And if I were, you know, this White House and this
administration -- and in fact you saw this with a House
Republican recently, in the Congressman from Louisiana

William Jefferson where it wasn't in their political
intersects to protect Mr. Jefferson when his office was
searched.  But on a legal basis, on a legal principle they
went to court and said we don't think offices should be
searched because they were protecting the institution.  So
I assume that the Vice President's office and Karl Rove's
lawyers and Scooter Libby's lawyers are going to assert the
immunity because they have to do so to protect the
institution.  But I would --

MS. REHM:  One last --

MS. TOENSING:  I would prefer to see discovery of
Mr. Wilson.  I have a lot of questions.

MS. REHM:  All right.  One last question for you,
Victoria.

MS. TOENSING:  Okay.

MS. REHM:  What are the implications do you
believe for national security and U.S. intelligence
operations if CIA agents face possible outing at any time
by their own administration?

MS. TOENSING:  Well, if -- but you are assuming a
fact not in evidence, in the --

MS. REHM:  No, I'm asking a hypothetical.

MS. TOENSING:  Well, if somebody is doing that on
purpose and they know it, then that's a whole different
matter than if somebody just knows that somebody works at
the CIA.  I know a lot of people who work at the CIA and
their status is not classified and there's no problem
whatsoever about saying, oh, so-and-so works at the CIA.

MS. REHM:  Victoria Toensing, she is former chief
counsel to the Senate Intelligence Community, former Deputy
Assistant Attorney General.  Thank you so much for joining
us, Victoria.

MS. TOENSING:  Thank you.

MS. REHM:  And at 26 before the hour, you're
listening to *The Diane Rehm Show*.

Joe Wilson, you've got an opportunity here to
respond to Victoria Toensing's perplexed nature, because,

she says the Vice President is under total immunity as an official of this administration; Rove, Libby have qualified immunity. So why would you bring this case?

AMBASSADOR WILSON: Well, let me say first of all that as Ms. Toensing admitted, according to the facts that she has in her possession when she defined whether or not Valerie was not covered or not or a covert, she doesn't have all the facts in her possessions. And I'll just leave it at that. Now, with respect to the Vice President's immunity or Mr. Rove or Mr. Libby's immunity we have, I think, a very prominent and well-respected Constitutional lawyer Erwin Chemerinsky, who is a law professor at Duke University, as a counsel to our legal team. And he is certainly of the view that this case has merit and should proceed.

MS. REHM: You have, once again, from *Time* magazine a Republican lawyer familiar with the defense saying this is a ploy, that Valerie Plame has a book deal to promote, and that Valerie Plame and Joe Wilson want to have their names front and center.

AMBASSADOR WILSON: We actually would have loved to have faded back into the background. The whole issue that was broached in my article was the issue of whether or not the administration had misstated the facts in a key part of the justification for going to war. Everything that has happened since then with respect to Wilson and Plame has been foisted upon us by this disinformation campaign that began even before my article appeared with Mr. Libby and Mr. Rove compromising my wife's identity.

The real issue here, when I wrote my article was not Wilson and his wife. It was who put the 16 words in the President's State of the Union address that were just simply not substantiated. And people lose sight of that. So we basically are responding to those who have taken it upon themselves to go after us because of a statement that never should have been in the State of the Union address in the first place. The White House acknowledged they should never have been in the State of the Union address the day after my article appeared.

MS. REHM: Why do you think they did that?

AMBASSADOR WILSON: Well, I think there were three reasons. One, I think they wanted to change the subject from the lie in the State of the Union address.

Two, I think they wanted to send a signal to others in the
foreign policy community that if you cross this
administration they will do to your family what they did to
Wilson's family.  And three, Mr. Rove has been reported as
running around the White House saying that it was delighted
to do this because Wilson was a Democrat, as if that was a
subspecies of cockroach.

MS. REHM:  Ambassador Joseph Wilson.  And when we
come back it's time to open the phones.  We have many
callers; I'll ask you to keep your questions brief.  But do
stay with us.

(Intermission)

MS. REHM:  Welcome back.  Former Ambassador
Joseph Wilson is here.  He has brought suit against the
Vice President, Karl Rove, Scooter Libby, and others in the
administration for -- he and his wife have brought this
suit against members of the administration for outing
Valerie Plame.  Here is an e-mail from Jeff in Boerne,
Texas.  He says, "It's my understanding that Bob Novak
called the public information officer at the CIA to confirm
Valerie Plame's employment there and that the CIA
confirmed.  Is this true?  If it is, how could it have been
a secret?"

AMBASSADOR WILSON:  Well, Mr. Harlow has been
quoted on several occasions as saying that he used the
language that they use when reporters accidentally trip
over covert officers in order to discourage them from using
the information.  He could no go any further than he did.
The language they have is very precise and it's designed to
warn them off and he has said repeatedly that he used that
language in the strongest terms.  I heard just today from
somebody who interviewed Mr. Novak yesterday that he had
said that -- he had called Harlow and Harlow had said --
Harlow being the spokesman for the CIA at the time, had
said that he had made it very, very clear to Novak that he
should not publish that information.

MS. REHM:  Let's go now to Jacksonville, Florida.
Good morning, Eric, you're on the air.

ERIC:  Good morning.

MS. REHM:  Hi.

ERIC:  I have a question for --

MS. REHM:  Sure.

ERIC:  -- Ambassador Wilson.  How would you respond to some on the right like Ann Coulter which would -- they would say that, you know, outing your wife's name did not damage national security?

AMBASSADOR WILSON:  Well, I mean, I don't know how to answer that other than to say that the CIA referred the matter to the Justice Department for an investigation because they believed that our national security had been damaged by this act.  There is all sorts of statutes on the books related to the handling of classified information, of which the one that Ms. Toensing claims authorship of, the Intelligence Identities Protection Act -- by the way it's absolutely true that that act, which was drafted to counter Phil Agee going around compromising the identities of covert officers.

Now, that act was written and it has in it ignorance of the law as an excuse.  I'm not exactly sure that I would be proud of having authored an act that actually allows ignorance of the law to be an excuse when it comes to betraying the national security of my country.  But then again, I'm not a real proponent of the betrayal of the national security of the country.

MS. REHM:  Let's go to Cincinnati, Ohio.  Good morning, Joe.

JOE:  Good morning, Diane, and Ambassador Wilson.  Ambassador Wilson, I understand you have to pay money to get your name in *Who's Who* of America so you were -- really weren't trying to keep --

MS. REHM:  Excuse me, sir.

JOE:  -- secret.

MS. REHM:  Excuse me, sir, if I could speak from personal experience, I've never paid a dime, and my name is in *Who's Who* of America.  I don't think Joe Wilson has paid a dime either.

AMBASSADOR WILSON:  No, I've never paid.  I've been in *Who's Who* since as I served as the first President Bush's acting Ambassador to Baghdad in the first Gulf War.  And by the way, the fact that my wife's name is in *Who's*

*Who* really doesn't identify her as a CIA officer. She could have been my wife forever and nobody would have known she was a CIA officer had it not been for the leak campaign orchestrated by -- out of the White House.

MS. REHM: Thanks for calling. Here is an e-mail from Gary in Kalamazoo, Michigan. He says, "Please point out that Ambassador Wilson and his wife are merely the most visible targets of abuse by the White House. I worked for years at the National Security Agency. I know personally what it means to hold intelligence awareness separate from personal and political beliefs. The leaks were intended to frighten into silence other honest members of the diplomatic corps, intelligence community, and appointed and elected officials throughout the world." Do you think that kind of campaign has actually gone on?

AMBASSADOR WILSON: Oh, absolutely. There is no doubt in my mind. It's very clear that after the leak of Valerie's name, a lot of the intelligence officials who were speaking on background about the pressure they had felt from the administration, they all dried up. So it's very clear. And there are others who are now coming out of the woodwork several years later who are finally summoning up the -- I think the intestinal fortitude to do so.

With respect to us as visible symbols I think that's absolutely right. We see ourselves really -- we see this as much broader and much deeper than just Joe Wilson and Valerie Wilson versus the U.S. Government. It really isn't -- it goes to the heart of what we are as a democracy and whether or not a citizen can in fact hold his government to account for what the government says and does in the name of all of us.

MS. REHM: Let's go to Mystic, Connecticut. Good morning, Richard, you're on the air.

RICHARD: Good morning, Diane.

MS. REHM: Richard, I'm afraid that cell phone may not hold.

RICHARD: Can you hear me okay now, Diane?

MS. REHM: A little bit better.

RICHARD: Okay.

MS. REHM:  Go ahead.

RICHARD:  Ambassador Wilson, if I may, George
Tenet came out with an alternative view at the prodding of
Senator Graham, which is the first I've ever seen a
director of the CIA go public, indicating that there was
alternative views.  Do you recall that?

AMBASSADOR WILSON:  Not specifically, but I do
know that -- from the contents of the -- well, the
reporting on the contents of the NIE there were lots of
alternative views that were offered on any number of
different subjects related to the WMD claims.

RICHARD:  Well, I've been very concerned that
there hasn't been a follow-up on that anywhere.  It's
something that at the time I thought was remarkable and no
one's picked up on it.  I wonder if there is anybody
confirming that but I know it was a very unusual
circumstance.  And I felt that George Tenet was saying,
"Stop, let's take a closer look at this."

AMBASSADOR WILSON:  Again, I don't recall the
specifics in the postmortem on all of this.  The Senate
Select Committee on Intelligence is supposed to be doing a
second part of their review of the intelligence
specifically related to the politicization of intelligence.
And I don't know when Mr. Roberts plans on having that out.

MS. REHM:  Now, to -- let's see, Royal Oak,
Michigan.  Good morning, Sally.

SALLY:  Good morning, Diane, and good morning to
the Ambassador.  I just wanted to say, if I could -- I
really don't have a question but I would just like to
comment on what a patriotic thing I think that he and his
wife Valerie Plame are doing standing up to this kind of
political blackmail.  And I'm trying to raise a 14-year-old
son right now who is very interested -- showing signs of
interest in politics.

And he is pretty dismayed about some of the
things that have happened when we hear people like Robert
Novak not even being able to answer a question directly
without sounding like he is lying.  And my 14-year-old
looks at me and says, "Mom, it sounds like that guy is
lying."  But isn't he supposed to be working for a
newspaper and aren't we talking about the Vice President of
the United States?

And anyway I just -- I guess I just want to say keep it up and congratulations for not caving, which -- it doesn't sound like you are cavers, but I just -- I'm just thrilled that this is going forward on behalf of all of us who believe in this country and believe in what this country really stands for.

MS. REHM:  All right, Sally, thanks for your call.

AMBASSADOR WILSON:  Thank you very much.  Valerie and I would not have served our country for a combined 43 years if we did not love it and if we did not believe that the Constitution is in fact the best social contract that's ever been devised between a people and those who govern the people.  And the whole purpose of this is to determine really whether or not those in power will in fact respect the rights of the citizens that they govern.

MS. REHM:  Here is an e-mail from Leonard in Arlington, Virginia, who says, "In all of the voluminous and nitpicking comments about the crime, no crime, harm, no harm concerning the revelation that Valerie Plame worked for the CIA, there seems little concern over the fact that the "front company" Ms. Plame used as her cover was also made public.  Do we have any information about the possible consequences faced by the foreign nationals who interacted with this trading company and thus could be at risk as having worked for U.S. intelligence?

AMBASSADOR WILSON:  I don't have any specific information related to any -- to that particular front company or any other front companies that may have been compromised through this.  But I will say this, the first thing that Valerie worried about when she read the Novak article was the impact that it was going to have on programs and projects and assets that she was responsible for throughout the world.

MS. REHM:  Why do you think Robert Novak finally broke his silence about his role?

AMBASSADOR WILSON:  I have no idea.  I have not the -- I would not pretend to know what goes on in Mr. Novak's mind.

MS. REHM:  He has named two of the people with whom he talked.  Do you believe that the third, as has been speculated, is Richard Armitage?

AMBASSADOR WILSON:  I don't know, but I would expect that that information will become public at some point, but I just don't know when or how.

MS. REHM:  There have been really innumerable debates about the larger picture here.  How do you see the larger picture in this case?

AMBASSADOR WILSON:  Well, my view of this is that our democracy and our debate on issues of national importance -- and there is no issue of greater importance than sending Americans off to kill and to die in the name of the American people, those debates ought to be framed by facts, not by ideologies that then use information as facts when in fact they are not, they are just lies.  And my view of this is that, one, we need to get back to fact- and reality-based debates, and two, the rights of citizens to participate in that debate ought to be sacrosanct.

They should be driven by -- from the public square based on character assassination campaigns or smear campaigns.

MS. REHM:  What about Novak's statement that Republicans okayed his release of Valerie Plame's name?

AMBASSADOR WILSON:  I don't know what he was talking about.  I believe most Republicans care as much about national security as Democrats do.  I think that this is -- and always has been a national security issue.  It has not been a partisan issue.  It has been made partisan by those who were engaged in this particular campaign.

MS. REHM:  But you've also said that this case is a metaphor for the administration's overall philosophy about rights?

AMBASSADOR WILSON:  Well, I think that this administration is not what I would consider a true Republican administration.  Remember, I was an ambassador in the first George Bush administration and if you go back and you take a look at the views that I expressed in the run-up to this war, they were very consistent with the views of those who served in the first Gulf War in the Bush administration of the first Gulf War, that this was perhaps not the best policy option we should have.

think that this administration is made up of

really a radical wing of the Republican Party, a fringe
wing of the Republican Party. And the sooner the
Republicans realize that, the better -- the sooner they
will be able to put into place the reforms that can restore
the Republican Party to its former greatness.

MS. REHM: Let's go to Manhattan in New York.
Good morning, Assante, you're on the air.

ASSANTE: Good morning, and thank you for taking
my call.

MS. REHM: Certainly.

ASSANTE: An excellent program as usual.

MS. REHM: Thank you.

ASSANTE: I just wanted to say that Joe Wilson's
only sin is being too graceful. He is a patriotic
American, he was hired to do a job for which he got no
money, and then his character was assassinated in the so-
called liberal media, because he's been characterized as a
critic of the administration. Well, all he did was when he
came back and -- report to your face that the information
from Niger that he had been sent to check was faulty. He
just said, "Hey, don't pin it on me. I told them what was
going on." So I think that the media are really at fault
here and that, you know, the old parameter that the media
are liberal should be laid to rest forever, because that's
not what's going on here.

MS. REHM: Thanks for calling. At 7 minutes
before the hour, you're listening to *The Diane Rehm Show*.
Joe, how much do you blame on the media?

AMBASSADOR WILSON: Well, let me just say first
of all that the report that I wrote or the article I wrote
in *The New York Times* clearly stated that our ambassador on
the ground had also -- had been the one who told me that
she thought that she had already debunked that particular
allegation. In addition, there was a four-star Marine
Corps general who went out there, Carlton Fulford, and he
concluded independently that there was nothing to the
allegation. So mine was really one of a number of reports
on this particular subject that were in the files of the
U.S. Government. So it's just -- it's perplexing to me
that they would go forward with this allegation in the
State of the Union address.

MS. REHM:  But what about the role of the media in this whole debate?

AMBASSADOR WILSON:  Well, I think the media --

MS. REHM:  And let's talk individually.  So often we get into --

AMBASSADOR WILSON:  Right.

MS. REHM:  -- the Media.

AMBASSADOR WILSON:  Well, let me just say this, I think that Dan Rather, whom I've known for almost 20 years, said it best after 9/11 when he said "I'm an American first and a journalist second."  And I think that that reflects really the media's view, that in a time of great crisis you suspend your natural skepticism of power.  And I think they did, and I think this administration took full advantage of that particular honeymoon.  And they pushed through a series of policies that have been a utter disaster to the American position globally and indeed domestically.

MS. REHM:  There is one other question I have, Joe, and that is that we invited both you and your wife to speak this morning.  You're here; Valerie is not.  How come?

AMBASSADOR WILSON:  Well, Valerie is trying to remain as private as she possibly can.  I have every expectation at some point she will have more to say but --

MS. REHM:  She spoke at the news conference the other day.

AMBASSADOR WILSON:  She did.  She made one statement which reflected her views and she is not yet prepared to say anything more about this.

MS. REHM:  Now, is that because she is writing a book?  Why is that?

AMBASSADOR WILSON:  Well, she has always been reticent to speak out, to -- but I think that the time will come.  It's just not quite yet.

MS. REHM:  How soon?

AMBASSADOR WILSON:  I don't know.  It's up to her.

MS. REHM:  All right.  One last call here, Verona, Illinois.  John, quickly, you're on the air.

JOHN:  Hi.  Mr. Wilson, you're a hero in some quarters.  I really wonder about the impeachment question. This is another link to the obvious duplicity of this administration and impeachment sounds like a solution. What's your comment?

AMBASSADOR WILSON:  Well, with respect to the hero comment.  I was just a citizen exercising my civic duty.  And as -- actually it was George Orwell who wrote "In a time of universal deceit simply telling the truth becomes a revolutionary act."  So see this really in the context in which it took place, the context of an administration that has deceived the population of the United States.  Now, with respect to impeachment, as a practical matter, unless the -- unless there is a Congress that puts its Constitutional responsibility of oversight above partisan loyalty it's not going to happen.

MS. REHM:  Joseph Wilson, he is former Ambassador to Gabon and former acting Ambassador to Iraq.  He and his wife Valerie Plame have filed a civil suit against administration officials.  Thanks for being here.

AMBASSADOR WILSON:  Thanks very much.  People can see the complaint, by the way, at www.wilsonsupport.org.

MS. REHM:  And thanks for listening.  I am Diane Rehm.


SPEAKER:  *The Diane Rehm Show* is produced by Sandra Pinkard, Anne Adams, Nancy Robertson, Jonathan Smith, and Tanya Weinberg, with help from Elizabeth Terry. The engineer is Andrew Chadwick.  Dorie Anisman answers the phones.

Visit drshow.org for audio archives, cassette, and CD sales, transcripts from Soft Scribe, and Podcasts of the Friday News Roundup.  Call (202) 885-1200 for more information.  Our e-mail address is drshow@wamu.org.

NEWSMAKER TRANSCRIPTS
Special Events
July 14, 2006

Former CIA Operative Plame and Former U.S. Ambassador Wilson Hold News Conference at the National Press Club on Civil Lawsuit Filed Against Vice President Cheney and Others

LIST OF SPEAKERS

WOLF:

Good morning. My name is Christopher Wolf, and I'm one of the lawyers representing Valerie Plame Wilson and Ambassador Joseph Wilson, who are here with me today.

For this news conference, here's how I would like to proceed: I will make brief opening remarks, and I'll be followed by Mrs. Wilson and by Ambassador Wilson, each of whom will make a statement.

Following their statements, I will take a few questions. However, since this news conference concerns the legal actions, the Wilsons will not be responding to questions, which is my job.

Late yesterday, on behalf of our clients, we filed an eight- count, 23-page civil complaint in the United States District Court for the District of Columbia against I. Lewis "Scooter" Libby, Vice President Richard B. Cheney, Karl Rove and as yet unidentified individuals who are named as John Doe defendants.

The complaint alleges a violation of our clients' constitutional rights and other legal wrongs as a result of conduct by the defendants in 2003.

Copies of the complaint are available online at www.wilsonsupport.org, and we have some hard copies here today as well.

I will not repeat what is spelled out in great detail in our complaint. But in brief summary, and as we allege in the complaint, in 2003 Ambassador Wilson exercised his First Amendment rights as an American citizen to challenge the president of the United States for assertions used to justify going to war in Iraq.

Specifically, Ambassador Wilson wrote a New York Times op-ed challenging 16 words in the 2003 State of the Union address about Iraq's nuclear intentions.

The administration subsequently admitted that it was a mistake to include the 16 words in the State of the Union. And there, the matter could and should have ended.

Alternatively, if the administration officials believed Ambassador Wilson was wrong to criticize, they could have addressed the issues substantively and on the record, speaking for attribution and publicly.

Instead, as we explain in the complaint, the defendants engaged in a secret whispering campaign designed to discredit or, as Special Counsel Fitzgerald has put it, to punish Ambassador Wilson.

The method chosen was to leak, off the record and not for attribution, the classified CIA employment of Ambassador Wilson's wife, Valerie Plame Wilson.

Three years ago today, journalist Robert Novak published a newspaper column that, for the first time, publicly identified Valerie Plame Wilson as an employee of the CIA. That reporting was based on leaks from persons Mr. Novak described as, quote, "senior administration officials," unquote.

We know today that senior administration officials also leaked Mrs. Wilson's identity to other journalists.

Those leaks from the administration and the resulting public disclosure of Mrs. Wilson's classified CIA employment status violated the Wilsons' civil rights under the United States Constitution and under civil law.

Ambassador Wilson had a right to speak out without his wife's career being destroyed and without his family's privacy being invaded and their personal safety put in jeopardy.

WOLF:

Mrs. Wilson had a right to continue her service as an intelligence officer at the CIA, to retain her privacy and not to have to worry about the safety of her small children as a result of the disclosure to her classified employment.

As Special Counsel Fitzgerald has put it, the fact that she was a CIA officer was not well known, for her protection or for the benefit of all of us.

It's important that a CIA officer's identity be protected, that it be protected not just for the officer but for the national security.

As one judge on the D.C. Circuit Court of Appeals put it in reviewing the reporter's subpoena issue, Valerie Wilson's exposure, therefore, not only may have jeopardized any covert activities of her own, but also may have endangered friends and associates from whom she may have gathered information in the past.

Let me say a word about the timing of the lawsuit we have filed. The law sets time limits on when claims may be filed. Therefore, given that today is the third anniversary of the Novak column, and to avoid any issue over whether a deadline has been missed, the complaint is being filed now.

The recently reported decision by Special Counsel Fitzgerald not to criminally indict Karl Rove was not part of the determination to file now.

We do note that the burden of proof and legal standards for our civil case are distinct from those involved in a criminal prosecution. We also note the fact that a civil defendant has not been indicted criminally is irrelevant to the merits of the case.

Many acts have civil, legal consequences, even if they do not result in a criminal indictment.

With respect to the ongoing criminal prosecution, criminal case against Scooter Libby, the Wilsons wish to commit to Special Counsel Fitzgerald that they do not wish to have their lawsuit interfere in any way with the ongoing prosecution.

Finally, the question may be raised as to how senior White House officials can be sued for actions taken while in office. We believe the law is clear, as articulated by the Supreme Court, that the kind of intentional and unconstitutional conduct set forth in the Wilsons' complaint does not allow the defendants to claim any kind of immunity from being sued.

WOLF:

As to this issue and all other legal issues in the case, all further submissions will be made to the court.

We understand the public interest in this lawsuit that challenges retaliation at the highest level of the White House against the critic and his family.

But as officers of the court, we have an obligation to try our case in court and not through the media.

DC01:464027.1

Accordingly, after today, neither the Wilsons nor their lawyers will be available to the media to comment on the legal issues involved in the lawsuit.

Now let me introduce to you Valerie Plame Wilson.

PLAME:

Good morning.

I am proud to have served by country by working at the Central Intelligence Agency. I and my former CIA colleagues trusted our government to protect us as we did our jobs.

That a few reckless individuals within the current administration betrayed that trust has been a grave disappointment to every patriotic American.

Joe and I have filed this action with heavy hearts, but with a renewed sense of purpose. I would much rather be continuing my career as a public servant than be a plaintiff in a lawsuit. But I feel strongly, and justice demands that those who acted so harmfully against our national security must answer for their shameful conduct in court.

Thank you.

WOLF:

Now Ambassador Wilson.

WILSON:

Good morning. My name is Joe Wilson. I proudly served my country as a foreign service officer for 23 years. I was deeply honored to be appointed ambassador to two African countries by President George Herbert Walker Bush, for whom I also served as acting ambassador to Iraq during the first Gulf War.

In that capacity, I was the last American diplomat to confront Saddam Hussein before the launching of desert storm.

In the Clinton administration, I served as senior director for African affairs at the National Security Council.

WILSON:

After my retirement from the foreign service in 1998, I undertook two discrete missions at the request of my government to the Republic of Niger to look into uranium-related matters.

In each case, I reported back my conclusions faithfully and truthfully.

One mission was to look into assertions that Iraq had purchased or was in the process of purchasing uranium yellow cake from Niger. I found no evidence that there was any truth to the allegation. Moreover, the U.S. ambassador to Niger and a four-star Marine Corps general also looked into the allegation and came to the same conclusion that the claim was bogus.

Weeks before President Bush uttered his now infamous 16 words in the 2003 State of the Union address, the national intelligence officer representing the intelligence community as a whole reported to the administration the allegation was baseless and should not be used.

Regrettably, that counsel was not heeded.

DC01:464027.1

In the months that followed the president's State of the Union address, I privately urged the administration to correct the public record on the falsehood contained therein.

When the administration refused to do so, I exercised my civic duty to hold my government to account for what it had said and done in the name of the American people. I wrote an article in the New York Times entitled, "What I Didn't Find in Africa."

The day following the appearance of the article, the administration spokesman finally admitted that the 16 words did not rise to the level of inclusion in the State of the Union. Subsequently, the director of central intelligence confirmed that the statement should never have been made.

Within weeks, the deputy national security adviser offered his resignation, acknowledging that he had been informed on several occasions that the intelligence community did not want the president to be a witness of fact on an unsubstantiated allegation.

Even as the administration was belatedly coming clean, however, some officials and their allies launched what the special prosecutor has called a concerted effort to use classified information to, quote, "discredit, punish or seek revenge," unquote, against my wife Valerie and myself.

This attack was based on lies and disinformation, and included the compromise of Valerie's identity as a classified officer of the Central Intelligence Agency.

These officials' abuse of power for personal revenge broke faith with their obligations as public servants to uphold and defend the Constitution.

WILSON:

This remains a nation of laws, and no administration official, however powerful, is above the law.

I have confidence in the American system of justice, and this suit is about the pursuit of justice.

To assist us in defraying the costs of this suit, the Joseph and Valerie Wilson Support Trust has been established with a Web site at www.wilsonsupport.org.

We are under no illusions about how tough this fight will be, but we believe the time has come to hold those who use their official positions to exact personal revenge accountable and responsible for their actions.

Thank you.

WOLF:

As I said, I'll take a few questions now.

QUESTION:

Specifically, can you lay out a little bit of your strategy of how you're going to try to prove a tangible conspiracy against the Wilsons in this case?

WOLF:

Actually, I won't. As I said in my prepared remarks, we're going to try our case in court. And so I really can't answer that question.

DC01:464027.1

Other questions?

QUESTION:

In the complaint, you have John Doe's 1 through 10. It's a little vague about who they are, who you think they are or what they did.

Can you explain that a little bit to us?

WOLF:

Sure. It still remains unclear exactly who was involved in the leaking of Mrs. Wilson's identity. Even this week, Robert Novak said there was a third man involved. If it wasn't the vice president, it was someone else in the White House, in the administration or allied with the administration.

In the discovery process, we would hope to find out who that is.

QUESTION:

So are there definitely 10 people, or is that a...

WOLF:

No. That's a typical way of framing the issue of unidentified defendants.

QUESTION:

Presumably, if you are successful here, you'll get some financial compensation. Are there any other goals that you have for this suit?

QUESTION:

I mean, in other words, what do you hope to achieve besides just getting money? Would you get information about the run- up to the war?

WOLF:

Well, certainly, the goals of our lawsuit are spelled out in the complaint. The lawsuit seeks to vindicate the wrongs that were done against the Wilsons. And we have asked for an unspecified amount -- to be determined in the course of the case -- of damages for the Wilsons.

From my perspective as their lawyer, that is the only goal of the lawsuit.

QUESTION:

Can you explain a little more clearly why Bivens case would allow you to sue the vice president?

WOLF:

Actually, I'm going to defer on that one as well. All I can tell you is the complaint was very carefully considered. The research was very carefully done. And we are convinced, as is our counsel in the case, Professor Irwin Temerinsky (ph), that this is a very well-grounded constitutional claim that will ultimately be successful.

QUESTION:

(OFF-MIKE) that you'll try to prove that the safety of the Wilsons and their children will have been compromised. I know the Wilsons don't want to answer questions right now...

WOLF:

   Yes.

QUESTION:

   ... but could you or they say if there have been any specific threats against their lives or the lives of their children?

WOLF:

   I really can't comment on that.

QUESTION:

   Until the support fund gets up and running, who's been paying the bills involved in this suit?

WOLF:

   The support fund is designed to pay the fees that will be incurred in preparing and prosecuting the lawsuit.

QUESTION:

   Do you plan to subpoena any journalists in an attempt to find out who Robert Novak's third source was? And if so, who?

WOLF:

   I really am not going to get into the details of our strategy in the case.

QUESTION:

   I hope I'm not redundant here, but with regard to the Bivens thing, I mean, the analysis I'm hearing is that you've got a steep climb in order to avoid being dismissed. But once you've gotten past that, it looks like you may have a decent shot.

   And what I'm hearing is that the Bivens this is usually used against, you know, officers of the law. Can you give me any kind of something to go on there?

WOLF:

   I really can't. If that issue is litigated, we'll make our position known in the papers in court.

QUESTION:

   And given the fact that your client identity has been revealed, does that mean she is going to give up her position at CIA?

WOLF:

DC01:464027.1

Mrs. Wilson retired from the CIA in January of this year.

Other questions?

QUESTION:

What basis is the (inaudible) claim in the lawsuit? Because over the last three years, Mr. Wilson has written a book, there was a photo shoot in Vanity Fair.

Can you just explain that a little?

WOLF:

Sure. I think it's pretty clear that, prior to the leak and prior to the disclosure in the press of Mrs. Wilson's identity, she worked secretly and privately and with protection of privacy in her job at the CIA.

But for that leak, she would be continuing in that role today. She was literally dragged into the public square by the leak to the media of her classified employment status.

That is a bell that can't be unrung. Or, to put it another way, a genie that can't be put back into the bottle.

Having been outed by the administration, she can't now be criticized for speaking out, nor can her husband, nor than they be criticized, I think, for pursuing this lawsuit to vindicate that invasion of her privacy.

QUESTION:

Do you expect the judge to issue a stay until the criminal trial of Scooter Libby is over?

WOLF:

There's been no motion made. We'll have to wait and see whether a motion for a stay is made and we'll respond.

QUESTION:

Is that happening?

WOLF:

We don't know what will happen. That's the nature of litigation.

QUESTION:

If there is a stay, won't your case interfere with the special prosecutor's case?

WOLF:

We really need to see, if there's a motion for a stay, what the nature of the motion is.

WOLF:

And, obviously, as I indicated in my statement, we will not do anything in this case that will interfere with the ongoing criminal prosecution. But I can't answer that question in advance.

QUESTION:

You said you didn't want to interfere with the special prosecutor's case, but do you see any of the documents, other than what has been collected on the Libby case, as fair game for the discovery process?

WOLF:

Well, certainly anything on the public record, which we've recited at great length in our complaint, we think will form part of the evidentiary basis. But, obviously, we'll have to take our own evidence, our own discovery in the process of the litigation.

Let me take two more questions.

QUESTION:

According to (OFF-MIKE) yesterday, the British government is prosecuting some officials who leaked a memo, I believe, that included a lot of information. Do you think that that precedent by the British government will improve the chances of your successfully prosecuting the leakers here?

WOLF:

I'm not at all familiar with that, so I really can't comment on that.

One more question.

QUESTION:

You said there's a list of 10 people, approximately, that you still want to talk to. Could the president eventually be indicted on that list, as well, with Cheney and Rove?

WOLF:

Well, we don't know who is on that list, and we hope in the process of discovery we'll find out.

Thank you all very much.
CQ Transcriptions, July 14, 2006
List of Speakers

VALERIE PLAME, FORMER CIA OPERATIVE

JOSEPH WILSON, FORMER U.S. AMBASSADOR TO IRAQ

CHRISTOPHER WOLF, PLAME ATTORNEY
Source: CQ Transcriptions