# EXHIBIT F

# YOUR WORLD TODAY

**Najaf Under Curfew After Bombing Near Shrine; Cynthia McKinney Apologizes Before House of Representatives; Pakistan and U.S. in Nuclear Talks**

Aired April 6, 2006 - 12:00 ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

JIM CLANCY, CNN INTERNATIONAL ANCHOR: A car bomb rocks the city of Najaf in southern Iraq. Now the wait to see if the Shia Muslims respond.

HALA GORANI, CNN INTERNATIONAL CORRESPONDENT: The leaders of Ireland and the U.K. try to reenergize a northern Ireland peace process once again disrupted by violence.

(BEGIN VIDEO CLIP)

UNIDENTIFIED FEMALE: It is swifter, higher, stronger.

(END VIDEO CLIP)

CLANCY: As China prepares for the Olympics, many of its people are speaking in tongues.

GORANI: It is 7:00 p.m. in Najaf, Iraq, 5:00 p.m. in Dublin.

I'm Hala Gorani.

CLANCY: I'm Jim Clancy. And this is YOUR WORLD TODAY.

GORANI: And we begin in Iraq, where the city of Najaf is under curfew after a bombing near the holiest Shiite shrine in Islam, as police try to keep anger there from spilling on to the streets.

There is good news on another front in the war against the insurgency.

Aneesh Raman joins us now from Baghdad with details.

Fears, presumably, Aneesh, that this will ignite sectarian tensions further.

ANEESH RAMAN, CNN CORRESPONDENT: Ignite sectarian tensions, Hala, and in doing so ignite fury among Iraq's Shia militias. But this, as you say, a day that saw both a push back against the insurgency as well as that insurgent attack that continues to try to bring Iraq into a civil war.

(BEGIN VIDEOTAPE)

RAMAN (voice over): A major catch. That's how the U.S. military is describing the capture last month of Abu Ayman, the head of an insurgent group with close ties to Abu Musab al-Zarqawi. Abu Ayman is also the principal suspect in the kidnapping of Italian journalist Giuliana Sgrena last year and is thought to be behind some of the deadliest attacks against coalition and Iraqi forces.

With Abu Ayman in custody, the military is now pushing him for new intelligence, hoping, even expecting he'll cooperate

UNIDENTIFIED MALE: There's a lack of specific quality inside the Zarqawi network. And that quality is loyalty. They tend to provide actual intelligence against their network and their leadership.

RAMAN: Intelligence that is desperately needed as the insurgency continues to try and force a civil war.

On Thursday, a car bomb detonated just outside Iraq's holiest Shia shrine in Iraq's holiest Shia city of Najaf. Nearly a dozen people killed, most worshiping at the Imam Ali Shrine. The anger here will undoubtedly spread further to the country's Shia militias, who are, by many accounts, the biggest threat to a stable Iraq.

DC01:464029.1

UNIDENTIFIED MALE: The people of Iraq and the government of Iraq have to get to the point where the only people carrying weapons are the people supposed to be carrying weapons as part of the Iraqi security force.

RAMAN: But with allegiance mixed and Iraqi security forces still not at full strength, Shia militia leaders say scenes like this are why they must protect themselves.

(END VIDEOTAPE)

RAMAN: But Hala, to disband the militias, you need a government. Now, nearly four months after election day, there is no Iraqi government formed, and many are saying that that power vacuum is helping to destabilize this country -- Hala.

GORANI: All right. Aneesh Raman, live in Baghdad -- Jim.

CLANCY: A major story breaking now out of Washington right now. According to court papers that were filed by prosecutors, I. Lewis Libby, Scooter Libby, who was a key man in the office of Vice President Dick Cheney, has alleged that U.S. President George W. Bush was the man who authorized the leaking of the name of a CIA operative and the wife of a former ambassador.

Now, that former CIA operator, Valerie Plame, was unmasked to journalists. There were accusations that this was done deliberately as payback because her husband had leaked -- had not leaked, but had challenged assertions by the Bush administration in the lead-up to the war in Iraq. Those related to efforts by Iraq, allegations that Iraq was trying to obtain nuclear material from Niger, and trying to buy yellow cake uranium from that source.

That was discounted by Valerie Plame's husband, and as a result of that challenge to the Bush administration at that period in time, it was said that her name was leaked out. This has caused a furor on Capitol Hill and among some people in the intelligence community. But at one period in time, President Bush addressed his cabinet and said that they were going to make an effort to find out who might have authorized that or who might have leaked out that information. But he said, you know how these things go on Capitol Hill, I don't know whether we'll ever find who is responsible.

What a turnaround, a stunning turnaround now as we are learning that one of the prosecutors has filed papers in that case saying that I. Lewis Libby, Scooter Libby, of Dick Cheney's office, saying there, alleging that it was the president himself that authorized the leaking of the fact that Valerie Plame was an operative with the CIA.

There are going to be major repercussions from this case. Once again, this is according to The Associated Press, saying that before his indictment, Libby was testifying to the grand jury, and saying that Cheney told him to pass on the information, and that it was Bush who authorized the leak.

Now, that is according to the court papers. There was a conversation between Libby and "The New York Times" reporter Judith Miller in that case, but Miller never reported on it.

It is not clear, then, what the line or trail was of that leak coming out. But, of course, it is against the law to leak out a CIA operative -- is, in fact, that, working for the CIA. That is what has made this case so serious.

But while many people were pointing a finger at senior aides to President Bush, no one had ever asserted that it might have been the president himself that authorized the leak. That is exactly what these papers are saying today.

We are going to be getting you some reaction, of course, from Capitol Hill as this bombshell drops and we assess just what the damage and the reaction is -- Hala.

GORANI: Absolutely following this story.

Now, moving to international news and a deadline in northern Ireland to close the chapter or close the book, the prime ministers of Britain and Ireland have announced a plan to recall northern Ireland's assembly in Belfast on May 15th. British Prime Minister Tony Blair and his Irish counterpart, Bertie Ahern, brokered the 1998 peace accord that called for a power-sharing agreement. Now, the body would have until late November to choose an actual administration led by democratic unionists and Sinn Fein or be dissolved.

(BEGIN VIDEO CLIP)

TONY BLAIR, BRITISH PRIME MINISTER: There can be no room for compromise or ambiguity on the commitment only to exclusively peaceful and democratic means. Political arguments are the only means of persuasion. That was set out clearly in the Belfast speech and remains. On the other hand, there can be no way forward that does not recognize the legitimate aspiration... (END VIDEO CLIP)

DARYN KAGAN, CNN ANCHOR: We're going to the House floor. This is Representative Cynthia McKinney, Democrat of Georgia, on the floor of the House. She's accused of striking an officer after he tried to stop her from entering a House office building back on March 29.

A grand jury is looking into possible criminal charges. McKinney claims this is a racial issue.

Let's listen in.

UNIDENTIFIED MALE: The gentlemen from Iowa is recognized.

UNIDENTIFIED MALE: Mr. Speaker, I ask unanimously consent that all members may have five legislative days in which to revise and extend the remarks on House Resolution 376, which the House is about to consider.

UNIDENTIFIED MALE: Without objection...

KAGAN: Those comments were short. We missed a bit of them. So we're going to re-rack the tape and listen back.

Once again, Representative Cynthia McKinney on the House floor just moments ago.

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: Without objection, she is recognized for one minute.

REP. CYNTHIA MCKINNEY (D), GEORGIA: Thank you, Mr. Speaker.

I come before this body to personally express again my sincere regret about the encounter with the Capitol Hill Police. I appreciate my colleagues who are standing with me who love this institution and who love this country.

There should not have been any physical contact in this incident. I have always supported law enforcement and will be voting for HR756, expressing my gratitude and appreciate to the professionalism and dedication of the men and women of the U.S. Capitol Police.

I am sorry that this misunderstanding happened at all, and I regret its escalation. And I apologize.

Thank you, Mr. Speaker.

UNIDENTIFIED MALE: The gentleman from Iowa is recognized.

(END VIDEO CLIP)

KAGAN: Well, another apology from Cynthia McKinney. Those words sounding closer to the statement that she made right after the incident took place on March 29th, when she said she was sorry for any misunderstanding or confrontation that happened there.

Once again, as we understand it, Cynthia McKinney was trying to go inside of this House office building. She has a different hairstyle, she wasn't wearing her pin. The Capitol Hill Police officer did not recognize her, and what has gone from there has, as she said, escalated.

Let's bring in Jeffrey Toobin here.

Jeffrey, this seems like it's kind of going full circle, because first we heard an apology, then we heard allegations from Cynthia McKinney that this was a racial incident. Now it seems as a grand jury is actually investigating the incident, she's back to apology.

JEFFREY TOOBIN, CNN SR. LEGAL ANALYST: Well, you've got to know when to hold and know when to fold, Daryn. You know, her position has been weak from the beginning, because she's never really said what happened.

DC01:464029.1

In her now famous interview with Soledad O'Brien yesterday, she simply would not say what happened. And the only version of the facts that are out there is that she really behaved inappropriately and perhaps criminally with this police officer.

So, I think she's recognizing the writing on the wall, that contrition, rather than defiance, is the way to try to get out of this trouble. And it's no guarantee that will be good enough.

KAGAN: So there is a grand jury that has subpoenaed two Capitol Hill aides that witnessed the confrontation. How serious possibly in terms of crime, Jeff, are we talking about?

TOOBIN: Oh, it's definitely serious. I mean, this is potentially a felony. It's not a jail felony, but it's certainly potentially a felony.

Hitting a police officer is a serious crime, even if the officer is not injured. So, you know, she's looking at potential felony charges. And that -- that concentrates the mind. And obviously she seems to be investing her legal strategy and political strategy on the fly.

KAGAN: As she goes. All right. Well, we'll be watching to see if the apology did the trick or if any charges come out of this.

Jeff, thanks for being available like that. We appreciate it.

And we'll go ahead and rejoin CNN International in progress.

(JOINED IN PROGRESS)

JIM BOULDEN, CNN INTERNATIONAL CORRESPONDENT: ... in pounds stolen from a bank in Belfast. There's punishment beatings, there's reprisals, and most people think that the murder of Denis Donaldson was a reprisal for his time as a British spy. And these things continue to go on. And both prime ministers said we cannot let people who do this in order to stop the peace process, cannot let them win. We must get the two parties together, put beyond their differences, try to focus on the similarities. And the similarities are that both sides have said that they want a democratic process and that they want local government.

The problem is, they just don't like to sit with each other in government. They've tried it twice before. In the eight years since the Good Friday agreement, we have only had two years of local power- sharing in this -- in this province in northern Ireland.

It's just become so difficult. That's why the two governments have said, look, here's your headline. Get together in mid-May, try to has out an agreement, but we're going to give you a deadline, we're not going to let it go on year in and year out.

CLANCY: All right. Jim Boulden there reporting to us from Belfast in northern Ireland.

And this programming note for international viewers. Coming up here on CNN, Jim interviewed Ireland's prime minister, Bertie Ahern. You can hear interview at 21:00 hours Greenwich Mean Time.

GORANI: Now, prosecutors told the jury in the sentencing trial of Zacarias Moussaoui that it's time for them to "hear the voices" of September 11th victims. Prosecutors are asking the jury to give Moussaoui the death penalty for his part in those attacks. The defense says Moussaoui is delusional and will ask the jury to give him life in prison without possibility of parole.

The first prosecution witness to take the stand was former New York major Rudolph Giuliani.

We will bring you a live report from Washington as soon as the court breaks for lunch. And that's going to happen in the next half hour.

You're with YOUR WORLD TODAY. Stay with us. A lot more ahead after a short break.

(COMMERCIAL BREAK)

CLANCY: Hello, everyone, and welcome back to YOUR WORLD TODAY here on CNN International.

GORANI: Now, we're going to take you to France. The embattled prime minister there says he will press on with the fight over a youth jobs law that has drawn millions of protesters to the streets. But there is growing speculation that the uproar could cause Dominique de Villepin is job.

CLANCY: President Jacques Chirac promising there are going to be changes in that employment measure, compromises, if you will. Government officials are meeting with labor leaders over possible amendments. GORANI: Now, the measure became law on Sunday, but the government has urged employers just not to implement those laws until changes have been made. Trade unions say they are giving the government until April 15th to repeal the law.

Millions of protesters have demonstrated against that jobs legislation over the past two weeks. On Thursday, students blocked a shipment of airplane parts and disrupted traffic at train stations in Paris and northern France.

CLANCY: Now, the labor leaders say that they don't want it modified. They want it pulled entirely. The law at the heart of all of this is aimed on one side, they say, at boosting employment by making it easier for employers to hire and fire young workers. It allows those employers to fire workers under the age of 26 during the first two years o the job without stating a reason.

GORANI: As the uproar grows steadily louder, some observers say the prime minister has been -- is not only at risk of losing his job, but that he's been sidelined by those who have supported him the most up until now.

CLANCY: And have the rug pulled out from under him. Negotiations going on with the interior minister instead of with the prime minister.

Jim Bitterman gives us now a look at the impact of the jobs law controversy on the man, Dominique de Villepin.

(BEGIN VIDEOTAPE)

JIM BITTERMANN, CNN INTERNATIONAL CORRESPONDENT (voice over): Even while their leaders were in talks with the politicians, French students were out on hit-and-run raids, blocking railroad tracks and roads to keep up the pressure on the government. None of the disruption was very serious, but it was a clear reminder that students and unions want the repeal of a controversial employment law by April 17th.

The beleaguered prime minister, Dominique de Villepin, and several members of his cabinet insist they will continue in office and continue the battle to reduce youth unemployment, now running at some 22 percent. De Villepin's approval rating has sunk to 28 percent, but asked if he submitted his resignation to President Jacques Chirac, he put it this way...

DOMINIQUE DE VILLEPIN, FRENCH PRIME MINISTER (through translator): The president has given me a mission, and I will carry out that mission to the very end. All the rest is pure speculation and fantasy.

BITTERMANN: He added it depended on the whole population to ensure that France remains a country of hope and ambition.

The finance minister said that so far the protests have caused no real economic damage, but there's a clear worry about the country's image. An image that the foreign minister told CNN might be misunderstood.

PHILIPPE DOUSTE-BLAZY, FRENCH FOREIGN MINISTER (through translator): Every time there is reform in France, there is political discussion. The French are, by definition, very outspoken and very turbulent. We always have been and will always be. But all of this is unfolding in a good humor way.

BITTERMANN (on camera): The good humor in recent events is perhaps a matter of perspective. But it's difficult to deny they're as serious politically as the government faces mounting and direct questions about its continued existence.

Jim Bittermann, CNN, Paris.

(END VIDEOTAPE)

CLANCY: We're going to take a short break. When we come back, a check of world markets.

GORANI: Higher oil prices send Wall Street lower, as they often do. We'll get a live update.

DC01:464029.1

That and more after this.

(COMMERCIAL BREAK)

CLANCY: Welcome back.

We want to make an important correction to our earlier reporting on those court papers, complicated (INAUDIBLE) that were filed relating to Scooter Libby's testimony to a grand jury. We erroneously reported that the court filing said the president gave permission to leak the name of CIA operative Valerie Plame to reporters. That wasn't the case. In fact, the court filing said the leak concerned sensitive information, intelligence information about Iraq.

Now, for more on this story, let's go up to CNN's David Ensor. He's been covering this leak investigation since the beginning.

And frankly, David, I got it wrong there trying to read this story on short notice and sort it out. What does -- what do the court papers actually say?

DAVID ENSOR, CNN NATIONAL SECURITY CORRESPONDENT: What is actually going on, Jim, is a struggle between the defendant, who is I. Lewis Libby, Scooter Libby, the former chief of staff of the vice president, and the prosecutor over how much information the defense can get declassified to use in the case.

Mr. Libby wants access to PDBs, presidential intelligence documents that he gets every day. He wants access to quite a few of them in order to show something about Mr. Libby's pace of work and so forth and help defend himself against the charge that he may have concealed information about this case from a grand jury.

What -- what the most recent document and the one that we're talking about here is the government's response to the defendant, Mr. Libby's request for an effort to get these documents out. And in it -- and I'm going to quote here -- the government says that "The vice president thought" -- Vice President Cheney -- "thought that it was very important for the key judgments of the NIE" -- and that's the National Intelligence Estimate about Iraq's weapons of mass destruction -- "to come out. The defendant further testified that he had first advised the vice president that he could not have this conversation with reporter Miller" -- that would be Judy Miller of "The New York Times" -- "because of the classified nature of the NIE. The defendant testified that the vice president later advised him that the president had authorized the defendant to discuss the relevant portions of the NIE."

So what's involved here, Jim, is that this document from the government says that the vice president informed Mr. Libby that the president himself had authorized Mr. Libby to leak certain information or give out certain information that came out of this document, this National Intelligence Estimate, on what the intelligence community thought Iraq had in the way of weapons of mass destruction. So, it had nothing to do with Valerie Plame-Wilson's name. It was simply about this matter of intelligence in the lead-up to the war.

And in that matter, the president, according to this document, authorized Mr. Libby to give out some information to Judy Miller. And by the way, he is legally entitled to do so.

If the president decides to declassify information, he has that legal right. So, it's not about a law being broken here, and it's not about Valerie Plame-Wilson's name. But it does show us the first evidence that the president himself wanted some of this information put out in the media.

CLANCY: Well, at the time, if you go back to that period in time, there was a clamor from not only the media, but from a lot of Americans that wanted more information, more details about what were, up to that point, rather vague statements at times by diplomats trying to assess just what was the threat there. So this was seen -- would this be normal business in Washington, really?

ENSOR: I'm afraid so, yes. And, you know, after all, the -- Ambassador Wilson -- Ambassador Wilson being Valerie Plame-Wilson's husband -- had put out a piece in which he said -- in which he attacked the administration for suggesting Iraq was going after uranium in Africa. The administration wanted to highlight certain parts of this until then classified document that suggested that Iraq was aggressively pursuing some aspects of a nuclear weapons program, was looking for ways of getting uranium.

And so, they wanted to have that evidence out there to help their care in the run-up to war. Selective leaking authorized at the highest level, that's -- I'm afraid that is business as usual in Washington. It's been practiced by Republicans and Democrats alike.

DC01:464029.1

CLANCY: All right. David Ensor, can't thank you enough. I'm glad you straightened all of that out. A rather complicated way that you have to understand what is going on and what is being said precisely in the grand jury.

David, as always, thank you very much.

And a final apology to you. We had been obviously erroneous earlier and we do apologize for that -- Hala.

All right. We're going to take a break somebody told me. So let's do it.

(COMMERCIAL BREAK)

DC01:464029.1

# EXHIBIT G

## washingtonpost.com

# Testimony Adds New Element to Probe of CIA Leak

By Michael A. Fletcher
Washington Post Staff Writer
Friday, April 7, 2006; A09

The allegation that President Bush authorized the dissemination of secret intelligence as part of an effort to buttress his case for war with Iraq introduces a new dimension to the long-running CIA leak investigation, while posing troubling new political problems for the administration.

Until now, the investigation had been about aides to Bush and their alleged efforts to attack the credibility of a vocal administration critic, including by possibly leaking classified information. Bush cast himself as a disinterested observer, eager to resolve the case and hold those responsible accountable.

But court papers filed late Wednesday night by Special Counsel Patrick J. Fitzgerald, in the perjury case of former White House official I. Lewis "Scooter" Libby, implicate Bush as knowing about efforts to disseminate sensitive information -- and also as orchestrating them.

Although Fitzgerald specifically said Bush was not aware of the leaking of a CIA agent's affiliation, the allegation that the president was involved at all in a leak campaign unleashed a torrent of criticism from Democrats.

"The buck doesn't stop anywhere with this White House. Now we know why the president hasn't been straight with Americans," said Sen. John F. Kerry (D-Mass.). "Two and a half years ago, President Bush said. 'If there is a leak out of my administration, I want to know who it is.' He said he'd fire whoever leaked classified information, and now we know the president himself authorized it. Now we know that the president's search for the leaker needs to go no further than a mirror."

The White House refused to comment directly on the court filing, except to point out that Bush's very decision to disclose classified information means he declassified it -- an assessment shared by independent legal experts.


Advertisement

There's a light at the end of the tunnel.

TROY

A future of opportunities.

877-TROY-NDC
troy.edu

A senior administration official, speaking on background because White House policy prohibits comment on an active investigation, said Bush sees a distinction between leaks and what he is alleged to have done. The official said Bush authorized the release of the classified information to assure the public of his rationale for war as it was coming under increasing scrutiny.

Also, the official said, the president has not been accused of authorizing the release of the name of Valerie Plame, the undercover CIA operative whose unmasking in a July 2003 newspaper column prompted the federal investigation.

"There is a clear difference between the two," the official said. "I understand that in politics these two can be conflated. And we're going to have to try to deal with that. But there is an active investigation and that limits our ability to do so."

Still, Bush's action stands in stark contrast to his condemnations of the kind of disclosure that the court filing said he authorized. "Let me just say something about leaks in Washington," Bush told reporters in September 2003. "There are too many leaks of classified information in Washington. There's leaks at the executive branch, there's leaks in the

Case 1:05-cr-00394-RBW    Document 246-5    Filed 01/16/2007    Page 11 of 36

legislative branch, there's just too many leaks. I want -- and if there's a leak out of the administration, I want to know who it is. And if a person has violated law, the person will be taken care of."

That statement was one of many Bush has made over the past three years condemning leaks of sensitive information. His strong words may make the distinction between leaks of classified data and what he is alleged to have done difficult for the White House to explain.

"It causes a political problem to the extent the White House lets it," said a former administration official, who spoke on the condition of anonymity because of the sensitive nature of the case.

The former official said Bush erred at the beginning of the scandal by saying he wanted to get to the bottom of the case and fire any leakers because he implicitly accepted that an illegal leak had occurred. That set the impression that anyone involved must have done something wrong. Now the documents suggest he was involved, and it is hard to argue that nothing wrong was done, the former official said.

Congressional Democrats certainly seized upon that vulnerability.

"I served for 13 years on the House intelligence committee, and I know intelligence must never be classified or declassified for political purposes," said House Minority Leader Nancy Pelosi (D-Calif.). "One of the constants in the Bush administration's miserable record on Iraq has been the manipulation of intelligence precisely for political purposes. That has caused our intelligence -- which used to be accepted without question around the world -- to be viewed with skepticism by the international community."

Sen. Charles E. Schumer (D-N.Y.) said the disclosure punctures the president's credibility.

"The president has always stood so strong against leaks. If he leaked himself, he should explain why this is different than every other leak," he said. ". . . The more we hear, the more it is clear this goes beyond Scooter Libby. At the very least, President Bush and Vice President Cheney should fully inform the American people of any role in allowing classified information to be leaked. Did they believe they had the right to do this and if so, in what circumstance?"

*Staff writer Peter Baker, washingtonpost.com staff writer Chris Cillizza and research editor Lucy Shackelford contributed to this report.*

© 2006 The Washington Post Company

Ads by Google

**Stop Genocide in Darfur**
Take Action Today and Demand UN Peace Keepers in Darfur
www.savedarfur.org

# EXHIBIT H

# washingtonpost.com

## A 'Concerted Effort' to Discredit Bush Critic
### Prosecutor Describes Cheney, Libby as Key Voices Pitching Iraq-Niger Story

By Barton Gellman and Dafna Linzer
Washington Post Staff Writers
Sunday, April 9, 2006; A01

Advertisement



As he drew back the curtain this week on the evidence against Vice President Cheney's former top aide, Special Counsel Patrick J. Fitzgerald for the first time described a "concerted action" by "multiple people in the White House" -- using classified information -- to "discredit, punish or seek revenge against" a critic of President Bush's war in Iraq.

Bluntly and repeatedly, Fitzgerald placed Cheney at the center of that campaign. Citing grand jury testimony from the vice president's former chief of staff, I. Lewis "Scooter" Libby, Fitzgerald fingered Cheney as the first to voice a line of attack that at least three White House officials would soon deploy against former ambassador Joseph C. Wilson IV.

Cheney, in a conversation with Libby in early July 2003, was said to describe Wilson's CIA-sponsored trip to Niger the previous year -- in which the envoy found no support for charges that Iraq tried to buy uranium there -- as "a junket set up by Mr. Wilson's wife," CIA case officer Valerie Plame.

Libby is charged with perjury and obstruction of justice for denying under oath that he disclosed Plame's CIA employment to journalists. There is no public evidence to suggest Libby made any such disclosure with Cheney's knowledge. But according to Libby's grand jury testimony, described for the first time in legal papers filed this week, Cheney "specifically directed" Libby in late June or early July 2003 to pass information to reporters from two classified CIA documents: an October 2002 National Intelligence Estimate and a March 2002 summary of Wilson's visit to Niger.

One striking feature of that decision -- unremarked until now, in part because Fitzgerald did not mention it -- is that the evidence Cheney and Libby selected to share with reporters had been disproved months before.

United Nations inspectors had exposed the main evidence for the uranium charge as crude forgeries in March 2003, but the Bush administration and British Prime Minister Tony Blair maintained they had additional, secret evidence they could not disclose. In June, a British parliamentary inquiry concluded otherwise, delivering a scathing critique of Blair's role in promoting the story. With no ally left, the White House debated whether to abandon the uranium claim and became embroiled in bitter finger-pointing about whom to fault for the error. A legal brief filed for Libby last month said that "certain officials at the CIA, the White House, and the State Department each sought to avoid or assign blame for intelligence failures relating to Iraq's weapons of mass destruction."

It was at that moment that Libby, allegedly at Cheney's direction, sought out at least three reporters to bolster the discredited uranium allegation. Libby made careful selections of language from the 2002 estimate, quoting a passage that said Iraq was "vigorously trying to procure uranium" in Africa.

The first of those conversations, according to the evidence made known thus far, came when Libby met with Bob Woodward, an assistant managing editor of The Washington Post, on June 27, 2003. In sworn testimony for Fitzgerald, according to a statement Woodward released on Nov. 14, 2005, Woodward said Libby told him of the

A 'Concerted Effort' to Discredit Bush Critic

intelligence estimate's description of Iraqi efforts to obtain "yellowcake," a processed form of natural uranium ore, in Africa. In an interview Friday, Woodward said his notes showed that Libby described those efforts as "vigorous."

Libby's next known meeting with a reporter, according to Fitzgerald's legal filing, was with Judith Miller, then of the New York Times, on July 8, 2003. He spoke again to Miller, and to Time magazine's Matt Cooper, on July 12.

At Cheney's instruction, Libby testified, he told Miller that the uranium story was a "key judgment" of the intelligence estimate, a term of art indicating there was consensus on a question of central importance.

In fact, the alleged effort to buy uranium was not among the estimate's key judgments, which were identified by a headline and bold type and set out in bullet form in the first five pages of the 96-page document.

Unknown to the reporters, the uranium claim lay deeper inside the estimate, where it said a fresh supply of uranium ore would "shorten the time Baghdad needs to produce nuclear weapons." But it also said U.S. intelligence did not know the status of Iraq's procurement efforts, "cannot confirm" any success and had "inconclusive" evidence about Iraq's domestic uranium operations.

Iraq's alleged uranium shopping had been strongly disputed in the intelligence community from the start. In a closed Senate hearing in late September 2002, shortly before the October NIE was completed, then-director of central intelligence George J. Tenet and his top weapons analyst, Robert Walpole, expressed strong doubts about the uranium story, which had recently been unveiled publicly by the British government. The State Department's Bureau of Intelligence and Research, likewise, called the claim "highly dubious." For those reasons, the uranium story was relegated to a brief inside passage in the October estimate.

But the White House Iraq Group, formed in August 2002 to foster "public education" about Iraq's "grave and gathering danger" to the United States, repeatedly pitched the uranium story. The alleged procurement was a minor issue for most U.S. analysts -- the hard part for Iraq would be enriching uranium, not obtaining the ore, and Niger's controlled market made it an unlikely seller -- but the Niger story proved irresistible to speechwriters. Most nuclear arguments were highly technical, but the public could easily grasp the link between uranium and a bomb.

Tenet interceded to keep the claim out of a speech Bush gave in Cincinnati on Oct. 7, 2002, but by Dec. 19 it reappeared in a State Department "fact sheet." After that, the Pentagon asked for an authoritative judgment from the National Intelligence Council, the senior coordinating body for the 15 agencies that then constituted the U.S. intelligence community. Did Iraq and Niger discuss a uranium sale, or not? If they had, the Pentagon would need to reconsider its ties with Niger.

The council's reply, drafted in a January 2003 memo by the national intelligence officer for Africa, was unequivocal: The Niger story was baseless and should be laid to rest. Four U.S. officials with firsthand knowledge said in interviews that the memo, which has not been reported before, arrived at the White House as Bush and his highest-ranking advisers made the uranium story a centerpiece of their case for the rapidly approaching war against Iraq.

Bush put his prestige behind the uranium story in his Jan. 28, 2003, State of the Union address. Less than two months later, the International Atomic Energy Agency exposed the principal U.S. evidence as bogus. A Bush-appointed commission later concluded that the evidence, a set of contracts and correspondence sold by an Italian informant, was "transparently forged."

On the ground in Iraq, meanwhile, the hunt for weapons of mass destruction was producing no results, and as the bad news converged on the White House -- weeks after a banner behind Bush declared "Mission Accomplished" on the deck of the USS Abraham Lincoln -- Wilson emerged as a key critic. He focused his ire on Cheney, who had made the administration's earliest and strongest claims about Iraq's alleged nuclear program.

Fitzgerald wrote that Cheney and his aides saw Wilson as a threat to "the credibility of the Vice President (and the President) on a matter of signal importance: the rationale for the war in Iraq." They decided to respond by implying

that Wilson got his CIA assignment by "nepotism."

They were not alone. Fitzgerald reported for the first time this week that "multiple officials in the White House"-- not only Libby and White House Deputy Chief of Staff Karl Rove, who have previously been identified -- discussed Plame's CIA employment with reporters before and after publication of her name on July 14, 2003, in a column by Robert D. Novak. Fitzgerald said the grand jury has collected so much testimony and so many documents that "it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' Wilson."

At the same time, top officials such as then-deputy national security adviser Stephen J. Hadley were pressing the CIA to declassify more documents in hopes of defending the president's use of the uranium claim in his State of the Union speech. It was a losing battle. A "senior Bush administration official," speaking on the condition of anonymity as the president departed for Africa on July 7, 2003, told The Post that "the reference to Iraq's attempt to acquire uranium from Africa should not have been included in the State of the Union speech." The comment appeared on the front page of the July 8 paper, the same morning that Libby met Miller at the St. Regis hotel.

Libby was still defending the uranium claim as the administration's internal battle burst into the open. White House officials tried to blame Tenet for the debacle, but Tenet made public his intervention to keep uranium out of Bush's speech a few months earlier. Hadley then acknowledged that he had known of Tenet's objections but forgot them as the State of the Union approached.

Hoping to lay the controversy to rest, Hadley claimed responsibility for the Niger remarks.

In a speech two days later, at the American Enterprise Institute, Cheney defended the war by saying that no responsible leader could ignore the evidence in the NIE. Before a roomful of conservative policymakers, Cheney listed four of the "key judgments" on Iraq's alleged weapons capabilities but made no mention of Niger or uranium.

On July 30, 2003, two senior intelligence officials said in an interview that Niger was never an important part of the CIA's analysis, and that the language of Iraq's vigorous pursuit of uranium came verbatim from a Defense Intelligence Agency report that had caught the vice president's attention. The same day, the CIA referred the Plame leak to the Justice Department for criminal prosecution, the fateful step that would eventually lead to Libby's indictment.

*Researcher Julie Tate contributed to this report.*

© 2006 The Washington Post Company

Ads by Google

**Military Clearance Jobs**
Search jobs for reservists, retired veterans & former military.
www.ClearanceJobs.com

**Military Transition**
Getting out of the service? Make sure you're covered. Apply online.
www.asmba.com

**Veteran Loans**
Veteran Loans: Accept 100% Veteran Loans: Base 5.25%
www.securedloanfreedom.com

# EXHIBIT I

**MSNBC.com**

**Newsweek**

# Leaker in Chief? Scooter Libby and George Bush

Is he a CEO who stays above the fray? Or did he give the go-ahead to strike back at critics over prewar intel? A presidential mystery.
By Michael Isikoff and Evan Thomas
**Newsweek**

April 17, 2006 issue - George W. Bush likes to be seen as a man who dwells above the pettiness of political warfare. He has said he doesn't read the newspapers and shrugs off media criticism as carping of the chattering classes. Especially since 9/11, he has said that he looks to a higher power for guidance. He once threatened to stop sharing information with Capitol Hill if lawmakers didn't put a stop to leaking. "There are too many leaks of classified information," he told reporters in September 2003, "and if there is a leak out of my administration, I want to know who it is."

Last week a video clip of Bush making that statement became cable-TV wallpaper.

Bush, it appeared, was not above the old leaking game after all. The president who, as a younger man, once played the role of loyalty enforcer in his father's White House had not forgotten how to play hardball. According to a filing from the prosecutor in the Valerie Plame leak investigation, Lewis (Scooter) Libby, who has been indicted for lying in the case, told a grand jury that President Bush specifically authorized him to leak from an intelligence document on WMD in Iraq. The leak, according to Libby's testimony, was intended to rebut the allegations of an administration critic, former ambassador Joseph Wilson, who was disputing administration claims that Saddam Hussein's Iraq had been trying to buy uranium from the African country of Niger.

Democrats jumped on the news, calling Bush a hypocrite. Republicans on Capitol Hill worried that the attacks on Bush's integrity would further sink his poll ratings and hurt the GOP in November. "Leaker in chief is something that could stick," said a senior GOP aide, who declined to be named for fear of angering the president. The White House has not denied the central thrust of Libby's claim. But by late last weekend, the White House was scrambling to distance Bush from the leak, putting out the word that the president had not been involved in tactical decisions—like who should leak, or picking which reporter to leak to. The White House may just be spinning—or the reaction could portend a rift between Bush and Vice President Dick Cheney, who seemed to be giving Libby his marching orders.

Legally, Bush did nothing wrong. The president can declassify a document any time he wants. Indeed, a sanitized version of the document in question—a National Intelligence Estimate compiled by the CIA and other agencies—was formally declassified and made public only 10 days after some of its contents were leaked by Libby to New York Times reporter Judith Miller in July 2003. But the administration was unquestionably playing games with reporters, whether or not the president was directly involved.

For instance, on July 11, seven days before key portions of the NIE were released, reporters badgered the then national-security adviser Condoleezza Rice to allow them to see some of the NIE, which had been used by the administration to make the case for war with Congress. "We don't want to try to get into kind of selective declassification," said Rice, though she added, "We're looking at what can be made available."

What Rice did not say was that just a few days before, Libby, who was Cheney's chief of staff and national-security adviser, had been doing some highly selective leaking to Miller over breakfast at the St. Regis Hotel in Washington. (A spokesman for Rice said she had no comment because of the ongoing investigation.) Miller later wrote in The New York Times that Libby appeared "agitated" about an article Ambassador Wilson had published two days earlier on the Times's op-ed page. Wilson had disputed one of the more sensational claims made in Bush's State of the Union address in January—that Iraq was seeking yellowcake uranium from Africa for its nuclear-weapons program. Wilson wrote that, as a former diplomat with African experience, he had been asked by the CIA to travel to Niger to check out the claim, and found no evidence to support it.

At his meeting with Miller, Libby asked to be identified only as a "former Hill staffer"—a position he had not held for several years. Libby proceeded to rip into Wilson as a minor figure whose report about African uranium had never been seen by the White House. He went on to tell Miller that a highly classified National Intelligence Estimate had "firmly concluded that Iraq was seeking uranium." He also made a passing reference to Wilson's wife, who was working at the time on WMD at the CIA. At one point, wrote Miller in her notes (later subpoenaed by the prosecutor in the leak investigation), Libby seemed to be "reading from a piece of paper he pulled from his pocket."

Leaker in Chief? Scooter Libby and George Bush - Newsweek Politics - MSNBC.com                    Page 2 of 2

It is not clear how much Libby might have been freelancing and how much he was working under orders. According to the filing by the prosecutor, Libby told the grand jury that he had been authorized by Cheney to disclose the "key judgments" of the NIE. Libby further testified that Cheney told him he had "consulted" with Bush. A lawyer familiar with the investigation, who asked not to be identified because of the sensitivity of the matter, told NEWSWEEK that the "president declassified the information and authorized and directed the vice president to get it out." But Bush "didn't get into how it would be done. He was not involved in selecting Scooter Libby or Judy Miller." Bush made the decision to put out the NIE material in late June, when the press was beginning to raise questions about the WMD but before Wilson published his op-ed piece. (Bush once harrumphed that he would fire whoever had outed Plame. No one is accusing Bush of leaking Plame's name, but he started the ball rolling that ended up with her exposure.)

Judging from Miller's account of her breakfast with Libby, the vice president's man went well beyond the "key judgments" of the NIE. The reference that Saddam was prospecting in Africa for uranium was inserted in the NIE's back pages, along with a dissent from intelligence analysts at the State Department who were "highly dubious" about the report. A former U.S. intelligence official who declined to speak for the record due to the sensitivity of the matter told news-week that the NIE staff, writing under strict time pressures, adopted a "kitchen sink" approach, throwing in all sorts of reports that had not been fully vetted.

The dissenting opinions were included in the declassified NIE released to the press on July 18, 2003. But Libby said nothing about them to Miller when he was leaking to her on July 8. Cheney's role in this operation remains murky, as does the precise role played by Bush (both men were questioned by the prosecutor, Patrick Fitzgerald—Bush at the White House, Cheney at an unknown location—but not under oath). The filing by Fitzgerald ties Cheney more directly to Libby's leak than any evidence so far. It says Libby testified that after Wilson's op-ed appeared on July 6, Cheney questioned whether Wilson's trip to Africa was legitimate, or "whether it was a junket set up by Mr. Wilson's wife," Valerie Plame, a CIA operative then working in the agency's counterproliferation division of the directorate of operations.

Libby has been charged with lying to a grand jury and to the Feds about when and from whom he learned Plame's identity. The theory was that Libby was trying to intimidate or get back at Wilson by exposing his wife's undercover role. Libby has argued all along that he was so preoccupied with important national-security matters, he barely noticed that Wilson's wife was involved, and later forgot that he had mentioned anything about her to reporters when he was questioned by investigators in the leak probe. To defend himself, Libby may now want to call both Cheney and Bush as witnesses at his trial. That is not likely to endear him to the president—the one man who has the power not only to declassify secrets but also to pardon convicted felons.

URL: http://www.msnbc.msn.com/id/12228726/site/newsweek/

---

© 2007 MSNBC.com

# EXHIBIT J

# washingtonpost.com

# Libby Wasn't Ordered to Leak Name, Papers Say

By R. Jeffrey Smith
Washington Post Staff Writer
Thursday, April 13, 2006; A07


Advertisement

UNIVERSITY OF
MARYLAND

ROBERT H. SMITH
SCHOOL OF BUSINESS

Leaders for the Digital Economy

exceptional
» reputation
» faculty
» convenience

Ranked #1 in
the region

In grand jury testimony two years ago, former White House aide I. Lewis "Scooter" Libby did not assert that President Bush or Vice President Cheney instructed him to disclose the name of CIA officer Valerie Plame to reporters as part of an effort to rebut criticism of the Iraq war, Libby's lawyers said in a court filing late yesterday.

A court filing last week by the special federal prosecutor investigating the disclosure of Plame's identity had highlighted the fact that Bush and Cheney ordered Libby to disclose details of a previously classified intelligence report as part of an effort to rebut criticism by her husband, Joseph C. Wilson IV. This disclosure provoked speculation that Bush or Cheney had instructed Libby to disclose Plame's identity.

But the lawyers asserted that White House documents outlining what Libby was to say in conversations with reporters did not mention Plame's name. They said this supports Libby's contention that he did not participate in a campaign to damage Wilson by disclosing Plame's CIA employment or in a coverup of the episode.

The statement that Libby did not link Bush and Cheney to the disclosure of Plame's name during his 2004 grand jury testimony is meant to bolster Libby's contention that no conspiracy existed to make selective disclosures to undermine a key administration critic, as some in Washington have charged.

Libby, Cheney's former chief of staff, was indicted last year for allegedly lying to the FBI and a grand jury when he said he had not known, that the CIA employed Plame and had not told reporters that. Wilson had traveled to Niger at the CIA's behest to look into allegations that Iraq was trying to obtain nuclear weapons materials there.

After Wilson's return, he wrote a newspaper article in July 2003 disputing those claims and accusing the administration of twisting intelligence "to exaggerate the Iraqi threat."

The article set off an intense effort by the Bush administration to rebut the criticism by documenting its anxieties about Iraqi intentions, partly by leaking -- at the instruction of Bush and Cheney -- details from a classified, October 2002 intelligence estimate about Iraq.

Libby was a key player in the effort, and met privately with a few reporters who later were subpoenaed by Special Counsel Patrick J. Fitzgerald, who was assigned in December 2003 with finding out who leaked Plame's name. Several of the reporters told Fitzgerald that Libby not only discussed the intelligence estimate but also mentioned Plame's employment.

According to the indictment, Libby told several reporters that Wilson's trip was requested by Plame. Fitzgerald, in his court filing last week, said the motive for leaking this information was to undermine Wilson's credibility by making it seem as if he "received the assignment [to visit Niger] on account of nepotism."

Libby's court filing yesterday was the latest salvo in his battle to gain access to a wide range of information held by the administration and by government investigators about Wilson's trip to Niger, and about other officials' statements to reporters regarding Wilson and Plame.

Libby has said he needs these documents partly to prepare for expected testimony at his trial by current and former senior administration officials, who Libby says were also aware of Plame's employment. Yesterday's filing also noted Libby's suspicion that one of those, former CIA director George J. Tenet -- who directed the agency when it lodged a formal complaint to the Justice Department over the leak of Plame's name -- had a "bias against Mr. Libby." The suspicion appears to stem in part from past disagreements between the CIA and Cheney's office over the credibility of the White House's alarm about Iraq.

Libby has said the documents will show that Plame's employment was a peripheral matter in his conversations with others, and that thus he had good reason to forget precisely what he said to reporters about it. "He testified to the grand jury unequivocally that he did not understand Ms. Wilson's employment by the CIA to be classified information," the new court filing states.

Libby's legal team complained that he had received less than 10 percent of Fitzgerald's investigative file, a document production it called "exceptionally meager." It also said the case is complex and described as "a fairy tale" the government's assertion that it involves only false statements by Libby.

In his April 5 filing, Fitzgerald urged the court to dismiss Libby's demand for information about leaks to reporters by other government officials, on the grounds that what really counts in the case against Libby are the actions taken by him and "the discrete number of persons with and for whom he worked." Anything occurring outside those White House offices, Fitzgerald said, is "a irrelevant distraction from the issues of the case."

Although he pointedly said he was not accusing Libby of involvement in a White House conspiracy against Wilson and Plame, Fitzgerald said the evidence he had accumulated demonstrated that "multiple people" there wanted to repudiate Wilson's criticisms.

In light of the grand jury testimony, Fitzgerald said, "it is hard to conceive of what evidence there could be that would disprove the existence of White House efforts to 'punish' Wilson."

© 2006 The Washington Post Company

Libby Wasn't Ordered to Leak Name, Papers Say

Ads by Google

**Free HP Photo Calendars**
Starring Your Photos, Made Easy Brilliantly Simple. Learn More
www.hp.com

# EXHIBIT K

ADVERTISEMENT



ADVERTISEMENT

**News Features**

Jan. 13, 2007

**National Journal Group**
Learn more about our publications and sign up for a free trial.

**E-Mail Alerts**
Get notified the moment your favorite features are updated.

**Need A Reprint?**
Click here for details on reprints, permissions and back issues.

**Advertise With Us**
Details on advertising with National Journal Group -- both online and in print -- can be found in our online media kit.

**Go Wireless**
Get daily political updates on your handheld computer.

GOVEXEC.COM

**ONLINE EXCLUSIVE**
## CIA Leak Probe: Inside The Grand Jury

By Murray Waas, *National Journal*
© National Journal Group Inc.
Friday, Jan. 12, 2007

Late in the morning of July 12, 2003, Vice President **Dick Cheney** stood atop a pier at Naval Station Norfolk in Virginia awaiting the commissioning of the nuclear-powered aircraft carrier USS Ronald Reagan, a ship 20 stories high that took eight years to construct. More than 15,000 people stood under clear skies to watch the pomp and ceremony. As she christened the carrier by breaking a bottle of champagne over its bow, **Nancy Reagan** told the crowd: "I only have one line. Man the ship and bring her alive."

A *Washington Post* reporter recounted what happened next: "With those time-hallowed words, hundreds of crew members wearing dress whites ran aboard the 20-story Reagan and lined the flight deck while four fighter jets flew overhead and every crane, radar, whistle, and alarm aboard was turned on simultaneously."

Cheney himself later took the podium, and as he spoke, the spirit of the crowd turned somber: "The Ronald Reagan sets sail in a world with new dangers," he said, "The outcome is certain. There will be victory for the United States."

The moment of triumph would prove to be illusory. Americans had no idea that the war in Iraq, then not even four months old, would take a turn for the worse, that more than 3,000 American servicemen would die in the line of duty; that "liberated" Iraq would spiral down into sectarian violence; and that the war would not only divide the Iraqi nation but the American one as well.

On the flight back to Washington, Cheney huddled with two of his top aides -- I. Lewis "Scooter" Libby, his then-chief of staff, and **Catherine Martin**, then assistant to the vice president for pubic affairs. According to federal court records, the three discussed how to counter and discredit the allegations made by a former U.S. ambassador, **Joseph C. Wilson IV**, that the Bush administration had manipulated and distorted intelligence information to make the case to go to war with Iraq.

Ad Spotlight
Almanac
Buzz Columns
Campaigns
Daybook
Earlybird
Markup Reports
News Features
Poll Track



Search


On January 16, Libby will go on trial in the federal courthouse in Washington D.C. on five counts of lying to federal investigators, perjury, and obstruction of justice. He is accused of attempting to conceal his role, and possibly that of others, in leaking to the media that Wilson's wife, **Valerie Plame**, was a CIA officer, and that she might have played a role in sending her husband on a CIA-sponsored mission to Niger in 2002 to determine whether **Saddam Hussein** had attempted to procure uranium from Niger to build a nuclear weapon.

In attempting to determine Libby's motives for allegedly lying to the FBI and a federal grand jury about his leaking of Plame's CIA identity to journalists, federal investigators theorized from the very earliest stages of the case that Libby may have been trying to hide Cheney's own role in encouraging Libby to discredit Wilson, according to attorneys involved in the case.

Cheney is scheduled to be a defense witness in the Libby trial. Regarding this, a spokesperson for the Vice President says: "We've cooperated fully in this matter and will continue to do so in fairness to the parties involved."

Both Cheney and Libby have repeatedly denied -- both publicly and to federal investigators -- that Cheney ever encouraged Libby specifically to leak information to the press about Plame. But since the early days of the leak probe in fall 2003, even before it was taken over by Special Prosecutor **Patrick Fitzgerald**, investigators have maintained that Libby devised an elaborate cover story even though he must have known that contemporaneous records and the testimony of others was very likely to show that he was lying. Other than the motive to protect himself, the only other driving force behind Libby's actions, federal investigators have theorized, was to protect Cheney or other superiors, according to attorneys who have been involved in the CIA leak probe.

On July 6, six days before Cheney's trip to Norfolk, Wilson had charged in an op-ed piece in The *New York Times* that during a March 2002 CIA-sponsored trip to Niger he found no evidence to substantiate Bush administration claims that Saddam had attempted to purchase uranium from that African country. Despite Wilson's report, and other warnings to administration officials that the Niger information might have been untrue, it was cited in **President Bush**'s 2003 State of the Union speech as evidence of an Iraqi program to build an atomic weapon, a major argument in the case to go to war.

Cheney was incensed as Wilson's allegations gained public currency in the days following the op-ed, his top aides would recall later.

The vice president had apparently first learned in June 2003, according to the indictment, that Wilson's wife was a CIA officer, and that she might have been responsible for her husband being sent to Niger. He scribbled in the margins of Wilson's *New York Times* op-ed: "Have they done this sort of thing before? Send an Amb. [sic] to answer a question? Do we ordinarily send people out pro bono to work for us? Or did his wife send him on a junket?"

During testimony before the federal grand jury in the CIA leak case, a federal prosecutor approached Libby with a copy of the marked-up column and asked if he recalled the Vice President expressly raising the same issues with him. A small amount of grand jury testimony has been made public in court filings by the special prosecutor. Additional accounts of what occurred in the grand jury were provided by sources with first-hand knowledge of the testimony.

"Do you recall ever discussing those issues with Vice President Cheney?"

"Yes, sir."

"And tell us what you recall about those conversations," the prosecutor pressed Libby.

"I recall that along the way he asked, 'Is this normal for them to just send somebody out like this uncompensated, as it says?' He was interested in how did that person come to be selected for this mission. And at some point, his wife worked at the Agency, you know, that was part of the question."

The extraordinary amount of time and energy that Cheney personally devoted to the issue, as well as his intensity of emotion regarding it is underscored by this exchange between a federal prosecutor and Libby when Libby testified before the grand jury:

"Was it a topic that was discussed on a daily basis?" a federal prosecutor asked.

"Yes, sir," answered Libby.

"And it was discussed on multiple occasions each day in fact?"

"Yes, sir."

"And during that time did the vice president indicate that he was upset that this article was out there which falsely in his view attacked his own credibility?"

"Yes, sir."

"And do you recall what it is the vice-president said?"

"I recall that he was very keen to get the truth out. He wanted to get all the facts out about what he [Cheney] had or hadn't done—what the facts were or were not. He was very keen on that and said it repeatedly. 'Let's get everything out.'"

On the plane ride back to Washington from Norfolk on July 12, Cheney strategized once again with Libby and Martin as to how to discredit Wilson's allegations, according to people familiar with the federal grand jury testimony of both Libby and Martin.

Cheney, then-Deputy National Security Adviser **Stephen Hadley**, White House counselor **Dan Bartlett**, and Libby had over the course of the previous several days taken to reviewing classified records to reconstruct what occurred regarding Wilson's mission and to see what if anything in them might undercut his credibility. Working with then CIA-director **George Tenet**, they undertook a formal declassification process that would enable them to make public intelligence records that they thought would help them make the case.

"We were trying to figure out what happened and get the story out," said a senior official, involved in the process, "There was nothing nefarious as to what occurred."

But the same official confirmed in an interview what has also been said in federal grand jury testimony and public court filings: that Cheney and Libby often acted without the knowledge or approval and of other senior White House staff when it came to their efforts to discredit Wilson -- including leaking classified information to the press.

Aboard Air Force Two, Cheney, Libby, and Martin discussed a then-still highly classified CIA document that they believed had information in it that would undercut Wilson's credibility. The document was a March 8, 2002 debriefing of Wilson by the CIA's Directorate of Operations after his trip to Niger. The report did not name Wilson or even describe him as a former U.S. ambassador who had served time in the region, but rather as a "contact with excellent access who does not have an established reporting record." The report made no mention of the fact that his wife was Valerie Plame, or that she may have played a role in having her husband sent to Niger.

Cheney told Libby that he wanted him to leak the report to the press, according to people with first-hand knowledge of federal grand jury testimony in the CIA leak case, and federal court records.

Cheney believed that this particular CIA debriefing report might undermine Wilson's claims because it showed that Wilson's Niger probe was far more inconclusive on the issues as to whether Saddam attempted to buy uranium from Niger. The report said that Wilson was restricted from interviewing any number of officials in Niger during the mission, and he was denied some intelligence information before undertaking the trip.

But other senior White House aides -- including Hadley and Bartlett -- later told federal investigators that they were unaware that Cheney had authorized the disclosure of the CIA report on Wilson's Niger mission.

According to a court filing by the special prosecutor, Patrick Fitzgerald, Libby also testified to the federal grand jury "that on July 12, 2003, he was specifically directed by the Vice President to speak to the press in the place of Cathie Martin (then the communications person for the Vice President) regarding the National Intelligence Estimate [on Iraq] and Wilson. [Libby] was instructed... to [also] provide information contained in a document [he] understood to be the cable authored by Mr. Wilson."

Four other people -- including a senior White House official involving in the effort to declassify Wilson's debriefing, a former senior CIA official, and two private attorneys involved in the CIA leak case -- had previously told *National Journal* the document in question was not a cable regarding the trip but rather the March 8, 2002 CIA debriefing report.

Almost immediately after disembarking Air Force Two, once back in Washington, D.C., Libby made three telephone calls to two journalists: **Matthew Cooper**, then of *Time* magazine, and **Judith Miller**, then of The *New York Times.*

During both of those conversations, according to the federal grand jury testimony of both Cooper and Miller, Libby said absolutely nothing at all about the March 8, 2002 CIA debriefing report regarding Wilson.

Instead, both testified that Libby discussed the fact that Valerie Plame was a CIA officer, and that she had been responsible for sending her husband on his mission to Niger. The discussion between Libby and Cooper was the first that the then-vice presidential chief of staff and the *Time* correspondent spoke of Plame.

But Libby and Miller enjoyed a long professional relationship and also shared a personal friendship. Before the two telephone calls that Libby placed to Miller that day, both had spoken about Plame on two earlier occasions, on June 23, 2003 and July 8, 2003.

Telephone records presented to Miller during her grand jury appearance indicated that she twice spoke with Libby also on July 12.

The first phone call lasted three minutes, the phone records indicate. Miller testified that she believed she might have taken the call on her cell phone in a cab, and told Libby she would soon talk to him after she arrived home, although she was unsure of this, according to the sources familiar with her grand jury testimony.

The second telephone conversation between Libby and Miller lasted for 37 minutes, according to telephone records examined by attorneys familiar with her grand jury testimony. Miller told the grand jury that she believed that telephone conversation took place after she had arrived at her home in Sag Harbor, N.Y., although she was not entirely sure.

By the end of those two additional conversations, Miller testified that she felt confident that she could write a story saying Plame was a former CIA officer and that Plame had played a role in her husband being selected to go to Niger. During an earlier conversation with Libby, she had also agreed to identify Libby, not as a White House source, but as a former Capitol Hill staffer. By doing so, readers would be left in the dark that Libby or anyone in the White House was behind the effort to disclose Plame's covert status as a CIA officer.

What Miller herself did not know during her grand jury testimony was that a key issue for federal investigators was whether she would testify as to

whether Libby had attempted to leak her anything about the CIA debriefing report of Wilson after his Niger trip. Prosecutors believed that Miller was perhaps attempting to protect Libby in her testimony.

As *National Journal* first reported, during her first grand jury appearance Miller did not even tell prosecutors about a June 23, 2003 meeting with Libby about Plame and prewar intelligence about Iraq that took place at Libby's office at the Old Executive Office Building which adjoins the White House.

Prosecutors did not want to tip Miller as to why it was so crucial to them to learn whether Libby had ever mentioned the March 2002 Wilson debriefing report to her or Cooper shortly after he disembarked Air Force Two.

The reason was that Libby's failure to mention the March 2002 debriefing was one more piece of an ever increasing body of circumstantial evidence that led prosecutors to believe that Libby had devised a cover story to protect himself, and perhaps even the Vice President, to conceal the fact that his agenda was to leak information about Plame from the very start.

During one of his initial interviews with the FBI, Libby was shown copies of his own notes showing that as early as June 11 or June 12, 2003, Vice President Cheney was either the first or second person to tell him that Plame was a CIA officer and might have also played a role in sending her husband to Niger. At the time, Wilson had not yet written his *New York Times* op-ed or put a public face to his allegations, but press reports had already aired Wilson's account of his trip to Niger without naming him.

Cheney, Libby, Martin, and a score of other White House officials worked together from that point on to discredit Wilson's allegations, although Cheney and Libby frequently did things without the knowledge of other White House officials, according to the federal grand jury testimony of several of those officials. Those efforts intensified after Wilson's July 6, 2003 op-ed. The indictment of Libby charges that he lied to the FBI and a federal grand jury to conceal that he had leaked information to journalists that Plame was a CIA officer.

The federal grand jury indictment of Libby states: "A major focus of the Grand Jury Investigation was to determine which government officials had disclosed to the media... information concerning the affiliation of Valerie Wilson to the CIA, and the nature, timing, extent, and the purpose of such disclosures, as well as whether any official making such a disclosure did so knowing that the employment of Valerie Wilson by the CIA was classified information."

In his interviews by the FBI and testimony before the federal grand jury, Libby testified that it was the reporters who told him, and not the other way around, that Plame was a CIA officer. Prosecutors are expected to argue during the trial next week that Libby lied because to tell the truth Libby would have to admit that he leaked classified information and might politically embarrass the White House. But the prosecution may very well subtly make the case that another motive was for Libby to protect his then-

boss, Cheney. In private, some federal investigators have asserted that Libby
might have lied from the beginning to protect Cheney.

Two days after Wilson's July 6 column, on July 8, 2003, Libby had breakfast
with Miller at the St. Regis hotel in Washington, D.C. Miller has testified,
and the grand jury has alleged, that Libby provided Miller with information
that Plame was a CIA officer and had played a role in sending Wilson to
Niger.

On July 12, 2003, after returning from Norfolk, according to testimony by
Miller and *Time's* former correspondent, Cooper, Libby told Cooper for the
first time and Miller for the third time that Plame worked for the CIA.

Libby told the FBI and testified to the federal grand jury that when talking to
Miller and Cooper he was not providing them with information that he
learned from Cheney or other government officials, but merely repeating
rumors about Plame's CIA employment that he heard from other journalists.

Libby claimed that he had heard from NBC Washington Bureau Chief **Tim
Russert** on July 10, 2003 that Plame might have worked for the CIA, and
that in talking to Cooper and Miller, he was simply repeating the gossip.
Russert has testified that he and Libby never discussed Plame at all, and the
indictment charges that Libby lied to investigators when he claimed that
Russert and he had talked.

Russert is expected to be a crucial prosecution witness against Libby. Miller
and Cooper are also likely to testify that Libby never said that he was merely
passing along rumors heard from Russert and other journalists when he told
them that Plame was a CIA officer, if their trial testimony is consistent to
what they have already testified to the federal grand jury.

Libby also testified that when he told reporters that Plame was a CIA officer
he had totally forgotten by then that that he might have been originally told
that information by Cheney. Investigators are still attempting to determine
whether he made the claim to protect Cheney.

In a further possible attempt to protect Cheney, Libby also testified to the
grand jury that he did not believe he had discussed that Plame worked for the
CIA with Cheney during the critical period that Libby was leaking such
information to the press — and didn't discuss it with the vice president until
after syndicated columnist **Robert Novak** first disclosed on July 14 that
Plame was a CIA "operative."

It would be significant that Cheney and Libby only discussed Plame's CIA
employment after the July 14 Novak column because instead of discussing a
highly classified secret, the information would then have been considered
public information, and not illegal, because Novak had disclosed it in his
column.

While questioning Libby during grand jury testimony, prosecutors were
incredulous regarding Libby's claims that he and Cheney had not discussed
Plame's CIA employment during the critical July 6 to July 14 period. They

also expressed skepticism that Libby had supposedly forgotten -- even though Libby's own written notes indicated otherwise -- that Cheney had told him that Plame worked for the CIA much earlier, on either June 11 or June 12. They were also disbelieving of Libby's claims that even though Libby and Cheney met several times every day after Wilson's July 6 column appeared, the two men did not discuss Plame during the subsequent eight days, not until Novak's column appeared. And finally, prosecutors were disbelieving when Libby claimed that he was simply passing on a rumor to Cheney that he had purportedly learned from Tim Russert that Plame was a CIA officer.

Libby even mused before the grand jury that Cheney may have scribbled his comments about Plame working for the CIA and having been involved in selecting her husband for his "pro bono" mission to Niger only after Novak's column appeared on July 14, eight days after Wilson's own column appeared in the *New York Times*.

Exasperated prosecutors indicated during more than one of Libby's grand jury appearances that these claims by Libby seemed implausible.

On March 5, 2004, special prosecutor Patrick Fitzgerald himself questioned Libby before the grand jury.

Asked by Fitzgerald if he recalled a conversation with Cheney during which they discussed Plame and that she sent her "husband on a junket," Libby replied:

"I don't recall the conversation until after the Novak piece. I don't recall it during the week of July 6. I recall it after the Novak...after the Novak article appeared..."

Fitzgerald then bore down on the witness: "And are you telling us under oath that from July 6th to July 14th you never discussed with Vice President Cheney whether Mr. Wilson's wife worked at the CIA?"

Libby replied: "No, no, I'm not saying that. On July 10 or 11 I learned, I thought anew, that the wife—that the reporters were telling us that the wife worked at the CIA. And I may have had a conversation with the Vice President either late on the 11th or on the 12th in which I relayed that reporters were saying that." As Libby further told it, if he discussed with Cheney that Plame was a CIA officer, he had only done so in the context of saying that the information was only an unsubstantiated rumor that he had heard from Tim Russert.

In a subsequent grand jury appearance, a skeptical prosecutor indicated that he found it hard to believe that Cheney would have written the notations he did in the margins of former Ambassador Wilson's July 6, 2003 *New York Times* op-ed only after Robert Novak's July 14, 2003 column appeared saying that Valerie Plame was a CIA "operative."

"OK," the prosecutor said, before asking, "And can you tell us why it would be that the Vice President read the Novak column and had questions, some

of which apparently seem to be answered by the Novak column, would go back and pull out an original July 6th op-ed piece and write on that?"

"I'm not sure...," Libby answered, "He often kept these columns for awhile and keeps columns and will think on them. And I think what may have happened here is what he may have -- I don't know if he wrote, he wrote the points down. He might have pulled out the column to think about the problem and written on it, but I don't know."

Libby then added: "You'll have to ask him."

*— Previous coverage of pre-war intelligence and the CIA leak investigation from Murray Waas. Brian Beutler provided research assistance for this report.*

------------------------------------------

Sign up now to get **four free issues** of *National Journal* or **two free weeks** of *CongressDaily.*

------------------------------------------

**Need A Reprint Of This Article?**
National Journal Group offers both print and electronic reprint services, as well as permissions for academic use, photocopying and republication. Click here to order, or call us at 877-394-7350.

[ E-mail NationalJournal.com ]
[ Site Index | Staff | Privacy Policy | E-Mail Alerts ]
[ Reprints And Back Issues | Content Licensing ]
[ Make NationalJournal.com Your Homepage ]
[ About National Journal Group Inc. ]
[ Employment Opportunities ]

Copyright 2006 by National Journal Group Inc.
The Watergate · 600 New Hampshire Ave., NW
Washington, DC 20037
202-739-8400 · fax 202-833-8069
NationalJournal.com is an Atlantic Media publication.

# EXHIBIT L

**The New York Times**
nytimes.com



PRINTER-FRIENDLY FORMAT
SPONSORED BY

January 15, 2007

# Trial Is Set to Begin for Former Cheney Adviser

**By NEIL A. LEWIS**

WASHINGTON, Jan. 14 — I. Lewis Libby Jr., the former chief of staff to Vice President Dick Cheney, will go on trial on Tuesday, nearly three years after a C.I.A. operative's name appeared in a newspaper column, setting off a major investigation of who leaked the name and why.

But neither Mr. Libby nor anyone else has been charged with disclosing the name, which might have violated a federal law protecting the identities of Central Intelligence Agency officers. Instead, he faces five felony counts that he lied to a grand jury and the F.B.I. agents investigating the leak.

The situation of Mr. Libby, who once worked at the highest reaches of government power in Washington and now faces the possibility of a long jail sentence, is a vivid example of what has become a contemporary capital cliché: "It's not the crime but the cover-up" that often leads to legal problems for officials in high-profile investigations. The perjury and obstruction of justice charges against Mr. Libby stem not from the leak but from his behavior in the leak investigation.

The trial, expected to last at least a month, may serve as a stage for such intriguing issues as how the administration dealt with critics before going to war in Iraq, the changed relationship between journalists and senior government officials, and the always vexing question about the wisdom of using an independent prosecutor to investigate crimes in an administration.

Among the trial's highlights will be a likely appearance from Mr. Cheney, in what historians believe would be the first time a sitting vice president has testified in a criminal trial. Mr. Cheney would testify for the defense. He is expected to praise Mr. Libby as a public servant and attempt to clothe many of his actions in official vice presidential approval.

In an interview on "Fox News Sunday," Mr. Cheney called Mr. Libby "one of the finest individuals I've ever known." Pressed about his former aide's honesty, Mr. Cheney replied, "I believe he's one of the more honest men I know."

Whatever the nature of Mr. Cheney's remarks, if he testifies, the very fact of his appearance would underscore how the trial has created a deeply uncomfortable moment for the White House. It is a problem not only because a former official faces serious charges, but also because the subject is connected closely with how the administration may have used flawed intelligence about Iraq to justify going to war.

Mr. Libby is charged with lying to a grand jury and the F.B.I. agents investigating the leak of the name of the C.I.A. officer, Valerie Wilson, who was known by her maiden name, Valerie Plame. Her name first appeared in a July 14, 2003, column by Robert D. Novak, saying that she worked at the C.I.A. and was married to Joseph C. Wilson IV, a former ambassador. Only days earlier, Mr. Wilson had written an article that was published on the Op-Ed page of The New York Times, charging that the administration twisted intelligence to build a case to invade Iraq.

Patrick J. Fitzgerald, the top federal prosecutor in Chicago, was assigned to investigate whether anyone violated a federal law that prohibits the disclosure of the names of C.I.A. officers, and whether Ms. Wilson's name was leaked in an effort to discredit Mr. Wilson.

Mr. Libby told the grand jury and the Federal Bureau of Investigation that he had not disclosed information about Ms. Wilson to any journalists. But Judith Miller, then a reporter for The New York Times, and Matthew Cooper of Time magazine told the grand jury that Mr. Libby had indeed spoken to them about Ms. Wilson.

Mr. Libby also testified that he learned of Ms. Wilson's identity from a third journalist, Tim Russert of NBC News, but Mr. Russert is expected to testify that that is false. Prosecutors have said that Mr. Libby learned of Ms. Wilson's identity from administration officials including Mr. Cheney.

Looming over the proceedings is speculation that Mr. Libby would be a plausible if not likely recipient of a presidential pardon if convicted.

Away from the wide-angle political drama, the trial will have its own legal script. Court filings and hearings leading to trial have built two views of the case.

The prosecution view goes something like this:

The only issue that should matter to the jury is whether Mr. Libby lied as charged. To avoid the possibility that he could be charged with violating the law that prohibits disclosing C.I.A. officers' names, he decided to lie about his conversations with reporters about Ms. Plame.

Mr. Libby "had strong reason to believe" that the reporters would successfully resist testifying and that the leak investigation would end inconclusively, as so many others had. He concocted the idea that he had learned of Ms. Wilson's identity from Mr. Russert because he thought Mr. Russert would not testify and contradict him.

The defense case goes like this:

Mr. Libby may never even have mentioned Ms. Wilson's name to Mr. Cooper and Ms. Miller, whose testimony to the contrary may be the result of their remembering their conversations incorrectly. But even if he did talk about her and later deny it, it was an innocent case of remembering inaccurately what was a

trivial matter compared with his agenda in the summer of 2003.

In addition to his chief of staff duties, Mr. Libby dealt with issues of vast importance as Mr. Cheney's national security adviser. To demonstrate that, defense lawyers are hoping to present the jury with a picture of Mr. Libby's workaday world, a complicated, fast-moving place in which an issue like naming Ms. Wilson was relatively insignificant.

The judge in the case, Reggie M. Walton of Federal District Court in Washington, has so far weighed in on the side of the government in narrowing the issues to whether Mr. Libby's statements to investigators and the grand jury violated the law.

The trial is also notable for its roster of celebrity witnesses. In addition to Mr. Cheney and Mr. Russert, host of "Meet the Press," Bob Woodward of The Washington Post may testify.

Mr. Woodward has acknowledged that although he did not write about it, he learned the identity of Ms. Wilson in 2003 from the man who turned out to be the source for Mr. Novak.

That source was Richard L. Armitage, a former deputy secretary of state, who acknowledged publicly last August that he had told Mr. Fitzgerald he was the original source.

That disclosure raised questions among Mr. Libby's defenders and others about why Mr. Fitzgerald chose to prolong the investigation when he knew as early as October 2003 that Mr. Armitage was the leaker, and that he had not violated any laws because of the circumstances in which he disclosed Ms. Wilson's name.

To those critics, Mr. Fitzgerald's investigation demonstrated the same problems as those conducted by independent counsels in previous cases who, unchecked by normal constraints, often proceeded until they could charge someone with a "process" crime like perjury.

Copyright 2007 The New York Times Company

Privacy Policy  |  Search  |  Corrections  |  | RSS |  |  First Look  |  Help  |  Contact Us  |  Work for Us  |  Site Map