THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>) CR. NO. 05-394 (RBW)<br>v. )<br>)<br>I. LEWIS LIBBY, )<br>    also known as Scooter Libby )  | |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT
GOVERNMENT EXHIBITS 422 AND 423**

      The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special Counsel, respectfully submits this motion *in limine* to admit Government Exhibits 422 and 423. As discussed below, these exhibits are highly probative of defendant's state of mind and motive to lie at the time of the charged offenses, and should be admitted.

**BACKGROUND**

      As this Court is aware, defendant is charged with obstruction of justice, perjury, and making false statements to investigators, in violation of 18 U.S.C. §§ 1503, 1623 and 1001 in connection with an investigation concerning the possible unauthorized disclosure of classified information regarding the employment of Valerie Plame Wilson, the wife of former Ambassador Joseph Wilson. To sustain these charges, the government must prove beyond a reasonable doubt, among other things, that the charged statements were false and that defendant made them knowingly and intentionally. As part of its proof of defendant's knowledge and intent, the government seeks to introduce in evidence at trial copies of two newspaper articles (Government Exhibits 422 and 423), both of which were produced to the government from the defendant's files.

*Government Exhibit 422*

Government Exhibit 422 is a copy of a three-page article by Walter Pincus and Mike Allen entitled, "FBI Agents Tracing Linkage of Envoy to CIA Operative," which was published in the *Washington Post* on October 12, 2003.  The exhibit was produced to the government on February 6, 2004 under the defendant's certification.  As produced to the government, key passages of the article are marked with handwritten underlining and other markings.  A line at the bottom of all three pages appears to indicate that the article was printed from the Internet on October 14, 2003.  Defendant testified before the grand jury that he recalled reading Government Exhibit 422, probably at the time it was printed, and that the underlining did not look like he usually did it but it might be his.  3/24/04 GJ Tr. 122-123.

The article states that, as of the date of the article, FBI agents were questioning witnesses about events going back to June 2003, and analyzes the reasons these topics were being covered:

> In their interviews, FBI agents are asking questions about events going back to at least early June, the sources said.  That indicates investigators are examining not just who passed the information to Novak and other reporters but also how Plame's name may have first become linked with Wilson and his mission, who did it and how the information made its way around the government.  <u>Administration sources said they believe the officials who discussed Plame were not trying to expose her, but were using the information as a tool to try to persuade reporters to ignore Wilson.  The officials wanted to convince the reporters that he had benefitted from nepotism in being chosen for the mission.</u>

> What started as political gossip and damage control has become a major criminal investigation that has already harmed the administration and could be a problem for President Bush for months to come.  <u>One reason investigators are looking back is that even before Novak's column appeared, government officials had been trying for more than a month to convince journalists that Wilson's mission was not as important as it was being portrayed</u>. . . . The FBI is trying to determine when White House officials and members of the vice president's staff first focused on Wilson and learned about his wife's employment at the agency.

> \*    \*    \*
>
> Investigators are trying to establish the chain of events leading to the leak because, for a successful prosecution under the law prohibiting unauthorized disclosure of a covert U.S. officer's name, the disclosure must have been intentional, the accused must have known the person was a covert officer and the identity must not have been disclosed earlier.

GX 422 at 1 (emphasis in original).

The article continues with a summary of information related to events that occurred between the publication of a June 12, 2003 article by Walter Pincus concerning Wilson's trip (previously admitted in evidence as DX705),[1] and the publication of the July 14, 2003 Robert Novak column in which Ms. Wilson's identity was publicly disclosed (previously admitted in evidence as DX 709). *Id.* at 2-3. In particular, the article discusses disclosures by "top White House officials," an "administration official," and "government officials" regarding Ms. Wilson to at "least six Washington journalists" during the week of July 7, 2003:

> [T]wo top White House officials disclosed Plame's identity to (*sic*) least six Washington journalists, an administration official told The Post for an article published September 28. The source elaborated on the conversations last week, saying that officials brought up Plame as part of their broader case against Wilson. "It was unsolicited," the source said. "They were pushing back. They used everything they had."
>
> \*    \*    \*
>
> On July 12, two days before Novak's column, a Post reporter was told by an administration official that the White House had not paid attention to the former ambassador's CIA-sponsored trip to Niger because it was set up as a boondoggle by his wife, an analyst with the agency working on weapons of mass destruction. Plame's name was never mentioned and the purpose of the disclosure did not appear to be to generate an article, but rather to undermine Wilson's report.

---

[1] Defendant testified before the grand jury that he could have been a source for Walter Pincus's June 12, 2003 article, and that it was during preparation for providing information to Mr. Pincus that the Vice President informed him that former Ambassador Wilson's wife worked at the CIA. 3/5/04 GJ Tr. at 60-63.

*Id.* (emphasis in original).

The article goes on to quote the following statement from the July 17 on-line version of a Time magazine article entitled, "A War on Wilson?":

> "<u>some government officials have noted to Time in interviews, (as well as to syndicated columnist Robert Novak) that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction,</u>" [2]

and to report efforts by White House officials to draw attention to Ms. Wilson's role with "several high-profile reporters," including "<u>Andrea Mitchell of NBC</u> News," and "<u>MSNBC television host Chris Matthews</u>," after the Novak column appeared. *Id.* at 3 (emphasis in original).

Finally, the article discusses the issue of Ms. Wilson's employment status and the potential harm caused by the disclosure of her employment. Specifically, the article quotes former Ambassador Wilson's assertions during a July 22 television appearance that "disclosing the name of a U.S. intelligence officer would be 'a breach of national security,'" and "could compromise that officer's entire network of contacts and could be a violation of federal law," and ends with the following quote from an "administration source": "One of the greatest mysteries in all this is what was really the rationale for doing it and doing it this way." *Id.* at 3.

***Government Exhibit 423***

Government Exhibit 423 is a copy of a two-page article by Walter Pincus and Mike Allen entitled, "Leak of Agent's Name Causes Exposure of CIA Front Firm," which was published in the *Washington Post* on October 4, 2003. A line at the bottom of both pages appears to indicate that the

---

[2] As the Court is aware, this is the article for which defendant was a confirming source, and defendant's conversation with Matthew Cooper related to this article forms part of the basis for the indictment.

article was printed from the Internet on October 4, 2003. The exhibit was produced under the certification of defendant's assistant, Jennifer Mayfield. Ms. Mayfield told the FBI in an interview on March 17, 2004 that she had provided the defendant with news articles that would be of interest to him, and that those articles relating to the Wilson issue had subsequently been filed in a folder marked either "Niger" or "Uranium." The day after Ms. Mayfield's interview, the Office of Special Counsel requested and received the contents of those files, and Government Exhibit 423 was found among them.

The article begins, "The leak of a CIA operative's name has also exposed the identity of a CIA front company, potentially expanding the damage caused by the original disclosure, Bush Administration officials said yesterday." GX 423 at 1. The article names a firm identified by Ms. Wilson as her employer in 1999, and discusses whether the fact that Ms. Wilson identified her employer as a private firm makes it more likely that Ms. Wilson was a covert agent and, thus, whether it was more likely that the disclosure of her identity constituted "a criminal violation of the Intelligence Identities Protection Act." *Id.* On one hand, the article suggests that, since in 1999 Ms. Wilson identified her employer as a private firm, rather than the CIA, she may have been working undercover within five years of the disclosure of her identity. *Id.* On the other, the article quotes Robert Novak as reporting that the firm is a fictitious entity and as saying that he had been told that "CIA people are not supposed to list themselves with fictitious firms if they're under a deep cover." *Id.* at 2.

In addition, the article discusses the fact that the Department of Justice had commenced a criminal investigation on September 26, 2003. *Id.* at 1. The article states that nearly 2,000 White House employees had been given a broad request for documents that "relate in any way to former

U.S. Ambassador Joseph C. Wilson, his trip to Niger in February 2002, or his wife's purported relationship with the Central Intelligence Agency." *Id.* The article goes on to state that FBI agents had begun attempts to interview journalists, but that the number of journalists who had been contacted was unclear. *Id.* at 2.

## ARGUMENT

In deciding whether the government has met its burden of proving the charges beyond a reasonable doubt, the jury will consider whether defendant had a motive to lie when he was interviewed by the FBI and when he testified before the grand jury. Defense counsel has argued vigorously that defendant had no motive to lie, because he was "innocent" and had done nothing wrong, because he had no reason to believe that the investigation focused on anything other than the disclosure of Ms. Wilson's employment to Robert Novak, a disclosure in which he played no part, and because the defendant had no reason to know or believe that Ms. Wilson was, or might have been a covert officer, or that her employment at the CIA was classified. The government is entitled to present evidence of the defendant's knowledge at the time of the charged offenses, regardless of its source, and to rebut the defendant's claim that he had no motive to lie. *See United States v. Yousef*, 327 F.3d 56, 121 (2d Cir. 2003)(cited by the Court on February 1, 2007)(approving admission of a letter relating to a different crime, as opposed to the articles here which relate to the very same matter being investigated). Moreover, in the words of a case oft-quoted by the defense in the context of the CIPA proceedings, the government is entitled to present such evidence with the persuasive power of the "concrete and particular." *Old Chief v. United States*, 519 U.S. 172 (1997).

I.  **Government Exhibits 422 and 423 Are Probative of Defendant's Knowledge that the Scope and Focus of the FBI and Grand Jury Investigations Was Not Limited to the Disclosure to Novak.**

Evidence related to defendant's knowledge and understanding of the scope of the FBI's and Grand Jury's investigations is highly probative of whether defendant had a motive to lie, given the defense argument that defendant believed that the scope of the investigations was limited to conduct in which he had no involvement. Government Exhibit 422 provides powerful evidence that, on the day of his first FBI interview, defendant was in possession of information indicating that the focus and scope of the FBI's investigation extended well past the disclosure of Valerie Wilson's identity to columnist Robert Novak. This exhibit, which appears to have been printed on the day of the first FBI interview, and which is marked with handwritten underlining, discusses the nature and scope of questions being asked by FBI agents conducting the criminal investigation and specifically refers to disclosures regarding Ms. Wilson to at "least six Washington journalists" during the week of July 7, 2003. Notably, every one of the article's references to disclosures to journalists other than Novak, including the reference to the very article for which defendant was a confirming source, is underlined. Likewise, Government Exhibit 423 indicates that the FBI was beginning attempts to contact multiple journalists in connection with the probe, and thus was not limiting its investigation to Novak. Accordingly, defendant's possession and retention of these articles effectively rebuts defendant's suggestion in opening statement, and through cross-examination of government witnesses, that defendant believed that the investigations were focused solely on the disclosure to Novak.

Moreover, Government Exhibit 422 reports that FBI agents conducting the criminal investigation were asking "not just who passed the information to Novak and other reporters, but

also how Plame's name may have first become linked with Wilson and his mission, who did it and how the information made its way around the government." Thus, this exhibit shows that, at the time of defendant's first FBI interview, defendant was in possession of information indicating that that the FBI was investigating events dating "more than a month" before the publication of the Novak column, a period that included defendant's first disclosure of Ms. Wilson's employment to Judith Miller. The exhibit also shows that defendant was aware that when and how he and other government officials "first focused on Wilson and learned about his wife's employment at the agency," was important to a determination of whether a successful prosecution for disclosing the identity of a covert officer could be brought. Thus, defendant's possession and retention of Government Exhibit 422 supports the prosecution theory that, at the time of the first FBI interview, defendant understood the need to craft a story so as to indicate that he obtained information regarding Ms. Wilson's employment from a source that would not have suggested to him that the information was or might be classified.

II.    **Government Exhibits 422 and 423 Are Probative of Defendant's Knowledge of the Possibility that Valerie Wilson's Employment Status Was Classified and that Its Disclosure Could Cause Harm.**

Defendant's awareness that Ms. Wilson might have been a covert officer, and that her employment status might be classified, is an important aspect of defendant's motive to lie. As part of its preliminary instructions, this Court instructed the jury that:

> You may consider . . . what if anything Mr. Libby knew or believed about her status and any damage disclosure of her status could cause in assessing what his state of mind was when he spoke to the FBI agents and testified before the Grand Jury. You must, however, keep in mind that none of the evidence offered to show Mr. Libby's state of mind establishes anything about what Ms. Wilson's status actually was or what damage if any was or could have been caused by the disclosure of her status.

1/23/07 a.m. Tr. 20.

The defense argued vociferously prior to trial that defendant did not understand, and had no reason to believe, that Ms. Wilson's status was classified or covert. In opening statement and during cross-examination of the government's witnesses, the defense has repeatedly alluded to this point. See 1/31/07 a.m. Tr. at 53 (Q: "Did Mr. Libby ever indicate to you any information that made you believe she was an undercover operative as opposed to an analyst?" A: "No, sir."); 1/24/07 p.m. Tr. at 57 (Q: "And, in fact, the person gave you no indication, the person you talked to, gave you no indication that Wilson's wife was a covert or covered employee, correct?" A: "That's right."); 1/25/07 p.m. Tr. at 50 (Q: "You have no knowledge, as you sit there, that Mrs. Wilson's job status was classified or covert, correct?" A: "Correct.").

Anything defendant knew at the time of his FBI interviews and his grand jury appearances about the possible classified status of Ms. Wilson's employment or the possible ramifications of disclosing information regarding Ms. Wilson's employment, is directly relevant to defendant's state of mind and motive to lie, and directly relevant to the defendant's arguments. Government Exhibits 422 and 423 are highly probative of the fact that, before defendant's first FBI interview, he was aware of the possibility that Ms. Wilson was a covert officer of the CIA at the time defendant disclosed her employment to reporters Miller and Cooper and to White House Press Secretary Ari Fleischer.

Government Exhibit 422, apparently printed on the very day of the defendant's first interview, contains information regarding the potential collateral damage caused by the disclosure of the identity of a covert officer, which reinforced in defendant's mind that the investigation was

a serious matter. Thus, this exhibit is relevant to show that it is highly unlikely that defendant's focus during the FBI interview was drowned out by national security concerns.

Government Exhibit 423 reports specific information that would suggest to defendant that Ms. Wilson may have worked in a covert or undercover capacity within five years of the public disclosure of her identity. If this information turned out to be accurate, it could mean that Ms. Wilson was a covert officer within the meaning of Intelligence Identities Protection Act and defendant might have committed a criminal offense. Thus, defendant's possession of this article is probative of the fact that – whatever defendant may or may not have thought or understood about Ms. Wilson's employment status at the time he spoke with reporters Miller and Cooper in June and July 2003 – only ten days before his first FBI interview, defendant learned of evidence that suggested the possibility that his conversations with Miller and Cooper put him in legal jeopardy.

Exhibits 422 and 423 supplement the evidence the government has presented thus far tending to show that defendant had concerns about Ms. Wilson's status prior to the time of defendant's first FBI interview. David Addington, then-Counsel to the Vice President, testified that, at the time the investigation was announced or was imminent, defendant asked how one could determine whether a CIA employee was covert, and that he provided defendant with a copy of the Intelligence Identities Protection Act. 1/30/07 a.m. Tr. 7-8. In addition, CIA briefer Craig Schmall testified that he raised the issue of potential harm with the defendant and the Vice President after the Novak article was published. Next week, the jury will hear grand jury testimony by the defendant indicating that he was specifically focused on the possibility that Ms. Wilson's employment was classified, based on allegations" whipping around in the press." 3/24/04 GJ Tr. 154-55.

**III.     The Probative Value of Exhibits 422 and 423 Is Not Substantially Outweighed by Any Potential of Unfair Prejudice.**

As discussed above, the probative value of Government Exhibits 422 and 423 is substantial. These news articles are dated just before the defendant's FBI interview, and focus on two issues that go to the heart of the government's proof of defendant's motive to lie -- defendant's knowledge of the nature and scope and potential seriousness of the investigation in which the defendant was to be interviewed, and defendant's awareness that the CIA officer whose employment he disclosed to reporters might have been a covert officer. The fact that defendant retained the two articles in his files is reflective of the importance he attached to the information contained in them. The fact that the articles apparently were printed on the day of, and ten days before, the defendant's first interview indicates that the information they contained was on defendant's mind at the time of the interview. The fact that Government Exhibit 422, which was printed on the very day of the interview, specifically addresses the importance of information regarding the way in which government officials learned of Ms. Wilson's employment, tends to show that defendant's selection of details to include in the story he told the FBI was informed by the information contained in that news article. In sum, both articles are highly probative of defendant's motive to lie at the time of the first FBI interview, and the government is entitled to present them to the jury with all their fair and legitimate force. *See Old Chief*, 519 U.S. 172 (1997).

Case law generally supports the admission of Government Exhibits 422 and 423 against an objection under Rule 403. See *United States v. Yousef*, 327 F.3d 56, 121 (2d Cir. 2003)(cited by the Court on February 1, 2007). In similar circumstances, the Fourth Circuit approved the admission, in a methamphetamine delivery case, of a newspaper article concerning the arrest of meth traffickers

in an unrelated case which was seized from the defendant's car, as proof of knowledge and intent. *United States v. Cardenas*, 2001 U.S. App. LEXIS 8870 (4th Cir. 2001). The argument for admission of Government Exhibits 422 and 423 is substantially stronger than in these cases, as the articles in question relate to the very investigation in which defendant was preparing to be interviewed.

An analogous case from the D.C. Circuit is *United States v. Bussey*, 432 F.2d 1330 (D.C. Cir. 1970), in which the court approved the admission of a newspaper article regarding the bank robbery with which defendant was charged, which was recovered from defendant's person at the time of his arrest three days after the robbery, for the purpose of establishing defendant's consciousness of guilt.[3] Similarly, in *United States v. Viefhaus*, 168 F.3d 392 (10th Cir. 1999), the Tenth Circuit held that it was proper to admit hate literature, books on bomb-making, and a list of facilities occupied by Jewish, Muslim, and Native American groups seized from defendant's residence on the issue of the defendant's state of mind in transmitting a bomb threat, in that they tended to counter defendant's allegation of benign purpose. See also *United States v. Safavian*, 435 F.Supp.2d 36, 46 (D.D.C. 2006)(district court allowed the government to introduce e-mails related to public official's efforts on behalf of private parties, not to prove the official's actual abuse of his government employment or acceptance of bribes but, rather, to prove his motive to lie when speaking to investigating agents). These cases establish that materials found in defendant's possession that are probative of defendant's knowledge, intent, and motive to lie are admissible.

---

[3] In reversing the defendant's conviction on other grounds, the court ordered that, at a retrial, the article should be redacted to exclude any reference to a second robbery with which the defendant was charged in a separate case, and that additional cautionary instructions should be given.

Contrary to defendant's contention, the admission of Government Exhibits 422 and 423 would pose no substantial risk of unfair prejudice. Details concerning the questioning being conducted by FBI agents is not inflammatory or prejudicial in any way and, in any event, as has been the procedure with every news article offered by the government and the defense thus far in the trial, the jury may (and should) be instructed that the exhibits are being offered only with respect to the defendant's state of mind, and not for their truth.

With respect to the portions of the articles that discuss the possible covert status of Ms. Wilson, the jury has been, and will be, instructed that the issue of Valerie Plame Wilson's status with the CIA, and the question of whether any damage will result from the disclosure of her status, are totally irrelevant to the jury's assessment of the defendant's guilt or innocence, and that it "must not consider those matters in [its] deliberations or speculate or guess about them." Moreover, as indicated above, the jury will also be instructed that the exhibits are not being offered, and should not be considered, for their truth. With such instructions, any potential confusion of the issues or prejudice to the defendant will be eliminated.

The risk of unfair prejudice is reduced even further by the fact that the subjects discussed in both of the articles have already been raised before the jury. Government Exhibit 422 recounts the events leading up to and following the May 6, 2003 Nicholas Kristof article in *The New York Times*, the June 12, 2003 Walter Pincus article in the *Washington Post*, the July 6, 2003 Op Ed by Joseph Wilson in *The New York Times* (as well as his July 6, 2003 appearance on Meet the Press), the July 11, 2003 statement by then CIA director George Tenet, and the July 14, 2003 syndicated column by Robert Novak. All of these have been described repeatedly throughout the trial to date. The article also describes Valerie Plame as a "clandestine case officer." Any potential prejudice from that

reference is minimized by the numerous references to Ms. Plame or Ms. Wilson's alleged employment with the CIA that the jury has heard and seen to date.[4] Other information in the October 12, 2003 article concerns the investigation the defendant is charged with obstructing, and there cannot be any serious contention that the descriptions of the investigation in the article are unfairly prejudicial, given their significant and obvious relevance.

The October 4, 2003 article also discusses subjects that have already been raised before the jury. The article recounts the July 14, 2003 syndicated column by Robert Novak, and describes the investigation the defendant is charged with obstructing, including quoting from the email sent to all White House employees regarding the scope of the request for documents, the exact language of which is in GX 53, an exhibit Mr. Wells has referred to repeatedly in cross examination of government witnesses. 1/30/07 a.m. Tr. at 64-67; 1/30/07 p.m. Tr. at 3; 2/1/07 p.m. Tr. at 82. In addition, the article describes Ms. Wilson as a "CIA operative," which is not unfairly prejudicial for the same reasons discussed above. The article also describes potential damage resulting from the

---

[4] Ms. Plame is, for example, referenced in admitted exhibits as an "agency operative" (DX 709), a "CIA official who has monitored the proliferation of weapons of mass destruction" (DX 703), a "CIA WMD Manager" (DX 71), and a "CIA agent," (GX 521A). Moreover, defense counsel has at least twice read aloud to the jury the title of the *Newsday* article concerning Ms. Wilson, "Columnist Blows C.I.A. Agent's Cover." 1/30/07 Tr. at 69; 2/1/07 p.m. Tr. at 85 (quoting from GX 53). In addition, numerous witnesses have referenced Ms. Wilson's alleged employment with the CIA. Mr. Grenier testified on direct examination that he was uncomfortable with the fact that he had provided information about Ms. Wilson to Mr. Libby because he "knew that there was a good chance that that person could be undercover." 1/24/07 p.m. Tr. at 59. Mr. Fleischer testified on direct examination that he never would have thought that Ms. Wilson was, as he read in the papers, a "covert agent in the Central Intelligence Agency." Mr. Schmall testified on direct examination as to the damage to Valerie Wilson and the dangers of leaking the name of a "CIA officer," 1/24/07 p.m. Tr. at 87, and on cross examination he testified that he was using Mrs. Wilson as an example of a covert agent. 1/25/07 a.m. Tr. at 10.

leak of Ms. Wilson's name, a subject that was discussed by Mr. Schmall on direct examination, 1/24/07 p.m. Tr. at 87, and followed up on by Mr. Cline during cross examination of Mr. Schmall. 1/25/07 p.m. Tr. at 10.

Thus, given the probative value of Government Exhibits 422 and 423, and the absence of substantial risk of unfair prejudice, the government should be permitted to introduce both exhibits as proof of defendant's motive to lie, and to rebut the defendant's specific arguments that he had no reason to believe or fear that Ms. Wilson's employment status was or may have been classified, or that the scope of the FBI and grand jury investigations included any conduct in which he had participated.

## **CONCLUSION**

For all of the foregoing reasons, the government respectfully requests that it be permitted to introduce Government Exhibits 422 and 423 into evidence for the limited purpose of establishing defendant's state of mind at the time of the charged offenses.

Respectfully submitted,

   /s/
PATRICK J. FITZGERALD
Special Counsel

Debra Riggs Bonamici
Kathleen M. Kedian
Peter R. Zeidenberg
*Deputy Special Counsels*

Office of the Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

Dated:   February 2, 2007

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on this 2nd day of February 2007, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

>William Jeffress, Esq.
>Baker Botts
>The Warner
>1299 Pennsylvania Avenue, N.W.
>Washington, DC 20004-2400
>Facsimile: 202-585-1087
>
>Theodore V. Wells, Esq.
>Paul Weiss
>1285 Avenue of the Americas
>New York, NY 10019-6064
>Facsimile: 212-373-2217
>
>John D. Cline, Esq.
>Jones Day
>555 California Street
>San Francisco, CA 94104
>Facsimile: 415-875-5700

>>Patrick J. Fitzgerald
>>Special Counsel
>>U.S. Department of Justice
>>1400 New York Ave., N.W.
>>Washington, D.C. 20530
>>202-514-1187
>>
>>By: _____/s/_____
>> Debra Riggs Bonamici
>> Deputy Special Counsel

Dated: February 2, 2007