UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CR. NO 05-394 (RBW) |
| v. ) | |
| ) | |
| I. LEWIS LIBBY, ) | |
|     also known as "Scooter Libby" ) | |

**GOVERNMENT'S MOTION *IN LIMINE* TO
PRECLUDE TESTIMONY OF ANDREA MITCHELL**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special Counsel, respectfully submits this motion *in limine* to preclude the defendant from eliciting from defense witness Andrea Mitchell testimony regarding her knowledge, prior to July 14, 2003, that Valerie Plame Wilson worked for the CIA, for the purpose of attempting to impeach her with a prior statement that would otherwise be inadmissible. Such impeachment is improper and should be excluded.

**BACKGROUND**

The defendant has notified the government that he plans to call Ms. Andrea Mitchell, Chief Foreign Affairs Correspondent for *NBC News*, as a witness. Ms. Mitchell was at one time erroneously identified as someone who may have known about Valerie Plame Wilson's employment with the CIA prior to Robert Novak's July 14, 2003 column. First, a September 29, 2003 *Washington Post* article left the misleading and false impression that Ms. Mitchell was one of the journalists who had received information about former Ambassador Wilson's wife prior to Mr. Novak's column. Howard Kurtz, "Media Review Conduct After Leak," Wash. Post, Sept. 29, 2003, at A4.[1] When asked during a segment of the October 3, 2003 broadcast of *CNBC*'s "Capital Report"

---

[1] A different *Washington Post* article, published the same day, described Ms. Mitchell as a reporter who was contacted *after* the Novak column appeared. *See* Mike Allen, "Bush Aides Say

how widely known it was in Washington that Joe Wilson's wife worked for the CIA, Ms. Mitchell replied, "It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger. So a number of us began to pick up on that." "Capital Report" (*CNBC* Television Broadcast Oct. 3, 2003).

      Ms. Mitchell and her employer, *NBC*, made numerous other public statements disputing the accuracy of the statements made regarding Ms. Mitchell in the September 29, 2003 *Washington Post* article, and denying that she was a recipient of the information about Ambassador Wilson's wife prior to Mr. Novak's July 14, 2003 column.  On September 29, 2003, *NBC*'s Tom Brokaw issued the following statement concerning Ms. Mitchell: "*NBC News* correspondent Andrea Mitchell has been identified by some as one of the recipients of a leak about the undercover agent. But tonight, Mitchell said that was not the case, that her first discussion with an administration official about the matter was after the Robert Novak column was published. And that discussion, she said, was off the record." *NBC Nightly News* (*NBC* television broadcast, Sept. 29, 2003);  On October 29, 2005, Ms. Mitchell told *NBC News* that the *Washington Post* story had erroneously reported that she had been a recipient of the leak about Valerie Wilson before Novak's column, and reiterated that she had in fact not been a recipient of the leak before Novak's column was published.  "Tim Russert Show" (*CNBC* television broadcast, Oct. 29, 2005 ("I was called by the CIA because it was erroneously

---

They'll Cooperate With Probe Into Intelligence Leak," *Washington Post*, Sept. 29, 2003, at A1 ("Wilson said that in the week after the Novak column appeared, several journalists told him that the White House was trying to call attention to his wife. . . . Wilson identified one of the reporters as Andrea Mitchell of *NBC News*.")

reported in The Washington Post that I was the recipient of the leak before Novak's column came out, and I had not been.")

Ms. Mitchell has repeatedly stated that she was not aware of Valerie Plame Wilson's identity or employment before Mr. Novak's column, and has maintained that she mis-spoke or misunderstood the question when addressing this issue on the October 3, 2003 "Capital Report." Since that broadcast, Ms. Mitchell consistently has maintained that her comment on the "Capital Report" should not be understood as an indication that she knew of Ms. Wilson's employment prior to Mr. Novak's July 14, 2003 column. For example, in a November 10, 2005 interview with radio host Don Imus, Ms. Mitchell stated that her October 3, 2003 quote was taken out of context, and that when she made the comment on October 3, 2003, she was referring to *after* the publication of the Novak column. She also definitively said that she did not know about Valerie Wilson before the Novak column. *See* DX 1661.5 ("Imus in the Morning" (*MSNBC* television broadcast, Nov. 10, 2005). In a November 23, 2005 interview with radio host Don Imus, Ms. Mitchell repeated that she did not know about Joe Wilson's wife until after Novak's column, and that when she read Novak's column, she went to her producer and asked "How the heck did we not know that?" *See* DX 504.3 ("Imus in the Morning" (*MSNBC* television broadcast, Nov. 23, 2005)). Moreover, in court filings her counsel has specifically stated that neither *NBC* nor Ms. Mitchell possess any documents (1) prepared or received by them prior to July 14, 2003, that refer to the wife of former Ambassador Joseph Wilson (by name or otherwise), or (2) that indicate or suggest that any employee of *NBC News* was aware, prior to July 14, 2003, that former Ambassador Wilson's wife, Valerie Plame Wilson, was employed by the CIA. *See* Memorandum of Points and Authorities in Support of Non

3

Parties *NBC News* and Andrea Mitchell to Quash Subpoenas, at 1, *United States v. Libby*, 06-MS-126 (Apr. 18, 2006).

Thus it is clear that, if asked about this issue, Ms. Mitchell will testify that she did not know about Ms. Wilson's employment at the CIA or possible role in arranging Ambassador Wilson's 2002 trip to Niger prior to July 14, 2003.

## ARGUMENT

**I.    The Law is Settled That a Party May Not Elicit Testimony for the Primary Purpose of Impeaching That Witness With Otherwise Inadmissible Evidence**.

A party cannot call a witness for the primary purpose of impeaching that witness with an otherwise inadmissible prior statement. Although Rule 607 of the Federal Rules of Evidence provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness," courts have consistently held that it is improper for a party to call a witness for the primary purpose of putting before the jury evidence that is not otherwise admissible. *See United States v. Johnson*, 802 F.2d 1459, 1466 (D.C. Cir. 1986) (holding that it was "entirely inappropriate" for the prosecution to call a witness for the sole purpose of bringing about the admission of a statement that was not independently admissible); *United States v. Peterman*, 841 F.2d 1474, 1479 n.3 (10th Cir. 1988)(noting that "[e]very circuit has said evidence that is inadmissible for substantive purposes may not be purposely introduced under the pretense of impeachment"); *United States v. Sebetich*, 776 F.2d 412, 429 (3d Cir. 1985) ("It is well established, however, that witnesses may not be called for the purposes of circumventing the hearsay rule by means of Rule 607"); *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) ("The overwhelming weight of authority is, however, that impeachment by prior inconsistent statement may not be permitted where employed as a mere

4

subterfuge to get before the jury evidence not otherwise admissible"); *United States v. Fay*, 668 F.2d 375, 379 (8th Cir. 1981) ("Although Rule 607 allows a party to impeach his own witness, '(c)ourts must be watchful that impeachment is not used as a subterfuge to place otherwise inadmissible hearsay before the jury'"); *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 184).

In *Johnson*, the government called a witness whom prosecutors knew would provide testimony favorable to the defendant, and whom they also knew had made a prior statement that was unfavorable to the defendant. The court found that it was reasonable to conclude that the prosecution was calling the witness "not for any testimony he could be expected to give, but for the sole purpose of bringing about the admission of a post-arrest statement that, as the prosecution well knew or should have known, was not independently admissible." *Johnson*, 802 F.2d at 1466. The court found such conduct improper, stating, "There is no authority in the Federal Rules of Evidence or elsewhere, suggesting that a party may on rebuttal call a witness–who the party knows will not offer any relevant evidence–and then impeach that witness by introducing . . . an earlier hearsay statement favorably [sic] to that party's case. Indeed, the case law is to the contrary." *Id.*

Similarly, in *Morlang*, the government called a witness whom it knew would deny making a statement to a prisoner implicating the defendant. *Morlang*, 531 F.2d at 188. The government then called the prisoner to testify that the witness had indeed made such a statement to him. *Id.* The Fourth Circuit reversed the defendant's conviction, reasoning that the government had used the rule allowing impeachment with prior inconsistent statements to put inadmissible evidence before the jury. *Id.* at 189-90.

*Sebetich* and *Fay* likewise restate the principle that a witness may not be called for the primary purpose of impeaching him with otherwise inadmissible testimony, and do so in the context of efforts by defendants to obtain the admission of otherwise inadmissible evidence. In *Sebetich*, the defendant in a bank robbery case sought to call a witness who allegedly had told third parties that the witness planned to commit the robberies in question. The defendant expected the witness to deny making the statements, but intended to impeach him with the hearsay statements of the third parties. The Third Circuit held that the district court correctly ruled that if the witness was called, he could not be impeached by the third parties' statements. *Sebetich*, 776 F.2d at 428-29. In *Fay*, the Eighth Circuit held that when the defense called a witness knowing that she would deny making a statement, the trial court properly barred an attempt to impeach her with an alleged prior inconsistent statement that was otherwise inadmissible hearsay. *Fay*, 668 F.2d at 378-79.

Courts have routinely recognized that the danger of permitting such testimony is that it creates an end-run around the rule against impermissible hearsay, by allowing parties to call witnesses, knowing those witnesses are adverse, merely to impeach the witnesses and allow the jury to hear statements they could not otherwise have heard. *See, e.g., Johnson*, 802 F.2d at 1466; *United States v. Peterman*, 841 F.2d 1474, 1479 (10th Cir. 1988); *United States v. Frappier*, 807 F.2d 257, 259 (1st Cir. 1986). To avoid witnesses being called for this purpose, this Circuit and others have looked to the primary purpose for which the witness is being called, and whether the witness is being called as a "mere subterfuge" to get before the jury evidence that is not otherwise admissible. *Johnson*, 802 F.2d at 1466; *Morlang*, 531 F.2d at 190; *Sebetich*, 776 F.2d at 429; *Fay*, 668 F.2d at 379. *See also* Graham, *Handbook of Federal Evidence* § 607:3 (6th Ed. 2006) ("impeachment of

a party's own witness may not be employed as a 'mere subterfuge' or for the 'primary purpose of placing before the jury substantive evidence which is not otherwise admissible'").[2]

## II. The Defense Should Be Precluded from Asking Ms. Mitchell About Her Knowledge Regarding Ms. Wilson's Employment Prior to July 14, 2003.

If the defendant is permitted to call Ms. Mitchell, he would question her about when and from whom she first learned information about Ms. Wilson's employment. Ms. Mitchell has publicly stated on numerous occasions that she was not aware of Ms. Wilson's employment until after Mr. Novak's July 14, 2003 column, and the government fully expects that any testimony she would give at trial would be consistent with those public statements. The defendant would then seek to impeach Ms. Mitchell with her prior inconsistent statement that "It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger," a statement Ms. Mitchell has repeatedly disavowed and explained as having been the product of mis-speaking, or misunderstanding the question to which she responded.

Rather than seeking to use Ms. Mitchell's prior statement to undermine her credibility, the defendant would be seeking to admit the prior inconsistent statement for the truth of the matter asserted therein. As a legal matter, however, Ms. Mitchell's prior statement would be admissible solely for impeachment purposes, and could not be considered as substantive evidence. *See e.g.*,

---

[2]At least one commentator has suggested that courts require that a party calling a witness be "surprised" by the testimony of the witness at trial prior to permitting impeachment of a party's own witness. *See* Graham, *Handbook of Federal Evidence* at n.5-8 (6th Ed. 2006). Such "surprise" is obviously inapplicable here, where defendant is fully aware of Ms. Mitchell's prior inconsistent statement, having placed on his exhibit list transcripts and videos of that statement. DX 508.

*Johnson*, 802 F.2d at 1466; *United States v. Winchenbach*, 197 F.3d 558 (1st Cir. 1999)(when two statements are irreconcilably at odds, "the cross-examiner is permitted to show the discrepancy by extrinsic evidence if necessary — not to demonstrate which of the two is true but, rather, to show that the two do not jibe"). Thus, the defendant would be eliciting testimony for the sole purpose of putting before the jury the truth of a statement that is inadmissible hearsay. As a matter of law, there is no question that without Ms. Mitchell's testimony, her prior inconsistent statement benefitting the defense is otherwise inadmissible, and there is also no question that eliciting that statement is the purpose for which the defendant is seeking her testimony. An effort to present such evidence would amount to impermissible "bootstrapping" and a clear abuse of the rule prohibiting otherwise inadmissible hearsay and should be precluded.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court preclude the defendant from eliciting testimony from Ms. Mitchell regarding her knowledge concerning the employment of Valerie Plame Wilson prior to July 14, 2003.

        Respectfully submitted,

        /s/
        ―――――――――――――――――
PATRICK J. FITZGERALD
Special Counsel
Kathleen M. Kedian
Debra Riggs Bonamici
Peter R. Zeidenberg
*Deputy Special Counsels*

Office of the Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

Dated:   February 6, 2007

**CERTIFICATE OF SERVICE**

      I, the undersigned, hereby certify that on this 6th day of February, 2007, I caused true and correct copies of the foregoing to be served on the following parties by electronic mail:

      William Jeffress, Esq.
      Baker Botts
      The Warner
      1299 Pennsylvania Avenue, N.W.
      Washington, DC 20004-2400
      Facsimile: 202-585-1087

      Theodore V. Wells, Esq.
      Paul Weiss
      1285 Avenue of the Americas
      New York, NY 10019-6064
      Facsimile: 212-373-2217

      John D. Cline, Esq.
      Jones Day
      555 California Street
      San Francisco, CA 94104
      Facsimile: 415-875-5700

      Patrick J. Fitzgerald
      Special Counsel
      U.S. Department of Justice
      1400 New York Ave., N.W.
      Washington, D.C. 20530
      202-514-1187

      By: _____/s/_____
      Kathleen M. Kedian
      Deputy Special Counsel