## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

### CONSOLIDATED OPPOSITION OF DEFENDANT I. LEWIS LIBBY TO GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE TESTIMONY OF ANDREA MITCHELL AND TO MOTION OF NON-PARTY ANDREA MITCHELL TO QUASH SUBPOENA IN PART

Mr. Libby respectfully submits this consolidated opposition to the government's motion *in limine* and to Andrea Mitchell's motion to quash, both of which seek to preclude relevant and powerful evidence.

### PRELIMINARY STATEMENT

The defense intends to elicit testimony from Ms. Mitchell to show that she was intensely covering the Wilson story during the relevant time period. Her activities included interviewing Mr. Wilson on television and talking to government officials (including officials at the CIA) about his trip. Based on her focus on the Wilson story, the defense will explore the likelihood that Ms. Mitchell had heard a rumor, prior to July 14, 2003, that Mr. Wilson's wife worked for the CIA. At a minimum, the defense plans to establish a factual record that the possibility of Ms. Mitchell hearing such a rumor cannot be ruled out. If she testifies that she did not hear – or cannot remember hearing – a rumor about Ms. Wilson's CIA employment, the defense will then request to impeach her with her October 2003 statement. However, regardless of the ultimate admissibility

of the October 2003 statement for impeachment purposes, the defense certainly has the right to develop the factual record described above.

Ms. Mitchell's October 2003 statement also impeaches Tim Russert, who has testified that if Ms. Mitchell had heard something about Ms. Wilson, she would have passed that information on to him. Because Mr. Libby intends to use Ms. Mitchell's statement to challenge Mr. Russert's credibility, the factual scenario here is far different from the cases cited by the government and Ms. Mitchell.

In addition, Ms. Mitchell's October 2003 statement is admissible as substantive evidence under the residual hearsay exception and the principles set forth in *Chambers* v. *Mississippi*, 410 U.S. 284, 302 (1973).

## BACKGROUND

The defense wishes to elicit testimony from Ms. Mitchell regarding the possibility that, prior to July 14, 2003, she had heard a rumor that former Ambassador Joseph Wilson's wife worked at the CIA. The defense contends that it is likely that Ms. Mitchell heard such a rumor, although she may not have learned Ms. Wilson's name or her actual role at the CIA until she read Robert Novak's July 14, 2003 column.[1]

Ms. Mitchell (even more than Mr. Russert or David Gregory) was actively focused on the Wilson story prior to July 14, 2003. On July 6, she interviewed Mr. Wilson on *Meet the Press*, and she made follow-up reports on his trip later in the week. Cathie Martin has testified that on July 8, CIA spokesperson Bill Harlow told her that Ms. Mitchell had called him and was working on a story about the sixteen words. Jan.

---

[1]    Compare this statement to the NBC News statement issued on August 9, 2004, which denied that Mr. Russert knew "Ms. Plame's name and her role at the CIA" before reading Mr. Novak's column.

25, 2007 AM Tr. at 106.  At the time Ms. Mitchell spoke to Mr. Harlow, he knew that

Mr. Wilson's wife worked at the CIA – in fact, he had told Ms. Martin that information.

In addition, as chief Foreign Affairs Correspondent for NBC News, Ms. Mitchell closely

covered the State Department, where Richard Armitage (who disclosed Ms. Wilson's

identity to two reporters, Bob Woodward and Robert Novak) worked.  In October 2003,

Ms. Mitchell made a statement that indicates, at the very least, that she was trying to find

additional information about Mr. Wilson in the relevant time period.

On October 3, 2003, on the CNBC television program *Capitol Report*, the

following exchange occurred between Ms. Mitchell and Alan Murray (the host of the

show):

> MURRAY:  And the second question is: Do we have any
> idea how widely known it was in Washington that Joe
> Wilson's wife worked for the CIA?
>
> MITCHELL:  It was widely known among those of us who
> cover the intelligence community and who were actively
> engaged in trying to track down who among the foreign
> service community was the envoy to Niger.  So a number
> of us began to pick up on that.  But frankly I wasn't aware
> of her actual role at the CIA and the fact that she had a
> covert role involving weapons of mass destruction, not
> until Bob Novak wrote it.[2]

The defense intends to explore this statement with Ms. Mitchell on the

witness stand.  The defense believes the statement was accurate when Ms. Mitchell said

it, even if she no longer recalls events in the same manner.  However, even if Ms.

Mitchell had not made this statement, the defense would seek to examine the possibility

---

[2]    The actual footage of this exchange, as well as Ms. Mitchell's subsequent attempts to
explain what she meant on the *Imus in the Morning* program, were given to the Court
along with the Offer of Proof that the defense submitted on February 8, 2007.  *See*
DX 1972.

that Ms. Mitchell had learned, prior to July 14, 2003, that Ms. Wilson worked for the CIA.

In addition, Ms. Mitchell's October 2003 statement – unlike her current position – was made less than three months after the events in question, and prior to the time when Mr. Russert, Ms. Mitchell's boss, began to deny publicly that he had been aware of Ms. Wilson's CIA employment prior to July 14, 2003. Ms. Mitchell has never been asked to explain her October 3, 2003 statement under oath, and examination by defense counsel may yield more nuanced answers than the flat denials contained in her motion to quash. For example, it is possible that what Ms. Mitchell said on *Capitol Report* accurately reflected her knowledge in October 2003, although she has subsequently forgotten what she knew about Ms. Wilson and when she learned it.

When Ms. Mitchell is on the witness stand, we wish to explore how she was intensely focusing on the Wilson matter during the time period of July 6 through July 14 (although, as promised, we will not ask her to reveal the identity of her sources). If she denies that it is possible that she "began to pick up" on the fact that Mr. Wilson's wife worked for the CIA prior to July 14, we will move to impeach her with her October 2003 statement. Thus, the defense has a good faith basis for calling Ms. Mitchell – to elicit testimony about how she paid significant attention to the Wilson story and how it is likely that she did in fact her a rumor that Mr. Wilson's wife worked for the CIA.

Ms. Mitchell has previously attempted to explain why she said "it was widely known" that Ms. Wilson worked at the CIA on at least two appearances on the *Imus in the Morning* program (November 10 and 23, 2005). She gave a variety of explanations, including that she misspoke and that she was confused, and even joked that

she was drunk. *See* DX 1972. Ms. Mitchell's attempts to explain her October 2003

statement to Mr. Imus on November 23, 2005 make clear that it is fair to interpret that

now-retracted statement to mean that she and others knew, prior to July 14, that Ms.

Wilson worked at the CIA. *E.g., id.,* ("So clearly back in October of '03, I screwed it up.

. . . I was quite surprised to hear about [making the October 2003 statement] because it

isn't consistent with anything in my memory. I can't find any notes that reflect this, this

alleged knowledge, and so I was muddled on the timeline, that is all I can imagine.").

Ms. Mitchell may have been motivated to retract her October 3, 2003

statement because it tends to demonstrate that Mr. Russert likely knew, prior to July 14,

2003, that Valerie Wilson was employed by the CIA. Mr. Russert has stated in public

and testified in court that had Ms. Mitchell heard such information prior to July 14, 2003,

she would have shared it with him. This was the practice and pattern in the NBC

Washington Bureau at the time. For example, on February 8, Mr. Russert gave the

following testimony:

> Q. Well, based on pattern and practice that existed in terms
> of how news teams worked at N.B.C. News, was the
> expected practice that if one of the key reporters on the
> team got important information, that they would come and
> report it to the group?
>
> A. Yes.
>
> Q. Okay. And Ms. Mitchell and Mr. Gregory – they were
> important members of the Wilson team, correct?
>
> A. They were two of them.

February 8, 2007 AM Tr. at 42.

During her November 23, 2003 appearance on the *Imus* show, Ms.

Mitchell stated that during the time period in question, she talked to Mr. Russert and

others at NBC about the Wilson story, although she claims that she did not discuss Mr.

Wilson's wife with Mr. Russert until after July 14, 2003. *See* DX 1972. In addition, on

October 29, 2005, Ms. Mitchell stated on television that she expected that if Mr. Russert

had learned that Ms. Wilson worked for the CIA, he would have told her. Oct. 29, 2005,

CNBC, The Tim Russert Show Tr. at 11 (DX 502). The defense fully expects Ms.

Mitchell to testify (similar to Mr. Russert) that had she known that Ms. Wilson worked at

the CIA prior to reading Mr. Novak's column, she would have communicated that

information to Mr. Russert.

      The defense contends that if Ms. Mitchell had not retracted her prior

statement, great embarassment would have been caused to Mr. Russert and the NBC

television network, particularly because the indictment against Mr. Libby was based in

large part on testimony provided by Mr. Russert. Accordingly, the defense may also

wish to elicit testimony from Ms. Mitchell regarding her retractions of her October 3,

2003 statement.

      Finally, even if Ms. Mitchell's current position is that her October 2003

statement was mistaken, the defense is nevertheless entitled to conduct further inquiries

about it. In particular, the defense should be permitted to probe the possibility Ms.

Mitchell may have been making similar, mistaken statements to Mr. Russert prior to July

14, 2003.

## ARGUMENT

## I.  A PARTY MAY IMPEACH ITS OWN WITNESS BY PRIOR INCONSISTENT STATEMENT

      The Federal Rules of Evidence leave no doubt that a party may impeach

its own witness by use of a prior inconsistent statement. Rule 613(b) states that "extrinsic

evidence of a prior inconsistent statement" may be admitted for impeachment purposes "if the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Rule 607 states: "The credibility of a witness may be attacked by any party, including the party calling the witness." Together, Rules 607 and 613(b) permit a party to impeach its own witness by prior inconsistent statement. *E.g.*, *United States* v. *Sollars*, 979 F.2d 1294, 1298 (8th Cir. 1992) ("Under these rules, a party is allowed to impeach its own witness and may use a prior inconsistent statement to do so.") The government does not – and cannot – dispute this proposition.

When a party impeaches a witness by prior inconsistent statement, the statement is presented only for impeachment purposes and not as substantive evidence of the truth of the matter asserted.[3] If there is a risk that the jury will be confused by this distinction, the proper remedy is a limiting instruction, not preclusion of the testimony. *United States* v. *Lewis*, 693 F.2d 189, 197 n.34 (D.C. Cir. 1982). In its brief, the government takes one exception to the impeachment rules – that a "party cannot call a witness for the primary purpose of impeaching that witness with an otherwise

---

[3]    If Mr. Libby has to impeach Ms. Mitchell, he understands that her prior statement will come in for impeachment purposes only, not as substantive evidence. One of the principal cases on which the government relies, *United States* v. *Sebetich*, 776 F.2d 412 (3d Cir. 1985), has been distinguished by the Third Circuit on this ground. In *Goodman* v. *Pennsylvania Turnpike Commission*, 293 F.3d 655 (3d Cir. 2002), the Third Circuit noted, "*Sebetich* does not apply to this case. Sebetich and his codefendants were trying to admit Sala's statements for substantive purposes under a hearsay exception at the same time that they were ostensibly proposing to admit it for 'impeachment' purposes under Rule 607. It was obvious that their intent was to place the substance of the statement before the jury." *Id.* at 666-67. In *Goodman*, where the proponent of the evidence introduced the testimony for impeachment purposes only, *id.* at 667, the evidence was properly admitted, *id.* at 668.

inadmissible prior statement" (Gov.'s Mot. at 4) – and seeks to use it to swallow Rules

607 and 613(b), despite the fact that all of the cases cited by the government are easily

distinguishable from the facts and circumstances of Mr. Libby's case.

II.    THE D.C. CIRCUIT'S DICTUM IN *JOHNSON* DOES NOT PRECLUDE THE
       DEFENSE FROM IMPEACHING MS. MITCHELL BY PRIOR
       INCONSISTENT STATEMENT

      The government and Ms. Mitchell attempt to use the D.C. Circuit's dictum

in *United States* v. *Johnson*, 802 F.2d 1459 (D.C. Cir. 1986), to run roughshod over Mr.

Libby's right to examine witnesses in his defense.  A fair reading of the D.C. Circuit's

limited pronouncement in *Johnson* makes clear that the case does not in any way limit the

scope of Mr. Libby's potential examination of Ms. Mitchell.

      In *Johnson*, witness David Halmon had implicated the defendant in a

signed post-arrest statement, but later testified at a pretrial hearing that the statement was

false.  *Id.* at 1463.  At trial, the government called Halmon in its rebuttal case.  When

Halmon refused to implicate the defendant, the trial court permitted the government to

introduce and publish the post-arrest statement.  *Id.*  Although the defense failed to object

to the government's introduction of the evidence as impermissible bootstrapping, the

D.C. Circuit considered the propriety of the practice in dictum.  The Circuit found "that

the prosecution called Halmon *not for any testimony he could be expected to give, but for

the sole purpose* of bringing about the admission of a post-arrest statement that, as the

prosecution well knew or should have known, was not independently admissible."  *Id.* at

1466 (emphasis added).  The Circuit found this conduct by the government improper and

offered a paragraph of analysis to explain and limit its dictum:

        There is no authority, in the Federal Rules of
        Evidence or elsewhere, suggesting that a party may on
        rebuttal call a witness-*who the party knows will not offer*

8

> *any relevant evidence*-and then impeach that witness by introducing, under Fed.R.Evid. 613(b), an earlier, hearsay statement favorably [*sic*] to that party's case. Indeed, the case law is to the contrary. Impeachment evidence is to be used solely for the purpose of impeachment, and it may not be 'employed as a mere subterfuge to get before the jury evidence not otherwise admissible.' This type of bootstrapping is impermissible, and it is *an abuse of the rule, in a criminal case, for the prosecution to call a witness that it [knows will] not give it useful evidence*, just so it [can] introduce hearsay evidence against the defendant….

*Id.* at 1466 (alterations in original) (emphasis added) (citations omitted) (internal quotation marks omitted).

Thus, the D.C. Circuit issued the following limited dictum: (i) *the government* (ii) may not call a witness who "it [knows will] not give it useful evidence" (iii) "not for any testimony he could be expected to give, but for the sole purpose of bringing about the admission of a … statement that, as the prosecution well knew or should have known, was not independently admissible." As will be demonstrated below, none of the three elements of the *Johnson* dictum apply to Mr. Libby's case.

A.    Nobody Knows How Ms. Mitchell Will Testify at Trial

In its brief, the government states that "it is clear that, if asked about this issue, Ms. Mitchell will testify that she did not know about Ms. Wilson's employment at the CIA or possible role in arranging Ambassador Wilson's 2002 trip to Niger prior to July 14, 2003." (Gov.'s Mot. at 4.) The government acknowledges Ms. Mitchell's statement to the contrary on *Capital Report* on October 3, 2003, a statement that was captured on video and was Ms. Mitchell's first public statement on the subject after the Novak article ran. (*Id.* at 1-2.) The government bases its certainty that Ms. Mitchell will testify contrary to her statement on *Capital Report* on self-serving public statements of

Ms. Mitchell, self-serving statements by Ms. Mitchell's employers, and the arguments of

Ms. Mitchell's counsel in a legal brief. (*Id.* at 2-4; *see also* Mitchell's Mot. at 4 ("Ms.

Mitchell would testify that she did not know that Ms. Wilson worked for the CIA prior to

July 14 . . . .").)

          What neither the government nor Ms. Mitchell cites to, because it does not

exist, is sworn testimony by Ms. Mitchell, subject to examination by counsel and

observation by the jury, about how she was intensely focused on Wilson story prior to

July 14, 2003, and the possibility that she picked up a rumor about Mr. Wilson's wife –

even if she has forgotten it now. The lack of a sworn statement by Ms. Wilson is a

crucial factor distinguishing her potential testimony from the testimony in *Johnson*. In

*Johnson*, the witness at issue had testified at a pretrial hearing that he had falsely

implicated the defendant in a post-arrest statement. *Johnson*, 802 F.2d at 1463. Because

the witness in *Johnson* was locked in by his testimony at the hearing, the government

knew the answers he would give when called to testify and intentionally elicited that

testimony in order to impeach him with the contradictory post-arrest statement. This is

why the D.C. Circuit explicitly stated that it is "an abuse of the rule, in a criminal case,

for the prosecution to call a witness that it [knows will] not give it useful evidence, just so

it [can] introduce hearsay evidence against the defendant." *Id.* at 1466 (alterations in

original).

          The Tenth Circuit has spoken eloquently on the uncertainty of predicting

trial testimony:

> Appellate courts are reluctant to find that a party
> called a witness for an improper purpose. The reason is
> simple. Evaluating the purpose of counsel's decision to call
> a witness is akin to pushing a string–neither is easy. . . .

> Will the formality of the courtroom, the oath, and the
> penalties of perjury change the witness' decision? What is
> the importance of the expected truthful testimony? . . . Any
> experienced trial attorney has encountered a witness who
> has changed his testimony between the final interview and
> trial. Counsel seldom knows with certainty what a witness
> will relate once on the witness stand. However, an attorney
> is entitled to assume a witness will testify truthfully. For
> these reasons, courts should find a party called a witness
> for an improper purpose only where the trial record
> establishes clearly and unequivocally the circumstances
> showing an improper purpose existed.

*United States* v. *Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992). Mr. Libby is hopeful that

Ms. Mitchell will testify truthfully at trial by stating that, given her intense focus on the

Wilson story, it is possible that she learned about Ms. Wilson's employment at the CIA

prior to July 14, 2003, perhaps because she heard a rumor or learned of a "buzz" about

why Mr. Wilson was selected for his trip to Niger. The defense is calling her, in part, to

elicit that truthful testimony. If Ms. Mitchell testifies falsely, he will attempt to impeach

her with her prior statement, as is his right. But *Johnson* simply does not stand for the

proposition that a defendant is required to assume a witness will give harmful testimony,

when she has previously made crucial exculpatory statements. The D.C. Circuit's dictum

in *Johnson* is inapplicable to Mr. Libby's case on the strength of this distinction alone.

The uncertainty surrounding Ms. Mitchell's potential testimony also

serves to distinguish three of the four principal cases from other Circuits on which the

government relies. In *Sebetich*, the Third Circuit found that "when appellants moved to

subpoena [a witness], they did so with the expectation that he would deny making such

statements to [other witnesses]. The express purpose for calling [the witness] was thus to

impeach him…." *Sebetich*, 776 F.2d at 428. In *United States* v. *Morlang*, 531 F.2d 183

(4th Cir. 1975), the Fourth Circuit similarly found: "Wilmoth was called by the

government as its first witness despite the fact that it was fully aware that his testimony would tend to exonerate Morlang from participation in the bribery although damning against Ballard and Barron as well as Wilmoth himself. The real purpose for calling Wilmoth was apparently to elicit from him a denial that he had ever had any conversation with a fellow prisoner in which he implicated Morlang." *Id.* at 188.  In *United States* v. *Fay*, 668 F.2d 375 (8th Cir. 1981), defense counsel made an offer of proof that a witness would deny a statement before seeking to call another witness to impeach the first witness with a prior inconsistent statement. *Id.* at 379.

The circumstances here could not be more different.  Unlike in the cases cited above, Mr. Libby is not calling Ms. Mitchell for the sole purpose of impeaching her. Rather, he has an entirely independent basis for seeking her testimony.  The defense will establish how intensely she was working on the story during the week of July 6, from whom she was seeking information (e.g., Mr. Harlow), and about what (how Mr. Wilson got sent).  That testimony alone, given by NBC's lead reporter on the story (who is known to have strong contacts at the CIA and State Department) will allow the defense to argue that Ms. Mitchell may well have picked up some "buzz" about the wife's employment and passed that along to Mr. Russert.  If Ms. Mitchell denies it is even possible that she could have heard such a rumor, only then will Mr. Libby seek to impeach her with her statement that it was widely known before Mr. Novak's column that Mr. Wilson's wife worked for the CIA.

Mr. Libby believes Ms. Mitchell may testify that her statements on *Capital Report* could have been accurate at the time she made them.  In the event that Ms. Mitchell testifies to the contrary, Mr. Libby's right to impeach her should not be

constrained based on cases in which the proponent of the evidence knew the witness

would testify inconsistently and put on the witness for the purpose of later impeaching

him.

> **B.    The Defense Intends to Call Ms. Mitchell for Other Good-Faith Purposes as Well**

The government argues that a "party cannot call a witness for the *primary*

purpose of impeaching that witness with an otherwise inadmissible prior statement."

(Gov.'s Mot. at 4) (emphasis added).  As discussed above, in *Johnson*, the D.C. Circuit

found misconduct according to a different standard, when the government called its

witness "not for any testimony he could be expected to give, but for the *sole purpose* of

bringing about the admission of a … statement that, as the prosecution well knew or

should have known, was not independently admissible."  *Johnson*, 802 F.2d at 1466

(emphasis added).  The defense intends to call Ms. Mitchell for a purpose apart from

whether it is possible that she knew that Ms. Wilson worked at the CIA prior to July 14,

2003.  She will also be questioned about her telephone conversation with Mr. Libby on

July 8, 2003, and about what she did to cover the Wilson story before July 14, 2003.

Under the law of the D.C. Circuit, Mr. Libby is entitled to call and question Ms. Mitchell

for all relevant purposes, including impeachment if that becomes necessary.

Consistent with the law in this Circuit, other circuits have held that, when

a witness may give testimony that is both helpful and harmful to a party, the party may

call the witness and impeach her with prior inconsistent statements if necessary.  In

*United States* v. *Eisen*, 974 F.2d 246 (2d Cir. 1992), the Second Circuit distinguished the

D.C. Circuit's dictum in *Johnson* on this ground, stating: "Where the Government has

called a witness whose corroborating testimony is instrumental to constructing the

Government's case, the Government has the right to question the witness, and to attempt

to impeach him, about those aspects of his testimony that conflict with the Government's

account of the same events." *Id.* at 262-63. In *United States* v. *Webster*, 734 F.2d 1191

(7th Cir. 1984), which the government cites without comment, the Seventh Circuit

*affirmed* the admission of a prior inconsistent statement by the government to impeach its

own witness. Judge Posner wrote for the panel:

> Suppose the government called an adverse witness that it
> thought would give evidence both helpful and harmful to it,
> but it also thought that the harmful aspect could be nullified
> by introducing the witness's prior inconsistent statement.
> As there would be no element of surprise, Professor
> Graham[4] would forbid the introduction of the prior
> statements; yet we are at a loss to understand why the
> government should be put to the choice between the Scylla
> of forgoing impeachment and the Charybdis of not calling
> at all a witness from whom it expects to elicit genuinely
> helpful evidence.

*Id.* at 1193; *United States* v. *Patterson*, 23 F.3d 1239, 1246 (7th Cir. 1994) ("The most

that we can say about Taylor as a witness is that he provided testimony that was both

helpful and harmful at the same time. In such a case the prosecutor is allowed to call the

witness and discredit the harmful testimony with prior inconsistent statements if

possible.").

    C.    The *Johnson* Dictum Has Not Been Applied to Criminal Defendants

        The government assumes without support that the dictum in *Johnson*

applies to criminal defendants as proponents of evidence, but that is not the law of the

---

[4]    In this passage, the Seventh Circuit specifically rejects the "surprise" evidentiary theory of Prof. Graham, which the government has cited at footnote 2 of its brief. For what purpose the government has cited Prof. Graham's work is unclear. The government does not argue that it is the law of the D.C. Circuit, or any jurisdiction, that a party calling a witness must be "surprised" by the witness's testimony in order to be permitted to impeach the witness.

D.C. Circuit.  The government cites no cases within the D.C. Circuit for the proposition

that *Johnson* restricts the right of a defendant to impeach his own witness by prior

inconsistent statements.  As discussed above, *Johnson* involved an attempt by the

government to impeach its own witness by a prior inconsistent statement.  The *Johnson*

dictum explicitly states that it is "an abuse of the rule, in a criminal case, *for the*

*prosecution* to call a witness that it [knows will] not give it useful evidence, just so it

[can] introduce hearsay evidence *against the defendant*…."  *Johnson*, 802 F.2d at 1446

(alteration in original) (emphases added) (quoting *Webster*, 734 F.2d at 1192) (internal

quotation marks omitted).  Indeed, in each of the five cases from other Circuits cited in

*Johnson*, the government was the proponent of the testimony in question.  *Morlang*,

which the D.C. Circuit cited in *Johnson* and on which the government attempts to rely,

explicitly grounds its rule in protection of the defendant's rights.  *Morlang*, 531 F.2d at

190 ("Foremost among these concepts is the principle that men should not be allowed to

be convicted on the basis of unsworn testimony."); *id.* ("The introduction of such

testimony, even where limited to impeachment necessarily increases the possibility that a

defendant may be convicted on the basis of unsworn evidence….")

      In fact, all but two of the cases cited in the government's motion address a

government attempt to impeach its own witness.  *See United States* v. *Buffalo*, 358 F.3d

519, 525 (8th Cir. 2004) ("The vast majority of cases on the issue of impeaching one's

own witness with a prior inconsistent statement speak to the government's use of the

statements to impeach its witnesses where the statements inculpate the defendant.").  One

of the two cases the government cites which involves the defendant as the proponent of

the evidence is the Third Circuit's opinion in *Sebetich*, which as discussed in footnote

II.A of this brief, has been distinguished by the later Third Circuit opinion in *Goodman*.

In addition as we argue, *Sebetich* has also been distinguished on its facts in section II.A

of this brief. The other case that the government cites applying the impeachment rule to a

defendant is the Eight Circuit's 1981 decision in *Fay*, which has also been distinguished

on its facts in section I.A of this brief. Furthermore, the Eighth Circuit's recent opinion

in *Buffalo* appears to have limited *Fay* to the generic proposition that there is a "potential

for abuse in impeaching one's own witness with prior inconsistent statements." *Id.* at

522. In its detailed opinion in *Buffalo*, the Eighth Circuit applies a Rule 403 balancing

test as the last step in determining whether a defendant should have been allowed to

impeach his own witness by prior inconsistent statement.[5] The Eight Circuit's analysis,

which sounds in the same policies as *Johnson* and *Morlang*, casts serious doubt on the

government's attempt to use Eighth Circuit precedent to argue that Mr. Libby may not

impeach Ms. Mitchell by prior inconsistent statement if necessary:

> "When the prosecution attempts to introduce a prior
> inconsistent statement to impeach its own witness, the
> statement's likely prejudicial impact often substantially
> outweighs its probative value for impeachment purposes
> because the jury may ignore the judge's limiting
> instructions and consider the 'impeachment' testimony for
> substantive purposes. That risk is multiplied when the
> statement offered as impeachment testimony contains the
> defendant's alleged admission of guilt."
>
> ….
>
> When the defendant seeks to introduce a prior
> inconsistent statement for impeachment purposes, the

---

[5]  In *Johnson*, the D.C. Circuit did not apply a Rule 403 analysis as part of its
determination. Instead, the D.C. Circuit chose to examine the intentions of the party
proffering the testimony under its "sole purpose" test. *Cf. Buffalo*, 358 F.3d at 523-24
(comparing the Eighth Circuit's Rule 403 analysis with the "primary purpose" test of
several other Circuits).

> dangers identified above are not implicated. Simply put,
> the prejudicial impact of the statement does not endanger
> the defendant's liberty by risking a conviction based on
> out-of-court statements that are not subject to confrontation
> by way of cross-examination.

*Id.* at 525 (citations omitted) (quoting *United States* v. *Ince*, 21 F.3d 576 (4th Cir. 1994)).

To sum up, Mr. Libby seeks to call Ms. Mitchell to testify on a variety of topics, including whether it is possible that she knew, prior to July 14, 2003, that Ms. Wilson was employed at the CIA. Mr. Libby expects that when Ms. Mitchell is sworn on the witness stand, she will testify truthfully, admitting that she may have been aware of Ms. Wilson's status. If Ms. Mitchell does not testify truthfully, Mr. Libby may well have to impeach her with her prior inconsistent statement. Neither the government nor Ms. Mitchell has cited a single case that says he may not do so on these facts.

III.    MS. MITCHELL'S OCTOBER 2003 STATEMENT IS NECESSARY TO CONTRADICT MR. RUSSERT

The case presents a much different factual scenario from the ones discussed above because Ms. Mitchell's October 2003 statement is not only relevant to her expected testimony, but to the testimony of Mr. Russert. The government called Mr. Russert and elicited testimony that it was impossible for him to have asked Mr. Libby about Ms. Wilson because he did not know anything about her until July 14, 2003. Mr. Russert's testimony also indicates that the way his news team worked, if Ms. Mitchell (or Mr. Gregory) had known that Ms. Wilson worked for the CIA, she would have told Mr. Russert. Thus, whether Ms. Mitchell had heard a rumor that Ms. Wilson worked for the CIA prior to July 14, 2003 is directly relevant to Mr. Russert's credibility. It is unfair for the government to make the issue of when Mr. Russert learned of Ms. Wilson's identity

of critical importance in this case, and then hide behind a cramped view of evidentiary

rules to bar the defense from introducing a contradictory statement by Ms. Mitchell.

IV.    APPLICATION OF THE RESIDUAL EXCEPTION PROVIDED BY RULE 807
       IS WARRANTED IN THIS CASE

              As noted above, Mr. Libby is clearly entitled to call Ms. Mitchell to

provide testimony useful to the defense, testimony that does not rely on admission of her

October 3, 2003 statements.  Only if necessary will Mr. Libby seek to impeach Ms.

Mitchell using those prior statements.  Separate and apart from that, Mr. Libby submits

that Ms. Mitchell's October 3, 2003 statements should be admitted for their truth under

Fed. R. Evid. 807, the residual hearsay exception.  The residual exception afforded by

Rule 807 is, undoubtedly, a narrow one.  But where, as here, the conditions necessary to

invoke the exception are present, the interests of justice require that it be applied to

ensure a trial reaches a fair result.  *See Chambers* v. *Mississippi*, 410 U.S. 284, 302

(1973).[6]

              *First,* the out of court statements that Mr. Libby seeks to admit are

undoubtedly "evidence of a material fact."  Mr. Russert made clear in the deposition he

gave to Mr. Fitzgerald and in his testimony at trial that the reason he is so certain he did

not ask Mr. Libby about Ms. Wilson's employment is because he did not know about her

employment at that time.  Feb. 7, 2007 P.M. Tr. at 12, 34-35, 38; Aug. 7, 2004 Russert

---

[6]    Rule 807 states, in relevant part: A statement not specifically covered by Rule 803 or
       804 but having equivalent circumstantial guarantees of trustworthiness, is not
       excluded by the hearsay rule, if the court determines that (A) the statement is offered
       as evidence of a material fact; (B) the statement is more probative on the point for
       which it is offered than any other evidence which the proponent can procure through
       reasonable efforts; and (C) the general purposes of these rules and the interests of
       justice will best be served by admission of the statement into evidence.

Dep. at 15. Evidence that Mr. Russert *did* know about Ms. Wilson's employment would directly undermine Mr. Russert's testimony, and is therefore crucial to Mr. Libby's defense. Indeed, even evidence that Mr. Russert had heard a rumor regarding Ms. Wilson's employment would be sufficient to cast doubt on Mr. Russert's testimony. As Mr. Russert himself acknowledged, information learned through rumor is a sufficient basis to ask questions seeking to confirm or deny the rumor. Feb. 7, 2007 P.M. Tr. at 37.

Ms. Mitchell's October 3, 2003 statements are highly probative on the issue of what Mr. Russert knew and when. They are, however, highly probative on that issue. Mr. Russert's own testimony (and Ms. Mitchell's public statements) regarding the information flow in the NBC newsroom make clear that if Ms. Mitchell had known, or heard rumors about Ms. Wilson's employment, she would have shared that information with Mr. Russert. *See* Feb. 7, 2007 P.M. Tr. at 42:9-18; DX 502 at 11. Moreover, as noted above, there is every reason to believe that when asked at trial whether she would have shared information about Ms. Wilson with Mr. Russert, Ms. Mitchell will acknowledge that to be true.

The bottom line is that if permitted to admit the evidence in question, the defense will be able to argue to the jury:

1. that, contrary to her current position, Ms. Mitchell *did* in fact possess information regarding Ms. Wilson's employment before Mr. Novak's column;

2. that Ms. Mitchell would have relayed whatever information she had to Mr. Russert; and

3. that, given his acknowledged drive to get the story first, Mr. Russert would have sought to confirm that information when he was, fortuitously, contacted by Mr. Libby.

19

This argument does not, contrary to the Court's concerns, rely on a chain of speculative inference. Rather, it is a simple and compelling argument that is based on evidence already in the record and that is crucial to Mr. Libby's defense.

*Second*, Rule 807 requires that the evidence in question be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Ms. Mitchell made the October 3, 2003 statements regarding her knowledge of Ms. Wilson's employment close in proximity to the events of July 2003, and long before she had any possible motive to color her recollection of events. As the Court knows, the defense has sought from Ms. Mitchell and NBC any evidence regarding her knowledge of Ms. Wilson's employment at the time and have been told that no such evidence exists. The prosecution also has no information from that time period, as Ms. Mitchell declined to be interviewed and was not subpoenaed to provide testimony. Thus, the public statements Ms. Mitchell made on the *Capital Report* are the only means available to the defense to establish that Ms. Mitchell's knowledge about Mr. Wilson's wife was then – regardless of what she remembers or is willing to testify to now.

*Third*, Rule 807 requires that the statements being offered have "circumstantial guarantees of trustworthiness." In Mr. Libby's view, statements Ms. Mitchell made regarding her pre-July 14 knowledge of Ms. Wilson's employment less than three months after the fact are significantly more reliable than what she has to say about that issue now, when a motive to shade her testimony may be present. What is more, Ms. Mitchell is not an unavailable declarant, but rather will be a witness at trial and therefore can be questioned by the prosecution about her October 2003 statements and

asked to explain them.  Both the D.C. Circuit and other courts have held that where that opportunity for cross-examination is available, concerns about the trustworthiness of the statement at the time it was made are lessened.  *See SEC* v. *First City Fin. Corp.*, 890 F.2d 1215, 1225 (D.C. Cir. 1989) ("Appellants had ample opportunity to cross-examine Greenberg about his out-of-court statements during his two depositions to probe for weaknesses. They also could challenge David Hyman's preparation of the chronology during Hyman's deposition. Thus, the primary rationale for the hearsay rule-the inability to cross-examine the out-of-court declarant on the veracity of his statement-was at least partially offset here."); *see also United States* v. *Valdez-Soto*, 31 F.3d 1467, 1471-72 (9th Cir. 1994) (admitting evidence under residual hearsay exception when declarant testified at trial); *United States* v. *McPartlin*, 595 F.2d 1321, 1350-51 (7th Cir. 1979) ("Furthermore the degree of reliability necessary for admission is greatly reduced where, as here, the declarant is testifying and is available for cross-examination, thereby satisfying the central concern of the hearsay rule."); *United States* v. *Leslie*, 542 F.2d 285, 290 (5th Cir. 1976) ("We agree with Judge Learned Hand's observation that when the jury decides the truth is not what the witness says now but what he said before, they are still deciding from what they see and hear in court.").

   *Finally,* and perhaps most importantly, there is no doubt that here, "the interests of justice will best be served by admission of [Ms. Mitchell's] statement into evidence."  Important as adherence to the hearsay rules are, the Supreme Court has admonished that those rules must yield where necessary to ensure a defendant's constitutional right to a fair trial and to present a complete defense is protected.  That principle was made clear in *Chambers* v. *Mississippi*, where the Supreme Court explained

that "the hearsay rule may not be applied mechanistically to defeat the ends of justice,"

410 U.S. at 302, and recently affirmed in *Holmes* v. *South Carolina*, 126 S. Ct. 1727

(2006).  The defense recognizes and appreciates that the residual exception is not to be

invoked lightly.  But we submit that where, as here, the evidence in question is so

relevant to a central and perhaps outcome determinative issue in a criminal case, the

application of Rule 807, and the teachings of the *Chambers* case, are plainly warranted.

# CONCLUSION

For the foregoing reasons, I. Lewis Libby respectfully requests that the Court deny the government's motion *in limine* and Ms. Mitchell's motion to quash.

Dated:  February 9, 2007                    Respectfully submitted,


_____/s/_____            _____/s/_____
Theodore V. Wells, Jr.                      William H. Jeffress, Jr.
(DC Bar No. 468934)                         (DC Bar No. 041152)
James L. Brochin                            Alex J. Bourelly
(DC Bar No. 455456)                         (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton               Baker Botts LLP
  & Garrison LLP                            1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas                 Washington, DC  20004
New York, NY  10019-6064                    Tel:  (202) 639-7751
Tel:  (212) 373-3089                        Fax: (202) 585-1087
Fax: (212) 373-2217


_____/s/_____
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700