**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

MAR   2 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Throughout the trial in this matter, which commenced on January 16, 2007, the parties

have raised a number of evidentiary disputes.  During the course of the trial, the Court resolved

those disputes from the bench.  Nonetheless, the Court concludes that it is appropriate to

memorialize some of those rulings in a written opinion.  Accordingly, this Memorandum

Opinion sets forth the Court's ruling on the following motions:  (1) the Government's Motion in

Limine to Preclude Testimony of Andrea Mitchell;[1] (2) the Brief of I. Lewis Libby on

Admissibility of State of Mind Evidence Without Defendant's Testimony;[2] and (3) the

---

[1]  The following papers were submitted in connection with this motion: (1) the Government's Motion in
Limine to Preclude Testimony of Andrea Mitchell ("Gov't's Mitchell Mot."); (2) Motion of Non-Party Andrea
Mitchell to Quash Subpoena in Part and Supporting Memorandum of Points & Authorities ("Mitchell Mot.");
(3) Consolidated Opposition of Defendant I. Lewis Libby to Government's Motion in Limine to Preclude Testimony
of Andrea Mitchell and to Motion of Non-Party Andrea Mitchell to Quash Subpoena in Part ("Def.'s Mitchell
Mot."); (4) the Government's Reply in Support of Motion in Limine to Preclude Testimony of Andrea Mitchell
("Gov't's Mitchell Reply); and (5) Reply Memorandum in Support of Motion of Non-Party Andrea Mitchell to
Quash Subpoena in Part ("Mitchell Reply").  Because the government's and Mitchell's motions and arguments are
nearly identical, for the purposes of this consolidated memorandum opinion, the Court shall cite primarily to the
government's motion.

[2]  The following papers have been submitted to the Court in connection with this motion: (1) Brief of
Defendant I. Lewis Libby on Admissibility of State of Mind Evidence without Defendant's Testimony ("Def.'s State
(continued...)

1

defendant's Memorandum of Law in Support of Introducing Additional Evidence to Impeach

Government Witness Tim Russert ("Def.'s Russert Mot."). Because this Court has, on several

occasions, set forth the facts underlying the charges lodged against the defendant, see, e.g.,

United States v. Libby, 432 F. Supp. 2d 81, 82-83 (D.D.C. 2006); United States v. Libby, 432 F.

Supp. 2d 26, 28-29 (D.D.C. 2006); United States v. Libby, 429 F. Supp. 2d 27, 28-29 (D.D.C.

2006); United States v. Libby, 429 F. Supp. 2d 1, 4 (D.D.C. 2006), it need not repeat them here,

but will turn immediately to the evidentiary disputes.

### I.    Government's Motion In Limine to Preclude Testimony of Andrea Mitchell

The defendant sought to elicit testimony from Andrea Mitchell, a reporter with NBC

News, regarding her knowledge of Valerie Plame Wilson's employment with the Central

Intelligence Agency ("CIA") for the purpose of undermining NBC News Washington Bureau

Chief Tim Russert's direct examination trial testimony that it would not have been possible for

Russert to have broached the topic of Ms. Wilson with the defendant because he did not know

anything about her when the conversation occurred. Mitchell Mot. at 2; Trial Transcript ("Tr.")

2/7/07 p.m. at 12, 34-35, 38. Russert further testified that Mitchell, as one of the members of the

NBC news team, would have disclosed important news information to him. Tr. 2/8/07 a.m. at

42. To attack Russert's credibility, the defendant sought to introduce evidence that on October 3,

2003, Mitchell made a statement to CNBC's Allen Murray indicating that there was a rumor

among Washington reporters regarding Ms. Wilson's CIA employment before Russert spoke to

---

[2](...continued)
of Mind Br."), (2) the Government's Response to Defendant's Brief Concerning Admissibility of Evidence of State
of Mind ("Gov't's State of Mind Resp."); and (3) Reply Brief of Defendant I. Lewis Libby on Admissibility of State
of Mind Evidence without Defendant's Testimony ("Def.'s State of Mind Reply"). The Court heard argument on
this matter on February 12 and 14, 2007.

the defendant.[3]  However, shortly thereafter, Mitchell recanted this exchange, repeatedly

asserting that she did not know Ms. Wilson worked at the CIA prior to the publication of the

Robert Novak article, from which Russert testified he first learned about Ms. Wilson's

employment, and that she had "misunderstood Allen's question and screwed it up."  Mitchell

Mot. at 4.  And, counsel for Mitchell proffered to the Court that if called as a witness, Mitchell

would testify that she had no knowledge of Ms. Wilson's CIA employment prior to the

publication of the Novak article.  Tr. 2/8/07 p.m. at 101-02; Mitchell Mot. at 4.  Nonetheless, the

defendant opined that by demonstrating that Mitchell may have had some knowledge of Ms.

Wilson's affiliation with the CIA, it is reasonably inferred that she would have shared this

information with Russert before he had his conversation with the defendant, and thus, the jury

should not credit Russert's testimony that he did not know of Ms. Wilson's affiliation with the

CIA until the Novak article was published.  Moreover, the defense asserted that it should be able

to introduce this evidence to challenge Mitchell's credibility.

The defendant advanced four legal theories as support for the introduction of this

evidence.  First, the defendant contended that he should be entitled to establish a "factual record

that the possibility of Mitchell's hearing such a rumor cannot be ruled out."  Def.'s Mitchell Mot.

---

[3]  The October 2003 exchange is as follows:

> MURRAY: And the second question is: Do we have any idea how widely known
> it was in Washington that Joe Wilson's wife worked for the CIA?
>
> MITCHELL: It was widely known amongst those of us who cover the
> intelligence community and who were actively engaged in trying to track down
> who among the foreign service community was the envoy to Niger.  But frankly I
> wasn't aware of her actual role at the CIA and the fact that she had a covert role
> involving weapons of mass destruction, not until Bob Novak wrote it.

Def.'s Mitchell Mot. at 3.

at 1.  Second, that if Mitchell denied hearing such a rumor, the defense could use her statement
to Murray to impeach her credibility.  Id.  Third, that under United States v. Chambers, 410 U.S.
284, 298 (1983), the defense could use the October 2003 statement to impeach Russert's
credibility because he testified that had Mitchell heard such a rumor she would have reported that
information to him and therefore it was possible for him to bring the topic to the defendant's
attention.  Id. at 2.  And finally, that the October 2003 statement was admissible as substantive
evidence under Federal Rule of Evidence 807, the residual hearsay exception.  Id. at 2.  The
Court will first address the latter two arguments.

A.      **Mitchell's October 2003 Statement Could Not be Introduced as Substantive
        Evidence.**

        The defendant argued that he should be permitted to utilize Mitchell's October 2003
exchange to impeach Russert's credibility.  Def.'s Mitchell Mot. at 17.  As this Court noted
during the trial, the October 2003 exchange would only impeach Russert's credibility if it could
be admitted as substantive evidence for the truth of the matter asserted—i.e., that Mitchell had
actually heard rumors regarding Ms. Wilson's employment status with the CIA.  If admitted for
its truth, the defendant could ask the jury to infer, consistent with Russert's testimony, that
Mitchell would have reported this information to him as her "boss," and that Russert would have
had a factual basis for asking the defendant about it during their telephone conversation on July
10 or 11, 2003.  However, there was simply no basis for the October 2003 interview being
introduced as substantive evidence under either the Supreme Court's pronouncement in
Chambers or Federal Rule of Evidence 807, as suggested by the defendant.

In Chambers, the Supreme Court concluded that Chambers had been denied a fair trial: (1) when he was not afforded the opportunity on re-direct examination to question his own witness regarding the witness's confession that he had committed the offense for which Chambers was on trial and that had been introduced during the witness's direct examination but repudiated by him during the State's cross-examination,[4] and (2) when the trial court prevented Chambers from impeaching this witness's testimony denying guilt with prior confessions made to third parties. See Chambers, 410 U.S. at 298. Concluding that the trial court's evidentiary rulings deprived Chambers of a fair trial, Justice Powell noted that the "right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Id. at 294. Further, the Court noted that "[t]he rights to confront and call witnesses in one's own behalf have long been recognized as essential to due process." Id. While recognizing that the prohibition on hearsay was well established in American law, the Court held that where the testimony was "critical to Chambers' defense," and "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." Id. at 302. The Court reached this conclusion reasoning that the hearsay in question "bore persuasive assurances of trustworthiness and . . . was well within the basic rationale of the exception for declarations against interest."[5] Id.

---

[4] The trial court excluded this testimony based on Mississippi's "voucher rule" that permitted confrontation only when a witness was adverse. In overruling Mississippi on this point, the Court criticized the now defunct voucher rule which was rejected in the federal system when Federal Rule of Evidence 607 was adopted in 1987. Chambers, 410 U.S. at 294. The Court, however, did not hold that this error alone would have merited reversal. Rather, the Court found this error, in combination with the erroneous exclusion of testimony from several other witnesses about the confession, denied Chambers a fair trial. Id. at 298.

[5] At the time Chambers was decided, Mississippi law did not recognize statements against penal interest as an exception to the hearsay rule. See Chambers, 410 U.S. at 299.

5

Specifically, the Court noted that the confessions (1) were made spontaneously to friends, (2) were corroborated by evidence already in the case, and (3) were clearly against McDonald's interest.  See id. at 300.  Therefore, the confessions were deemed reliable and were "well within the basic rationale of the exception for declarations against interest."  Id. at 302.  Thus, the Court concluded that Chambers should have been permitted to not only use the confessions to undermine McDonald's credibility, see id. at 295-98, but also as substantive evidence for their truth, see id. at 302.

The Supreme Court's holding in Chambers does not provide a legal basis for the admission of an otherwise inadmissible hearsay statement.  See id. at 302.  First, the statement in Chambers was a hearsay statement that was against the witness's penal interest.   Federal Rule of Evidence 804(b)(3) now formally recognizes statements tending to expose the declarant to criminal liability as an exception to the hearsay rule so long as the declarant is unavailable within the meaning of the rule.  In the case at bar, Mitchell's October 2003 statement did not fall within any of the recognized hearsay exceptions, including, as discussed below, Rule 807.  Second, the Supreme Court in Chambers concluded that the introduction of the confession was proper because it was critical to the defendant's case and was reliable.  See Chambers, 410 U.S. at 302.  Such was not the case here.  The defense offered no evidence from which the Court could attach a level of trustworthiness to Mitchell's October 2003 exchange, which would have permitted the exchange to be admitted as substantive evidence.  Moreover, the introduction of Mitchell's October 2003 exchange was not critical to the defendant's case.  As already noted, there were a number of inferences and leaps in the logic the jury would have to make to conclude that the October 2003 statement had any bearing on the defendant's innocence.  Thus, unlike the third-

party confession in <u>Chambers</u>, Mitchell's statement did not go to the heart of Libby's defense. Rather, even if there was a basis for admitting the statement for its truth, as noted above, the jury would still have to draw a number of inferences leading to transgression into the realm of speculation before being able to reach the conclusion that Russert raised Ms. Wilson's CIA employment with the defendant during their telephone conversation. Additionally, there was no corroborative evidence to support the reliability of Mitchell's October 2003 statement. Indeed, Mitchell and NBC repeatedly repudiated the exchange as false and misleading. And this Court's own assessment of the statement led it to the conclusion that while it certainly can be read consistent with the defendant's interpretation, ambiguity nonetheless exists, especially in light of Mitchell's recantation.

Finally, it is important to recognize that the Supreme Court in <u>Chambers</u> limited its holding to the unique facts of that case. Indeed, Justice Powell noted, "[i]n reaching this judgment, we establish no new principles of constitutional law. . . . Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." <u>Chambers</u>, 410 U.S. at 302-03; <u>see</u> <u>Grochulski v. Henderson</u>, 637 F.2d 50, 55-56 (2d Cir. 1980) (distinguishing <u>Chambers</u> and noting that it was a narrow holding limited to the unique facts where the witness had confessed to the charged crime and there was corroborating evidence indicating the trustworthiness of the hearsay confessions). Accordingly, contrary to the defendant's position, <u>Chambers</u> simply does not provide a vehicle for the introduction of the Mitchell statement.

The defense also contended that Mitchell's statement should be admitted for its truth under Federal Rule of Evidence 807, the residual exception to the ban on hearsay. Def. Mitchell Mot. at 18. Rule 807 provides that a

> statement not specifically covered by Rule 803 or 804 but having equivalent guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807. The second requirement—that the evidence be more probative than any other available evidence—goes beyond the evidence's mere reliability and trustworthiness. Rather, it must be "very important and very reliable" such that it is the best evidence to prove the defense's point and there is no other evidence available that would have the same influence. See, e.g., United States v. Washington, 106 F.3d 983, 1001 (D.C. Cir. 1997) (quoting U.S. v. Kim, 595 F.2d 755, 766 (D.C. Cir. 1979)) (construing the residual hearsay exception previously codified as Rules 804(24) and 804(b)(5)). The District of Columbia Circuit has declined to construe admission under Rule 807 liberally. Rather, the Circuit Court has held that the residual exception is to be narrowly construed, see Washington, 106 F.3d at 1001, and its application "is appropriate only in exceptional circumstances," Kim, 595 F.2d at 765-66; see also Barry v. Trs. of Int'l Ass'n Full-Time Salaried Officers & Employees of Outside Local Unions & District Counsel's (Iron Workers) Pension Plan, ___ F. Supp. 2d ___, ___, 2006 WL 3759851, at * 11

(D.D.C. Dec. 22, 2006).[6] It is through this narrow lens that the Court considered the defendant's

Rule 807 argument.

The defense argued that Mitchell's October 2003 statement satisfied Rule 807's three

criteria. Def.'s Mitchell Mot. at 19-22. This Court could not agree. The October 2003 exchange

was not sufficiently trustworthy or reliable to render it admissible under Rule 807. Indeed,

Mitchell represented to the Court through counsel and stated publicly that she was mistaken

when she had spoken these words on the Capitol Report. Mitchell Mot. at 4; Tr. 2/8/07 p.m. at

101-03. And as previously noted, this Court's own review of the statement showed that the way

it is worded makes it somewhat ambiguous as to when Mitchell was saying she first heard about

Ms. Wilson's affiliation with the CIA. The Court simply could not find any indication that this

statement had the requisite level of trustworthiness to qualify as an exception to the hearsay rule

under this Circuit's construction of the residual hearsay exception. Because the District of

Columbia Circuit commands this Court to strictly construe Rule 807 narrowly, and because

Mitchell's October 2003 statement lacks sufficient indicia of reliability, admitting this statement

under the residual hearsay exception would have perverted the limitation on the admissibility of

hearsay statements.

---

[6] Some courts permit the use of Rule 807 in situations "when necessary and reliable hearsay almost fits—but does not quite fit—within an established exception to the rule." George Fischer, Evidence 514 (2002). Thus, the Sixth and Eighth Circuits have interpreted Rule 807's "specifically covered" language liberally "to mean that if a statement is admissible under one of the hearsay exceptions, that exception should be relied on instead of the residual exception." United States v. Laster, 258 F.3d 525, 530 (6th Cir. 2001) (internal quotation marks and citation omitted); see also United States v. Earles, 113 F.3d 796, 800 (8th Cir. 1997). Other jurists argue for a more narrow interpretation of Rule 807, contending that the Federal Rules of Evidence are very explicit about the requisite requirements underlying hearsay exceptions and that courts should not be allowed to fork the will of Congress by misusing Rule 807; rather, Rule 807 should be reserved for scenarios Congress did not contemplate and not for "near misses" or for evidence that is "close enough" to one of the established hearsay exceptions recognized under the Federal Rules of Evidence. See, e.g., Laster, 258 F.3d at 533-35 (Moore, J. dissenting).

For the reasons set forth above and expressed by this Court during the trial, there is simply no basis for admitting Andrea Mitchell's October 2003 statement as substantive evidence.

**B.   Mitchell's October 2003 Statement is Not Admissible as Impeachment Evidence under Federal Rule of Evidence 607**

Federal Rule of Evidence 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Fed. R. Evid. 607. This rule was amended in 1987 to codify a growing trend in the circuit courts abandoning the traditional "voucher" doctrine whereby a party could not impeach its own witness because a party assured its own witness's veracity. 1 Kenneth S. Broun, McCormick On Evidence § 38 (6th ed. 2006). The amendment reflected the drafters' notion that because a party often does not have a "free choice in selecting [a witness]," preventing a party from impeaching his own witness "leaves the party at the mercy of the witness and the adversary." Fed. R. Evid. 607, advisory committee's notes. But, if a party attempts to undermine a witness's credibility with a prior inconsistent hearsay statement, such a statement is admissible only for impeachment purposes and may not be utilized as substantive evidence. See, e.g., United States v. Carter, 973 F.2d 1509, 1512 (10th Cir. 1992); United States v. Webster, 734 F.2d 1191, 1192 (7th Cir. 1984); United States v. Miller, 664 F.2d 94, 97 (5th Cir. 1981) (noting that the prosecution may not utilize prior inconsistent statements for the primary purpose of exposing the jury to otherwise inadmissible evidence).

Despite Rule 607's broad language, courts, including the District of Columbia Circuit, have limited a party's ability to impeach its own witness. In United States v. Johnson, 802 F.2d 1459 (D.C. Cir. 1986) the District of Columbia Circuit concluded that "[i]mpeachment evidence is to be used solely for the purpose of impeachment, and it may not be 'employed as a mere

subterfuge to get before the jury evidence not otherwise admissible,'" id. at 1466 (quoting United States v. Morlang, 531 F.2d 183, 190 (4th Cir. 1975)).[7] In that case, Johnson was charged and convicted of possessing cocaine with an intent to distribute. See id. at 1461. During the government's rebuttal case, the prosecution called David Halmon as its witness. See id. at 1463. Halmon had previously given the police a signed statement indicating he had sold drugs for the defendant in the past. See id. During a hearing outside of the jury's presence, Halmon refused to implicate Johnson. See id. Thus, the prosecution knew that Halmon's testimony would contradict his earlier statement to the police. Over Johnson's objection, the trial court permitted the government to question Halmon in the jury's presence. See id. When he testified consistent with his previous testimony, the government impeached its own witness with his prior inconsistent statement made to the police. See id. After his conviction, Johnson appealed, contending that Halmon's statement to the police was "improperly bootstrapped into the record as a prior inconsistent statement." Id. The District of Columbia Circuit concluded that the prosecution inappropriately called Halmon to the stand not for the testimony he was expected to

---

[7] The defense dismissed this portion of Johnson as mere dicta, thereby asking the Court to ignore this portion of the Circuit Court's opinion. Def.'s Mitchell Mot. at 8-9. This argument is without merit. As the Circuit Court noted, this issue was the "most troublesome" aspect of Johnson's appeal for the Court. 802 F.2d at 1466. Although the Circuit Court did not have to fully address this issue because the defendant had waived his objection when he failed to object to the introduction of the hearsay statement, the Circuit Court felt so strongly about this evidentiary issue that it was compelled to note that the majority of Circuits that addressed the issue have held the prohibition on the admissibility of hearsay evidence cannot be circumvented by putting the same evidence before the jury when its relevance is solely for the purpose of impeachment. Therefore, even if what the Johnson court said is dicta, this Court cannot lightly dismiss this portion of the Johnson opinion. See Gabbs Exploration Co. v. Udall, 315 F.2d 37, 39 (D.C. Cir. 1963) (recognizing "the fact that, although a decision of an appellate court is controlling only to the extent of the actual facts involved, and an expression as to the law based on other facts involved, and an expression as to the law on other facts is regarded as dictum and not controlling on lower courts, such dictum certainly deserves serious consideration"); see also Young v. New Process Steel, 419 F.3d 1201, 1204 (11th Cir. 2005) (observing that while courts "are not bound to follow dictum" they should "accord it any respect it earns through persuasive value"); PDV Midwest Ref. v. Armada Oil & Gas Co., 305 F.3d 498, 510 (6th Cir. 2002) (noting that "[a]lthough dictum is unnecessary to the decision, it may nevertheless be followed if 'sufficiently persuasive.'" (citations omitted)).

give, "but for the sole purpose of bringing about the admission of a post-arrest statement that, as

the prosecution well knew or should have known, was not independently admissible." Id. at

1466. The Circuit Court condemned the government having called Halmon as a witness

knowing that he would offer testimony favorable to the defendant as a means to undermine its

own witness's testimony with otherwise inadmissible hearsay. See id. Compare Webster, 734

F.2d at 1192 (concluding that the prosecution "abuses" Rule 607 when it calls a witness that it

"knew would not give useful evidence" against the defendant for the purpose of putting before

the jury hearsay evidence incriminating the defendant), with United States v. Eisen, 974 F.2d

246, 262-63 (2d Cir. 1992) (permitting the government to impeach its own witness where the

witness was called to corroborate portions of the government's case and not solely for

impeachment purposes), and Walker v. Lockhart, 763 F.2d 942, 952 (8th Cir. 1985) (concluding

that the trial court improperly prevented defendant from calling witness because he sought to do

so for a permissible purpose and not just for impeachment, and the impeachment would have

occurred only during redirect examination after the government's cross-examination was

completed).

In assessing whether a party is simply calling a witness solely to impeach the witness,

many courts attempt to discern the primary purpose for the witness's testimony. United States v.

Gilbert, 57 F.3d 709, 711-12 (9th Cir. 1995); United States v. Patterson, 23 F.3d 1239 (7th Cir.

1994). Cf. Johnson, 802 F.2d at 1466 ("[i]mpeachment evidence is to be used solely for the

purpose of impeachment . . .") (emphasis added). But see Carter, 973 F.2d at 1513 (noting that

courts hesitate to rule that a party called a witness for an improper purpose because "[e]valuating

the purpose of counsel's decision to call a witness is akin to pushing a string—neither is easy").[8]

In <u>United States v. Ince</u>, 21 F.3d 576 (7th Cir. 1994), however, the Seventh Circuit concluded

that the Court's inquiry into the prosecution's purpose "does <u>not</u> ask the judge, either at trial or

upon appellate review, to crawl inside the prosecution's head to divine his or her true

motivation." <u>Id.</u> at 580 (emphasis in original); <u>see United States v. Buffalo</u>, 358 F.3d 519, 523

(8th Cir. 2004) (noting that in determining "whether testimony of a prior inconsistent statement

is a 'mere subterfuge' to get before the jury otherwise inadmissible hearsay, the proper inquiry is

whether, as an objective matter and irrespective of the [calling party's] motive, the probative

value of a statement for impeaching the credibility of a witness is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury" (internal quotation

marks and citation omitted) (alteration in original)).  Rather than evaluating whether the

prosecutor's motivation was primarily to circumvent the hearsay rules, the Seventh Circuit held

that courts should engage in a 403 analysis, weighing the "testimony's impeachment value

against its tendency to prejudice the defendant unfairly or to confuse the jury." <u>Ince</u>, 21 F.3d at

---

[8] Recognizing that it is difficult to ascertain with any degree of certainty exactly what a witness's testimony will be, the Tenth Circuit has noted that a party is "entitled to assume a witness will testify truthfully" and that a court "should find a party called a witness for an improper purpose only where the trial record establishes clearly and unequivocally the circumstances showing an improper purpose existed." <u>Carter</u>, 973 F.2d at 1513. Here, in its motion <u>in limine</u>, the government argued that the defendant knew Mitchell would testify that she repudiated her prior inconsistent statement as a misrepresentation of what she actually intended to import. Thus, posits the government, the defense's purpose for eliciting this testimony was improper because its motivation for calling Mitchell was to put before the jury otherwise inadmissible hearsay. The defendant refuted this contention, arguing that because Mitchell had never made a statement on the subject under oath, she was unencumbered from changing her story. Def.'s Mitchell Mot. at 12. During the trial, however, this Court provided the defense the opportunity to question the witness out of the jury's presence so that both the defense and the Court could assess exactly what Mitchell's testimony would be. And despite her counsel's proffer that Mitchell would testify that she did not know Ms. Wilson's name prior to the Novak column being published, the Court was willing to provide defense counsel the opportunity to examine Mitchell to determine whether her testimony would in fact conflict with the October 2003 exchange.  If Mitchell did in fact testify consistent with her earlier October 2003 statement, then neither Rule 607 nor <u>Johnson</u> would be implicated and Mitchell would then have been permitted to testify before the jury. Instead, accepting the proffer by Mitchell's attorney, the defense declined this Court's invitation to question Mitchell outside the presence of the jury. Tr. 2/26/07 a.m. at 21-22.

13

580.[9] The court went on to note that if the testimony does not "affirmatively damage" the case of the party calling the witness, the impeachment evidence has "no probative value <u>for impeachment purposes</u>." <u>Id.</u> at 581-82 (emphasis in original).

Admittedly, the vast majority of cases addressing this issue involve attempts by the government to circumvent the hearsay rules. And there are few cases that address whether a different standard should be applied when the defendant is attempting to impeach his own witness. Undoubtedly, the risk of unfair prejudice and of the jury convicting the defendant on hearsay evidence is not as pronounced when it is the defense seeking to impeach its own witness with a prior inconsistent statement. In fact, the Fourth and Eighth Circuits have recognized that the risk that a jury will, despite a limiting instruction, consider evidence for its truth as opposed to merely for impeachment, is multiplied when the impeachment testimony contains an admission of the defendant's guilt. <u>See</u> <u>Ince</u>, 21 F.3d at 581; <u>Buffalo</u>, 358 F.3d at 525. "Thus, a trial judge should rarely, if ever, permit the [g]overnment to 'impeach' its own witness by presenting what would otherwise be inadmissible hearsay if that hearsay contains an alleged confession to the crime." <u>Buffalo</u>, 358 F.3d at 525. And because most courts emphasize the potential prejudicial impact to the defendant when excluding the government's attempts to impeach its own witness, at least one Circuit Court—the Eighth Circuit in <u>Buffalo</u>—has held that under Rule 403, the balance weighs in favor of permitting the defense to impeachment its own witness. <u>See id.</u> at 525-26. The <u>Buffalo</u> Court noted that when the defendant moves to introduce

---

[9] In <u>Buffalo</u>, the Eighth Circuit noted that in conducting a 403 analysis, it must examine whether under Rule 613(b) the witness is being improperly impeached on a collateral matter with extrinsic evidence of a prior inconsistent statement, concluding that such a statement "may be shown only on a matter material to the substantive issues of the trial." 358 F.3d at 524.

14

prior inconsistent statements for the purpose of impeachment, the above noted concerns are inapplicable because "the prejudicial impact of the statement does not endanger the defendant's liberty by risking conviction based on out-of-court statements that are not subject to confrontation by way of cross-examination." Id. at 525.

While this Court strived to afford the defendant every opportunity to present his defense, and to challenge the credibility of the government's witnesses, the law simply did not support the introduction of Mitchell's October 2003 statement when the sole purpose of calling her was for impeachment. Johnson points out that a witness cannot be called for the primary purpose of impeaching that witness. See Johnson, 802 F.2d at 1466. Mitchell's testimony only added value to the defense if the jury could consider her October 2003 statement for its truth and then inferred that Mitchell's knowledge of the rumor about Ms. Wilson's employment could be imputed to Russert.[10] If so, then as the defendant testified at the grand jury and as he told the FBI agents, the jury could infer that it would have been possible for Russert to disclose Ms. Wilson's identity and a rumor that she was employed by the CIA to the defendant during the disputed phone conversation between the two. Because Mitchell's prior inconsistent statement could not be used by the jury for that purpose, the distinct possibility that the jury would have inappropriately used

---

[10] During the trial, the defendant represented that he was calling Mitchell as a witness not solely for the purpose of questioning her regarding her knowledge of Ms. Wilson's employment prior to the publication of the Novak article, but also to elicit how intensely Mitchell was investigating the Wilson story. Tr. 2/13/07 a.m. at 21. The Court afforded the defense an opportunity to query Mitchell about the intensity of her investigation outside of the jury's presence, but it cautioned the defense that the scope of its questioning would be limited to this point. In response, the defendant argued that because he wished to question Mitchell about the intensity of her investigation, and not just her knowledge of Ms. Wilson's employment, Johnson did not control. Tr. 2/13/07 a.m. at 20-22. However, as this Court concluded during the trial, testimony regarding the intensity of Mitchell's investigation was probative only if it was coupled with evidence that tended to prove that she may have heard a rumor regarding Ms. Wilson's employment, which as indicated, the defendant wanted imputed to Russert as a basis for contending that Russert would have had a factual basis for telling the defendant that there was a rumor among reporters that Ms. Wilson worked for the CIA. Standing alone, however, the intensity of the investigation has no probative value to the defense. Therefore, contrary to the defendant's position, the Court concluded that Johnson did apply.

15

the October 2003 statement for its truth, the Court ruled that Mitchell could not be called as a witness by the defendant pursuant to the teaching in Johnson. And employing the balancing test of Rule 403 led to the same conclusion because the impeachment of Mitchell with her prior statement alone had no probative value, whereas, the risk of the jury misusing the statement was significant, and such misuse would have been unduly prejudicial to the government.

For all the reasons set forth during the trial in this matter and expanded upon in this opinion, the Court granted the Government's Motion in limine to Preclude Testimony of Andrea Mitchell.

## II.    The Admissibility of State of Mind Evidence Without Defendant's Testimony

During the course of the trial, this Court was called upon to determine the extent to which the defendant could introduce evidence concerning his "memory defense" without the defendant actually testifying. Specifically, the defendant sought to introduce (1) the "Statement Admitting Relevant Facts" ("Statement") agreed to by the parties during the proceedings conducted pursuant to the Classified Information Procedures Act, 18 U.S.C. app. III (2000) ("CIPA"), (2) the testimony of several of the defendant's colleagues in the Office of the Vice President ("OVP") about the matters that consumed his time and attention during several periods in 2003 at issue in this case, and (3) materials from his morning intelligence briefings that the defendant received from several CIA briefers during the relevant time periods.[11] As set forth during the

---

[11] In the months preceding trial in this case, the Court was engaged in the intensive process specified by the CIPA for controlling the presentation of classified information in this case. In the first of two major phases of that process, on September 27, 2006, pursuant to § 6(a) of the CIPA, the Court commenced a series of hearings to address the "use, relevance, and admissibility" of the classified information the defendant sought to admit into evidence. At the conclusion of these hearings, the Court issued a Memorandum Opinion memorializing its § 6(a) rulings concerning the admissibility of such evidence. United States v. Libby, ___ F. Supp. 2d ___, 2006 WL

(continued...)

16

trial, much of the evidence the defendant sought to introduce was not relevant without his

testimony and was therefore excluded.[12]  The Court will discuss each category of evidence in

turn.

A.    **The Statement Admitting Relevant Facts**

The first item of evidence upon which the Court had to rule concerned the Statement

agreed to by the parties as a substitution for various classified information the defendant wished

to introduce.  The Statement itself is a one-page document containing five paragraphs that

describe the nature of the defendant's job as a senior official in the Office of the Vice President

("OVP") and identifies his duties with respect to a number of issue areas relating to national

security, noting three specific matters about which the defendant was "concerned" during periods

surrounding the key events in this case.   The defendant argued that the document should be

---

[11](...continued)
3461482 (D.D.C. Dec.1, 2006) ("Libby I") (redacted version).  As the Court made clear in that Memorandum
Opinion, however, those rulings rendered at the close of the § 6(a) phase could not and did not conclusively
determine the relevance, proper use, and admissibility of all of the evidence the defendant wished to present.  See id.
2006 WL 3461482, at *14.  As the Court observed, the CIPA requires the Court "to look into the future and attempt
to divine what evidence each party will present to the jury," id., making prospective determinations of the relevance
and proper use of evidence without knowing with certainty what other evidence the parties would offer or how the
trial would unfold extremely difficult, see id.  And although the parties did advise the Court how they expected the
trial would unfold, the Court expressly recognized that neither the government nor the defense was in a position to
"say with absolute certainty what a witness will say, or what questions will be asked." Id. at *14.  Thus, rather than
"limit the witnesses' testimony to verbatim recitations of the attorneys' pretrial proffers," id., the Court expressly
reserved the right to amend its § 6(a) rulings, including by "declar[ing] otherwise relevant evidence inadmissible
under either Rule 401 or 403, depending upon how the facts [would] actually develop[] during the trial," id.
        Having completed the first phase pursuant to § 6(a) of the CIPA, the Court's focus turned to evaluating the
government's proposals, provided for in § 6(c) of the CIPA, for substituting portions of the classified evidence the
Court provisionally declared admissible during the § 6(a) proceedings.  After a second series of hearings to address
this issue, and after extensive negotiation by the parties and prodding by the Court, the Court issued a subsequent
Memorandum Opinion approving the government's final proposed substitutions. United States v. Libby, ___ F.
Supp. 2d ___, 2006 WL 3759450 (D.D.C. Dec. 22, 2006) ("Libby II") (redacted version).

[12] Also in dispute was the admissibility of the testimony of other officials within the Office of the Vice
President ("OVP")—including John Hannah, the defendant's subordinate during the relevant periods—concerning
the matters on which the defendant worked and that consumed his time and attention during the dates in question.
The Court permitted the defendant to present this testimony.  See Tr. 02/12/2007 p.m. at 80.

admitted in its entirety, whether or not he chose to testify. See generally Def.'s State of Mind Brief. Pointing to the title of the document—a "Statement Admitting Relevant Facts"—the defendant asserted that it constitutes an "unequivocal and unconditional admission" of fact by the government that independently establishes the truth of the statements it sets forth. Def.'s State of Mind Reply at 3-5. With respect to relevance, the defendant argued that the first two paragraphs were relevant because they describe the nature and areas of the defendant's responsibilities, facts that would bear on the jury's determination of the defendant's ability to remember certain facts during the periods at issue. Def.'s State of Mind Reply at 3-4. The last three paragraphs, which specify three issues that concerned the defendant at times pertinent to this case, were relevant in his view because they establish by their terms that the defendant's focus was trained, inter alia, upon these three particular issues. Def.'s State of Mind Reply at 3.[13] This Court did not agree.

After thorough consideration of the parties' arguments, the Court concluded that the Statement was inadmissible in the absence of the defendant's testimony. During the course of the CIPA hearings, this Court concluded that certain pieces of evidence were relevant to assist in establishing the defendant's "memory defense" based upon the expectation that the defendant's own testimony would establish that his attention was consumed by various matters other than the key events outlined in the indictment. See, e.g., Libby I, ___ F. Supp. 2d at ___, 2006 WL 3461482, at *8 (noting that because "the defense has affirmatively stated that the defendant intends to testify on his own behalf[, i]t will therefore be the defendant's testimony about what he

---

[13] Beyond the actual admissibility of the Statement, the defendant further argued that excluding the Statement—especially because counsel for the defendant read the Statement to the jury, without objection from the government, during its opening argument—violates his constitutional rights under the Fifth and Sixth Amendments. These arguments are addressed in Section III.B, infra.

18

was focused on and that his workday was consumed by" specific information the defendant

sought to offer as evidence that lays the foundation for much of the classified evidence the

defense sought to admit).[14] Without the defendant's testimony, however, much of the classified

evidence that this Court concluded was relevant no longer satisfied this evidentiary predicate for

admissibility. Thus, substitutions for evidence that this Court concluded would be relevant if the

defendant testified became irrelevant once the defendant exercised his right not to testify. It is of

no moment that one of those substitutions was a statement admitting relevant facts as permitted

under CIPA. In no way can the Statement reasonably be construed as an unqualified admission

of fact that was intended to bind the government (or this Court which approved the substitution)

even if the defendant chose not to testify.

To be sure, neither the defense's representations nor the Court's assumption that the

defendant would testify provide a basis for deeming the defendant to have waived his Fifth

Amendment privilege. Under the Supreme Court's decision in <u>Brooks v. Tennessee</u>, 406 U.S.

605, 610 (1972), the defendant retains a constitutional right to reserve decision on whether to

take the stand until the end of his trial.[15] But as the Court observed when issuing its § 6(a)

rulings, the CIPA requires courts to issue rulings on the basis of assumptions about how the trial

will unfold, assumptions informed primarily through the representations of the parties. Rather

---

[14] In its Response, the government identified at least a dozen occasions during the CIPA proceedings when the defense affirmatively represented that the defendant intended to testify, <u>see</u> Gov't's State of Mind Resp. at 2-3, and nine instances when the Court's statements suggested that its relevance determinations were predicated upon the defendant's testimony laying the necessary foundation for the admissibility of specific evidence, <u>see</u> Gov't's State of Mind Resp. at 4-5.

[15] In this regard, the defendant's disclaimer expressed during the § 6(a) proceedings that there remained a possibility that the defendant might not testify merely stated a truism. Although the defendant surely retained then, and retained until the very end of his trial, the choice whether to testify, there can be little doubt that the Court and the parties labored during the CIPA phase of these proceedings under the assumption that the defendant would testify as part of his defense.

than abdicate its responsibility under the CIPA to make such predictions in the face of uncertainty, however, the Court made provisional determinations of relevance, use, and admissibility—erring on the side of admitting the classified evidence when in doubt—in light of the expressed expectations of the parties. More important to the present issue, the CIPA also forced the parties to prepare for trial in reliance on similar shared assumptions and within the constraints set by the Court's rulings based on those same assumptions.

In this case, as counsel for the government represented—and the Court credits its representations as officers of the Court—the compromise that resulted in the Statement was predicated upon the assumption that the defendant would testify, which would both provide a foundation for the information contained in the Statement and provide the government an opportunity to cross-examine the defendant about the extent to which the issues described did in fact consume his time and attention. Permitting the defendant to put the Statement before the jury without testifying himself, both would have relieved him of the burden of laying a sufficient foundation for the Statement's listing of matters that purportedly concerned him and would have insulated him from cross-examination on this point. The Court simply could not accept that this accurately reflected the parties' understanding (and surely not the government's) when they agreed to the use and admissibility of the Statement. Accordingly, just as the Court refused to cast its § 6(a) rulings in stone because of the unforeseeable path the trial might take, see Libby I, 2006 WL 3461482, at *14, it could not require the government to stand by a substitution of evidence that it agreed to with the understanding—and in light of this Court's rulings, based on the same understanding—that the defendant himself would testify. Consequently, the Court

20

concluded from the bench that it would not construe the Statement as an unqualified admission

of fact that binds the government now that the defendant has elected not to testify.

The conclusion that the Statement did not constitute an unqualified admission of fact

yielded several important consequences for its admissibility. With respect to the final three

paragraphs, because the Statement could not be treated as independently establishing that the

defendant was concerned with the matters described, the relevance of those paragraphs

vanished.[16] Without a showing through his own testimony, or other evidence, that these three

subjects were in fact of concern to the defendant during the pertinent time periods, the matters

described had no relevance to this case, and thus were inadmissible under Rule 401.[17] Moreover,

whatever evidentiary value the description of these matters still possessed once the defendant

exercised his right not to testify, it was far outweighed by the potential prejudice and confusion

their presentation would occasion. Admitting these paragraphs in the absence of the defendant's

---

[16] In other words, when understood in context, these paragraphs are most reasonably read not as establishing the fact that the defendant was concerned about various national security issues, including the three enumerated in those paragraphs, but rather merely as providing abbreviated descriptions of specific issues that the defendant would show by his own testimony to have occupied his attention. To read these paragraphs instead as independently establishing the fact that the defendant was concerned about such matters would unjustifiably ignore the unique CIPA context out of which the Statement arose.

[17] The defense argued that this predicate already had been satisfied both through the testimony of Craig Schmall, see Def.'s Br. at 10, and because of the nature of the materials that reflected their urgency, see Def.'s Br. at 9. Both of these arguments were unavailing. First, the testimony by Schmall that the information contained in these materials was "significant" and "important" and that Libby read it six days a week for at least forty minutes falls far short of establishing that the defendant's attention was consumed by this information. That Schmall himself, or his superiors, deemed the information important does not, of course, mean that it occupied the defendant's time or concern beyond when the briefings were actually being conducted, and the fact that he read the materials most days implies neither that it "consumed" his workday nor that he was particularly concerned about it. Second, the suggestion that the document's content itself could provide a basis for the jury to infer the that the defendant deemed it to be important is even more unsound. Resting the materials' relevance to the defendant's state of mind on their own content would ignore the fact that the defendant, unlike the jurors (and likely most lay persons), is experienced and acclimated to dealing with such high priority information on a regular basis as a part of his duties, and thus likely reacts to such information in a very different way. Only if the defense had first laid a foundation establishing the level of concern or attention the defendant devoted to the briefing materials—both as a class and with respect to specific documents—could the contents of those materials have been relevant.

own testimony would have provided the government no opportunity to cross-examine him on the extent and nature of his concern about these issues, with the result that the jury would have been presented an entirely one-dimensional, one-sided portrayal of the defendant's state of mind with respect to these issues. Neither Rule 403 nor the basic principles of fairness underlying the Federal Rules of Evidence, see Fed. R. Evid. 102, would permit the defendant to put the final three paragraphs of the Statement before the jury in such manner. Therefore, this Court concluded that the final three paragraphs could not be admitted into evidence.

Similarly, the Court concluded that the first two paragraphs also were inadmissible. Because the Statement was not an unconditional admission of fact by the government, it was not admissible to establish the defendant's work responsibilities and job duties. Moreover, what little probative value the first two paragraphs might have, is outweighed by their cumulative character, as the defense had already presented evidence, through the testimony of John Hannah, that described the responsibilities and duties described in the first two paragraphs of the Statement. For these reasons, the Court concluded that no part of the Statement was admissible in the absence of the defendant's own testimony.

**B.    The Testimony of the Defendant's Intelligence Briefers**

The same fundamental issues framed the parties' dispute with regard to the second category of evidence regarding the defendant's state of mind or memory defense. The defendant sought to offer the testimony of three government officials who were collectively responsible for briefing the defendant six days per week on various issues of national security and providing him up-to-date intelligence on those issues. Through that testimony, the defendant desired to present to the jury, in varying degrees of detail, the issues about which he was briefed—and which he

22

therefore asserted occupied his attention—during the days and weeks surrounding the events that formed the basis for the charged offenses.

The first question the Court addressed was whether and how such testimony would be relevant. As the Court made clear on earlier occasions, the content of the briefings "themselves are not relevant, as they do not show what the defendant believed was important or what matter the defendant devoted his efforts to on a given day," Libby I, 2006 WL 3461482, at *8, but for the actual time when the briefings were being conducted. Rather, as the Court explained, what made the briefings relevant was the "defendant's testimony about what he was focused on and that his workday was consumed by the information" contained in them. Id. The Court, as discussed above, was operating under the assumption that the defendant would in fact testify to this effect, an assumption which was removed from the equation. In the absence of the defendant's testimony, or other evidence that could be substituted for the defendant's testimony, allowing the briefers' testimony to convey to the jury that the defendant was more concerned about the issues on which they briefed him than about the events at issue in this case would have left the government with no avenue to challenge that suggestion through cross-examination.

The defendant argued that such testimony was relevant nonetheless because the jury reasonably could infer from fact that the issues were part of the constant flow of information the defendant received that they, along with many other things, were among the matters that concerned the defendant on key dates. In other words, the defendant opined that the length of time he spent each day receiving the briefers' reports, as well as the fact that on occasion he requested to keep the briefing materials throughout the day or overnight, suggested at the very least that the defendant spent some amount of time focused on these issues. In short, the

defendant argued that even if he cannot portray through the briefers' testimony the relative importance he ascribed to various national security issues, he should at least be permitted to show that he was concerned to some extent by the information he received about those issues.

In the government's view, however, the distinction the defense drew between the inference the jury could draw from the briefers' testimony that the defendant was more concerned with national security matters than the Plame affair, on the one hand, and testimony that the defendant simply was concerned, at least to some degree, about these matters of national security, on the other hand, was a semantic illusion. From the government's perspective, even if the briefers did not explicitly suggest the relative importance the defendant attributed to the national security matters on which he was briefed, the briefers' testimony concerning those matters would invite the jury to speculate about the relative significance the defendant attached to them. The government argued that testimony about the briefings should be precluded in its entirety because the Court's CIPA rulings on the admissibility of the briefings was premised on the defendant presenting testimony on the briefing subjects.

The government was correct that, as was true of the Statement Admitting Relevant Facts, the Court's § 6(a) rulings pertaining to the defendant's intelligence briefings, and the level of detail the Court deemed admissible, hinged on its assumption that the defendant himself would lay a foundation establishing their relevance. Likewise, as with the Statement, the Court was cognizant of the potential for prejudice that would have arisen if the defendant had been permitted to portray his own state of mind without allowing the government any effective means of challenging it through cross-examination. And there was indeed a significant danger that if presented with details of national security issues and suggestions by those who worked with him

24

that the defendant himself was personally concerned about those issues, the jury would have been unable to resist speculating about the relative import of those matters to the defendant.

By the same token, excluding any reference to the briefings or the topics they covered would have overly inhibited the defendant's ability to present his memory defense. The defendant's decision not to testify did not preclude him entirely from presenting his memory defense to the jury. Rather, it simply limited the scope of that defense and what he could argue. Without the defendant's own testimony, he could not present through the briefers evidence suggesting what matters were allegedly consuming his time or attention beyond when the briefings were conducted, or the relative importance of those matters he was tasked to address at a particular time. However, the defendant still had the ability to present evidence through the briefers of the nature of the information they presented to him to show what was occupying his attention during the briefings.[18] Although the details of the matters covered during the briefings were not relevant without the defendant's testimony and would have created a risk of prejudice and confusion because the jury may have impermissibly speculated on the relative importance of those details as compared to the matters that are the subject of this prosecution, it would impair the defendant's right to a fair trial to prohibit him from providing the jury with at least a general perspective on the matters he was advised about by the briefers. Accordingly, the Court concluded that the defendant could present to the jury, through the briefers' testimony or

---

[18] Additionally, the defendant was permitted to present detailed information concerning the intelligence briefing he received on June 14, 2003, the day he asked the briefer about Mr. Wilson's wife. Tr. 02/14/07 a.m. at 68.

otherwise, the topic areas he was briefed on during the dates in question as a means of giving the jury a general appreciation of the matters he was responsible for addressing on those dates.[19]

## C.     The Defendant's Fifth and Sixth Amendment Rights

Notwithstanding the Court's conclusion about the admissibility of the Statement and the briefers' testimony, the defendant argued that excluding that evidence to any degree would violate several of his constitutional rights under the Fifth and Sixth Amendments.  First, he argued in general terms that excluding evidence of his state of mind because he chose not to testify would violate his right to present a defense under the Fifth and Sixth Amendments.  Def.'s State of Mind Br. at 1-2; Tr. 02/14/07 a.m. at 48.  Second, he asserted that such a ruling making the admissibility of the disputed evidence conditioned upon his willingness to testify in his own behalf would impermissibly burden his Fifth Amendment right to remain silent.  Def.'s State of Mind Br. at 10-12; Tr. 02/14/07 a.m. at 47.  Third, along similar lines, he contended that the ruling would infringe his Sixth Amendment right to have the benefit of counsel in making his decision regarding whether and when to testify.  Def.'s State of Mind Br. at 10-12; Tr. 02/14/07 a.m. at 47.  Finally, with respect to the Statement, the defendant contended that because he relied upon its admissibility when reading it to the jury during his opening statement, excluding the Statement as inadmissible thereafter would violate his Fifth Amendment right to due process.  Def.'s State of Mind Reply at 5; Tr. 02/14/07 a.m. at 48.  Upon careful consideration, the Court could not accept any of the defendant's constitutional arguments.

---

[19] After this Court's ruling from the bench, the parties stipulated to what the briefers would have testified to, rather than calling the briefers themselves as witnesses.

1.    Fifth and Sixth Amendment Right to Present a Defense

Among the fundamental guarantees ensured to a criminal defendant by the Constitution is the right to present a defense to the charges he is facing. See Taylor v. Illinois, 484 U.S. 400, 409 (1988) (citing Washington v. Texas, 388 U.S. 14, 19 (1967)). As the Supreme Court recognized in Washington, this right finds its roots in the accused's Sixth Amendment right to compulsory process to obtain the testimony of witnesses. See 388 U.S. at 19 (observing that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense").[20]

An accused's entitlement to "a meaningful opportunity to present a complete defense[,]" Holmes v. South Carolina, __ U.S. __, __, 126 S. Ct. 1727, 1731 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986), however, is neither unlimited nor absolute. United States v. Scheffer, 523 U.S. 303, 308 (1998). First, although the Constitution entitles a defendant an opportunity "to present [his] version of the facts . . . to the jury so it may decide where the truth lies," Washington, 388 U.S. at 19, that guarantee extends only to relevant evidence, see Scheffer, 523 U.S. at 308; United States v. Solomon, 399 F.3d 1231, 1239 (10th Cir. 2005) ("Simply stated, a criminal defendant does not have a constitutional right to present evidence that is not relevant and not material to his defense."); United States. v. Prince-Oyibo, 320 F.3d 494, 501 (4th Cir. 2003) (holding that "criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial"); United States v. Munoz, 233

---

[20] Although the Supreme Court in Washington further indicated that the right to present a defense is also grounded in the Fifth Amendment's due process guarantee, see 388 U.S. at 19 (noting that the right to present a defense "is a fundamental element of due process of law"), the Court's later decision in Strickland v. Washington, 466 U.S. 668 (1984), clarified the relationship of these two sources of the right, see id. at 684-85 (observing that "[t]he Constitution guarantees a fair trial though the Due Process Clause[] [of the Fifth Amendment], but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment").

27

F.3d 1117, 1134 (9th Cir. 2000) (holding that exclusion of irrelevant evidence does not violate

defendant's Sixth Amendment rights). Second, even "[a] defendant's right to present relevant

evidence is not unlimited, but rather is subject to reasonable restrictions," Scheffer, 523 U.S. at

308, including restrictions imposed by the other rules of evidence such as Rule 403. Cf. Taylor,

484 U.S. at 410 (holding that the Sixth Amendment does not confer on defendants "an unfettered

right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard

rules of evidence").

Here, the defendant argued that his right to present a defense would be impermissibly

impaired by the Court's ruling excluding evidence concerning the specific national security

matters on which he worked and about which he continuously received information. Def.'s State

of Mind Br. at 1. As indicated above, however, the evidence the Court has excluded was not

admissible standing alone. While the general topics of the briefing materials had some relevance

to his memory defense—and were therefore admissible regardless of whether the defendant

testified—the Statement that the Court has excluded and the level of detail he sought to introduce

through the briefers' testimony had no basis for their admissibility, absent a showing, through the

defendant's testimony or otherwise, that these matters were in fact of specific concern to him.

Moreover, as explained above, even if relevant, these items of evidence were inadmissible under

Rule 403 because of their potential for prejudice to the government in the absence of an

opportunity to challenge the extent of their importance to the defendant through cross-

examination. Although the Court remained, as it did throughout the trial, deeply concerned with

ensuring that the defendant is provided a meaningful opportunity to present his chosen defense, it

could not agree with the defendant that the Constitution entitled him the unfettered right to present evidence the Court found irrelevant or otherwise inadmissible.[21]

2.    Fifth Amendment Right to Remain Silent

The defendant alleged that this case does not present the straightforward, uncomplicated scenario where the Court's ruling that particular evidence is inadmissible merely precludes him from introducing that specific evidence. Instead, he argued, the Court's ruling that the disputed evidence is inadmissible is predicated upon his decision not to testify—a decision reserved to him by the Fifth Amendment's proscription on compelled self-incrimination. Def.'s State of Mind Br. at 10; Tr. 02/14/07 a.m. at 47. Thus, by effectively conditioning the admissibility of such evidence on his willingness to take the witness stand, the defendant argued that the Court imposed an impermissible burden on the exercise of his Fifth Amendment right to remain silent. The Court could not agree with the defendant's position.

The Fifth Amendment entitles an accused "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." Malloy v. Hogan, 378 U.S. 1, 8 (1964). Accordingly, neither a state by enacting a statute, nor a court through its actions, may "exact[] a price for [the defendant's] silence," Brooks, 406 U.S. at 610, in a way that hinders the exercise of his Fifth Amendment rights. In Brooks, for instance, the Supreme Court invalidated a state law requiring that criminal defendants electing to testify on

---

[21] The defendant also had a number of other vehicles of presenting to the jury the nature and scope of his work responsibilities. In fact, during the defendant's case, John Hannah, the Vice President's current National Security Advisor, and formerly the defendant's deputy, testified about the nature and scope of the national security work the defendant performed during the critical dates of this case. And had he chosen to do so, the defendant could have also recalled David Addington during his case to testify about the scope of his responsibilities as Chief-of-Staff to the Vice President, a position also held by the defendant during the times pertinent to this case. Additionally, the defendant's former administrative assistant could have been called as a witness to discuss his daily schedule, and his calendars could have been introduced as exhibits to show the jury the demands of the defendant's daily schedule. Moreover, the defendant could have called the Vice President to testify concerning the issues he directed the defendant to address and upon which the Vice President expected the defendant would devote his time and attention.

their own behalf do so before any other defense witness testified. See id. at 611. Although

recognizing the ancient origins of the rule underlying the statute at issue, see id. at 607, the Court

held that Tennessee's law violated the defendant's Fifth Amendment rights because it forced the

defendant to decide whether to exercise that right without first hearing the testimony of his own

witnesses, see id. at 612. While an accused "will usually have some idea of the strength of his

evidence," id. at 609, the Court recognized that a criminal defendant "cannot be absolutely

certain that his witnesses will testify as expected or that they will be effective on the stand[,]" id.

As a result, "a defendant may not know at the close of the [prosecution's] case whether his own

testimony will be necessary or even helpful to his cause." Id. at 610. By "pressuring the

defendant to take the stand [and] foreclosing later testimony if he refuses," id. at 611, effectively

making the defendant's choice to testify a 'now or never' decision, the Tennessee law "casts a

heavy burden on a defendant's otherwise unconditional right not to take the stand," id. at 610-11.

Accordingly, the Court concluded that the statute violated the Fifth Amendment. See id. at 612.

Likewise, in Griffin v. California, 380 U.S. 609 (1965), the Court held that comments by

the court or by the prosecution to the jury concerning the defendant's refusal to testify, and the

significance the jury should attach to that refusal, imposes an impermissible burden on the

defendant's exercise of his right to remain silent. See id. at 614. At issue in Griffin was the trial

court's jury instruction indicating that the jurors could "take [the accused's] failure [to testify]

into consideration as tending to indicate the truth" of "any evidence or facts against him which

the defendant can reasonably be expected to deny or explain because of facts within his

knowledge." Id. at 610. Such comments, the Supreme Court held, amount to "a penalty imposed

by the courts for exercising a constitutional privilege," effectively "cut[ting] down on the

30

privilege by making its assertion costly." Id. at 614. Notably, the Court distinguished the burden

such an instruction would impose from the inevitable cost a defendant faces in refusing to testify

and thus leaving it to the jury to consider for itself the import of that refusal. See id. ("What the

jury may infer, given no help from the court, is one thing. What it may infer when the court

solemnizes the silence of the accused into evidence against him is quite another.").

    In light of these decisions, the defendant was quite correct that the Court could not,

consistent with his constitutional rights under the Fifth Amendment, impose artificial strictures

on his decision of whether and when to testify. The defendant was wrong, however, to suggest

that the Fifth Amendment prohibits the Court from excluding evidence that is not otherwise

relevant unless and until the defendant lays an adequate foundation for its admissibility, even if

that foundation can only be laid through his own testimony. Although Brooks, Griffin, and other

cases cited by the defendant preclude the Court from imposing penalties on the defendant's

exercise of his right to remain silent, the Supreme Court has never held that the Fifth

Amendment is infringed whenever a defendant faces any cost in the exercise of that privilege.

On the contrary, the Court has long recognized that the defendant's decision to testify or to

remain silent always imposes costs.[22] As Brooks itself makes clear, a defendant's choice to

testify inevitably presents the possibility of a devastating cross-examination, while declining to

testify may mean that the accused gives up the chance to put the most probative evidence in his

favor before the jury. See Brooks, 406 U.S. at 609. The costs a defendant must assess, include,

---

[22] The weight of authority is in accord. See, e.g., 1 Kenneth S. Broun, McCormick on Evidence § 136 (6th ed. 2006) ("Even the privilege of an accused in a criminal case itself does not mean that an accused is constitutionally entitled to be completely free of any penalty or burden in that criminal case itself from the accused's reliance on the privilege in that case.") (citing Bordenkircher v. Hayes, 434 U.S. 357 (1978)); 10A Fed. Proc., L. Ed. § 26:651 ("The principle that the invocation of the privilege may not be too costly does not mean that it must be costless.") (citing S.E.C. v. Graystone Nash, Inc., 25 F.3d 187 (3d Cir. 1994)).

not merely the benefit or damage his own testimony might generate, but also the consequences

his decision whether to take the stand may have on the admissibility of other evidence. See id.

(noting that "a defendant's choice to take the stand . . . 'may open the door to otherwise

inadmissible evidence which is damaging to his case'") (quoting McGautha v. California, 402

U.S. 183, 213 (1971), vacated on other grounds sub nom. Crampton v. Ohio, 408 U.S. 941

(1972)). Yet, despite these costs and the potential effect they may have on the defendant's

decision to testify, "'it is not thought inconsistent with the enlightened administration of criminal

justice to require the defendant to weigh such pros and cons in deciding whether to testify.'" Id.

(quoting McGautha, 402 U.S. at 215). Indeed, the Court's primary concern in Brooks was

ensuring that the defendant had an opportunity to evaluate all of these costs before choosing,

once and for all, whether to testify in his own defense or instead to remain silent. See id. at 610-

11.

      The central teaching of the Supreme Court's holdings in this area of the law is that the

Fifth Amendment does not command courts to equalize the costs and benefits defendants face in

deciding whether to testify. Instead, it merely precludes a court from imposing additional,

artificial costs upon the defendant or from disabling the defendant from evaluating these costs

before making a final decision whether to testify. What is therefore of ultimate concern is the

character and source of the costs a defendant faces when choosing whether to testify, not whether

there are any costs whatsoever to assess.

      Thus, the costs that naturally follow from a defendant's decision to testify—or

alternatively, to remain silent—do not violate the Fifth Amendment. As noted above, the

Supreme Court in Brooks expressly acknowledged the consequences a defendant's decision to

take the stand might have on the admissibility of other evidence, noting that doing so may "open the door to otherwise inadmissible evidence." 406 U.S. at 609 (quoting McGautha); cf. McGautha, 402 U.S. at 213 (rejecting the proposition "that the mere force of evidence is compulsion of the sort forbidden by the [Fifth Amendment] privilege"). Likewise, in Griffin, the natural inferences a jury might draw from a defendant's silence in the absence of a jury instruction—as distinct from those it would be directed to reach by the court's instruction—do not constitute costs that the Fifth Amendment prohibits. See Griffin, 380 U.S. at 614; see also United States v. Lindo, 18 F.3d 353, 356-57 (6th Cir. 1994) (holding that where a defendant declined to testify and failed to offer any other evidence satisfying the threshold requirements of a good faith defense to securities charges, the district court's refusal to instruct the jury on good faith defense did not impermissibly burden the defendant's Fifth Amendment privilege against self-incrimination), cited with approval by United States v. DeFries, 129 F.3d 1293, 1308 (D.C. Cir. 1997).[23]

On the other hand, burdens imposed by statute or by a court that penalize the exercise of a defendant's Fifth Amendment rights by levying some additional, artificial cost upon the invocation of that right do run afoul of that Amendment's guarantees. Thus, the requirement of the state statute in Brooks that the defendant testify first in his case in chief or not at all infringed his Fifth Amendment rights because it imposed an additional and artificial price on his exercise

---

[23] The defendant pointed to United States v. Duncan, 850 F.2d 1104, 1115 n.9 (6th Cir. 1988) (noting that "the standard of evidence necessary to warrant [a good faith] instruction cannot include an absolute requirement that the taxpayer must testify"), to illustrate his sweeping position that "placing limits on the defense unless the defendant testifies may violate the Fifth Amendment right to remain silent." Def.'s State of Mind Br. at 12. The defendant's reliance on Duncan was misplaced, however, for two reasons. First, the statements in that case upon which the defense relies are plainly dictum, see 850 F.2d at 1115 n.9 (stating "due to [the court's] disposition of this issue on other grounds, [it] need not reach this possible constitutional question"). Second, all that the Sixth Circuit's dictum suggests is that a bright-line requirement that the defendant-taxpayer himself must testify in order to merit a good faith instruction would violate the Fifth Amendment.

of the privilege. See 406 U.S. at 609. Similarly, the Court's comments to the jury in Griffin, which "solemnize[d] the silence of the accused into evidence against him", also infringed Griffin's right not to testify. See 380 U.S. at 614.

An evidentiary ruling barring certain defense evidence when a defendant decides not to testify falls squarely into the first category. It is true, of course, that whether such evidence will be admitted could have an effect on the defendant's decision whether to waive his Fifth Amendment privilege, as what evidence he may introduce is predicated upon his own testimony laying the foundation for the evidence's admissibility may affect his calculus of whether to testify. But this simply is not the sort of impermissible cost the Supreme Court foreclosed in Brooks and Griffin.

Thus, in this case, by excluding the evidence the defense seeks to offer because it is not independently relevant, and would be unduly prejudicial, the Court did not preclude the defendant from exercising his choice of whether and when to testify. Indeed, the defendant was entitled to adopt a different course until the very close of his case, consistent with the dictate of Brooks, 406 U.S. at 609. Rather, this Court's ruling excluding such evidence absent adequate foundation simply reflected the reality—implicitly acknowledged by the Supreme Court in Brooks, id., and McGautha, 402 U.S. at 213—that declining to testify comes at the unavoidable cost of forfeiting the opportunity to introduce evidence that is irrelevant or not otherwise independently admissible. Just as a defendant who invokes the Fifth Amendment privilege to refrain from testifying, thereby abandoning the opportunity to present what may be the best evidence available to him, the defendant here elected to sacrifice the benefit the disputed evidence might have afforded him. Cf. United States v. Stanfa, 685 F.2d 85, 89 (3d Cir. 1982)

34

(affirming district court's exclusion [in prosecution for making false declarations to grand jury] of evidence of "gangland-style slayings" of defendant's associates, offered in support of duress defense to show defendant's fear of reprisals at time of grand jury testimony, because defendant failed to establish through his own testimony or otherwise that he feared such reprisals at the time of his testimony); United States v. Scott, 660 F.2d 1145, 1166 (7th Cir. 1981) (upholding district court's exclusion of defense witnesses' testimony offered to show defendant's state of mind where defendant failed to lay foundation through his own testimony or otherwise). Accordingly, the Court concluded that excluding the challenged evidence in light of the defendant's decision not to testify does not violate the defendant's Fifth Amendment right to remain silent.

3.    Sixth Amendment Right to Assistance of Counsel

Along similar lines as his Fifth Amendment claim, again relying on Brooks, the defendant also argued that the Court's ruling making the admissibility of the disputed state of mind evidence conditional upon his testimony violates his Sixth Amendment right to the assistance of counsel in his determination of whether to exercise his Fifth Amendment right to remain silent. Def.'s State of Mind Br. at 10-11; Tr. 02/14/07 a.m. at 47.  In Brooks, the Supreme Court held that beyond violating the Fifth Amendment, requiring a defendant to testify at the outset of his case also denies the accused and his attorney "an opportunity to evaluate the actual worth of their evidence . . . restricts the defense—particularly counsel—in the planning of its case[,]" thereby withholding from the defendant "the guiding hand of counsel" guaranteed to the accused by the Sixth Amendment.  406 U.S. at 612.  Relying on Brooks, the defendant argued that making the admissibility of the disputed evidence depend upon his decision to testify effectively precludes

him from reserving his decision whether to testify until the end of his case. Although he did not

explicate this argument in any detail in his Brief or during oral argument, the defendant's core

contention seemed to be that excluding such evidence without his testimony would make it

impossible to wait until the end of his case-in-chief to choose whether to take the stand, as he

would not be able to introduce the other evidence he deems essential to his case unless he first

testifies to lay an adequate foundation for its admissibility.

The defendant's position was mistaken. As discussed above, nothing in Brooks, nor any

other controlling case, bars this Court from finding that the relevance of evidence proffered by

the defense depends upon a foundation being laid by the defendant's own testimony, or by other

evidence or the testimony of other witnesses laying the foundation for the admissibility of the

extrinsic evidence at issue. Although the Supreme Court in Brooks concluded that "the accused

and his counsel may not be restricted in deciding whether, and when in the course of presenting

his defense, the accused should take the stand[,]" 406 U.S. at 613, its holding applied to court-

imposed restrictions, not the consequences resulting from a defendant's decision not to testify on

the admissibility of other evidence. It would stretch Brooks beyond recognition to construe that

decision as creating a per se rule forbidding any ruling by a trial court conditioning the admission

of evidence on a properly laid foundation because the foundation can only be laid by the

defendant's own testimony.[24]  In short, nothing in the Court's decision to preclude the admission

of the disputed evidence absent the defendant's testimony seriously hindered the defendant's

---

[24] It is possible that a criminal defendant may express a tentative desire to testify but wish to present the
extrinsic evidence of his state of mind prior to giving his own testimony, which itself would lay a foundation for the
extrinsic evidence's admissibility, pursuant to Federal Rule of Evidence 104(b).  This case did not present that
situation, however.

ability to reserve his decision on whether to testify until the end of his case-in-chief, and

therefore, he has not been deprived of the assistance of counsel in making that determination.

4.    Fifth Amendment Right to Due Process of Law

Finally, the defendant asserted that the Court's ruling, issued during the trial, precluding

the admission of certain parts of the Statement would infringe his right to due process of law

secured by the Fifth Amendment. According to the defendant, because his counsel relied on the

assumption that the Statement would be admissible in reading the statement to the jury in its

entirety during his opening, precluding its admission would deny him due process. Arguing that

the government cannot meet the "manifest injustice" standard that must be met to permit the

retraction of admissions in civil cases, the defendant argued that the government could not

possibly satisfy the "higher" standard for retraction in criminal cases.[25]

The fatal flaw in the defendant's due process argument was that it, like his argument on

the merits of the Statement's admissibility, mischaracterizes the Statement as an unconditional

admission by the government. As discussed above, the Statement was agreed to by the

government only after the Court had issued its CIPA rulings. In those rulings, the Court

prospectively found that certain evidence regarding a variety of national security issues would in

fact be relevant, assuming that the defendant's own testimony established that those issues were

of concern to him. After those rulings admitting specific evidence were issued, the Statement

was agreed upon as a compromise between the parties to serve as a substitute for specific

testimony, as well as certain documents, that would otherwise be introduced when the defendant

took the stand.

---

[25] The defendant fails to indicate what standard would apply for the retraction of admissions by the government in criminal prosecutions, and he cites no authority even for the broad proposition that the standard is, in fact, higher. Def.'s State of Mind Reply at 5.

As discussed above, the government agreed to the admission of the Statement on the assumption that the defendant would testify, in turn laying a foundation for Statement's assertions and enabling the government to cross-examine the defendant about the extent and nature of his concern about these national security issues.  To hold the government to the agreement reflected in the Statement once that predicate had been removed, would have done nothing to safeguard the defendant's right to due process; if anything, it would have deprived the government of a fair trial.  Accordingly, the Court could not view the Statement as an "unequivocal and unconditional admission" in the sense the defendant suggested.  Def.'s State of Mind Reply at 5.  As such, ruling that the Statement was inadmissible did not deprive the defendant of due process.

### III.    Defendant's Memorandum of Law in Support of Introducing Additional Evidence to Impeach Government Witness Tim Russert

The final evidentiary dispute this opinion will address is whether the defense, after Tim Russert completed his testimony and had been excused, should have been permitted to impeach Russert's testimony with an additional prior inconsistent statement.

### A.    Russert's Prior Statements Regarding Knowledge of Grand Jury Procedure

The first set of evidence the defendant wished to use to impeach Russert consists of prior allegedly inconsistent statements made by Russert when appearing on various television shows pertaining to his knowledge of grand jury procedure.  During Russert's cross-examination, counsel for the defendant sought to bring out before the jury the accommodations Russert had been afforded by the government to show potential bias toward the government.  Def.'s Russert Mem. at 1-2.  Among those accommodations was the government's agreement that Russert could provide his grand jury testimony through a deposition that would be taken with his lawyer

38

present, as opposed to appearing before the grand jury in person. Def.'s Russert Mem. at 1 & Ex.
A. When questioned about this concession, Russert testified that he was not aware that under the
ordinary procedure for the taking of grand jury testimony, an individual testifying before the
grand jury is not permitted to have his attorney with him in the grand jury room. Tr. 02/08/2007
a.m. at 27-28. Apparently surprised by Russert's response, the defendant subsequently
uncovered prior statements made by Russert in 1997 and 1998 when appearing on several
television programs that purportedly contradict Russert's statement disavowing knowledge of the
ordinary procedure under which witnesses testify before grand juries without the presence of
their attorney.

After Russert had completed his testimony and the government had rested its case, the
defendant sought to introduce both the videotapes and transcripts of these earlier statements,
arguing that they are admissible as prior inconsistent statements under Federal Rule of Evidence
613(b). Under Rule 613(b), a witness's prior inconsistent statement cannot be proved by
extrinsic evidence unless (1) "the witness is afforded an opportunity to explain or deny" the
statement and (2) "the opposite party is afforded an opportunity to interrogate the witness"
regarding the statement. Fed. R. Evid. 613(b).[26] The situation here was complicated by the fact

---

[26]    Although Rule 613(b) does not define "extrinsic evidence," the term is understood to encompass
evidence other than the live testimony at trial of the witness who made the prior statement is at issue. See Charles
Alan Wright & Victor James Gold, 28 Federal Practice and Procedure § 6203 (1993) ("Wright & Gold Treatise")
(noting that "[w]hile [extrinsic evidence] is not explicitly defined, . . . the context in which the term is used . . . .
suggests that evidence is extrinsic when it is any evidence other than testimony given at the instant proceeding by the
witness in question"); cf. Behler v. Hanlon, 199 F.R.D. 553, 560 (D. Md. 2001) (contrasting extrinsic evidence
within the meaning of Rule 613(b) with witness's own testimony). Thus, courts have considered to be extrinsic the
witness's own out-of-court statements, 28 Wright & Gold Treatise § 6203 (citing United States v. Williams, 668
F.2d 1064, 1068 (9th Cir.1981)), the testimony of other witnesses, id. (citing United States v. Xheka, 704 F.2d 974,
987 (7th Cir.), cert. denied, 464 U.S. 993 (1983)), tape recordings, id. (citing United States v. Young, 248 F.3d 260,
267-68 (4th Cir.), cert. denied, 533 U.S. 961 (2001)), and documents, id. (citing United States v. Lashmett, 965 F.2d
179, 181-182 (7th Cir. 1992)). In this case, there was no dispute that the tape recordings and transcripts of Russert's
prior statements constitute extrinsic evidence of those statements.

that Russert's testimony concluded several days before the impeachment evidence was discovered. Although he could have been recalled as a witness and was available for that purpose, the District of Columbia Circuit appears not yet to have addressed the question of whether a witness may be impeached with extrinsic evidence of prior inconsistent statements after the witness has completed his testimony. The Courts of Appeals of at least four other circuits, however, have held that extrinsic evidence may be used in such a circumstance so long as the witness can be recalled to explain or deny the statement. See United States v. Moore, 149 F.3d 773, 781 (8th Cir. 1998); United States v. Young, 86 F.3d 944, 949 (9th Cir. 1996); United States v. McCall, 85 F.3d 1193, 1197 (6th Cir. 1996); United States v. Hudson, 970 F.2d 948, 955 (1st Cir. 1992). Here, counsel for the defendant and Russert represented to the Court that Russert was available to be recalled as a witness, and therefore would have an opportunity to explain or deny the prior statements at issue and further examined by the government. Tr. 02/14/2007 a.m. at 13, 18-19. Accordingly, the Court agreed with the defendant that Rule 613(b) did not bar the use of the statements.

That Rule 613(b) did not preclude the evidence did not end the inquiry, however. The government's central objection to the statements' admission was that the issue about which Russert would by impeached by the statements was entirely collateral.[27] Relying on United States v. Hayes, 369 F.3d 564, 567 (D.C. Cir. 2004), the government asserted that extrinsic evidence may not be offered to impeach a witness on a collateral issue. Thus, even assuming that

---

[27] Moreover, noting that Russert has already admitted before the jury that he did receive a benefit in exchange for his testimony, Tr. 02/14/2007 a.m. at 37, that his agreement was already admitted into evidence, id. at 14, and that the prior statements were made nearly a decade ago during television appearances for which he presumably had been briefed in advance, Tr. 02/13/2007 p.m. at 33, the government argues that even if they are not collateral, the statements had very little probative value.

the prior statements are inconsistent, which the government did not concede, Tr. 02/13/2007 p.m.

at 33-34, it argued that the defendant's knowledge of the rules and practices governing grand jury

procedure could have no bearing on his potential bias or credibility, id. at 33. As the District of

Columbia Circuit made clear in United States v. Tarantino, 846 F.2d 1384, 1409 (D.C. Cir.), cert.

denied, 488 U.S. 867 (1988)—the principal case upon which it relied in deciding

Hayes—although the rule permitting a trial court to exclude extrinsic evidence of a prior

statement offered solely to impeach a witness on a collateral issue predates the Federal Rules of

Evidence by well over a century, it now finds its source in Rule 403. See Tarantino, 846 F.2d at

1409. Accordingly, the Court can, in an exercise of its discretion under Rule 403, exclude the

extrinsic evidence the defendant wishes to introduce—consisting of videotapes and transcripts of

Russert's prior statements—if it concludes that it relates to only a collateral issue.

The critical question was, therefore, whether the issue on which the defendant would

impeach Russert with these prior statements was collateral. The defendant argued that the issue

was not collateral because it related to Russert's own potential bias, credibility, or both. That

potential bias arises from the accommodations he received from the government, the defendant

argued, and therefore, evidence that he testified untruthfully concerning one of those

accommodations is not collateral to the case. The government argued that the issue is collateral,

however, as it bore no relation to the main subject of Russert's testimony, (i.e., his conversation

in July 2003 with the defendant), and because his agreement with the government pertaining to

accommodations he received—the only subject to which the statements could be relevant—was

already before the jury. Tr. 02/13/2007 p.m. at 37. After careful consideration of the parties'

41

positions, the Court concluded that the matter is collateral, and therefore the defense could not present extrinsic evidence of the statements.

While there is no hard and fast rule, as the test is ultimately a function of the Court's discretion under Rule 403, see Tarantino, 846 F.2d at 1409, the basic test for determining whether a matter is collateral is whether facts described in the statement could be relevant to any relevant purpose other than contradicting the witness's testimony.  Cf. United States v. Roulette, 75 F.3d 418, 423 (8th Cir. 1996) ("A prior inconsistent statement contains collateral matter and is therefore inadmissible if the facts referred to in the statement could not be shown in evidence for any purpose independent of the contradiction."); United States v. Beauchamp, 986 F.2d 1, 4 (1st Cir. 1993) ("A matter is considered collateral if the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." (internal citation and quotation marks omitted)).  Moreover, because the rule against impeachment by extrinsic evidence on collateral matters is grounded in Rule 403, the Court may properly weigh the probative value of such evidence against the costs of admitting it, including prejudice, delay, and waste of time.  See Tarantino, 846 F.2d at 1409; cf. Beauchamp, 986 F.2d at 4 ("Stated another way, extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence.") (citing Tarantino, 846 F.2d at 1409).

Here, the prior statements made by Russert were collateral in that they did not cut to the heart of his testimony but rather solely related to his knowledge of the criminal justice process. Weighed against the high countervailing costs, the minimal probative value of the prior

statements becomes even less worthwhile. First, Russert had already acknowledged through his testimony that he did receive benefits, including the ability to present his testimony without actually appearing before the grand jury. Second, presenting the prior statements to the jury essentially in a vacuum and out of context of Russert's earlier testimony, would not only involve unnecessary time and delay,[28] but it would have created a risk of undue prejudice to the government resulting from the impeachment being isolated from the rest of his testimony on a matter that did not relate directly to the substance of his testimony.[29]  For these reasons, the Court concluded that the tape recordings containing Russert's prior statements that the defendant would offer to impeach his statements concerning grand jury procedures relate to collateral matters, and therefore the defendant could not use them to impeach Russert.

**B.    The Government's February 3, 2007,  Letter to Defendant's Counsel**

The second item of evidence the defendant wished to introduce was a letter sent by the government to counsel for the defendant in response to a discovery request on February 3, 2007, pertaining to certain accommodations that were provided to Tim Russert, a key witness for the government. The letter informed the defendant that after Tim Russert received a grand jury

---

[28]  If the Court permitted the introduction of this evidence, the government would have to be provided the opportunity to elicit testimony concerning why Russert, a non-practicing attorney, would not have known how the criminal justice process operates and why he would have made the prior statements. This would have created a side-show that had nothing to do with the main event.

[29]  Notably, this is not a case where the Court's ruling barring the defendant from impeaching Russert on this particular issue therefore deprived the defendant of the opportunity to call Russert's bias or credibility into question before the jury. Indeed, the defendant cross-examined Russert for more than five hours, probing issues bearing on his potential bias and credibility in extreme detail.  See Tr. 02/07/07 p.m. at 15-89; Tr. 02/08/07 a.m. at 8-62, 79-86; Tr. 02/08/07 p.m. at 15-37. Accordingly, the Court is convinced that permitting the defendant to cross-examine Russert on this single additional point would have had no substantial impact on whether the jury would discredit his testimony.

subpoena, counsel of the government and counsel for Russert spoke and the government noted

that if Russert sought to quash the grand jury subpoena issued to him on First Amendment

grounds, the government's legal argument would be predicated upon the Supreme Court's ruling

in Branzburg v. Hayes, 408 U.S. 665, 681 (1972), as opposed to an argument that Russert waived

any First Amendment protection when he spoke to the FBI Agent Eckenrode in the fall of 2003.

Tr. 02/14/2007 a.m. at 36-38.

 The defendant argued that the letter should be admitted because it bore on Russert's

potential bias as a witness by revealing an accommodation he received from the government.[30]

While perhaps insignificant at first glance, the defendant pointed out that the government's

concession is of great significance because it allowed Russert to keep from public view the fact

that he had spoken with the FBI in fall 2003. Tr. 02/14/2007 a.m. at 29-30, 37. By declining to

raise in its argument opposing Russert's motion to quash the fact that Russert had already spoken

to the FBI, the defendant argued that the government allowed this fact to remain hidden from

public view. Id. at 29. Indeed, as the defendant noted, this fact remained publicly unknown until

Russert testified during this trial. Id. at 29-30, 37-38. And according to the defendant, the

potential import to Russert of keeping this fact secret was enormous: on the one hand, Russert

publicly portrayed himself as having vigorously challenged the government's subpoena for his

testimony—agreeing to testify only after losing his legal battle—while in fact, he had voluntarily

spoken with an FBI agent long before challenging the government's subpoena in court. Id. at 37.

Thus, the defendant argued, had the government not reached the agreement with Russert's

counsel that was at issue and instead argued in the subpoena proceedings that the fall 2003

---

[30] Although the letter is an out-of-court statement offered for its truth, it appeared to fall outside the scope of the hearsay rule as an admission of a party-opponent. See Fed. R. Evid. 801(d)(2). In any event, the government did not challenge the letter on this ground.

conversation with the FBI agent amounted to a waiver of Russert's First Amendment privilege, that conversation would have been made public several years ago, and Russert would have been unable to maintain the appearance of championing the cause of the First Amendment reporter's privilege. Id.

In response, the government's chief argument was that Russert himself was never aware of the understanding reached between the government and Russert's counsel, and therefore it can have no bearing on Russert's potential bias. Tr. 02/13/2007 p.m. at 26-27. Beyond the absence of any direct evidence that Russert was personally aware of the government's litigation position, id., the government argued that its litigation position was not important enough for Russert to be made aware of it. Tr. 02/14/2007 a.m. at 26. The government's position was not offered as a means of securing Russert's testimony, as were the accommodations included in the written agreement subsequently reached between the government and Russert. Id. at 21. The understanding to which the defendant referred, the government pointed out, was not part of the formal written agreement that was negotiated between the government and Russert after another member of this Court denied Russert's motion to quash the subpoena.[31]  Tr. 02/13/2007 p.m. at 27-28. Rather, the government's position on the waiver issue was merely an oral understanding, reached between counsel for the government and counsel for Russert, pertaining to what specific arguments the government would raise—and to which Russert's attorney would therefore need to respond—in its brief on Russert's motion to quash. Id. at 28-29. Thus, the government argued,

---

[31] The difference in time between the government's position on the waiver issue and the formal agreement reached with Russert's counsel should not be understated. The government's position on waiver was communicated to Russert's counsel while Russert was in the midst of mounting a legal challenge to the government's subpoena. The formal agreement between the government and Russert extending him special accommodations concerning the manner of his grand jury testimony, by contrast, was entered into only after Russert's challenge to the subpoena was rejected.

it was extremely unlikely that Russert was ever made aware of the agreement by his counsel. Tr. 02/14/2007 a.m. at 26.

Moreover, the government argued that the defendant vastly overstated the value of the concession to the defendant and the government. The government's brief—in which it expressly noted that it was not raising the waiver argument, and presumably in which the government would have made mention of Russert's 2003 FBI interview had it decided to argue the waiver issue—was filed under seal. Id. at 30. Accordingly, had the understanding never been reached, there was little reason to think that Russert's 2003 interview would have become public knowledge. The government never intended, it asserted, to argue that Russert's 2003 conversation with an FBI agent amounted to waiver of his First Amendment privilege. Id. at 21, 34. Believing its argument on the merits of Russert's First Amendment privilege claim to be sufficient, under Branzburg, 408 U.S. at 665, to defeat Russert's challenge to his subpoena, the government represented that it viewed the waiver issue as unnecessary, and thus had not planned to raise that issue. Tr. 02/14/2007 a.m. at 21. In sum, because there is neither evidence tending to show that Russert was in fact aware of the concession, nor any reason to infer that he would have sought out this information or that his counsel would have relayed it to him, the government asserted it cannot be admissible to show bias.

After carefully examining the issue, the Court concluded that the letter should not be admitted. First, the Court was not convinced that the agreement not to raise the waiver argument amounts to the type of accommodation the defendant is entitled to put before the jury. The government's assertion that it did not intend to raise the waiver issue in any event and that its understanding with Russert's counsel therefore was not the product of an effort to secure

Russert's testimony—but rather merely a response to Russert's counsel's query about what arguments the government planned to raise—undercuts the defendant's argument that the alleged concession was of such great importance that Russert was necessarily apprised of it.

Second, the letter was only relevant to show Russert's potential bias if the jury could reasonably infer that Russert was in fact aware of the government's position, see Fed. R. Evid. 104(b), and the Court could not conclude from the evidence before it that the jury reasonably could so find.[32]  To be sure, the potential significance of the government's position—to whatever extent, if any, it aided Russert in keeping out of public view his fall 2003 FBI interview—may indeed suggest it was of sufficient importance for Russert's counsel to have been informed him of it.  However, the fact that the government's pleading in which the waiver argument would have been made was filed under seal lessens the potential impact the position would have had on Russert's decision to provide his grand jury testimony.  Accordingly, the Court ruled that the government's decision not to raise the waiver position was not relevant to show potential bias by Russert,[33] and therefore, the government's letter to the defendant's counsel revealing this position could not be admitted into evidence.

---

[32]Moreover, the representations of Russert's own counsel—to the effect that he never disclosed to Russert his understanding with counsel for the government that the waiver argument would not be raised, Tr. 02/14/2007 a.m. at 59-60—further reinforce the Court's conclusion that from the evidence in the record, the jury could not reasonably conclude that Russert was aware of, and therefore influenced by, the agreement.  Although Russert's counsel was not subjected to cross-examination as requested by the defendant's counsel, the Court credits his representations as an officer of the Court that he did not make known the government's position to Russert.

[33] If anything, the government's position was an accommodation to Russert's attorney and not Russert himself, since it alleviated counsel's need to respond to a legal argument the government decided not to raise.

### VI.    Conclusion

For the reasons set forth during the trial in this matter, and expanded upon in this memorandum opinion, the various evidentiary motions raised by the parties are granted in part and denied in part.

**SO ORDERED** this 1st day of March, 2007.

REGGIE B. WALTON
United States District Judge

48