# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

## DEFENDANT I. LEWIS LIBBY'S OPPOSITION TO THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS PROPOSED SENTENCING GUIDELINES CALCULATIONS

Defendant I. Lewis Libby, through his counsel, respectfully submits this memorandum in opposition to the Government's Memorandum of Law in Support of Its Proposed Sentencing Guidelines Calculations ("Gov't Guidelines Mem."), filed May 25, 2007. In addition, we respond here to certain arguments raised in the Government's Sentencing Memorandum ("Gov't Sent. Mem."), also filed May 25, 2007. Mr. Libby's sentencing hearing is scheduled for Tuesday, June 5, 2007 at 9:30 a.m.

### Introduction

The government contends that the Probation Office incorrectly determined the offense level for the crimes of which Mr. Libby was convicted, and that the Court should apply either of two enhancements under the Sentencing Guidelines. For the reasons set forth below, the government's arguments are wrong as a matter of both fact and law.

*First*, and most significantly, the government relies on numerous "facts" that are not supported by the record, and on evidence that was withheld from Mr. Libby during discovery. Even worse, many of the government's assertions about Mr. Libby's

conduct are inconsistent with the record or otherwise misleading.  The government urges the Court to violate due process when it suggests that sentencing enhancements should be based on secret or unproven facts.

*Second*, the language of and the commentary to the Guidelines, in conjunction with the relevant case law, contradict the government's positions.

*Third*, the government fails to acknowledge the unique circumstances of this case.  Mr. Libby did *not* commit an underlying offense relating to unauthorized disclosure of national defense information.  Just as significantly for purposes of the Guidelines, neither did anyone else.  These facts were unmistakably clear from early in the government's investigation, and certainly cannot be disputed now, in light of the evidence adduced at trial.  The government has used the sentencing process to reinject into the case, unconstrained by the rules of evidence, issues long since ruled irrelevant.  It seeks to have Mr. Libby sentenced on the basis of the case it could have sought to try – but chose not to.  In sum, the sentencing enhancements the government asks the Court to impose would result in a punishment that is grossly disproportionate to the conduct on which Mr. Libby's conviction was based.

## I.    Factual Background

The Court is familiar with the evidence at trial, and we do not wish to rehash the evidence any more than necessary in this memorandum.  Nevertheless, because the government has distorted so many relevant facts, we are compelled to set the record straight here.

### A.    The Nature of the Government's Investigation

Valerie Wilson's employment at the CIA was disclosed publicly in a column by Robert Novak published on July 14, 2003.  There is no doubt that

Mr. Novak's column triggered the government's investigation.  After the CIA referred the matter to the Justice Department, an FBI investigation began in late September 2003. It is undisputed that, as the investigation swiftly uncovered, Mr. Novak's two primary sources were Richard Armitage and Karl Rove, and that CIA spokesperson Bill Harlow also confirmed information about Ms. Wilson's CIA employment to Mr. Novak. Mr. Libby had nothing to do with this leak.  He was not a source for Mr. Novak, and he was not acting in concert with any of Mr. Novak's sources.  The government has never suggested otherwise.

During the investigation, Mr. Libby consistently told the FBI and the grand jury that he had first learned that Ms. Wilson worked at the CIA from the Vice President in early June 2003.  The government's suggestion to the contrary (*see* Gov't Sent. Mem. at 5) is belied by the trial record.  According to Mr. Libby, months later he thought he had forgotten that Ms. Wilson worked at the CIA and relearned this information, to his surprise, from Tim Russert in a telephone conversation on July 10 or 11.  Mr. Libby told the FBI and the grand jury that he also discussed Ms. Wilson's identity with two reporters on July 12:  Matthew Cooper and Judith Miller.[1]  Mr. Libby

---

[1]    The government repeatedly claims that Mr. Libby has stated that his "disclosures of information regarding Ms. Wilson's employment may have been sanctioned by the Vice President."  Gov't Guidelines Mem. at 6-7; *see also* Gov't Sent. Mem. at 12, 14. This is a misleading characterization of Mr. Libby's statements to the FBI and his grand jury testimony.  Mr. Libby repeatedly told both the FBI and the grand jury that the Vice President had *not* instructed him to disclose any information regarding Ms. Wilson to the press, and his notes of discussions with the Vice President corroborate such statements and testimony.  Only after repeated questioning by an FBI agent and the Special Counsel about whether it was *possible* that the Vice President had recommended such a disclosure did Mr. Libby allow that it was possible, although he had no such recollection.  *See, e.g.*, Mar. 24, 2004 G.J. Tr. at 69-70 (GX 2).

said that when he communicated this information to Mr. Cooper and Ms. Miller, he attributed it to reporters, and said he did not know if it was true.

B.    The Charges Against Mr. Libby

On October 28, 2005, Mr. Libby was indicted for obstruction of justice, perjury, and making false statements, based on his account of his conversations with Mr. Russert, Mr. Cooper and Ms. Miller.  Although the government had investigated potential offenses under the Intelligence Identities Protection Act ("IIPA"), 50 U.S.C. § 421 and the Espionage Act, 18 U.S.C. § 793, neither Mr. Libby nor anyone else was charged with violating either of those two statutes or with any other offense involving misuse of classified information.  It is entirely unremarkable that no such charges were ever brought.  As detailed below, the overwhelming evidence from the FBI and grand jury investigations and the trial proceedings shows that neither Mr. Libby nor the numerous other government officials who discussed Ms. Wilson's employment during June and July 2003 believed that she was covert or that her employment status was classified.

At the close of the government's case, the defense moved to dismiss from the indictment the allegation that Mr. Libby had lied about his July 12 conversation with Ms. Miller, because the evidence did not support this allegation.  The government did not oppose this motion, and the Court granted it.

On March 6, 2007, Mr. Libby was convicted on Count 1 (obstruction), Count 2 (false statements), and Counts 4 and 5 (perjury).  Mr. Libby was acquitted on Count 3, which charged that he had made false statements about his conversation with Mr. Cooper.  Thus, it appears that Mr. Libby's conviction rests principally on the jury's determination that he lied to the FBI and the grand jury in saying Mr. Russert told him

that Ms. Wilson worked at the CIA, and in saying that he thought, when he talked to other reporters about Ms. Wilson, that he was only passing on information from reporters and did not know if it was true.[2]

The government now makes sweeping accusations that Mr. Libby "lied about nearly everything that mattered." Gov't Sent. Mem. at 5. Of course, the record simply does not support the government's claims. The Court should disregard such unsubstantiated, last-ditch attempts to accuse Mr. Libby of additional misconduct. The government chose to charge a narrow case, and the jury's verdict was on even narrower grounds (*e.g.,* the Court dismissed the allegation that Mr. Libby lied about his conversation with Ms. Miller, and the jury acquitted Mr. Libby of lying about his conversation with Mr. Cooper). Neither the record nor the jury's verdict supports the government's belated allegations of uncharged improper conduct.

C.    The Government's Unsupported Claims About Ms. Wilson's Status

Both of the sentencing memoranda the government filed on May 25, 2007 include unfounded assertions that Mr. Libby's conduct interfered with its ability to determine whether anyone had violated the IIPA or the Espionage Act. *See* Gov't Sent. Mem. at 13-15; Gov't Guidelines Mem. at 15. These assertions represent an attempt to reinject into the case an issue the government could have raised earlier, but chose not to.

---

[2]    Although the jury convicted Mr. Libby on Count 5, which also alleges false testimony about his conversation with Mr. Cooper, the instructions permitted the jury to convict on that count based solely upon Mr. Libby's testimony that "the only thing I had, I thought at the time, was what reporters are telling us." Accordingly, the conviction on Count 5 appears to be based on Mr. Libby's characterization of his state of mind subsequent to his conversation with Mr. Russert, rather than on Mr. Libby's account of what he actually said to Mr. Cooper. This is consistent with the jury's decision to acquit Mr. Libby on Count 3, which only alleged that Mr. Libby lied about his conversation with Mr. Cooper.

We are necessarily hampered in our ability to counter the government's assertions regarding Ms. Wilson's status under the IIPA because the Court ruled – at the government's behest – that the defense was not entitled to discovery of the information necessary to challenge them. But even a review limited only to the publicly available information suggests that the conclusion the government touts as "fact" is subject to significant doubt.

        1.      It Is Not Clear That Ms. Wilson Was a Covert Agent Under the IIPA

The government has refused for years to take a position regarding whether Ms. Wilson was a covert agent as defined under the IIPA. For example, in his October 28, 2005 press conference, in response to a reporter's question, the Special Counsel stated: "I am not speaking to whether or not Valerie Wilson was covert." Special Counsel Patrick J. Fitzgerald's Press Conference, Oct. 28, 2005 Tr. at 8.

Early in discovery, Mr. Libby sought discovery of documents relating to whether Ms. Wilson's status as a CIA employee was classified. *See* Mot. of I. Lewis Libby To Compel Disc. of Rule 16 and *Brady* Material in the Possession of Other Agencies at 2 (Jan. 31, 2006) (Dkt. 32). The government refused to provide the requested discovery on the ground that it was irrelevant. It noted (correctly) that Ms. Wilson's CIA status was "not an element of any of the three statutory violations charged." Gov't Consol. Resp. to Def. Mots. to Compel Disc. at 28 n.11 (Feb. 16, 2006) (Dkt. 36). In fact, according to the government, it was "irrelevant whether Mr. Wilson's wife actually did work at the CIA" at all. Gov't Resp. to Def. Third Mot. to Compel Disc. at 11 (April 5, 2006) (Dkt. 80).

On June 2, 2006, the Court issued a discovery order "set[ting] forth what this case is and is not about."  Order at 1 (June 2, 2006) (Dkt. 112).  After noting that Mr. Libby had not been charged with illegally disclosing Ms. Wilson's affiliation with the CIA, the Court explained that "the only question the jury will be asked to resolve in this matter will be whether the defendant intentionally lied" to the grand jury and the FBI about his conversations with three news reporters.  *Id.* at 2.  The Court made clear that the actual status of Ms. Wilson's CIA employment had nothing to do with answering that question.  *See id.* at 3.  Denying Mr. Libby's discovery requests, the Court held that "Ms. Wilson's documented status as an employee of the CIA, unless viewed by the defendant or the content of the documentation was made known to him or a potential government witness, is simply immaterial to the preparation of the defense and thus not discoverable."  *Id.* at 6 n.3.

The Court's comments during the trial also made clear that Ms. Wilson's status with the CIA was irrelevant to the case.  In preliminary instructions to the jury, the Court stated that what Valerie Wilson's

> actual status was or whether any damage would result from the disclosure of her status are totally irrelevant to your assessment of the defendant's guilt or innocence on the offenses the defendant has been charged with in this case.

Jan. 23, 2007 A.M. Tr. at 19:25 to 20:12.  The Court repeated this and similar statements several times during the trial.

The government has now adopted a new position on Ms. Wilson's status in a brazen attempt to convince the Court that Mr. Libby should be punished as if he outed a covert CIA official or mishandled classified information – a position it carefully avoided taking before or at trial.  The government baldly asserts:  "At the time of the

leaks, Ms. Wilson in fact qualified as a 'covert agent' within the meaning of the IIPA."
Gov't Guidelines Mem. at 5; *see also* Gov't Sent. Mem. at 12.  The prosecution offers
two supposed grounds for this belated conclusion.  Both are unconvincing.

　　　　　First, the government claims that its "investigators were given access to
Ms. Wilson's classified file."  Gov't Guidelines Mem. at 5 n.2.  This is tantamount to
asking the Court and Mr. Libby to take the government's word on Ms. Wilson's status,
based on secret evidence, without affording Mr. Libby an opportunity to rebut it.  Such a
request offends traditional notions of fairness and due process.  *United States* v.
*Blackwell,* 49 F.3d 1232, 1235 (7th Cir. 1995) ("It is well established that a convicted
defendant has a right to be sentenced on the basis of accurate and reliable information,
and that implicit in this right is the opportunity to rebut the government's evidence.");
*United States* v. *Edelin*, 180 F. Supp. 2d 73, 75 (D.D.C. 2001) (it is necessary "to protect
the defendant's Fifth Amendment due process right by ensuring that defendant has the
ability to rebut any aggravating factors asserted by the Government").

　　　　　Second, the government relies on a terse two-and-a-half page summary of
Valerie Wilson's employment history that was generated by the CIA, which purports to
establish that "Ms. Wilson was a covert CIA employee for whom the CIA was taking
affirmative measures to conceal her intelligence relationship to the United States."[3]  We
have never been granted an opportunity to challenge this conclusory assertions or any of
the other unsubstantiated claims in this document, nor permitted to investigate how it was
created.  If nothing else, the fact that the CIA's spokesperson confirmed Ms. Wilson's

---

[3]    Gov't Guidelines Mem. at 5, and Ex. A thereto.

CIA employment to Mr. Novak calls into question whether the government was taking affirmative measures to conceal her identity.

The summary described above was provided to the defense along with a companion summary that defined a "covert" CIA employee as a "CIA employee whose employment is not publicly acknowledged by the CIA or the employee."[4]  It is important to bear in mind that the IIPA defines "covert agent" differently.  It states:  "The term 'covert agent' means— (A) a present or retired officer or employee of an intelligence agency . . . (i) whose identity as such an officer, employee, or member is classified information, and (ii) who is serving outside the United States or has within the last five years served outside the United States."  50 U.S.C. § 426.  The CIA summary of Ms. Wilson's employment history claims that she "engaged in temporary duty (TDY) travel overseas on official business," though it does not say whether such travel in fact occurred within the last five years.  Further, it is not clear that engaging in temporary duty travel overseas would make a CIA employee who is based in Washington eligible for protection under the IIPA.  In fact, it seems more likely that the CIA employee would have to have been stationed outside the United States to trigger the protection of the statute.  To our knowledge, the meaning of the phrase "served outside the United States" in the IIPA has never been litigated.  Thus, whether Ms. Wilson was covered by the IIPA remains very much in doubt, especially given the sparse nature of the record.

---

[4]    Remedial Measures Following the Disclosure of Valerie Wilson's Employment Relationship With The CIA, produced to the defense on June 9, 2006.

2. Neither Mr. Libby Nor Anyone Else Understood Ms. Wilson To Be Covert or Classified

The Court's focus during trial on what Mr. Libby actually knew about Ms. Wilson's status was correct, in light of the discovery provided to the defense. And to the extent that the Court needs to consider Ms. Wilson's status during this phase of the proceedings, it remains correct. There is simply no evidence that Mr. Libby received information indicating that Ms. Wilson's position at the CIA was covert or classified.

Mr. Libby consistently testified that he did not understand Ms. Wilson to be covert or classified. As detailed below, all of the relevant evidence – including the grand jury and trial testimony of the government's own witnesses – *corroborates* Mr. Libby's testimony that he was unaware of Ms. Wilson's status. In light of the record, then, it is misleading for the government to suggest that Mr. Libby's grand jury testimony on this point should not be believed.

As Mr. Libby told the grand jury, the Vice President told him that Ms. Wilson worked at the CIA in June, but did not indicate that Ms. Wilson was covert or that her job status was classified. This is consistent with Mr. Libby's notes of that conversation, which do not identify Ms. Wilson as covert or classified. *See* GX 104; GX 104T. At trial, the government produced three witnesses who said they, too, had told Mr. Libby that Ms. Wilson worked at the CIA: Marc Grossman; Robert Grenier; and Cathie Martin. None of them testified that he or she had told Mr. Libby that Ms. Wilson was covert or classified.

The government also called five witnesses who said that Mr. Libby had mentioned or referred to Ms. Wilson in conversations during June and July 2003: Craig Schmall; Ari Fleischer; David Addington; Judith Miller; and Matthew Cooper. None of

these witnesses (nor any other trial witnesses) testified that Mr. Libby said Ms. Wilson was covert.  None of them testified that they believed Mr. Libby had been communicating classified information to them.  In sum, none of the witnesses who testified at trial said that prior to July 14, 2003, they believed that Ms. Wilson's affiliation with the CIA was protected information.

Indeed, as far back as August 2004, the government effectively admitted what this record makes plain:  that Mr. Libby was unaware of Ms. Wilson's alleged covert status.  At that time, the Special Counsel submitted an affidavit to the District Court in opposition to Ms. Miller's motion to quash grand jury subpoenas.  That affidavit indicates the government was *not* considering prosecuting Mr. Libby under the IIPA because it had "no direct evidence that Libby knew or believed that Wilson's wife was engaged in covert work."  Aug. 27, 2004 Aff. of Patrick J. Fitzgerald at 28 n.15.  We are aware of no evidence to the contrary adduced since that time.[5]  Indeed, the government admits in its Guidelines Memorandum that "the information to which defendant was given access did not expressly identify Ms. Wilson as a covert agent."  Gov't Guidelines Mem. at 8 n.7.

The government does not explicitly concede a related point:  that the information provided to Mr. Libby did not identify Ms. Wilson as *classified* either.  But there can be no escaping this fact.  We reiterate:  no witness claims to have told Mr. Libby that Ms. Wilson's affiliation with the CIA was classified.  (In fact, putting aside what these witnesses actually told Mr. Libby, none of them testified that they

---

[5]   By August 27, 2004, the government had obtained grand jury testimony from all of the eight witnesses who testified at trial about discussing Ms. Wilson with Mr. Libby, except for Ms. Miller.

personally believed that Ms. Wilson's status was classified at the time). Logically, then, there is no basis to conclude that Mr. Libby received information about Ms. Wilson that he knew was classified. For this reason alone, Mr. Libby could not have knowingly violated the IIPA or the Espionage Act.

## II.     The Probation Office Applied the Guidelines Correctly

It bears reiterating that under current law, the Guidelines are advisory. Under the sentencing regime set forth in 18 U.S.C. § 3553(a), the relevant sentencing range under the Guidelines is merely one of many factors that the Court must consider. *See United States* v. *Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005). (The departure issues are addressed in our Sentencing Memo, which is being filed separately today).

The Probation Office, the defense, and the government all concur that the base offense level in this case is 14. The Probation Office and the defense agree that no enhancements should be added to this offense level, and that there are grounds for a departure downward from that level.   In contrast, the government maintains that two sentencing enhancements are applicable here, and disagrees with the bases for departure identified by the Probation Office.

### A.     The Government's Proposed Guidelines Calculations Are Incorrect

The government has asserted that with respect to the obstruction of justice and perjury counts, the Court is obligated to apply the cross reference to the guideline provision applicable to those convicted of being accessories after the fact, U.S.S.G. § 2X3.1. Employing this cross reference would lead, in the government's view, to an offense level of 19. As detailed below, the government's arguments lack merit.

1.      The Cross Reference Provision in the Obstruction of Justice
         Guideline Is Not Applicable To Count 1

U.S.S.G. § 2J1.2(c)(1), the obstruction of justice guideline, indicates that

the cross reference to § 2X3.1 is triggered when the defendant's obstruction is "in respect

to" a criminal offense.  This requires, as a predicate, the commission of an underlying

criminal offense by the defendant or someone else.  This interpretation, which is based on

the language of the obstruction guideline, is reinforced by the Commentary to the

guideline,[6] which states:

> Because the conduct covered by this guideline is frequently
> part of an effort to avoid punishment *for an offense that the*
> *defendant has committed or to assist another person to*
> *escape punishment for an offense*, a cross reference to
> § 2X3.1 (Accessory After the Fact) is provided.  Use of this
> cross reference will provide an enhanced offense level
> when the obstruction is in respect to a particularly serious
> offense, *whether such offense was committed by the*
> *defendant or another person*.  (Emphasis added.)

The government argues that the fact that this commentary was amended

"to make clear that the cross reference should be applied in cases in which the defendant

committed obstruction to escape punishment for his own criminal conduct, as well as to

assist another person to escape punishment" supports its reading of § 2J1.2(c)(i).  Gov't

Guidelines Mem. at 11.  In fact, the opposite is true; it supports our reading of this

provision.  The commentary initially suggested that the cross reference was applicable

only when the defendant obstructed justice with respect to an underlying offense

committed by *another person*.  The Sentencing Commission then amended the

---

[6]      This Commentary is entitled to substantial weight.  "[C]ommentary in the Guidelines
Manual that interprets or explains a guideline is authoritative unless it violates the
Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading
of, that guideline."  *Stinson* v. *United States*, 508 U.S. 36, 38 (1993)

commentary to clarify that the cross reference should also be applied where the defendant obstructed justice with respect to an underlying offense committed by the *defendant himself*. From this amendment, the government draws the illogical conclusion that the cross reference should also be applied where *no one* committed an underlying offense. Nothing suggests that the Sentencing Commission intended such an illogical result. *See* U.S.S.G., Amend. 401.

Before it could apply the cross reference, the Court would have to make a finding, supported by at least a preponderance of the evidence, that a specific underlying offense was committed by someone. Here, no underlying offense was committed by Mr. Libby or anyone else. The government's investigation did not result in any charges under the IIPA, the Espionage Act, or any other federal statutes relating to national defense information. Indeed, regardless of whether any charges were brought, the government has not even asserted that it believes any underlying, uncharged violation actually took place. The government has not come close to showing, even by a preponderance of the evidence, the existence of an actual violation that would trigger the cross reference. This is not surprising, because, as discussed above, the evidence shows that neither Mr. Libby nor anyone else believed that Ms. Wilson was covert or classified. Accordingly, the record is devoid of any evidence on which it is possible to conclude that an underlying offense occurred.

Presumably because it cannot credibly assert than an underlying crime was in fact committed by Mr. Libby or anyone else in this case, the government argues, without support, that the defendant's mere *intent* to obstruct justice is enough to trigger the cross reference in the obstruction of justice guideline, even if no underlying crime

occurred.  *See* Gov't Guidelines Mem. at 12 ("The cross reference in 2J1.2 is designed to match the offense level to the conduct and result *intended* by the defendant . . . .") (emphasis in original).  The government's theory conflicts with the purpose of the cross reference, creates unsurmountable practical problems when it is applied to the facts of this case, and is at odds with the relevant case law.

a.     The Purpose of the Cross Reference

The Commentary to the obstruction guideline indicates that the purpose of the cross reference is to punish more severely a defendant who causes (or intends or attempts to cause) the obstruction of "a particularly serious offense."  That purpose cannot fairly be assessed without a finding that an underlying offense was actually committed by someone.  Because it appears that no underlying crime in fact occurred, and the Court's rulings prevented inquiry on this critical issue, it would be inappropriate for the Court to rely on the cross reference.

We do not dispute the government's assertion that in certain situations, a court can apply the cross reference regardless of whether "the defendant was charged or convicted of the criminal offense under investigation."  Gov't Guidelines Mem. at 10. But the government goes too far in suggesting that the cross reference can be triggered without "any requirement of proof that the underlying offense was committed," and in arguing that "what crime actually occurred" is irrelevant to the Court's analysis.  *Id.* at 10, 12.  Its proposed rule has never been applied by any court – and for good reason. Even in a Guidelines world in which prosecutors have extraordinarily broad power to manipulate sentences, this is one step beyond.

       b.     The Government's Application of the Cross Reference Is Misguided

The flaws in the government's reading of the cross reference in the obstruction guideline become most apparent when it attempts to apply the cross reference to the IIPA and the Espionage Act, the statutes at issue here. Because the government's reliance on what the grand jury was investigating for the basis of the obstruction cross reference is not grounded on proof of any actual violation, it is essentially standardless. Its approach affords the government an extraordinary amount of discretion, usurps the fact-finding role of the Court, and undermines the purpose of the cross reference, as expressed in the commentary.

Both the Espionage Act and the IIPA include several possible violations, each of which requires the government to prove a different state of mind. The corresponding Guidelines sections reflect these distinctions (as well as distinctions for what type of information was disclosed). Thus, for example, the base offense levels under U.S.S.G. § 2M3.3, which governs a violation of 18 U.S.C. § 793(d), are *11 points higher* than the base offense levels under section § 2M3.4, which governs a violation of § 793(f). This difference reflects the fact that § 793(d) proscribes willful disclosures of classified information, while § 793(f) applies to grossly negligent disclosures. The government asserts without explanation that the Court should apply the guideline for a willful disclosure. Yet, the fact that one guideline results in a higher offense level than another is not reason to apply it.

The government provides no evidentiary basis for its assertion that Mr. Libby should be sentenced as an accessory after the fact to a willful, instead of a grossly negligent, disclosure of classified information. The government claims that "§ 793(f)

*could have been* applicable to disclosures that *could be* characterized as 'grossly

negligent,'" without providing any facts about the nature and circumstances of the

alleged disclosures.  Gov't Guidelines Mem. at 9 n. 8 (emphasis added).  At another

point, the government urges the Court to apply U.S.S.G. § 2M3.3 rather than § 2M3.2

"given the circumstances of this case," without giving any explanation of what those

circumstances are, even though they have enormous ramifications for the calculation of

the appropriate sentence.  *Id.* at 9.  Phrases like "could have been" and vague references

to the "circumstances of this case" make clear that there is no factual basis on which the

Court could make findings on this issue.

   The government's explanation for how the Court should apply the

guideline pertaining to violations of the IIPA (U.S.S.G. § 2M3.9) faces similar problems.

The government admits, as it must, that "the information to which defendant was given

access did not expressly identify Ms. Wilson as a covert agent."  Gov't Guidelines Mem.

at 8 n.7.  This concession would seem to eliminate the possibility that Mr. Libby could

have violated the IIPA, because that statute includes very strict knowledge and intent

requirements that are clearly not met here.  The relevant provision of the IIPA states:

> Whoever, as a result of having authorized access to
> classified information, learns the identify of a covert agent
> and *intentionally discloses* any information identifying such
> covert agent to any individual not authorized to receive
> classified information, *knowing that the information
> disclosed so identifies such covert agent and that the
> United States is taking affirmative measures to conceal
> such covert agent's intelligence relationship to the United
> States*, shall be fined under title 18 or imprisoned not more
> than five years, or both.

50 U.S.C. § 421(b) (emphasis added).  Because Mr. Libby was not given information that

identified Ms. Wilson as a covert agent, he thus could not have known that the United

States was "taking affirmative measures" to conceal her identity. The IIPA is therefore inapplicable to his conduct.

Nevertheless, "in the government's view," Mr. Libby should be treated as if he obstructed the "particularly serious offense" of disclosing a covert agent's identity. The government provides no facts, however, to support any finding by the Court that a violation of the IIPA should be deemed the applicable underlying offense here. Moreover, the government's Guidelines calculation with respect to the IIPA turns on a choice between two Guidelines provisions, each of which provide different base offense levels depending on what kind of access to classified information the defendant had. *See* U.S.S.G. § 2M3.9. The government offers in support of its choice between those provisions only its "view" that the focus of the investigation was closer to one of the provisions than the other. The government's "view" of the appropriate cross reference (even if it works in the defendant's favor) is simply not an adequate basis for a court to apply the cross reference.

The fact that the government's approach to the cross reference affords it so much leeway in determining which guideline to apply is evidence that its reading of this provision is wrong. The Court's analysis of the Guidelines should be transparent. The only way to achieve this result is for the government to prove a specific underlying offense that was actually charged or committed by the defendant or someone else, so the Court can make the necessary findings. Due process requires that the Court, not the government, determine which underlying offense actually occurred before the cross reference in the obstruction of justice guideline is triggered.

c.     The Cases the Government Cites Are Not Applicable

In all but one of the cases the government cites in support of its contention

that the Court should apply the cross reference, either the defendant or another person

was charged with an underlying crime.[7]  The one case the government cites in which

underlying charges apparently were not brought, *United States* v. *Quam*, 367 F.3d 1006

(8th Cir. 2004), presents an inapposite fact pattern.  In that case, the court applied the

cross reference in conjunction with the obstruction of justice guideline to punish a

defendant who had testified falsely in a grand jury investigation regarding the drug-

trafficking activities of her live-in boyfriend.  The court followed the cross reference to a

drug-trafficking statute and made drug-quantity findings, "notwithstanding the fact no

one ha[d] been indicted or convicted of an underlying drug offense." *Id.* at 1009.  In that

case, a confidential informant had observed the defendant participating in drug

transactions at her residence, and during a "subsequent search, law enforcement

discovered 111.5 grams of marijuana [and] 2.3 grams of methamphetamine." *Id.* at 1007.

Thus, the prosecution presented evidence that an underlying crime had, in fact, occurred.

That evidence provided a factual basis for making the findings necessary to apply the

cross reference.  There can be little doubt that an underlying drug crime was in fact

committed by someone in the *Quam* case, even in the absence of any drug charges.  No

such factual basis exists here.

---

[7]     *See United States* v. *LeMoure*, 474 F.3d 37 (1st Cir. 2007) (underlying civil rights
charge); *United States* v. *Gay*, 44 F.3d 93 (2d Cir. 1994) (underlying conspiracy to
commit armed robbery charge); *United States* v. *Kimble*, 305 F.3d 480 (6th Cir. 2002)
(underlying murder charge); *United States* v. *Russell*, 234 F.3d 404 (8th Cir. 2000)
(underlying drug charges); *United States* v. *Arias*, 253 F.3d 453 (9th Cir. 2001)
(underlying drug and weapons charges); *United States* v. *Brenson*, 104 F.3d 1267
(11th Cir. 1997) (underlying drug charges); *United States* v. *McQueen*, 86 F.3d 180
(11th Cir. 1996) (underlying money laundering charges).

To be sure, the case law suggests that an acquittal is not necessarily a bar to the application of the cross reference, as the government points out. *See, e.g., Gay*, 44 F.3d at 95; *Arias*, 253 F.3d at 459; *McQueen*, 86 F.3d at 182-83.[8]  Acquitted conduct is not at issue here, however.  The *Gay*, *Arias*, and *McQueen* cases should not be interpreted to mean that the government does not have to articulate an actual underlying offense by the defendant or someone else.  Moreover, *Gay* suggests that before the sentencing court can apply the cross reference to acquitted conduct, it must make a finding about the underlying crime supported by evidence.  44 F.3d at 95 ("the district court found that the [underlying crime] *had unquestionably been committed*") (emphasis added).  Here, the government cannot meet its burden (even under a preponderance of the evidence standard) to support a finding that any underlying crime was in fact committed, which should end the inquiry.

The government has not cited a single case where a court applied the accessory after the fact cross reference even though no underlying charges were brought against the defendant or someone else, or where it was not unmistakably evident that a crime had actually been committed.  Nor has our research uncovered such a case.  The government's reading of this Guidelines provision is unsupported.[9]

---

[8]    To the extent that the government suggests that these three decisions stand for the idea that the cross reference should be followed without regard to "whether an offense could be shown to have been committed at all," *Arias*, 253 F.3d at 459, such statements are dicta.  In all three cases, the government did in fact charge an underlying offense.

[9]    The unreasonable nature of the government's approach is illustrated by its insistence that even in the hypothetical case where a defendant is convicted of obstructing an investigation into a potential murder that turns out to be a suicide, the cross reference to the guideline for homicide must nevertheless be applied.  Such an absurd result

Finally, even if the government's argument that the cross reference must be applied mechanically whenever a defendant intends to obstruct an investigation had any merit – which it does not – the circumstances of this case are so unique as to justify a departure from the offense level that would result. This case does not fit within the heartland of cases in which the cross reference is properly applied because it presents the unprecedented situation where the government has requested the application of the cross reference without charging or even identifying an actual underlying violation. We also note that courts should tread lightly where the government sets forth sentencing enhancement factors that are so severe that they become a tail wagging the dog of a substantive offense. *See United States* v. *Townley*, 929 F.2d 365, 369 (8th Cir. 1991).

2.    The Cross Reference Provision in the Perjury Guideline Is Not Applicable To Counts 4 or 5

U.S.S.G. § 2J1.3(c)(1) states: "If the offense involved perjury . . . in respect to a criminal offense, apply § 2X3.1 in respect to that criminal offense . . . ." For the reasons set forth above concerning the obstruction guideline, the perjury guideline also requires an underlying criminal offense to have actually been committed by the defendant or someone else. It is appropriate to use similar analysis for the two guidelines because, as the Commentary to U.S.S.G. § 2J1.3 explains, "perjury should be treated similarly to obstruction of justice. Therefore, . . . an alternative reference to the guideline for accessory after the fact is made."

The case law is clear that in considering whether perjury is "in respect to a criminal offense," a sentencing court should determine whether "the defendant knew or

---

demonstrates the need for a sentencing court to determine that an actual underlying offense was committed before applying the cross reference.

had reason to know, at the time of his perjury, that his testimony concerned such a criminal offense." *United States* v. *Leon-Reyes*, 177 F.3d 816, 824 (9th Cir. 1999) (quoting *United States* v. *Rude*, 88 F.3d 1538, 1543 (9th Cir. 1996)). In *Leon-Reyes*, the Ninth Circuit affirmed the district court's determination that the defendant's perjury in a trial involving money laundering and drug trafficking charges brought against two other individuals "was only in respect to" the former charges. *Id.* The court found that because Leon-Reyes's "entire testimony" concerned certain "business and financial affairs," and would have had a "very insignificant effect . . . on the drug trafficking charges, . . . the district court properly exercised its discretion in determining that Leon-Reyes's perjury was only in respect to the money laundering charges." *Id.* This case makes clear that the Court should make findings concerning the nexus between the defendant's perjury and the underlying criminal offense.

As we have repeatedly emphasized, there is no evidence in the record here to support a finding that any underlying offense was actually committed by Mr. Libby or anyone else. In addition, as we have discussed above, because the government focuses on what the grand jury was investigating rather than proof of an actual violation, it engages in standardless Guidelines calculations. The government's approach should be rejected because it provides no facts for the Court to make findings regarding which provisions of the Guidelines governing violations of the IIPA and the Espionage Act are applicable. The *mens rea* requirements, and the corresponding offense levels, vary significantly among these provisions, making it improper for the government to exercise discretion in this area.

The government contends that the testimony by Mr. Libby the jury found to be false "bore directly on the elements of the IIPA and the Espionage Act." Gov't Guidelines Mem. at 14. This is an unfair characterization of Mr. Libby's testimony. Even a quick review of the testimony at issue in Counts 4 and 5 indicates that it has nothing to do with whether Ms. Wilson's status was covert or classified, which are the focus of the IIPA and the Espionage Act. Instead, Count 4 relates to Mr. Libby's description of his conversation with Mr. Russert (essentially, Mr. Libby testified that Mr. Russert mentioned Ms. Wilson's CIA employment to him and that he was struck by what Mr. Russert said). And Count 5 relates to what Mr. Libby told reporters, and his state of mind at the time (*e.g.*, "I told a couple reporters what other reporters had told us").

The government also argues that Mr. Libby tailored his testimony to suggest that he did not know that Ms. Wilson was a covert agent or that information about her employment was classified. *See id.* This conclusion is undermined by the record evidence, which shows that Mr. Libby did not know prior to July 14, 2003 that Ms. Wilson was covert or classified.

The government attempts to prop up its faulty theory by pointing to events that occurred *after* Mr. Libby discussed Ms. Wilson with reporters. For example, the government notes that news articles in Mr. Libby's files alleged that Ms. Wilson was covert, and that David Addington testified that he gave Mr. Libby a copy of the IIPA. Such evidence is entirely beside the point. Either Mr. Libby was told prior to his discussions with reporters that Ms. Wilson was covert or classified, or he was not. The evidence clearly establishes that he was not. And contrary to the government's claims,

nothing in the record suggests that Mr. Libby "well knew" that any violations of the IIPA or the Espionage Act had in fact been committed; indeed, Mr. Libby believed the opposite. Accordingly, his testimony was not "in respect to" any actual violations of the IIPA or the Espionage Act, making the cross reference inapplicable.

Finally, with respect to the perjury counts, the government relies heavily on *United States* v. *Suleiman*, 208 F.3d 32 (2d Cir. 2000), to support the proposition that a defendant's intent to commit perjury is enough to trigger the cross reference provided by § 2J1.3(c). *Suleiman*, however, like the cases cited by the government with respect to the obstruction of justice cross reference, involves a situation where an underlying crime (conspiracy) had actually been charged, and is thus inapposite.

3.      The Cross Reference Provision Is Not Applicable To Count 2

U.S.S.G. § 2B1.1 governs the offense of making false statements (Count 2). According to the government's analysis, if the conduct charged in Count 2 established a violation of 18 U.S.C. § 1505 (obstruction of proceedings before federal agencies), then § 2B1.1(c)(3) would require the court to apply the guideline for that violation. The government concludes that "the propriety of applying the cross reference to Count 2 is debatable," because that count did "not specifically allege that defendant made the charged false statements 'corruptly,' with intent to obstruct the FBI's investigation." Gov't Guidelines Mem. at 17-18. We agree that the cross reference should not be applied to Count 2 because it is not clear that Count 2 constitutes a violation of 18 U.S.C. § 1505. Nevertheless, even if the Court looked to the guideline applicable to violations of 18 U.S.C. § 1505, there would be no basis for the court to apply a cross reference to the guidelines for violations of the IIPA or the Espionage Act, for the same reasons already set forth above.

4.     The "Substantial Interference" Enhancement Is Not Warranted

The government has also argued that a three-level increase in the offense levels for perjury and obstruction of justice is warranted here because Mr. Libby's crimes purportedly "resulted in substantial interference with the administration of justice," by causing "the unnecessary expenditure of substantial governmental or court resources." *See* Gov't Guidelines Mem. at 18.  The government's arguments are misplaced because Mr. Libby neither "caused" the government's expenditures nor were those expenditures "unnecessary" or "substantial" as required by U.S.S.G. §§ 2J1.2(b)(2) or 2J1.3(b)(2).

a.     Mr. Libby's Conduct Did Not Cause the Government's Expenditures

The government cannot show – as it must to justify a three-level enhancement under U.S.S.G. §§ 2J1.2(b)(2) or 2J1.3(b)(2) – that *Mr. Libby's* conduct caused many of the expenditures described in its submission.  Specifically, the government has pointed to expenditures associated with: (1) obtaining testimony from Mr. Russert and other reporters, including negotiations and litigation concerning grand jury subpoenas; (2) conducting interviews and obtaining testimony from government officials, including the Vice President, Cathie Martin, Robert Grenier, and others; and (3) obtaining and reviewing documents.  *See* Gov't Guidelines Mem. at 20.  The government's arguments ignore several key facts that make clear that it was not Mr. Libby who caused these activities and expenditures.  Therefore, he should not be penalized for them.  *See, e.g.*, *United States* v. *Jackson*, 67 F.3d 1359, 1370 (8th Cir. 1995) (finding error in the district court's application of U.S.S.G. § 2J1.2(b)(2) where the defendant's actions and the ensuing investigation were not sufficiently connected).

As the PSR correctly states, Mr. Libby was not responsible for the First Amendment litigation between the government and reporters.  Early in the government's investigation, Mr. Libby signed a waiver giving reporters permission to speak with the government about their conversations with him.  The waiver stated, in part,

> I request any member of the media with whom I may have communicated regarding the subject matters under investigation to fully disclose all such communications to federal law enforcement authorities.  In particular, I request that no member of the media assert any privilege or refuse to answer any questions from federal law enforcement authorities on my behalf or for my benefit in connection with the subject matters under investigation.

GX 11, Statement & Waiver of I. Lewis Libby, signed Jan. 5, 2004.  Throughout the government's investigation, whenever requested, Mr. Libby and his counsel provided reassurances to reporters that his waiver was voluntary.  Those reporters who fought the subpoenas did so because they believed the so-called "journalist's privilege" protected their conversations with sources and feared the subpoenas were "fishing expeditions" designed to obtain evidence about sources other than Mr. Libby.  For example, as Tim Russert stated at trial, he "fought that subpoena because we were very concerned at NBC News about a reporter being called into a proceeding which could be open-ended, a so-called fishing expedition.  That could have a chilling effect on my ability to talk to people."  Feb. 7, 2007 P.M. Tr. at 72:24 to 73:3; *see also* Matthew Cooper, *What Scooter Libby and I Talked About*, TIME, Oct. 30, 2005 at 1 (explaining that he fought the subpoena "to protect the principle of source confidentiality").

The government contends that Mr. Libby's waiver does not "preclude the application of the enhancement" with respect to the expenditures related to obtaining testimony from journalists for two main reasons.  First, according to the government,

Mr. Libby was "well aware" when he was interviewed by the FBI that reporters tried to

protect their sources, and "thus anticipated the possibility of litigation over any

subpoenas the government might issue." Gov't Guidelines Mem. at 21. This argument

fails because it was far from clear in January 2004 that certain reporters would refuse to

testify notwithstanding the existence of the waiver. For example, several reporters not

mentioned in the government's submission accepted Mr. Libby's waiver when coupled

with his personal assurances, and testified without mounting any legal challenges to the

subpoenas. *See*, *e.g.*, Feb. 12, 2007 A.M. Tr. at 43:2-7 (testimony of reporter Walter

Pincus); Feb. 12, 2007 P.M. Tr. at 57:23-58:23 (testimony of reporter Glenn Kessler).

Moreover, Mr. Libby signed the waiver *before* any litigation between the government and

reporters occurred. Even if that litigation could have been anticipated notwithstanding

the waiver, it hardly stands to reason that Mr. Libby caused it.

       Second, the government resurrects the old canards that Mr. Libby was

responsible for Ms. Miller's incarceration and that he sought to influence her testimony in

a letter sent to her in jail. Ms. Miller's testimony is to the contrary. At trial, she admitted

that she had not contacted Mr. Libby regarding the validity of his waiver until *after* she

was already incarcerated:

> Q: Why did you . . . not contact Mr. Libby earlier
> regarding his personal waiver?
> A: Because I did not have the agreement from
> Mr. Fitzgerald to limit any questioning of me about sources
> to either one source and the subject at hand. I was afraid of
> a fishing expedition. . . . I was very nervous about that, that
> this was the beginning of a long set of questions about who
> my sources were . . . .

Jan. 31, 2007 A.M. Tr. at 99:10-20.  Further, in her grand jury testimony, Ms. Miller

stated that she did not understand Mr. Libby's letter to her in jail as an attempt to

influence her testimony.  Miller Oct. 12, 2005 G.J. Tr. at 42.

Moreover, given the exacting manner in which the government proceeded

with its investigation of the disclosure of Valerie Wilson's CIA employment to reporters,

it seems likely the government would have issued subpoenas to reporters – and litigated

their motions to quash – even if Mr. Libby's grand jury testimony had been consistent

with that of Mr. Russert, Ms. Miller and Mr. Cooper.  This conclusion is supported by the

trial testimony of the FBI Case Agent in charge of the investigation, who testified at trial

about its broad scope:

> We were trying to determine how it happened that [Valerie
> Wilson's] name and her employment at the CIA got to the
> media. . . . We were trying to find out the names of the
> people who knew about her employment at the CIA and her
> identity, as well as where they learned the information,
> [and] who they told. . . .

*See* Feb. 1, 2007 P.M. Tr. at 37:24-25; 39:5-13 (testimony of Special Agent Deborah S.

Bond).

It therefore seems likely the government would have interviewed the

government officials it claims were interviewed only because of Mr. Libby (such as the

Vice President), and continued to gather documents, even if it had not doubted the

veracity of Mr. Libby's testimony.  The mere fact that the interviews occurred after

Mr. Libby's grand jury testimony is insufficient to justify a three-level enhancement if

that testimony did not cause the FBI to conduct those interviews.  For these reasons, the

government's conclusory allegations regarding its purported additional expenditures are

unconvincing.

b.   The Government's Expenditures Were Not "Unnecessary" or "Substantial"

The government's argument that the Court should apply a 3-level enhancement under U.S.S.G. §§ 2J1.2(b)(2) or 2J1.3(b)(2) fails for another reason as well. The government cannot show that any expenditures resulting from Mr. Libby's grand jury testimony were "unnecessary" or "substantial," as it must under U.S.S.G. §§ 2J1.2, cmt. n.1 and 2J1.3, cmt. n.1, because any such expenditures were made primarily if not exclusively to build a case against Mr. Libby for lying to the grand jury.

It is well settled that the government may not rely on its expenditures in prosecuting the defendant for perjury to demonstrate "substantial interference with the administration of justice." Courts have held that imposing a three-level enhancement based on such circumstances would in effect raise the base offense level for perjury, because every perjury conviction would result in a three-level enhancement. *See United States* v. *Norris*, 217 F.3d 262, 273 (5th Cir. 2000) (following the Second, Tenth and Ninth Circuits in holding that "the expenses associated with the underlying perjury offense should not form the sole basis for an enhanced sentence under section 2J1.3(b)(2). . . . Otherwise, every perjury conviction would carry the enhancement"); *United States* v. *Duran*, 41 F.3d 540, 546 (9th Cir. 1994) (rejecting the district court's imposition of a three level adjustment "[b]ecause the government could not identify any expenses in addition to the costs of bringing [the defendants] to trial"). This reasoning is equally applicable to the obstruction of justice guideline, U.S.S.G. § 2J1.2(b)(2), which contains the identical requirement that the offense result in "substantial interference with the administration of justice." Indeed, this logic is particularly appropriate here, where

the obstruction charge was based on the same conduct that resulted in Mr. Libby's conviction for perjury.  *See* Feb. 21, 2007 A.M. Tr. at 23:18-21 (jury instructions).

If the government expended any resources as a result of Mr. Libby's statements to the grand jury, it was to gather evidence used to prosecute Mr. Libby for lying about his conversations with reporters.  The government has conceded that this was an objective of its investigation.  In February 2004, at the Special Counsel's request, the Justice Department clarified that the Special Counsel had authority to investigate and prosecute crimes of perjury and obstruction of justice.  Feb. 6, 2004 Ltr. from James B. Comey, Acting Attorney General, to Patrick J. Fitzgerald.

The government maintains that the expenditures it has identified "were necessary in order to determine both whether defendant had violated the IIPA or Espionage Act, as well as whether he had perjured himself or obstructed justice."  Gov't Guidelines Mem. at 19.  This argument is unpersuasive.  The government realized early in its investigation that Mr. Libby had not received any information indicating that Ms. Wilson was a covert agent within the ambit of the IIPA, as the Special Counsel's August 27, 2004 affidavit reflects.  And given that the government never adduced any evidence that Mr. Libby was told that Ms. Wilson's CIA employment was classified information, its claim that it was focused on whether Mr. Libby could have violated the Espionage Act rings hollow.

The cases cited by the government at pages 20 to 21 of its Guidelines Memorandum do not support a sentencing enhancement under § 2J1.2(b)(2).  In all of these cases, courts applied the enhancement because expenditures had been incurred in the prosecution of either different defendants or different underlying charges.  *See United*

*States* v. *Tackett*, 193 F.3d 880, 885 (6th Cir. 1999) (expenditures related to "different charges [and] entirely different defendants"); *United States* v. *Sinclair*, 109 F.3d 1527, 1540 (10th Cir. 1997) (expenditures related to the trial of a different defendant); *United States* v. *Harrington*, 82 F.3d 83, 87 (5th Cir. 1996) (expenditures related to "successful prosecution of [the underlying offense]").  By contrast, the expenditures incurred in this case were related to the perjury charges against Mr. Libby.  No charges were brought against other defendants, and Mr. Libby was not prosecuted for an underlying offense.

Leaving aside expenditures by the government that had nothing to do with Mr. Libby's conduct, and others that were made in order to prosecute Mr. Libby for perjury and obstruction of justice, the government is left with little, if any, evidence that Mr. Libby's testimony before the grand jury caused it unnecessarily to expend substantial government resources.  Accordingly, the government's request for a three-level enhancement under U.S.S.G. §§ 2J1.2(b)(2) and 2J1.3(b)(2) should be rejected.

## Conclusion

For the reasons above, the two sentencing enhancements identified by the government should not be applied when the Court calculates the applicable Guidelines offense level as part of its sentencing analysis under 18 U.S.C. § 3553(a).


Dated:  May 31, 2007                              Respectfully submitted,


_____/s/_____                    _____/s/_____

Theodore V. Wells, Jr.                              William H. Jeffress, Jr.
(DC Bar No. 468934)                                 (DC Bar No. 041152)
James L. Brochin                                    Alex J. Bourelly
(DC Bar No. 455456)                                 (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                       Baker Botts LLP
  & Garrison LLP                                    1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas                         Washington, DC  20004
New York, NY  10019-6064                            Tel:  (202) 639-7751
Tel:  (212) 373-3089                                Fax: (202) 585-1087
Fax: (212) 373-2217


_____/s/_____

John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700