## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

### SENTENCING MEMORANDUM ON BEHALF OF I. LEWIS LIBBY

Defendant I. Lewis Libby, through his counsel, respectfully submits this memorandum in aid of sentencing. The sentencing hearing is scheduled for Tuesday, June 5, 2007 at 9:30 a.m.

### Introduction

Distinguished public servant. Generous mentor. Selfless friend. Devoted father. This is the rich portrait of Mr. Libby that emerges from the descriptions of him in the more than 160 heartfelt letters submitted to the Court on his behalf. The letter writers, who range from administrative assistants to admirals, neighborhood friends to former colleagues, Democrats to Republicans, bear witness to Mr. Libby's character and patriotism. As detailed below, Mr. Libby's accomplishments in the State Department, the Defense Department, and the Office of the Vice President demonstrate his extraordinary commitment to public service. His dedication to promoting freedom abroad and keeping American citizens safe at home is beyond question. Mr. Libby has also earned a reputation for treating people fairly and kindly and comforting those who are distressed. He has avoided the Washington limelight to focus on nurturing his young children. Even

those who disagree vociferously with policies he supported while serving in the government believe his conviction is not characteristic of the life he has led.

On the unique facts of this case, and the unique contributions of this man, we believe that under 18 U.S.C. § 3553, a non-Guidelines sentence of probation is warranted.

## I.    The Applicable Sentencing Standard

Following *United States* v. *Booker*, 125 S. Ct. 738 (2005), the Court must impose a sentence in accordance with 18 U.S.C. § 3553(a), and should no longer presume that a sentence calculated pursuant to the United States Sentencing Guidelines is appropriate. *United States* v. *Pickett*, 475 F.3d 1347, 1353 (D.C. Cir. 2007). Indeed, the correctly calculated Guidelines range is but one factor for the Court to consider in imposing sentence. Most significantly, the Court must impose a sentence "sufficient, *but not greater than necessary*" to comply with the purposes of punishment set forth in 18 U.S.C. § 3553(a)(2). *See also United States* v. *Foreman*, 436 F.3d 638, 644 n. 1 (6th Cir. 2006) ("district court's job is not to impose a 'reasonable' sentence [but] to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)"); *United States* v. *Tucker*, 473 F.3d 556, 561 (4th Cir. 2007) (same); *United States* v. *Willis*, 479 F.Supp.2d 927, 929 (E.D. Wis. 2007) (explaining that "the so-called parsimony provision . . . directs the court to impose the minimum term necessary to comply with the statutory goals of sentencing"). Those purposes include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A), (B) and (C).

Pursuant to § 3553(a), courts must also consider a number of other factors, including "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the kinds of sentences available"; and the Guidelines. *Id.* at § 3553(a)(1), (3), and (4); *see also United States* v. *Simpson*, 430 F.3d 1177, 1186 (D.C. Cir. 2005). Under this new sentencing regime, a court should consider all of the relevant sentencing factors, giving no more weight to one factor than to any other factor. The focus of the new regime is thus a sentence based on the whole person before the sentencing court, rather than simply the version of the person reflected in the numbers and grids of the Guidelines. Here, that focus means that we respectfully urge the Court to sentence Mr. Libby on the basis of the portrait of him presented in the Presentence Investigation Report ("PSR") and in the letters submitted on his behalf, rather than on the basis of some incomplete or distorted picture.

The Probation Office calculated the applicable Guidelines range at 15-21 months and identified several grounds for downward departure from that range. As discussed more fully below (and in a separate memorandum of law addressing Guidelines issues filed today)[1], we believe that the Probation Office's calculations are correct and the grounds for downward departure well supported. Full consideration of the other factors outlined in § 3553(a), including the fundamental command that the sentence be sufficient, but not greater than necessary to serve the purposes of punishment, makes clear that a sentence of probation is warranted here.

---

[1] In that Memorandum, we address the government's requests for certain sentencing enhancements. Where relevant to those Guidelines arguments, we have addressed the government's allegations about the record in this case. Because they have no relevance to this proceeding, we have not in either brief responded to the government's arguments defending their charging decisions and conduct of the investigation.

**II.    Mr. Libby's Personal and Professional History Support A Sentence of Probation**

Under § 3553(a)(1), in sentencing Mr. Libby the Court must consider his "history and characteristics." We have submitted over 160 letters from a comprehensive cross-section of people who know Mr. Libby, all attesting to Mr. Libby's decency, work ethic, and "quiet patriotism." The letter writers come from many different periods in Mr. Libby's life and from across the political spectrum. They are conservatives and liberals; career public servants and people working in journalism, medicine, and law; professional mentors and pro bono clients. They run the gamut from four-star generals and admirals to non-commissioned officers; renowned professors and cabinet officials to secretaries, law firm associates, and junior staffers. Mr. Libby has touched all of these people's lives, and we rely on their letters to show what he is truly like. We urge the Court to consider the letters for what they are: powerful evidence of mitigation supporting a sentence of probation.[2]

**A.    Mr. Libby Has Made Great Contributions to the Public Interest**

After graduating from law school in 1975, Mr. Libby worked in private practice until 1981, when he first entered government service with the State Department. He initially served as a speechwriter on the Policy Planning Staff, and then moved into positions in the Bureau of East Asian and Pacific Affairs. His work included, for example, contributing to the policies that helped bring an end to the Marcos dictatorship in the Philippines and fostered the creation of a democratic government in that country.

---

[2]    The letters have been provided to the Court by the Probation Office in connection with the Presentence Investigation Report ("PSR"). Out of respect for the writers' privacy, we do not identify individual letter writers by name here.

One of Mr. Libby's former State Department colleagues remembers him from that time period:

> Scooter was deeply committed to public service and very much of a team player. It was not just that he worked well with me; he worked well with everyone. His sense of humor, often self-deprecating, won him many friends.. He was never dogmatic, even if he had strong viewpoints. He kept confidences and he always offered good advice. If I was inclined toward an impetuous action, he would gently talk me into thinking about what I had in mind and how best to act on it. He is someone I came to trust and who I felt could always be counted on.

In 1985, at the end of his tenure at the State Department, Mr. Libby won the Department's Foreign Affairs Award for Public Service. When he returned to private practice, he dedicated substantial time to public interest matters, including pro bono assistance on a study regarding the reorganization of Pentagon bureaucracy. Mr. Libby was called to government service again in 1989, this time for the Defense Department, and he was subsequently confirmed by the Senate as Deputy Under Secretary of Defense for Policy. According to one of his former Pentagon colleagues, Mr. Libby "stood out as a true and dedicated professional who placed the nation's interests first, above those of party politics or self-advancement. His concern was for the good of the country." Another former colleague and career civil servant writes:

> Scooter greatly impressed me by his determination to fully understand for himself, and convey to his superiors, the complexity and details of the issues. He did not stand on rank or ceremony. His focus was relentlessly substantive, and he pored over analytical reports in a way that I do not believe is common in busy, high level political appointees. He educated himself about technical, military issues previously unfamiliar to him. He was forthright about what he knew, and eager to learn from the knowledge of others. I believe his performance exemplified the very highest standards of government service.

A retired vice admiral who worked with Mr. Libby recalls that during these years,

> Scooter was at the center of the storm – a trusted advisor as we worked through the liberation of Panama, a crisis in the Philippines, the fall of the Berlin wall and . . . Operations Desert Shield/Storm (Gulf War I). When we worked late nights – or even all night – Scooter was likely to be there. . . . Scooter's counsel was routinely sought, respected and taken.

Another retired admiral recalls that Mr. Libby's efforts "were central to our success in the [Gulf] war. Prime examples were his role in helping plan the 'left hook' into Southern Iraq from Kuwait, the truly effective bio-defense posture of the United States military and his untiring efforts to gain funding from allies. . . ." As described below, Mr. Libby would continue to develop his expertise in bio-defense, and this knowledge became particularly critical after the 9/11 terrorist attacks.

While at the Pentagon, Mr. Libby also helped to bring stability and democracy to Eastern Europe at the end of the Cold War. A former civilian military leader remembers, "I grew to admire his intellect and his wisdom during that remarkable period in which the Soviet empire, and ultimately the Soviet Union itself, disintegrated – a period in which both Scooter and I played important roles." For example, in the words of another former Pentagon colleague, "[n]ot only did he oversee important reductions in the nuclear arsenals of Russia and the United States, but his patience, persistence, and ability to listen to all sides were critical qualities in brokering a key agreement with Ukraine – one in which that country agreed to get rid of its arsenal of nuclear weapons." According to a retired colonel, Mr. Libby "worked tirelessly" to assist "the people of Eastern Europe and the Soviet Union who were at the beginning of their emancipation

from tyranny.  In meetings with senior officials in the Soviet Union, Hungary, Poland, and elsewhere he was a strong advocate for the rule of law, civilian control of the military, and respect for human rights."

Without Mr. Libby's leadership in building alliances with former Eastern Bloc countries, writes one admiral, he "could not have fully succeeded as Commander in Chief of Allied Forces Southern Europe in Bosnia and with the 'Partnership for Peace Alliance' under NATO."  A former top official in the State Department and the State Department recalls that Mr. Libby "made decisive contributions to the development of our first post-Cold War defense strategy – a shift that made possible a nearly 40% reduction in spending and force levels – and played a leadership role in developing entirely new relationships with . . . the former Warsaw Pact countries."  In 1993, at the end of his service at the Pentagon, Mr. Libby won the Department of Defense Distinguished Service Award and the Department of the Navy Distinguished Public Service Award.

From 1993 through 2001, Mr. Libby again worked in private legal practice.  During this time, he was asked to serve as the managing partner of the Washington, D.C., offices of two separate law firms (first, Mudge, Rose, Guthrie, Alexander & Ferdon; then, Dechert, Price & Rhodes).  Although he became a busy and successful attorney in Washington, Mr. Libby's commitment to the public interest never waned.  He devoted considerable time to pro bono projects, many of which concerned national security.  For example, after he left the Pentagon, Mr. Libby volunteered repeatedly to help train young policy analysts in the Defense Department's annual Summer Study program at the Naval War College in Newport, Rhode Island.  In 1998,

Mr. Libby served, practically on a full time basis for over half the year, as the Legal

Advisor to the House Select Committee on National Security, known as the Cox

Committee, which uncovered the theft of U.S. military secrets (including nuclear

weapons technology) by the People's Republic of China.  According to the Chairman of

the Committee,

> Scooter's service . . . was twofold.  First, he shared his
> considerable talents and expertise largely pro bono.
> Second, having been hired with the approval of both the
> Democratic and Republican leaders of the committee, he
> worked very hard to ensure that the committee's work was
> conducted entirely on a bipartisan basis.  The committee's
> unanimous report to the Congress was in part a reflection of
> the bipartisan spirit of dedication to the nation's interests
> that he brought to his work as Legal Advisor.

From 1999 to 2000, Mr. Libby led a pro bono project for the Center for

Strategic and International Studies, a bipartisan research organization, which focused on

the laws that would apply in the aftermath of a domestic biological weapon attack.  In the

wake of the 9/11 attacks, Congress found this scholarship particularly useful when

crafting new legislation to help cities, hospitals and EMR personnel respond to chemical

or biological attacks.

In the late 1990s, Mr. Libby also served on the Board of Advisers of the

Center on Russian and Eurasian Studies of the RAND Corporation, and on the ABA

Standing Committee on Law and National Security.  In addition, he informally advised

professors and think tanks on a variety of national security issues, ranging from the rise

of China to the conflict in the Balkans to U.S. defense budgets.

Mr. Libby did not focus his commitment to pro bono activities entirely on

issues of public policy.  Throughout his career in private practice, Mr. Libby frequently

represented individuals for little or no compensation, including active or former

government officials who found themselves embroiled in ethical or regulatory inquiries.

Such individuals often had limited financial means (because they were career civil

servants) and found themselves overwhelmed by the situations they faced.  A former

staffer in the Office of the Vice President ("OVP"), who also worked in private practice

with Mr. Libby, recalls that he built a reputation among government employees "as

someone to go to in times of need.  Whether it was straightening out a regulatory matter

related to travel receipts or advising someone's transition to the private sector, Scooter

took special care to treat these clients as well as the largest corporations."  A former

colleague and national security professional reports that "[in] several instances that I am

aware of, Mr. Libby devoted many hours over many months to these cases and his

counsel was instrumental in sparing innocent people from what might otherwise have

been completely undeserved but very onerous consequences."  One such former pro bono

client writes:

> Scooter acted as my counsel when I worked in the White
> House and was being investigated for a possible leak of
> classified information to a national newspaper.  The
> unfounded charge would have ruined me professionally and
> fighting it would have potentially ruined me financially.
> With no hesitation, and like the good friend he is, Scooter
> provided pro bono advice and assistance that ultimately led
> to my regaining a security clearance and saving my career
> in national security.

Mr. Libby also donated his time to individuals and organizations outside

the U.S. government.  These pro bono projects included representing the Corporation for

Public Broadcasting, helping to establish an overseas school for handicapped children,

and assisting the Holocaust Museum.  And Mr. Libby has represented individuals who

worked outside the government.  In one case, he helped a Vietnam veteran obtain an endorsement deal for prosthetic limbs, and in another he represented a housekeeper who had been held against her will by her employer.  In addition, Mr. Libby served on the board of advisors for Freedom House, a non-partisan organization established by Eleanor Roosevelt and Wendell Wilkie that promotes democracy and human rights.  Keenly aware of the importance of public service, Mr. Libby also encouraged his colleagues to take on pro bono matters and accept positions in the government, as several letter writers have noted.

In 2001, Mr. Libby was called to serve his country for a third time, and he became the Chief of Staff and the National Security Advisor to the Vice President.  As numerous letters indicate, Mr. Libby did not seek high office for partisan purposes or for personal aggrandizement, and he was most comfortable toiling behind the scenes, out of the public eye.  One high school friend and former journalist describes Mr. Libby as a "policy wonk."  A former diplomat reports:  "Scooter was not a political partisan, or actually 'political' in any sense commonly used."  Similarly, according to a former Pentagon colleague, Mr. Libby never acted out of "partisan animus, much less the sort of vengefulness attributed to him in the press."  Another friend recalls his conversations with Mr. Libby about public service as "captur[ing] Scooter's utter lack of interest in hard-edged partisanship."  When called upon in 2001, Mr. Libby returned to government service to work for the Vice President for the same reasons that he encouraged this friend to take a high-ranking position in the State Department during the Clinton administration: because "the matter had nothing to do with Washington partisanship and everything to do with duty."  According to this friend, Mr. Libby believes that "when you're offered a

position [in government] of . . . significance – and you believe you can do the job well – the presumption ought to be that you'll take it."

This description of Mr. Libby's sense of duty is echoed throughout the letters submitted on his behalf. For example, one writer explains that Mr. Libby sacrificed time with his family because "of a belief in public service not out of some great ambition for visibility." And an economic analyst who has known Mr. Libby for over thirty years describes Mr. Libby as "an understated, undemonstrative man, but his love for and devotion to America is palpable to anyone who has worked with him. It is his quiet patriotism, rather than careerism in even the slightest degree, that has motivated his public service and the serious, principled, and selfless manner in which he has conducted himself."

In the OVP, Mr. Libby combined his talent for managing a large group of professionals (he supervised over 80 staffers) and his expertise in military and foreign policy analysis and policy-making. John Hannah, who succeeded Mr. Libby as the Vice President's National Security Advisor, testified at trial that Mr. Libby essentially held two full-time jobs, and that he (Hannah) found holding just one of them to be "very challenging," even "overwhelming." Feb. 13, 2007 Trial Tr. at 36-37.[3] A former OVP deputy recalls:

> During my time in Washington I never met anyone who worked longer hours, had a broader range of responsibilities, or was more serious about fulfilling them than Mr. Libby. . . . [I]n all of my dealings with him, I always found Mr. Libby to be exceptionally thoughtful and open-minded. Far from being an ideologue, . . . Mr. Libby

---

[3]    Mr. Libby also held the position of Assistant to the President, which required him to perform additional domestic and national security duties.

was genuinely interested in ideas and in hearing a variety of arguments and points of view.

Not surprisingly, Mr. Libby's job became even more taxing after the 9/11 terrorist attacks. Mr. Libby's former colleagues in the OVP believe that after those attacks, he drove himself "relentlessly," even "mercilessly." The Vice President's White House physician comments that during this time period, "[t]he stress was continuous and intense. . . . I can tell you for certain that Mr. Libby worked himself to exhaustion day after day. This is a testimony to his devotion to our nation and the Vice President." Despite his fatigue, Mr. Libby led by example. According to a former OVP staffer: "It was Scooter's work ethic, steadiness and commitment in the days, months and years following 9-11 that most inspired me and has taught me the definition of true leadership in the face of adversity."

As the Court is well aware, while he served in the OVP, Mr. Libby began most mornings by participating in a CIA briefing with the Vice President, and spent much of the rest of the day in meetings on national security issues, including meetings of the National Security Council. His counsel was respected by senior participants in those meetings, who were grappling with new threats to national defense and great uncertainty. According to a former Chairman of the Joint Chiefs of Staff,

> [Scooter] brought clarity and innovation to our discussions, qualities that are refreshing and so needed in a large bureaucracy. On many occasions he would seek me out before or after a meeting to get my advice on military matters or ask me further questions. Scooter's dedication to the nation's security and his thoughtfulness were evident . . . . I always came away from our encounters thinking how lucky the country was to have someone of his caliber helping think through the great security challenges we all faced.

A former professor and high-ranking government official writes:

12

> During these years at the White House, I encountered no
> one more driven by analytical temperament, firmness
> of mind and sound policy reasoning than Scooter Libby. …
> He was always at the center of the policy debates, quietly
> courteous, powerfully analytical, attentive to the views of
> others, including those who disagreed with him and striving
> to protect the United States and its democratic institutions
> from terrible and abiding external threats.  In sum, Mr.
> Libby in my judgment has been over the decades an
> exemplary public policy practitioner of the kind I sought to
> develop among students during my 14 years as a Dean and
> Professor at Harvard's Kennedy School of Government.

Mr. Libby devoted long hours to, among other things, addressing threats from terrorist groups such as Al Qaeda, trying to stabilize the situation in Iraq, and monitoring developments in Iran and North Korea.  We will not rehash Mr. Libby's national security duties here.  Nevertheless, we emphasize that preventing another terrorist strike on American soil was Mr. Libby's number one objective.  According to a former OVP deputy, "I saw first-hand his deep commitment to do everything humanly possible to prevent another terrorist attack."

Applying the experience he had been developing for more than a decade, Mr. Libby focused in particular on protecting the nation against mass casualty attacks using weapons of mass destruction.  For example, he rang the alarm concerning the nation's failure to develop and stockpile adequate countermeasures against bioterror threats such as anthrax, smallpox, botulism, and the Ebola virus.  A former OVP deputy reports that Mr. Libby

> was motivated by an extraordinary commitment to
> protecting the nation from terrorist attacks, and particularly
> those that might involve mass casualties from nuclear,
> chemical or biological weapons.  His knowledge and
> expertise in these matters predisposed him to raise concerns
> and possible scenarios that others had simply overlooked,

13

particularly in the areas of transportation security and bio-defense.

Mr. Libby successfully advocated legislation for Project Biowatch (which provides for early detection of biological aerosol attacks) and Project Bioshield (which lends Federal support to the development of medical countermeasures against biological attacks). A senior official at the National Institutes of Health and renowned expert in the field writes, "I do not believe that we would have had the Bioshield legislation or several of the countermeasures that we now have in the Strategic National Stockpile were it not for the tireless efforts of Mr. Libby." And an OVP staffer reports that due in large part to Mr. Libby's urging, "the nation's ability to detect and respond to the covert introduction of fissile material" was strengthened "through the creation of the Domestic Nuclear Detection Office in the Department of Homeland Security." By stiffening our defenses, these efforts serve to discourage attacks on America, and may yet save the lives of tens of thousands of Americans.

B.      Mr. Libby Has Demonstrated Strong Moral Character

Several additional themes leap out from the many letters submitted on Mr. Libby's behalf. Mr. Libby is known for being fair and generous, particularly by the people who have worked with him. For example, he has mentored countless young professionals in Washington. Letter after letter portrays Mr. Libby as uncommonly kind and unselfish, as someone who constantly looks to help others. And Mr. Libby is regularly described as a modest, genuine man who treats everyone with respect.

As numerous letters show, Mr. Libby's friends and former colleagues were stunned by his indictment and saddened and perplexed by his conviction. Indeed, even people who are not particularly close to Mr. Libby are bewildered by this sad turn of

events.  This is evidence that the crimes for which he was convicted represent an

aberration in an otherwise upstanding life.

        1.       Mr. Libby Is Known For His Fairness and Generosity

        Mr. Libby was known as a great boss, both in private practice and the

public sector.  Commenting on Mr. Libby's appointment as managing partner of two

different law offices, a former colleague noted that such organizations "are notorious for

being difficult to manage.  In my mind, Scooter gain[ed] the respect of this prickly group

of people partly due to his terrific skills and talents, but in no small measure also due to

the sense of fairness that imbues all of his actions."  Indeed, one of Mr. Libby's former

law partners reports that he was appointed to lead Dechert's Washington office "because

we saw in him a man of character who would give his time and attention to creating an

environment that would allow others to succeed."  In a similar vein, a lawyer who

worked for Mr. Libby as an associate remembers:

> Scooter consistently helped other lawyers without their
> even knowing that they benefited from his generosity
> (Scooter was too modest to tell anyone what he did for
> them, and he was not the type of person who sought praise
> for his good deeds).  For example, I recall several instances
> in which Scooter brought in a new client or matter to the
> law firm and gave the "credit" in registering the client or
> matter to another lawyer in order to build the other lawyer's
> practice.  He did this to his own financial detriment.

        Numerous letters refer to Mr. Libby's support for young professionals in

Washington.  He took a personal interest in their careers, supporting their work and

enabling them to excel.  A former State Department colleague writes:

> I have had many occasions to observe and admire
> Mr. Libby's interest in identifying talented and
> independent-minded young professionals and helping to
> launch them on promising scholarly, legal, or governmental
> careers.  To my personal knowledge, he has unselfishly

mentored dozens of individuals who have become stars in their respective fields and has done so with total disregard for their race, gender, or political or ideological persuasion.

A former Defense Department and OVP colleague recalls that although "we were at different levels and in different parts of the Undersecretary for Policy's operation, Scooter went out of his way to help a junior colleague survive and succeed in what was then a challenging and sometimes hostile environment for a 30 year old single woman." Similarly, a former OVP staffer reports:

> It is with . . . compassion that Scooter took me under his wing and mentored me. As a mentor, Scooter tested me, showed me how to work in the complex governmental system and taught me how to think about problems and ask the right questions to ensure that I obtained the most accurate and complete information. . . . [He] has inspired me to pursue a career as a public servant.

Mr. Libby's interest in the careers of his mentees continues long after they have stopped working with him. Another former OVP staffer writes that her relationship with Scooter and his family lives on today. "He has a genuine interest in my success personally and professionally. Whether it's over dinner at his family's home, or in a phone call or email to check in, Scooter is the kind of person everyone wants to have as a friend or a boss."

Finally, Mr. Libby is committed to equal opportunity. According to one of his former OVP deputies, when Mr. Libby assembled the OVP staff, "he was focused on not only hiring the most highly qualified people, but also providing opportunities for women and minorities as well. . . . At one point, I recall that seven out of twelve senior staffers were women." A former OVP senior staffer recalls that Mr. Libby urged the administration to engage

leaders from urban areas or constituencies with high
African-American and Hispanic-American populations and
other communities of color.  Actions speak louder than
words, and I was struck by the manner in which Mr. Libby
quietly but forcefully demonstrated his strong leadership
and commitment to ensure the President and Vice President
received input from voices of people who felt they might
not have had a credible voice within this Administration.

2.     Mr. Libby Is Known for His Caring and Unselfish Nature

Mr. Libby has a reputation for helping people through difficult times, even
if he does not know them well, and regardless of any stress he is experiencing in his own
life.  For example, according to the Vice President's residence manager and social
secretary:

Scooter is selfless and even when a heavy workload
preoccupied his mind, Scooter never forgot others.  When
my brother was deployed to Iraq, Scooter sought me out to
tell me stories of all the good things my brother, Bryan, and
his unit were doing in northern Iraq.

After Scooter was indicted and he lost his job working in
the White House, he remained interested in my brother's
well-being.

In a similar vein, one of Mr. Libby's neighbors reports:  "On several
occasions Scooter has quietly provided guidance to [my son] that has helped us keep him
on the right path.  Scooter Libby is someone I unfailing trust my children with.  That is
the highest compliment I can pay any man."  A former OVP colleague and family friend
puts it this way:  "My lifelong view, which has only been validated in adulthood, is that
kids are the most honest and true evaluators of people.  Watching my children with
Scooter, and all children with him, you'd think he hung the moon.  He is gentle and
caring.  He is genuinely interested in others' well being and still inspires me to this day."

Many of the letter writers describe occasions when Mr. Libby comforted them in times of great personal distress. One friend recalls: "He always showed great kindness to my son, my daughter and me, particularly when my husband was a reporter in Iraq during the spring of 2003. Several times, he took time from his incredibly busy schedule to call me to check on the kids and to make sure we were managing. He never seemed rushed or perfunctory; his concern was authentic." A military aide to the Vice President describes finding out while traveling on Air Force Two that his father had suddenly passed away. "One thing that I will remember about the first few hours after I had received the news and began sorting out what do next, is Mr. Libby's genuine concern for me and my family. He personally informed the Vice President of the situation and offered his assistance in helping me make arrangements to return home." A colleague from the Hudson Institute, Mr. Libby's most recent employer, describes a two-month period "when, two-and-a-half weeks after my mother succumbed to a long illness, my father suffered a massive cerebral hemorrhage. This was a very dark period, but Scooter, who certainly was facing immense personal challenges himself preparing for the trial, was regularly in touch and constantly of good cheer. His support was a source of real strength to me during that awful period."

Mr. Libby's considerate nature is summed up well by a friend who has known him for 25 years: "From the time I met him, I've been struck by Scooter's low-keyed but loyal interest in contributing to the endeavors of others, a rarity for ambitious and incredibly busy Washingtonians. He is the opposite of a hard-driving calculator of his own advantage or an ideologue."

Mr. Libby's concern for the well-being of others extends beyond the boundaries of his community and even the borders of his country. Throughout his government service, Mr. Libby has developed policies designed to improve the lives of oppressed people throughout the world, and has advocated a view of the national interest that embraces international human rights. This humanistic approach to American foreign policy has made a lasting impression on government officials who have served alongside him. For instance, one former colleague who helped Mr. Libby promote democracy in the Eastern Bloc and later sought Mr. Libby's assistance at Freedom House describes how Mr. Libby

> has shown himself . . . to be a dedicated and intelligent advocate for freedom, democracy and civil liberties in the world. . . . [He has] always expressed interest in the human beings [affected by U.S. policies] and the opportunities and dangers they faced.

Another career civil servant who worked with Mr. Libby during his Pentagon years notes that his "efforts [in crafting U.S. policy] reflected his belief in the dignity of all individuals." Mr. Libby has advocated his convictions even when doing so was unpopular within a particular administration. For example, a former defense official recalls that in the early 1990s Mr. Libby "knew a moral principle was at stake [in the conflict in Bosnia] and tried in every way to convince his superiors that the United States should help the persecuted Muslims in Bosnia, or should at least give them weapons for their self-defense . . . ." Mr. Libby championed this view, even though it ran counter to official administration policy, in an effort to convince other policy makers that a change was necessary for humanitarian reasons.

Mr. Libby's attention to the human impact of foreign and military policy decisions did not flag when he served in the OVP. An individual aware of Mr. Libby's

role in diplomatic discussions on Middle East peace "vividly recalls" Mr. Libby's

concern for the suffering that both Israelis and Palestinians endured as a result of the

second intifada. This individual describes Mr. Libby's "meticulous efforts with regard to

issues concerning the prevention of loss of innocent lives and human suffering on both

sides," and remembers being "surprised . . . at the length of time Scooter was devoting to

the human issues, and the in-depth questions he had on matters regarding the human

tragedy aspect of the conflict."

> One of Mr. Libby's former OVP deputies puts it best:
>
> Standing up for the dignity of the individual and expanding
> the realm of human freedom were particularly consistent
> features of Scooter's approach to international affairs. No
> matter how frenzied his schedule, no matter how
> overwhelming his responsibilities, Scooter never failed to
> make time to see the countless number of human rights
> activists and political dissidents who streamed through
> Washington desperately seeking a few minutes with any
> U.S. official, much less the national security advisor to the
> Vice President of the United States . . . .
>
> One person who closely observed Scooter's quiet nurturing
> of those struggling against great odds to uphold the cause
> of human decency in the Middle East was my friend, Natan
> Sharansky, the great Israeli human rights activists and
> former Soviet dissident. Referring to Scooter, Sharansky
> once remarked to me that he could not easily recall an
> American official who had done so much to instill hope in
> the region's beleaguered democrats and yet whose work
> remained so unsung.

### 3.  Mr. Libby Treats Everyone with Respect

Whether working as a partner in a law firm or serving in a senior position

in government, Mr. Libby remained unpretentious and unassuming. A legal secretary for

one of his attorneys reports: "He treated everyone with consideration and respect,

whether you were an attorney, secretary or messenger. I believe Scooter's ability to

connect with people on every level is due to his high moral character, honesty and concern for his fellow citizens."

Mr. Libby's former special assistant in the OVP recalls that "[d]espite his demanding work load, Scooter was always available to staff, [including] drivers, stewards, Secret Service agents, military aides and interns."  Similarly, another former OVP assistant remembers that he

> acknowledged the little things that most bosses take for granted; he rarely walked out the door in the evening without saying thank you to his staff; he never raised his voice in anger, no matter how well deserved; he always insisted on carrying his own bags; and, in a city where one's level of importance is dictated by the order in which parties arrive on the telephone, Scooter always wanted to be the first on the line, regardless of the stature of the person he was calling. . . . He exuded a humility uncharacteristic of Washington officials . . . .

A fitting example of Mr. Libby's approachable, down-to-earth demeanor is the way that he interacted with the staff in the E. Barrett Prettyman Courthouse. Beginning in December 2005, Mr. Libby began to spend a significant amount of time in the Courthouse, because it provided the only facility where he could review classified discovery materials.  The staff grew to have great affection for him.  "'You got to know him,' said James Huff, a sixth-floor court security officer who has seen his share of high-profile defendants walk through these hallways in the past 20 years.  'You got to talk to him.  You got to like him.'"  Matt Apuzzo, *Behind the Scenes – Scooter has left the building,* Associated Press, March 8, 2007.

C.    <u>Mr. Libby Is Devoted to His Family</u>

Mr. Libby's dedication to serving his country is surpassed only by his commitment to his family.  He met Harriet Grant in the late 1980s, and they have been

married for over 15 years.  They have a son who is 13 years old and a daughter who is 10.

Like Mr. Libby, Ms. Grant was drawn to public service.  She worked as counsel for

Senator Joseph Biden from 1989 to 1993, but left her legal career to raise their children.

   The demands of the OVP required Mr. Libby to sacrifice time with his

family.  He usually left his home by 6:15 in the morning, before his children were awake,

and did not return until late at night, after his children were asleep.  Particularly after the

9/11 attacks, writes a former OVP deputy, "he suffered frequent separations from his

family as he accompanied the Vice President to undisclosed locations to preserve the

continuity of government in the event of a second wave of terrorist attacks."  But in the

limited time when he could escape from his duties to the country, Mr. Libby lavished

attention on his young children.  He faithfully attended their school plays, their sporting

events, and even their play dates with other children.  According to a friend of the family,

> Scooter and Harriet have always chosen their family over
> the high end Washington political lifestyle that comes with
> the Vice President's Chief of Staff job.  Some political
> insiders thrive on the perks of the job, but they could *not*
> have cared less.  They routinely chose the soccer field with
> their children over elbow rubbing with Washington's
> political elite.

Another friend says the same thing:  "In the course of his recent White House years he

may have turned down more invitations to downtown institutional receptions, dinner

parties, and other social events than any other senior official" to spend time with his

family.

   By all accounts, Mr. Libby is a terrific father.  A neighbor notes that she

expects to see him in his yard every weekend, "running, playing, engaging his children in

the direct, physical way that I believe all children wish for from their fathers, and few, I

think enjoy." Another family friend notes: "As a pediatrician I've encountered and observed many parenting styles. I wish I could package Scooter's patience and unflappable temperament so that other families could learn from his style. Whether explaining current events or answering the constant 'why?' of childhood, he speaks in a simple direct manner exactly to the child's level."

Mr. Libby's indictment and conviction have led to great distress for his children. The media's obsessive, intrusive coverage – which is far beyond any ordinary case – has magnified their anguish. Indeed, just turning on the television or glancing at the front page of the newspaper can be a painful experience for them. The PSR indicates that Mr. Libby's children "have experienced a very difficult time in school." In fact, they have been subjected to cruel teasing about their father's very public legal woes, and this is likely to continue even if Mr. Libby is not sent to prison. In addition, as the PSR notes, they have had to face television reporters and cameras staking out their home waiting for their father to enter and exit. Mr. Libby's children have suffered tremendously already, and will continue to suffer greatly if he is separated from them, which is one of the reasons we seek a non-incarcerative sentence.

Admittedly, all children who face the loss of a parent to jail suffer, but as a result of the high profile of this case and the resulting press coverage, the Libby children's suffering has been particularly acute. Most children of convicted defendants do not endure what Mr. Libby's children have had to endure for over three and a half years.

### III.    The Nature and Circumstance of the Offense

Under § 3553(a)(1), the Court must also analyze the "nature and circumstances" of the convicted offenses. Mr. Libby fully acknowledges that perjury,

false statements, and obstruction of justice are serious crimes.  We feel compelled to point out, however, that the circumstances that led to Mr. Libby's conviction are unusual and perhaps unique.

To begin with, Mr. Libby was convicted for lying to the FBI and the grand jury, which were both investigating the possible improper disclosure of Valerie Wilson's CIA employment to reporters, primarily Robert Novak.  Mr. Libby, of course, was *not* Mr. Novak's source.  As discussed more fully in our Guidelines memo, there is no evidence that Mr. Libby committed any underlying crime.  And, no evidence suggests that he learned that Ms. Wilson's status was covert or classified before her identity was publicly disclosed.[4]  Accordingly, there is no basis for concluding (even in the absence of formal charges) that Mr. Libby did anything unlawful when he discussed Ms. Wilson with any reporter prior to July 14, 2003.

More broadly, no one was ever charged with improperly disclosing Ms. Wilson's identity and to this day it is unclear, if not highly doubtful, that any improper (much less illegal) disclosure was made by any government official.  Therefore, this is the rare case where the statements by the defendant that were found to be false did not cover up any underlying crime.

We do not mean to suggest that the absence of an underlying offense excuses obstruction and perjury.  Rather, we believe it is appropriate for the Court to consider that Mr. Libby was not covering up any illegal activity when deciding how

---

[4]     In 2004, the Special Counsel represented to Chief Judge Thomas F. Hogan that there is "no direct evidence that Libby knew or believed that Wilson's wife was engaged in covert work."  Aug. 27, 2004 Aff. of Patrick J. Fitzgerald at 28 n.15.  Last week, the government admitted that "the information to which defendant was given access did not expressly identify Ms. Wilson as a covert agent."  Gov't Guidelines Mem. at 8 n.7.

severely he should be punished. The government's own motive theory suggests that

Mr. Libby made false statements not because he did anything illegal in June or July of

2003, but because he allegedly feared (albeit mistakenly) in October 2003 that his prior

statements to reporters *might* have been wrongful. This motive should bear on the issue

of the appropriate punishment, especially in light of *Booker*. *See United States* v. *Brown*,

439 F.Supp.2d 134, 135-36 (D.D.C. 2006) ("*Booker*'s remedy . . . ensured that a

sentencing court may consider whatever facts it deems relevant – subject to limitations

imposed by Congress – in determining the appropriate penalty within the statutorily

prescribed spectrum for an offense."); *United States* v. *Milne*, 384 F.Supp.2d 1309, 1313

n.4 (E.D. Wis. 2005) ("[A]fter *Booker*, courts are *required* to consider any § 3553(a)

factor put forward by the defense that might make the guideline sentence inappropriate. .

. . In many cases, this requirement will necessitate consideration of the defendant's

motive for committing the offense . . .") (emphasis in original; citations omitted).

## IV.    The Relevant Guidelines Calculations

Although the Supreme Court declared the Guidelines advisory, we

recognize that the Court is obligated to compute the relevant sentencing range under the

Guidelines when completing its sentencing analysis. *United States* v. *Coumaris*, 399

F.3d 343, 351 (D.C. Cir. 2005) ("a sentencing court is required to consider Guidelines

ranges applicable to the defendant, but is permitted to tailor the sentence in light of other

statutory concerns as well") (internal citations and quotations omitted). To begin with,

the defense and the government both agree with the Probation Office that the base

offense level here is 14. For the reasons set forth in a separate memorandum filed today,

the Guidelines calculation in the PSR is correct; the offense level is 14, which

corresponds to a sentence of 15-21 months. The Court should begin its consideration of

the Guidelines factor in its analysis under § 3553(a) from that point.  The Probation

Office also identified grounds for downward departure from that offense level under

U.S.S.G. §§ 5K2.0 and 5K2.20.  The Probation Office is also correct in that regard, and

we urge the Court to apply either of those grounds for a downward departure.

   In accordance with U.S.S.G. § 5K2.0 and the Supreme Court's opinion in

*United States* v. *Koon*, a court may depart from the Guidelines if it finds that mitigating

factors, not otherwise prohibited by the Guidelines, are "present to an exceptional degree

or in some other way make[] the case different from the ordinary case where the factor[s

are] present."  518 U.S. 81, 96 (1996).  In this case, the PSR identifies at least three

mitigating factors that are present to such a significant degree to warrant downward

departure:  (1) Mr. Libby's outstanding record of public service and prior good works; (2)

collateral employment consequences for Mr. Libby, including the expected loss of his

license to practice law; and (3) the improbability of any future criminal conduct by

Mr. Libby.

   These factors may form the grounds for a departure when they are present

to an exceptional degree, as they are in this case.  *See Koon,* 518 U.S. at 96; U.S.S.G.

§ 5K2.0(a)(4).  And, even if the factors are not truly exceptional in their own right, in

combination they may nonetheless remove the case from the "heartland" of typical

guidelines cases.  *See* § 5K2.0(c).  In this case, Mr. Libby's outstanding record of public

service is sufficiently extraordinary to justify a downward departure on that basis alone;

but certainly, when considered in conjunction with the other factors, this case is outside

the "heartland" of typical guidelines cases.  *Koon*, 518 U.S. at 96.

As discussed more fully in section II above, Mr. Libby has devoted much of his professional career to serving the public interest. And although the government attempts to minimize it in its sentencing memorandum, no objective observer can deny that Mr. Libby's record of achievement in public service is extraordinary. To take just a few examples, while working in the Executive Branch, Mr. Libby helped the United States win the Gulf War, assisted with the transition to democracy in Eastern Europe, helped craft a strategy for reduced defense spending, and played a significant role in the largest nuclear arms reduction in history. He worked vigorously to counter the most pressing threat to national security in the post-9/11 era – the use of weapons of mass destruction by terrorists on American soil. He helped to ensure that Americans today are safer from the threat of nuclear attack by improving domestic detection capabilities and recommending measures to prevent nuclear proliferation by A.Q. Khan's sinister network. And if America were attacked with biological or chemical weapons, hundreds of thousands – possibly millions – of Americans may be saved due in large part to Mr. Libby's singular focus on ensuring that the United States is adequately prepared for such a crisis.

In private practice, Mr. Libby was extraordinarily devoted to pro bono matters. For instance, he served as legal advisor to the Cox Committee and rescued numerous government officials facing ethics inquiries from career and financial disaster.

The countless hours Mr. Libby spent training and mentoring young professionals in the public and private sectors to succeed (regardless of their race, gender, or political affiliation) are also above and beyond the call of duty. He has had a remarkable effect on young people in Washington, inspiring many of them to likewise

devote themselves to public service.  A former Pentagon and NSC colleague sums it up

well:

> [f]or those privileged to work for him, he always showed a
> keen interest in helping to develop their skills and talents
> for not only their personal advancement, but to improve the
> value of their public service for the citizens of our nation.
> Legions of seasoned professionals are the beneficiaries of
> that sense of personal responsibility and dedication to their
> development.

Mr. Libby also inspired his peers to serve the country.  One of his former

law partners reports, "Scooter inspired me as a lawyer and encouraged me as a citizen

aspiring to receive an appointment to a position in the federal government."

The point is not, as the government suggests, that any diligent federal

employee convicted of a crime should receive a "discount" at sentencing.  Rather, such

significant contributions to the nation over a 30-year career constitute a mitigating factor

that is truly "present to an exceptional degree" in Mr. Libby's case, thus justifying a

downward departure.  *See, e.g., United States* v. *Canova*, 412 F.3d 331, 358-359 (2d Cir.

2005) (district court did not abuse its discretion in granting a downward departure for

extraordinary public service and good works); *United States* v. *Kuhn,* 351 F. Supp. 2d

696, 705-706 (E.D. Mich. 2005) (downward departure granted based on defendant's

community involvement and continuous employment history in the public sector); *United

States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (downward departure based in part on

defendant's charitable and civic good deeds not an abuse of discretion).

The government's memorandum suggests in effect that Mr. Libby's public

service should work against him at the time of sentencing.  It urges that Mr. Libby should

be punished more harshly because he was a public servant; but it cannot be that a person

who performed a thousand good acts merits a harsher sentence than someone who has lived for himself alone. Mr. Libby deserves a credit, not a debit, for his service to the nation. Indeed, Judge Urbina recently sentenced developer Douglas Jemal to a period of probation for his felony fraud conviction based largely on his extensive contributions to the well-being of the community. *See* Carol D. Leonnig, *Jemal's Good Works Pay Rich Dividend*, WASH. POST, Apr. 22, 2007 at C01 (Judge Urbina stated that "supporters' letters and testimony showcased a lifetime of good deeds and that such a genuine outpouring led to his decision"). We ask this Court to do the same here.

The Court should also consider the extent to which conviction alone is devastating to Mr. Libby. It is unlikely that he will be able to return to the private practice of law because, as the PSR notes, he has been suspended from the practice of law and will likely lose his law license if the conviction is affirmed on appeal. In addition, his conviction will almost certainly prevent him from ever holding public office again. Further, because Mr. Libby has been the object of so much negative media attention, it will be extremely controversial for any employer to hire him. Accordingly, whatever employment he obtains is not likely to be commensurate with his unique skills and abilities. Because Mr. Libby's future employment opportunities are now so sharply circumscribed, a downward departure is appropriate. *See United States* v. *Jones*, 158 F.3d 492, 499 (10th Cir. 1998) (affirming downward departure based in part on the "collateral employment consequences [the defendant] would suffer").

It is also appropriate for the Court to consider that Mr. Libby is highly unlikely to commit a criminal offense in the future. Mr. Libby has never violated the law previously, and the letters submitted on his behalf suggest that he has no propensity

toward criminal behavior.  The government's unsupported argument to the contrary is specious.

The Probation Office also noted in the PSR that the Guidelines provision pertaining to aberrant behavior (U.S.S.G. § 5K2.20) is applicable here.  A defendant is eligible for such a downward departure when the crimes for which he was convicted represent a single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation from an otherwise law-abiding life.  In making its determination whether to depart under § 5K2.20, the Court may consider Mr. Libby's employment record and prior good works, which have previously been described.  *See* § 5K2.20 cmt. n. 3.[5]

## V.    A Sentence of Probation Would Satisfy The Requirements of Section 3553(a)(2)

Turning to § 3553(a)(2), the Court must also consider the need for Mr. Libby's sentence to (i) reflect the seriousness of his offense, promote respect for the law, and provide just punishment for the offense; (ii) adequately deter criminal conduct; and (iii) protect the public from further crimes of the defendant.

### A.    The Seriousness of the Offense

The offenses here are serious ones.  Nevertheless, as the Court metes out "just punishment," we urge the Court not to overlook the punishment Mr. Libby has already received, and stands to receive in the future, as a result of his convictions. Mr. Libby's felony convictions make it unlikely that he will ever work in government or

---

[5]    Several of the cases the government cites in its Guidelines Memorandum were decided prior to the adoption in 2000 of § 5K2.20 and are therefore inapposite to the issue of what constitutes aberrant behavior under the current version of the Guidelines.

practice law again, and his notoriety will also hinder his future job prospects.  He and his family have endured crushing public humiliation as a result of unceasing press coverage. The media commentary about Mr. Libby has often been particularly unfair.  Although he did not "out" Ms. Wilson, Mr. Libby has been continually blamed with leaking or orchestrating the leak of her identity.  As the evidence at trial showed, as far back as September 2003, reporters were insinuating that Mr. Libby was the leaker.  Indeed, based on such false assumptions, Mr. Libby has been repeatedly and wrongfully accused by some people of serious crimes including treason.

The burden of relentless and unfair media coverage has fallen heaviest on Mr. Libby's young children, and imprisonment would separate him from them at a particularly formative time in their lives.  The Court should consider these collateral consequences to make sure that Mr. Libby's punishment is not "greater than necessary."

B.    A Sentence of Probation Will Adequately Deter Future Criminal Conduct and Promote Respect for the Law

With respect to deterrence, Mr. Libby endured a very public fall from grace, beginning with his resignation from the White House on the day he was indicted and culminating in his four felony convictions.  These dire consequences are likely enough to warn the public – and high ranking government officials in particular – that it is important to take FBI and grand jury investigations very seriously.  In this light, it is not necessary to incarcerate Mr. Libby to promote respect for the law or to serve the interests of general deterrence.

C.    Mr. Libby Does Not Pose A Threat To Society

Mr. Libby has no prior criminal history and has led an otherwise upstanding, exemplary life.  There is therefore no basis to conclude that he is likely to

commit any crimes in the future.  For the same reason, the public does not need to be protected from him.

## VI.     Sentencing Recommendation

The public nature of Mr. Libby's indictment, trial, and conviction will ensure that he and his family carry the stigma of those convictions forever.  The impact of Mr. Libby's convictions, on himself and his family, is profound and devastating.  It will continue to be so, regardless of the sentence this Court chooses to impose.

There is no denying the seriousness of the crimes of which Mr. Libby was convicted.  At the same time, there is no denying the kind of person Mr. Libby is and the contributions he has made to his country.  In light of these factors and the goals of § 3553(a), a prison sentence for Mr. Libby would be "greater than necessary" punishment in this case.  A sentence of probation, perhaps combined with community service alternatives, would allow Mr. Libby to continue serving the public interest, and would still promote respect for the law.

## Conclusion

For the reasons set forth in this Memorandum and in the PSR, we

respectfully request that the Court sentence Mr. Libby to a term of probation.


Dated:  May 31, 2007                          Respectfully submitted,


_____/s/_____        _____/s/_____
Theodore V. Wells, Jr.                          William H. Jeffress, Jr.
(DC Bar No. 468934)                            (DC Bar No. 041152)
James L. Brochin                                   Alex J. Bourelly
(DC Bar No. 455456)                            (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton              Baker Botts LLP
  & Garrison LLP                                  1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas              Washington, DC  20004
New York, NY  10019-6064                 Tel:  (202) 639-7751
Tel:  (212) 373-3089                           Fax: (202) 585-1087
Fax: (212) 373-2217


_____/s/_____
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700