June 1, 2007

Honorable Reggie B. Walton
United States District Court for D.C.
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**FILED**

JUN - 5 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Dear Judge Walton:

Since writing to you in regard to the pending sentencing of I. Lewis Libby seems to be a popular pastime, I thought I would also write to express my opinion before it's too late.

In my opinion, I hope you impose the longest possible prison term for Mr. Libby.

Mr. Libby broke the law and, his years of public service notwithstanding, deserves to spend time behind bars.  Unfortunately, I would prefer to see Mr. Rove or Vice President Cheney behind bars so, in a sense, Mr. Libby is their proxy.  He was the puppet, but they pulled the strings.  This White House has, through its actions, shown a disdain for the rule of law.  Instead, they have chosen to shroud their actions in secrecy and have constantly invoked presidential privilege to keep their questionable and border line legal actions from seeing the light of day.

I have no doubt that president Bush will pardon Mr. Libby as one of his final acts before, thankfully, he rides off into the sunset.  Until then, I hope Mr. Libby goes to jail as soon as possible and for as long as possible.  I'm sure the wealthy corporate friends of George Bush, Sr. will reward Mr. Libby for his loyalty.

Sincerely,

An Angry Citizen

(And I don't use my name because I don't trust them, either.)

# KEN ADELMAN



April 18, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Judge Walton:

I wish to attest to the character and integrity of Scooter Libby, and urge that he not be imprisoned. He is a fine person who sacrificed much to serve his country, which he did selflessly in several capacities. This nightmare should finally end, tragically after inflicting permanent damage on Scooter's reputation, family, and career.

Your Honor, I have known Scooter Libby since the beginning of the Reagan Administration in 1981. He was appointed to a top State Department position by a mutual friend. I worked with them in my capacity as a U.S. Ambassador to the United Nations, and then as Director of the Arms Control and Disarmament Agency. Likewise during the time the two of them served the Secretary of Defense in the Pentagon from 1989 to 1993. When this Administration was entering office, Scooter asked my advice about setting up the Vice President's office in the White House, which I had assisted in doing in a prior Administration.

During these years of public service, whenever I attempted to contact Scooter, he made himself readily available. He worked long hours, seemingly non-stop, and consistently followed through with information and assistance. Never for a moment, on any occasion, did I have any reason to question his integrity, dedication, or judgment. They were always above reproach.

Moreover, Scooter was not a political partisan, or actually "political" in any sense commonly used. He was, and is, a man of substance who served in various Administrations because top officials of those Administrations realized his impressive talents. When not serving in government, he was practicing law and attending public policy seminars.

Consequently, when first hearing about the Valerie Plame leak, it was inconceivable to me that Scooter Libby could have been responsible for this activity. And that judgment turned out to be correct – he was not responsible.

Regardless, his is the name which will stick to this scandal. His is the name that is blackened, career that is ruined, and integrity that is now smeared.

Your Honor, this is punishment enough. Hence I ask that this decent man not be subjected to time in jail, and allowed to cope with his conviction as best as anyone could in these circumstances. After all, Scooter Libby is a good person.

Sincerely,

Kenneth L. Adelman



## JOHNS HOPKINS
U N I V E R S I T Y

### The Paul H. Nitze School
### of Advanced International Studies

1740 Massachusetts Avenue NW
Washington, DC 20036

www.sais-jhu.edu

**Middle East Studies**

The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
United States Court House
333 Constitution Avenue, NW
Washington, DC 20001

May 1, 2007

Your Honor, I write about Scooter Libby from my vantage point as a scholar of Middle Eastern affairs, Arab political culture, and American foreign policy. I have been teaching and writing for well over three decades, first at Princeton, and since 1980 at Johns Hopkins University. In 2006, I had the high honor of receiving the National Medal of the Humanities, way beyond all the dreams I brought with me to this country from my ancestral land of Lebanon.

Scooter Libby is one of the most honorable people I have known in public life. It was my privilege to come to know this distinguished public servant in the aftermath of 9/11. Modest, driven by a relentless work ethic, patriotic and concerned about the interests and safety of our country, Scooter Libby never put on airs, or took his high position in government for granted. For Mr. Libby the work and the public service always came first. Possessed of a keen mind, of a deep curiosity about distant peoples and lands, Scooter Libby's interests in Islam and Islamic radicalism brought us together. No facet of Arab politics escaped his attention. His questions were always probing, it was a sheer joy to share with him the inner workings of the Wahhabist creed in Arabia, the trends of thought among the Shia of Lebanon and Iraq, the temptations of the Iranian revolutionaries. Faithful to the public trust given him, Scooter was always keen to draw on the widest available expertise about subjects our government was called upon to address in the aftermath of the terrors of 9/11 and of the American involvement in Iraq. An honorable man, Scooter never bent the views of his interlocutors, or presented their findings as his own. A tireless worker, he checked in from campaign stops in Wisconsin and Ohio, he read everything I sent him, assimilated every possible piece of detail. He called and worked evenings and weekends. His fidelity to the truth of what he saw and heard deeply touched and impressed me. Of all the people in our government I have gotten to know, I grew fondest of him. Our lives and career paths were different, and save for a long weekend in the summer of 2005 where I visited with him at the home of a mutual friend, I knew him through the public work – his life's passion and motivation.

You Honor, it pains me to think what became of the life of Scooter Libby. I never thought I would be writing of him under these circumstances. More likely, I thought, I would be writing to commend him on public service, or to praise a brilliant new novel (he wrote a spectacular first



novel) he wrote, or to reflect on his contributions to a particular set of policies. But we are where we are, and the life of this good man, this wonderful husband and father, this extraordinary public servant, has been dealt a shattering blow. As you ponder this case before you, and you render the awesome judgment that is yours, I urge you to consider the full range of this good man's life, the dreams he took into public service, the consuming attention to his work, the modesty and earnestness with which he prosecuted his work. The devotion to him reflected in the defense effort put together by his friends speaks volumes about Scooter Libby. One can't wave a magic wand and wish all this hurt and pain of Scooter Libby and his family away. But he comes before a just court, in a just and decent country, and as you think of him, it is my earnest hope that you would consider this plea, the hope that you will see Scooter Libby in the totality of his life and career. This is a man who never shirked his duty, who would never set out to hurt anyone, who served our country when it truly needed his service.

Truly,

Fouad Ajami
The Majid Khadduri Professor of Middle East Studies



# Edie R. Albert, Esquire



April 20, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E  Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

I am writing to you as a friend and former colleague of Lewis "Scooter" Libby.   By way
of introduction, I graduated from Tufts University in 1989 (*B.A, Political Science, Magna
Cum Laude*) and from The National Law Center, George Washington University in 1992
(J.D., *Cum Laude; Editorial Board, The George Washington Journal of International Law
and Economics*)

From 1993 until 1998, I worked with Scooter Libby in private practice as an Associate in
his Public Policy/Litigation Division.  This time frame encompassed the time Scooter was
a partner at the New York-based law firm of Mudge Rose Guthrie Alexander & Ferdon
(1993-95) and the Philadelphia-based law firm of Dechert Price & Rhodes (1995-98*).*
Although I left private practice in 1998 to stay home full-time with my son, Scooter and I
have remained friends.  Because I worked with him on a daily basis (and was often the
only Associate assigned to a particular case or legal matter with him), I was able to gain
clear insight into his character.

Scooter Libby consistently conducted himself with honor and integrity.  This opinion was
universally held by everyone at both firms   He was not the type of person who changed
his position, demeanor or personality to suit the situation or for personal gain.  Instead, he
was a person that you could trust and a person that you could go to if you had a problem,
wanted some advice, or needed someone to represent your interests or help resolve a
conflict.

There are numerous examples demonstrating the trust that everyone had in Scooter.  For
instance, within approximately one year's time at both Mudge Rose and Dechert Price &
Rhodes, Scooter was elected Managing Partner of the firm's Washington D.C. Office.   All
of the partners at both firms knew that Scooter would always take the high road, put the
interests of the firm before his own, and that he could be trusted to be honest and
forthcoming.  Scooter's clients also knew of his impeccable character.  For example,

Scooter represented a large well-known public corporation. ███████████

Scooter was always calm. He never raised his voice. He was the consummate negotiator, mediator and problem solver. He never compromised himself, his principles or his integrity.

Scooter consistently helped other lawyers without their even knowing that they benefited from his generosity (Scooter was too modest to tell anyone what he did for them, and he was not the type of person who sought praise for his good deeds). For example, I recall several instances in which Scooter brought in a new client or matter to the law firm and gave the "credit" in registering the client or matter to another lawyer in order to build the other lawyer's practice. He did this to his own financial detriment. I recall another time when a partner in the New York office of Mudge Rose "took credit" for a matter that Scooter brought to the firm. I recall that Scooter decided to let the other partner take the credit and not to bring it to the attention of his colleagues. He did this in the interest of the firm's well being. Yet another example occurred when the Mudge Rose law firm closed its doors after 125 years. Scooter did everything that he could to assist lawyers in finding jobs. Indeed, he took several lawyers with him to Dechert, Price & Rhodes even though the lawyers were not profitable for his practice group. His actions were never about what he could get out of it personally... they were about how he could help others.

Scooter was also very generous in terms of giving his time pro bono. His reputation for helping others was apparently very well known, because I recall his receiving numerous requests for assistance. To my knowledge, he never said no to someone in need. I recall working on many pro bono matters that Scooter brought to the firm. The type of matters ranged from establishing an overseas school for handicapped children, to negotiating an employment contract for a non-profit museum, to representing a housekeeper who had been held against her will by her employer. Scooter also donated hundreds of hours to a quasi-public corporation involved in educating and informing the public.

I want to stress that Scooter is an extremely modest and understated person. During the approximately five years that I worked with him, he never mentioned his accomplishments, his prior high level government positions, the types of people he knew, or how he helped others. This modesty was one characteristic that made him very approachable to everyone.

Finally, I cannot state strongly enough that Scooter's conviction is completely inconsistent with his character. First, as described above, Scooter is extremely honest I never knew him to lie, exaggerate or bend the truth, NEVER. Like most extremely intelligent men, he is forgetful when focused on other things, which he compensated for by taking notes and relying on me or others who worked for him.

2

I urge this Court to be as lenient as possible in considering Scooter's sentence. This man has led an honorable life, helped others and served our country unselfishly and with distinction. I am honored to have known him, to have worked for him, and to call him a friend.

Sincerely yours,

Edie R. Albert

3

LAUREN ALLGOOD ███████████████████████████████████████████████████

May 1, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

To the Honorable Reggie B. Walton,

Originally from a small town in South Georgia, I have lived and worked in Washington, DC for
the past 8 years. I worked on Capitol Hill for the late United States Senator Paul Coverdell in
1999 and 2000. From January 2001 until December 2005, I held various positions at the White
House in the administration of President George W. Bush. Currently, I am an MBA candidate at
George Washington University and on staff at McLean Bible Church.

I have known Scooter Libby in both a professional and personal setting for 6 years. In that time,
I have had nothing but the deepest respect for his character and values. While working in the
legislative affairs office for Vice President Dick Cheney, I was first introduced to Scooter and
served under his leadership in 2001. I observed an extremely intelligent man working tirelessly
for this country and the ideals of freedom that he so highly regarded as the right of every man on
earth. I cannot remember a single evening that his light was not on when I left after a very long
day. He is a kind man to those working under him and was always interested in my career. As I
transitioned from the Vice President's office to other offices at the White House, I could count
on Scooter to be one of my biggest supporters. He encouraged me to take a job with the National
Economic Council and even recommended me to the new director. He was not only dedicated to
our country but took a real interest in the lives of the people around him.

In 2002, my family vacationed in Jackson, Wyoming. During that time, Scooter and his family
were also vacationing there, so we decided to get our families together. My father still talks
about the evening where Scooter was a husband and father first and a humble servant of the
American people second. We were blessed to be in the company of such a distinguished
government official who loved his family and enjoyed meeting new people and telling stories. It
was a time my family will always recall with fond memories.

Scooter's conviction for perjury and obstruction of justice is inconsistent with my knowledge of
his character and integrity. When I heard the verdict, I was filled with sadness and thought that it
must be a mistake. He is a good man of high moral integrity and strong character. He is helpful,
generous, and committed to his family and the security of the American people.

Sincerely,

Lauren Allgood

April 1, 2007

The Honorable Reggie Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue
Washington, DC 20001

Dear Honorable Walton,

After graduating from college in June 1992 I lived with my parents as I worked on my MBA until February 2004. Mr. Libby and his family ███████ and over the years have become close friends. Still living in the area, I visit my family and see him from time to time. I am now a 36 year old stay at home mother of two. Now that I have my own family I feel strongly that being a good parent and role model to children is one of the most important achievements a person can have.

One of the things I admire most about Mr. Libby is the fact that he devotes time to his children, ███████████ even with the extremely busy work schedule he had in recent years. I often see him playing with them outside on the trampoline or playing soccer, and I know he attends their soccer games even when they are held out of town.

This is one reason I'm asking you to be lenient in your sentencing--this is a very good father and a good man altogether. He and his family have suffered a great deal already and any more hardship on the family would simply leave an undeserving permanent mark on the family and most of all the children. They are well-rounded moral citizens... largely because of the time, devotion and love Mr. Libby clearly displays to them on a daily basis. When deciding the sentence I'm asking you to please consider the suffering that has already been caused to Mr. Libby, his family, and all those who admire and respect him greatly.

Sincerely,

Emily C. Ashman

Emily Ashman

April 4, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton,

My friendship with Scooter Libby began about 17 years ago, after he invited my husband to join a long-standing Sunday morning football game. Through this continual event, Scooter became friends with my son, my daughter, my husband and me. In fact, on the Sunday after his conviction, Scooter and his son ▮▮▮ showed up at ▮▮▮▮▮▮▮▮ to play football so ▮▮▮ would have at least a couple of hours of normalcy in an otherwise nightmarish week. Over the years, my husband, Scooter, Harriett and I spent many evenings together, exchanging stories about our children, our lives, our aging parents and politics.

Many of my political views differ from Scooter's. However, these differences never colored our friendship or his attitudes toward our family. He always showed great kindness to my son, my daughter and me, particularly when my husband was a reporter in Iraq during the spring of 2003. Several times, he took time from his incredibly busy schedule to call me to check on the kids and to make sure we were managing. He never seemed rushed or perfunctory; his concern was authentic.

Scooter has always cared for his friends for who they are, rather than for what they do, who they know or how much power they have. I am an academic health researcher at the National Institutes of Health who certainly has no political influence. Scooter always inquires about my job, the post-graduation plans of the kids and other matters that are in no way related to his recent position in the White House. He is a wonderful, caring human being of great character.

My hope is that Scooter and his family can end their suffering and return to a normal life. I worry most about Scooter's family, who have been tortured by the continual attention from the press, including staking out the children's bus stop. Though he has never expressed his feelings out loud, I also know Scooter's family is his biggest concern. I feel he has already paid a great penalty, and I urge you to consider this as you decide his sentence.

Sincerely,

Jane C. Atkinson, D.D.S.



April 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am the Director and Corporate Chair of the Center for Russia and Eurasia at the RAND Corporation, a not-for-profit, non-partisan institution that conducts policy research to serve the public interest. Before joining the RAND Corporation, I served for four years as a member of Secretary of State George Schultz's Policy Planning Council, three years as a member of the National Intelligence Council, and twenty years as a Professor of Political Science at the University of Chicago.

In all of these positions I have interacted closely and productively with I. Lewis (Scooter) Libby and have gotten to know him well. In the process, I have had many occasions to observe and admire Mr. Libby's interest in identifying talented and independent-minded young professionals and helping to launch them on promising scholarly, legal, or governmental careers. To my personal knowledge, he has unselfishly mentored dozens of individuals who have become stars in their respective fields and has done so with total disregard for their race, gender, or political or ideological persuasion.

I have also had many opportunities to observe Mr. Libby's participation in governmental deliberations over extremely important and highly contentious issues. One of the things that struck me most about the way that Mr. Libby conducted himself during these meetings was the respect he consistently showed to those who disagreed with him and his refusal to allow concerns over his personal prestige or bureaucratic clout to interfere with his search for consensus and his single-minded pursuit of the national interest.

The Honorable Reggie B. Walton

April 23, 2007
Page 2

At a more personal level, I have encountered numerous examples of Mr. Libby's generosity in providing *pro bono* advice on legal matters to mutual friends in need of professional guidance and support but unable to afford it.  In several instances that I am aware of, Mr. Libby devoted many hours over many months to these cases and his counsel was instrumental in sparing innocent people from what might otherwise have been completely undeserved but very onerous consequences.

In sum, everything I have learned about Mr. Libby over twenty years of professional collaboration and personal friendship has convinced me that he is someone of unusually high responsibility and integrity.  His conviction for perjury and obstruction of justice has done nothing to shake my confidence in his devotion to the welfare of his country, his community, and his close and loving family.

Respectfully yours,

Jeremy R. Azrael

JRA:mz

12 MAY 07

TRIPP BADGER

▓▓▓▓▓▓▓▓▓▓▓▓

JUDGE WALTON

I am writing you for two reasons.

First: to thank you for the work you do — especially related to the recent Irving "Scooter" Libby Trial. Now, I am no lawyer, but i do pay attention, and it seem clear to me that you made US proud with your work here!

Second: I strongly implore you to put "Scooter" in JAIL. He is a criminal AND Deserves NO "Special" treatment. In fact his high profile AND privilegged BACKground, make it even more important that he be treated with no special deference.

Scooter must be JAILED!

(over)

When we average Americans
tell our children about things
like this we need to be able
to impress upon them that
the law should apply to All —
even the rich, powerful, & "connected"!

Thank You again Judge...

March 28, 2007


Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001


RE: Libby Sentencing


Dear Judge Walton:

I am writing to urge that Scooter Libby receive the maximum possible sentence. Due to the crimes for which he was convicted, we may never know of the more substantial criminal activities for which he served as a firewall.

Many Americans have lost faith in our system of government.  We see so many instances of corruption and dishonesty from those in power.  Please help us to begin to remedy this situation with your decision regarding Libby's sentencing. As politicians keep reminding us, no one is above the law.

Sincerely,

Jerry Barnett

April 25, 2007

The Honorable Reggie B. Walton

United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington DC 20001

Dear Honorable Walton,

My name is ████████ and I have served on active duty in the United States Air Force for the past 17 years. Stationed at Andrews AFB, Maryland, I am the head flight attendant aboard Air Force Two. My job is to guarantee that the Vice President and his staff are safe and comfortable and that all their needs are met while they are aboard the aircraft.

I met Mr. Libby when he became the Vice President's Chief of Staff. Over the past six years and working in this capacity, I have developed an admiration for Scooter because of his personal qualities. Scooter always treated the crewmembers with the utmost of respect. He was always willing to help me make my job easier. There were many instances while in Jackson Hole, Wyoming when he would take the time to say hello and engage us in conversation. On several occasions he would offer to pay for our dinners to show his appreciation for our service. I truly believe that his friendly personality and care for others is one of Scooter's most genuine traits.

One particular instance has really made a lasting impression on me. The aircraft landed in Wyoming and everyone left. I overlooked Scooter's duffle bag which was left behind in the overhead compartment. I personally delivered the bag to Mr. Libby at his residence. As minute as this might seem, it is my responsibility to assure that every detail aboard this elite aircraft is executed properly. I felt disappointed and irresponsible for not paying attention to the simplest of details. As I tried to apologize, Scooter stopped me and said, "Ron, don't worry about it. You have done it right a hundred times before, so this one incident is not a big deal. It happens." His reassurance and compassion defines the man that he is.

I hope that this letter can truly articulate the amount of respect that I have for Scooter Libby. Even though Scooter has been convicted in Federal Court, I do not believe that this is an accurate image of Scooter's character and integrity. I would work for him without any hesitations. He is a great American and I am proud to have worked for him. Thank you for your time and if you have any questions, please feel free to call me at ████████████ mail ████████

Very Respectfully,

Ronnie J. Beil



# ATT GROUP

AMERICAN TRANSBRIDGE TECHNOLOGIES, LLC

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Daryn P. Beringer and I am the ███████████████████████████ of companies which include transportation logistics, alternative energy development and minerals beneficiation. My business partner ████████████████ and his daughter Jennifer Mayfield was the chief assistant to I. Lewis "Scooter" Libby during the first term of the current administration under President Bush. I had the very distinct privilege to not only meet with Scooter on several occasions but also, through Jenny, understand not only the level of commitment to his job but also an understanding of the man as a whole.

The first time I met Scooter was shortly before Christmas of 2000 at his office. What immediately struck me about him was that he was absolutely genuine. He was and continues to be engaging, highly intellectual and kind. In every subsequent meeting, he was more interested in our business and how we were doing personally than he ever was in our congratulating him on writing a fascinating book or working on high level issues in the government. He has given us advice, especially on our alternative energy business because he was genuinely interested in helping us succeed in this endeavor, not just because my partner's daughter worked for him.

If a picture is truly worth a thousand words then there are thousands of words to demonstrate Scooter's sincerity and his concern for the well being of others throughout the White House. The photographic record that I have seen, especially during the tragedy of Sept. 11th, shows just how much Scooter was concerned and the enormity of his responsibility. He has a wry sense of humor but he is not a good actor. It would have been impossible for him to fake what the eye of the camera candidly caught on film.

When I heard that he had been indicted on charges of perjury and obstruction of justice and subsequently convicted, I was stunned. That is not possible for a man of his honesty and integrity. It is the polar opposite of his character.

Through Jenny, I was also able to understand his unwavering loyalty to his family. He is a wonderful father and husband despite a terrible schedule and a commitment to serving his country. In fact, it always seems as though he is concerned with everyone else first and foremost, and never concerned for his own well being.

I have had experience working with government leaders, not only in our country but others as well. I have also worked with leaders in industry worldwide. Although many have been charismatic and all very successful, I can't say that I have been left with the impression that any had a moral fiber equal to that of Scooter's.

Sincerely,

Daryn P. Beringer
Executive Vice President

LEA BERMAN



May 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman, United States Courthouse
333 Constitution Avenue, NW
Washington DC  20001

Dear Judge Walton:

My name is Lea Berman.  I served with Scooter Libby in the Office of the Vice President
for two and one half years.  As Residence Manager and Social Secretary, and later Chief
of Staff to Mrs. Cheney, I worked with Scooter every day and came to know him well.

Scooter was always at the Vice President's Residence before I arrived in the morning, no
matter how early I was there.  He was present at social events, and worked on the third
floor of the Residence when the Vice President worked at home, so our paths crossed
daily.  Scooter Libby is a selflessly-dedicated public servant, a man of great intellect who
treated his staff with an easy camaraderie that created a close-knit organization.  He spent
his rare free time with his family

Most importantly, I saw the enormous volume of work that Scooter managed every day.
As the White House Social Secretary in the second term of the Bush Administration (a
position I left in February of this year), I too was inundated with hundreds of details in
my job every day.  If I made a mistake the worst that could happen was that someone
didn't have the correct seat at dinner.  For Scooter, working on national security issues,
the potential consequences of a mistake or oversight added tremendous pressure to his
job.  Unless one has worked in the White House environment, it is impossible to fully
appreciate how easy it is to forget things, or the order in which they occurred.

Scooter is a fine, brilliant man and a wonderful husband and father.  If I were to speculate
as to whom would be the least likely person I know to face a conviction for perjury or
obstruction of justice, it would be Scooter.  I sincerely hope that this will be taken into
consideration when it is time to review his future.  He does not deserve what has
happened to him.

Respectfully,

Lea Berman



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Ave., NW
Washington, DC 20001

Your Honor,

    As you consider the case of I. Lewis Libby, perhaps you may find it useful to have some further insight into his character. I am a recently retired high school teacher and the ████████████████ (d. 2001) who, for about a year in 1989-1990, worked directly under Mr. Libby in Policy Planning at the Department of Defense. I got to know Scooter then, through my husband's daily debriefing at home, as an utterly dedicated public servant who sought no personal glory or advantage but shouldered heroic amounts of work and cared intensely about helping to carry out the section's vital mission. Though I met him only a few times, I remember his talking with love and pride of his family. As a former English teacher, perhaps I may add that I consider his novel (published in the early 90s I think) to be serious literature of high quality, far removed from the usual Washington insider's product; it has stayed in my memory ever since I read it over ten years ago.

    In the period from 1997 to about 1999, my husband who had left DOD for the National Defense University and then a DOD research institute in Germany ████████████████████████████████████████████████████████

When Scooter, who had by then moved back into private legal practice, learned of the situation, he offered to find time to represent my husband, virtually pro bono, for a nominal fee. For an extended period he not only provided copious, excellent legal advice and the research services of staff but also served as constant counselor and support to this man who had been no more than an ex-colleague. I saw the enormous difference his help made to my husband, both professionally and personal – in spirit – and I will never forget his kindness.

Obviously, my husband would have written this testimonial had he been still alive, more vividly and in more detail than I can. As it is, I wanted to do the best I could in his place to express our gratitude for and admiration of Scooter's generosity to an old colleague who could be of no use to him whatever. In all my husband's and my dealings with Scooter, he was never less than completely honest and principled. I hope that the noble instincts he revealed to us and the practical, unselfish assistance he gave us may count in his favor.

Thank you for your attention.

Sincerely,

Sandra Bernstein

(SANDRA BERNSTEIN)

Please forgive this handwritten note. I am in the middle of moving and temporarily without a printer.

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001


Judge Walton,

My name is David Bohrer and I am the official photographer to Vice President Dick Cheney. I began with The White House in May 2001, after a 16-year career with the Los Angeles Times as a photojournalist. While there, I was a part of three group Pulitzer Prizes, a published author, and was happy in the direction my life was going. In the back of my mind was only one career accomplishment that would have made me uproot everything and leave the West Coast – a job as an official photographer at The White House.

For a photojournalist, the opportunity to photograph history as it is being made and having access to do so, is the ultimate goal of the profession. A White House photographer has just that opportunity.

On the day in April 2001 when I interviewed with the vice president and six others I was, needless to say, quite nervous. Having been relatively apolitical in the past, I was being quickly thrust into an unfamiliar world.

On this day, I met I. Lewis "Scooter" Libby. I interviewed with him immediately after Vice President Cheney. Aside from the questions asking where I see myself in 5 years – in ten years - it was not a standard interview. Scooter made me feel at ease, as he does with anyone he meets. I left impressed, but unaware of the affect this man would have on my life.

Scooter is the kind of man that stands up when a woman enters the room, holds the door for everyone, and always has time for you. He juggled one of the highest stress jobs in the nation, worked 14-hour days and was still concerned about whether you'd had a good weekend. Scooter was also kind enough, despite this schedule, to take time to write a recommendation letter for me when I applied to graduate school.

At age 41, I have had the pleasure to meet many people in my life - of stature, and significance. There are few that rival Scooter. At work, he exhibited the utmost in integrity, professionalism and devotion to this country's security and the welfare of its citizens. He has, through his actions, taught me to hold myself to a higher standard. His devotion to his job, his family, and his ideals make him a friend that I hope to have in my life forever.

It is for all these reasons and many other personal experiences that I feel that Scooter's conviction for perjury and obstruction of justice is inconsistent with my knowledge of his character and integrity.

I hope you will take this letter and the many others I'm sure you will receive into account when making your decision on sentencing.


Sincerely,

David Bohrer

## BARBOUR GRIFFITH & ROGERS, LLC

AMBASSADOR ROBERT D. BLACKWILL
PRESIDENT, BARBOUR GRIFFITH & ROGERS INTERNATIONAL

To: The Honorable Reggie B. Walton
    United States District Court
    1225 E. Barrett Prettyman
    United States Courthouse
    333 Constitution Avenue, N.W.
    Washington, DC 20001

From: Ambassador Robert D. Blackwill
    President, Barbour Griffith & Rogers International
    1275 Pennsylvania Avenue
    Washington DC 20004

Subject: Scooter Libby

Date: May 15, 2007

I write on behalf of Scooter Libby whom I have known for almost 20 years, beginning when we both worked in President George H. W. Bush's Administration.  More recently, I served with him in the White House in 2003-2004, where I was Deputy National Security Advisor for Strategic Planning, Presidential Envoy to Iraq and U.S. policy coordinator for Afghanistan and Iran.  In the course of the latter period, I saw and interacted with Mr. Libby in the office several times a week.  We especially worked together on the wars in Iraq and Afghanistan and on Iran, the Middle East Peace Process and North Korea's nuclear weapons program – all issues connected to America's most vital national interests.

During these years at the White House, I encountered no one more driven by analytical temperament, fairness of mind and sound policy reasoning than Scooter Libby.  On Iraq, I always met with him soon after returning from my many visits to that country.  I did this both because he was influential in the inner deliberations within the White House and because his penetrating questions and observations always sharpened my own policy judgments and prescriptions.  Never during this period did I encounter any ideological bias on Mr. Libby's part with respect to American policy.  Rather, he sought only to improve the many dimensions of that policy -- military, political, economic and diplomatic -- on behalf of the United States and its people, and to push the Administration to apply more quality thinking and action to increase the likelihood of success in Iraq.

TENTH FLOOR
1275 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004



1

In this regard, I especially recall the Administration debate in 2003 concerning whether to bring forward the date of the transfer of sovereignty to the Iraq government. While many others were quick to have an opinion on the subject, Mr. Libby as always went through a methodical examination of the pros and cons of the issue. Continually guided by George Marshall's ever present policy question, "Why might I be wrong?", Mr. Libby insisted that the Administration decision making process rely on facts and not vaporous opinion. In this spirit, he was a tough critic of my own policy inclinations and recommendations and I benefited enormously from his counsel and advice. When the President ultimately decided to follow my recommendation and bring forward by two years the transfer of sovereignty to the Iraqis, Mr. Libby was a crucial voice in favor of that decision which in retrospect clearly provided a major boost at the time to U.S. policy objectives in Iraq. Sadly, I believe that Mr. Libby's premature departure from the Administration has been a major reason for the downward spiral of the situation in Iraq and the consuming mess in which we find ourselves today regarding that country. The American people miss Mr. Libby's wise voice, discipline and generosity of spirit in the corridors of power.

I cite this one example of many I could give to try to demonstrate the enduring elements of Scooter Libby's admirable character. A deeply committed servant of U.S. public purposes, during these years he sacrificed personal prerogatives and family on behalf of our country. With a routine schedule of 14-16 hours a day at the White House, he was constantly in tense and often crisis situations. Never once did I see Mr. Libby's humanist values slip during these months and years of war and conflict as the Administration after 9/11 sought to prevent another terrorist attack on the American homeland. He was always at the center of the policy debates, quietly courteous, powerfully analytical, attentive to the views of others including those who disagreed with him and striving to protect the United States and its democratic institutions from terrible and abiding external threats. In the White House and in the Administration writ large, he was an island of virtue, stability and good sense.

In sum, Mr. Libby in my judgment has been over the decades an exemplary public policy practitioner of the kind I sought to develop among students during my 14 years as a Dean and Professor at Harvard's Kennedy School of Government. I held that view of Scooter Libby when I left the White House in November, 2004. I hold that view of Scooter Libby today.

2

## SANDER M. BIEBER

May 3, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Walton:

I am writing to you concerning my former law partner, and friend,
Scooter Libby.  I am a partner in the Washington office of the
Dechert LLP law firm.  I have practiced law with Dechert since
1981.  Between 1976 and 1981, I worked as an attorney with the
U.S. Department of Transportation and another law firm.  I was
elected to the partnership in 1986.  During law school, I was
honored to serve as a judicial intern at the Supreme Court, and
worked on several judicial administration projects with Chief
Justice Burger.

I met Scooter in the fall of 1995, when he interviewed with our
firm to join as a lateral partner. Scooter and I are about the same
age, and went to college and law school at about the same time.
From the moment he was elected a partner and settled into the
office, I realized that someone very special, with very special
talents, had joined us.  While Scooter focused on litigation and
public policy issues, and I on securities regulation and mutual
funds, we had numerous opportunities to talk about our practices,
the firm, our personal goals, our abilities, and our principles.
While practicing law with us, I observed with admiration Scooter's
intensity and intellect.

I recall having a conversation with Scooter one evening in his
office, discussing the challenges of building our practices in our
respective highly competitive fields, and Scooter's insights into
what distinguishes one lawyer from another, and what enables

The Honorable Reggie B. Walton
May 3, 2007
Page 2

lawyers to achieve. We talked about hard work, intense loyalty to
clients, the pursuit of excellence, and ethics. To this day, I think
back to that conversation and it continues to inspire me, to help me
believe I can reach the next goal, achieve the next dream.

Scooter served as managing partner of the Washington office
before leaving to join the Bush administration. I succeeded
Scooter to the position of managing partner. Once working in the
Executive Office, I made it a practice of getting together with
Scooter at his office. While we do not share political views or
ideologies for the most part, we do share a common vision of
patriotism and duty to country. In recent years, there have been
opportunities presented to me which, had they proved successful,
would have resulted in my being appointed to certain Democratic
party-designated positions within the federal government. I
consulted Scooter on these occasions about the opportunities and
public service, and he strongly encouraged me to pursue the
opportunities because of the great satisfaction one could derive
from serving one's country.

It is in the context of our experiences together as law partners, as
someone with whom I consulted about public service, as someone
I got to know on a personal level, that I find it difficult to
understand how Scooter now stands convicted of perjury and
obstruction of justice. I observed Scooter represent firm clients
and practice law. Scooter was someone with whom I felt I could
discuss legal ideas and ideals. Scooter inspired me as a lawyer and
encouraged me as a citizen aspiring to receive an appointment to a
position in the federal government. When I would visit him at the
office in the Eisenhower Building, I sometimes felt guilty taking
his precious time, yet he rarely made me feel he was under
pressure to resume work or cut my visit short. We talked about his
schedule, his routine, the long hours and days he was working, his
personal sacrifice, and the little time he had left for a family about
which he cared immensely. I told him it sounded like overload to
me – yet he continued at that almost inhuman pace each day and
over the years as he continued to work for the Bush administration.

The Honorable Reggie B. Walton
May 3, 2007
Page 3

Yet despite his schedule, when the firm partners' retreat was held near Dulles Airport, Scooter gave up a Sunday morning to come speak with the partners about his experiences working with the Vice President and for the White House.  I watched as Scooter, the intellect, almost like magic, produce his first novel, *The Apprentice,* which is set in early 20th century Japan.  He dedicated the book "for my family", and inscribed my copy "To Sandy, The best part of practicing law."    You don't forget these things.

Given what I know of Scooter and what I have observed in our relationship as professionals and colleagues, I cannot imagine Scooter lying under oath, affirmatively not telling the truth, or taking actions to frustrate our judicial system.  Scooter's training is as a litigator, a really good litigator.  He's an officer of the court, not someone who would try to manipulate the judicial system.   I can't accept what his convictions imply.

I hope your honor will take my views into account when considering a sentence for Scooter.  Thank you for your time and consideration.

Sincerely yours,

Sander M. Bieber



# JOHN R. BOLTON



May 14, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

*Re: Sentencing of I. Lewis Libby*

Dear Judge Walton:

I respectfully submit this letter for your consideration in the sentencing of Scooter Libby. I have known and dealt with Mr. Libby for over twenty years, principally during our respective service in various positions in the Federal government.

Currently, I am a Senior Fellow at the American Enterprise Institute in Washington, engaging in speaking, researching and writing on foreign policy and national security issues. Before that, I served for slightly over sixteen months as the United States Permanent Representative to the United Nations, after having completed four years of service as Under Secretary of State for Arms Control and International Security Affairs. During the Administration of President George H. W. Bush, I was Assistant Secretary of State for International Organization Affairs from 1989-1993.

In the Reagan Administration, I served briefly in the Office of the Counsel to the President in 1981, before becoming General Counsel of the U.S. Agency for International Development (1981-82) and then later USAID Assistant Administrator for Program and Policy Coordination (1982-83). After returning to Covington & Burling as a partner in 1983 (and where I had been an associate in 1974-1981), I returned to the Reagan Administration in 1985 at the Department of Justice, where I served first as Assistant Attorney General for the Office of Legislative Affairs, and then as Assistant Attorney General for the Civil Division. I am a graduate of Yale College (1970) and Yale Law School (1974), and I am a member of the Bar of this Court.

During the last six years in particular, I have had considerable interaction with Mr. Libby on a wide variety of national security issues, including, among many other issues, the 2001 U.S. withdrawal from the Anti-Ballistic Missile Treaty of 1972; the negotiation of the Treaty of Moscow (signed and ratified in 2002, and which committed Russia and the United States to the approximately two-thirds reduction of their respective forces of operationally deployed strategic nuclear warheads over a ten-year period; and numerous efforts against the proliferation of weapons of mass destruction and their means of delivery, especially ballistic missiles.

With the end of the Cold War some fifteen years ago, the prospect of a massive nuclear exchange with Russia faded, but the risk of nuclear proliferation grew. In 1998, India and Pakistan both tested nuclear devices, and the proliferation networks of A.Q. Khan and others grew to meet the demand of rogue states seeking to acquire a nuclear weapons capability. The attacks of September 11, shattering as they were, would be as nothing compared to a terrorist attack successfully using nuclear chemical or biological weapons. Although not a military threat in the Cold War sense, the use of weapons of mass destruction could exact a horrible toll of innocent civilian deaths, in the United States or the lands of our friends and allies. Retaliation after the fact, however massive, could never bring back the innocent dead.

The proliferation threat from rogue states and terrorist groups has to concentrate the mind of any senior U.S. official in the national security area. Preventing or defending against the use of these weapons has a small margin of risk, especially for those who are the potential targets. As the leader of one terrorist group once said to a Western leader: "you have to get it right every time. We only have to get it right once."

In the face of all of these demands, keeping every detail straight is impossible. No one has a photographic memory, and no one has perfect recall. Recollections differ even as participants try to write up a "summary of conclusions" of an interagency meeting held earlier that same day. I have myself been to meetings after which I could not remember what agency or Department most of the people worked for, or even why they were there. With classified information, it was frequently hard to know who was cleared to see what or what could be discussed with whom. If there is anyone who fully understands our "system" for protecting classified information, I have yet to meet him.

It was in these circumstances that I dealt with Scooter Libby. He was -- unfailingly -- concentrated on substantive issues. Not on personalities, not on turf, not on politics, but on substance. All of hours were long, but his were longer, operating across a range of issues whose scope and complexity cannot be adequately described in less than book length. I fully understand that letters such as this are not permitted to relitigate issues before the court, but if I can accomplish nothing else, I hope to convey that Scooter Libby was busy with matters of state of the highest urgency and moment for the American people. As such, information flowed across his desk on a daily basis like water coming out of a high-pressure fire hydrant, with more demands for action than could humanly be met. Much of this was classified information from the intelligence community.

I would be pleased to supply any additional information the Court might deem helpful.

Sincerely,

John R. Bolton

# FIRST THINGS

A Monthly Journal of Religion and Public Life

April 20, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

My name is Joseph Bottum, and I am a widely published poet and essayist, the editor of an intellectual journal called *First Things*, and a friend of Scooter Libby's. I am writing today to ask that you apply, in your sentencing of Mr. Libby, the greatest leniency and judicial mercy.

Others will doubtless write you about the man's generosity, his kindness, and his parental care for his family. All this is true: From personal experience, I believe—more, I *know*—him to be a good person, a good civil servant, and a good friend.

I wish that I could find the words to show you Scooter Libby as I know him: his intelligence, his charm, his wit, his internal goodness. It was Scooter who introduced me to the Washington horror known as "the breakfast meeting." That was back in 1996, as I remember. I hadn't met him before, but I'd just reviewed his novel, *The Apprentice*, and he sent me a thank-you note, diffidently suggesting that the next time I was in D.C. we might sit down and talk about books for an hour.

Unfortunately, the hour he had in mind was 7:00 a.m., and still sleepy midway through my third cup of coffee, I finally snapped—explaining to him in a snarl the great law that binds all night-owl book readers: Anyone who actually has something to say about the structure of a novel like James Joyce's *Ulysses* is incapable of saying it before noon. 11:15, in a pinch.

He leaned back in the restaurant booth for an instant, offended, I think—then suddenly laughed and gave me that odd smile I remember best about him, his mouth in a wry twist that showed you the other side of the smooth K Street lawyer: the reader, the novelist, the ironic observer. From then on, we met for late lunches and even later dinners. It was always hard to get him out in the evening: He refused to turn the children over to the babysitter until he'd read them to sleep, which made it 9:00 before he could join us—talking nonstop about books he'd read, their plot devices and narrative techniques, until he finally remembered he had a breakfast meeting with someone from the FCC the next morning, and wrenched himself away.

Published by The Institute on Religion and Public Life
156 Fifth Avenue, Suite 400 • New York, New York 10010 • (212) 627-1985 • Fax (212) 627-2184
www.firstthings.com          ft@firstthings.com

To incarcerate such a man feels horribly wrong to me. He still has much to offer the
world, and his indictment, trial, and conviction have already damaged him enormously.
What money does he have left? What chance, with his law license gone, does he have to
make it back? What reputation can he ever regain? Why must any more punishment be
heaped upon him?

More, I fear a deep philosophical injury from all this—a damage not just to my friend but
to the nation. When I first heard of Scooter's conviction, I sat down and wrote these lines:

> I have several friends—a surprising number with real literary talent—who
> were invited to help this administration. And each one I urged to accept
> the appointment. You owe it to your country, I said, particularly in times
> like these. Public service is a duty you can't refuse, when your turn comes.

> Never again. *Bene vixit, bene qui latuit,* Ovid once warned ambitious
> young men about the bloodsports of ancient Roman politics: "He lives
> well who is well hidden." Good advice, I suppose. Keep your head down.
> Don't look for trouble. Stay under the radar. Cultivate your own garden.
> It's just that, until now, I never really believed this was America. I never
> really believed this was us.

Written in grief, those words are ones I now wish I could recall. But I beg you, Your
Honor, to think of the damage done to the political health of the republic—to the
willingness of the talented and serious to participate in public life—by further
punishment of Scooter Libby. The moral of his tale is already that political life can easily
end in financial bankruptcy, legal disbarment, and utter destruction of reputation. It need
not—it should not—reach to additional judicial sentences.

Judge Walton—I, who make my living with words, find words failing me here. All I can
do is ask: Please, Your Honor, see *beneath* this man's conviction to the potential that
remains with him. And please, Your Honor, see *beyond* this man's conviction to the
dangers further punishment would mean to our shared lives in this country.

Sincerely Yours,

Joseph Bottum



*Catherine L. Bridge*
*Attorney at Law*

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

     RE:    Scooter Libby

Dear Judge Walton:

I am an attorney in private practice in the law firm of Barnes & Thornburg LLP, which is a law firm of 440 lawyers with offices in Indianapolis, Chicago, Washington, D.C. and Grand Rapids, Michigan.  I graduated from Columbia Law School in New York City in 1975 as a Kent Scholar, was admitted to the New York Bar in 1976 and was admitted to the Indiana Bar in 1978. I jointed Barnes & Thornburg LLP in 1978 as an associate and became a partner in 1982. During my almost 30 year tenure, I have served on the Firm's Executive, Management and Long Range Planning Committees and most recently concluded service as the Chairperson of the Firm's Business Department.  I concentrate my practice in mergers and acquisitions and in the securities law areas.  I have received recognition in the Best Lawyers in America and Chambers USA.

Scooter Libby was one of my very best friends at Columbia Law School.  I met Scooter in the fall of 1972 when I started dating a fellow classmate, John B. Bridge.  Scooter and I were in several classes together and became close friends.  Scooter and I probably spent part of every day together for the next three years.  Scooter was one of the close group of friends whom John and I invited to our small wedding our third year of law school.  Scooter and I have kept in contact ever since.

As every attorney knows, law school is a stressful, demanding period in an attorney's life.  As a law student at Columbia Law School, Scooter was one of the hardest working, most intelligent and most diligent members of our class.  He was also a true gentleman.  Never in the three years I was in close contact with Scooter was there ever any question of his honesty or integrity.  He was also a terrific friend.  He was always smiling and never failed to have a

cheerful and witty remark for you. Several of the best quips I remember from any of my classmates in law school were from Scooter. The pressure of law school never seemed to get to Scooter. He was always above that. Indeed, during our third year of law school, he was able to start writing his novel. His admirable personal qualities and many talents made him very well suited to take on the leadership positions which he eventually assumed in prestigious private law firms and our federal government.

After John and I moved to Indianapolis and Scooter moved to Philadelphia, naturally we were unable to stay in as close contact as we had while we were classmates. Nevertheless, we remained good friends. When Scooter was employed at the State Department during President Reagan's first term, he wrote to John and me to tell us of his new job and invited us to visit him in D.C. Shortly after that John did visit Scooter at the State Department. He had a remarkable position in the Reagan administration for a relatively young attorney. Over the years, we continued to have contact with Scooter, in letters, telephone calls and personal visits. When he became Chief of Staff to the Vice President of the United States, it seemed like a logical part of Scooter's lifelong career path. I think that our nation has benefited greatly from Scooter's able and loyal service.

There is absolutely no question in my mind that Scooter's conviction for perjury and obstruction of justice is totally inconsistent with my 35-year long knowledge of his character and integrity. It is inconceivable to me that Scooter would lie to anyone at any time, much less while under an oath to tell the truth. He would never need to do that to advance or keep his position. His talents and integrity are sufficient to ensure that Scooter would be highly respected and valued by peers and colleagues. Scooter Libby would be successful and happy whether he stayed in government service or not. Based on my daily observation of Scooter over a three year period and my contacts with him over the years since then, I am sure that he is a person of the utmost integrity and honesty. It is my opinion that Scooter Libby is not someone who would commit any kind of crime, particularly the crimes of which he has been convicted. It is unfortunate that he and his family have had to suffer through this terrible ordeal.

Thank you for your attention to my letter.

Very truly yours,

Catherine L. Bridge

INDS01 CLB 944254v1

# PLEWS SHADLEY RACHER & BRAUN LLP

## ATTORNEYS AT LAW

GEORGE M. PLEWS [1]
SUE A. SHADLEY
PETER M. RACHER
CHRISTOPHER J. BRAUN [1,2]
JEFFREY D. CLAFLIN
FREDERICK D. EMHARDT
LEONARDO D. ROBINSON [3]
S. CURTIS DEVOE
JOHN B. BRIDGE [4]
STEPHEN A. STUDER [3,5]
JEFFREY A. TOWNSEND
JEFFREY D. FEATHERSTUN
DONNA C. MARRON, PH.D.
JOHN H. LLOYD, IV [1,3]
JOHN M. KETCHAM [5]
ALEXANDRA S. SYLVIA [6]
BRETT E. NELSON [7]
DAVID L. PIPPEN
JOHN D. MORIARTY
TINA M. RICHARDS [8]
KAREN B. SCHEIDLER, CPCU
AMY E. ROMIG [6]
JONATHAN P. EMENHISER
TODD J. JANZEN
JAMIE B. DAMERON, LPG
GREGORY M. GOTWALD
THAO T. NGUYEN
J. MICHAEL BOWMAN
RUTH M. RIVERA
ANGELA M. DORRELL

1346 NORTH DELAWARE STREET
INDIANAPOLIS, INDIANA 46202-2415
TELEPHONE (317) 637-0700
FACSIMILE (317) 637-0710

53732 GENERATIONS DRIVE
SOUTH BEND, INDIANA 46635-1539
TELEPHONE (574) 273-1010
FACSIMILE (574) 271-2050

www.psrb.com



OF COUNSEL:
CHRISTINE C.H. PLEWS
MARY ANN F. SAGGESE [9]
F. RONALDS WALKER [1,3]
P. KEVIN THOMPSON

[1] REGISTERED MEDIATOR
[2] ALSO ADMITTED IN THE
    DISTRICT OF COLUMBIA
[3] ALSO ADMITTED IN ILLINOIS
[4] ALSO ADMITTED IN NEW YORK
[5] ALSO ADMITTED IN MICHIGAN
[6] ALSO ADMITTED IN KENTUCKY
[7] REGISTERED TO PRACTICE
    BEFORE THE U.S. PATENT
    AND TRADEMARK OFFICE
[8] ALSO ADMITTED IN OREGON
[9] ALSO ADMITTED IN VIRGINIA

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

        Re:    Scooter Libby

Dear Judge Walton:

        I am an attorney in private practice in the Indianapolis law firm of Plews Shadley Racher & Braun LLP.  I graduated from Columbia Law School in New York City in 1975, was admitted to the New York Bar in 1976 and was admitted to the Indiana Bar in 1977.  I joined my present firm in an of counsel capacity in 1996 and was admitted to the partnership in 1999.  I served as Managing Partner of the firm in 2004-2005.  Previously, I was Executive Vice President and General Counsel of Seaboard North American Holdings, Ltd. and its predecessors for 12 years.  Before that, I had worked in other corporate law departments and at the law firms of Baker & Daniels in Indianapolis and Shearman & Sterling in New York City.  My practice consists largely of corporate transactions, real estate transactions, financings and general business law.

        Scooter Libby was one of my very best friends at Columbia Law School.  I met Scooter in the fall of 1972 when I started dating the woman who became my wife, Catherine L. Bridge.  Cathy and Scooter were in several classes together and had become close friends.  Scooter and I probably spent part of every day together for the next three years.  Scooter was one of the close group of friends who Cathy and I invited to our small wedding our third year of law school.  Scooter and we have kept in contact ever since.

Honorable Reggie B. Walton
Page Two
May 1, 2007

_____

As every attorney knows, law school is a stressful, demanding period in an attorney's life. People show their true character during those three years. As a law student at Columbia, Scooter was one of the hardest working, most intelligent and most diligent members of our class. He was also a true gentleman. Never in the three years I was in close contact with Scooter was there ever any question of his honesty or integrity. He was also a terrific friend. He was always smiling and never failed to have a cheerful and funny remark for you. Several of the best quips I remember from any of my classmates in law school were from Scooter. The pressure of law school never seemed to get to Scooter. He was always above that. Indeed, during our third year of law school, he was able to start writing his novel. He seemed naturally destined for great things.

After Cathy and I moved to Indianapolis and Scooter moved to Philadelphia, naturally we were unable to stay in as close contact as we had while we were classmates. Nevertheless, we remained good friends. When Scooter was employed at the State Department during President Reagan's first term, he wrote to Cathy and me to tell us of his new job and invited us to visit him in D.C. Shortly after that I did visit Scooter at the State Department. He had a remarkable position in the Reagan administration for a relatively young attorney. Over the years, we continued to have contact with Scooter, in letters, telephone calls and personal visits. When he became Chief of Staff to the Vice President of the United States, it seemed like a logical part of Scooter's lifelong career path.

There is absolutely no question in my mind that Scooter's conviction for perjury and obstruction of justice is totally inconsistent with my 35-year long knowledge of his character and integrity. It is inconceivable to me that Scooter would lie to anyone at any time, much less while under an oath to tell the truth. He never had needed to do that to advance or keep his position. Scooter Libby would be successful and happy whether he stayed in government service or not. Based on my daily observation of Scooter over a three year period and my contacts with him over the years since then, I am sure that he is a person of the utmost integrity and honesty. It is my opinion that Scooter Libby is not someone who would commit any kind of crime, particularly the crimes of which he has been convicted.

Thank you for your attention to my letter.

Very truly yours,

John B. Bridge

JBB/ksb

# Dechert
LLP

Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
+1  215  994  4000   Main
+1  215  994  2222   Fax
www.dechert.com

**STEPHEN D. BROWN**



April 26, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Re:    I. "Scooter" Libby

Dear Judge Walton:

I have had the pleasure of knowing Scooter Libby for over twenty years.  I first met
Scooter when we were both young lawyers at the Philadelphia law firm of Schnader,
Harrison, Segal and Lewis in the late 1970's and early 1980's.  Scooter was bright,
hardworking and a terrific lawyer.  He was an asset to the Schnader firm in all ways, and
I know the firm was sorry to see him leave to do government work in the early 1980s.

I next came to know Scooter as a partner here at the Dechert law firm starting in 1995.  I
had come over to Dechert as a partner from the Schnader firm in 1991.  When I heard
that Scooter may come aboard as a partner, I was very excited given how talented and
hardworking he was.  I knew he would be an asset to Dechert and, indeed, he was an
asset.  He helped build our Washington, D.C. office and, in fact, rose to the level of
managing partner in that office.  Once again, I was sad to see him go back to government
work.  I also appreciated as an American the tremendous sacrifice he was making giving
up a considerable income here at the Dechert firm in exchange for a government salary.
However, he felt strongly about government service and the need for extremely bright
and committed people such as himself to serve our country.

I know him as one of the smartest people whom I ever met and of impeccable moral
character.  If there was ever a time for compassion and mercy to award a person for
giving up so much in the private sector to serve in public office, now is that time.

Very truly yours,

Stephen D. Brown

SDB:paw

Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton  San Francisco  Washington DC
Brussels  Frankfurt  London  Luxembourg  Munich  Paris

Dear Judge Walton,

Please sentence Scooter Libby to prison. He is neither a patriot nor a defender of freedom. He needs to be punished for what he did. This is not a popularity contest. But he needs to serve as an example of what happens when you beat your chest and claim to defend freedom and then expose CIA agents in a patently traitorous act & then lie about it over & over again & claim you were just to busy to be bothered with the truth.

~~To declare them fair game is a blatant~~ tramp. My father once told me that the lowes

a man can get its to attack
another man's wife because
he is too cowardly to attack
the husband directly. To
declare Valerie Plame as "fair
game" as a blantant example
of this low-life cowardly
behavior.

You have to consider
that this man was chief of staff
in the office that brought us
torture as part of the SOP of
our military forces (Abu Ghraib
) constitutionally threatening wire
tapping, an illegal war on par
with some of the most immoral
in our recent history, complete
rejection of the rule of law, with
signing statements to Congressional

bills that effectively negate the content & effect of law of the bill.

So let this man go, would be, ~~with~~ with probation, another travesty, in the last part of any government that has been thoroughly corrupted by these guys. This was a traitorous act designed to punish a whistle blower who could have kept us out of war & showed just how far these profligates would go to shut shut down, end the careers & so after the wives of anybody who would dare question their exhortations.

Give this man time. you can go to jail for stealing a loaf of bread, then if you ~~cot~~ ca

se to jail for endangering
our whole country & exposing
one of our intelegence officers
for cheap petty politics.

Sincerely

W E Buffington

Jonathan W. Burks

April 28, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Jonathan W. Burks and I have been a public servant and federal
government employee since September 1998. During my professional career, I have
served in the Legislative and Executive Branches, including stints at the White House (on
both the President's and the Vice President's staffs), the Department of the Treasury, and
my current position as Director of Legislative and Intergovernmental Affairs at the
Securities and Exchange Commission. I first met Scooter Libby in Spring 1999 when he
was serving as legal adviser on a Select Committee of the U.S. House of Representatives,
which was chaired by the Member of Congress for whom I also worked at the time. I
subsequently worked under Mr. Libby's supervision in the Office of the Vice President
(OVP) first as a Special Assistant to the Vice President for Domestic Policy and then
ultimately as Deputy Assistant to the Vice President and Staff Secretary. I continued to
work with Mr. Libby from time to time after I joined the President's staff.

During the eight years in which I have known Scooter, he has been a tireless
advocate for policies intended to increase the security of the United States in a dynamic
and ever-changing international and domestic security environment. For example, long
before the terrorist attacks of September 11, 2001, Scooter was focused on the problems
of homeland security and was putting together a team of experts to conduct a top-to-
bottom review of U.S. homeland security.

In my experience Scooter always conducted himself as a model of
professionalism – driven by a determination to make decisions based on the best
available information and the highest standards of analysis. He set a high ethical
standard for everyone who worked in the OVP and was recognized throughout the White
House as a model of discretion and good judgment.

On a personal level, Scooter has been a dear friend – providing me with
opportunities for personal growth and providing support in times of personal tragedy.
For example, following the death of my father in 2005, Scooter handwrote a long,
personal letter relating to me the challenges he faced when his father passed away and
offering his support in whatever way he could as I dealt with my grief. Once I had
returned to the White House following my father's funeral, Scooter delayed his arrival at
a meeting with the Vice President to seek me out to personally offer his condolences and
reiterate his availability to support me in whatever way he could.

Hon. Reggie B. Walton
Page 2

     In all of my dealings with Scooter he has been a decent and patriotic man, dedicated to his family and his country. I hope you will consider these facts as his case proceeds.

          Sincerely,

          Jonathan W. Burks



May 15, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

I am writing on behalf of Scooter Libby, who I have known and admired for close to
twenty years.

I am a former director (general) of the Voice of America. I am also a former president &
ceo of the Corporation for Public Broadcasting.

I came to know Scooter Libby well in my professional life. Scooter was CPB's outside
counsel and performed that duty with great distinction, often for reduced compensation,
or no compensation at all. It was typical of Scooter to put in a dozen or more hours on a
problem of ours, completely *pro bono*. Scooter Libby was genuinely public spirited in
everything he did for us. He believed in the broad democratic goals of public radio and
TV and I believe that his love of country motivated him in his work for CPB. His advice
was invariably careful, always analytic and intelligent, and enormously useful.
He was of great benefit to US public broadcasting. The entire senior staff of CPB,
including our General Counsel and our Executive VP (who went on to replace me as ceo
when I left) shared this view of Scooter. Scooter had been a very serious mentor to my
CPB General Counsel who had been elevated from a staff lawyer's position. He helped
her regularly with sound and personally kind advice, as I have seen him help so many
others. One of them was a young law school student, a friend of my family, now a
successful Washington lawyer, who I introduced to Scooter one summer. I watched him
develop professionally over the years because of Scooter's interest and generosity.

Scooter Libby's current legal situation is ironic to me. I find it impossible to reconcile the
charges and conviction with my knowledge of the positive and admirable way Scooter
has conducted his life, as an attorney and public servant, as a loving husband and father
to his two wonderful children, and as a thoughtful and sensitive friend. I consider him a
selfless man, a person of high integrity and absolute honesty

Over the years of our professional relationship –which blossomed into a personal
friendship, he has earned my deep respect. Please consider my views in your sentencing.

Sincerely,

Richard W Carlson
US Ambassador (ret.)

# W. Seth Carus



May 29, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am a Distinguished Research Fellow at the National Defense University and Deputy Director of the Center for the Study of Weapons of Mass Destruction. In this capacity, I am an excepted service employee of the Department of Defense, but this letter is written strictly in a personal capacity. During the past decade, my works has focused primarily on the threat of bioterrorism, including serving as a formal and informal advisor to officials in the White House, the Departments of Homeland Defense, Defense, State, and Health and Human Services, and to the Intelligence Community.

My relationship with Mr. Libby dates to August 1991, when I was asked to apply for a position as a career employee in an office reporting to him at the Defense Department. I served under Mr. Libby for approximately eighteen months—from the time I entered government service in August 1992 until he left at the end of the administration in January 1993. During that time I had the usual episodic interactions of an action officer with an official at his level of seniority. After he left the Department, we met several times, always concerning issues related to biological warfare.

Subsequently, in the summer of 2001, I was detailed by the National Defense University as a bioterrorism expert to the staff of the National Preparedness Review, which was established in the Office of the Vice President to recommend how the White House should organize to address the threat of catastrophic terrorism. I served in the Office of the Vice President as an advisor on biodefense from September 2001 to February 2003. During that period, I interacted with Mr. Libby on a regular basis on bioterrorism related issues.

My perspectives on Mr. Libby are shaped by my perspectives of the role that he played in enabling the United States to better respond to the threat of bioterrorism. Like many of my colleagues inside and outside government, I believe that biological weapons pose one of the most serious national security challenges facing the United States in the 21st Century. In my considered opinion, Mr. Libby has done more to enable the United States to address the challenges of bioterrorism than any other single person. I do not know when, or even if, we will be the target of biological weapons. What I do know, is that if

such an attack occurs, many people will survive who otherwise would have died without the preparations enabled by the processes that he enabled.

Mr. Libby was uniquely placed to accomplish what he did. Only occasionally does Washington see a person who understands and cares about an issue, and is also well placed to advocate for it at the highest levels of policy-making. Mr. Libby was in that position in 2001, and the country's security is improved because of it. One example of the role Mr. Libby played in this regard is what is now known as Project BioShield, which was enacted into law in July 2004. When enacted, BioShield was the single most important legislation aimed at improving the nation's ability to acquire new medical countermeasures to address catastrophic threats. As with any complex legislation, many people played a role in shaping it. The most important person, however, was almost certainly Mr. Libby. In early 2002, Mr. Libby asked his staff to think about a "medical NASA" to jump start our ability to fix the long-standing failure of the government to develop and acquire medical countermeasures. Mr. Libby established the conceptual foundations for an innovative new approach to the problem, so that when the Department of Health and Human Services proposed a vaccine trust fund in late 2002, he had already created support for an initiative inside the Executive Office of the President. Mr. Libby never claimed credit for his seminal role in the creation of BioShield, yet without him it would never have come into being.

Mr. Libby cares passionately about the security of the American people, and from my own personal knowledge has done much to help make the country safer. On more than a few occasions, I disagreed strongly with positions he advocated on specific issues. However, I never doubted that he was motivated by a desire to enhance the security of the United States and to protect the American people.

In closing, I was shocked at Mr. Libby's conviction, because it was impossible for me to believe that he would knowingly commit perjury. Mr. Libby is an honorable man who cares passionately about this country and for what it stands.

Sincerely,

W. Seth Carus, Ph.D.
Distinguished Research Professor
National Defense University

**Navigators**
ANDERSON•MURPHY•PITTS•CONDA

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

My name is **Ronald Christie** and I write you today as you consider the sentence to be imposed upon my friend, colleague and mentor, **I. Lewis Libby** (hereinafter "Scooter Libby"). As a member of the District of Columbia Bar and having served our country in public service for more than a decade, I have come across few individuals in my career with the honesty, integrity and passion for public service than Mr. Libby.

Immediately following the Supreme Court's decision in *Bush v. Gore*, I received a phone call from Mr. Libby inviting me to meet with him to discuss potential opportunities to serve in the new Administration. We met shortly thereafter and spoke at great length about the importance of public service. Scooter recounted his experience working on Capitol Hill as well as serving in the Administration of President George H.W. Bush. I was immediately struck by the passion and conviction Scooter displayed when discussing the virtues and honor of public service. Shortly after our conversation, I was offered a position within the Office of the Vice President to serve as Deputy Assistant to the Vice President for Domestic Policy – a position in which I would interact extensively with Mr. Libby in a professional capacity.

From the first day in the White House, Scooter urged the staff in the Vice President's Office that our sole responsibility was to assist the Vice President in any way possible to ensure the President and his staff had all the information they needed to make the best decisions on behalf of the country. As one of the Vice President's domestic policy advisors, I took advantage of Scooter's open door policy to seek his advice and input on issues that confronted us.

Scooter created an atmosphere in the Office of the Vice President where ideas and strong input were welcomed and where we were encouraged to offer our candid and honest assessments. From colleagues who had served in previous Administrations, I heard that Libby's approach towards his staff was rare – we were made to feel like we were part of a

901 7th Street, NW, Suite 200, Washington, DC 20001     T 202.315.5100     F 202.315.5010
301 South Bronough Street, Suite 650, Tallahassee, FL 32301     T 850.222.2140     F 850.222.2160
1415 L Street, Suite 430, Sacramento, CA 95814     T 916.930.0100     F 916.930.0101
www.navigatorsllc.com

**Navigators**

ANDERSON • MURPHY • PITTS • CONDA

close-knit team where our opinions were valued and encouraged. Rather than hoarding ideas in order to take them to Scooter or the Vice President to receive credit, our office worked as a team under Libby's encouragement towards a mutual goal – the goal of doing the best we could to help the President and Vice President represent the American people.

Beyond policy and politics, I was struck by Mr. Libby's keen interest in ensuring that all Americans in the country had a voice that deserved to be heard in the Bush White House. As you may know, only 9% of African-Americans in the country cast their votes for President Bush in the 2000 Presidential election. As an African-American, I was very cognizant of the low Black turnout, but wanted to find ways in which the Administration could make significant inroads in communities of color.

Although he was very busy with his duties as a member of the President's staff in addition to his responsibilities as the Vice President's Chief of Staff and National Security Advisor, Mr. Libby encouraged me to create concrete and specific areas in which the fledgling Administration could ensure that its policies would appeal to all Americans – even to those who might not have voted for or supported the President. Much to my surprise, after briefing Mr. Libby on my ideas, he arranged for me to convene a lunch meeting with Vice President Cheney to discuss the best manner for the Administration to engage leaders from communities around the country – leaders from urban areas or constituencies with high African-American and Hispanic-American populations and other communities of color. Actions speak louder than words, and I was struck by the manner in which Mr. Libby quietly but forcefully demonstrated his strong leadership and commitment to ensure the President and Vice President received input from voices of people who felt they might not have had a credible voice within this Administration.

I was a member of the Vice President's Office when America came under attack on September 11, 2001. When we returned to work on September 12th, the staff was nervous, scared and uncertain as to what horrors might lay ahead. Mr. Libby displayed a remarkable degree of compassion and patience under trying circumstances to pull the staff together and explain what had happened during that fateful day. He offered consolation and strength to us during a very uncertain time in our lives. While undoubtedly overwhelmed with analyzing information and seeking to protect the country from another attack, Scooter provided unforgettable empathy and strength to us during one of the most difficult periods in American history.

I left the Office of the Vice President in early 2002 to accept an appointment as Special Assistant to President Bush in the USA Freedom Corps – the President's domestic and international community service initiative. As the Deputy Director of my office, I found myself working closely with Mr. Libby once again – this time as a colleague and fellow

901 7th Street, NW, Suite 200, Washington, DC 20001    T 202.315.5100   F 202.315.5010
301 South Bronough Street, Suite 650, Tallahassee, FL 32301    T 850.222.2140   F 850.222.2160
1415 L Street, Suite 430, Sacramento, CA 95814    T 916.930.0100   F 916.930.0101
www.navigatorsllc.com

**Navigators**

ANDERSON•MURPHY•PITTS•CONDA

commissioned officer to the President of the United States. Scooter and I often had the opportunity to sit next to each other during the President's senior staff meetings held each morning, during which I found that he still maintained a strong interest in my personal and professional development. Whether offering his opinion on a particular policy matter or advising me on protocol before my first Cabinet meeting, Mr. Libby was always interested in bringing out the best in those around him.

With more than 3 ½ years of public service within the White House, having served together with Mr. Libby as members of the Vice President's office as well as colleagues on the President's team, I have had the ability to observe him very closely. I am hard pressed to identify anyone with Scooter's commitment to service, integrity, honesty and decency inside or outside of government. From the day we first met in 2000 until my final day in White House in 2004, Scooter always pushed me to be the best. Not just the best policy advisor, but to be the best person that I could.

Your Honor, as a fellow member of the District of Columbia Bar, I respect the verdict returned by the jury in Mr. Libby's proceedings. At the same time, I strongly believe that Mr. Libby's conviction for perjury and obstruction of justice is not only inconsistent with the man alongside whom I was honored to serve, but this conviction is incongruent with Libby's strong moral character and his unassailable integrity.

While many with Mr. Libby's expansive background would have pursued lucrative opportunities in the private sector, Mr. Libby instead chose to serve his country at great sacrifice to his family. As you deliberate and ultimately return with your decision regarding Mr. Libby's sentence, I would urge you to consider his strong commitment to his family and his strong commitment and dedicated service to the people of the United States of America.

Sincerely,

Ronald Christie, Esq.
Vice President/Counsel

**Emilio W. Cividanes**



April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

       Re: I. Lewis Libby

Dear Judge Walton:

As you know, I have been a long time resident of the District of Columbia and an active member of the local legal community. I write in connection with the upcoming sentencing of I. Lewis "Scooter" Libby, whom I have known for 22 years, initially as a professional colleague at the Dickstein Shapiro law firm, then as a fellow martial arts enthusiast, and ultimately as a friend. During the years that have transpired: I was one of only five persons in attendance at Scooter's surprise 40th birthday party in 1990; Scooter was one of only ten friends who attended my bachelor party at a local steakhouse in 1994; my wife and I have dined with Scooter and his wife, Harriet, several times, including at their home; and Scooter, unsolicited, offered to help arrange for my children to attend the White House's annual Easter Egg Hunt a few years ago.

Scooter is a man of simple tastes (he prefers jeans to suits, and contemplation to celebration) and basic values, focused upon family, civic duty, and fairness. He is one of those who believe that "it is better to light a candle than to curse the darkness." This has led Scooter to serve in policy positions in successive Republican Administrations, even though he is not otherwise active in the Republican Party or partisan politics.

In my experience, one can tell a lot about a man by the woman he marries – especially when he marries later in life. Scooter and I both married late in life – I was 38 and he was 41. His wife is an accomplished lawyer, having counseled unions while in private practice and having served as General Counsel to the Senate Judiciary Committee, under the chairmanship of Senator Joe Biden. Like him, she has an independent streak, not afraid to speak her mind, and shares with him a strong sense of public service, responsibility, and fairness. Together, they are imparting these values upon their two children.

Scooter's sense of responsibility and civic duty make it difficult for him to let injustices go unnoticed. Time and again, I've known him to stop what he is doing to help total

strangers in need, and to buck the establishment to help fellow colleagues. I was first exposed to this during my days at Dickstein Shapiro when he secured firm approval to assist on a pro bono basis an African American Vietnam veteran who Scooter did not previously know and when, without any management title or special standing within the firm, he challenged a practice group's evaluation of an associate with whom he had worked closely. He has never abandoned those natural instincts.

Scooter's knack for gaining the respect of the people who have entrusted important matters to him has resulted in his having been asked to serve as the managing partner of the Washington, D.C., offices of two separate law firms – organizations that are notorious for being difficult to manage. In my mind, Scooter gains the respect of this prickly group of people partly due to his terrific skills and talents, but in no small measure also due to the sense of fairness that imbues all of his actions.

I was stunned when Scooter was indicted, and disappointed when he was convicted. Some of the characterizations of Scooter that emerged at trial are fundamentally at odds with the man I have known for two decades, a man whom I admire and respect (although I often enough disagree with) and whose friendship I value greatly.

I hope that through this letter you get to see a little more complete picture of the man whom you are about to sentence, and will take into account in your decision all that is good and honorable about him.

Sincerely,

Emilio W. Cividanes

### DR. ELIOT A. COHEN



25 April 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am a professor at Johns Hopkins University's School of Advanced International
Studies; as of this coming Monday I will begin service as Counselor of the Department of
State. I am writing on behalf of Mr. I. Lewis Libby, whose case is before you.

I first met Scooter in 1989, when I left the Naval War College, where I was a professor in
the Strategy Department, to serve on the newly created policy planning staff in the Office
of the Secretary of Defense. Scooter, as principal deputy undersecretary of defense, was
my boss's boss, and we often worked together. I left government in 1990 to take up my
current position, but we have remained in cordial social contact ever since.

Scooter has always struck me as someone of impeccable integrity and impartiality.
Scrupulous in his handling of classified information, objective and fair in his
consideration of individuals and problems, he struck me as having an exceptionally
judicious mind. I have, despite my new position, been critical in print and on television
of the current administration's execution of the Iraq war – some would say, harshly so.
Despite that, Scooter would often, over these last few years, engage in courteous and
ruefully honest appraisals of what had gone well and what poorly. While always discreet,
he never betrayed the kind of partisan animus, much less the sort of vengefulness
attributed to him in the press. If anything characterized him, it was a wry sense of humor.

Scooter, and his family, have endured much – not merely the hardships of a public
pillorying, the attacks on his reputation and character, and the financial burdens of legal
representation, but the long years of public service. From all that I know of his case, I
simply cannot believe that he merits anything other than the greatest leniency.

Respectfully,

Eliot A. Cohen

# Dechert
## LLP

30 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

**ROBERT A. COHEN**

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:  I. Lewis Libby

Dear Judge Walton:

I am a partner in the New York offices of Dechert LLP, where I head our litigation practice.
I write as a friend and colleague of I. Lewis ("Scooter") Libby to share my views of his character
and integrity as Your Honor considers his sentence.

Scooter joined our Firm's Washington DC office in the mid-1990's.  I worked closely with him
from then until he left our Firm in early 2001 to join the administration of then newly-elected
President Bush.  Scooter so quickly won the confidence and support of the Firm's Policy
Committee, on which I sat at the time, that he was appointed the Managing Partner of the
Washington office, a growing and important office of our Firm.  He won that appointment
because we saw in him a man of character who would give his time and attention to creating an
environment that would allow others to succeed.  Many of us thought Scooter's strong
interpersonal skills,  his caring and nurturing nature, his integrity, and his prominence as a man
who unselfishly and at great personal and financial sacrifice has devoted significant parts of his
professional career to distinguished public service, qualified him to be the future head of our
1,000 lawyer, world-wide, law Firm.

More personally, I worked very closely with Scooter on litigation matters for clients that Scooter
introduced to the Firm.  Over many years, and on many matters, he always had the strongest
ethical compass; he was a tenacious but fair and honest advocate.  And he insisted that all who
worked with him played by those rules.  It is incomprehensible to me that Scooter has been
convicted of perjury and obstruction of justice.  Behavior of that kind is totally inconsistent with
the character of the man I know and worked closely with for many years.

Respectfully,

Robert A. Cohen

U S  Austin  Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton
San Francisco  Washington DC   EUROPE  Brussels  London  Luxembourg  Munich  Paris



# Navigators
ANDERSON ∘ MURPHY ∘ PITTS ∘ CONDA

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to offer my personal observations of Scooter Libby, who as Chief of Staff to the Vice President was my direct boss from 2001 to 2003 when I was Assistant to the Vice President for Domestic Policy. I am currently a Principal of Navigators LLC, a public affairs firm headquartered in Washington, D.C.

By way of background, I am the son of Filipino-American immigrants. My father was an enlisted man in the U.S. Navy and my mother was a nurse. I grew up in Virginia Beach, Virginia, graduated from the College of William and Mary, and through hard work and some luck became a Congressional policy and legislative advisor in the United States Senate, where I worked for over a dozen years.

It is a testament to this great country that this son of immigrants had the opportunity to work in the White House as a senior policy advisor to the Vice President of the United States. Scooter Libby was the one who gave me that opportunity.

I did not know Mr. Libby before he called me in mid-December of 2000. At that time, I was seeking employment opportunities in the private sector because my former boss, U.S. Sen. Spencer Abraham of Michigan, had lost his bid for reelection in November.

Scooter was tasked with assembling the Office of the Vice President ("OVP ") staff within the White House. What struck me at the time was that he was focused on not only hiring the most highly qualified people, but also providing opportunities for women

901 7th Street, NW, Suite 200
Washington, DC 20001-3719

Tel  202 315 5100  •  Fax 202 315 5010
www.dcnavigators.com

The Honorable Reggie B. Walton
May 1, 2007
Page 2

and minorities as well. Our domestic policy senior staff included me, an Asian American, Ron Christie, an African-American, Jonathan Burks, an African-American, and Nina Rees, an Iranian-American. When Mr. Christie left to work for the President, Scooter replaced him with Mr. Ado Machida, a Japanese-American.

During my time at OVP, senior staff included several women in leadership positions in legislative affairs, communications, Mrs. Cheney's Office, and national security affairs. At one point, I recall that seven out of twelve senior staffers were women.

On a personal level, I found Scooter to be a quiet, unassuming gentleman of great intelligence and integrity. He had dedicated most of his career to public service as a staffer in the Congress, State Department, and Defense Department. When duty called in 2001, he left a very lucrative law practice to serve in government. As the Vice President's Chief of Staff, Scooter was a great boss. While he gave my staff and me some general direction about what the Vice President required, he was not a micromanager. He gave us a lot of leeway and direct access to the Vice President.

Scooter also was a believer in providing upward mobility for his staffers and helped guide them in their career decisions. As a result, people who started as administrative staffers in 2001 have eventually moved up to fill other key senior staff positions.

Scooter is a gem of a person and was a great boss, which produced a very loyal staff. As a consequence, our OVP staff had very little turnover in the first term, which is an anomaly working in these pressure-packed White House positions. He would think about the little things to reward staff for their hard work and sacrifice, such as arranging for a staff photo in the Oval Office with both the President and the Vice President.

I saw Scooter at his best after 9-11. Both Scooter and the Vice President were examples to the staff on how to remain cool, calm and collected in the wake of the 9-11 attacks and the evacuation of the White House complex. I recall that all of the OVP staff returned the next day to do our jobs. Scooter's leadership helped us focus on the important tasks at hand. In the days after 9-11, I recall thanking God that both Cheney and Libby were the right men in their positions at the right time in history. Scooter spent countless hours away from his family – often in undisclosed locations with the Vice President – during the weeks and months following the 9-11 attacks.

Working on domestic and economic policy issues, I was not privy to a lot of Scooter's work on national and homeland security matters. I do know he did take a tremendous interest in bio-defense. From what I could observe, he was driven by an intense desire to keep his family and all American families safe from terrorists.

The Honorable Reggie B. Walton
May 1, 2007
Page 3


I very much hope that you will take my personal observations of Scooter Libby into account when you make your decision with respect to sentencing.  Mr. Libby is a gentleman, a great family man, and a public servant whose only motivation was to make America a stronger and safer country.

Sincerely,

Cesar V. Conda

CVC/kwb

ROBERT T. COONROD
████████████████████
████████████████████

April 25, 20007

The Honorable Reggie B. Walton
United States District Court
225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

This letter concerns I. Lewis Libby. It is my understanding that you will soon make decisions concerning his sentencing. While I cannot assess the merits of the issues before your court, I have had ample opportunity over the years to come to appreciate Mr. Libby's personal characteristics. I hope those will factor in your decision.

Mr. Libby and I first met in 1990 in the context of some Inter-Agency meetings. He was a Deputy Undersecretary in the Defense Department, and I was the Deputy Director of the Voice of America (VOA). It was during the period of the Gulf War and the liberation of Kuwait. Our Arab coalition partners were often critical of VOA's reporting. They considered our attempts to offer balanced reports from the region as an expression of a pro-Sadam bias. The programming was effective, but it did complicate the work of the USG officials responsible for managing relations with our coalition partners. Mr. Libby was one of the few in the Inter-Agency meetings who did not respond reflexively to the charges of VOA bias. I recall that he took the time to understand VOA's perspective on the issues, and I appreciated that.

I retired from government in December 1992 to become Executive Vice President and later President and CEO of the Corporation for Public Broadcasting (CPB). I left CPB in 2004. Mr. Libby was an attorney in private practice during much of the time I worked at CPB, and we frequently engaged him as our outside counsel on legal matters that were complex in nature or required a high degree of tact and sensitivity.

For example, he drafted key provisions of the employment contracts for me and other senior CPB officials. This required tact, excellent judgment and an ability to reconcile institutional, professional and personal considerations. He understood that the fiduciary duty of the Board of Directors extended beyond simply assuring that employment contracts conformed to applicable law, regulation and Corporate by-laws. He helped them act on their broader public service mandate, thus enabling me, as CEO, to attract and retain key talent within the salary levels appropriate to a Congressionally supported non-profit corporation.

I have direct experience of his commitment to telling the truth, despite personal risk. Mr. Libby represented the Corporation in a lawsuit against a program funder who had failed to meet contractual obligations. The funder claimed dissatisfaction with the final cut of a program it had commissioned. During the pre-trial discovery phase, Mr. Libby and the Corporation's staff counsel were advised by the program's producer that certain materials sought by the Defendant that were detrimental to our case could not be produced, because such materials did not exist. Mr. Libby unwittingly represented this position to the court. Upon subsequently learning that the producer had "found" these materials during an office move on the final day of pretrial discovery, Mr. Libby did not hesitate. He insisted that the Court be immediately informed, despite the fact the new information weakened our case and exposed him and my CPB colleague to a possible criminal contempt citation.

As you are no doubt aware, Mr. Libby is a fine author. As I have watched his indictment and trial proceed, a brief passage from his novel, *The Apprentice*, has frequently come to mind, "For the storm had reached the point beyond the strength of men."

In our work together, Mr. Libby often demonstrated that virtue is demonstrated by how we face the storm not by how deftly we duck to avoid it. I trust that trait of character will have served him well in this instance.

Sincerely Yours,

Robert T. Coonrod

**Christopher Cox**



April 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

As you consider the proper sentence for Scooter Libby
from the standpoint of its impact on him and on society as a
whole, I hope that the following insights may be of help to
you.

I have known Scooter since 1998, when he worked as
Legal Advisor for the House Select Committee on U.S.
National Security, of which I was then the Chairman.  He had
come to my attention because of his exemplary work as the
former Director of Special Projects in the Bureau of East
Asian and Pacific Affairs at the U.S. Department of State,
and as the former Deputy Undersecretary for Policy in the
U.S. Department of Defense.

Scooter's service to the Congress was twofold.  First,
he shared his considerable talents and expertise largely pro
bono.  Second, having been hired with the approval of both
the Democratic and Republican leaders of the committee, he
worked very hard to ensure that the committee's work was
conducted entirely upon a bipartisan basis.  The committee's
unanimous report to the Congress was in part a reflection of
the bipartisan spirit of dedication to the nation's
interests that he brought to his work as Legal Advisor.  His
willingness to contribute so much of himself for no other
purpose than the betterment of his country was exceptionally
admirable.

The Honorable Reggie B. Walton
April 23, 2007
Page Two


Because of this professional introduction, I later came
to know Scooter personally. His children, like mine, were
very young when he went to work at 6:15 in the morning and
continued late into the night on the Select Committee. At
that time, Scooter's son ████████and his daughter ▒▒▒▒
▒▒▒▒▒ His pro bono work, therefore, represented not just a
contribution of his own time and talent, but also time away
from family. This high personal cost of his pro bono
voluntarism was made higher still by the fact that for many
years his wife, Harriet, also worked in a very demanding job
for Senator Joe Biden on the Senate Judiciary Committee (she
ultimately became Sen. Biden's General Counsel). Scooter
nonetheless gave of himself willingly. His work was first
rate, his dedication was exemplary, and we are all still
benefiting from it.

The Libby children are not little now; ████████████
entering that time when girls grow and change startlingly
quickly, and ████████████████████████████████████
████████████████████████████████████████████████
████████████████████and I saw him there with his Dad
at an introductory parent-student convocation just a few
weeks ago. What I observed was a very dedicated father
quietly devoting himself to a role of trust and
responsibility every bit as important as the pro bono
service to his country I'd witnessed years earlier.

In yet another connection I have also observed the
significant impact of Scooter's pro bono service to our
communities and our country. As Chairman of the House
Committee on Homeland Security in the years following 9/11,
one of the issues on which I focused intently was how our
cities, hospitals, and EMR personnel could respond to a
chemical or biological attack. I discovered that Scooter had

The Honorable Reggie B. Walton
April 23, 2007
Page Three

made a very significant (and voluntary) contribution to that effort by leading a large pro bono project for the Center for Strategic and International Studies, a bipartisan research organization, focused on the laws that would apply in the aftermath of a biological weapon attack. This pro bono scholarship was of enormous importance to our work in the Congress, and to the safety and security of every one of us. Scooter's intiative and, once again, his selflessness in devoting his talents to the betterment of society marked this contribution as well.

The generosity of spirit that Scooter has demonstrated over the last decade during which I have known him is truly remarkable.  He is as willing to give of himself in large matters as in small.  I know him to be an individual of integrity who has consistently devoted his energies to helping others in the past, and -- given the opportunity -- can be counted upon to do so in the future.

Sincerely,

Christopher Cox



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Re:  I. Lewis "Scooter" Libby

Dear Judge Walton:

My name is Kathleen Cox and I am writing on behalf of Lewis "Scooter" Libby.  I have a
nursing degree, a law degree and masters in pubic policy.  I have worked in law firms, at
a large telecommunications company and most recently at the Corporation for Public
Broadcasting (CPB).  Over the eight years I was at CPB I served in various capacities
including general counsel, chief operating officer and president and chief executive
officer. I left CPB reluctantly two years ago.  I count myself among the early casualties of
the Bush Administration's aggressive efforts to politicize various institutions.  Despite
any general ill feelings I might have toward the Administration as a result of this, I feel
compelled to write this letter because of my personal experience with Scooter as a friend
and colleague.

I first came to know Scooter in 1997 when I was serving as General Counsel during my
time at CPB.  Scooter was at the law firm of Dechert, Price and Rhoads and provided
outside legal counsel to CPB.  We worked together until he left for the White House in
2001. Although it receives its funding from Congress, CPB is a private 501 (C) (3)
corporation - the Public Broadcasting Act sets out detailed specifications for how funds
should be allocated and provides for a very small percentage that can be allocated to
administrative costs including legal fees.  Scooter was very mindful of these constraints
and this was reflected in the way he approached his work for CPB.  Scooter worked
numerous hours and provided the highest quality of work at a fraction of what his firm
would have typically charged. This, combined with his deliberate efforts to find answers
and solutions to problems in ways that would best strengthen the organization, always
gave me the sense that he viewed his work for public broadcasting as public service.

I rarely saw Scooter after he went to the White House; his schedule was extraordinarily
hectic.  Yet despite this, on more than one occasion he offered to make himself available
to talk to my son and his high school class about his work and the events of the day, as
well as to my daughter, a recent college graduate, about her interest in foreign affairs.
Though extremely dedicated to his work, he often lamented the time he had to spend

The Honorable Reggie B Walton
May 1, 2007
Page 2

away from his wife and children. As the years passed this continued sacrifice stuck me as extraordinary; when I asked him about this his reply was simply: if you are asked to serve your country and you feel you can make a contribution, you do not have a choice. Indeed, he has sacrificed much for an extraordinary career of public service.

I was truly stunned to hear of Scooter's indictment, puzzled by what was reported about the trial and saddened by the verdict. The entire affair is totally inconsistent with my personal and professional experience with Scooter and my sense of who he is. It is also inconceivable to me that he would do anything that would put his family and his future in this kind of jeopardy. It is for these reasons that I write this letter. Thank you for the opportunity to do so.

Sincerely,

Kathleen Cox

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Ave. N.W.
Washington, DC 20001

Dear Judge Walton,

My name is Stan Crock. I currently am Senior Editorial Director on the Federal
Sales Team at Accenture LLP, an international consulting firm, where I have worked
since January 2006. For nearly 23 years before that, I was News Editor, then Chief
Diplomatic Correspondent in Business Week's Washington Bureau. I have been a
journalist in Washington for nearly three decades.

I have had the distinct honor and pleasure of knowing Scooter Libby for more
than 40 years. We first met in 1965 as classmates at Phillips Academy in Andover MA.
We were together again a decade later when our time at Columbia Law School
overlapped. And we have seen each other regularly since he came to Washington in the
Reagan Administration. We double-dated when we were single. I have read not only the
prose he has written (*The Apprentice*), but also the less-well known, unpublished, and
equally high quality poetry this true Renaissance man has written. He attended my
wedding. His wife and mine are friends. Our sons are close in age, as are our daughters.

My family has had both personal and professional contact with Scooter. When
Scooter was in private practice in Washington, D.C., and my wife was a staff attorney in
the General Counsel's office at the Corporation for Public Broadcasting, they worked
together on several matters. My wife had a great deal of respect for Scooter's service to
the corporation, which funds public broadcasting. There was a good reason he was Len
Garment's right-hand man at several law firms—Scooter is a brilliant lawyer and
provides sound counsel.

As a reporter, I had professional contact with him as well. He was remarkably
(sometimes frustratingly) discreet and cautious in discussing policy matters, even to a
trusted friend who had never burned a source. I never saw Scooter abuse anyone's trust.

Scooter's stints in government during the Reagan and two Bush Administrations
demonstrate an admirable devotion to public service and the nation. He first came into
government when a former professor at Yale, Paul Wolfowitz, sought him out. When Mr.
Wolfowitz received an appointment in the Reagan Administration and had to staff his
State Department office, he recalled what he considered the best final paper in his
strategic policy course ever written by an undergrad. And he tracked down that student—
Scooter. As far as I know, Mr. Wolfowitz didn't know if Scooter had a party affiliation. It
didn't matter. Mr. Wolfowitz wanted to bring in the brightest people he knew, and his
protégés included such All-Stars as strategic thinker Francis Fukuyama, Middle East

negotiator Dennis Ross, and Russia specialist Steve Sestanovich. Scooter was just as much of a star in this intellectual firmament. Scooter at the time was practicing law in Philadelphia. He gave up a promising and lucrative practice for public service.

When he again left private practice for public service during the George H.W. Bush Administration, he did not want a post that required Senate confirmation. He is intensely private and didn't want to be in the limelight. He was especially concerned that someone may look at his record and in hindsight consider something untoward that was perfectly acceptable at the time. Eventually, then-Defense Secretary Dick Cheney thought Scooter was at a disadvantage at the table when meeting with counterparts from other agencies who had been confirmed. Mr. Cheney created a confirmable post at the Pentagon for Scooter. The confirmation hearing was uneventful. I had the privilege of attending his swearing in.

Scooter's fears about Monday morning quarterbacking proved prescient when, in the furor over President Clinton's pardon of Marc Rich, Congress called Scooter to testify about his representation of Mr. Rich. Scooter asked me if I thought the story would have legs. I told him I doubted it. For one thing, he had testified fully. He did not act as if he had anything to hide. Second, he had not represented Mr. Rich in the request for a pardon, but rather on tax evasion charges. Third, Justice Ginsburg's husband, Marty, a top tax lawyer and a Democrat, had produced an analysis that supported the legal position Scooter had taken for Mr. Rich. Finally, ███████████████████████ who was an investigative reporter and had looked into the charges against Mr. Rich reached the startling conclusion (for her) that the charges didn't hold much water. This was a reporter whose instinct was to conclude the opposite, to lock someone up and toss away the key. Put all of that together, and I predicted the story about his representation would vanish. And it did. But that is the Scooter I know: One who acts as if he has nothing to hide because he doesn't. The Scooter portrayed by the prosecution is not the policy wonk I have known for four decades.

This whole affair is, unfortunately, too similar to something that happened on a lesser scale to Scooter's wife, Harriet, in the wake of her service as Chief Nominations Counsel to then-Senate Judiciary Chairman Joseph Biden. She was pilloried in a book about Anita Hill because she had taken a principled stand. ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ Thus the name of a dedicated Democratic public servant was dragged through the mud unfairly.

Now I fear the same thing is happening to her husband. As someone who has observed Washington carefully and professionally for three decades, I find nothing more

troubling than the prospect that top-flight public servants such as Scooter and Harriet pay such a heavy price for their service to their country. I fear for the country if such bright lights decide it simply is not worth serving in government. I hope and pray that you can see your way to avoid making the price of service for Scooter, Harriet, and their young children any higher than the far too high price they already have paid.

Thank you so much for considering this letter.

Very truly yours,

Stan Crock



March 28, 2007

Judge Reggie B. Walton
U.S. District Court
Washington DC

Dear Judge Walton,

No one asked me to write this letter and, as a former Secretary of the Navy and Under Secretary of the Navy in the Clinton Administration, I strongly disagree with many of Scooter Libby's views about policy and politics. Nonetheless, I have some experience with Mr. Libby that may contribute to a fuller perspective of him and as a member of the D.C. Bar I feel some obligation to add it to the record as you consider sentencing.

While in my Department of Defense positions I focused, at first as a subsidiary exercise but then with increasing emphasis, on the risks we faced from biowarfare and bioterrorism. Reviewing the history on this point, I found that Mr. Libby had responsibility for these issues before the first Iraq War and had discharged this responsibility with energy and competence. Notwithstanding partisan differences, when I asked him to meet with me I found him to be unstintingly candid and helpful. Over the decade from about 1994-2004 I met with Mr. Libby about a dozen times, always without public visibility and always in an effort to further our national interest. I found him to be no different in his thoughtfulness, decency and dedication to the public interest when he was at the center than when he was at the margins of power. There is in Scooter Libby a gentleness, self-effacement, and ultimate care about the public interest that warrants respect --- even honor --- no matter how much I may disagree with his views or, more seriously, you may assess his integrity in the particular events before you.

I would not presume to comment on what happened in the activities that have resulted in his conviction. My own experience, however, leads me to believe that this is a remarkably sincere public servant who has sacrificed money, fame, and position over a long number of years in order to serve his fellow citizens. I would hope that you would take this into account in your reckoning of how much he may now owe us.

Sincerely,

Richard Danzig

April 11, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue NW
Washington, DC 20001

Dear Judge Walton:

I am a writer--author of six books, mostly in the field of
social criticism--and I also worked for some years as an
editor in a publishing company.  In the 1980s I left my job
to serve as the executive director of the Committee for the
Free World, an organization of journalists, professors,
scientists, labor leaders and concerned citizens devoted to
countering the disrespect for American institutions and
values that we feared was beginning to seep into the very
pores of American culture and education. (When the Soviet
Union collapsed, the Committee folded, and I became a full-
time author.)

Now I am writing to you about Scooter Libby, out of my
unshakable conviction that the Scooter Libby I have known
for a number of years now is someone about whom such crimes
as perjury and obstruction of justice seem as improbable to
me as life on Mars.  Down through the years I have not seen
him with any frequency--I live in New York, and he, of
course, has long lived and worked in Washington, a place
that I visit no more than three or four times a year and
then only briefly--but we have maintained contact through
mutual friends and interests.  And I have never known him
to be anything but straight, decent, and deeply
responsible.  The government of the United States of
America has been fortunate to attract a man of his
intellectual as well as moral caliber to serve it (when he
might instead, for instance, have applied his many talents
to becoming wealthy), and I can only hope that he will one
day in the future be called upon to serve it again.

Sincerely yours,

Midge Decter

*American Enterprise Institute for Public Policy Research*



Christopher C. DeMuth
President

April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

*Re: Sentencing of I. Lewis Libby*

Dear Judge Walton:

I am writing to offer a few personal insights into the character and integrity of my friend Scooter Libby that argue strongly for leniency in your upcoming sentencing decision.

I have been president of the American Enterprise Institute since 1986. I am a graduate of Harvard College and the University of Chicago Law School. Between college and law school I was a staff assistant to the president in the first two years of the Nixon Administration, working for Daniel P. Moynihan on urban affairs and welfare policy. After law school I practiced for several years with Sidley & Austin and was assistant general counsel of the Consolidated Rail Corporation. Subsequently I was on the faculty of the Kennedy School of Government and director of the Harvard Faculty Project on Regulation; administrator of the Office of Information and Regulatory Affairs at the Office of Management and Budget in the first term of President Ronald Reagan; managing director of Lexecon, Inc. (a law-and-economics consulting firm); and publisher and editor-in-chief of *Regulation* magazine. I have served on the visiting committees of the Kennedy School and the University of Chicago Law School. My primary areas of academic research and writing, law practice, government service, and economic consulting have been government regulation and administrative law, environmental policy, antitrust, and intellectual property.

I first met Scooter Libby in the 1970s, when a partner at Sidley & Austin introduced me to an ABA section concerned with national security issues of which Scooter was a part. We became better acquainted when I moved to Washington in 1981 and, especially, after 1984 when I was an economic consultant and worked on several cases (including one criminal case) for his law firm, Dickstein Shapiro. Scooter and I remained friends after I came to the American Enterprise Institute; he participated in occasional AEI projects and conferences. In 2001–2005, when Scooter was chief of staff to Vice President Cheney (also a friend of mine and a former AEI senior fellow and trustee), our relationship intensified and included many meetings to discuss policy

1150 Seventeenth Street, N.W., Washington, D.C. 20036    202.862.5895    Fax 202.862.5921    E-mail: cdemuth@aei.org

The Honorable Reggie B. Walton
April 27, 2007
Page 2

(especially defense and foreign policy) and personnel (Administration appointment) issues. Following his indictment in the case before you, I have tried to be a good friend and sympathetic supporter for Scooter and his family and have contributed to his legal defense fund.

In my various occupations and in my many years in Washington, I have encountered individuals of high, medium, and low integrity — some people of exemplary character, some scoundrels and opportunists, and many between the two extremes. I have always regarded Scooter Libby as someone in the former category, a man of the highest integrity — utterly honest, conscientious, discrete, modest, and devoted to his family, community, and nation. We have been close professional colleagues rather than intimate friends, so I cannot offer the kinds of personal anecdotes that I understand a judge in your position is interested in hearing about. But I know him well and we have collaborated on legal cases (in the 1980s) and policy issues (in recent years) in circumstances that were often momentous, complex, contentious, and fraught with uncertainties. From these character-revealing experiences I can attest to the following:

1. Scooter is devoted to truth. Where questions of legal representation or government policy were at issue, and others were focused on strategy and tactics, Scooter has been unfailingly concerned with the truth of the matter at hand as the basis for right decisions. When we have consulted in recent years on issues of government policy, he has been exclusively and intently concerned with the facts and objective merits of the issue — especially where partisan considerations, ideology, or "conventional wisdom" seemed to be pointing toward ill-considered decisions. When we have consulted on appointments, his first interest has always been in the personal character and objective professional qualifications of the individual under discussion.

2. Scooter is serious and discrete. I have never met a Washington lawyer or government official more completely devoted to the substance of his work and more incapable of, or immune to, gossip, small-talk, or trivia. In the course of innumerable conversations during his recent White House tour, he never once uttered a word that was "out of school," indiscreet, careless of the interests of others, or unworthy of the seriousness of the subject at hand.

3. Scooter is a scholar. He is very well-read, especially in history and literature and in various academic journals, and to an unusual degree he applies the learning and wisdom that he has acquired to his professional and personal life.

The Honorable Reggie B. Walton
April 27, 2007
Page 3

4.  Scooter is selfless.  I have never once heard him name-drop, exaggerate, or take credit for anything—including when credit was richly deserved.  I happen to know that he has made tremendous positive contributions to good government and American well-being.  But it would never occur to him to mention them.  He takes his satisfactions from intrinsic results; he does not avoid thankless assignments, and when questions of credit arise he instinctively points to others.

5.  Scooter is devoted to his family and vocation.  In the course of his recent White House years he may have turned down more invitations to downtown institutional receptions, dinner parties, and other social events than any other senior official.  He is not the least bit anti-social, but rather is kind, generous, and gently convivial.  But in an intense and demanding job, when he has not been at the office he has been home with his wife and young children.  During his recent travails he has seemed to me to be more intent on protecting them than on protecting himself.

6.  Scooter is a patriot.  He is an understated, undemonstrative man, but his love for and devotion to America is palpable to anyone who has worked with him.  It is his quiet patriotism, rather than careerism in even the slightest degree, that has motivated his public service and the serious, principled, and selfless manner in which he has conducted himself.

Mr. Libby is a man of high and consistent virtue.  The personal traits that I have described are characteristic, not selective, and they are obviously inconsistent with the acts for which he has been convicted.  He also possesses the intellect, inclination, and resilience to contribute much more to his family, community, and nation.  For these reasons, I believe that his case is one that merits extraordinary leniency from the sentencing judge.

I appreciate the opportunity to submit this letter for your consideration and hope that it is helpful to you.

Yours truly,

Christopher DeMuth

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

Scooter Libby is one of the most genuine, kind, hardworking and patriotic people I know.
I got to know Scooter and his family very well when I worked with him in the Office of
the Vice President. In my capacity as the vice president's residence manager and social
secretary, I often saw Scooter daily and interacted with him and his family in and outside
of work.

From the first time I met Scooter, I was impressed. I knew he was bright and in a
position of power, but he never had airs about him. As long as I have known him, in the
best of times and the worst, he is always the same upbeat, pleasant guy.

Scooter is dedicated to our country and works tirelessly on behalf our nation's security.
Post September 11, 2001, I sharpened my view of Scooter, as I watched him work harder
and harder. His work-life became all-consuming, and I often worried about his health
and his family as his days grew longer and his workload mounted.

Scooter started his day at The Vice President's Residence. He got up early, got his own
intelligence briefing at his house before coming to the vice president's house. Once at
The Vice President's Residence, he sat through much of the same information again as
the vice president heard it for the first time. He did this so he could offer the best advice
for the vice president, if he was asked. This is the Scooter I know - always the thoughtful
staffer, not wanting to waste his boss's time.

Throughout the day, Scooter shadowed the vice president everywhere-briefing him,
supporting him, staffing him. And when many people were heading home at the end of a
typical, long White House day, Scooter went back to his office and put his day's worth of
meetings into action. He met with staff, returned phone calls. Sometimes he stayed all
night to get the job done.

I remember hearing from Scooter's assistant how Scooter would practically abandon his
car in places all across town because he had to leave it to get to another meeting in

RE: Scooter Libby
Page 2

support of the vice president. It was often a challenge for Scooter to figure out the logistics of supporting the vice president and still get to his car at the end of the day. He was just that busy. And though it was clear to me that Scooter was tired, he never complained and always had a smile and kind words when you saw him.

Scooter is selfless and even when a heavy workload preoccupied his mind, Scooter never forgot others. When my brother was deployed to Iraq, Scooter sought me out to tell me stories of all the good things my brother, ████ and his unit were doing in northern Iraq. After my conversations with Scooter, I would immediately call my parents and repeat what he had shared. He has no idea how much comfort he gave me and my family when we were all so worried.

After Scooter was indicted and he lost his job working in the White House, he remained interested in my brother's well-being. At a time when he could have been focused on just himself, he remained committed to ████ When I had a party welcoming ████ ome, Scooter showed up for us when it would have been easier for him to just to hide out. He knew no one at the party, but he and Harriet came and stayed for an hour talking to my brother absorbing everything he had to say about his wartime experience. My brother and Scooter compared notes on people, places and by brother's perception of the war. At the end of the conversation, it was clear to me that Scooter wanted my brother's honest assessment of how things were going over there. Even when Scooter didn't have the job he was so passionate about, he was still very passionate about the morale of our troops, the safety of our country and doing the right thing in Iraq.

The last day Scooter walked out of the White House, my heart broke. I could feel a vacuum sucking the wind out of our office, out of the White House. I could feel his absence immediately in a very large way. I still can't figure it out. This is a good man who has sacrificed so much of his life to do what he thinks is right for our country, and in the end, he was asked to stop doing that. I think our country, if not the world, lost when we lost him.

Throughout all of the ups and downs of a job that required so much of his time, his family has always supportive, and they love him so much. He sacrificed so much of his time with them to do so much good for this country and to give them and all of us a safer future. So now it would be an even greater loss if he had to lose any more time with them.

I know Scooter is a good man. I know him well, and I hope I have helped you get to know him a little better. Thank you for your time.

Sincerely,

*Elizabeth A. Dunn*



James Denton
Executive Director and Chief Operating Officer

1319 Eighteenth Street, NW, Washington, DC 20036-1802 ⚑ T: 202.296.6267 ext. 1266 ⚑ F: 202.296.5149
jdenton@heldref.org ⚑ www.heldref.org

### heldref
#### PUBLICATIONS

May 10, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington DC 20001

Dear Judge Walton,

I am the executive director of Heldref Publications. We publish about 50 magazines and
academic journals on a range of topics including education, environment, international
relations and medical science. I have previously served in leading staff or consulting
positions at the Corporation for Public Broadcasting, the National Democratic Institute. I
was the executive director of Freedom House during the period of revolutionary
democratic change in Eastern Europe. Founded by Eleanor Roosevelt and Wendell
Willikie—Freedom House is the oldest and most prominent human rights and
democratization group in the USA. I was a naval officer for five years out of college. I
have formally represented heads of state and government in the United States. I am the
father of two perfect young women. I have attached a bio.

I first met Scooter Libby on a sandlot football field across from American University in
the 80s when we were among a group of weekend semi-jocks still in denial of our lost
youth and declining vigor. We played every Sunday, rain or snow, for about six months
at a stretch for about 4-5 years. Eventually I dropped out, but I understand Scooter is still
at it. Years later, I would direct Freedom House—America's most prestigious human
rights monitor and democracy advocate worldwide. It was founded by Eleanor Roosevelt
and Wendell Willkie and continues to be led by a bipartisan group of distinguished
American and foreign security experts and leaders. Scooter eventually left government
and as soon as he did he joined our board of advisors and I took great pride that he
formally identified himself with our work.

I didn't know anything about Scooter when I met him on the football field. But in the first
weeks I could see from the respect and deference others showed him that perhaps he was

"someone important." But, I distinctly remember that the image didn't quite fit because he didn't act like an important someone, if you know what I mean. He just played football hard and well and I more or less decided the source of his respect had something to do with his on-the-field determination, focus and prowess. He was a soft spoken and unassuming but sure-handed and fleet-footed. He was the consummate team player. When Scooter complimented a pass or catch you'd made, you noticed. Everyone on his field knew he was the leader and that a compliment from Scooter raised you up.

Athletic competition has a way of revealing your qualities or exposing your shortcomings. Scooter was in a class by himself on the field. He was all quality and everyone knew it.

In time, I learned that Scooter was, as I recall the Principle Deputy Assistant Secretary in the Office of Policy at the Department of Defense under Secretary Cheney. It was the late 80s and the Soviet Empire was loosening up. At that time, I was running a small but feisty foundation that was part of a community of non-profit groups promoting political and economic pluralism and an independent judiciary in Eastern Europe and the Soviet Union. In those early years, we were supporting bands of Solidarity students and intellectuals in Poland, and similarly disposed groups in Hungary and what was then Czechoslovakia. I was working with dissidents, among them, Lech Walesa (who I later represented in the US in 1990 until he became Poland's first modern-day elected president) and Vaslev Havel (who would be elected President of Czechoslovakia and would serve on my board for six years).

Early in 1989, I called Scooter at DOD for the first time hoping to get an appointment with someone to explain what we were doing and seeing in the region. It's difficult to recall today, but the idea that the Warsaw Pact would dissolve and democracy would spread in Eastern Europe--or that NATO would expand--was not being seriously considered at that time. So, I was surprised to get through to Scooter and stunned that he quickly convened a small group of experts to hear me out. From that day, Scooter has shown himself to me to be a dedicated and intelligent advocate for freedom, democracy and civil liberties in the world. Ever conscious of the potential danger in a power vacuum, Scooter became an avid consumer of information, always expressing interest in the human beings involved and the opportunities and dangers they faced. While he was especially alert to their safety and security needs, he was also eager that they be supported in ways that would equip them with the professional know-how and experience they would need to successfully transform their countries from closed communist systems to open and pluralistic systems.

His support never involved government grants or anything related to finances. His contributions were infinitely more valuable. Given his stature in officialdom and his reputation, when Scooter asked others to help--doors and possibilities opened and things just happened. Whether he was in or out of government, Scooter found the time (unfailingly) to meet with support the democratic advocates in the region. He offered generous amounts of time when there was nothing really "in it" for him, important insight, sage advise, inspiration and encouragement to many of the new leaders who

visited Washington DC—among them, Prime Minister Zoran Djindjic of Serbia shortly after he dethroned and extradited the dictator Milosevic; Ambassador Zantovsky of the Czech Republic to discuss international trade/security relations and the countless young people with no official stature to whom Scooter showed every courtesy. He never failed to make the US government seem a lot smarter than it often deserved. And, he never failed to make me proud of my government and country.

I don't claim to be a close personal friend of Scooter. Our social encounters have been very few. My encounters with him on professional matters, however, have been more regular. No matter what his position in or out of government, he has returned calls, often from home, and helped out--usually doing more than was expected.  He has been kind and generous and modest and unassuming. The football player is the policymaker is the lawyer is the friend—all the same person. Throughout my association with him, I have often remarked that Scooter Libby is among small group of people in Washington whose integrity is unmatched by any pursuit of personal interest. In more recent and visible years, when that view might seem counterintuitive to a reader of the newspapers, I sought opportunities to add emphasis to say that Scooter Libby has more integrity in his fingernails than do most Washingtonians. In my experience, he is the ideal and consummate public servant.

Sincerely,

James S. Denton
Executive Director/Publisher



**diGENOVA & TOENSING, LLP**
ATTORNEYS-AT-LAW

May 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

Our interest in this case developed solely as a professional matter. We had met Scooter only once, and briefly, prior to this investigation. So our knowledge of him was limited to his superb professional reputation. Yet, as the investigation continued and we wrote and commented on the legal issues, we met not only Scooter and Harriet, but also their numerous supportive friends.

One incident stood out to us that we want to share with the Court. On a particularly rough trial day, Victoria approached Scooter at a break and invited him and Harriet to come over for dinner as a social break from the pressure. One could tell by looking at Scooter's expression that he would have loved to do so. Yet, he immediately replied, "No, Harriet and I need to be with the kids. It's important we spend time with them now." We were so touched that in the midst of his ordeal, his priority was his family.

This priority reflects a man of deep commitment to those dependent upon him and to a set of values worthy of recognition by the Court. We respectfully urge the Court to impose a sentence of probation on this honorable and caring man whose history of valued public service is equally worthy of consideration. Thank you.

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001
May 24, 2007
Page 2


Sincerely,


Victoria Toensing


Joseph E. diGenova



*Brian E. Doll*

April 29, 2007

The Honorable Reggie B. Walton
United States District Court
United States Courthouse
1225 E. Barrett Prettyman
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to you in support of Scooter Libby. I am a 56 year old Chemical Engineer who has spent the majority of his career solving environmental problems for a large multinational corporation. On February 28 of this year I was invited to speak as an expert panelist to the United Nations Commission on Sustainable Development in New York at the panel session on Air Pollution. I have known Scooter Libby for nine years.

I have sat through many soccer games and basketball games with Scooter over the years watching our sons compete. I have visited his home and have had him as a guest in my home on numerous occasions. I have also seen him at various elementary school plays and other events where he would come to support his children.

In all this time, I never heard Scooter utter an unkind word about anybody, even though the questionable officiating at our sons' sporting events typically provided a golden opportunity to vent. Our conversations frequently related to current events in Washington and Scooter was continually focused on what was best for our country.

I have always regarded Scooter with the greatest respect and view him as a man of sterling character and integrity. He has devoted years in service to our country.

Scooter's character is inconsistent with his conviction for perjury and obstruction of justice. I believe that sentencing him to prison would harm not just Scooter, but his wife Harriet, his teenage son ▉▉ and his young daughter ▉▉▉▉▉▉▉▉ are at critical developmental stages of their young lives. They really need their Dad at home.

Regardless of the final outcome of this trial, Scooter Libby will always be welcome in our home and I will remain proud to call him my friend.

Sincerely yours,

Brian E. Doll

██████████

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
United States Courthouse
1225 E. Barrett Prettyman
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am grateful for the opportunity to write this letter in support of Scooter Libby, a man I admire. After working in Utah as a prosecutor, I moved to Washington, DC to serve as an attorney in the Department of Labor. At present, I am a member of the Utah State Bar. In the nine years that my family has had the privilege of knowing Scooter Libby, he has always been a man of excellent character and unquestionable integrity as demonstrated by his actions as a caring and devoted father, son, and husband.

When Scooter's son and ours met at kindergarten orientation in 1997, they were both wearing Power Ranger shoes and they became instant friends. Scooter's wife Harriet and I arranged a play date for the boys. I was impressed that Scooter joined his family for that play date. He was the only father on the playground. In spite of Scooter's busy schedule, he took the time to meet his son's new friend and devote the day to his family.

Over the past years, Scooter has attended and supported numerous school events, parties, and trips. I can still see him seated on a blanket on the blacktop to picnic with his children, ████████████ during the first grade Reading Rodeo. Scooter was often the only father attending even the most routine school activities. It was obvious that he enjoyed being with his family and that he was making time to show his children how important they were in his life.

Scooter also was a regular at his children's soccer and basketball games. While visiting with him during these times I was treated with the same kind and gentle demeanor he gave to his family and acquaintances. Always, he was positive and encouraging as he interacted with his children.

As a devoted father, Scooter was present not only at Hal's birthday parties, but also in our home when our son celebrated his own birthday. Once, Scooter asked my advice on a gift for ███████████████, and I noted that such a busy man would take the time to personally buy his son a gift rather than passing the task on to his wife. This is just one example of his devotion to his wife Harriet. He always treated her with respect and kindness as he supported her involvement with the children and the community.

As a devoted son to his elderly parents, Scooter was ever attentive to their needs, both physical and emotional. I watched him include his parents in his son's birthday party activities and engage them in conversation. Scooter also ensured that they always had time with their grandchildren.

This is the decent man I know. Scooter's character, as evidenced by his devotion to family, is inconsistent with his conviction for perjury and obstruction of justice. Now more than ever, at this critical time in his children's lives, they need their father to provide the kind of support, love, and guidance that they have always relied on. They need him home.

Please allow Scooter the opportunity to see his son go from kindergarten orientation Power Ranger shoes to high school graduation dress shoes.

Sincerely yours,

Donna Doll

April 25, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, Northwest
Washington, D.C 20001

Dear Judge Walton:

I am writing to ask for the Court's understanding and compassion as you consider
sentencing for my friend and former colleague, Scooter Libby.

I have known Scooter for more than fifteen years, both personally and professionally. He
and I became friends in the early 1990's when we worked at the Department of Defense.
I had come to DoD to serve as Deputy Assistant Secretary of Defense for InterAmerican
Affairs after being a Congressional staffer and holding several posts at the Department of
State and in the Reagan White House. Though we were at different levels and in different
parts of the Undersecretary for Policy's operation, Scooter went out of his way to help a
junior colleague survive and succeed in what was then a challenging and sometimes
hostile environment for a 30 year old single woman. Scooter's wise counsel, dedication
to public service, and sense of humor taught me a lot about government service in the
three years that we served together in the Pentagon.

Our professional connection resumed in 2000 when President Bush was elected and
Scooter became the Vice President's Chief of Staff. I agreed to come on board as the
Vice President's Assistant for Legislative Affairs and later Deputy Director of the Office
of Management and Budget. I served alongside Scooter through the turbulent times
associated with September 11, the economic recession, the anthrax incident on Capitol
Hill, the Afghanistan campaign and the first year of the Iraq conflict. During all those
times and under extreme pressure, Scooter drove himself mercilessly. His intellect, his
strategic thinking and his broad range of experience both in and out of government put
him at the center of almost every debate. Though he often saw his wife and children for
only a few hours on weekends and late at night, he always was concerned about me
getting home to my family and worried about the effect of long hours and work pressures
on marriages and families.

Luckily, Scooter has in Harriet Grant an incredibly supportive and loving spouse and two
wonderful children. I have known all four of them over the years, as their children are
roughly the same ages as mine. We commiserated about the missed soccer games, the
homework woes and the truncated vacations that come with public service. Harriet and
the children had given up a lot during Scooter's White House tenure but had hoped that at
the end of the term, they would return to a more normal family life. It is truly tragic to
think that they would suffer both the emotional, economic and social costs associated
with a lengthy sentence, after all they have been through to date.

Scooter has devoted at least half of his professional life to public service. He has been a friend, colleague and mentor to many young people who came to Washington not for public gain but to serve their country. I count myself among that group. At no time during the fifteen years that I have known him have I ever had reason to question his integrity or his true commitment to public service.

I hope that the Court will take into account Scooter's dedicated service to the United States, and the needs of his family when considering this case. The last eighteen months have been a nightmare for such a man and his family. Scooter has been punished in the press and the public eye beyond all reason. He is deserving of all the wisdom and compassion the Court can muster.

Thank you for the opportunity to express my views.

Sincerely,

Nancy Dorn

*ERIC AND PATRICIA EDELMAN*



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue
Washington, D.C. 20001

Dear Judge Walton,

I am a career Foreign Service Officer now entering my 28th year of service. I currently am on detail to the Department of Defense where I serve as the Under Secretary of Defense for Policy. This is the second time I have served at DoD having been detailed before from 1990-93.

In that context I have known Scooter Libby for about 26 years. I first worked with him when he was a speechwriter for Secretaries of State Al Haig and George Shultz and I was a member of the Secretariat Staff and then Special Assistant to Secretary Shultz. I continued to work with Mr. Libby when he became a senior aide to the Assistant Secretary of State for Asian Affairs.

In 1990 Mr. Libby, then serving as Principal Deputy Under Secretary of Defense for Policy, asked me to join his staff as Assistant Deputy Under Secretary for Soviet and East European Affairs in which capacity I served for three years. In December 2000, when he was contemplating leaving behind his highly successful career as an attorney in the private sector, he asked me to return from service overseas as the U.S. Ambassador to Finland to join him on the staff of the Office of Vice President Cheney where I served from 2001-03 as the Principal Deputy Assistant to the Vice President for National Security Affairs.

During the course of this long association I came to know Mr. Libby and his family in both a professional and personal capacity. He was a deeply dedicated public servant whom I saw working long hours during the first Gulf War and in the months after the September 11 attacks on New York and Washington. He was motivated by an extraordinary commitment to protecting the nation from terrorist attacks, and particularly those that might involve mass casualties from nuclear, chemical or biological weapons. His knowledge and expertise in these matters predisposed him to raise concerns and possible scenarios that others had simply overlooked, particularly in the areas of transportation security and bio-defense.

In the weeks after September 11 he drove himself relentlessly and suffered frequent separations from his family as he accompanied the Vice President to undisclosed locations to preserve the continuity of government in the event of a

second wave of terrorist attacks. An intellectually demanding boss who held also a devoted husband and father and a compassionate supervisor. Even during stressful periods of work filled with 16 or 18 hour days during the military operations in Afghanistan or during the diplomatic run-up to the war in Iraq, he found time to attend his son's sporting events. He was understanding and considerate when I asked for time to attend to my family's needs as well whether for vacations or family events away from Washington.

His loyalty to individuals and the nation was unwavering. Throughout his tenure at the White House he sought to ensure that outstanding public servants, like Amb. Zalmay Khalilzad, had a chance to serve the country at the White House as well as in Kabul and Baghdad. When military officers serving in the Office of the Vice President asked to be released for service in Iraq he personally saw to it that their orders were cut to get them to the theatre of operations.

Mr. Libby was one of the most dedicated public servants I have known in my career. His devotion to the cause of defending the American public was extraordinary. I believe that his honesty, integrity and diligence in that regard has led even many who have criticized the Bush Administration's policies but who know him, like Frances Fukuyama, to raise their voices on his behalf. I can say without any doubt that his conviction for perjury and obstruction of justice is at complete variance with everything I know about him and the integrity he has displayed in his distinguished career as a government official.

I hope these reflections are useful to you as you weigh your own serious responsibilities in this case.

Sincerely,

Eric S. Edelman

4/21/07

# GARY R. EDSON



April 22, 2007

The Honorable Reggie B. Watson
United States District Court
1225 E. Barrett Prettyman
 United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

I served in the Reagan Administration (as Special Assistant to the Deputy Secretary of State), the Administration of George H. W. Bush (as Chief of Staff and General Counsel to Carla Hills, the U.S. Trade Representative), and in the current Bush Administration, where I spent the first term as Deputy National Security Advisor and Deputy Assistant to the President for International Economic Affairs. I first met Scooter Libby in the Reagan Administration and have known him for roughly 25 years, and have been friends with his wife and children, as well. Indeed, in between government service, when I was in business in Chicago, I would often stay at the Libby's home when I visited Washington.

But despite the demands of his job, and the obvious pressure Scooter has been under these last few years, he found time to frequently call and even to visit with me throughout an extremely difficult period for me, my wife, and our two small children, who are close in age to Scooter's own children. His concern, sympathy and empathy – given his own young family – were a great morale boost for me.

From my 25 years of friendship with Scooter, in and out of government, it is my firm belief that his conviction for perjury and obstruction of justice is utterly inconsistent with my knowledge of – and direct experience with – his character, integrity, and humility.

I know from personal experience and observation, how fast paced and demanding his job was as Chief of Staff to the Vice President, and the enormous workload he labored under on a daily basis, juggling several jobs, multiple issues, and myriad meetings. His dedication to public service and to his country was obvious to all.

Yet, whenever I had a problem, especially a personal one, and needed his advice, he always took the time not merely to talk with me, but to make time to meet for a lunch or

1

breakfast, where I could share my issues in a more relaxed way. These issues often involved career advice or advice on how to balance the demands of my job and my young family – an issue I know he struggled with, as well.  I valued these occasions because, while I have been fortunate to know and work with many accomplished people with great analytic skills, I have known few with the heart and keen judgment that Scooter possesses.

[text redacted] *Pres[?] father in*

[text redacted]. I have always said that if I should ever be in need of candid counsel and honest, unvarnished advice, the first person I would call would be Scooter Libby.

Also, when my father needed business advice regarding entering certain foreign markets, Scooter generously arranged several meetings with my father and his companies' leaders on a purely pro bono basis to give his advice and judgment. It turned out to be extremely helpful.

In short, my own 25 years of personal experience have tangibly demonstrated to me Scooter Libby's generosity of spirit, the integrity of his intellect, and the honesty of his heart. I admire him and am proud to be his friend.

Sincerely,

Gary R. Edson

2

# Dechert
### LLP

1775 I Street, N.W.
Washington, D.C. 20006-2401
+1 202 261 3300  Main
+1 202 261 3333  Fax
www.dechert.com

**FRANK J. EISENHART**

frank.eisenhart@dechert.com
+1 202 261 3306  Direct
+1 202 261 3006  Fax

May 3, 2007


The Honorable Reggie B. Walton
United States District Court for The District of Columbia
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:     I. Lewis Libby

Dear Judge Walton:

My name is Frank Eisenhart.  I am a Partner in the law firm Dechert LLP, and from 1995 to June 6, 2000 I served as the Managing Partner of the Firm's Washington Office.  I am sixty-one years old, and I have spent my entire legal career at Dechert – the first seventeen years in the Firm's Philadelphia Office, and the last eighteen years in Washington.  I am a litigator specializing in Banking and Securities Litigation.  For five years I was pleased to call Scooter Libby my Partner. For the past twelve years, I have been pleased to call him my friend.

I first met Scooter in 1995 when he and several other lawyers from the old Mudge Rose law firm joined Dechert in the Washington Office.  I was deeply involved in the negotiations that preceded their coming to Dechert, and from the beginning it was apparent to me that the prize in this package was Scooter Libby.  I was not wrong about that.  Scooter quickly became an integral and important part of this office, particularly in the ongoing effort to define the strategic image of what this office should be.  It was no surprise to me that when my term as Managing Partner ended in 2000, Scooter was picked to be my successor.  His departure for the White House at the end of 2000 was a sad day for us in the Dechert Washington Office, but we saw it as a happy day for our country.

The Scooter Libby I know is a man who is highly intelligent, loyal, patriotic and of the highest integrity.  As I have watched this tragedy unfold over the past several years, I have been deeply perplexed as well as deeply saddened.  What Scooter has been accused, and now convicted, of doing is something that the Scooter I know is simply not capable of doing.  The hurt that this whole episode inflicts on Scooter, his family and our country greatly saddens me.  I am fully familiar with the various ends that are served by criminal punishment, and I cannot imagine what purpose could be served by inflicting criminal punishment on Scooter Libby.



The Honorable Reggie B. Walton
May 3, 2007
Page 2

I ask Your Honor to impose a sentence that does not add further tragedy to what is already a too tragic situation.

Very truly yours,

Frank J. Eisenhart

15 April 2007

Fritz W. Ermarth



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing you in consideration of the decisions you must make with respect to sentencing and other matters in the case of I. Lewis Libby. I am a retired officer of the Central Intelligence Agency of some 25 years service and a veteran of work on US national security spanning more than 40 years, involving intelligence, defense, and foreign policy affairs, in government, think tanks, and private industry. Not incidentally, in that capacity I have long known that effective "cover" is a robust practical reality assured by diligent, sustained, and expensive effort; it is not a formal or bureaucratic arrangement or designation compomisable by casual awareness of the covered person's open activities.

I have known Mr. Libby in several public and private capacities since the late 1980s when he served in the Office of the Secretary of Defense and I was Chairman of the National Intelligence Council. Throughout our association, I have known Mr. Libby as the most honest and reliable public servant and the most decent of human beings.

In the context of the case before you, Your Honor, I know Mr. Libby best as a lawyer. Some years ago, I retained him for advice and representation in a matter, although less grave, somewhat similar to that which put him on trial. It concerned official secrecy and classification, its definition and interpretation, varying recollections of who behaved how with respect to it, and aspects of abuse by authorities. In this case, Mr. Libby's advice to me was to behave strictly by the rules very strictly constructed and to trust the decency and honesty of the process, even if that trust was not entirely justified. The Libby I know from this experience would never intentionally misrepresent his recollections to investigators, much less lie under oath, especially for the supposed aim of protecting his job where he  knew there was no underlying crime.

Also relevant, Your Honor, I know from long personal experience in intelligence and national security work that accurately remembering the provenance…from whom, from what document, when…of a learned fact or allegation is much more difficult than remembering the fact or allegation, especially when neither the fact nor its provenance were initially recognized as terribly significant.

I firmly believe that Mr. Libby has suffered a grave injustice. And I devoutly hope that my reflections on him will favorably influence your decisions.

Very respectfully,

Fritz W. Ermarth



April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to report information about the character of Mr. Scooter Libby that I believe is relevant to your consideration of an appropriate sentence. Much of my knowledge of Scooter was acquired when he was Deputy Undersecretary of Defense for Policy (1989-1993). I have been a career civil servant in the Defense Department for 26 years, 20 of them as Deputy Director of Net Assessment, a small office that serves the Secretary of Defense as an internal think tank for long range strategic issues.

Scooter's years of devotion to public service speak for themselves. The quality and intensity of that service are what I observed and can testify to. At the Pentagon I had regular contact with Scooter due to our common focus on the Soviet Union, which was then in a period of enormous uncertainty and upheaval. Scooter greatly impressed me by his determination to fully understand for himself, and convey to his superiors, the complexity and details of the issues. He did not stand on ceremony or rank. His focus was relentlessly substantive, and he pored over analytical reports in a way that I do not believe is common in busy, high level political appointees. He educated himself about technical military issues previously unfamiliar to him. He was forthright about what he knew, and eager to learn from the knowledge of others. I believe his performance exemplified the very highest standards of government service.

Before and after his service in the Defense Department, Scooter was an attorney in private practice, and in both periods I know that he sacrificed many otherwise billable hours by serving the Department without pay. My office conducts an annual summer study, assembling several small groups of academics, military officers, and other experts to study issues of strategic importance. Scooter several times traveled to these events to work with the groups to sharpen their findings and their briefings for Defense Department officials. I encountered Scooter at several other activities where his participation was entirely pro bono. He served in 1988 on a panel to plan a reorganization of the office of the Undersecretary of Defense for Policy, and in 1999 on a privately organized study group on the emergence of China. I served

on the latter panel as part of my job; for Scooter it was unpaid public service.

I first met Scooter years before his Pentagon service at a Sunday morning pickup softball game. The weekly softball game is not a bad laboratory in showing human virtues and vices, and Scooter was always a man of exemplary sportsmanship and honesty, a modest, sympathetic manner, and simple human kindness, manifested most memorably to me in his warmly welcoming my then-young son into an adult game.

Scooter's outstanding talents and high level of energy made it easy to see why his contributions to any enterprise would be so highly valued. That so many of these contributions were dedicated to the national security of our country is, to me, cause for gratitude and inspiration, and something I hope will be weighed properly in his favor.

Sincerely yours,

David F. Epstein

Ruth S. Epstein



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
    United States Courthouse
333 Constitution Avenue, N.W.
Washington DC  20001

Re:  I. Lewis Libby

Dear Judge Walton:

I am writing in support of I. Lewis Libby, my friend and former partner, who is scheduled for sentencing before this Court on June 5, 2007.  I have known Mr. Libby personally and professionally for many years, and respectfully hope that my personal experience of his character and other virtues may be helpful to the Court in reaching a just decision.

I am a partner with the Washington, D.C. office of Dechert LLP, which I joined in the fall of 1999.  After my graduation from law school in 1977, I clerked for the Honorable William Wayne Justice in the United States District Court for the Eastern District of Texas.  Following that I spent five years with the Securities and Exchange Commission in D.C.,  beginning in the Division of Enforcement under Stanley Sporkin.  I have been in private practice since 1984, first at Covington & Burling and now at Dechert LLP, and in recent years have practiced mainly in the financial services industry.

Mr. Libby and I have been friends for about a decade, and were partners from 1999 until he left Dechert LLP in 2001.  Mr. Libby was, unintentionally on his part, an important influence on my decision to join Dechert.  Although he did not try to persuade me to leave my former firm, my experience of Mr. Libby's integrity, talents, and personal warmth added to my estimation of the firm he represented.

While he was with Dechert,  Mr. Libby made us a better firm, and he helped both his partners and his associates to become better lawyers.  He highlighted for us the importance of the professional, rather than the commercial, aspects of law.  He cared deeply about the world at large, and his work dealt with important, public issues.  He inspired associates and generously made the time and effort to mentor them.   He treated colleagues and staff alike with true gentility -- unfailingly accessible, respectful, and courteous to everyone around him.

The Honorable Reggie B. Walton
May 1, 2007
Page 2

Perhaps most importantly, Mr. Libby set an example for all of us by the extent and significance of his public interest work.  While Mr. Libby worked on many public interest matters throughout his career with Dechert, he remains best known here for his work for the Cox Committee in the late 1990s, assisting the Committee in the preparation and adoption of a bi-partisan report  on its investigation into the transfer of United States weapons technology to China.  It is characteristic of Mr. Libby that his pride in this work focuses on the bi-partisan nature of the Committee's report, and the ultimate adoption of the report by a unanimous vote of the Committee's five Republicans and four Democrats.  This work, which for many months required Mr. Libby's full time commitment,  was to a large extent done on a pro bono basis.

Many of us had only a general idea of the nature of Mr. Libby's public interest work.  And certainly we did not all  share his political views.  But we saw in him a fellow lawyer deeply engaged in work on policy issues critical to the national interest, and we saw our firm giving him the freedom to do so.  Our associates witnessed an individual of deep conviction and national reputation, who imposed on himself the highest standards of intellectual and moral rigor, yet whose dealings with all of us were marked by humility, openness, and interest in others rather than himself.

During his last year with Dechert, Mr. Libby  was the managing partner of our Washington office.  A natural leader, he seemed destined to rise to the top of our firm as a whole and maintain, if he chose, a thriving and lucrative private practice.  He did not so choose, answering rather to the call of full time public service.

In my dealings with Mr. Libby, he has been invariably honest, candid, straightforward, and open-minded – all in the highest degree.  Conduct at odds with these virtues would be entirely inconsistent with the individual that I have known and revered.

I hope I have conveyed at least a small part of the manner in which Mr. Libby reflected credit and honor on our firm and our profession.  I believe he has had a similar impact for the good in every setting where he has served.   I respectfully ask the Court to reach a resolution of this matter that will enable Mr. Libby immediately to dedicate his talents,  virtues, and selfless work ethic to  the service of the public good.

Thank you very much for your consideration of this letter.

Very truly yours,

Ruth S. Epstein



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

National Institutes of Health
National Institute of Allergy
and Infectious Diseases
Bethesda, Maryland 20892

Building 31, Room 7A-03
31 Center Drive, MSC 2520
National Institutes of Health
Bethesda, MD, 20892-2520

April 17, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: I. Lewis (Scooter) Libby

Dear Judge Walton:

My name is Anthony S. Fauci, M.D.   I am the Director of the National Institute of
Allergy and Infectious Diseases (NIAID), a component of the National Institutes of
Health (NIH), in the Department of Health and Human Services.  I have been Director of
NIAID since 1984. In this capacity, I am responsible for directing the bulk of Federally
funded research on emerging and re-emerging infectious diseases such as HIV/AIDS,
malaria, tuberculosis, and influenza among others.  In addition, NIAID has been given
the primary responsibility for conducting the biomedical research involved in the
development of countermeasures (diagnostics, therapeutics, and vaccines) for bioterror
threats such as the 2001 anthrax attack on our Nation.

It was in the context of my responsibilities to develop a strategic plan and research
agenda for the biodefense efforts of NIAID that I came to know Mr. Libby.  I have
known him and have worked with him for the past 5 years. Our nation was pressed to
develop and stockpile countermeasures against the high risk threats of bioterror such as
anthrax, smallpox, botulism, Ebola, as well as radiological, nuclear and chemical
weapons.  The office of the Vice President took a keen interest and was extremely helpful
to us in bridging the gaps between basic and applied research, production of
countermeasures and acquisition of the actual products.  Mr. Libby, in particular, showed
a genuine enthusiasm and commitment to helping in this complex task and would listen
intensively during the several times that I briefed him and the Vice President on the
progress that we were making.  I was impressed by his open-mindedness and his genuine
interest in listening and then offering to help in any way that he possibly could.  It was
very clear to me that his main interest was in protecting the Nation from terror attacks
and he made himself available to me with his support, encouragement, and excellent

ideas about how we could accomplish this common goal.  Although he is not a scientist by training, he is obviously a brilliant person who understood quickly and thoroughly the complexity of the issues related to the development of biodefense countermeasures.  In this regard, it was gratifying to see how this obviously extremely busy person would take the time to make himself available to listen and to help.

   His offers to help were not just hollow promises.  We identified a gap in the process of countermeasure development.  My institute performed much of the research and early development of products, but it was necessary to get the pharmaceutical industry involved in product development for purchase and deposit into the Strategic National Stockpile.  Mr. Libby worked closely with us in the development of  the "Project Bioshield" legislation.  Project Bioshield was created in order to have set-aside money for the guaranteed purchase by the Federal government of medical countermeasures against bioterror attacks.  The money would serve as an incentive for biotechnology and pharmaceutical companies to take the risk of entering a field of product development that was financially risky, since there was no guarantee that the product would ever be used.  I do not believe that we would have had the Bioshield legislation or several of the countermeasures that we now have in the Strategic National Stockpile were it not for the tireless efforts of Mr. Libby.  It was a pleasure to get to know Mr. Libby over the past 5 years. Throughout this entire period, I was impressed with Mr. Libby's integrity, honesty, unselfishness, and tireless efforts in helping to safeguard our Nation.  He is a very kind person, strong in character, but gentle and self-effacing. I have come to admire greatly this outstanding American.  It was a pleasure and an honor to have been able to work with him towards the goal of safeguarding the citizens of our Nation, and I hope that I will get the opportunity to do so again.

   Thank you for allowing me to express my views.  Best regards.

                              Sincerely,

                              Anthony S. Fauci, M.D.
                              Director
                              National Institute of Allergy and
                                   Infectious Diseases

# Douglas J. Feith



April 24, 2007

The Honorable Reggie B. Walton
U.S. District Court
1225 E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Re:  Lewis "Scooter" Libby

Dear Judge Walton:

I hope these observations about Lewis "Scooter" Libby will help you in your deliberations on his sentence.

I worked with Scooter closely in the government and came to know him fairly well.  We are not social friends, but, when he worked for the Vice President, I was the Under Secretary of Defense for Policy and we spent several hours together in meetings every week day, more or less, and occasionally on weekends too.

First, a word about my background:  I am now a professor at Georgetown University and teach national security affairs.  I received my bachelor's degree from Harvard College and a law degree from Georgetown University Law Center.  I worked at the White House and Pentagon in the Reagan administration.  In 1986 I left and, with a friend, started the Washington, DC law firm of Feith & Zell, PC.  I served as managing attorney of that firm until 2001, when I returned to government service as Under Secretary of Defense.  I held that position at the Pentagon until August 2005.  In addition to my Georgetown teaching, I am now writing a book about the war on terrorism and am a Visiting Scholar at Harvard's Kennedy School of Government and a Distinguished Visiting Fellow at the Hoover Institution at Stanford.

The Honorable Reggie B. Walton
Page 2
April 22, 2007

I first met Scooter, I think, approximately 18 years ago, during the George H.W. Bush administration, when he was in government and I was recently out. We became well acquainted with each other, however, only over the last six years, when we both worked for the government.

Scooter stood out in the government as a person of deeply philosophical outlook and humane principles. I spent hours with him discussing the U.S. Constitution, civil liberties and the history of how governments, in the name of public safety, have tended to limit civil liberties in times of war or crisis. In these discussions, Scooter showed an admirable concern for preserving civil liberties.

Scooter worried that liberties restricted during times of danger do not always get restored when the danger passes. A major part of the terrorist threat, he and I agreed, was the danger that a series of 9/11-types attacks could fundamentally alter – perhaps permanently – the state of civil liberties in America. Scooter played an important role in identifying the nation's stakes in the struggle against terrorism as the free and open nature of our society. I saw him work to get that statement included in the President's speeches and in the National Security Strategy of the United States. He often said that the aim of our strategy in that struggle is to preserve our constitutional system and the freedoms it secures for the American people.

Scooter showed a personal interest in protecting the freedom and rights of all Americans, men and women, of all races, religions and creeds. We often had to deal with difficult questions of how to balance competing values – for example, airport security versus personal privacy and liberty. Scooter approached those questions with respect for individual rights and a love of the Constitution.

Scooter's humane outlook on policy matters is consistent with the kind disposition he has toward people on the personal level. Scooter is a pleasant and considerate colleague. He speaks to people courteously and treats them gently and well. This is one of his outstanding traits.

Scooter was remarkably diligent. His work hours often extended into the late evening and into weekends. I had a number of meetings and phone

The Honorable Reggie B. Walton
Page 3
April 22, 2007

calls with him at those times.  He had to deal with enormous quantities of
material.  I was always impressed by the number of policy papers and
intelligence analyses he had read.  It was more than one could keep straight
in one's mind, but Scooter demonstrated dedication and organizational skill
through the papers and notes he prepared on the basis of his reading.  He
was devoted to government service.

I saw Scooter as particularly active in a number of fields.  He was
intensely involved in homeland security efforts, countering the dangers of
biological agents such as anthrax and smallpox, Arab-Israeli peace issues
and war on terrorism issues generally.  He wrote papers on those subjects,
developed ideas for legislation and executive branch reorganization,
generated policy initiatives and served as an analyst and advocate in
interagency meetings.  I saw all this personally.

In all my dealings with him, I found Scooter not only to be honest, but
to be someone whose honesty was rooted in serious reflection about what it
means to be an honorable person.  I saw that he loves this country and
contributed to making it better and safer.

I trust you will give due weight to all these points.  I believe they
support clemency.

With respect, I am

Yours truly,

Eric Fernandez

04-11-07

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
222 Constitution Avenue, N.W.
Washington, DC 20001

Dear Hon. Walton:

I wish to take a moment of your time to describe ███████ Scooter Libby ██████
████████████████████████ was often touched by his altruism and
humility. On at least two occasions that I recall while I was merely a teenager, he
employed me to handle tasks around the home. I understand that his doing this was
partly his desire to help me enjoy a sense of accomplishment. He always had a pleasant
character about him, and seems to have been doing well in raising his family despite his
career commitments. Please consider an arrangement in these processes which does
not cause any additional grief for him and his family.

Sincerely,

Eric Fernandez



**EMILIO A. FERNANDEZ**

April 21, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

Nearly a half century ago I immigrated to the United States. I pursued my education in the DC area earning degrees in engineering and business from local universities. It has been my fortune to develop several innovative ideas into commercially successful enterprises. I have headed companies of various sizes, from one-person start-ups to a New York Stock Exchange traded corporation. I have prospered in this land of opportunity because of a judicial process that maintains a consistent, fair, and productive environment. I have also been involved in many philanthropic activities in the community. These life-long experiences have instilled in me an appreciation for commitment, work ethics, and integrity.

Over the last fifteen years it has been my pleasure to know Scooter personally. I have watched him and Harriet lovingly raise two smart, well-educated, and polite children. During our friendship, we have also had a few opportunities to share professional interactions.

I had lunch with Scooter, just a few days after Mr. Cheney asked him to serve in the new administration should the Republican Party win the 2000 elections. It was clear that Scooter was honored by the offer and delighted with the prospect to once again serve his Country. Accepting a position with the new administration would mean personal and financial sacrifices, but the highest hurdle hampering his decision was balancing his workload to make certain he had significant time with his children during their formative years. I was not surprised that he was deeply concerned about                    because I had witnessed his devotion as a father, always involved whether reviewing school projects, on the soccer field, or participating in other activities with his children.

Scooter has been a caring friend. Some years back, I lost a very dear relative in a tragic accident. While delivering the eulogy at the memorial service, I noticed my friend among the congregation. He didn't have to attend but he took time from an extremely busy schedule to lend his support with his presence — it meant a lot to me.

Scooter is selfless and I admire him for this trait. He is more interested in giving than receiving. When we talk he is more concerned about my life than talking about himself. Not long ago we were walking and chatting in front of our homes. It wasn't until he explored the nuances of my recent and relatively insignificant business trip to Pittsburgh that the conversation shifted to his most important, grueling and dangerous trip to Afghanistan with the Vice-President. Scooter had many opportunities during his distinguished career to "brag" to his friends — from flights on Air Force One to being in the White House Bunker on 9-11, but he never discussed his endeavors until prodded and he would characteristically downplay the significance of his accomplishments.

I am fortunate because Scooter is the person everyone desires as a neighbor. I have seen him soothe relations among the residents in our neighborhood over seemingly petty issues at the same time he was an integral part of a major peace initiative in the Middle East that included visits with heads of state in the region. On another occasion, I found him helping a neighbor dig his car out of the snow, a neighbor who is staunch Democrat. His actions constantly illustrate his willingness to give of himself.

Once I asked Scooter to recommend a law firm that could advise me on a complicated Intellectual Property case involving international issues. I expected a name and a phone number, instead he spent significant time questioning me with intense thoroughness about every aspect of the case. It soon became apparent I had found the best attorney. Scooter professionally defined the line and with unimpeachable integrity helped me understand the difference between right and wrong in the context of this case. His advice was most valuable and, in spite of several requests, he never sent me a bill. Generosity and integrity are arguably two defining qualities in a human being and Scooter demonstrates both of them everyday.

When he started to serve under the current administration, I lost a part of my friend to the demands of his new job and to the service of our Country. He maintained such an exhausting schedule that it did not leave much time for social contact. He has been completely immersed with his responsibilities and ▮▮▮▮▮▮▮▮▮▮ have been limited to a couple of occasions.

Mr. Libby can be described in very simple terms -- he is a good and decent man. He is needed as a father, husband, and friend. He has made tremendous contributions to his family, community, and our Country. It seems to be in our collective interests to allow him to remain productive and engaged in these activities. Scooter and his family have suffered significantly as a result of these recent events. I have seen his wife's face in the early morning while getting the newspaper after a sleepless night and I have seen their son step out of the school bus with sadness in his eyes. I urge you to help a good and decent person by considering the most lenient sentence consistent with your sense of social balance and your judicial responsibility.

Sincerely,



**DLA Piper US LLP**
1251 Avenue of the Americas, 27th Floor
New York, New York  10020-1104
www.dlapiper.com

Robert F. Fink



April 30, 2007

The Honorable Reggie B. Walton
United States Distict Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**Re:     Scooter Libby**

Your Honor:

I am a 1970 graduate of Columbia University Law School of Law and currently a partner in DLA Piper US LLP, which is the United States branch of a large, international law firm.  During a period that extended about fifteen years, until 1999 or early 2000, interrupted by Scooter's public service, I worked with him on the "Marc Rich case" having been involved even before he and Leonard Garment joined the defense team.  Over those years, I worked closely, sometimes for days at a time, and even traveled for a few days on holiday with Scooter (whose real name I did not know until the criminal investigation into his case began).

While I worked on the Marc Rich pardon, Scooter did not.  Other than the day we both testified to Congress on the pardon (about February 28, 2001 as I recall), I have not spoken with Scooter since some time in 2000.  So I am not writing as a close friend or active colleague but as a historical observer of Scooter because I think you and he are entitled to my assessment.

In the years I worked with Scooter, I found he was a person of great intelligence and dedication to his work; he was also resourceful, a forceful advocate and, to my repeated observations, honest and accurate in what he said.  While I know the verdict is in, and highly unfavorable, Scooter, during all those years, was a careful, honest, precise lawyer who well represented the legal profession.  I can only wonder what happened in his case but know that Scooter has for many years been a model for the legal profession.

Respectfully submitted,

Robert F. Fink
Partner

RFF:rm
NEWY1\8102116.1
1-16



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
   United States Courthouse
333 Constitution Ave, NW
Washington, DC  20001

Your Honor,

I am writing on behalf of Mr. Scooter Libby, whom I worked with from March 2003 –
July 2005. During this time I was serving as one of the Military Aides to the Vice
President and frequently assisted Mr. Libby with communications and other support
items. We traveled together in ground and air movements with the Vice President, and
worked together to ensure that communication requirements for the Vice President were
effective at all times.

During the time that we worked together, he was extremely polite, respectful and
appreciative of everything that the Military Aides and other military support personnel
did for the Vice President in particular as well as the few things we did to help Mr. Libby
in his role as the Chief of Staff. Mr. Libby was always a perfect gentleman. At no time
did he express the slightest bit of impatience or disappointment despite the inevitable
moments when communications were disrupted by technical problems.

On a personal note, Mr. Libby was with me on Air Force 2 when I found out that my
father had suddenly passed away. As you can imagine, this was a very difficult moment
for me. One thing that I will remember about the first few hours after I had received the
news and began sorting out what to do next, is Mr. Libby's genuine concern and support
for me and my family. He personally informed the Vice President of the situation and
offered his assistance in helping me make arrangements to return home. In addition, he
made time to speak with me after my return to duty to express his sympathy and ensure
that my family and I did not need further assistance.

I was stunned when I learned of Mr. Libby's conviction, as it just does not match my
experiences with him or the character that I saw displayed under a variety of personal and
professional circumstances. Mr. Libby has always struck me as a committed public
servant, exemplary gentleman and consummate professional. Thank you for your
consideration of my opinions and thoughts on Mr. Libby's character & integrity.


Sincerely,

Paul A. Flynn

Princeton University    Robertson Hall
Princeton, New Jersey 08544-1013



**Aaron L. Friedberg**
*Professor of Politics and International Affairs*

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

May 1, 2007

Dear Judge Walton,

I write regarding Mr. I. Lewis Libby, who is scheduled to come before you for sentencing on June 5.

I first met Mr. Libby in the early 1990s, when he was working in the Department of Defense. Although I encountered him on a few occasions thereafter, I did not really get to know him until the summer of 2003 when I began what would become a two year assignment as a Deputy Assistant for National Security Affairs in the Office of the Vice President. (During that time I took a public service leave of absence from my job as a professor of politics and international affairs at Princeton University, where I have taught since 1987.) From June 2003 to June 2005 I worked closely with Mr. Libby, sometimes meeting or speaking with him several times a day. Although our contacts were limited to a busy and often intense professional setting, I got to know him quite well during this period and so feel able to offer the following observations about some aspects of his character and personality.

I am sure that others will attest to Mr. Libby's extraordinary commitment to his work and, in particular, to preserving our nation's security. During my time in Washington I never met anyone who worked longer hours, had a broader range of responsibilities, or was more serious about fulfilling them than Mr. Libby. Suffice it to say that I do not think I ever arrived at work earlier, or left the office later, than Mr. Libby. Like him, I have young children, so I know very well the personal price he paid to do his job. I hope that his dedication, and the sacrifices he has already made, will be given some weight in determining his fate.

I would like to comment on two aspects of Mr. Libby's character that, as a teacher, I found especially admirable and impressive, but which I have not seen widely mentioned.

WOODROW WILSON SCHOOL OF PUBLIC AND INTERNATIONAL AFFAIRS

First, in all of my dealings with him, I always found Mr. Libby to be exceptionally thoughtful and open-minded. Far from being an ideologue, the kind of person who knows the answer before he even hears the question, Mr. Libby was genuinely interested in ideas and in hearing a variety of arguments and points of view. Given all of the uncertainties and complexities with which he was wrestling, this seemed to me an appropriate and necessary attitude, but I did not find it to be nearly as common in government as I had perhaps naively expected it to be. Mr. Libby was an exception. Whenever I brought up an article or a piece of academic research that bore in some way on the issues he was addressing, he always asked me for details and usually requested that I provide him with a copy so that he could read it for himself. Before I left the government in 2005 I happened to mention an obscure book by a French philosopher on differences in Chinese and Western approaches to strategy that I had found helpful in thinking through some issues of current policy. When I spoke with Mr. Libby by telephone a few weeks ago he mentioned that he had finally had the time to read it.

Mr. Libby also took a strong interest in the development and subsequent careers of his subordinates. In one case with which I am familiar, Mr. Libby gave a young man who had been working on the Vice President's support staff the opportunity to develop his skills by covering meetings and drafting memos, and later promoted him to a full-time analytical position. Last year I happened to be serving on the Woodrow Wilson School's admissions committee and noticed this young man's name on the list of applicants. When I read his folder I found that, despite his own troubles and preoccupations, Mr. Libby had taken the time to write a long and thoughtful letter describing the applicant's background and experiences and making the case for admission. Because Mr. Libby's case was much in the news at that time, my colleagues recognized his name and many were, I suspect, inclined to take his endorsement as a reason *not* to admit the applicant. But when they read Mr. Libby's letter they were so impressed by its insights and its judicious tone that they voted unanimously in favor of admission.

Mr. Libby has already contributed, and sacrificed, a great deal as a public servant, and he has paid a very heavy price for whatever mistakes he may have made. I am confident that, thanks to his character and experience, he has much more yet to offer our country. I hope that you will see fit to treat him with compassion and leniency at sentencing.

Sincerely,

Aaron L. Friedberg

# Dechert
### LLP

1775 I Street, N.W.
Washington, DC  20006-2401
+1  202  261  3300  Main
+1  202  261  3333  Fax
www.dechert.com

**PAUL H. FRIEDMAN**



April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Counstitution Avenue, N.W.
Washington, DC  20001

Re:  I. Lewis Libby

Dear Judge Walton:

I am the Managing Partner of the Washington, D.C. office of Dechert LLP.  I have practiced law
here in Washington since 1979, first at Arter & Hadden and, since 2000, at Dechert.  I am an
antitrust litigator and have appeared before a number of judges in this District as well as in other
district and circuit courts around the country.  I chair the Civil Practice & Procedure Committee
of the Antitrust Section of the ABA.

I am writing on behalf of my friend and former partner, Scooter Libby.  I have known Scooter
since early 2000, when I joined Dechert.  I have known Scooter as a friend, colleague and trusted
adviser.  As a partner and colleague, Scooter was everything one could ask for.  He welcomed me
as a new lawyer into the firm and eased my transition greatly.  I observed this same interest in
others time and again.  Scooter frequently served as mentor for a number of younger lawyers and
exhibited a genuine and sincere interest in their career development.  When the Firm called on
Scooter to take on the responsibility of management on top of his busy practice, Scooter agreed to
serve.

Scooter's sense of public responsibility and the importance of giving back to our society plays an
important role in his character.  When candidate Cheney asked Scooter to interrupt his highly
successful law practice to help prepare for the upcoming debates, Scooter put personal and
financial interests in the background and devoted himself to public service. And when the Vice
President-elect asked for an even greater sacrifice, Scooter did not hesitate, but, instead, dedicated
himself to serving our country.   Our law firm was doing quite well before Scooter left private
practice, and Scooter was a "rising star" in our firm, but he did not hesitate when the call came to
serve.

I know Scooter to be a compassionate man of great integrity and intellectual honesty.  I know him
to be a devoted and loving husband and father.  I know Scooter to be a person of keen intellect

U S  Austin  Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton
San Francisco  Washington DC   EUROPE  Brussels  London  Luxembourg  Munich  Paris



The Honorable Reggie B. Walton
April 27, 2007
Page 2

and a wry sense of humor.  And, at the end of the day, I know Scooter as a friend that I can trust to put the interest of others ahead of his own.

Respectfully yours,

Paul H. Friedman
Partner

# Stephen Friedman

April 27, 2007


The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Walton:

My personal background is primarily in finance:  I am a retired Chairman of Goldman, Sachs & Co. and currently Chairman of Stone Point Capital, a private equity firm. On the not-for-profit side, I am Chairman Emeritus of Columbia University and currently a member of the Board and Executive Committee of Memorial Sloan Kettering Cancer Center in New York.  From late 2002 until shortly after the 2004 Presidential election I was President Bush's senior economic advisor and Chairman of the National Economic Council.  In that role, I worked closely with Scooter Libby, and my wife and I become friendly with him and his wife.  I was with him regularly at White House senior staff meetings, for important domestic policy meetings of the senior staff and with the President; also, when Scooter and the Vice President were in town, for weekly working lunches, as well as on social occasions. Thus, I have had a good opportunity to know and appraise Mr. Libby.

In my experience, he epitomized the best of what we hope for in a public servant:  high intelligence, an awesome work ethic, discretion, an ego under great control -- to the point of being self-effacing -- and a sage ability to add value to any policy discussion in which he participated.  He received one of the nicest compliments I can imagine, from one of the few iconic figures in our government: "He [Scooter] doesn't talk a lot in meetings but when he does he's well worth listening to."  Scooter impresses me as a kind person and very family oriented; he was widely admired and respected by the people we both dealt with.  I have always found him to be direct and, in my experience, his integrity and candor were unquestioned.

Scooter served at enormous personal sacrifice -- in terms of foregone income and a flourishing legal career laid aside, and bore a brutal work load in a position which afforded him none of the limelight coveted by so many in Washington.   In my judgment, he was motivated only by a deeply felt and personal commitment to what he felt was best for the country.

Sincerely,

Stephen Friedman

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is José Fuentes and I served with Mr. Lewis Libby during my tenure at the White House from 2001 to 2003. I had the distinct honor and privilege to know "Scooter" on both a professional and personal level during my years as Deputy Director of Advance to the Vice President.

I came to rely on Scooter for his wisdom on many issues ranging from the look and feel of a particular event to what my next professional position should involve. Scooter was always willing to listen and assist on both a personal and professional level. I was always treated with honesty, integrity, personal respect and I felt my opinions where sincerely valued by him.

I have always admired Mr. Libby's tenacity, his work ethic and his dedication to his family. Like all of us, Scooter understood the demands of working for the White House, but he always had time for his family which helped all of the staff keep things in perspective. As a young married man and just starting a family, he served as a true role model for me. How he could manage to work so late into an evening and still find the time to spend with children and wife was commendable. I personally have some grave concerns for his children in the event he is sentenced to any length of time in prison as his two children are quite dependent on him at a most important time in their life. Scooter's accolades are many, but the few you will never hear about is his selfless compassion for others, his honesty, integrity and his sense of humor even during tense and stressful moments.

The charges against Scooter are not consistent with the person I have known as a colleague, a mentor and good friend since 2001. I respectfully ask the court for leniency and give serious consideration to any penalty leveled for charges stemming from his tireless public service in a most grueling, thankless and compromising positions in government service.

Sincerely,

José A. Fuentes



# JOHNS HOPKINS
### U N I V E R S I T Y

**The Paul H. Nitze School**
**of Advanced International Studies**

**Francis Fukuyama**
Bernard Schwartz Professor of International Political Economy
Director, International Development Program

April 28, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

I am writing on behalf of Lewis Libby, who is to be sentenced by your court. I would like to attest to his character, integrity, and dedication to community based on my long personal acquaintance with him.

I am currently Bernard L. Schwartz Professor of International Political Economy at the Paul H. Nitze School of Advanced International Studies of Johns Hopkins University in Washington, DC. I was previously Omer and Nancy Hirst Professor of Public Policy at George Mason University, a member of the Political Science Department of the Rand Corporation, and twice member of the Policy Planning Department of the US Department of State.

It was in the last capacity that I first met Scooter Libby in the spring of 1980, when we were both serving on the State Department's Policy Planning Staff. He was at that time the Staff's chief speechwriter, and we worked together on a number of speeches for Secretaries of State Alexander Haig and George Schultz. I have since remained a close friend of his, seeing him both professional and personally with some frequency in the nearly thirty years since that time. We have known each other in a wide variety of contexts over this period. During the early 1980s we socialized frequently after work, being younger members of an office and without families at that point. After I left government and moved to California to work at the Rand Corporation, we saw each other periodically on vacations; Scooter for example came out to attend my wedding in



Santa Monica. In 1990 I turned to him for legal advice when negotiating a book contract, and on his recommendation used his law firm to help finalize my publishing agreement. Aft██████were both married, we ended up lived near each other in McLean, Virginia; Scooter's son ███ ██ my son █████re both on the same Little League team, and I saw him at numerous baseball practices. In another context, while Scooter was writing his novel *The Apprentice*, I read several early drafts and gave him comments, and when the book was finally published wrote a jacket blurb for it. Over the past six years, we have continued to stay in touch. While he was working for Vice President Cheney, he was extraordinarily busy, but nonetheless took time out periodically to have lunch with me.

There are several points that I would like to emphasize in vouching for Scooter Libby's character. The first is that he was always an extremely dedicated public servant whose first interest was always in public policy issues and the public good. As a successful attorney he always had lucrative opportunities available to him in private life, but from the beginning he was always more interested in government service. His work ethic was always legendary; he was always in the office later than most members of the staff, and over the years sacrificed both leisure time and time with his family in the interest of service to his country. It is hard to imagine the kinds of personal sacrifices that are required of officials at his level. While he has been portrayed in the press as an ideologue and highly partisan, this characterization is very far from the truth in all of my dealings with him over the years. To the contrary, in my discussions with him on issues from Middle East diplomacy to his work on the Cox Commission to the Iraq war, he has always been open to different views and notably without rancor. He always approached issues from the standpoint of American national interest. He was always straightforward in his advocacy of policy, and never vindictive or personal in his dealings with others.

In addition to my professional dealings with him, I have also been privileged to be a close personal friend of Scooter. I have never known him to be anything but helpful, straightforward, honest, and reliable through the different phases of our lives. Despite the heavy obligations of work, he always made time for his family. He is devoted to his wife Harriet Grant and to his son and daughter. On the occasions that I have had to turn to him for help, such as when I was considering getting married, returning to Washington to go back into government, or writing my first book, Scooter was always there with support and advice. In the course of his legal career, Scooter did considerable pro bono work, and was always willing to volunteer time and effort to support his friends, and causes he believed in. On several occasions, he took time to help me with various problems and questions I had at various points in my career and life. I know that he has done this for many other friends as well. In every dealing I have ever had with him, he has always been extremely scrupulous and fair. I believe that this should be taken into account in the process of his sentencing.

Thank you very much for your consideration.

Sincerely,

Francis Fukuyama

- 2 -

June 1, 2007

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington D.C. 20001

RE:   U.S. v Libby / Sentencing

Dear Honorable Judge Walton,

Lying in sworn testimony  before a Grand Jury, and  obstructing justice in a matter regarding the "outing" of an undercover CIA agent, are serious crimes warranting substantial penalty.   The severity of such crimes is magnified when the perpetrator is a 'public servant' at White House Administration level.  Therefore, I. Lewis "Scooter" Libby should be sentenced to the maximum prison term allowed under U.S. District Court guidelines.

Anything less than maximum sentence for I. Lewis "Scooter" Libby would send a message to the world that public servants in this country are not (seriously) held to high, or even lawful, standards.

Such a message would serve to encourage public servants - from the highest office at Federal level, down to the lowest position at local level - to disregard the laws of the land.  That is not a message that any public servant should hear.

The United States cannot afford further degradation to its laws.  And it can afford neither literal nor implied  degradation to its public service standards.  Not in the eyes of its Citizens, and not in the eyes of the world.

Your Honor, I would respectfully encourage you to sentence I. Lewis "Scooter" Libby to the longest prison term applicable to his case under law.

Respectfully Yours,

Lana Galyean



April 6, 2007

The Honorable Reggie B. Walton
United States District Court for the District of Columbia
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

I have been a senior litigation partner in law firms in New York and Washington. I have also been engaged in public service. I served as special consultant, then counsel to President Richard Nixon. I served as assistant to President Gerald Ford and, upon appointment by President Ford, as United States Representative to the United Nations Commission on Human Rights. I was chair of the bipartisan committee established by Senator Daniel P. Moynihan for the selection of federal district court judges in the Second Circuit. At the appointment of Griffin Bell, Attorney General under President Jimmy Carter, I served as vice chair (Judge Lawrence E. Walsh was chair) of the Second Circuit judicial selection committee. During the administration of President George H.W. Bush, I was named co-chair, with John Brademas, of the independent commission created by Congress to address the future of the National Endowment for the Arts. Last year I received the National Medal of the Arts.

Several years ago, I left the active practice of law and moved home to New York, to teach as an adjunct professor at my alma mater, Brooklyn Law School, and serve as chairman of the National Jazz Museum in Harlem.

I know you have received a large number of letters apprising you of factors that should counsel leniency in your sentencing of I. Lewis Libby. None is written with a heavier heart than mine, because no one has seen more than I have of the intelligence and decency that Scooter has exhibited throughout his professional and public life.

Scooter and I met when we were partners at what was then Dickstein, Shapiro & Morin. I asked him to work with me on the Marc Rich case. After that case, we worked on many others together. For almost a decade, Scooter was my closest professional associate. We traveled together; we became friends of one another's families. I knew his professional and personal qualities perhaps better than those of any other attorney with whom I have worked. I saw repeated evidence not only of his intelligence but of his capacity to handle stress and complexity and his loyalty. Scooter habitually protected me from my own imprudence. When I migrated from Dickstein to Mudge, Rose, Guthrie, Alexander & Ferdon, then from Mudge Rose to Dechert, Price & Rhodes, Scooter went with me even though the moves gave him no personal or professional advantage.

I should also take note of Scooter's humane wit, which sustained me in many trying circumstances.

After Scooter joined the Vice President's staff, I would visit with him in his office in the Old Executive Office Building. By then, I was largely out of public affairs, while he was mired in them. But there was never a time when he was too busy to see an old friend. We would reminisce, catch up with each other's families and trade unclassified White House gossip. He was unchanged from the days when we worked together.

The offenses of which Scooter was convicted bear absolutely no similarity to any behavior of his that I have ever seen first-hand or have ever heard about from anyone else who has known him in the more than 50 years of his life.

Consistent with his years as a dedicated public servant, Scooter did not act with any intent to profit personally from his conduct. He has already paid a price for such conduct that is grossly disproportionate to any misdeeds or errors of judgment he may have committed. I believe these circumstances form a proper basis for an exercise of judicial leniency. Accordingly, I respectfully urge that you exercise the maximum leniency available to the court in determining Scooter's sentence.

Sincerely,

Leonard Garment

June 1, 2007

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington D.C. 20001

RE:   U.S. v Libby / Sentencing

Dear Honorable Judge Walton,

Lying in sworn testimony  before a Grand Jury, and  obstructing justice in a matter regarding the "outing" of an undercover CIA agent, are serious crimes warranting substantial penalty.   The severity of such crimes is magnified when the perpetrator is a 'public servant' at White House Administration level.  Therefore, I. Lewis "Scooter" Libby should be sentenced to the maximum prison term allowed under U.S. District Court guidelines.

Anything less than maximum sentence for I. Lewis "Scooter" Libby would send a message to the world that public servants in this country are not (seriously) held to high, or even lawful, standards.

Such a message would serve to encourage public servants - from the highest office at Federal level, down to the lowest position at local level - to disregard the laws of the land.  That is not a message that any public servant should hear.

The United States cannot afford further degradation to its laws.  And it can afford neither literal nor implied  degradation to its public service standards.  Not in the eyes of its Citizens, and not in the eyes of the world.

Your Honor, I would respectfully encourage you to sentence I. Lewis "Scooter" Libby to the longest prison term applicable to his case under law.

Respectfully Yours,

Lana Galyean

Fax Number;        ▬▬▬▬▬

Date:              June 1, 2007

To:                The Honorable Judge Reggie B. Walton

From:              Lana Galyean, a common U. S. citizen in Nevada

RE:                U.S. v Libby / Sentencing

Page:              One of two.


Message:           Hard copy to follow via U. S. Postal Service.



May 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United
        States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Re: Lewis "Scooter" Libby

Dear Judge Walton:

I am a government attorney and an attorney supervisor, but am writing to Your Honor on behalf of Lewis "Scooter" Libby in my personal capacity.

I have known Scooter for more than 20 years, primarily in a social, rather than professional, setting. We have mutual friends and colleagues and I have had the pleasure of Scooter's company on a number of occasions. Most significantly, however, is that Scooter and I have participated in a weekend touch football game during most weeks from October through March for more than two decades. During those many years, I have formed a strong impression of Scooter's character, values, and integrity.

First, Scooter is an exceptionally decent, kind, and considerate man. During our always competitive and sometimes heated weekly football games, he has never once lost his temper. He is one person who can be counted on to maintain his composure and perspective and to defuse any tense situation through the exercise of leadership and his keen sense of humor. Scooter is solicitous of others, not only for their personal well-being on the playing field, but also when they are in need of a kind word or friendly advice. Scooter is a natural leader and is both respected and well-liked by everyone with whom he comes in contact. He also is exceptionally loyal and is someone in whom I would unhesitatingly place my trust.

Second, Scooter cares deeply about our nation, our government, and our people. As you are aware, he has devoted a large part of his professional career to government service. And he has done so for the very best of reasons – not for personal advancement or financial aggrandizement, but because he believes strongly in helping others and in promoting and protecting the values and future of this wonderful nation. Scooter is exceptionally bright and hardworking, and the government and people of this country have benefitted greatly from his selfless service to them.

Finally, Scooter has an extraordinary relationship with his son ██████ as accompanied Scooter to most of our weekly football games during the past several years. I have watched at close quarter ██████ has grown and matured. Scooter's relationship with his son is exceptional. He is tender without being paternalistic. He instructs and guides without being overbearing or pedantic. They appear to be not only a father and son, but best of friends. Their mutual respect and love for each other are apparent to anyone who watches them interact. I only wish that I could have been half as good a father or that my relationship with my children were half as strong as Scooter's relationship with his son.

During the course of the prosecution and trial, I have not altered my impressions of Scooter's character and integrity. His conviction for perjury and obstruction of justice is hard to reconcile with everything I know and have observed about him. I believe it is an aberration and not a reflection of Scooter's true character.

Scooter is a good man, who cares deeply about people and the public at large. He is a considerate and generous person and a devoted husband and father. I urge the Court to take these factors into account, along with his extensive record of selfless public service, in imposing the lightest sentence possible in this case.

I greatly appreciate your consideration of my remarks.

Sincerely,

Bruce S. Gelber



25 April 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
    United States Courthouse
333 Constitution Avenue, N. W.
Washington, D. C.  20001

Dear Judge Walton:

I am a citizen of the United States.  My primary occupation for the past thirty years is as a businessman.  In 1985 I founded a chemical company which is today a multi-national chemical and fertilizer company, headquartered in New York, New York.

Shortly after Mr. Ariel Sharon was elected to his first term as Israel Prime Minister, he has asked me to fulfill the role of a private confidential channel between him and the then the Secretary of State Colin Powell and the White House.

During the years of 2002 and 2003, I had the responsibility and privilege to serve in that role.  It is during that period that among other high U. S. government officials, I met Mr. Scooter Libby.

The period was very tense, as terrorist violence in the Israel was raging. The second Intefada initiated by Mr. Arafat was at its height, inflecting heavy civilian human toll on Israeli citizens.  This resulted in

Page Two
The Honorable Reggie B. Walton
25 April 2007

active military campaigns by the Israeli defense forces targeted at the terrorists operating out of the Arab territories, as well as taking protective steps by imposing various restrictive measures in Arab civilian towns and on Arab civilian movement.  It is with this background that my many meetings with Scooter alone and with other White House officials took place.  A central subject in many of those meetings was the issue of the preservation of civilian lives of Israelis, as well as those of the Palestinian's.

I vividly recall Scooter's attention in those meetings to the human suffering resulting from the conflict.  His meticulous efforts with regard to issues concerning the prevention of loss of innocent lives and human suffering on both sides, was remarkable.  I was surprised in many discussions we had at the length of time that Scooter was allocating to the human issues, and the in-depth questions he had on matters regarding the human tragedy aspect of the conflict.  He had a sincere determination to seek alternative new ways to bring about a reduction to the civilian casualties and suffering on both sides of the conflict.  He conducted those discussions in the utmost professional way, yet with clear concern for the preservation of innocent life, a true outstanding personal characteristic.  An attribute I am quite sure not many had the opportunity to be exposed to and one which I learned to respect greatly.  Scooter has served his national responsibilities as a proud, loyal American and at the same time had the unique ability to keep focused on the humane side of the issue, a remarkable characteristic.

Sincerely yours,

Arie Genger

Ir

April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

As a resident of McLean, Virginia, with three children, I have been a volunteer in the Fairfax County Public School system for over seventeen years, holding executive level PTA positions in four different schools. I have also dedicated the past eight years to extensive volunteer work and fundraising at Children's National Medical Center in Washington, D.C. and have personally raised over one million dollars for research on neuromuscular diseases at Children's.

This experience has given me the opportunity to meet and work with hundreds of outstanding citizens and parents in the Washington metropolitan area. The purpose of my letter is to tell you specifically about my relationship and experience with Scooter Libby both as a father, a member of our community and a friend.

I have known Scooter and his family for several years now. Our sons are the same age, attended the same preschool, played on the same soccer team and are now in the █████████████████████████████████ I remember when I first met Scooter, I saw him as a high level public official who probably would never have time to attend a soccer game, come to a school event, or volunteer in the community. Nothing could have been farther from the truth. This is a man who has been to as many of these events as any other hard working father in the community. His dedication and commitment to his children is unmatched. The picture painted of Scooter during the trial is not the Scooter Libby we all know.

Scooter's recent conviction was devastating to all of us who know him on a personal level. The thought of him going to prison is even more devastating. The last couple of years have been very difficult for the entire Libby family and for community. We have watched a man with the highest moral and ethical character be accused of perjury and obstruction of justice in a country that he has worked tirelessly to make better for all of us.

I believe in the justice system and the system has spoken. I don't agree with the verdict but as an American citizen, I must accept the jury's decision. However, before you impose a sentence on Scooter, I hope you consider what this will do to his family. His children ███████ are very young. They are both bright and articulate, traits they have learned from their father. ██████ has been admitted t███████████████ S██████████████ █████rting next year. This is not a feat that could have been accomplished without the ongoing support of dedicated parents. But most importantly, ██████████ love and respect their father. Their father is a good man. We recently went skiing with the Libby's in Colorado, and I was moved by the closeness and love I saw between he and his children. Children grow up all too quickly. This whole judicial process has already robbed them of precious time together. Please don't take away any more. In my opinion the entire Libby family has already served their time.

I respectfully request that you consider all of this before you sentence Scooter to jail. Scooter is not a hardened criminal or a danger to society. On the contrary, he is one of the finest men I know. The only thing a jail sentence would do is take him away from his much loved family. His wife and children don't deserve this. They deserve to have their husband and father with them. He is a good man.

Thank you for your consideration.

Sincerely,

Jean Godla
█████████

# JOHN C. GOSSEL

April 25, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

My name is John C. Gossel and I am writing to you in support of I. Lewis "Scooter" Libby. I had the privilege to work with Scooter in the Office of Vice President Richard B. Cheney and found him an inspiring leader and a kind and caring individual. Thus, I would like to offer you insights into the character and integrity of Scooter Libby as well as his service to this country.

I served as Information Technology Specialist in the Vice President's Operations Office from January 2001 through July 2003. While I worked with Scooter throughout my tenure in this position, I was most inspired by him in the days and weeks after September 11, 2001. After the terrorist attacks on our nation, all Americans, including those who worked for the Vice President, had to both recover psychologically and begin to change their ways of life. As White House staff members, we had to deal with the emotional aftermath of the attacks, while ensuring the nation's work was done and would continue in the event of another attack.

Scooter capably led us in this mission and became a trusted resource to me personally. He provided all of us with a shoulder to lean on. I was particularly impressed at the support and comfort he offered to the younger staff members who were taking things especially hard. In addition to being a caring individual, Scooter proved to be a true leader during those difficult weeks playing a key role in the development of an emergency plan for the Office of the Vice President. As I served on the team developing that plan, Scooter provided us with expert guidance. His calm and steady hand enabled us to craft, exercise and institute an office continuity plan which ensured the continuation of all essential services while considering the human and emotional needs of our staff.

Scooter Libby was leader and a friend at a time when our nation and I personally needed his strength and compassion. It was an honor and a privilege to serve under him in the Office of the Vice President. I hope that you will take this information into consideration as you sentence Scooter.

Sincerely,

John C. Gossel

**G. Michael Green**



May 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Re:  I. Lewis Libby

Dear Judge Walton:

My name is Michael Green, and I am writing on behalf of my longtime friend Scooter Libby.  I am a partner in the law firm of Dickstein Shapiro LLP and also serve as the Trustee of the Libby Legal Defense Trust.

I have known Scooter and his wife, Harriet, for more than twenty years.  I first met both of them when we were all working together as lawyers at the Dickstein firm in the mid-1980's.  Shortly after Scooter's arrival at the firm in 1985, I was assigned to work with him on a complex litigation matter that would remain open for years.  We became good friends as a result of working long days and nights and traveling extensively together on that matter.  I consider myself quite privileged to have been able to work so closely with him over such a long period of time.  I was impressed early on by Scooter's highly developed analytical skills and his relentless pursuit of solutions to problems that seemed to have no answers.  Scooter invariably found the answers and I just tried to keep up with him.  It did not take me long to realize that I was working with an immense legal talent and powerful advocate for those he represented.

There are many dimensions to this truly unique individual.  In addition to his exceptional legal acumen, he is an accomplished novelist and a highly respected expert on national security matters.  I understand that he began each day working as the Vice President's National Security Advisor by analyzing and responding to a matrix detailing that day's many threats to all Americans' safety.  The stakes that confronted Scooter daily can get no higher, and doing this inordinately stressful job well, while also serving at the same time as the Vice President's Chief of Staff and as an Assistant to the President, required enormous sacrifice on his part, a sacrifice he dutifully made each and every day.

I also happen to be a ▓▓▓▓▓ f Scooter's, and I know firsthand that his years working at the highest levels of our government allowed him far too little time home with Harriet and their two young children, ▓▓▓▓▓▓▓, both of whom I have known well since birth.  One of my two sons is close in age to ▓▓▓ and they have grown up together sharing many of the same interests.  My wife, ▓▓▓ who speaks to Harriet almost every day, treats ▓▓▓ like the daughter she never had.  Scooter juggled the best he could to make the games and parties and school functions, but answering the call of duty often made that impossible.  My heart dropped to the floor when I

The Honorable Reggie B. Walton
May 2, 2007
Page 2

learned for the first time, sitting next to Harriet at the trial, that one of the conversations covered
in the indictment actually occurred on their son ▮▮▮▮▮irthday while Harriet and the children
were outside a room at Andrews Air Force Base waiting impatiently for the conversation inside
to end so they could return home with Scooter to continue enjoying rare time together as a family
celebrating ▮▮▮▮birthday.

Scooter's family has already paid an incalculable price for his years of tireless service dedicated
to helping us remain secure from enemies intent on doing us unimaginable harm.  It extends well
beyond the irreplaceable losses they have suffered from Scooter's many absences from home.
The seemingly nonstop media barrage they have been forced to endure since the investigation
began over three years ago – in newspapers, magazines and online blogs, on television, and from
cameras camped outside their house and at the courthouse – has produced, I am saddened to
observe, many more tears in their home than most of us will shed in a lifetime.

The circumstances surrounding this case involved no financial gain to Scooter or his family.
Indeed, as one of Scooter's former law partners, I know that his Government position required
him to accept a sizable reduction in the income he had previously been earning in large firm
private practice.  In addition, as the Trustee of the fund that has been established to help defray
the costs of Scooter's defense, I know that the amounts incurred so far, for the fine legal team
that has been assembled to provide Scooter a realistic chance to compete against the enormous
resources the Government has dedicated to this intensely adversarial matter, greatly exceed the
sums that have been generously donated by his many friends and supporters to date.  These
donations have come from all over the country, and many of them have been accompanied by
notes from people who have never met Scooter but wanted to give what they could afford, in
some cases only a few dollars, in appreciation of the many thankless years of public service
undertaken on their behalf.

I respectfully request Your Honor to balance the huge emotional and financial strain this case has
already and will continue to inflict on this honorable patriot and his loyal wife and children in
reaching a fair and appropriate sentence.  One of the few jurors who has spoken publicly since
the verdict was rendered has said that she does not want to see Scooter sent to jail.  Every part of
me humbly pleads that the interests of justice will guide Your Honor to reach the same
conclusion.

Sincerely,

G. Michael Green

**Joan D. Green**



May 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton,

My name is Joan Green and I am writing to you on behalf of my friend Scooter Libby. I am a stay at home mom who has never been involved with law, politics or government. I have spent many hours over the last twenty years involved in the everyday life of the Libby family. My family and the Libby family have spent vacations, holidays, birthdays, dinners, sporting events and countless other activities together.

With this said I will, and can, attest to the integrity, strong family values, honesty and courtesy of my friend Scooter. Scooter will rise from his seat each and every time a female guest arrives or departs the dining table. Scooter will attend the weekly Sunday touch football game with his son ████ Scooter will travel to Richmond with his daughter's travel soccer team. Scooter will grieve his mother's death, during this long ordeal, and do the right thing according to her wishes. Scooter will go out of his way to help a friend's father receive the proper military funeral that he so deserved.

I have observed, first hand, the family sacrifices Scooter has had to make while serving his country. One that comes to mind is September 11, 2001, while his wife, Harriet, and I waited anxiously for word that Scooter, who was being safe housed in a bunker for many hours/days, was able to call home, and the days after September 11th when the Libby family was husbandless, fatherless and sonless.

Knowing the burden of Scooter's absence from his family, I get a stabbing feeling in my stomach each time I think that this dedicated family may experience his absence again. There are currently too many children in our country that are suffering because of the absence of two parent households. Your Honor, please do not separate this family again.

Thank you for considering my letter.

Sincerely,

*Joan Green*

Joan Green

David Gries

April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW
Washington, DC 20001

Dear Judge Walton:

This letter describes aspects of Scooter Libby's character that I hope will have an impact on his sentencing.

When I first met Libby in 1981, I was National Intelligence Office for East Asia at CIA. Later I headed CIA's relations with Congress and after that, was Vice-Chair of the National Intelligence Council, which prepares National Intelligence Estimates. Since retirement from CIA in 1994, I have consulted for American companies engaged in East Asia. Fortunately for me, my path has crossed Libby's throughout this period. I regard him as a true friend—as opposed to a government official who is a friend—and I deeply admire the broad-gauged intellect, dry humor, and commitment to public service that hide behind his unpretentious, self-effacing manner.

Four examples will, I trust, illuminate aspects of Libby as I have known him. The first sheds light on his respect for the law. In 1992, Libby was Under Secretary of Defense, and I was Vice-Chairman of the National Intelligence Council. Several CIA officials were indicted during the Iran-Contra scandal, and I was twice a witness for the defense in the subsequent trials. My role was to describe how the press of business and the consequences of compartmentation left many senior CIA officials incompletely informed on details of Iran-Contra. New to the witness box and personally uninvolved in Iran-Contra, I asked Scooter for advice because I valued his counsel. His response was unambiguous: "tell the truth." When I responded that I didn't know what the truth was regarding Iran-Contra, he told me to give answers I knew to be accurate from personal knowledge. Knowledge obtained from others was irrelevant, according to Libby, because I couldn't attest to it.

Libby is well known for his interest in balanced judgments, as shown in this second example. In the early 1990s, when I was Vice-Chair of the National Intelligence Council, I was often the last before the Director of Central Intelligence to sign off on Estimates. These speculative publications are very difficult to assess. It occurred to me that convening a panel from outside the intelligence community might bring fresh views to assessing Estimates before

David Gries ◄████████████████████████████████████►

releasing them to the President and Cabinet. I knew generally what intelligence community analysts thought; what I wanted to learn was whether outsiders might have different perspectives. Libby, still at the Department of Defense, encouraged me. I can't confirm that he arranged the attendance of DOD officials, but I do know that several participated on our panels and, along with others from government and academia, helped improve the quality of Estimates. I include this example to demonstrate Libby's commitment to deep probing and his reluctance to accept the first view offered.

Libby respects the law. In 1995, he left government for private practice. I was, by then, in the private sector running a small consulting firm. Libby had a client with business interests in Vietnam that required Hanoi's approval. My partner there was well qualified to contact the Vietnamese government on the client's behalf. Since dealing with Asian governments was part of our consulting business, we were very familiar with the provisions of the Foreign Corrupt Practices Act, which clearly applied in this instance. Libby went the extra mile for his client, requiring me to sign a written commitment to accept responsibility for compliance with FCPA. This was the only occasion during 12 years of consulting in Asia when I have been asked to confirm FCPA compliance with my signature. It was impressive.

Finally, I wish to say a word about Libby's *pro bono* work on behalf of government employees after he entered private practice in 1995. The best example, ironically, is the case of Richard Armitage, who was once under consideration for Secretary of the Army. As usually happens, there was opposition to the appointment, and Armitage was accused of improper business conduct in Vietnam, where he had earlier served two tours as a Navy Seal. I never knew the nature of the accusations, but I do know that Libby successfully defended him without remuneration. This was not the only instance. There are three or four other civil servants whom Libby helped without a fee on grounds that they could not afford expensive defense counsel.

Until his indictment, it never occurred to me that Libby's integrity might be in question. Nothing in our 25 year friendship pointed in that direction. I can imagine forgetfulness under the pressure of a crushing workload, but it is difficult to believe that my friend, who has devoted most of his adult life to serving his country, would have deliberately deceived a grand jury.

Respectfully,

*David Gries*

David Gries

May 25, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

I am writing to you to ask for leniency in the sentencing of I. Lewis "Scooter"Libby. The man I know bears no resemblance whatsoever to the individual who stands convicted in your courtroom. I met Scooter Libby as an intern at the Hudson Institute last year in Washington. A French student in political science, I took upon myself to spend a year abroad working in an American organization to acquire foreign policy experience. I did not expect when I started working, in October, that I would come to be assisting Mr. Libby in his research once he joined the institute in early 2006.

I must confess having had at first some apprehension when I was asked to work with Mr. Libby (conducting research on his behalf and preparing daily press reviews). Beyond being impressed by his experience, I was concerned that my young age and French origins might prove to be obstacles in my relation with him.

From the very first moments we met, I found my concerns to be totally out of touch with Mr. Libby's kind and warm behaviour towards me. He quickly went to considerable length to make me feel comfortable, always treating with great consideration despite my youth and inexperience. He has always showed great interest in my comments and inquiries. I have to say that his good natured character, generous in jokes, compliments as in friendly advices stands in sharp contrast to the portrayal I have often seen of him during the trial.

I have often been amazed by the constant effort he made to show interest in other people's personal stories and matters despite the tremendous challenges he was going through. I saw him for the last time during a trip to Washington in early May 2007 and despite his obvious and deep sorrow at the verdict, he greatly insisted on hearing about me and my personal endeavours.

Throughout my year in Washington, I have always been amazed at how people's first reactions when discussing the case went for Scooter Libby's personality. When meeting some of his former colleagues or acquaintants, I have always heard the same comments about his devotion to his friends and family and his caring behaviour toward others.

I have to say working with Scooter Libby was, in large part thanks to his good will, a very enriching experience for a young student like me. I feel tremendous sadness at his current personal situation.

I genuinely hope you will consider this sincere testimony when making your final decision. Please do not hesitate to contact me if necessary.    My telephone number is ███████████ ████████

Respectfully,

Benjamin Haddad

April 26, 2007
The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

I am writing on behalf of our good friend and neighbor of fifteen years, Scooter Libby.

My husband, Gregory Grady, and I have the highest respect and regard for Scooter.
The Libby's have been guests in our home on numerous occasions,
and we always enjoy seeing Harriet and Scooter outside on Live Oak Drive playing with
their children, and walking their dog.

Scooter very kindly came to my 'Westminster Mother's' book club, as our only guest
speaker over eight years. All of the mothers appreciated his thoughtfulness.

When the allegations arose, my daughter, who was sixteen, hand wrote
a letter to Scooter, which was heartfelt and sincere in her belief and trust in him.
A few weeks later, we invited Harriet and Scooter, and two other couples who are
mutual long time friends for dinner. While the adults were in the living room, Scooter
quietly slipped away and found my daughter reading in our breakfast room,
he sought Olivia to thank her in person for her note and to talk with her.

We appreciate that Scooter has served our country, working tirelessly. Harriet
has cared for Hal and Ricki during this time with equal support that her
husband was dedicated to the good of the American people.

Thank you for your time and consideration.

Sincerely,

Carol Harrison, Fine Art Photographer
Gregory Grady, Partner, Wright & Talisman
Olivia, Blake and Harrison Grady

May 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
 United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

First, allow me to apologize for the tardiness of this letter. I hope that its late arrival will not prevent its consideration in advance of Scooter Libby's June 5th sentencing.

While you may recall that I was a witness at Scooter's trial, let me take a moment to re-introduce myself. My name is John Hannah. In October 2005, I succeeded Scooter as Vice President Cheney's national security advisor, a position that I currently hold. In the four and a half years prior to that assignment, I served directly under Scooter as one of the Vice President's deputy assistants for national security. I have also held senior foreign policy positions at the State Department under both President George H.W. Bush and President Bill Clinton.

Throughout Scooter's tenure as the Vice President's chief of staff and national security advisor, I worked closely with him on a near daily basis. My particular expertise concerned the broader Middle East region, an area of the world that dominated the attention of the Bush Administration's highest officials, including Scooter, throughout the period 2001-2005. I can say, without hesitation, that Scooter was among the finest and most selfless public officials with whom I have ever worked. His dedication to pursuing the best interests of the American people was unparalleled in my more than ten years of high-level government service. Whether adopting controversial positions to advance the cause of peace between Israelis and Palestinians or pushing the executive branch bureaucracy after September 11, 2001 to ensure the widest protection of the U.S. public from a biological weapons attack, Scooter lived by one motto: Do the right thing. He constantly counseled his staff to follow suit. Don't be guided by what might be popular in the media or what might make our bosses look good, Scooter advised me on occasions too numerous to remember. Rather, gather as many facts as you can, ask the hard questions, challenge your own assumptions, and try to the best of your ability to figure out what would advance the interests of the country. Having fulfilled that core duty with faithfulness and diligence, Scooter believed that everything else would take care of itself.

No single idea could possibly do justice to the subtlety and nuance that characterized Scooter's understanding of America's role in the world. That said, standing up for the dignity of the individual and expanding the realm of human freedom were particularly consistent features of Scooter's approach to international affairs. No matter how frenzied his schedule, no matter how overwhelming his responsibilities, Scooter never failed to make time to see the countless number of human rights activists and political dissidents who streamed through Washington desperately seeking a few minutes with any U.S. official, much less the national security advisor to the Vice President of the United States. Long before they emerged as iconic voices in the defense of liberty for their respective nations, figures like Egypt's Saad Eddin Ibrahim, Iraq's Kanan Makiya, and Iran's Azar Nafisi first found a friendly ear and a word of encouragement in the office of Scooter Libby. One person who closely observed Scooter's quiet nurturing of those struggling against great odds to uphold the cause of human decency in the Middle East was my friend, Natan Sharansky, the great Israeli human rights activist and former Soviet dissident. Referring to Scooter, Sharansky once remarked to me that he could not easily recall an American official

2

who had done so much to instill hope in the region's beleaguered democrats and yet whose work remained so unsung.

Striving to do the right thing was not only the lodestar that guided Scooter's approach to public policy; it also manifested itself in every other aspect of his professional life, particularly his management of the Vice President's large support staff. Whether answering up the national chain of command or directing those on the lowest rungs of the organizational chart, Scooter's interactions were always characterized by the highest degree of professional courtesy, kindness and respect. No matter their level of seniority, departing staff members seeking a phone call or reference letter from Scooter to help boost the next phase of their careers were always loyally and dutifully mentored.

Scooter's dedication to the public good and professional decency were only exceeded by his devotion to his wife, Harriet, and their two young children. I quickly lost count of the number of times that Scooter interrupted heated discussions on the most pressing issues of national security to take a phone call from his son, ██████ o discuss with unbridled enthusiasm that afternoon's little league game. Or the number of Saturday mornings that I had the White House Situation Room urgently track Scooter down on the sidelines of one of his daughter's soccer games in order to get his guidance on an important matter of policy.

Your Honor, nothing in my deep experience with Scooter's outstanding character and profound integrity is consistent with the crimes for which he has been convicted. Scooter is not just one of the greatest public servants I have had the enormous honor to serve alongside. He is a very good and decent man. And he is a wonderful father of young children who desperately need him in their lives. Widely considered to be among the most brilliant lawyers of his generation, Scooter made enormous financial and personal sacrifices over the past 25 years to pursue what he sincerely believed was the higher calling of service and duty to country. He did so wholly without expectation of favor or fanfare, but simply because he sought always to do the right thing. His two decades' worth of contributions to the scales of our national wellbeing may be largely unheralded, but they are indeed significant. I pray that the due weight of those contributions will now find their place on the scales of Scooter's own life as it is evaluated by those entrusted with the awesome responsibility of doing so.

This, then, Your Honor, is the Scooter Libby that I know and admire. This is the Scooter Libby that I have struggled to convey to you in the brief confines of this letter. Thank you, sincerely, for your attention.

With great respect,

John P. Hannah

April 26, 2007
The Honorable Reggie B. Walton
          United States District Court
          1225 E. Barrett Prettyman
          United States Courthouse
          333 Constitution Avenue, N.W.
          Washington, DC 20001

I am writing on behalf of our good friend ████████████████████████



My husband, Gregory Grady, and I have the highest respect and regard for Scooter.
The Libby's have been guests in our home on numerous occasions,
and we always enjoy seeing Harriet and Scooter ███████████████ playing with
their children, and walking their dog.

Scooter very kindly came to my 'Westminster Mother's' book club, as our only guest
speaker over eight years. All of the mothers appreciated his thoughtfulness.

When the allegations arose, my daughter, who was sixteen, hand wrote
a letter to Scooter, which was heartfelt and sincere in her belief and trust in him.
A few weeks later, we invited Harriet and Scooter, and two other couples who are
mutual long time friends for dinner. While the adults were in the living room, Scooter
quietly slipped away and found my daughter reading in our breakfast room,
he sought ████ to thank her in person for her note and to talk with her.

We appreciate that Scooter has served our country, working tirelessly. Harriet
has cared ████████████ during this time with equal support that her
husband was dedicated to the good of the American people.

Thank you for your time and consideration.

Sincerely,

Carol Harrison, Fine Art Photographer
Gregory Grady, Partner, Wright & Talisman

April 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitutional Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

I am sure you have received letters on behalf of Scooter Libby from politicians, from lawyers, from journalists perhaps. This one is from an aging touch football player. For thirty years, every Sunday morning, I have played football or softball, depending on the season, with a group of guys; Scooter has been among them for the past fifteen years. There are probably about forty in the cadre in any given year but usually, by some mystical force, the right number of players seems to show up for each game. I am probably the senior member of the group and have seen many players come and go over the years. My day job is as a pediatrician.

It may seem trite, in light of the magnitude of the case, to be writing this letter about Scooter based on our Sunday morning football games, but you learn a lot about someone's character when you spend three hours together weekly in friendly competition. There are those who whine; there are those who argue; there are those who always have to leave early or those who are always late; there are those who are too competitive or those who don't try hard enough; there are those who are unfriendly or those who are uncaring. Scooter is none of these. Despite a very demanding schedule, he has found time to join us (a little less in the past seven years) and has often brought his son ███ to play. It has been obvious to me how he cherishes this time to spend together with his son and how much ███ enjoys this time with his dad. Scooter has always arrived with a smile and, even on those days when his team may have come up on the short end, left with the same smile. During our games, he is forever a gentleman, never participating in the petty bickering. As for giving his all, his garments are generally among the dirtiest when our games are over.

There are people from all walks of life playing in our Sunday game and you'd have a hard time standing on the sidelines trying to pick out the store clerk from the Pulitzer author. But character shows and you'd not have difficulty picking out the guy you'd like to have over for dinner from the guy you wouldn't even want to have a conversation with. If someone had asked me, before this political issue arose, who from our Sunday game would have his character and integrity questioned, Scooter Libby would have been at the bottom of my list.

Scooter is a good soul, committed to family and friends, who truly deserves some lenience given the circumstances in which he now finds himself.  Our Sunday morning games are a little but an important slice of life; I hope to see Scooter out there regularly and his son █████ needs to keep catching passes thrown from his dad.

Sincerely,

Stephen G. Harrison, MD



Debra A. Heiden

April 27, 2007

The Honorable Reggie B. Walton
Judge of the United States District Court
1225 E. Barrett Prettyman
    United States Courthouse
333 Constitution Avenue, Northwest
Washington, DC 20001

Dear Judge Walton:

    Although I am an employee in the Office of the Vice President (OVP), whose salary is paid by the Secretary of the Senate, this letter is written in my personal capacity only and not my official one. The views expressed in this letter are mine alone and not necessarily those of the OVP or the Senate.

    I. Lewis (Scooter) Libby and I first met when we both started working for the Vice President-elect in the Bush/Cheney Presidential Transition Office in late 2000. Since I am the executive assistant to the Vice President, I got to know Scooter quite well and usually saw him numerous times a day during the workweek in the Vice President's West Wing office suite. As an individual who has been in the workforce for over 37 years, I believe Scooter is one of the most talented individuals I've had the pleasure of working with. I always appreciated his honesty and integrity. He was a true public servant in every sense. Even when Scooter was extremely busy he was kind and considerate. It was not uncommon for him to offer to get us (support staff) a cup of coffee when he was going to get something for himself. He is a fine individual, and I can't say enough positive things about his character.

    I'll never forget his last day at the White House when he was in the West Wing, he paused as he was walking out the door, turned around and told me thank you for everything I had done. Considering what he was going to be facing, this speaks volumes about Scooter Libby.

    Scooter also has a wonderful family. I got to know his wife Harriet and their two children. I have remarked to others about what a lovely family he has and about his well-mannered children. In this day and time, it's refreshing to see such a loving, caring family as his.

    Thank you for your time and your consideration.

Sincerely,

Debra A. Heiden

# Dechert
LLP

1775 I Street, N.W.
Washington, D.C. 20006-2401
+1 202 261 3300  Main
+1 202 261 3333  Fax
www.dechert com

**ROBERT W. HELM**



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Re:  I. Lewis ("Scooter") Libby

Dear Sir:

I am a partner and Deputy Chairman of Dechert LLP.  I have been employed by Dechert since 1984 and have served as both vice chair and chair of its Financial Services Practice Group as well as a number of its Policy Committee.  It was my privilege to work with I. Lewis Libby as my partner from 1995 until he resigned to join the administration of President George W. Bush in January 2001.  Mr. Libby served as the Chair of our Government Relations Practice, and later assumed the role of Managing Partner for the Dechert Washington office. He led a number of firm initiatives related to the expansion of our office and worked both inside and outside the firm to raise our profile in the Washington legal community.

Mr. Libby's performance as Managing Partner was superb.  He had a unique talent for building consensus on complex issues, skills which I believe served him well in his government career. He quickly earned the trust and respect of his partners both in Washington and throughout the firm.  He was a trusted adviser to our Chairman and to those of us who served on the Policy Committee.  He was a partner who built bridges between partners and practice groups.  He was named as a possible candidate to lead our firm one day as Chairman.

Mr. Libby surprised many of us when he requested a leave of absence and permission to assist the Bush/Cheney campaign in the Fall of 2000.  We were not surprised, however, when the Vice President-elect called to ask him to lead his staff in the new administration.  Our only hope was that he would serve his country for a few years and then return to Dechert and the practice of law.

Other events intervened, and Mr. Libby found himself engaged in the serious business of protecting our nation from a new type of enemy.  We then came to understand that his strong sense of duty to country would mandate that he remain with the administration until the end of its term.  We continued to hope that Mr. Libby would return to Dechert when that term ended.

Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton  San Francisco  Washington DC
Brussels  Frankfurt  London  Luxembourg  Munich  Paris



The Honorable Reggie B. Walton
May 1, 2007
Page 2

I regard Scooter Libby as a shining example of selfless dedication to public service. He has made a enormous personal sacrifice of time and talent in the service of our country. At the end of his current ordeal we look forward to welcoming him back to Dechert and to his assumption of a significant role and responsibilities here. I can think of no finer person whom I would want to have as my partner, and I am honored to call him my friend.

Sincerely,

Robert W. Helm

705489.1

# STEPHEN P. HENNESSEY



EMAIL 

TELEPHONE 

April 4, 2007

The Hon. Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave. N.W.
Washington, D.C. 20001

**Re:    United States v. Libby**

Dear Judge Walton:

I read on the Washington Post's website that Mr. Libby's attorneys are soliciting letters to be sent to the court in advance of the scheduled sentencing hearing. I am quite sure that there are plenty of people who can genuinely say nice things about Mr. Libby.

It is important, however, to keep in perspective what Mr. Libby did, and **continues** to do. He was convicted because he lied to the FBI and to the Grand Jury in order to obstruct a federal investigation. His efforts in this regard have in fact proven to be successful in that the FBI and the Special Prosecutor have not been able to determine anything other than that there was a conspiracy to expose the identity of CIA operative. The full details of that crime will likely never be known nor will responsible individuals be prosecuted because of people like Mr. Libby.

Moreover, and for purposes of sentencing, special attention should be drawn to the fact that the crime is ongoing. Mr. Libby has never spoken out and actually said that he forgot his conversations with the press, that he was wrong or that he "misremembered" that he betrayed a CIA operative. Mr. Libby was found guilty of obstructing justice, and he is continuing to do so by not correcting the record and by not cooperating with the Special Prosecutor's investigation. He is not only remorseless, but he continues to further the efforts of those who would conceal the original crime.

Mr. Libby worked for the public. As a member of the public, I resent the fact that he obstructed and continues to obstruct an investigation into the truth.

I respectfully request that the court sentence Mr. Libby at the high end of the standard range

April 4, 2007
Page 2

and require that he start serving his sentence immediately following the hearing scheduled for that purpose. Thank you for taking the time to read my letter.

Very truly yours,

Stephen P. Hennessey

SPH:sph

**DICKSTEIN**SHAPIRO⊔ᴘ

1825 Eye Street NW  |  Washington, DC 20006-5403
ᴛᴇʟ (202) 420-2200  |  ꜰᴀx (202) 420-2201  |  dicksteinshapiro.com


April 30, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC  20001


Re:    I. Lewis Libby

Dear Judge Walton:

I am a partner and Head of the Antitrust Practice at Dickstein Shapiro LLP here in Washington,
D.C.  I write on behalf of Scooter Libby. I first met Scooter when he joined Dickstein Shapiro in
1985.  He was always exceedingly well respected by his colleagues as a supremely capable
lawyer of great integrity.  I am not, however, submitting this letter as a lawyer who worked with
Scooter.

Over the past 22 years, my wife and I have become very close personal friends of Scooter and
his wife, Harriet Grant (also a Dickstein Shapiro alum).  We live within a few miles of the
Libbys, we see each other regularly, have shared many holidays and vacationed together.  The
Libby children,                                        are the same ages as our son and daughter.  The
children have been friends all of their lives.

When Vice President Cheney asked Scooter to join the administration as his Chief of Staff in
2000, the decision to accept was a hard one for the Libby family.  At that time, Scooter enjoyed a
very successful private law practice in which he had a fair amount of control over his schedule.
This control was very important because it enabled Scooter to spend time with the children who
were then only 6 and 3 years old.  Harriet was particularly worried that the life she and Scooter
had built would be unduly disrupted if he took the job.  She feared that Scooter would become so
immersed that the family would "lose him" until he returned to private life.

As expected, the Vice President's demands on Scooter's time were considerable. He was working
very hard and struggling to make time for the family.  He was often on the road, and greatly
missed.  Harriet was holding down the fort. She thought he was "missing" the kids childhood.  I
remember her saying that "at most", Scooter would stay in the government until the end of the
first term.  It has become almost a cliché to say that "everything changed" after September 11,
2001.  It certainly did in the Libby household.


Washington, DC  |  New York, NY  |  Los Angeles, CA                    DSMDB.2251946.01

**DICKSTEIN**SHAPIRO LLP

The Honorable Reggie B. Walton
April 30, 2007
Page 2

Scooter went into overdrive. He worked all the time. Thoughts of his leaving the Vice President were completely abandoned. While I share few political views with Scooter, I told his children and my own, that we were lucky to have someone as smart and dedicated as Scooter doing everything he could to protect the country. Indeed, while Scooter was working at "undisclosed locations" his family had good reason to fear for his and their own safety. It was a great sacrifice. We were proud of him. It become clear that Scooter felt that he could not leave the government.

It is tragic how this has all ended-up, for Harriet, the children and Scooter. If it were not for 9/11 and his subsequent loyalty to the administration, Scooter would have left the White House, and would now be happily pursuing private practice, making a great deal more money and his reputation would be intact. Scooter gave some of his best years to public service. Accordingly, I respectfully request that you spare Scooter and the family further hardship.

Sincerely,

R. Bruce Holcomb

R. Bruce Holcomb

RBH/kmm

DSMDB.2251946.01

# D.D. Holcomb



April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I was heartsick to see Scooter Libby's conviction for perjury and obstruction of justice. My husband and I have known Scooter for over twenty years, and this conviction is inconsistent with his character and his integrity. He is an intelligent, honest, hard-working civil servant who is dedicated to his family and his country. I urge leniency in the sentencing phase of this trial

Scooter and I had a professional acquaintanceship at the State Department, where we both worked in the early 1980s. He was respected and highly regarded by his peers, civil servants, foreign service officers and political appointees alike. We became better acquainted in the mid 1980s when he joined the law firm Dickstein, Shapiro and Morin, where my husband is a partner. Our family friendship began there, and has continued throughout his marriage to Harriet Grant and has expanded with the birth of his two children, who are the same age as our children. We have vacationed together and shared family holidays together. Our children have grown up together; we have known each other's parents and siblings.

Scooter is a committed husband and father. Throughout his marriage, he has been dedicated to his wife of 16 years, Harriet. On occasion, we'd be together in a group, and he'd look at her and say "isn't she beautiful." We would all want to throw up, but this devotion to his wife has been a constant. They are friends, partners who respect each other's strengths and understand each other's weaknesses. They have differing political views, but have one view on the most important priority – their family.

They are a very private, close-knit and self-reliant family. Scooter and Harriet have always chosen their family over the high end Washington political lifestyle that comes with the Vice President's Chief of Staff job. Some political insiders thrive on the perks of the job, but they could *not* have cared less. They routinely chose the soccer field with their children over elbow rubbing with Washington's political elite. When the job required, they participated in events, but it would not be their first choice.

Scooter and Harriet's children ███████████ are life-long friends of our children, ███████████. They are the same age and have known each other since birth. Harriet's hands cradle my daughter in the photo we sent with ██████ birth announcement. We are not the same religion, but we have shared our family traditions with each other.

Harriet and I were pregnant together with both kids and we have shared the play-by-play of parenthood, which includes good natured teasing of our husbands. When ████ was a baby, Harriet told Scooter that it was unhealthy for him to kiss his son too much. Scooter responded in all seriousness "it is?" before he got the joke. Scooter has always taken as much time as possible to be an active, involved father to his children.

I am proud of the poise with which █████████ have faced this difficult period in their lives. It is a credit to their parents that they have exhibited such grace under pressure. The job has taken their father away from them as is; a jail term would cause undue suffering to the children and a devoted wife. My husband and I have known Scooter well for a long time. Please know that he is a fine man of integrity and a good citizen.

Sincerely,

D.D. Holcomb

April 26, 2007

Lewis A. Hofmann, MD



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton

I consider it a distinct honor to write to you about my personal experiences with Lewis
Libby.  I am an active duty Air Force Colonel and Family Physician who has been
assigned to the White House since July of 2000.  My particular assignment, since January
20, 2001, is The Vice President's White House Physician.  In addition to providing
comprehensive medical care to the Vice President and his family, my responsibility is to
ensure that his entire staff is optimally well to serve the Vice President and the nation.
From Inauguration Day 2001 until today, I have had served the Vice President and his
staff around the clock, through every circumstance.  I have lived in their world, and stood
beside them through good times and during the remarkable aftermath of an attack not
only on our nation, but on their home.  My "office hours" are on Air Force Two, in
undisclosed locations, and in offices, homes, and hotel rooms around the world.  When I
give medical care, I enter their world rather than vice-versa.

I am not an expert at the law, but I have spent much of my 23 year career in the military
evaluating people for the most responsible positions in our society.  While teaching in
Family Practice Residency programs between 1994 and 2000, I was responsible for the
selection of the next generation of Family Physicians.  During my tenure at the White
House, I have been entrusted with the selection of present and future members of the
White House Medical Unit.

These experiences allow me to bring you a unique perspective – the perspective of a
military officer and physician whose duty is to be apolitical, the perspective of someone
who has a true "inside" view as events of this administration unfold, and the perspective
of someone who is well versed and respected for his ability to judge character, honesty,
integrity, and devotion to country and family.

I would like to make very clear that although I am a member of the armed forces assigned to duty with the Office of the Vice President (OVP), this letter is written in my personal capacity only, and not in my official capacity, and the views expressed in this letter are mine alone and not necessarily those of the OVP or the Department of Defense.

I knew and worked with Mr. Libby for the entire time he was the Vice President's Chief of Staff. In addition to treating him for minor illnesses, I was sought by him to consult on medical issues and threats associated with travel and terrorism. I am certain that I had direct contact with him several times per month on this basis.

I think it is important for you to know the "mindset" that was pervasive throughout OVP in the aftermath of the attack on September 11th. Mr. Libby was focused on assisting the Vice President in his role of formulating plans to respond to the attack, preparing for the next attack, ensuring continuity of government, and securing a safe future for all Americans. The stress was continuous and intense. There was real fear about what the future held and an incredible sense of responsibility. I can tell you for certain that Mr. Libby worked himself to exhaustion day after day. This is a testimony to his devotion to our nation and the Vice President. I also believe that such continuous stress and total exhaustion is just the setting where a person might honestly confuse what he said to who on what day.

Life as a "high official" at the White House presents many potential challenges to integrity. I have always thought that the definition of integrity is "doing the right thing when no one is looking". I have been "inside the door" enough times with Mr. Libby to see him act with perfect integrity when there was clearly the option to do otherwise, and that option would have benefited him or his family personally and substantially. As I have seen him display utmost integrity when no one was watching, I cannot imagine that he would act otherwise under the spotlights "outside the door".

At every opportunity I observed, Mr. Libby placed his country ahead of himself. Yet, as a doctor who cared for him, I can tell you that he also placed his family ahead of himself. His devotion to his wife, Harriet, and his children was evident in many of our interactions. With literally the weight of the world on his shoulders, he often expressed his concern for them, and sought my opinion for their care.

I feel very fortunate to have led a truly remarkable life which has led me to this point, where I can say with impartiality, authority, and specificity that Lewis Libby is a man of the utmost honesty, character, integrity, and devotion to his nation and his family.

Very Respectfully

Lewis A. Hofmann, MD

Jackson Rip Holmes





May 31, 2007

The Honorable Reggie B. Walton
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    I urge you to deny bail on appeal to Lewis "Scooter" Libby.

Dear Honorable Judge Walton:

I urge you to deny bail on appeal to Lewis "Scooter" Libby.

My reasons for urging you not to grant bail on appeal to Mr. Libby are numerous, and include both facts relevant to the specifics of the case before you, i.e. Mr. Libby's perjury and obstruction of justice in the investigation of the leaking of the identity of C.I.A. employee Valerie Plame, and facts relevant to, in my opinion, far greater, and far more serious, crimes which Lewis "Scooter" Libby has committed against our country.

As we know, a great deal of dissembling was engaged in by the Bush Administration in order to convince the United States Congress, and the American people, to choose to redirect the bulk of the United States military response—to the attack on our country of September 11, 2001—away from pursuing the 9/11 attackers,

1

Osama Bin Laden and his Al Qaeda co-conspirators in Afghanistan and Pakistan, and instead to concentrate our military efforts on overthrowing Saddam Hussein in Iraq.

As we know, one of the major justifications put forth by the Bush Administration to justify militarily invading Iraq was that there was an ongoing effort by Saddam Hussein to develop a nuclear weapon, for potential ultimate use against the United States, distributed by Saddam Hussein to Al Qaeda for delivery. The State of the Union speech, we all know, contained false information supporting this allegation of a major nuclear effort by Saddam Hussein, and Ambassador Joe Wilson sought to debunk some of the disinformation with his published article.

We further know that shortly after Mr. Wilson's article, the undercover, Central Intelligence Agency, identity of his wife, Valerie Plame, was divulged in one or more press articles, an action which violates, and damages, our national security.

The public has also, finally, learned in the press—after years of public, videotaped, denial by the highest ranking members of the Bush Administration—that the "outing" of C.I.A. undercover operative Plame was done by people within the Bush Administration, apparently as retaliation for her husband, Mr. Wilson, telling the truth about Saddam Hussein's not purchasing "yellow cake" in Niger.

The article by Mr. Wilson, if dealt with honestly, would have, apparently, undercut the basis for the military invasion of Iraq, at a time, prior to the 2004 Election, wherein, had the American people known then, what they know now: 1) President Bush would likely not have been re-elected, and more importantly, 2) some 1,500 American military personnel likely would not have been killed, 3) some 10,000 American military personnel would likely not have been seriously wounded, and 4) our forces likely would have been redeployed back to the pursuit of Osama Bin Laden and Al Qaeda in Afghanistan/Pakistan, such that we would have long since won the real war (by capturing and/or killing Osama Bin Laden and his 9/11 Al Qaeda co-conspirators), and would now be at peace.

The notion advanced by Lewis "Scooter" Libby that is is acceptable to lie to authorities investigating the "outing" of a covert Central Intelligence Agency operative, and to obstruct their investigation, particular when the matters involved affect the lives and limbs of thousands of our United States military personnel, and when the very national security, and national defense, of the United States, is at stake, is perhaps best answered by my attachment to this letter, wherein I advance three grounds for Impeachment to the Committee on the Judiciary of the United States House of Representatives.

Lewis "Scooter" Libby, I submit to you, Honorable United States District Judge Walton, has committed some of the most serious offenses against our country in its entire 231 year history. He has been convicted of perjury and obstruction of justice. I believe he is also guilty of, although he hasn't been tried for, 1) helping the enemies of the United States, Osama Bin Laden and Al Qaeda Afghanistan/Pakistan, escape justice,

2

through his lies misdirecting U.S. military efforts away from bringing them to justice, 2) helping cause the needless, and unjustifiable, deaths of some 1,500 U.S. military personnel, and serious injuries to some 10,000 U.S. military personnel, again through his deliberately deceitful conduct, in misdirecting the post-9/11 U.S. military response away from the 9/11/2001 attackers, and into the quagmire of Iraq, and 3) doing so in part to enrich the former company, Halliburton Oil, of his employer, Vice President Cheney, per the enclosed investigation of the House Government Oversight Committee's Congressman Henry Waxman.

For the foregoing reasons, Honorable Judge Walton, I pray that you will deny bail, on appeal, to Lewis "Scooter" Libby.

Sincerely,

Jackson Rip Holmes

cc:    Independent Counsel Patrick Fitzgerald
       Attorney William Jeffress
       Begging your forgiveness, Judge Walton, also to members of the media and/or
       distinguished national leaders, who have been courageously involved, as you
       have, in trying to see that the American people, and their institutions, are not
       improperly deceived, by people such as Mr. Lewis Libby, in these harrowing
       times of war.

Attachment

3

Jackson Rip Holmes





April 24, 2007

House Judiciary Committee Chairman John Conyers
House Judiciary Committee Ranking Member Lamar Smith
Congressman Howard Berman
Congressman Rick Boucher
Congressman Jerold Nadler
Congressman Robert Scott
Congressman Melvin Watt
Congresswoman Zoe Lofgren
Congresswoman Sheila Jackson Lee
Congresswoman Maxine Walters
Congressman Martin Meehan
Congressman William Delahunt
Congressman Robert Wexler
Congresswoman Linda Sanchez
Congressman Steve Cohen
Congressman Hank Johnson
Congressman Luis Gutierrez
Congressman Brad Sherman
Congressman Anthony Weiner
Congressman Adam Schiff
Congressman Artur Davis
Congresswoman Debbie Wasserman Schultz
Congressman Keith Ellison
Congressman James Sensenbrenner
Congressman Howard Coble
Congressman Elton Gallegly
Congressman Bob Goodlatte
Congressman Steve Chabot
Congressman Daniel Lungren
Congressman Chris Cannon
Congressman Ric Keller

1

Congressman Darrell Issa
Congressman Mike Pence
Congressman Randy Forbes
Congressman Steve King
Congressman Tom Feeney
Congressman Trent Franks
Congressman Louie Gohmert
Congressman Jim Jordan

RE:    I submit to you that the American people have decided we should not have gone to war in Iraq, that it is unrelated to the war on terror, and that we should be pursuing our real enemies, Osama Bin Laden and Al Qaeda in Pakistan, rather than wasting the lives and limbs of our American military youth, not to mention hundreds of billions of taxpayer dollars. **I further submit to you that the American people would prefer that the Congress, rather than allow President Bush to send more young American men and women to their needless deaths in Iraq, begin investigations and hearings which, if necessary could lead to impeachment, so as to spare the needless sacrifice of the lives and limbs of our young soldiers in Iraq.**

In keeping with my perception of the heart, and will, of the American people, I submit for your consideration:

Three proposed grounds for Impeachment:

1) helping the enemies of the United States, Osama Bin Laden and his 9/11 Al Qaeda co-conspirators in Pakistan, escape justice, through pervasive lying (e.g. "we must attack our enemies where they live, in Iraq", while knowing no Iraqi in human history has ever attacked the US homeland, and that our enemies, Osama Bin Laden and Al Qaeda, are in PAKISTAN.

2) deceitfully and unnecessarily causing the deaths and maimings of U.S. military personnel -- over 1,500 deaths, and over 10,000 injuries, since Arms Inspector David Kay publicly concluded there were no weapons of mass destruction in Iraq to justify the invasion. And

3) war profiteering conspiracy—the Halliburton no bid Iraq oil contract was probably illegally engineered by Bush Administration political appointees, and the enrichment of Halliburton Oil Company, Vice President Cheney's former company, in former oil company president, President Bush's, home State of Texas, was apparently one of the five or six reasons the Bush Administration decided to go to war in Iraq.

Dear House Judiciary Committee Chairman Conyers, House Judiciary Committee Ranking Member Smith, Congressman Sensenbrenner, Congressman Berman, Congressman Boucher, Congressman Nadler, Congressman Scott, Congressman Watt, Congresswoman Lofgren, Congresswoman Jackson Lee, Congresswoman Walters, Congressman Meehan, Congressman Delahunt, Congressman Wexler, Congresswoman Sanchez, Congressman Cohen, Congressman Johnson,  Congressman Gutierrez, Congressman Sherman, Congressman Weiner, Congressman Schiff, Congressman Davis, Congresswoman Wasserman-Schultz, Congressman Ellison, Congressman Sensenbrenner, Congressman Coble, Congressman Gallegly, Congressman Goodlatte, Congressman Chabot, Congressman Lungren, Congressman Cannon, Congressman Keller, Congressman Issa, Congressman Pence, Congressman Forbes, Congressman King, Congressman Feeney, Congressman Franks, Congressman Gohmert, and Congressman Jordan:

2

*DISCLAIMER: I apologize to those who may be offended by my remarks. My intent is patriotic— I believe we are fighting the wrong, post-9/11, national self-defense war, and our national security is endangered thereby. I believe that our United States military deserve the same selfless devotion by the public, to their lives and limbs, which they are devoting to ours, and that all of us should take risks to minimize unnecessary U.S. military deaths and maimings, to the extent we believe they are caused by potential government corruption. Finally, I am proud to support Sacred First Brother Jeb Bush as probably the individual who, along with his Sacred Wife Colomba, and Sacred Children, has contributed more to the well-being of my native South Florida than anyone in history, except the first native American settlers. If I have inadvertently overstated any personal opinions in a manner which the reader considers inappropriate, I withdraw such statements. Jackson Rip Holmes*

### Introduction

I believe that President Bush's, and Vice President Cheney's, war in Iraq, has lost the support of the American people, because they believe they were misled by the Bush Administration as to its reasons for going into Iraq, because they do not believe it is conscionable to support more American military youth losing their lives, and limbs, in an unjustifiable war, and because they believe the war is unconnected to the real war on terror, against Osama Bin Laden and his 9/11 Al Qaeda leadership, based in Pakistan. Finally, I believe Americans are concerned that the no-bid Iraq Halliburton Oil Company contract was improper.

Most Congresspeople, and most Americans, probably prefer to simply correct the Bush Administration's mistakes—i.e. change course in our national defense by withdrawing from Iraq, while continuing to pursue Osama Bin Laden—rather than pursue Impeachment. However, the Bush Administration, which has the full power to choose whether to respect the wishes, and judgment, of the American people, or to disrespect the wishes, and judgment, of the American people.

Therefore, like Senator Hagel, I believe that most Americans would rather see the Congress begin to consider the possibility of Impeachment investigations, than continue to see young Americans sent to their deaths in Iraq, not to mention seeing billions of taxpayer dollars arguably wasted there.

Because the Bush Administration is flouting the decisive will of the American people—that we stop wasting lives and taxpayer money and our national reputation on "fighting the wrong war"—Congress, which was elected to change the course of our national defense, must consider whether it will capitulate to the Bush Administration's contempt for the American people, or will, as a last resort, undertake investigations which can lead to Impeachment.

In keeping, then, with my belief that the American people would rather Congress undertake pre-Impeachment investigations and hearings, than continue to send American military youth to their needless injuries and death in, let alone squander billions of taxpayer dollars on, the Iraq war, I submit for your consideration my following three grounds for Impeachment of President Bush and Vice President Cheney.

### Discussion

I submit to you that the Bush Administration's is de facto helping the enemies of the United States—the perpetrators of the 9/11/2001 attacks on our country, Osama Bin Laden and his 9/11 Al Qaeda co-conspirators—escape justice. I submit it did this by pretending their threat arose from, and resides in, Iraq, rather than in Afghanistan/now Pakistan, and by deceitfully misdirecting the application of our U.S.

3

military resources away from capturing, or if necessary killing, the 9/11/2001 perpetrators, now in Pakistan, instead into Iraq (despite the fact that no Iraqi in the history of the human race has ever attacked the U.S. homeland).

The foregoing deceitful misdirection of U.S. military resources, from the legitimate pursuit of Osama Bin Laden and Al Qaeda in Pakistan, to the meritless "democratization" of Iraq (democracy elected terrorist Hamas in Palestine, which the Bush Administration admits is bad news, eviscerates the Bush Administration claim that democracy is the magic cure for the Middle East and terrorism) has made it possible for Osama Bin Laden and his Al Qaeda, headquartered in Pakistan, to carry out 13 of 15 post-9/11 attacks, including:

A.   -Shoe bomber on U.S. bound passenger jet
B.   Attack in Saudi Arabia
C.   Attack in Morocco
D.   -Stinger missile fired at Israeli passenger jet in Kenya
E.   Attack in Turkey
F.   -Spanish railroad bombings
G.   Virtually all Homeland Security code alerts
H.   The major pre-invasion argument for going into Iraq was the danger of weapons of mass destruction being passed by Saddam Hussein to Al Qaeda to attack within the United States
I.   Osama Bin Laden's public recruiting of Al Zarqawi to directly attack the United States.
J.   Attack in Egypt.
K.   Second attack in Egypt.
L.   -Metro attacks on London, per the videotapes released by Al Qaeda of Ayman Al Zawahiri, second in command to Osama Bin Laden, and Ian Blair, London Chief of Police, were supervised and supported by Osama Bin Laden's Al Qaeda network in Pakistan.
M.   -Osama Bin Laden's January, 2006, audiotape promising more attacks on the United States homeland.
N.   -Attempted terrorist attacks, via liquid explosives, on U.S. bound jets from London airport in late 2006.

Worse, Osama Bin Laden, from Pakistan, told us in his January, 2006 audiotape that he is going to attack our U.S. homeland again soon. The Bush Administration's bold-faced lies have been designed to perpetuate our nation's "fighting the wrong post-9/11 national self defense war", in Iraq, instead of bringing the 9/11, and post-9/11, attackers to justice in Pakistan. For example, after the London metro attacks, which were immediately proclaimed to be the work of Osama Bin Laden's Pakistan-based Al Qaeda by London Police Chief Ian Blair, President Bush said the London attacks support continuing the war in Iraq, because "we must attack the enemy where he lives". President Bush knows full well that Osama Bin Laden and his Al Qaeda leadership are responsible for 13 of the 16 major international terrorist attacks/threats post-9/11, are based in Pakistan, not Iraq.

And President Bush knows that no Iraqi in the history of the human race has ever attacked the United States homeland, and that the terrorists in Iraq have never, struck outside of Iraq and Musab Al Zarqawi's home country of Jordan. President Bush has deliberately lied to the American public about "where the enemy lives", pretending Osama Bin Laden and his Al Qaeda leadership, the perpetrators of the 9/11/2001 attack, and 13 of 16 post-9/11 attacks, live in Iraq, when he knows they live in Pakistan.

## Impeachment Article One

### President Bush has been helping the Enemies of the United States—Osama Bin Laden and his Al Qaeda 9/11 Co-Conspirators

4

—escape justice, through his systematic lies about "where the enemy lives", deceitfully misdirecting U.S. military resources away from pursuing Osama Bin Laden and Al Qaeda in Pakistan, and thereby helping Osama Bin Laden and Al Qaeda prepare and carry out 13 of 16 post-9/11 major international terrorist actions, and helping Osama Bin Laden prepare and carry out his announced—January, 2006 audiotape—upcoming second wave of attacks on our United States homeland.

Because President Bush has relentlessly lied to the American people as to "where the enemy lives", deceitfully pretending that Osama Bin Laden and his Al Qaeda leadership lives in Iraq rather than Pakistan, and has thereby misdirected U.S. military resources away from protecting the United States from these 9/11, and post 9/11 international terrorist attacks—e.g. Spanish railroad bombings, London metro bombings, Kenya Stinger missile fired at Israeli passenger jet in Kenya, and attempted bombings of U.S. bound planes leaving London— President Bush, through his knowing and willful lies, has helped the enemy of the United States.

Further, because we know we should have taken Osama Bin Laden's pre-9/11 attack threats seriously, and didn't, and because we should now take Osama Bin Laden's January, 2006, audiotape threat to attack the United States homeland seriously, but President Bush continues to lie, pretending that Osama Bin Laden's threat and danger to this country resides in Iraq, not Pakistan, President Bush is enabling/helping the enemy of the United States to prepare and carry out another attack on the United States homeland. I therefore submit to you that he should be impeached.

. . .

## Impeachment Article Two

Deceitfully, recklessly, indifferently, and immorally causing the deaths of over 1,500 United States military personnel, and deceitfully, recklessly, indifferently, and immorally causing injuries to over 10,000 United States military personnel.

The American people, and the United States Congress, accepted the proposition that the Bush Administration was speaking honestly in claiming its invasion of Iraq was based on the fear that Saddam Hussein possessed weapons of mass destruction, which could be passed to Al Qaeda, and which could in turn result in a terrorist attack on the United States homeland of far larger devastation than the 9/11 attack. However, once U.S. Arms Inspector David Kay pronounced that there were no weapons of mass destruction in Iraq, either after the invasion, or before it, President Bush disclosed that weapons of mass destruction was not his real reason for the invasion. He said in the 2004 Presidential Election Debate in Miami, and at least on two other occasions, including in the summer of 2006, that "if I knew before the invasion what I know now— that there were no weapons of mass destruction possessed by Saddam Hussein—I would still have invaded Iraq."

Whereas most Americans supported the apparent, self-defense, weapons of mass destruction, reason for invading Iraq, most Americans have not supported, did not support, and do not support invasion of Iraq for non-WMD reasons. Because the American people, as expressed by polls, believe the U.S. should not have remained in Iraq after Arms Inspector David Kay found there were no weapons of mass destruction there, the support for the war sufficient to justify further deaths and maimings being incurred by United States military personnel did not exist once we learned there were no weapons of mass destruction there.

Since Arms Inspector David Kay pronounced there were no weapons of mass destruction in Iraq to have justified the U.S. invasion, or continued presence, over 1,500 United States

military personnel have been killed there, and over 10,000 United States military personnel have been injured there.

President Bush bears the responsibility for the deaths and maimings of U.S. military personnel incurred after the American people ceased supporting, upon discovering there were no weapons of mass destruction, the war in Iraq.

### Impeachment Article Three

Conspiracy to commit war profiteering on behalf of Vice President Cheney's former company, Halliburton Oil of Houston, in former oil company president, President Bush's, home State of Texas.

The company which is making more money on the Iraq War than any other private entity on earth is Halliburton Oil, of Houston, Texas. Is it a coincidence that Halliburton Oil is the company which Vice President Dick Cheney headed immediately before he became Vice President? Is it a coincidence that President Bush is a former oil company president from Texas, the site of Halliburton's headquarters? Is it a coincidence that Halliburton Oil was granted an extremely lucrative, no-bid, contract for oil services in the Iraq War?

Then Ranking Member Congressman Henry Waxman, of the House Government Oversight Committee, has researched this subject extensively. He found that the closer one looks, the more it appears that Vice President Cheney's former Chief of Staff, Lewis Libby, and other prominent Bush Administration political appointees, were not only heavily involved in the awarding of the no-bid contract to Halliburton, but were the ones who proposed, and gave preliminary approval to, the Halliburton Oil, no-bid, Iraq war contract. That is despite Vice President Cheney's public statements to the contrary. More importantly, it is despite the fact that Bechtel Oil had the previous Iraq war contract—but was denied a chance to bid on this contract—and that the General Accounting Office, of Congress, has determined that the no-bid contract was illegal.

There is a definitive and compelling appearance that one of the five or six reasons the Bush Administration decided to launch the Iraq War is that Vice President Cheney's former company, and President Bush's Texas oil friends, would gain extraordinary financial profit from the decision. Halliburton Oil has now apparently made in excess of $25 billion dollars in U.S. government contracts from the Iraq War, the biggest being the apparently politically rigged, and illegal, no-bid field oil services contract.

The appearance is that President Bush had as one of his major factors in deciding to invade Iraq the profits which his Texas oil friends would earn thereby, irregardless of the loss of the lives and limbs of United States military personnel. Even after no weapons of mass destruction were found, the appearance is that President Bush decided to continue sending 1,500 United States military personnel to their deaths (despite the opposition to this by the majority of the American people), and to continue sending 10,000 United States military personnel to be wounded (despite the opposition to this by the majority of the American people), with a primary motive being the enrichment of his Texas friends.

This would seem to provide grounds for an Article of Impeachment.

*DISCLAIMER: I apologize to those who may be offended by my remarks. My intent is patriotic—I believe we are fighting the wrong, post-9/11, national self-defense war, and our national security is endangered thereby. I believe that our United States military deserve the same selfless devotion from the public, to their lives and limbs, which the military are devoting to ours, and that all of us must take risks to minimize unnecessary U.S. military*

6

*deaths and maimings which we believe are caused by potential government corruption. Finally, I am proud to support Sacred First Brother Jeb Bush as probably the individual who, along with his Sacred Wife Colomba, and Sacred Children, has contributed more to the well-being of my native South Florida than anyone in history, except the first native American settlers, and a primary motivation of mine is to protect the Miracle created by Miami's Republican Cuban-American community, and the Jeb Bushes, what I call, "The Cuban-American Miracle, the Internationalization of Miami". If I have inadvertently overstated any personal opinion in a manner which the reader considers inappropriate, I withdraw such statement.  Jackson Rip Holmes*

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

     Honorable Chairman, Ranking Member, and Members of the Committee on the Judiciary of the United States House of Representatives, I thank you for taking the time to read this letter, and once again ask your forgiveness that I obviously will never possess your talents, personal strengths and talents, and diplomacy.

Sincerely,

Jackson Rip Holmes

Cc:    Distinguished Members of the Media
       Possibly to the President, Vice President, and other Executive Branch officials
       Possibly to many other, if not all, U.S. Senators and Congresspersons
       Possibly to other responsible national, and pro-United States international, leaders

7



April 25, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue NW
Washington, DC 20001

Dear Judge Walton:

I am writing to offer a personal perspective on Scooter Libby both as a friend and a colleague and on the situation in which he now finds himself. My sense of it comes from more than a quarter century of knowing Scooter and, from time to time, working with him, most recently at the Hudson Institute, where I have been Senior Fellow since 1995. At Hudson, before his resignation in March, we had begun to consider work we would do together about China and Asia. But I first worked with him at the Department of State in 1981, and at other times in between. The passage of time matters as nothing else does. To have known a man at the very outset of his professional life, and then to have grown older along with him, deepens one's understanding of him and provides otherwise unavailable insight not only into what he has gone about but, more, why he has gone about it.

I am sure that Scooter, himself a published novelist by avocation, would sympathize with my writing to you in this way; he would also appreciate why it is difficult and dismaying for me to do so. That Scooter now awaits sentencing in your court for violation of laws of the United States is startling—an unfathomable episode in the personal story he has been writing for more than twenty-five years. Yet, in its essence, it is no different from my own story and the story of most of the others in our once obscure, but now well-known, cohort: Young men come to Washington from some other place and some prior occupation; they may be drawn to the capital by a leader like Kennedy or Reagan; and they may have become uneasy that the country which made possible their own place in the scheme of things could be in some jeopardy. Only a tiny number of them descend from well-established ancestors. No, their forebears lived in some other milieu. If they could see their grandsons or great-grandsons stationed in the halls of power or working in close proximity to Presidents or Senators or Supreme Court Justices, they would be more than astounded; they would be uncomprehending.

We Americans may all be born with the chance to live, someday, in this rarefied world where history can be made, but we are not born knowing *how* to live in it. We have to teach ourselves and thereby acquire the requisite instincts by becoming close observers of the ebb and flow of things. If we are fortunate, we will also have teachers—mentors, we now call them—

who care about us and look out for us, even though they do not have to. And, if we are more fortunate still, we will somehow come out at the other end the better for it. But what happens if, without warning, the story takes an abrupt and, yes, a frightening turn?

I am older than Scooter, and had already worked in the United Sates Senate and taught at Georgetown University before becoming a Deputy Assistant Secretary of State in the first Reagan Administration. Scooter joined the department's Policy Planning Staff in 1981; its incoming director had, in the early 1970s, been one of his teachers at Yale and had gotten him interested in the things that "defense intellectuals" do. In retrospect, the staff was a noteworthy group, holding future ambassadors and other high-ranking State Department officials, well-known scholars and university teachers, a Secretary of the Air Force, and also other officials in the Defense Department—of which the head of this little group was himself to become Deputy Secretary. Because of my prior academic study, I had a special interest in China and, even then, China had begun to figure prominently in issues that Scooter and I would work on. As a professional Sinologue, I was reassured when he moved to the Department's Bureau of East Asian Affairs.

I mention this because, truth to tell, I noticed almost immediately that Scooter was different from his more demonstrative and sometimes boisterous policy planning colleagues. It quickly became apparent that he had not come to the Department of State to call attention to himself but to attend to the matters at hand. He had not set out on what we euphemistically call a career pattern. And because he had not, his perspective and insight and thoroughness soon made him unusually credible to me. And, over time, I believe that this is why other people came to trust his judgment and his discretion. It was not merely that he was not much of a gabber, but also that he was mercifully free of self-inflating blather.

I left the government in 1990 and so I cannot comment as a government insider on his tenure at the Department of Defense between then and the end of 1992. But it is obvious that these were demanding years, remembered especially for the first Persian Gulf War. That work was well done, and it is therefore not surprising that two of the principal architects of that great success, would, in the administration of the next President Bush, serve as Vice President of the United States and as Deputy Secretary of Defense. Scooter's now well-known gifts of cogency and care made it equally unsurprising that he would become one of the new administration's most dependable councilors.

I have tried to follow the bewildering blizzard of detail that has comprised Scooter's story recently. Despite his best efforts to the contrary, he has become a famous man, and it has been hard not to pay attention. But, Your Honor, I will say to you that the true enormity of it was driven home to me only a few days ago by a story I read in the *Wall Street Journal*. The story described the time inside a Federal prison spent by one of the men convicted in the Enron scandal—and he, mind you, one of the defendants who had co-operated with prosecutors. It is a jarring account; indeed, its detailing of the danger and deprivation of life as a Federal inmate could serve as the basis for a very scary movie. And as impossible as it is to imagine Scooter's spending even an hour in such a place, it has become a genuine possibility. In this respect, Scooter's story is no longer some "political scandal," or some panel discussion broadcast by C-

SPAN about "freedom of the press," or some lecture about "weapons of mass destruction." It is not a metaphor for anything.

What then is it? It is first of all the critical moment in the life of man has lived usefully and honorably. Anyone who knows him will tell you the same thing and they will also tell you of their own anguish when they think about his current predicament and what it could mean to him and his family. But this is also a public affair, one that involves the administration of justice. What about that? No, this is not one man's problem. It forces us to think about what we want from this system of ours, about how we want it to punish and protect, but also about how we want it to edify us, especially our young people. What would we like them to learn from it? What do we think they actually will learn from it?

I can still remember 1974 and the Watergate hearings. The television off in the corner of room 135 in what was then called the old Senate Office Building droned on for days. And I actually saw one of the memorable encounters of those hearings. A young man, almost my exact age, had gotten caught up in it—Gordon Strachan, a White House lawyer from Utah. Senator Joseph Montoya of New Mexico asked him, given his experience of being trapped in the scandal, what he would say to the young people of America. I suspected that the Senator wanted young Strachan to recite the traditional pieties. Instead, he said: "Stay away." Only that. And I also remember some of the commentary that followed: Such cynicism in one so young, some of the oracles of that day complained. And yet...

How faulty was Strachan's advice to his agemates? In particular, would Scooter Libby have been better off if he had followed it? Still an open question, Your Honor, and I hope—and I hope it also for the sake of my own sons who are now about the same age Scooter and I were back then, and who now face the same choice we did then—that the decision you render in Scooter's case will not encourage them to stay away, nor make Scooter Libby want to relive the day he came to Washington to serve our country.

Sincerely,

Charles Horner



Michael J. Horowitz

April 2, 2007

Honorable Reggie Walton
United States District Judge
United States District Court for the
    District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

Dear Judge Walton:

I have sought for a lifetime to be, and to be regarded by others, as an honorable and an honest man.

The effort has of course been its own reward, but a moment is now at hand when I hope it will yield benefit for another – this because I now offer to the Court, and with every shred of credibility and integrity I have worked to earn, my judgment of Scooter Libby as one the most balanced and decent and honorable men I have known.

I have known Scooter for more than 20 years – as a law partner, colleague and friend -- and know him to be a model to his friends and colleagues on every count that makes a man a man. In a town where power corrupts, his ego to intelligence and ego to integrity ratios are unmatched; characteristically, Scooter treated others no differently while an intimate colleague of the Vice President and President than he did when he was one of many lawyers in a town filled with them. I have seen Scooter act with grace and caring in moments of crisis for others – as, for example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ when colleagues and clients endured like stress. Through the nightmare of the past year, I have seen ultimate evidence of his character: He has been the prime source of comfort to his friends, rather than seeking it from them. I have learned of the loving manner in which he has dealt with his children when they were cruelly taunted at school about their father. I have seen the remarkable tenderness he has shown his wife – on whom, typically for Scooter, he thought the burden had fallen much more heavily than it did on himself.

Hon. Reggie Walton
April 2, 2007
Page Two

I know that for the purpose of this letter I must not challenge the judgment of the jury but, knowing Scooter as I do, I believe him to be a man incapable of acting with criminal intent. This view is based on my knowledge of Scooter, and it is also based on the frightening personal experience of having offered information while being examined by federal investigators in a high profile, politically charged matter.  In that case I unambivalently and unreservedly – but, as I soon learned, wrongly -- denied having taken certain actions I had been asked about but did not (and still do not) recall.  There, but for the discretion of the investigators to whom I had offered my information, might I have faced charges and might I have been obliged to defend a failure to remember an episode that put me in an unfavorable light – perhaps even without being prudently able to take the stand on my behalf.

Many who know the iconic man now before the Court feel as I do about him -- and this is yet another ground on which I pray that the Court will find great and special stores of wisdom and courage to deal with the case before it.   Disposition of the Libby case will have much to do with whether the country will further and gravely descend into "us v. them" feelings of bitterness and contention.  As the Bork case led inexorably led to the Clinton impeachment, so can the case before the Court profoundly criminalize and poison the country's political process with calls for retribution on the part of many who will never believe – *never* – that Scooter merits criminal punishment or, God forbid, incarceration.  It is an irony that Scooter would be the last to support such an embittering development, but the esteem in which he is held is such that any but the most Solomon-like disposition of his case could easily ensure this occurrence.

A good man stands before the Court, and I hope -- and know -- that the Court will take this into account as it performs its solemn duties.

Respectfully,

Michael Horowitz



The Honorable Reggie B. Walton
United States District Court
1225 Barrett Prettyman United States Courthouse
333 Constitution Ave NW
Washington DC 20001

Dear Judge Walton,

As you begin the sentencing process for Scooter Libby, I hope it is helpful to hear from a longtime friend of his. But first, let me introduce myself. An editor and writer, I began my career with a long stint at *The New Republic* magazine, and am now a contributing writer at *The New York Times Magazine.* I'm also a contributing editor at *Slate, The American Scholar* and *The Wilson Quarterly,* as well as the author of two books, *The Interior Castle: The Art and Life of Jean Stafford* and *Raising America: Experts, Parents, and a Century of Advice About Children.*

I met Scooter 25 years ago, through my husband, Steve Sestanovich, when they were young colleagues at the State Department. Since then, Scooter has become a true family friend, the kind we know we can count on, no matter what might come up. From the time I met him, I've been struck by Scooter's low-keyed but loyal interest in contributing to the endeavors of others, a rarity for ambitious and incredibly busy Washingtonians. He is the opposite of a hard-driving calculator of his own advantage or an ideologue. Instead, he has a notably broad perspective—I've appreciated especially his literary interests— which is something all too easy to lose (or never acquire) in the midst of a high-pressured career in law and the government. I've found Scooter always ready with a balanced, honest, clear-eyed view of things—not just his friends' situations, but also his own. I've been completely unable to square this sense of him, firmly rooted for me over a long friendship, with the accusations lodged against him.

Scooter's empathy and those wide-ranging interests not only make him an indispensable friend; they have also inspired a moral imagination, evident in his life, not just in the novel he wrote. He has been someone I've fruitfully talked with about my own writing for as long as I can remember. When I was at work on my first book, I ran into a familiar biographer's tangle with permissions issues. I didn't think twice about where to turn, and I couldn't have hoped for more incisive guidance more willingly offered than the advice Scooter gave. It was an unexpected pleasure when my turn came to offer some of my own expertise: a manuscript of the novel I knew Scooter had been working on arrived in a big binder for me to look at. We'd been talking about the abandoned draft for quite a few years, and I confess I didn't see how Scooter would actually find time to return to a

project begun decades earlier. But he did, and produced a novel that took me by surprise when I read it: I'd had no idea of his capacity for imagining worlds so completely different from his own. Scooter welcomed criticisms and proceeded to work yet more, revising in ways I also never anticipated. Conferring with him about *The Apprentice* (a subtle, stylistically beautiful novel that met with acclaim when it was published) was one more occasion to be struck by Scooter's wide-ranging curiosity, and his responsiveness and determination to get things right.

Scooter's family has been an incredible source of strength to him, but I think that's surely because he has been such an important presence for his wife and his children. As someone whose husband at one point had a demanding stint in the government, I know how hard it can be on family life—and I had to weather only three years when Steve worked for President Clinton under far less stressful circumstances. In the way he does with everything, Scooter has thrown himself into the scarce time he has had with his family. He's anything but the absent dad or distant husband. His son and daughter think the world of him, and have thrived on his example of energy and total commitment— which he brings home to them, as he has always brought it to his work. For me, his marriage is a model of love and loyalty triumphing over political differences.

I hope these thoughts are of use to you as you consider what lies ahead for Scooter, who has added immeasurably to the lives of his friends.

Sincerely,

Ann Hulbert



Steven C. Hychka

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrell Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

March 30, 2007

Dear Judge Walton:

I write to ask that you sentence I. "Scooter" Libby to the toughest sentences you feel are warranted when an officer of the court and an assistant to the President and Vice President of the United States of America is convicted on several counts of perjury and obstruction of justice for lying under oath to Federal Bureau of Investigation officers and a federal grand jury in a matter related to the disclosure of the identity of a covert agent of the Central Intelligence Agency during a time of war.

The message sent by this man's actions and the posturing of his cronies that Mr. Libby has been convicted wrongfully for innocent misstatements, at most legal technicalities, is an appalling approval of outrageous behavior that undermines the justice system and undermines faith in government.

I ask that you send a very strong message that the crimes committed are indeed serious and were committed by learned counsel placed in positions of extreme trust.

Sincerely,

Steven C. Hychka

JOHNS HOPKINS
U N I V E R S I T Y

Division of Infectious Diseases
1830 East Monument Street/Suite 450
Baltimore MD  21205-21200
410.215.3957/FAX 410.614.8488
http://www.hopkins-id.edu
http://hopkins-abxguide.org

Noreen A Hynes, MD, MPH, DTM&H

28 May 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing this letter to provide you with further information for consideration during your deliberations regarding the sentence to be meted out following the perjury and obstruction of justice conviction of Mr. I. Lewis (Scooter) Libby.  I am a practicing physician in the areas of infectious diseases and public health as well as an educator and scientist with over 30 years of experience in health care delivery and public health. I recently retired from government after serving for over 25 years as a Commissioned Corps officer in the United States Public Health Service. My final position was as Deputy Assistant Secretary of Health for Public Health Emergency Preparedness in which capacity I was responsible for an office that undertook advanced research and development as well as procurement of medical countermeasures to treat the consequences of public health catastrophic events including pandemic influenza and bioterrorism.

I have known Mr. Libby since September 2001. At that time, I was sent by then serving Health and Humans Services Secretary Tommy G. Thompson to the Office of the Vice President (OVP) to serve as a subject matter expert with regard to the medical and public health aspects of terrorism on the National Preparedness Review staff.   This detail was subsequently extended and I served as the Senior Medical and Public Health Advisor in the Homeland Security Affairs section of the OVP.

My interactions with Mr. Libby focused on medical and public health preparedness and response issues, particularly with regard to bioterrorism, including the anthrax letter attacks—as the events were unfolding—and national policy regarding the resumption of smallpox vaccinations.  Additionally, I worked closely with Mr. Libby and other members of his staff in conceptualizing and

formulating the basic elements of Project BioShield, proposed legislation (subsequently enacted) to improve the Nation's preparedness by developing, manufacturing, and purchasing needed vaccines, drugs, and diagnostics for use in the event of a terrorist attack or other public health catastrophic emergency. During my 16 months of interaction with Mr. Libby I was impressed by his dedication to and focus on improving our ability to protect the nation against these potentially catastrophic threats.

Although tough-minded and opinionated, Mr. Libby was never arrogant or supercilious during my interactions with him.  Rather, he insisted upon clarity particularly on basic scientific, medical and public health principles before proceeding with recommendations.  For example, he wished to understand how smallpox and anthrax vaccines were manufactured and regulated, how the human body developed immunity to these vaccines, what were their side effects, and what were the issues related to storage, stockpiling, distribution and administration of these vaccines.

I respect Mr. Libby, not because we always agreed on how best to approach public health issues.  We did not.  In fact, on several occasions we vehemently disagreed.  However, in my dealings with him, Mr. Libby's ever-present and paramount concern was always for the well being of the American public in a future terrorist attack or public health catastrophe and showed him to be a man of character and integrity.   I believe these to be essential qualities in Mr. Libby and remain unaltered in his character.

Sincerely,

Noreen A Hynes, M.D.

Noreen A Hynes, M.D., M.P.H., D.T.M.&H.
Captain, United States Public Health Service (Retired)
Former Deputy Assistant Secretary for Public Health Emergency Preparedness
Department of Health and Human Services

Division of Infectious Diseases
Department of Medicine
        and
Department of International Health
Bloomberg School of Public Health



**FRED C. IKLÉ**



April 25, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington D.C.

Dear Judge Walton,

Scooter Libby and I have known each other for seventeen years. After my service in the Reagan Administration as Undersecretary of Defense for Policy, I met Scooter frequently when he worked for my successor in the first Bush Administration (1989-1992). And since then we have collaborated on various projects. His legal training complemented my professional background in defense strategy and political science. I was Professor of Political Science at MIT, worked at the RAND Corporation, and served as Director of the Arms Control Agency in the Ford Administration.

As is the case for most people, Scooter's personality is not without inner conflicts. He strives to help other people with carefully thought-out projects, rather than wearing do-goodism on his sleeves. For those who do not know him well, his reticence conceals his strong desire to alleviate human suffering and to help people to escape oppression. His moral principles inspired many initiatives that he promoted during his government service. To implement these initiatives, Scooter often had to navigate carefully because the "official" government position did not address these moral values.

For example, in the early 1990s, well-armed Serbians engaged in a campaign of "ethnic cleansing" in Bosnia. At that time Scooter was the Principal Deputy Undersecretary for Policy in the Pentagon. I remember well how strongly he defended the right moral principles and pursued them even though the administration's policy was to look the other way as these atrocities in Bosnia occurred. Only Muslims in Bosnia suffered from the Serbian attack, so why should the United States become entangled in this internal religious war? "We don't have a dog in that fight," said James Baker, then Secretary of State. Indeed, we didn't. But Scooter knew a moral principle was at stake and tried in every way to convince his superiors that the United States should help the persecuted Muslims in Bosnia, or should at least give them weapons for their self-defense. Alas, his unrelenting efforts did not succeed, because then Defense Secretary Cheney, and apparently also the President, did not concur.

During the same period, when Scooter served the first Bush administration in the Defense Department, he stepped forward to accelerate the restoration of freedom and democratic principles in Eastern Europe. He was asked to head a U.S. government delegation to the East European nations which recently had gained independence from the Soviet Union. But President George H. W. Bush and his senior officials hewed to a cautious policy toward Eastern Europe, fearing that if the United States pressed too vigorously for freedom and democracy in Eastern Europe, Gorbachev's gradual liberalization of the Soviet Union would be jeopardized. Without violating the instructions for his mission, Scooter managed to change the animating spirit of the message which he conveyed to the East Europeans. They understood his subtle encouragement. They began to realize that America would be their new ally, if they prudently moved forward to replace the oppressive Warsaw pact regimes with genuine democracies.

After the 1992 election, when William Clinton defeated George H. W. Bush, Scooter joined a major law firm. Undoubtedly, his new line of work was of great importance and rewarding. But this did not diminish Scooter's sense of moral duty to serve our country and to help improve the welfare of the American people. To this end, he made the financial sacrifice to work pro bono. For example, in the late 1990s it became increasingly clear to those of us who followed world affairs that our homeland was becoming dangerously vulnerable to terrorist attacks. To study this problem, I obtained a small foundation grant for a working group at the Center for Strategic & International Studies. Our principal conclusion was that in the event of a terrorist attack with a weapon of mass destruction, the Defense Department would have to play a leading role. This proposition is now official US policy. But at that time, our workshop had to counter legalistic obstructionism in the Pentagon, where many officials opposed diverting even a tiny fraction of their huge budget to homeland defense. By misinterpreting the Posse Comitatus Act, the Pentagon tried to shirk its responsibility. Evidently, our workshop needed legal advice; but the foundation grant was too small to pay for it. So I asked Scooter if he could help us. He agreed instantly and donated several hundred hours of his time to prepare a decisive explanation why the law does not prohibit the Defense Department to contribute to the defense of the homeland. Moreover, he explained how the legal thicket must be cleared to avert calamitous delays and confusion in the event of a major attack. Scooter's pro bono work became the basis for a new national policy and remains of great value to this day.

Sincerely yours,

Fred C. Iklé

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing this letter in behalf of Lewis "Scooter" Libby.  I am a contract attorney
working in San Francisco.

As a young staff lawyer on the House of Representatives Select Committee on U.S.
National Security and Military/Commercial Concerns with the People's Republic of
China, I had the privilege of working closely with Scooter when he served as Legal
Advisor to the Committee.  I was inspired by his intellect and diligence as well as his
integrity and professionalism.  Scooter brought knowledge, attention, and care to the
serious security matters facing the nation and gave the Committee his best advice in a
persuasive yet collegial manner.  It was this combination of qualities that made him
extraordinarily influential in the crafting of the Committee's unanimous, bipartisan
report, and qualities, I believe, that have served the nation well in the current war on
terror.

Despite the demands of his position, Scooter was always courteous and generous to all of
us who worked for him.  He showed an interest in our careers, and was willing to help
and advise us.  In recent years, during what must have been difficult times for him, he
took the time to send me handwritten notes.  He is also devoted to his family – as I recall,
he would take time out from his hectic work schedule to return home to put his young
children to bed.

Of all the people whom I have been fortunate to work for, there are few I admire as much
as Scooter Libby.  He has served the President and the nation with great distinction and,
just as importantly, he is a kind and decent man.

I hope that sharing my thoughts concerning Scooter Libby will assist you in your decision
in his case.  Thank you for your kind consideration.

Sincerely,

Ruby M. Itchon

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:    Sentencing of I. Lewis "Scooter" Libby Jr.

April 1, 2007

Dear Judge Walton,

I am just an American Citizen with no other relationship to my Government or anyone in it. I feel it is my patriotic duty to express an opinion in this matter.

Libby was convicted of obstruction of justice in an extraordinarily important case, one involving the probable treason *(as I see it; legal definitions aside)* of exposing a covert CIA operative and her network, for the purposes of political revenge. If he or anyone were to have been convicted of the latter crime, a judge would probably be mulling the death penalty.

For obstructing the probe into that heinous crime *(which MUST have been committed by someone)* I say that he should receive the heaviest possible sentence, irrespective of prior record or previous position.

Thank you for your consideration of my views.

Very truly yours,

Daniel N. Kalikow, Ph.D.
CEO, Facultech Inc.
21 Irving Road
Natick, Massachusetts 01760

# John Kelly
### 6952 Day St.
### Tujunga, Ca 91042

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

April 2, 2007

**Re:** "Scooter" Libby Jr. Sentencing

Dear Judge Walton,

I feel it is my patriotic duty as an American citizen to express an opinion in this matter.

Libby was convicted of obstruction of justice in this extremely important case, involving the probable treason of exposing a covert CIA operative, for what appears to be nothing more than political revenge.

For obstructing the probe into this heinous crime, I ask that he should receive the heaviest possible sentence, irrespective of prior record or previous position.

Thank you for your consideration of my recommendation.

Very truly yours,

*John Kelly*

**REUBEN JEFFERY III**

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

As you approach the next phase of the Libby matter, I wanted
to take this opportunity to share some thoughts about Mr. Libby. I
am a former colleague of Scooter's having been a government
employee since early 2002. Previously I spent 20 years in the private
sector including an initial period practicing law.

I met Scooter in the summer of 2003 and our paths crossed
frequently during the ensuing two years, primarily in the context of national
security related matters when I worked at the Pentagon and at the National
Security Council.

There are few people that I have encountered in my professional
career with Scooter's particular combination of work ethic, commitment
to public service, intellect and integrity. He is an outstanding professional.
Like many people in the government, Scooter put on hold a successful
private sector career to serve the public interest and work for the current
Administration.

The Honorable Reggie B. Walton
Page 2

I attended many meetings with Scooter in which sensitive matters were discussed. Never did I have the slightest question about Scooter's integrity or judgment. He is not someone I would ever have thought would knowingly violate a public trust.

On a personal level Scooter became a friend, sharing on occasion work related thoughts and frustrations, family and other concerns. We have remained friends during this difficult period.

As the Court ponders Mr. Libby's fate, I can only hope that due consideration be given to his record of public service, his professionalism and his selfless character.

Thank you for your time and consideration.

Respectively submitted,

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Sir

April 25, 2007

My Name is Nathaniel "Skip" Johnson Jr; I'm a 21 year active duty Commissioned Officer assigned to the Military District of Washington.  Although I am a service member, this letter is written in my personal capacity only and not in my official capacity.  Furthermore, the views expressed in this letter are mine alone and not those of the Department of Defense.

This letter of support is intended to articulate my observations of Scooter's character, integrity, and service to his country.  In January 2004, I was selected to be the Army Military Aide to the Vice President.  As one of the Military Aides, I worked very close with Scooter in coordinating  Emergency Actions with the Vice President's Staff, Inter-governmental Agencies, Secret Service and Law enforcement Agencies.  I also worked with Scooter on a daily bases in both official and unofficial setting for almost two years.

My first observation of Scooter was his humility as he interacted with the staff in coordinating actions for the Vice President.  As a person in his position of power and authority.  My admiration and respect for Scooter approach him and found him to be a consummate professional.  My admiration and respect for Scooter as a leader was continually validated throughout my service within the Office of the Vice President (OVP), during very difficult and arduous times leading up to re-elections.  His calm, reflective demeanor was always leveraged to make sound decisions and provide wise council.  I never witnessed him say or do anything observation was beyond reproach and without question.  His integrity, in my unethical.

In my 22 months of observation, it is my opinion that Scooter is a man of great integrity and would not lie about the matter in question.  I have seen his unwavering dedication to his family and committed service to the Office of the Vice President and country.  It is my deepest belief that Scooter's conviction for perjury and obstruction of justice is inconsistent with my knowledge of his character and integrity.   If I can assist further, I can be reached: (703) 888-3913 or (703) 269-7265.

Respectfully submitted

Nathaniel "Skip" Johnson
LTC, USA

*Put in the file*

UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**JUDGE'S COPY**

APR 2 7 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
                                    )    CR. NO 05-394 (RBW)
            V.                      )
                                    )
I. LEWIS LIBBY,                     )
        Also known as "Scooter Libby"  )

VICTIM IMPACT STATEMENT AT SENTENCING HEARING
AND REQUEST THAT DEFENDANT, I. LEWIS LIBBY'S BAIL
PENDING APPEAL BE REVOKED.
18 U.S.C. Sec. 3771 (a)(4); Fed. R. Crim. Proc. 32(i)(4)(C)

Patrick Johnston

In Pro Se

I, Patrick Johnston, do hereby allege and state as follows:

1.      At all times relevant herein I have been a citizen of the United States of America,
and a registered voter in the State of California.

2.      I allege that at all times relevant herein I was, and presently still am, and for the
foreseeable future will be, directly and proximately harmed by the commission of the
Federal offenses alleged in the indictment in the above entitled matter, filed in this Court
October 28, 2005, which offenses occurred in the District of Columbia and for which
defendant I. Lewis Libby was convicted by jury verdict on March 6, 2007.

1                          Victim Impact Statement and
                                    Request Bail Pending Appeal
                                    be Revoked

3.      Pursuant to 18 U.S.C. Sec.3771 (a)(4) and Fed. R. Crim. Proc. 32 (i)(4)(C).
I am submitting this Victim Impact Statement and this Request that bail for convicted
felon, Defendant, I. Lewis Libby pending appeal be revoked.

4.      The crimes of perjury and obstruction of justice for which Defendant I. Lewis
Libby was convicted were an integral part of a successful cover up by Defendant Libby
and the President and Vice President and/or their closest advisors of these individuals
personal participation and involvement in the endeavor to destroy the credibility of Mr.
Joe Wilson and thereby diminish any political repercussions from the charges made by
Mr. Wilson on the then upcoming November, 2004 general election

5.      Defendant Libby and Messers Rove, Cheney and Bush understood that, after the
Administration's vehement denial of any involvement in the outing of Valerie Plame as a
covert agent of the Central Intelligence Agency,  and after President Bush's well
publicized pledge to fire anyone in the Administration who leaked classified information,
were Defendant Libby thereafter to tell the truth to the FBI on October 14, 2003, thirteen
months before the upcoming election, of his participation and that of the Vice -President
and others in orchestrating the outing of a covert CIA nuclear nonproliferation operative
and also the release of a top secret memorandum, and were the electorate to learn of Mr.
Libby's admissions and statements to the F.B.I. before the election, the prospects of
President Bush's and Vice president Cheney's re-election in a very tight contest would
diminish dramatically.  Defendant Libby's certainty , and others in the Administration, of
the severe and dire political consequences were their participation revealed is aptly
demonstrated by the willingness of Mr. Libby and others to commit the crimes for which
he was convicted.

6.      Defendant Libby's crimes, committed on October 14, 2004  and November 26,
2003, delayed and frustrated the FBI investigation into the outing of Valerie Plame
eventually necessitating the appointment of  Mr. Fitzgerald as Special Prosecutor on

Victim Impact Statement and
Request Bail Pending Appeal
be Revoked

December 30, 2003 which delayed the conclusion of the initial investigation.

6.      When Defendant Libby again committed the crimes of perjury and obstruction of justice on March 5, 2004 and March 24, 2004 , Defendant Libby and the Administration did not, and could not, know the status of Mr. Fitzgerald's investigation. Defendant Libby did not, and could not, know if Mr. Fitzgerald's investigation would conclude in the spring, summer or fall of 2004 or whether his report on his investigation detailing the facts stated in the indictment and the facts presented at trial might be issued before the November, 2004 elections. What Defendant Libby and others did know was they could not take the chance that the facts discovered by Mr. Fitzgerald during his investigation might be leaked to the press before the election or that Mr. Fitzgerald might write and release a report of his investigation before the election and the voters of this nation learn thereby the truth of their activities as respect Mr. Wilson and/or Ms. Plame.

7.      Defendant Libby's perjury and obstruction of justice successfully frustrated and delayed Mr. Fitzgerald's investigation through the first week of November, 2004 and allowed the Administration to dodge all questions and scrutiny regarding its involvement in the outing of Valerie Plame throughout the 2004 election cycle, reciting the mantra, "We cannot and will not comment on a pending investigation;" and allowed Administration spokespersons to state falsely no Administration official, particularly Defendant Libby, Karl Rove or Vice President Cheney, had any role in outing Valerie Plame. The testimony at Defendant Libby's trial demonstrate conclusively those assertions to the American electorate were lies.

8.      The crimes of I. Lewis Libby prevented the scheme of the Bush/Chaney Administration in outing Valerie Plame from being revealed before the 2004 Presidential election. Defendant Libby directly and proximately cheated and defrauded me and all others who voted in the 2004 Presidential election out of a fair and fully informed election for President of the United States. Had these activities of the Bush/Cheney

3

Victim Impact Statement and
Request Bail Pending Appeal
be Revoked

Administration been widely known before the election, President Bush and Vice President Cheney would not have been re- elected in 2004

9.     By his crimes for which he was convicted, I. Lewis Libby directly and proximately cheated and defrauded me, and all the people who voted in the 2004 Presidential election, out of a January 20, 2005 start on a return of this great nation to its fundamental purpose of being a nation of laws, out of a January 20, 2005 re-dedication of this nation as a champion of justice and human rights at home and abroad, out of a January 20, 2005 start on the repair of this nation's world wide reputation as a beacon of hope and an inspiration to greatness to the entire world.

10.     As a result of the crimes of I. Lewis Libby, the rendition of people to countries for torture, the torture of human beings by employees and agents of the Federal government, the indefinite imprisonment of persons without charges being filed and without access to attorneys or to the court system, has continued unabated since January 20, 2005 and will likely continue until the end of the Bush Administration. As an American citizen these activities were and are carried out and accomplished in the name of all American citizens, including myself, directly and proximately causing great mental pain and anguish and shame to myself and all other similarly situated.

11.     As a result of the crimes of I. Lewis Libby, the activities and policies of the Bush Administration will continue until January 20, 2009, thereby directly and proximately causing me great inconvenience and loss of opportunities and possibly physical danger, because I, as an American citizen, cannot presently and not until January 20, 2009 at the earliest, if ever, travel safely to or in many parts of the world,

12.     As a result of I. Lewis Libby's crimes the opportunity to begin on January 20, 2005 the repair of the damage to the economy and future economic health of the United States caused by the Bush Administration's tax policies and the manner by which this

4

Victim Impact Statement and
Request Bail Pending Appeal
be Revoked

Administration has funded the debacle in Iraq was lost and delayed to until January 20, 2009, at the earliest, thus directly and proximately causing me and all others similarly situated great and incalculable financial damage and loss.

13.     As a result of I. Lewis Libby's crimes  the domestic spying undertaken by the Bush Administration continued past January 20, 2005 directly and proximately causing me and all others similarly situated loss of peace of mind and a sense of, and actual privacy.

14.     As a result of I. Lewis Libby's crimes  the Bush Administration's distortion of, and attack on, the American judicial philosophy, practice and procedure will continue until at least January 20, 2006.

15.     As a result of I. Lewis Libby's crimes the opportunity on January 20, 2005 to once again revel in my unbounded pride in what the United States did and stood for was postponed until January 20, 2009 thus directly and proximately causing me great mental pain, anxiety and anguish.

16.     President Bush will not allow I. Lewis Libby to spend a day in prison for his crimes. President Bush will pardon Defendant Libby before his term as president expires. The only uncertainty is when the pardon will be issued. As soon as Defendant Libby is ordered to prison, President Bush will pardoned him.

17.     Upon sentencing the judgment of conviction of Mr. Libby is final for purposes of appeal. Mr. Libby and his attorneys have already stated Mr. Libby intends to appeal the judgment. 18 U.S.A. 3143(b)(B), the code section detailing the criteria for release or detention of a defendant pending appeal states in relevant part "...the judicial officer <u>shall order</u> that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be

5

Victim Impact Statement and
Request Bail Pending Appeal
be Revoked

detained, unless the judicial officer finds - (B) that the appeal is not for the purpose of delay and raises a substantial question of law of fact likely to result in - (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment... ." Mr. Libby cannot meet either of the relevant standards. ( Whereas I do not contest that Mr. Libby can probably provide enough evidence to satisfy subsection (A) of this portion of Section 3143, such a showing by itself is not sufficient. Subsection A and B are stated in the conjunctive. In addition to proving subsection (A), Mr. Libby also has the additional burden of demonstrating that his appeal is not for the purpose of delay and that the appeal raises substantial issues likely to result in a reversal.)

18.     Given the certainty of a pardon, Mr. Libby's appeal will be solely for the purpose of delaying the date of his imprisonment so as to allow President Bush the opportunity to pardon Mr. Libby just before he leaves office. Such tactic is a clear violation of 18 U.S.A. 3143(b)(B). Moreover, a thorough review of the trial testimony, the exhibits admitted into evidence, the rulings of the Court and a review of the law regarding the crimes detailed in the indictment, reveal there are no obvious trial errors that would likely compel a reversal of the conviction or re-trial.

19.     The appeal process will take approximately 18 months, if not more time. If on the off chance Mr. Libby's appeal is decided before January 20, 2009, Defendant Libby will seek review by the Supreme Court, again playing for as much time as possible. It is not reasonable to expect the entirety of the appellate review process  be completed before January 20, 2009

17.     Neither Defendant Libby nor the Bush Administration should be allowed to game the judicial system. The court of appeal does not exist to provide President Bush political cover. President Bush intends to pardon Libby, but he does want not to burden the remainder of his presidency with the political scorn a pardon for I. Lewis Libby will bring if he can avoid doing so. Therefore unless forced to grant a pardon now because

6

Victim Impact Statement and
Request Bail Pending Appeal
be Revoked

1  Defendant Libby's bail pending his appeal is revoked, Defendant Libby and President

2  Bush and Vice President Cheney will continue to play politics with the unwitting

3  assistance of this Court.

4

5  18.    If Mr. Libby's bail is revoked pending his appeal and as expected he is there after

immediately pardoned by President Bush, Mr. Libby would no longer be in legal jeopardy

6  for any crimes relating to the outing of Valerie Plame. In that circumstance, Ms. Plame

7  can subpoena Mr. Libby for a deposition in her civil lawsuit and Mr. Libby can be

8  required to testify. He, unlike all the other known participants in that wretched scandal,

9  could not invoke his rights under the 5th Amendment and refuse to testify. Only if Mr.

10 Libby is granted a pardon is he going to be available to Ms. Libby as a witness. In all

11 likelihood Mr. Libby represents the only opportunity that Ms. Plame and the all the voters

12 in the 2004 General Elections will have to learn exactly what happened, who was behind

13 her outing and why it was done.

14

15 19.    It is respectfully requested that Mr. Libby's bail pending his appeal be revoked so

16 that President Bush will pardon Mr. Libby so as to make Mr. Libby available to Ms.

17 Plame as a useful witness in her litigation. Or failing a pardon to allow Mr. Libby the

opportunity to work out a plea arrangement with the Special Prosecutor in exchange for

18 his testimony about who else was behind the outing of a covert nuclear non-proliferation

19 CIA agent.

20

21 DATED: April 24, 2007                    By _____

22                                         Patrick L. Johnston, Pro Se

23

24

25

26

27

28

7                      Victim Impact Statement and
                       Request Bail Pending Appeal
                       be Revoked

## CERTIFICATE OF SERVICE

1

2    I, the undersigned, hereby certify that on this 25th day of April, 2007, I caused true and

3    correct copies of the foregoing to be served on the following parties by electronic mail:

4
                    William Jeffress, Esq,
5                    Baker Botts
                    The Warner
6                    1299 Pennsylvania Avenue, N.W.
                    Washington, DC 20004-2400
7                    Facsimile: 202-585-1087

8
                    Theodore V. Wells, Esq.
9                    Paul Weiss
10                   1285 Avenue of Americas
                    New York, NY 10019-6064
11                   Facsimile: 212-373-22I7

12
                    Patrick J.  Fitzgerald, Esq.
13                   Special Counsel
                    U.S. Department of Justice
14                   1400 New York Ave., N.W.
                    Washington, D.C.20530
15                   Facsimile: 202-514-1187

16

17

18

19    By: _____
                    Patrick L. Johnston, Pro Se
20

21

22

23

24

25

26

27

28

8                                    Victim Impact Statement and
                                    Request Bail Pending Appeal
                                    be Revoked



# S. ALISON JONES

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Alison Jones and I am the Manager for Political Affairs at Ford Motor Company and currently work in Ford's Government Affairs' Office in Washington, D.C. I originally moved to Washington, D.C. from Atlanta, Georgia in 1994 and worked for the late U.S. Senator Paul Coverdell (R-GA) for six years as his Executive Assistant and Deputy Administrative Assistant. When the Senator passed away in July 2000, I was offered a job working for Victory 2000 at the Republican National Committee managing congressional affairs outreach. After the November 2000 election, I went on to work as a Congressional Affairs Liaison on the Bush/Cheney Transition Team. In January 2001, I was honored to be hired in the Executive Office of the President, Office of Legislative Affairs, as an Assistant to the Deputy to the President for Senate Legislative Affairs. In this position, I worked closely with the U.S. Senate assisting with the confirmation process of Presidential nominations.

During my three years at the White House, I came to know Scooter Libby and many of the staff who reported to him in the Vice President's office (especially Jenny Mayfield, Scooter's assistant, and the Vice President's Legislative Affairs' team). The Vice President's office also worked closely with the U.S. Senate given the Vice President's role as President of the Senate. What I remember most about Scooter, is the steadiness, unwavering leadership and heroic example of support he provided the Vice President's office and the White House staff in the aftermath of September 11th. We were a Nation and a White House staff stunned by the horrific attacks that were launched on our country, and we were extremely fortunate to have the leadership in place that could help us move forward and heal us. It was Scooter's work ethic, steadiness and commitment in the days, months and years following 9-11 that most inspired me and has taught me the definition of true leadership in the face of adversity.

Scooter is truly a unique leader given his humble nature - - a trait that is often times rarely found in a town like Washington. He is genuine, honest, kind and unassuming. He leads through his actions and not through mere words. There were many times he was the most important person in the room, but you would never have known it given his quiet demeanor and approachable style. He was effective, professional, and he was a workhorse.

– 2 –                                                                May 1, 2007

You could tell by the amount of time and energy he put into his work that he was passionate and truly believed he was in his role to make a difference – and he did.

As I have followed the trial in the media, I find myself asking "how can something like this happen to someone like Scooter?"  The situation is completely inconsistent with my knowledge of Scooter's character and integrity.   Scooter will always be a role model for me and I continue to stand amazed at his ability to not waiver in the face of personal adversity. He is an inspiration and someone who has truly made a positive impact on our country through his leadership.  I have no doubt he will continue to find ways in the future to inspire, lead and make a real difference.

If I can be of assistance, or answer any questions with regard to this letter, please feel free to contact me ██████████.

Sincerely,

S. Alison Jones

April 27, 2007



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

     I write on behalf of Lewis Scooter Libby for your consideration with regard to his sentencing. My initial experience with Scooter was when he was associated with the law firm of Dickstein, Shapiro and Morin and I was a partner in that firm from 1987-89. Before that, I had been a Member of Congress for fourteen years and subsequent to that I was CEO of the American Stock Exchange in New York, a United States Ambassador and am now Co-Chairman of Manatt Jones Global Strategies in Washington.

     I came to know Scooter well when my law partner, Len Garment, and I were representing a Japanese company on a major case here. Scooter was the associate who worked diligently on this case. In that capacity, I found him to be very smart, thorough in his research, a very loyal person who took direction and followed through with implementation. I never questioned his sense of ethics or honesty.

     Although I strongly disagree with most of Scooter's political beliefs, I do believe that he is motivated to public service for all the right reasons. I can also understand why he may have made some misstatements to authorities as I occupied a similar position at the White House in the Johnson Administration. So much material, information, conversations and pressure crosses that desk in the ordinary course of business, it is not possible to recall everything with accuracy or precision.

     I hope that you will take these comments into consideration as you weigh the proper sentencing in his case.

                         Sincerely,

                         James R. Jones

JRJ:ara

The Honorable Reggie B. Walton                                April 21, 2007
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001


Dear Judge Walton:

I am writing on behalf of Scooter Libby who I have known for more than 15 years. Last
month I retired as a career civil servant after more than 25 years in government. In that
time, I served through five presidential administrations at the Department of Defense, on
the National Security Council, and most recently at the State Department as the
Undersecretary for Arms Control and International Security reporting directly to the
Secretary of State. I am a long time resident of Alexandria, Virginia, active in civic
affairs.

At various times in my service, I have had the good fortune of working closely with
Scooter. We first met in 1989, and worked together at the Pentagon for several years on
a number of defense and national security issues. This was a time of immense change
and turmoil, with the fall of the Soviet Union and the rise of new and more complex
threats to our country. In Scooter, I witnessed an individual of superb intellect and
insight with outstanding analytical skills and an unmatched work ethic. Even more
apparent, Scooter stood out as a true and dedicated professional who placed the nation's
interests first, above those of party politics or self-advancement. His concern was for the
good of our country. Never did I observe any partisanship in his choice of staff or in his
advocacy of policies. He reached out to career professionals such as myself with the goal
of building the strongest, most capable team possible. More than a decade later, I still
remember his concern for others in his office, both on a professional and personal basis.

I also worked with Scooter from 2001 through 2004, when I had the honor of working for
the President on the National Security Council staff. Again, as a career civil servant, I
was struck by Scooter's professionalism and his dedication to public service. The
intensity and pace of the White House environment is well known. What is less well
known is how some individuals stand out as truly unique. Scooter is one of these
individuals. No matter how busy he was, he was always willing to help on any issue I
raised with him. Most strikingly, I will never forget his compassion under pressure, how
much he genuinely cared about all the people on his staff and on the NSC staff, making
no distinction based on rank or politics. He mentored others and provided sound advice
to young professionals on career advancement. On a personal level, I know he was there
for me when I needed him, and I am confident that is the case for many others. I am
honored to call him a friend.

Your Honor, I was very disturbed by Scooter's conviction. Over all the years that I have known him, he has demonstrated impeccable character and integrity. He is a man I greatly admire for his many contributions to the security of our country and for his many personal sacrifices for our common good.

Sincerely,



Robert G. Joseph

**Mr. Andrew and Dr. Diane Kane**



May 2, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

     **Re:**   **Mr. I. Lewis Libby**

Your Honor,

As you approach the sentencing hearing for Mr. Lewis Libby, we would like to share with you our joint thoughts regarding the 'Scooter' that we know and care for deeply.

Andy is a regional municipal investment banker specializing in affordable housing, as well as having practiced law for a dozen years with a large East Coast firm; Diane is a pediatrician with a California-based health maintenance organization. We have two children who are freshmen in high school and live in the Denver metropolitan area.

I, Andy, have known Mr. Libby for 30 years – long before settling down with families. I first met Scooter while taking the Pennsylvania Bar Exam cram course in Philadelphia in 1976 – he and I shared a few light moments in the class, and we got to know each other socially from that point on. He was witty, affable and fun-loving – always with a special quality of insight and classiness. We have maintained a friendship throughout his career, both while he has been in and out of government service. He and I spent a fair amount of time together during his period as an attorney with a Philadelphia law firm – parties, events with his dates, and such. After he moved to DC, I continued to see him regularly, as I had business reasons to be there quite often and would spend time with Scooter. As he married and we both established our families, we also have vacationed together for many years: having first rafted the Colorado River with Scooter and then-fiancée Harriet (pre-children for both of us), followed by several visits to Jackson Hole, family trips to the Washington/Virginia area (I went to graduate school in Charlottesville), ski trips here in Colorado, and such. All in all, even though separated at times by some distance, I feel that we have maintained a meaningful camaraderie and relationship for a long, long time – I have only a few childhood friends from Philadelphia that I can say I have known longer and better.

The Honorable Reggie B. Walton
United States District Court
May 2, 2007
Page Two

Several qualities about Scooter are notable.  First is his belief in the role of government was strong enough that he would leave a lucrative law practice and return to government service, not once, but twice.  But then, that is Scooter.  He believes in service to our democracy and is deeply devoted to our country.  Another observation is how utterly professional he was while in government service, careful not to discuss any matters of his work outside of work, even in an oblique way.  Because so much of what he engaged in was non-public, we hardly ever discussed politics or governmental affairs – his public life was always minimalized and rarely mentioned.  I had to ask him for information as to "how work was going"; none was ever offered.  Yet, he has never appeared to be impressed with his role, nor swayed by the possibility of personal recognition or the premise of power.  In that regard, even something as mundane as dining reservations were never made in his name.  He is courteous to, and genuinely interested in, people from all walks of life.  I have not had an interaction or instance in the past 30 years where I questioned his integrity. In fact, I have always been impressed by his humbleness and sincerity.

I must say that I find his conviction totally out of character for someone who has always exhibited the highest standards of fidelity and commitment to a moral and ethical code of conduct higher than I, and many others I suspect, could personally hold themselves to.

I, Diane, have known Scooter for 20 years, since the Grand Canyon raft trip where I learned first hand Scooter's keen intellect and quick wit.  He plays a mean game of Botticelli (a version of Twenty Questions), and I was promptly trounced.  I could have been intimidated, but Scooter doesn't use his intellect to put others down; rather, he has an engaging style and sincere interest in others which quickly put me at ease.  By the end of the week, I felt I had known him for years.

On that trip, I remember Scooter being considerate, affectionate, and attentive with Harriet, his fiancée, and he remains so today, many years into marriage.  Their mutual respect is evident when they interact, whether around choosing dinner or problem solving issues with the children.

Over the years our families have spent many vacations together, lasting from a few days to more than a week's time.  Joint family vacations have all the makings for stress – crying toddlers, tired preteens, and adolescents challenging authority – yet, I have never heard Scooter raise his voice to his children, even when it might have been warranted.  I have observed him debate and reason a request with his older son, then turn, and in a nanosecond lightheartedly cajole his younger daughter into cooperation toward the same task.  When a child would whine about being too tired to finish a hike, Scooter would simply swing him or her up onto his shoulders and keep going.  There was no annoyance, or impatience, he just handled the situation assuring the hike was successful for all.

The Honorable Reggie B. Walton
United States District Court
May 2, 2007
Page Three


As a pediatrician I've encountered and observed many parenting styles. I wish I could package Scooter's patience and unflappable temperament so that other families could learn from his style. Whether explaining current events or answering the constant "why?" of childhood, he speaks in a simple direct manner exactly to the child's level. It is common for Scooter to leave the circle of adult conversation and strike up a conversation with a nearby child or turn and 'check in' with one of his children. You can see their faces light up with his attention: Scooter's kindness makes the children feel as important and as comfortable as he makes adults feel.

You can see, I am sure, that I hold Scooter in high esteem for many reasons. That is why I find his conviction so out of character to the person that I know and care for. I have never once had an occasion to doubt his honesty or integrity in any matter, large or small.

<div align="center">****************************</div>

We appreciate the opportunity to share with you our mutual thoughts about Mr. Lewis Libby. We are proud to think of him as our friend.

Sincerely,

Mr. Andrew B. Kane                          Dr. Diane Kane

# Robert Story Karem

May 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Robert Karem, and I am writing on behalf of I. Lewis "Scooter" Libby, for whom I worked as an assistant from February through October 2005. I currently serve as a special advisor for national security affairs in the Office of the Vice President (OVP), although the views contained in this letter are strictly my own. Prior to joining OVP, I spent four years working as an advisor to a United States Senator, and previously worked at a Washington-based foreign policy think tank.

I first met Scooter when I interviewed for a position as his assistant around January 2005. At the time, I knew precious little about him. A string of phone calls to various individuals who might have first-hand knowledge of the man left me with the impression of an intensely serious, dedicated, and intelligent public servant. My own interview with Scooter confirmed this impression, but made clear that it did not fully capture his personality. I was struck by Scooter's consideration and kindly demeanor, as well as by his sense of humor. Interrupted frequently by phone calls throughout the interview, Scooter apologized for each interruption with surprising genuineness – as if he were keeping *me* from pressing matters of state rather than vice versa. My first personal interaction with Scooter hinted at a decency and humility not generally found in Washington, and I knew before I left his office that I very much wanted to work for him.

I recall, shortly after starting as his assistant, feeling overwhelmed by the sheer volume of information on each issue Scooter had to manage, not to mention the number of disparate issues Scooter had to handle in a given day. Despite the intense pressure and frustrations that came with his job, I cannot recall Scooter ever losing his temper with me or his other assistant (Christian Woelk, who has separately written of her own impressions of Scooter's character). On the contrary, the same courtesy he displayed in my interview prevailed in the nightly apologies he extended for keeping us at the office so late.

Far from needing an apology, I felt guilty for having not found a way to avoid troubling him with more paperwork that invariably kept him late at the office and away from his family. For while Scooter would gamely put up with the annoyances of editing memos from OVP staff, reviewing inter-agency policy papers, or returning innumerable phone calls until late at night, it was clear that being kept from his young children was a different burden altogether. Telephone calls to and from his kids during the day must have comprised the majority of his interaction with them during the week, given his pre-dawn departures for work and frequently late returns in the evening. While these calls

buoyed Scooter, a proud father, they also served as a frequent reminder of the familial sacrifices his job entailed.

Scooter accepted these sacrifices, along with the great responsibilities his position entailed. Confronted on a daily basis by myriad reports of threats and challenges to the United States, these responsibilities were clearly never far from his mind. Still, I was often struck by Scooter's appreciation of the personal costs and risks of foreign policy. Two meetings in particular gave me a more nuanced appreciation of Scooter's thinking in this regard. Both were with men who had experienced great personal tragedy as a result of their commitment to political ideas. The first, Amine Gemayel, assumed the Presidency of Lebanon when his brother was assassinated. The second, Mithal al-Alusi, an Iraqi Sunni targeted by insurgents, lost his sons in an assassination attempt. I recall Scooter being visibly moved by the burdens these men carried as a result of their commitment to their ideals.

Scooter's awareness of such personal tragedies was further reflected in the way I saw him view larger issues of foreign policy. For example, Scooter appeared not only to see the threat posed to the U.S. by a nuclear-armed Kim Jong-Il, the tyrannical ruler of North Korea, but also the plight of an entire nation of North Koreans whose lives were ruined by his despotic rule. Scooter once asked me to keep a copy of a nighttime satellite image of North and South Korea in a folder of key documents he kept for reference. It is an image that seemed to perfectly express for Scooter the divergent political paths of South and North Korea, and the personal fortune (and misfortune) of their citizens: one Korea plunged in almost total darkness, the other bathed in electrical light.

I note these examples because I believe they illustrate an aspect of the Scooter Libby I got to know from the many long hours I spent working for him. And the Scooter I know is vastly different than the caricature I have since witnessed described on television. The frenzied media attention to the investigation, indictment, and trial has provided air-time to often uninformed or ill-intentioned pundits whose negative commentary cannot but have taken a toll on Scooter and his family – and all the other individuals affected by this case. I have been stunned by the frequency with which commentators who hardly know Scooter – if they know him at all – so cavalierly impugned his character, all while egged on by television hosts eager to create more controversy about the case. No family deserves such treatment.

I believe Scooter is an uncommonly decent man in an uncommonly vicious city, and I am proud to be able to call him a mentor and a friend. As you consider his sentencing, I hope you will weigh the sacrifices Scooter has made on behalf of our country, as well as the tremendous burden he and his family have already borne throughout the investigation and trial. With all due respect, I feel strongly that any debt Scooter Libby owes to our society he has paid in full.

Sincerely,

Robert Story Karem

HENRY A. KISSINGER

April 23, 2007

Dear Judge Walton:

I have volunteered to write a letter that might assist you in the sentencing of I. Lewis "Scooter" Libby.  I have been involved for most of my adult life in the field of international relations, in government and as a private citizen. During the Administrations of Presidents Nixon and Ford, I served as Assistant to the President for National Security Affairs from 1969-1975 and, concurrently, as Secretary of State from 1973-1977.  From the time I left government, I have advised other Presidents, chaired Presidential commissions, served on governmental advisory boards and often have been called to testify before Congressional committees on issues of policy and national security.

I met Scooter early in the second Bush administration, when he served as Chief of Staff to Vice President Cheney.  In that capacity, he attended all my meetings with the Vice President.  He also acted as a kind of liaison for me to the National Security process.  I was deeply impressed by his dedication, seriousness, patriotism and essential decency.  He is a man of strong views, some of which I do not share.  But in my observations, he pursued his objectives with integrity and a sense of responsibility.  I would never have associated the actions for which he was convicted with his character.  Nor do I believe that they will ever be repeated.  Having served in the White House and under pressure, I have seen how difficult it sometimes is to recall precisely a particular sequence of events.  This does not justify the action, but it may help you consider mitigating circumstances.

With good wishes,

Henry A. Kissinger

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

# Elizabeth W. Kleppe



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Court House
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Sir:

I am very honored and pleased to be able to speak of Scooter Libby's character while saddened at the circumstances that require me to do so. I was Director of Scheduling for Mr. Cheney during the 2000 election. Currently, I am the Director of Scheduling for Vice President Cheney and have held this position since January 2001. I worked directly with Scooter Libby in this capacity beginning with the transition and continuing until his resignation from the Office of the Vice President. This letter is written in my personal capacity and the views expressed are mine alone and not necessarily those of the OVP or of the Senate.

Scooter is the hardest working, most compassionate, straight-forward employer I have ever had the good fortune to know. His dedication to the well-being of our great country is beyond compare. Scooter worked incredibly long hours while balancing the needs of his young children, wife and elderly mother. Further he did it with a grace and patience that is rare in this world. I witnessed his professionalism and devotion to the United States on a daily basis and it was truly an inspiration.

While I was working for Scooter, I experienced several losses in my personal life. Through these difficult times, Scooter always took time out of his busy schedule to make sure I was adjusting to my new circumstances and dealing with the loss in my life. He offered condolences, encouragement and support. I was often stunned that anyone in his demanding government position might find the time to provide such support to his staff.

Further, the true testament to his personal character is the way he treated his elderly mother. During one of her visits to Washington, D.C., Scooter escorted his mother to one of our White House Christmas parties. I believe the way we treat our aging parents is a true testament to our character. Scooter was proud, tender and sincere in his attention to this lovely lady. I felt at that moment I was seeing a wonderful example of how I should treat my own parents. It may sound negligible or trite but just that brief moment with the two of them taught me a great deal about the respect our elderly deserve and need from their families.

I realize you will receive far more eloquent letters regarding Scooter's character. However, I can assure you that you won't receive one with more heartfelt words. It is truly an honor for me to know Scooter and to have worked for him.

Thank you for your time and consideration.

Sincerely,

Elizabeth W. Kleppe

**AARON D. KRAMER**



April 29, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

I have known Scooter Libby for over 6 years both as a co-worker and a friend. I met Scooter and his family as a sophomore in college and, from 2003-2005, I worked under him in the office of the Vice President. During my tenure at the White House I had the opportunity to observe Scooter's dedication to his work and to our country. I also saw first hand, his dedication as a loving father and husband during time that I spent with his family. It is with these insights that I commend Scooter to you as a loyal friend, a compassionate mentor and a dedicated public servant who has selflessly served our nation with integrity and humility.

Scooter committed vast amounts of time and made great personal sacrifices as the Chief of Staff and Advisor for National Security to the Vice President. As a supervisor, Scooter acted with unflinching patriotism and dedication to both our country's well being and to the Vice President. He inspired me to do the same. As our leader, Scooter worked with a high-ethical standard and required the same rigorous standards from all of his subordinates. He would not be satisfied with reports unless we meticulously verified all information and fleshed out all the important facts. Scooter persistently questioned the arguments of his staff and those around him to ensure that the most honest and factual results came through in all of our work.

Scooter led with compassion as well. He was concerned about the personal lives of his subordinates and took great care in ensuring that his staff was properly taken care of and happy. It was not unusual to see Scooter in the halls laughing with staff members or talking about life out of the office. It is with this compassion that Scooter took me under his wing and mentored me. As a mentor, Scooter tested me, showed me how to work in the complex government system and taught me how to think about problems and

ask the right questions to ensure that I obtained the most accurate and complete information. Most importantly, however, Scooter extolled the virtues of integrity, straight-forwardness and modesty. It is Scooter's embodiment of these qualities as well as his dedicated service that has inspired me to pursue a career as public servant.

Scooter has worked long hours, endured the burdens of a high-pressure job and sacrificed the financial rewards of a private law career and time with his wife and two children in the service of the public good. Scooter never sought the spotlight for his actions, but worked selflessly for the country and way of life in which he believes. It is this sacrifice that makes the notion that Scooter could be incarcerated so appalling.

In light of Scooter's dedicated and self-sacrificing career in public service, the personal sacrifices, anguish and humiliation suffered by his family as a result of this ordeal, the financial costs Scooter has incurred and the impairment of his ability to work as a public servant or in the legal profession, I believe that Scooter has already received his punishment and to a greater degree than he could ever deserve.

No public good or moral lesson will be served by the incarceration of a good man and exemplary public servant or the separation of a father from his two adoring children. Your honor, I ask you to keep this in mind as you contemplate your sentencing decision and I hope that you will make the right and just decision not to incarcerate Scooter Libby.

Sincerely,

Aaron D. Kramer

Carol R. Kuntz



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

I am a career civil servant who worked directly for Scooter Libby for almost ten years. I served as his special assistant during most of his tenure in the Pentagon during the administration of President George H.W. Bush and as the Vice President's Homeland Security Advisor through most of the administration of President George W. Bush. I wanted to share some observations with you from this long professional association and friendship. Amidst the controversy of the Iraq War, the record should contain recognition of Scooter's extraordinary accomplishments in other aspects of security policy and his many wonderful qualities as an individual.

As a citizen, I believe perjury and obstruction of justice are very serious crimes that threaten our core values as a nation. It is extremely hard for me to reconcile these convictions with the behavior of a man I worked with so closely for so long. I accept the outcome of our judicial system, deferring to those who had much greater access to and understanding of the facts of the case and the law.

Scooter and I worked on defense strategy together during the remarkable period of the dissolution first of the Warsaw Pact and then of the Soviet Union, with the security context of the Cold War unraveling day by day and the world demanding that the US figure out how to respond to those changed circumstances. Scooter and I watched television together in the White House complex, in those first moments after the second of the World Trade Center Towers was hit by an aircraft on September 11, 2001. We struggled in those first moments and in the months and years that followed to understand the new threat posed to the United States and some of the measures now necessary to secure the homeland.

Both of these periods of service – in the Pentagon and in the White House – were marked by fundamental challenges to the nation, demanding creative and thoughtful solutions. In my personal observation, Scooter was motivated in both of these periods by the sincere desire to do what was right for the country. He had remarkable talents of intellect and of analysis, and, frankly, of sheer endurance that he fully bent to the service of the nation.

1

I wanted to share with you three observations in particular. First, in the conversations that Scooter and I have had in the period since his indictment, our discussions have focused on his concerns about his children. His daughter is only a little older than mine and his son is in middle school. If the judicial system has a place for compassion, I would ask that you have some compassion for these children and minimize or eliminate any forced separation from their father. In my discussions with Scooter, he has grieved most the stress these proceedings have placed on his children and wants to attempt to make it up to them.

Second, he was a great boss and friend to me. To my observation, he was supportive of his staff. He was quick to applaud our efforts and linked our day-to-day labors in the bureaucracy to some higher purpose in service of the nation. He was loyal to his staff, absorbing criticism from outside of the organization himself but always generously sharing the praise. While Scooter was certainly a tough, disciplined competitor in the rough and tumble of bureaucratic life, I did not observe him going over the line into personal attacks and disregarding core analytics or information. He argued the substantive issues, with unusual clarity and insight. In our work together in the Pentagon, now more than fifteen years ago, one of the things I admired was his ability to stand back and critically evaluate his own work, playing devil's advocate and identifying its flaws and weaknesses.

Third, he helped catalyze work both in the Pentagon and in the White House that I believe was of genuine and enduring benefit to the nation. In the Pentagon, he led efforts to shape the strategic response to the end of the Cold War. It's easy to guess how the story turns out after the histories are written. But in 1989, it was not completely obvious what should be done in response to Mikhail Gorbachev. Scooter played a critical role in shaping the Department of Defense policies, programs and forces in response to the evolving changes in the Soviet Union and the Warsaw Pact. No one involved would claim these efforts were perfect, but the fundamental tenets of the work – the importance of allies, the critical role of uncertainty, and the need to hedge against reversals – were sound strategic priorities that greatly improved US policy during this period of profound change.

Scooter played an important role in the 1991 Persian Gulf War after the Iraqi invasion of Kuwait. He developed briefings that identified critical strategic issues and helped assure the military thought through these issues and reshaped their plans and forces accordingly. After the conclusion of the war, he led the efforts to conduct the lessons learned assessments that helped correct deficiencies in our forces. These studies identified, for example, the need to strengthen defenses against a military opponent armed with chemical, biological, radiological or nuclear weapons.

In the White House, the Homeland Security staff in the Vice President's office worked hard to strengthen the nation's defenses particularly against biological and nuclear terrorism. These efforts were only partially motivated by concerns about a particular adversary. They were more fundamentally motivated by broader trends that

2

are increasing biological and nuclear threats to the nation and that are widely recognized by the bipartisan security community. Significant improvements were made in the country's defenses against these threats during the administration of President George W. Bush and Scooter played a critical role catalyzing these improvements.

Over the course of the President's administration, spending on biological countermeasures increased over thirty-fold. Numerous programs were initiated – Biowatch (which seeks to provide early detection of biological aerosol attacks); Bioshield (which seeks to speed the development and effective use of medical countermeasures); and many others. In the nuclear area, significant steps were taken to strengthen the quality of medical countermeasures against radiation poisoning and to strengthen the nation's ability to detect and respond to the covert introduction of fissile material through the creation of the Domestic Nuclear Detection Office in the Department of Homeland Security. These efforts are often criticized now for not going far enough, or fast enough, but it is easy to believe that they would not be going at all without the critical role that Scooter played.

I am neither a lawyer nor an expert on the Iraq War. As an experienced foreign policy and defense expert, though, I know that the United States has greatly benefited from Scooter's extraordinary talents and efforts in many areas of security policy over many years. As you look to the future and sentence Scooter, I ask that you recognize and honor these remarkable substantive accomplishments, the many personal sacrifices they demanded, and his love and concern for his children.

Sincerely,

Carol R. Kuntz

Mary Kathleen Lang

April 25, 2007

The Honorable Reggie B. Walton
United States District Court
c/o Wiliam H. Jeffress, Jr.
Baker Botts LLP
1299 Pennsylvania Avenue, NW
Washington, D.C.  20004

Dear Judge Walton:

My name is Mary Kathleen Lang and I worked with Scooter Libby approximately five years during the 2000 Presidential Transition and then in the Office of the Vice President at the White House.  During my time in the Office of the Vice President I served as the Deputy Director of Scheduling for the Vice President.  Previous to working in the White House, I was on the 2000 Bush-Cheney Presidential campaign, and prior that I worked in both Texas state government and in corporate relocation after receiving a Bachelors Degree in Business Administration from Texas Tech University in 1993.  I am originally from Richardson, Texas and now reside in Alexandria, Virginia.  Since leaving government service in 2006, where I additionally served at the State Department and in the White House Press Office, I have been teaching school at Queen of Apostles Catholic School in Alexandria.

I came to know Scooter during the first days of the 2000 Presidential Transition, which Vice President Cheney was leading on behalf of President Bush.  During this process, Scooter served as a key counselor to the Vice President on the numerous matters relating to White House staffing and other essential transition issues.  From the very start of my working with Scooter, I specifically recall him as being diligent, thoughtful, and -- while always demanding -- respectful towards his co-workers at all times.  This principle held throughout the approximately five years in which we worked together at the Transition and the White House.  I also saw in him from the very start a desire not just to work in politics, but overall, a calling to serve in government towards the goal of a greater good.

On a personal note from this period, I arrived from the Vice President-elect's staff on the campaign with no immediate experience in Washington, but a desire to serve.  While it is naturally requisite that any new Administration -- and particularly a White House - to seek seasoned hands to carry out important responsibilities, Scooter looked past my own inexperience in politics and government and trusted in me to be part of the transition process and to ultimately serve a key role in managing the daily schedule of the Vice President.

On this same note, to flash forward several years, as I was looking to make a career change following my time at the White House and elsewhere in government, Scooter was very generous with his time and counsel, and was quick to provide ideas and make introductions where he could. I won't forget that he gave me as much time as he could to provide not just broad counsel, but specific ideas as to my career.

During the course of overseeing the Office of the Vice President as Chief of Staff, Scooter consistently proved himself to be fair, honest, and diligent at all times.  In overseeing the office, he was always respectful of his fellow staff members – even under conditions that were generally stressful and demanding.  On many a late night as we were at the office late finalizing the Vice President's schedule, Scooter would be there as well, making sure that as long as staff was there working, he would be there with us.  At the same time, Scooter was always quick to emphasize the importance of balancing work with family.  I consistently observed this principle in his own life where he made sure to dedicate as much time as possible to his wife and children.

During my five years of working with him, I found Scooter to be full of integrity, loyalty, and honor.  As I came to know Scooter, I saw what it means for individuals to be drawn not just to Washington and to politics, but more specifically to the principle of service to country and to the protection of the United States.  I know that Scooter carried out this desire to serve the country to the best of his abilities throughout his time in government.  By my observations of Washington and of government and politics, these traits are, regrettably, all too frequently lacking – including in the realm in which we worked together.

I am deeply saddened that Scooter has been found guilty of the offenses with which he was charged, and I hate the thought that he should suffer beyond the turmoil that he and his family have already been through.  I would respectfully ask, your Honor, that in the interest of a good man and of his family, you please afford whatever leniency that you can to Scooter Libby.

Most Sincerely,

Mary Kathleen Lang

April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Cassandra R. Lee. I have lived in Fort Washington, MD with my husband since 2002. I am an Administrative Program Specialist in the Department of Defense, Pentagon.

I have known Mr. I. Lewis Libby for 15 years. He was my supervisor when he was Principal Deputy Under Secretary of Defense (Strategy & Resources) in the Department of Defense during the first Gulf War. In all my experience with Mr. Libby his integrity has been impeccable, he has always been a gentleman, and he has been very thoughtful and considerate of the feelings of others. In addition, he is a well rounded family man.

When I worked for Mr. Libby during his tenure at the Department of Defense, there was never a second when I or, to my knowledge, anyone in the office doubted his honesty, integrity, or devotion to the country. War documents were going fast and furious in and out of our office during those times. I doubt that Mr. Libby could have remembered even half the items that were put before him on their way to the Secretary of Defense and President of the United States. Mr. Libby is a very trustworthy individual and in my experience would never do anything intentionally unlawful or unethical.

Mr. Libby's conviction for perjury and obstruction of justice is inconsistent with my knowledge of his character and integrity.

Sincerely,

*Cassandra R. Lee*

Cassandra R. Lee

Jay P. Lefkowitz • Elena N. Lefkowitz



May 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

> Re:   Scooter Libby

Dear Judge Walton:

My name is Jay Lefkowitz and I am a litigation partner at Kirkland & Ellis, LLP, where I am resident in the New York City office and serve on the firm-wide Management Committee. I also serve as the United States Special Envoy for Human Rights to North Korea, a position to which I was appointed by President Bush in August, 2005, pursuant to the North Korean Human Rights Act of 2004.

In addition to practicing law, I have held several other positions in the United States Government over the past 15 years. From 2001-2003, I served as General Counsel in the Office of Management and Budget and then as Deputy Assistant to President Bush for Domestic Policy. Previously, I served as Director of Cabinet Affairs and Deputy Executive Secretary to the Domestic Policy Council for President George H. W. Bush from 1991 to 1993.

I first met Scooter Libby in 1993 when he was then in the process of establishing a Washington, D.C. office of the law firm of Dickstein & Shapiro with Leonard Garment. We became friendly through a mutual acquaintance and he invited me to join his regular Sunday morning softball game in Bethesda, Maryland. We discussed practicing law together, but in the end I decided to join Kirkland & Ellis. However, we kept in touch periodically over the next several years.

In 2001, I left private practice again to take a position in the White House, and from early 2001 until the end of 2003, I saw Scooter nearly every day, both at senior staff meetings and in briefings for the President. We worked together on a variety of policy matters where our responsibilities overlapped. My duties in the White House included developing policies on a broad range of domestic issues, coordinating those policies throughout the Administration, and working with Congress on legislative issues.

. ...onorable Reggie B. Walton
May 23, 2007
Page 2

        In connection with most of these activities, either Scooter, or a member of his staff, was nearly always involved.  In addition, I worked with Scooter on numerous projects for the President related to our domestic response to the attacks on September 11.  Scooter often attended and participated in these meetings with the President where we dealt with domestic policy issues, and I saw firsthand how much both the President and the Vice President valued Scooter's judgment and counsel.

        In particular, I recall working closely with Scooter on a wide variety of issues relating to bioterrorism preparedness and the public health.  As a member of the senior staff, he often had to take positions on sensitive and controversial issues.  I never saw him allow partisan politics to interfere with his decision-making.  Sometimes his views caused him to disagree with Republicans, and sometimes they put him at odds with Democrats.  He also voiced his opinions freely in White House meetings, even when those opinions departed from the conventional wisdom.  In short, Scooter called things like he saw them.

        In my dealings with Scooter, I found him to be serious, hard-working, well-intentioned, and above all, honest and modest.  In two tours of duty in the Federal Government, I have met all types of people.  Scooter was one of the most impressive.  He never brought his ego with him to meetings or played political games.  And he understood the important trust that the public places in the hands of those who serve in senior government positions.  I never saw him abuse that trust in any way.

        Scooter is someone whom I admire both for his integrity and his intellect.  I am deeply saddened both by his prosecution and its result.  As a lawyer who represents defendants both in civil and criminal matters, I know that prosecutors and jurors and judges are often called upon to exercise judgment.  I hope that the Court treats Scooter as leniently as possible under the law.  I have known him for nearly 15 years and in my view he has been a model public servant.

                                        Sincerely,

                                        Jay P. Lefkowitz

Joseph S. Leventhal ▮▮▮▮▮▮▮▮▮▮                                    VIA U.S. MAIL

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

**RE: Scooter Libby**

Dear Judge Walton:

I first met Scooter Libby in 2003 when I was 25 years old and I interviewed with him for a position on Vice President Cheney's staff. Even though I was to be the youngest Deputy Assistant to the Vice President, Scooter trusted me, trusted my capabilities, and trusted my dedication.

During the interview, Scooter asked me what policy position of the Administration I most disagreed with. I was honest, and it struck me that Scooter valued my candor and my willingness to work hard for the American people. Those traits were more important to him than a common ideology. I quickly realized that Scooter was driven by his belief that the 18-plus-hour days he worked were for the benefit, health and safety of his children and the children of all Americans.

I had the privilege to work with Scooter as a staff member in his office until I moved back to California in November 2004 to return to the private practice of law. During my almost two years working for Scooter, I saw a man with amazing character and integrity. Until one works in an environment like the White House, it is difficult to explain the extent to which you can judge a person's character by how they react in certain circumstances and situations. While I would be yelled at by some, Scooter always had a smile and a calm approach -- even during the busiest, most vital moments.

For example, I traveled with Scooter and the Vice President to Japan, China and Korea in April 2004. The global-political environment was challenging, especially in Japan, where a number of Japanese civilians were being held captive in Iraq. There were numerous times during this trip when Scooter could have used my mistakes as an opportunity to yell, raise his voice, or aggressively attempt to correct my oversight; for instance, when I gave the Vice President the incorrect salutation for a dignitary or when I arrived late with the briefing slides for a secure video-conference with the Vice President, President, and National Security team. Instead, Scooter chose not to comment at all, putting aside the strains and stresses of his job and that of the Vice President's and recognizing the efforts I was undertaking.



The Honorable Reggie B. Walton
**April 30, 2007**
Page Two

Perhaps most relevant to this letter, I remember vividly when questions started being raised about whether someone in the Bush Administration leaked, for political reasons, the name of a covert CIA operative.  In our regular senior staff meeting, Scooter started the meeting by assuring us, in no uncertain terms, that none of us would ever feel ashamed or embarrassed by the work we were doing on behalf of the American people.  Scooter spoke from his heart and with conviction and acknowledged that, while some will disagree with the decisions that are being made by the Administration, the decisions were being made with the goal of improving the lives of the American people.

I could go on with many more examples.  But it is impossible to express in a letter what you learn about a man after working with him for almost two years, hours upon hours a day, seven days a week, and his office next to yours. A question I asked myself often was how Scooter could spend that many hours away from his wife and his two young children.  I realized the answer in Scooter's own words.  When he recognized that the Vice President's staff was working extraordinarily long hours, he would put our work into perspective by reminding us of the military men and women who were serving our country abroad.  He would remind us of their families.  Especially after September 11, 2001, I believe Scooter saw his service in the Administration as his sacrifice.  Given Scooter's years of service to our country – most recently in the Bush Administration, but previously in the Pentagon and the State Department – I hope that he will soon be able to spend time with his Harriet and their children.

Sincerely,

Joseph S. Leventhal

1 May 1, 2007

The Honorable Reggie B.Walton
United States District Court
1225 E. Barrett Prettyman
 United States Courthouse
333 Constitution Avenue,  N.W.
Washington, DC 20001

Dear Judge Walton,

        This letter is in support of I. Lewis, "Scooter", Libby whom I have known since
August of 1990 when I assumed the duties of Senior Military Assistant to the Secretary
of Defense, where I worked with Scooter on almost a daily basis.  I am now a retired
United States Navy Admiral, President of the Information Manufacturing Corporation
(IMC) and serve on three Boards that support our U.S. Armed Forces. I am one of two
officers in the history of the U.S. Navy to serve as an enlisted man (five years) and later
achieve the rank of a four star Admiral.  Because of my roots in rural West Virginia and
Naval service at most enlisted and officer ranks I have an appreciation of the
requirements of leadership, dedication and work ethic at every level.   Over my military
and civilian careers I have engaged military and civilian leaders at all levels and from all
backgrounds.  I retired in 1999 after completing my tours of duty as Commander in Chief
of U.S Naval Forces, Europe and Commander in Chief of Allied Forces, Southern
Europe.   Prior to those tours and subsequent to the two years in the Secretary of
Defense office, I served as the Commander of the U.S. Navy's Sixth Fleet and then as
Deputy Chief of Naval Operations for Resources, Warfare Requirements and
Assessments. I am a Vietnam Veteran and served as Commanding Officer of River
Assault Division 153 in the Mekong Delta.

        The first few days of my working with Mr. Libby were momentous. The day before
(in August of 1990) I became the Senior Military Assistant to the Secretary of Defense,
Sadamm Hussein invaded Kuwait. Scooter Libby was the Principal Deputy for the Under
Secretary of Defense for Policy.  Within days the Department of Defense and our
Country had to prepare for war. The one key member of the Secretary's team that I saw
most frequently was Scooter Libby.  For months we started the day (at 0615) with the
Intelligence Brief and then went into planning session.  The only civilian leader that
engaged with me almost daily was Scooter Libby.  He worked seven days a week and
equally well with the military officers of the Joint Staff, the Armed Services, and the
unified staff such as the Central Command and the European Command.  He was the
linchpin between the civilian arm of the Department of Defense and our military planners
to ensure our war fighters had the right support to win.  His policy planning and travel to
the Persian Gulf region for negotiations and planning were central to our success in the
war. Prime examples were his role in helping plan the "left hook" into Southern Iraq from
Kuwait, the truly effective bio-defense posture of the United States Military and his
untiring efforts to gain funding from allies which resulted in 52 Billion dollars funded by
other countries to support the war effort.  Throughout my tenure in the SecDef office Mr.
Libby was the senior member of the team for planning and implementing Defense

Strategy as well the leader reviewing the budget and policy decisions for war fighting procurements such as major aircraft and shipbuilding.

Two other impact areas of significant National importance were led by Scooter Libby.  One was the Conduct of the Gulf War Report to the Congress which examined the use and performance of all equipment and systems used in the war. It further examined strategy and planning processes and results.  It was one of the few times a report of this nature was received by the Congress as honest and forthright, which is a testament to Mr. Libby's efforts to "do what is right".  The second area of impact was his leadership and efforts in Eastern Europe as the Soviet Union disintegrated.  His efforts to build relationships and alliances were instrumental helping the U.S. and NATO re-engage with countries that had been on the other side of the "Iron Curtain".  Without that building block I could not have fully succeeded as Commander in Chief of Allied Forces Southern Europe in Bosnia and with the "Partnership for Peace Alliance" under NATO.

I have remained in contact with Mr. Libby in the years intervening between our service together in the Department of Defense and his most recent position as Chief of Staff to the Vice President.  I believe that Scooter Libby has made significant positive contributions to our Country and the U. S. Armed Forces to maintain peace and stability in our world.  He has my admiration.

Admiral T. Joseph Lopez, USN (Ret.)

**DICKSTEIN**SHAPIROLLP

1825 Eye Street NW  |  Washington, DC 20006-5403
TEL (202) 420-2200  |  FAX (202) 420-2201  |  dicksteinshapiro.com

March 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington. D.C.  20001

Re:    I. Lewis Libby

Dear Judge Walton:

I am a partner at Dickstein Shapiro LLP based in Washington, DC.  I joined the firm in March
1973, more than 34 years ago, and have served at various times as the firm's Managing Partner
and in other management roles.  I am currently a member of the Executive Committee and
Chairman of the Compensation Committee (a post I have held for 22 years).  In addition, I chair
the firm's Corporate & Finance practice group.  My experience and perspectives have been aided
by service as a Director on a multiplicity of Boards of public, private and public interest
organizations.

Scooter Libby was a partner of this firm from 1985 to 1989, while I was Managing Partner and
Chair of the Executive Committee.  I was involved in the recruitment of Scooter, and worked
with Scooter both on substantive client matters and on firm-related matters.  It was during that
period that Scooter met Harriet Grant, an associate at the firm who later became Scooter's
beloved wife.

Given the very high level of Scooter's integrity and performance throughout his tenure at the
firm, I could never have imagined writing this letter, urging compassion and consideration for
Scooter on the occasion of his sentencing.  I do not, unfortunately, recall the details of all of the
client matters on which I worked directly with Scooter, but the impression Scooter made on me
is indelible.  Scooter was always focused on serving the clients' best interests, on achieving
superior results on time or ahead of schedule, and above all else on keeping clients informed of
the progress being made on their behalf.  There were never any lapses in judgment or integrity;
Scooter never cut corners.  Indeed, Scooter was as "straight up" a lawyer as I've ever worked
with.  In both his professional and personal roles, Scooter conveyed an intense loyalty to our
system of government, and despite its many flaws, Scooter was a great defender of the system as
the best on Earth.  One matter Scooter and I worked on together involved the permitting and
eventual construction of a very large international and interstate pipeline system, extending from
Western Canada to Long Island.  The project involved intense conflict between state and federal
regulators, and had more than its share of parochial (and sometimes colorful) detractors.  As
frustrating as the process was, Scooter was always a calm voice, assuring the client-proponents

Washington, DC  |  New York, NY  |  Los Angeles, CA                                    DSMDB.2234913 01

**DICKSTEIN**SHAPIRO<sub>LLP</sub>

The Honorable Reggie B. Walton
March 27, 2007
Page 2

that objections should never be dismissed, but met with the positive benefits of the project.  His advice was good, it was followed and the project was successful.

Perhaps ironically, Scooter's trust in our system of government most likely gives him comfort that justice will be done when he is sentenced.  I share his confidence and would urge Your Honor to take into account Scooter's many years of dedication to public service as well as his excellent reputation in the private sector.  I often hear "Given what Scooter's been through, why would anyone want to serve in the government?"  If Scooter is sentenced fairly – and I'm sure Your Honor will do so – Scooter would likely be the first to rebut that view, and to encourage others to commit themselves to public service despite the risks involved.

Sincerely,

Frederick M. Lowther

**Andrew D. Lundquist**



April 26, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

My name is Andrew Lundquist and I have worked in Washington, D.C. in various capacities for the last 20 years. I am currently managing principal of a business and governmental affairs consulting firm that I founded five years ago.

I moved to Washington, D.C. in 1987 from Alaska to work for Senator Ted Stevens of my home-state. I served in Senator Stevens' office for seven years during which time I also received my Juris Doctor from Catholic University. I then worked for Senator Murkowski of Alaska as his Chief of Staff and subsequently on the Senate Energy Committee for Senator Murkowski as his Staff Director. In early 2001, I concluded my service in the Senate to take a position at the White House serving both President Bush and Vice President Cheney as the Director of the National Energy Policy Development Group (NEPDG). I managed, under the direction of the President and Vice President, the cabinet-level task force that produced the President's National Energy Policy. Following rollout of the policy, I then served the President and Vice President as a senior advisor and strategist on energy issues.

It was just prior to my service at the White House, during which time I led the 2000 Bush-Cheney Department of Energy transition team for the newly-elected President Bush, that I first met I. Lewis "Scooter" Libby. It is my honor to now be writing this letter to tell you what I know about this man who is a former colleague and who I am proud to call my friend.

When I met Scooter, he had just been named chief of staff for the Vice President. I immediately saw what a hard working man Scooter was – devoting everything he had in him to the service of the Vice President and President, and to his country. During my time in the Senate, I saw countless hard-working Members of Congress and staff members, but Scooter really stood out. He worked tirelessly and gave it his all, and truly

did it because he believed in making his country a better place. And while doing this, he managed to be one of the truly nicest people I have ever met – taking time out of his extremely busy schedule to check in with staff to see how they were doing or ask about their families - making it a point to connect with people.

Not long after meeting Scooter, he hired me to run the NEPDG. I reported to Scooter and the Vice President directly. During this time, my respect and admiration only grew for Scooter as I got to know him better. He is smart, analytical and thoughtful. There is almost no one for whom I have a greater respect and I've never worked with anyone with more integrity and a stronger work ethic. Scooter is a committed civil servant who has dedicated much of his life to making this country a better place. It appeared to me too that everyone that worked with Scooter liked and respected him – from his deputies to the interns answering the phones.

During the time that I've known Scooter, first as a colleague and now as a friend, I've never known him to be anything but honest, straightforward and conscientious. Scooter is also a wonderful husband to Harriett and father to his two children. They are a very close-knit and loving family.

In closing, while I was not at all involved in Scooter's trial, I did follow the news about the case and obviously noted the verdict. I can say unequivocally that the verdict is totally out of character given my long-term experience with Scooter. I sincerely hope in deciding Scooter's sentence that you will take into account the tremendous personal, professional and financial hardship that this case has already had on Scooter and his family.

I have appreciated the opportunity to tell you what I know about my former colleague and now friend, Scooter Libby.

Best Regards,

Andrew D. Lundquist



# KAIZEN

KAIZEN STRATEGY

April 21, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Dear Judge Walton:

I do not know if you will recall, but I had the distinct pleasure of sitting with you and your lovely wife at the 25th Anniversary Gala Dinner and Performance for the Center for Neighborhood Enterprise, Bob Woodson's group ("CNE").

I left Akin Gump at the end of last year, and started my own company, The Kaizen Strategy Group, to focus more on providing strategic consulting for international companies in the Washington, D.C. area. I also continue to assist Bob and his good works as a Board Member of CNE.

Today I am writing to you as someone who spent two years working closely with Scooter Libby in the Office of the Vice President, The White House. At the White House, I was the Deputy Assistant to the Vice President, and Acting Director of the Vice President's Domestic Policy Office. As such, Scooter Libby was my direct supervisor starting in March of 2002 through to October of 2003. During the course of my work for the Vice President, I interacted with Scooter almost on a daily basis and sought him out for everything from professional and career advice to how to navigate the White House complex. I found him to be very generous with his time, engaging, and would often go out of his way to assist me.

In particular, I recall one professional episode in which he knew how passionate I was with respect to an issue that the President was considering. While it is highly unusual for someone at my level to have an Oval Office meeting with the President, Scooter made sure that I would be present and attend the President's briefing on the issue so that I would personally have the opportunity to advance my recommendation to him directly. On a personal level, I asked him to attend my Administration departure party, and he rescheduled his day in order to make a personal appearance.

KAIZEN

The Honorable Reggie B. Walton
April 21, 2007
Page 2

I am sure that you will hear many stories from former staffers and employees, but I cannot express more strongly that I have seen and believe Scooter to be a gentleman of the highest ethical order and integrity. As officials paid by the taxpayer, as patriots serving our President and country, he ingrained in all of us the limitations, perils, and pitfalls of ever letting our guard down and to remain ever vigilant on staying at the highest level of ethical awareness. In the post-9/11 world we live in, I can honestly say that my family and I slept a little better knowing that men and women like him was at the highest levels defending our nation.

On a more personal side, when I had determined that the time had come for me to seek employment back in the private sector, while I repeatedly sought Scooter for career advice, I did not once contemplate seeking endorsement or even a recommendation from him or the Vice President as it would "appear" unseemly and heavy-handed. Such was the atmosphere he created as our Chief-of-Staff, and I do not believe that I have ever heard of any staffer, current or past, of ever complaining that this was too harsh.

I have and continue to support all and any efforts to exonerate the man that I know as Scooter Libby, and I am proud to have served with him and to continue to call him my mentor and friend.

Should you have any questions, or require me to further elucidate my views upon the matter, I am at your disposal.

I am

Sincerely yours,

Ado A. Machida
President



ANDREW W. MARSHALL

27 April 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Ave. N.W.
Washington, DC 20001

Dear Sir,

       I first met Scooter Libby in the late
1970's. For the past 34 years I have been the
head of a small office that is part of the
Office of the Secretary of Defense, and it is
in connection with the activities of this office
that I have known Scooter. Especially, when
he was the Principable Deputy to Paul Wolfowitz
during the period 1988-92 I saw him very
often to discuss the various analyses of the
Soviet Union the office of Net Assessment was
undertaking. Also, since the mid-1980's Jim
Roche and I have each year run Summer
Studies for 10 days at the Naval War College
in Newport, Rhode Island. We have often
had Scooter help us review the studies before
they were finally briefed, to take advantage of

the government. I had occasional contact
with him at parties and social events.

Through all of this time I have had
a personal admiration for him. He has been
helpful to me in my work, often without
any compensation. He is a person of the
integrity, a great patriot, and wonderfully
kind and generous to others. It is hard to
think of a better person, or of one so
sensible and judicious in thought or
behavior.

I find his current predicament so
at odds with all that I know about him,
that it is a puzzle and a cause of
dismay to me.

Sincerely,

Andrew W. Marshall



**THRESHOLD
EDITIONS**

May 10, 2007


The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001


Dear Judge Walton:

Thank you for considering the thoughts of Scooter and Harriet Libby's many friends.
Though I have worked in Washington politics for over twenty-five years, for Presidents
Reagan and George Herbert Walker Bush, and while I knew Scooter Libby by his highly
regarded reputation, I did not cross paths with him until I joined Dick Cheney's staff as
Assistant to President George W. Bush and Counselor to the Vice President. As Chief of
Staff, Scooter was my superior but given our similar life circumstances, we very quickly
became close friends.

His wife and my husband share similar political views and we are all late life parents with
children the same ages. Neither Scooter nor I joined the administration as a career
enhancement, but because we believe in public service. Our service put great strains on
our respective families, especially following the events of 9/11, which required not only
long but also intense and often off-site work at the so-called "undisclosed secure
locations". Our families bonded and our friendships deepened.

You have likely learned much through these letters regarding Scooter's unique service,
his superior intellect, unmatched work ethic and quiet leadership in government. I would
like to address his family and personal values.  Though my husband James Carville, a
Democratic Strategist and Clinton supporter, shares neither political nor philosophical
views with Scooter, he has a deep respect for his intellect, his integrity, and joins me in
the sentiments expressed here.


Mary Matalin  |  *Editor in Chief*

Simon & Schuster, Inc.  |  www.SimonSays.com



**THRESHOLD
EDITIONS**

One of my many enduring and endearing memories of Scooter is of his *universal* love of families. While on one of our early "undisclosed location" work trips, (which were always driven by unfolding threatening events and were therefore unscheduled and unanticipated by our families and us), coincided with Halloween, which I am sure you know is the favorite event of most children's lives. The Cheney grandchildren were required to accompany us on this particular trip, yanked out of school and away from their much-awaited night of Trick-or-Treating. Their disappointment being trapped in the desolate, nothing-to-do location was heartbreaking, as was our own, missing our small children that night. While I was working up a pretty annoying whine, Scooter flew into action, finding treats, creating costumes and arranged an ad hoc Trick-or-Treat and Halloween games for the kids. This was no small undertaking given our removed location and minimal resources. It took hours and a very creative effort on his part. And when the little ones finally trotted off to bed happy and full of candy and stories, Scooter went back to work, as was always the case, late into the night.

On the many other occasions our children were forced to accompany Scooter and I on location with the Vice President, Scooter always arranged to have our work and schedules revolve around the kids. He always planned ahead and discovered the most fun and interesting activities for all of them. To this day, whenever I talk to my girls about attending any White House event, they always ask, "Is Mr. Scooter going to be there?"

My lifelong view, which has only been validated in adulthood, is that kids are the most honest and true evaluators of people. Watching my children with Scooter, and all children with him, you'd think he hung the moon. He is gentle and caring. He is genuinely interested in others well being and still inspires me to this day. He is a compelling teacher and extraordinary role model for integrity and humility.

I have seen what this trial has done to my own kids, just their reading about it. I cannot imagine the toll on Scooter and Harriet's young ones. Setting aside the pain of the Libby family, my girls just don't understand. They are old enough to intellectually comprehend the facts of the case but associating these "facts" with "Mr. Scooter" remains a complete disconnect to them.

Mary Matalin  |  *Editor in Chief*  |

Simon & Schuster, Inc.  |  www.SimonSays.com



**THRESHOLD
EDITIONS**

My family is praying the wisdom and mercy you bring to bear in determining Scooter's future will include a consideration of his family, the price they have already paid and what further justice would be served by additional devastation to them and the many other children who love Scooter.

With respect and gratitude for your service,

Mary Matalin

James Carville



**AMERICAN TRANSBRIDGE TECHNOLOGIES, LLC**

April 17, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is E. Gay Mayfield, and I am President of the ATT Group, LLC, a group of companies specializing in renewable energy project development and engineered biofuels. Our sustainable energy projects are highly rated in Georgia and we have gained global notoriety in our approach to the conversion of biomass to energy. I am also the proud father of Jennifer H. Mayfield, who served as I. Lewis (Scooter) Libby's assistant for the first term of the Bush/Cheney administration. My wife, Phyllis, and I got to know Scooter through Jenny's daily account of life working in the administration of Vice President Cheney. From the beginning, Jenny developed the utmost respect for Scooter due to his moral convictions; his humble approach to public service; his focused dedication on making a difference to his country; his unwavering support for his staff; and his love of family. No one knows Scooter better than Jenny and she truly believes he is among the most admirable people she has met in her young professional and personal life. She is recognized by her peers as a leader and a person of great insight into authenticity of character and motives.

When I met Scooter in person, I immediately understood why Jenny had gained so much respect for him in such a short period of time. I have never met a person like him. His optimism, enthusiasm and dedication was infectious. Every comment he makes is unmistakably genuine and unassuming and he exudes an aura of integrity in everything he says and does. I was so impressed with the diversity of the duties he performed for both the Vice President and President and the selfless way he approached his responsibilities that I became motivated to encourage him to be more visible. I told him on countless occasions that the average US citizen needed to see more mainstream government leaders like him that have no hidden agenda and whose actions are totally directed at doing the right thing without pretense.

My wife and I were always touched by his constant concern with Jenny's well being. Regardless of how busy he was, he would contact us to routinely assure us that Jenny was in good hands and that her working environment was safe in all her travels and when she worked very late in the Eisenhower Executive Office Building. Scooter would call us at the most inconvenient times in his schedule to tell us what a great job Jenny was doing and how much he appreciated her dedication and hard work. He thanked us often for encouraging our daughter to "serve" in such a demanding job. He viewed Jenny's efforts more as a

patriotic contribution than a professional obligation as he always made it clear that he could *never* compensate her fully for the job she did. This was very gratifying for us as parents. Parents always hope for the best for their children and we could not have been more pleased with Jenny's opportunity to work for such a fine, honorable and intelligent person as Scooter Libby. The longer we know him, the more we respect him. Even today, our family admires him as much as anyone we have met and we have had the opportunity in our lives to meet many leaders in government and industry. Scooter continues to be and will always be, one of our dearest friends.

We also believe Scooter played a large role into developing our daughter into the *professional* person she is today. She exemplifies the integrity he instilled in her and she works only for the common good and <u>never</u> allows a hidden agenda to effect her actions or decisions. If you knew my daughter, you would view her *total* respect and admiration for him as a testimony to his outstanding character and the fine person he truly is. Our family is willing and eager to testify on Scooter's behalf at any time with minimal notice. He's an exceptional human being and we will do *anything* to defend his character and the moral foundations that drive his motives.

Sincerely,

E. Gay Mayfield, Jr.
President

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

My name is Elizabeth Mayfield.  Since I moved to Washington in the spring of 2004, I
have worked as an executive assistant to Wayne Berman, Managing Director at Ogilvy
Government Relations.  My responsibilities at Ogilvy included managing and organizing
the day to day operations of the firm's top lobbyist as well as providing administrative
support to three other Vice Presidents within the firm.

The first time I ever heard Scooter Libby's name was during the transition in December
of 2000 when my sister, Jennifer Mayfield, went to work for him.  He was the newly
appointed Chief of Staff to the Vice President and National Security Advisor.
Immediately, Scooter took my sister under his wing.  Always guiding her in the right
direction; making sure that her hard work and determination never went unnoticed.

In the summer of 2002, I moved to Washington to work as a Vice Presidential intern in
the office of Lynne Cheney.  Although I had been introduced to him several times before,
I was looking forward to finally getting to know the Scooter Libby I had heard so much
about from my sister.  That summer, 9/11 was still very fresh in all of our minds.  Every
television, in every office in the Eisenhower Executive Office Building was turned to
FOX News; constantly reminding us of the immediate threat of another attack and a war
that was inevitable.   The Vice President and his staff were regularly being relocated to
undisclosed locations.  On the days when he was in his office, Scooter's door was always
open.  He always made himself available to his staff and even the interns; constantly
engaging with us, entertaining our ideas and making us feel as though our opinions
mattered.

As an intern, I hung out in my sister's office every chance I got.  I would often catch
Scooter as he finished one meeting and prepared to race off to another.  In the three
available minutes he had between meetings he would always stop and speak to me.  Ask
me what I was up to; always wanting me to tell him a funny story.  He was genuinely

interested in my ridiculous pastimes; never judging me.  Scooter has an amazing ability to make you feel like you are the only person in the room and I often felt very special after our chats.  I soon realized that he treated his entire staff with the same amount of respect and undivided attention.

The Libby's often invited me and my sister to join their family dinners; sharing the few moments they had together as a family with us.  I was always amazed at the way Scooter could transition from Chief of Staff to father at the sight of his two young children; how the conversation could shift seamlessly from Iraq to soccer.  As I watched him interact with his children, it occurred to me how hard it must have been for him to leave them every morning before the sun came and up and return home long after they had gone to bed.  As a public servant, Scooter made sacrifices that affected every aspect of his life.

To know Scooter Libby is to know true greatness. He is the most loyal, principled, admirable person I have ever met in my life.  I feel honored and blessed to know such an amazing human being.  In our lives, we are constantly being tested and throughout this experience Scooter Libby has shown a tremendous amount of strength and courage.

It is with great honor and respect and that I write you this letter.  Should you have any questions please feel free to contact to me.

Sincerely,

Elizabeth Mayfield



April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

My name is Jennifer Mayfield.  I recently moved to Jackson, Wyoming from Washington, DC and currently serve as a principal in one of the west's premiere public relations firms.  I manage the firm's Wyoming office, and service a high caliber client base, to include a few re-known developers and an environmental friendly energy services company.  In just six short months, I have made every effort to contribute to my new community, becoming involved in the Chamber of Commerce; Imagine Jackson, a community development non-profit; Rotary Club of Jackson Hole; and the Wyoming Business Council.  Before moving to Jackson, Wyoming, I worked for Vice President Cheney, and for the first four years of my White House tenure, I was privileged to serve as Scooter Libby's special assistant.

When Scooter was indicted in October 2005, I was devastated.  I had been at Scooter's side during those key months in the summer of 2003, and I knew the accusations to be false.  Anyone on the staff could tell you that Scooter's memory was imperfect.  Matter of fact, my colleagues called me "Scooter's Palm Pilot," because, with such incredible responsibility, Scooter had to rely on me to remember the details.  But, more importantly, I know Scooter is not capable of committing a crime.  Scooter is a man of great moral convictions, and, while in office, he did all he could to serve our country to the best of his ability.

After Scooter resigned, on the day of the indictment, he was forced to leave the White House immediately.  As I drove him home to be with his family, he did not shed one tear, nor did he express any anger.  He held his head high, and graciously called staffers who he had been unable to tell goodbye.  I have seen nothing less of Scooter throughout this process.  When I decided to leave the White House last fall, Scooter insisted on making my private sector career a priority.  We spent countless hours brainstorming about my future -- hours that should have been devoted to trial preparation.  In March, after the verdict, Scooter actually called to see if I was okay as he was worried about me dealing with the news far from family in Jackson.

Scooter Libby is the most intelligent, caring, humble, dignified man I have ever known. To work in the White House is truly an amazing experience, but serving under Scooter was the opportunity for which I am most grateful. In my life, I attribute much of my character and success to my parents and Scooter Libby. My parents impressed upon me humility, strong morals and ethics. Scooter Libby instilled in me during my more formative years confidence, integrity, leadership and respect for public service. Scooter has stood by me, both professionally and personally, since the day I met him, and I intend to stand by him and his wonderful family as they persevere in this tragedy.

Scooter and I first met in December of 2000, when a mutual friend recommended that Scooter hire me to help manage his vast responsibilities as the Vice President's Chief of Staff and National Security Advisor. It was not until several weeks later that Scooter realized I was fresh out of college and without federal government experience. This could have caused great distress for anyone of Scooter's stature, yet he took me under his wing and made time available to teach me the necessary policies and procedures. I was in my early twenties when I worked for Scooter, but age never once was an issue. Scooter valued my opinion, challenged me constantly, expanded my duties and, most importantly, taught me to believe in myself when I doubted my own ability.

As Scooter's special assistant, I think it is fair to say that no one knew Scooter as well as me. We worked around the clock together, and when apart we communicated regularly via phone. Scooter's overwhelming selflessness and dedication to his family, country and staff never ceased to amaze me. Scooter's typical day -- filled with back to back important national security, homeland security and domestic policy meetings -- started at 6:00am and ended at 9:00pm. Despite his demanding work load, Scooter was always available to staff, to include drivers, stewards, Secret Service agents, military aides and interns. In typical Scooter fashion, I remember, amid rigorous schedules, him insisting that he call a former intern after learning of her father's sudden death, consoling a staffer when he realized that the staffer and his wife were not eligible to adopt a child and providing daily comfort to a staffer diagnosed with cancer.

Particularly after September 11, when his schedule consumed him 24 hours a day and most nights were spent away from his own family, Scooter recognized the emotional impact that had befallen on the staff. Scooter, once again, attempted to ease everyone else's concerns and immediately implemented an evacuation plan for our staff in case of another emergency, long before the White House came up with one of their own. In the months after the invasion of Iraq, Scooter -- as Vice President's right hand man -- became a potential target of a terrorist attack. In recognition of this and to protect his life, the White House assigned a security vehicle to take him to and from work. Every morning when he left his house he had to worry about the safety of his own family, yet, when many people might have walked away, he continued to serve the President, Vice President and the future of our country.

Scooter's generosity also extended to people that he did not know. Even before September 11, unlike many other leaders in government, Scooter was undeterred by bureaucracy, challenged both sides of the argument and, no matter how exhausted, spent

day and night contemplating on how better to protect Americans. I recall one Friday night, Scooter and I had planned to leave the office at a reasonable hour, when we received a panicked phone call from an official at the Central Intelligence Agency. A *Los Angeles Times* reporter was about to run a story that would jeopardize the life of an overseas agent, and the official could find no one to help. Scooter, who instilled in me the importance of America's service people, was determined to protect the agent at any cost. Scooter and the reporter negotiated for hours and hours. At the eleventh hour, Scooter was able to convince the reporter not to write the story and, thank goodness, the agent lives today. Even for a 29 year-old, it is hard to remember the details, but I will never forget what it was like to witness such a selfless, heroic act. Six years later, it literally gives me chills down my spine to reflect on that moment.

After the campaign of 2004, I decided to explore other career opportunities. Looking back, I find the decision humorous as no job would ever compare to my role as Scooter's special assistant and I had absolutely no experience in my new chosen field, communications. Nonetheless, Scooter respected fully my decision and, once again, believed in me enough to create the Deputy Press Secretary position in the Vice President's office. With Scooter's support, I was able to grow into the job, which proved useful to our communication's operation and gave me an opportunity to learn new skills. Thanks to Scooter I spent the last two years of my service in this capacity.

Scooter has been a mentor and friend for nearly seven years. I consider him, his wife, Harriet, and his two kids, ▮▮▮▮▮▮ to be a second family. I, better than anyone, know how much Scooter sacrificed to serve his country. I pray that his children understand, though the media would like to report otherwise, that their father deeply touched many lives, always fought for what was right and, in many ways, changed the course of history. I believe whole-heartedly in America and our judicial system, and I hope that justice will soon prevail so that Scooter may be free. Should you care to discuss in greater detail, I will make myself available on a moments notice.

Respectfully,

Jennifer Mayfield

**Brian V. McCormack**



May 8, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

Thank you for this opportunity to write to you on behalf of Mr. Lewis "Scooter" Libby, whom I consider a former colleague, supervisor and friend. I appreciate you taking the time to read and take into account my perspective of his character.

I first met Scooter in the summer of 2000 when we were both involved in the Bush-Cheney campaign. As with any effort on that scale, time was precious and we didn't really have a chance to get to know each other. That would change after Election Day, the Inauguration, and especially after September 11, 2001.

From November 2000 thru May 2003, I served as Vice President Dick Cheney's personal aide. That role took on different meaning and responsibility as he transitioned from private citizen, to Vice President – Elect, to Vice President. Beginning with Vice President – Elect is when I began working more closely with Scooter and having the opportunity to know him better.

Like many, I think my first question upon meeting him was, "Scooter, what type of name is that?" With a nickname like that, I would not have imagined him to be the serious, intense, sober, intellectually-minded individual that he is.

After September 11, 2001, the work load at the White House and throughout government reached a new level of intensity. This change impacted everyone but especially those like Scooter in the national security realm. In order to preserve the continuity of our government, the Vice President began significantly alternating his schedule and spending a majority of time "undisclosed". While this became fodder for late night television later it was very real for those involved. It also required some of us to be away from home and family. In Scooter's case, this meant being away his wife Harriet and young children

During this period everyone was busy, being challenged in new ways and doing everything they could to support our leadership through a grave period in America's history. We were all working hard and trying to do our best. As for Scooter, he was the Vice President's Chief of Staff and National Security Advisor, and the diversity of issues and concerns on his plate was extremely challenging, if not overwhelming.

In my position as Personal Aide, I worked with Scooter on a daily basis and observed first-hand he immersed he was in a myriad of issues and challenges. He appeared to have a real sense of mission and intensity about his work. In my opinion he took on the traits of a college professor - knowledgeable on so many fronts, but at times absent-minded on logistical type details. I attribute this to be part of his personal nature and part of the experiences in which we were living.

When Scooter was indicted I felt a sense of disbelief. After years of working alongside him I felt confident there was no way he could guilty of this crime, or any crime for that matter. Needless to say, I was shocked when the jury found him guilty.

Your honor, you are in a position of significant authority and power. Scooter Libby is a man brimming with integrity who has sacrificed much to our Nation's benefit. I encourage you to give full consideration to the character of this man as you make your final determination of his fate. The faith of many in our legal system lies with your

Sincerely,

Brian V. McCormack

May 25, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barret Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

The Honorable Reggie B. Walton,

My name is Megan McGinn and I had the pleasure and privilege of working for I. Lewis "Scooter" Libby while he was Chief of Staff and National Security Advisor to Vice President Cheney.  For nearly three years, I sat outside of Scooter's office and not a day passed where I did not received a warm greeting from him (often before 7:30 A.M.) or a "thank you for your service" at the end of a fifteen hour day. While these are simple gestures of kindness, please permit me to share a few stories that explain why Scooter was an exceptional boss, father and friend.

I was just twenty-one years old when I started working for the Vice President and had lost my father, the most influential person in my life, a short six months earlier. Having never lived more than a few hours from home before, moving to Washington and working at the White House was an overwhelming experience. Scooter recognized the difficult circumstances under which I started and often would pull me into his office to "see how things were going." He would frequently ask me if I was doing ok and if there was anything he or his wife could do for me and my family.  I was truly touched to see a man with a family and such a demanding job care so much.

For three years, I also had the opportunity to witness what a loving and wonderful father Scooter was (and still is).  I cannot remember a day going by where Scooter did not stop to talk to his two children or his wife.  In fact, the only time I ever saw Scooter get upset was when a picture frame of his kids fell off his desk and broke. He let out a silent "damn" and asked his assistant if she wouldn't mind seeing if she could get it fixed as it was his "favorite picture."

I understand that you are faced with the sentencing of Scooter and reviewing letter's attesting to his character. Working with someone five to six days a week for three years in an intense, demanding environment gives you a good glimpse into what kind of human being that individual is.  I can honestly say that Scooter is one of the most genuine human beings I have ever met.  His kindness, sense of humor and generosity are matched by few I know.  I can only hope that you take this into consideration when you are making your decision.

Best regards,

Megan E. McGinn



**manatt**

manatt | phelps | phillips



C. Dean McGrath, Jr.
Manatt, Phelps & Phillips, LLP

May 1, 2007

Client-Matter:  08888-005

The Honorable Reggie B. Walton
United States District Judge
United States District Court
1125 E. Barrett Prettyman Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

Dear Judge Walton:

I am writing in behalf of my friend and former colleague I. Lewis ("Scooter") Libby.  I have known Scooter for nearly twenty years.  I am currently a partner in the D.C. office of Manatt, Phelps & Phillips.  Prior to joining Manatt in early 2006, I retired after almost 25 years of federal government service.

I first met Scooter in the late 1980s when we worked together on the implementation of the Packard Commission's recommendations on defense acquisition reform.  I was initially impressed by Scooter's ability to work with groups of attorneys, military officers, and procurement specialists and quickly gain their respect and admiration.  We have remained friends since.

In 1998, I was the Staff Director of the United States House of Representatives Select Committee on U.S. National Security and Military/Commercial Concerns with the People's Republic of China.  We hired Scooter as our Legal Advisor.  Our investigation, which uncovered Chinese espionage of nuclear weapons secrets, involved long hours and tense hearings, meetings, interviews, and depositions concerning some of our Nation's most vital secrets.  Scooter supervised many of the Committee's junior attorneys and worked closely with all Committee staff (Republican, Democrat and independent investigators).  Despite the pressure-cooker atmosphere, I never once saw Scooter lose his cool.  His high standards of professional conduct were deeply respected -- and appreciated -- by the Chairman and every Republican and Democratic Member of the Committee.  Scooter was an invaluable contributor to the Committee's unanimous bipartisan report.  Scooter also served as a mentor and role model for our younger attorneys and staff -- many of whom later personally thanked me for the opportunity to work with Scooter.  While Scooter was technically under contract with the Committee, given the thousands of hours he actually worked, he was essentially working pro bono much of the

**manatt**

manatt | phelps | phillips

The Honorable Reggie B. Walton
Washington, D.C. 20001

May 1, 2007
Page 2

time – and given the pressures within law firms for billable hours I know that this was a significant sacrifice on his part.

I also worked for five years with Scooter in the Office of the Vice President. I was Deputy Chief of Staff to Vice President Cheney, and Scooter was Chief of Staff and National Security Advisor. I worked with Scooter on a daily basis. I was impressed by the fact that he treated everyone on the staff in a straightforward manner, with courtesy and respect. Like everyone else in the White House, Scooter was deeply affected by the events of September 11, 2001. I saw first-hand his deep commitment to doing everything humanly possible to prevent another terrorist attack. At the same time, he was also deeply worried about the personal safety and security of each member of the Vice President's staff and had us develop contingency plans to respond to possible attacks on the White House. Throughout the five years I worked closely with Scooter at the White House, Scooter was always the consummate professional – never over-reacting and never losing his perspective.

On a more personal note, I was always struck by Scooter's commitment to his family. In particular, the death of his father, which took place unexpectedly a few months after September 11, had on profound effect on Scooter. Following his father's death he spent much of his free time over the next few years comforting his mother until she passed away in the fall of 2005. I remember that he would take time out of his hectic schedule to visit her in the hospital -- even as world events swirled around him and a potential indictment loomed – an indictment that was handed-down shortly after her death. But what I remember most vividly are those occasions at the end of long and trying days when the thing that truly preoccupied Scooter was that he might not be able to get home in time to see his two kids -- for the first time that day -- to say good night. I know that there is nothing Scooter would do intentionally to hurt his kids.

While I am certainly not an objective observer, I simply cannot believe that the Scooter Libby I know would intentionally lie – putting in jeopardy his family, his career and his reputation. As an attorney and adjunct professor of law, I fully appreciate the jury's verdict to the contrary. But I also understand that individuals – especially in Washington, D.C. -- sometimes get caught up in events that spiral out of control. This appears to be such a case.

In making your sentencing determination, I respectfully submit that Scooter's long and unblemished record of service to his country and his profession, together with his commitment to his wife and kids -- who have been devastated by the verdict, the crush of hostile media attention, and the uncertainty of what lies ahead -- counsel against a harsh sentence. Scooter's career as a lawyer and public servant are in a shambles and, knowing him as I do, believe that he

**manatt**
manatt | phelps | phillips

The Honorable Reggie B. Walton
Washington, D.C. 20001

May 1, 2007
Page 3

will continue to be haunted by the verdict for the rest of his life. Exacerbating that punishment would not, in my view, serve the interests of justice.

I appreciate the opportunity to provide you with my views and thank you for your consideration.

Sincerely,

C. Dean McGrath, Jr.

# WASHINGTONIAN

**1828 L Street, NW, Washington, DC 20036**
**Phone 202/296-3600    Fax 202/785-1822**

**ELEANOR MERRILL**
PRESIDENT & PUBLISHER

May 14, 2007

Dear Judge Walton:

My name is Eleanor Merrill. I am Chairman and Publisher of Capital-Gazette Communications, Inc. which publishes six newspapers in the state of Maryland, including the daily, "The Capital" in Annapolis. I am also the publisher of Washingtonian magazine in D.C. I serve on several non-profit Boards, including Ford's Theatre and the Shakespeare Theatre. I am Chairman of the Board of Visitors of the University of Maryland Journalism School. I have known Scooter and Harriet Libby for over 20 years.

My late husband, Philip Merrill, knew Scooter longer than that and actually worked with him in the Defense Department. He appreciated Scooter's intelligence, character and friendship. Phil was an astute and very successful businessman who also spent a lot of time in public service. His most recent posts were as Assistant Secretary General of NATO and President of the U.S. Import-Export Bank.

Phil and I were shocked, disturbed and unbelieving when the charges against Scooter were made public. We quickly made the maximum allowed contributions to his Legal Defense Fund. We could not believe and I still cannot believe that Scooter would ever do the things of which he was accused. It was not in his nature or character even to be thought possible.

Scooter is a true patriot who believes in serving his country. He is a man of impeccable integrity. He is a giving man who cares deeply about his family and friends. He is a wonderful role model for his children. He is generous in giving wise advice. He is open to hearing and taking advice. (In 1996 Scooter wrote a wonderful, sensitive novel called "The Apprentice." He asked me to read the book and I was pleased and proud when he made the changes I had suggested.)

I am writing to you to say that his conviction is inconsistent with my knowledge of his character and integrity. I have heard from many, many people that they share my view of this situation.

Sincerely,

Eleanor Merrill



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
    United States Courthouse
333 Constitution Avenue NW
Washington, DC 20001

I am writing to commend the character of I. Lewis "Scooter" Libby.

I am a retired senior civil servant now in my third year of post-government
employment as a Vice President in the business consulting firm headed by former
Senator and Secretary of Defense William Cohen. My thirty one years of government
service included three years as a naval officer (1972-75), two years in the Department of
State (1977-79), twenty two years in the Office of the Secretary of Defense (1979-2001),
and four years in the White House as both Senior Director for Defense Policy on the
National Security Council staff and as a Special Assistant to President George W. Bush.
I became a member of the Senior Executive Service in 1984. I have served as a Deputy
Assistant Secretary of Defense (1989-1993), a Principal Deputy Assistant Secretary
(1993-1996 and 1997-2001), and from September 1996 until November 1997 as an
Acting Assistant Secretary.  I was the senior career civilian in the Department of Defense
during Secretary Cohen's tenure.  I have received the Defense Department's highest
civilian award, the Defense Distinguished Civilian Service Medal, five times, and have
received similar awards from the Department of State, the Navy Department and the
Chairman of the Joint Chiefs of Staff.  In addition, I have been awarded an honorary
knighthood by Queen Elizabeth II, the Legion of Honor by President Chirac, and the
Royal Order of Merit by King Harald of Norway.  I have devoted virtually my entire
professional career to the service of our Nation and deeply understand and respect the
concept of public trust and responsibility.  I write to you, therefore, in defense of Scooter
Libby, a man who in my experience was a highly valued public servant who took his
position of public trust with great seriousness.

I first met Scooter Libby in the Spring of 1989 when he joined the Department of
Defense.  We worked closely together during the entire period that Dick Cheney served
as Secretary of Defense. I grew to admire his intellect and his wisdom during that
remarkable period in which the Soviet empire, and ultimately the Soviet Union itself,
disintegrated – a period in which both Scooter and I played important roles.  We had
occasional contact during the period 1993 – 2000, in particular when he was serving as

counsel to the Cox-Dicks Congressional Commission; I was impressed during that particular set of interactions with Scooter's fairness and his ability, in a highly political atmosphere, to seek the facts in a non-partisan and unbiased manner. Beginning in January 2001, Scooter and I resumed our close professional relationship and conversed or met on a near daily basis until I retired from the government in March 2005.

I have always found Scooter to be deeply devoted to the public welfare and to defending our way of life. In my experience, he always demonstrated the utmost integrity in his professional dealings. He was tough, but fair; aggressive in the best sense of the word without being demeaning or abrasive. He was a considerate and decent boss, concerned about the personal welfare of his team and of his friends who, after September 11, 2001, worked even longer and more grueling hours than one normally associates with the crushing burden of a White House position. He himself was, despite the exhausting work he was performing (and in which he believed so deeply) always stoic and upbeat. He cherished the small amount of time he was able to spend with his wife and children, and often spoke nostalgically about being able to be with them more once he left the government.

I do not pretend to understand the circumstances which have placed him in the situation in which he now finds himself. His conviction on charges of perjury and obstruction of justice do not comport, however, with the patriotism, character, integrity, and humanity of the Scooter Libby I know.

Sincerely,

Franklin C. Miller



April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
    U.S. Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Re:    I. Lewis Libby

Dear Judge Walton:

My name is Kathy Miller and I am a legal secretary at Dickstein Shapiro.  I have been employed
with Dickstein for 26 years.  I was Scooter Libby's secretary from 1985 to 1987 while he was an
attorney at Dickstein.  I also know his wife, Harriett Grant from working with her at Dickstein.  I
have been in contact with them regularly since we share common acquaintances.  Scooter is one
of the most respectful people I have ever met.  He was an absolute joy to work for as he always
showed the highest integrity and professionalism in his work and personal life.  He has always
been extremely dedicated and passionate about everything in his life from family, friends, work,
his clients, his writing, his martial arts interests and obviously his dedication to public service.
For all the time and effort he has put in to his work in the Bush administration and the
consequences that have come out of it I hope you will spare Scooter and his family from any
further hardship.  Thank you for your time and attention to this most important matter.

Sincerely,

Kathy Miller

Kathleen M. Miller

Peter W. Morgan

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:  United States v. Libby

Dear Judge Walton:

I currently am a partner and general counsel of Dickstein Shapiro LLP, where, particularly, in our junior partner years, Mr. Libby and I practiced law closely together as colleagues and friends.

I left private practice in 1989 for a couple of years to teach law, and Mr. Libby returned to government service. My teaching and writing focused upon legal and government ethics. If you had asked me at the time whom among my former colleagues I would have named as models to my law students for creative, effective and zealous advocacy *within* the bounds that govern members of the Bar, Mr. Libby's name would have been at the top of the list. He had a single-minded determination to advance a client's cause as his own, working honestly, effectively, and unceasingly in the best tradition of legal service.

Some years later, on a mountain biking trip we took with our wives, I was struck by the detail of Scooter's repeatedly circling back, smiling, to see if some straggling member of our group needed help. True, it was a relatively small thing. Yet, it seemed to me to capture both Scooter's sensitivity and joy in serving others -- always circling back to make sure that there was nothing else he could do to help.

Others can attest far better than I as to Mr. Libby's tireless and dedicated public service. I write simply to add another voice to the large chorus of witnesses to the proposition that, whatever mistakes Mr. Libby made in the matters before Your Honor, they are out of keeping with the highest tradition of conscientious service Mr. Libby has shown, year after year, in happier, less stressful, less exhausting, less fractious times.

Hon. Reggie B. Walton
April 30, 2007
Page 2


I respectfully urge Your Honor, in exercising the Court's discretion, to give great weight to Mr. Libby's career of dedicated service to others.

Sincerely,

Peter W. Morgan

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Ave. N. W.
Washington, D. C. 20001

*May 21, 2007*

Dear Judge Walton,

I am Richard B. Myers, General, USAF, Retired. I served in the U. S. Military for 40 years, the last four as Chairman Joint Chiefs of Staff. I was sworn in as chairman on October 1, 2001 and left office on September 30, 2005. Prior to that, I had several other positions since 1996 where I worked intimately with the National Security Council as well as other departments and agencies of the U. S. Government.

In the four years I served as chairman I got to know Scooter well. As the Vice President's National Security Advisor we were in hundreds of National Security Council meetings as well as other meetings together. These meetings were either chaired by Dr. Rice or the President. The topics of these meetings generally centered around the U. S. war on terrorism or addressing these and other threats to our national security.

I always enjoyed working with Scooter. He was smart and usually showed great insight in addressing the challenges before us. He brought clarity and innovation to our discussions, qualities that are refreshing and so needed in a large bureaucracy. On many occasions he would seek me out before or after a meeting to get my advice on military matters or ask me further questions. Scooter's dedication to the nation's security and his thoughtfulness were evident and his comments were always about the substance of the issue, not personalities. I always came away from our encounters thinking how lucky the country was to have someone of his caliber helping think through the great security challenges we all faced.

I found Scooter to be a man of integrity who always put our national security first. He understood the capabilities and limitations of the military instrument of national power and was often helpful to me and my military colleagues as we worked our way through tough security problems. His conviction for perjury and obstruction of justice is inconsistent with the character and integrity I observed through four years of working with Scooter.

Sincerely,

Richard B. Myers
General, USAF, Ret.

# Geoff Conner Newlan
## Attorney at Law

MAIL TO: P.O. BOX 20224
SANTA BARBARA, CALIFORNIA 93102



March 29, 2007

The Honorable Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:     US v I. Lewis Libby

Dear Judge Walton:

I followed closely the coverage of the pre-trial and trial proceedings against I. Lewis Libby held in your court. Before that I followed with even greater interest the investigation of the outing of Valerie Plame as a CIA agent.

During the trial I "kept tabs" on the proceedings in your courtroom throughout the day *via* the Internet by reading the close paraphrasing of the questioning and argument, referred to by many as "live blogging," which was made available to the public through the efforts of many, but spearheaded by the people at FireDogLake.com.

I am writing to express my great concern that Mr. Libby will have accomplished his end by receiving a sentence within the range specified in the Sentencing Guidlines.  I regret the impact such a sentence will have on Mr. Libby's family, but it seems to me that if the court does not make an upward departure from the Guidelines, Mr. Libby and the individuals that likely benefited from the illegal actions he took, for which he was convicted, will be rewarded.  I believe the evidence that was admitted at trial reveals what I would call a "personal calculation" by Mr. Libby: balancing his truthfulness against crime and the severity of punishment.

I urge the court to weigh in on the side of truth when making its own sentencing calculation by making an upward departure from the range otherwise specified.

Very truly,

Geoff Conner Newlan

GCN/neo

THE LOBERO BUILDING - 924 ANACAPA STREET, SUITE 3B SANTA BARBARA, CALIFORNIA 93101

**JAY H. NEWMAN**



April 26, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:  I. Lewis Libby, Jr.

Dear Judge Walton,

I have had the great pleasure and the good fortune to have known Scooter Libby for over twenty years. I count him as a close friend. We met during law school, and we have been friends since. I commend him to you as a man of integrity, a dedicated public servant, and a loyal friend. Above all, I commend Scooter to you as a true patriot – a man who has served his country with diligence and dedication, without seeking personal aggrandizement.

Scooter and I met during law school in a class on litigation, a class that, as it turned out, was as much about legal ethics as anything else. The class was divided into two groups, each of which functioned as a team of lawyers representing fictitious clients in a commercial litigation. The first ethical question that our team faced was raised by Scooter, who was responsible for reviewing documents as part of discovery. Scooter came to us with a client document on which several lines had been scratched out. Scooter informed us that we had no choice but to confront the client, insist that we be given an un-altered document or, failing that, to inform the other side and the Court. Needless to say, when Scooter approached our client, the client affected outrage. Scooter stood his ground, informing the client that he could fire us, but that firing us would not change the outcome. I recount this now because Scooter has always had a clear, strong sense of what is right and what is wrong, what is ethical and what is not.

Ten years ago, when I asked Scooter to represent my firm in commercial litigation, he brought the same high standards to his advice and to the practice of law. Scooter is not a man who cuts ethical corners.

Over the many years that Scooter has served in government he was often unable to tell me, or anyone else, precisely what he was working on. But one phrase repeatedly comes to mind. When I would ask Scooter how things were going, he would often reply that he felt he was "making a difference." Scooter is a modest person. He has never bragged about what he was doing; he never dropped names. What mattered – what matters – to him is *making a difference*. That is what led him into public service, and what led him to serve for so long. Scooter did not drop into public service, briefly, to score a notch on his resume. He took on difficult tasks and he stuck with them. During his entire career in public service he worked doggedly, worked long hours, worked with dedication and worked selflessly. Even though we do not know and may never know the nature of his contributions to this country, it is my unshakeable belief that, through his brilliance and dedication, Scooter has made major contributions to these United States. In particular, in the wake of 9/11, I believe that Scooter has made important contributions to the safety of our nation. I am thankful that he chose to devote so much of his life and energies, often sacrificing time with his wife and two children, to our common good.

Like so many of Scooter's friends and supporters, I cannot reconcile what I know of the man with the charges against him. But I do know that Scooter has already suffered greatly for things that he did not do. For several years, he was wrongly accused in the press of having knowingly outed a CIA covert agent. Many of us knew that this could not have been true of Scooter, and the trial has shown that he did not know anything about Ms. Wilson possibly having a special status. But Scooter and his family suffered from these false charges in the press for over two years, nonetheless. Scooter was wrongly charged in the press with having been the source for Robert Novak. We have since learned that Scooter was not responsible for that, either. But he and his family unjustly suffered for this, too.

As you consider what you will do in sentencing Scooter, I respectfully request that you place great weight on Scooter's exemplary legal career, his extensive public service, the personal sacrifices that he and his family have made in the public interest, the ruin of his legal career and the humiliation that he and his family have already suffered. I have never had to bear the responsibilities that you bear, but, in my experience, given all that he has done for the good of his fellow citizens, I truly believe that it would be wrong to sentence such a man to jail.

Sincerely,

Jay H. Newman

April 23, 2007

Hon. District Judge Reggie B. Walton
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue NW
Washington, DC 20001

Re: Amicus Curiae; United States of America v. Lewis Libby

Hon. Judge Walton:

    I write to you today sir, to weigh in on the matter of sentencing
for Mr. Lewis Libby.  I respectfully urge you to sentence this man to
the absolute term of incarceration permittable under the law.  To be
sure, Mr. Libby's crimes are no less egregious than the very similar
crimes of traitors Robert Hansen or Aldrich Ames.  It is only through
sheer luck that no one was killed in this matter (that we know of).
    The deeper point here is that the motives for these crimes, by
Mr. Libby, et al, is absolutely no different than those motives of
Hansen and Ames; pure greed.  With Hansen and Ames it was greed for
money.  With Libby it was the greed of power, absolute power, the
power to "punish" and the deisre to perpetuate and increase that
power by publicly punishing anyone who posed any perceived threat
to that absolute power.
    Anyone who has ever worked in the intelligence field, as I have,
will tell you that the full effects of this deliberate act may not
ever be fully known.  Intelligence services of other countries, as
do we, routinely surveil opposing agents, suspected agents, and
their contacts.  They keep very very detailed records of all meetings
and contacts.  When an enemy agent becomes known, they go back and
review every single contact they are aware of that person had.  What
people are now in jeopardy now that Mr. Plame's identity have been
leaked?  What ongoing sources of intelligence or operations have
been compormised?  What is the value to this country of Ms. Plames
now lost ability to obtain information on a covert basis?  Obviously,
no one in the administration ever thought through the consequences
of their mindless actions.
    While Mr. Libby's offense of conviction may not be for espionage
or treason, it is surely just as egregious, and under the United
States Sentencing Guidelines, "Relevant Conduct" and "reasonable
foreseeability" must surely be considered in this most serious
matter.  I assure you sir, that friends of mine who still work in
covert capacities for this country are devastated that the office
of the Vice-President of the United States would put their lives,
their operations, and the security of our country at stake for the
self-aggrandizement of their unquenchable thirst for power.
    I respectfully urge you sir, to sentence Mr. Libby to the max-
imum term of imprisonment permitted through consecutive sentences,
to be served in a maximum security facility, no less than Ames or
Hansen.  The Sentencing Guidelines are only advisory,  When consider-
ing all available factors, this is surely an act of treason.

Respectfully,

J. Raymond Niblock

**Kevin M. O'Donovan**



May 3, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman U.S. Courthouse
333 Constitution Ave NW
Washington DC 20001

Dear Judge Walton:

I am writing on behalf of Scooter Libby, a former colleague and a friend. I had the privilege to work for Scooter from March 2003 until September 2005, during which time I served first as Deputy Assistant to the Vice President for Domestic Policy and then as Assistant to the Vice President for Domestic Policy.

Scooter has qualities as a boss that one might look for in a friend in that he is witty, kind, dedicated and sincere. At no point in my acquaintance with him has it ever occurred to me to question his impeccable integrity.

Scooter always looked out for your wellbeing. There are plenty of long days and no shortage of stress working in the White House. During the busiest times it was not uncommon for Scooter to set aside what he was working on and ask about how you were doing with a level of sincere interest beyond the perfunctory. He also has a unique ability in the most tense of moments (waiting to brief the Vice President for the first time) to have just the right joke or quip to put you at ease.

One example of Scooter's concern for his colleagues that stands out to me occurred when I began thinking about leaving the Vice President's office for another opportunity. I enjoyed every day I worked for the Vice President but in the Fall of 2005 was ready to pursue another challenge. When I began to discuss this with Scooter, he asked me to stay but once I reaffirmed my interest in moving on, he helped me think through different career paths. I really appreciated his willingness to take the time to provide this guidance.

Beyond his concern for his staff, Scooter's dedication to his duty as a public servant is something I admire. He was regularly the first in the office and the last to leave and I marveled at the humor and energy that he displayed when many of us were tired and ill tempered. When I think about all those long hours and many years of government service I am also struck by how much he has given to his country.

I am confident that Scooter will continue to give back to society in the way he has throughout life and the public would not be well served by confining this exemplary person in prison.

Sincerely,

Kevin M. O'Donovan

**Sean O'Keefe**



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
Unites States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

     As you consider the appropriate sentencing, this is to offer my views on the character and integrity of Mr. I. Lewis Libby. I have known and worked with "Scooter" nearly 20 years and can attest to his sense of public service responsibility, personal integrity, and moral character.

     We first met during our Pentagon service in the late 1980's and early 1990's, when I first served as the Defense Comptroller and CFO, and later as Secretary of the Navy, and he as the Principal Deputy Undersecretary at the Defense Department. We worked together closely again at the beginning of the current Administration when I was the Deputy Director at OMB and he assumed duties as the Vice President's Chief of Staff. Our close working relationship continued even as I moved from the White House staff to NASA when I was appointed Administrator there in 2002. I left the Washington area in February 2005, when I assumed my present capacity as Chancellor of the Louisiana State University.

     In the span of time I have known Scooter, I never witnessed behavior or demeanor that would suggest that he could ever commit perjury and obstruction of justice. To the contrary, this is a gentleman who always demonstrates the highest integrity, an evident moral compass, and an endless capacity for working to reach closure to make the situation better than the way he found it. In reading the public accounts of the recent legal proceedings, I cannot imagine that Scooter would be capable of the behavior he is accused of given what I know of him and his character.

     In our earliest days working together, I saw characteristics that have persisted throughout our personal and professional experiences. He always demonstrated a respect for other views and an interest in hearing them out. In large measure, this demeanor facilitates his larger objective to serve the public to the very best of his ability.    For

Page 2
The Honorable Reggie B. Walton
May 1, 2007

those privileged to work for him, he always showed a keen interest in helping to develop their skills and talents for not only their personal advancement, but to improve the value of their public service for the citizens of our nation. Legions of seasoned professionals are the beneficiaries of that sense of personal responsibility and dedication to their development.

His dedication to public service and the extraordinary time required is unwavering. Years ago, as we worked through the national security challenges during the fall of the Soviet Union, Operation Desert Storm, and countless historic events of that time, he was an ever present source of strength and encouragement.

As I came to know the measure of the man, our solid professional working relationship also translated to personal friendship. Even during our years in private sector pursuit for Scooter and academia for me, we maintained a working relationship on a variety of projects. Over the years, I've been witness to his expanded sense of responsibility as he married Harriet and assumed the most important responsibilities as husband and father. His sense of duty to family transcends all other obligations, yet he somehow maintains a capacity to meet these and other responsibilities. That resolve was tested as we rejoined the public service at the beginning of this Administration.

The events of September 11, 2001, fundamentally changed the way Americans look at security in our country. The national mood was much more tolerant of actions to protect the country even if it meant extreme measures. Yet, what I witnessed with Scooter's leadership was a calm, sober consideration of issues. Our frequent involvement as members of the White House National Security Council "Deputies Committee" reminded me of that same sense of moral grounding and composure I witnessed all those years before at the Pentagon with Scooter. It was a source of great confidence and reassurance that he was at the center of the consideration of critical issues.

A year after I moved to NASA, the space shuttle Columbia tragedy occurred. At the risk of understatement, the event drew considerable public attention and scrutiny for an extended period of time. Concurrently, the events in Iraq intensified. Throughout that challenging period, Scooter's attention to the international sensitivities in the aftermath of the accident, advice and thoughtful consideration of alternatives were available to me. Given the swirl of attention at the White House on other important matters, I found his attentiveness remarkable and assistance invaluable.

Page 3
The Honorable Reggie B. Walton
May 1, 2007


Your Honor, I earnestly submit to you that Scooter Libby is a very different man than the sketch that has been presented in the public accounts of the recent legal proceedings. In your desire to secure a fair and reasoned judgment as to the proper sentence, I implore you to consider the perspective I have offered of consistent, high moral character and integrity of Scooter Libby as public servant, husband, father and friend.

The nation owes him a debt of gratitude for his tireless public service. No action on his part can expunge the record of his invaluable contributions to the country. I ask that you consider this factor as you determine my friend's future.

With great respect and appreciation for your consideration,

Sincerely

Sean O'Keefe



Judge Reggie B. Walton
U.S. District Court for the District of Columbia
E. Berrell Prettyman United States Court
333 Constitution Avenue N.W.
Washington, D.C.

Re: Sentencing of I. Scooter Libby

April 3, 2007

Dear Judge Walton,

I am writing to encourage you to give the harshest possible penalty to I. Scooter Libby under the law. When a top administration official to the President and Vice President of the United States of America lies to a federal prosecutor, nothing less than maximum punishment is warranted.

As a fifth grade teacher, I teach American history. I am sure you are aware that you will be in history books in the future. At a time when our country has narrowly escaped a Constitutional crisis, and when our entire federal Judicial system is in question, the sentence that I. Scooter Libby receives will send a message across the world about America and democracy.

Thank you for considering my thoughts.

Sincerely,

Terry Olson

# Dechert
### LLP

1775 I Street, N.W.
Washington, D.C. 20006-2401
+1 202 261 3300 Main
+1 202 261 3333 Fax
www.dechert.com

**RALPH OMAN**



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

As the Register of Copyrights of the United States from 1985 to 1994, as the former Chief Counsel of the U.S. Senate Subcommittee on Criminal Law, as the former President of the Capitol Hill Chapter of the Federal Bar Association, as the former President of the Giles S. Rich Inn Court, and as the former Senior Legislative Assistant to Hugh Scott of Pennsylvania, the Senate Republican Leader from 1969 to 1977, I write on behalf of my friend and former colleague at the Dechert law firm, Scooter Libby.

I have known Scooter since 1994, when I left the Copyright Office -- first at Mudge Rose, and then, after the collapse of Mudge, at Dechert, where both of us moved in 1995 as part of a "package deal" of five Mudge lawyers that also included Len Garment, the former White House Counsel. Scooter was the legal star of that package, and he made the deal attractive to Dechert. He is a brilliant, disciplined, and hardworking lawyer, charming in a gruff way, and not long on small talk. A natural leader, he became the managing partner of Dechert's Washington office shortly after his arrival. We practiced in different areas of the law, and I never had the chance to work with him on legal issues, but he was always a pleasure to deal with. As a copyright lawyer, I try to represent my share of struggling poets, songwriters, and photographers, as well as the usual high rollers in the copyright industries. Scooter, as a published novelist, understood the importance of nurturing artists and writers and helping the little guy, and he always strongly supported my pro bono work on their behalf. At his request, I helped a children's soccer coach secure her copyright in her book "What Every Soccer Mom Should Know," and then, with Scooter's encouragement, I helped her get her book published.

He was also the mentor to a large number of Dechert associates. He treated them with great respect, and they treated him with the same, measure for measure. My office is just down the hall from the firm's conference room, and on one particular afternoon I heard a loud peal of laughter and applause. I stuck my head in the room to see if I were missing a party. As it turned out, I was. It was a surprise party organized and paid for by the loyal and loving Dechert associates to honor their hero. Scooter invited me in to join the party, but I politely declined, recognizing that I would be intruding on a private family gathering.


LLP

The Honorable Reggie B. Walton
May 1, 2007
Page 2

He is still their hero, and he changed their lives. He made them see the practice of law as ennobling, challenging, and fun. And I know that he continues to inspire them, and me, as a man of grace, courage, and great integrity in this vale of tears we call Washington.

Sincerely,

Ralph Oman
Counsel

May 9, 2007


Judge Reggie B. Walton's
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton,

When powerful men in government lie and obstruct justice in investigations important to
national security, the crimes are of great consequence. Mr. Libby's obstruction of justice
in the CIA leak investigation was a betrayal of our national security, and his perjury is a
betrayal of our public trust in the executive branch. Both felonies are an affront to a
nation of laws.

That Mr. Libby committed these crimes during his employ as Chief of Staff in the Office
of the Vice President is a circumstance that makes the felonies conspicuously more
offensive. Mr. Libby's crimes raise doubts about whether senior White House officials
are accountable to the law in the same way other American citizens are accountable. Mr.
Libby's sentence should be severe to leave no doubt that White House officials who
obstruct justice and commit perjury will receive a sentence proportional to the impact
their crime.

No responsibility or accountability for the disclosure of CIA agent Plame's identity has
been assigned due to Mr. Libby's perjury and obstruction. The disclosure seems to have
been organized and deliberate and if that is so, it may have been a conspiracy to leak
classified information, or at worst a conspiracy to commit treason. We will never know.
There will be no justice served in the CIA leak investigation due to Mr. Libby's crimes.
Mr. Libby's sentence should reflect that.

If powerful men such as those who work in the White House, learn that lying and
obstructing justice is an option worth considering when they run afoul of the law, then
they will choose that course rather than testify honestly and tell the whole truth. Mr.
Libby's sentence should reflect that.

Sincerely,

Jan Ostendarp

General Peter Pace                                                                                    May 21, 2007



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001


Dear Judge Walton,

    At the request of Mr. Scooter Libby, I am writing you to provide my opinion of Mr. Libby's
professional character for your consideration.  I am the Chairman of the Joint Chiefs of Staff, and
have served in this position since October 1, 2005.  I served as the Vice Chairman of Joint Chiefs
of Staff from October 1, 2001 until assuming the position of Chairman, and it is during my
tenure as Vice Chairman that I came to know Mr. Libby.
    The Vice Chairman of the Joint Chiefs of Staff assists the Chairman in his role in providing
independent military advice to the President of the United States, Secretary of Defense, the
National Security Council, and the Homeland Security Council regarding national security issues
facing our nation.  During my service as the Vice Chairman, I regularly attended Deputy
National Security Council meetings, which included Mr. Scooter Libby, who served as assistant
to the Vice President for national security affairs and later as Chief of Staff for the Vice
President.  The issues we addressed during these meetings involved national security concerns
facing the United States Government at the time.
    I know Mr. Libby in a professional capacity, and my opinion of him is based on our
professional interactions.  From this perspective, I was always very impressed with Mr. Libby's
professionalism and his focus and attention to the matters at hand.  He impressed me as a team
player when addressing issues and with his selfless approach to his wide-ranging responsibilities.
I especially recall during my meetings with Mr. Libby, that when considering options and
courses of action, he always looked for not just what was in the best interests of the country, but
also for the right way to proceed - - both legally and morally.  From my perspective dealing with
Mr. Libby on national security issues, he served the United States Government extremely well.
    I hope you find this information helpful.

                                                    Sincerely,

                                                    Peter Pace
                                                    General, United States Marine Corps

Hon. Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Thursday, May 31, 2007


Dear Judge Walton,

I am writing to ask that you *not* allow I. Lewis Libby to escape his conviction for perjury with a sentence of probation.

His crime and his refusal to accept responsibility call for incarceration as both punishment and as a deterrent to others who might follow the example of Mr. Libby in lying to Federal officials and investigators.

Not since the 1970's have we seen an administration with a more arrogant sense of power and entitlement. The deliberate sacrificing of a career CIA operative for purely partisan reasons is unconscionable. Lying about it is beyond the pale.

I hope that you will see fit to impose a just and fitting sentence that incorporates at least some time in prison as a way to persuade Mr. Libby that he cannot dismissively lie and get away with it.

Thank you and very best wishes.

Respectfully

Joel Palmer



Joel Palmer



Neil Patel

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

As someone who has known Scooter Libby and his family for more than 10 years in both a professional and personal capacity, I am writing to attest to Scooter's character and integrity. I am currently employed as head of domestic and economic policy at the Office of the Vice President (OVP). Since graduating from the Georgetown University Law Center I have had the honor of working with Scooter at OVP, at two law firms and on Capitol Hill. During this time, I have grown to know both Scooter and his family. It is my hope that in deciding Scooter's fate, you will take into account his service to his country, his compassion for and generosity towards those around him and his absolute loving commitment to his young children.

Upon entering my law firm summer associate position during law school, I was struck by Scooter's biographic materials listed in our firm's materials. As a person interested in public policy matters and in public service, I was interested in Scooter's years of service in the Departments of State and Defense in the 1980s and 1990s. When I approached Scooter about my interest, I was pleasantly surprised. Scooter was more than happy to talk to me about his career, about my interests and to offer his advice for a career in Washington. In contrast to the arrogance or self-absorption that characterize too many senior partners of Washington's major law firms, Scooter was interested in younger attorneys and took time out to offer many of us advice on career and other matters. I relay this character trait of Scooter's as a direct beneficiary of Scooter's generosity and as someone who has been reminded of this fact by countless other young attorneys who have come into contact with Scooter during their careers. In my own case, it would be accurate to say that there has been no greater career mentor than Scooter Libby.

Scooter's generous and unpretentious nature was on special exhibit during his time as Chief of Staff to the Vice President. Anyone on the Vice President's staff, from the Deputy Chief of Staff to a Staff Assistant just out of college or an enlisted member of the military serving as a Steward at the Vice President's Residence, would agree with two fundamental points which are important to understanding Scooter Libby's character. First, Scooter always made time for others. He was interested in those around him. He took an interest in their lives, in their careers and in their families. Second, this trait of taking time out for others to the extent that Scooter Libby does is a rare characteristic at the highest levels of government. Whatever the reasons, possibly the packed work schedules or the stressful issues on the agenda, it is a fact that Scooter Libby was very different from most senior government officials in his treatment of those around him. This dynamic is especially true for Scooter's respect for and interest in those serving in the lowest rungs of government service.

May 1, 2007
Page Two

While practicing law with Scooter, I was struck by his integrity, his commitment to his clients and his sense of service. These character traits translated into the unusual caseload that Scooter chose to pursue. In addition to some of the traditional corporate client issues practiced by Washington's major firms, Scooter took a real interest in, and devoted considerable time to, public interest matters. During my time with Scooter, I assisted him with representing: public sector entities including the Corporation for Public Broadcasting; non-profit research institutions such as the Center for Strategic and International Studies (on an intensive research project on homeland security matters); a Congressional investigative committee (the U.S. House of Representatives Select Committee on U.S. National Security and Military/Commercial Concerns with the People's Republic of China); and numerous individuals, mostly career government employees, who were involved in government regulatory or ethics disputes.

Scooter's representation of people in or just out of government service is especially worthy of mention. When an individual citizen, especially an individual of limited financial means such as a career civil servant, becomes involved in a dispute with the U.S. government, it can be overwhelming. Scooter enjoyed a reputation among those he had worked with at State and Defense, and many others who heard about him through the government grapevine, as someone to go to in times of need. Whether it was straightening out a regulatory matter related to travel receipts or advising someone's transition to the private sector, Scooter took special care to treat these clients as well as the largest corporations. In fact, it would be fair to say that Scooter spent extra time catering to the needs of these individual clients. Needless to say, these often pro bono clients were not as lucrative financially for Scooter as many of the corporate clients that were interested in representation from him. Scooter's commitment to these clients does, however, underscore character traits of Scooter that I hope you take into account (service, generosity, commitment to America's security).

The Libby's are an extremely close family who have been through a lot of strain these past two years. Since first getting to know Scooter, it has been apparent that he was close to his family and devoted to his children. However, upon joining Scooter at the Office of the Vice President, the extent of his devotion and love became even clearer. OVP, like most government service, entails quite a bit of sacrifice. Scooter sacrificed time with his family during his children's formative years in order to serve his country. However, despite his chaotic work schedule, Scooter made it an absolute commitment to take time out for his family whenever possible. As someone who was often forced by events to call Scooter's cell phone during his few hours away from the office, I was struck by the fact that he was always doing something with his kids. When the weather was nice, he was outside with his kids playing football or other sports. And when it was raining, I would often end up interrupting a family game of cards or monopoly.

Our service at OVP entailed quite a bit of travel. During extended trips to Wyoming, where the Vice President has a second office, Scooter and I would each bring our families. Scooter's kids are older than mine. It's not often the case that kids in the 10 to 12 year old range ███████████████████ are eager to play with kids who are all 5 and under (like mine), but ██████████ were exceptions to this rule. ██████████████ are smart, caring, and fun. If I mention their names to my 5 year old, she immediately lights up. The love, support and direction provided to Hal and Ricki by Scooter and Harriet quickly becomes apparent through

May 1, 2007
Page Three

even the briefest interaction with the Libby family. These kids adore and respect their father. ██████████████ are approaching what I understand is a tough and formative age for many children. It is my sincere hope that these great kids will be able to have their father at home during these important years.

With all due respect for our system of justice and with love for my country, it is my hope that it is appropriate for you to take into account some of the qualities and the circumstances that I have set forth in this letter as you consider Scooter's sentence. I hope specifically, that service to country, compassion towards others and family situation are appropriate points for you to consider. Putting aside arguments over Scooter's current legal situation, acts such as perjury and obstruction of justice are thoroughly inconsistent with my knowledge of this honorable man's history and his character. It is my greatest hope and prayer that a lifetime of service and decency are relevant to his disposition.

If I can answer any questions or elaborate in any way, please call me any time at ██████

With sincere appreciation for your consideration;

Neil Patel



May 10, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

Having known Scooter Libby for many years, I am unable to reconcile the man I know with the crime for which he has been convicted.  The qualities that stand out most in my experience with Scooter are honesty, integrity, fairness and balance—and an unparalleled dedication to public service and our nation.

There are many aspects to integrity, but perhaps the most difficult to sustain is the courage to say what one thinks will best serve the country, even when others in powerful positions may disagree.  Many people aren't willing to ask tough questions, or buck a consensus position, when doing so would risk exposing themselves to criticism from their peers or those officials whose judgment can make or break public careers. Scooter had the courage and integrity to present his views to his colleagues for a full debate, which is a crucial element of good government.

As is well known to the Court, Scooter has spent most of his professional life in various capacities in government dealing with national security.  As a professional colleague (I served in the Department of Defense as Assistant Secretary and as a member and Chairman of the Defense Policy Board), I always found Scooter to be open and straight forward.  Never in my experience over 20 years did he dissemble or misrepresent.

Scooter has always been generous, finding time to help a colleague or a student writing a paper, counseling young people about careers in government, remaining at the office after everyone else had gone home.  His career in government has been exemplary.  He has returned to public service at great personal sacrifice, both financially and in terms of the imbalance between work and leisure that the burdens



of public service impose on conscientious, dedicated officials.

Those of us who have been privileged to know and work with Scooter can only hope that any sentence imposed on him will enable him to return to his friends and family and the community he has devoted his energies to serving.

Sincerely yours,

Richard Perle



### DAVID C. PICARD

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Dave Picard, I am the owner of a government relations and political consulting firm in the state of Wyoming.  In addition to my firm's client work I also served on the 2000 Bush/Cheney campaign and the Presidential Inaugural Committee doing "advance" work for the candidates.  I have served the White House in a volunteer capacity doing advance work since January, 2001 and it is through that service that I came to meet and admire I. Lewis "Scooter" Libby.

I write to you today to share my personal and professional experience and interaction with Scooter.  Mr. Libby, in his capacity as Chief of Staff, traveled on most all of the trips that the Vice President made.  He became known to me at first through the professional side of the work and then personally as we spent time during trips talking about family, activities and skiing.

I have witnessed Scooter serving our country on major trips to the Middle East and Europe and doing his daily duty on trips to the smallest towns in America.  One day, on a trip in Wyoming he and I discussed my role and possible future role at The White House in the Vice President's Office of Advance.  We talked candidly about challenges and commitment and most strikingly I heard the words "honor and privilege to serve" repeated often in our discussion.  Serving our government is not the most lucrative endeavor and I knew exactly what Scooter meant "honor and privilege to serve."

Honor and privilege became synonymous with loyalty, integrity, character and truth as I came to appreciate more and more his service and that of others, like yourself, who give of themselves to keep this country the best on earth.

In all of my interactions with and observations of Scooter I can not find any instance where he acted outside the highest level of confidence and morals.  I know him to be a man of honor and integrity.

The verdict is completely inconsistent with the Scooter Libby I know.  I hope, as you determine Scooter's sentencing that you will take into account into consideration my heartfelt comments.  Scooter is an exceptional human being, and I would be honored to testify on his behalf.  Please do not hesitate to contact me with questions.

Very truly,

Dave Picard

March 26, 2006

Hon. Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001


Dear Judge Walton:

I am writing to you from Washington State, where we refer to D.C. as "the other Washington."
I have no special position other than as an interested citizen.

I urge you to give the maximum permissible sentence to Lewis I. Libby, and to direct that he
begin serving his term immediately rather than remaining free pending an appeal.

Mr. Libby committed his crimes as a senior public official and as an attorney who is familiar
with the law and was sworn to uphold it. I strongly believe that people in such positions
should be held to our highest standards. An ordinary citizen who committed perjury in a case
like this would be harshly penalized, so I see no reason to cut Mr. Libby any slack.

I would like to say something about the partisan aspect of this. I am a Democrat, but when
Martha Stewart, a prominent Democrat, was convicted of lying about her stock trading in a case
that received much attention, I wrote a letter very much like this one and urged the judge to
give her the maximum applicable sentence. I argued that, as a prominent person who knew the
rules, she had no business violating them.

Later this year I will turn 50 years old, and as someone who's now been around the block a
couple of times I believe there is too much corruption at top levels in this country. This sort of
decadence and dry rot sets a bad example, and if left unchecked it will take us in the direction
of Rome's decline. I don't care where someone stands on the political spectrum. A corrupt
official is *never* my ally.

Please do your part to counteract this worrisome trend toward official corruption in America.
How can we ask the general citizenry to "accept personal responsibility" if we don't demand it
of the powerful? Judge Walton, the change starts with you.


Sincerely,

Charles W. Pluckhahn

Commentary

[redacted]

NORMAN PODHORETZ, EDITOR-AT-LARGE

April 10, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I was editor-in-chief of *Commentary* for thirty-five years (1960-1995), and since retiring from that position I have been editor-at-large of the magazine and a fellow of the Hudson Institute. In addition, I have continued writing articles and books (my eleventh will be published in September), mainly about American foreign policy and American literature. I am also proud to say that I hold this country's highest civilian honor, the Presidential Medal of Freedom.

Because of my intense interest in foreign policy over the years, it was inevitable that I would become acquainted with Scooter Libby and familiar with his work in that area. He is a fairly reticent person, and a modest one, not (to put it mildly) given to making much of himself, but based on own experience, as well as on what others who had worked with him (including my son and my son-in-law) told me, I came to develop enormous respect for Scooter. Indeed, I regard him as among the most gifted and valuable public servants of his generation--intelligent, conscientious, reliable, loyal, and a fervent lover of this country. Like everyone else who knows him, I find it inconceivable that a man of his sterling character, who is also famous for his lawyerly scrupulousness, could deliberately have told lies to a grand jury, or for that matter to anyone else.

Sincerely,

**Chambers of Judge Reggie B. Walton**
Telephone Number: 202-354-3290          **Fax Number: 202-354-3292**
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W. Washington, D.C. 20001

May 31, 2007

**Dear Judge Walton**
**I understand that citizens are allowed to express a view about crimes
and sentences, and I would like to avail myself of this right in the case of
former White House aide I. Lewis "Scooter" Libby.**

**Lying in public service constitutes the exact opposite of what 'public
service' should be. Lying is the beginning of the dishonesty. A denial of
truth and transparency leads to corruption. Moral as well as financial
corruption are rife, their root causes need serious sanction.**

**Democracy can survive only in a climate of honesty and transparency.
Accepting dishonesty and lying by government servants puts us on the
road that leads to corruption, and ultimately to dictatorship.**

**Everybody expects Libby to benefit from a Presidential Pardon – a
probability so widely accepted that it could almost be considered as
contempt of your court. I urge you to strengthen the court, and
democracy, by imposing the maximum sentence allowed to you.
Sincerely yours,**

**Robin Edward Poulton**, MA (Hons), MSc, PhD, MBIM, ChONM, ChROSC
International Consultant
Managing Partner, EPES Mandala Consulting
Senior Research Fellow, UNIDIR Geneva
            United Nations Institute for Disarmament Research
Guest Professor, European Peace University (Austria)
Adjunct Professor, University of Richmond  (Virginia)
Visiting Professor in International Studies 2002-2004 at VCU
            Virginia Commonwealth University

**"Our lives begin to end the day we become silent about things that matter."**
--Martin Luther King, Jr.

# DAVID K. PORTER
### LAWYER



Honorable Reggie B. Walton
United States District Judge for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, DC 20001                                                April 2, 2007

re:     Sentencing of I. Lewis "Scooter" Libby

Your Honor,

As you sift through the factors involved in sentencing Mr. Libby for his egregious misconduct, one can only hope that you will give proper weight to the impact of his actions upon the administration of justice and the foundations of our nation's Constitution. Mr. Libby has done serious and lasting damage to both - far more serious, lasting, and far-reaching than your average felony assault.

A person shooting another person during a robbery affects the immediate victim and that person's immediate family. The ripples extend for a bit, through personal contact and general fear of similar events. That is about it. Once your average criminal defendant gets to the age of 35, he or she has usually either calmed down or died.

A person subverting the administration of justice and the principles of a democratic republic has uprooted the essential requirement of truth-telling. When this person is the Chief of Staff to the most powerful Vice President our country has ever known, the ripples run deep and long. If Mr. Libby does not receive a sentence in excess of ten years, we might just as well throw away the laws and let these fascists run the place any way they choose.

Kindest Regards,

David K. Porter

# Dechert
### LLP

1775 I Street, N.W.
Washington, DC 20006-2401
+1 202 261 3300 Main
+1 202 261 3333 Fax
www.dechert.com

**JEFFREY S. PURETZ**
*Partner*



May 1, 2007

**VIA FEDERAL EXPRESS**

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re: Scooter Libby

Dear Judge Walton:

This is a request for leniency in the sentencing of I. Lewis "Scooter" Libby. I am a partner at the law firm of Dechert LLP, where Scooter was a partner from 1995 through 2001, and, at the request of our Chairman, served as the Managing Partner of our Washington office from June of 2000 until he left in 2001. During that time, I had the opportunity to work with Scooter on servicing clients, recruitment, associate retention, client development, and office administration. I had the opportunity to observe Scooter, first as a colleague, and later as a firm leader.

Scooter had a highly successful career while with this firm. He provided excellent counsel to the firm's clients. He provided strong leadership for this office and the people who worked here. Here are some specifics:

- In representing a not-for-profit media company, Scooter was careful to tailor legal services so they would not be too costly for the public-focused enterprise;

- In representing the "Cox Committee," a committee of the House of Representatives, despite a limited budget and knowing that much of the work would be unpaid, Scooter intentionally sought out young associates to work on the project to provide a training and educational opportunity for them, and to expose them to the congressional process;

- Scooter personally invested his time in efforts to recruit and train young associates, and took an active interest in their career development;

U S  Austin  Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton
San Francisco  Washington DC   EUROPE  Brussels  London  Luxembourg  Munich  Paris

**Dechert**
LLP

The Honorable Reggie B. Walton
May 1, 2007
Page 2

- Scooter went out of his way to help his colleagues enhance client relationships; he personally attended meetings and events with clients for me and others in the office to represent to these clients the firm's commitment to them;

- While Managing Partner of our firm's Washington office, Scooter encouraged our attorneys to take on pro bono representations.

Based on my experience in working with him, I have the highest regard for Scooter's legal talents, his leadership talents, his commitment, his judgment, his ethics, and his integrity.

Clearly Scooter is a highly talented individual who has much to contribute to others, whether in a business context, a policy context, or otherwise. I strongly urge leniency so that he may be permitted to put those talents to work in a constructive and useful fashion.

Sincerely,

Jeffrey S. Puretz

13590651.1.BUSINESS

**George T. Raach** ███████████████████████████████

May 16, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
   United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is George Raach and for nearly 30 years I served in the United States Army, retiring in 1994 with the rank of Colonel. Following retirement, I worked for the United States Congress and managed a Carnegie Corporation project on the prevention of ethnic conflict. For the past nine years I have been a senior associate at a major management consulting firm with offices in McLean, Virginia, and Leavenworth, Kansas.

I have known Mr. I. Lewis (Scooter) Libby since November 1989, and from January 1990 until January 1993 I served as his military assistant when he was the Principal Deputy Under Secretary of Defense for Strategy and Resources. The office had responsibility for the Soviet Union and Eastern Europe, policy planning, competitive strategies, and preparation of the document that guides the allocation of resources within the Department. I worked closely with Mr. Libby on a daily basis, participated with him in policy review and decision-making meetings, and traveled with him for ministerial and sub-ministerial conferences. Thus, I had the opportunity to observe Mr. Libby in a variety of settings that involved both deliberations on the most sensitive national security matters and his interaction with his staff and the staffs of other senior officials in the Department of Defense.

In my experience, Mr. Libby is a dedicated patriot who gave up a lucrative law practice to enter a government position that offered much less in material comforts, prestige, and financial remuneration. He did this because he believed that he could be of benefit to the nation at a time when there was the potential for great instability as the Soviet Union disintegrated. He worked tirelessly to develop and implement policies to reduce the possibility of chaos, especially its effects on the oppressed people of Eastern Europe and the Soviet Union who were at the beginning of their emancipation from tyranny. In meetings with senior officials in the Soviet Union, Hungary, Poland, and elsewhere he was a strong advocate

1

for the rule of law, civilian control of the military, and respect for human rights. His approach was always diplomatic and very effective in achieving national objectives.

For example, aspects of the transition from Soviet rule that could have produced untoward effects for the populations of these countries were minimized by his involvement in high-level policy deliberations. Specifically, Mr. Libby was instrumental in helping dissuade the Soviet Union from intervening in the Baltic countries when they declared their independence from Moscow and it appeared that the Soviet Army was preparing to use force against them. He brought an understanding of democratic processes for civil-military relations to the Government of Hungary at a time when it was unclear as to whether the Hungarian military would submit to the new civilian government. He was also involved in the provision of humanitarian aid to Hungary in late 1990. Mr. Libby's efforts in the Central Asian Republic of Kazakhstan were, in my opinion, important in preventing the government of that country from drifting toward authoritarian rule, as had occurred in neighboring Uzbekistan.

Mr. Libby was a key figure in the development of the first post-Cold War National Security Strategy, announced by President George H.W. Bush in the summer of 1990. The pillars of this strategy have informed all subsequent National Security Strategies of both Republican and Democratic administrations, especially with respect to the United States' commitment to supporting democracy and its policy of constructive engagement with other nations. In my opinion, his work with the National Security Council Staff and the interagency stakeholders on these matters was masterful, and many of the key tenets of this document (and its legacy as reflected in all subsequent National Security Strategies) are the products of his intellectual power, insight, and perseverance.

During the first Gulf War in 1990-1991, Mr. Libby was influential in the inner circle of policy makers whose decisions guided that conflict to a successful conclusion. He was especially central to policy decisions that restrained other nations from exacerbating the existing situation; protected American and allied forces from the threats posed by chemical and biological weapons widely believed to be part of Iraq's arsenal; and in the deliberations for terminating the conflict expeditiously to minimize civilian and military casualties on all sides and prevent further damage to Iraq's infrastructure, which would have resulted in widespread suffering in the aftermath of the war. At the outset of the crisis, Mr. Libby played a key role in tightening the economic strictures that prevented the Government of Iraq from acquiring the spare parts and munitions that would have made its

2

armed forces more effective. The indirect result of this action was, of course, fewer coalition casualties and a quicker end to the conflict, which spared countless civilian lives as well.

Following the Gulf War, Mr. Libby continued his efforts to facilitate a smooth transition in Europe and Central Asia as the Soviet Union dissolved. He was among the first to identify the potential for radical Islamic fundamentalism to infiltrate and disrupt the Central Asian states, at least one of which possessed nuclear weapons. He was personally involved in defining this threat and establishing U.S. policy parameters. Through personal diplomacy with senior leaders in Israel, Egypt, Turkey, and Kazakhstan he did much to prevent radicals from increasing their footprint in the region during the early 1990s.

Throughout my association with him, I was impressed by his leadership skills and his genuine concern for his staff. His interest in their well-being and professional development was consistent with the best traditions of American leadership. He welcomed diversity and was especially helpful in bringing women into the policy organization—something that was not at all common at that time. Mr. Libby empowered his staff; saw that they were provided with the necessary resources; and encouraged initiative and innovation that let them grow professionally. He was a conscientious mentor, and I believe was a key reason for my success as well as the success of others.

For example, partly through his advice and counsel two members of the staff went on to become United States ambassadors, and one of them was later selected to be the Under Secretary of Defense for Policy. Two of the women that he brought into the office have attained executive level positions in other government departments, and another has risen to a senior administrative position in the Department of Defense. Other staff members have risen to Senior Executive Service positions within the Defense Department, and at least one of the military members of the organization became a general officer.

All of these successes were, in my judgment, positive steps for the good of the nation, and all of them were the result of Mr. Libby's leadership, exemplary conduct, fundamental fairness, and in-depth concern. His approach to guiding the staff has helped to produce a new generation of national security professionals and is an enduring legacy.

Mr. Libby's conviction contravenes my knowledge of his character and his integrity and is, I believe, an aberration. During my service as his military

assistant, he insisted on absolute compliance with the laws of the United States and the regulations and directives of the Department of Defense. I recall a number of meetings in which he questioned a proposed policy on legal grounds, and/or at which he insisted on a legal opinion from Pentagon lawyers before proceeding. On several occasions involving extremely important policy decisions he refuse to accept promising alternatives whose legality was questionable.

Watching him engage others in the frequent meetings that were part of our daily routine, I never knew him to be anything other than completely honest. The upright nature of his character and his refusal to bend either the law or the rules increased the respect that the staff of our office and of other offices had for him. If he gave his word, he kept it, and he never equivocated on matters of integrity. Whether it involved mundane or momentous issues, his conduct and integrity in my experience were impeccable.

In the years since my service in his office, I have kept in contact with Mr. Libby, and I know of no instances that would call either his professionalism or his character into question. I am aware of several instances in which he helped former members of the staff enhance their careers by providing recommendations for them or networking on their behalf. In my professional experience I have found this sort of long term care to be a desirable but very rare occurrence and greatly to his credit.

In conclusion let me offer the following:

- Mr. Libby is a true patriot as evidenced by his willingness to give up a successful, high profile law practice in order to take a government position that demanded longer hours and was far less lucrative. Once appointed, he worked tirelessly to enhance our national security, sacrificing personal time and rarely taking a vacation in order to pursue the nation's security objectives.

- As Principal Deputy Under Secretary of Defense for Strategy and Resources, Mr. Libby made a significant and positive contribution to the security of the United States and the freedom of numerous peoples at a very uncertain time in world history. Had he not done as he did, conditions in the post-Cold War world could have been much more chaotic. This, of itself, is no mean accomplishment and demonstrates his great concern for the welfare of his fellow man.

4

- In times of crisis his levelheaded thinking, insightful understanding of issues, and willingness to seek innovative solutions that were beneficial to the United States were legendary within the Department. The most senior Defense Department officials (including the Secretary and Deputy Secretary of Defense and the Chairman and Vice Chairman of the Joint Chiefs of Staff) often sought his advice on difficult and sensitive matters ranging from the implications of the disintegration of the Soviet empire, to the spread of radical militant Islam, to the conduct of hostilities against enemies of the United States.

- He was genuinely concerned about the welfare and professional development of his staff and took the extra steps necessary to help them achieve their career goals—even when doing so was an inconvenience. He was and remains available to members of his staff, and he has made a difference in their careers, thereby enhancing national security. In my judgment, few if any, leaders had higher standards of leadership or showed a higher degree of concern for their subordinates than did Mr. Libby.

- Mr. Libby's insistence on high ethical and professional standards during his tenure as the Principal Deputy was consistent and rigorous in all matters, large and small. Thus his conviction is inconsistent with my experience. In daily contact with him I never knew him to act in a manner that was not consistent with the highest ethical and legal standards. In this respect, he was exemplary.

I understand that there are consequences associated with his conviction. I also understand that there is a broad range of options available for your consideration. I respectfully ask that you consider the good that Mr. Libby has done for the country over the years, the sacrifices he has made, and his demonstrated concern for the professional development of his associates, which has done much to provide the nation with the next generation of national security experts. I also ask that you consider the good that Mr. Libby could do for the nation in the future, which in my opinion is considerable.

Very Respectfully,

George T. Raach
Colonel, United States Army (retired)

5

April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N. W.
Washington, DC 20001

Dear Judge Walton,

I am writing you in reference to I. Lewis ("Scooter") Libby.

By way of background, I am a retired U. S. Navy Vice Admiral, now in my fortieth year of US Government service. Currently I serve as the Director of the National Counterterrorism Center (NCTC) located in Northern Virginia. As such, I am a senate-confirmed, presidential appointee at the Executive Service Level Two, reporting to the President for matters of Strategic Operational Planning and to the Director of National Intelligence (DNI) for intelligence issues, both relating to counterterrorism. I have been in this position since August 1, 2005.

Prior to my current position, I also served in a civilian capacity as Executive Director of the Commission on Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction ("WMD Commission") and, briefly, as Chief Operating Officer (COO) and Deputy Administrator of the Coalition Provisional Authority (CPA) in Baghdad during 2004. Most of my government service has been in uniform, serving in the U. S. Navy from 1962 until retirement in 1998. In the Navy I commanded eight organizations, founded and commanded the U. S. FIFTH Fleet in the Middle East, and served in various staff positions in Washington, culminating with duty as the Director of Strategic Plans and Policy (DJ-5) on the Joint Staff.

I have known Scooter for almost two decades. We first served together in the Pentagon from 1989 to 1991, working for the Under Secretary of Defense for Policy (USDP). I served as chief of staff to USDP and interacted with Scooter on a daily basis. This was one of the most dynamic periods in our history as we transitioned from the cold war into an uncertain period of global change.

My immediate and enduring assessment of Scooter was of a very bright, wise, selfless, effective and hard working public servant. Throughout those tumultuous two years, Scooter was at the center of the storm – a trusted advisor as we worked through the liberation of Panama, a crisis in the Philippines, the fall of the Berlin wall and, for the last year, Operations Desert Shield/Storm (Gulf War I). When we worked late nights – or even all night – Scooter was likely to be there. When there was a small group of three or four working a tough issue, Scooter's counsel was routinely sought, respected and taken. He was respectful of his subordinates and peers as well as his seniors and was in turn respected by those around him, including members of the military. His overriding goal was to do the best thing for the country. I found that trait unchanged years later when I returned to government in 2004. Scooter Libby remains the consummate patriot.

April 27, 2007

Scooter has also been a good friend and a good leader. He took care of the people who worked for him, mentoring them, ensuring they received credit for their good work and advancing their careers. As an example, one of the bright young women who started her career working for him in the Defense Department is now a Senior Executive Service officer who has made invaluable contributions to our national security.

Perhaps the most important thing I could tell you is that I believe Scooter is a man of high integrity. I do not say that lightly. My values were formed by my training at the United States Naval Academy (USNA) and by my Christian faith. My classmates (USNA '66) elected me as one of six members of the Honor Committee and I served for four years in that capacity, which included sitting in judgment on alleged honor offenses. I have also served as an Elder in my Presbyterian denomination.

All of those experiences have taught me to value highly character and integrity under pressure. I have unfailingly observed those traits in Scooter. In my experience, he has always been a straight shooter who spoke the truth, even when it was unpleasant or difficult. Significantly, in all my relationships with him, I always knew I could take his word to the bank. That was true when we worked in the Pentagon and in my experience it remained true years later when he worked for the Vice President. For those reasons, I continued to seek his advice and counsel when I returned to government service as a civilian. Indeed, I probably would not have come back were it not for his advice and encouragement.

As I hope the above makes clear, the conviction of perjury and obstruction of justice is completely inconsistent with the Scooter Libby I know and respect.

I appreciate your attention and respectfully request your consideration of the above as you evaluate Scooter's sentence.

John Scott Redd
Vice Admiral, U. S. Navy (Ret.)

WALTER REICH, M. D.



March 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

  I write to you in anticipation of the sentencing of I. Lewis Libby.  I hope that what I say will be of value to you as you proceed with this process.

  Allow me to introduce myself.  I'm a psychiatrist, and hold the position of Yitzhak Rabin Memorial Professor of International Affairs, Ethics and Human Behavior, and Professor of Psychiatry and Behavioral Sciences, at The George Washington University.  In my previous position, which I held from 1995 to 1998, I served as the Director of the United States Holocaust Memorial Museum.

  I first met Mr. Libby in 1995, when I was asked to become the Director of the United States Holocaust Memorial Museum.  Advised to consult a lawyer in connection with the preparation of my employment contract with the museum, I was referred to Leonard Garment at Dechert Price & Rhoads.  Mr. Garment in turn introduced me to Mr. Libby, his colleague at the firm.  Both Mr. Garment and Mr. Libby then served as my attorneys for this purpose, with Mr. Libby carrying out the great bulk of the work.  Since the appropriate crafting of the contract was complicated and required a great deal of legal research, I spent a significant amount of time with Mr. Libby and worked closely with him.  Despite this very considerable expenditure of time, effort and resources, Mr. Libby did all of his work on a pro bono basis.  He believed that a properly-researched and properly-prepared contract would be of value to both his client and the Holocaust Museum.

  I should add that, in the course of working with Mr. Libby, I was struck by his remarkable devotion to the task—despite the fact that he knew he would not be compensated for it—and by his painstakingly scrupulous efforts to make sure that all relevant laws and regulations, both in fact and in appearance, were observed.  In this work, Mr. Libby was dedicated, selfless and intensely focused on doing what was right—

not only what was right in his view, but what was right and proper under the law. I emerged from this experience not only impressed by Mr. Libby's legal skills but also by his impeccably humane values, his deep decency and his unfailing, conscientious, rigorous and principled integrity.

In the course of this time, I also became acquainted with Mr. Libby as family man--as a husband and as a father; it was clear that he was utterly devoted to his family, and that the integrity of this devotion, and the ways in which he expressed it, were of a piece with the integrity of the man.

I must say that, based on my experience with Mr. Libby, I find his conviction for perjury and obstruction of justice to be profoundly at odds with all of the experiences that I have had with him and with my estimation of his character. The painstaking devotion to the law that I saw in his work for me, the scrupulous care he took to make sure that his work conformed to what is right, the thoroughgoing decency of character and values that he displayed and his dedication to the public good for so much of his life, often at great personal sacrifice, are, in my judgment, starkly inconsistent with that conviction.

I therefore hope, Your Honor, that, in the sentencing phase of Mr. Libby's case, you take into consideration the consistently high standards of honor, decency, integrity, character and devotion to the law and to the public good that Mr. Libby demonstrated in his experience with me and that he has demonstrated repeatedly during his life and his career. I hope that you consider these outstanding qualities and behaviors as you take up the difficult task of determining a sentence that is appropriate not only to the conviction but also to the man.

Sincerely,

# Wm. Bradford Reynolds

April 3, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

      I am a private practitioner who has been a member of the legal profession
for 40 years.  My experience includes practicing in the public sector as a member of
the Department of Justice in the early 1970s (Office of the Solicitor General) and
most of the 1980s (Assistant Attorney General and Counsel to the Attorney General
of the United States), and in the private sector, first as a young associate with the
New York law firm of Sullivan & Cromwell, and then (sandwiched around my
Justice Department service) as a Washington, DC partner with several highly
respected firms in the area.  I am presently a Senior Litigation Partner with Howrey
LLP.

      Scooter Libby has been a personal friend for more than 15 years.  In the
early 1990s, we were partners in the law firm Dickstein Shapiro and Morin
(presently Dickstein, Shapiro, Morin & Oshinsky), and worked closely together on
client matters, one of which was particularly sensitive, involved exceedingly
complicated issues, and concerned information of a highly confidential nature.
Scooter's involvement was critical, and his performance was superb, not only in
terms of his legal contributions, but also in terms of his sound judgment and wise
counsel on a host of ethical concerns arising out of the representation.  Throughout
my relationship with Scooter as a friend and colleague, he has been a pillar of
integrity and a man of unquestioned character under both intense pressure and
when the pressure was not so intense.

      I cannot and would not presume to speak to the jury verdict against Scooter,
except to observe that perjury is so inconsistent with every instinct and fiber of the
man I know that it is excruciatingly difficult for me to accept.  Scooter is multi-
talented, and, precisely because he is so competent and capable, more has
invariably been demanded of him than most and he is regularly called upon to
juggle a large number of responsibilities.  Memories are not infallible, and, from
my own experience both within and outside Government, total recall of the time,

DM_US:20358470_1

The Honorable Reggie B. Walton
April 3, 2007
Page 2

place and exact wording of each conversation, or even who was on the other end,
can be an impossible challenge the same day, let alone days later.

Perjury is a crime of moral turpitude.  Yet, even accepting his
misstatements made to the Grand Jury, Scooter Libby is not a man of moral
turpitude, nor has he ever been portrayed as such.  Apart from the present incident,
he has no history or reputation of lying, dissembling, or making false statements—
to anyone anywhere. Indeed, everything this man has said and done throughout his
career has personified the utmost integrity.  He is today, and has always been, a
good, decent and caring person who commands the trust and respect of all those
around him.  This should, in my humble estimation, be accorded considerable
weight in the most difficult sentencing task that the Court now has before it.

I thank Your Honor for the time and attention given to these remarks.  As I
am sure has not been lost on the Court, they are heartfelt, strongly held, and offered
with the seriousness that the matter most certainly deserves.

Respectfully yours,

Wm. Bradford Reynolds

JAMES G. ROCHE, DBA

April 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
    United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton:

I have known I. Lewis "Scooter" Libby for 25 years, both professionally and personally. I am a retired Captain in the U.S. Navy, a retired corporate executive having been President of the Northrop Grumman Electronics businesses, and most recently, the 20th Secretary of the U.S. Air Force. I also served in the State Department, the Office of the Secretary of Defense, the Senate Select Committee on Intelligence, and was the Staff Director for the Democrats of the Senate Committee on Armed Services. I have advanced degrees in Operations Research from the U.S. Naval Postgraduate School, and a doctorate in Decision Analysis from Harvard University.

It has been very difficult for me to relate the Scooter I have known for so long with the person convicted in his recent trial. Your Honor, if I might impose, I would want you to know some things about Scooter Libby as seen through my eyes.

We first met in 1981 when he gave up his legal practice in Philadelphia to join the Policy Planning Directorate in the Department of State where I was the Principal Deputy Director. At Policy Planning, he was both a speechwriter and a policy analyst. He entered government because he believes that each of us has a duty to serve our country. He did a wonderful job while in State. He is a natural leader with a very agile mind. Later, he went into private practice, and I left the Navy to pursue a second career. Oddly, the lawyer and the former ship captain managed to stay closely in touch with each other, even when I was transferred to Los Angeles. When in Washington for business, we typically had dinner together, joined after a few years by his then future wife, Harriet. If he was in Los Angeles, he joined my wife and me for dinner in our home.



While always a very busy and successful lawyer in Washington, he never forgot the "little people" he befriended. It is deep in his character to help others. In one case, one of our mutual friends, a junior staffer in the White House, became embroiled in the scary situation of failing to pass a polygraph. Scooter, on his own time, helped our friend to work his way through this situation. Why? Because, as he noted to me, "It was the right thing to do." After all, our friend had little money, but did have a wife and young children at home who depended on him. He is now doing nicely many years later as a respected policy analyst in Washington.

– 2 –                                                                April 23, 2007

In 1989, I was asked to leave business and join the Administration, but couldn't for family reasons described later in this letter. Subsequently, I was asked to study and recommend changes to the organization of the Office of the Under Secretary of Policy in the Department of Defense. In turn, I asked Scooter if he would donate some of his *pro bono* time to work with me. He did so, and we spent weeks interviewing various officials and putting together a revamped Policy organization which would better serve the needs of the Armed Forces and the Secretary of Defense. In doing so, we created a new position, the Deputy to the Under Secretary, to concentrate on the East Block countries then beginning to grasp that freedom might be within reach. When I told Scooter that he was the best qualified person for this position, but it would mean having to give up considerable income and time, he thought about it, spoke with Harriet, and made the sacrifice to serve his country once again. When asked by others why he did this, he answered simply: "Because it's the right thing to do."

After leaving the government in 1992, he returned to private practice. However, as the co-chair of an annual Defense Department Summer Study with Andrew Marshall, the Director of the Office of Net Assessment in the DoD, whenever I asked him to donate some *pro bono* days to help our study groups, especially the young policy analysts we were training, he always did so. He is a superb mentor of young intellectuals. Again, his love for our country and his concern that he had to help drove him to forfeit income for public service.

And, in 2001, when I was being asked to give up my very successful business career and join the government as the Secretary of the Air Force, Scooter's argument to me was most succinct: "Do it, Jim, because it's the right thing for you to do for our countrymen."

Your Honor, I have observed over time that Scooter is always sensitive to the needs of others, quite independent of their status. He is a loving brother; and, he gave of himself to help a mutual friend caught up in a polygraph issue. But, I experienced, on a very personal level, his willingness to help a fellow human being who was hurting. In 1987, our family was one of those to suffer from a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓Scooter took time off of work and drove to our home to console us, and to "be there" for us. On one of these days, ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He volunteered to mount a legal challenge to the ▓▓▓▓▓▓▓all *pro bono,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Knowing that ▓▓▓▓▓▓▓he was trying to help me deal with the ▓▓▓▓▓▓▓▓▓ My wife and I knew how difficult this might be for him in terms of lost time and income, and could not let him devote so much to us. When I asked why he would do this, he said, "Because you are a friend, and it's the right thing for me to do."

Lastly, I sometimes let myself think that there are few examples of political courage in Washington these days. When I left our Air Force, there was a Senator who had gone out of his way to vilify me for my last year in office. As is so often the case in this town, an official mired in controversy, independent of facts and truth, is not someone with whom many senior officials would want to be seen. But, Scooter went out of his way to invite me to lunch in the White House Mess just to let everyone know that he understood the truth and that he was proud to stand by me. Your Honor, I know this is but a miniscule point in the overall scheme of things, but to me it said so much about Scooter's integrity and decency.

I would hope, Your Honor, that you can see why this man is so special in my mind. Over 25 years, my experience with him supports my firm conviction that his integrity has been the highest, his

– 3 –                                          April 23, 2007

character among the noblest, and, his love of our country deeper than that of most people I have
known. And, maybe even more important, I am witness to his sensitivity to real, human needs,
especially of those overwhelmed by circumstances. These characteristics have been the quiet
hallmark of his life.

Thank you for giving me this opportunity to address you.

Respectfully,

James G. Roche

*put in his file*

J O H N   E .   R O G E R S



Friday, March 30, 2007

The Honorable Reggie Walton
United States District Judge
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Re:      United States v. I. Lewis Libby
         Sentencing

Dear Judge Walton:

I am a former Assistant United States Attorney for the District of
Columbia who served under Tom Flannery from 1969-72. Like many
former Assistants, I am immensely proud of my public service in that
office.

For a high government officer to do what was done in this case, to lie
and lie and lie and continuously dissemble in order to block a criminal
investigation of a national security breech is an extremely serious
matter, very akin to treason.

In its ultimate effects on the security of the United States, is what was
done here really that different from what was done by Aldrich Ames,
Jonathan Pollard and Robert Hanssen?

Perjury, especially repeated acts of perjury and obstruction of justice by
a high government officer strike at the very foundations of the
Republic and the rule of law.

I urge you to impose a sentence in this case appropriate to the crimes
committed by this defendant, taking into consideration his betrayal of
his high position and his country, his superior knowledge as a lawyer
and former partner in a major law firm as to exactly what he was doing,
and his continuing unrepentant conduct. Whether he is kind to his dog,
a nice guy, a good neighbor, or anything else is, of course, irrelevant to
what he did and continues to do.

Yours truly,

May 11, 2007



Judge Reggie B. Walton
U.S. District Court for the District of Columbia
E. Berrell Prettyman United States Court
333 Constitution Avenue N.W.
Washington, D.C.


Re: Sentencing of I. Scooter Libby



Dear Judge Walton,

I am writing to you to express my humble opinion about the sentencing of Mr. Libby.

I followed the trial closely with the help of several conscientious blogs such as Firedoglake.com.

I sensed then, and even more so now, that, all in all, Mr. Libby deserves the maximum sentence under the law.

I am not a law professional, but work in pharmaceutical investigational research. I am a small part of the maintenance of highest ethical standards and quality of documentation in this field. I expect the same or better from those serving our government in Washington.

Finally, I have appreciated your diligence for this important trial and throughout your career.


Thank you for your kind attention.



Sincerely,

Suzanne E. Rogers

# WILLIAM F. ROPE

April 22, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Public Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Your Honor:

I am a D.C. Public School teacher, in my eighth year as an elementary (third grade) classroom teacher. Before becoming a teacher I worked for the Johns Hopkins University in China, and I had a 31 year federal government career, first as a Naval Officer (4 years), then as a Foreign Service Officer of the Department of State (27 years). In this last capacity I came to know Lewis (Scooter) Libby, and I am proud to have been his friend for 25 years, both professionally and personally. I am *not* a political associate of his. Indeed I and my wife are lifelong Democrats who demonstrated *against* the Iraq war *before* it was launched in 2003. Regardless of where we stand politically, however, I consider Scooter Libby a good, honest, and loyal friend; and I have been tremendously saddened by the outcome of his trial.

For all the years I have known him, I have found Scooter Libby to be a moral, decent, kind, warm, and unfailingly courteous colleague. I have also found him to be totally reliable – a person of high integrity, dedicated to the best interests of our country. I first got to know him in the early 1980s when, as head of the State Department's China Desk, I collaborated with him on important matters relating to U.S. policy toward China and other East Asian issues.

We worked together, lunched together, and traveled to China together. He was hardworking, trustworthy, thoughtful and helpful – a man who was both straightforward in presenting his own views and flexible when it came to forging agreements within a bureaucracy. I greatly valued his instincts and abilities when it came to building collegial working relationships to advance the national interest. He was also a lively and good-natured colleague who believed in making life and work enjoyable. He was also modest and self-sacrificing. By this, I mean that I never saw him put his personal interests first or act in a self-aggrandizing way. He had a zest for bureaucratic competition and maneuver; but he played by the rules. He never took an argument or a policy struggle personally. He treated opponents fairly. When an issue was settled, it was settled; and people remained friends.

Both in my association with him in those East Asia days and later, when we were in more senior positions in government, Scooter took a personal interest in developing young officers and in helping others with their careers. In my case, Senator Helms, and others on the "Republican Right," were unhappy with actions on China/Taiwan policy taken while I headed the China Desk – to the point where it threatened to affect my career. Scooter kept me



– 2 –                                                   April 22, 2007

informed and sought to use his influence as an assistant to my Assistant Secretary to ensure that I got a challenging ongoing assignment. I believe it was at least in part due to his interventions that I was able to continue to develop and serve my country.

Later in that decade, I was again in close touch with Scooter, when he headed a Policy Planning Staff at the Pentagon and I served as the Principal Deputy Assistant Secretary for Political Military Affairs in the State Department. Scooter was always on the lookout for strong strategic thinkers, and I was interested in giving outstanding young Foreign Service Officers the opportunity to serve outside State where they could broaden their point of view. It was a time of significant achievements in arms control, in the management of the Cold War's end, and in Iraq, with the first Gulf War. Again, Scooter was the kind of cooperative, capable colleague with whom one could work easily and whom one could rely upon and trust. The young "FSOs" whose assignment to his office we arranged together, were all given significant responsibility. They not only emerged from Scooter's "shop" as stronger strategic thinkers but forged new relationships that helped assure their rise to important national security responsibilities. When I watch on C-Span as some of these officers acquit themselves well years later, I am proud of the role Scooter and I played in their development.

I retired from State in 1995, but Scooter and I have kept in touch socially ever since. I see him particularly often on the football field (about which you may have read); and we play softball together. Scooter's 1990 invitation to me to join a group he played with has led me, ultimately, into three different senior leagues and a variety of other activities that have truly enhanced my life. On the playing field, I see the same friendly, optimistic, warm and talented Scooter Libby I have long known; but there is now an added dimension. During these years, I've seen Scooter marry and become a devoted husband to a very fine woman. I've watched him raise a wonderful young son. For the past few years he has brought young "█████ out on the football field, and I and our football friends have seen the boy grow from a bright, lively, good-natured child into an adolescent who is bold, possessed of a bright sense of humor, responsible and secure. It is characteristic of Scooter that, rather than go out alone on a Sunday morning, escaping life's pressures with friends, he brings his son along. One doesn't have to watch them together, as Scooter teaches and supports, ████o know what a fine father Scooter is. One needs only to see ███to know how he has been treated and the kind of role model Scooter provides.

Your Honor, I do not treat the matter that brings Scooter Libby before you lightly. I know, however, that the Scooter Libby I have long known is honorable, kind and decent. I know him as father to a boy who – as he moves through critical teenage years – will need Scooter's guidance and support. I know he is a devoted husband. He is a selfless man who works hard and seeks only to serve his country without regard for personal interest. I hope this, and many other testimonials you will surely read, will help inform your sentencing decision. I hope you will show Mr. Libby your utmost compassion.

Sincerely,

*William F. Rope*

William F. Rope

Bruce A. Rosenfield

April 23, 2007

The Honorable Reggie B. Walton
United States District Court
1225 East Barrett Prettyman
    United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:    **I. Lewis Libby, Jr.**

Dear Judge Walton:

I am a partner in the law firm of Schnader Harrison Segal & Lewis, LLP.  I am chair of the firm's trust and estates department and have been with the firm since 1978.  I also serve as Executive Director and a Co-Trustee of the Oberkotter Foundation, a national private foundation trying to help deaf children listen and talk (and in the process have helped establish 23 programs across the county to help accomplish this).  Let me note in addition that my wife and I are life-long Democrats.

Shortly after my arrival at Schnader, I met Scooter.  We were both young associates at the firm and spent a great deal of time together.  We also socialized on off-hours with my wife, Bonnie Brier.  By the time Scooter left the firm, I considered him my best friend at the firm.  Scooter and I (and my wife) have remained close friends in the almost two decades since he left the firm.  That is not an accident.  Scooter is a wonderful person and a great and loyal friend.

While Scooter was at Schnader, he was one of the rising stars in the firm's litigation department.  Accordingly, he was selected to serve on some of the most important cases in which the firm was involved.

While engaged in these cases, Scooter also volunteered for numerous pro bono assignments, particularly those involving organizations in the arts.  In the process, he represented numerous struggling artists and actors (including a Vietnam veteran).

Scooter left Schnader to work with the State Department, showing an early commitment to public service.  I have always been impressed with his willingness to forego significant remuneration in private practice to work for our country.  I know firsthand the hours that Scooter devoted to government service, and the impact that had on the time he had for his family (although he has constantly worked at also being a great father and husband).

The Honorable Reggie B. Walton
April 23, 2007
Page 2


Despite the pressures of his personal and professional life, Scooter consistently cares about his friends.   For example, our eldest child was on an externship in Ghana during the tragic events of September 11th.   Upon learning this (and of our concern), despite the enormous pressures of state facing Scooter, he researched the situation in Ghana and called us at 11 pm (having just gotten home from work) to discuss what he had learned.

In the nearly 30 years that I have known and worked with Scooter, I can vouch for his integrity without hesitation (which makes the actions of which he was convicted in the matter before Your Honor inexplicable to me).  He is a valued confidante and both my wife and I would trust him with our lives and the lives of our three children.

I sincerely hope that you will take his previously unblemished record, the enormous regard in which he is held by his numerous friends, and the sacrifices he has made over the last many years and service to our country into consideration in deciding whatever sentence you choose to impose on him.


Respectfully,

Bruce A. Rosenfield

2                                    PHDATA 1436490_1



THE
**WASHINGTON INSTITUTE**
*for Near East Policy*

Dennis Ross
Counselor and
Ziegler Distinguished Fellow

March 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

My name is Dennis B. Ross. I served as President Clinton's chief negotiator in the Middle East from 1993 until the end of the administration. Prior to that time, I held different governmental positions, including as the head of the Policy Planning Staff in the State Department during George H.W. Bush's presidency.

I first met Scooter Libby during the Reagan administration when we were both serving as staff members of the Policy Planning Staff in the State Department. I believe we would have met sometime in 1981. I had responsibilities on the Middle East and Scooter was serving, at least initially, as a speechwriter.

From the outset, I found Scooter engaging, self-effacing, inquisitive, and funny. Even if he was serious about the work, he never took himself too seriously. He was anxious to learn as much as he could, and we spent long hours talking about the Middle East and other issues in which he wanted to gain a deeper understanding. He played down his own expertise, even though I found him well read and extremely level-headed. As a Democrat, I could be critical of the administration's domestic policies and found in Scooter a sympathetic ear. In general, we would talk a lot about where we thought the administration was on the right track in foreign policy and where we were concerned.

Both of us felt a strong impulse to serve. Scooter was deeply committed to public service and very much of a team player. It was not just that he worked well with me; he worked well with everyone. His sense of humor, often self-deprecating, won him many friends. He was never dogmatic, even if he had strong viewpoints. When he would be drafting speeches, he would work closely with those who had the lead substantive responsibilities in the areas on which he was writing. He would find ways to reconcile differences with them and others as he began to assume more substantive responsibilities on Asia and the Far East.

We developed a friendship because of a convergence of interests professionally and personally. We were both sports nuts, playing as much as watching. I naturally gravitated toward Scooter as someone with whom I felt much in common. He is someone in whom I felt it easy to confide. He kept confidences and he always offered good advice. If I was inclined toward an impetuous action, he would gently talk me into thinking about what I had in mind and how best to act on it. He is someone I came to trust and who I felt could always be counted on.

Over the years as I stayed in government and he left, we would see each other periodically. When I was the negotiator in the Clinton administration and appearing to be on endless shuttles to the Middle East, he would take the time to ask how I was doing without prying into what was going on. When he assumed his duties for the Vice President after I left the government, I would do likewise, wanting to know how he was holding up.

I know what it takes to do these kinds of jobs. I know the hours involved, the time spent away from family, the preoccupation even when one is home and the general pressures one feels. Scooter did the job by choice, but certainly made profound sacrifices along the way. He did it out of a belief in public service not out of some great ambition for visibility. He came to public service with the right mindset, and now, of course, he is in danger of paying an extraordinary price.

It is hard for me to fathom what has happened to him. What he has been charged with—and now convicted of—is very hard to reconcile with the person I have known for over twenty-five years. For someone who only had an interest in serving his country and its interests, and who always exhibited not just core decency but also integrity, it is hard for me to accept what he is now facing.

As someone who fears the criminalization of policy differences, I must admit I hope very much you will take into account the person Scooter has always been and the sacrifices he has already made as you consider his sentencing.

Sincerely,

Dennis B. Ross



April 13, 2007

The Honorable Reggie B. Walton
United States District Judge
United States District Court
1125 E. Barrett Prettyman Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

<u>United States v. Libby</u>

Dear Judge Walton:

I am writing on behalf of my old friend I. Lewis ("Scooter") Libby. I have known him since we entered college together in the fall of 1968; we were in the same dorm. We formed a friendship that has endured and deepened over time. After college, our paths crossed again in Washington where we became professional colleagues and friends. While I served as Legal Adviser to the National Security Council under Colin Powell and Brent Scowcroft, Scooter came into the Defense Department as a Deputy Under Secretary. We worked together at the House of Representatives, helping then-Representative Christopher Cox investigate high technology transfers to China. We were colleagues after September 11, 2001, when I went to work at the U.S. Mission to the United Nations while he served at the White House. In all this time, I have seen Scooter as passionate patriot and conscientious and careful professional, aware all the time of the constraints imposed by legal ethics and responsibilities and by the savage realities of Washington politics.

We come now to the most painful part of the story, his indictment and conviction. In my experience, lying is completely foreign to Scooter's character. The jury's conclusion leaves me perplexed as well as saddened. How should a man of such long, dedicated, and patriotic service under three Presidents be punished? To such a man – a public servant, a husband, a father – the price paid already has been high. We look to judges to lead us to justice under law. That is not an easy burden. We all have confidence that you will see your way to a just outcome toward a man who has always accepted the consequences of his acts and, when his country has called, has been weighed in the balance and never found wanting.

Sincerely,

Nicholas Rostow

Michael R. Rubenstein



April 22, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington DC 20001

Re: Scooter Libby's sentencing

Dear Judge Walton,

My name is Michael Rubenstein. I am a wealth manager specializing in multi-generational family wealth transfer and business succession planning in Jackson Hole, Wyoming. My clients include some of the wealthiest families in the nation. I am active civically in my community as a board member for the Teton County Library Foundation, a Freemason in Jackson Lodge #48, and a past active member of Teton County Search and Rescue. I am engaged to Jennifer (Jenny) Mayfield, who served as Scooter's special assistant from 2000 – 2004.

The Vice President's staff spent many holidays in Jackson Hole, and, as a local, I was fortunate to get to know many of them over the years. When Jenny first introduced me to Scooter over the Christmas holiday in 2004, I was honored to be in his presence. It was obvious that he was a man of exceptional integrity and capacity. Despite Scooter's tremendous responsibility, Scooter made every effort to get to know me. Today, Scooter and his wife, Harriett, remain close friends of ours, and I can honestly say that he is one of the finest men I have ever met.

Scooter's integrity is exemplified during Jenny's succession from her position at the White House. In October of 2006, when Scooter was tirelessly preparing for his trial, Jenny decided to leave the White House to pursue options in the private sector. Scooter spent countless hours assisting Jenny with her job search. With the trial months away, it had become increasingly difficult for Scooter to be in the public. Nonetheless, Scooter was insistent on planning and attending Jenny's farewell party. That night Scooter gave the most heartfelt remarks in honor of Jenny, and, to me, his participation illustrated his dedication to friends and colleagues.

After Jenny left the White House, she moved to Jackson, Wyoming. To move from Washington, DC to Jackson, Wyoming is certainly a big change, and would likely have

been impossible without friends like Scooter. Scooter and Harriett called Jenny daily to make sure that she was adjusting to her new lifestyle. These calls meant the world to me. Scooter even called Jenny on the evening of the verdict to ensure that she was handling the news okay. I will forever remember, in light of his personal distress, Scooter's ability to put others' needs before his own.

Jenny and I got engaged one month ago. Still to this day, despite the upcoming sentencing, Scooter and Harriett could not be more supportive in our lives. This selfless behavior is indicative of the Scooter Libby that I have come to know. I hope that as you consider options for Scooter's sentencing you will recognize his unique contribution to our country and our lives. Please don't hesitate to contact me if I can be of further assistance to you.

Sincerely,

Michael R. Rubenstein
Jackson Hole, Wyoming

*Donald H. Rumsfeld*

April 5, 2007

The Honorable Reggie B. Walton
United States District Court for the District of
    Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

Dear Judge Walton,

This letter is to express my confidence in and respect for Mr. I. Lewis "Scooter" Libby.

I have served in the Federal Government off and on for the past fifty plus years, in both military and civilian capacities, in both legislative and executive positions, frequently dealing with sensitive national security matters. My most recent service has been as U.S. Secretary of Defense for the past six years.

I know a great many of our fellow citizens hope and pray that those who serve in our Federal Government will be individuals of strong character and integrity, who cherish our freedoms and our way of life. Over these past decades, I have had the privilege of serving with a great many people of that type, and, among them, without hesitation, I would include Mr. I. Lewis Libby.

I know Mr. Libby to be a patriot, a dedicated public servant, a strong family man, and a tireless, honorable, selfless human being. Our country has been fortunate to have had his service. I have always felt that he is the type of person others can

hold up to their children and grandchildren as an example of a truly honorable public servant.

My hope and prayer is that his outstanding record, his many contributions to our country and his value as a citizen will be considered carefully.

Respectfully,

2

April 25, 2007

Robbie Koch Sabathier, Esq.
Senior Vice President
Capitol Hill Consulting Group

The Honorable Reggie B. Walton
United States District Court
225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Your Honor:

I am writing on behalf of Scooter Libby who is to be sentenced before your court on June 5, 2007. I am a former colleague of Mr. Libby's. I am writing to you to attest to Mr. Libby's good character and integrity.

I am currently a Senior Vice President at the government relations consulting firm of Capitol Hill Consulting Group. I am an attorney, however, my main practice is in government relations with respect to the aerospace industry. However, my experience with Mr. Libby came approximately 10 years ago during my first legal job at the law firm of Dechert LLP where Mr. Libby was a Partner. I worked with Mr. Libby on numerous projects during my two years at Dechert. Mr. Libby is the only person from the law firm that I stayed in touch with after I left, and the only Partner I wanted to stay in touch with. As a Partner, Mr. Libby was willing to engage first year associates in unique and interesting projects. He treated us with respect and kindness, and valued our work, as well as our opinions. Although we were not equals as first year associates, Mr. Libby treated us as such. This is unfortunately not the norm for big law firms.

I recall a number of experiences where Mr. Libby allowed me, as a first year associate, to interact with and often interface with the client. I had spent a number of years living in Japan, and Mr. Libby had a Japanese client. He allowed me to be the point of contact on matters with his client. He put a lot of trust in his first year associates, and had a lot of faith in us. This built confidence in me where as most Partners just try to tear that

confidence apart.  Mr. Libby was the one Partner I truly enjoyed working for, and through my work with him I saw a man of high integrity, who valued his family, and his colleagues.  In law firm life it is rare to find such a balanced, and just individual.

I believe I could detail many more accounts of my experiences with Scooter, however, I believe you are a very busy man, and I simply would like you to know that Scooter's conviction for perjury and obstruction of justice is inconsistent with my knowledge of his character and integrity.  This man should not be put behind bars.  He has a wife and kids, and I know he loves them with all his heart.  As a mother myself, I could not imagine my daughter living day-to-day without the influence and love of her father.  Please don't take that away from the Libby family.

I thank you very much for your time.

Sincerely,

Robbie Koch Sabathier

April 25, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

I am writing to express my support, deep admiration, and respect for Scooter Libby. I am currently a Senior Program Officer at the Smith Richardson Foundation, which supports research and analysis related to U.S .foreign and security policy interests. I have been an active member of the foreign policy community for over almost two decades: first as career civil servant in the Department of Defense, and now as a member of the non-profit/academic communities. I received my M.A. degree from Johns Hopkins School of Advanced International Studies and then, about ten years later, my Ph.D. in strategic studies from the same institution.

I met Scooter over ten years ago, when I was working in the Office of the Secretary of Defense. Scooter was a positive and constructive force in that office, overseeing many key developments following the collapse of the Soviet Union.

The news today is filled with retrospectives on Boris Yeltsin. What will probably never be mentioned is the key role Scooter played to ensure that the Cold War ended without a spasm of violence. His calm, reasoned and compassionate approach to the challenge of the USSR's dissolution helped to create the conditions for the nations of the former Soviet Union to transition to independence and democracy with support from the United States. During this time he was an advocate for greater human freedom and quality of life for the people of the Soviet bloc. He did that by overseeing the difficult work the U.S. government did behind the scenes to ensure that freedom and democracy had a chance to take root.  These efforts reflected his belief in the dignity of all individuals.

In particular, Scooter worked hard while at the Pentagon to give a free and independent Ukraine the opportunity to emerge from the shadows of the Soviet Union and take its place in the community of nations.  Not only did he oversee important reductions in the nuclear arsenals of Russia and the United States, but his patience, persistence, and ability to listen to all sides were critical qualities in brokering a key agreement with Ukraine – one in which that country agreed to get rid of its arsenal of nuclear weapons. (The first and only time a sovereign nation has voluntarily relinquished its strategic nuclear arsenal). It is frankly hard to imagine that the deal could have made without Scooter, as it required the deft management of various interests in the U.S. foreign policy establishment and interests in Ukraine and Russia. Scooter's ability to relate to all actors in a calm, respectful and thoughtful manner was critical in getting all parties to agree

to a delicate final deal. And that agreement marked a measurable improvement in American security, as well as that of the rest of the world, since it safely transferred and secured hundreds of nuclear weapons.

As a career civil servant, I saw all sorts of political appointees join the government. I understand and support the idea that political appointees enter a bureaucracy to "infuse" fresh, new ideas into an often staid system. However, many new appointees enter the system with a predisposition against career civil servants. This was NOT the case with Scooter. He was considerate to everyone on his staff, always making time for individuals, whether for personnel matters or policy issues. Scooter had that quality of leadership which enabled him to combine authority with an openness to new ideas.  This quality is, quite frankly, not common enough in Washington. Few high-level individuals are willing to listen to new ideas (especially from younger people) and if relevant, adopt them. Scooter was supportive of younger people in the system and made specific efforts to improve their careers by providing them will new opportunities. He did not have to do so. Anyone who has worked for the federal government knows how hard it is to improve or change things – especially in the domain of personnel! Scooter worked hard to improve things for those around him. He promoted younger individuals – career experts – into promotable positions. He took the time to mentor them. If more policymakers were as generous as Scooter with his expertise and time, perhaps ewer career civil servants would leave the government in frustration. Knowing that he would eventually leave the Defense Department, Scooter nevertheless invested time and effort into improving career opportunities for younger civil servants. Scooter was and is a true public servant.

Scooter is kind, thoughtful, and extremely knowledgeable. He is open to ideas, and debate. I strongly believe that Scooter's conviction is inconsistent with his character.  I believe that he had the deep misfortune of being caught in the center of a deeply bitter, divisive debate about the Iraq war, one which has torn this country apart, and created a deeply divided polity. Now, this bitterness is tearing apart the life of a man and his family.  Scooter does not deserve to be ruined. He chose to serve in government and did so because he wanted to give something back to his country.

I hope that the court will consider this letter as a heartfelt testament to a truly good and decent person.

Sincerely yours,

*Nadia Schadlow*

Nadia Schadlow, Ph.D.
Senior Program Officer
Smith Richardson Foundation

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 20001

**In Re:** Sentencing of I. Lewis "Scooter" Libby Jr.

April 7, 2007

Dear Judge Walton,

I am a mother, therapist/teacher, and citizen. I struggle each day over how to best impart and model respect for the truth to my adolescent clients and college level psychology students—and to my own young adult children, who are at the age where they will measure their beliefs and values against the pragmatics of politics. They are watching the Libby case closely, and will learn whether lying--or telling the truth--will enhance their survival.

Many people will request leniency for Mr. Irving (Scooter) Libby, because he has a family. Judge Walton, so do most of us. Mr. Libby knew he had a family when he chose to lie. Some will cry that he was the "fall guy" for someone else. Your honor, how do I teach my teenage clients and college students to not be the "fall guy" if the consequence of lying for someone else, is legally safer than the consequence of telling the truth?

Mr. Libby did not steal bread to feed his children—for which I would urge a lighter sentence. Rather, he is a lawyer with a brilliant mind, who *chose* to break these laws in a critical case, that now may never be solved, and more importantly damaged real people. His disrespect for the law, and all who believe in it, is stunning.

I believe that our government administrators have the responsibility of guarding our laws, and therefore, they hold each man, woman, and child in the balance. Lies and obfuscation destroy our individual and collective trust and security—in our homes, schools, workplaces, even our country. How will any of us know the importance of integrity, respect for the law, and loyalty to the truth, if Mr. Libby is made an exception?

I take no pleasure in this, but I humbly request that he be sentenced to the fullest extent of the law. Our young people are watching.

Very sincerely,

Nancy Schmelter

American Enterprise Institute
1150 17th Street, NW
Washington, DC 20036

April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I'm writing on behalf of Scooter Libby, a friend and colleague for more than two decades. Currently, I am a resident scholar and director of advanced strategic studies at the American Enterprise Institute for Public Policy Research here in Washington, D.C. Previously, I served as the minority staff director for the Senate Select Committee on Intelligence under the late Senator Daniel Patrick Moynihan and, in the Reagan White House, as executive director of the President's Foreign Intelligence Advisory Board. I have also taught at the School for Advanced International Studies, Johns Hopkins University, and have been a member of the faculty at the University of Virginia.

I have lived and worked for more than a quarter of a century in and around the nation's capital. In that time, I have met and worked with some of the brightest and most talented individuals one could ever imagine coming across. I have also known any number of individuals who have had an unwavering dedication to serving our nation, regardless of the personal cost or hardship in doing so. And, finally, I have had the pleasure of knowing others who, regardless of the demands placed on them by their job and family, have never hesitated for one moment to offer help and advice to a friend in need. What is unusual, of course, is finding all of those traits in a single individual. Scooter Libby is the rarest of the rare: a talented individual who has dedicated himself to serving the public good and has never been anything but the best of friends.

I have known Scooter while he has served in government, while he worked as a lawyer in private practice, and on the playgrounds of D.C., playing softball and football with friends. While in government, he helped craft not only the policies that led to the peaceful resolution of the Cold War but he also helped develop the policies that moved us from that period to the uncertain one following the fall of the Berlin Wall. He has shown time and again imagination in thinking about what might be done to help secure this

country and great sensitivity in designing policy options that are consonant with this country's democratic spirit.

When asked to serve his country, he has never wavered in doing what he considers to be his duty. This has been the case even when the prospect of a high government position in return was not in the cards. Scooter spent a year, for example, working as legal advisor to the Cox Commission ("The House Select Committee on U.S. National Security and Military/Commercial Concerns with the Peoples' Republic of China"). The work of the committee was a landmark, multi-volume study on a topic that had been largely ignored. By volunteering his services to the Select Committee, Scooter was not taking on a post that would enhance his career; if anything, the bipartisan Cox Commission was taking on an issue—the security implications of largely unfettered economic relations with China—that most of Washington wanted to avoid looking at. Given the vast and growing amount of commercial relations between the U.S. and China, it took real courage for a lawyer in this town to step up and help the Congress take an honest look at the situation. There was certainly no guarantee that it would not come back to hurt his own practice. The firms and individuals who lobby for American business interests in China can play awfully rough at times.

On a more personal note, Scooter acted as my counsel when I worked in the White House and ███████████████████████████████████████████████ ████████████████████ The unfounded charge threatened to ruin me professionally and fighting it would have potentially ruined me financially. With no hesitation, and like the good friend he is, Scooter provided pro bono advice and assistance that ultimately led to my regaining ██████████████████████████████████████████ This experience is one very specific reason why I have always thought the charges brought against Scooter fly in the face of what I know of him both as a lawyer and individual. He is the last person I would ever expect to do something that would put himself in jeopardy when it comes to the law or would in any way be cavalier with information that pertains to national security. As I and his closest friends know, that simply does not fit with the Scooter we know.

Of course, were these charges true, Scooter would have been putting not only himself in jeopardy but, in reality, his family, as well. Again, this is inconceivable to those who have known him over the years. Scooter married somewhat later than many of us and, as his friends used to joke, he did so only when he was absolutely dead certain that he had found the perfect woman. But once he did, Scooter has been as conscientious about being a father and husband as any of us. I know, from conversations with him, that it clearly bothered him that the long hours he put in as the Vice President's Chief of Staff were hours he was missing at home with his young family.

To sum up, Scooter's professional life has been one of public service. He cares deeply about this country and has regularly left far more lucrative jobs to work in government when asked to do so. But it would be incredibly misleading to see Scooter as

only a public figure. To his friends, he has been generous and loyal, and to his family, he remains a great dad and husband. The jury has made its decision. But for those of us who have known Scooter for years, who have seen him in action, who have sought his counsel, and who know first-hand his sense of discretion and concern about the law, it strikes us as implausible that he would put himself and his family at risk by either perjuring himself or attempting to obstruct an investigation.

With due respect,

Gary J. Schmitt
Resident Scholar,
American Enterprise Institute

$\mathcal{L}arry\ \mathcal{S}eaquist$

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington DC 20001

**Re: I. Lewis Libby**

Dear Judge Walton:

This is to report my extended, first-hand observations of the truly admirable qualities which Mr. I. Lewis Libby consistently brought to his professional responsibilities as a senior government official and to his personal relationships.

As his Number Two when he served as Deputy Under Secretary of Defense, I worked very closely with Mr. Libby for almost three and a half years from the Fall of 1989 to January 1993. "Very closely" means sharing an office and interacting all day every day. Our days usually stretched from 7am until 9 or 10 at night, routinely included Saturdays and often Sundays as well, as Mr. Libby received high-ranking official visitors, advised the Secretary of Defense and White House officials, and conducted the minute by minute business of managing the work of a large and diverse staff. I traveled with him on important national security trips abroad. Although our working routines rarely left time for a personal life, we did occasionally socialize. After those years I continued to stay in touch, including visiting him a couple of times during his years with the Office of the Vice President.

Which is to say: I know this man's admirable character and total integrity very well. The portrait of him conveyed by the press during the investigation and trial is not a picture of the man I know and admire. Mr. Libby was always under enormous pressure from senior officials, was always under scrutiny by the press and foreign governments, was always working under to an endless flurry of deadlines. Never – repeat, never – did I ever see anything but his meticulous sense of probity, honesty, and deep respect for the institutions of our democracy.

Here briefly are two specific, first-hand illustrations drawn from those years when, as a top official at Defense, Mr. Libby shouldered an exceptionally important portfolio of responsibilities for the Secretary of Defense and for our country.

**'TELL THE WHOLE TRUTH, WARTS AND ALL."** Congress levied a requirement at the end of the First Gulf War in 1991 for a comprehensive report on the conduct of the war. Working directly with the Secretary of Defense and other top officials, Mr. Libby led the year-long project. His first and often-repeated guidance to our large staff and to the many military agencies and commands involved was, "tell the whole truth, warts and all."



This was much more than a quip. As to be expected in any large organization dependent on Congressional approval for funding, many of the constituent commands had an interest in "selling" particular points of view and in downplaying the problems inevitably encountered on the battlefield. Mr. Libby was so successful in imposing this "total sunshine" discipline that our report was never challenged either by the Congress in its classified version or by the public in its unclassified version. His Conduct of the War report remains to this day the benchmark for candid, accurate, let-the-chips-fall-where-they-may reporting by a government agency. That success was, in my (closely involved) opinion, entirely due to his relentless insistence on our higher duty of openness and total honesty.

**"CAN WE LOOK EVERY MOTHER IN THE EYE AND SAY, 'WE DID EVERYTHING CONCEIVABLE TO PROTECT YOUR CHILD'? "** In 1990-91 during Operations Desert Shield and Desert Storm, Mr. Libby was the principle official responsible for civilian oversight of the details of the preparations, first to defend the Saudi peninsula from Saddam's attack and then to expel the Iraqis from Kuwait. Among the most thorny of the problems was our preparations for (and thereby hope of deterring) a biological attack as we massed troops in the Saudi Peninsula. BW, biological warfare, was a new business for everyone, military and civilian, field troops and headquarters staffs. More than any single official, it was his personal effort which kept the staff driving our successful preparations forward. I clearly recall his challenge in the quote above as we reached the eve of launching our own attacks.

Facing the risk of catastrophic losses from what was clearly a credible threat, Mr. Libby was exceptional effective in my (closely involved) opinion. He was, in my view, modeling the highly conscientious public stewardship that we expect of our officials in our democracy.

On a personal note, I always found Mr. Libby to be especially thoughtful, personable, and even-tempered with everyone: seniors and subordinates, friends and foreign visitors.

In sum, this is a good man and an outstanding public servant whom I am honored to call a friend.

Sincerely,

Larry Seaquist
State Representative, 26th District, Washington State

*Biographical note: At the time of our working association, I was an active duty Navy Captain, recently come ashore to the Pentagon after service as Commanding Officer of the Battleship Iowa. Following my retirement from the military and several years of international work and writing, I was elected to the Washington State legislature.*



The Honorable Reggie B. Walton
United States District Court
1225 Barrett Prettyman United States Courthouse
333 Constitution Ave, NW
Washington, D.C.

Dear Judge Walton:

I am writing you about I. Lewis Libby, in the hope that hearing from friends and colleagues who have known him over a long period of time can provide you a fuller picture of him before his sentencing.

I have known Scooter Libby for more than 25 years, since we were both junior members of the Policy Planning Staff at the Department of State. We have both been in and out of government in the interim, but have not worked together since that time; in fact, we have not even worked in the same administration. My most recent governmental position was as Ambassador-at-Large at the State Department under President Clinton, with responsibility for policy toward Russia and other states of the former Soviet Union. In 2001 I became a senior fellow of the Council on Foreign Relations and a professor at Columbia University, and have remained in both these positions to the present day.

My tenure in the Clinton Administration has a direct bearing on what I want to tell you about Scooter, since I ended up taking the job in significant part because of his advice. The transition team working for Secretary-designate Albright had approached me in early 1997, and my initial response to their inquiry had been negative. Just three years earlier I had joined the Carnegie Endowment for International Peace as director of a large new program on Russian affairs, and I didn't feel either that the job was complete or that I had come to a natural break in what I was doing.

Scooter changed my mind: although he had worked for the first President Bush, his view of the matter had nothing to do with Washington partisanship and everything to do with duty. He said that when you're offered a position of this significance – and believe you can do the job well – the presumption ought to be that you'll take it. You might have some reservations about other policies of the Administration, but unless you're asked to be a spokesman for things you don't believe in, the right thing is to say yes, accept the challenge and do the best job you can. It makes no difference, he said, that you can think of other people who might do the job well: they're asking <u>you</u>.

Our conversations about serving the Clinton Administration occurred almost exactly ten years ago, but they have stuck with me for two reasons. First, because we repeated them – in slightly different form – four years later, when he was the one who was offered a position that, however attractive, involved substantial personal sacrifice. The commitment he would make by going into government was clearly going to take a much larger toll on family life than mine had. Although my international travel schedule had been demanding, he knew his workload would be incomparably greater. But he decided the same way that he had advised four years before, and with the same sense of obligation that he had urged on me.

These conversations have stayed with me for a second reason: they capture Scooter's utter lack of interest in hard-edged partisanship. In the years I served as Ambassador-at-Large, we definitely had more conversations in which <u>he</u> tried to persuade <u>me</u> of the soundness of particular Clinton Administration policies than the other way around. His concern was always with getting the policy right; his instinct was never to start with the politics of the problem.

As an out-of-government Clinton appointee, I had continuing opportunities to observe this trait in Scooter after he joined the government in 2001, and not just because we have stayed in touch as friends. I had access to senior officials of the new administration because Scooter thought it important for outside perspectives to be heard and understood on the inside. Having been deeply involved in Russia policy in the 1990's, I had a lot to say that was critical, either implicitly or explicitly, of the Bush Administration, but that didn't bother Scooter. He thought it was his job to keep the debate going.

The current administration is not exactly famed for its openness to alternative viewpoints, but I can tell you that in my field I have known of no one who did more than Scooter to assure that policymakers were exposed to a broad range of views – and who did so out of the same conviction that there was no other way to produce good policy. In government work this is, to my mind, no small measure of how well you've done your duty. But it reflects something even more important -- the thoughtfulness, fair-mindedness, and personal integrity that anyone who knows Scooter Libby well can always count on.

Sincerely,

Stephen Sestanovich



## THE SHALEM CENTER

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barret Prettyman
U.S. Courthouse
333 Constitution Avenue N.W.

To the Honorable Reggie B. Walton,

While I am not an American citizen, I wanted to write to you on behalf of Scooter Libby.

I have known Mr. Libby for many years, and have met with him on numerous occasions both in my service as an Israeli Government Minister and as a private citizen.

I have always found him to be a man of remarkable integrity and decency, someone who inspired confidence in his professionalism and competence.

I hope that in deciding his sentence, you will consider the views of those like me who experienced him as a fine American public servant and a good man.

Sincerely yours,

Natan Sharansky

Abram N. Shulsky



May 5, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman U. S. Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

I am writing to provide some background and perspective on I. Lewis ("Scooter") Libby,
whom I have known for sixteen years. I first came to know Scooter in 1991 when I was
a member of the Policy Planning staff in the Office of the Under Secretary of Defense for
Policy, where he was Principal Deputy Under Secretary. Prior to that, I had served as
Secretary of Defense representative to the Defense and Space Talks with the Soviet
Union, as director of the Pentagon's Office of Strategic Arms Control Policy, and as
member and minority staff director of the Senate Select Committee on Intelligence,
working for the late Senator Daniel Patrick Moynihan. Since that time, I have maintained
contact with Scooter, both while he was not in government service, and more recently
when he was Chief of Staff to the Vice President and I had returned to the Department of
Defense.

Scooter is a very private and reserved individual, but one who cares deeply for his fellows
and who forms deep attachments to them. He has been particularly generous with his time
and counsel. In one case with which I am familiar, he put in many *pro bono* hours on
behalf of a friend of mine who -- in the process of establishing a military educational
institution for military officers and civilian government officials of the former Communist
countries of Eastern Europe and Eurasia -- became entangled in Inspector General
investigations instigated by a disgruntled subordinate. Although the end result of the
investigations demonstrated the pettiness or baselessness of the allegations, my friend
would have been ruined financially by the cost of defending himself but for Scooter's
generosity.

Scooter is an extremely intelligent lawyer, with a lawyerly attention to detail and proper
procedure. The carefulness, combined with scrupulous honesty, which, from my
experience and observation, marks his character, seems to me totally inconsistent with the
perjury and obstruction of justice of which he was convicted. He always seemed to me to
be the very opposite of reckless.

Yet, the way his mind works is anything but pedestrian or predictable. In the course of
working with him at the Department of Defense, I was always amazed at his ability to come

page 1

at a problem from an unexpected direction, and to grasp its unfamiliar and generally unexplored aspects.

In this connection, I was amused to see in the press various conspiratorial explanations advanced for the poetic nature of a well-publicized letter Scooter wrote to Judith Miller; clearly, our Washington press corps couldn't imagine a government official expressing himself with such originality and artistry. This is a mistake they could have avoided had they read Scooter's novel, *The Apprentice*, which garnered, along with low sales, critical praise.

I mention this to point out the complexity and depth of Scooter's character and personality. While a dedicated and hard-working public servant, with strong public policy views for the sake of which he is willing to work and fight hard, his horizon has never been limited to the political arena. Whenever I thought I figured him out, I discovered a new interest or perspective. He is a hard person to understand, but an easy one to admire.

Sincerely,

Abram N. Shulsky

**BARRY SIMON**



May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, D.C. 2001

   Re: <u>United States v. I. Lewis Libby</u>

Dear Judge Walton:

  I am writing this letter, as a close friend of Mr. I. Lewis Libby, for your consideration in connection with your Honor's deliberations on his sentencing. I am a member of the bar of the Supreme Court of Pennsylvania and the managing shareholder of the Philadelphia office of the law firm of Ogletree, Deakins, Nash, Smoak & Stewart, P. C.

  I graduated from Temple University Law School in 1967, served a judicial clerkship in the Philadelphia Court of Common Pleas, and then entered active duty with the United States Navy JAG Corps where I served for three years. After leaving active duty in January 1971, I went to work for the Philadelphia law firm of Schnader, Harrison, Segal & Lewis, where I became a partner. I left the Schnader firm about ten years ago to start my own law firm, which, in January of this year, merged into Ogletree Deakins.

  I recently had my 64th birthday. I am married, have three children, and three grandchildren.

  I have known Mr. Libby since the mid-1970s when he came to work for the Schnader firm as an associate. In addition to working together, we soon became friends. We have been close friends to this day. Mr. Libby and I have gone on vacation together. We have skied and rode mountain bikes together. We attended each others weddings. He attended my daughter's wedding. I am a friend of his wife, have been a guest in their home, and have enjoyed being with them and their two children.

  Mr. Libby was working as an associate at the Schnader firm when he told me that he had received a phone call from one of his former college professors, Prof. Paul Wolfowitz, who asked Mr. Libby if he would consider working for him at the United States Department of State. That phone call was both unexpected and flattering. Mr. Libby and I discussed that opportunity, and the benefits, as well as the sacrifices, of his leaving the private practice of law for government service. Although Mr. Libby was just

about one year away from being eligible for consideration for election to partner, he decided on public service, and moved to Washington, D.C.

I have spoken to Mr. Libby many times about his family, his career (which has included the private practice of law and public service appointments), and his government service. I feel that I have experienced, although second hand, some of the challenges he has faced, and I have admired his dedication, as a public servant. I will mention just a few of his challenges in the hope that your Honor will consider not just the titles of the positions he has held but also the time in our history that he was called upon to serve, his qualities, and what he has given of himself, selflessly, in his positions.

I remember when Mr. Libby was working in the Department of Defense during the First Gulf War. He was working days and nights, giving his all, when the country was at war. In that effort, he of course was not alone. But he was one of many who was involved and who was totally immersed in the effort. I was with him and his wife one evening in Washington when he could barely break away from his duties for an hour to eat dinner. I saw the strain on him from the long hours and the stressful issues – neither he nor his wife complained nor whined about the hours and demands – and I realized at that moment how lucky we were, those of us who just sat and watched the war reports on the news, that there were people like Mr. Libby, and our men and women in the services, carrying the heavy burden.

After the first Bush Administration ended, Mr. Libby returned to the private practice of law. However, his services on behalf of our government were requested again, this time by a congressional committee. I recall discussing with Mr. Libby the various personal and career considerations pertaining to his taking on the significant responsibility of Legal Advisor on The United States House of Representatives Select Committee on the U. S. National Security and Military/Commercial Concerns with the People's Republic of China. Mr. Libby decided to accept that position, his commitment to public service overwhelmingly taking precedence over any personal and professional considerations. He made adjustments and sacrifices to his private practice so that he might fulfill his public obligations.

The First Gulf War was not the only time that Mr. Libby faced war time challenges. When George W. Bush was elected President, Mr. Libby and I discussed the possibility of his being asked to serve in some capacity in the new administration. Among the matters he brought up was the importance to him of his being home with his family in whatever position might be offered. The position offered to Mr. Libby, working for the Vice President of the United States and as a special assistant to the President, did not involve his being stationed abroad or extensive travel abroad. Mr. Libby once again decided on government service.

Then came September 11th. Mr. Libby had to leave his family on many occasions and go with the Vice President to what has been publicly described as an undisclosed

Page 3

location. The country was at war again, and Mr. Libby was once again faced with the demands of war time service.

Mr. Libby has served most prominently in Republican Administrations. However, when we were both much younger, working at the Schnader firm, he told me about his work as an intern for Abraham A. Ribicoff, the Democratic Senator from Connecticut. Such was his background when he received that phone call from Dr. Paul Wolfowitz many years ago.

Mr. Libby has never complained to me about his personal sacrifices. Nor has he ever bragged to me about his accomplishments. From what I have seen, he has just performed his duties at the highest level of his considerable abilities as a matter of course, quietly and selflessly.

I had the pleasure of spending time with Mr. Libby's parents. Mr. Libby was close to them, and I saw how proud they were of him. Although they are deceased now, when old age and illness struck, Mr. Libby and his wife did all they could for them. When his mother was alone, living in Washington D.C., and ill, Mr. Libby and his wife were there for her, caring for her. He was a devoted son.

My family also personally experienced the good in Mr. Libby through, for example, his support and encouragement when ████████████████ █████ and his arranging for educational visits to the White House for the students in my wife's high school classes where she teaches.

Mr. Libby is a decent man who is gifted with extraordinary insight and analytical ability. He is also a devoted family man. His wife and children are at the center of his world. He wants to be with them. Mr. Libby has been a dedicated public servant who has worked tirelessly, not out of personal ambition, but rather for the greater cause of the public welfare. Mr. Libby is an honorable man, a man of sound moral principle, and I am honored to have him as a friend. I write this letter out of an abiding respect for him.

I pray that your Honor will give great weight to all that is good about Mr. Libby and all the good that he has done, when imposing a sentence.

Very respectfully,

Barry Simon

**Kenneth M. Simon**

May 3, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing in connection with the upcoming sentencing of I. Lewis (Scooter) Libby. I've known Scooter for more than twenty years – ever since he came to what was then Dickstein, Shapiro & Morin in 1985. Scooter and I were in the same law firm "class," and became partners in the firm together with two others at the beginning of 1986. Although we were competitors for the "brass ring" of partnership, and our backgrounds are quite different -- I'm a Democrat who attended public schools in Pittsburgh -- those factors had no affect on our relationship. I have come to like and respect Scooter immensely, even if I disagree with his politics.

The Scooter I know is a regular guy, a good lawyer with sound judgment, a very hard worker, but also a friend willing to play on the firm softball team or organize touch football games for other busy hard-working people. If Scooter asked me to join a game once, he asked ten times, and ultimately succeeded in getting me to play. My lasting impression of Scooter is on the field, playing shortstop (compensating for a weak arm with good positioning and anticipation) exhorting his teammates with words of encouragement. The media reports often refer to Scooter's reserved demeanor, and Andover/Yale background, but the Scooter I know was reserved only about his background, first name, and politics. Scooter is outgoing and enthusiastic about many other things, such as sporting events, a good legal argument or strategy, or even a good joke.

My impression is that Scooter plays by the rules. When he and Harriet became serious, she chose to leave the firm rather than maintain the awkward situation of an associate dating a partner. Their subsequent marriage proves that both believe there are more important things in life than politics. (As young lawyer, Harriet was quite outspoken and very much a Democrat.) As a young partner trying to build a practice, Scooter let the senior partners take the credit for his good ideas; yet, he was first to acknowledge the work of more junior lawyers. I never saw Scooter even tempted to do something unethical or illegal. I still find it hard to believe that his FBI interviews and grand jury testimony brought on such difficulties. It is so at odds with the character of the person I know. Scooter's boyhood friend, Nick Brommel, wrote in an article on Salon.com (Jan. 24, 2007), describing Scooter as "[e]asygoing, tolerant, humane, balanced, modest and witty . . . ." The fellow Brommell describes is the guy I know.

I hope this letter shows you a side of Scooter that is apparent to so many of us. Scooter is a good person in a bad situation. Please be lenient.

Yours truly,

Kenneth M. Simon

ALAN K. SIMPSON



# United States Senator (Ret.)
WYOMING

April 17, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United State Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

My name is Alan K. Simpson. I served as United States Senator from Wyoming from
January 1979 to January 1997. I was elected Assistant Majority Leader of the United
States Senate in 1984 under the superb leadership of the then Majority Leader Senator
Robert Dole. I served in that capacity for ten years. During my first election to the
United States Senate in 1978, I campaigned with a young man running for Congress from
the single Congressional District of Wyoming, one Richard B. Cheney. We were both
successful in that campaign and served together in Congress for ten years until he was
nominated by President George H.W. Bush as Secretary of Defense.

In view of that long relationship with my old friend Dick Cheney I came to know Lewis
"Scooter" Libby. During my years of my friendship with Scooter, I found a singular
attribute which will always remain undiminished in my mind. That is the attribute of
Loyalty – unswerving, unselfish, unwavering loyalty. One could also almost
superimpose upon his brow the accolade "The Good Soldier." I have seen him perform
tasks and achieve results when it seemed to me that nothing could be forthcoming. I have
seen him "at the side" of my old friend Dick Cheney – attentive, thoughtful, gracious,
patient and always – always – exceedingly efficient and I observed on many occasions
how Dick relied on this man. The situation that has been presently played out is a bitter
pill for all of us.

I came to know Scooter even better during my time on "campaign swings" – various
election cycles when the Vice President would be "on the road" – most always with his
dear daughter Mary Cheney and often with Scooter. They were a remarkable
combination. Scooter would review speeches, gather information, prepare
memorandums, prepare position papers, vet issues and persons, assist in scheduling and
be a sound and honest source of advice – always.
He is not some hard-hearted partisan who delights in subterfuge, or "cover up", or
mendacity. He is a splendid human being.

I am fully aware of the skills, patience and judicial temperament you espoused during the trial. I commend you. I am not aware of all of the vagaries of the case – which I believe you presided over in splendid fashion. I shall always remain eternally puzzled how the situation ever "came to this." Some are of the opinion that he has "fallen upon his sword" and yet, it is my perception that the sword has fallen upon him!

When I think of what has happened to him – words fail me (and who of my friends would believe that one?!) because all of this is so totally inconsistent with the basic attributes and the reputation of the man I know. I have never heard him whimper or whine during these entire proceedings – never commenting on "his situation" and always just "being there" in his steady, thoughtful, perceptive way – and always remaining a friend to his friends.

It was a tough case, with a tough result, and now you move on to the tough issue of sentencing. I just wanted to share these things with you Sir, about my friend Scooter Libby. From my knowledge of him, I say without equivocation or hesitation whatsoever, that he is a very good man.

Please advise if I may furnish any further information regarding this fine person. God Bless you in your deliberations.

Sincerely and with great respect and high regard,

Alan K. Simpson
U.S. Senator, Wyo. (Retired)

April 28, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

Dear Judge Walton:

My name is Patrick C. Smith and I am writing the court on behalf of Lewis "Scooter" Libby.

Last July I retired from the United States Secret Service after more than thirty (30) years of service. My relationship with Scooter Libby began in January 2001, upon my assignment as Special Agent in Charge of the Vice Presidential Protective Division. During the subsequent five (5) years I came to know Scooter Libby well both professionally and personally.

Professionally, I worked closely with Scooter Libby almost daily on a variety of issues regarding Vice Presidential security, the White House complex and many other issues vital to national security and of vital interest to the country. I came to know Scooter as a man of the utmost integrity, a consummate professional and a patriot. As can be imagined the White House can be a highly charged environment. In the wake of the tragic events of September 11th, that environment was charged beyond all of our imaginations. Yet, for his part, Scooter Libby showed courage and resolve, dedication and compassion, grace under pressure and love of country. With the daily pressures, deadlines and stress of his position, I routinely witnessed Scooter Libby's ability and willingness to step back from the fray and look after the professional and personal needs of his staff and others he encountered.

Personally, I have come to know Scooter's wife and two (2) young children and have witnessed first hand the love and devotion Scooter Libby has for his family and they for him. As a husband and father myself, I have no doubt that the greatest regret and pain that Scooter Libby has personally experienced during this ordeal, is the pain and worry for his welfare that his family has had to endure. The Libby family has undoubtedly suffered greatly to this point and is extremely concerned for their husband and father's future and that of their family as a whole. I know that is yet to be determined. I also know that a father needs his children, but children need their father more.

Your Honor, my professional and personal experiences and observations regarding Lewis "Scooter" Libby have proved him to be nothing less than a man who deeply loves his family and his country. With the utmost respect for the court and the decision you have to make, I sincerely hope that my comments on Scooter Libby's behalf will be favorably considered in weighing his future and that of his family.

Respectfully,

Patrick C. Smith
United States Secret Service (Retired)

March 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Ave. NW
Washington DC  20001

Dear Judge Walton,

I am a former small business owner who closed my business of 17 years after witnessing
the assault on democracy at the hands of the GOP in disenfranchising thousands of low
income African American voters in Ohio in 2004.  Since I am a mother, I felt it was my duty
to pay attention to what was occurring in our country and work for change, so I closed my
business.  I closely followed the I Lewis Libby trial and am outraged at the members of the
Bush Administration who blatantly used political revenge on a dedicated covert agent Ms.
Valerie Plame Wilson (as her testimony under oath to congress proved).  I realize the trial
was not about outing Ms Wilson, but perhaps if members of the Bush Administration, such
as Mr Libby, did not attempt to obstruct justice, real justice could be served.  Regardless,
Mr Libby was convicted of lying and obstructing justice.  I urge you to make an example of
him to send a message to others that this behavior will not be tolerated.  Since Mr Libby
will likely be pardoned by President Bush, I urge you to not allow him to remain free while
on appeal , but instead to immediately send him to prison, where he belongs.

Thank you for your consideration.

Sincerely,

Dorri Steinhoff

cc:
Mr William H. Jeffress Jr
Baker Botts LLP
1299 Pennsylvannia Ave. NW
Washington DC  20004

# ⬛ Capital International℠

Walter P. Stern
Vice Chairman of the Board

Capital International, Inc.
630 Fifth Avenue, 36th Floor
New York, New York 10111-0121



April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Court House
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing, as a friend and admirer of Scooter Libby.  I am a senior officer of The Capital Group Companies, a large investment management firm, and have been active in the public policy area as the (recently retired) Chairman of the Hudson Institute and a co-founder of The Washington Institute for Near East Policy, along with a number of other pro-bono activities.

I have known Scooter, since he joined the office of the Vice President – where I had occasional  meetings with him in his official capacity.  Since leaving that office, he has – until his conviction – been working part time at Hudson Institute where I have gotten to spend considerable time with him and his family.

I hold the view that Scooter's conviction for perjury and obstruction of justices is absolutely inconsistent with my knowledge of his character and integrity.  This is a man who devoted himself selflessly to doing what he felt was in the best interest of his country.  While the very long hours he put in in meeting his obligations took a toll on family life, he tried his best to be a good father and husband.  Scooter has a great wife (Harriet) and two kids (one teen-age and one pre-teen-age) to whom he is totally devoted – and who badly need him at home.  Serving jail time will – in my opinion – have a devastating effect on these two kids.

Scooter is a man devoted to public service and an individual of the highest personal and professional integrity in every endeavor in which I have had the opportunity to observe him.

I hope you will take these factors into consideration in your decisions on his future life.

Sincerely,

Walter P. Stern

WPS:sr

## PAUL SCHOTT STEVENS



April 30, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman US Courthouse
333 Constitution Avenue, NW
Washington, DC 20001

<div align="center">Re: <u>United States vs. Libby</u></div>

Dear Judge Walton:

I currently am President and CEO of the Investment Company Institute, the national association of
US mutual funds. Earlier in my career, I was in private law practice as a partner of Dickstein Shapiro &
Morin and later of Dechert LLP. I have known Scooter Libby and his wife Harriet for more than
twenty years, having worked closely with him at both of these firms. Like Mr. Libby, I also have served
at the White House in senior positions having responsibility for national security affairs. Between 1987
and 1989, I was Special Assistant for National Security Affairs to President Reagan; Executive Secretary
(chief of staff) of the National Security Council (NSC); and the first Legal Adviser of the NSC, a
position established in the wake of the Iran-contra affair. I am writing to offer the Court my
perspective based on this shared experience.

I look back on my two years at the White House and NSC as the most mentally and physically taxing of
my professional career. The national security agenda in those days concerned, among other things, the
Cold War, US-Soviet summitry, the INF treaty and conflict in the Persian Gulf. By comparison to me,
Mr. Libby served at the White House considerably longer and during an even more challenging period
in our history, through 9-11 and well into the war in Iraq. On those occasions I had to meet with him
while he was at the White House, he seemed physically fatigued and mentally exhausted. We spoke of
the toll exacted by his long and relentless official schedule, which made even the most demanding
periods of our private law practice pale by comparison. At that level of government, of course, all the
issues are complex and difficult and consequential. Despite everything, Mr. Libby was sustained, I
know, by the thought of serving our nation to the very best of his considerable abilities. He spoke to me
of what a privilege it was to be called upon to do so.

April 30, 2007
The Honorable Reggie B. Walton
Page two

The offenses for which Mr. Libby has been convicted are altogether out of keeping with the person I have known as a friend and law partner and colleague in the national security field. I firmly believe they are not representative of his personal character. Nor are they indicative of the honorable quality and high value of his service to the United States over many years, not only at the White House but also at the Defense Department and State Department. As the Court considers sentencing, I hope it will bear in mind the full record of that service and the attendant personal sacrifice it has involved.

Sincerely,

Paul Schott Stevens

**THE STEVENS AND SCHRIEFER GROUP**
A STRATEGIC COMMUNICATIONS COMPANY

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton,

I am writing to offer my opinion of one of the finest men I know, Scooter Libby.

By way of introduction, I'm a writer (books and television shows) and political consultant. I first met Scooter in the summer of 2000 while working on the Bush-Cheney campaign. We became close friends over our shared love of literature and our mutual enjoyment of the outdoors.

As you no doubt know, campaigns, especially Presidential campaigns, can be brutal affairs. Like other intense, high pressure endeavors, campaigns can be quite illustrious of a person's character, temperament and values.

In the twenty plus years I've been involved professionally in campaigns, I have never known anyone to act with as much decency, ethical concern and integrity as Scooter. We worked together in the 2000 and 20004 campaigns and on numerous occasions, Scooter was the calm voice in the room reminding us that we should be conducting the campaign in a manner consistent with the highest ethical standards and that we should never let the seeming urgency of each day's crises distort a fundamental sense of right and wrong. In the campaign world, this is rare indeed.

I remember vividly being cross-examined by Scooter – there is really no other word to describe it – as to the accurateness and basic fairness of some campaign material I was preparing. His concern was focused not on the effectiveness of the material but rather on more fundamental questions of honest representation. This may seem rudimentary but, rather shamefully, I can say that it is exceedingly rare behavior in a campaign environment. It reflects a fundamental concern with issues of right and wrong that supersede the expediency of the moment.

Without speaking to the specifics of this case, I can only say with all my heart and conviction, that the Scooter Libby I know and have seen operating under intense pressure, has always evidenced the highest character and integrity.

Thank you for your consideration.

Yours,



Stuart Stevens

# Schnader
### ATTORNEYS AT LAW

1600 MARKET STREET   SUITE 3600
PHILADELPHIA, PA 19103-7286
215.751.2000  FAX 215.751.2205  schnader.com

April 30, 2007

Dennis R. Suplee
Direct Dial 215-751-2068
Direct Fax 215-751-2205
E-mail: dsuplee@schnader.com

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Re:     *I. Lewis ("Scooter") Libby*

Dear Judge Walton:

Immediately after graduation from Penn Law School in 1967, I joined the Schnader Firm, more particularly its Trial Department, where I have spent my entire career. I served as Chairman of the Firm from 1992 to 1998. I have handled a wide range of civil litigation, including antitrust, RICO, patent and trademark cases, commercial and insurance coverage disputes, and defense of mass tort litigation. Earlier in my career, I was assigned by the Court to handle a number of criminal cases on a pro bono basis, including three murder cases.

Besides handling a busy trial practice, I have co-authored two books on pretrial and trial practice, one now in its fourth edition.

I am a Fellow of the American College of Trial Lawyers and served as Regent for Pennsylvania, New Jersey and Delaware from 2001 to 2005. I am a Fellow and Vice President of the International Academy of Trial Lawyers. I serve on the Boards of St. Joseph's University, Mercy Fitzgerald Hospital and pro bono net.

I have known Scooter Libby for more than 30 years and have always had a very high opinion of his abilities and integrity.

In 1974-1975, along with a couple of my partners, I lobbied hard to convince Scooter to join the Schnader firm. We were delighted when Scooter decided to come with us, and very disappointed when he left in the early 1980s, though we all understood his desire to render public service.

After he left, I stayed loosely in touch with Scooter, partly for selfish reasons (that is, I was hoping he would rejoin Schnader when his government stint was over) but mainly because I did not want to fall out of touch with such a remarkable person.

Schnader Harrison Segal & Lewis LLP

NEW YORK   PENNSYLVANIA   CALIFORNIA   WASHINGTON, DC   NEW JERSEY   DELAWARE

PHDATA 1438287_1

Schnader
ATTORNEYS AT LAW

The Hon. Reggie B. Walton
April 30, 2007
Page 2

In the mid 1990s, when Scooter was looking to join a private firm, I tried very hard as Chairman of our Firm to convince him to rejoin us in our D.C. Office. I regarded him then - - as I do now - - as an exceptionally fine lawyer and exceedingly decent person.

Scooter did outstanding legal work when he was with us. (More about that below.) Perhaps more important, he became a great favorite of lawyers at every level, as well as staff.

Scooter was unfailingly courteous, indeed deferential, to senior lawyers, including those less intellectually gifted (which meant just about everybody). It is a long tradition at the Firm that, since we are all lawyers, from Day 1 the youngest lawyer is expected to address all others by first name. Scooter had great difficulty with that custom. One day about a year after Scooter had joined us, Irving ("Buddy") Segal, then the Firm's most demanding lawyer and best trial lawyer, mused aloud whether Scooter, of whom he was very fond, was ever going to address him as Buddy. Had Scooter called him "Mr. Segal," Buddy would have reprimanded him; for a long time, Scooter somehow found a way of talking to Buddy without ever addressing him by any name.

What made Scooter so admirable is that he was not only courteous and thoughtful in his dealings with his seniors at the Firm, but was exactly the same way in dealing with secretaries, receptionists, messengers, et al. There was no one here who did not regard him with great fondness.

During his tenure with us, I worked closely with Scooter on an antitrust case against our client UPS, tried before Judge Kevin T. Duffy and a jury in the Southern District of New York in 1980, in which Scooter took lead responsibility for preparing our accounting experts to testify; and on a breach of contract action involving allegedly defective computer chips in which we represented Western Electric. In both cases, Scooter did, by any standard, truly first-rate work for the client. During the trial of the UPS case in particular, we were working long hours and there were, as in any such case, some tense moments as we grappled with the other side's latest gambit. Never once during that time did Scooter suggest taking any ethical or professional shortcut.

But the case that speaks best about Scooter was a much less complex case: a suit brought on behalf of a teenager who had lost an eye as a result of an unfortunate accident involving a BB gun. Plaintiff brought suit against (a) James Rooney (not his real name), another teenager, who had pulled the trigger on the BB gun, mistakenly thinking the safety was on, and (b) the manufacturer of the BB gun on the theory that the safety was defectively designed.

We were retained to defend James Rooney by his family's homeowner's insurance carrier. The case was assigned to Scooter.

PHDATA 1438287_1

Schnader Harrison Segal & Lewis LLP

JCHNAUCI
ATTORNEYS AT LAW

The case against James Rooney was strong: by his own admission, he had pointed the rifle at plaintiff and pulled the trigger, resulting in plaintiff's loss of an eye. Accordingly, the Rooneys' insurance company paid its policy limits to resolve the case against James Rooney.

But that was not the end of the matter. Plaintiff's case against the manufacturer went to trial. In Pennsylvania in such a situation, where one defendant has settled and the other has not, the case goes to trial against both defendants with the jury unaware that one defendant has settled. The theory is that if the jury finds in favor of plaintiff against the non-settling defendant for $X, it is necessary to know whether the settling defendant (here, Rooney) was a joint tortfeasor, in which event the verdict will be reduced either by the amount of the settlement or proportionately. Usually counsel for the settling defendant gives a short pro forma opening, does not cross-examine or put on a case, and makes a short pro forma closing. Since his client has nothing at stake, best to stay out of it.

The Rooney case was different. Though there were no dollars at stake, the jury's verdict mattered greatly to James Rooney and his parents. They believed that the accident was exclusively the manufacturer's fault; that, however immature James's actions, the accident never would have happened if the safety had not been designed in such a way that it was so confusing as to whether it was on or off. In short, they were earnestly hoping for a judicial determination that plaintiff's loss of an eye was not James's fault.

Rather than brushing off the Rooneys and going through the motions, Scooter defended the case against James Rooney as fervently as any lawyer could have. It would be nice to say that the case ended with a verdict in James Rooney's favor. It did not. But that, of course, is not the point.

That kind of defense did not matter to the insurance company that had retained us or, for that matter, to anybody else. It mattered only to the Rooneys. And Scooter would not turn his back on them.

Scooter's conviction is utterly out of character with all of my experience with him and everything I know about him.

Respectfully,

Dennis R. Suplee
For SCHNADER HARRISON SEGAL & LEWIS LLP



Amy H. Swonger

April 26, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Amy Swonger and I am writing in support of Scooter Libby. I met Scooter in 2004 during his time as Chief of Staff to Vice President Dick Cheney and worked for him as a Deputy Assistant to the Vice President for Legislative Affairs.

Scooter is a hard working and dedicated public servant who always demonstrated the highest standards of integrity and commitment to his country. He is a consummate professional but more importantly a decent human being. He is well liked by his colleagues and staff whom he treated with the utmost respect.

Although humble and quiet, those who know Scooter enjoy his sharp sense of humor and affable personality. It was not unlike him to crack a joke to lighten the mood of a tense situation.

It is also important to note that even with the long hours and demanding nature of his job, Scooter's family remained a priority. He is an admirable dad and husband.

I hold Scooter Libby in the highest regard and thank you for your consideration.

Sincerely,

Amy H. Swonger

GEORGETOWN UNIVERSITY

*Department of Linguistics*

April 4, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue NW
Washington, DC 20001

Dear Judge Walton,

My title is university professor and professor of
linguistics at Georgetown University, where I have been
a member of the linguistics department faculty since
1979, when I received a PhD from the University of
California at Berkeley.  I have published twenty books
and over 100 articles in my field, including those for
which I am best known outside academia: You Just Don't
Understand: Women and Men in Conversation, which was on
the New York Times best seller list for nearly four
years in the early 90's, and my most recent You're
Wearing THAT?: Understanding Mothers and Daughters in
Conversation, which was on that list for ten weeks last
year.  Although most of my books are concerned with
personal relationships, as seen and understood through
ways of speaking, I have also written a book about
public discourse, The Argument Culture.  In connection
with these and other books, and generally as a
commentator on the use of language in public life, I
have appeared on most major radio and television news
and information shows, and have written for most major
magazines and newspapers, including Time, Newsweek, The
New York Times, The Washington Post, USA Today, and The
Harvard Business Review.  I write to you today,
however, as the ███████████████ of Scooter Libby.

I have known Scooter and his family for nearly a dozen
years, ever since my husband and I ███████████████
██████████████████████████.  As next-door neighbors, we
have had many occasions to observe and benefit from
Scooter's generosity and kindness, and to observe his
dedication to his family as well as the personal
sacrifices he made to enter public service.  I have
sincerely admired Scooter for these characteristics,
even though I am a passionate liberal Democrat.

*3700 37th Street, N.W.*

*ICC 479  Box 571051  Washington DC 20057-1051*

*Telephone (202) 687-5956  Facsimile (202) 687-6174*

*www.georgetown.edu/departments/linguistics*

Scooter's neighborly generosity showed itself as soon
as my husband and I moved into this house, and has
reasserted itself regularly ever since.  For example,
early on, I appeared on his doorstep and asked to
borrow a tool that is needed to turn a valve that
regulates our septic field.  Scooter not only
graciously produced the tool; he walked with me to the
valve and did the job himself.  When he spied my
husband laboring to dig our car out of a pile of snow,
without saying a word, Scooter retrieved a shovel and
began working alongside my husband to dig out the car.
These are just two of many examples that we quickly
came to take for granted, as Scooter and Harriet
distinguished themselves as inordinately considerate
and helpful ████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████    This has given
me the opportunity to observe first-hand Scooter's
devotion to and involvement with his children, which
attests both to the kind of person he is as well as to
the sacrifice he made in entering public service.  When
I first moved into this house, Scooter was a highly
paid and busy attorney.  Yet I saw that he spent all
his non-working hours with his family, engaging in
various games and activities with his children on that
lawn.  When he left the private practice of law to
enter government service, the long hours demanded by
his position meant curtailing those hours with his
children--hours of their childhoods irretrievably lost
to him.  During the years he has served in this
capacity, I have come to expect that each weekend I
will see him out there, running, playing, engaging his
children in the direct, physical way that I believe all
children wish for from their fathers, and few, I think,
enjoy.

Add to this an unfailing courteousness and gentlemanly
warmth that Scooter exhibits whenever our paths cross.
One last example: Scooter and I happened to meet at the
polling place on election day last November.  Despite
the concerns that were no doubt weighing heavily upon
him at the time, he expressed the most sincere sympathy
to me regarding my father's recent death.  The
emotional tone of his words, the look of empathy on his
face, communicated a sincerity that would be hard to
dissemble.  I remember thinking as I walked back to my
car that it was astonishing for him to evince such
sincere concern for my loss, which was, after all, an
expected part of the normal life cycle, even though he
was at the time going through a most unexpected and
doubtless overwhelming personal ordeal of his own.

In sum, my experience as his ████████████████ has left me with an unalloyed sense of Scooter as a person of unusually large complements of generosity and kindness toward acquaintances and devotion to family who made a significant personal sacrifice when he entered government service.  I hope your honor will take these qualities into account when determining an appropriate sentence.

Sincerely,

Deborah Tannen
University Professor

# Dechert
LLP

2929 Arch Street
Philadelphia, PA 19104-2808
+1 215 994 4000 Main
+1 215 994 2222 Fax
www.dechert.com

JOSEPH A. TATE



April 18, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

As you may know, I represented Mr. Libby during the grand jury investigation. I write to you now on behalf of Mr. Libby as you consider the sentence that you will impose on him.

I am a lawyer admitted to practice in Pennsylvania since 1966 and before various U.S. District Courts and Courts of Appeals around the country, as well as the United States Supreme Court. Before entering private practice, I spent four years as a prosecutor with the U.S. Department of Justice in Washington. I am a partner in Dechert LLP in Philadelphia.

I have known Mr. Libby for over thirty years. He was an associate of mine for some years and we worked very closely together on many matters. We became close friends then and have remained so over the years. After several stints in government service, he returned as a partner of mine, serving as the Managing Partner of Dechert's Washington, D.C. office. We remain close friends today.

My representation of Mr. Libby involved preparing and representing him at both FBI interviews and both times he testified before the grand jury. As you know, his testimony on those four occasions was the subject of the charges against him. Mr. Libby could have asserted the protections of his Fifth Amendment privilege and not testify. He felt that he did nothing wrong and, as a public servant, he should not decline to testify. He was straight forward and felt a civic and professional obligation to testify. Keeping in mind that he was not the cause of any leak and committed no crime, he went forward to the best of his abilities to cooperate with the government. I have never doubted the honesty of his recollections at that time or now.

I will not express my opinion on the verdict. I must accept that. But I will tell you that Mr. Libby's decision not to assert his privilege and to go forward is entirely consistent with the man I have known for these many years. Clearly, if he asserted his privilege as most citizens would, he would not be in the mess he is in. But he is honest and forthright and wanted to act like a good citizen and assist in the investigation. In all my dealings with him over these many years, I have

U.S. Austin  Boston  Charlotte  Harrisburg  Hartford  New York  Newport Beach  Palo Alto  Philadelphia  Princeton
San Francisco  Washington DC   EUROPE  Brussels  London  Luxembourg  Munich  Paris

**Dechert**
LLP

known a man committed to doing the right thing the right way. In his sessions with the FBI and the grand jury, he made every effort to be thorough, answer the questions asked and provide honest answers. I have no doubts with regard to his honesty and veracity.

It has been said that a man should not be measured by one act, but rather by a lifetime of acts, both good and bad. He has gone far beyond most professionals, and for that matter most citizens, and devoted his life to public service and protecting our country. He has given up the riches of a law firm and/or corporate life to serve his President and the nation. This misstep should be viewed in that perspective and I urgently ask you to do that.

I believe you have in front of you a man who is honest, is of high moral character, has served his country and his President to the best of his abilities. In that context, I plead with you to show mercy on him when you fashion your sentence. Consider his lifetime of remarkable achievements, of service to the country, his decision to cooperate and weigh that against this prosecution and verdict.

I thank you for your consideration of these facts.

Sincerely,

Joseph A. Tate

JAT/dt

# Allan R. Tessler

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.

Your Honor:

My name is Allan R. Tessler and I live in Jackson, Wyoming. I am a retired member of the federal and state bar of the state of New York where I spent the bulk of my professional life. I am the chairman of the Hudson Institute, a trustee emeritus of Cornell University, a national governor of the Boys and Girls Clubs of America, and a director of a number of corporations, both public and private. I write to you respectfully to assist you in your sentencing deliberations in the case of I. Lewis Libby ("Scooter Libby").

The conviction of Scooter Libby has shocked my entire family and me for it is so antithetical to our deep respect and affection we have for him and his family. I have known Scooter for approximately six years and have visited with him in Washington and at home. His family has dined at our home and we consider him a close friend. I have always been a deep admirer of his sense of duty, work ethic and complete immersion in life as a public servant. The intensity and sacrifice made by Scooter in the public interest was vividly brought into focus for me and my fellow trustees at the Hudson Institute by a talk Scooter gave at a dinner meeting describing a typical day of duty at the White House. He noted that his day began by leaving home before dawn, working through numerous meetings and briefings with the Vice President and others and tending to other required duties before returning home to his family in the evening. We were all surprised by this described intensity of the day dealing with matters of important national interest and the many personal sacrifices which his professional life required. Given the nature of his work, it is difficult for me to address the specifics he covered, but I sincerely believe his work was part of his deeply held belief that he was working for the good of the United States.

Scooter and his family have had a tragic and crushing experience, both emotionally and financially, as a result of his conviction. I am a believer in the judicial process in our country as the best system devised under our Constitution. I am also respectful of the responsibilities placed on you by the system in your role as the sentencing judge. I hope that you will be able to take into account the already heavy costs borne by Scooter and his family; his dedicated service to the country and the views of me and others who stand by Scooter's personal integrity. I hope that you will be fair and lenient to Scooter in the circumstances.

Respectfully Yours

Allan R. Tessler

Diane Thompson



April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

I have been Joseph Tate's secretary and assistant since 1970, first at Schnader, Harrison, Segal & Lewis and from 1991 at Dechert LLP.  I am writing to you on behalf of Mr. Scooter Libby and ask that you consider my letter as you impose a sentence upon him.

I met Mr. Libby over thirty years ago when he came to Schnader as an associate in 1975.  Mr. Libby worked closely on several matters with Mr. Tate up until the time he left the firm in 1981.  Because of his close friendship with Mr. Tate, and as the Managing Partner of Dechert's Washington, D.C. office, I have spoken with Mr. Libby over the years, including when Mr. Tate represented him during the grand jury investigation.

"Scooter" was hard-working, diligent and committed to whatever he was doing.  He treated everyone with consideration and respect, whether you were an attorney, secretary or messenger.  I believe Scooter's ability to connect with people on every level is due to his high moral character, honesty and concern for his fellow citizens.  Scooter's move to public service clearly showed his desire and sincerity to do more for his fellow man and country than the average person.  I have the utmost respect and admiration for him.

My most recent contacts with Scooter were during his preparation to appear before the grand jury.  At all times his desire was to cooperate with the government and tell the truth.  He worked tirelessly to do that.  Never did he entertain the thought of doing anything but testifying.  He felt a real obligation to do the right thing … testify and tell the truth.  There is no doubt, in my mind, that is what he has done.

-2-

English author and satirist, Douglas Adams said, "To give real service you must add something which cannot be bought or measured with money, and that is sincerity and integrity." Scooter Libby has given "real service" to his country and fellow citizens.

I ask that as you think about the sentence you must impose you consider the whole of Scooter's life – his dedication to his family and friends, his sincerity in working for the public good and his integrity in telling the truth.

Thank you in advance for your consideration of my letter.

Sincerely,

Diane Thompson

**Larry D. Thompson**



April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Walton:

My name is Larry D. Thompson, and I served as Deputy Attorney General of the United States from 2001 to 2003.  It was as Deputy Attorney General when I first met Scooter Libby.  Scooter and I sat next to each other in previously assigned seats at numerous Deputies' meetings of the National Security Council.

What impressed me most about Scooter Libby during the time we spent together was his absolute devotion to our country, as well as his basic honesty and integrity.  Scooter and I had entered public service at relatively advanced stages in our respective careers.  In discussing this fact, Scooter acknowledged the financial sacrifices involved, but would often smile, and, as I remember it, would say something like this is important and "we need to do it."  Like many other similarly situated public servants, I consider Scooter Libby a patriot.

I also became very fond of Scooter.  Despite his very busy schedule, he was kind to his colleagues.  He was very generous with his time and counsel to me, a Washington newcomer, on how to navigate the labyrinth of relationships one must deal with in Washington in order to be effective.  I will always appreciate his warm smile and good counsel.

As a lawyer, while I respect the jury's decision in Scooter's case, I find it completely inconsistent with the person I know, and worked with, during some of the darkest hours in our nation's history.  The Scooter Libby I know is a good man who deserves all the consideration Your Honor can give him during this difficult period of his life.

Sincerely,

Larry D. Thompson



April 11, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

      I will retire as a partner at the end of April from Dechert LLP, having practiced law for over 41 years.  I spent the first fifteen years of my career in government service on the staff of the Securities and Exchange Commission where I was schooled in pursuing the public interest.  My last post at the SEC was as deputy director of the enforcement division when Judge Stanley Sporkin was the director.  Since entering private practice in 1979, I have been active in bar associations activities and have served as chair of ABA and Federal Bar committees, including chairman of the executive council of the Securities Law Committee of the Federal Bar Association.  I have also been an adjunct professor of the law schools of Georgetown, American and George Mason universities.


      I met Lewis Libby when I joined Dechert LLP in 1996.  From 1997 until he left to join the Vice President's staff in 2001 we were in adjoining offices, and for a portion of that time Lewis Libby was managing partner of

the Washington office of Dechert. Although we did not work on matters together, we did discuss cases and issues, and I had the opportunity to see how he approached the law. I saw someone whose approach was always of the highest ethical standard. There was never a hint that he would cut a corner. I believe that he is not capable of unethical conduct.

I also believe his first calling and his ultimate dedication was to public service. Having known Lewis Libby for over 10 years and having had almost daily contact with him for a five year period during which I observed his character, I do not believe he would ever intentionally mislead government investigators or obstruct an investigation.

Sincerely,

Wallace L. Timmeny

### James E. Tolan, Esq.



April 5, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I submit this letter for your consideration at the sentencing of I. Lewis Libby.

I am a member of the Bar of the State of New York and various other courts of the
United States and have been practicing for about 45 years.

I am presently Senior Counsel at Dechert LLP.  I am a member of the Board of the
Fordham Alumni Association, a past President and a recipient of its Medal of
Achievement.  I am a member of the Board of Advisors of the Fordham University
School of Law Crowley Program in International Human Rights.  I am a Fellow of the
American College of Trial Lawyers and a member of the Character and Fitness
Committee, of the Supreme Court of the State of New York, Appellate Division, First
Department.

I have known Mr. Libby for approximately 12 years, having practiced law together as
partners at Dechert from approximately 1995 to 2000.  I also had the good fortune  to
have worked closely with him on a significant case and observed his conduct during the
course of that representation.

Based on the above, I always found Mr. Libby to act in a totally professional manner,
courteous but firm, honest and a man who's integrity was beyond question.  I state
without reservation that if I were faced with a serious legal matter I would not have
hesitated to consult with Mr. Libby and place my future in his competent professional
hands.  Mr. Libby's conviction of perjury and obstruction of justice is totally inconsistent
with my knowledge of his character and integrity

Respectfully,

James E. Tolan

April 30, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton,

From February 2002 to February 2006, I, Sarah Straka Wallerstein, worked in the Office of Vice President Cheney, serving as Mrs. Cheney's personal aide.  I met Scooter Libby my first day of work in the Vice President's office.  I remember this instance, as we were seated next to each other in a motorcade to a black tie dinner and my predecessor had specifically instructed me to wear a suit (not a black tie outfit) to the event.  Well, as soon as Scooter saw me, he said, "So, first day... they forget to give you the dress code memo," but spoken in the most jovial way that I would grow to love over the next few years. He instantly made me feel comfortable, when I was anything but. This interaction, while brief, was representative of the respect, concern, and thoughtfulness that I witnessed Scooter demonstrated in his interactions with his colleagues and subordinates, at all levels, during the 4 years that we worked together.

During my 4 years working for Scooter, the core group of traveling staff for the Vice President was extremely small, and Scooter helped to foster a close knit family environment.  Most of the traveling staff was young, unmarried, and without children, and Scooter and his wife, Harriett, and their children, ███████████ it upon themselves to include us in holiday plans while we were away from our homes in Washington, D.C.

One Christmas Eve, even though the Libby's celebrated Chanukah, they took other traveling staff members (who did not have families with them) out for dinner and made a special point that the dinner was for Christmas!  Not only did this reiterate to me how thoughtful Scooter was that he thought of the rest of the staff being sad without their families, he also wanted to make sure everyone felt included, when he could have easily spent the holidays solely with his family.

I got to know Scooter and his family especially well during the summer months and holidays in Wyoming, when our staff often had to be away from their loved ones and families.  Despite the fact that Scooter was usually up hours before anyone else on the staff (or most working people, for that matter) so he could be prepared to brief the Vice President; Scooter always treated his family and his "extended family" (our staff) as a

priority; making time to introduce his children and staff to some of the activities such as mountain biking, and skiing that Scooter enjoyed in Wyoming.

In the midst of the Vice President's Debate preparation and campaign frenzy in October 2004, my future husband flew to Wyoming, where we were staying that weekend, to propose marriage. Scooter was out to dinner that night with other members of the senior staff and the debate prep team, but took time to come meet and congratulate my fiancé and I. This side of Scooter, the side that truly cared about what the rest of his staff was doing, personally, was a side that made him so endearing to us.

Scooter Libby demonstrates that it is possible, despite how busy or important someone is, to make those around you (above, and more importantly below!) feel respected, and important -- and to treat family as the number one priority. His leadership inspired all employees to work hard and treat everyone with respect and dignity, despite the personal hardship and time away from one's "real" family that comes with serving in the White House.. He would always listen; no matter how busy he was, letting me bounce my future career ideas off him, everything from starting my own make-up line to becoming an actress on Law and Order, to working for Prince Charles.

Even after I left the Office of the Vice President, I still saw Scooter and his family, and Scooter always genuinely asked how my new job was treating me. His kind heart, jovial personality and utmost dedication to serving our country are traits not found in many people, but traits that were the core of Scooter Libby.

Thank you,

Sarah Straka Wallerstein

29 March 2007

Judge Reggie B. Walton
United States District Court for the District of Columbia
E. Barrett Prettyman United States Courthouse
333 Constitution Ave NW
Washington DC 20001

RE: Sentencing of I. Lewis Libby

Dear Judge Walton,

I am writing to ask for an upward departure from the range specified in the Sentencing Guidelines for Mr. Libby. My name is Michael Walsh, and I live in Saint Paul, Minnesota. A couple of months ago I took my small son to the funeral of Sgt. James Wosika, from my home town, who was killed near Fallujah on 9 January 2007. We now know that the basis for this war was not factual.

The truth can be a very serious matter. Mr. Libby's obstruction and perjury was instrumental to a larger picture of obstruction and perjury. Mr. Libby was motivated by that big picture. Many people have died. Prosecutor Fitzgerald has said that "the public has an interest here." I have a profound interest here. I do not want to lose my son to some future war based on such untruths.

When it comes to sentencing Mr. Libby, I hope you will be able to consider the extreme seriousness of his criminal purpose - and the fact that he continues to pursue that purpose, unredeemed and unrepentant.

Sincerely,

Michael Walsh

Michael Walsh

Arthur P. Fisch, M.D. *
Stephen B. Guss, M.D. *
Richard I. Watson, M.D. *
Audrey F. von Poelnitz, M.D. *
Karel Raska, M.D. *
Allen Hsieh, M.D. *
Jeffrey G. Schwartz, M.D. *
Craig M. Rosen, M.D. *

MORRISTOWN CARDIOLOGY ASSOCIATES

*Diplomates in Cardiovascular Disease
American Board of Internal Medicine
Fellows of the American College of Cardiology\**

April 28, 2007

The Honorable Reggie B. Walton
US District Court
1225 E. Barett Prettyman
US Courthouse
333 Constitution Avenue, NW
Washington, DC  20001

Dear Judge Walton,

I am writing this letter in the strong support of the character of Scooter Libby.

Few people have known Scooter Libby as long as I. We met as freshman at Yale in 1968 and are friendship became even closer after graduation. Over the subsequent years, we have kept in close contact, including vacations together, occasional visits, and frequent phone calls. Scooter Libby was the best man at my wedding.

During all of these thirty-nine years, I have always found Scooter to be a man of great intelligence, responsibility, wit, and personal charm. I have known him to be a great friend, caring husband, and loving father.

During our long relationship, there has never been any hint of any improprieties or unusual behaviors. He has always been a pinnacle of professional behavior and a responsible parent. My knowledge of him as a professional has included only the highest principles and distinctions. At a prestigious law firm, Scooter quickly rose to become a managing partner, and is greatly respected by his partners, colleagues, and clients.  As a member of the defense department and later as vice president Chaney's chief of staff, those around him showed great deference, respect, and collegiality. As a family man, he has been  an ideal father, despite recent incredible demands upon his time. Scooter's family is of great importance to him and his two young children depend upon him greatly.



PAGE TWO

I am very proud to call him my friend. I have the utmost respect for his intelligence, honesty, and integrity. If asked, I would be very willing to do whatever he would request of me, that is the type of friendship that Scooter Libby has engendered and that is the type of honorable man that he is.

Sincerely,

Richard I. Watson, M.D.

RIW/nmh



The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001


Dear Judge Walton:

I am writing with respect to my friend Scooter Libby.

As background, I was born and raised in Washington, DC and attended public schools here. I have a JD from Georgetown University and an MA in International Affairs from the University of Pennsylvania. I have spent many years in government service — on Capitol Hill as Legislative Director for US Senator John Heinz of Pennsylvania and at the US Department of Defense as a Deputy Assistant Secretary of Defense for European and NATO Policy. I have also worked in the private sector in recent years as an attorney and international business adviser.

I have known Scooter Libby since 1986. I first met Scooter through our mutual interest in sports activities at a summer weekly pick-up softball game that has continued to the present day. Subsequently, it turned out that we both greatly enjoyed playing football, and we began playing together. At first, we not only played in a regular pick-up game each Sunday during the cold weather seasons, but we also went down to the Mall and played in other games, including tackle football. Scooter was tough and a good tackler; he reminded me of Pat Fischer the 5'7" former Washington Redskins cornerback.

We continue to play football together, as recently as this year. Someone once said that you can lean a lot about a person and his character from sports. From the years playing football with Scooter, I learned important things about his character. First, he has integrity and a sense of fair play. While most players (including myself) would argue and seek advantage on close calls (with no referees we of course made our own calls), Scooter would unfailingly refrain from arguments, conceding that the other side could have actually gotten the call right, and tried to find a middle ground between the two sides.

1

Weinrod
Re Scooter Libby

Secondly, I learned the value that Scooter places on family. Scooter almost always brought his son██████to the games with him, even during the most stressful and challenging weeks over the past year or so and in fact ████has joined in the game as a part of our younger generation transition.

I have also spent considerable time with Scooter in other settings. On a professional level, Scooter and I served at the Pentagon during the same period (1989 – 1993). We were both in the Office of the Secretary of Defense, and we worked together very regularly and closely on various projects and activities. We also traveled overseas together on Defense Department business for meetings with senior officials in European governments.

In my experience, Scooter was very hard-working and dedicated, and he served his country with great skill and purpose. He had a very important role in developing Pentagon policies on a wide variety of issues during the time he was at the Defense Department. He was always straightforward in his dealings with others at the Department.

Finally, before we both were married, Scooter and I used to socialize after work. Scooter was, and is, a person who does not take himself too seriously, and who brings people together.

In sum, Scooter is a person of real integrity and a family man, as well overall a good person, who has served his nation well over many years. I very much hope Scooter's life and character will be taken fully into account in the days ahead.

Sincerely,

W. Bruce Weinrod

2

# HUDSON
## I N S T I T U T E

1015 15th Street, N.W.    Sixth Floor    Washington, D.C. 20005
202.974.2404    202.974.2410 Fax
www.hudson.org

May 1, 2007

Kenneth R. Weinstein, Ph.D.
*Chief Executive Officer*

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to you to ask for leniency in the sentencing of I. Lewis "Scooter" Libby. The man I know bears no resemblance whatsoever to the individual who stands convicted in your courtroom.

I came to know Scooter well, after he joined Hudson Institute as a Senior Advisor in January 2006. Before then, though I had met Scooter only in passing, I knew of him primarily through reputation -- as an extremely decent and forthright public servant, a policy intellectual, who – rare in Washington, was highly thought of by respected individuals on both sides of the political aisle.

Scooter's fundamental decency is perhaps the main reason why he has attracted such a distinguished group of leading policymakers and civic leaders, Republicans and Democrats, to assist in his legal defense fund efforts. I saw this fundamental decency first-hand on any number of occasions over the past year and a-half. Scooter is not only a dedicated public servant but a gentle and caring soul.

At Hudson, as in all his prior posts, he spent a significant time mentoring younger scholars and interns, as well as other policy analysts who sought his professional guidance and advice. As Scooter joined Hudson in mid-academic year 2006-2007, we shared the services of an intern, Ben Haddad, a young French undergraduate with few ties to the U.S. Haddad is immensely grateful to Scooter for generously spending a significant amount of time to mentor him.

On a personal level, I went through a rather difficult period in May-June 2006, when, two-and-a-half weeks after my mother succumbed to a long illness, my father suffered a massive cerebral hemorrhage. This was a very dark period, but Scooter, who certainly was facing immense personal challenges himself preparing for the trial, was regularly in touch and constantly of good cheer. His support was a source of real strength to me during that awful period.

Finally, let me add on a personal level for Scooter that he has two young children to whom he is intensely devoted. I know the trial and the conviction has affected them adversely in numerous ways, not the least being ostracism from their peers.

HUDSON INSTITUTE

Given Scooter's character, his long and honorable public service, and his extenuating family circumstances, I urge you to offer Mr. Libby the greatest leniency possible.

Many thanks, your Honor, for your most kind consideration.

Sincerely,

Kenneth R. Weinstein
Chief Executive Officer



LEON WIESELTIER

May 28, 2007.

The Honorable Reggie B. Walton
United States District Court
Washington D.C.

Dear Judge Walton,

I am the literary editor of The New Republic, a position that I have proudly held since 1983. I am the author of books about religious philosophy and history, and modern identity, and nuclear strategy, and also of many essays on political and cultural subjects. I am in no sense a neoconservative, as many of my neoconservatives adversaries will attest. I am, to the contrary, the kind of liberal whom many neoconservatives like to despise. (This is fine with me.)

I trouble you with these internecine details of the intellectual wars because I do not want my expression of admiration for Scooter Libby to be mistaken for ideological solidarity, or to be dismissed as the testimonial of a political comrade. What I want to say to you about Libby, as you consider his sentencing, is instead the heartfelt effusion of a grateful friend.

I say grateful, because I have been—more precisely, my family has been—in Libby's debt for a very long time. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮What I do remember is that we were desperate for legal help, and that we could not afford the legal help that the problem clearly required. I called Leonard Garment, an old friend, who agreed that something needed to be done, and he promptly put a young colleague of his on the case. The colleague was Scooter Libby. In the months that followed, Libby devoted many long hours to our difficulty, worked indefatigably and compassionately, found a solution to the problem, and did not charge us a dime. His kindness was really amazing. He had better things to do, more pressing things, more lucrative things—but he helped us anyway, and in the finest spirit of charitable assistance.

As a consequence of this moving episode, we became friends. In two decades of friendship I have found Libby to be a good and sensitive man, a man of probity, a large-hearted individual always attentive to the human dimension of things. We do not have the same politics, but there is more to life than politics, even in Washington. About his character I would put my own hand on the Bible. Should you choose to show Scooter mercy, you will not be misjudging him.

Yours respectfully,

**R. Robert Willmann, Jr.**



**Telephone:**

31 May 2007

Honorable Reggie B. Walton
United States District Judge
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue, N.W.
Washington, D.C.  20001

RE:  Sentencing letter to the Court
     U.S. v. I. Lewis Libby; No. 05-394

Dear Judge Walton:

    Truth-telling is the foundation of all that is constructive.

    I have been in and around the courthouse in Texas for almost 27 years, with time spent in the criminal law in cases from traffic tickets to capital murder, including work for seven years as a part-time magistrate in the State system.

<p style="text-align:center">I.</p>

    A big spread stretches across conduct even in homicide cases:  from the carelessness of negligent homicide,  to a deliberate and vicious murder for hire, a capital felony carrying the death penalty.

    What, then, is the worst end of the spread for perjury and obstruction of justice?

    It stares us in the face here.

    A.  Not just a lawyer.

    B.  A lawyer with experience in criminal cases, certainly experienced enough to be involved in the the case of the notorious "fugitive financier" known as Marc Rich.

    C.  Not just a lawyer with experience in criminal cases, but a lawyer who worked in the U.S. Department of State and Department of Defense.

    D.  Not just a lawyer with experience in criminal cases who worked in the Departments of State and Defense, but one who worked at the higher, policy-making areas of those agencies.

    E.  Not just a lawyer who knew criminal cases and worked in the policy-making part of the Departments of State and Defense, but one who worked as a lawyer for a U.S. House of Representatives Select Committee involving national security (the Cox Committee).

    F.  A lawyer who then will know there are people working for the Central Intelligence Agency (CIA) whose identities and work are known as "classified", or secret.  And some whose work is known as covert with a non-official cover.

    G.  But not just a lawyer described above, but one who worked in the vice-president's office in the White House, as an advisor on national security and as chief of staff.

    H.  And a lawyer who will know that if a covert officer's identity is disclosed, entire networks of informants and operations can be destroyed, and those involved can be harmed or killed.

-2-

I. A lawyer who, knowing all the above, has himself prepared for questioning in the investigation of the disclosure of Valerie Plame Wilson's identity by retaining a lawyer, and having that lawyer present when he talks to the Federal Bureau of Investigation (Paragraph 26 of Count I of the indictment).

Just as deliberate, calculated conduct constitutes the worst of criminal homicide, calling for the most stringent of sentences, so also does the deliberate, calculated conduct of deceit, lying, and obstruction of justice in its stark harshness before us.

II.

The defendant Libby's perjury and obstruction of justice occurred during the course of an investigation into the leaking of the identity of a covert CIA officer. Blowing a person's cover can get members of a clandestine network tortured or killed. This raises the question: what happened to the operations run by Valerie Plame Wilson after her identity was disclosed?

This Court would determine whether the damage wrought by outing the CIA covert officer's identity would be relevant to the sentencing of defendant Libby. An argument can be made that it is. However, simply the chance that such harm can come to others, along with the loss of an information-gathering network, and that this possibility was known to the defendant, makes his present conduct egregious.

III.

Accordingly, since the federal sentencing guidelines are now advisory, and based on the record that is known at this time, it is respectfully requested that this Court impose a sentence of 12 to 15 years.

Sincerely,

Robert Willmann, Jr.

April 29, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is Katie Wilson and I currently serve as Marketing and Communications Manager for the Global Anti-Counterfeiting and Piracy Initiative at the U.S. Chamber of Commerce. Prior to this job, I worked for the Gallatin Group, a northwest public affairs firm, and before that time, served almost three years at the White House in the Office of the Vice President.

I have known Scooter for almost five years. We first met at the end of 2002 when I was interviewed and hired for a job in the Vice President's Advance Office. I can say without reservation that Scooter Libby is one of the most selfless, respectable, dignified, kind, hardworking, intelligent, and sincere people I have ever met. I feel lucky not only to have worked with him, but also to call him a friend.

I know Scooter both professionally and personally. Professionally, Scooter is one-of-a-kind. Washington is full of individuals driven by ego, personal agendas, selfishness, and power. Scooter isn't driven by any of these characteristics. He is driven by service. Scooter Libby is the epitome of a public servant. As the Chief of Staff to the Vice President and the National Security Advisor, Scooter spent countless hours selflessly working to make the United States a better place, and he did it with an unparalleled grace. It didn't matter if you were a junior staffer like myself at the White House or a Cabinet Secretary; Scooter treated everyone with the same level of respect. I can't remember a time when I passed Scooter in the hall that he didn't stop to say hello and check to see how I was doing. I feel a great honor and privilege to have worked for Scooter. He is an outstanding professional in every regard.

When I think of Scooter on a personal level, I think of his interactions with his family. Every summer when I worked in the Vice President's Office, we would travel to Jackson Hole, Wyoming for the month of August. It was during that time that I got to not only know Scooter better, but also Harriet, ▮▮▮▮▮▮▮▮ They invited me out to dinners. I played with his children. We went bike riding. They came for visits to our staff office. Scooter Libby is the epitome of a family man.

Since I left the White House, my relationship with Scooter and the entire Libby family has continued. He has a genuine interest in my success personally and professionally. Whether it's over dinner at his family's home, or in a phone call or email to check in, Scooter is the kind of person everyone wants to have as a friend or a boss. I feel fortunate to know him and call him a friend.

Scooter's conviction for perjury and obstruction of justice is entirely inconsistent with my knowledge of his character and integrity. Any time I think about it, it's implausible. When I see something on the news, read something in the newspaper, or hear discussions about the case, words can't explain my frustration. It's tragic to me that someone who has given so much to this country has to go through all of this for no reason. I believe Scooter has done nothing but serve our country at the highest level and he should be commended.

I have a long line of West Point graduates in my family. Scooter Libby exemplifies the West Point motto, "Duty, Honor, Country," unlike anyone else I've known. Please take these important qualities into consideration.

Sincerely,

Katie Wilson

# S. ENDERS WIMBUSH



April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to attest to the extraordinary qualities and character of I. Lewis
Libby, whom I have known in various incarnations for over 25 years. My own
career as a strategist has intersected with Scooter's at many junctures. Both of us
have worked together extensively in long-range security planning exercises for
America's foremost strategist, Andrew W. Marshall, Director of the Office of Net
Assessment of the Office of the Secretary of Defense, for virtually all of that time,
including at several of Marshall's famous Summer Studies. As a senior executive
at Booz Allen Hamilton and Science Applications International Corporation, I
came to value Scooter's broad knowledge of strategic dynamics, his unerring
good advice, and his sense of fair play and team work.

From 1987-93, I directed Radio Free Europe/Radio Liberty in Munich, Germany
as the Cold War was reaching its peak. Scooter was a constant supporter and
advisor to this complex effort, which coincided with the fall of the Berlin Wall
and the collapse of the Soviet Union. These were uncertain times. During those
years, I would often visit with Scooter when I periodically returned to
Washington. I remember one lunch, in particular. It was early in 1991, and the
Soviet Union was coming apart. Radio Liberty was America's principal
broadcaster to the USSR, and our audience was substantial. I told Scooter how
uncertain I felt about how this volatile landscape was unfolding, fearing that we
might be seen as contributing to the unraveling of the Soviet state. His advice,
which I have always remembered, was very simple and correct. We cannot stop
the forces of history from taking their course, he said, but you can prepare people

thorugh your broadcasts to understand a world that seems to be fast approaching them. Keep a firm hand on the rudder and remain fair, honest and balanced. A power greater than us will decide the rest.

I have often remembered Scooter's advice, not just during my Radio time but in many circumstances later. It characterizes for me the elegant qualities of Scooter's thinking about the future and, most of all, his compassion for those who might be discomfited or disadvantaged by forces they could not control.

I do not recognize the Scooter Libby who was portrayed publicly throughout the process over which you so ably presided. The Scooter I have know all these years is quiet and modest, reserved in his judgments, careful never to cross into uncharted territory, and commited fully to the service of his country. He neither lied nor dissembled. It just isn't part of his character. He has selflessly given of himself to the larger good of his fellow citizens when he could easily have been enriching himself in the private sector. Scooter has always insisted on a higher standard. He serves because he believes that it is everyone's duty to do so. The young people who have worked with him and, especially, for him in my experience have always found his sense of duty inspirational. He is responsible for many of them seeking careers in public life.

Scooter Libby is a warm, generous and thoughtful man. To my knowledge, he has no rogue qualities of any kind: no arrogance, no hubris, no insolence, no sense of superiority. Yet he is in most respects a superior human being. I consider myself immensely privileged to have known and worked with him for so many years.

Yours sincerely,

S. Enders Wimbush

# CHRISTIAN J. WOELK

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman, United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Judge Walton:

I began working as Scooter Libby's executive assistant in January of 2005. Though the length of time I served as his assistant may not seem long, I was one of the first to see him each morning and the last each evening. I sat directly outside his door and accompanied him on all official travel.

I am confident you will receive numerous letters with reflections about the many great things Scooter has done throughout his life and how honorably he has served his country; I am certain of this because he has done so. But, the things that speak the most about the character of a man are the things that are small, those actions that most never see.

Scooter Libby, who served in one of the most senior positions in the Administration, acknowledged the little things that most bosses take for granted; he rarely walked out the door in the evening without saying thank you to his staff; he never raised his voice in anger, no matter how well deserved; he always insisted on carrying his own bags; and, in a city where one's level of importance is dictated by the order in which parties arrive on the telephone, Scooter always wanted to be the first on the line, regardless of the stature of the person he was calling.

Scooter was a master at the quiet and subtle lessons, always advising with a caring tone. He exuded a humility uncharacteristic of Washington officials, and he carried leadership in such a way that I can only hope to serve others throughout my career in a similar manner.

In the grand scheme of the great things he has done, these actions may seem like minutia, but to someone who served beneath him, they were significant. Beryl Markham once said, "If a man has any greatness in him, it comes to light, not in one flamboyant hour, but in the ledger of his daily work." I will forever admire Scooter Libby; not just for dedicating his life in service to our country, but also for the way his daily actions and considerations demonstrate true greatness.

Sincerely,

Christian J. Woelk



**Mike Woelk**

April 23, 2007

The Honorable Reggie B. Walton
United States District Court
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My acquaintance with Mr. I. Louis "Scooter" Libby is perhaps unusual among those interceding for leniency. I have only met Scooter a couple times. But he has had an indelible effect on my family. My 26-year-old daughter Christian Woelk was the executive assistant to the Vice-President's Chief-of Staff through the second administration until February of 2006. I only met Mr. Libby briefly twice through that time. As Your Honor considers the weight of his sentence, I am compelled to address what this man has meant to my daughter and our family.

From the time she was in junior high school, Christian's dream has been to see our nation return to the distinct Constitutional and religious moorings of its early history. Along that path, she has worked in the offices of U.S. Representative Joann Emerson, in the campaign of U.S. Senator John Ashcroft, and for Jack Oliver at the Bush-Cheney 04 campaign organization where she was Midwest Coordinator for Fundraising. She graduated from College of the Ozarks where she was steadily and intently trained for public affairs leadership. Her best mentor was Scooter Libby.

Scooter did not agree with all my daughter's opinions or beliefs. Yet it was his steadfast practice to draw out the strengths of his subordinates and to seek and value their opinions. He treated them with dignity and respect, systematically looking for opportunities wherein they could use their strengths to advance the causes for which the Office of the Vice-President worked. I came to marvel how my daughter worked for such a busy man who yet made it his business to teach and train her to lead with boldness and integrity.

She continually spoke of his high ideals, his professional ethics, and his personal integrity. I witnessed the very positive and profound effect he had on her life in less than the one year she worked for him. As I told Scooter after his indictment, "If I had it to do again, I would recommend without reservation that she work for you." That sentiment remains mine today. No single person in her professional life has done so much to train Christian for what I as a Christian pastor would call godly leadership.

Some experiences in my daughter's career have conspired to frustrate her esteem for our nation's institutions and her determination to serve them. Her time with Scooter was exactly the opposite. In spite of how she saw Scooter's work at the White House end, he left her inspired and dedicated to her goals about our nation's future.

I am of course perplexed by the circumstances surrounding this legal proceeding. Its results contradict everything my daughter reflected, or that I sensed, about Scooter during the year she worked for him. Yet perhaps, Judge Walton, this will make your task a little easier: regardless of the sentence you decide upon and regardless of where his life might take him, I. Louis "Scooter" Libby is of such character and motivation that he will continue to have a strong, indelible and positive influence on those whom he serves, on those who are his friends and colleagues, and on those who work under his authority. You can also know that he will serve whatever sentence he is given with honor and humility.

I simply ask this: please take advantage of all the mercy your guidelines afford you. Our good system demands that we respect its result, but kindly remember that his error is but a brief moment in the career of the quintessential humble public servant and devoted private family man.

Respectfully Yours,

Mike Woelk



CHARLES WOLF, JR.
SENIOR ECONOMIC ADVISOR
CORPORATE FELLOW IN
INTERNATIONAL ECONOMICS

 

PERSONAL


April 24, 2007


The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 2001


Dear Judge Walton:

This letter is written in my personal capacity, and not as a member of the Rand Corporation's senior staff. However, to help in your consideration of what follows, I will offer a few personal credentials: I am currently senior economic adviser at Rand, and I hold Rand's corporate chair in international economics; I am dean emeritus in the Pardee Rand Graduate School, and served as that institution's founding dean for 27-years; I am also a senior fellow at the Hoover Institution at Stanford, and serve as a member of the advisory committee on international business education and research at the Anderson Graduate School of Business at UCLA, and as a member of several corporate boards.

I am writing to express my strong personal belief that Scooter Libby's conviction for perjury and obstruction of justice is fundamentally and profoundly inconsistent with my extensive knowledge of and long-standing experience with his character and integrity.

I have known Scooter for more than 25-years in various capacities and in differing contexts: as a Defense Department official in the 1980's; as managing partner of the Dechert law firm in Washington in the 1990's; and as a senior official in the White House since 2001. During this span I had occasion to discuss with him many emergent Rand research projects (for example, European defense and security policy), on-going projects (for example, the sources and prospects of China's economic growth), and possible future projects (for

RAND RESEARCH AREAS
THE ARTS
CHILD POLICY
CIVIL JUSTICE
EDUCATION
ENERGY AND ENVIRONMENT
HEALTH AND HEALTH CARE
INTERNATIONAL AFFAIRS
NATIONAL SECURITY
POPULATION AND AGING
PUBLIC SAFETY
SCIENCE AND TECHNOLOGY
SUBSTANCE ABUSE
TERRORISM AND
HOMELAND SECURITY
TRANSPORTATION AND
INFRASTRUCTURE
WORKFORCE AND WORKPLACE

OFFICES

SANTA MONICA, CA
WASHINGTON, DC
PITTSBURGH, PA
JACKSON, MS

DOHA, QA

CAMBRIDGE, UK

www.rand.org

OBJECTIVE ANALYSIS. EFFECTIVE SOLUTIONS



example, convergent and divergent interests between the US and China). During his tenure with Dechert, I recall discussions with Scooter on the subject of international risk assessment including questions of methodology, different risk categories, their empirical measurement, and legal as well as political and economic dimensions of building and implementing a risk assessment system for various possible clients. Some of these discussions were one-on-one, while others were discussions with four or five others or in larger groups including younger and new staff members from Rand as well as from the government during Scooter's government service, and from the Dechert law firm during his tenure there. Throughout this extended period, and in all of these wide-ranging discussions, Scooter's attitude always displayed abundant forthrightness, open-mindedness, good-will, and a disposition to be helpful and responsive. He was always a good listener as well as a responsive interlocutor, with especially keen interest in encouraging younger, up-and-coming participants. I have always found his judgments to be not only insightful but also fair and balanced; such criticisms as he offered were always conveyed in a constructive and helpful spirit.

In sum, in my opinion, Scooter has been and is a highly intelligent, widely-experienced, and immensely productive person whose capacity to benefit society will be enhanced by allowing full scope for pursuit of his appeal and, conversely, will be diminished by circumscribing that appeal through needless incarceration.

I would be pleased to clarify or elaborate any of the above if that would be helpful.

Respectfully,

Charles Wolf, Jr

WOLFENSOHN & COMPANY, L.L.C.

James D. Wolfensohn
Chairman

April 4, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Your honor:

I was President of The World Bank from 1995 to 2005 and during that period of time came to now I. Lewis Libby when the Republicans came to office in the year 2000. My association developed both as a professional relationship and a personal relationship with him and his family during their frequent visits to the home of the Vice President in Jackson Hole, Wyoming where I also have a home.

I should like to go on record with my observation that Scooter Libby served as a devoted and honorable public servant as well as a great father and family friend. He and his wife Harriet are model parents and great and respected friends.

I came to know Scooter during my work at the bank and on every single occasion when I sought his advice and help in relation to matters affecting the Bank itself he was constructive and consistent. On several occasions I needed to meet with the Vice President to discuss with him the contributions of the United States to The World Bank and to explain the broad range of activities of that institution. My meetings with the Vice President were always constructive and I must say that it was the preparation by Scooter that I think helped both the spirit and the outcome of those meetings.

After leaving The World Bank I undertook more than a year of negotiations on behalf of the Quartet in intermediating between the Israelis and the Palestinians. The Quartet is composed of the United States, Russia, The European Union and the United Nations and I needed to have support and help from the Administration. My meetings with Scooter Libby led me to have several full scale meetings in the White House with the President and the Vice President and their advisors and I have no doubt that his behind the scenes work contributed greatly to the success of these meetings.

In addition I should observe that Scooter and his wife are remarkable parents and are devoted to each other and to their children. They create a wonderful family and the devastation that has been wrought on them by this trial is already a severe punishment for anything it is perceived that he did in the past. I have always found him impeccable in his performance and devoted to the highest ideals for his family, his children and for our country and it gives me enormous pain to think that he has now been convicted of perjury and obstruction of justice, which is totally inconsistent with my knowledge of him.

I have not written a letter of this type before but feel so strongly on this occasion that I wanted to place before you my views.

With respect and appreciation,

Sincerely yours,

James D. Wolfensohn

JDW/msa



# Paul Wolfowitz



May 29, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
  United States Courthouse
333 Constitution Avenue, NW
Washington, D.C. 20001

Re:     Character Reference for I. Lewis Libby

Your Honor:

I am currently serving, until June 30 of this year, as President of the World Bank. I previously spent more than twenty-four years in U.S. government service, under seven different administrations, including twelve years in the Department of Defense as Deputy Assistant Secretary, Undersecretary for Policy and Deputy Secretary; eight years at the State Department as Director of the Policy Planning Staff, Assistant Secretary of State for East Asian and Pacific Affairs and Ambassador to Indonesia and four years in the U.S. Arms Control and Disarmament Agency. In between government service, I served for seven years as Dean of the Johns Hopkins School of Advanced International Studies.

I first met Scooter Libby in 1972, when I was a young assistant professor at Yale and he was a student in my class. It was I who persuaded him to leave his successful law practice in 1981 to come and work in the State Department, and I persuaded him once again to leave law practice in 1989 to work for me in the Defense Department.

It is painful for me to reflect on the fact that his life would have been very different if we had never met. He would almost certainly now be a successful attorney in Philadelphia, enjoying a comfortable life with his wonderful wife and their two beautiful children. However, our country would have also been deprived of the very considerable service that he has rendered, service which helped us navigate successfully through the end of the Cold War and which played a decisive role, after the terrorist attacks of 9-11, in the development of effective defenses for the country against a biological attack. Mr. Libby has made many other contributions to our common security – and put in many long hours of selfless hard work – not out of ambition but solely out of a deep sense of responsibility and a desire to make this country safer for all of us. I hope Your Honor will consider his years of selfless service in deciding what sentence to impose.

When I first recruited Mr. Libby to come and work for me on the Policy Planning Staff at the Department of State, it was because we had significant speech-writing responsibilities and I had been impressed by his writing ability as an undergraduate. At State he demonstrated a talent for policy analysis, particularly when he moved with me to

the Bureau of East Asian and Pacific Affairs as my Special Assistant. He was extremely helpful in our successful efforts to support a peaceful transition in the Philippines from the Marcos dictatorship to democracy and to stabilize U.S.-China relations after several years of tension.

After that experience, Mr. Libby went back to the practice of law and I eventually went to Indonesia to serve for three years as American ambassador. When I was called back to Washington in 1989, to serve as Undersecretary of Defense for Policy, Mr. Libby assisted me on a *pro bono* basis in planning the reorganization of the office. Subsequently I persuaded him to come back to government to assist me as Deputy Undersecretary for Strategy, a job that he performed with distinction for nearly four years. He made decisive contributions to the development of our first post-Cold War defense strategy – a shift that made possible a nearly 40% reduction in spending and force levels – and played a leadership role in developing entirely new relationships with the civilian leaderships of the Defense Ministries in the former Warsaw Pact countries. He was also a leading proponent within the U.S. government – against strong initial resistance – for recognizing the importance of Boris Yeltsin's emergence as the legitimate leader of a democratic Russia. During that same period, Mr. Libby was instrumental in securing early U.S. recognition of Ukrainian independence and setting the conditions for the successful denuclearization of Ukraine.

In the aftermath of the failed coup in the Soviet Union, the Department of Defense – with Mr. Libby providing important staff support – recommended to then-President George H.W. Bush that the U.S. should propose deep unilateral cuts in nuclear forces and challenge Gorbachev and Yeltsin to reciprocate. This initiative was successful, leading in ten days to more significant reductions in nuclear forces than anything that had been achieved through twenty previous years of negotiations.

Mr. Libby made many other important contributions during this period, particularly during the 1991 Persian Gulf War. He and his staff provided critical analysis and support for the development of the famous "left hook" around Kuwait by U.S. and coalition forces, for the strategy that successfully persuaded Israel not to retaliate against Iraqi missile attacks and for the initiative that raised a record $52 billion from our allies to cover the financial costs of Operation Desert Storm.

Mr. Libby's most important contributions – and his most punishing schedule – were as the Vice-President's Chief of Staff, particularly after the terrorist attacks of September 11, 2001. In part because of his Defense Department experience, Mr. Libby was extremely concerned about what terrorists might do if they got possession of biological or nuclear weapons; the anthrax attacks in 2001 greatly increased the level of his concern. He was disturbed to find how little preparation had been made to protect the country in the event of biological attack – despite more than ten years of warnings – and became one of the principal officials responsible for the adoption of what became the Bioshield program.

Mr. Libby played an influential role, both as an advisor to the Vice-President and as a principal member of the "Deputies Committee," in developing policy and strategy on a wide range of other issues, including responses to various terrorist threats, the North Korean nuclear issue, the problem of Yasir Arafat and the Middle East peace process and

the strategy and policy for wars in Afghanistan and Iraq. On the latter I remember most of all – during the spring and summer of 2003, when some others were envisioning a prolonged American occupation – that he was a strong advocate for a more rapid build-up of the Iraqi army and a more rapid transfer of sovereignty to the Iraqis, points on which history will prove him to have been prescient.

All of this required incredibly hard work and long hours. It entailed costs not only to Mr. Libby's legal career but to something he values even more – precious time with his family. He rarely talks about his motivation, but it is clear to me that it is in the noblest spirit of selfless service. He is not ambitious in the usual Washington sense. In a city where many people crave public office for prestige and recognition, Mr. Libby is remarkable for the quiet way he goes about his work. He has never sought the limelight or public recognition. But he cares deeply about this country and about his fellow citizens.

That sense of responsibility was very much in evidence when he addressed the threat of biological terrorism and asked – both in meetings and privately – what would we say to families who might lose loved ones in a future biological attack if we had not done everything possible to prevent it and to deal with its consequences. It was that sense of duty that led him to immerse himself in the details of the biological threat in a manner unlike any other public official I know. It also led him to dig deeply into the details of many of the terrorist threat alerts we were receiving, particularly those which warned of chemical or biological attacks. For more than four years he drove himself day-after-day, often for twelve to fourteen hours a day, sometimes to the point of exhaustion, for no reason other than the enormous sense of responsibility he felt having been placed in a position where he could make a major difference.

Although our previous work together in the Pentagon in the early 1990's did not have quite the same intensity, I remember Mr. Libby's motivation then as being very similar – a concern that we do everything in our power to protect American lives in the Gulf War or to help the people of Eastern Europe escape brutal tyranny or to help the people of Somalia escape terrible famine.

I know of many examples of Mr. Libby's service to individuals, but let me mention two that are particularly relevant in the context of the present case. One involves his effort to persuade a newspaper not to publish information that would have endangered the life of a covert CIA agent working overseas. Late into the evening, long after most others had left the matter to be dealt with the next day, Mr. Libby worked to collect the information that was needed to persuade the editor not to run the story. His assistant Jenny Mayfield told me that was when she realized she was working for a very special person – as indeed she was.

I also remember how Mr. Libby offered his services *pro bono* or at reduced cost – after he had returned to private law practice – to help former colleagues and friends with legal issues. In one case he helped a public official defend himself successfully against libelous accusations, something that is extremely difficult to do for anyone in public office. The official in question was Richard Armitage who more recently served as Deputy Secretary of State.

May 29, 2007
Page 4

Despite some of the malicious gossip about him, I also know that Mr. Libby is one of the least partisan individuals you will find in Washington. Although he has served in three Republican administrations, some of his closest friends were senior officials in the Clinton Administration and his wife is a life-long Democrat. Before I brought him to the State Department, his prior political experience consisted of volunteering for Democratic Senator Abraham Ribicoff of Connecticut and for Governor Michael Dukakis of Massachusetts. Unlike so many others in this city that thrives on gossip, he is also unusual because he never seems to take any pleasure in the misfortunes of others, even those with whom he strongly disagrees. In twenty-five years of knowing him, I have never seen him act out of malice or vindictiveness, even during some of the toughest policy battles of recent decades. I have also known him to be someone with the courage to defend positions that he believes to be correct, even if it meets the disapproval of more powerful people.

Finally, I have the perspective of a close friend of the entire Libby family who has remained close to them throughout the ordeal of the last year and a half. Mr. Libby and his wife and son and daughter have already been punished heavily. His career and reputation are in ruins. He has already lost a year and half of his life. But what is most painful for him and his wife is the suffering this has inflicted on their children. Both children are strong individuals and, even though still young, are each impressive in their own way. But because this is a high-profile case, they have suffered disproportionately both from fears about the future and from cruel comments in the present. Harriet and Scooter Libby are both deeply loving parents and the suffering of their children has been a torture for them both.

I appeal to Your Honor, both in recognition of Mr. Libby's extraordinary and selfless public service and in recognition of the punishment that his indictment and conviction have already imposed, to show the maximum possible leniency in imposing sentence in this case.

Sincerely,

Paul Wolfowitz

May 7, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Your Honor,

In over two decades in the Air Force and around four years of subsequent civilian service, I have written difficult letters before, including some to families of those who died while under my command. This is the most important and difficult letter I have ever attempted, and I thank you in advance for considering what I have to say on behalf of I. Lewis "Scooter" Libby. I should note at the outset that I do not propose to second-guess the jury in his case nor to suggest in any way that I know more about the facts of the case than those who were involved in the trial. But I would claim with absolute certainty to know a great deal more about Scooter than could have come out at trial, thus I write as you approach the responsibility of deciding his sentence.

By way of background, I served in the Air Force for 22 years, about half the time as a fighter pilot and commander, and half in jobs ranging from faculty duty at the Air Force Academy to speechwriter for the Air Force Chief of Staff to strategy analyst in the Office of the Secretary of Defense. I served closely with the CIA and the State Department, and I earned a Masters Degree at Harvard. Scooter hired me into the Office of the Vice President for what turned out to be my last two years on active duty from 2001 to 2003, and he hired me again as Deputy Assistant to the Vice President for National Security in 2005. I worked with him closely and came to know him well.

There is no one in the U.S. government past or present, military or civilian, in any capacity, whom I trust more than Scooter Libby. Part of this trust is based on personal loyalty, which Scooter earns from those above and below by his own loyalty to those around him. But blind loyalty is common in Washington and often no more than thinly-disguised selfishness. Scooter's brand of loyalty is, in my experience, much more rare: principled and grounded unfailingly in truth. With that quality of integrity, he is hired by, and attracts to him, those who share his determination to remain faithful to the truth while serving at the highest levels of government. The startling part was that he made this combination of honesty and senior responsibility seem utterly natural, even relaxed, as if there were no alternative. Yet I recall quite vividly from dealing with the most senior military officers and civilian officials in DoD, NASA (where I worked for two years), and elsewhere that such a combination is not inevitable, nor even typical. Scooter Libby is a man of genuine integrity manifest in service to others.

The following examples may help you understand how Scooter operates:

- Scooter never lied, deceived, nor minimized the truth to me in the six years I have known him.

- Despite the demands of his own schedule, he took time to assist me with recommendations for jobs after I had decided to retire from the military.

- He served in government at extraordinary financial opportunity cost to himself and his family while completely shunning personal publicity and advancement.

- He demanded absolute, documented proof for any assertion in any policy product intended to reach the Vice President (including my own memos, which benefited from his rigorous demands for thorough documentation).

- He has not received any honor from the Administration, yet has not published his own "story" nor attempted in print, on film, nor in any medium to flay publicly those in the Administration whose stories and motives differ from his own.

- In September 2005, Scooter became aware of his likely imminent indictment just as he lost his mother.  As he moved around on crutches from a leg injury, he continued to attend subordinate staff meetings to offer insight and encouragement. He constantly inquired as to the personal welfare of his people and kept his staff of 80+ people on an even keel, just as he had done throughout the time we served together.  He was kind, brilliant, and selfless in the face of the most extreme personal adversity.

Your honor, I believe my experience offers a sound perspective on who knows right from wrong.  Scooter Libby knows, and does, what is right regardless of the cost to himself.

Thank you for your consideration.

Yours respectfully,

Joseph R. Wood, Colonel, USAF (Ret)





R. James Woolsey

May 1, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

My name is R. James Woolsey. I am currently a Vice President of Booz
Allen Hamilton, working on energy issues. Before I came to the firm in 2002 I
practiced law for 22 years, on four different occasions, at Shea & Gardner in
Washington (merged two years ago with Goodwin Procter). I also served in
the US Government on five different occasions for a total of twelve years,
holding Presidential appointments in two Democratic and two Republican
administrations. My government service was all in the field of national
security, most recently as Director of Central Intelligence under President
Clinton.

I have known Scooter Libby for approximately ten years, as a fellow member
of the Washington legal community, in his position as chief assistant to the
Vice President, and since. I know him as a man of great integrity and
fairness. I have met with him during his service to the Vice President on
highly classified matters and I have been with him at social occasions. I
believe him to be a man who was rightly entrusted with some, indeed
most, of our country's extremely sensitive intelligence information and dealt
with it professionally and responsibly. Were I in a position of responsibility in
the government today I would continue to trust him to deal with such
information according to the highest of standards. His conviction for perjury
and obstruction of justice is completely inconsistent with my knowledge, and
highest evaluation, of this man's character and integrity.

Sincerely,

R. James Woolsey

DC Asia Advisory, LLC

████████████████████████
████████████████████████
April 24, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am writing to offer perspective on the character, integrity, and service of my friend Scooter Libby as he is about to be sentenced in federal court.

Based in Washington, I have spent my career focused on American policy towards Asia – first as a missionary in Taiwan, then as an analyst at the National Security Agency, Johns Hopkins SAIS, the Heritage Foundation, and the Office of the Vice President. After leaving government I established the small business consulting practice from which I write today.

I first met Scooter during the interview process for a position in the current Bush administration. Having been recommended by a mutual friend and approved by the Vice President, I worked with Scooter on a near daily basis from April 2001 to September 2005 as one of his deputies on the national security affairs staff.

Prior to working together I only knew Scooter by reputation. He was widely known to be tough-minded intellectually, very tight with information, and kind-hearted personally. My experience working with Scooter was entirely consistent with this reputation.

As you know, our work required privileged access to information of many kinds, ranging from intelligence to executive deliberations to political strategy to preparations for remarks by the President or Vice President. Scooter had more privileged access than I, and his portfolio went far beyond that of national security affairs and Asia.

I found from many colleagues in other parts of the U.S. government that it was common for their superior to share with them contents of privileged communications among Principals and special intelligence briefings, despite the fact that the information was agreed to be kept close hold. Never in five years of working with Scooter did he follow this common practice. At times to the disadvantage of our work, Scooter always kept privileged information within the circle of individuals for which it was intended.

The pace and volume of work was tremendous. I often felt stretched beyond capacity with my own work and often wondered how Scooter could possibly keep up with his.

Especially during the period prior to and immediately following major military operations in Iraq, the demands were particularly intense. Still, Scooter tried as hard as possible to keep up with ongoing negotiations and policy deliberations related to North Korea, China, India, Pakistan, Afghanistan, and Southeast Asia. It was an impossible task, and that was only from the part of the world I was following on his behalf.

During that period, we often would meet or speak by phone at the beginning of the day, and then if it worked out we would meet or speak again at the end of the day. The meetings at the end of the day were especially poignant, as he tried mightily to wrap up many loose ends from the day in order to make it home to be with his wife and children. With the crush of events, he always remembered the arguments and issues we were trying to advance, but sometimes would lose track of specific actions or information we needed to follow.

While it was at times frustrating not to have him fully available as a resource, we all understood how much he was trying to do and how it stretched the limits of human capacity.

In the midst of everything, he made great effort to stay close with his family. Often he would take calls from his children during our day-end meetings. We did not mind. It was important for him and for us.

Scooter suffered great personal loss during this tour of government service with the passing of both of his parents. I never heard him complain about the sacrifice his commitment to government service required, but not being available to your parents in their last years of life is painful, especially for someone so publicly quiet and close to family as Scooter.

Even with all he was dealing with substantively and personally, he always made an effort to know about and care for what we were dealing with as we worked for him. He went out of his way to help me deal with the passing of my grandfather and a failed adoption in the same week. He walked with us through a second failed adoption and a breast cancer scare for my wife. And he celebrated with us as we at last succeeded in adopting our son.

In all of this, it was clear to me that while Scooter was a senior political and policy official, and a high-profile target of interest and attack in Washington, he cared deeply about the people affected by his work. He cared deeply about the sacrifice of his family, friends, and staff that allowed him to conduct his job. He also cared about the welfare of the people our policies were meant to affect – whether it was opportunity for ordinary Americans or easing the burden of those suffering under oppression around the world.

As Scooter continues to be judged, I hope these important qualities are not lost in the process. I must confess that the jury's finding of guilt on perjury and obstruction of justice in this case is inconsistent with what I know of the integrity and professional conduct of the man accused.

With respect, I hope that this and other testaments to Scooter's character are helpful as the court continues its important work.

Sincerely,

Stephen J. Yates
President

**Don Zarin**



May 1, 2007

The Honorable Reggie D. Walton
United States District Court
1225 E. Barrett Prettyman United
    States Courthouse
333 Constitution Avenue, N.W.
Washington, DC  20001

Dear Judge Walton:

I am currently a partner in the law firm of Holland & Knight, LLP.  I serve as co-head of the International Trade Practice Group and head of the Foreign Corrupt Practices Team, a part of the white-collar practice.

Prior to joining Holland & Knight, I was a partner for many years in the law firm of Dechert, LLP.  During that period, I worked closely with I. Lewis (Scooter) Libby, also a partner at Dechert, on a number of international legal matters.  I had the opportunity to observe Scooter's approach to the law, the legal advice he provided to clients, and the ethical standards he applied to this process.  I was always impressed with the intellectual honesty that Scooter brought to a matter, and the highest ethical standards he applied when advising his clients.

For example, we worked together on several international transactions involving the U.S. Foreign Corrupt Practices Act.  In each instance, the advice Scooter provided to his clients was conservative in approach and rigorous in his interpretation and application of the law to the client's situation.

Scooter also served as a mentor to a number of junior attorneys in the firm, and devoted considerable time to their training.  He was, at all times, a terrific role model for the junior attorneys.

Scooter was highly respected in the firm.  This was demonstrated, in part, by his selection as the managing partner in the D.C. office of Dechert.  In that capacity, he strongly encouraged attorneys in the firm, including myself, to be active in pro bono activities for the benefit of the community.

In closing, during the period of time that I worked with Scooter, he always demonstrated the highest level of professional integrity and ethical standards.

Thank you.

Sincerely,

Don Zarin

# 4516497_v1

Scott Ramminger



April 27, 2007

The Honorable Reggie B. Walton
United States District Court
1225 E. Barrett Prettyman
United States Courthouse
333 Constitution Avenue, N.W.
Washington, DC 20001

Dear Judge Walton:

I am a friend and neighbor of Scooter Libby.    I am the president of a national trade
association based in the Washington DC area, the American Wholesale Marketers
Association. I have resided in the Washington DC area for some 25 years.

Scooter and Harriet's children, ████████████████████████████████████████
████████████████████████████ I have known Scooter for several
years ████████████████████

Though I have been in Washington for quite a while, I am by no means a political insider
of any sort.  Both my wife and I are fairly simple people.  I like to think that we have
retained an "outside the beltway" view of the world, along with the values that come with
it.   We count among our friends a diverse group that includes handymen, surgeons,
artists, lobbyists, jazz musicians, members of the administration, heating and air
conditioning repairmen, lawyers, scientists, and firemen.  I recount that list simply to
make this point.  Neither I nor my wife choose our friends based on their politics, what
they look like, or what they do for a living, etc.  Our friendships are formed on the basis
of character, integrity, compassion, and values.

I know Scooter Libby to be a man of the highest character and integrity.   He has
dedicated his life to public service – public service that until recently has come largely
outside any public limelight.  Even prior to the matter over which you are presiding,
Scooter's public service came at no small cost to himself and his family -- both in terms
of foregone income and in terms of the long hours he has given in to our nation.   He
chose this path not because of any personal gain or notoriety it would bring him, but
because he truly loves our country.

████████████████████████████████████████ The experience of raising the boys – particularly,
our oldest, ████████ has made me appreciate Scooter's friendship, character, and moral
compass even more. ████████ is a very smart, independent sort.  As such, and as one might
expect at this age ████████ occasionally question's his own father's wisdom.   On several
occasions Scooter has quietly provided guidan████████████ that has helped us keep him on
the right path.  Scooter Libby is someone I unfailing trust my children with.  That is the
highest compliment I can pay any man.

████████████████████████████████████████████████
████████████████████████████  ████████████████████████



Scooter has given generously of his time at our local elementary school despite his extremely busy schedule, patiently answering questions and encouraging the kids to explore and understand how our government works.

I truly believe that we live in the greatest country on earth. That is due in no small part to our judicial system, a system under which any man or woman charged with a crime is entitled to a trial by his peers. It's something I do not take for granted. I've long admired our nation's judges. On a regular basis you must make decisions that can forever alter the lives or those who come before your court and their families. That is an enormous responsibility, and a great service to our country.

I am neither a judge nor a lawyer. I do not pretend to be an expert in the facts of this case. What I know about the matter before your court involving Scooter Libby is what I have read in the paper. I will say simply this. I was truly shocked at Scooter's conviction for perjury and obstruction of justice. This conviction is at total odds with the behavior and character of the man I know and call my friend.

In this case you are faced with an enormous task — one I do not envy. A jury of his peers has tried and convicted Scooter Libby. A man I know to be of the highest moral character will stand before you for sentencing.

Scooter Libby is a fine man who has given greatly and selflessly to his country. He and his family have suffered severely in this matter already. Removing Scooter Libby from this community, from his family, and his friends for any amount of time will be a tragic loss for all concerned. The suffering to his children and wife would be immeasurable and life altering.

I respectfully urge you to consider all of the above in your deliberation on this matter and to hand down the lightest sentence possible in this case.

Sincerely,

Scott Ramminger