## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

### I. LEWIS LIBBY'S MOTION FOR RELEASE PENDING APPEAL

I. Lewis Libby, through his counsel, hereby respectfully moves this Court for release pending appeal pursuant to 18 U.S.C. § 3143.  On June 5, 2007 Mr. Libby was sentenced to a term of 30 months imprisonment, plus the maximum fine and two years of supervised release.  He intends to file a notice of appeal after entry of the Court's written judgment.

At the sentencing hearing, the government agreed with the defense that Mr. Libby does not represent a flight risk or a danger to the community, and the Court concurred. Nonetheless, the government took the position that Mr. Libby is not entitled to release under § 3143 because none of the issues he plans to raise on appeal qualify as substantial. The government is wrong.  While the Court may be firmly convinced that all of its decisions are correct, we respectfully submit that the Court's own opinions and rulings show why the standard for release pending appeal is easily satisfied in Mr. Libby's case.

## ARGUMENT

**I.    SECTION 3143 DOES NOT REQUIRE A DEFENDANT TO CONVINCE THE COURT THAT IT COMMITTED ERROR; A CLOSE QUESTION IS ENOUGH**

Pursuant to 18 U.S.C. § 3143(b), a defendant is entitled to release pending appeal when two conditions are present. First, the Court must find by clear and convincing evidence that the defendant is not likely to flee and does not pose a danger to public safety. § 3143(b)(1)(A).[1] Second, the Court must find by a preponderance of the evidence that "(1) [the defendant] is appealing for purposes other than delay, (2) the appeal 'raises a substantial question of law or fact,' and (3) a favorable appellate ruling on that substantial question would likely result in a reversal, an order for a new trial," or a reduced sentence. *United States v. Quinn*, 416 F. Supp. 2d 133, 135 (D.D.C. 2006) (quoting § 3143(b)(1)(B)). When these two requirements are satisfied, "the sentencing court '*shall* order the release of the person' pending resolution of the appeal." *Id.* (quoting § 3143(b)(1)(B)) (emphasis added). That is, bail pending appeal is mandatory, not discretionary.

Importantly, a decision to grant release pending appeal does *not* require a finding by the district court that it erred, or that reversal is the probable outcome on appeal. As the Third Circuit has explained,

> Judges do not knowingly leave substantial errors uncorrected, or deliberately misconstrue applicable precedent. Thus, it would have been capricious of Congress to have conditioned bail only on the willingness of a trial judge to certify his or her own error.

---

[1] Because the Court has already found, with no objection by the government, that this requirement is satisfied, we do not address it here.

> For a similar reason, the phrase "*likely* to result in reversal or an order for a new trial" cannot reasonably be construed to require the district court to predict the probability of reversal.

*United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985). Accordingly, the "substantial question" standard "does not require the district court to find that it committed reversible error," *United States v. Pollard*, 778 F.2d 1177, 1181-82 (6th Cir. 1985), or even that the "defendant has shown a likelihood of success on the merits of the appeal," *Quinn*, 416 F. Supp. 2d at 136 (citing *United States v. Rittweger*, No. 02-CR-0122, 2005 WL 3200901, at *4 (S.D.N.Y. Nov. 30, 2005) ("By finding that there is a substantial issue for appeal for defendants . . . , the Court does not find that the issue will ultimately succeed or that it has merit.")).

Rather, as the D.C. Circuit has made clear, § 3143(b) simply requires the district court to find that a single one of the defendant's issues on appeal presents "a 'close' question or one that very well could be decided the other way." *United States v. Perholtz*, 836 F.2d 554, 555 (D.C. Cir. 1987) (citing cases from the First, Second, Fifth, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits). Thus, in *Quinn*, the court granted the defendant's motion because the question for appeal found "some support in [the relevant] body of law" and the court could not conclude that the question was "insubstantial or not susceptible to a different answer." 416 F. Supp. 2d at 136.

A recent opinion from a court in this district, *United States v. Safavian*, No. 05-CR-0370, 2006 WL 3378479 (D.D.C. Nov. 16, 2006), is also instructive on the application of § 3143(b). In that case, the Court granted release pending appeal in an obstruction and false statements case even though it was quite skeptical about the defendant's appeal issues. Judge Friedman explained, "Although the Court is confident

in its decisions and unpersuaded by the defendant's arguments, it is also aware that some of the issues he has raised (though certainly not all) . . . present close questions of law that could be decided in another way." *Id*. at *1. In reaching this conclusion, Judge Friedman noted that some of the defendant's appeal issues were "without precedent in [the D.C.] Circuit." *Id.*

As *Safavian* illustrates, a substantial question is present where there is a dearth of precedent or conflicting legal authorities pertinent to the defendant's appellate issues, or "where a defendant challenges the Court's ruling on a novel question of law and provides a rationale for a contrary interpretation that is supported by arguably applicable legal authority," *Quinn*, 416 F. Supp. 2d at 136.

Those circumstances are clearly present in Mr. Libby's case.

## II.    MR. LIBBY WILL PRESENT SUBSTANTIAL ISSUES ON APPEAL

As in *Quinn*, "there has been no suggestion that [Mr. Libby's] appeal is merely a dilatory tactic, and so the only dispute is the extent to which the appeal 'raises a substantial question of law that is likely to result in . . . reversal [or] an order for new trial.'" 416 F. Supp. 2d at 135 (quoting § 3143(b)(1)(B)). Mr. Libby's pre-trial and trial motions, combined with defense objections preserved in the record, present a number of close questions that are more than sufficient to satisfy the requirements of § 3143(b). In considering and deciding those questions, this Court has published several lengthy and significant opinions. We respectfully submit the Court did not do so because the questions presented were easy ones, or ones as to which precedent in this Circuit clearly dictated the answer. However confident this Court may be in the correctness of the

4

decisions reached, the difficulty of the issues — as evidenced by the Court's own lengthy writings — warrants release pending appellate review.

We discuss below certain of the issues that Mr. Libby intends to present to the Court of Appeals. Each of the issues, if resolved favorably to Mr. Libby, would lead to reversal of the conviction or a new trial.

**A.      Whether The Exercise Of Authority By The Special Counsel Violated The Constitution And Federal Statutes Is A Substantial Question**

The question whether the appointment of Patrick Fitzgerald as Special Counsel satisfied the Appointments Clause of the Constitution, art. II, § 2, cl. 2, is a close one. The Court of Appeals could easily reach the opposite conclusion from this Court.

To answer that question (and a closely related statutory question), this Court wrote a 31-page opinion (20 pages in the Federal Supplement). *See United States v. Libby*, 429 F. Supp. 2d 27 (D.D.C. 2006). In that opinion, the Court recognized that though Mr. Fitzgerald has been appointed by the President and confirmed by the Senate as a U.S. Attorney, he could not be given duties that would qualify him as a "principal officer" absent a separate appointment. *See id.* at 43 n.15. The Court recognized that whether the duties given to Mr. Fitzgerald as Special Counsel qualify him as a principal or an inferior officer under *Edmond v. United States*, 520 U.S. 651 (1997), is a "difficult question because the Special Counsel's work is conducted largely without direction and supervision." *Libby*, 429 F. Supp. 2d at 45. The Court further recognized that "there appears to be some tension between" *Edmond* and the earlier case of *Morrison v. Olson*, 487 U.S. 654 (1988), on which the Court ultimately relied in upholding the appointment. 429 F. Supp. 2d at 37.

What is more, the Court noted that the parties' "differing conclusions" on the validity of the appointment "result more from each [party's] interpretation of the scope of the Special Counsel's authority than the cases on which they rely." *Id.* at 38. The Court then engaged in its own interpretation of the scope of that authority, but indicated that the task was not particularly straightforward and that its own research did not "reveal[] any case law that clearly addresses th[e] point." *Id.* at 39.

Under this Court's own analysis, if the Court of Appeals resolves the tension between *Morrison* and *Edmond* in a different manner than did this Court, *or* if the Court of Appeals construes the Special Counsel's authority differently than did this Court, it is likely to reverse this Court's decision and order dismissal of the indictment.[2]

The Court of Appeals — which has never addressed the "tension" between *Edmond* and *Morrison* — could well conclude, as have some commentators,[3] that the generally applicable constitutional test for inferior-officer status is not the multi-factor, *ad hoc* balancing test applied in *Morrison*, but rather the clear test more recently set forth by the Court in *Edmond*, 520 U.S. at 663: "'inferior officers' are officers whose work is

---

[2] Such a ruling would not, contrary to the Court's concern, immunize high-level administration officials from future investigation and prosecution. Indeed, the *Department's own regulations* provide for the appointment of a special counsel who *is* subject to supervision and direction by the Attorney General. *See* 28 C.F.R. Part 600. Those regulations give a special counsel a degree of independence appropriate where high-ranking executive officials are under investigation, *see* §§ 600.6, 600.7(b) — without wholly abdicating the Department's supervisory obligation. The government has never satisfactorily explained why the Acting Attorney General saw fit expressly to exempt Mr. Fitzgerald from those regulations.

[3] *E.g.*, Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 811 (1999); Nick Bravin, Note, *Is Morrison v. Olson Still Good Law? The Court's New Appointments Clause Jurisprudence*, 98 Colum. L. Rev. 1103 (1998).

directed and supervised at some level by others who were appointed by Presidential

nomination with the advice and consent of the Senate."

The Court of Appeals could well agree with Justice Souter, moreover, that

"[h]aving a superior officer is necessary for inferior officer status, but not sufficient to

establish it," without something more. *Id.* at 667 (opinion concurring in the judgment).

*But cf. Libby*, 429 F. Supp. 2d at 37 (relying on cases that stand for the exact opposite

proposition, *i.e.*, that supervision by a superior officer is sufficient but not necessary for

inferior-officer status).

Finally, because Mr. Fitzgerald was explicitly relieved from *any* "supervision or

control of any officer of the Department," Letter from James Comey, Deputy Attorney

General, to Patrick Fitzgerald, U.S. Attorney (Dec. 30, 2003), the Court of Appeals could

well conclude that the Special Counsel is not an inferior officer under *Edmond*.

In sum, we respectfully submit that this Court's prior finding that there is a

tension between *Edmond* and *Morrison* and its conclusion that the application of *Edmond*

to the Special Counsel is a "difficult question" is a recognition that the Appointments

Clause issue is "close" and "very well could be decided the other way" by the appellate

court. *Perholtz*, *supra*, 836 F.2d at 555. Because such a decision would lead to dismissal

of the indictment, the requirement of § 3143(b)(1)(B) is satisfied by this issue alone.

**B.      Mr. Libby's Memory Defense Issues Present Substantial Questions**

Throughout these proceedings, the Court and the parties wrestled with a series of

novel issues arising from Mr. Libby's central defense that any errors in his statements to

the FBI or grand jury were the result of confusion, mistake, or faulty memory rather than

deliberate deception. These "memory defense" issues included, for example, Mr. Libby's

request to present expert testimony concerning memory; the adequacy of the
government's substitutions for relevant and admissible classified information under CIPA
§ 6(c); and the Court's exclusion of the government's statement admitting relevant facts
as well as much of the CIA briefers' testimony following Mr. Libby's decision not to
testify.  The Court addressed these issues at length in three published opinions.

These memory issues go to the heart of Mr. Libby's defense.  In a case where
questions of memory were so important, and where the jury deliberated for nine days on a
five-count indictment against a single defendant, we respectfully submit that if the
appellate court reaches a contrary conclusion on any one of these issues, a new trial on all
counts will be required.

1.      **Expert testimony on memory**

Mr. Libby proffered the testimony of Dr. Robert Bjork on relevant findings from
scientific research on human memory.  The Court found Dr. Bjork "eminently qualified
to testify on the subject of memory and perception."  *United States v. Libby*, 461 F. Supp.
2d 3, 8 n.6 (D.D.C. 2006).  It acknowledged that "today . . . the science of memory is
well established and accepted in the scientific community, and the subject of Dr. Bjork's
testimony has been well tested and subjected to peer review."  *Id.*  And it predicted
(accurately) that "the memory and recollection of the principal players will undoubtedly
play a substantial role in the assessment of the defendant's culpability in the upcoming
trial."  *Id.* at 5.  Nonetheless, the Court excluded Dr. Bjork's testimony under Fed. R.
Evid. 702 on the ground that Mr. Libby failed to establish that the testimony would be
helpful to the jury, and under Rule 403 because of concerns about delay, waste of time,
and jury confusion.  *See id.* at 18-19.

Though this Court ultimately decided to exclude Dr. Bjork's testimony, it recognized that "[t]here is no clear case authority, or absolute rule, on when an expert should be permitted to testify on issues regarding memory and perception." *Id.* at 9. That dearth of relevant precedent is sufficient to satisfy § 3143(b). Faced with this novel issue, the Court of Appeals could well conclude that this Court's refusal to allow the proffered testimony — particularly in a case where issues of memory and its reliability were so fundamental — was incorrect.

On appeal, the defense expects to argue that the Court's decision was contrary to the Federal Rules' "general approach of relaxing the traditional barriers to 'opinion' testimony," *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 588 (1993) (citation and internal quotation marks omitted), and gave insufficient weight to Rule 702's presumption in favor of admitting expert testimony, *Weinstein's Federal Evidence* § 702.02[1] (2d ed. 2006) (citing cases); *see* Fed. R. Evid. 702, advisory committee's note to 2000 Amendments (noting that the exclusion of expert testimony is "the exception rather than the rule").[4] Consistent with these well-established principles, the Court of Appeals could well conclude that, contrary to this Court's decision, the Federal Rules did not require Mr. Libby to demonstrate that most prospective jurors do not understand the subject of the proffered testimony — a standard that would require the exclusion of much evidence now routinely admitted, including (for example) testimony that the prosecution offers every day from gang experts, drug distribution experts, and others.[5]

---

[4] *See also, e.g., United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007) (noting that "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases . . . .") (quotation omitted).

[5] *See, e.g., United States v. Martinez*, 476 F.3d 961, 967 (D.C. Cir. 2007) (expert on drug trafficking routes); *United States v. Padilla*, 387 F.3d 1087, 1094 (9th Cir. 2004) (gang

Likewise, the appellate court might well reject this Court's conclusion that cross-examination and jury instructions provided an adequate substitute for Dr. Bjork's testimony. *See* 461 F. Supp. 2d at 15-16.[6]  It could recognize that, in fact, cross-examination had no ability whatsoever to explain how *Mr. Libby's* memory could have failed, which was the central purpose for introducing Dr. Bjork's testimony in the first place. *See, e.g.*, Reply of I. Lewis Libby in Support of his Motion to Admit Expert Testimony under Fed. R. Evid. 702 (Sept. 15, 2006) (Dkt. 142).  Moreover, the appellate court might well determine, as the Third Circuit has, that even skillful cross-examination is largely ineffectual when it comes to exposing the flaws in the recollection of a confident witness (*e.g.*, Tim Russert or Ari Fleischer, two of the witnesses most important to the government's case).  *See United States v. Downing*, 753 F.2d 1224, 1230 n.6 (3d Cir. 1985) (where witnesses are confident in their memories, "cross-examination can hardly be seen as an effective way to reveal the weaknesses in a witness's recollection of an event").

Finally, the Court of Appeals, like other courts, might find that jury instructions are an unsatisfactory substitute for reliable expert testimony on questions of human memory and perception, especially where, as here, the instructions merely list certain

expert); *United States v. Young*, 745 F.2d 733, 761 (2d Cir. 1984) (heroin distribution expert); *see also, e.g., United States v. Hadley*, 918 F.2d 848, 852-53 (9th Cir. 1990) (child sexual abuse accommodation expert); *United States v. Alonso*, 48 F.3d 1536, 1540 (9th Cir. 1995) (expert in surveillance and counter surveillance practices used by drug dealers); *United States v. Anderson*, 851 F.2d 384, 392 (D.C. Cir. 1988) (expert on the lifestyle of pimps and their relationship with prostitutes); *United States v. Peralta*, 941 F.2d 1003, 1009 (9th Cir. 1991) ("Stockholm syndrome" expert); *United States v. Glover*, 265 F.3d 337, 343-44 (6th Cir. 2001) (vehicle parts expert); *United States v. McPhilomy*, 270 F.3d 1302, 1312-14 (10th Cir. 2001) (expert in quality, quantity, and value of stone).

[6] Mr. Libby objected to the adequacy of the Court's memory instruction and will likely argue that issue on appeal as well.

factors for the jury to consider in assessing memory without explaining their significance.[7] *See, e.g., United States v. Sullivan*, 246 F. Supp. 2d 696, 699 (E.D. Ky. 2003) (introducing such information "for the first time in the jury instructions, without providing the jury any information about how those factors affect the [eyewitness] identification process, is likely to be more confusing than helpful").

In a case where the determination of guilt or innocence turned on whether Mr. Libby could have forgotten, the appellate court could easily conclude that it was a mistake to ask the jury to try to answer that fundamental question without the benefit of relevant and reliable scientific evidence. The jurors themselves apparently thought so. *See* Denis Collins, *My 15 Minutes, All Because of Scooter*, The Washington Post, Mar. 11, 2007, at B1 (noting that eight days into the deliberations one juror asked, "'[i]f this trial is all about memory, why haven't we heard from any memory experts? . . . *I'd like to know what's possible to forget*'") (emphasis added) (attached hereto as Exh. A).

At a minimum, the admissibility of Dr. Bjork's testimony presents a "close" question, one "that very well could be decided the other way." *Perholtz*, 836 F.2d at 555.

## 2.    Substitutions under CIPA § 6(c)

Following lengthy proceedings under CIPA § 6(a), the Court found most of Mr. Libby's proposed classified evidence relevant and admissible. *United States v. Libby*,

---

[7]  Here, the memory instruction the Court ultimately adopted failed to explain several well-established but likely counter-intuitive findings of memory science that were highly relevant to Mr. Libby's defense, and about which Dr. Bjork could have reliably testified. These include (among several others) that a person's confidence in his memory bears at most a weak correlation to the accuracy of that memory; that, through the phenomenon of memory conjunction error, it is normal for a person to accurately remember the contents of a conversation but inaccurately recall the person with whom he had that conversation; and that a person who hears a conversation is less likely to recall the substance of the conversation accurately than a person who both hears and observes a conversation.

467 F. Supp. 2d 1 (D.D.C. 2006).  The Court then held a series of hearings under CIPA §

6(c) to determine whether the government's proposed substitutions afforded Mr. Libby

"substantially the same ability to make his defense" as the classified information itself.

The hearings produced a series of oral rulings, some rejecting the government's proposed

substitutions and some accepting those substitutions, often over Mr. Libby's objection.

The Court resolved the final, crucial substitution issues in the government's favor in a

published opinion.  *United States v. Libby*, 467 F. Supp. 2d 20 (D.D.C. 2006).

      The adequacy of the government's substitutions under CIPA § 6(c) presents a

substantial question on appeal.  As the Court acknowledged, "[t]here is no existing

written case authority describing the lens through which a Court should look to determine

whether a proposed substitution 'will provide the defendant with substantially the same

ability to make his defense as would disclosure of the specific classified information.'"

*Id.* at 25-26 (quoting CIPA § 6(c)).  The Court described the CIPA § 6(c) process as a

"tedious and complex expedition" through terrain "largely uncharted by written

precedent."  *Id.* at 40.  Given the complexity and novelty of the issues with which the

parties and the Court grappled under § 6(c), and the significance of those issues to the

defense, they clearly present "close" questions or ones that "very well could be decided

the other way."

### 3.    The government statement admitting relevant facts

The Court's exclusion of the government's statement admitting relevant facts and much of the CIA briefers' testimony following Mr. Libby's decision not to testify presents another substantial question on appeal.

The government's statement admitting relevant facts formed a crucial part of its CIPA § 6(c) substitutions. *See Libby*, 467 F. Supp. 2d at 28. Despite the importance of the government admission, the Court excluded it when Mr. Libby exercised his Fifth Amendment right to remain silent, because government counsel represented that they had offered the admission on the assumption Mr. Libby would take the stand and subject himself to cross-examination about its contents. *See United States v. Libby,* 475 F. Supp. 2d 73 (D.D.C. 2007).

Mr. Libby intends to argue on appeal that the government never conditioned the statement admitting relevant facts on Mr. Libby testifying; that any such condition would have been illogical, because by its nature the admission substituted for — that is, replaced — the underlying classified information, including the classified information in Mr. Libby's potential testimony; that the government was on notice throughout the pretrial proceedings — from Mr. Libby's counsel, from the Court's opinions, and from questions during voir dire, among other sources — that Mr. Libby might not testify, but made no objection and imposed no condition when defense counsel proposed to read the admission in opening statement; that the defense suffered an unfair hit to its credibility when, after discussing the admission at length in its opening, it was precluded from admitting the government's statement for a reason it could not have anticipated; and that,

in light of these circumstances, the exclusion of the government admission violated Mr. Libby's right to due process, his right to present a defense, and his right to remain silent.

Exclusion of the admission presents a "close" question and one that "very well could be decided the other way."

### 4.    The CIA briefers' testimony

The Court's exclusion of most of the CIA briefers' testimony, including testimony about the matters Mr. Libby confronted in his morning intelligence briefings on crucial dates in June and July 2003, similarly presents a substantial question on appeal.  The Court ruled this evidence irrelevant under Rule 401 and inadmissible under Rule 403 in the absence of testimony from Mr. Libby himself about the importance he assigned to the morning intelligence items.  *See United States v. Libby*, 475 F. Supp. 2d 73 (D.D.C. 2007).  In making this ruling, the Court acknowledged that the issue presented "a tough call," and that it was "just not sure" what to do.  Tr., Feb. 13, 2007, A.M. Session, at 111, 114.

Mr. Libby expects to contend on appeal that, even without his testimony, there was ample foundation for admission of the briefers' testimony and that he easily satisfied the "minimal level of probability" that Rule 401 requires for evidence to be relevant, *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir.), *cert. denied*, 126 S. Ct. 2948 (2006), and overcome any Rule 403 concerns.

For example, Craig Schmall testified that the morning intelligence briefing book presented to Mr. Libby six days per week included the "most significant current intelligence available"; that Mr. Schmall developed an understanding of what Mr. Libby found particularly important and sought to include items in Mr. Libby's book reflecting

his interests; that Mr. Libby read the book for forty minutes on weekdays and an hour or more on Saturdays and sometimes asked to have portions returned for further review; and that the information presented in the morning intelligence briefings allowed the Vice President and Mr. Libby to address "very significant national security issues," including terrorism, homeland security, nuclear proliferation around the world, North Korea and its nuclear ambitions, Iraq, the Middle East, and other urgent matters. Tr., Jan. 24, 2007, P.M. Session, at 90-101.

Similarly, John Hannah, who worked closely with Mr. Libby, described the extraordinary importance to Mr. Libby of nine specific national security topics, which collectively encompass all of the morning intelligence briefing items that Mr. Libby sought to present. A jury could reasonably infer from the Schmall and Hannah testimony that those morning intelligence items would have such significance for Mr. Libby that they would tend to cause him to confuse or forget other, less important matters such as snippets of conversation about Mr. Wilson's wife.

Mr. Libby also expects to contend that barring the briefers' testimony was particularly unfair because the Court admitted a wide range of circumstantial state of mind evidence offered by the government. This circumstantial evidence includes (for example) testimony from Mr. Schmall about a conversation in which he allegedly warned Mr. Libby and the Vice President about the dangers of revealing a covert agent, Tr., Jan. 24, 2007, P.M. Session, at 87, some of Mr. Libby's calendars, portions of press briefings by White House spokesman Scott McClellan (GX 418, 420, 421), and Mr. Libby's classified information nondisclosure agreement (GX 5-A). It also includes newspaper articles from July 2003 and October 2003 that were found in Mr. Libby's voluminous

files (GX 412, 413, 422 and 423), even though in some cases there is no evidence the articles were even read by Mr. Libby.

The Court admitted this evidence, over objection, to show that Mr. Libby was focused on Ambassador Wilson and (by speculative inference) on his wife.[8]  Mr. Libby expects to contend on appeal that the admission of newspaper articles to show, through a lengthy chain of questionable inferences, Mr. Libby's purported focus on Ms. Wilson, was wholly at odds with the exclusion of defense evidence concerning the matters that, as the Schmall and Hannah testimony shows, *actually* commanded his attention at the relevant times.

* * * *

The memory defense issues were hard-fought and at times contentious.  We have no doubt that the Court remains confident in the correctness of its rulings.  Mr. Libby is not, however, required to shake the Court's confidence to be entitled to release.  Rather, all he needs to show is that a question could be decided differently on appeal.  For the reasons given, the memory issues readily meet that standard.

**C.     Whether The Court Properly Refused To Permit Mr. Libby To Call Andrea Mitchell Raises A Substantial Question**

There is no question that the testimony – and therefore credibility – of Tim Russert was crucial to the government's case.  The core theory of the prosecution was that Mr. Libby lied when he said that Mr. Russert told him that Mr. Wilson's wife worked at the CIA, and when he said he recalled that at the time of the conversation, this

---

[8] *E.g.*, Tr., Feb. 7, 2007, A.M. Session, at 8-11; *see* Tr., Feb. 6, 2007, P.M. Session, at 34-37 (government offers GX 412 and 413 to "show[] that [Mr. Libby] is heavily focused on the press response at this time . . .  [T]his is not something that [was] drowned out by other duties because he spent time himself preparing it.").

information surprised him. These allegations were the centerpiece of Count 1 (obstruction),[9] and the sole basis for Counts 2 and 4 (false statement and perjury, respectively). And Count 5 (perjury) alleged that Mr. Libby lied about whether he had told Mr. Cooper and others that reporters were his source of information. Because Mr. Russert was the principal reporter from whom Mr. Libby said he had received this information, Mr. Russert's testimony was, again, critical to the conviction on Count 5.

At trial, Mr. Russert testified that, while he could not recall saying anything to Mr. Libby about Ms. Wilson, "it would have been an impossibility" for him to have done so, because he became aware of Ms. Wilson's identity only "when [he] read Robert Novak's column." Tr., Feb. 7, 2007, P.M. Session, at 29. Significantly, Mr. Russert acknowledged that, given the pattern and practice at NBC News, if one of the other key NBC reporters had obtained important information, he or she would have come forward and reported it to the entire group. Tr., Feb. 8, 2007, A.M. Session, at 42. Both Andrea Mitchell and David Gregory, Mr. Russert added, were key members of the news team. *Id.* It easily follows that if Ms. Mitchell had known about Ms. Wilson's role and identity, she likely would have told Mr. Russert — in which event, his testimony would be untrue.

As the Court knows, in October 2003 Ms. Mitchell was asked, point blank, whether she had had any idea "that Joe Wilson's wife worked for the CIA." *Libby*, 475 F. Supp. 2d 73, 76 n.3. Ms. Mitchell replied that this fact "was widely known amongst those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger." But, Ms. Mitchell added, it was not until Mr. Novak published his column that she also

---

[9] The remaining Count 1 allegations were either dismissed by the Court (Miller) or rejected by the jury (Cooper).

became aware of Ms. Wilson's "actual role at the CIA and the fact that she had a covert role involving weapons of mass destruction." *Id.*

The defense sought to call Ms. Mitchell and ask about her knowledge of Ms. Wilson's employment prior to Mr. Novak's column. As the defense explained, the jury could well conclude, in light of Ms. Mitchell's October 2003 statement, that she did, in fact, know Ms. Wilson's identity prior to reading about it in the Novak column. Relying on *United States v. Johnson*, 802 F.2d 1459 (D.C. Cir. 1986), however, this Court declined to permit the defense to call Ms. Mitchell. *See Libby*, 475 F. Supp. 2d 80-84. As the Court put it:

> [I]t seems to me the only value [calling Ms. Mitchell] has is if you are able to say to the jury, you can't believe her when she says she didn't hear anything about Wilson's employment with the CIA before the Novak article. And it seems to me the implication from that, obviously, is that, well, then she must have known about it. And I think there is the distinct potential, as the *Johnson* case held, that there would be an inappropriate use of that statement, inconsistent with my understanding of the circumstances under which the statement could be used.
>
> So, I think, consistent with *Johnson*, that since the only reason that that witness would be called as it relates to this aspect of her testimony, would be for the purpose of bringing out that prior inconsistent statement, it seems to me that *Johnson* controls, and in this Circuit, it would not be admissible.

Tr., Feb. 13, 2007, A.M. Session, at 17-18.

At the very least, this ruling presents a "close" question that the Court of Appeals could easily see differently. It could, for example, distinguish the *Johnson* case. In that case, (i) the government called a witness (ii) on rebuttal for (iii) no purpose other than to impeach, and (iv) under circumstances in which there was no apparent corroboration for the truth of the prior inconsistent statement. Indeed, far from being corroborated, the prior statement was a post-arrest, in-custody confession that cast blame on the defendant

— and was thus, as the appellate court observed, classically untrustworthy. *See* 802 F.2d at 1465 (quoting *United States v. Coachman*, 727 F.2d 1293, 1296 (D.C. Cir. 1984) ("It is common knowledge that an arrestee can 'curry[] favor with law enforcement authorities by implicating others in the offense.'")).

The present case bears little relationship to *Johnson*. Here, it was the defense, not the government, that sought to call Ms. Mitchell. Although courts strive to be fair to both sides in a criminal case, it is only the defense that enjoys a Sixth Amendment right to a fair trial. What is sauce for the goose is not always sauce for the gander.

Perhaps more critically, the defense did not call Ms. Mitchell "*solely* for the purpose of impeachment." *Johnson*, 802 F.2d at 1466 (emphasis added). Rather, as counsel made clear, notwithstanding the representations of her counsel, Ms. Mitchell might, when called to the witness stand and sworn under oath, have testified consistent with her prior statement. She might, for example, have admitted that it was possible that she had learned of or heard a rumor about Ms. Wilson's employment prior to the Novak article even if she did not remember that happening all these years later. *See United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992) ("Will the formality of the courtroom, the oath, and the penalties of perjury change the witness' decision? . . . Any experienced trial attorney has encountered a witness who has changed his testimony between the final interview and trial.").

And, even if Ms. Mitchell did testify that she did not know Ms. Wilson's identity before July 14, the jury was free to infer that Ms. Mitchell's testimony was false and that the opposite was true. More than 50 years ago, in *Dyer v. MacDougall*, 201 F.2d 265, 268 (2d Cir. 1952), Judge Learned Hand explained that disbelief of a witness

19

> may satisfy the tribunal, not only that the witness' testimony is not true,
> but that the truth is the opposite of his story; for the denial of one, who has
> a motive to deny, may be uttered with such hesitation, discomfort,
> arrogance or defiance, as to give assurance that he is fabricating, and that,
> if he is, there is no alternative but to assume the truth of what he denies.

Accord, *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir. 1991) ("The government

cannot force a defendant to take the stand, of course, but if he does and denies the

charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other

evidence.").

Here, the jury would have had an abundant basis on which to disbelieve Ms.

Mitchell and to infer that the opposite of her testimony was true.  Apart from demeanor

alone, and her prior statement from October 2003 (which was made much closer in time

to the relevant events than her subsequent retraction), there was the fact that David

Gregory had learned Ms. Wilson's identity in time to apprise Ms. Mitchell.  There was

the practice at NBC News, well-established by evidence admitted at trial, of sharing

important information in a timely manner.  And there was Ms. Mitchell's motive to shade

her trial testimony in order to protect Mr. Russert and the NBC franchise from the

embarrassment that would ensue if she testified in a way that undercut Mr. Russert's

credibility.  Taken together, the jury would have been entirely reasonable to discredit any

testimony from Ms. Mitchell denying pre-July 14 knowledge about Ms. Wilson and infer

that quite the opposite was true.

Significantly, for § 3143 purposes, this important principle of law remains open

and unresolved in this Circuit.  In *United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir.

1991) — a case decided after *Johnson* — the court described as open the question

whether a fact finder may infer, from demeanor evidence alone, whether the opposite of

what the witness states is true.  *Jenkins* ultimately had no occasion to resolve this

"difficult and important" (*id.* at 1179) issue, as it found sufficient other evidence, apart from disbelief of the defendant, to support the conviction.

So too here.  If Ms. Mitchell had been permitted to testify, defense counsel could have confronted her with her prior statement, her motive to change stories, and the fact that one of her close NBC colleagues, David Gregory, had learned of Ms. Wilson's role before the Novak article (and prior, as well, to Mr. Libby's conversation with Mr. Russert).  The jury could have used those pieces of proof, together with Ms. Mitchell's demeanor on the stand, to infer that — notwithstanding her testimony — she did in fact know Ms. Wilson's identity before the Novak article appeared.  *Johnson* does not hold otherwise.

This crucial legal issue may very well come out the other way on appeal.  (Indeed, we believe it will.)  Because Ms. Mitchell's testimony cuts right to the heart of Mr. Russert's central claim — that he could not have told Mr. Libby about Ms. Wilson's employment — the question whether the defense should have been allowed to call Ms. Mitchell easily meets the "substantial question" standard.

## CONCLUSION

For the foregoing reasons, the requirements of § 3143 are overwhelmingly satisfied in this case and Mr. Libby is entitled to release pending appeal of his conviction.

Dated:  June 7, 2007                                  Respectfully submitted,

_____/s/_____              _____/s/_____
Theodore V. Wells, Jr.                              William H. Jeffress, Jr.
(DC Bar No. 468934)                              (DC Bar No. 041152)
James L. Brochin                                    Alex J. Bourelly
(DC Bar No. 455456)                              (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton                  Baker Botts LLP
  & Garrison LLP                                    1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas                  Washington, DC  20004
New York, NY  10019-6064                    Tel:  (202) 639-7751
Tel:  (212) 373-3089                              Fax: (202) 585-1087
Fax: (212) 373-2217

_____/s/_____
John D. Cline
(D.C. Bar No. 403824)
Jones Day
555 California Street, 26th Floor
San Francisco, CA  94104
Tel:  (415) 626-3939
Fax: (415) 875-5700