# EXHIBIT A

# washingtonpost.com

# My 15 Minutes, All Because of Scooter

By Denis Collins
Sunday, March 11, 2007; B01

We were in the eighth day of deliberations, a full seven weeks into the trial of I. Lewis "Scooter" Libby, and Delia was peering into a dark hole.

"If this trial is all about memory, why haven't we heard from any memory experts?" she asked. "I'd like to know what's possible to forget."

Advertisement



Q: Where can you find the nation's highest concentration of knowledge workers?

○ Boston
○ Chicago
○ New York City
○ San Francisco
○ Washington DC region.

We entertained more than a few such questions during our deliberations, some more relevant than others. Was Valerie Plame really an undercover CIA operative? ("Whether she was or whether she was not covert is not relevant to the issues you have to decide in this case," Judge Reggie B. Walton told us.) Why didn't the two final CIA witnesses take the stand (not to mention Libby and Vice President Cheney)? And were the news media actually paying attention to how jurors dressed (papal white smoke for a verdict coming if we wore jeans, black and no verdict if we wore dress pants) and the office supplies we ordered?

The large metal drawers in the jury room, filled with testimony and exhibits, held no answers. And we weren't allowed access to dictionaries, computers or news accounts to advance the search. So we could only plow forward, conscious that we were the least-informed people in the courtroom.

When it was over and the media swarm began, the first indication that the world outside our lounge had changed came with a question: "How would you feel if Scooter Libby was pardoned?" Pardoned? He was just convicted 20 minutes ago.

I spoke to the media because no one else on the jury would. Reporters wanted to know why. I couldn't answer for all the jurors. A few said they were just too overwhelmed. One told me, "I've seen how reporters can get things twisted." I hesitated to repeat that, not wanting to cast aspersions. But I'd soon learn that the casting of aspersions had started soon after the trial began.

We were smart enough to know that this trial was receiving more than a small dose of attention. And if we forgot, Walton reminded us twice a day. After U.S. marshals dropped us off at ever different Metro stations each night, there was nothing to stop us from reading news reports, other than our own integrity. And quick reflexes. One night, four of us were standing on a red line train when a seated passenger opened the front section of The Washington Post. The first of us to see the photo of Libby jumped in front of the others Superman-style.

My wife, Pam, was my gatekeeper. Occasionally she'd say, "I'm saving a story you're going to love to read after this is over." One of those articles dealt with the role of bloggers in this trial. Five to 10 of them were given credentials, and various blogs printed transcripts of every witness.

Another story she suggested I read was by former prosecutor Victoria Toensing in The Post's Outlook section. It criticized Special Counsel Patrick J. Fitzgerald, the media and a host of administration officials. Apparently a firestorm erupted over whether this article could contaminate jurors who read it. I find it interesting, reading it now, but don't believe it would have affected my decisions. She had a clear agenda, but no decisive new facts.

When I finished talking to the media that first morning after our verdict, I knew that would not be the end of the story. But I wasn't prepared for the heat of the attention, especially from television shows. One woman from CNN was standing on my steps when I got home. "You're the only juror who's talking and the country wants to know more about the work of the jury."

Let's be honest, I was ready to be seduced.

On "Larry King Live" that night, I learned something else I hadn't known. During the trial, former White House spokesman Ari Fleischer testified that he tried to give John Dickerson, then of Time magazine, the Plame scoop but that Dickerson wasn't interested. In the green room before the show, Dickerson, who hadn't been called to testify, introduced himself. "Ari never told me that," he said. "What he said was, 'You ought to check out who sent Joe Wilson to Niger.' " That probably wouldn't have made any difference in the trial, but it was good to know.

Wilson, the administration critic whom Libby and others were trying to discredit when Libby got caught up in a lie, was in the green room, too, along with Matthew Cooper, another former Time magazine reporter who testified that Libby talked to him about Plame, and former White House spokesman Scott McClellan, who had declared well before the trial that Libby had not been involved in the leak.

Cooper's testimony was relevant in the one count (out of five) in which we found Libby not guilty. Cooper was a good witness, but there was nothing in his notes to confirm the small difference in wording that was being disputed. We thought the prosecution hadn't provided enough evidence. So not beyond a reasonable doubt.

Wilson turned to me and asked, "Were you on the jury?" And he came over, shook my hand and said, "Thank you. You jurors did a great job. You should be proud of yourselves." Cooper, who was sitting across from me, wanted to know more about why the only not-guilty verdict was on the count involving his conversation with Libby. It was basically his word against Libby's, I told him, and on every other count there was more evidence. I didn't tell him that I was the primary voice defending Libby on that charge.

The pardon issue grew larger with each interview. I kept repeating that we had done what was asked of us: to look only at whether Libby lied to the FBI and to the grand jury and whether he subverted justice by doing so. Whether to pardon was for others to decide. I knew that if I looked beyond Libby's actions, I could link this case to troops dying in Iraq and to Plame's career. But because I was representing the jury, I was determined to stay neutral on that subject. As for Plame's covert status, we followed the judge's instructions not to speak about it. After the verdict, a fellow juror told MSNBC that it "kind of bothers me" that no one was charged with exposing a covert CIA officer, the crime for which Fitzgerald had begun his investigation, and that Libby "got caught up in the investigation as opposed to in the actual crime." But that was never an issue for me.

I was asked about Fitzgerald and defense attorney Ted Wells. I thought that both did as well as they could with the ammunition provided them. On day three of the trial, I wrote in my notebook: "Never do anything to get Fitz on my case." Wells sobbing at the end of his closing argument when discussing

Libby was interesting. I would have liked to ask the other jurors what they thought of it, but we were so discreet that no one said a word. I did discover after the trial that Wells grew up very close to where I went to grade school, and knew some of my friends.

What we didn't know was how novel it was for jurors to be allowed to take notes. I don't think we could have done our jobs without them. Whenever someone asked for a piece of testimony, it could be found in at least one juror's notebook.

Walton also allowed jurors to submit questions to the witnesses. Ann Redington asked Bob Woodward whether, after former deputy secretary of state Richard Armitage revealed Plame's name to him, he told anyone else. Yes, his Post colleague Walter Pincus. What we didn't know was how closely reporters were dicing those questions for clues to our sentiment. I certainly didn't pick up any greater meaning.

After one witness's testimony, our three questions precipitated a 30-minute conference with lawyers at the judge's bench. Ann leaned over and said to me, "This contradicts the notion that there is no such thing as a dumb question."

Although restricted from speaking about certain things, we were a frisky group. During the testimony phase, we played cards at lunch, yearned for the hot dogs being sold on the street outside our windows, and talked about everything from "American Idol" to gag wigs (don't go there). One of the jurors brought long-sleeved red shirts into the courtroom on Valentine's Day for us all to wear. Only one juror declined. I heard afterward that there had been speculation about why she hadn't matched up with the rest of us -- in fact, she just didn't like the fit. As it turns out, she would be the juror whom Walton later eliminated for an accidental infraction.

The mood changed slightly when we began championing certain points during deliberation. One juror opened things up by declaring, "I think they're lying. Every one of them." A few others were frustrated that we had only Libby to consider. We knew from testimony that Armitage and Karl Rove were the first ones to divulge Plame's name and occupation to reporters. One juror asked, "Where are Rove and Armitage? Weren't they the ones who leaked it first?" That remark was answered with "Amen." Another juror said that Libby took the hit for Cheney, his former boss. But we kept reminding one another that we had been tasked with deciding only Libby's guilt or innocence. People seemed surprised by the length of our deliberations. I can only say it's not because we were in hot debate for 10 days; we were painstakingly sifting the evidence. Although there was no unanimity on any count at the beginning, there were no great splits. For instance, our initial vote on the first count we considered -- perjury -- was 9 to 2 in favor of guilt. And on the last count we considered it was also 9 to 2 -- but for not guilty. Through it all, our collegiality was never threatened.

Thirty hours after the trial ended, I was sick of hearing myself talk. (I know, imagine how *you* felt!) I was receiving chiding e-mails from friends:

"The idea of you being a spokesperson for anything is quite alarming."

"Aren't you the man who almost got us killed in a pool hall when last we met?"

"I didn't think you had two clean shirts and two ties."

"Did you know that Laura Ingraham is calling you 'ski jacket boy'?"

I would speak no more forever. Just as soon as I finished the MSNBC "Countdown" appearance. As I

walked into that studio, I was delighted to see my fellow juror Ann Redington on "Hardball With Chris Matthews." I felt as though I'd received my own pardon.

At the end of my bit, I told the interviewer I was quitting showbiz and passing the torch to Ann.

What I didn't know was that Jon Stewart would soon make fun of me on "The Daily Show."

Fair play. And that was something we did learn on Scooter Libby's jury.

*Denis Collins, a former Washington Post reporter,*

*is the author of the novel "Nora's Army" (Washington Writers Publishing House).*

© 2007 The Washington Post Company

Ads by Google

**Pre-Employment Screening**
Criminal Background Checks People Selection Made Easy w/ ADP
www.ADPhire.com

**To Serve & To Protect**
Protect & Investigate. Bodyguards, Surveillance,skip tracing,fraud.
excalibur.localplacement.com

**Background Checks $9.95**
Comprehensive background checks. Low cost and fast turn around time.
www.1-background-checks.com