THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. NO. 05-394 (RBW) |
| v. | ) | |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as Scooter Libby | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR RELEASE PENDING APPEAL**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, Special

Counsel, respectfully submits this Response in Opposition to Defendant's Motion for Release

Pending Appeal.

## INTRODUCTION

Defendant I. Lewis Libby was charged in an indictment with obstruction of justice, making

false statements to federal investigators, and perjury.  During the trial on those charges, nine

witnesses provided testimony that contradicted the defendant's grand jury testimony and FBI

interviews.  The recollections of each of these witnesses was corroborated either by documents or

by the testimony of other witnesses.  The government also introduced extensive evidence of the

defendant's motive to lie.  On March 6, 2007, the jury convicted defendant on four of the five counts

in the indictment.

At a sentencing hearing conducted on June 5, 2007, this Court indicated that it would enter

defendant's sentence on June 14, 2007.  At the same hearing, defendant orally requested that he be

permitted to remain on bond pending the resolution of his appeal.

On June 7, 2007, defendant filed a written motion for release pending appeal.  In his motion,

defendant argues that on appeal he will challenge:  (a) the validity of the Special Counsel's exercise

of authority; (b) the Court's rulings related to evidence defendant sought to introduce in support of his memory defense; and (c) the Court's exclusion of the testimony of Andrea Mitchell.   As demonstrated below, none of these issues is "substantial" or likely to result in reversal or in an order for a new trial.   Therefore, the motion should be denied.

## ARGUMENT

## I.   LEGAL STANDARD APPLICABLE TO RELEASE PENDING APPEAL

Title 18, United States Code, Section 3143(b) governs the Court's determination of whether the defendant may be granted release pending appeal.  *United States v. Perholtz*, 836 F.2d 554 (D.C. Cir. 1987)(per curiam).  The statute provides in pertinent part that a defendant who is not a flight risk or a danger to the community,[1] and who has been sentenced to a term of imprisonment, "shall" be detained pending appeal, unless a court finds that the appeal "raises a substantial question of law or fact likely to result in – (I) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."  18 U.S.C. § 3143(b).

Prior to the enactment of Section 3143(b), there existed a presumption in favor of granting convicted defendants bond pending appeal.  Section 3143(b) was enacted by Congress in 1984 for the express purpose of reversing that presumption.  S. Rep. No. 225, 98th Cong., 1st Sess. 27, *reprinted in* U.S. Code Cong. & Ad. News 3182, 3209.  Rather than permitting defendants who appeal their convictions to be released on bond as a routine matter, the new statute requires the court to permit bond pending appeal only upon "an affirmative finding that the chance for reversal is

---

[1]The government does not contend that defendant poses a risk of flight or danger to the community, or that defendant's appeal is frivolous, or brought solely for purposes of delay.

substantial." *Id.* at 3210.  This requirement "assure[s] that post-conviction bail is confined to those who are among the more promising candidates for ultimate exoneration." *United States v. Schoffner*, 791 F.2d 586, 589 (7th Cir. 1986).

The new presumption of confinement pending appeal "gives recognition to the basic principle that a conviction is presumed to be correct." S. Rep. No. 225, 98th Cong., 1st Sess. 27, *reprinted in* U.S. Code Cong. & Ad. News 3182, 3209.  The change in the law also reflects Congress's appreciation that "[r]elease of a criminal defendant into the community after conviction may undermine the deterrent effect of the criminal law, especially in those situations where an appeal of the conviction may drag on for many months or even years." *Id.*  In other words, Congress has recognized that "harm results not only when someone is imprisoned erroneously, but also when execution of sentence is delayed because of arguments that in the end prove to be without merit." *Schoffner*, 791 F.2d at 589.  Consistent with the reversal of the presumption, Congress intended "that in overcoming the presumption in favor of detention, the burden of proof [would rest] with the defendant." S. Rep. No. 225, 98th Cong., 1st Sess. 26, *reprinted in* U.S. Code Cong. & Ad. News 3182, 3210.  *See also id.* at 3210, n. 86.

Section 3143(b)(1)(B) requires a two-part inquiry: "(1) Does the appeal raise a substantial question? (2) If so, would the resolution of that question in the defendant's favor be likely to lead to reversal?" *Perholtz*, 836 F.2d at 555.  With respect to the first prong of this test, the D.C. Circuit has held that a "substantial question" must be "a 'close' question or one that very well could be decided the other way." *Perholtz*, 836 F.2d at 555-56.[2]  In determining whether the question raised

---

[2] After considering two competing standards for determining substantiality adopted in various other circuits, the court in *Perholtz* adopted the more demanding one, because, in its view, it appeared "better to accord with the expressed congressional intent to increase the required showing

3

on appeal is a "close" one, the trial court must "return its attention to its own analysis of these issues

at earlier stages of the proceedings" and "essentially evaluate the difficulty of the question he [or she]

previously decided." *Schoffner*, 791 F.2d at 589 (applying the same standard for "substantiality" that

is applied by the D.C. Circuit). This function nevertheless has a "predictive character because

appeals with more merit have a correspondingly greater 'chance' of resulting in reversal." *Id.*

Even if a question is determined to be "substantial" within the meaning of § 3143(b), the

defendant must also show, as a second step, that a resolution of that question in the defendant's favor

would be likely to lead to reversal or the grant of a new trial. This aspect of the inquiry requires the

Court to consider the potential impact of a decision in defendant's favor in light of the nature or type

of question involved. *E.g., United States v. Handy*, 761 F.2d 1279, 1280 (9th Cir. 1985) (the second

prong focuses on the type of question that must be presented). "[H]armless errors, errors that have

no prejudicial effect, or errors that have been insufficiently preserved," which would not result in

reversal or a new trial, do not satisfy the applicable standard. *See United States v. Bilanzich*, 771

F.2d 292 (7th Cir. 1985) (affirming denial of motion for bond pending appeal based on purported

illegally seized evidence where, not only was the question of the seizure's legality not close, but the

---

on the part of the defendant." *Perholtz*, 836 F.2d at 555-56.

The standard adopted by the court in *Perholtz* has been adopted in all circuits except the
Third and the Ninth. *See United States v. Bayko,* 774 F.2d 516, 523 (1st Cir.1985); *United States v.
Randell,* 761 F.2d 122, 125 (2d Cir. 1985); *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir.
1991); *United States v. Valera-Elizondo,* 761 F.2d 1020, 1024 (5th Cir. 1985); *United States v.
Pollard,* 778 F.2d 1177, 1182 (6th Cir. 1985); *United States v. Shoffner,* 791 F.2d 586, 589 (7th Cir.
1986); *United States v. Powell,* 761 F.2d 1227, 1231-32 (8th Cir. 1985); *United States v. Affleck*, 765
F.2d 944, 952 (10th Cir. 1985); *United States v. Giancola,* 754 F.2d 898, 901 (11th Cir. 1985). The
standard applied in the Third and Ninth Circuits interprets the term "substantial" to mean that the
question is "fairly debatable," "fairly doubtful," or "one of more substance than would be necessary
to a finding that it was not frivolous." *See United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir.
1985); *United States v. Messerlian,* 793 F.2d 94, 96 (3d Cir. 1986).

conviction would not have been reversed in any event because none of the seized evidence was admitted at trial).  Similarly, questions that address matters that are not "integral to the merits," or to which deferential standards of appellate review apply, are substantially less likely to satisfy the second prong of the inquiry required by § 3143(b).  *See*, *e.g.*, *United States v. Powell*, 761 F.2d 1227 (8th Cir. 1985)(en banc)(substantial question must be "integral to the merits"); *United States v. Day*, 433 F. Supp. 2d 54, 56-57 (D.D.C. 2006)(Friedman, J.)(denying motion for bond pending appeal, and noting that evidentiary rulings, which are reviewed for abuse of discretion, are less likely to result in reversal than rulings on issues of law, which are reviewed *de novo*).[3]  Thus, while defendant has argued (Def. Mot. at 2-3) that it is not necessary for a judge to predict the probability of reversal in order to grant bond pending appeal, the governing statute clearly requires that the court find that an issue cited by defendant presents a "substantial" chance of reversal.  *See* S. Rep. No 225, 98th Cong., 1st Sess. 27, reprinted in 1984 Code Cong. & Ad. News 3182, 3210 (noting that § 3143 "requires an affirmative finding that the chance for reversal is substantial.")

_____

[3]  *See also United States v. Reich*, 420 F. Supp. 2d 75, 90 n.6 (E.D.N.Y. 2006) (denying motion for bond pending appeal where defendant sought to appeal evidentiary ruling with respect to which district court was afforded discretion under Fed. R. Crim. P. 403); *United States v. Kemp*, 379 F. Supp. 2d 690 (E.D. Pa. 2005)(denying bond pending appeal where rulings related to jurors were matters within court's discretion and rulings were consistent with precedent from other circuits);  *United States v. Lane*, 194 F. Supp. 2d 758, 777, 786 (N.D. Ill. 2002) (denying motion for bond pending appeal on ground that no substantial question was raised regarding the exclusion of evidence and, "more significantly," that such exclusion could not legitimately be found to constitute an abuse of discretion), *aff'd*, 281 F.3d 638 (7th Cir. 2002); *United States v. Butler*, 704 F. Supp. 1351, 1354 (E.D. Va. 1989) (denying motion for bond on ground that denial of mistrial, in part because ruling was reviewable only for abuse of discretion); *United States v. Draiman*, 614 F. Supp. 307, 311 (N.D. Ill. 1985)(denying bond where court's restriction of cross examination was a matter of discretion).

## II.   DEFENDANT'S CLAIM THAT THE DELEGATION OF AUTHORITY TO THE SPECIAL COUNSEL VIOLATED THE CONSTITUTION AND FEDERAL STATUTES DOES NOT CONSTITUTE A SUBSTANTIAL QUESTION ON APPEAL.

Defendant Libby moved to dismiss the indictment, contending that the delegation of authority to the Special Counsel violated statutory provisions, 28 U.S.C. §§ 516 and 519, and the Appointments Clause of the Constitution, art. II, § 2.  In a thorough and carefully reasoned opinion, this Court rejected defendant's statutory and constitutional arguments and denied the motion to dismiss the indictment.  *United States v. Libby*, 429 F. Supp. 2d 27 (2006).[4]  Neither of these arguments present a substantial question entitling the defendant to release pending appeal.

With respect to defendant's statutory claim, this Court interpreted the relevant statutory provisions and rejected defendant's argument, finding defendant's points "unfounded" and "unconvincing" and concluding that the result was "compelled" by the plain language of the statutes and supported by D.C. Circuit precedent.  *Id.* at 33-34.  This Court also rejected defendant's Appointment Clause challenge, carefully analyzing the limits on the Special Counsel's authority and tenure, including being subject to dismissal at will, before concluding that the case "falls squarely into the mold of *Morrison* [*v. Olson*, 487 U.S. 564 (1988)]," which "remains binding authority" from the Supreme Court.  429 F. Supp. 2d at 44-45.  The government respectfully submits that the defendant's appeal from this Court's denial of his motion to dismiss the indictment does not present a "substantial question" and that the defendant has failed to carry his burden under 18 U.S.C.

---

[4] Defendant contends that it can be inferred from the length of this Court's written opinion that the legal issues presented constitute substantial issues for appeal.  Def. Mot. at 5.  It is a strange sort of logic that infers that the likelihood of reversal increases with the thoroughness of a written opinion.

§ 3143(b) of establishing that "the chance for reversal is substantial."[5]

Defendant's motion for release pending appeal gives short shrift to his statutory argument, so it will be addressed briefly. Defendant contended that the delegation of authority to the Special Counsel violated 28 U.S.C. §§ 516 and 519, which state that, "[e]xcept as otherwise provided by law," the prosecution of criminal cases be supervised and directed by the Attorney General. Defendant claimed that, in appointing the Special Counsel, the Acting Attorney General "expressly abdicated supervision and direction." 429 F. Supp. 2d at 30. Defendant recognized that Sections 516 and 519 both contain the express exception "[e]xcept as otherwise provided by law," but argued that there was no applicable statutory exception. *Id.* at 31. In addressing this issue of statutory interpretation, this Court found that 28 U.S.C. § 510 provided an applicable statutory exception to Sections 516 and 519. Section 510 provides the Attorney General with the authority to delegate to any other officer of the Department of Justice "any function of the Attorney General." 28 U.S.C. § 510. This Court had little difficulty concluding that the plain language of Section 510 allows the Attorney General to delegate any of his authority, including the authority to supervise and direct criminal cases: "This result is compelled, as there is no language in Section 510 which limits the type of functions which can be delegated." 429 F. Supp. 2d at 33.[6] This Court also found support for its conclusion in D.C. Circuit precedent. *Id.*, citing *In re Sealed Case*, 829 F.2d 50, 55 (D.C. Cir. 1987)(holding that the relevant statutory provisions, including Section 510, accommodate a

---

[5] *Quoting* S. Rep. No. 225, 98th Cong., 1st Sess. (1983), *reprinted in* 1984 U.S. Code Cong. & Admin, News. 3182, 3210.

[6] This Court noted that "there could never be a wholesale abdication" of supervisory responsibility because "any delegation of authority is subject to the constitutional limits set forth in the Appointments Clause." 429 F. Supp. 2d at 34.

delegation by the Attorney General of prosecutorial authority "virtually free of ongoing supervision").[7]  In sum, defendant's statutory argument does not present a substantial issue on appeal.

In his motion for release on appeal, defendant places primary emphasis on his constitutional argument concerning the authority of the Special Counsel. As this Court stated, the question is "whether the Special Counsel is a principal officer requiring nomination by the President with advice and consent of the Senate or an inferior officer subject to independent appointment by the Attorney General." 429 F. Supp. 2d at 35.[8]  This Court concluded that the Special Counsel is an inferior officer and that his appointment by the Acting Attorney General was consistent with the Appointments Clause.  In doing so, this Court relied on binding Supreme Court precedent concerning when special prosecutors are inferior officers.  *Morrison v. Olson*, 487 U.S. 654 (1988).

Defendant does not argue that under the *Morrison* decision the appointment of the Special Counsel was unconstitutional.  Indeed, the appointment of the Special Counsel presents an easier case than the appointment upheld in *Morrison* because the Special Counsel can be dismissed by a principal officer *at will*, while the Independent Counsel at issue in *Morrison* could only be dismissed

---

[7] This Court's opinion addressed several other arguments advanced by defendant regarding the interpretation of the relevant statutes and dismissed them as "unfounded" and "unconvincing." 429 F. Supp. 2d at 33-34.

[8] Although this Court believed it was compelled to reach the Appointments Clause issue, *see* 429 F. Supp. 2d at 43, n. 15,  the government respectfully submits, as it did in its response to the motion to dismiss, that because this case involves a valid statutory delegation of additional authority, revocable at will, to an existing officer within the Department of Justice, that the Appointments Clause is not implicated.  *Cf. Weiss v. United States*, 510 U.S. 163, 170-73 (1994)(no reappointment required under the Appointments Clause where additional duties delegated to Officers of the United States) That said, in the government's arguments in this brief concerning the Appointments Clause issue, for purposes of the discussion it is assumed that the clause applies, and the terms "appointment" and "delegation" are used interchangeably.

*for good cause*.  Rather than making a futile attempt to make a case under *Morrison*, the thrust of

defendant's argument is that *Morrison* is no longer good law and has been overruled *sub silentio* and

supplanted by *Edmond v. United States*, 520 U.S. 651 (1997).  Defendant presses this argument

despite the fact that in *Edmond*, a case that did not involve a special prosecutor, the Supreme Court

did not overrule *Morrison*, disavow it, or even suggest that *Morrison* was no longer good law or that

the outcome in *Morrison* would have been different under *Edmond*'s formulation of what constitutes

an inferior officer.  Nevertheless, defendant contends that this issue is "a close one" and that the D.C.

Circuit "could easily reach the opposite conclusion from this Court."  Def. Mot. at 5.

     Defendant's contention simply cannot withstand scrutiny.   As this Court concluded,

*Morrison* and *Edmond* can be read to be in harmony.   But even if there were any significant

"tension" between the two Supreme Court cases, defendant's contention ignores a fundamental

principle that governs the resolution of legal issues by the District Courts and the Courts of Appeals,

namely the obligation of the federal courts to faithfully apply Supreme Court precedent in the

absence of some clear command to the contrary.  This Court's decision in this case was based upon

such an application of binding precedent.  The Court of Appeals also is obligated to apply *Morrison*.

*See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)("The Court of Appeals was correct in applying [the

principle of stare decisis] despite disagreement with *Albrecht*, for it is this Court's prerogative alone

to overrule one of its precedents."); *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490

U.S. 477, 484 (1989)("If a precedent of this Court has direct application in a case, yet appears to rest

on reasons rejected in some other line of cases, the Court of Appeals should follow the case that

directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Tribune

Co. v. F.C.C.*, 133 F.3d 61, 69 (D.C. Cir. 1998)("The Supreme Court has told lower federal courts

in no uncertain terms that we are to leave the overruling of its opinions to the Court itself."). For these reasons, the chance of reversal by the Court of Appeals is, at best, remote – certainly not "substantial."

This Court's written opinion, fairly read, belies the notion that the Appointments Clause argument presents a close question that could have been decided differently. The Court made factual findings and drew conclusions about the appointment of the Special Counsel. The Court concluded that "the Special Counsel's authority is limited." 429 F. Supp. 2d at 40. The plain language of the appointment letters, the Court concluded, established that "the Special Counsel is limited by the specific scope of the investigation he was directed to conduct. Accordingly, the Special Counsel cannot make any decisions that extend beyond his express jurisdiction." *Id.* at 41. The Court further concluded that the Special Counsel had no authority to disregard Department of Justice policies promulgated by the Attorney General. The Court stated, "[T]he only logical way to interpret the Deputy Attorney General's delegation to the Special Counsel of 'all the authority of the Attorney General,' is that the delegation simply permitted the special Counsel to bypass certain approval requirements contained in the regulations and policies, not ignore them altogether." *Id.* at 42. Finally, the Court concluded that "the Special Counsel's tenure is both limited and temporary." *Id.* This conclusion was based in part on the Special Counsel's limited jurisdiction, which carried the implicit limitation that once the "assigned mission is complete his tenure as Special Counsel will end." *Id.* The conclusion about the Special Counsel's tenure was also supported by the fact that the Special Counsel's delegation could be revoked at will. *Id.* at 43.[9] Having made these conclusions

---

[9] This Court relied on D.C. Circuit precedent in finding that the power of the Attorney General to rescind or revoke the delegation of authority of a special prosecutor is an important limitation on tenure. *In re Sealed Case*, 829 F.2d at 56-57.

about the source and scope of the Special Counsel's authority, this Court applied the Supreme Court's Appointment's Clause precedents.

This Court first discussed the Supreme Court's decision in *Morrison v. Olson*, 487 U.S. 654 (1988), the case cited by the government as controlling. That case involved a challenge to the Ethics in Government Act that contended that the Independent Counsel, who was appointed by a special court without senate confirmation, was a principal officer whose appointment violates the Appointments Clause. The Supreme Court rejected that challenge, concluding that the Independent Counsel was an inferior officer. In reaching that conclusion, the Supreme Court relied on (1) the fact that the Independent Counsel was removable by the Attorney General for good cause subject to judicial approval; (2) the limited duties of the Independent Counsel; (3) the Independent Counsel's lack of authority to formulate policy; and (4) the limited jurisdiction and tenure of the Independent Counsel. *Id.* at 663, 671-72.

This Court next discussed *Edmond v. United States*, 520 U.S. 651 (1997), the case that the defendant claimed was controlling. That case held that judges on the Coast Guard Court of Criminal Appeals were inferior officers, thereby rejecting an Appointment Clause challenge. The Supreme Court discussed its decision in *Morrison*, noting that it "did not purport to set forth a definitive test" for determining whether an officer is inferior. *Id.* at 661. Further noting that several of the factors considered in *Morrison* were inapplicable to the case before it, the Court in *Edmond* described inferior officers as "officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 663. The Supreme Court went on to conclude that the judges in question were inferior officers by virtue of being subject to administrative oversight, uniform rules of procedure, review of their decisions

11

before they could become final, and removal without cause, which the Court termed "a powerful tool

for control." *Id.* at 664-65.

Defendant's motion to dismiss on Appointments Clause grounds is premised on his argument

that *Morrison* is no longer good law, an argument this Court flatly rejected. He now claims that his

argument raises a substantial question entitling him to release pending appeal. This Court's decision

to apply *Morrison* rather than *Edmond* is not a close question. As this Court stated:

> The defendant relies heavily on *Edmond*, suggesting that it has "supplanted" the
> Supreme Court's approach in *Morrison*. Def.'s Mem. at 19 n. 8. This Court cannot
> agree that *Edmond* has that consequence. Neither *Morrison* nor *Edmond* established
> a bright-line test under which Appointments Clause challenges are resolved. Rather,
> the cases simply employed factors that the Supreme Court deemed important when
> resolving the Appointments Clause challenges that were before it in those particular
> cases. Neither case states explicitly, or even suggests, that the factors relied upon are
> exclusive. In fact, the Court in *Morrison* stated that "it need not attempt. . . to decide
> exactly where the line falls between [principal and inferior] officers. . . . " *Morrison*,
> 487 U.S. at 671, 108 S.Ct. 2597. And while there appears to be some tension
> between the two decisions because they do not rely on identical factors, *Edmond* did
> not reject the validity of the *Morrison* factors, suggest that the result in *Morrison*
> would have been different had the Court employed the *Edmond* analysis, or indicate
> that factors relied on in *Edmond* would be the governing factors for all future
> Appointments Clause challenges.

429 F. Supp. 2d at 37 (footnote omitted).

Defendant cites this Court's reference to "tension" between *Morrison* and *Edmond* as a sign

that this is a close question. Def. Mot. at 5. It is not. As this Court concluded: "This case falls

squarely into the mold of *Morrison*, where the Supreme Court concluded that the independent

counsel was an inferior officer. The factors employed in *Morrison* to reach that conclusion are

equally applicable here." 429 F. Supp. 2d at 44.[10] This Court rightly emphasized the fact that in

_____

[10] *See United States v. Gantt*, 194 F.3d 987, 999 n.9 (9th Cir. 1999) (reconciling the holdings
of *Morrison* and *Edmond*); *United States v. Hilario*, 218 F.3d 19, 25 (1st Cir. 2000)(same).

*Morrison* the Independent Counsel was removable, subject to judicial review, by the Attorney General for good cause or other condition that would substantially impair the performance of the independent counsel's duties. This factor carries even greater weight in this case because the Special Counsel is removable at will; his delegation of authority may be revoked without cause and without further review. As has been pointed out – and it bears repeating – Justice Scalia's dissent in *Morrison* explicitly stated that had the Independent Counsel been removable at will, even in his view of the Appointments Clause, the Independent Counsel statute would have passed constitutional muster. *Morrison*, 487 U.S. at 716 (Scalia, J., dissenting) (stating that if the Independent Counsel was removable at will by the Attorney General "then she would be subordinate to him thus properly designated as inferior.").

While the removability of the Special Counsel was an important factor, it was by no means the only *Morrison* factor relied upon by this Court in rejecting the Appointments Clause challenge in this case. This Court also emphasized the following factors: the Special Counsel is empowered only to perform limited duties and is obligated to follow policies and regulations promulgated by the Attorney General; his jurisdiction is limited; and he has limited tenure. 429 F. Supp. 2d at 44-45. Based upon all of these factors – the *Morrison* factors – this Court concluded that "[t]his case falls squarely into the mold of *Morrison*." *Id.* at 44. The Court's holding was based on a straightforward application of binding precedent.

Defendant's arguments based on *Edmond* do not have sufficient merit to constitute a substantial issue on appeal.[11] Defendant's argument is premised on the claim that when the *Edmond*

---

[11] This Court granted leave to a group of constitutional law scholars to file an amicus curiae brief. Amici's brief notes calls by some academics for the Supreme Court to revisit the question presented in *Morrison* and overrule that case. A.C. Br. at 1. To the extent that the amici or the

decision stated that inferior officers "are officers whose work is directed and supervised *at some*

*level*" by other principal officers, 520 U.S. at 663 (emphasis added), that the Supreme Court was

reworking its Appointments Clause jurisprudence and overruling *Morrison sub silentio*. In light of

the *Edmond* decision's discussion of *Morrison*, defendant's interpretation of *Edmond* is extravagant,

especially for a judge whose role is to identify and apply binding precedent. Defendant's contention

that *Edmond* overruled *Morrison* also completely ignores the fact that the case of the Coast Guard

---

defendant ask this Court to judge the substantiality of the Appointments Clause issue with respect to whether the issue is "ripe for reconsideration" by the Supreme Court, it is incongruous to suggest that a district court or court of appeals could view an argument for a change in the law as a substantial issue. Furthermore, it is important to note that under 18 U.S.C. § 3143(b), "[w]hat may be substantial and likely to result in reversal in terms of invoking the mandatory appellate jurisdiction of a court of appeals may well be insubstantial and unlikely to warrant the Supreme Court's plenary review when one seeks to invoke the discretionary certiorari jurisdiction of the Supreme Court." Stern, Gressman, Shapiro & Geller, *Supreme Court Practice* 762-63 (8th Ed. 2002). *See Julian v. United States*, 463 U.S. 1308 (1983)(Rehnquist, C.J.)("At a minimum, a bail applicant must demonstrate a reasonable probability that four justices are likely to vote to grant certiorari."). Thus, it is very difficult to establish that a question is "substantial" to the Supreme Court. With respect to the legal issues confronting this Court, the amici add little for the Court's consideration. The amici insist that *Edmond* "sets forth a *generally applicable* test of inferior-officer status." A.C. Br. at 4. As this Court has observed, the Supreme Court did not supplant *Morrison* and this Court likely would have reached the same result under *Edmond*. The amici also attempt to distinguish *Morrison* from the case at bar. A.C. Br. at 3. First, the amici state that the Special Counsel's office was not created by Congress. This ignores that the Attorney General, acting pursuant to statute, delegated authority to a Department of Justice attorney holding the statutory office of United States Attorney, subject to revocation at will. Second, the amici state that unlike the Independent Counsel law, no statute requires the Special Counsel to follow Department policies. As this Court concluded, as a member of the Department, the Special Counsel was obligated to follow such policies to the extent possible. Third, amici argue that the Special Counsel was able to expand his jurisdiction, and was therefore not sufficiently limited. This Court properly found that was not the case. Having made attempts to distinguish *Morrison* in favor of the defendant's argument, the amici attempt to discount the fact that strengthens the government's argument under *Morrison*: unlike the Independent Counsel, the Special Counsel is removable at will. A.C Br. at 5-6. The gist of amici's argument is that removability alone is not sufficient. That ignores this Court's analysis of the other limitations on the Special Counsel, Justice Scalia's dissent in *Morrison* stating that removal at will of the Independent Counsel would have changed the outcome, and the *Edmond* court's conclusion that removal is "a powerful tool for control." Thus, the amici have not established that there is a substantial question as defined by 18 U.S.C. § 3143(b).

judges presented an extremely different situation from that presented in *Morrison*, namely, the

vexing problem of how to handle investigations of high-ranking government officials while

maintaining the perception – and reality – of fairness.  The precise issue surely influenced the Court

in *Morrison*, just as it influenced this Court, which stated:

> The integrity of the rule of law, which is a core ingredient of the American system
> of government, is challenged to the greatest degree when high-level officials come
> under suspicion for violating the law.  And a criminal investigation of any individual,
> prominent or not, for suspected violations of law must be beyond reproach to
> preserve respect for the fairness of our system of justice.  There must therefore be a
> process by which the perception of fairness withstands the scrutiny of the American
> public when prosecution authority is called upon to investigate public officials.
> Creating that perception of fairness obviously starts with those who are charged with
> the responsibility of conducting the investigations.

429 F. Supp. 2d at 45.  The Supreme Court in *Morrison* and this Court in the case at bar were called

upon to interpret and apply the Appointments Clause in the context of the appointment of a special

prosecutor.  This Court's application of *Morrison* as binding precedent was correct and does not

create a substantial issue for appeal.  Rather, had this Court adopted *Edmond* as binding precedent,

embraced defendant's interpretation of that case, and dismissed the indictment,[12] it would have been

the government that would have had a meritorious issue on appeal, and it is respectfully submitted

that it would not have been a "close question."[13]

_____

[12] Because this Court concluded that the delegation of authority to the Special Counsel was
in conformity with the Appointments Clause, this court had no occasion to address the remedy for
failure to conform with the Clause.  The government submits that if the delegation to the Special
Counsel was in any way defective – a point the government in no way concedes – that under the
circumstances of this case the defendant in this case was not prejudiced and that any error was
harmless.

[13] Defendant's motion to dismiss was premised not only on *Edmond* being controlling rather
than *Morrison*, but on defendant's preferred reading of *Edmond,* which would require inferior
officers to be subject to something akin to day-to-day supervision.  As evidence that this Court's
Appointments Clause decision presents a substantial question, defendant quotes this Court's

III.    **DEFENDANT'S CHALLENGES TO THE COURT'S EVIDENTIARY RULINGS RELATED TO DEFENDANT'S MEMORY DEFENSE DO NOT CONSTITUTE SUBSTANTIAL QUESTIONS LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL.**

A.    **Denial of Defendant's Motion to Admit Expert Testimony**

Defendant sought to introduce the expert testimony of Dr. Robert A. Bjork regarding "thirteen scientific principles concerning human memory, including the process by which memory is encoded, stored, retained, and retrieved and various scientific bases for memory errors including 'content borrowing,' source misattribution, subsequent recall, divided attention, and 'retroactive interference.'" *United States v. Libby*, 461 F. Supp. 2d 3, 5 (2006) (citing Exhibit A to defendant's motion to admit expert testimony ("Def. Exp. Mtn.") at 2). The purpose of this testimony, according to defendant, was "to show that it was entirely plausible, given how memory has been found to function, that Mr. Libby or the government witnesses – or both – have innocently confused or misremembered the conversations on which this case turns." *Id.* at 5 (citing Def. Exp. Mtn. at 2).

After carefully considering the parties' briefs and exhibits, and the testimony presented

---

comment that "the question of whether the Special Counsel is an inferior under *Edmond* is a much more difficult question because the Special Counsel's work is conducted largely without direction and supervision." Def. Mot. at 5. Of course, this Court made clear that it was relying on *Morrison*. 429 F. Supp. 2d at 45. Nonetheless, this Court noted that the Special Counsel's "appointment would also likely survive under *Edmond*." *Id.,* n. 17. This Court stated that it "would have no basis for adopting the view that an inferior officer must be under active day-to-day supervision. Rather, an inferior officer's work must be simply be 'directed and supervised at some level.'" *Id.* After reviewing the limits on the Special Counsel's authority, including removability at will (which *Edmond* labeled a "powerful tool for control"), this Court concluded that for purposes of the Appointments Clause, "the Special Counsel is subject to the direction and control of the Deputy Attorney General." *Id.* Even if this Court had applied *Edmond*, the defendant's argument that *Edmond* requires day-to-day supervision, while perhaps presenting a more difficult question than the application of *Morrison*, would not present a substantial issue on appeal.

during a hearing on the motion, the Court, in a thorough written opinion,[14] denied defendant's

motion to admit Dr. Bjork's testimony on two grounds:  first, that the testimony had not been shown

to be helpful to the jury, as required by Fed. R. Evid. 702; and, second, pursuant to Fed. R. Evid.

403, that the probative value of the testimony was substantially outweighed by considerations of

undue delay and waste of time, and by the risk of unfair prejudice, confusion of the issues, or

misleading the jury.  *Id.* at 1, 18-19.

Contrary to defendant's contention (Def. Mot. at 9-11), the Court did not err, much less abuse

its discretion, in denying defendant's motion to admit expert testimony, and the court's ruling

provides no basis for granting release pending appeal.  In deciding defendant's motion to admit

expert testimony, the Court correctly applied Fed. R. Evid. 702[15] and properly performed the

"gatekeeping" function mandated by the Supreme Court in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993).  The Court began by applying *Daubert*'s two-

prong test of admissibility, determining:  "[a] whether the reasoning or methodology underlying the

---

[14] Once again, the Court's careful and conscientious approach is not evidence of the "closeness" of the question for purposes of 18 U.S.C. § 3143(b).  As in the case of the court's analysis in *Day*, while the issue "required close attention to the proffered testimony and careful analysis of the applicable standards, . . . the ultimate decision to exclude the proffered evidence was not a 'close' one" because "[w]hatever relevance the proffered testimony might have had was significantly outweighed by its lack of reliability and potential to confuse the jury. . . ." *Day*, 433 F. Supp. 2d at 57.

[15] Fed. R. Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

testimony is scientifically valid and [b] whether that reasoning or methodology properly can be applied to the facts in issue."[16]   461 F. Supp. 2d at 7.  Thereafter, the Court considered whether the probative value of the proffered testimony was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." 461 F. Supp. 2d at 8, 17-18 (citing Fed. R. Evid. 403); *Daubert*, 509 U.S. at 595 (recognizing that "expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it," and holding that, therefore, "the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.")

In light of the government's concession that the proffered testimony met the first prong of the two-part *Daubert* test, the Court correctly focused its attention on the question of whether

---

[16]   Defendant incorrectly characterizes his motion to admit expert testimony as having raised a "novel issue" for which there was a "dearth of relevant precedent."  District courts  routinely are called upon to determine the admissibility of expert testimony in both criminal and civil cases, and in doing so, they routinely apply, just as the Court did in this case, Fed. R. Evid. 702 in light of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993) and other relevant authorities.  Nor was the jury in this case asked to do anything unique or novel.  Juries in many, if not most, cases assess the memory and credibility of witnesses and evaluate competing versions of events without lengthy explanations of the current state of research into human memory.

In context, the Court's observation that "[t]here is no clear case authority, or absolute rule, on when an expert should be permitted to testify on issues regarding memory or perception" indicates only that it was required to decide the case by applying general principles to the particular facts and circumstances of the case before it.  The absence of controlling precedent determining the admissibility of expert testimony in circumstances identical to those before the Court is not a "dearth of relevant precedent."  Following defendant's logic to its conclusion, all determinations regarding the admissibility of expert evidence, and all determinations for which the law requires that case-by-case determinations be made by the district court, would constitute "novel" issues warranting release pending appeal.  But the opposite is true.  Decisions committed to the sound discretion of the trial judge are even less likely to result in reversal or a new trial and, thus, are less likely to justify release pending appeal.  *See United States v. Day*, 433 F. Supp. 54, 56 -57 (D.D.C. 2006).

defendant had established[17] that the proffered testimony "could properly be applied" to the facts in issue, or in other words, that the testimony would "assist the jury in understanding or determining" any of those facts."[18] 461 F. Supp. 2d at 8-9. In analyzing this issue, the Court considered the information and testimony offered by defendant in support of his claim that "jurors are generally unaware of the frequency and causes of honest errors of recollection, and that they underestimate the fallibility of memory."[19] *Id.* at 10. The Court properly considered, based on those submissions, (1) whether the proffered testimony was relevant; (2) whether it was within the juror's common knowledge and experience; and (3) whether it would usurp the juror's role of evaluating a witness's credibility. *Id.* at 7. As the case law relied upon by the Court (*see* 461 F. Supp. 2d at 7) makes clear, expert testimony regarding matters that are already familiar to the jury is *not* helpful and, thus, not admissible.[20] *See United States v. Long*, 328 F.3d 655, 666 (D.C. Cir. 2003)(approving expert

---

[17] The Court correctly held defendant, as its proponent, to the burden of establishing the admissibility of the proffered testimony. 461 F. Supp. 2d at 6 (citing *Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 n.9 (D.C. Cir. 2001) and *Daubert*, 509 U.S. at 592, n.10).

[18] As the Court noted, the Supreme Court cautioned in *Daubert* that "[f]it is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." 461 F. Supp. 2d at 6 (citing *Daubert*, 509 U.S. at 591).

[19] Defendant submitted to the Court, together with his motion, a number of studies which purported to demonstrate jurors' general lack of awareness of the frequency and causes of honest errors of recollection. At the *Daubert* hearing conducted by the Court, defendant presented the testimony of Dr. Elizabeth Loftus, regarding her opinions about the extent to which "principles" of memory to which Dr. Bjork would testify if permitted were commonly understood by the general public, and regarding the potential benefits of expert testimony on memory in criminal cases generally. Dr. Loftus did not testify regarding the application of Dr. Bjork's thirteen "principles" to the facts at issue in the case.

[20] In addition, the Advisory Committee Notes to Rule 702 state:

There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine

testimony regarding *modus operandi* where such information was "not ordinarily familiar to the average layperson"); *United States v. Mitchell*, 49 F.3d 769, 780 (D.C. Cir. 1995)(upholding the exclusion of expert linguistics testimony where recorded conversation was in evidence and its contents were within the common understanding of jury).  *See also United States v. Welch*, 368 F.3d 970, 974 (7th Cir. 2004) (noting that "[w]here expert testimony addresses an issue of which the jury is already generally aware, such testimony does not assist the jury") (internal quotation marks omitted)(overruled on other grounds).[21] [22]

---

       intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Fed. R. Evid. 702, Advisory Comm. Notes.

[21]  Defendant's suggestion that an application of the Court's analysis would result in the exclusion of expert testimony routinely admitted in other cases is untenable.  *See* Def. Mot. at 9-10, n. 5.  Whereas, as the Court found, the average juror can understand, based on his or her own common sense, knowledge and experiences, that any defendant or witness might be mistaken when he or she tries in good faith to remember and testify about details concerning past events and conversations, it cannot seriously be argued that most jurors are likely to have first-hand experience with, and knowledge of, narcotics trafficking routes, pimp-prostitute relations, "Stockholm syndrome," or specialized businesses such as vehicle parts or stone.

[22]  Similarly, expert testimony that duplicates arguments available to counsel for the parties is not helpful to the trier of fact.  *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004)("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.")(citing 4 Weinstein's Federal Evidence § 702.03[2] [a]).

After carefully considering Dr. Loftus' testimony, the Court correctly concluded that the studies upon which it was based were:

> inapposite to what the jurors [would] have to decide in this case because: (1) the studies examine issues of memory and cognition under substantially different factual situations than the situation here; (2) the research does not demonstrate that jurors will underestimate the fallibility of memory when the matter is addressed in the trial setting though voir dire, cross-examination, closing arguments, and jury instructions; and (3) insofar as the studies relied on by Dr. Loftus purport to demonstrate the failure of jurors to sufficiently understand factors that impact the accuracy of memory, the scientific value of the studies themselves is suspect.

461 F. Supp. 2d at 10. Specifically, the Court found that the studies relied upon by defendant were based on research into prospective jurors understanding the factors that could impact the reliability of eyewitness identification, and were not "applicable in any meaningful way to the case at hand, because they [did] not focus on the precise issues before the Court." 461 F. Supp. 2d at 12. In particular, the Court noted that, because prospective jurors generally have little or no experience as eyewitnesses to crimes, they are likely to be less familiar with concepts that may impact on a witness's identification, whereas common everyday experiences serve to familiarize them with how memory works and sometimes does not work. *Id.* The Court found that it was this familiarity, rather than a knowledge of the scientific bases and labels attached to the causes of memory errors, that was necessary "to appreciate that people sometimes experience mistaken memories." *Id.* In addition, the Court found that, because the studies relied upon by defendant "examined responses to questions posed in the abstract, and not through the lens of the actual trial process, their usefulness in establishing that jurors need assistance from an expert witness to understand the fallibility of memory is extremely limited, at best." *Id.* at 14. Based on all of these reasons, this Court determined that defendant failed to meet his burden of establishing that the proffered testimony of

Dr. Bjork would be helpful to the jury.[23]

This Court went on to consider whether Dr. Bjork's testimony was properly excluded under Fed. R. Evid. 403. The Court found that: (a) the probative value of the proffered testimony was limited to drawing more attention to principles about which the jury would appreciate, if not at the beginning of the trial, then at the beginning of deliberations; and (b) that value was substantially outweighed by considerations of undue delay and waste of time, as well as the "danger of unfair prejudice, confusion of the issues, or misleading the jury." 461 F. Supp. 2d at 18. Accordingly, the Court held that, even if it could conclude that Dr. Bjork's testimony satisfied the requirements of Rule 702, it would nevertheless exclude the evidence under Fed. R. Evid. 403. *Id.* (noting that "as the collective wisdom of the jurors, aided by the trial process itself, will more than adequately provide the jury with the means to assess the credibility and veracity of the witnesses, [] testimony concerning scientific principles regarding memory and cognition would only serve to confuse those determinations.")

Defendant argues that the Court of Appeals "might well reject this Court's conclusion that cross-examination and jury instructions provided an adequate substitute for Dr. Bjork's testimony."

---

[23]Defendant's reference to comments made by a juror to the press after the verdict was returned (Def. Mot. at 11) adds nothing to the equation because, as defendant is well aware, the Court is not permitted to consider such comments:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. . . . A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b). *See also United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003).

Def. Mot. at 10.  However, in light of the trial record, such a result is at best doubtful.[24]  During

extensive, skillful cross-examination, defense counsel repeatedly and effectively demonstrated

countless examples of misrecollection and otherwise faulty memory on the part of government

witnesses.  For instance, Robert Grenier testified at trial that he recalled telling Mr. Libby that

Ambassador Wilson's wife worked at the CIA in the same unit where the idea originated to send

Ambassador Wilson to Niger, but admitted that at the time of his earlier sworn testimony in the

grand jury, he did not recall whether or not he had spoken to Mr. Libby about Wilson's wife.  Mr.

Fleisher, who testified under a grant of immunity, testified that he had no recollection of speaking

to Walter Pincus about Ms. Wilson, and was later contradicted by Mr. Pincus, who claimed that such

a conversation did, in fact, occur.  Defense counsel made extensive use of these examples and others

in arguing forcefully to the jury that defendant was no different from the government's witnesses,

thus illustrating how defendant's memory may have failed.  Nor is there any basis for concern that

defense counsel's cross-examination of "confident" witnesses such as Mr. Russert was ineffective.

Counsel subjected Mr. Russert to nearly five hours of cross-examination during which several

instances of faulty memory were exposed, and used these as support for the argument that it may

have been Mr. Russert, rather than defendant, who had misrecollected the details of their

conversation.   Indeed, the record confirms that, as the Court predicted, cross-examination was an

effective tool for examining the issue of "faulty memory" before the jury.  The fact that the jury

---

[24]  In fact, before the trial even began, the defense was assured that the jury comprehended important aspects of the memory defense.  Defense counsel took full advantage of the wide latitude provided by the Court in jury selection, asking probing voir dire questions of each individual prospective juror.  During individual voir dire, defense counsel asked each juror some variant of the question whether if two people gave differing accounts of the same events, one of the persons must be lying.  Many of the jurors answered that honest people can remember things differently.  The defense had the opportunity to strike jurors who had answers that concerned the defense.

apparently differentiated between defendant and the government's witnesses, and rejected the defendant's faulty memory defense, does not mean that defendant was precluded from effectively presenting his defense. Likewise, the Court's instructions to the jury presented the "faulty memory" theory of defense in narrative form, and fully covered pertinent types and causes of errors in the recollection of witnesses, effectively highlighting for the jury those aspects of the evidence which defendant argued supported his defense.

Moreover, the defense also had at its disposal, and made effective use of, means other than cross-examination to put before the jury his theory that the magnitude of defendant's responsibilities, and the volume of national security information he received on a daily basis, made it unlikely that he would remember details concerning the conversations at issue in the trial. For example, defendant presented the testimony of John Hannah and the stipulated testimony of CIA briefers, which described in detail both defendant's job responsibilities and important national security issues he dealt with at relevant times.[25] And defense counsel made extensive use of this evidence in arguing to the jury that defendant could not be expected to remember details in light of the crush of responsibilities he experienced during the relevant time period.

In light of this Court's careful consideration of the applicable legal standards, the nature of the proffered testimony, the minimal usefulness to the jury and potential risks of confusing and misleading the jury, not to mention waste of time, there is little or no possibility that the Court of Appeals will find that this Court's exclusion of Dr. Bjork's testimony constituted error, particularly in view of the deferential standard of review applicable to the Court's determination. *See Day*, 433 F. Supp. 54, 56-57 (D.D.C. 2006)(denying bond pending appeal where defense challenged court's

---

[25] *See* discussion *infra* at Parts III.B.2 and III.B.3.

denial of motion to admit expert testimony related to defendant's capacity to form the requisite *mens rea*, in light of the facts that the court accepted the legal theory of the defense, instructed the jury on that theory, and permitted defendant to present the testimony of lay witnesses in support of that theory).  Thus, the denial of defendant's motion to admit expert testimony provides no basis whatever for granting defendant release pending appeal.

### B.    Issues Stemming From the Proceedings Under the Classified Information Procedures Act

The defendant advances three separate arguments that bear on issues decided by this Court during the proceedings under the Classified Information Procedures Act ("CIPA"):  (1) the adequacy of the government's proposed substitutions; (2) the exclusion at trial of the Statement Admitting Relevant Facts; and (3) the exclusion at trial of a portion of the testimony of the defendant's CIA briefers.  As is clear from a review of the record of the CIPA proceedings and of the trial, none of these issues presents a substantial question, much less one that, if decided the other way, would likely result in a reversal or an order for a new trial.

During the CIPA process, the defendant sought to convince the Court that there were specific details of highly classified information that he needed to introduce at trial to show that he was "obsessed" and "consumed" with particular national security issues on particular dates, which he alleged caused him to have a faulty memory that was the source of any inaccuracies in the information he provided to the FBI and the grand jury.  On numerous occasions during the CIPA hearings, the defendant represented to the Court and the government that at trial his own testimony would establish the relevance for the classified information he sought to introduce.  *See* Government's Response to Defendant's Brief Concerning Admissibility of Evidence of State of

25

Mind, at 2-3 (citing examples of repeated instances during the CIPA proceedings when the defendant affirmatively represented that he intended to testify). Not surprisingly, the Court explicitly based its CIPA § 6(a) relevancy determinations on the expectation that the defendant's own testimony would establish the foundation for the relevance of that evidence. *See id.* at 4-5 (citing numerous examples of Court's statements that its relevance determinations were predicated on the defendant's testimony laying the necessary foundation for the admissibility of specific evidence).

The Court applied a liberal standard during the § 6(a) hearings,[26] which ultimately resulted in the defendant having available to his defense a "dizzying panoply of classified information" subject to the substitution provisions of CIPA § 6(c), *United States v. Libby*, 467 F. Supp. 2d 20, 29 (2006), the vast majority of which was entirely unrelated to the facts supporting the indictment. Thereafter, in the § 6(c) proceedings, the Court adopted a standard favored by the defendant and opposed by the government, which eliminated any balancing of the government's national security interest in assessing the adequacy of the proposed substitutions. *See id.* at 25 n.4. Ultimately, using that standard, the Court found that the final substitutions provided by the government gave the defendant "substantially the same ability to present his defense," as required under § 6(c). The defendant then declined to testify at trial to those matters that he had proffered were important

_____

[26] *See, e.g., United States v. Libby*, 453 F. Supp. 2d 35, 40-44 (D.D.C. 2006) (rejecting the government's view that the Court should balance the defendant's interest in disclosure against the government's need to protect classified information in favor of the defendant's view that only the Federal Rules of Evidence should control the 6(a) determination); *United States v. Libby*, 467 F. Supp.2d 1, 8 n.12 (D.D.C. 2006) (stating that "[b]ecause this Court wants to provide the defendant every possible accommodation to put on his defense, the Court has been extremely reluctant to exclude evidence on [Rule 403] grounds."); *United States v. Libby*, 475 F.Supp.2d 73, 86 (noting that during the CIPA hearings, "the Court made provisional determinations of relevance, use, and admissibility – erring on the side of admitting the classified evidence when in doubt . . ."). Although the government respectfully disagrees with the standard applied by the Court during the § 6(a) hearings, it is important to recognize that the Court applied a standard in defendant's favor.

because he was "consumed" with them, and many of the substitutions therefore were not admitted into evidence.

### 1.    The Adequacy of the Government's Proposed Substitutions

The defendant first contends that the adequacy of the government's proposed substitutions under § 6(c) of CIPA provides a basis under which he should be granted release pending appeal. This is simply not true. First, it is of no small import that despite the favorable rulings the defendant received throughout the CIPA § 6(a) stage, and the fact that he had available to him extremely detailed and voluminous substitutions, he failed to make use of most of those substitutions at trial. Having not even used the substitutions as part of his defense, the defendant has no basis by which he can claim that a different ruling on the adequacy of the substitutions would result in reversal or an order for a  new trial. Thus the adequacy of the proposed substitutions can in no way meet the test for release pending appeal.

In any event, the adequacy of the substitutions does not present a "close question." The Government prepared extensive and detailed substitutions for all of the defendant's nine topic narratives and all of the documents deemed relevant and admissible by the Court pursuant to § 6(a), going back to the intelligence community on numerous occasions at the Court's request to elicit greater details to bring the substitutions even closer to the original classified text in the documents and the defendant's topic narratives. *See Libby*, 467 F. Supp. 2d at 23 (noting that the government provided revised versions of proposed substitutions throughout the course of the CIPA proceedings). As is readily apparent from a review of the substitutions,[27] they were more than adequate to give the

---

[27]A set of the government's final proposed substitutions was provided to the Court on December 4, 2006, and additional revisions for specific substitutions were provided to the Court on December 7 and 8, 2006.

defendant "substantially the same ability to make his defense," and any suggestion that the adequacy of the substitutions poses a "close question" is wholly without merit.

As a basis for arguing that the adequacy of the government's substitutions poses a substantial question, the defendant cites this Court's statements that "[t]here is no existing written case authority describing the lens through which a Court should look to determine whether a proposed substitution will provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information," *see* Def. Mot. at 12 (quoting *Libby*, 467 F. Supp. 2d at 25-26), and that the § 6(c) process was "largely uncharted by written precedent" *id.* at 40. The defendant ignores the fact that in the § 6(c) proceedings, the Court actually adopted the "lens" proposed by the defendant, rejecting the government's view that national security interests should be considered when assessing the adequacy of substitutions. The defendant also ignores the fact that the Court's § 6(c) determinations, like its § 6(a) determinations, are evidentiary determinations not rulings of law. *See United States v. Rezaq*, 134 F.3d 1121, 1142-1143 (D.C. Cir. 1998) ("The district court's substitution decisions turned on the relevance of the facts contained in the discoverable documents, and are therefore reviewed, like other relevance decisions under CIPA, for abuse of discretion.") As such, these determinations are entitled to great deference on appeal, making reversal even more unlikely. *See Day*, 433 F. Supp. 2d 54, 57 (denying motion for bond pending appeal, and noting that "[e]videntiary determinations . . . are reviewed by the court of appeals for abuse of discretion, and thus are less likely to result in reversal on appeal"). Adopting the defendant's view that the Court's assessment of the substitutions constitutes a "close question" would suggest that every time a judge makes a relevance determination to resolve an issue, there will be a "close question." That obviously is not and cannot be the case.

Contrary to what the defendant's motion suggests, the Court offered no equivocation in determining that the final substitutions provided by the government gave the defendant "substantially the same ability to make his defense" as required under CIPA. In a detailed, thorough analysis rejecting the defendant's objections to certain items, the Court made the following observations:

- "There can be no credible argument that the defendant does not have a vast quantity of information at his disposal to present to the jury concerning what matters he was involved in during this critical time period." *Id.* at 37.

- "Finally, it is important to also note that the defendant retains the ability to saturate the jury with classified information he received on June 11 and the dates immediately surrounding this date to show what was the focus of his attention at that time." *Id.* at 39.

- "There can be no serious contention that based upon this overwhelming amount of information, the defendant will be able to argue to the jury that the volume and magnitude of the important national security information presented to him on June 11, 2003, and the days immediately before and after that date, was so formidable that it is inconceivable that the accuracy of his memory would not have been impaired." *Id.*

As part of its analysis, the Court noted that the adequacy of the substitutions had to be assessed in conjunction with the nature of the defendant's defense and the other evidence proffered in furtherance of that defense, which included, among other things the defendant's daily calendars. The lack of equivocation in the Court's assessment and the overwhelming nature of the information available to the defendant through the government's proposed substitutions and other evidence demonstrates that the adequacy of the substitutions does not present a substantial question.

### 2. Exclusion of the Statement Admitting Relevant Facts

Among the substitutions provided by the government pursuant to CIPA § 6(c) was a one-page, five-paragraph document describing the nature of the defendant's job, and his duties and responsibilities with respect to a number of national security issues, which was entitled "Statement

Admitting Relevant Facts."[28]   The admission of this substitution, like the admission of the other substitutions provided by the government during the § 6(c) process, was conditioned on the § 6(a) relevancy determinations made by the Court, e.g., without the foundational predicate establishing the relevance of the information that was being substituted, the substitution itself certainly could not be relevant.

During trial, the defendant sought to introduce the Statement despite the fact that he had not taken the stand.  The Court excluded the Statement in its entirety under Federal Rules of Evidence 401 and 403 as both irrelevant and unduly prejudicial without the defendant's testimony, stating that "it could not require the government to stand by a substitution of evidence that it agreed to with the understanding – and in light of this Court's rulings, based on the same understanding – that the defendant himself would testify."  *Libby*, 475 F. Supp. 2d at 86.  The Court added:

> Admitting [the Statement's last three] paragraphs in the absence of the defendant's own testimony would have provided the government no opportunity to cross-examine him on the extent and nature of his concern about these issues, with the result that the jury would have been presented an entirely one-dimensional, one-sided portrayal of the defendant's state of mind with respect to those issues.  Neither Rule 403 nor the basic principles of fairness underlying the Federal Rules of Evidence . . . would permit the defendant to put [those paragraphs] before the jury in such manner.

*Id.* at 87-88.

---

[28]Although the defendant attempted to characterize this document as an "unqualified admission" based solely on its title, the Court correctly found that characterization inappropriate, stating, "[i]n no way can the Statement reasonably be construed as an unqualified admission of fact that was intended to bind the government (or this Court, which approved the substitution) even if the defendant chose not to testify."  *Libby*, 475 F. Supp. 2d at 86.  The title "Statement Admitting Relevant Facts" comes from the language in CIPA § 6(c)(1)(A), ". . . the United States may move that, in lieu of the disclosure of such specific classified information, the Court order . . . the substitution for such classified information of a *statement admitting relevant facts* that the specific classified information would tend to prove . . . ." (emphasis added).

The defendant's claim that the exclusion of the Statement presents a substantial question is wrong. The Court's decision to exclude the Statement was a straightforward one supported entirely by the representations made by the defense during the CIPA hearings that the defendant's testimony is what would make such information relevant at trial and the consideration that admitting it would violate Rule 403. Moreover, the decision constitutes a routine evidentiary ruling well within the district court's discretion. Such decisions are entitled to substantial deference, and are unlikely to result in reversal on appeal. *See Day*, 433 F. Supp. 2d at 57.

The defendant's baseless claim that the exclusion of the Statement violated his Constitutional rights fails to turn this routine evidentiary issue into a substantial question. As this Court noted, defendant's guarantee under the Constitution to present his version of facts to the jury "extends only to relevant evidence." *See Libby*, 475 F. Supp. 2d at 91 (citing, among others, *United States v. Prince-Oyibo*, 320 F.3d 494, 501 (4th Cir. 2003) (holding that "criminal defendants do not have a right to present evidence that the district court, in its discretion, deems irrelevant or immaterial")). The Court's decision not to admit evidence it found irrelevant and unduly prejudicial did not in any way deprive the defendant of his rights to due process, to present a defense, and to remain silent.

Finally, the defendant ignores the fact that at trial, he was able to introduce a substantial portion of the information contained within the Statement through, for example, the testimony of John Hannah and a stipulation for the defendant's CIA briefings (as discussed further below). In fact, the Court found that admitting the first two paragraphs of the Statement would be cumulative under Rule 403 in light of Mr. Hannah's testimony. *See Libby* 475 F. Supp. 2d at 88. Thus, even assuming the doubtful proposition that exclusion of the Statement does present a substantial question, there is no basis for believing that a favorable appellate ruling on the issue would result

in a reversal or an order for a new trial.[29]

### 3.    Exclusion of a Portion of the Testimony of the CIA Briefers

The defendant also sought at trial to introduce the testimony of three CIA briefers who provided him with morning intelligence briefings.  The Court ruled that he could present to the jury some of the information he sought to bring out through that testimony.  Specifically, the Court concluded that "the defendant could present to the jury, through the briefers' testimony or otherwise, the topic areas he was briefed on during the dates in question as a means of giving the jury a general appreciation of the matters he was responsible for addressing on those dates."  *Libby*, 475 F. Supp. 2d at 89.  The Court also noted, "[a]dditionally, the defendant was permitted to present detailed information concerning the intelligence briefing he received on June 14, 2003, the day he asked the briefer about Mr. Wilson's wife."  *Id.* at 89 n.18.  The Court prevented the defendant from eliciting from the briefers specific details from briefings on dates other than June 14, 2003, or that otherwise would tend to suggest what matters were allegedly consuming the defendant's time and attention.  After the Court's ruling, instead of calling the briefers to the stand, the defendant chose to present to the jury a stipulation between the parties that described in detail the topics on which he was briefed on the morning of June 14, 2003, including a list of terrorist threat items from that date, and more general information about the kinds of intelligence information and topics on which he was briefed during the period "between May 2003 and March 2004, including the weeks of June 9

---

[29]In addition, it is worth noting, as this Court did, that the defendant had the opportunity to call a number of other witnesses at trial to provide additional testimony relating to information in the Statement.  *See Libby*, 475 F. Supp. 2d at 91 n.21.  The defendant's failure to call those witnesses, including the Vice President (who was present with the defendant during many of the intelligence briefings and could offer better testimony than the briefer Mr. Schmall as to the defendant's responsibilities),  should not now enable him to claim that his defense was somehow impaired by his inability to admit information contained within the Statement.

through June 14 and July 7 through July 14, 2003." Tr. Feb. 14, 2007, A.M. Session, at 69-74.

The defendant claims that the Court's exclusion of a portion of the testimony from the briefers presents a substantial question. This claim likewise lacks merit. The decision to exclude a portion of the briefers' testimony was, like the exclusion of the Statement, based on the fact that the relevance of that testimony was predicated on testimony from the defendant regarding the importance he attached to the information the briefers provided him. "Without the defendant's own testimony, he could not present through the briefers evidence suggesting what matters were allegedly consuming his time or attention beyond when the briefings were conducted, or the relative importance of those matters he was tasked to address at a particular time." *Libby*, 475 F. Supp. 2d at 89.

In permitting the defendant to admit some testimony from the briefers, while excluding other information whose relevance was specifically predicated on the defendant's testimony, the Court struck a careful balance under Federal Rules of Evidence 401 and 403. As with its decision regarding the Statement, nothing about this ruling presents a "close question." The defendant's citations to this Court's statements that it was "not sure" whether to exclude a portion of the testimony or that it was "a tough call" must be put in context. These statements were made in the context of a district court's routine and discretionary evidentiary determinations under Rules 401 and 403. They are highly fact specific, based on the district court's assessment of relevance, and of what the defendant was able, through other evidence, to put before the jury. These statements also preceded the district court's thorough analysis in its March 1, 2007 opinion as to why a portion of the briefers' testimony was justifiably excluded at trial, an analysis that offered no equivocation on the issue:

> The government was correct that, as was true of the Statement Admitting Relevant Facts, the Court's § 6(a) rulings pertaining to the defendant's intelligence briefings, and the level of detail the Court deemed admissible, hinged on its assumption that the defendant himself would lay a foundation establishing their relevance. Likewise, as with the Statement, the Court was cognizant of the potential for prejudice that would have arisen if the defendant had been permitted to portray his own state of mind without allowing the government any effective means of challenging it through cross-examination. And there was indeed a significant danger that if presented with details of national security issues and suggestions by those who worked with him that the defendant himself was personally concerned about those issues, the jury would have been unable to resist speculating about the relative import of those matters to the defendant.

*Id.* at 89.

Moreover, the defendant was able to introduce at trial a significant amount of information relating to the intelligence briefings he received, through the stipulation ultimately read to the jury and through the testimony of John Hannah and cross-examination of Craig Schmall. Mr. Libby's Motion for Release Pending Appeal even cites some of this evidence, *see* Def. Mot. at 14-15,[30] which the government would argue actually supports the government's position that given the evidence that *was* introduced at trial, there is absolutely no basis for believing that, if this issue presented a substantial question, a decision to permit additional testimony from the briefers would likely result in a reversal or an order for a new trial.

---

[30] Incidentally, it is important to note, as this Court did, that the testimony of Craig Schmall did not show what "actually commanded" the defendant's attention at relevant times, thereby establishing a predicate for what was in fact of concern to him. *See Libby*, 475 F. Supp.2d at 88 n.17. Mr. Schmall testified that he did not even recall the specific items on which he briefed the defendant. *See* Tr. Jan. 24, 2007, P.M. Session, at 101-06. Similarly, the testimony of John Hannah did not and could not demonstrate what actually "consumed" the defendant's attention at relevant times.

**C.    Even if Erroneous, the Court's Evidentiary Rulings Were Harmless in Light of the Overwhelming Evidence of the Defendant's Guilt.**

In sum, none of the issues defendant raises with respect to his memory defense constitutes a "substantial question," much less one likely to result in a reversal or a new trial. In its rulings on each of the issues raised by the defendant, the Court's determinations were clear and lacking in equivocation. Moreover, the Court's determinations on all of these issues were routine, discretionary decisions by the district court based on standard evidentiary rules, thus entitled to substantial deference and unlikely to result in reversal. Finally, the government respectfully submits that, in a case in which the Court recognized at sentencing that the "evidence overwhelmingly indicated Mr. Libby's culpability, despite the best efforts of counsel," Tr. June 5, 2007 at 80, it is highly unlikely that an appellate court would find that a different ruling on any of these issues could possibly have led to an acquittal. Thus, it is clear that none of these issues provide a basis for overcoming the presumption in favor of detention pending appeal.

**IV.    DEFENDANT'S CHALLENGE TO THE COURT'S EXCLUSION OF THE TESTIMONY OF ANDREA MITCHELL DOES NOT CONSTITUTE A SUBSTANTIAL ISSUE LIKELY TO RESULT IN REVERSAL OR A NEW TRIAL.**

Tim Russert testified that he did not tell defendant that Mr. Wilson's wife worked at the CIA when he spoke with defendant late during the week of July 6, 2003. Tr. February 7, 2007 PM at 11, 26. Mr. Russert indicated that he was certain of this, and that he could not have spoken with defendant regarding Ms. Wilson because, at the time of their conversation, he knew nothing about her.[31] *Id.* Mr. Russert also specifically denied knowing about Ms. Wilson's CIA-employment until

---

[31] Mr. Russert's testimony made clear that he recalled his conversation with defendant, and was certain that he did not mention Ms. Wilson during that conversation, and was not, as defendant implies, merely inferring from the sequence of events that he "could not have" mentioned Ms.

he read about it in Mr. Novak's column. *Id.*

At trial, defendant sought to introduce the testimony of Andrea Mitchell, Chief Foreign Affairs Correspondent for *NBC News*, purportedly to testify regarding "her knowledge of Ms. Wilson's employment" prior to the publication of Robert Novak's column on July 14, 2003. According to defendant, if Andrea Mitchell knew of Ms. Wilson's employment before the publication of Mr. Novak's column, it could reasonably be inferred that she would have told Mr. Russert, and if that occurred, then Mr. Russert could be shown to have lied or been mistaken regarding his knowledge of Ms. Wilson's employment at the time of his conversation with defendant, and also that he may have lied or been mistaken about whether he mentioned Ms. Wilson's employment to defendant. This tall stack of inferences depended on the defendant's being able, at a minimum, to convince the jury that Ms. Mitchell knew of Ms. Wilson's employment prior to July 11, 2003.

Ms. Mitchell moved to quash defendant's trial subpoena, and during the course of proceedings on the motion, advised the Court through counsel that, if called to testify, she would deny having known, prior to the publication of Mr. Novak's column, that Ms. Wilson worked at the CIA.[32] Nevertheless, defendant sought to attack Mr. Russert's credibility by introducing evidence that on the October 3, 2003 episode of CNBC's "Capitol Report," Ms. Mitchell made a statement

---

Wilson to defendant.

[32] While the defense initially requested that the Court order that Ms. Mitchell submit to questioning on this point outside the presence of the jury, eventually, counsel accepted the representation of Ms. Mitchell's counsel, which was consistent with repeated public statements made by Ms. Mitchell. See 475 F. Supp. 2d at 82, n. 8. As discussed below, counsel's waiver of an opportunity to question Ms. Mitchell constitutes a waiver of any argument that she would have testified inconsistently with her attorney's representation.

suggesting that she had been aware of Ms. Wilson's CIA-employment prior to the publication of Mr. Novak's column.[33]  Defendant contended that, despite Ms. Mitchell's repeated public statements in which she explained that she mis-spoke or misunderstood the question when addressing this issue on the October 3, 2003 broadcast, and in which she insisted that the broadcast should not be understood as an indication that she knew of Ms. Wilson's employment prior to Mr. Novak's July 14, 2003 column,[34] the jury could permissibly conclude from her October 3, 2003 statement that she had in fact known about Ms. Wilson and that she would have shared this information with Mr. Russert prior to his conversation with defendant.  CITE.  According to defendant, Ms. Mitchell's October 3, 2003 statement could thus be used to discredit Mr. Russert's credibility.

   After reviewing briefs submitted by the parties and counsel for Ms. Mitchell, and hearing

---

[33]  When asked during a segment of the October 3, 2003 broadcast of *CNBC*'s "Capital Report" how widely known it was in Washington that Joe Wilson's wife worked for the CIA, Ms. Mitchell replied, "It was widely known among those of us who cover the intelligence community and who were actively engaged in trying to track down who among the foreign service community was the envoy to Niger. So a number of us began to pick up on that." "Capital Report" (*CNBC* Television Broadcast Oct. 3, 2003).

[34] Ms. Mitchell and her employer, *NBC*, later made numerous public statements disputing the accuracy of these statements.  For example, on October 29, 2005, Ms. Mitchell told *NBC News* that the *Washington Post* story had erroneously reported that she had been a recipient of the leak about Valerie Wilson before Novak's column, and reiterated that she had in fact not been a recipient of the leak before Novak's column was published.  "Tim Russert Show" (*CNBC* television broadcast, Oct. 29, 2005) ("I was called by the CIA because it was erroneously reported in The Washington Post that I was the recipient of the leak before Novak's column came out, and I had not been.")  In a November 10, 2005 interview with radio host Don Imus, Ms. Mitchell stated that her October 3, 2003 quote was taken out of context, and that when she made the comment on October 3, 2003, she was referring to *after* the publication of the Novak column.  She also definitively said that she did not know about Valerie Wilson before the Novak column.  *See* DX 1661.5 ("Imus in the Morning" (*MSNBC* television broadcast, Nov. 10, 2005)).  In a November 23, 2005 interview with radio host Don Imus, Ms. Mitchell repeated that she did not know about Joe Wilson's wife until after Novak's column, and that when she read Novak's column, she went to her producer and asked "How the heck did we not know that?" *See* DX 504.3 ("Imus in the Morning" (*MSNBC* television broadcast, Nov. 23, 2005)).

extensive argument, this Court determined that (a) there was no legal basis upon which Ms.

Mitchell's October 3, 2003 statement could be introduced as substantive evidence;[35] (b) under *United*

*States v. Johnson*, 802 F.2d 1459 (D.C. Cir. 1986) and cases from other jurisdictions, Ms. Mitchell's

October 3, 2003 statement was not admissible as impeachment evidence; and (c) an analysis under

Rule 403 also led to the exclusion of the testimony, because the impeachment of Ms. Mitchell with

her prior statement lacked probative value, whereas, the risk that the jury would misuse the prior

statement to the undue prejudice of the government, was significant.  475 F. Supp. 2d at 79-80, 83-

84.

        As this Court found, defendant's purpose in calling Ms. Mitchell was indeed to put before

the jury her prior statement, and this tactic violated not only well-settled authority in the D.C.

Circuit, but authority from other jurisdictions as well.  *See United States v. Johnson*, 802 F.2d 1459,

1466 (D.C. Cir. 1986) (holding that it was "entirely inappropriate" for the prosecution to call a

witness for the sole purpose of bringing about the admission of a statement that was not

independently admissible); *United States v. Peterman*, 841 F.2d 1474, 1479 n.3 (10th Cir.

1988)(noting that "[e]very circuit has said evidence that is inadmissible for substantive purposes may

not be purposely introduced under the pretense of impeachment"); *United States v. Sebetich*, 776

F.2d 412, 429 (3d Cir. 1985) ("It is well established, however, that witnesses may not be called for

the purposes of circumventing the hearsay rule by means of Rule 607"); *United States v. Morlang*,

---

[35] This Court held that the statement was not admissible under *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973) or under Fed. R. Evid. 807.  475 F. Supp. 2d at 77.  Since defendant does not argue that either of these rulings supply a "substantial issue" likely to result in reversal or a new trial, the government omits discussion regarding them other than to say that neither ruling constituted error, much less an abuse of discretion.

531 F.2d 183, 190 (4th Cir. 1975) ("The overwhelming weight of authority is, however, that impeachment by prior inconsistent statement may not be permitted where employed as a mere subterfuge to get before the jury evidence not otherwise admissible"); *United States v. Fay*, 668 F.2d 375, 379 (8th Cir. 1981) ("Although Rule 607 allows a party to impeach his own witness, '(c)ourts must be watchful that impeachment is not used as a subterfuge to place otherwise inadmissible hearsay before the jury'"); *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984). As in all of these cases, allowing the defense to call Ms. Mitchell posed the unacceptable risk that the jury would improperly consider Ms. Mitchell's October 3, 2003 statement for its truth. Indeed, defense counsel repeatedly argued that the jury should be permitted to do just that. Thus, the Court correctly concluded that because the law did not allow defendant to call Ms. Mitchell solely, or for the primary purpose of, putting before the jury her October 3, 2003 statement, her testimony must be excluded.

Defendant argues that the question of the admissibility of Ms. Mitchell's testimony presents a "close" question because: (a) the court of appeals could distinguish *Johnson*; (b) Ms. Mitchell "might have" testified consistently with her October 3, 2003 statement; and (c) the jury might have concluded that Ms. Mitchell was lying or mistaken when she denied knowing of Ms. Wilson's CIA-employment prior to the publication of Mr. Novak's column and on that basis the jury might have inferred that Ms. Mitchell relayed the information concerning to Ms. Wilson to Mr. Russert prior to Mr. Novak's column. Contrary to defendant's contention, none of these arguments presents a substantial issue likely to result in reversal or a new trial.

The suggestion that the court of appeals "could" distinguish the D.C. Circuit's decision in *Johnson* does not come close to establishing a "substantial question" likely to result in reversal or a new trial, particularly in view of the deferential standard of review applicable to this evidentiary

issue on appeal.[36] In this case, as in *Johnson*, defendant insisted in calling the witness despite his knowledge that she would provide testimony unfavorable to the defendant, and that she had made prior out-of-court statements that were also unfavorable to his defense. As was the case in *Johnson*, the only favorable evidence that could be introduced through the witness was her prior out-of-court statement, which was inadmissible. In view of these facts, the Court correctly found, as did the court in *Johnson*, that the defense planned to call Ms. Mitchell solely or primarily for the purpose of putting before the jury her prior out-of-court statement.

None of the factors identified by defendant as distinguishing this case from *Johnson* establish any basis for finding that there is any likelihood that the court of appeals will determine that this Court's exclusion of Ms. Mitchell's testimony constituted error, much less an abuse of discretion. While the proponent of the evidence in *Johnson* was the prosecutor and the proponent here is the defendant, as this Court noted, this distinction does not reduce the likelihood that the jury in this case would misuse the October 3, 2003 statement and consider it for its truth. *See* 475 F. Supp. 2d at 83. Moreover, the reliability of Ms. Mitchell's uncorroborated October 3, 2003 statement was even more doubtful than the post-arrest statement at issue in *Johnson*. *See* 475 F. Supp. 2d at 78, 80. As the Court found, it was not even clear that the statement was properly interpreted as defendant suggested, that is, to mean that Ms. Mitchell knew about Ms. Wilson's employment prior to the publication of Mr. Novak's column. *See* 475 F. Supp. 2d at 80. In any event, Ms. Mitchell had consistently, and repeatedly, refuted the accuracy of the statement as interpreted by defendant.

Defendant's speculation that Ms. Mitchell might have testified consistently with her October

---

[36] As previously stated, determinations regarding the admissibility of evidence are reviewed only for abuse of discretion, and thus are less likely to be reversed on appeal. *See Day*, 433 F. Supp. 2d at 57.

3, 2003 statement or admitted on cross-examination that "it was possible that she had learned of or heard a rumor about Ms. Wilson's employment prior to the Novak article even if she did not remember that happening all these years later" (Def. Mot. 19) provides no basis for distinguishing *Johnson* or other relief. As the Court noted, it is difficult in any case to ascertain with certainty exactly what a witness's testimony would be. 475 F. Supp. 2d at 82, n. 8. Moreover, in this case, defendant ultimately waived the opportunity to find out whether Ms. Mitchell's account would differ from what she represented once she was placed under oath by accepting her attorney's representations. *See id.* In any event, Ms. Mitchell's repeated public statements refuting the fact that she had known about Ms. Wilson's employment prior to reading Mr. Novak's column, combined with the representation of counsel, provided the Court with far more assurance regarding her likely testimony than was present in *Johnson*.

Likewise, defendant's suggestion that, had Ms. Mitchell testified, the jury may have inferred from her demeanor or otherwise that Ms. Mitchell had heard a rumor about Ms. Wilson, told Mr. Russert about it, and later lied to protect Mr. Russert and the NBC franchise from embarrassment (Def. Mot. 21), is fantastical, as is the proposition that this unsupported "theory" raises a legal question regarding whether a factfinder may properly infer from demeanor evidence alone that a the opposite of what a witness says is true. In fact, the utter and complete lack of evidence supporting defendant's "theory" is persuasive proof of the correctness of this Court's determination that defendant's purpose in calling Ms. Mitchell was merely to put her October 3, 2003 statement before the jury. There is no reasonable possibility that the court of appeals will disagree.

Finally, in the unlikely event that the court of appeals were to determine that the Court erred in excluding Ms. Mitchell's testimony there is no possibility that it would find that the error was

anything but harmless.  As this Court found, the probative value of the testimony was minimal at best and in light of the overwhelming evidence of defendant's guilt, any error in excluding this evidence was necessarily harmless.

For all of these reasons, and the reasons stated in this Court's March 2, 2007 Memorandum Opinion, this Court's exclusion of the testimony of Andrea Mitchell provides no basis for granting defendant release pending appeal under § 3143(b).

<u>CONCLUSION</u>

For the reasons discussed above and for all the reasons set forth in the Court's prior opinions and orders reported at 429 F. Supp. 2d 27 (D.D.C. Apr. 27, 2006), 453 F. Supp. 2d 35 (D.D.C. Sept. 21, 2006), 461 F. Supp. 2d 3 (D.D.C. Nov. 2, 2006), 467 F. Supp. 2d 1 (D.D.C. Dec. 1, 2006), 467 F. Supp.2d 20 (D.D.C. Dec. 22, 2006), and 475 F. Supp. 2d 473 (Mar. 1, 2007), the government respectfully requests that this Court deny defendant's motion for release pending appeal.

Respectfully submitted,

_____/s/_____

PATRICK J. FITZGERALD
Special Counsel
219 South Dearborn, 5th Floor
Chicago, Illinois   60604
(312) 353-5300

Dated: June 12, 2007

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that on this 12th day of June, 2007, I caused true and correct

copies of the foregoing to be served on the following parties by electronic mail:


William Jeffress, Esq.
Baker Botts
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2400
Facsimile: 202-585-1087

Theodore V. Wells, Esq.
Paul Weiss
1285 Avenue of the Americas
New York, NY 10019-6064
Facsimile: 212-373-2217

John D. Cline, Esq.
Jones Day
555 California Street
San Francisco, CA 94104
Facsimile: 415-875-5700


Patrick J. Fitzgerald
Special Counsel
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, D.C.  20530
202-514-1187

By: _____/s/_____
Debra Riggs Bonamici
Deputy Special Counsel