## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 05-394 (RBW) |
| | ) | |
| I. LEWIS LIBBY, | ) | |
| also known as "Scooter Libby," | ) | |
| Defendant. | ) | |

## I. LEWIS LIBBY'S REPLY IN FURTHER SUPPORT
## OF HIS MOTION FOR RELEASE PENDING APPEAL

The government is correct that it is the defense's burden to show that Mr. Libby will raise substantial issues on appeal. It errs, however, in suggesting that the Court must conclude that its decisions were incorrect for Mr. Libby to prevail. The government cannot answer this motion by pointing out that *this* Court has already ruled against Mr. Libby on these issues. Rather, it is sufficient for Mr. Libby to show that the issues he will raise on appeal are "close" and, if resolved in his favor, would require reversal of the conviction or a new trial. While the length of the Court's opinions cannot alone answer the § 3143(b) inquiry, those opinions are powerful evidence that the issues are thorny, and could well be decided differently on appeal. Moreover, contrary to government's assertion, the principal testimony offered against Mr. Libby (including, perhaps most critically, that of Mr. Russert) was *not* corroborated by documents or other witnesses. Rather, this was a he-said, he-said case of competing recollections, one in which the errors Mr. Libby has identified are highly unlikely to be deemed harmless.

Mr. Libby has met his burden and is entitled to release pending appeal.[1]

---

[1] As noted in our motion, David Safavian, who was convicted of obstruction and false statements, was recently held to be entitled to release pending appeal by a court in this district. Likewise, Frank Quattrone, Kirk Shelton, Martha Stewart, Lynn Stewart, Bernie

I.    **MR. LIBBY'S CHALLENGE TO THE AUTHORITY OF THE SPECIAL COUNSEL SATISFIES THE REQUIREMENTS OF § 3143(b)**

The government virtually concedes that, if this case is controlled by the "direction and supervision" test set forth *Edmond v. United States*, 520 U.S. 651, 662-63 (1997), then Mr. Libby's Appointments Clause challenge presents (at the least) a "close" question for appeal.  It confines its discussion of *Edmond* largely to the margin, and insists that *Morrison v. Olson*, 487 U.S. 654 (1988), "dictates" the answer in this case.  Govt's Resp. in Opp'n to Defendant's Mot. for Release Pending Appeal at 9-10 ("Resp.").  It suggests, moreover, that whatever the scope of his powers, Mr. Fitzgerald's theoretical removability is itself sufficient to render him an inferior officer no matter what test applies, and that the issue is not even close.  The government is wrong on all counts.[2]

First, as explained in Mr. Libby's motion, the appellate court could easily conclude that the straightforward rule announced in *Edmond* — rather than the ad hoc analysis used in *Morrison* — provides the appropriate framework for review.  While *Edmond* did not expressly overrule *Morrison*, it made no attempt to conform to its analysis and made a point of stating that *Morrison* did not "set forth a definitive test for whether an office is 'inferior' under the Appointments Clause."  520 U.S. at 661; *see also Morrison*, 487 U.S. at 671 (declining to set forth a general test because on the facts of

---

Ebbers, John and Timothy Rigas, and Solomon Kaplan (among others) were also convicted of non-violent crimes, and were also afforded the same relief Mr. Libby seeks here.

[2] While Mr. Libby relies primarily on his constitutional challenge for purposes of this motion, he expects to present his statutory challenge to the court of appeals as well.  For the reasons stated in his motion to dismiss and reply in support thereof, that issue presents a substantial question as well.

that case the answer to the principal-inferior officer question was clear).  The Court then went on to provide a straightforward rule — stated in generally applicable terms — for making the inferior-officer determination.  It gave no indication that this rule should not be applied to Appointments Clause challenges subsequently raised.

Thus, while *Morrison* might dictate the outcome if a court were confronting a special prosecutor whose authority was *identical* to that of the independent counsel in all material respects, it does not have the binding effect that the government posits.  Because the office at issue in *Morrison* and in this case differ in several significant respects, and because *Edmond* and *Morrison* are concededly in "tension," it is at least a close question whether *Morrison* applies at all.  *See* I. Lewis Libby's Mot. to Dismiss (filed Feb. 23, 2006) (Dkt. 45) at 19-21 (outlining the differences between the appointment of the Special Counsel here and the independent counsel under the Ethics in Government Act).

Second, given the sweeping scope of his powers, the appellate court might well conclude that the Special Counsel is a principal officer — under *Edmond* or *Morrison*.[3] To take one example, unlike the independent counsel, Mr. Fitzgerald is not obligated by any statute or regulation to comply with Justice Department policies and regulations.  We recognize that this Court reached a different conclusion on that question.  But, as with its other conclusions regarding the scope of Mr. Fitzgerald's power, it did so by applying principles of agency law.  The appellate court might well decide that the application of agency law is misplaced since it assumes the answer to the question presented:  whether

---

[3] Contrary to the government's assertion, Resp. at 8-9, it has consistently been the defense's position that the Special Counsel is a principal officer even under the *Morrison* analysis.  *See* Mot. to Dismiss at 18-22.

the Special Counsel is an agent of a principal within the Department or a principal

himself.

     In considering this question, the court of appeals might instead rely on the

language in Mr. Comey's February 6, 2004 letter, language that actually defines the

scope of the appointment and expressly relieves Mr. Fitzgerald of any obligation to

comply with 28 C.F.R. § 600 et seq. Those regulations require all *other* Special Counsel

to comply with Department policies and regulations. By virtue of Mr. Comey's letter,

Mr. Fitzgerald would appear to be exempt. The appellate court could, moreover, easily

find irrelevant the fact that Mr. Fitzgerald is obligated to comply with Department

policies in his role as a U.S. Attorney since, in his role as special counsel, he is relieved

of numerous other requirements otherwise binding on a U.S. Attorney.

     The appellate court might also find significant the fact that Mr. Fitzgerald

assumed (and perhaps was ceded) significant powers under CIPA — an issue that did not

arise at all in *Morrison*. Section 14 of CIPA expressly requires that "[t]he functions and

duties of the Attorney General under this Act may be exercised by the Deputy Attorney

General, the Associate Attorney General, or by an Assistant Attorney General designated

by the Attorney General for such purpose and *may not be delegated to any other official*."

(Emphasis added.) That provision reflects Congress's clear concern that, given the

extraordinary interests at play in a CIPA case, certain crucial steps must be taken by the

Attorney General himself or other specifically enumerated members of the Department.

For example, CIPA clearly provides that it is the *Attorney General* who must sign and

submit to the court the § 6(c) "affidavit certifying that disclosure of classified information

would cause identifiable damage to the national security of the United States and

explaining the basis for the classification of such information." Yet, here, it was Mr. Fitzgerald who provided the § 6(c) affidavits, in apparent violation of the CIPA statutory scheme. This fact alone is compelling evidence that the Special Counsel, with all of his sweeping powers, qualifies as a principal officer under the Appointments Clause.

The government insists that it need not demonstrate "day-to-day supervision" to establish inferior officer status under *Edmond. See* Resp. at 15 n. 13. That may be true. But *Edmond* clearly requires "direction and supervision" by a principal officer "at some level." As the foregoing examples show, here there is no supervision at all.

Third, contrary to the government's suggestion, Mr. Fitzgerald's theoretical removability is not necessarily dispositive on the inferior-officer question. *See* Resp. at 13, 14 n. 11. While removability may be a "powerful tool for control," the court of appeals could easily conclude that that power has no practical, and therefore no legal, significance, where it is not coupled with some degree of supervision or direction. Here, there is no oversight or monitoring mechanism in place and, unlike other special counsel, Mr. Fitzgerald has no obligation to report significant developments to the Department. What's more, in a case necessitating numerous in camera and ex parte proceedings under CIPA, Mr. Fitzgerald's conduct cannot be effectively monitored from afar. We are aware of no case where supervision was so wholly lacking, yet the power to remove was held sufficient to render an officer inferior. Whether the appellate court will reach that conclusion here is, in our view, quite doubtful. It is, at the least, a close question.

Finally, the government contends — for the first time in this filing — that even if the Special Counsel's appointment were unconstitutional, reversal would not be required because Mr. Libby "was not prejudiced and . . . any error was harmless." Resp. at 15 n.

12.  The government has never before made this argument, and for good reason.  Where, as here, a federal official exercises authority in violation of federal law, his actions must be invalidated regardless of whether specific prejudice is shown.  *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809-14 (1987) (plurality) (contempt convictions must be reversed, regardless of any showing of harm, where district court erroneously appoints counsel for an interested party to prosecute alleged violations of a court order); *id.* at 815-25 (Scalia, J., concurring in the judgment) (concluding that appointment of counsel to prosecute contempt charges exceeded district court's power under Article III and that convictions therefore must be reversed); *Nguyen v. United States*, 539 U.S. 69, 79 (2003) (judgment of court of appeals constituted in violation of federal law must be invalidated without assessment of prejudice); *cf. United States v. Providence Journal Co.*, 485 U.S. 693 (1988) (dismissing case for want of jurisdiction because special prosecutor lacked the statutory authority to represent the United States in a petition for certiorari).  Indeed, the D.C. Circuit has already indicated that a violation of the Appointments Clause qualifies as structural error and therefore cannot be subjected to harmless error review.  *See Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1130-32 (D.C. Cir. 2000).

Nor can it be said that Mr. Fitzgerald's unsupervised and undirected exercise of principal-officer power has not made a difference in this case.  As Special Counsel, he has made numerous crucial decisions — implicating national security, First Amendment interests, and the appropriate use of prosecutorial resources — that are typically subject to oversight and approval by a principal officer properly appointed by the President with the advice and consent of the Senate.  Here, by the express terms of Mr. Fitzgerald's

appointment, no such oversight or review occurred. If, as Mr. Libby contends, the appointment of Mr. Fitzgerald and his exercise of the authority conferred upon him was unconstitutional, the remedy is dismissal of the indictment.

## II.    EACH OF MR. LIBBY'S MEMORY DEFENSE ISSUES PRESENTS A CLOSE QUESTION, WHICH COULD EASILY BE DECIDED DIFFERENTLY ON APPEAL.

The government labors for nineteen pages (Resp. at 16-35) to show that Mr. Libby's memory defense issues do not present close questions. One theme runs through the government's argument: it insists that the Court's memory defense rulings represent "routine" evidentiary decisions that will be routinely affirmed. *E.g., id.* at 18 n.6, 31, 33, 35. But there was nothing "routine" about the Court's decision to exclude Dr. Bjork's testimony, a ruling for which the Court found "no clear case authority, or absolute rule." *United States v. Libby*, 461 F. Supp. 2d 3, 8 n.6 (D.D.C. 2006). There was nothing "routine" about the Court's "tedious and complex expedition" through CIPA terrain "largely uncharted by written precedent." *United States v. Libby*, 467 F. Supp. 2d 20, 40 (D.D.C. 2006). And there was nothing "routine" about the Court's decision to exclude the government's admission and significant portions of the CIA briefers' testimony when Mr. Libby exercised his right not to testify.

### A.    Expert testimony on memory.

As it has throughout the case, the government concedes Dr. Bjork's qualifications, and it does not dispute the scientific validity of the findings concerning memory on which he sought to testify. Resp. at 18. The government's argument, boiled down to its core, is that the defense failed to prove that Dr. Bjork's testimony would "assist the trier of fact," as Rule 702 requires--and that, indeed, the admissibility of Dr. Bjork's concededly

reliable evidence about the central issue in the case does not even present a close question.  We disagree.

.To begin with, it is an odd notion that jurors would grasp as a matter of common experience aspects of human memory that Dr. Bjork and other scientists at some of this country's finest universities, including Harvard, Stanford, UCLA, and others, have spent decades exploring through rigorous experimentation and publication in peer-reviewed journals.  *See United States v. Libby*, 461 F. Supp. 2d 3, 8 n.6 (D.D.C. 2006) (citing scientific literature underlying Dr. Bjork's proposed testimony).  Why would eminent researchers and their institutions devote enormous time and resources to discovering characteristics of memory that everyone knows already as a matter of common sense?

The government never answers this obvious question.  Instead, it rehashes a series of purported flaws in the studies that the defense offered through Dr. Loftus to show that jurors do not intuitively grasp key aspects of memory.  Resp. at 21.  In its focus on the minutiae of the studies, the government misses the larger evidentiary picture that emerged from the hearing on Dr. Bjork's testimony.  Through Dr. Loftus and the studies, the defense showed that substantial numbers of potential jurors do not understand important aspects of memory.  By contrast, the government presented no evidence of its own to show (in the words of the Rule 702 advisory committee note that the government quotes, Resp. at 19-20 n.20) that "the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Dr. Bjork indisputably has "a specialized understanding" of human memory, and the government has not refuted the defense showing that many "untrained laym[e]n" are *not*

qualified to determine "intelligently and to the best possible degree" the memory issues that this case presents.

The government recites the Court's conclusion that the studies on which Dr. Loftus relied had insufficient probative value because they "'[did] not focus on the precise issues before the Court.'" Resp. at 21 (quoting *Libby*, 461 F. Supp. 2d at 12). But the court of appeals may well find that the standard of proof the Court required on the "assist the trier of fact" prong of Rule 702--a methodologicially perfect study addressed to prospective jurors' understanding of "the precise issues before the Court"--is far too onerous. Indeed, the government cites no case, and we have found none, that requires any such showing. Courts routinely admit expert testimony based on the assumption, unsupported by evidence, that prospective jurors may not fully understand the subject at issue without the expert's testimony.[4] Here, the defense went far beyond mere assumption and, indeed, far beyond the showing made by the proponent of any expert testimony in any case we have found.

The government, echoing the Court, insists that the jurors learned everything they needed to know about memory from the cross-examination of government witnesses and from the Court's instruction listing factors the jurors could consider in assessing memory. Resp. at 22-24. We will not rehash our arguments on this point. We merely note that the

---

[4] For example, the government (Resp. at 19-20) cites with approval *United States v. Long*, 328 F.3d 655 (D.C. Cir. 2003). In *Long*, the court of appeals affirmed the admission of a government expert's testimony about the behavior of certain sex offenders. *See id.* at 665-68. The opinion contains no suggestion that the government offered any evidence of any kind to show that jurors do not understand such behavior as a matter of common knowledge. The district court and the court of appeals appear merely to have assumed the absence of such a common understanding. The defense here made a far more substantial showing that Dr. Bjork's testimony would "assist the trier of fact" than the government did with respect to the expert testimony in *Long*.

court of appeals may well find that the trial's truth-finding function would be far better served by providing jurors with relevant scientific information directly through expert testimony than by asking the jurors to infer that information from observing cross-examinations or from jury instructions that list factors the jurors may consider but provide no guidance in how to apply or weigh them. The exclusion of Dr. Bjork's testimony presents, at the least, a close question.

## B.    Substitutions Under CIPA § 6(c)

The government's argument concerning substitutions under CIPA § 6(c) is wrong in three principal respects.

First, the government insists that the Court applied a legal standard favorable to the defense and that its substitution rulings thus can only be reviewed for abuse of discretion. Resp. at 28. We disagree. The Court equated the "substantially the same ability" standard under CIPA § 6(c) with the Sixth Amendment right to present a defense. *See United States v. Libby*, 467 F. Supp. 2d 20, 25-28 (D.D.C. 2006). Applying the Sixth Amendment standard, the Court required Mr. Libby to accept substitutions that eliminated facts and even entire subjects that the Court had previously found relevant and admissible and that reduced much of the remaining information to bland generalities.

We expect to argue on appeal that the Court erred in equating the CIPA § 6(c) "substantially the same ability" standard with the Sixth Amendment right to present a defense. Congress rejected a "fair trial" CIPA substitution standard similar to the Court's approach in favor of the more stringent "substantially the same ability" standard. It adopted the latter standard "to make it clear that alternate disclosure was to be allowed *only if the court found that it was, in effect, equivalent disclosure*." H. Rep. No. 96-831,

pt. 1, 96th Cong., 2d Sess. 20 (1980) (emphasis added).[5]  Thus, a court may require the

defense to use a substitution "in those circumstances where the use of the specific

classified information, rather than the statement or summary, is of *no effective*

*importance to the defendant.*"  *Id.* at 19 (emphasis added).  As the Conference Committee

Report on CIPA concluded, the "substantially the same ability" standard "is intended to

convey a standard of substantially equivalent disclosure," although "precise, concrete

equivalence is not intended."  H. Conf. Rep. 96-1436, 96th Cong., 2d Sess. 12 (1980).

    Second, the government errs in arguing that the substitutions the Court ultimately

approved met the CIPA § 6(c) standard.  The Court itself repeatedly rejected several of

the government's key substitutions before finally accepting them in its December 8

ruling.  At a closed hearing on November 29, the Court declared that Mr. Libby could not

receive a fair trial if it accepted some of the substitutions that it then approved just over a

week later.  *E.g.,* T. 11/29/06 at 24.  The court of appeals may well find that the Court's

November 29 assessment was correct and its December 8 decision constituted error.

    Third, the government insists that Mr. Libby cannot complain about the Court's

substitution rulings because he did not use the substitutions available to him.  Resp. at 27.

Contrary to the government's assertion, however, the defense did not "fail[] to make use

of most of th[e] substitutions at trial."  *Id.*  The testimony of John Hannah about Mr.

Libby's national security responsibilities, which the government touts elsewhere (Resp. at

24), consisted largely of a series of leading questions read verbatim from the narrative

substitutions that the Court required the defense to accept.  T. 2/13/07 a.m. at 57-89.  The

---

[5] *See* Memorandum of Defendant I. Lewis Libby on Legislative History of CIPA
    Substitution Provision (filed Nov. 14, 2006) (Docket no. 183) (discussing legislative
    history of CIPA § 6(c)).

briefers' stipulation similarly embodied some of the substitutions, and the additional testimony Mr. Libby proffered from the briefers (but which the Court excluded) likewise rested heavily on the substitutions. We expect to argue on appeal that if the Court had applied CIPA § 6(c) as Congress intended, both the Hannah testimony and the briefers' evidence would have been far more powerful. At a minimum, the question is a close one.

### C.     The Government Statement Admitting Relevant Facts.

The government insists that its "statement admitting relevant facts" was both conditioned on Mr. Libby's testimony and irrelevant without that testimony. Resp. at 29-32. We address the relevance issue below in connection with the CIA briefers' testimony. We focus here on the government's claim that it conditioned its admission on Mr. Libby's testimony.

The government's contention lacks any basis in the record. The government was on notice from the beginning of the CIPA proceedings that Mr. Libby might not testify. T. 9/27/06 at 7. Despite this notice, it never hinted during those proceedings that the "statement admitting relevant facts" was conditioned on Mr. Libby's testimony. *E.g.*, T. 11/7/06 at 10. The government never hinted at such a condition when, at a hearing shortly before trial, the defense announced its intention to read the statement in opening. T. 1/10/07 at 29-30. It never hinted at such a condition when the Court and the defense asked potential jurors during voir dire how they would react if Mr. Libby did not testify. *E.g.*, T. 1/16/07 a.m. at 23, 108, 111; T. 1/17/07 a.m. at 123; T. 1/17/07 p.m. at 31, 44. And it never hinted at such a condition when defense counsel opened with the statement. T. 1/23/07 p.m. at 48-51.

It is not surprising that the government never conditioned its admission on Mr. Libby's testimony at trial. Any such condition would have been illogical. An admission *admits* the facts contained in it. It would have made no sense for the government to *admit* the matters contained in the "statement admitting relevant facts" and then challenge its own admissions through cross-examination of Mr. Libby. For example, the admission conceded that Mr. Libby was "concerned" or "very concerned" about three specific matters during the summer of 2003. T. 1/23/07 p.m. at 50-51. Having admitted that Mr. Libby was concerned about these matters, the government could not reasonably have expected to show the contrary at trial, on cross-examination of Mr. Libby or by any other means.

In this respect, the admission stands in stark contrast to the unclassified *summaries* the government provided--the second form of substitution that CIPA § 6(c) contemplates.[6] The summaries admitted nothing; they merely provided an approved form in which evidence could be presented to the jury, either through a witness (such as Hannah) or a document. The government was free to challenge the information contained in the summaries; it was not free to disavow its own admissions.

Given the unconditional nature of the "statement admitting relevant facts," the Court should not have permitted the government to withdraw it mid-trial, after defense counsel had read it in opening and relied upon it in structuring the defense. Even in the

---

[6] Under CIPA § 6(c)(1)(A), the government may propose as a substitution for relevant and admissible classified information a "statement admitting relevant facts that the specific classified information would tend to prove." Under CIPA § 6(c)(1)(B), the government may propose as a substitution "a summary of the specific classified information." The government's admission constituted the first type of the substitution. The summaries it offered for the other classified information that the district court found relevant and admissible constituted the second type of substitution.

civil context, parties cannot withdraw or modify admissions when the opposing party would suffer prejudice. *See, e.g., Rainbolt v. Johnson*, 669 F.2d 767, 768-69 (D.C. Cir. 1981). Indeed, in civil cases a court may grant a motion to withdraw an admission after trial has begun only to prevent a "manifest injustice." *Baker v. Potter*, 212 F.R.D. 8, 13 n.5 (D.D.C. 2002); *see, e.g., American Automobile Association v. AAA Legal Clinic*, 930 F.2d 1117, 1120 (5th Cir. 1991). The government did not even meet the civil "manifest injustice" standard for withdrawing or modifying its admission. Exclusion of the admission presents, at the least, a close question.

### D. The CIA Briefers' Testimony.

The government contends that the Court's exclusion of much of the CIA briefers' testimony under Rules 401 and 403, including testimony about Mr. Libby's briefings on dates the Court recognized as critical, does not present a close question on appeal. Resp. at 32-34. We disagree.

Evidence is relevant under Rule 401 if it "ha[s] *any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). The evidence of the terrorist threats and other urgent national security matters that the morning intelligence briefings covered during the two key weeks easily satisfied the "liberal standard" of Rule 401. *United States v. Leonard*, 439 F.3d 648, 651 (10th Cir.), *cert. denied*, 126 S. Ct. 2948 (2006).

The evidence went directly to Mr. Libby's state of mind, "[a] fact that is of consequence to the determination of the action." This Court acknowledged pretrial that "there can be no question that what otherwise allegedly consumed the defendant's time

14

and attention during [the week of June 9 through 14, 2003] is relevant and extremely probative to the prosecution and defense of this action." *United States v. Libby*, 467 F. Supp. 2d 1, 9-10 (D.D.C. 2006). Similarly, the Court held that the week of July 6 through 12, 2003 is "critical to the case, and the events occurring during this week are relevant and highly probative." *Id.* at 10.

Evidence of the morning intelligence briefings for these crucial weeks was relevant regardless of whether Mr. Libby testified. Courts have often recognized that both the prosecution and the defense may present circumstantial evidence of the defendant's state of mind. Indeed, "as a general rule most evidence of intent is circumstantial." *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998); *see, e.g., United States v. Macpherson*, 424 F.3d 183, 189 (2d Cir. 2005) ("The law . . . recognizes that the mens rea elements of knowledge and intent can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom."); *Redbook*, Instruction 3.02 ("[Y]ou may infer the defendant's knowledge from the surrounding circumstances."); *Modern Federal Jury Instructions*, Instruction 6.06 (2006) ("[K]nowledge [is] usually established by surrounding facts and circumstances as of the time the acts in question occurred, or the events took place, and the reasonable inferences to be drawn from them."). Here, the Schmall and Hannah testimony about the national security matters that Mr. Libby found important readily satisfied the "minimal level of probability" that Rule 401 requires, *Leonard*, 439 F.3d at 651; testimony from Mr. Libby himself to that effect was not necessary.

Nor (we will argue on appeal) could the Court properly exclude the morning intelligence briefers' testimony under Rule 403. As the Court recognized pretrial, Rule

403 "is an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence." *Libby*, 467 F. Supp. 2d at 20; *see also, e.g., United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007) ("Rule 403 tilts, as do the rules as a whole, toward admission of evidence in close cases . . . .") (quotation omitted). The morning intelligence substitutions had great probative force, as the Court recognized during the CIPA process. None of the Rule 403 dangers "substantially outweigh[ed]" that probative value. The Court trusted limiting instructions to guide the jury's consideration of the potentially prejudicial circumstantial state of mind evidence that it admitted at the prosecution's request. Such instructions would have adequately addressed any legitimate concerns about jury confusion or speculation arising from the morning intelligence briefing substitutions. The exclusion of the CIA briefers' testimony presents, at a minimum, a close question.

      **E.**      **Harmless Error.**

      Finally, the government insists that the decisions regarding the memory defense, even if erroneous, are harmless — so clearly harmless, in fact, that those issues are not even close. Resp. at 35. The government bases this contention on its view that the evidence of guilt was so overwhelming that admission of the memory defense evidence would not have affected the verdict.

      The government is wrong. The Court correctly recognized before trial that "the memory and recollection of the principal players will undoubtedly play a substantial role in the assessment of the defendant's culpability in the upcoming trial." *Libby*, 461 F. Supp. 2d at 5. The trial was exceptionally hard-fought, largely over the central question whether Mr. Libby deliberately lied to the FBI and the grand jury or innocently confused,

misrecollected, or forgot the snippets of conversation involving Ms. Wilson. The jury

deliberated for all or part of ten days before reaching a verdict, and it took that long

without even having the benefit of the erroneously excluded evidence. On this record,

the government cannot satisfy the *Chapman* "harmless beyond a reasonable doubt"

standard for constitutional error or even the less demanding standard of Fed. R. Crim. P.

52(a) for non-constitutional error.

## III.  THE GOVERNMENT OFFERS NO REMOTELY PLAUSIBLE DEFENSE OF THIS COURT'S REFUSAL TO PERMIT THE DEFENDANT TO CALL ANDREA MITCHELL

The government does not dispute that Tim Russert's testimony was crucial to

every single count of conviction. Nor does it dispute that Mr. Russert's denial of Mr.

Libby's account was closely linked to his stated belief that he *could not* have told Mr.

Libby about Ms. Wilson because he did not learn about her role until he read the Novak

column. The government nevertheless contends that this Court's Mitchell ruling is not

even a "close" question. As we show below, the government's arguments are flawed at

every turn.

### A.    The government misreads *Johnson* and the other court of appeals decisions.

As the government acknowledges, it was *the government* in *United States v.*

*Johnson*, 802 F.2d 1459 (D.C. Cir. 1986), that sought to call and impeach its trial witness

with inadmissible hearsay. Not only that, the prior statement in *Johnson* was a post-arrest

statement by a co-conspirator spreading responsibility to the defendant – a classically

untrustworthy form of hearsay. To make matters worse, there was *no* apparent

corroboration for the truth of the prior statement that the prosecutors in *Johnson* were

seeking to admit against the defendant.

In the government's view, however, none of these distinctions makes a difference. As the government reads *Johnson*, the D.C. Circuit intended to adopt a broad rule of law forbidding a party – *any* party – from calling and impeaching a witness he knows will disavow a prior inconsistent statement.

That simply makes no sense. Cross-examination would swiftly cease to be "the greatest engine for the discovery of truth ever invented" if criminal defendants were forbidden to challenge a witness's lawyer's claim that the witness's testimony will be "X" or "Not X" It is one thing to forbid *the government* from calling a witness simply to impeach; it is quite another to impose that restriction on the defense. Criminal defendants, after all, have Sixth Amendment rights. The government doesn't.

Not surprisingly, then, the D.C. Circuit has never once cited *Johnson* as support for any limitation on a criminal defendant's right to call and impeach a witness at trial. And although one would scarcely know this from the government's brief, the great weight of the remaining cases cited by the government hold that it is *the prosecutor* who is forbidden in a criminal case to call a witness simply to place inadmissible evidence before the jury. The courts could hardly have stated the distinction more plainly.

Thus, for example, in *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975), the Fourth Circuit distinguished one of its prior decisions – which had permitted *a defendant* to impeach his own witness – precisely because "constitutional considerations which may have been present in those cases are obviously not involved where the government calls a witness having in mind no other apparent purpose than to elicit from him testimony which may thereafter be impeached." *Id.* at 189. As the Fourth Circuit explained more recently (in reversing a conviction because of similar government impeachment

practices), "[a]t a criminal trial, . . . there are limits on *the Government's power* to impeach its own witnesses." *United States v. Ince*, 21 F.3d 576, 579 (4th Cir. 1994) (emphasis added). "When *the prosecution* attempts to introduce a prior inconsistent statement to impeach is own witness, the statement's likely prejudicial impact often substantially outweighs its probative value. . . ." *United States v. Buffalo*, 358 F.3d 519, 525 (8th Cir. 2004) (emphasis added). Conversely, the Eighth Circuit noted, "[w]hen *the defendant* seeks to introduce a prior inconsistent statement for impeachment purposes, the dangers identified above are not implicated." *Id.* (emphasis added). Surveying the case law generally, Judge Posner stated that "all circuits that have considered the issue" have accepted "the limitation that we have quoted on *the prosecutor's rights* under Rule 607" – specifically, that "it would be an abuse of the rule in a criminal case, *for the prosecution* to call a witness that it knew would not give it useful evidence, just so it could introduce hearsay evidence against the defendant in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence — or, if it didn't miss it, would ignore it." *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984) (emphasis added). Accord, *United States v. Peterman*, 841 F.2d 1474, 1479 (10th Cir. 1988) ("*a prosecutor* may not use impeachment as a guise for submitting to the jury substantive evidence that is otherwise unavailable") (emphasis added).

The government frets that "allowing the defense to call Ms. Mitchell posed the unacceptable risk that the jury would improperly consider Ms. Mitchell's October 3, 2003 statement for its truth." Resp. at 39. But that's why trial judges give limiting instructions — which juries are conclusively presumed to follow. *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *Lakeside v. Oregon*, 435 U.S. 333, 340 n.11 (1978) ("[W]e have not yet

attained that certitude about the human mind which would justify us in . . . a dogmatic

assumption that jurors, if properly admonished, neither could nor would heed the

instructions of the trial court"). The Court applied that principle repeatedly in admitting

evidence offered by the government against Mr. Libby in this case. The court of appeals

might well conclude that it could (and should) have done the same for Mr. Libby with

respect to Ms. Mitchell's testimony.

> ### B.   The defense did *not* waive its right to challenge Ms. Mitchell's claim that she would disavow her October 2003 statement.

Prior to calling Ms. Mitchell as a witness, the Court provided the defense with an

opportunity to examine the witness outside the presence of the jury to assess whether she

would, as her lawyer represented, disavow her prior statement. The defense declined that

opportunity; as a consequence, the government now contends (Resp. at 36 n.32), Mr.

Libby "waive[d] . . . any argument that [Ms. Mitchell] would have testified inconsistently

with her attorney's representation."

Not so. There is no rule of practice or procedure that requires litigants to pre-

screen their examinations on pains of waiver. So long as a party has a good-faith basis

for calling the witness in the first place — and here, Mr. Libby plainly did — he has no

duty to do a test run before putting the witness on the stand. The entire premise of the

"test run" is flawed: If the defense *had* taken the Court up on its offer, and discovered

outside the presence of the jury that Ms. Mitchell likely would attempt to disavow her

prior statement, counsel *still* would have been entitled to actually put Ms. Mitchell on the

stand and attempt to shake her story. And even if Ms. Mitchell thereafter persisted in her

disavowal under fire, the jury could well have disbelieved her. That is precisely what the

D.C. Circuit suggested in *United States v. Jenkins*, 928 F.2d 1175 (D.C. Cir. 1991) – a

post-*Johnson* case that the government omits even to acknowledge in its response, much less distinguish.

The short of the matter is this: The defense cannot be deemed to have waived any rights by declining to participate in a test run that it had no legal duty to undertake in the first place.

### C.    The preclusion of Ms. Mitchell will not be disregarded as harmless on appeal.

The government contends, finally, that the preclusion of Ms. Mitchell is not a "close" question because the court of appeals is likely to treat it as harmless error. It bases this surmise on two assertions: first, that it is "fantastical" (Resp. at 41) to suppose that the jury might have disbelieved Mr. Russert if Ms. Mitchell had been allowed to testify, and second, that the error will wash away "in light of the overwhelming evidence of defendant's guilt" (Resp. at 42). Both claims are entirely unpersuasive.

There is, first and foremost, nothing "fantastical" about the prospect that the jury might have used Ms. Mitchell's testimony as basis for rejecting Mr. Russert's assertions. It bears repeating that Mr. Russert grounded his contradiction of Mr. Libby in his belief that he *could not have* told Mr. Libby about Ms. Wilson prior to the Novak column. Yet his testimony also establishes that if one of his colleagues — Ms. Mitchell herself or David Gregory — learned about Ms. Wilson in time to tell him, he or she likely would have done so. The evidence established that Mr. Gregory *was* told about Ms. Wilson in time to tell Mr. Russert. If Ms. Mitchell had been allowed to testify, and had the jury resolved any credibility dispute in Mr. Libby's favor, the evidence, taken as a whole, would have been *powerful* support for Mr. Libby's version of the Russert conversation. But the defense was blocked even from treading down that path. Like any other

wholesale curtailment of a line of examination, the court of appeals will require the government to demonstrate harmlessness beyond a reasonable doubt. *See Davis v. Alaska*, 415 U.S. 308 (1974).

Moreover, given the centrality of Mr. Russert's testimony to the government's entire case, it is *inconceivable* that the preclusion of Ms. Mitchell's testimony, if error, would be disregarded as harmless. At the very least, that is an exceedingly "close" question.

## CONCLUSION

For the foregoing reasons and those stated in our motion, the requirements of § 3143 are overwhelmingly satisfied and Mr. Libby is entitled to release pending appeal of his conviction.

Dated: June 13, 2007                     Respectfully submitted,

_____/s/_____              _____/s/_____
Theodore V. Wells, Jr.                   William H. Jeffress, Jr.
(DC Bar No. 468934)                      (DC Bar No. 041152)
James L. Brochin                         Alex J. Bourelly
(DC Bar No. 455456)                      (DC Bar No. 441422)
Paul, Weiss, Rifkind, Wharton            Baker Botts LLP
 & Garrison LLP                          1299 Pennsylvania Avenue, NW
1285 Avenue of the Americas              Washington, DC  20004
New York, NY  10019-6064                 Tel:  (202) 639-7751
Tel:  (212) 373-3089                     Fax: (202) 585-1087
Fax: (212) 373-2217

_____/s/_____              _____/s/_____
John D. Cline                            Lawrence Robbins
(D.C. Bar No. 403824)                    (D.C. Bar No. 420260)
Jones Day                                Robbins, Russell, Englert, Orseck and
555 California Street, 26th Floor        Untereiner
San Francisco, CA  94104                 1801 K Street, NW
Tel:  (415) 626-3939                     Washington, DC  20006
Fax: (415) 875-5700                      Tel:  (202) 775-4501