UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

JUN 2 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA,      )
                               )
                               )
                               )
    v.                         )    Criminal Action No. 05-394 (RBW)
                               )
I. LEWIS LIBBY,                )
                               )
            Defendant.         )
                               )

## MEMORANDUM OPINION

On March 6, 2007, the defendant was convicted on four counts of obstruction of justice,

perjury, and making false statements to federal investigators. On June 5, 2007, as a consequence

of these convictions, the defendant was sentenced, <u>inter alia</u>, to a term of thirty months

imprisonment.[1] Upon the imposition of the sentence, the defendant requested that he be released

on bond pending his appeal pursuant to 18 U.S.C. § 3143 because one or more of the issues he

plans to raise on appeal constitute "substantial question[s] of law or fact likely to result in [a

reversal of his convictions or an order for a new trial]." 18 U.S.C. § 3143(b) (2000); <u>see also</u> I.

Lewis Libby's Motion for Release Pending Appeal ("Motion") at 2-5; I. Lewis Libby's Reply in

Further Support of His Motion for Release Pending Appeal ("Reply") at 1. The government

opposes the defendant's request. Government's Response in Opposition to Defendant's Motion

for Release Pending Appeal ("Opp.") at 1. For the following reasons, and in accordance with the

---

[1] The facts of this case have been thoroughly related by the Court in previous opinions, and it is
unnecessary to recite them again here. <u>See, e.g.</u>, <u>United States v. Libby</u>, 429 F. Supp. 2d 27, 28-29 (D.D.C. Apr. 27,
2006) (Appointments Clause issue); 432 F. Supp. 2d 81, 82-84 (D.D.C. June 2, 2006) (defendant's third motion to
compel); 461 F. Supp. 2d 3, 4-5 (D.D.C. Nov. 2, 2006) (admission of expert testimony); 475 F. Supp. 2d 73, 75
(D.D.C. Mar. 1, 2007) (evidentiary issues).

Court's oral orders issued at the June 14, 2007 motions hearing, the defendant's motion for release pending appeal is denied.

## I. Legal Standard

The United States Code requires that a federal criminal defendant "who has been found guilty of an offense and sentenced to a term of imprisonment" be detained during the pendency of his appeal, unless the Court finds (1) that the person does not pose a flight risk or a danger to the community; and (2) "that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in . . . reversal[] [or] an order for a new trial."[2] 18 U.S.C. § 3143(b)(1). Thus, under § 3143(b), "[t]he law has shifted from a presumption of release to a presumption of valid conviction," United States v. Perholtz, 836 F.2d 554, 556 (D.C. Cir. 1988) (citation omitted), and the defendant bears the burden of rebutting this presumption and "demonstrat[ing] that he has a substantial question to present [upon appeal] before he may be admitted to bail," United States v. Schoffner, 791 F.2d 586, 589 (7th Cir. 1986); see United States v. Colon Berrios, 791 F.2d 211, 214 n.4 (1st Cir. 1992) (stating that "[i]n enacting § 3143[(b)], Congress placed the burden as to all elements bearing on whether to grant bail pending appeal on [the] defendant[]") (emphasis in original) (citations omitted); see also Reply at 1 (stating that "[t]he government is correct that it is the defense's burden to show that Mr. Libby will raise substantial issues on appeal").

In United States v. Perholtz, the District of Columbia Circuit held that an issue is "substantial" for the purposes of § 3143(b) if it "is a close question or one that very well could

---

[2] The government notes in its opposition to the defendant's motion that it "does not contend that [the] defendant poses a risk of flight or danger to the community, or that [the] defendant's appeal is frivolous[] or brought solely for purposes of delay." Opp. at 2 n.1. The Court agrees with this assessment.

have been decided the other way."[3]  Perholtz, 836 F.2d at 555 (internal quotation marks and

footnote omitted); see also, e.g., United States v. Day, 433 F. Supp. 54, 55 (D.D.C. 2006)

(applying the Perholtz standard); United States v. Quinn, 416 F. Supp. 2d 133 (D.D.C. 2006)

(same).[4]  In so holding, the Perholtz Court considered "[t]wo differing standards for determining

substantiality [that had] been adopted in the various circuits," choosing to adopt the "more

demanding" of the two standards "because it appears better to accord with the expressed

congressional intent to increase the required showing on the part of the defendant."[5]  Perholtz,

836 F.2d at 555-56.  Accordingly, if the Court cannot conclude that the defendant raises "a close

question or one that could very well have been decided the other way," Perholtz, 836 F.2d at 555

(internal quotation marks and footnote omitted), it is bound to order that the defendant be

detained.  18 U.S.C. § 3143(b)(2).  However, if the Court finds that the defendant does raise a

---

[3]  Contrary to the defendant's suggestion, the Court can find no caselaw which suggests that a given question is "close" merely because there is no "precedent in this Circuit [which] clearly dictate[s] the answer." Motion at 4.

[4]  In Quinn, the District Court concluded that the § 3143(b) substantiality test was satisfied "where a defendant challenges the Court's ruling on a novel question of law and provides a rationale for a contrary interpretation that is supported by arguably applicable legal authority." Quinn, 416 F. Supp. 2d at 136; see also id. (stating that "the Court cannot say that the question for appeal is insubstantial or not susceptible to a different answer"). The Quinn Court provides no support for its particular interpretation of the Perholtz standard, which appears to this Court to be somewhat less "demanding" than was contemplated in Perholtz itself. Perholtz, 836 F.2d at 555. Rather, the plain language of Perholtz seemingly rejects the proposition that a question is "substantial" for the purposes of § 3143(b) merely because the issue raised is novel and there is a contrary interpretation of the law that is "arguably applicable." Quinn, 416 F. Supp. 2d at 136; see Perholtz, 836 F.2d at 555 (holding that an issue is substantial if it "is a close question or one that very well could have been decided the other way") (emphases added) (internal quotation marks and footnote omitted). Indeed, it is easy for this Court to imagine "novel" questions of law to which, after a careful examination of the issues presented therein, it is evident that there is nevertheless only one clear answer, even if the questions might possibly be "susceptible" to differing "arguably applicable" interpretations. Quinn, 416 F. Supp. 2d at 136. Such questions would not, in this Court's view, be considered "substantial" under Perholtz.

[5]  The less demanding of the two standards considered by the Perholtz Court provides that "a substantial question is one that is 'fairly debatable,' 'fairly doubtful,' or 'one of more substance than would be necessary to a finding that it was not frivolous.'" Perholtz, 836 F.2d at 555 (footnote omitted). Only the Third and Ninth Circuits have adopted this standard. See id. at 555 n.2 (citing cases).

substantial question of law or fact, it must release the defendant while he pursues his appeal. 18

U.S.C. § 3143(b)(1); see Motion at 2 (observing that "bail pending appeal is mandatory, not

discretionary," once the requirements of § 3143 are found to have been met).

## II. Legal Analysis

Here, the defendant proffers numerous issues for the Court's consideration, each of which

he claims "raises a substantial question of law or fact likely to result in . . . reversal [of his

convictions]," 18 U.S.C. § 3143(b)(1), and each of which the Court addressed during the June

14, 2007 hearing on the defendant's motion.[6] See Motion at 4 (stating that the defendant's "pre-

trial and trial motions, combined with defense objections preserved in the record, present a

---

[6] At both the June 5, 2007 sentencing hearing and the June 14, 2007 motion hearing, the defendant adverted to the length of this Court's opinions on those issues the defendant plans to raise on appeal as an indication that he has presented one or more "substantial question[s] of law or fact" entitling him to release on bond until his appeal can be heard. See Motion at 5 (arguing that "the difficulty of the issues [is] evidenced by the Court's own lengthy writings"); see also id. (noting that "[t]o answer [the Appointments Clause] question (and a closely related statutory question), this Court wrote a 31-page opinion (20 pages in the Federal Supplement)) (citation omitted). It should be evident, of course, that the fact that this Court has taken the time to explore the issues before it in a careful and thorough manner is in no way reflective of the closeness of the questions presented. It is the habit of this Court—confirmed by a cursory examination of the collective corpus of its published opinions—to evaluate every legal issue, however close, to the fullest extent merited by, among other things, the novelty of the question in this Circuit, the complexity of the facts, the import of the case, and the quality of each party's legal representation. Indeed, each of the foregoing factors was abundantly present here. Accordingly, the Court's desire to decide an issue completely and correctly to the best of its ability should not be taken as an indication that the issue is "one that could very well have been decided the other way." Perholtz, 836 F.2d at 555 (internal quotation marks and footnote omitted).

Similarly, the defendant quotes liberally from dicta within the Court's opinions in an apparent attempt to prove to the Court that it believed the defendant's proffered issues to be close at the time that it decided them. See, e.g., Motion at 6 (citing the Court's statement that the parties had come to "differing conclusions" on the Appointments Clause issue and stating that "[t]he Court then engaged in its own interpretation . . ., but indicated that the task was not particularly straightforward and that its own research did not 'reveal[] any case law that clearly addresses th[e] point'") (citations omitted), 12 (stating that "[t]he Court described the CIPA § 6(c) process as a 'tedious and complex expedition' through terrain 'largely uncharted by written precedent'") (citations omitted). This "[T]almudic dissection[]" of the Court's word choice and phrasing scissors the language of the Court out of its memorandum opinions in a manner that deprives it entirely of context, see Opp. at 33 (observing that "[the] Court's statements that it was 'not sure' whether to exclude a portion of the testimony or that it was 'a tough call' must be put in context"), and does not befit a considered and searching analysis of the defendant's claims on their own merits, in accordance with the circumstances of the case and all relevant precedent, to determine whether a substantial question of law or fact has or has not been raised by the defendant. Church of Scientology of Calif. v. IRS, 792 F.2d 153, 157 (D.C. Cir. 1986).

number of close questions that are more than sufficient to satisfy the requirements of §

3143(b)"). Among the issues identified as "substantial" by the defendant is whether the Special

Counsel in this case qualifies as an "inferior officer" or a "principal officer" under the

Appointments Clause of the United States Constitution, art. II, § 2, cl. 2.[7] Motion at 5-7; see

generally United States v. Libby, 429 F. Supp. 2d 27 (D.D.C. 2006) (holding that the Special

Counsel is an inferior officer). The Court addresses this question at greater length below.[8]

### The Appointments Clause

The defendant argues that "[t]he question whether the appointment of Patrick Fitzgerald

as Special Counsel satisfied the Appointments Clause of the Constitution . . . is a close one," and

one for which "[t]he Court of Appeals could easily reach the opposite conclusion from this

Court."[9] Motion at 5. The Court disagrees. In its April 27, 2006 Memorandum Opinion

addressing this issue, the Court undertook a thorough and painstaking, yet ultimately

---

[7] The Appointments Clause provides that:

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

[8] The Court articulated its grounds for denying the defendant's motion as to each of the other issues he plans to raise upon his appeal at the conclusion of the June 14, 2007 hearing. Here, the Court concludes that it is appropriate to fully memorialize its ruling as to the defendant's constitutional challenge to ensure that the Circuit Court has a clear record of this Court's conclusion and reasoning when considering the defendant's appeal of the denial of his § 3143 motion. The remaining issues presented by the defendant need no further explanation.

[9] The defendant also argues, albeit in extremely perfunctory fashion, that the Court's conclusion that the Special Counsel's appointment comported with the relevant federal statute authorizing the Attorney General to delegate "any function" of his position to a Department of Justice subordinate, 28 U.S.C. § 510 (2000), is similarly a substantial question of law or fact entitling the defendant to release pending his appeal. Motion at 5; Reply at 2 n.2; see Libby, 429 F. Supp. 2d at 31-34 (examining statutory question). For the reasons articulated in its April 27, 2006 Memorandum Opinion, see id., the Court is convinced that the defendant's statutory argument does not "raise[] a substantial question of law or fact" under § 3143(b).

5

straightforward analysis of the role of the Special Counsel in the constitutional firmament,

concluding easily that the scope of the Special Counsel's duties and authority fit "squarely into

the mold of [Morrison v. Olson, 487 U.S. 654 (1988)], [in which] the Supreme Court concluded

that the independent prosecutor [in that case] was an inferior officer." Libby, 429 F. Supp. 2d at

44; see generally id. at 34-45.  As a result, and based upon the applicable Supreme Court

precedent—most notably Morrison and Edmond v. United States, 520 U.S. 651 (1997)—it is

absolutely clear to this Court that the Special Counsel, like the independent prosecutor in

Morrison, should be considered an inferior officer, and that the terms of his appointment by the

acting head of the Department of Justice were therefore entirely proper under the Appointments

Clause.

### 1. Factual Background

The circumstances of the Special Counsel's appointment are set forth in great detail in the

Court's April 27, 2006 Memorandum Opinion, see Libby, 429 F. Supp. 2d at 28-29, but it is

helpful to relate them briefly here.  Under 28 U.S.C. § 510, the Attorney General is empowered

to "authoriz[e] the performance by any other officer, employee, or agency of the Department of

Justice of any function of the Attorney General."  28 U.S.C. § 510 (2000) (emphasis added); see

also Libby, 429 F. Supp. 2d at 33 (interpreting § 510 and observing that "there is no language in

[that statute] which limits the type of functions which can be delegated").  On December 30,

2003, Deputy Attorney General James Comey, acting in his capacity as Acting Attorney General,

exercised his authority under § 510, among other statutes, to appoint an individual from within

the Department of Justice to oversee a criminal investigation into the possible unauthorized

disclosure of Valerie Plame Wilson's affiliation with the Central Intelligence Agency ("CIA") by

members of the Executive Branch.[10]  See id. at 28.  Comey selected Patrick J. Fitzgerald—who

was then, and is currently, the United States Attorney for the Northern District of Illinois—for

this role, delivering to Fitzgerald two letters purporting to describe the scope of his authority and

duties as Special Counsel with regard to the investigation.[11]  See id. at 28-29.  In the first letter,

dated December 30, 2003, Comey stated that Fitzgerald was being delegated "all the authority of

the Attorney General with respect to the Department's investigation into the alleged unauthorized

disclosure of a CIA employee's identity," and directed him "to exercise that authority as Special

Counsel independent of the supervision or control of any officer of the Department."  Id.

(quoting Motion of I. Lewis Libby to Dismiss the Indictment and Memorandum of Support

Thereof ("Def.'s Mem."), Exhibit ("Ex.") C (December 30, 2003 letter from James Comey to

Patrick Fitzgerald) at 1) (internal quotation marks omitted).  In the second letter, dated February

6, 2004, Comey clarified the terms of the delegation to Fitzgerald by stating that the Special

Counsel's authority with respect to the Plame investigation was "plenary" and that it included,

inter alia, " the authority to investigate and prosecute violations of any federal criminal laws

related to the underlying alleged unauthorized disclosure, as well as federal crimes committed in

the course of, and with intent to intefere with, [the] investigation, such as perjury, obstruction of

---

[10]  As the Court notes in its April 27, 2006 Memorandum Opinion, then-Attorney General John Ashcroft "recused himself from all matters involving the [Plame] investigation" and designated Comey as Acting Attorney General with respect to the delegation of authority to Fitzgerald and to the investigation generally.  Libby, 429 F. Supp. 2d at 28.

[11]  It is the Court's understanding, undisputed by the defendant, that Fitzgerald did not relinquish any of his duties as United States Attorney upon accepting the appointment as Special Counsel, and that he has continued to serve in both capacities—and always as a Department of Justice employee—during the pendency of this investigation and throughout the prosecution of the defendant.  See Libby, 429 F. Supp. 2d at 41 (stating that Fitzgerald "has continued to occupy [his] position [as United States Attorney] throughout his tenure as Special Counsel").

justice, destruction of evidence, and intimidation of witnesses."[12] Id., Ex. D (February 6, 2004

letter from James Comey to Patrick Fitzgerald) at 1.  As a result of this delegation of authority,

Fitzgerald assumed the mantle of Special Counsel and commenced his investigation.  See Libby,

429 F. Supp. 2d at 29.  Importantly, Comey retained his position as Acting Attorney General over

the Plame investigation until his resignation from the Department of Justice in August 2005.  See

Def.'s Mem. at 30; Government's Response to Defendant's Motion to Dismiss the Indictment

("Gov't Resp.") at 21.  At that time, in a letter dated August 12, 2005, Comey delegated to

Associate Deputy Attorney General David Margolis "all of [his] authority as Acting Attorney

General with respect to [the Plame] investigation and Mr. Fitzgerald's service as Special

Counsel."[13]  Def.'s Mem., Ex. B (August 12, 2005 letter from James Comey to David Margolis)

at 1.

### 2. The *Morrison* Factors

In evaluating whether the delegation of authority to Fitzgerald in his role as Special

Counsel was sufficiently broad and unconstrained as to make him a principal officer (and thus

---

[12] The letter further stated that the "conferral [upon Fitzgerald] of the title 'Special Counsel' in this matter should not be misunderstood to suggest that [his] position and authorities are defined and limited by 28 C.F.R. Part 600." Def.'s Mem., Ex. D at 1.  The defendant contends that this reference to 28 C.F.R. Part 600 is an indication that Fitzgerald is not bound by the policies and procedures of the Department of Justice in the course of his appointment as Special Counsel. See Motion at 4 (arguing that "[t]hose regulations give a special counsel a degree of independence appropriate where high-ranking executive officials are under investigation . . . without wholly abdicating the Department's supervisory obligation"); Reply at 4 (stating that "[t]hose regulations require all other Special Counsel to comply with Department policies and regulations") (emphasis omitted).  However, 28 C.F.R. Part 600 is specifically directed at individuals who, unlike Fitzgerald, are not already Department of Justice employees at the time of their appointment as Special Counsel.  28 C.F.R. § 600.3 (2007) (stating that "[t]he Special Counsel shall be selected from outside the United States [g]overnment").  Accordingly, these regulations were not, and could not be, applicable to the Special Counsel in this case, and his exemption from them cannot plausibly be construed as an implicit waiver of the obligation to follow Department of Justice polices and procedures that was imposed upon Fitzgerald in his capacity as United States Attorney.

[13] As the Court discusses below, this letter clearly, although not conclusively, indicates that the Special Counsel was, at the very least, subject to "some level" of supervisory authority throughout the course of his investigation by officials within the Department of Justice. Edmond, 520 U.S. at 663.

subject to appointment by the President and confirmation by the Senate) within the meaning of

the Appointments Clause, the Court turned first to the four factors deemed dispositive by the

Supreme Court in Morrison.  Libby, 429 F. Supp. 2d at 36-37, 44-45 (discussing Morrison).  In

Morrison, the Supreme Court considered the question of whether an independent counsel

appointed pursuant to the Ethics in Government Act, 28 U.S.C. §§ 591-599 (1982 ed., Supp. V),

qualified as a principal or inferior officer for Appointments Clause purposes.[14]  Morrison, 487

U.S. at 670-73.  In determining that the independent counsel was a constitutionally inferior

officer, the Morrison Court employed "factors relating to . . . ideas of tenure, duration[,] and

duties," id. at 672, and concluded that (1) "the fact that [the independent counsel] can be

removed by the Attorney General indicates that she is to some degree 'inferior' in rank and

authority," id. at 671; (2) the independent counsel "is empowered . . . to perform only certain,

limited duties," and must "comply to the extent possible with the policies of the [Department of

Justice]," id. at 671-72; (3) "[the] independent counsel can only act within the scope of the

jurisdiction that has been granted . . . pursuant to a request by the Attorney General," id. at 672;

and (4) although there was no specific time limit set on the independent counsel's appointment,

"the office of the independent counsel is 'temporary' in the sense that an independent counsel is

appointed essentially to accomplish a single task, and when that task is over the office is

terminated," id.  The Supreme Court further observed that "[b]ecause the subordinate officer is

charged with the performance of the duty of the superior for a limited time and under special and

temporary conditions[,] he is not thereby transformed into the superior and permanent official."

---

[14] As the Morrison Court explained, "the Constitution for purposes of appointment divides all its officers into two classes. . . .  Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." Morrison, 487 U.S. at 670 (internal bracketing, quotation marks, citations, and ellipses omitted).

Id. (internal quotation marks and citation omitted).  Nor was this a difficult or tenuous

conclusion.  Indeed, the Morrison Court stated that it was unnecessary for it "to decide exactly

where the line falls between the two types of officers," because the independent counsel in that

case "clearly [fell] on the 'inferior officer' side of that line."[15]  Id. at 671.

        Here, after analyzing the text of the Comey letters and carefully reviewing the parties'

arguments and all relevant precedent, this Court held in its April 27, 2006 Memorandum Opinion

that "[the present] case falls squarely into the mold of Morrison," and that "[t]he factors

employed in Morrison . . . are equally applicable here."  Libby, 429 F. Supp. 2d 27.  Specifically,

the Court, applying the Morrison factors, found that (1) Fitzgerald was removable from the

position of Special Counsel by the Acting Attorney General not merely for good cause, but for

any reason at any time, see id. at 42 (stating that "it is axiomatic that, at any time, the Deputy

Attorney General who delegated to the Special Counsel his authority can revoke that delegation")

(citations omitted); (2) Fitzgerald's duties as Special Counsel "are specifically limited to the

investigation and prosecution of certain federal crimes arising out of [a particular set of operative

facts]," id. at 44, during which he "does not have the authority to ignore substantive or

procedural Department of Justice policies and regulations," id.; (3) the boundaries of the Special

---

[15]  In dissent, Justice Scalia disagreed with the Morrison majority's elicitation of the relevant Appointments
Clause factors.  Morrison, 487 U.S. at 716-723.  Among other points of contention, Justice Scalia noted that the
independent counsel is "removable only for 'good cause' or for physical or mental capacity," a factor which he
concluded "lends no support to the view that [Morrison] is an inferior officer."  Id. at 716 (Scalia, J., dissenting)
(citation omitted).  The dissent stated, however, that "[i]f [the independent counsel] were removable at will by the
Attorney General, then she would be subordinate to him and thus properly designated as inferior."  Id. (emphases
added); see also id. at 719 (stating that "the independent counsel is not an inferior officer because she is not
subordinate to any officer in the Executive Branch") (emphasis in original).  Later in his dissent, Justice Scalia
appears to qualify his conclusive statement that an officer who is removable at will by somebody other than the
President is "properly designated as inferior," id. at 716, explaining that "it is not a sufficient condition for 'inferior
officer' status that one be subordinate to a principal officer[,] . . . [b]ut it is surely a necessary condition," id. at 722
(emphases in original).  The Court does not, and need not, attempt to reconcile this conceivably contradictory
language.

Counsel's jurisdiction are described and limited by the Acting Attorney General's express

delegation of authority, id. at 44-45; see also id. at 45 n.17 (noting that "[t]he Deputy Attorney

General . . . set forth explicit parameters in which the Special Counsel could operate"); and (4)

Fitzgerald's tenure is limited in that his authority expires "[a]s soon as [he] has completed his

assigned task," id. at 45; see also id. (concluding that the Special Counsel "has no ongoing

responsibilities that extend beyond the accomplishment of the mission that [he] was appointed

for and authorized to undertake") (quoting Morrison, 487 U.S. at 672) (internal quotation marks,

bracketing, and ellipsis omitted).  The Court therefore held that "just as the independent counsel

in Morrison was deemed to be an inferior officer, the same is true for Special Counsel

Fitzgerald."  Id.

        The defendant asserts that the District of Columbia Circuit could very well rule that,

under Morrison, the Special Counsel is a principal officer within the meaning of the

Appointments Clause because one or more of the Morrison factors do not apply.  See Reply at 3

(contending that "[b]ecause the office[s] at issue in Morrison and in this case differ in several

significant respects . . . it is at least a close question whether Morrison applies at all").  For the

reasons articulated in its April 27, 2006 Memorandum Opinion and during the June 14, 2007

hearing, the Court is unconvinced that this case is a close question under Morrison.  Not only are

all of the factors present in Morrison plainly met in this case as well, see Libby, 429 F. Supp. 2d

at 40-45, but the fact that the Special Counsel is removable at will makes the question in this case

an even easier one than was presented in Morrison—in which the Supreme Court concluded that

the independent counsel was "clearly" an inferior officer, Morrison, 487 U.S. at 671—in at least

that one important respect.  See id. at 716 (Scalia, J., dissenting) (opining that "[i]f [the

independent counsel] were removable at will by the Attorney General, then she would be subordinate to him and thus properly designated as inferior") (emphasis added). The defendant's points of disagreement with the Court's application of the Morrison factors are predicated on illogical leaps of reasoning and inferences that no appellate court is likely to draw based on the facts of this case. See Reply at 3-5; Def.'s Mem. at 19-21.

For example, the defendant argues that an appellate court "might well conclude that . . . unlike the independent counsel [in Morrison], Mr. Fitzgerald is not obligated by any statute or regulation to comply with Justice Department policies and regulations" and that his power to act is therefore unconstitutionally unrestrained. Reply at 3. The defendant's primary argument in this regard is that the February 6, 2004 letter from Comey to Fitzgerald "expressly relieves Mr. Fitzgerald of any obligation to comply with 28 C.F.R. § 600 et seq." Id. at 4. As discussed above, however, see supra at n.12, this regulation, one provision of which does indeed require compliance with Department of Justice policies and procedures, applies only to Special Counsel who have been appointed from positions outside the federal government. 28 C.F.R. § 600.3. It therefore has no application when an individual from within the Justice Department—someone who is already obligated to abide by internal Department policies—is delegated the authority to act as Special Counsel, as Fitzgerald clearly was.

Nor is it convincing to claim, as the defendant does, that an appellate court might well decide that Fitzgerald is no longer bound by Department of Justice rules and regulations because he has been "relieved of numerous other requirements otherwise binding on a [United States] Attorney" in his capacity as Special Counsel. Reply at 4. The defendant substantially overstates the plausible breadth of the authority granted to Fitzgerald by the Comey letters. They do not

confer upon Fitzgerald as Special Counsel the prosecutorial equivalent of James Bond's license

to kill, and are unlikely to be read by any court as a blank check "permitt[ing] [him] to ignore

well-established Department of Justice policies without any clear authorization to do so." Libby,

429 F. Supp. 2d at 41-42.  Rather, the letters delegate to Fitzgerald "all the authority of the

Attorney General" within the limited sphere of the Plame investigation, Def.'s Mem., Ex. C at 1,

an authority which allows him, in his role as Special Counsel, "to bypass certain approval

requirements contained in the regulations and policies, not to ignore them altogether," Libby, 429

F. Supp. 2d at 42.  As the Court explained in its April 27, 2006 Memorandum Opinion, "the

Attorney General himself is obligated to comply with Department of Justice rules and

regulations." Id.; see, e.g., 5 C.F.R. §§ 735 et seq. (2007), 2635 et seq. (2007) (prescribing

standards of ethical conduct for employees of the Executive Branch, including the Department of

Justice, and defining "employee" as "any officer or employee of an agency, including a special

Government employee") (emphasis added); 28 C.F.R. §§ 45 et seq. (2007) (applying and

supplementing §§ 735 and 2635 with respect to Department of Justice employees), 50 et seq.

(2007) (setting forth statements of policy applicable to "personnel of the Department of Justice");

cf. Exec. Order No. 350-65, 30 Fed. Reg. 17,202 (Dec. 31, 1965) (stating that "[p]residential

appointees shall be deemed employees for the purposes of [Department of Justice rules and

regulations]").  By conferring upon Fitzgerald "all the authority of the Attorney General with

respect to the Department's investigation into the alleged unauthorized disclosure of a CIA

employee's identity," Def.'s Mem., Ex. C at 1, the Comey letters are not, and cannot be, fairly

read to give the Special Counsel more power to flout Department regulations than the Attorney

General in fact possesses.[16]  The Court is therefore confident that its conclusion that Fitzgerald's

"appointment as the Special Counsel, a permissible expansion of his role as an officer of the

Department of Justice, did not relieve [him] from continued compliance with [Department]

regulations and policies, both as a United States Attorney and as Special Counsel," Libby, 429 F.

Supp. 2d at 41, is not "one that very well could have been decided the other way," Perholtz, 836

F.2d at 555 (internal quotation marks and footnote omitted).[17]

### 3. Section 14 of the Classified Information Protection Act

The defendant's argument regarding Fitzgerald's exercise of authority under the

Classified Information Protection Act ("CIPA"), 18 U.S.C. Appx. III et seq. (2000), is similarly

without merit, albeit for different reasons.  See Reply at 4-5.  The defendant contends that in the

course of the CIPA proceedings held during the fall and winter of 2006, Fitzgerald assumed

---

[16] The Court also notes, contrary to the defendant's suggestion, that the Supreme Court in Morrison found that the independent counsel was only expressly obligated to comply with Department of Justice policies "to the extent possible." Morrison, 487 U.S. at 672 (citation omitted); see 28 U.S.C. § 594(f) (stating that "[a]n independent counsel shall, except to the extent that to do so would be inconsistent with the purposes of this chapter, comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws"); see also Opp. at 14 n.11 (representing that "as a member of the Department [of Justice], the Special Counsel was obligated to follow [Department] policies to the extent possible").

[17] In addition, the obligation of the independent counsel in Morrison to comply with Department of Justice rules and regulations was only one of the factors which, taken together, led the Supreme Court to conclude that her duties were limited and that she therefore "clearly [fell] on the 'inferior officer' side of the line." Morrison, 487 U.S. at 671. That is, the Morrison Court found that the independent counsel was "empowered . . . to perform only certain, limited duties" because (1) her role was "restricted primarily to investigation and . . . prosecution for certain federal crimes"; (2) her "grant of authority [did] not include any authority to formulate policy for the Government or the Executive Branch"; (3) she had no "administrative duties outside of those necessary to operate her office;" and (4) her grant of authority "specifically provides that in policy matters [she] is to comply to the extent possible with the policies of the Department." Id. at 671-72 (citations omitted). Thus, even if it were a close question whether Fitzgerald was exempted by the Comey letters from strict compliance with Department policies in his capacity as Special Counsel, which it is not, it does not inexorably follow that it is therefore a close question whether the Special Counsel is a constitutionally inferior officer, or even whether the Special Counsel's duties, like those of the independent counsel in Morrison, are circumscribed and limited. Indeed, it cannot seriously be disputed that all three of the other factors cited by the Morrison Court in support of its conclusion that the independent counsel possessed "only certain, limited duties" apply with equal force in this case as well. Id. at 671; see Libby, 429 F. Supp. 2d at 44.

certain duties that could only have been performed "by the Attorney General himself or other specifically enumerated members of the Department" and thus could not lawfully have been delegated to the Special Counsel. Id. at 4. Specifically, the defendant argues that Fitzgerald improperly exercised the authority to submit to this Court (1) an affidavit pursuant to § 6(a) of the CIPA requesting that the CIPA proceedings be conducted in camera, 18 U.S.C. Appx. III § 6(a), and (2) affidavits pursuant to § 6(c) of the CIPA "certifying that disclosure of classified information would cause identifiable damage to the national security of the United States and explaining the basis for the classification of such information," id. § 6(c)(2). The defendant claims that Fitzgerald's submission of the § 6(c) affidavits, in particular, "is compelling evidence that the Special Counsel, with all of his sweeping powers, qualifies as a principal officer under the Appointments Clause." Id. at 5.

The Court first notes that this argument has never previously been raised by the defendant or briefed by the parties. At the time the Court issued its April 27, 2006 Memorandum Opinion denying the defendant's motion to dismiss the indictment on Appointments Clause grounds, the CIPA proceedings had not yet been initiated, and the defendant did not renew his Appointments Clause argument once it became evident to him that Fitzgerald was handling all aspects of the CIPA process on behalf of the government.[18] Cf. United States v. Libby, 453 F. Supp. 2d 35 (D.D.C. Sept. 21, 2006) (discussing § 6(a) of the CIPA); 467 F. Supp. 2d 20 (D.D.C. Dec. 20, 2006) (discussing § 6(c) of the CIPA). In addition, because the defendant first raised the CIPA

---

[18] In this regard, the Court observes that Fitzgerald's submission of the § 6(a) affidavit on September 5, 2006, was a matter of public record which was placed on the docket and transmitted electronically to the defendant at that time. See Petition for In Camera Hearing, D.E. #134 (Sep. 5, 2006) (stating that "[t]he United States of America, by its attorney, Patrick J. Fitzgerald, Special Counsel, pursuant to Section 6(a) of CIPA, respectfully requests that this Court conduct an in camera hearing").

issue in his reply in support of his motion for release pending appeal, the government has had no opportunity to provide a response brief addressing the defendant's contentions. Nevertheless, the Court has examined the defendant's argument regarding the CIPA on its merits to determine whether it transforms the Appointments Clause issue into a close question. It plainly does not.

Section 14 of the CIPA provides that "[t]he functions and duties of the Attorney General under [the CIPA] may be exercised by the Deputy Attorney General, the Associate Attorney General, or by an Assistant Attorney General designated by the Attorney General for such purpose and may not be delegated to any other official." 18 U.S.C. Appx. III, § 14 (emphasis added). At the June 14, 2007 hearing, the defendant's attorney argued that (1) the Special Counsel performed certain functions during the CIPA proceedings that could not have been delegated to him; and (2) the fact that the Special Counsel performed those non-delegable functions is an indication of his "sweeping powers" and suggests strongly that he should be considered a principal officer under the Appointments Clause. Reply at 5. It is true that, by the plain language of § 14, the Special Counsel cannot be delegated certain duties under the CIPA that are expressly assigned by Congress to the Attorney General and his duly designated proxies.[19] See 18 U.S.C. Appx. III, § 14. It is similarly true that the Special Counsel appears to

---

[19] There are three relevant "functions and duties" under the CIPA that are identified as being the sole province of the Attorney General. 18 U.S.C. Appx. III § 14. First, the Attorney General is empowered to certify to the Court that a public proceeding under § 6 of the CIPA "may result in the disclosure of classified information." Id. § 6(a). If the Attorney General so certifies, the Court is required to conduct the §6 proceedings in camera. Id. The Court is similarly required to hold in camera proceedings under § 6(c) of the CIPA "at the request of the Attorney General." Id. § 6(c)(1). Second, in connection with a § 6(c) motion, the government is entitled to "submit to the [C]ourt an affidavit of the Attorney General certifying that disclosure of classified information would cause identifiable damage to the national security of the United States and explaining the basis for the classification of such information." Id. § 6(c)(2). Finally, in the event that the Court denies the government's motion for a § 6(c) order directing the substitution or summary of specific identified classified material for use by the defendant, the government may "file[] with the Court an affidavit of the Attorney General objecting to the disclosure of the classified information at issue." Id. § 6(e)(1). The Court is then obliged to "order that the defendant not disclose or cause the disclosure of such information." Id. In the present case, the defendant represents, and the government

(continued...)

have performed at least some of these duties, in seeming contravention of § 14.[20]  And if the

scope of authority given to the Special Counsel by the Comey letters encompassed duties that no

inferior officer could possess, this is indeed strong evidence that the Special Counsel is a

principal officer for Appointments Clause purposes.[21]  Here, however, the defendant has not

demonstrated, nor even credibly argued, that Comey intended for his delegation of authority to

Fitzgerald under 28 U.S.C. § 510 to include powers expressly declared to be non-delegable to

United States Attorneys (such as Fitzgerald) under § 14 of the CIPA.  It further follows that if the

delegation of these duties under the CIPA was not intended—if, by the terms of his appointment

as Special Counsel, Fitzgerald never actually possessed the powers to act in the Attorney

General's stead in submitting §§ 6(a) and 6(c) affidavits in the CIPA proceedings—then the

Appointments Clause is not implicated at all, and the defect identified by the defendant is one of

statutory, rather than constitutional, dimension.

Indeed, standard principles of statutory interpretation support this conclusion.  As the

Supreme Court has observed, "it is a commonplace of statutory construction that the specific

---

[19](...continued)
does not dispute, that the Special Counsel submitted affidavits pursuant to the above provisions in §§ 6(a) and 6(c).
However, because the Court did not deny the government's motion for a § 6(c) order, there was no occasion for the
submission of an affidavit under § 6(e) of the CIPA by the Special Counsel or anyone else.

[20]  At the June 14, 2007 hearing, the government argued that (1) the functions at issue here—specifically,
the §§ 6(a) and 6(c) affidavits submitted by the Special Counsel during the CIPA proceedings—are purely pro forma
and ministerial; and (2) accordingly, no harm was done even if the Special Counsel was precluded de jure from
performing those actions under § 14.  Because the Court concludes that any arguably improper exercise of CIPA
authority in this instance would constitute, at worst, a violation of § 14 of the CIPA, and would not cast doubt upon
the Special Counsel's status as an inferior officer under the Appointments Clause, it is unnecessary to decide whether
submission of the §§ 6(a) and 6(c) affidavits would properly be classified as ministerial.

[21]  The Deputy Attorney General, the Associate Attorney General, and the several Assistant Attorneys
General are all appointed by the President and confirmed by the Senate.  28 U.S.C. §§ 504 (2000) (Deputy Attorney
General), 504(a) (2000) (Associate Attorney General), 506 (2000) (Assistant Attorneys General).  Although to the
best of this Court's knowledge the constitutional status of these positions under the Appointments Clause has never
been resolved (nor even addressed) by any court, the Court assumes, for the sake of the defendant's argument, that
they are all properly considered principal, rather than inferior, officers.

governs the general." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992); see also

Rodriguez v. Puerto Rico Fed. Affairs Admin., 435 F.3d 378, 383 (D.C. Cir. 2006) (stating that

"the canons of statutory construction require that the specific govern the general"); Nevada v.

Dep't of Energy, 400 F.3d 9, 16 (D.C. Cir. 2005) (noting that the Supreme Court has "reiterated

repeatedly . . . that 'a more specific statute will be given precedence over a more general one'")

(quoting Busic v. United States, 446 U.S. 398, 406 (1980)).  Moreover, under the canon of

constitutional avoidance, "every reasonable [statutory] construction must be resorted to, in order

to save a statute from unconstitutionality." Gonzales v. Carhart, ___ U.S. ____, ____, 127 S. Ct.

1610, 1631 (2007); see Clark v. Martinez, 543 U.S. 371, 381 (2005) (stating that the canon of

constitutional avoidance "is a tool for choosing between competing plausible interpretations of a

statutory text, resting upon the reasonable assumption that Congress did not intend the alternative

which raises serious constitutional doubts") (citations omitted).  Thus, the only natural

conclusion that can be drawn is that "the general statutory provision" of § 510, which permits the

delegation of 'any function of the Attorney General,' 28 U.S.C. § 510, "cannot trump the clear

language of the more specific" prohibition on delegation of certain functions of the Attorney

General in § 14 of the CIPA, Dep't of Housing and Urban Dev. v. Rucker, 535 U.S. 125, 133 n.5

(2002) (citation omitted), particularly when such a construction might be constitutionally

problematic. Cf. Libby, 429 F. Supp. 2d at 33-34 (noting that "any delegation of authority [under

§ 510] is subject to the constitutional limits set forth in the Appointments Clause").  Therefore, a

delegation of "all the authority of the Attorney General with respect to the [Plame] investigation"

pursuant to § 510 could not have conferred upon Fitzgerald an array of powers and authorities

which included duties deemed non-delegable under § 14 of the CIPA, Def.'s Mem., Ex. C at 1,

and absent actual evidence or some persuasive argument (neither of which the defendant has

presented here) that the scope of the Special Counsel's authority at the time of the delegation was

intended to encompass all functions relating to CIPA proceedings, Fitzgerald's failure (if indeed

there was a failure) to recognize that § 14 foreclosed him from submitting §§ 6(a) and 6(c)

affidavits on behalf of the government amounts, at best, to a procedural error, and one that the

defendant did not previously bring to the Court's attention.[22]  Finally, if it is true that the Comey

letters did not delegate, and could not have delegated, any authority to Fitzgerald to exercise

those "functions and duties" reserved for the Attorney General under the CIPA, 18 U.S.C. Appx.

III § 14, then the Special Counsel's duties are sufficiently limited that he does not possess "all the

authority of the Attorney General" even within the boundaries of his particular demesne, Def.'s

Mem., Ex. C at 1, and the correctness of the Court's conclusion regarding the Appointments

Clause issue is, if anything, substantially more certain.  Applying the Morrison factors, it is

therefore resoundingly clear that the constitutional status of the Special Counsel as an inferior

officer for the purposes of the Appointments Clause is not a close question.

---

[22] The defendant does not contend that he was specifically prejudiced by the Special Counsel's ostensibly improper submission of §§ 6(a) and 6(c) affidavits, nor does he argue that a violation of § 14 of the CIPA—as opposed to a violation of the Appointments Clause, see Reply at 5-6—is an error that is "so fundamental and pervasive that [it] require[s] reversal without regard to the facts or circumstances of the particular case," Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) (citations omitted).  Although the issue has not been briefed, it is this Court's strong belief that such a statutory violation would be subject to harmless error review only.  See id. (stating that "[t]he harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error") (citations omitted); see also United States v. Bentley, ___ F.3d ____, ____, 2007 WL 1597711, at *3 (D.C. Cir. June 5, 2007) (discussing harmless error standard for nonconstitutional violations).

### 4. The *Edmond* Standard and the Continuing Vitality of *Morrison*

The defendant next suggests that the factors articulated in <u>Morrison</u> have been supplanted, either in whole or in part, by the "straightforward rule" set forth in <u>Edmond</u>, Reply at 3, in which the Supreme Court concluded that judges of the Coast Guard Court of Criminal Appeals were inferior officers under the Appointments Clause because "[their] work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." <u>Edmond</u>, 520 U.S. at 663; <u>see generally id.</u> at 658-66. This argument fails in three respects.

First, there is nothing in <u>Edmond</u> to suggest that the <u>Morrison</u> factors do not remain a valid method of determining whether an officer is a principal or an inferior for the purposes of the Appointments Clause. <u>See</u> <u>United States v. Hilario</u>, 218 F.3d 19, 25 (1st Cir. 2000) (finding that "[t]he <u>Edmond</u> Court did not overrule <u>Morrison</u>, . . . but cited it as precedent") (citation omitted); <u>see also</u> <u>Libby</u>, 429 F. Supp. 2d at 37 (concluding that <u>Edmond</u> "did not reject the validity of the <u>Morrison</u> factors, suggest that the result in <u>Morrison</u> would be different had the Court employed the <u>Edmond</u> analysis, or indicate that [the] factors relied on in <u>Edmond</u> would be the governing factors for all future Appointments Clause challenges"). Indeed, the approving reference to the <u>Morrison</u> factors in <u>Edmond</u> makes it unlikely in the extreme that the <u>Edmond</u> Court intended to overturn or even significantly abrogate <u>Morrison</u> as binding precedent. <u>See</u> <u>Edmond</u>, 520 U.S. at 661-62; <u>see generally</u> <u>Libby</u>, 429 F. Supp. 2d at 36-36 (discussing the relationship of <u>Edmond</u> to <u>Morrison</u>).

Surveying the state of Appointments Clause jurisprudence, the Supreme Court in <u>Edmond</u> observed that "[its] cases have not set forth an exclusive criterion for distinguishing between

20

principal and inferior officers for Appointments Clause purposes." Edmond, 520 U.S. at 661.

The Edmond Court then noted that Morrison marked the "most recent[]" examination of the

question of principal and inferior officers, id., and stated:

> In reaching [its] conclusion [that the independent counsel was an inferior officer],
> [the Morrison Court] relied on several factors: that the independent counsel was
> subject to removal by a higher officer (the Attorney General), that she performed only
> limited duties, that her jurisdiction was narrow, and that her tenure was limited. . .
> . [The] [p]etitioners are quite correct that the last two of these conclusions do not
> hold with regard to the office of military judge at issue here. . . . However, Morrison
> did not purport to set forth a definitive test for whether an office is "inferior" under
> the Appointments Clause. To the contrary, it explicitly stated: "We need not attempt
> here to decide exactly where the line falls between the two types of officers, because
> in our view [the independent counsel] clearly falls on the 'inferior officer' side of that
> line."

Id. (internal citations and bracketing omitted) (emphasis added). Thus, because the Morrison

factors did not appropriately fit the facts of the case then before it, the Court in Edmond

predicated its conclusion that the Coast Guard Court of Criminal Appeals judges were

constitutionally inferior officers on alternative grounds. See id. at 662-63. Specifically, the

Court reasoned that "the term 'inferior officer' connotes a relationship with some higher ranking

officer or officers below the President," id. at 662, and held that "in the context of a Clause

designed to preserve political accountability relative to important [g]overnment assignments," it

is "evident" that "'inferior officers' are officers whose work is directed and supervised at some

level by others who were appointed by Presidential nomination with the advice and consent of

the Senate," id. at 663. On this basis, and because, inter alia, "the Judge Advocate General may .

. . remove a Court of Criminal Appeals judge from his judicial assignment without cause," id. at

664; see also id. (stating that "[t]he power to remove officers . . . is a powerful tool for control")

(citations omitted), the Court concluded that the appointment of such judges by the Secretary of

Transportation "is in conformity with the Appointments Clause of the Constitution, since those judges are 'inferior [o]fficers' within the meaning of that provision," id. at 666.

The defendant contends that it is at least a close question whether "the 'direction and supervision' test set forth in [Edmond]" is now the sole rule that should be applied when evaluating challenges under the Appointments Clause. Reply at 2; see also Motion at 6 (arguing that "[t]he Court of Appeals . . . could well conclude . . . that the generally applicable constitutional test for inferior-officer status is not the multi-factor, ad hoc balancing test applied in Morrison, but rather the clear test more recently set forth . . . in Edmond") (citation omitted). It need hardly be said, however, that the Edmond Court's accurate observation that Morrison "did not purport to set forth a definitive test" for inferior officer status and its acknowledgment that several of the Morrison factors were inapplicable in the case before it in no way amount to a repudiation of the Morrison calculus. Edmond, 520 U.S. at 661. Moreover, nowhere in Edmond does the majority remotely intimate that the "direct[ion] and supervis[ion]" on which it based its conclusion constituted the "exclusive criterion" that had theretofor been lacking from the Supreme Court's examinations of the issue. Id. at 661, 663; see generally id. at 658-66. Instead, the only conclusion that can logically be gleaned from Edmond's amicable treatment of Morrison is that the cases articulate two equally plausible and equally valid methods, once a court has examined the facts of a case, for determining whether an officer rises to the level of principal status under the Appointments Clause.[23]  See United States v. Gantt, 194 F.3d 987, 999 n.6 (9th

---

[23]  Indeed, if neither the Morrison factors nor the Edmond test "set forth an exclusive criterion for distinguishing between principal and inferior officers for Appointments Clause purposes," Edmond, 520 U.S. at 661, then it naturally follows that there might be other factors, unarticulated in either Edmond or Morrison, that should sometimes be given primacy when undertaking an Appointments Clause analysis, depending upon the facts of a particular case. See, e.g., Weiss v. United States, 510 U.S. 163, 194 (1994) (Souter, J., concurring) (opining that "[w]here the label that better fits an officer is fairly debatable, the fully rational congressional determination surely
(continued...)

Cir. 1999) (examining Morrison and Edmond and concluding that "supervision by a superior officer is a sufficient but perhaps not a necessary condition to the status of an inferior officer"); see also Hilario, 218 F.3d at 25 (concluding that officers whose work is not directed and supervised by someone other than the President "might still be considered inferior officers if the nature of their work suggests sufficient limitations of responsibility and authority") (citation omitted). And if Morrison and Edmond can coexist peaceably—if there remains no "definitive test for whether an office is 'inferior' under the Appointments Clause," Edmond, U.S. 520 at 661, and the applicable factors vary depending on the factual circumstances, see id. at 668 (Souter, J., concurring) (stating that "a single rule of sufficiency" is unnecessary and that courts should take "a detailed look at the powers and duties of [the office in question] to see whether reasons favoring [an] inferior officer status within the constitutional scheme weigh more heavily than those to the contrary")—then it cannot be said, as the defendant suggests, that the Edmond test has subsumed or superseded the Morrison factors. See Motion at 6-7; Reply at 2-3.

Rather, it is simply the task of this Court to determine, based on the facts of the case, whether the Special Counsel's status is more appropriately analyzed using the framework set forth in Edmond or in Morrison, and (if the latter) to what extent its conclusion is therefore compelled by the Morrison factors. As discussed above, the Court has done so, concluding after careful analysis that the scope of the Special Counsel's duties and authority fit "squarely into the mold of Morrison." Libby, 429 F. Supp. 2d at 44; see also id. at 34-46. Indeed, even the defendant concedes that the Court likely would be required to apply the Morrison factors if the scope of the authority of the office at issue was sufficiently similar to that of the independent

---

[23](...continued)
merits tolerance") (internal quotation marks, ellipses, and citation omitted).

counsel in that case, as the Court has concluded that they are.  Reply at 3 (stating that "Morrison might dictate the outcome if a court were confronting a special prosecutor whose authority was identical to that of the independent counsel [in Morrison] in all material respects") (emphasis omitted).  Accordingly, because Morrison remains the Supreme Court's only examination of the status that a federally appointed prosecutor specifically tasked with the investigation of high-ranking Executive officials properly holds under the Appointments Clause, and because neither Edmond nor any other subsequent Supreme Court decision has cast doubt upon the applicability of the factors employed by the Morrison Court as a general matter in assessing such status, the Court's conclusion that the Morrison factors are dispositive of the Appointments Clause issue in this case is surely not "one that very well could have been decided the other way."  Perholtz, 836 F.2d at 555 (internal quotation marks and citation omitted).

Second, even if the defendant is correct that the Edmond formulation should now be considered a necessary (if not by itself sufficient) predicate for concluding that an office is inferior for Appointments Clause purposes, he has still failed to present "a substantial question of law or fact" under § 3143(b).  18 U.S.C. § 3143(b)(1); see Motion at 7 (contending that "[t]he Court of Appeals could well agree . . . that 'having a superior officer is necessary for inferior officer status, but not sufficient to establish it,' without something more") (quoting Edmond, 520 U.S. at 667 (Souter, J., concurring)).  That is, the Special Counsel's status as a constitutionally inferior officer is beyond serious question regardless whether the scope of his authority is analyzed under the Morrison factors—which remain, as this Court has explained, binding authority which it is obligated to apply in this case—or under "the 'direction and supervision'

24

test set forth in [Edmond]." Reply at 2; see also Libby, 429 F. Supp. 2d at 45 n.17 (concluding

that "[the Special Counsel's] appointment would also likely survive under Edmond").

As stated above, the Edmond Court concluded, at least for the purposes of the facts

before it in that case, that "'inferior officers' are officers whose work is directed and supervised

at some level by others who were appointed by Presidential nomination with the advice and

consent of the Senate." Edmond, 520 U.S. at 663 (emphasis added). The phrase "at some level"

does not connote a demanding standard, and the bar it sets is surely cleared in this case. This is

true for multiple reasons.

To begin with, the fact that the Special Counsel is removable at will by the Acting

Attorney General is a concrete indication that he is not acting without "some level" of

supervision and direction. Id. As the Edmond Court observed, "[t]he power to remove officers .

. . is a powerful tool to control." Id. at 664 (citations omitted). Moreover, in addition to this

power of removal, the Acting Attorney General has assigned the Special Counsel a particular

(albeit broadly drawn) task to perform and has dictated the terms and boundaries of his

appointment, either of which could be revoked or altered at any time on a unilateral basis. See

Libby, 429 F. Supp. 2d at 43 (stating that the authority of the Special Counsel is "confined to the

narrow objective of accomplishing the specific mandate he was given [by the Acting Attorney

General]"). This, as well, firmly suggests that the Acting Attorney General is "direct[ing] and

supervis[ing] [the Special Counsel] at some level." Edmond, 520 U.S. at 663; see also In re

Sealed Case, 829 F.2d 50, 56 (D.C. Cir. 1987) (finding that because the Attorney General was

empowered to "abolish[]" his office at any time, "the Independent Counsel: Iran/Contra [was]

charged with the performance of the duty of a superior [i.e., the Attorney General] for a limited

time and under special and temporary conditions") (internal quotation marks and citation omitted) (emphasis added).

That the Acting Attorney General continued to exercise some degree of supervisory authority over the Special Counsel following the December 2003 and February 2004 appointment letters is further indicated by the transfer of authority that occurred between James Comey and David Margolis upon Comey's retirement in August 2005. See Def.'s Mem., Ex. B. If Fitzgerald truly was not "directed and supervised at some level," Edmond, 520 U.S. at 663, then Comey would have had no reason or occasion to "delegate to [Margolis] all of [his] authority as Acting Attorney General with respect to [the Plame] investigation and Mr. Fitzgerald's service as Special Counsel," Def.'s Mem., Ex. B at 1, one and a half years after Fitzgerald was appointed to the position. Simply put, if Comey had exercised no continuing supervisory authority over Fitzgerald, there would have been no authority to delegate to Margolis.

More basically, however, it is clear that Fitzgerald's appointment as Special Counsel satisfies the Edmond test because (as the Court has already concluded) the facts of this case fit "squarely into the mold of [Morrison]," Libby, 429 F. Supp. 2d at 44, and the Edmond Court does not "suggest that the result in Morrison would be different had the [Morrison] Court employed the Edmond analysis," id. at 37. That is, even if this Court were to accept the defendant's proposition that Edmond holds that all inferior officers are "directed and supervised at some level" by a principal officer who is not the President, Edmond, 520 U.S. at 663; see Reply at 3 (contending that Edmond "gave no indication that [its] rule should not be applied to Appointments Clause challenges subsequently raised"), it remains true that the Edmond Court does not derogate the ultimate holding in Morrison in any manner whatsoever. It therefore

26

follows, under the defendant's argument, that one or more of the Morrison factors, viewed

together, must have satisfied Edmond's prescription that an inferior officer must naturally have a

superior. If this were not true, the Edmond Court would likely have distinguished Edmond from

Morrison by stating that the outcome of Morrison would have been different under the "direction

and supervision" test, which it did not. See generally Edmond, 520 U.S. at 658-66. Accordingly,

the only fair reading of Morrison, if the "direction and supervision" test is a necessary if not

sufficient condition of inferior officer status, is that the satisfaction of the Morrison factors in

some combination must also satisfy the Edmond criterion. Cf. Gantt, 194 F.3d at 999 n.6 (stating

that the independent counsel in Morrison was "subject to only limited supervision by executive

and judicial branch officers") (emphasis added). And because this Court has already determined

conclusively that the scope of the Special Counsel's authority in this case is consonant with each

of the factors elucidated in Morrison, see Libby, 429 F. Supp. 2d at 34-46, it is no difficult matter

to conclude that the Acting Attorney General's delegation of authority to the Special Counsel

passes muster under Edmond as well.

Finally, the Court acknowledges that Comey's December 2003 letter to Fitzgerald

expressly authorizes him "to exercise [his] authority as Special Counsel independent of the

supervision or control of any officer of the Department." Def.'s Mem., Ex. C at 1. As this Court

noted in its April 27, 2006 Memorandum Opinion, "[t]he integrity of the rule of law, which is a

core ingredient of the American system of government, is challenged to the greatest degree when

high-level government officials come under suspicion for violating the law," and "[t]here must

therefore be a process by which the perception of fairness [within our system of justice]

withstands the scrutiny of the American public when prosecution authority is called upon to

27

investigate [such] public officials." Libby, 429 F. Supp. 2d at 45; see In re Nofziger, 925 F.2d

428, 437 (D.C. Cir. 1991) (stating that "[t]he impartiality of [an] independent counsel and the

thoroughness of his investigation ensures that the public will have confidence that the

investigation as a whole is unbiased and entitled to respect"). And it is appropriate, when

appointing a Justice Department employee to investigate high-ranking officials within the

Executive Branch, for the Office of the Attorney General to be mindful of these precepts and, for

the sake of public confidence in the integrity of the system, to endeavor where possible (as

permitted by the Constitution and all relevant statutory authority) not to unduly constrain the

discretion of the investigator. Cf. In re Pierce, 102 F.3d 1264, 1265 (D.C. Cir. 1996) (per

curiam) (describing the importance of "insulat[ing]" the Office of the Attorney General "from the

independent counsel's investigation [under the Ethics in Government Act] in order to avoid any

possible conflicts of interest that may arise from a high-level executive branch official, like the

Attorney General, investigating another high-level official in the same [a]dministration")

(citation omitted); Nofziger, 925 F.2d at 437 (stating that "[t]he independent counsel mechanism

[in the Ethics in Government Act] was designed," inter alia, "to ensure that a fair, impartial, and

thorough investigation is conducted into all criminal allegation against senior government

officials[,] . . . [and] to insulate the investigation of senior officials from personal or political

influence"). Here, it appears to the Court that the Office of the Attorney General has acted with

prudent and creditable caution in this case and has struck a difficult yet clearly demarcated

balance between the interests of "continuing public confidence in our democratic system," id.,

and the mandates and purposes of the Appointments Clause, see Edmond, 520 U.S. at 659-60

(stating that the Appointments Clause was intended, in part, "to curb Executive abuses of the

appointment power[,] to promote a judicious choice of persons for filling the offices of the

union[, and] to ensure public accountability for both the making of a bad appointment and the

rejection of a good one") (internal quotation marks, citation, and bracketing omitted); see also id.

at 668 (Souter, J. concurring) (opining that courts determining whether an officer is properly

considered principal or inferior under the Appointments Clause should take "a detailed look at

the powers and duties of [the officer] to see whether reasons favoring their inferior officer status

within the constitutional scheme weigh more heavily than those to the contrary").  In striking this

balance, the literal connotation of the language of the Comey letters is substantially tempered by

an examination of the relationship between Fitzgerald and the Office of the Attorney General

throughout the whole of the investigation and prosecution, including Comey's transfer of his

supervisory authority over the Special Counsel to Margolis in August 2005.  See Def.'s Mem.,

Ex. B.  That transfer, coupled with the Acting Attorney General's continuing ability to remove

the Special Counsel at will and to rescind or refashion the terms of his authority at any time,

demonstrates that the Special Counsel was and is clearly a subordinate within the Department of

Justice, even if he has not been closely supervised or directed on a day-to-day (or even week-to-

week) basis in a manner that might cause his independence and impartiality, so necessary in an

investigation of this type, to legitimately be questioned.[24]

---

[24] In addition, it is of at least some relevance that § 510 of Title 28 permits, in undeniably broad terms, the delegation of "any function of the Attorney General" to Justice Department employees.  28 U.S.C. § 510.  As Justice Souter sagely remarked in Weiss v. United States, "[w]here the label that better fits an officer is fairly debatable, the fully rational congressional determination surely merits tolerance."  Weiss, 510 U.S. at 194 (1994) (Souter, J., concurring) (internal quotation marks, ellipses, and citation omitted); see also Edmond, 520 U.S. at 668-69 (Souter, J., concurring) (reiterating Justice Souter's position that where "it is hard to say with any certainty whether [the officer at issue] should be considered principal or inferior . . ., deference to the political branches' judgment is appropriate") (internal quotation marks omitted).

### III. Conclusion

For the foregoing reasons, and for the reasons stated in its April 27, 2006 Memorandum

Opinion and at the June 14, 2007 hearing, the Court concludes that the Appointments Clause

issue raised by the defendant does not present "a substantial question of law or fact likely to

result in . . . reversal." 18 U.S.C. § 3143(b)(1). In addition, for the reasons expressed at the June

14, 2007 hearing as well as in its various other Memorandum Opinions addressing the other

issues on which the defendant attends to appeal, see Libby, 453 F. Supp. 2d 35 (D.D.C. Sept. 21,

2006) (addressing § 6(a) of the CIPA); 461 F. Supp. 2d 3 (D.D.C. Nov. 2, 2006) (addressing the

admissibility of expert memory testimony); 467 F. Supp. 2d 20 (D.D.C. Dec. 20, 2006)

(addressing § 6(c) of the CIPA); 475 F. Supp. 2d 73 (D.D.C. Mar. 1, 2007) (addressing

evidentiary rulings), the Court concludes that none of the defendant's other claims are "close

[questions] or one[s] that very well could have been decided the other way," Perholtz, 836 F.2d

at 555 (internal quotation marks and footnote omitted), requiring the defendant's release on bond

pending the resolution of his appeal.

SO ORDERED this 21st day of June, 2007, nunc pro tunc to June 14, 2007.[25]

REGGIE B. WALTON
United States District Judge

---

[25] An Order consistent with the Court's ruling accompanies this Memorandum Opinion.